# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

THOMAS H. KRAKAUER, on behalf
of himself and all others similarly
situated,

       Plaintiff,

          v.

DISH NETWORK, LLC,

       Defendant.

**Civil Action No. 1:14-cv-00333CCE-JEP**


**PLAINTIFF'S MEMORANDUM OF LAW IN
SUPPORT OF MOTION FOR CLASS
CERTIFICATION**

<u>T</u>ABLE OF <u>C</u>ONTENTS

Introduction ....................................................................................................................... 1

I.    Applicable Law: TCPA And DNC Protections And Remedies ............................... 3

II.   Facts ....................................................................................................................... 4

      A.  From May 2009 Through September 2011 SSN Called Krakauer Promoting Dish TV—
          Despite His DNC Registry Status And Even Though He Complained to Dish About It . 4

      B.  SSN Indiscriminately Made Calls On Dish's Behalf To At Least Twenty Thousand
          Other DNC Registrants ................................................................................... 5

      C.  Krakauer's Analysis Identifies 20,450 DNC Registrants SSN Called To Promote Dish
          Services, And An Additional 7,979 Numbers On SSN And Dish's Internal Do Not Call
          List That SSN Similarly Called .......................................................................... 6

          1.  Five9's Records Disclose That SSN Made 57,900 Calls To Do Not Call Registrants
              From May 2010 to August 2011 ................................................................ 6

          2.  Krakauer Has Identified Virtually All Putative Class Members' Names And
              Addresses ................................................................................................... 8

III.  The Proposed Classes ............................................................................................ 9

IV.   Argument ................................................................................................................ 9

V.    All Rule 23 Requisites Are Met ............................................................................ 10

      A.  The Proposed Class Is Objectively Defined And Readily Identifiable ........................ 10

      B.  The Class Is Sufficiently Numerous That Joinder Is Impracticable .............................. 12

      C.  Krakauer And Class Members Share Common Factual And Legal Issues .................... 13

      D.  Krakauer's Claims Are Typical Of Those Of Class Members ........................................ 14

      E.  Krakauer Has No Conflicts With Class Members, Possesses A Genuine Personal
          Interest In The Case, And Will Adequately Represent Class Members ........................ 15

      F.  Common Issues Predominate And A Class Action Is The Superior Method Of
          Adjudicating This Matter .............................................................................. 17

          1.  Common Issues Predominate ................................................................... 17

          2.  A Class Action Is The Most Manageable, Efficient, And Superior Mechanism For
              Resolving Class Members' Claims ............................................................. 18

VI.   Conclusion ............................................................................................................ 19

i

**Cases**

*Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559 (W.D. Wash. 2012) .......................................... 11

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ...................................................... 15

*Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240 (N.D. Ill. 2014) .............................. 12

*Black v. Rhone-Poulenc, Inc.*, 173 F.R.D. 156 (Va. 1996) ................................................... 16

*Boundas v. Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408 (N.D. Ill. 2012) ......................... 10

*Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir. 1998) .................... 15

*Brown v. Nucor Corp.*, 576 F.3d 149 (4th Cir. 2009) .......................................................... 14

*Brunson v. Louisiana-Pacific Corp.*, 266 F.R.D. 112 (D.S.C. 2010) ........................................ 13

*Bullock v. Bd. of Educ. of Montgomery Cnty.*, 210 F.R.D. 556 (D. Md. 2002) ........................... 15

*Central Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177 (4th Cir. 1993) ................................. 10

*Comcast Corp. v. Behrend*, --- U.S. ---, 133 S. Ct. 1426 (2013) ........................................... 9

*Deiter v. Microsoft Corp.*, 436 F.3d 461 (4th Cir. 2006) ..................................................... 14

*Donaca v. Dish Network, LLC*, 303 F.R.D. 390 (D. Colo. 2014) ............................................. 14

*EQT Prod. Co. v. Adair*, 764 F.3d 347 (4th Cir. 2014) ...................................................... 9, 10

*Gen. Telephone Co. of Southwest v. Falcon*, 457 U.S. 147 (1982) .......................................... 15

*Harris v. Rainey*, 299 F.R.D. 486 (W.D. Va. 2014) .......................................................... 16

*Haywood v. Barnes*, 109 F.R.D. 568 (E.D.N.C. 1986) ......................................................... 13

*Hughes v. Kore of Ind. Enter., Inc.*, 731 F.3d 672 (7th Cir. 2013) ........................................ 12

*In re A.H. Robins Co., Inc.*, 880 F.2d 694 (4th Cir. 1989) ................................................... 10

*In re Electronic Books Antitrust Litig.*, No. 11 MD 2293, 2014 WL 1282293
 (S.D.N.Y. Mar. 28, 2014) ......................................................................................... 10

