**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT**
**OF NORTH CAROLINA**

| | | |
|---|---|---|
| THOMAS KRAKAUER, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. 1:14-CV-00333-CCE-JEP |
| | ) | |
| -vs- | ) | |
| | ) | |
| DISH NETWORK LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT DISH NETWORK L.L.C.'S OPPOSITION TO**
**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**
**ORAL ARGUMENT REQUESTED PURSUANT TO LR 7.3(c) AND LR 23.1(b)**

Defendant DISH Network L.L.C. ("DISH") submits this Opposition To Plaintiff's Motion For Class Certification. Pursuant to LR 7.3(c) and LR 23.1(b), DISH hereby requests a hearing or an oral argument to fully address the issues discussed herein.

# TABLE OF CONTENTS

Page

I.  STATEMENT OF FACTS ....................................................................................... 3

    A.  Plaintiff Thomas Krakauer Never Requested To Be Added To DISH's IDNC List And Never Complained Of Any Telemarketing Law Violation. ................................................................................................ 3

    B.  SSN Used Five9, An Unapproved Third-Party Vendor, To Initiate All Calls In This Case. ................................................................................... 5

II.  LAW & ARGUMENT ........................................................................................... 7

    A.  STANDARD FOR CLASS CERTIFICATION. ............................................ 7

    B.  PUTATIVE CLASS MEMBERS ARE NOT ASCERTAINABLE. ............ 8

        1.  Plaintiff's Expert Does Not Present A Reliable Methodology To Identify The Subscriber Of A Telephone Number—*i.e.*, The Putative Class Member—At The Time Of the Alleged Calls. ................................... 9

        2.  Plaintiff's Methodology To Identify The Date On Which Individuals Registered On The DNC Registry Is Flawed. ......................................................................................... 11

        3.  Plaintiff's Methodology To Identify Individuals Who Requested To Be Added To The IDNC List Is Inaccurate And Unreliable. ............................................................... 12

    C.  RULE 23(b)(3): INDIVIDUALIZED ISSUES OVERWHELM ANY ISSUES COMMON TO THE CLASS. ....................................................... 13

        1.  Non-Actionable Calls To Individuals With Whom DISH Had An EBR Cannot Be Identified Absent Individualized Inquiry. ................................................................. 14

        2.  Non-Actionable Calls to Businesses Cannot Be Identified Absent Individualized Inquiry. ....................................... 17

        3.  Whether A Wireless Number Was a "Residential" Line Cannot Be Determined Absent Individualized Inquiry. ................... 19

i

4.    Non-Actionable Calls Where Individuals <u>First</u> Called
      SSN Cannot Be Determined Absent Individualized
      Inquiry. ............................................................................................20

5.    Whether Individuals Voluntarily Provided Their
      Telephone Number To SSN Cannot Be Determined
      Absent Individualized Inquiry........................................................22

6.    Whether Individuals Requested A Call-Back On The
      First Call Cannot Be Identified Absent Individualized
      Inquiry. ............................................................................................23

D.    RULE 23(a)(3) And 23(b)(3): VICARIOUS LIABILITY CANNOT
      BE DETERMINED ABSENT INDIVIDUALIZED INQUIRY,
      AND PLAINTIFF'S CLAIM IS ATYPICAL OF THE PUTATIVE
      CLASS..................................................................................................24

E.    RULE 23(a)(3): PLAINTIFF'S CLAIM IS ATYPICAL OF
      INTERNAL DNC CLASS MEMBERS AS PLAINTIFF NEVER
      REQUESTED TO BE PLACED ON AN IDNC LIST...............................27

III.   CONCLUSION ...................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Avalon Ctr. Inv. Co. v. Commercial Defeasance, LLC*,
No. 08-cv-00535, 2010 U.S. Dist. LEXIS 65239 (W.D.N.C. May 21,
2010) ...................................................................................................................... 27

*Bailey v. Domino's Pizza, LLC*,
867 F. Supp. 2d 835 (E.D. La. 2012) .......................................................................... 28

*Breslow v. Wells Fargo Bank, N.A.*,
755 F.3d 1265 (11th Cir. 2014) .................................................................................... 9

*Brey Corp. v. LQ Mgmt. LLC*,
No. 11-718, 2014 U.S. Dist. LEXIS 11223 (D. Md. Jan. 30, 2014)........................... 10

*Carrera v. Bayer Corp.*,
727 F.3d 300 (3d Cir. 2013)........................................................................... 8, 10, 17

*CE Design, Ltd. v. Prism Bus. Media, Inc.*,
606 F.3d 443 (7th Cir. 2010) ....................................................................................... 15

*Clark v. Experian Info. Solutions*,
2001 U.S. Dist. LEXIS 20024 (D.S.C. March 19, 2001) ............................................. 8

*Cochran v. Volvo Group N. Am., LLC*,
No. 11-CV-927, 2013 U.S. Dist. LEXIS 57158 (M.D.N.C. April 22,
2013) (Eagles, J.) ..................................................................................................... 6, 7

*DISH Network, L.L.C. v. FCC*,
552 F. App'x. 1 (D.C. Cir. 2014)................................................................................. 26

*Donaca v. Dish Network, LLC*,
303 F.R.D. 390 (D. Colo. 2014) ................................................................................... 1

*Elkins v. Medco Health Solutions, Inc.*,
No. 12CV2141, 2014 U.S. Dist. LEXIS 57633 (E.D. Mo. Apr. 25,
2014) ........................................................................................................................... 28

*EQT Prod. Co. v. Adair*,
764 F.3d 347 (4th Cir. 2014) ................................................................................. 8, 11

*Gene & Gene LLC v. BioPay LLC*,
    541 F.3d 318 (5th Cir. 2008) ...................................................................... 14

*Golan v. Veritas Entm't, LLC*,
    No. 14CV00069, 2014 U.S. Dist. LEXIS 68910 (E.D. Mo. May 20,
    2014) .................................................................................................... 25, 27, 28

*Hamilton v. Spurling*,
    No. 11cv00102, 2013 U.S. Dist. LEXIS 38585 (S.D. Ohio March 20,
    2013) ............................................................................................................ 24

*Johnson v. Hondo, Inc.*,
    125 F.3d 408 (7th Cir. 1997) ...................................................................... 26

*Levitt v. Fax.com*,
    No. 05-949, 2007 U.S. Dist. LEXIS 83143 (D. Md. May 25, 2007).................... 14, 27

*Liles v. Am. Corrective Counseling Servs.*,
    231 F.R.D. 565 (S.D. Iowa 2005) ............................................................... 10

*Martin v. Comcast Corp.*,
    No. 12 C 6421, 2013 U.S. Dist. LEXIS 169221 (N.D. Ill. Nov. 26,
    2013) ............................................................................................................ 22

*Raymond James Fin. Servs. v. Cary, Inc.*,
    709 F.3d 382 (4th Cir. 2013) ...................................................................... 25

*In Re Tel. Consumer Prot. Act of 1991*,
    68 FR 44144 (July 25, 2003) .................................................................. 19, 20

*In Re Tel. Consumer Prot. Act of 1991*,
    7 F.C.C.R. 8752 (1992)........................................................................... 22, 23

*In Re Tel. Consumer Prot. Act of 1991*,
    70 FR 19330 (2005) ................................................................................. 17, 18

