IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| THOMAS H. KRAKAUER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:14-CV-333 |
| | ) | |
| DISH NETWORK L.L.C., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

This matter is before the Court on a motion for class certification filed by the plaintiff, Thomas Krakauer. (Doc. 47.) Dr. Krakauer is a member of the proposed classes and has demonstrated that the members of the proposed classes are ascertainable. Dr. Krakauer's claims are typical of class members, common questions of law and fact predominate, and the class action is the superior method of adjudication. The defendant's arguments against predominance are largely speculative and otherwise present minor potential individual issues that are manageable and that do not defeat the predominance of the common, central issues in this case. The Court will grant the motion for class certification.

## BACKGROUND

The Telephone Consumer Protection Act ("TCPA") authorizes the Federal Communications Commission to regulate telemarketing activities and prohibits sellers from making phone solicitations to people who list their phone numbers on a national do-

not-call registry ("NDNC list") without consent. *See* 47 U.S.C. § 227(c); 47 C.F.R.

§ 64.1200(c)(2); *see also Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 745-46 (2012).

Congress enacted the TCPA "to curb abusive telemarketing practices that threaten the

privacy of consumers and businesses" by "placing restrictions on unsolicited, automated

telephone calls." *Ashland Hosp. Corp. v. Serv. Emps. Int'l Union*, 708 F.3d 737, 740-41

(6th Cir. 2013); *see also Mims*, 132 S. Ct. at 745. Individuals may register land-line and

wireless telephone numbers on the NDNC list. *See United States v. Dish Network,*

*L.L.C.*, 75 F. Supp. 3d 942, 961 (C.D. Ill. 2014), *vacated in part on other grounds on*

*reconsideration*, __ F. Supp. 3d __, 2015 WL 682875 (C.D. Ill. Feb. 17, 2015).

    The TCPA also requires sellers and telemarketers to maintain an "internal" do-not-

call list ("IDNC list"), that is, "a list of persons who request not to receive telemarketing

calls made by or on behalf of that [seller]." 47 C.F.R. § 64.1200(d); *see also Dish*

*Network*, 75 F. Supp. 3d at 960. The TCPA prohibits a telemarketer from calling

individuals on its IDNC list or on the IDNC list of a seller on whose behalf the

telemarketer calls, even if those individuals' phone numbers are not on the NDNC list.

*See* 47 C.F.R. § 64.1200(d)(3), (6).

    The TCPA creates a private right of action for injunctive and monetary relief for

any "person who has received more than one telephone call within any 12-month period

by or on behalf of the same entity in violation of the [TCPA] regulations." 47 U.S.C.

§ 227(c)(5); *see also* 47 C.F.R. § 64.1200(d)(3) (liability for IDNC list violations). These

rules only apply to residential telephone numbers; calls to business are not actionable.

*See* 47 C.F.R. § 64.1200(c)(2), (d)(3). Calls are also not actionable if a seller has an

"established business relationship" ("EBR") with a person,[1] which is created after an individual makes a purchase, inquiry, or application for products or services and lasts for a certain number of months. *See* 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(c)(2), (f)(5); *see also Snow v. Glob. Credit & Collection Corp.*, No. 5:13-CV-721-FL, 2014 WL 5781439, at *4 (E.D.N.C. Nov. 6, 2014) (collecting cases).

## DR. KRAKAUER'S MOTION
## FOR CLASS CERTIFICATION

In 2003, Dr. Krakauer registered his residential phone number on the NDNC list. (Doc. 48-1 at 8.) Dr. Krakauer alleges that Dish Network, a seller of satellite television programming and related services, (Doc. 56-4 at ¶ 5), or its authorized dealer, Satellite Systems Network ("SSN"), called him on this number numerous times between May 2009 and September 2011, including at least two calls in a 12-month period, in violation of the TCPA. (Doc. 32 at ¶¶ 25-30, 54-59.) In these calls, SSN attempted to sell Dr. Krakauer Dish services. (Doc. 32 at ¶ 26.) The calls continued even after Dr. Krakauer called Dish to complain about SSN's sales tactics and after Dish placed Dr. Krakauer on its IDNC list and instructed SSN to do the same. (Doc. 32 at ¶¶ 27-28; *see also* Doc. 81-51 at 3-12; Doc. 81-54.) During this time, SSN was an authorized dealer for Dish and only marketed for Dish. (Doc. 32 at ¶ 28; *see also* Doc. 48-5 at 6.)

---

[1] The EBR defense does not apply to an individual's internal do-not-call request. *See* 47 C.F.R. § 64.1200(f)(5)(i) ("The subscriber's seller-specific do-not-call request . . . terminates an [EBR] for purposes of telemarketing and telephone solicitation even if the subscriber continues to do business with the seller.").

Dr. Krakauer contends that Dish is liable for these calls under agency principles of actual authority, apparent authority, and ratification. (Doc. 32 at ¶¶ 30, 54-59.) He seeks injunctive and monetary relief, (Doc. 32 at 14), and class-wide relief on behalf of two proposed classes: (1) all persons whose telephone numbers were on the NDNC list for at least 30 days, but who received telemarketing calls from SSN to promote Dish between May 1, 2010, and August 1, 2011 (the "NDNC class"); and (2) all persons whose telephone numbers were on the IDNC list of Dish or SSN, but who received telemarketing calls from SSN to promote Dish between May 1, 2010, and August 1, 2011 (the "IDNC class"). (Doc. 47.)

## ANALYSIS

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (internal quotation marks omitted). To show that a case falls within the exception, the plaintiff "must affirmatively demonstrate his compliance" with Federal Rule of Civil Procedure 23. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011); *see also Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 318 (4th Cir. 2006) (noting that "district courts must conduct a rigorous analysis to ensure compliance with Rule 23" (internal quotation marks omitted)).

As threshold matters, the putative class representative must show that he is a member of the proposed class, *see* Fed. R. Civ. P. 23(a) ("One or more members of a class may sue . . . as representative parties on behalf of all members . . . ."), and must establish that the members of the proposed class are "readily identifiable" or

4

"ascertainab[le]." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014). The plaintiff must then establish that the case satisfies all four requirements of Rule 23(a) and fits into at least one of the three subsections of Rule 23(b). *Comcast*, 133 S. Ct. at 1432; *see also Bussey v. Macon Cty. Greyhound Park, Inc.*, 562 F. App'x 782, 787-88 (11th Cir. 2014) (per curiam).

It is undisputed that each of Dr. Krakauer's two proposed classes is so numerous that joinder of all members is impracticable. *See* Fed. R. Civ. P. 23(a)(1). The NDNC class as proposed includes 20,450 members and the IDNC class includes 7,831 members. (*See* Doc. 48 at 10-12; Doc. 48-2 at 10-15.) Dish has not challenged that there are common questions of law and fact as to either class, *see* Fed. R. Civ. P. 23(a)(2); discussion *infra*, nor has Dish challenged Dr. Krakauer's ability to fairly and adequately protect the interests of the classes. *See* Fed. R. Civ. P. 23(a)(4); (*see generally* Doc. 56.) Thus it is undisputed that Dr. Krakauer has met the requirements of Rule 23(a)(1), (2), and (4), and the Court so finds. As to the NDNC class, Dish also does not dispute that Dr. Krakauer is a member of the putative class. (*See* Doc. 56 at 33-34.)

