# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

**THOMAS H. KRAKAUER,**
on behalf of a class of persons,

    Plaintiff,

v.

Civil Action No. 1:14-cv-00333-CCE-JEP

**DISH NETWORK, L.L.C.,**

    Defendant.

## PLAINTIFF'S TRIAL BRIEF

John W. Barrett
Brian A. Glasser
John Roddy
**Bailey & Glasser LLP**
209 Capitol Street
Charleston, WV 25301
Telephone: (304) 345-6555
jbarrett@baileyglasser.com
bglasser@baileyglasser.com
jroddy@baileyglasser.com

## Table of Contents

Introduction ............................................................................................................. 1

Legal Claims ........................................................................................................... 3

Overview of Evidence ............................................................................................ 4

1. SSN was a Dish "National Sales Partners/OE Retailer" contractually under Dish's control. ............................................................................................................ 4

2. SSN called Dr. Krakauer and the classes in violation of the TCPA. ............................. 5

3. SSN indiscriminately made calls on Dish's behalf to more than 20,000 other DNC/IDNC registrants. ..................................................................................... 6

4. SSN called 20,450 DNC registrants to promote Dish services, and an additional 7,979 numbers on SSN and Dish's internal do not call lists. ......................................... 7

5. SSN made 57,900 calls to Do Not Call Registrants from May 2010 to August 2011 ... 7

6. Dish is vicariously liable for the calls. ........................................................................ 8

   a. Requirements for vicarious liability. ..................................................................... 8

   b. Dish had the right to control SSN's conduct. ...................................................... 10

   c. Dish exercised its right to control SSN with respect to many matters – but not telemarketing compliance. .................................................................................. 11

7. Dish's violations were willful and knowing. ............................................................. 13

8. Dish is not entitled to the EBR and consent defenses regarding the non-Charter calls, and is not entitled to assert the safe harbor defense at all. .............................. 15

Verdict Sought ...................................................................................................... 16

## Introduction

The national Do Not Call Registry is one of the most popular government programs ever created. The Registry was established in 2003 to provide a safe haven from unwanted telemarketing calls. It has more than 223 million active registrations, including that of the class representative plaintiff, Dr. Thomas Krakauer. Despite Dr. Krakauer's registration, Satellite Systems Network, one of Dish's authorized dealers, called him repeatedly to market Dish's subscription TV service.

After Dr. Krakauer complained to Dish about a May 2009 call, both Dish and SSN knew that he was on the national and internal DNC lists, but SSN kept calling, and kept touting Dish TV, for another two years. During this entire time, and in fact for some years prior, Dish knew of and tacitly condoned SSN's misconduct because SSN provided Dish with a significant subscription base and thousands of new customers. In all, Dish paid SSN $12.3 million for its efforts.

Dish and SSN are repeat offenders, treating enforcement actions and penalties as the costs of doing business. For example, in 2004, SSN agreed to a consent judgment with the North Carolina Attorney General addressing its telemarketing violations. Later, Florida followed suit based on SSN's Do Not Call violations there. Still, SSN's pattern of ignoring Do Not Call Provisions continued unabated.

As a result, in 2009 the Federal Trade Commission and four state attorneys general brought the *U.S. v. Dish* case, suing Dish for the very claims Krakauer makes here—calling DNC registrants. *See United States v. Dish Network, LLC,* 75 F. Supp. 3d 942 (C.D. Ill. 2014). In December 2014, the *US v. Dish* court found Dish liable for

4,094,099 calls it or its vendors made to DNC Registrants and for 2,730,842 calls its retailers, including SSN, made to those Registrants.[1]

Krakauer brings this class action representing a class of some twenty thousand people who, like him, took the affirmative step of getting on the DNC list, but received repeated calls from SSN marketing Dish TV products anyway. He also represents a second class composed of people who told Dish or SSN not to call them anymore but received calls anyway.