*In re Joint Pet. Filed by Dish Network*, 28 FCC Rcd. 6574 (2013) .......................................... 4

*Ira Holtzman, C.P.A. v. Turza*, 728 F.3d 682 (7th Cir. 2013) ............................................... 2

*Jay Clogg Realty Grp., Inc. v. Burger King Corp.*, 298 F.R.D. 304 (D. Md. 2014) ................... 19

*Mims v. Arrow Fin. Servs., LLC,* 132 S. Ct. 740 (2012) ........................................................... 3, 17

*Quint v. Trident Mgmt., Inc.*, No. 14-00287, 2014 WL 4556944 (M.D.N.C. Aug. 20, 2014) ....... 9

*Soutter v. Equifax Information Servs., LLC,* 498 F. App'x 260, 265 (4th Cir. 2012) ................... 15

*United States v. Dish Network, L.L.C.*, No. 09-3073, 2014 WL 7013223 (C.D. Ill.
    Dec. 12, 2014) ................................................................................................................... 1, 2

*Ward v. Dixie Nat'l Life Ins. Co.,* 595 F.3d 164 (4th Cir. 2010) ................................................. 10

**Other Authorities**

7A Wright, Miller & Kane, § 1760 ............................................................................................ 11

7A Wright, Miller & Kane, *Federal Practice and Procedure* (2d ed. 1986) § 177 .................... 17

*Manual for Complex Litigation, Fourth* § 21.222 (Fed'l Judicial Ctr. 2004) ........................ 10, 11

*Newberg on Class Actions* § 3.22 (3d ed. 1992) ........................................................................ 16

*Newberg on Class Actions* § 3:3 .............................................................................................. 10

**Rules**

Fed. R. Civ. P. 23(a)(1) ............................................................................................................ 13

Fed. R. Civ. P. 23(a)(4) ............................................................................................................ 15

**Regulations**

16 C.F.R. § 310.4(b) .................................................................................................................. 8

16 C.F.R. § 310.4(b)(3)(iv) ......................................................................................................... 5

47 C.F.R. § 64.1200(c)(2)(ii) ...................................................................................................... 5

47 C.F.R. § 64.1200(d) .............................................................................................................. 5

47 U.S.C. § 227(c)(5) .................................................................................................................. 6

iii

# INTRODUCTION

The national Do Not Call Registry is one of the most popular government programs ever created. The Registry was established in 2003 to provide a safe haven from unwanted telemarketing calls. It has more than 223 million active registrations, including that of the Plaintiff, Dr. Thomas Krakauer. Despite Krakauer's registration, Satellite Systems Network, one of Dish's authorized dealers, called him repeatedly to market Dish's subscription TV service. SSN knew that Krakauer was on the national DNC list, and he complained to Dish's corporate office about SSN's calls.

But SSN kept calling, and kept touting Dish TV, for another two years. During this entire time, and in fact for some years prior, Dish knew of and tacitly condoned SSN's misconduct because SSN provided Dish with a significant subscription base, more than 46,000 new customers, and Dish paid SSN $12.3 million for its efforts. *United States v. Dish Network, LLC,* No. 09-3073, 2014 WL 7013223, at *32 (C.D. Ill. Dec. 12, 2014) opinion vacated in part on reconsideration *sub nom. United States v. Dish Network, LLC* (C.D. Ill. Feb. 17, 2015) and opinion amended on reconsideration *sub nom. United States v. Dish Network, LLC*, No. 09-3073, 2015 WL 684178 (C.D. Ill. Feb. 17, 2015)(hereinafter "*Dish Network*").

Dish and SSN are repeat offenders, seemingly treating enforcement actions and their subsequent economic consequences as the costs of doing business. For example, in 2004 here in North Carolina, SSN agreed to a consent judgment with the Attorney General addressing its telemarketing violations. Florida followed suit because of SSN's

1

Do Not Call violations there. *Dish Network*, at *30-31. Still, in 2005 SSN paid so little attention to telemarketing restrictions that incredibly, it used illegal means to call Marguerite M. Sweeney, the Indiana Attorney General's Chief Counsel for Telephone Privacy Enforcement, to pitch a Dish subscription. *Id.*, at *31-32.

This consistent pattern of ignoring Do Not Call prohibitions continued unabated, and so in 2009 the Federal Trade Commission, in conjunction with four state attorneys general, brought the *Dish Network* case, suing it for the very claims Krakauer makes here—calling DNC registrants. In December 2014, the *Dish Network* court found Dish liable for 4,094,099 calls it or its vendors made to DNC Registrants and for 2,730,842 calls its retailers, including SSN, made to those Registrants. *Id.*, at *56.