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
    445 F.3d 311 (4th Cir. 2006) ............................................................*passim*

*United States v. DISH Network*,
    No. 09-3073, 2014 U.S. Dist. LEXIS 172020 (C.D. Ill. Dec. 11, 2014)..... 6, 20, 25, 26

*Vega v. T-Mobile USA, Inc.*,
    564 F.3d 1256 (11th Cir. 2009) .................................................................. 27

*Wal-Mart Stores, Inc. v. Dukes*,
  __ U.S. __, 131 S. Ct. 2541 (2011) ......................................................................... 8, 17

**Statutes**

47 U.S.C. § 227(c)(5) ...................................................................................... 1, 17

**Other Authorities**

47 C.F.R. § 64.1200(c)(2), (d)(3) ........................................................................ 17

47 C.F.R. § 64.1200(d)(3) ........................................................................... 12, 28

47 C.F.R. § 64.1200(f)(5) ........................................................................ 15, 21, 22

47 C.F.R. § 64.1200(f)(14) ................................................................................ 23

Fed. R. Civ. P. 23 ................................................................................ 3, 7, 8, 16

Restatement (Third) of Agency § 4.01, cmt. ........................................................ 26

Rule 23(a) ................................................................................................ 8, 13

Rule 23(a)(3) ......................................................................................... 25, 27

Rule 23(b)(3) .......................................................................................... 8, 13

# MEMORANDUM IN SUPPORT

This is now the third time that Plaintiff's attorneys have attempted to certify a class action involving the calls at issue in this case, with both of their prior motions for class certification failing. *See Donaca v. Dish Network, LLC*, 303 F.R.D. 390, 394-95, 402 (D. Colo. 2014). But nothing has changed between now and their former attempts except that Plaintiff, a former putative class member in *Donaca*, now seeks to serve as class representative.

DISH did not initiate a single call at issue in this case. Instead, Plaintiff seeks to represent a class of approximately 20,000 persons who were allegedly on the national do-not-call registry ("DNC Registry") or DISH's internal do-not-call list ("IDNC List"), and who received calls initiated more than four years ago by Satellite Systems Network ("SSN"), a former third-party Independent Retailer of DISH. Plaintiff alleges that these calls violate the Telephone Consumer Protection Act, 47 U.S.C. § 227(c)(5) ("TCPA"), and seeks to hold DISH vicariously liable for the calls initiated by SSN.

Plaintiff proposes two classes. (Doc. 47, pp. 1-2.)

- A "National DNC Class" of persons "whose telephone numbers were listed on the federal Do Not Call registry for at least 30 days, but who received telemarketing calls from [SSN], to promote the sale of Dish satellite television subscriptions from May 1, 2010 to August 1, 2011."

- An "Internal DNC Class" of persons "whose telephone numbers were listed on either [DISH's] or [SSN's] company specific Do Not Call registries, but who received telemarketing calls by or at the direction of [SSN], to promote the sale of Dish satellite television subscriptions from May 1, 2010 to August 1, 2011."

1

Plaintiff obtained a series of telephone call logs from Five9, Inc., a third-party vendor through which SSN initiated the calls (the "Five9 Call Logs"). Plaintiff relies upon his purported expert, Anya Verkhovskaya, to identify putative class members and to try to resolve the multiple individualized issues in this case. Plaintiff's expert's analysis is inaccurate, unreliable, and incomplete for a number of reasons, as Ms. Verkhovskaya:

- Fails to present a reliable methodology to ascertain the identity of *any* class member, which requires identifying: (1) *the subscriber to the telephone number*; (2) when putative class members registered with the DNC Registry; and (3) whether an individual requested to be added to an IDNC List;

- Brushes aside the fact that thousands of non-actionable calls were made to individuals with whom DISH had an established business relationship, cannot be resolved through classwide proof at trial, and require individualized inquiry;

- Fails to accurately identify and exclude telephone numbers assigned to businesses on a classwide basis, thereby requiring individualized inquiry;

- Fails to prove how Plaintiff will establish that wireless numbers were used as "residential" lines, thereby requiring individualized inquiry; and

- Fails to account for numerous individualized issues evidenced on the Five9 Call Logs, including calls made by SSN only in response to first receiving an inbound call from a consumer, calls by SSN to telephone numbers voluntarily provided by individuals, and calls in which the called individual on the first call (for which there is no potential violation) requested a call back.

Plaintiff has also failed to meet his burden of proof by ignoring:

- How DISH's vicarious liability for SSN's actions could be established under theories of apparent authority or ratification on a classwide basis—indeed, *Plaintiff's own claims* are atypical of putative class members since even he admits that SSN never represented itself to him as an agent of DISH or that he believed that SSN was authorized to initiate the calls; and

- How Plaintiff could ever represent a class of persons on DISH's IDNC List when he admits that he never requested to be added to the IDNC List.

2

These issues, whether ignored by Plaintiff or encapsulated by Plaintiff's expert's flawed methodology, predominate and overwhelm any issues common to the class. Accordingly, a class action is not a superior means of litigation given the facts of this case. Plaintiff cannot meet his burden under Fed. R. Civ. P. 23 ("Rule 23").

## I.     STATEMENT OF FACTS

### A.     PLAINTIFF THOMAS KRAKAUER NEVER REQUESTED TO BE ADDED TO DISH'S IDNC LIST AND NEVER COMPLAINED OF ANY TELEMARKETING LAW VIOLATION.

On May 9, 2009, Plaintiff alleges that he received a telephone call from SSN, a former Independent Retailer of DISH. (*See* EXHIBIT 1.) Plaintiff alleges that the call from SSN originated from the Caller ID number 800-375-8211.[1] (*Id.*)

SSN called Plaintiff, spoke to him regarding his current DirecTV subscription, and then told Plaintiff that he could save money by switching to DISH. (EXHIBIT 1, pg. 2); (Deposition of Thomas Krakauer, 79:12-19, Oct. 14, 2014, attached as EXHIBIT 2.) Plaintiff testified that SSN only mentioned DISH once, at the very end of the call, and never represented or held itself out as DISH. (EXHIBIT 2, 79:12-19); (*see also* Deposition of Thomas Krakauer, 10:1-18, Sept. 28, 2011, attached as EXHIBIT 3.) Indeed, SSN never represented that it was DISH, or even that it was authorized by DISH to make the call. (EXHIBIT 3, 50:6-14.)

---

[1] As discussed *infra*, Plaintiff identifies the telephone number 800-375-8211 in his putative class list, and thus *identifies SSN as a putative class member*. This rather glaring misidentification shows not only the facial unreliability of Plaintiff's methodology, but also how Plaintiff has failed to accurately identify and exclude telephone numbers belonging to businesses.

Plaintiff, *citing no evidence and merely relying on the allegations of his Amended Complaint*, alleges that he requested to be placed on SSN's IDNC List. (*See* Doc. 48 at pg. 4 ¶ 2, citing First Am. Compl., Doc. 32, ¶ 27.) But in his deposition, Plaintiff testified under oath that he did *not* tell the caller during the May 2009 call to add him to an IDNC List. (EXHIBIT 2, 63:3-5) ("Q. And you don't remember if you told [SSN] not to call you back again, right? A. I did not."). In fact, Plaintiff admitted that he did not even know that he *could* make a request to be added to an internal DNC list:

> Q. Do you know what an internal Do Not Call Registry is or list is?
> A. I do not.
> . . .
> A. Off the record, I would love to know the phone call or the means that I could get myself put on an internal DISH Network Do Not Call listing. How do I go about doing that?