As to the IDNC class, Dish challenges whether Dr. Krakauer has met the threshold requirement of membership in the class and therefore contends that his claims are not typical. (*See* Doc. 56 at 33-34); Fed. R. Civ. P. 23(a)(3). As to both proposed classes, Dish challenges whether the class members are ascertainable, (*see* Doc. 56 at 14-19), and whether common questions predominate over questions affecting only individual members as required by Rule 23(b)(3). (*See* Doc. 56 at 19-33); Fed. R. Civ. P. 23(b)(3).

5

# I.     Threshold Issues: Membership in the IDNC Class and Ascertainability

## A.     Membership in the IDNC Class

In 2009, Dr. Krakauer had an account with another satellite television provider, DirecTV. (Doc. 102 at 3.) In May 2009, he received a call from a man named "Ken" who led him to believe that he could save money on DirecTV. (*See* Doc. 102 at 14-15.) Dr. Krakauer gave Ken his credit card information and, later in the call, believed Ken had used this information to pose as him and get his account information from DirecTV. (*See* Doc. 102 at 15; Doc. 56-1 at 3.) At some point, Ken said if Dr. Krakauer switched to Dish he could save money. (*See* Doc. 102 at 15.) Dr. Krakauer became "annoyed" that Ken posed as him to get details of his DirecTV account and ended the call. (Doc. 102 at 15.) When asked if he "told Ken not to call [him] back again," Dr. Krakauer testified that he did not. (Doc. 102 at 17.)

Days later, Dr. Krakauer called Dish and DirecTV to complain. (*See* Doc. 102 at 15-16.) Dr. Krakauer spoke to "Rebecca" with Dish who discovered that Ken worked for SSN. (*See* Doc. 102 at 15; Doc. 56-1.) Dr. Krakauer told Rebecca that he "was annoyed" and thought it "was completely inappropriate . . . what [Dish was] doing." (Doc. 102 at 15.) In explaining why he called Dish, Dr. Krakauer testified that he "was trying to find out what had happened, why [he] had received this call and why somebody affiliated with Dish Network would [call to get him] to change . . . to Dish" and that he called "to see if Dish Network could stop it." (Doc. 102 at 16.) Dr. Krakauer testified that someone with Dish told him that Ken was not a Dish employee, but a contractor, so Dish was "not able to do anything." (Doc. 102 at 16.)

6

In internal emails, Dish and SSN employees characterize Dr. Krakauer's complaint as a "DNC issue" or a "'Do Not Call' violation." (*See* Doc. 56-1; Doc. 74-7 at 2-3; Doc. 74-1 at ¶ 21.) In one email, a Dish employee states that she "received the DNC" and characterizes Dr. Krakauer's complaint as "his DNC issue." In SSN emails, an SSN employee states that, before Dr. Krakauer's complaint, SSN "did not know that [he] wanted off [SSN's] calling list" and characterizes the complaint as the type where a customer asks not to be contacted again. (*See* Doc. 74-7 at 2.) Dish also directed SSN to add Dr. Krakauer to SSN's IDNC list. (*See* Doc. 81-54; *see also* Doc. 87 at 7 n.1.)

Dish does not dispute that Dr. Krakauer continued to receive calls from SSN promoting Dish. (*See generally* Doc. 56.) Dr. Krakauer testified that all calls after May 2009 were "virtually identical[]" on the caller's end and that, each time, he either "was pleasant and said [he was] not interested . . . or [he] just hung up." (Doc. 102 at 17.)

The TCPA regulations state that if a person makes "a request . . . not to receive calls" from a telemarketer, the telemarketer must place that person on its IDNC list and not call that person without consent. 47 C.F.R. § 64.1200(d)(3). Neither the TCPA nor its regulations define what constitutes "a request." Dish contends that Dr. Krakauer has not provided sufficient evidence "that he made an affirmative request not to receive future calls." (*See* Doc. 56 at 33-34.) Dr. Krakauer contends that no "magic words" are required and that he made a request. (*See* Doc. 81 at 18-20.)

Dish relies primarily on *Bailey v. Domino's Pizza, LLC*, 867 F. Supp. 2d 835 (E.D. La. 2012). (*See* Doc. 56 at 33-34; Doc. 74 at 12.) In *Bailey*, the court granted the defendant's motion to dismiss the plaintiff's IDNC claims because he did not allege that

he made an "affirmative request" to not receive calls.  *See Bailey*, 867 F. Supp. 2d at 842.

Given the procedural posture and short discussion of the relevant regulations, that case is

not particularly helpful in determining what language or evidence would or would not

would constitute "a request" not to receive calls.  *See id.*

Dr. Krakauer's testimony as to what he told a Dish employee and the purpose of

his calls to Dish along with Dish's and SSN's internal documents concerning his

complaints support the determination that Dr. Krakauer made "a request" not to be called.

Dr. Krakauer testified that he called Dish to find out why someone affiliated with Dish

would call "to get [him] to change from DirecTV to Dish" and "to see if Dish . . . could

stop it."  (Doc. 102 at 16.)  Dish contends that Dr. Krakauer was only trying to get Dish

to "stop" having its retailers impersonate him to get account information.  (*See* Doc. 87 at

5-7.)  Dr. Krakauer's testimony is equally consistent with Dr. Krakauer asking Dish to

"stop" having its retailers call him to get him to switch to Dish.  That is in fact how Dish

and SSN interpreted his calls, as their own internal documents show.  (*See* Docs. 56-1,

74-7.)

Dish's argument to the contrary depends on a strained interpretation of its own

internal documents and the internal documents of its authorized dealer and ignores their

common sense meaning.  In internal emails, Dish and SSN employees generally

characterized Dr. Krakauer's complaint as a "DNC issue" or "'Do Not Call' violation,"

(*see* Docs. 56-1, 74-7), and discussed practices to remove such individuals who do not

want to be called.  (*See* Doc. 74-7 at 2.) While there was one email which characterized

Dr. Krakauer's complaint as one based on harassment, that email is ambiguous as to the

DNC request.[2]  The *post hoc* testimony from a Dish manager that Dish added Dr.

Krakauer to its IDNC list "even though the . . . [c]omplaint d[id] not reflect that [Dr.]

Krakauer requested to be added to DISH's IDNC list," (Doc. 56-4 at ¶ 14), is not

persuasive in the face of the emails written at the time.

On the whole, Dr. Krakauer has established by a preponderance of the evidence

that he is a member of the proposed IDNC class.  *See Brown v. Nucor Corp.*, 785 F.3d

895, 931-32 (4th Cir. 2015) (collecting cases).  For purposes of this motion, the Court so

finds.