The law Krakauer relies on, the Telephone Consumer Protection Act ("TCPA") was enacted to protect consumers from just such invasive—and maddening—telemarketing practices. As described below, Dish is liable for SSN's violations of the TCPA, both because the statute giving rise to the claims asserted permits consumers to sue the entity on whose behalf the calls were made, and because Dish authorized SSN to telemarket on its behalf and subject to its control under a contractual provision that requires SSN to take any action or refrain from taking any action that Dish demands.

---

[1] Judge Myerscough recently completed a four-week bench trial in *US v. Dish*. After trial, she denied Dish's Rule 52(c) motion for judgment on partial findings, and found that the plaintiffs presented sufficient evidence to show, among other things, that Dish had an agency relationship with its retailers, including SSN. *United States v. Dish Network, LLC*, No. 3:09-03073, text order of Feb. 23, 2016. She has not issued her final order, but stated at a recent status conference, "I will tell you that thus far, given what the evidence is, I'm inclined to rule with the plaintiffs."

## Legal Claims

On behalf of two certified nationwide classes, Krakauer alleges that DISH violated TCPA provisions that prohibit solicitation calls to persons on the national Do Not Call Registry and on the seller's internal do not call registry.[2]

The TCPA regulates the marketing of goods or services by telephone. The National Do Not Call Registry provisions prohibit telemarketers from placing more than one call to a residential telephone line within a twelve month period, if the line was listed on the Registry for at least 30 days prior to the calls. (Pl.'s Jury Instr. No. 1, citing 47 U.S.C. § 227(c)(5).)

The TCPA's internal do not call provisions prohibit telemarketers from placing more than one call to a residential telephone line within a twelve month period, if the line was listed on the telemarketer's or the seller's internal do not call list for at least 30 days prior to the calls. (Pl.'s Jury Instr. No. 2, citing 47 C.F.R. § 64.1200.)

A person who receives calls in violation of these laws may bring an action against the caller or the party on whose behalf the call was made. (Pl.'s Jury Instr. No. 3, 47 U.S.C. § 227(c)(5).)

---

[2] The classes are: (1) all persons whose telephone numbers were on the NDNC List for at least thirty days, but who received telemarketing calls from SSN to promote DISH between May 1, 2010 and August 1, 2011 (the "NDNC Class"), and (2) all persons whose telephone numbers were on the IDNC list of DISH or SSN, but who received telemarketing calls from SSN to promote DISH between May 1, 2010 and August 1, 2011 (the "IDNC Class"). *See* ECF No. 111 (Class Certification Order) at 4.

## Overview of Evidence

1. **SSN was a Dish "National Sales Partners/OE Retailer" contractually under Dish's control.**

While Dish has thousands of retailers nationwide, only around 35 are what Dish calls "National Sales Partners," "OE partners," or "OE retailers." These retailers *exclusively* market and sell (but do not install) Dish satellite-TV systems, and sell Dish subscriptions using Dish's online Order Entry Tool ("OE Tool").

In approximately 2001, SSN became an OE Retailer. As an authorized Dish National Sales Partner, SSN accessed the OE Tool on a Dish web site, where it would place customers' orders with Dish, arrange for payment directly to Dish, and arrange for Dish to install the equipment and set up the service. Dish would then run credit checks, provide the satellite dish and other equipment, perform the installation, set up the selected programming services, and receive the payment from the customer.

The SSN/Dish relationship was governed by a Retailer Agreement that subjected SSN to Dish's control. Under the agreement, executed by SSN owner Alex Tehranchi:

- Dish appointed SSN as an "Authorized Retailer to "market, promote, and solicit orders" for Dish, 2010 Retailer Agt., ¶ 2.1, at 6;

- Dish authorized SSN to use Dish trademarks in marketing, *id.* at 34;

- Dish required that SSN "shall take all actions and refrain from taking any action, as reasonably requested by [Dish] in connection with the marketing, advertisement, promotion of, or taking of orders[,]" *id.* ¶ 7.3, at 18;

- Dish could establish "Business Rules" with which SSN must comply, *id.* ¶¶ 1.7, 7.3, at 2, 17;

- Dish prohibited SSN from selling Dish subscriptions, instead designating Dish as the seller, *id*. ¶ 7.2, at 18; and

- If SSN violated any state or federal laws or regulations, the "agreement shall terminate automatically . . . unless EchoStar notifies the Retailer to the contrary in writing[,]" *id*. ¶ 10.4, at 21-22.