Krakauer brings this class action to stop Dish from so brazenly flouting the law in pursuit of profit, seeking to represent a class of some twenty thousand people who, like him, took the affirmative step of getting on the DNC list, but received repeated calls from SSN marketing Dish TV products anyway. He also seeks to represent a second class, composed of people who told Dish or SSN not to call them anymore, and that Dish or SSN acknowledged that request, but continued to call them nonetheless.

The law he relies on, the Telephone Consumer Protection Act ("TCPA") was enacted to protect consumers from just such invasive—and maddening—telemarketing practices. As one federal appeals court recently observed, "[c]lass certification is normal [in TCPA cases] . . . because the main questions . . . are common to all recipients." *Ira Holtzman, C.P.A. v. Turza*, 728 F.3d 682, 684 (7th Cir. 2013). That observation holds true here as

well, as there are only three main questions for the Court: did SSN call DNC registrants or those who told it not to call them again, did those calls violate the TCPA, and is Dish is vicariously liable for SSN's misconduct?

## I. APPLICABLE LAW: TCPA AND DNC PROTECTIONS AND REMEDIES

Congress enacted the TCPA more than twenty years ago to regulate the explosive growth of telemarketing, which it recognized as a nuisance and an intrusive invasion of privacy. *See Mims v. Arrow Fin. Servs., LLC,* 132 S. Ct. 740, 745 (2012). Among other things, the TCPA and its accompanying regulations prohibit sellers from making telephone solicitations to people who have listed their telephone numbers on the national Do Not Call Registry. A telemarketer is prohibited from calling a DNC registrant unless that registrant consents to receive the calls in a signed, written agreement. 47 C.F.R. § 64.1200(c)(2)(ii). To avoid calling a number listed on the Registry, a telemarketer can easily and inexpensively "scrub" its call lists against the Registry database at least once every thirty-one days. *See* 16 C.F.R. § 310.4(b)(3)(iv). TCPA regulations also require entities to maintain internal Do Not Call registries. 47 C.F.R. § 64.1200(d). When a residential telephone subscriber tells a telemarketer to stop calling, the telemarketer must place that person's phone number on its own internal Do Not Call registry within thirty days. *Id.* And not call that number again.

These rules apply not only to sellers of goods and services, but also to the sellers' authorized marketing agents, like SSN. It is well-established that a seller of goods or services can be liable for TCPA violations even if the seller does not directly place or

3

initiate the calls. "A person who has received more than one telephone call within any 12-month period *by or on behalf of* the same entity in violation of the regulations prescribed under this subsection" may bring an action for damages and injunctive relief. 47 U.S.C. § 227(c)(5) (emphasis added). Likewise, 47 C.F.R. § 64.1200(d)(3) provides that once a number is added to an entity's internal Do Not Call registry, "*the person or entity on whose behalf the telemarketing call is made* will be liable for any failures to honor the do-not-call request." (emphasis added).

As the FCC has explained, vicarious liability may be based on the principles of apparent authority, actual authority, and ratification, or, under the express terms of §227(c), when unlawful calls are placed "on behalf of" the seller. *In re Joint Pet. Filed by Dish Network*, 28 FCC Rcd. 6574 (2013).

## II.    FACTS

### A.    FROM MAY 2009 THROUGH SEPTEMBER 2011 SSN CALLED KRAKAUER PROMOTING DISH TV—DESPITE HIS DNC REGISTRY STATUS AND EVEN THOUGH HE COMPLAINED TO DISH ABOUT IT

Krakauer placed his residential telephone number on the Registry more than a decade ago, in 2003. First Amended Complaint ("FAC") ¶ 25; Exhibit A, Deposition of Thomas Krakauer ("Krakauer Depo"), 72:25-73:2-9. Nonetheless, beginning in May 2009, Krakauer received numerous telephone solicitations from Dish's authorized dealer, SSN. FAC ¶ 26; Krakauer Depo 30:22-25-31:2-16. Naturally, Krakauer told SSN he did not wish to receive any more calls. FAC ¶ 27. This request triggered the requirement that both Dish and SSN place his number on their respective internal Do Not Call registries.

4

Undeterred, SSN continued to call Krakauer for more than two years, until September 2011, continuing to promote Dish TV. FAC ¶ 28; Krakauer Depo 63:12-21. SSN did not have a signed, written agreement from Krakauer allowing SSN, or any Dish representative, to call him. FAC ¶ 29. SSN was exclusively promoting Dish's services during this entire time. *Id*.