(EXHIBIT 3, 51:25-52:14.) Instead, Plaintiff simply told SSN that he was not interested and hung up the phone. (EXHIBIT 2, 79:12-19); (*see also* EXHIBIT 3, 39:5-12.)

On May 10, 2009, Plaintiff complained to DISH regarding the call, *not* because SSN contacted him in violation of any telemarketing laws, but because he thought that SSN had fraudulently obtained his DirecTV account information. (EXHIBIT 1, pg. 2); (EXHIBIT 2, 54:6-16, 79:12-19.) After receiving Plaintiff's complaint, DISH, *on its own initiative*, added Plaintiff to its IDNC List. (Affidavit of Bruce Werner ¶ 14, attached as EXHIBIT 4.)

The IDNC List is not exclusively reserved for individuals who request not to be called. As a matter of policy and practice, DISH adds any individuals who provide any complaint regarding unwanted calls, including calls that allege rude behavior,

4

harassment, or other unwanted conduct.  (*Id.* at ¶¶ 9-10); (EXHIBIT 5, pg. 1.)  Although Plaintiff's complaint did not include a request not to be called, DISH added Plaintiff to its IDNC List to placate an unhappy consumer.  (EXHIBIT 4 at ¶¶ 12, 14.)

DISH investigated Plaintiff's complaint and contacted SSN.  On May 28, 2009, SSN responded to DISH, explaining that it had previously sold DirecTV to Plaintiff.  (*See* EXHIBIT 6.)  SSN then added Plaintiff's number to its IDNC List because of DISH's inquiry regarding Plaintiff's complaint, not because of Plaintiff's request.  (*Id.*)

Plaintiff alleges that between June 2010 and August 2011, he received a series of additional calls from SSN.  Plaintiff admits, however, that DISH was never mentioned in any of these calls and that he did not tell SSN to add him to an IDNC List.  (EXHIBIT 2, 65:16-19, 66:8-15); (EXHIBIT 3, 39:5-12, 40:6-12, 53:4-18.)  More importantly, despite allegedly receiving these subsequent calls, Plaintiff did not contact DISH or complain to DISH that he ever received any additional calls at issue in this case.  (EXHIBIT 4, ¶ 15.) Upon learning of the calls to Plaintiff and the putative class members, DISH terminated SSN as an Independent Retailer.  (Deposition of Bruce Werner, 37:6-38:3, March 17, 2015, attached as EXHIBIT 7.)

> **B.   SSN USED FIVE9, AN UNAPPROVED THIRD-PARTY VENDOR, TO INITIATE ALL CALLS IN THIS CASE.**

DISH is in the business of delivering DISH Network® brand direct broadcast satellite television services to residential and business customers throughout the United States.  (EXHIBIT 4, ¶ 5.)  DISH has contractual agreements with thousands of

5

independent third-party retailers ("Independent Retailers"), all of which are independent contractors, to market DISH Network® services on a non-exclusive basis. (*Id.* at ¶ 6.)

SSN is a former non-exclusive Independent Retailer of DISH. (*Id.* at ¶ 7.) DISH's Independent Retailers contractually agree to comply with all applicable laws, including the TCPA. (*Id.* at ¶ 8.) All calls at issue in this case were made by SSN, using software provided by Five9, an unapproved third-party vendor of SSN.

In an effort to muddy the waters, Plaintiff relies heavily upon the Central District of Illinois decision, *United States v. DISH Network*, No. 09-3073, 2014 U.S. Dist. LEXIS 172020 (C.D. Ill. Dec. 11, 2014) (the "FTC Decision" or the "FTC Case"), to try and paint SSN as a "repeat TCPA offender." In reality, the allegations referenced in the FTC Case occurred roughly a decade ago and years before the putative class period here. SSN's past behavior, even if accurate, "is not, in the end, enough for class certification," and is simply not relevant to the particular facts of *this case*.[2] *See Cochran v. Volvo Group N. Am., LLC*, No. 11-CV-927, 2013 U.S. Dist. LEXIS 57158, *13-14 (M.D.N.C. April 22, 2013) (Eagles, J.). More importantly, however, as detailed below, many of the District Court's findings in the FTC Case confirm that the issues regarding the calls in this case are not amenable to adjudication in one sweeping determination.

---

[2] Many of the prior alleged bad acts involved SSN's former use of prerecorded messages, a practice that SSN abandoned *years* before the allegations in this case, and an issue entirely unrelated to the allegations of this case: live calls to individuals allegedly on the DNC Registry. If this issue were relevant, DISH would also present evidence that many of the complaints against SSN were ultimately unfounded. Regardless, complaints dating back over a decade are irrelevant to class certification and the particular facts in *this* case.

Regardless, Five9 provided a software system that allowed SSN to upload call lists and initiate calls. (Deposition of David Hill, 15:25-16:5, 18:19-24, Oct. 10, 2014, attached as EXHIBIT 8.) Through Five9, SSN received both inbound calls from consumers and initiated outbound calls. (Deposition of Bahar Tehranchi, 52:15-53:14, 55:22-56:1, Aug. 26, 2013, attached as EXHIBIT 9); (Declaration of Rehan Quader, ¶ 12, attached as EXHIBIT 10.) Plaintiff asserts that SSN used call logs produced by Five9 from May 2010 through August 2011 (the "Five9 Call Logs") to initiate live telemarketing calls to individuals on the DNC Registry or IDNC List.

Because not all calls give rise to a potential TCPA claim, Plaintiff proposes a five-step methodology to identify class members and resolve the individualized issues in this case. (*See* Doc. 48, pg. 11.) As detailed below, Plaintiff's proposed methodology is fatally flawed in myriad ways, and the overwhelming evidence demonstrates that there are critical individualized issues that cannot be resolved through classwide proof. The result is that the proposed classes cannot be ascertained without a call-by-call analysis to separate class members who have potential claims against DISH from those who do not.

## II. LAW & ARGUMENT

### A. STANDARD FOR CLASS CERTIFICATION.

"The class action is an 'exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.' To show that his case falls within the exception, a party 'must affirmatively demonstrate his compliance' with Federal Rule of Civil Procedure 23." *Cochran*, 2013 U.S. Dist. LEXIS 57158 at *4 (internal citations

7

omitted), quoting *Wal-Mart Stores, Inc. v. Dukes*, __ U.S. __, 131 S. Ct. 2541, 2551 (2011).  The Court must conduct a "rigorous analysis" of whether Plaintiff has proven that all of the requirements of Rule 23 are met, not only to ensure that the rights of absent class members are protected, but also "*the right of the defendant* to present facts or raise defenses that are particular to individual class members."  *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 318 (4th Cir. 2006) (emphasis added).

Whether the challenge is ascertainability, commonality, typicality, predominance, or superiority, one thing is for certain: there are multiple flaws in the evidence with respect to the elements of Rule 23(a) and Rule 23(b)(3).  And the failure to meet even one requirement for class certification mandates the denial of Plaintiff's Motion.  *Clark v. Experian Info. Solutions*, 2001 U.S. Dist. LEXIS 20024, *14 (D.S.C. March 19, 2001).