### B.    Ascertainability

As a threshold matter, Rule 23 requires "that the members of a proposed class be

readily identifiable" or "ascertainab[le]."  *EQT*, 764 F.3d at 358 (internal quotation marks

omitted).  "A class cannot be certified unless a court can readily identify the class

members in reference to objective criteria."  *Id.*  The plaintiff bears the burden of offering

"a reliable and administratively feasible mechanism for determining whether putative

class members fall within the class definition."  *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d

349, 355 (3d Cir. 2013).  If a court cannot identify class members "without extensive and

individualized fact-finding or 'mini-trials,' then a class action is inappropriate."  *EQT*,

764 F.3d at 358; *see also* 7A Charles Alan Wright et al., *Federal Practice and Procedure*

§ 1760 (3d ed. 2005) ("[T]he requirement that there be a class will not be deemed

---

[2] In one Dish email, Dr. Krakauer's complaint is characterized as one for "harassment."
Under "Nature of the complaint," Dish marked "Yes" beside "Harassment, a malicious call
pattern"" and "No" beside "Caller hung up when asked for identity or to be added to DNC."
(Doc. 56-1 at 3; *see also* Doc. 56-4 at ¶ 12.)

satisfied unless . . . it is administratively feasible for the court to determine whether a particular individual is a member.").  The Court concludes that the class members are ascertainable.

### 1.  The putative class lists

Dr. Krakauer has offered evidence from Anya Verkhovskaya who, with her company A.B. Data, analyzed SSN's call records and other data to identify putative class members for both classes.  (*See* Doc. 48 at 9-12; Docs. 48-2 to 48-4.)  Dr. Krakauer received records for calls placed by SSN from Five9, Inc., a company that provided SSN with software to assist in making telemarketing calls.  (*See* Doc. 48 at 10-11; Doc. 48-2 at 8-9; Doc. 56-8 at 4-5.)  Ms. Verkhovskaya used a five-step process and other information from various data vendors to remove calls that could not possibly result in TCPA liability,[3] (*e.g.*, Doc. 103 at 11), and, as a result, identified 20,450 members in the NDNC class and 7,831 members in the IDNC class.  (*See* Doc. 48 at 11-12; Doc. 48-2 at 10-16.)

As to the NDNC class, Ms. Verkhovskaya determined which of the more than 1.6 million calls in the SSN records were "connected."  (Doc. 48 at 11; Doc. 48-2 at 8-10; Doc. 103 at 21.)  Second, she identified numbers that received more than one connected call in any 12-month period during the class period.  (Doc. 48-2 at 10; Doc. 103 at 14-15); *see also* 47 U.S.C. § 227(c)(5).  Third, she used data from Nexxa, Inc., a vendor that collects data on when individuals registered on the NDNC list, to determine which of

_____

[3] Dish separately challenged Ms. Verkhovskaya's report and analysis.  (Doc. 57.)  The Court denied Dish's motion to strike and found her expert report and testimony admissible.  (Doc. 110.)  That Order discusses Ms. Verkhovskaya's methodology in additional detail.  (*See* Doc. 110 at 4-8.)

these numbers were registered on the NDNC list as of April 1, 2010. (Doc. 48 at 11; Doc. 48-2 at 4, 10; *see also* Doc. 103 at 24-25.) Fourth, she removed non-actionable calls to businesses by (1) removing calls "assigned the disposition 'Business'" in the SSN call logs and then (2) coordinating with LexisNexis, a vendor that provides information on whether a number is associated with a business or residence during a specific time period, to remove additional business numbers. (Doc. 48 at 11; Doc. 48-2 at 5, 10-11; Doc. 103 at 26-28.) Last, she removed non-actionable calls to Dish customers by removing calls "assigned the disposition of 'Dish Customer'" in the SSN call logs. (Doc. 48-2 at 11; Doc. 48 at 11; Doc. 103 at 15.) This resulted in a list of 20,450 unique numbers that received 57,900 calls. (Doc. 48 at 11-12; Doc. 48-2 at 11-12.) Using information already in the SSN call logs and supplemented by Lexis data, she obtained the names and addresses of most persons associated with these numbers during the class period. (Doc. 48 at 12; Doc. 48-2 at 8-9, 12, 15-16; Doc. 103 at 34, 37; *see also* Docs. 48-2 to 48-4.) These persons make up the NDNC class. (*See* Doc. 47.)

For the IDNC class, she performed a similar analysis. (*See* Doc. 48-2 at 12-15.) As to Dish's IDNC list, Dr. Krakauer provided Ms. Verkhovskaya with files containing Dish's IDNC list, and she followed the same methodology as with the NDNC list and identified 7,117 unique numbers. (Doc. 48-2 at 12-14.) As to SSN's IDNC list, she used the SSN call logs to identify connected calls with "DNC" or "Do Not Call" in the disposition field, (Doc. 48-2 at 14); she took this to mean that these numbers were on SSN's IDNC list. (Doc. 103 at 15-17, 21-22.) She then performed steps two through five above and identified 714 unique numbers. (Doc. 48-2 at 14-15.) Adding the numbers

from SSN's and Dish's IDNC lists, she identified 7,831 numbers that received 22,607 calls in the IDNC class. (*See* Doc. 48-2 at 13-15.) As with the NDNC class, Ms. Verkhovskaya used the SSN call logs supplemented by Lexis data to obtain the names and addresses of most persons associated with these numbers during the class period. (Doc. 48-2 at 13-16; *see also* Doc. 48-4 at 36-175.)

### 2.    Standing to sue under Section 227(c)

First, Dish contends that only the telephone number subscriber has standing to sue under the TCPA for receiving a telemarketing call on a number on the NDNC list. (Doc. 56 at 15.) Dish contends that the data Ms. Verkhovskaya used does not identify the subscriber and therefore the class members for both proposed classes are not ascertainable. (Doc. 56 at 15-17; *see also* Doc. 103 at 37-38; Doc. 56-13 at ¶ 7.)

Section 227(c) of the TCPA and the related regulations protect the privacy of residential telephone subscribers and allow them to register their numbers on the NDNC list. *See* 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2) ("No person or entity shall initiate any telephone solicitation to . . . [a] residential telephone subscriber who has registered his or her telephone number on the [NDNC list] . . . ."); *see also Mims*, 132 S. Ct. at 746. The standing provision, Section 227(c)(5), states that "[a] person who has received" a call in violation of the Section 227(c) regulations may sue. 47 U.S.C. § 227(c)(5). Dish's argument that only the subscriber has standing to sue under Section 227(c) appears to focus on the provisions allowing subscribers to register their numbers on the NDNC list, *see id.* § 227(c)(1)-(3), and ignores the broader standing provision of Section 227(c)(5).