### 2. SSN called Dr. Krakauer and class members in violation of the TCPA.

Dr. Krakauer placed his residential telephone number on the NDNC Registry in 2003, the first year of its existence. Nonetheless, on May 9, 2009, Dr. Krakauer received a call from an SSN representative, named "Ken," who started the conversation by noting that Dr. Krakauer was a long-time subscriber to DirecTV. Ken told Dr. Krakauer he could save him some money. Ken asked Dr. Krakauer for the last four digits of his DirecTV account and placed Dr. Krakauer on hold.

When Ken returned, he had detailed information about Dr. Krakauer's DirecTV account, and tried to persuade Dr. Krakauer to switch from DirecTV to Dish. Shortly afterward, Dr. Krakauer phoned Dish and complained about the call. Dish employee Rebecca Doherty handled his complaint. Dr. Krakauer expressed annoyance at the telemarketing call and told Ms. Daugherty the call was inappropriate. Dr. Krakauer testified that the purpose of his complaint was "to see if Dish Network could stop it[.]" Ms. Doherty investigated Dr. Krakauer's complaint and confirmed that Dr. Krakauer had been contacted by SSN, and that he was on both the National Do Not Call List and on Dish's internal do not call list.

When Dr. Krakauer did not hear from Dish for several days, he contacted Ms. Dougherty, who told Dr. Krakauer that the person who called him was not a "Dish

employee" and that Dish was not responsible for the actions of its contractors. Although Ms. Dougherty knew SSN had run a credit check on Dr. Krakauer without his permission, she did not disclose that fact.

On May 27, 2009, Dish wrote to SSN, describing Dr. Krakauer's complaint that SSN had violated the TCPA by calling him, and asking SSN to ensure that Dr. Krakauer was added to SSN's internal do not call registry.

Despite this, Dr. Krakauer continued to receive telemarketing calls from SSN. In fact, Dr. Krakauer received so many calls from SSN promoting Dish that he became concerned that his number had somehow been dropped from the National Do Not Call Registry and registered his number for a second time.

### 3. SSN indiscriminately made calls on Dish's behalf to more than 20,000 other DNC/IDNC registrants.

At the same time, SSN made similar Dish promotional calls to tens of thousands of other individuals whose numbers were also listed on the National Do Not Call Registry and their own internal DNC lists. In entering summary judgment against Dish, the *US v. Dish* court found that SSN, on behalf of Dish, violated the Telemarketing Sales Rule[3] by making more than 380,000 calls to DNC Registrants—the very claim Krakauer makes here. According to the court: "The undisputed evidence establishe[d] … that Dish retained the Retailer [SSN]…authorized [SSN] to market Dish products and services, and [SSN] violated the TSR by initiating Dish telemarketing calls to numbers on the [DNC] Registry." *US v. Dish,* 75 F. Supp. 3d at 1013; *see also* 16 C.F.R. § 310.4(b).

---

[3] 16 C.F.R. § 310.4(b). That statute is not at issue in this case, but is substantially the same as the applicable statutes and regulations here.

6

### 4. SSN called 20,450 DNC registrants to promote Dish services, and an additional 7,979 numbers on SSN and Dish's internal do not call lists.

Dr. Krakauer has eliminated the potential logistical and manageability issues inherent in identifying all recipients of unwanted calls throughout Dish's far-flung telemarketing enterprise by narrowing his focus to SSN's calls, made to DNC registrants and those on internal DNC lists, from May 11, 2010 to August 1, 2011, as reflected through records from a third-party company called Five9. SSN confirmed that those calls were telemarketing calls promoting Dish subscriptions, and that at the time the calls were placed, SSN was an exclusive Dish dealer.

### 5. SSN made 57,900 calls to Do Not Call Registrants from May 2010 to August 2011.

Five9 provides telephone software applications that telemarketers can access via the internet to make telemarketing calls. It contracted to provide services to SSN. SSN would upload telephone numbers onto Five9's calling platform and those numbers would be dialed automatically so SSN's telemarketers could connect with prospective Dish customers.