### B.  SSN INDISCRIMINATELY MADE CALLS ON DISH'S BEHALF TO AT LEAST TWENTY THOUSAND OTHER DNC REGISTRANTS

At the same time, Dish, through SSN, made similar calls to tens of thousands of other individuals whose numbers were also listed on the National Do Not Call Registry and their own internal Do Not Call lists. *See* Exhibit B, Expert Report of Anya Verkhovskaya, A.B. Data, Ltd., at 10-11 ("Verkhovskaya Report"). Dish sells its satellite television services through a network of authorized dealers. FAC ¶ 31, *Dish Network, *27-38.* SSN is one such authorized dealer, entitled by agreement with Dish to market on its behalf, and to use the Dish trade name, trademark, or service mark. FAC ¶ 32, *Dish Network, *30-32.* This agreement provided SSN with access to confidential, proprietary information regarding its pricing and products as well as access to dishes internal information systems. FAC ¶ 33, *Id.*

In entering summary judgment against Dish, the *Dish Network* court found that SSN, on behalf of Dish, violated the Telemarketing Sales Rule[1] by making more than 380,000 calls to DNC Registrants—the very claim Krakauer makes here. "The undisputed evidence establishes … that Dish retained the Retailer [SSN]…authorized

---

[1] 16 C.F.R. § 310.4(b).

[SSN] to market Dish products and services, and [SSN] violated the TSR by initiating Dish telemarketing calls to numbers on the [DNC] Registry." *Dish Network,* at *56.

### C. KRAKAUER'S ANALYSIS IDENTIFIES 20,450 DNC REGISTRANTS SSN CALLED TO PROMOTE DISH SERVICES, AND AN ADDITIONAL 7,979 NUMBERS ON SSN AND DISH'S INTERNAL DO NOT CALL LIST THAT SSN SIMILARLY CALLED

Krakauer has eliminated the potential logistical and manageability issues inherent in identifying all recipients of unwanted calls throughout Dish's far-flung telemarketing enterprise by narrowing his focus to SSN's calls, made to DNC registrants and those on internal DNC lists, from May 11, 2010 to August 1, 2011. *See* Verkhovskaya Report, at 8. SSN confirmed that those calls were telemarketing calls promoting Dish subscriptions, and that at the time the calls were placed, SSN was an exclusive Dish dealer. (Ex. C, S. Tehranchi Dep., at 18: 21-23; 121:17-20).

#### 1. FIVE9'S RECORDS DISCLOSE THAT SSN MADE 57,900 CALLS TO DO NOT CALL REGISTRANTS FROM MAY 2010 TO AUGUST 2011

Five9 provides telephone software applications that telemarketers can access via the internet to make telemarketing calls. Exhibit D, Deposition of David Hill, 12:18-19. It contracted to provide services to SSN. *Id.*, 16:14-25. SSN would upload telephone numbers onto Five9's calling platform, and those numbers would be dialed automatically so SSN's telemarketers could connect with prospective Dish customers. *Id.,* 62:2-21.

Krakauer's analysis of Five9's call records shows that SSN placed two or more calls in a twelve-month period to 20,450 telephone numbers that were listed on the Do Not Call Registry for at least thirty days prior to the call, in alleged violation of 47 U.S.C.

6

§ 227(c). Krakauer's telemarketing expert, Anya Verkhovskaya of the class action administration/data management firm AB Data, performed this analysis using the following methodology:

(1) Ms. Verkhovskaya reviewed Five9 call records showing more than 1.6 million telephone calls made during the class period, and identified approximately 230,000 calls that were connected to the called party (Verkhovskaya Report, at 8-9);

(2) of that smaller subset, Ms. Verkhovskaya identified just over 58,000 numbers that were dialed more than once in any 12 month period (*id*. at 9);

(3) she then cross-checked the 58,000 numbers against the numbers listed on the national Do Not Call Registry on April 1, 2010, thirty days prior to the May 1, 2010 inception date of the Five9 call record compendium, and determined that 23,625 distinct telephone numbers fit that criteria, to which 66,448 calls were made (*id*.);

(4) Ms. Verkhovskaya then identified 1,275 unique telephone numbers assigned the disposition code "Business" in the Five9 records and coordinated with LexisNexis to identify an additional 118 business-identified numbers, bringing the total of such numbers to 1,393, reducing the 23,625 numbers to 22,258;

(5) she further reduced this subset by identifying 1,782 unique numbers that the Five9 records identified as "Dish customer." *Id*. at 9-10.

In the final analysis, as of April 1, 2010, there are 20,450 unique phone numbers on the national Do Not Call Registry that were not identified as business-related or Dish customers, and which received more than one call from SSN. The total number of such

calls made and connected was 57,900. *Id.* at 10-11. Ms. Verkhovskaya performed a similar analysis on the internal Do Not Call lists and do not call requests SSN/Dish received to find an additional 7,979 numbers. *Id.* 11-14.