### B.    PUTATIVE CLASS MEMBERS ARE NOT ASCERTAINABLE.

The Fourth Circuit has "repeatedly recognized that Rule 23 contains an implicit threshold requirement that the members of a proposed class be 'readily identifiable.'" *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014).  While Plaintiff need not actually identify each class member now, he must prove *now* that the class is "currently and readily ascertainable based on objective criteria," and can be reliably ascertained without resort to individualized fact finding.  *Carrera v. Bayer Corp.*, 727 F.3d 300, 305 (3d Cir. 2013); *see EQT Prod. Co.*, *supra*.

Plaintiff's proposed methodology is fatally flawed in at least three key ways:

1. None of the data relied upon by Plaintiff identifies the *actual subscriber to the telephone number*, *i.e.*, the proper putative class member.

2. The Nexxa data contains errors regarding individuals' registration dates on the DNC Registry, requiring individualized inquiry; and

3. Identifying individuals who requested not to be called cannot be determined on a classwide basis for the Internal DNC Class.

Accordingly, determining membership in the class will invariably resort to extensive and individualized fact-finding, rendering class action treatment impossible.

### 1. Plaintiff's Expert Does Not Present A Reliable Methodology To Identify The Subscriber Of A Telephone Number—*i.e.*, The Putative Class Member—At The Time Of the Alleged Calls.

Plaintiff proposes three steps for identifying putative class members. First, Plaintiff proposes that the class members are those individuals identified on the Five9 Call Logs. (Doc. 48, pg. 15 ¶ 2.) As conceded by Plaintiff's expert, however, the Five9 Call Logs only show the name of the person SSN intended to call. (Deposition of Anya Verkhovskaya, 145:5-146:6, March 6, 2015, attached as EXHIBIT 11.); (*see also* Expert Report of Debra Report, pg. 12 ¶ 34, attached as EXHIBIT 12.) But it is the *subscriber* to the telephone number who has standing to assert a claim under the TCPA, not the intended recipient. *E.g.*, *Breslow v. Wells Fargo Bank, N.A.*, 755 F.3d 1265, 1267 (11th Cir. 2014). Plaintiff's primary method to identify class members does not identify the person with the actual cause of action.

Second, Plaintiff proposes that if the Five9 Call Logs do not contain the individual's name, "his expert has supplemented the data through additional research

using Lexis/Nexis," (Doc. 48, pg. 15 ¶ 2).[3]  Plaintiff's expert believes that the LexisNexis data identifies the subscribers to the telephone numbers.   (EXHIBIT 11, 130:6-12.) Plaintiff's expert is wrong.   LexisNexis confirms that its data "*does not purport to identify the subscriber to the telephone number.*"[4]   (Declaration of Laura Dozois, ¶ 7, attached as EXHIBIT 13.)  Plaintiff has no evidence as to who the subscriber and proper putative class member is for any telephone number.

Finally, Plaintiff proposes a "notice procedure" to "confirm the identities of class members."  (Doc. 48, pg. 15 ¶ 2.)  But Plaintiff never explains what this procedure is or how it would be effective.  Plaintiff must propose a reliable methodology for identifying a class *now*, before sending any notices to putative class members.  *See Brey Corp. v. LQ Mgmt. LLC*, No. 11-718, 2014 U.S. Dist. LEXIS 11223, *2 (D. Md. Jan. 30, 2014). DISH has a due process right to challenge the reliability and means of ascertaining other class members.  *See Carrera*, 727 F.3d at 307; *Liles v. Am. Corrective Counseling Servs.*, 231 F.R.D. 565, 572 (S.D. Iowa 2005) ("[p]ublished notice after certification does little to 'facilitat[e] [the] court's ability to ascertain [class] membership in some objective manner.") (citation omitted).

---

[3] Also, in an attempt to overcome the fact that the Five9 Call Logs only show the intended recipient and not the subscriber to the number, Plaintiff may propose that all class members could instead be identified from the LexisNexis data.

[4] Because the LexisNexis data only identifies individuals who have used a particular telephone number, the LexisNexis data also frequently lists the same telephone number as being associated with multiple names.  (EXHIBIT 12, pg. 14 ¶ 41.)  Further, even *if* the data identified the subscriber (it does not), there is no identifying information for over half of the telephone numbers during the time period for the putative class.  (EXHIBIT 13 ¶¶ 5-6); (EXHIBIT 12, ¶¶ 48-49.)

Neither the Five9 nor LexisNexis data identifies the subscriber to the telephone number. Even if it did, Plaintiff concedes that some undefined and unspecified follow up method is necessary "to confirm the identities of class members." (Doc. 48, pg. 15 ¶ 2.) This is the exact type of "individualized fact-finding or 'mini-trials'" precluded by the Fourth Circuit, such that class certification is improper. *EQT Prod. Co.*, *supra*.

### 2. Plaintiff's Methodology To Identify The Date On Which Individuals Registered On The DNC Registry Is Flawed.

Nexxa provided Plaintiff's expert with data showing when a particular telephone number was registered on the DNC Registry. (EXHIBIT 11, 93:21-94:2.) Plaintiff's expert attempted to use this data to identify telephone numbers that had been on the DNC Registry for more than 30 days prior to the date of the call. (*See* Doc. 48-2, pg. 10 ¶ 3.)

Despite claiming that Nexxa provides "maximum accuracy and reliability," Plaintiff's expert admits that she has never tested the reliability of the data provided by Nexxa. (EXHIBIT 11, 73:2-7.) In fact, the Nexxa data is wrong, *even with respect to Plaintiff himself*, who is—literally—the only individual in this case for which any quality assurance comparison could be made. Plaintiff registered his number on the DNC Registry on July 3, 2003, and produced a screen shot of his registration on the DNC Registry, printed directly from the national DNC Registry website:

| Area Code | Phone Number | Transaction Date | Transaction Type | Transaction Source | Delete Reason |
|-----------|--------------|------------------|------------------|--------------------|---------------|
| 919 | 4719459 | 7-03-2003 | Register | Web | |
| 919 | 4719459 | 6-27-2010 | Register | Web | |

Provided by the Federal Trade Commission

(EXHIBIT 14.)

11

The Nexxa data, however, shows Plaintiff's registration as having occurred on June 1, 2003. (EXHIBIT 15, row 53630.) Reliability is critical to determine *when* a number was registered on the DNC Registry. Plaintiff's number is the only one for which DISH was able to compare the actual DNC registration date with the Nexxa data. So far, Plaintiff's error rate is 100%—*and that is with the named Plaintiff himself*.

### 3. Plaintiff's Methodology To Identify Individuals Who Requested To Be Added To The IDNC List Is Inaccurate And Unreliable.

For a putative class member of the Internal DNC Class to have a potential claim against DISH, such individual must make a request to SSN or DISH not to be called. *See* 47 C.F.R. § 64.1200(d)(3). Plaintiff does not propose a reliable methodology based upon any evidence to make this determination on a classwide basis.