In *Moore v. Dish Network L.L.C.*, 57 F. Supp. 3d 639 (N.D.W. Va. 2014), the district court considered the standing provision under Section 227(b). *See Moore*, 57 F. Supp. 3d at 648-50. Section 227(b) prohibits the use of autodialers and prerecorded messages without the consent of the "called party" and allows "[a] person or entity" to sue for a violation. *See* 47 U.S.C. § 227(b)(1), (3). In *Moore*, the defendant contended that only the "called party" had standing to sue for a Section 227(b) violation. *Moore*, 57 F. Supp. 3d at 648. The court disagreed and sided with numerous other courts in concluding that the "plain language" of Section 227(b)'s standing provision does not limit standing to the called party and "simply states that 'a person or entity'" can sue. *See id.* at 648-50 (collecting cases); *see also* 47 U.S.C. § 227(b)(3).

In considering whether an individual has statutory standing, courts consider whether the individual "is a member of the class given authority by a statute to bring suit." *CGM, LLC v. BellSouth Telecomms., Inc.*, 664 F.3d 46, 52 (4th Cir. 2011). "Normally, where the statutory language provides a clear answer, [the] analysis begins and ends with that language." *Id.* at 53 (internal quotation marks omitted). The *Moore* defendant presented a similar argument as Dish has here, and the standing provision under the TCPA section at issue in *Moore* and the one here are similarly broader than the *Moore* defendant and Dish contend. *Compare* 47 U.S.C. § 227(b)(3), *with* 47 U.S.C. § 227(c)(5); *see also Moore*, 57 F. Supp. 3d at 648-50; (Doc. 56 at 15.)

The TCPA simply states that "[a] person who has received" a call in violation of the Section 227(c) regulations may sue and, by its plain language, does not limit standing to only subscribers. *See* 47 U.S.C. § 227(c)(5); *see also Charvat v. EchoStar Satellite,*

13

*LLC*, 630 F.3d 459, 465 (6th Cir. 2010); *Roylance v. ALG Real Estate Servs., Inc.*, No. 5:14-cv-02445-PSG, 2015 WL 1522244, at *3 (N.D. Cal. Mar. 16, 2015) (Grewal, M.J., report and recommendation, adopted by Freeman, J.) (stating that the plaintiff "has standing to pursue a claim under Section 227(c) because he alleges that he had received eight calls in violation of Section 227(c)"). As did the court in *Moore*, the Court rejects Dish's argument to the contrary.

### 3. <u>Date of NDNC list registration</u>

Dish contends that the data Ms. Verkhovskaya used to determine when individuals registered on the NDNC list is inaccurate and therefore the members of the NDNC class are not ascertainable. (*See* Doc. 56 at 17-18.) The only example Dish provides concerns Dr. Krakauer's registration date. (*See* Doc. 56 at 17-18.) That example is a red herring.

The data from Nexxa that Ms. Verkhovskaya used indicates that he registered on June 1, 2003, but the NDNC list website shows that he registered on July 3, 2003. (*See* Doc. 56 at 17-18; Docs. 56-14, 56-15.) The discrepancy occurred because Dr. Krakauer registered his number twice; a Nexxa employee testified that Nexxa maintains the initial date of registration while the date on the NDNC website can be "overwritten" by a later registration. (*See* Doc. 76 at 14; Doc. 76-4 at ¶¶ 2-5.) This quirk seems unlikely to occur often, and it is unlikely to be material. As to Dr. Krakauer, under either date his number was on the NDNC list for at least 30 days before he received calls from SSN.

### 4. <u>Individuals on the IDNC lists of Dish or SSN</u>

Finally, Dish contends that the data Ms. Verkhovskaya used to identify individuals on the IDNC lists is inaccurate and unreliable and therefore the members of the IDNC

class are not ascertainable.  (*See* Doc. 56 at 18-19.)  The TCPA regulations require telemarketers to maintain IDNC lists, that is, "a list of persons who request not to receive telemarketing calls made by or on behalf of [a] person or entity."  47 C.F.R. § 64.1200(d).  A telemarketer must record on its IDNC list the name and number of a subscriber who makes "a request" not to receive calls and honor that request.  *Id.* § 64.1200(d)(3), (6).

Dish has offered evidence that its IDNC list is not limited to individuals who ask not to be called, but also includes other individuals Dish has decided not to call for other reasons, such as allegations of rude behavior.  (*See* Doc. 56 at 19; Doc. 56-4 at ¶¶ 9-10.) Dish contends that because its IDNC list includes more than just individuals who request not to be called and because neither Dr. Krakauer nor Dish can tell who on the list made such a request, the members of the IDNC class are not ascertainable without "individual fact-finding" as to each putative class member.  (*See* Doc. 56 at 19.)

Dish's argument that its IDNC list is overinclusive and therefore the IDNC class members are not ascertainable is not persuasive.  Dish made this same argument in an earlier case, and the Court agrees with that court's reasoning.  *See Dish Network*, 75 F. Supp. 3d at 1014.  If the Court were to deny certification because Dish does not keep an accurate list as the regulations require and Dish itself cannot identify which individuals on the list actually requested not to be called, it would create the perverse incentive for entities to keep poor records and to violate the TCPA's clear requirement that such a list be kept.  *See id.* at 1014 n.21; *see also Carrera v. Bayer Corp.*, No. 12-2621, 2014 WL 3887938, at *3 (3d Cir. May 2, 2014) (Ambro, J., dissenting) ("Where . . . a defendant's

15

lack of records and business practices make it more difficult to ascertain the members of an otherwise objectively verifiable low-value class, the consumers who make up that class should not be made to suffer.").

The fact that Dish has listed a person on its IDNC list is persuasive circumstantial evidence that a person associated with that number asked Dish not to make telemarketing calls. *See Dish Network*, 75 F. Supp. 3d at 1014. Dish's claim that it failed to distinguish persons who made an internal do-not-call request from other persons Dish says it decided not to call for different reasons does not make the list unreliable or the class members not ascertainable.

As to SSN, Dr. Krakauer did not receive files containing SSN's IDNC list as he did with Dish; rather, he took the disposition codes "DNC" and "Do Not Call" in SSN's call records to mean that the called individual was on SSN's IDNC list. (*See* Doc. 48-2 at 14-15; Doc. 103 at 33.) Dish has provided evidence that these codes mean something completely different: SSN's general manager testified that these codes "do not indicate a 'do not call' request," but rather signal other SSN agents to not call the individual because a "particular SSN agent would personally call back that individual (*i.e.*, it was 'their lead')." (Doc. 56-10 at ¶ 4; *see also* Doc. 56 at 18.) Dish contends that the IDNC class members Dr. Krakauer identified as coming from SSN's IDNC list are therefore not ascertainable. (Doc. 56 at 18-19.)

At the Court's June 30 hearing on the pending motions, Dish's counsel stated without dispute that "SSN is no longer in business, so there is no subpoena to SSN" for

16

its IDNC list. (*See* Minute Entry June 30, 2015.) The list derived from SSN's call logs appears to be the best record there is of the numbers on SSN's IDNC list.