Krakauer's analysis of Five9's call records shows that SSN placed two or more calls in a twelve-month period to 20,450 telephone numbers that were listed on the Do Not Call Registry for at least thirty days prior to the call, in alleged violation of 47 U.S.C. § 227(c). Krakauer's telemarketing expert, Anya Verkhovskaya of the class action administration/data management firm AB Data, performed this analysis using the following methodology:

7

- First, Ms. Verkhovskaya reviewed Five9 call records showing more than 1.6 million telephone calls made during the class period, and identified approximately 230,000 calls that were connected to the called party.

- Second, of that smaller subset, Ms. Verkhovskaya identified just over 58,000 numbers that were dialed more than once in any 12-month period.

- Third, she then cross-checked the 58,000 numbers against the numbers listed on the national Do Not Call Registry on April 1, 2010, thirty days prior to the May 1, 2010 inception date of the Five9 call record compendium, and determined that 23,625 distinct telephone numbers fit that criteria, to which 66,448 calls were made.

- Fourth, Ms. Verkhovskaya then identified 1,275 unique telephone numbers assigned the disposition code "Business" in the Five9 records and coordinated with LexisNexis to identify an additional 118 business-identified numbers, bringing the total of such numbers to 1,393, reducing the 23,625 numbers to 22,258.

- Finally, she further reduced this subset by identifying 1,782 unique numbers that the Five9 records identified as "Dish customer." *Id*. at 9-10.

In the final analysis, as of April 1, 2010, there are 20,450 unique phone numbers on the national Do Not Call Registry that were not identified as business-related or Dish customers, and which received more than one call from SSN. The total number of such calls made and connected was 57,900. Ms. Verkhovskaya performed a similar analysis on the internal Do Not Call lists and do not call requests SSN/Dish received to find an additional 7,979 numbers.

**6. Dish is vicariously liable for the calls.**

**a. Requirements for vicarious liability.**

Even though Dish did not place the calls to the Dr. Krakauer and the class members, Dish is responsible for TCPA violations committed by SSN because SSN

8

placed the calls on behalf of Dish. "On behalf of" Dish means in the interest of Dish, for the benefit of Dish, as a representative of Dish, or in support of Dish. (Pl.'s Jury Instr. No. 5, citing 47 U.S.C. § 227(c)(5); Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/on%20behalf%20of%20someone, last visited March 15, 2016.)

Dish is also responsible for TCPA violations committed by SSN under vicarious liability principles. Vicarious liability prevents a seller from avoiding responsibility for illegal telemarketing by outsourcing telemarketing activities to an unsupervised third party. It also gives the seller incentives to ensure that their telemarketers comply with the TCPA. (Pl.'s Instr. No. 6, citing *In re Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574 ¶ 37 (2013).)

Dr. Krakauer alleges Dish is vicariously liable because SSN acted as Dish's agent when it placed the telemarketing calls. If the jury finds that Dish allowed or approved of SSN to act on behalf of Dish and for its benefit, Dish is liable for the calls. (Pl.'s Jury Instr. No. 7, citing *Restatement (Third) of Agency,* § 1.01.)

Also, if the jury finds that Dish had the right to control SSN's telemarketing, whether or not that control was ever exercised, then Dish is vicariously liable. (Pl.'s Jury Instr. No. 8, citing *Lushe v. Verengo Inc.*, No. 13-07632, 2014 WL 5794627, at *4 (C.D. Cal. Oct. 22, 2014).)

And if the jury finds that Dish gave SSN express or implied authority to market its goods or services, then Dish is vicariously liable. (Pl.'s Jury Instr. No. 9, citing *In re Dish Network, LLC*, 28 FCC Rcd. ¶ 47; *Restatement (Third) of Agency,* § 2.01.).