### 2. KRAKAUER HAS IDENTIFIED VIRTUALLY ALL PUTATIVE CLASS MEMBERS' NAMES AND ADDRESSES

Ms. Verkhovskaya culled from Five9's records the names and addresses identified to the applicable DNC registrants, including internal DNC lists, that SSN called. *Id.* at 11, 12, 14. Where this information was incomplete, A.B. Data engaged LexisNexis to provide supplementary information identified to the respective numbers, including but not limited to the names and addresses of telephone number subscribers for a specific time period. *Id.* at 14-15. If the proposed classes are certified, this database would be furthered refined via the United States Postal Service's National Change of Address ("NCOA$^{\text{Link}}$") database, and Experian's MetroNet® service, which provides information for any addresses determined to be undeliverable. A.B. Data also coordinates with companies like Experian to identify addresses based upon name and telephone number information and/or to identify additional name information based upon telephone number, to further enhance the accuracy and reach of the class member database.[2] *Id.* 15.

---

[2] Class members who cannot be identified can receive effective notice through publication of a court-approved notice through a court-approved publication plan.

8

## III.  THE PROPOSED CLASSES

Class 1:

> All persons throughout the United States whose telephone numbers were listed on the federal Do Not Call registry for at least 30 days, but who received telemarketing calls from Satellite Systems Network, to promote the sale of Dish satellite television subscriptions from May 1, 2010 to August 1, 2011.

Class 2:

> All persons throughout the United States whose telephone numbers were listed on either the defendants or Satellite Systems Network's company specific Do Not Call registries, but who received telemarketing calls by or at the direction of Satellite Systems Network, to promote the sale of Dish satellite television subscriptions from May 1, 2010 to August 1, 2011.

## IV.  ARGUMENT

A putative class action must satisfy each of the four requirements of Rule 23(a): (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. In addition, the proposed class action must fall into one of the three categories enumerated in Rule 23(b). *See Comcast Corp. v. Behrend*, --- U.S. ---, 133 S. Ct. 1426, 1432 (2013). Krakauer here seeks certification under Rule 23(b)(3), which adds two additional prerequisites: predominance and superiority. This court recently addressed the application of Rule 23(b)(3) in *Quint v. Trident Mgmt., Inc.*, No. 14-00287, 2014 WL 4556944 (M.D.N.C. Aug. 20, 2014) (Eagles, J.).

Although the movant must present some evidence that the putative class complies with Rule 23, a court should not "engage in free-ranging merits inquiries at the class certification stage," but "should consider merits questions only to the extent that they are relevant to determining whether the Rule 23 prerequisites . . . are satisfied." *EQT Prod.*

*Co. v. Adair*, 764 F.3d 347, 357-358 (4th Cir. 2014). Ultimately, "[d]istrict courts have 'wide discretion in deciding whether or not to certify a proposed class,' and their decisions 'may be reversed only for abuse of discretion.'" *Central Wesleyan Coll. v. W.R. Grace & Co.,* 6 F.3d 177, 185 (4th Cir. 1993) (citing *In re A.H. Robins Co., Inc.,* 880 F.2d 694, 728-29 (4th Cir. 1989); *see also Ward v. Dixie Nat'l Life Ins. Co.,* 595 F.3d 164, 179 (4th Cir. 2010).

## V.     ALL RULE 23 REQUISITES ARE MET

### A.     THE PROPOSED CLASS IS OBJECTIVELY DEFINED AND READILY IDENTIFIABLE

The Fourth Circuit has "repeatedly recognized that Rule 23 contains an implicit threshold requirement that the members of a proposed class be readily identifiable." *Adair*, 764 F.3d at 358 (internal quotation marks omitted). That a class is identifiable does not mean that each member of the class must be identified with 100% accuracy. *See In re Electronic Books Antitrust Litig*., No. 11 MD 2293, 2014 WL 1282293, at *23 (S.D.N.Y. Mar. 28, 2014) (rejecting Defendants' argument that records need to be available at the time of class certification to definitively identify every class member.)

Rather, that the class be identifiable means the definition allows the court to "readily identify the class members in reference to objective criteria." *Adair,* 764 F.3d at 358. *See also* 1 *Newberg on Class Actions* § 3:3; *Manual for Complex Litigation, Fourth* § 21.222 (Fed'l Judicial Ctr. 2004)(same). A court need not determine "absent class members' actual identities ... before a class can be certified." *Boundas v. Abercrombie & Fitch Stores, Inc.,* 280 F.R.D. 408, 417 (N.D. Ill. 2012). Rather, all that is needed is an

objective class definition which permits class members to be identified during a claims administration process if the class prevails. *Id. Manual for Complex Litigation,* § 21.222, at 270; *see also* 7A Wright, Miller & Kane, *supra,* § 1760, at 736.