In an attempt to try and identify individuals who requested not to be called by SSN, Plaintiff's expert identified calls with a "DNC" and "Do Not Call" in the "Disposition" field in the Five9 Call Logs. (Doc. 48-2, pg. 14 ¶ 1.) Plaintiff's expert concedes that she does not know if these Dispositions actually reflect an IDNC Request, and instead "Plaintiff's counsel represented to [her] that's what it meant." (EXHIBIT 11, 129:12-14.) Plaintiff's counsel's assumption was wrong.

In fact, a "DNC" or "Do Not Call" Disposition does *not* reflect an IDNC request made to SSN by a called individual. (EXHIBIT 10, ¶ 4.) Instead, it reflects just the opposite. These dispositions were used internally by SSN agents as an instruction to other agents: "do not call" that number, because that SSN agent would personally call back that individual (*i.e.*, it was "their lead"). (*Id.*)

12

Likewise, Plaintiff's expert also attempted to identify individuals who allegedly made IDNC requests to DISH by reference to DISH's IDNC List. (Doc. 48-2, pp. 12 ¶ 2, 13 ¶ 1.) She again admits that she does not know whether the names on the IDNC List actually represent people who requested not be called. (EXHIBIT 11, 59:5-11, 127:6-11, 79:2-22.) In fact, DISH's IDNC List is not exclusively reserved for individuals who request not to be called. As a matter of policy and practice, DISH also adds any individuals who provide any complaint regarding unwanted calls, including calls that allege rude behavior, harassment, or other unwanted conduct, which is precisely what happened here. (EXHIBIT 4, ¶¶ 9-10); (EXHIBIT 5.) This differentiation of the genesis of numbers on the IDNC List can only be discerned by specific, individualized inquiry.

Plaintiff's assumptions about the meaning of the Disposition fields on the Five9 Call Logs and the composition of DISH's IDNC List are stunningly wrong. Plaintiff's expert has failed to provide a reliable and accurate means to identify individuals who requested not to be called, such that the Internal DNC Class is not ascertainable without additional individual fact-finding from each putative class member.

## C. RULE 23(b)(3): INDIVIDUALIZED ISSUES OVERWHELM ANY ISSUES COMMON TO THE CLASS.

Plaintiff must prove that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Rule 23(b)(3); *Thorn*, 445 F.3d at 319 ("The predominance requirement is similar to but 'more stringent' than the commonality requirement of Rule 23(a)."). While "there are no invariable rules regarding the suitability of a particular case filed under . . . the TCPA for

13

class treatment; the unique facts of each case generally will determine whether certification is proper." *Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 328 (5th Cir. 2008). Plaintiff "must advance a viable theory employing generalized proof to establish liability with respect to the class involved, and it means too that district courts must only certify class actions filed under the TCPA when such a theory has been advanced." *Id.*

Here, the existence of individualized issues is not hypothetical. The Five9 Call Logs and data relied upon by Plaintiff indisputably show that:

1. Plaintiff's proposed methodology for identifying individuals with whom DISH had an established business relationship is flawed;

2. Plaintiff's proposed methodology for identifying telephone numbers belonging to businesses is flawed;

3. Plaintiff proposes no method for proving that wireless numbers on the DNC Registry (or IDNC list) were used for "residential" purposes; and

4. There are other instances of non-actionable calls where: (i) individuals initiated inbound calls to SSN and SSN placed a return call to the individual; (ii) individuals voluntarily provided SSN with their telephone number to be called; and (iii) instances where the called individual requested a call back from SSN.

The inability to resolve these individualized issues on a classwide basis renders this case "readily distinguishable" from suits where TCPA class actions were certified. *Levitt v. Fax.com*, No. 05-949, 2007 U.S. Dist. LEXIS 83143, *12 (D. Md. May 25, 2007).

### 1. Non-Actionable Calls To Individuals With Whom DISH Had An EBR Cannot Be Identified Absent Individualized Inquiry.

DISH is not liable for calls made to individuals with whom DISH or SSN had an established business relationship ("EBR"). An EBR exists: (1) where the individual was

14

a current DISH subscriber or former DISH subscriber within 18 months of terminating his or her relationship with DISH; and (2) for three months after an individual expresses an interest in obtaining a subscription to DISH. *See* 47 C.F.R. § 64.1200(f)(5). An EBR is construed broadly. *CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 451 (7th Cir. 2010) (noting that the FCC has "continued to emphasize a broad reading of the relationships covered by the EBR defense.").

To attempt to eliminate the viability of DISH's EBR defense on a classwide basis, Plaintiff's expert excluded calls that had a disposition of "DISH customer" on the Five9 Call Logs. (EXHIBIT 11, 40:12-15, 122:16-25.) But, as Plaintiff's expert readily conceded, her analysis would not identify current or former DISH customers if the called person or entity did not expressly identify themselves as such. (*Id.*, 124:4-19.)[5]

Most importantly, in discovery, DISH produced voluminous account details, identifying every telephone number on the putative class list associated with a customer account of DISH. (*See* EXHIBIT 16.) Plaintiff made no effort to exclude individuals with whom DISH had an EBR. Instead, Plaintiff claims that "Dish could have scrubbed putative class members' telephone numbers to identify any existing Dish customers who may have an [EBR] with Dish. But Dish has produced no evidence of an EBR between it and any class member…." (Doc. 48, pg. 22.)

---

[5] Further, the call data contains contradictory information in which the called party may have misidentified himself or herself as a DISH customer. (EXHIBIT 12, pg. 11, ¶¶ 32-33.)

DISH did not "scrub" its EBR evidence against the putative class list because it is *Plaintiff's burden* to do so at the class certification stage.[6]   The Fourth Circuit has expressly held that, even when a defendant bears the burden of proof for an affirmative defense on the merits, in moving for class certification, the plaintiff retains the burden of showing how the defense can be resolved on a classwide basis:

> [The plaintiff's] argument, of course, assumes that [the defendant] bears such a burden. *Our cases prove this assumption false; we have stressed in case after case that it is not the defendant who bears the burden of showing that the proposed class does not comply with Rule 23, but that it is the plaintiff who bears the burden of showing that the class does comply with Rule 23 . . . .*
>
> Seeking to avoid this conclusion, [the plaintiffs] argue that because [the defendant] bears the burden of proving the merits of its statute of limitations defense, it should also bear the burden of demonstrating that resolution of that defense cannot occur on a class-wide basis. *Even assuming that* [the defendant] *has the burden of proving its statute of limitations defense on the merits, we reject this argument. Our cases permit no exception to the rule that the plaintiff bears the burden of showing compliance with Rule 23.* . . . We therefore continue, as we must, to allocate to the plaintiff the burden of proving compliance with Rule 23.

*Thorn*, 445 F.3d at 321-22 (4th Cir. 2006) (internal citations omitted) (emphasis added). Plaintiff's gambit of simply ignoring the EBR evidence produced by DISH is fatal to his bid for class certification.

An examination of the EBR evidence reveals thousands of EBRs between DISH and putative class members, a non-exhaustive list of which is shown on EXHIBIT 17. DISH has the right to litigate its EBR defense with respect to each and every putative

---

[6] Not only is it not DISH's burden, but DISH is not aware of any means by which it could "scrub" this list against the putative class list on a classwide basis because one telephone number is often associated with multiple accounts with varying subscription periods.

class member. *Wal-Mart Stores, Inc.*, 131 S. Ct. at 2561 ("[a] class cannot be certified on the premise that [a defendant] will not be entitled to litigate its statutory defenses to individual claims."); *Carrera*, 727 F.3d at 307 ("A defendant in a class action has a due process right to raise individual challenges and defenses to claims, and a class action cannot be certified in a way that eviscerates this right or masks individual issues.").