This dispute does not make the SSN IDNC class members not ascertainable. Ascertainability only requires that a court be able to "identify the class members in reference to objective criteria," *EQT*, 764 F.3d at 358, which means "that identifying class members is a manageable process that does not require much, if any, individual inquiry." *Bussey*, 562 F. App'x at 787. Here, Dr. Krakauer's IDNC class definition is, *inter alia*, numbers on SSN's IDNC list during the class period. As discussed *supra*, every telemarketer is required to maintain an IDNC list and should have a system in place to notify its employees of who is on that list. The phrases "DNC" and "Do Not Call" in SSN's call records are, in context, persuasive circumstantial evidence that persons associated with those numbers had asked to not be called and, for purposes of this motion, suffice to provide the IDNC list required by the class definition. Thus, those class members are ascertainable. Dr. Krakauer is not required to prove that, without a doubt, every single person on the class list would be able to recover to satisfy the ascertainability requirement.[4] *See, e.g.*, *In re Nexium Antitrust Litig.*, 777 F.3d 9, 22-23 (1st Cir. 2015); *see also* discussion *infra*.

## II.    Rule 23(b)(3)

Dr. Krakauer asserts that this action falls under Rule 23(b)(3). (*See* Doc. 47; Doc. 48 at 13.) "Rule 23(b)(3) has two components: predominance and superiority." *Thorn*,

---

[4] Whether Dr. Krakauer's list of persons on SSN's IDNC list will persuade a factfinder on the merits is simply a common question of fact. *See* discussion *supra*.

445 F.3d at 319. First, the predominance requirement tests whether the proposed class is "sufficiently cohesive to warrant adjudication by representation" and is satisfied when "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 362 (4th Cir. 2004); *see also* Fed. R. Civ. P. 23(b)(3). "A common question is one that can be resolved for each class member in a single hearing" rather than one that "turns on a consideration of the individual circumstances of each class member." *Thorn*, 445 F.3d at 319. The predominance requirement focuses on the quality of common issues rather than just the quantity. *See Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 429 (4th Cir. 2003); *see also EQT*, 764 F.3d at 366 (noting that, to satisfy predominance, the plaintiff must show that the defendant's common conduct has sufficient bearing on the central issue in the litigation). Second, "[t]he superiority requirement ensures that 'a class action is superior to other available methods for the fair and efficient adjudication of the controversy.'" *Thorn*, 445 F.3d at 319 (quoting Fed. R. Civ. P. 23(b)(3)).

Rule 23(b)(3) provides a non-exclusive list of factors for courts to consider in deciding whether a class action meets these two requirements:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3); *see also Thorn*, 445 F.3d at 319; *Stillmock v. Weis Mkts., Inc.*, 385 F. App'x 267, 278 (4th Cir. 2010).

18

Dr. Krakauer identifies a number of common questions of law and fact, (*see* Doc. 48 at 17-18), and specifically urges that two common issues appropriate for class resolution predominate over individual issues such that a class action is superior to other methods for resolving the case. (*See* Doc. 48 at 21-22); *see also* Fed. R. Civ. P. 23(b)(3). These issues are: (1) whether SSN called a number on the NDNC or IDNC lists; and (2) whether Dish is liable for SSN's actions. (Doc. 48 at 21-22.)

## A. Predominance

### 1. Common Questions

#### a. Whether SSN called a putative class member

Dr. Krakauer proposes to prove that SSN called the numbers in both classes during the class period through testimony from one expert witness and using the SSN call logs. (*See* Doc. 48 at 23.) Dish has not disputed that the SSN logs this expert used represent calls SSN made to promote and sell Dish products and services during the relevant period. (*See* Doc. 56 at 8, 11-13.) Nor has Dish disputed that the question of whether SSN called a number on the NDNC list, Dish's IDNC list, or SSN's purported IDNC list is a common question that can be decided in one hearing. (*See* Doc. 56 at 19-30.) This is the first key question for determining liability, and it is a common question of fact.

#### b. Vicarious liability of Dish for SSN's calls

The question of whether SSN made these calls on Dish's behalf is the second key question for determining liability, and its importance cannot be minimized. Indeed, it is the central issue on which liability depends. *See* 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(d)(3). Dish concedes that the question of whether Dish may be held liable for

SSN's calls under a theory of actual authority is a common question, but contends that questions as to liability based on apparent authority and ratification are not common questions. (*See* Doc. 56 at 30-33.)

Under the TCPA, a seller like Dish may be held vicariously liable for violations committed by a third-party telemarketer like SSN if the telemarketer is acting "on behalf of" the seller. *See* 47 U.S.C. § 227(c)(5); *see also Smith v. State Farm Mut. Auto. Ins. Co.*, 30 F. Supp. 3d 765, 773 (N.D. Ill. 2014) (noting that vicarious liability attaches to violations of Section 227(c)(5)). While neither the TCPA nor its regulations define "on behalf of," courts have applied ordinary principles of agency law to make this determination. *See, e.g.*, *Jackson v. Caribbean Cruise Line, Inc.*, __ F. Supp. 3d __, __, 2015 WL 667862, at *5-6 (E.D.N.Y. Feb. 17, 2015); *Smith*, 30 F. Supp. 3d at 777; *Donaca v. Dish Network, LLC.*, 303 F.R.D. 390, 394 (D. Colo. 2014); *Mey v. Monitronics Int'l, Inc.*, 959 F. Supp. 2d 927, 932 (N.D.W. Va. 2013). A seller can be held vicariously liable if there is actual authority, apparent authority, or ratification. *See Smith*, 30 F. Supp. 3d at 772-73; *Donaca*, 303 F.R.D. at 394; *Mey*, 959 F. Supp. 2d at 932. Dr. Krakauer relies on all three theories. (*See* Doc. 48 at 17-18; Doc. 75 at 19-23.)

It is well-established that whether an agency relationship exists is a factual determination. *See Ashland Facility Operations, LLC v. N.L.R.B.*, 701 F.3d 983, 990 (4th Cir. 2012). As noted *supra*, Dish does not dispute that the question of actual authority is a question common to all class members, (*see* Doc. 56 at 30-33), as actual authority depends only on the relationship and conduct between Dish and SSN. *See Ashland Facility*, 701 F.3d at 990. If Dr. Krakauer can prove to a jury's satisfaction that SSN had

actual authority to make the calls at issue on Dish's behalf, the class may recover from Dish for any violations by SSN. Thus, the issue of actual authority is a common question of fact that is central to this case.

The issues of apparent authority and ratification are less clear. There is a significant dispute between the parties as to the appropriate legal tests to be applied to determine liability under apparent authority and ratification.