9

Written limits on a party's authority are not effective if the parties' conduct is not consistent with the written limits. So, even if a written agreement between Dish and SSN generally prohibits illegal acts, the jury may find Dish liable for SSN's telemarketing based on Dish's conduct. Likewise, even if the agreement says SSN is not Dish's agent, the jury may find Dish liable based on its conduct. (Pl.'s Instr. No. 12, citing *Proctor v. Metro. Money Store Corp.*, 579 F. Supp. 2d 724, 737-38 (D. Md. 2008); *Restatement (Third) of Agency* § 1.02.)

### b. Dish had the right to control SSN's conduct.

Dish's relationship with SSN is governed by its form Retailer Agreement. Section 7.3 of the Retailer Agreement provides in pertinent part:

> **Retailer shall comply with all Business Rules**, including without limitation all Business Rules **which govern or are applicable to any Promotional Program in which Retailer participates**. Retailer shall disclose to each prospective DISH Network Subscriber the relevant terms of the Promotional Program in which the prospective DISH Network Subscriber is interested as well as any other terms as set forth in any applicable Business Rule. **Furthermore, Retailer shall take all actions and refrain from taking any action, as requested by EchoStar [DISH] in connection with the marketing, advertisement, promotion and/or solicitation of orders for Programming and the sale of DISH DBS Systems**, and Retailer shall cooperate by supplying EchoStar with information relating to those actions as EchoStar reasonably requests . . .

Section 1.6 defines a "Business Rule" as:

> **any term, requirement, condition, condition precedent, process or procedure associated with a Promotional Program** or otherwise identified as a Business Rule by EchoStar which is communicated to Retailer by EchoStar or an Affiliate of EchoStar either directly (including e-mail) or through any method of mass communication reasonably directed to EchoStar's retailer base, including, without limitation, a 'Charlie Chat", e-mail, facts blast, or posting on EchoStar's retailer web site. Retailer agrees that EchoStar has the **right to modify any Business**

**Rule at any time and from time to time in its sole and absolute discretion for any reason or no reason**, upon notice to Retailer.

The Retailer Agreement appointed Dish Retailers such as SSN "Authorized Dealers"; authorized them to "market, promote, and solicit" orders for Dish; authorized them to use Dish trademarks in their marketing; gave Dish access to each OE Retailer's records with respect to its Dish dealership; and required each Retailer to "take all actions and refrain from taking any action, as requested by EchoStar in connection with the marketing, advertisement, promotion and/or solicitation of order" for Dish programming and related goods and services.

### c. Dish exercised its right to control SSN with respect to many matters – but not telemarketing compliance.

Dish exercised control over SSN and other OE Retailers through several means. First, Dish exercised control through the OE tool itself. "[OE] Retailers accessed the [OE] Tool on a Dish web site. The[y] . . . placed customers' orders with Dish, arranged for payment directly to Dish, and arranged for Dish to install the equipment and set up the service." Dish controlled access to the OE Tool through the log-ins it provided to Retailers, and it trained the OE Retailers on how to use the OE Tool. And after OE Retailers like SSN obtained customers using the OE tool, "Dish ran . . . credit checks, provided the satellite dish and other equipment, performed the installation, set up the selected programming services, and received the payment from the customer." The OE tool essentially walked the telemarketing agents at Dish's OE Retailer call centers through every step of the sales process, with Dish generating and performing all the tasks necessary to make the retailers' sales activities as efficient as possible.

11

The OE tool required that the OE call-center agent take a credit-card payment from the consumer, and also required that the agent solicit the consumer to give Dish authorization to auto-charge the consumer's credit card every month. The payments that resulted from this screen were not payments from the consumers to the OE retailers; they were payments directly from the consumer to Dish.

Second, Dish controlled the communications between OE Retailers and potential customers by reviewing and approving telemarketing sales scripts.

Third, Dish controlled which entities OE Retailers could use to help them market Dish subscriptions, insisting on written approval of any third-party affiliate retained by the retailer.