As one federal court recognized in a TCPA class action, the identity of each class member need not be known at the time of certification, the class definition simply must be definite enough for the court to determine whether an individual is a member. *Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559, 566 (W.D. Wash. 2012). In fact, in *Agne* the only information that was available to the Plaintiff was the cellular telephone numbers of putative class members. *Id.* at 562.

Here, however, virtually all class members have been identified. Krakauer's expert has listed the names and addresses associated with the winnowed group of numbers that constitute the proposed class members. Verkhovskaya Report, at 11, and Exhibit A to that Report. Where the SSN call records Krakauer obtained do not include the names and addresses of class members or those records are incomplete, his expert has supplemented the data through additional research using Lexis/Nexis. *Id.*, at 14-15. Krakauer's expert has identified and verified the names and addresses of proposed class members to a reasonable certainty. Those steps, coupled with the notice procedure and directives this Court may issue concerning notice and further efforts to confirm the identities of class members satisfy the requirement that the class be reasonably identifiable.

Krakauer's efforts more than satisfy the identifiability requirement, which does not require, as Krakauer has done here, that all class members be identified prior to

11

certification. For example, in *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 245 (N.D. Ill. 2014), another TCPA case, in rejecting the defendants' argument that the class was not identifiable, the court found that it was not necessary to identify all class members at the time of certification; it was enough that the court could see that an objectively defined class existed, which could be identified in due course. The court also found that denying class certification where the defendants failed to keep sufficient records of their actions would only create an incentive for wrongdoers to violate the law "on a mass scale" and avoid consequences for their actions because of that absence of documentation.

Similarly, in *Hughes v. Kore of Ind. Enter., Inc.*, 731 F.3d 672 (7th Cir. 2013), the plaintiff sought to certify a class of consumers who were charged ATM fees without the required notice. *Id.* at 674. The available records did not make the class members easy to identify. *Id.* at 675. Based in part on its conclusion that the notice requirement could not be satisfied because all class members could not be identified with reasonable certainty, the trial court decertified the class. *Id.* at 677. On appeal, the court of appeals held that the inability to identify all class members was not an obstacle to class certification. The court reaffirmed that, "[w]hen reasonable effort would not suffice to identify the class members, notice by publication, imperfect though it is, may be substituted." *Id.*

### B. THE CLASS IS SUFFICIENTLY NUMEROUS THAT JOINDER IS IMPRACTICABLE

Courts in this Circuit have generally found that classes of roughly forty or more plaintiffs are sufficient. *See Brunson v. Louisiana-Pacific Corp.*, 266 F.R.D. 112, 117

(D.S.C. 2010) (collecting cases). There can be no doubt then, that in this case, the calls to more than 20,000 members of the putative class establish that "joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).

### C. KRAKAUER AND CLASS MEMBERS SHARE COMMON FACTUAL AND LEGAL ISSUES

Here, every Class Member's claims arise from the same common nucleus of operative facts—SSN called them on Dish's behalf to market Dish TV services despite their status as DNC registrants. Similarly, every Class Member has an interest in the same overarching question of law, *i.e.,* whether Dish violated the TCPA by allowing SSN to make these calls. In addition, SSN called people who expressly told it to stop calling on Dish's behalf. The persons who are in this second class similarly share a commonality of interest in the resolution of the legal issue whether Dish's misconduct violates the internal do not call regulations.

These common issues predominate over any individualized issues because their resolution will determine whether Dish is liable to the entire class. If the Court ultimately finds that Dish violated the TCPA, that ruling will determine Dish's liability for *all* Class Members' claims. On these issues alone, a class exists. *See Haywood v. Barnes,* 109 F.R.D. 568, 577 (E.D.N.C. 1986) ("[A] single common question [of law or fact] is sufficient to satisfy the rule.").

Here, the common questions of law and fact include:

- Did SSN place telemarketing calls to Plaintiff and class members?
- Is Dish liable under TCPA § 227(c) for telemarketing calls placed by SSN?
- Did SSN place the calls under Dish's actual authority?

13

- Did SSN place the calls under Dish's apparent authority?
- Did Dish ratify SSN's illegal conduct by accepting the benefit of its illegally-generated business and failing to exercise its authority to end the violations?
- Were the SSN calls placed for Dish's benefit, or on its behalf?
- Do Dish's dealer agreements shield it from liability for SSN's TCPA violations?