It is Plaintiff's burden to establish how the issue of whether putative class members had an EBR with DISH could be resolved on a classwide basis. *See Thorn*, 445 F.3d at 321-22. Plaintiff has failed to do so.

## 2. Non-Actionable Calls to Businesses Cannot Be Identified Absent Individualized Inquiry.

The prohibitions of Section 227(c)(5) only apply to "residential" telephone subscribers. Calls to business are not actionable. 47 C.F.R. § 64.1200(c)(2), (d)(3); *In Re Tel. Consumer Prot. Act of 1991*, 70 FR 19330, 19331 (2005). Plaintiff's expert claims that: (1) she removed calls that had a disposition of "Business" as identified on the Five9 Logs; and (2) then "coordinated with LexisNexis" to identify other business numbers. (Doc. 48-2, pp. 10-11.)

Plaintiff's expert claims that LexisNexis identified only 118 telephone numbers on the National DNC Class and 350 numbers on the Internal DNC Class as business numbers, and claims that she excluded such business numbers from her classes. (Doc. 48-2, pp. 11 ¶ 1, 13 ¶ 2 .) Plaintiff's expert is wrong for at least two reasons:

- Despite whatever unknown telephone numbers Plaintiff's expert allegedly removed, the LexisNexis data identifies hundreds of *additional* business

telephone numbers that still appear in Plaintiff's putative class list, a non-exhaustive list of which is attached as EXHIBIT 18.

- LexisNexis identifies many numbers as *both* business and residential numbers, a non-exhaustive list of which is shown in EXHIBIT 19.

Plaintiff's methodology cannot identify whether these telephone numbers should be part of the putative class. In addition, if the telephone number was used for both business and residential purposes, such telephone numbers necessitate individualized inquiry to determine the primary purpose of the line. *See* 70 FR at 19331 (holding that the FCC will review calls to home-based businesses "as they are brought to our attention to determine whether or not the call was made to a residential subscriber.")

Further, Plaintiff's expert concedes that LexisNexis does not guarantee the accuracy of its results (and concedes that in her prior examinations of LexisNexis data she has encountered *error rates of up to 14% percent*), yet she admits that she did not even attempt to verify any of the LexisNexis data in any way. (EXHIBIT 11, 102:19-103:6, 103:12-14, 163:3-6.) The misidentification of telephone numbers belonging to businesses is not an insignificant issue. In a putative class where Plaintiff alleges that approximately 60,000 calls were made in violation of the TCPA, the error rate according to Plaintiff's own expert runs the risk of erroneously including up to 8,400 calls, creating the potential for nearly $13 million in liability for calls to businesses erroneously included in the class and *with no cognizable claim against DISH*.

In addition to the LexisNexis data, Plaintiff's expert also excluded roughly 1,300 telephone numbers that had a disposition of "Business" on the Five9 Call Logs.

18

(EXHIBIT 11, 100:22-101:7.)  These numbers also appear in the LexisNexis data.  If Plaintiff's proffered methodology were reliable, all (or at least a very high percentage) of the telephone numbers with a disposition of "Business" should be identified as business numbers by LexisNexis.  But they are not.

Out of the calls examined by DISH that had a disposition of "Business," the LexisNexis data only shows *13%* of these numbers as business numbers, LexisNexis reached the *contrary result* by concluding that 24% of "Business" disposition numbers were actually residential lines, and LexisNexis had no data regarding the remaining 57% of the numbers.  For example, the telephone numbers on EXHIBIT 20 were identified as a "Business" number according to the Five9 Call Logs (and therefore excluded from the class), but LexisNexis identifies these same numbers as residential lines.

Plaintiff's methodology for determining whether a telephone number was residential or business at the time of the alleged calls, whether based upon the LexisNexis data or the Five9 Call Logs, simply does not work.

### 3. Whether A Wireless Number Was a "Residential" Line Cannot Be Determined Absent Individualized Inquiry.

Plaintiff's expert did not perform any analysis to distinguish wireless numbers from residential numbers or to confirm whether a wireless number was used as a residential line.  (EXHIBIT 11, 106:17-107:2); (*see also* EXHIBIT 12, pp. 8-9 ¶¶ 23-26.) Cellular numbers may be registered on the DNC Registry.  *See In Re Tel. Consumer Prot. Act of 1991*, 68 FR 44144, 44146-47 (July 25, 2003).  The FCC, however, held that whether a wireless number is used as a residential line "may be more fact-intensive than

making the same determination for a wireline subscriber," and expressly held that a wireless subscriber must "provide *further proof* of the validity of that presumption" for purposes of an enforcement action. *Id.* at 44147 (emphasis added).

Indeed, the District Court in the FTC Case recently addressed this exact issue:

> The Plaintiffs also argue that the FCC established a presumption that calls to wireless phones were calls to residential telephone subscribers. Thus, any Dish argument about calls to wireless numbers is irrelevant under TCPA. The Court again disagrees. . . . The FCC stated that *the complainant still bore the burden to prove that the wireless number was used as a residential telephone number.* The FCC did not create an evidentiary presumption. The FCC created an administrative presumption that would allow wireless phone users to register on the Registry, but *the complaining registrant would still need to show that the phone was used for residential purposes*.

*United States v. DISH Network*, 2014 U.S. Dist. LEXIS 172020 at *204-06 (emphasis added) (internal citations omitted).

The LexisNexis data confirms that many wireless phones are not used for residential purposes, but as business numbers. (*See* EXHIBIT 21.) For a wireless number to be part of the class, Plaintiff must prove that a particular wireless number was used for residential purposes. Plaintiff has failed to do so.

### 4. Non-Actionable Calls Where Individuals <u>First</u> Called SSN Cannot Be Determined Absent Individualized Inquiry.

Plaintiff's expert purports to exclude all inbound calls (where an individual first called SSN) from her analysis. (EXHIBIT 11, 80:18-21, 86:2-24.) Yet, she concedes that she did not cross-reference the inbound calls with outbound calls to see if any of the outbound calls were only in response to first receiving an inbound call from a consumer. (EXHIBIT 11, 86:25-87:4.); (*see also* EXHIBIT 12, pg. 17 ¶ 51.)

20

SSN returned calls to individuals who *first* initiated inbound calls to SSN. (EXHIBIT 10, ¶ 12); (EXHIBIT 9, 52:15-53:14, 55:22-56:1.) In these instances, SSN was permitted to call back these individuals for up to three months after the consumer's initial inquiry. *See* 47 C.F.R. § 64.1200(f)(5). A review of the Five9 Call Logs reveals a multitude of instances where SSN called a putative class member *only after* receiving an inbound call from that person, examples of which are attached as EXHIBIT 22.

Even if Plaintiff retroactively modified his methodology to examine inbound calls, he still would not be able to identify all inbound calls to SSN for three reasons: (1) the originating caller id ("ANI") was not available for many calls (and the individual's telephone number was input into other fields); (2) the ANI information is missing completely for some calls; and (3) *many of the calls also show an SSN telephone number for both the ANI (originating number) and DNIS (destination number), indicating transferred calls.*[7] (*See* EXHIBIT 23); (*see also* EXHIBIT 10, ¶ 9.)