For both theories, Dr. Krakauer relies on the FCC's interpretation embodied in a 2013 declaratory ruling. (*See* Doc. 75 at 19-23); *see also In re Dish Network, LLC*, 28 FCC Rcd. 6574, 2013 WL 1934349 (May 9, 2013); *Mey*, 959 F. Supp. 2d at 932. As to apparent authority, Dr. Krakauer contends that it is sufficient to show that Dish allowed SSN to hold itself out as an authorized Dish dealer or that Dish allowed SSN to use certain information and systems in Dish's control. (*See* Doc. 75 at 20-22); *see also In re Dish Network*, 2013 WL 1934349, at *15; *Mey*, 959 F. Supp. 2d at 932. As to ratification, he contends that it is sufficient to show that Dish was aware that SSN routinely violated the TCPA and did not terminate SSN as an authorized dealer. (*See* Doc. 75 at 22-23); *see also In re Dish Network*, 2013 WL 1934349, at *15. If Dr. Krakauer is correct, both theories would present common questions of fact as they, too, concern only the relationship between Dish and SSN.

Dish contends that apparent authority requires proof that: (1) the called individual reasonably believed that Dish consented to have SSN act for Dish; and (2) the individual's belief is based on some conduct traceable to Dish. (*See* Doc. 56 at 30-31.) Dish contends that ratification requires proof that: (1) SSN represent to each caller that it

is calling on Dish's behalf; (2) Dish have knowledge of and assent to each call; and (3) knowingly accept some benefit from each call.  (*See* Doc. 56 at 32; *see also* Doc. 74 at 22-25.)  If Dish's view is correct, both theories would present individual questions of fact as to every class member.

Numerous courts have concluded that the FCC's guidance on apparent authority and ratification is not binding nor entitled to deference and have rejected this guidance as inconsistent with common law agency principles.  *See, e.g.*, *Dish Network, L.L.C. v. F.C.C.*, 552 F. App'x 1, 2 (D.C. Cir. 2014) (per curiam) ("The FCC agrees that the 'guidance' in question has no binding effect on courts [and] is not entitled to deference . . . ."); *Toney v. Quality Res., Inc.*, 75 F. Supp. 3d 727, 744-45 (N.D. Ill. 2014); *Smith*, 30 F. Supp. 3d at 778-79; *Dish Network*, 75 F. Supp. 3d at 1018.

The question of what legal standard applies to the determination of apparent authority and ratification is a common question of law.  Dish is highly likely to win on this question, however, as the reasoning in the cases it cited is quite persuasive.  (*E.g.*, Doc. 56 at 30-32.)  This would mean that apparent authority and ratification would involve many individual questions.  On the other hand, it will not be necessary to reach apparent authority or ratification if Dr. Krakauer and the class prevail on an actual authority theory.  It is also likely that Dr. Krakauer will be unable to muster sufficient evidence of apparent authority or ratification, *see Dish Network*, 75 F. Supp. 3d at 1016-18 (discussing the plaintiff's lack of class-wide evidence on these theories), such that these two issues will likely disappear from the case.

### 2.     **Individual questions**

Dish identifies several issues concerning both classes that it says will have to be determined on an individual basis and contends that these individual issues predominate and preclude certification under Rule 23(b)(3). (*See* Doc. 56 at 20.) Dish contends that an individual determination will have to be made as to whether: (1) a phone number, including a wireless number, is associated with a business; (2) Dish had an established business relationship with a class member at the time of a call; (3) an individual first called SSN; and (4) an individual consented to be called. (*See* Doc. 56 at 20-30.)

### a.  Is the number called a business number?

The TCPA section at issue only prohibits calls to residential numbers. *See* 47 C.F.R. § 64.1200(c)(2), (d)(3); *see also* 47 U.S.C. § 227(c)(5). Dr. Krakauer, as the plaintiff, bears the burden to prove that a number called was residential. *See Dish Network*, 75 F. Supp. 3d at 1024. Dish contends that Dr. Krakauer's expert did a poor job of removing business numbers from the putative class list and made no effort to remove wireless numbers associated with businesses. (*See* Doc. 56 at 23-26; *see also* Docs. 56-18 to 56-21.) As a result, Dish says that "hundreds" of individual inquiries will be needed. (*See* Doc. 56 at 23-26.)

Dish has not presented evidence to support these contentions. Dish has only presented evidence of a few dozen numbers that appear to be business or mixed use, (*see* Docs. 56-18 to 56-21), and has submitted no evidence, and indeed only counsel's assertions in a brief, that there are "hundreds" or "many" others. (*See* Doc. 56 at 23-26); *see also Adjabeng v. GlaxoSmithKline, LLC*, No. 1:12-CV-568, 2014 WL 459851, at *3

(M.D.N.C. Feb. 5, 2014) (collecting cases holding that counsel's unsworn statements in briefs are not evidence).

The fact that a class list contains members whose claims may fail on the merits does not mean that the class cannot be certified. "[E]xcluding all uninjured class members at the certification stage is almost impossible in many cases, given the inappropriateness of certifying what is known as a 'fail-safe class'—a class defined in terms of the legal injury." *Nexium*, 777 F.3d at 22; *see also Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012) (noting that a fail-safe class "is improper because a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment"). But, "a class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant." *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009). "There is no precise measure for 'a great many.' Such determinations are a matter of degree, and will turn on the facts as they appear from case to case." *Messner*, 669 F.3d at 825.

Dr. Krakauer will have to prove that the class members are entitled to relief, *i.e.*, that their numbers were used for residential purposes at the time. Certifying the class with a few dozen possible business numbers included does not obviate Dr. Krakauer's ultimate burden of proof. Based on the record before the Court, it does not appear that the putative class list "contains a great many persons who have suffered no injury." *See Kohen*, 571 F.3d at 677. Even if resolution of these issues requires some individualized

inquiry, these issues are not complex and are entirely manageable. *See* Fed. R. Civ. P. 23(b)(3)(D).

As to wireless numbers, Dish additionally relies on *United States v. Dish Network* where the court noted that the FCC presumes that a wireless number on the NDNC list is residential but "may require a complaining wireless subscriber to provide further proof of the validity of that presumption." *Dish Network*, 75 F. Supp. 3d at 1024; (*see also* Doc. 56 at 26.) The wireless phone user still bears the burden of proving that the number was used for residential purposes; the "administrative presumption" only allows wireless users to register on the NDNC list. *See Dish Network*, 75 F. Supp. 3d at 1024; (*see also* Doc. 56 at 26.) Dish contends that this means that, at the certification stage, Dr. Krakauer must show that any wireless number is a residential number. (*See* Doc. 56 at 26.) However, the district court discussed the presumption in the context of summary judgment and noted that it was an issue of fact for trial as to whether the wireless calls were to residences. *See Dish Network*, 75 F. Supp. 3d at 1024. This case says nothing about the wireless residential/business issue at the certification stage.

To the extent Dish has evidence that some numbers on Dr. Krakauer's putative class list were associated with businesses during the class period, Dish can present that evidence through an expert witness using data from Lexis or another vendor. On the record before the Court, to the extent resolution of these issues presents individual questions, these questions appear few in number, straightforward, and peripheral to the central issues in this litigation discussed *supra*.