Fourth, Dish exercised control through its Quality Assurance ("QA") call-monitoring program, which required OE retailers to upload dozens of recordings of sales calls every week to Dish for qualitative evaluation by a team of Dish sales personnel. The stated goal of the QA program was to monitor Dish's "sales partners" to "ensure a high quality representation of Dish Network…" Dish personnel monitoring telemarketing calls scored Dish's "sales partners" using a forty-eight topic matrix covering a wide variety of required disclosures. In Dish's view, 100% compliance with the disclosure obligations was required, although Dish did not monitor TCPA compliance through the QA program at all.

Dish augmented its QA program by having employees and executives regularly visit SSN's offices, including its call center, to review and provide feedback on SSN's marketing plans, including how SSN planned to market Dish subscriptions; which types

12

Case 1:14-cv-00333-CCE-JEP   Document 164-1   Filed 04/01/16   Page 14 of 20

of promotions worked; how to increase market share; which offers SSN would promote; SSN's marketing budget; SSN's plans for growth; and to "pitch marketing ideas." In general, Dish met with OE retailers to discuss ways to "increase their marketing spend" and to encourage additional marketing.

### 7. Dish's violations were willful and knowing.

The Court may treble TCPA damages if the violations were knowing and willful. 47 U.S.C. § 227(c)(5). This does not require a finding that Dish knew the calls violated the TCPA, because ignorance of the law is no excuse. (Pl.'s Jury Instr. No. 4, citing *First Nat'l Collection Bureau, Inc. v. Walker,* 348 S.W.3d 329, at *15 (Tex. App. 2011); *In re Dynasty Mortg., L.L.C.*, 22 F.C.C. Rcd. 9453, 9470 n.86, 2007 WL 1427724 (May 14, 2007).

Dish's willful and knowing violations are evidenced in part by the fact that Dish has long known of SSN's illegal telemarketing, but failed to stop it. Beginning in 2002, Dish began receiving complaints about SSN's telemarketing. On June 12, 2002, Dish sent a letter informing SSN it had violated the Retailer Agreement because it was not complying with telemarketing laws. On November 6, 2002, a Dish representative visited SSN and raised the issue of SSN using prerecorded calls in its telemarketing. Dish's notes reflect that the Dish representative explained that the "entire executive group is watching close."

In June 2004, the State of North Carolina sued SSN for illegally calling residents on the DNC Registry and placing prerecorded telemarketing calls to them. That matter

13

was resolved in 2005 through a consent judgment imposing a $15,000 fine and a permanent injunction against unlawful telemarketing.

Despite this documented history of illegal conduct, Dish allowed SSN to become a OE Retailer. Throughout the relationship, Dish was intimately involved in supervising SSN's telemarketing. For example, in April 2005, a Dish representative made the following entry into a computer database titled "TOP 20 MEETING - SATELLITE SYSTEMS NETWORK:

> Met with Alex. Covered details on the Satellite Market and the Spanish Market. Went over details on what works with marketing compared to the competitors.

Dish's knowledge of SSN's illegal telemarketing reached the upper echelons of company management. For example, in response to one telemarketing complaint, Dish's in-house counsel traced the call to SSN, and reminded senior management that "Charter got an injunction against SSN about six weeks ago," to which Dish's senior vice president of sales Amir Ahmed responded, "Ok, apparently we could not convince Alex [Tehranchi, SSN's owner]. Oberbillig, I'm so tired of this bull****. I will deal with [SSN counsel] Novak and let legal deal with it."

On September 26, 2005, Novak responded:

> We know that SSN is using autodialers and automessages. Teranchi been warned time and again (by me, by you, by the region, by phone, in writing, in person) that these activities could violate the law....

> In the past, we have successfully resisted the argument that we are responsible for the conduct of independent retailers, however, SSN is a problem because we know what he is doing and have cautioned him to stop. There is a risk in continuing to give warnings without a follow-through action. Eventually, someone will try to use that against us.

14

> I favor probation, provided that there is unanimous understanding that if EchoStar becomes aware of ANY ONE additional violation, he's terminated.