These questions are dispositive, apply equally to all class members, and, importantly, can be *answered* using common proof and uniform legal analysis. The commonality requirement is therefore met.[3]

### D.  KRAKAUER'S CLAIMS ARE TYPICAL OF THOSE OF CLASS MEMBERS

As with commonality, the threshold requirement for typicality is "not high." *See Brown v. Nucor Corp.*, 576 F.3d 149, 153 (4th Cir. 2009). To meet the typicality requirement of Rule 23(a)(3), a class representative must simply "be part of the class and possess the same interest and suffer the same injury as the class members." *Deiter v. Microsoft Corp.,* 436 F.3d 461, 466 (4th Cir. 2006) (quoting *Amchem Prods., Inc. v.*

_____

[3] In its opposition brief, Dish Network likely will rely heavily on *Donaca v. Dish Network, LLC,* 303 F.R.D. 390 (D. Colo. 2014), where the court denied class certification in a TCPA case brought by the same counsel prosecuting this case. *Donaca* only serves as a counterpoint to illustrate why certification here is appropriate. Here, Krakauer received telemarketing calls from Dish dealer SSN, and seeks to represent a class of persons, all identifiable through telephone calling records, who also received Dish promotional calls from SSN. By contrast, in *Donaca,* the plaintiff received telemarketing calls from three dealers for whom no call records existed, while class members received calls from three *other* dealers for whom call records *did* exist. *Id.* at 396-97. Consequently, the court concluded, "I do not question [plaintiff's] zeal or the ability and experience of his team of lawyers. But the fact that he received four different calls from different dealers in different years is incidental to the fact that, in reality, he wishes to represent a group of people of which he is not a member." *Id.* at 397. On that basis, the court concluded the *Donaca* plaintiff was not a member of the class he sought to represent. No similar deficiency exists here.

14

*Windsor,* 521 U.S. 591 (1997)). Typicality does not require that the representative's claims be identical to every other member of the class. *See Soutter v. Equifax Information Servs., LLC,* 498 F. App'x 260, 265 (4th Cir. 2012) (citing *Broussard v. Meineke Discount Muffler Shops, Inc.,* 155 F.3d 331, 340 (4th Cir. 1998)). Instead, where the named plaintiffs' claims arise "from the same event or practice or course of conduct that gives rise to the claims of other class members," and are "based on the same legal theory" as the claims of the class, typicality is met. *Bullock v. Bd. of Educ. of Montgomery Cnty.,* 210 F.R.D. 556 (D. Md. 2002).

Krakauer, like all class members, received SSN telemarketing calls on a number listed in the DNC Registry, as well as on Dish company-specific Do Not Call registries. He seeks the same relief as the class. By proving his own legal claims, Krakauer will prove the class claims. No individualized inquiry is necessary.

### E. KRAKAUER HAS NO CONFLICTS WITH CLASS MEMBERS, POSSESSES A GENUINE PERSONAL INTEREST IN THE CASE, AND WILL ADEQUATELY REPRESENT CLASS MEMBERS

The named plaintiff must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy requirement "tend[s] to merge" with the commonality and typicality criteria; in other words, when those requirements are met, the interests of the class members will likely be protected in their absence. *See Gen. Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 157, n.13 (1982). The adequacy inquiry further serves to "uncover conflicts of interest between named parties and the

class they seek to represent," as well as the "competency of class counsel." *Harris v. Rainey*, 299 F.R.D. 486, 491 (W.D. Va. 2014).

A class representative is inadequate only if there is evidence of a true conflict of interest between the representative and class members. *See Amchem,* 521 U.S. at 625. The "conflict must be more than merely speculative or hypothetical," and must "go to the heart of the litigation." *Gunnells v. Health Plan Services, Inc.,* 348 F.3d 417, 430-31 (4th Cir. 2003)(citation omitted). Courts consider counsel's competence and experience "attributes which will most often be presumed in the absence of proof to the contrary." *Black v. Rhone-Poulenc, Inc.,* 173 F.R.D. 156, 162 (Va. 1996) (citing Herbert B. Newberg, *Newberg on Class Actions* § 3.22 (3d ed. 1992)). Attached as Exhibit E are declarations from Krakauer's counsel addressing the factors the Court "must consider" under Rule 23(g).

Here, Krakauer has no conflicting interests with class members and has demonstrated an unyielding commitment to carrying out all of the duties of a class representative, including but not limited to responding to numerous discovery requests and undergoing deposition. In fact, by investigating, documenting, filing and prosecuting this case Krakauer has demonstrated a desire and ability to protect class members' interests. There is nothing to suggest that Krakauer has any interest antagonistic to the vigorous pursuit of the class claims against Dish. Rather, his interests are perfectly aligned with those of class members. All seek a determination that Dish violated the TCPA, and all seek the same statutory damage remedy.