Most importantly, Plaintiff's putative class spans the time frame of May 2010 through August 2011. However, inbound call records are **only** available for September 2010 through February 2011, even though SSN received and responded to inbound calls during all of 2010 and 2011. (EXHIBIT 10, ¶ 12.) This means that inbound call records

---

[7] SSN used the telephone numbers 800-375-8211 to conduct business. (EXHIBIT 9, 34:23-35:2, 35:21-36:1) Ironically, *Plaintiff has identified SSN itself as a class member as part of his Internal DNC Class.* (*See* Doc. 48-4, pg. 171, Record 511.)

are missing for February[8] to August 2010 and March 2011, precluding a classwide determination of which outbound calls were the result of SSN originally receiving an inbound inquiry from an individual.

> ### 5. Whether Individuals Voluntarily Provided Their Telephone Number To SSN Cannot Be Determined Absent Individualized Inquiry.

There is no TCPA violation if a consumer voluntarily gave the telephone number to SSN. *See, e.g.*, *Martin v. Comcast Corp.*, No. 12 C 6421, 2013 U.S. Dist. LEXIS 169221, *8-10 (N.D. Ill. Nov. 26, 2013), citing *In Re Tel. Consumer Prot. Act of 1991*, 7 F.C.C.R. 8752, ¶ 31 (1992) ("[T]elemarketers will not violate our rules by calling a number which was provided as one at which the called party wishes to be reached.").

The "number1" and "number2" fields were used by SSN to input both primary and secondary contact information for an individual. (EXHIBIT 8, 54:8-55:5); (EXHIBIT 10, ¶ 9.) Plaintiff's expert did not examine the "number1" or "number2" fields on the Five9 Logs. She concedes that her analysis does not identify calls where SSN first called an individual *not* on the DNC Registry and where the individual voluntarily provided a second number that was on the DNC Registry that SSN subsequently called.[9] (EXHIBIT 11, 81:11-13, 142:20-144:5.); (*see also* EXHIBIT 12, pg. 17 ¶ 51.)

---

[8] Because an individual's inquiry to SSN creates an EBR, *see* 47 C.F.R. § 64.1200(f)(5), SSN was permitted to return calls for up to three months after the consumer's original inbound call. Thus, it is necessary to identify inbound calls back to February 2010, as the putative class begins in May 2010.

[9] Such instances can either be characterized as an EBR in which the consumer expresses interest in a product or service, 47 C.F.R. § 64.1200(f)(5), or are exempted from the

For example, as seen on EXHIBIT 24, SSN first called an individual at 540-580-2571, a telephone number not on the DNC Registry. After speaking to the called party a second time, a second number ("Number2") appears in the log as 540-580-2571, which *was* on the DNC Registry. When adding this second number, the SSN representative included the comment "missy wife 2nd number," evidencing that this second number was provided by the called individual so that SSN could contact his wife. But because the second number was on the DNC Registry, Plaintiff misidentifies the second call in his class list.[10] A non-exhaustive list of additional similar calls is attached as EXHIBIT 24.

Plaintiff's methodology cannot identify such instances on a classwide basis. Indeed, the only means by which DISH discovered these instances was by individually examining *each of* the calls.

### 6. Whether Individuals Requested A Call-Back On The First Call Cannot Be Identified Absent Individualized Inquiry.

Even if an individual is on the DNC Registry or IDNC List, such individual does not have a cause of action unless he or she received two or more calls within a twelve month period. (*See* Doc. 48-2, pp. 2 ¶ 2, 10 ¶¶ 1-2.) If, on the first call, a consumer

---

definition of a "telephone solicitation" as the number is given with invitation or permission to call. 47 C.F.R. § 64.1200(f)(14); 7 F.C.C.R. 8752, ¶ 31.

[10] Plaintiff may argue that the called individual on the first call may not have had permission to provide his wife's telephone number to be called. However, this is one of the few instances in which the intended recipient on the Five9 Call Logs (Mr. Andrews) is actually the same as the person identified on the LexisNexis data. Even if the LexisNexis data identified the subscriber (it does not), the putative class member, Mr. Andrews, is also identified on the second telephone number that was called, meaning that he was permitted to voluntarily provide that number to be called. Either way, this is a quintessential example of the need to individually examine the calls.

requests to be called back, this request gives rise to an EBR, such that there is no violation for subsequent calls. *See Hamilton v. Spurling*, No. 11cv00102, 2013 U.S. Dist. LEXIS 38585, *34 (S.D. Ohio March 20, 2013).

Yet, Plaintiff's expert admits that she is unable to identify such calls. (EXHIBIT 11, 95:13-20, 96:10-17, 97:13-14); (*see also* EXHIBIT 12, pg. 17 ¶ 51.) SSN confirms that many individuals did, in fact, request more information or call backs on the first call, (EXHIBIT 10, ¶ 6), and the Five9 Call Logs confirm this testimony. (*See* EXHIBIT 25.)

Plaintiff's proposed methodology does not, and cannot, identify such calls. Only a call-by-call examination reveals the instances in which individuals requested to be called.

### D. RULE 23(a)(3) AND 23(b)(3): VICARIOUS LIABILITY CANNOT BE DETERMINED ABSENT INDIVIDUALIZED INQUIRY, AND PLAINTIFF'S CLAIM IS ATYPICAL OF THE PUTATIVE CLASS.

Separate and apart from the flaws in Plaintiff's methodology to ascertain putative class members, vicarious liability cannot be established on a classwide basis. Plaintiff seeks to hold DISH vicariously liable on a classwide basis under theories of apparent authority and ratification. Yet, in the FTC Case, the District Court *rejected* the theory that DISH could be held liable under these theories on a uniform basis, *which included the exact same calls at issue in this case*, holding:

> The Plaintiffs have significant problems of proof to establish agency by apparent authority or ratification. *Apparent authority turns on what the third party who dealt with the apparent agent reasonably believed. The Plaintiffs have presented almost no evidence on what the recipients of the Retailers' telemarketing calls reasonably believed. The Plaintiff must also present proof that the call recipients' reasonable beliefs are traceable to some manifestation by Dish.*

24

The Plaintiffs' ratification theory also faces problems of proof. Ratification requires proof that Dish affirmed the actions of the Order Entry Retailers. The only obvious actions that Dish may have ratified would be acceptance of completed sales. *Most of the telemarketing calls did not result in sales*, so ratification would not seem applicable to the majority of the calls. In addition, *ratification requires proof that the Retailer represented that it was the agent of Dish*. The Plaintiffs have almost no evidence of the representations that the Retailers made during these telemarketing calls. Absent such proof, the Plaintiffs may not be able to establish ratification.

*United States v. DISH Network*, 2014 U.S. Dist. LEXIS 172020 at \*185-86. The Fourth Circuit has adopted the same requirements for apparent authority. *E.g.*, *Raymond James Fin. Servs. v. Cary, Inc.*, 709 F.3d 382, 387-88 (4th Cir. 2013).