25

### b.    Is there an established business relationship?

A call is exempt from TCPA section at issue if the seller has an established business relationship ("EBR") with the residential subscriber.  *See* 47 U.S.C. § 227(a)(4), (c)(3)(F); 47 C.F.R. § 64.1200(c)(2), (f)(5), (f)(14)(ii); *see also Snow*, 2014 WL 5781439, at *4 (collecting cases); *Wolfkiel v. Intersections Ins. Servs. Inc.*, 303 F.R.D. 287, 291 (N.D. Ill. 2014); *but see supra* note 1.  EBR is a defense for Dish to prove, and the absence of an EBR is not an element of a TCPA claim that Dr. Krakauer has to prove. *See Dish Network*, 75 F. Supp. 3d at 1008 (discussing the EBR defense and stating that "[a]n exemption from the general rule is treated as an affirmative defense for which [the defendant] bears the burden of proof").  Nonetheless, Ms. Verkhovskaya testified that she excluded from Five9 call logs phone numbers with "Dish Customer" in the disposition field.  (*See* Doc. 103 at 15, 32; *see also* Doc. 48-2 at 11.)

Dish first contends that it provided a customer list to Dr. Krakauer and that he failed to remove "thousands" of customers on this list from the class.  (*See* Doc. 56 at 21-22.)  Dr. Krakauer contends that the list has not been prepared in a way that allowed him or his expert to exclude customers from the class list.  (*See* Doc. 75 at 17.)  The list itself is certainly incomprehensible, (*see* Doc. 75 at 17; *see, e.g.*, Doc. 56-16 at 2), and Dish has not provided evidence or explained to the Court as to how it could be used to exclude such customers.

Dish next contends that Dr. Krakauer must offer a method that would allow Dish to prove this EBR defense on a class-wide basis and that he has failed to do so.  (*See* Doc. 56 at 22-23.)  This position is correct.

First, the presence of affirmative defenses does not "automatically" render class certification inappropriate. *See Brown v. Kelly*, 609 F.3d 467, 483 (2d Cir. 2010). "Rather, like other considerations, affirmative defenses must be factored into the calculus of whether common issues predominate." *Gunnells*, 348 F.3d at 438. When the defendant's affirmative defenses "may depend on facts peculiar to each [class member's] case, class certification is erroneous." *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 342 (4th Cir. 1998) (internal quotation marks omitted). In cases where the Fourth Circuit has denied certification based on issues presented by an affirmative defense, the defense at issue involved "considerable individual inquiry." *See Gunnells*, 348 F.3d at 434 (each class member's reliance); *Thorn*, 445 F.3d at 317 (each class member's knowledge); *Broussard*, 155 F.3d at 342-43 (both).

Here, Dish has again provided no evidence to support its assertion that there are "thousands" of customers on the class list as to whom it would be entitled to an EBR defense; indeed, it has identified only 16 such persons. (*See* Doc. 56 at 22; Doc. 56-17.) As noted *supra*, unsubstantiated claims in a brief do not preclude class certification. *See Adjabeng*, 2014 WL 459851, at *3 (collecting cases).

Moreover, even if there are several times this number, it appears highly likely that this defense can in fact be resolved on a class-wide basis, at least in large part. As Dr. Krakauer has demonstrated, (*see* Doc. 48 at 21-22; Doc. 75 at 17), Dish can prove this defense by, for example, offering a comprehensible customer list along with testimony about the list and which calls were to Dish customers; the factfinder could then determine whether those individuals as a group are not entitled to recover because of an EBR. To

the extent there are a few situations where individual inquiry into the dates during which Dish is entitled to the EBR defense may be needed or where the parties dispute these dates, these issues appear to be easily manageable.

Resolution of the EBR defense does not involve "considerable individual inquiry," and individual hearings will not be routinely necessary to determine if a putative class member was a Dish customer at the time of a call. *Cf. Gunnells*, 348 F.3d at 434; *Thorn*, 445 F.3d at 317. Rather, identifying a company's customers during a time period should be an "objectively verifiable" task. *See Carrera*, 2014 WL 3887938, at *3 (Ambro, J., dissenting). Dr. Krakauer has demonstrated how Dish can assert this defense on a class-wide basis. To the extent resolution of this defense involves any inquiry into individual circumstances, such an inquiry is simple and mundane. *See Gunnells*, 348 F.3d at 429.

### c.     Did a putative class member contact SSN?

If an individual first contacted SSN and made an "inquiry or application" for Dish products or services, this would establish an EBR and allow SSN to contact that individual for up to three months. *See* 47 C.F.R. § 64.1200(f)(5). Dish contends that such calls cannot be determined without individualized inquiry. (Doc. 56 at 26-28.) Just as with its arguments on business numbers and EBRs with customers, Dish has done little more than speculate about the frequency of this potential issue and the difficulties it would raise in a class setting.[5] (*See* Doc. 56 at 26-27; Doc. 56-22.)

---

[5] Indeed, Dish's statement that there are "a multitude" of instances of a putative class member initiating a call to SSN, (Doc. 56 at 27), is of no moment, as unsworn statements by counsel in briefs such as these are not evidence. *See Adjabeng*, 2014 WL 459851, at *3

28

Moreover, to the extent Dish contends that the call records on which Dr. Krakauer relies are insufficient to allow Dish to identify every possible call to which it can assert this defense, (*see* Doc. 56 at 27-28; Doc. 56-23 at 3; Doc. 56-10 at ¶¶ 9, 12), that is not Dr. Krakauer's fault. If the records that Dish and its affiliates keep do not allow Dish to identify every possible EBR, that should not preclude persons with valid claims from recovering, nor does it prevent class certification under Rule 23(b)(3).

### d. Did a putative class member consent to be called on a NDNC number?

Dish maintains that there is no TCPA violation if an individual voluntarily gives a telemarketer a number registered on the NDNC or asks to be called back at such a number.[6] (Doc. 56 at 28-30); *see* 47 C.F.R. § 64.1200(c)(2), (f)(14)(i); *see also Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1118 (11th Cir. 2014). Ms. Verkhovskaya testified that her analysis did not identify calls where SSN first called an individual on a non-NDNC number and the individual asked to be called back on a different number on the NDNC list. (*See* Doc. 103 at 25, 37; Doc. 56 at 28.)

---

(collecting cases). Further, if one were to speculate, one might speculate that it is unlikely that a person who asked to be placed on a do-not-call list would actually initiate a telephone call to a telemarketer making calls on behalf of Dish. One might also speculate that a person interested in Dish products would call Dish, not a Dish telemarketer. Lastly, Dish has only presented an exhibit of 14 numbers it contends are instances of an individual first calling SSN. (*See* Doc. 56 at 27; Doc. 56-22.) For these few individuals, the Court can manage the individual EBR defense.