Ahmed replied that he preferred "30 or 60 day probation where if these tactics happen again it would be grounds for termination." Dish received information about that "ANY ONE" additional violation just one month later, when another consumer complained about SSN's illegal telemarketing. But Dish still did not terminate SSN. Instead, when senior Dish executives again were informed that SSN was behind this new complaint, Ahmed responded, "This is Alex's last chance. Fix it or he gets a letter and will lead to termination. It's that simple." Nonetheless, consumers continued to complain about SSN's telemarketing, and still SSN remained an OE Dealer, even after *Dish itself* sued SSN for indemnification from claims arising from SSN's illegal telemarketing.

Even then, consumer complaints continued, and Dish failed to terminate SSN or fine or discipline it in any way. Over and over, Dish did not punish SSN for its illegal calls, but rewarded it, paying SSN millions in incentive payments and even awarding SSN's principals with a trip for top-performing retailers.

### 8. **Dish is not entitled to the EBR and consent defenses regarding the non-Charter calls, and is not entitled to assert the safe harbor defense at all.**

Based on the order granting summary judgment to the United States and the State Plaintiffs on Dish's affirmative defenses of consent and established business relationship in *US v. Dish,* Dish is collaterally estopped from asserting those defenses with respect to the "non-Charter" calls at issue in this case. *See Pl.'s Mot. Partial Summ. J.* (ECF No. ) As explained in Plaintiff's summary judgment briefing, the plaintiffs in *US v. Dish* did

15

not seek summary judgment with respect to SSN calls designated in the calling records as "Charter" calls.

Additionally, the court in *U.S. v. Dish* granted partial summary judgment to the plaintiffs on Dish's "safe harbor" defense. *See* 75 F. Supp. 3d at 952-53. The safe harbor defense requires Dish to provide evidence that it "established and implemented written procedures to comply with the national do-not-call rules. *See id.* at 961 (quoting 47 C.F.R. 64.1200(c)(2)(i)). For this reason, Dish also is not entitled to raise the safe harbor defense in this action.

## Verdict Sought

Plaintiff proposes the following verdict form, and will request the jury award $500 for each unlawful call. Plaintiff will also request the jury find Dish's violations willful and knowing, which will subject the jury's award to trebling under 47 U.S.C. § 227(c)(5).

## National Do Not Call Claims

1. Is DISH Network liable for calls to telephone numbers on the national do-not-call list?

   YES _____  NO _____

2. If yes, for how many calls is DISH Network liable?

   _____

3. What amount do you award Dr. Krakauer and the class for each call?

   _____

16

4. Did DISH Network violate the national do-not-call laws willfully or knowingly?

    YES _____    NO _____

### Internal Do Not Call Claims

5. Is DISH Network liable for calls to telephone numbers on DISH Network's or SSN's internal do-not-call lists?

    YES _____    NO _____

6. If yes, for how many calls is DISH Network liable?

    _____

7. What amount do you award Dr. Krakauer and the class for each call?

    _____

8. Did DISH Network violate the internal do-not-call laws willfully or knowingly?

    YES _____    NO _____

Respectfully submitted.

                                    */s/ John W. Barrett*
                                    John W. Barrett
                                    Brian A. Glasser
                                    John Roddy
                                    **Bailey & Glasser LLP**
                                    209 Capitol Street
                                    Charleston, WV 25301
                                    Telephone: (304) 345-6555
                                    jbarrett@baileyglasser.com
                                    bglasser@baileyglasser.com
                                    jmarshall@baileyglasser.com
                                    jroddy@baileyglasser.com

17

*/s/ J. Matthew Norris*
J. Matthew Norris
**Norris Law Firm, PLLC**
1033 Bullard Court, Suite 207
Raleigh, NC 27615
(919) 981-4775
(919) 926-1676 *facsimile*
jmn@ncconsumerlaw.com

Matthew P. McCue
**The Law Office of Matthew P. McCue**
1 South Ave., Third Floor
Natick, MA 01760
(508) 655-1415
Telephone: (508) 655-1415
mmcue@massattorneys.net

Edward A. Broderick
Anthony Paronich
**Broderick Law, P.C.**
99 High Street, Suite 304
Boston, MA 02110
Telephone: (617) 738-7089
ted@broderick-law.com

*Counsel for Plaintiff Thomas H. Krakauer*

Dated: April 1, 2016

18