16

**F.    COMMON ISSUES PREDOMINATE AND A CLASS ACTION IS THE
SUPERIOR METHOD OF ADJUDICATING THIS MATTER**

If this class action is not allowed to proceed, the alternative is likely the lack of

any relief for affected DNC registrants, a disfavored result. Most of those who received

these unwanted calls would not seek relief on an individual basis because the cost of

proceeding on an individual basis would not be practical or economical given the

potential size of individual awards. *See Mims v. Arrow Fin. Servs., LLC,* 132 S. Ct. 740,

753 (2012) (noting the unlikely possibility that a consumer would pay the $400 federal

court filing fee to bring a $500 claim, and emphasizing that all 65 TCPA cases brought in

the 7th Circuit since 2005 were class actions); 7A Wright, Miller & Kane, *Federal

Practice and Procedure* (2d ed. 1986), at 518, § 177 (a class action enables those who

have small claims that might not be worth litigating individually to combine their

resources and vindicate their rights collectively).

**1.    COMMON ISSUES PREDOMINATE**

The predominance analysis balances the common issues previously identified

against any individualized issues that may exist. This test is qualitative, not quantitative,

and so common issues may predominate even when some individualized inquiry is

required. *See Gunnells,* 348 F.3d at 429. The central concern is "whether proposed

classes are sufficiently cohesive to warrant adjudication by representation." *Amchem,* 521

U.S. at 623.

Here, common issues overwhelmingly predominate: whether SSN called a number

on either the national or the in-house Do Not Call lists, and whether Dish is liable for

SSN's actions. There are virtually no individual issues or defenses. Dish could have scrubbed putative class members' telephone numbers to identify any existing Dish customers who may have an existing business relationship ("EBR") with Dish. But Dish has produced no evidence of an EBR between it and any class member, and it has the burden of proving an EBR exemption. Nor has Dish presented any evidence that any class member provided express written consent to Dish or SSN to place telemarketing calls.

### 2. A CLASS ACTION IS THE MOST MANAGEABLE, EFFICIENT, AND SUPERIOR MECHANISM FOR RESOLVING CLASS MEMBERS' CLAIMS

Rule 23(b)(3) requires that the class action device be superior to individual litigation. In assessing superiority, the Court must consider at least some of the factors in Rule 23(b)(3), including: "the class members' interests in individually controlling the prosecution or defense of separate actions," "the extent and nature of any litigation concerning the controversy already begun by or against class members," "the desirability or undesirability of concentrating the litigation of the claims in the particular forum," and "the likely difficulties in managing a class action."

Here, the large number of claims, along with the relatively small statutory damages, the desirability of adjudicating these claims consistently, and the probability that individual class members would not have a great interest in controlling the prosecution of these claims, all indicate that a class action would be superior. For these reasons, district courts in this Circuit have frequently recognized that class actions provide a superior method for adjudicating claims under the TCPA. *See Jay Clogg Realty*

18

*Grp., Inc. v. Burger King Corp.*, 298 F.R.D. 304, 308-09 (D. Md. 2014) (collecting cases).

If Krakauer's claims are certified as a class action, a trial in this matter will be eminently manageable. All of the tens of thousands of violations that Krakauer alleges can be proven by one expert witness through a series of call logs obtained from one authenticated source. The evidence with respect to Dish's vicarious liability for the telemarketing activities of SSN is the same for the putative class as it would be if Krakauer went to trial on his individual claim.

## VI.   CONCLUSION

This case meets the requirements for class certification. The proposed class is defined by specific, objective, and verifiable criteria, it includes at least 20,000 people, and the claims are based on misconduct that is *per se* illegal. All of the primary issues of law and fact in the action are common to the class, and predominate over any individual issues.

In short, this is a model case for the application of the class action mechanism. It should be permitted to proceed under Rule 23. For the foregoing reasons, the Court should certify this action as a class action on behalf of the classes herein defined.


Dated: March 23, 2015

Respectfully submitted,


*/s/ John W. Barrett*
John W. Barrett – *Visiting Attorney*
Bailey & Glasser LLP
209 Capitol Street
Charleston, WV 25301
(304) 345-6555 / (304) 342-1110 facsimile
jbarrett@baileyglasser.com

J. Matthew Norris
NC Bar No. 37206
Norris Law Firm
1033 Bullard Court, Suite 207
Raleigh, NC 27615
Main: (919) 981-4475
Direct: (919) 926-1678
Facsimile: (919) 926-1676

Edward A. Broderick - *Visiting Attorney*
Anthony Paronich
Broderick Law, P.C.
99 High Street, Suite 304
Boston, MA 02110
(617) 738-7080 / (617) 951-3954 facsimile
ted@broderick-law.com

Matthew P. McCue - *Visiting Attorney*
The Law Office of Matthew P. McCue
1 South Avenue, Third Floor
Natick, MA 01760
(508) 655-1415 / (508) 319-3077 facsimile
mccue@massattorneys.net

*Attorneys for Thomas H. Krakauer*

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic File (NEF) and paper copies will be sent to those indicated as non-registered participants on March 23, 2015.

*/s/ John W. Barrett*
John W. Barrett – *Visiting Attorney*