Plaintiff makes no argument—let alone proffers evidence—as to how apparent authority could be established on a classwide basis. Apparent authority requires an individualized examination as to what each putative class member: (1) "reasonably believed"; and (2) whether that reasonable belief is traceable to a manifestation of DISH. So, apparent authority turns on what each *call recipient* reasonably believed and was told, not whether the calls were simply made by SSN.

That apparent authority cannot be established on a classwide basis is shown through Plaintiff's own testimony, as even he concedes that SSN did not represent itself as being with DISH and that SSN was not authorized to engage in the conduct at issue. (EXHIBIT 3, 10:1-18, 40:6-12, 50:6-14, 53:4-18.) Further, this renders Plaintiff atypical of putative class members under Rule 23(a)(3), as "Plaintiffs whose claims are subject to a defense are not qualified to act as class representatives, if other class members may not be subject to the same, or any, defense." *Golan v. Veritas Entm't, LLC*, No. 14CV00069,

2014 U.S. Dist. LEXIS 68910, *41 (E.D. Mo. May 20, 2014). Based upon Plaintiff's

own testimony, Plaintiff is subject to a unique defense atypical of the class, because

Plaintiff never believed that SSN was authorized to initiate that call.[11]

Ratification also requires an individualized examination as to: (1) whether DISH

obtained a benefit (*i.e.*, new subscriber) from a particular call; (2) whether DISH had

actual knowledge of the call;[12] and (3) whether SSN represented that SSN was an agent

of DISH. Plaintiff admits that SSN never represented itself as an agent or that it was

authorized to make the call. Further, after the May 2009 Call, Plaintiff never contacted

DISH to complain that he was still receiving calls. Finally, Plaintiff never purchased any

service from DISH and terminated the call. Plaintiff is again subject to a unique defense

atypical of the class as DISH will argue at trial that it never ratified the calls to Plaintiff.

A reasonable fact finder could find, based upon *Plaintiff's own testimony*, that

DISH is not liable under theories of apparent authority or ratification, rendering Plaintiff

atypical of the putative class. It is precisely the unique circumstances of each putative

---

[11] Plaintiff may argue that SSN had access to what is known as an "OE tool" which the FCC had previously opined could give rise to apparent authority. In addition to the fact that the District Court in the FTC Case (and district courts in other cases) have rejected the FCC's pontification on federal common law of agency, *see* 2014 U.S. Dist. LEXIS 172020 at *206, even the FCC has conceded that its "examples" of apparent authority are not binding. *DISH Network, L.L.C. v. FCC*, 552 F. App'x. 1, 2 (D.C. Cir. 2014) ("*The FCC agrees that the 'guidance' in question has no binding effect on courts, that it is not entitled to deference under Chevron*….") (emphasis added).

[12] Plaintiff has referenced SSN supposedly being a "repeat offender" of the TCPA. This is irrelevant to liability under a theory of ratification. "'[R]atification' in the law of agency refers to conduct by the principal *after* an agent has acted purportedly on behalf of the principal." *Johnson v. Hondo, Inc.*, 125 F.3d 408, 420 (7th Cir. 1997) (emphasis added); *see also* RESTATEMENT (THIRD) OF AGENCY § 4.01, cmt. b (2006).

class members' interaction with SSN which renders apparent authority and ratification individualized issues in this case. *See Avalon Ctr. Inv. Co. v. Commercial Defeasance, LLC*, No. 08-cv-00535, 2010 U.S. Dist. LEXIS 65239, *13 (W.D.N.C. May 21, 2010).

The flaws in Plaintiff's methodology show that Plaintiff's generic "common question" cannot be answered via classwide proof. *Thorn*, 445 F.3d at 319 (stating that a question is not common "if its resolution 'turns on a consideration of the individual circumstances of each class member.'"). Because of such evidentiary chasms, "[n]umerous courts, citing the lack of commonality, typicality and predominance of common issues, have determined that TCPA claims cannot be brought as a class action." *Levitt*, 2007 U.S. Dist. LEXIS 83143 at *9-11.

Any one of these individualized issues defeat class certification, and collectively, overwhelm any issues common to the class. And where, as here, the existence of myriad individual inquiries needed to arrive at a decision on the issue of liability renders class certification unmanageable, a class action is not a superior means of adjudicating this dispute. *See Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1278 (11th Cir. 2009).

E. **RULE 23(a)(3): PLAINTIFF'S CLAIM IS ATYPICAL OF INTERNAL DNC CLASS MEMBERS AS PLAINTIFF NEVER REQUESTED TO BE PLACED ON AN IDNC LIST.**

Plaintiff is also atypical of the IDNC Class as he is subject to another defense unique to him. *See Golan*, 2014 U.S. Dist. LEXIS 68910 at *40-41. Specifically, Plaintiff testified under oath that he did not tell the caller during the May 2009 Call to

27

add him to an IDNC List. (EXHIBIT 2, 63:3-5) ("Q. And you don't remember if you told [SSN] not to call you back again, right? A. I did not."); (EXHIBIT 3, 51:25-52:14.)

Yet, to prevail on his IDNC claim against DISH, Plaintiff must prove that he made an affirmative request not to receive future calls. *See* 47 C.F.R. § 64.1200(d)(3). Plaintiff's statement that he was not "not interested" and hanging up the telephone does not constitute a request "not to receive calls" under 47 C.F.R. § 64.1200(d)(3). *Elkins v. Medco Health Solutions, Inc.*, No. 12CV2141, 2014 U.S. Dist. LEXIS 57633, *19 (E.D. Mo. Apr. 25, 2014); *Bailey v. Domino's Pizza, LLC*, 867 F. Supp. 2d 835, 842 (E.D. La. 2012). Because Plaintiff's claim is subject to a defense, unique to the facts of his claim, and inapplicable to other putative class members, Plaintiff is atypical of individuals in the Internal DNC Class. *See Golan*, *supra*.

## III.  CONCLUSION

Plaintiff's proposed methodology for identifying putative class members and resolving the multitude of individualized issues in this case is simply not accurate or reliable. Class certification should be denied.

Respectfully submitted,

 s/ Eric Larson Zalud

ERIC LARSON ZALUD (Admitted Pro Hac Vice)
DAVID M. KRUEGER (Admitted Pro Hac Vice)
LAURA E. KOGAN (Admitted Pro Hac Vice)
Benesch, Friedlander, Coplan & Aronoff LLP
200 Public Square, Suite 2300
Cleveland, Ohio 44114
T: 216-363-4178 F: 216-363-4588
ezalud@beneschlaw.com
dkrueger@beneschlaw.com
lkogan@beneschlaw.com

BENJAMEN E. KERN (Admitted Pro Hac Vice)
Benesch, Friedlander, Coplan & Aronoff LLP
41 South High Street, Suite 2600
Columbus, Ohio 43215
T: 614-223-9300 F: 614-223-9330
bkern@beneschlaw.com

RICHARD J. KESHIAN
Kilpatrick Townsend & Stockton Llp
1001 W. Fourth St.
Winston-Salem, NC 27101
T: 336-607-7322 F: 336-734-2645
rkeshian@kilpatricktownsend.com

29

## CERTIFICATE OF SERVICE

The foregoing Opposition was filed electronically on April 13, 2015. Notice of this filing will be sent to all parties registered with the Court's electronic filing system by operation of the Court's system. Parties may access this filing through the Court's electronic filing system.

 s/ Eric L. Zalud
Eric L. Zalud