[6] Dish contends that these calls would be exempt from the TCPA either because of the called individual's consent, *see* 47 C.F.R. § 64.1200(c)(2), (f)(14)(i); *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1118 (11th Cir. 2014), or by establishing an EBR based on an inquiry. *See* 47 C.F.R. § 64.1200(f)(5); *Hamilton v. Spurling*, No. 3:11cv00102, 2013 WL 1164336, at *10-11 (S.D. Ohio Mar. 20, 2013) (opinion of Ovington, M.J.); (Doc. 56 at 28-30.)

Dish contends that this gives rise to individual issues, but it again provides only a handful of examples supported by unsworn statements in a brief.[7] (*See* Doc. 56 at 29-30; Docs. 56-24, 56-25.) Second, as discussed *supra*, the fact that it is impossible to exclude all uninjured class members at this stage does not prevent certification. *See Nexium*, 777 F.3d at 22; *Kohen*, 571 F.3d at 677.

### 3.    Evaluation of predominance

"[P]redominance under Rule 23(b)(3) requires that common issues predominate, but does not require all issues to be common." *In re Polyester Staple Antitrust Litig.*, No. 3:03CV1516, 2007 WL 2111380, at *27 (W.D.N.C. July 19, 2007) (collecting cases). There are two central factual issues that loom over this entire case: (1) whether SSN made the calls at issue; and (2) whether Dish is liable for SSN's calls under agency principles. To recover from Dish, Dr. Krakauer would have to prove that SSN called a number on the NDNC list or the IDNC list of Dish or SSN at least twice during any 12-month period, that SSN made these calls on behalf of Dish, and that Dish is liable for SSN's actions under agency principles. (*See* Doc. 48 at 17, 21-22.)

---

[7] As to the calls where Dish contends SSN first called an individual on a NDNC number and the individual asked to be called back, Dish cites an affidavit from an SSN general manager who testified that the call logs had a "Comments" field where SSN agents could enter notes or additional information about the calls. (*See* Doc. 56 at 30; Doc. 56-10 at ¶ 6.) This testimony says nothing about how frequently putative class members requested to be called back. Dish filed an exhibit including 10 numbers it contends are calls where an individual asked to be called back, but this conclusion appears to be based solely on Dish's counsel's interpretation of the comments. (*See* Doc. 56 at 30; Doc. 56-25.) Dish's assertion that this happened to any calls in the putative class list is largely speculative and unsupported by evidence. *See Adjabeng*, 2014 WL 459851, at *3 (collecting cases).

Moreover, to the extent that Dish has admissible evidence that these 10 calls were made in response to an individual's request to be called back, it can present such evidence, and the Court can easily manage any individual issues as to these few numbers and calls.

These questions "can be resolved for each class member in a single hearing" and do not "turn[] on a consideration of the individual circumstances of each class member." *Thorn*, 445 F.3d at 319. Indeed, these are the central issues to this litigation and predominate in quality and complexity over any potential individual issues. *See EQT*, 764 F.3d at 366; *Gunnells*, 348 F.3d at 429 (noting that a greater quantity of individual issues as compared to common issues does not necessarily mean common issues do not predominate where the common issues "far exceed in complexity [as compared to] the more mundane individual . . . issues").

As discussed *supra*, the question of whether a putative class member was a Dish customer at the time of a call should be a simple and objectively verifiable task, requiring little more than reference to Dish's own records. Dish's claim that the putative class list contains "hundreds" or "a multitude" of non-actionable calls, (Doc. 56 at 23, 27), is not supported by evidence. While there are potentially a number of individual issues, these issues appear to apply to only a small number of class members and are straightforward. These minor, peripheral issues do not defeat the predominance of the central issue: whether the calls were made by Dish's agent. The essential elements of the class members' claims can be proven at trial with common, as opposed to individualized, evidence. *See Hayes*, 725 F.3d at 359.

The Court finds that common questions of fact and law predominate.

**B.** **<u>Superiority</u>**

A class action is the superior method of litigation in this case. Given the relatively small statutory damages, *see* 47 U.S.C. § 227(c)(5), the class members likely have little

31

interest in controlling the litigation in this case.  *See* Fed. R. Civ. P. 23(b)(3)(A); *Gunnells*, 348 F.3d at 425; *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 616-17 (1997); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 533-34 (3d Cir. 2004).  Further, the type of injury allegedly suffered by the class members is not, for example, a personal injury or death where a plaintiff would ordinarily have "a substantial stake in making individual decisions on whether and when to settle." *Amchem*, 521 U.S. at 616.

There is no evidence of any litigation begun by or against any class members, *see* Fed. R. Civ. P. 23(b)(3)(B); *Gregory v. Finova Capital Corp.*, 442 F.3d 188, 191-92 (4th Cir. 2006), and given the large number of class members and claims, class-wide adjudication of the claims would be more efficient.  *See Gunnells*, 348 F.3d at 432-33; *Warfarin*, 391 F.3d at 533-34.  Adjudicating these claims in one forum would provide flexibility, control, and consistency that would not exist with individual litigation.  *See* Fed. R. Civ. P. 23(b)(3)(C); *Gunnells*, 348 F.3d at 425.  And, as discussed *supra*, the potential individual issues do not present great difficulties in managing the class.  *See* Fed. R. Civ. P. 23(b)(3)(D).

The Supreme Court has noted that, through Rule 23(b)(3), "the Advisory Committee sought to cover cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615 (internal quotation marks and ellipsis omitted).  Class-wide adjudication would achieve each of these goals.

Moreover, the legislative intent behind the TCPA supports the view that class action is the superior method of litigation. "[I]f the goal of the TCPA is to remove a 'scourge' from our society, it is unlikely that 'individual suits would deter large commercial entities as effectively as aggregated class actions and that individuals would be as motivated . . . to sue in the absence of the class action vehicle.'" *Jay Clogg Realty Grp., Inc. v. Burger King Corp.*, 298 F.R.D. 304, 309-10 (D. Md. 2014) (quoting *Landsman & Funk PC v. Skinder-Strauss Assocs.*, 640 F.3d 72, 95 (3d Cir. 2011)); *see also Amchem*, 521 U.S. at 617.

## III.   Conclusion

Dr. Krakauer has met the threshold requirements for class certification by demonstrating that he is a member of both proposed classes and that the class members are ascertainable. It is undisputed that Dr. Krakauer's proposed classes satisfy the numerosity, commonality, and adequacy of representation requirements of Rule 23(a)(1), (2), and (4). By demonstrating membership in the classes, Dr. Krakauer has satisfied the typicality requirement of Rule 23(a)(3). Dr. Krakauer's proposed classes satisfy Rule 23(b)(3) as common questions of law and fact predominate, and class action is the superior method of adjudication. As to Dish's arguments against predominance, the Court concludes that Dr. Krakauer has demonstrated that Dish may raise most of its defenses on a class-wide basis with minimal, if any, individual inquiry and that Dish's other arguments are largely speculative; any individual issues that exist are minor and do not defeat the class action because common issues nevertheless predominate.

It is **ORDERED** that the motion for class certification, (Doc. 47), is **GRANTED**.

This the 9th day of September, 2015.

_____
UNITED STATES DISTRICT JUDGE