IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


THOMAS H. KRAKAUER,           *  Case No. 1:14CV333
                           *
            Plaintiff,     *
                           *
vs.                    *  Greensboro, North Carolina
                           *  January 10, 2017
DISH NETWORK, L.L.C.,    *  11:55 a.m.
                           *
            Defendant.     *
*****************************


**TRANSCRIPT OF TRIAL**
BEFORE THE HONORABLE CATHERINE C. EAGLES,
UNITED STATES DISTRICT JUDGE, and a jury.



APPEARANCES:

For the Plaintiff:        JOHN W. BARRETT, ESQUIRE
                         BRIAN A. GLASSER, ESQUIRE
                         Bailey & Glasser, LLP
                         209 Capitol Street
                         Charleston, West Virginia 25301

                         MATTHEW P. MCCUE, ESQUIRE
                         Law Office of Matthew P. McCue
                         1 South Avenue, Third Floor
                         Natick, MA 01760

                         JACOB M. NORRIS, ESQUIRE
                         The Norris Law Firm
                         1033 Bullard Court, Suite 207
                         Raleigh, North Carolina 27615


For the Defendant:        PETER A. BICKS, ESQUIRE
                         ELYSE D. ECHTMAN, ESQUIRE
                         JOHN L. EWALD, ESQUIRE
                         Orrick Herrington & Sutcliffe, LLP
                         51 West 52nd Street
                         New York, New York 10019

```
 1                                    RICHARD J. KESHIAN, ESQUIRE
                                      Kilpatrick Townsend & Stockton, LLP
 2                                    1001 W. Fourth Street
                                      Winston-Salem, North Carolina 27101
 3

 4    Court Reporter:                 Lori Russell, RMR, CRR
                                      P.O. Box 20593
 5                                    Winston-Salem, North Carolina 27120

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24            Proceedings recorded by stenotype reporter.
         Transcript produced by Computer-Aided Transcription.
25
```

**P R O C E E D I N G S**

**THE COURT:**  All right.  Good morning.  We're ready to get started with jury selection.

My intention is to ask the clerk to send for the jurors and they'll -- we'll need to rearrange a little in here so that the jurors have someplace to sit.

And while we're waiting on them, if there are any housekeeping matters, we can take those up.

I know you all have not -- you all have had maybe 15 minutes to look at the questionnaires and it's noon, so realistically you're going to have the lunch break to look at them as well.

So where -- Marlene, where will the jurors sit, in the --

**THE CLERK:**  On the Plaintiff's side in the back.

**THE COURT:**  In the back.  Okay.  So everything is all right?

**THE CLERK:**  I believe so.

**THE COURT:**  Okay.  All right.  So if you would call downstairs and ask them to bring the jurors up.

**THE CLERK:**  I'm going to have to go get them.

**THE COURT:**  You have to go get them.  All right.  If you would go get them.

That means we can't do anything important while she's gone, but --

**MR. GLASSER:**  Your Honor, after you send the jury to

1  lunch, we do have a housekeeping matter that may take 10
2  minutes.  We've agreed on 95 percent of the redactions on the
3  assurance of compliance.  There's a couple paragraphs we're
4  arguing about we would like to get sorted out so we can clean
5  up the exhibit.

6          **THE COURT:**  All right.  We'll do that at lunch.
7      And you all saw the questionnaire specific to this case and
8  each got a copy of that, right?

9          **MR. BICKS:**  Yes.

10          **THE COURT:**  Okay.  And then there were a few jurors
11  who -- I think this was actually mostly duplicative of the
12  specific questionnaire, the one we always have them fill out.
13  A couple of people did indicate some specifics about health
14  issues or family members with court appearances, that kind of
15  thing.  So I think she showed that to you as well.  Yes.  Okay.
16  All right.

17      (Pause in the proceedings.)

18          **THE COURT:**  And we probably won't -- we'll stop for
19  lunch certainly no later than one o'clock.  We'll see how it
20  goes as to the best time to take a break.

21      (Pause in the proceedings.)

22      (Prospective jurors entered the courtroom.)

23          **THE COURT:**  You can remain seated while the jurors
24  come in.

25      (Pause in the proceedings.)

1    **THE CLERK:**  Judge, we have 30 jurors.

2    **THE COURT:**  All right.  Good afternoon, ladies and

3  gentlemen on the jury panel.  My name is Catherine Eagles.  I'm

4  a United States district judge for the Middle District of

5  North Carolina assigned to this civil term of court, and I want

6  to welcome each of you as you begin your jury service and thank

7  you for braving the elements to get here this morning.  I know

8  we had -- we were hoping to get this trial started yesterday,

9  but that probably would have been a bad idea given the weather.

10  So we appreciate you all being here today for us to get started

11  with this case.

12    I know that when people are summoned for jury service they

13  do so at some sacrifice to other plans in their lives, and for

14  some of you, you have to travel a pretty good distance.  This

15  is federal court and the Middle District goes from South

16  Carolina to Virginia.  So I know some of you really had a hike

17  to get here this morning.  I will certainly do my best to see

18  that your time is used efficiently while you are here.

19    Our jury system is one of the things that sets this nation

20  apart from others.  Jury service is one of the highest callings

21  of citizenship and by participating in this process, you are

22  fulfilling one of the guarantees set forth by our nation's

23  founders over 200 years ago, the right to decide disputes by

24  trial by jury.  In our system of justice, jurors, not judges,

25  determine the facts.  I'm not going to decide who wins or loses

1  this case.  The jury is going to make that decision.

2       In this case that we're about to start on, we will select

3  at least eight people for the jury, but before we do that, I

4  will have each of you sworn in for your jury service this -- in

5  this case, so please listen to the clerk.

6       (The prospective jurors were duly sworn.)

7            **THE COURT:**  Please say "I do."

8       (Prospective jurors complied with the request.)

9            **THE CLERK:**  Thank you.  You may be seated.

10           **THE COURT:**  All right.  Ladies and gentlemen, we are

11  ready to try -- I've called for trial the case of Thomas

12  Krakauer against DISH Network, L.L.C.  This is a civil case.

13  It is a dispute between the Plaintiff, Thomas Krakauer, and the

14  Defendant, DISH Network, L.L.C.  It is not a criminal case

15  where someone might go to jail.  If we don't need you in this

16  case, they are picking a jury in a criminal case down on the

17  first floor, so we might be trading off on jurors some.  But

18  this case is a civil case.

19       The Plaintiff, Thomas -- is Thomas Krakauer.

20       If you would stand, please, Dr. Krakauer.

21       He's seated -- he's standing there with his hand raised.

22  He is represented by his attorneys in this case.

23       And if each of you would stand when I call your name:

24  Brian Glasser, John Barrett, Matthew McCue, and Matthew Norris.

25  All right.  Thank you.  You can be seated.

1    The Defendant is DISH Network, L.L.C, who is present in

2  court through their representative Lawrence Katzin.  There is

3  Mr. Katzin standing on the other side.  He is represented --

4  DISH is represented by Peter Bicks, Elyse Echtman, John Ewald,

5  and Richard Keshian.

6    All right.  Thank you.

7    Now, this case concerns the federal law which establishes

8  the National Do Not Call Registry.  That allows folks to opt

9  out of receiving sales calls on their residential phone lines.

10  This is a class action involving the Telephone Consumer

11  Protection Act.  You may hear that referred to as the TCPA.

12  And the Plaintiff, Thomas Krakauer, seeks to recover money

13  damages on behalf of himself and a class of individuals from

14  the Defendant, DISH Network, for telephone calls made by a

15  company called Satellite Systems Network, or SSN, to phone

16  numbers that were allegedly on the National Do Not Call list.

17    So a class action is a lawsuit that is brought by one or

18  more people on behalf of a larger group of people who have

19  similar legal claims.  All of these people together are called

20  a class.  In this case, the class is composed of all persons

21  whose telephone numbers were on the National Do Not Call

22  Registry for at least 30 days, but who nonetheless received

23  telemarketing calls from SSN, that's Satellite Systems Network,

24  to promote DISH between May 1st, 2010, and August 1st, 2011.

25  Thomas Krakauer is the representative of this class and his

1  lawyers are also representing these class members.  Your

2  verdict here will be binding on all class members, as well as

3  on DISH.

4      Now, this statute, the Telephone Consumer Protection Act,

5  allows persons who receive calls -- telephone calls in

6  violation of the Act to recover damages up to $500 each.  The

7  Plaintiff contends that DISH is liable for phone calls made in

8  violation of the Act by its agent, SSN.  And the Defendant,

9  DISH, contends that SSN was not its agent and was not acting

10  within its authority, but was an independent contractor; and

11  that in any event, Dr. Krakauer has not proven that the phone

12  calls violated the Act.

13      So that's a two-sentence summary of what the case is about.

14  It's a little more complicated than that, but that gives you a

15  basic overview.

16      Now, as jurors, it will be your duty to listen to the

17  evidence and determine the truth of this matter.  You are the

18  judges of the facts, and you will listen to the witnesses and

19  evaluate their credibility, that is, their believability.

20  You'll consider any exhibits, such as documents or photographs.

21  You will weigh all of the evidence and then you will determine

22  what happened back in 2010 and 2011.  You will apply the law

23  that I will give to you to those facts.  It is your duty to

24  apply the law as I will give it to you and not as you think it

25  is or might like it to be.

1    If anything I tell you about the law is different from what
2  you thought based on something you read online or studied in
3  school or saw on TV or different from how you might like the
4  law to be if you were in Congress passing the laws that apply
5  to the citizens of this state, then it is your duty to follow
6  my instructions on the law and to set aside your personal views
7  of what you think the law is or might like it to be.  This is
8  important because justice requires that everyone who comes to
9  court on the same issue be treated the same way and have the
10  same law applied.

11    We don't make it up as we go along.  I'm not just sitting
12  up here pulling stuff out of the wind.  Congress has passed the
13  laws and that's what we all are supposed to follow.  If we made
14  it up as we went along or if we went by personal preferences or
15  personal views, that would be arbitrary and, generally
16  speaking, arbitrary is not good and we don't like to do that in
17  courtrooms.  So it's one of the reasons it's important for you
18  to follow the law.

19    We also don't reach verdicts based on personal biases,
20  stereotypes or general opinions.  Juries base their verdicts on
21  evidence offered in the courtroom in the presence of all the
22  parties under oath where the evidence is subject to questioning
23  and examination in the presence of everyone who has an interest
24  in the matter.

25    I particularly want to caution you about the law you may

 1  have heard about on TV entertainment shows.  You know, you can

 2  talk about, back in the, day *Perry Mason.*  Then you come

 3  forward.  Maybe there's *Matlock*.  Maybe you're a *Law & Order*

 4  fan.  I think you can watch *Law & Order* 24 hours a day if you

 5  have the right cable package, but I'm -- I know this is going

 6  to shock everybody, but on television shows, they make stuff

 7  up.  Okay.  Even in reality shows they make things up.  On TV

 8  they do not know what the law is that applies in this courtroom

 9  in this case.  So if you've picked anything up from watching

10  television, whether it's *Judge Judy,* who seems to be a very

11  nice lady if a bit stern, or, you know, some other TV show like

12  that, just really, please, put it aside.  All right.  I'm going

13  to tell you everything you need to know about the law that

14  applies in this case and you should take your instructions from

15  me, not from some TV judge or TV actor, okay?

16      Now, we're ready to start with jury selection.  Fourteen

17  people are going to be called over here in the jury box.

18  There's a couple of seats just right outside the jury box, but

19  if you're in those seats, you're still in the jury as far as

20  we're concerned.  I have a number of questions to ask folks.

21  Some folks may be excused if there is a reason they cannot be

22  fair in this case or if one of the parties decides to exercise

23  its right to excuse a juror.  If we do have a juror excused, we

24  may refill those seats.  So I do need everyone in the courtroom

25  to listen to the questions even if you're not seated in the

1 | jury box at the very beginning.

2 | If at any time you cannot hear or understand me, please

3 | raise your hand so I can repeat it. I will ask all of you to

4 | listen carefully. Sometimes the second time around, if we have

5 | a juror who is excused and another juror takes the place of

6 | that juror, I shorten the questions up a little bit to save

7 | time and be efficient, so please listen the first time through.

8 | You have each filled out a questionnaire that covers a lot of

9 | things I might ordinarily ask you to answer out loud in court,

10 | but there will be some follow-up questions for those of you who

11 | make it into the box.

12 | First, just let me confirm all of you filled out the

13 | questionnaire. Is there anyone who did not fill out the

14 | questionnaire? Okay. Good.

15 | And I do also want to be sure you filled it out accurately

16 | and truthfully. If at any time while you're in the jury box

17 | you remember something that you didn't think of when you were

18 | filling out the questionnaire, just bring it to my attention.

19 | This is not uncommon. You know, we're human beings. We

20 | remember what we remember. Sometimes our memory is jogged. So

21 | if something comes to your mind that you forgot to put down or

22 | that maybe makes one of your answers incorrect, just let me

23 | know when you're in the jury box.

24 | Now, the questions I will be asking you are designed to be

25 | sure and to find out that -- whether you can be a fair and

1  impartial juror in this case.  They're not designed to pry, but

2  if I do ask something that requires you to give information

3  you'd rather not state in front of the open courtroom, just let

4  me know that, and I'll figure out another way for you to

5  provide that information to me and to the parties.

6      Now, a fair and impartial juror has not made up his or her

7  mind before hearing the witnesses and seeing the evidence.  A

8  fair and impartial juror can listen to the testimony and judge

9  the credibility of the witnesses.  A fair and impartial juror

10 follows all of the Court's instructions, not just some of the

11 instructions, and a fair and impartial juror waits until all of

12 the evidence is presented before making up his or her mind.  A

13 fair and impartial juror decides the facts of the case based on

14 the evidence, not on bias, sympathy, prejudice or past

15 experience.

16     Now, we do not ask you to put aside your common sense and

17 life experience when you come into the courtroom.  Indeed, we

18 need you to bring that with you as you listen, evaluate, and

19 weigh the evidence.  Having jurors with different backgrounds

20 and experiences helps ensure that all the evidence and all

21 aspects of the case are carefully and thoughtfully evaluated

22 during deliberations.  Your life experiences provide context

23 and background, but if they mean you cannot listen to a case

24 fairly and impartially, then you do need to let me know that.

25     I do suspect that everyone in the room has received a sales

1  call on the telephone at one time or another and that fact

2  alone does not disqualify you as a juror.  If it did, I think

3  it would be impossible for me to get a jury in this case.  So

4  the question is not whether you've ever gotten a sales call or

5  whether you agree or disagree with the Do Not Call law or

6  whether these calls do or do not bother you.  The question is

7  whether you can listen to the evidence in this case with an

8  open mind rendering a verdict based on that evidence and

9  whether you can follow the law that the Court will give you.

10 We do -- we may ask you some questions about your experiences,

11 but that is simply to find out if those experiences are such

12 that -- you know, they're just sort of ordinary life

13 experiences that constitute background or if there's something

14 that's going to prevent you from being fair in this case.

15     All right.  The clerk is going to call 14 of you to come

16 into the jury box and the security officer here will help be

17 sure you get into the right seat.  So please listen for your

18 name and come forward if it is called.

19     **THE CLERK:**  Juror number one, which will be on the

20 first row against the wall, is Colton Wheeler.  Juror number

21 two, which will be in the second seat, is Charles Lambis.

22 Juror number three is Tellie Smith.  Juror number four is Tiesa

23 Smith.  Juror number five is Lorri White.  Juror number six is

24 Randall Richter.  Juror number seven is Susan White.  Juror

25 number eight on the back row against the wall is Kelly Helner.

1  Juror number nine is Eric Turner.  Juror number ten is Karen

2  Dove.  Juror number eleven is Jane Frazier.  Number twelve is

3  Jean Martin.  Number thirteen is Robert Jackson and number

4  fourteen is Larry Cornwell.

5      (Prospective jurors entered the jury box.)

6          **THE COURT:**  I forgot to mention something very

7  important.  We are going to take a lunch break, okay.  So I

8  wanted to go ahead and get started this morning since we had a

9  little bit of a late start due to the weather, but, you know,

10  we're going to see if we can't make some progress here before

11  we all go to lunch, but I'm not going to make anybody starve.

12  All right.

13      Okay.  Good afternoon again to our 14 jurors.  First, if I

14  can ask if any of you know the Plaintiff, Thomas Krakauer.

15  That's Mr. Krakauer there raising his hand again.  Any of you

16  know him?

17      Did any of you know his lawyers:  Mr. Glasser, Mr. Barrett,

18  Mr. McCue or Mr. Norris?  Mr. Norris practices in Raleigh and

19  the other folks are out of state.  Okay.

20      Have any of you or anyone in your close families ever been

21  employed by DISH Network, the people who provide TV services?

22  Nobody.

23      Have any of you ever worked for a business that did work

24  directly for DISH?

25      And do any of you have any connection with any of DISH's

1 lawyers:  Mr. Bicks, Ms. Echtman, Mr. Ewald or Mr. Keshian?

2 Mr. Keshian is from North Carolina.  The other folks are from

3 out of state.  No.  Okay.

4     And based on the little that I have told you, does anybody

5 know anything about this case?  I don't think it's been in the

6 newspaper or online, but just in case.  All right.

7     Now, the law does apply to individuals and to corporations,

8 and parties should not be treated differently because of that

9 status.  Is there anyone here who would treat an individual

10 different from a corporation or a corporation different from an

11 individual?  Anybody just got any biases that way?  Everybody

12 can apply the law both to the individuals in this case,

13 Dr. Krakauer and the class members, as well as to DISH, which

14 is a limited liability company?  Is there anybody who cannot do

15 that?

16     Ms. Frazier, you have some concerns about that?

17         **PROSPECTIVE JUROR ELEVEN:**  I do.  I worked in the

18 corporate world former to -- prior to my education world

19 experience and kind of not real favorable opinions.

20         **THE COURT:**  Okay.  And are you concerned that those

21 experiences are going to prevent you from being fair to DISH?

22 Is that what you're saying?

23         **PROSPECTIVE JUROR ELEVEN:**  I'm going to try very hard

24 for them not to be, but I'm not a big corporate fan.

25         **THE COURT:**  All right.  Thank you for telling us.

1    **PROSPECTIVE JUROR ELEVEN:**  I'm sorry.

2    **THE COURT:**  So do you think that that is -- you know,

3    everybody has got their experiences and most of the time people

4    can -- I think they do find that they can put them aside and

5    base their verdict on only what they hear in the courtroom in

6    light of their full life experience.

7    Do you think that your opinions are such that you would

8    require DISH to prove the case to you?  The Plaintiff has the

9    burden of proof in this case, as in all civil cases.  So do you

10   think that your experience might prevent you from following

11   that law?

12   **PROSPECTIVE JUROR ELEVEN:**  In all honesty, DISH would

13   have to prove something to me right now.

14   **THE COURT:**  All right.

15   **PROSPECTIVE JUROR ELEVEN:**  I'm sorry.

16   **THE COURT:**  That's all right.  Do you think that's

17   something you can set aside?

18   **PROSPECTIVE JUROR ELEVEN:**  I can try real hard.

19   **THE COURT:**  Is that something you would -- you know,

20   just tell me what you think about that.  Is it something --

21   **PROSPECTIVE JUROR ELEVEN:**  I'm having a lot of anxiety

22   at this point just from speaking up and then also about my

23   feelings about the corporate side of things.

24   **THE COURT:**  All right.  Hold on just a second.  I

25   think --

1    **PROSPECTIVE JUROR ELEVEN:**  I want to be fair, but if
2  you ask me can I be certain I will be, I can't be certain at
3  this point.

4    **THE COURT:**  All right.  Just a second.

5    (Pause in the proceedings.)

6    **THE COURT:**  All right.  Thank you.  I may come back to
7  you in a minute.

8    Now, as I mentioned, this is a class action.  This means
9  that all of you, as jurors, will be deciding the case for a
10  substantial number of people who have claims here.  Is there
11  anyone who has any views about class actions that would prevent
12  them from being fair or prevent them from following the law?
13  Anybody?  No.  All right.

14    Can I just speak with counsel briefly at the court bench
15  here?

16    (The following bench conference was recorded.)

17    **THE COURT:**  So she also has some health issues here.
18  I would be inclined to excuse her for cause.  Does anyone
19  object to that?

20    **MR. GLASSER:**  No, ma'am.

21    **MR. BICKS:**  We don't.

22    (Conclusion of the bench conference.)

23    **THE COURT:**  Okay.  Ms. Frazier, thank you for your
24  time.  You can have a seat back in the courtroom.

25    (Excused prospective juror left the jury box.)

 1          THE COURT:  If the clerk would call one more juror,

 2  please.

 3          THE CLERK:  To take her position is Amanda Cloninger.

 4      (Prospective juror entered the jury box.)

 5          THE COURT:  All right.  Good afternoon, Ms. Cloninger.

 6  Do you know any of the lawyers or parties in this case?

 7          PROSPECTIVE JUROR ELEVEN:  No.

 8          THE COURT:  Anybody in your -- you or anyone in your

 9  family ever worked for DISH or worked for a business that did

10  work directly for DISH?

11          PROSPECTIVE JUROR ELEVEN:  (Shakes head.)

12          THE COURT:  Do you have any problems applying the law

13  to individuals and corporation?

14          PROSPECTIVE JUROR ELEVEN:  No, ma'am.

15          THE COURT:  Any feelings about class actions that

16  would prevent you from being fair?

17          PROSPECTIVE JUROR ELEVEN:  No, ma'am.

18          THE COURT:  Okay.  So now turning back to all the

19  jurors, I'm going to tell you who the witnesses are.  Other

20  than Dr. Krakauer, I don't think any of them are from

21  North Carolina.

22      Is that right?

23      So you probably don't know any of them, but I'm still going

24  to tell you who they are.  If you recognize any of their names

25  or know any of them, please let me know and raise your hand.

1  There's several folks from DISH who are going to testify:

2  Amir Ahmed, Michael Mills, Bruce Werner.  Other folks who might

3  testify are Reji Musso, Bahar Tehranchi, who works for SSN,

4  David Hill, Tonya Maslennikov.

5  Did I get that more or less right?

6  Anya Verkhovskaya, Debra Aron, Jim DeFranco, who is also

7  with DISH, Robert Fenili, Joey Montano, also with DISH, Holly

8  McRae, Brian Taylor.  No, wrong name.  Brian Neylon and Blake

9  Van Emst, also with DISH, both of those folks, and John Taylor,

10 who lives in Duluth, Georgia.

11 Any of those names sound familiar to anybody?

12 Now, several of you indicated on your jury questionnaires

13 that you have served on a jury before.  If you have served on a

14 jury, just raise your hand please again so we can -- a few of

15 you there.  All right.  And were any of those juries --

16 criminal for you?  Criminal, criminal, criminal.  Okay.

17 The burden of proof in a criminal case is different.  In a

18 criminal case, the Government has to prove a defendant's guilt

19 beyond a reasonable doubt.  This is a civil case, so the

20 Plaintiff here has a different burden of proof and it's lower.

21 He must prove the case by the greater weight of the evidence.

22 Does that cause anybody any problems who has been on a jury

23 before?  All right.  You still need to be sure, just not beyond

24 a reasonable doubt sure.  Okay.  All right.

25 And if I can ask those jurors.  Mr. Turner, anything about

1  your previous jury service that would affect your ability to be

2  fair in this case?

3         **PROSPECTIVE JUROR NINE:**  I don't feel comfortable, to

4  be honest with you.

5         **THE COURT:**  Say again.

6         **PROSPECTIVE JUROR NINE:**  I don't feel comfortable, to

7  be honest with you.

8         **THE COURT:**  You don't feel confident?

9         **PROSPECTIVE JUROR NINE:**  Comfortable.  I don't at all.

10         **THE COURT:**  Just generally being in the courtroom?

11         **PROSPECTIVE JUROR NINE:**  That too and just I don't

12  feel comfortable with none of this.  I ain't going to lie to

13  you.

14         **THE COURT:**  All right.  Were you on a jury in a

15  criminal case you told me?

16         **PROSPECTIVE JUROR NINE:**  Yeah, it was a while ago,

17  like 18.

18         **THE COURT:**  Eighteen years ago?

19         **PROSPECTIVE JUROR NINE:**  No, I was 18 years old.

20         **THE COURT:**  Oh, you were 18.  I was going to say, man,

21  how old are you?  You don't look that old.  Okay.  All right.

22  You were 18 years old.  All right.

23      And let me see.  Ms. Martin, you were on a criminal jury.

24  Anything about that service that would prevent you from being

25  fair?

1      **PROSPECTIVE JUROR TWELVE:**  No.

2      **THE COURT:**  And, Ms. White, anything about your

3  service that would prevent you from being fair in this case?

4      **PROSPECTIVE JUROR SEVEN:**  No.

5      **THE COURT:**  So, Mr. Turner, do you want to tell me --

6  hold on just one second.  Let me --

7    (Pause in the proceedings.)

8      **THE COURT:**  It looks like you have a traffic matter.

9      **PROSPECTIVE JUROR NINE:**  Yep.

10     **THE COURT:**  Yeah.  Anything about that that makes

11 you -- that's obviously very different from this case.

12     **PROSPECTIVE JUROR NINE:**  Yes.

13     **THE COURT:**  Is there anything about that that makes

14 you think you couldn't be fair?

15     **PROSPECTIVE JUROR NINE:**  Yes, I'm trying to really

16 take care of --

17     **THE COURT:**  I'm sorry.  Say again.

18     **PROSPECTIVE JUROR NINE:**  Yes, ma'am.  I've got that,

19 you know, over my head right now and then this whole courtroom

20 thing.  I just -- this ain't my cup of tea.

21     **THE COURT:**  Okay.  Well, I think it's safe to say

22 everybody would prefer not to be here.

23     **PROSPECTIVE JUROR NINE:**  And then I feel like -- I had

24 a bad encounter with DISH, too.

25     **THE COURT:**  You did.  Oh, I see that now on your

```
 1  questionnaire.  Is that experience something that would make it
 2  difficult for you to be fair to them, to DISH?
 3          PROSPECTIVE JUROR NINE:  Yes.
 4          THE COURT:  Say again.
 5          PROSPECTIVE JUROR NINE:  Yes, ma'am.
 6          THE COURT:  All right.  Mr. Turner, you can step down.
 7      (Excused prospective juror left the jury box.)
 8          THE COURT:  If you would call one more juror, please.
 9          THE CLERK:  To take his spot, Robbie Miller.
10      (Prospective juror entered the jury box.)
11          THE COURT:  Okay.  Ms. Miller, good afternoon.  Do you
12  know any of the lawyers, parties or witnesses or anything about
13  this case?
14          PROSPECTIVE JUROR NINE:  No, ma'am.
15          THE COURT:  Do you -- have you ever worked for DISH or
16  anyone in your family worked for -- somebody who worked for
17  DISH?
18          PROSPECTIVE JUROR NINE:  No, ma'am.
19          THE COURT:  Any problems being fair to individuals,
20  corporations, and class members?
21          PROSPECTIVE JUROR NINE:  No, ma'am.
22          THE COURT:  No problems following the law about all of
23  that?
24          PROSPECTIVE JUROR NINE:  No, ma'am.
25          THE COURT:  Have you ever been on a jury before?
```

1    **PROSPECTIVE JUROR NINE:**  No, ma'am.

2    **THE COURT:**  Okay.  Thank you.

3    All right.  Let me look through some of these

4    questionnaires and talk with folks a little bit about anything

5    that comes -- comes up as a result of that.

6    Many -- let me just speak generally.  I think almost

7    everybody said that they or a family member or someone close to

8    them had worked in sales, not surprisingly since there is a lot

9    of selling that goes on in our economy.  Has anybody had any

10   experience with sales work that gives you any reason to think

11   you couldn't be fair in a case in which we'll be talking about

12   telephone calls which are made in an effort to sell a

13   particular product?  Anybody with any concerns about that?

14   All right.  And many of you, you know, mentioned that you

15   have occasion -- you know, you've gotten sales calls on your

16   home or mobile phone.  Some of you not at all, some of you

17   often.  Does anybody have any feelings about those kinds of

18   telephone calls that would prevent them from being fair in this

19   case or prevent them from following the law? All right.  Thank

20   you.

21   Has anybody ever had any training about the law that

22   applies to telephone sales calls?

23   Ms. Helner, how did that come about?

24   **PROSPECTIVE JUROR EIGHT:**  I taught law at high school

25   for about ten years.  Contract law was one of the things that

 1  we focused most of our time on and so a lot of those contracts

 2  were current cases.  Some of those were these types of cases.

 3       **THE COURT:**  Okay.  And do -- how -- when did you

 4  teach -- I take it you're not teaching that now.  Or are you?

 5       **PROSPECTIVE JUROR EIGHT:**  I am not teaching that now.

 6  My last time that I taught it was two years ago, so pretty

 7  recent.

 8       **THE COURT:**  Was that sort of a civics-type class?

 9       **PROSPECTIVE JUROR EIGHT:**  It was actually business

10  law.

11       **THE COURT:**  And, Ms. Helner, if I should tell you

12  something about the law that relates to these telephone calls

13  that's different from what you understood it to be, would you

14  be able to put aside what you had picked up in your other life

15  and follow my instructions on the law?

16       **PROSPECTIVE JUROR EIGHT:**  It would be hard to because

17  it has been so ingrained since I taught it for over 10 years.

18  I would do my best, but it would be difficult to marry in my

19  head what I know versus what you might tell me.

20       **THE COURT:**  This was a business law class for high

21  school students?

22       **PROSPECTIVE JUROR EIGHT:**  Uh-huh.

23       **THE COURT:**  Do you yourself have legal training?

24       **PROSPECTIVE JUROR EIGHT:**  No.

25       **THE COURT:**  How much time did you spend on the law

1  that applies to the Do Not Call Registry?

2      **PROSPECTIVE JUROR EIGHT:** It usually was embedded

3  within the contracts section of what I taught and I spent

4  probably half of the class on contract law.

5      **THE COURT:** On contract law. Okay. And how -- how

6  was it that you talked about the Do Not Call Registry?

7      **PROSPECTIVE JUROR EIGHT:** I would try to pull current

8  cases and talk about them, so I would pull different things.

9  So every -- every semester would be a different case and those

10  have been several cases that have been in the news, so I tried

11  to pull those kinds of cases.

12      **THE COURT:** All right. Thank you, Ms. Helner.

13    Anybody else with any training about the Do Not Call

14  Registry?

15    Let's see. And, Mr. Lambis, it looks like your

16  brother-in-law might be a lawyer; is that right?

17      **PROSPECTIVE JUROR TWO:** In Ohio.

18      **THE COURT:** In Ohio. Okay. Ever had any

19  conversations with him about the Telephone Consumer Protection

20  Act?

21      **PROSPECTIVE JUROR TWO:** No, ma'am.

22      **THE COURT:** Anything about that family relationship

23  that would make it hard for you to be fair in this case?

24      **PROSPECTIVE JUROR TWO:** No, ma'am.

25      **THE COURT:** And you indicated that you have had some

1  negative experiences with a telemarketer along the way.  Would

2  you be able to put that aside and base your verdict on the

3  evidence?

4          **PROSPECTIVE JUROR TWO:**  Yes.

5          **THE COURT:**  And, Mr. Smith, you have had a DISH --

6  you've been a subscriber to DISH's services in the past; is

7  that right?

8          **PROSPECTIVE JUROR THREE:**  I just put down -- I thought

9  it meant any of them.  I don't know if it was them, so I just

10  said yeah because I'm thinking all of them was included in

11  that.

12          **THE COURT:**  Oh.

13          **PROSPECTIVE JUROR THREE:**  I was with Direct, which my

14  situation was --

15          **THE COURT:**  So your situation was with DirecTV, not

16  DISH.

17          **PROSPECTIVE JUROR THREE:**  Yes.

18          **THE COURT:**  Thank you for clarifying that.  It looks

19  like you maybe had a negative experience with them.

20          **PROSPECTIVE JUROR THREE:**  Yes.

21          **THE COURT:**  You won't hold that against DISH?

22          **PROSPECTIVE JUROR THREE:**  No.

23          **THE COURT:**  Anything about that that's going to

24  prevent you from being fair and impartial in this case?

25          **PROSPECTIVE JUROR THREE:**  No.

1    **THE COURT:**  And did any of those negative experiences
2  have to do with telephone solicitations?
3          **PROSPECTIVE JUROR THREE:**  (Shakes head.)
4      **THE COURT:**  And, let's see, Ms. Smith, it looks like
5  you have had a couple of totally different court matters along
6  the way.  Anything about those court experiences for you and
7  family members that would make it hard for you to be fair in
8  this case?
9          **PROSPECTIVE JUROR FOUR:**  No, ma'am.
10     **THE COURT:**  Thank you.
11     And, Ms. White, it looks like you've had some negative
12 experiences with telemarketers and other -- maybe some cable or
13 satellite TV companies.  Not DISH I take it.
14         **PROSPECTIVE JUROR FIVE:**  Me?  There are two of us.
15     **THE COURT:**  Two.  All right.  This is Lorri.
16         **PROSPECTIVE JUROR FIVE:**  Yes.
17     **THE COURT:**  And is there anything about those negative
18 experiences that's going to prevent you from being fair in this
19 case?
20         **PROSPECTIVE JUROR FIVE:**  I don't think so.
21     **THE COURT:**  You're not going to hold it against DISH
22 that you've had a bad experience with some other cable company?
23         **PROSPECTIVE JUROR FIVE:**  No.
24     **THE COURT:**  And you indicated that -- some personal
25 views about the effectiveness of the Do Not Call Registry.  Is

1 that something that you're going to hold against DISH in this

2 case or that would cause you not to be fair?

3          **PROSPECTIVE JUROR FIVE:**  I don't think so.

4          **THE COURT:**  Let's see.  Mr. Richter, you indicated you

5 have been part of a class action lawsuit before?

6          **PROSPECTIVE JUROR SIX:**  Well, just in the sense of

7 being one of the class --

8          **THE COURT:**  Okay.  All right.

9          **PROSPECTIVE JUROR SIX:**  -- and getting some award

10 based on that.  Not intimately, just as one of many.

11          **THE COURT:**  All right.  So you've gotten some mailings

12 about it?

13          **PROSPECTIVE JUROR SIX:**  Yes.

14          **THE COURT:**  And you recall making some recovery either

15 of money or benefits?

16          **PROSPECTIVE JUROR SIX:**  Yes, absolutely.

17          **THE COURT:**  Is there anything about that, Mr. Richter,

18 that's going to prevent you from being fair in this case?

19          **PROSPECTIVE JUROR SIX:**  No.

20          **THE COURT:**  Is it going to cause you to be more

21 favorable to the Plaintiff in this case?

22          **PROSPECTIVE JUROR SIX:**  No.

23          **THE COURT:**  You indicated some negative experiences

24 with a company, not DISH, that's provided cable or satellite TV

25 services in the past.

1    **PROSPECTIVE JUROR SIX:**  Just, you know -- just the

2  general getting things hooked up or it not working well or, you

3  know, just maintenance items.

4    **THE COURT:**  So nothing of a nature that would prevent

5  you from being fair in this case?

6    **PROSPECTIVE JUROR SIX:**  No.

7    **THE COURT:**  Thank you.  You also said some negative

8  experiences with telemarketers.  Anything about that that's

9  going to prevent you from being fair to DISH or to the

10 Plaintiff?

11   **PROSPECTIVE JUROR SIX:**  No.

12   **THE COURT:**  And, Mr. Richter, you had a civil matter

13 completely unrelated to anything like this.

14   **PROSPECTIVE JUROR SIX:**  Yes.

15   **THE COURT:**  Anything about that court experience

16 that's going to prevent you from being fair in this case?

17   **PROSPECTIVE JUROR SIX:**  No.

18   **THE COURT:**  No.  I usually don't ask about family law

19 matters because it's kind of like traffic tickets.  Everybody

20 has had some experience there.  Anything about that that's

21 going to prevent you from being fair?

22   **PROSPECTIVE JUROR SIX:**  No.

23   **THE COURT:**  Thank you.

24     And now turning to the other Ms. White.  Your spouse is a

25 retired attorney?

1    **PROSPECTIVE JUROR SEVEN:**  Yes.

2    **THE COURT:**  Have you ever had any conversations with

3  him about the Telephone Consumer Protection Act or the Do Not

4  Call Registry?

5    **PROSPECTIVE JUROR SEVEN:**  No.

6    **THE COURT:**  Anything about his work that would prevent

7  you from following the law in this case?

8    **PROSPECTIVE JUROR SEVEN:**  No.

9    **THE COURT:**  And you, like most -- many folks, have had

10  some negative experiences with companies providing cable or

11  satellite TV services and with telemarketers.  I take it that

12  was not with DISH.

13    **PROSPECTIVE JUROR SEVEN:**  No, it wasn't with DISH.

14    **THE COURT:**  Anything about those negative experiences

15  that's going to prevent you from being fair or cause you to be

16  harder on DISH or not be fair to them in any way?

17    **PROSPECTIVE JUROR SEVEN:**  No, ma'am.

18    **THE COURT:**  Thank you.

19    (Pause in the proceedings.)

20    **THE COURT:**  Let's see.  Ms. Helner, you mentioned some

21  health concerns.

22    **PROSPECTIVE JUROR EIGHT:**  Yes, ma'am.

23    **THE COURT:**  How are you doing?

24    **PROSPECTIVE JUROR EIGHT:**  (Gesturing.)

25    **THE COURT:**  If you were selected to serve on the jury,

| | |
|---|---|
| 1 | we could probably move you to a place where you weren't up |
| 2 | there in the corner.  Would that help?  Maybe? |
| 3 | **PROSPECTIVE JUROR EIGHT:**  Maybe. |
| 4 | **THE COURT:**  And would you be able, if your health |
| 5 | issues did flare up, to let me know that so we could take a |
| 6 | break and you could -- |
| 7 | **PROSPECTIVE JUROR EIGHT:**  I believe I would. |
| 8 | **THE COURT:**  All right.  And is that a problem that you |
| 9 | experience on a daily basis in a way that interferes with your |
| 10 | ability to -- |
| 11 | **PROSPECTIVE JUROR EIGHT:**  Absolutely. |
| 12 | **THE COURT:**  All right.  Thank you, Ms. Helner. |
| 13 | (Pause in the proceedings.) |
| 14 | **THE COURT:**  Ms. Cloninger, you indicated you have |
| 15 | had -- you've been a DISH customer in the past; is that right? |
| 16 | **PROSPECTIVE JUROR ELEVEN:**  (Nods head.) |
| 17 | **THE COURT:**  How long ago was that? |
| 18 | **PROSPECTIVE JUROR ELEVEN:**  Probably 30 years. |
| 19 | **THE COURT:**  So a long time.  Okay.  Anything about |
| 20 | that experience that's going to affect you at all in this case? |
| 21 | **PROSPECTIVE JUROR ELEVEN:**  No, ma'am. |
| 22 | **THE COURT:**  You're going to be able to treat DISH just |
| 23 | like any other company or business or individual? |
| 24 | **PROSPECTIVE JUROR ELEVEN:**  (Nods head.) |
| 25 | **THE COURT:**  Thank you. |

1    (Pause in the proceedings.)

2         **THE COURT:**  And, Ms. Martin, you also are on the Do

3    Not Call Registry and have some thoughts about that.  Are your

4    personal views about the effectiveness of that such that it

5    would give you any problems in being fair in this case?

6         **PROSPECTIVE JUROR TWELVE:**  No.

7         **THE COURT:**  So you understand the question is not

8    whether it's a good law or a law that works, but whether

9    there's been a violation, whether the Plaintiff has proven that

10   by the greater weight of the evidence and whether DISH is

11   responsible for that.

12        **PROSPECTIVE JUROR TWELVE:**  Right.

13        **THE COURT:**  Can you hold the Plaintiff to that burden

14   of proof?

15        **PROSPECTIVE JUROR TWELVE:**  I think so.

16        **THE COURT:**  Thank you, Ms. Martin.

17    And, Mr. Jackson, you've had some negative experiences with

18   other cable and satellite TV services and telemarketers.

19   Anything about that that's going to prevent you from being fair

20   to DISH in this case?

21        **PROSPECTIVE JUROR THIRTEEN:**  I don't think it would

22   prevent me from being fair and weighing the evidence.  I do

23   have some very strong opinions about telemarketers in general.

24        **THE COURT:**  And so, you know, that's -- lots of people

25   have personal views; and if we kicked everybody off with strong

1  personal views, I won't have any jurors then either.

2      So -- but I do want to be sure that those personal views

3  are not going to interfere with your ability to be fair to DISH

4  or to the Plaintiff in this case.  You're not going to say,

5  "Oh, I don't like telemarketing calls.  Therefore, the

6  Plaintiff wins.  I don't care what the evidence is," for

7  example.  I need to be sure you're not going to do that.

8      Do you think you can hold the Plaintiff to the burden of

9  proof in this case?

10             **PROSPECTIVE JUROR THIRTEEN:**  Yes, ma'am.

11             **THE COURT:**  And can you be fair to DISH and listen to

12  their evidence with an open mind?

13             **PROSPECTIVE JUROR THIRTEEN:**  I think so, yes, ma'am.

14             **THE COURT:**  It looks like you are a DISH subscriber

15  now and have not had negative experiences.

16             **PROSPECTIVE JUROR THIRTEEN:**  Correct.

17             **THE COURT:**  Is that going to cause you to be un -- to

18  be biased in favor of DISH?

19             **PROSPECTIVE JUROR THIRTEEN:**  No.

20             **THE COURT:**  All right.  Thank you, Mr. Jackson.

21      (Pause in the proceedings.)

22             **THE COURT:**  And, Mr. Cornwell, you're the one I have a

23  little trouble seeing back there.

24             **PROSPECTIVE JUROR FOURTEEN:**  Yes.

25             **THE COURT:**  Good afternoon.  It looks like you've --

1  you and your wife both work for the telephone company; is that

2  right?

3          **PROSPECTIVE JUROR FOURTEEN:**  That's correct.

4          **THE COURT:**  Okay.  And have you had any negative

5  experiences with a company that provides cable or satellite TV

6  services?

7          **PROSPECTIVE JUROR FOURTEEN:**  No, I haven't.

8          **THE COURT:**  And you indicated you have had some

9  negative experiences with telemarketers.  Is there anything

10 about that that's going to prevent you from being fair in this

11 case?

12         **PROSPECTIVE JUROR FOURTEEN:**  Nothing at all.

13         **THE COURT:**  And anything about your views on the

14 effectiveness or lack of effectiveness of the Do Not Call

15 Registry that's going to cause you to be biased or not fair in

16 this case?

17         **PROSPECTIVE JUROR FOURTEEN:**  No.

18         **THE COURT:**  All right.  If I can speak to counsel at

19 the corner here just briefly.

20     (The following bench conference was recorded.)

21         **THE COURT:**  As to Ms. Helner, who is the juror -- so

22 she -- I think given her health issues and her answers to the

23 questions, I'd be inclined to let her go for cause.

24         **MR. GLASSER:**  No objection.

25         **MR. BICKS:**  The thing when I was listening, Judge, is

 1 │ that she -- she's currently working and she's teaching in front
 2 │ of people.
 3 │         **THE COURT:**  Absolutely.
 4 │         **MR. BICKS:**  Sometimes you hear people saying things
 5 │ because they're --
 6 │         **THE COURT:**  She's actually not teaching.  She's in
 7 │ school administration now on her chart.
 8 │         **MR. BICKS:**  She's actively out there.
 9 │         **THE COURT:**  Absolutely.
10 │         **MR. BICKS:**  So, you know, that's my concern.
11 │         **THE COURT:**  Yeah.  Well, I'm -- you know, I sort of
12 │ take her at her word and she's expressed concern about her
13 │ ability to follow the law.  I don't require much, but I do
14 │ require that.  That was really my concern about her.  With her
15 │ health -- I tend to agree with you that the health alone would
16 │ not be enough.
17 │         **MR. BICKS:**  When you were saying "follow the law," I
18 │ didn't quite -- her experience of teaching some classes in high
19 │ school --
20 │         **THE COURT:**  You know, I agree with you.  It shouldn't
21 │ prevent her from following the law, but she said it might.
22 │ That's really all I can go with, so I think I'm going to let
23 │ her go.
24 │         **MR. GLASSER:**  No objection.
25 │     (Conclusion of the bench conference.)

1        **THE COURT:**  All right.  Ms. Helner, if you can get out

2    of there, I'm going to let you step down and have a seat in the

3    back of the courtroom.

4        (Excused prospective juror left the jury box.)

5        **THE COURT:**  And would you call one more juror.

6        **THE CLERK:**  Nancy Burgess.

7        (Prospective juror entered the jury box.)

8        **THE COURT:**  As soon as we get Ms. Burgess caught up,

9    we're going to take our lunch break, just so you all know where

10   we all are.

11      Okay.  Ms. Burgess, good afternoon.  Do you know any of the

12   lawyers, parties or witnesses in this case?

13        **PROSPECTIVE JUROR EIGHT:**  No.

14        **THE COURT:**  Have you or anyone in your close family

15   ever worked for DISH or a business that did work for DISH?

16        **PROSPECTIVE JUROR EIGHT:**  No.

17        **THE COURT:**  Do you have any feelings or views that

18   would prevent you from being fair to individuals and

19   corporations and class members?

20        **PROSPECTIVE JUROR EIGHT:**  No.

21        **THE COURT:**  Have you ever been -- you've never been on

22   a jury before, right?

23        **PROSPECTIVE JUROR EIGHT:**  No.

24        **THE COURT:**  And you've got a landline that you use for

25   a security service; is that right?

1         **PROSPECTIVE JUROR EIGHT:**  That's right, yeah.

2         **THE COURT:**  Okay.  And have I asked any questions of

3  anyone that have given you any concern or anything you need to

4  bring to my attention?

5         **PROSPECTIVE JUROR EIGHT:**  No.

6         **THE COURT:**  All right.  And you've not had bad

7  experiences with telemarketers or sales?

8         **PROSPECTIVE JUROR EIGHT:**  No.

9         **THE COURT:**  Okay.  Anything about the nature of this

10  case that would prevent you from being fair?

11         **PROSPECTIVE JUROR EIGHT:**  No.

12         **THE COURT:**  Thank you.

13    Okay.  Before -- we're not done, but we're close -- we're

14  close to being done, but I -- it's almost one o'clock and I

15  would like to give you all a little bit of a lunch break.  So

16  what I'm going to ask you to do is to be back -- do they need

17  to come back to the courtroom?  Just a second.  Let me ask a

18  logistical question of the clerk.

19    (Discussion between the Court and Ms. Saunders.)

20         **THE COURT:**  Okay.  There -- I'm not exactly sure

21  exactly what's going on, but on your way out of the courthouse,

22  I do need you to stop by Courtroom 2 where you all were checked

23  in this morning and just stop by in there.  They have something

24  they need to tell you about the logistics or housekeeping of

25  your jury service unrelated to this case, and then you can go

 1  on and get some lunch.  There's several places pretty close by

 2  and I think the snow has started melting, so you should be able

 3  to get there safely.  And I will ask you to be back at 1:15.

 4  All right.  2:15.  I'm so sorry.  2:15.  My goodness.  You all

 5  were going to be eating nabs in the break room downstairs.

 6  Yeah, 2:15.

 7      When you come back, I'll ask you to just gather out in the

 8  hallway right out here outside this courtroom here on the third

 9  floor; and when everybody is there, they'll bring you back in.

10  You all will sit in your same exact seat, so please notice

11  where you're sitting so you can get in your same exact seat.

12      And then for those of you on the panel, you'll just sit

13  back in that same general area.

14      Now, over the lunch recess, please do not talk about the

15  case among yourselves or about anyone else.  Now, that's really

16  kind of hard.  Here you are.  You've been sitting in here for

17  over an hour and you probably would like to talk about this

18  case because you've been, you know, having this sort of unusual

19  experience.  But don't do it.

20      Please do not talk with anyone else about the case either.

21  So if you see any of these lawyers or parties around the

22  courthouse, on the elevators or anything like that, don't speak

23  to them.  They won't speak to you.  They're not being rude.

24  There's just not supposed to be any contact between the lawyers

25  and parties and the jurors while the trial is going on.

1      And the reason that I ask you not to talk about the case is
2  because, you know, it's just human nature to express opinions
3  and you haven't heard any evidence.  You don't know anything
4  about the law.  So we just want you not to talk about the case
5  so that you don't express any opinions and start -- start
6  thinking about things before you know -- know what the evidence
7  is.  So that's one of the reasons that I ask you not to do
8  that.

9      So during the lunch break, you're certainly free to talk to
10  each other about anything else other than this case and you can
11  go to lunch with each other in small groups, that kind of
12  thing.  Please feel free.

13      So I'm going to excuse you.  Please stop by Courtroom 2 on
14  your way out of the courthouse and then come back to this space
15  right outside Courtroom 3 around 2:15 and we'll -- yeah, 2:15
16  and we'll start back at 2:15.  The jurors are excused.

17      If everyone else will remain seated while they step out.

18      (Prospective jurors left the courtroom at 12:55 p.m.)

19      **THE COURT:**  Okay.  So I believe I have asked the
20  individual questions that I was intending to ask.  I will -- I
21  do intend to still ask them if they know any other jurors,
22  about the length of trial, if that's going to cause any
23  problems, and then some general follow -- general fair and
24  impartial questions.

25      But if I missed anything as to any particular juror that

1   you want me to follow up on from the questionnaires, you're

2   going to need to let me know when we come back.  So I would say

3   that we'll come back at 10 minutes after 2:00 just so we've got

4   a couple of minutes for any specific question that you wanted

5   me to follow up on with a specific juror.

6       All right.  Anything else about jury selection before we

7   turn to the one exhibit that there was still some dispute

8   about?

9           **MR. GLASSER:**  Not from the Plaintiff, Your Honor.

10          **MR. BICKS:**  Just in terms of the afternoon, Your

11  Honor, and how you anticipate the schedule, do you think we'll

12  get to openings?

13          **THE COURT:**  Well, as I recall, you all told me, what,

14  about an hour each on your openings?  Is that what you said?

15          **MR. BICKS:**  Mine is probably a little under an hour,

16  but fairly close.

17          **MR. GLASSER:**  I'm shorter, Your Honor.  I'm probably

18  under 40 minutes.

19          **THE COURT:**  Okay.  Good.  I'm hoping we'll get the

20  opening statements made today, especially since we're a little

21  behind because of the weather.  You know, I'm almost done with

22  the jury selection and so I'll -- you all should be thinking --

23  I suppose we might lose one or two when I tell them how long

24  the trial is going to take, but I'm optimistic that we won't.

25  So, you know, you just need to be prepared to exercise your

challenges.  I do have to -- I don't want to stay late since
the weather -- it is starting to melt out there and it's not
supposed to freeze again, but still I would like to let them
get on their way.

      **MR. GLASSER:**  Remind me, Your Honor, what time is that
you get them on their way?

      **THE COURT:**  Usually by 5:00.  You know, we would stop
at 5:00.  So I would hope we would be able to get your opening
statements done today.

      **MR. BICKS:**  The DISH witnesses, Your Honor, they're in
town, and they would like to come and be here for the openings.
I want to make sure that was all right with you.

      **THE COURT:**  Yeah, that's fine.

      **MR. GLASSER:**  I kind of object to that.  I would like
to move to sequester the witnesses.  I think that is just a
road map to unsequestering basically.

      **THE COURT:**  Well, I mean, if you --

      **MR. BICKS:**  It's an opening statement, Your Honor.
It's not hearing witness testimony and I'm just saying they're
in town.  They're the ones who --

      **THE COURT:**  If you have DISH witnesses who are here,
I'll let them be present for the opening statements.

    That's a motion to sequester during testimony?

      **MR. GLASSER:**  Yes.

      **THE COURT:**  I'll allow that.

1    Obviously, your corporate witness can stay.  He's not a

2  witness, right?

3          **MR. BICKS:**  Right.

4          **THE COURT:**  But they can be here for the opening

5  statement.

6          **MR. BICKS:**  Thank you.

7          **THE COURT:**  The exhibit?

8          **MR. GLASSER:**  Yes, ma'am.  So I'm approaching with a

9  redacted Exhibit 55.  We provided a copy to defense counsel and

10  a proposed limiting instruction, which we've also provided to

11  defense counsel.

12      (Document handed to the Court by Mr. Glasser.)

13          **MR. EWALD:**  Which redacted version?

14          **MR. GLASSER:**  I didn't bring another copy with me.

15      As I understand it, Your Honor, the following matters are

16  in dispute.  So it's the Plaintiff's position that

17  paragraph 1.1 ought to be in there.

18          **THE COURT:**  I'm sorry.  Start again.

19          **MR. GLASSER:**  So paragraph 1.1 actually says who the

20  deal is between, it's the parties, and we propose that

21  paragraph 1.1 be in the exhibit that goes to the jury.

22  Defendants have a different position on that.

23      And I think the only other matter in dispute in here is --

24  this is our proposal, so we'll need to pull the actual 7 --

25  Exhibit 55.  In the Exhibit 55, there's also a paragraph 7.2, I

1  think.

2          **THE COURT:** Say again.

3          **MR. GLASSER:** Hold on. I'll find the exact paragraph,

4  Your Honor.

5      (Pause in the proceedings.)

6          **MR. GLASSER:** Yeah, in our proposal, Your Honor,

7  paragraph 7.2 in Exhibit 55 is redacted and I can express the

8  reasoning behind our proposal and then maybe the Defendants can

9  talk to why they think it ought to be in there. I think that's

10  our only item in dispute.

11          **MR. EWALD:** There's also -- I'll let the Court get the

12  exhibit first.

13          **THE COURT:** Say again.

14          **MR. EWALD:** I'll let the Court get the exhibit first.

15  We have another area of dispute.

16          **MR. GLASSER:** Remind me --

17          **THE COURT:** Hold on. Stop. Stop.

18      (Pause in the proceedings.)

19          **THE COURT:** Sorry. It took me a minute to find the --

20          **MR. GLASSER:** So it's Exhibit 55 at page 29, Your

21  Honor.

22          **THE COURT:** Okay. So the disputes are whether the --

23  whether paragraph 1.1 and 7.2 --

24          **MR. GLASSER:** So the dispute at 1.1 is we would like

25  it in and they would like it out. It follows from the dispute

1 of 1.1 that they would also like all the signatures, but it's
2 kind of the same dispute.

3     And then the dispute at page 29 with respect to Section 7.2
4 is that we think it ought to be out and be covered by a
5 limiting instruction, which we have proposed, because there's
6 parts of 7.2 that I think would be confusing to the jury and I
7 can get into that.

8     Specifically, the part -- we put in the limiting
9 instruction the part about it not being an admission for any
10 fact or violation of any law or regulation, but the reason we
11 don't think it ought to say that it's not evidence is -- it
12 isn't evidence of liable for a wrongdoing at the time it was
13 entered definitely and it's not evidence of liability for
14 wrongdoing in this case, but it is circumstantial evidence of
15 power and control.  It is evidence in this case and I'm
16 concerned that the jury will overinterpret this and say, well,
17 it can't even be evidence.  And obviously, because the Court is
18 allowing us to get into the sections in 4, it is evidentiary in
19 this case, just not precisely how this is disclaimed.  So I
20 thought a limiting instruction was a more logical way to handle
21 its treatment by the jury than this broad statement in 7.2.
22 That's the essential reason for the redaction.

23          **THE COURT:**  All right.  What does the Defendant say?

24          **MR. EWALD:**  Well, on the first point, Your Honor, it's
25 Defendant's position that should be referred to as certain

1  state Attorneys General.  There's no reason -- the Court can

2  instruct the jury about that.  There's no reason they need to

3  know the 46 different states sued.

4     Your Honor noted in the MIL ruling relating to the *U.S. v.*

5  *DISH* case that it would be unfairly prejudicial to say that

6  DISH has been sued by the federal government in another federal

7  court and the court agrees, and that same prejudice I think is

8  evident here.  We're trying to minimize that by these being

9  vague as to who has sued or who has entered the agreement with

10 DISH.

11          **THE COURT:**  Okay.  And what about 7.2?

12          **MR. EWALD:**  7.2, Your Honor, we think it's important

13 to include this even if there is a limiting instruction that

14 the parties agreed to these points at the time the agreement

15 was entered into.  It's also I think important to limiting the

16 prejudice to DISH.  On Friday when counsel for Plaintiff got up

17 and argued for the admission of this document, they argued and

18 contended that it did not relate to liability, fault or

19 wrongdoing, and now it seems to me that they are backing away

20 from that.  So we think it's appropriate to be included in

21 here.

22     I would also note there's one other area of disagreement

23 that was not raised by Mr. Glasser and that shows up on

24 page 22, Section 4.67 and 4.68.

25          **MR. GLASSER:**  Okay.  So shall I address why we want it

1    in and then he can address why he wants it out?

2         **THE COURT:** Okay. You all are not speaking up.

3         **MR. GLASSER:** Shall I address why we think it ought to

4    be in and then he address why it ought to be out or do you want

5    to hear the opposite?

6         **THE COURT:** Let me look at them first. 4.67 and 4.68;

7    is that right?

8         **MR. EWALD:** Yes, Your Honor.

9         **THE COURT:** And the Defendant says those should be

10   out?

11        **MR. EWALD:** Yes, Your Honor.

12        **THE COURT:** Okay. Well, I can make the Plaintiff's

13   argument for them, so let me hear from the Defendant.

14        **MR. EWALD:** Well, it can be confusing, Your Honor, I

15   think, if you're not familiar with the definitions in the

16   agreement.

17       This agreement covers three different situations: Calls

18   made directly by DISH Network, calls made by what is called in

19   this agreement an authorized telemarketer. And that is a

20   situation where a vendor is acting on DISH's behalf as an

21   agent. And then a third situation, the one that is relevant

22   here, that is referred to as a covered telemarketer or

23   third-party retailer; and the "covered telemarketer" definition

24   specifically includes OE retailers.

25       Now, if you look in particular at 4.68, that is referring

1  explicitly to direct calls made by DISH Network and
2  requirements for DISH to make telemarketing calls.  Now, the
3  rest of that section as it goes on to pages 23 and 24, covers
4  other situations; and the part that is left unredacted covers
5  the covered telemarketer, i.e., OE retailer, situation at issue
6  here.

7       I believe Plaintiff has argued that 4.73, which shows up at
8  the top of page 23, incorporates everything by reference, but I
9  just can't understand how this specific requirement that DISH,
10  for example, purchase National Do Not Call databases before it
11  directly calls consumers is at all relevant to the retailer
12  situation in this case.

13           **THE COURT:**  All right.  What does the Plaintiff say?

14           **MR. GLASSER:**  So 4.67 says DISH shall comply with all
15  the laws and then 4.73 makes it applicable to the covered
16  marketers.  So without 4.67, 4.73 doesn't make much sense.
17  What is it that's being applied?  There's not a repeat of the
18  general obligation to comply with the law.  So it makes sense
19  the way we've done it because that's -- the 4.73 makes DISH's
20  obligation also applicable through the business rules to the
21  covered marketers.  That's it.

22           **MR. EWALD:**  Your Honor, if I might respond briefly.  I
23  didn't hear any reason why 4.68 should be included in that.

24           **MR. GLASSER:**  The exact same reason, Your Honor.

25           **THE COURT:**  Okay.  Well, one of the problems with

redacting 1.1 is if you take it out completely then you don't
even know what the document is.  If you redact the names of all
the states, then -- I mean, it hardly -- it hardly serves the
purpose because it would be so many lines.  You know, it seems
like it wouldn't really meet the need.  I appreciate the
Defendant's argument.

    I think the best thing to do is we'll leave 1.1 in, but
there's really no reason for all these signature pages to go
back to the jury.  That doesn't seem necessary to me at all.
As to 7.2, that can stay in; and as to 4.67 and 4.68, that can
stay in.

         **MR. GLASSER:**  We'll fix it at lunch, Your Honor, and
distribute revised redactions.

         **THE COURT:**  All right.

         **MR. EWALD:**  Your Honor, just for the record -- I know
we obviously objected on Friday to the admission of any part of
this document into the record.  I would just note again that we
are not withdrawing that objection.  We object to the
document's submission.

         **THE COURT:**  That's fine.  And when they come to offer
it if you want to say, "Objection for the reasons previously
stated," I am never offended by you protecting your record.

         **MR. EWALD:**  Thank you, Your Honor.

         **THE COURT:**  Now, what -- is this limiting instruction
agreeable to the Defendant?

1      **MR. EWALD:** Your Honor, the limiting instruction, we

2 have two areas of disagreement that were directly tied to the

3 rulings Your Honor just made, one about referencing the

4 specific number of states at issue and the other -- I believe

5 the version in front of you --

6      (Discussion between counsel.)

7      **MR. EWALD:** The only issue, Your Honor, I believe

8 that's remaining is do you see in the third paragraph "the

9 Assurance does not constitute admission by DISH for any purpose

10 of any fact of any violation of any law, rule or regulation"?

11 We would add to that sentence a comma and say "nor does the

12 Assurance constitute evidence of any liability, fault or

13 wrongdoing," which tracks the language of 7.2.

14      **THE COURT:** Okay. So wouldn't it be better to just

15 tell the jury this is being offered by the Plaintiff on the

16 question of whether DISH has control over SSN and they are to

17 consider it only for that purpose and not to consider it for

18 any other purpose? I mean --

19      **MR. GLASSER:** That would be fine with us, Your Honor.

20      **THE COURT:** I mean, I don't mind giving some of the

21 rest of this, but if I'm going to tell them all of the things

22 they shouldn't consider it for, it seems like I should tell

23 them what they can consider it for.

24     Also, in telling them that it's redacted, you -- you know,

25 we're not hiding anything from them. The parts that we're

1  redacting have nothing to do with the case and it seems like --

2  I don't think the jurors want to read this 55-page document,

3  but if I just tell them that we've taken out all the parts that

4  don't have anything to do with this case, you know, that

5  usually makes them understand a little bit better.

6      So, I mean, I'm not -- but why don't you all talk about

7  this one a little bit further --

8          **MR. GLASSER:**  Yes.

9          **THE COURT:**  -- with that guidance from me.  I don't

10  mind giving them a limiting instruction, but I like to tell

11  them why they can consider it and limit it to that and also

12  tell them why it's redacted, just, you know, include them in it

13  so they understand.

14      All right.  What else before we take our lunch break?

15          **MR. EWALD:**  Your Honor, there are three minor issues

16  we wanted to raise with the preliminary instruction.  We can do

17  that at some point later today if you like, I don't want to

18  keep everybody from lunch, or we could address it now.

19          **THE COURT:**  What are -- well, I mean, we may not have

20  an opportunity.  I'm going to give them the preliminary

21  instructions as soon as they're impaneled, so what -- if it's

22  something you've already said, you don't need to repeat it.

23          **MR. EWALD:**  Understood.  And in the same vein of my

24  earlier point, we would like to preserve our objection for the

25  doc we filed, Document No. 253, our response objections to the

1  Court's original draft.  To the extent this draft deviates from

2  those objections, we maintain them here.

3          **THE COURT:**  Okay.  Well, certainly, you know, if I

4  misspeak during my preliminary instructions, you need to bring

5  that to my attention; but if I have already overruled your

6  objection, you know, you don't need to tell me that again.

7          **MR. EWALD:**  Understood.  So there are three issues and

8  one of these may have already been addressed.  We were editing

9  while in court and we noticed over the weekend that I'm not

10 sure the version --

11         **THE COURT:**  I have a new version.  Just tell me where

12 it is.

13         **MR. EWALD:**  The paragraph that states "an agent is a

14 person."

15         **THE COURT:**  Hold on.

16     (Pause in the proceedings.)

17         **MR. EWALD:**  The second page.

18         **THE COURT:**  Okay.  "An agent is a person."

19         **MR. EWALD:**  And then the next paragraph, the last

20 version we saw started with "in these situations."

21         **THE COURT:**  Yes.

22         **MR. EWALD:**  And because we modified the preceding

23 sentence in the previous paragraph, it didn't make as much

24 sense now.  We are now referring to independent contractor and

25 so I think if that language is still the same it should be

1 modified to be "in an agency relationship, a person granting

2 the authority."

3      **THE COURT:** Okay.

4      **MR. EWALD:** And then the second of the three, the next

5 paragraph refers to a principal not being bound by the act of

6 an agent unless that act falls within the scope of actual

7 authority granted by the principal to the agent. And so if you

8 can skip ahead two paragraphs, which begins "if you find SSN

9 was DISH's agent," we believe there should be a comma there

10 and, to be consistent with the preliminary instruction overall,

11 add "in that SSN acted within the scope of actual authority

12 granted by" --

13      **THE COURT:** Okay. I already ruled I was not going to

14 give complete and total instructions on every single time this

15 issue came up, so, you know, this is a summary.

16      **MR. EWALD:** Understood, Your Honor.

17      The last point is actually we made a suggestion in the

18 paragraph -- a couple paragraphs down that starts "Dr. Krakauer

19 and the class will be offering evidence from a witness."

20      **THE COURT:** Yes.

21      **MR. EWALD:** And four lines down we had suggested

22 inserting "and will offer its own witness to support that

23 position."

24      **THE COURT:** Yes, I added that.

25      **MR. EWALD:** We would like to withdraw that.

```
 1          THE COURT:  Okay.  I'll take that out.

 2          MR. EWALD:  Thank you, Your Honor.

 3          THE COURT:  Anything else?

 4          MR. EWALD:  (Shakes head.)

 5          THE COURT:  All right.

 6          MR. GLASSER:  Just for the record, so I'm right about

 7   the redaction, I'm leaving 1.1, I'm putting in 7.2, and I'm

 8   taking out all the signatures.

 9          THE COURT:  Right.

10          MR. GLASSER:  Okay.  All right.  No other matters for

11   the Plaintiff, Your Honor.

12          THE COURT:  Okay.  So I will see you all back here

13   briefly at 10 minutes after 2:00.  In the event you have any

14   individual questions you want me to follow up on with a

15   particular juror, you can let me know then.  Then the jurors

16   will be back hopefully 2:15 or soon thereafter.  So we will be

17   in recess until 10 after 2:00.

18       (A noon recess was taken from 1:20 p.m. until 2:10 p.m.;

19   all parties present.)

20          THE COURT:  All right.  For some reason, one of the

21   deputy clerks downstairs had the jurors come back to Courtroom

22   2, so Ms. Sanders is going to go get them.

23       While she does that -- you can go ahead and go get them --

24   are there individual questions anyone wanted me to ask a

25   particular juror?  For the Plaintiff?
```

1      **MR. GLASSER:**  No, ma'am.

2          **THE COURT:**  No.  For the Defendant?

3          **MR. BICKS:**  Yeah, we had a few questions, Your Honor,

4  if I could walk through it.

5          **THE COURT:**  All right.

6          **MR. BICKS:**  So starting with Tellie Smith, I think it

7  was juror 5, I think seat 3.

8          **THE COURT:**  Just a second.

9      (Pause in the proceedings.)

10         **THE COURT:**  I'm out of order here just -- okay.  Yes.

11         **MR. BICKS:**  And just the question on the

12  questionnaire, 17, you know, 17A, the call -- the telemarketing

13  calls really bothered him a great deal.  If the Court could

14  just say is that going to in any way -- have thoughts about

15  that.

16         **THE COURT:**  Okay.  I think I asked, didn't I?

17         **MR. GLASSER:**  Yes, ma'am, that's been covered.

18         **MR. BICKS:**  It was kind of a general question, Your

19  Honor, not tied to the questionnaire.

20         **THE COURT:**  Right.

21         **MR. BICKS:**  And on juror number 12, seat 5, Ms. White

22  --

23         **THE COURT:**  Juror number --

24         **MR. BICKS:**  I have seat 5.  I have juror 12 on the

25  questionnaire, but seat 5, Ms. White, Lorri White, if the Court

  1  wouldn't mind -- just the Question 12 there's a -- is she close

  2  to whoever sued anyone and she says "yes"; and she also had --

  3  the answer to the Question 17A, you know, the calls bothered

  4  her a great deal.  If -- just a general question from the Court

  5  on that we would ask for.

  6         **THE COURT:**  Okay.  Let's see.  What else?

  7         **MR. BICKS:**  And then juror 28 --

  8         **THE COURT:**  If you could tell me what seat.

  9         **MR. BICKS:**  It's seat 12, Mr. Jackson.

 10         **THE COURT:**  Seat 12 is Ms. Martin.

 11         **MR. BICKS:**  I have one over then.  I guess 13.  Again,

 12  if we could just ask him --

 13         **THE COURT:**  Just a second.  That's all right.  Step up

 14  to the corner, please, while the jurors are coming in.

 15     (Prospective jurors entered the courtroom.)

 16     (The following bench conference was recorded.)

 17         **THE COURT:**  Just whisper because we don't have someone

 18  turning on the white noise.

 19         **MR. BICKS:**  (Inaudible.)

 20         **COURT REPORTER:**  Judge, I can't even hear.  I can turn

 21  on the white noise.

 22     (White noise turned on by the court reporter.)

 23         **MR. BICKS:**  Mr. Jackson, again just 17A.  He just says

 24  again he's bothered by these calls a great deal.  If we can

 25  just ask him.

1          **THE COURT:**  Okay.

2          **MR. BICKS:**  This Mr. Cornwell, he's seat 14.  He

3    works, Your Honor, for AT&T and AT&T owns DISH's biggest

4    competitor, DirecTV.  If we could just ask him, "You work for

5    AT&T.  Do you know anything about" -- you know, they own

6    DirecTV and it's our client's biggest competitor.  We want

7    something in the record.

8          **THE COURT:**  All right.  Well, I'll ask a general

9    question of those three jurors who indicated it bothered them a

10   great deal and I don't mind touching on the other matters.

11         **MR. BICKS:**  Is there any way, Judge, Ms. White, who is

12   juror 14, you asked her if her husband was an attorney and the

13   only question we were missing is if there's a way -- you know,

14   is he -- did he handle one particular -- in other words, if

15   he's a class action plaintiff's lawyer.

16         **THE COURT:**  Well, he's retired, but I'll ask it.

17         **MR. BICKS:**  Just if he was.

18         **THE COURT:**  Okay.  Thank you.

19       (Conclusion of the bench conference.)

20         **THE COURT:**  All right.  I hope everybody got something

21   to eat and you didn't have to eat too terribly fast.

22       Just a few more questions here during the jury selection

23   process.  Let's see.

24       Ms. White, I neglected to ask you -- when I was looking at

25   your questionnaire, you indicate that you had been involved in

 1  a lawsuit.  This would be Ms. Lorri White.

 2           **PROSPECTIVE JUROR FIVE:**  Yes.

 3           **THE COURT:**  What kind of lawsuit was that?

 4           **PROSPECTIVE JUROR FIVE:**  From a car accident.

 5           **THE COURT:**  Okay.  Personal injury?

 6           **PROSPECTIVE JUROR FIVE:**  Personal injury, yes.

 7           **THE COURT:**  Anything about -- did that go to trial?

 8           **PROSPECTIVE JUROR FIVE:**  No, it did not.  It settled.

 9           **THE COURT:**  Anything about that that would affect your

10  ability to be fair in this case?

11           **PROSPECTIVE JUROR FIVE:**  No.

12           **THE COURT:**  And a few of you, I think it was, let's

13  see, Ms. White -- Lorri White and Mr. Smith and Mr. Jackson,

14  indicated that unwanted sales calls were more of a deal for you

15  all.  I just want to be sure.  Is there anything about the fact

16  that these calls generally aren't welcome that's going to

17  prevent you from being fair and particularly being fair to DISH

18  in this case?  Mr. Jackson?

19           **PROSPECTIVE JUROR THIRTEEN:**  No, I don't think so, I

20  pointed out previously.

21           **THE COURT:**  Yes, you did.  I just wanted to

22  double-check on that.  Ms. White, Lorri White?

23           **PROSPECTIVE JUROR FIVE:**  No.

24           **THE COURT:**  Mr. Smith?

25           **PROSPECTIVE JUROR THREE:**  (Shakes head.)

1           **THE COURT:**  Thank you.

2      And let's see.  Mr. Cornwell, hello again.  I know you told

3  me you worked for AT&T.  I think maybe they might own a

4  business that competes with DISH.

5           **PROSPECTIVE JUROR FOURTEEN:**  They do.

6           **THE COURT:**  Did you work with that part of the

7  business at all?

8           **PROSPECTIVE JUROR FOURTEEN:**  No, I didn't.

9           **THE COURT:**  And are you still working for them now?

10           **PROSPECTIVE JUROR FOURTEEN:**  Yes.

11           **THE COURT:**  Is there anything about the fact that AT&T

12  owns a competitor that's going to cause you any problems?

13           **PROSPECTIVE JUROR FOURTEEN:**  No, ma'am.

14           **THE COURT:**  All right.  Thank you.  You can be fair to

15  DISH in this case?

16           **PROSPECTIVE JUROR FOURTEEN:**  Oh, yes.

17           **THE COURT:**  All right.  And Ms. Susan White, you

18  indicated your husband is a lawyer.  He's retired?

19           **PROSPECTIVE JUROR SEVEN:**  Yes.

20           **THE COURT:**  What kind of practice did he have?

21           **PROSPECTIVE JUROR SEVEN:**  He did criminal law.

22           **THE COURT:**  Criminal law.  Okay.  Thank you.

23      All right.  I think that covers the individual questions.

24      Do any of the 14 of you know each other before you got here

25  today?  No.  Okay.

1    And this case is going to take the rest of this week and
2 into next week.  We will not be here Monday because Monday is a
3 federal holiday.  I can't excuse anybody for inconvenience
4 because that's another one of those things that would mean I
5 have no jurors.  If any of you do have, you know, nonrefundable
6 airplane tickets to Hawaii --
7         **PROSPECTIVE JUROR FIVE:**  Actually, I do.
8         **THE COURT:**  You do?
9         **PROSPECTIVE JUROR FIVE:**  Yes, but not until the 24th.
10        **THE COURT:**  Not until the 24th.  Okay.  Well, man, I
11 wish I was going with you.  Okay.  We'll be done by the 24th.
12 You're leaving on the 24th?
13        **PROSPECTIVE JUROR FIVE:**  Yes.
14        **THE COURT:**  You will be done.
15    Yes, sir.
16        **PROSPECTIVE JUROR TWO:**  I have customers coming to see
17 me from overseas all day next Wednesday.  They paid for their
18 tickets to see me.
19        **THE COURT:**  Work related?
20        **PROSPECTIVE JUROR TWO:**  Yes, work related.
21        **THE COURT:**  I'm so sorry.  I usually just ask people
22 to work around their work-related conflicts in one way or
23 another.  It's certainly possible we'll be done by then.
24 Probably not.  But I'm going to have to ask you to work around
25 that one.

1      Anybody else?  All right.

2      Now, can any --

3           MR. GLASSER:  Your Honor, I'm sorry, the juror on the

4  far left.

5           THE COURT:  Oh, I'm sorry.  Mr. Wheeler, I didn't see

6  you.

7           PROSPECTIVE JUROR ONE:  I didn't raise my hand high

8  enough.  Have there been any exceptions for people who work at

9  nighttime, third-shift employees?

10           THE COURT:  Usually people find they can't work at

11  night and come be here all day and pay attention.  I've had

12  problems with jurors falling asleep in that situation.  So just

13  like the rest of the jurors, usually you just need to take off.

14           PROSPECTIVE JUROR ONE:  Okay.

15           THE COURT:  But thank you for asking.  It's a good

16  question.

17      I know sometimes people who have flexible work situations

18  find they're able to get in two or three hours, but not

19  everybody has that kind of flexible situation.

20      So anybody -- all right.  Now, based on what little you

21  know about this case, has anybody formed an opinion about this

22  matter or do you have any opinions about this matter that is

23  going to affect your ability to be fair and follow the law?

24      Is there anything I have not asked about that you think

25  it's important for me to know in deciding if you can be a fair

1  and impartial juror?

2      Do any of you have any reason that would make it difficult

3  for you to be fair and impartial, base your verdict on the

4  evidence, and follow the law?  No.

5      All right.  Now, the parties have the opportunity to excuse

6  a pretty small number of you for no reason that they have to

7  explain and so I am going to give them just a few minutes to

8  fill out the form for that purpose and we will just all sit

9  quietly while they fill that out.  It shouldn't take but just a

10 few minutes.

11     (Pause in the proceedings.)

12         **THE COURT:**  And just hand it to Ms. Sanders when

13 you're finished.

14     (Pause in the proceedings.)

15         **THE CLERK:**  Your Honor, the following jurors have been

16 excused from this proceeding.  They need to go to the back of

17 the courtroom:  Tiesa Smith, Lorri White.

18         **THE COURT:**  So Ms. Smith and Ms. White -- Lorri White,

19 you can step down and go to the back of the courtroom.

20         **THE CLERK:**  Karen Dove.

21         **THE COURT:**  Ms. Dove, the same.

22         **THE CLERK:**  And Amanda Cloninger.

23         **THE COURT:**  And Ms. Cloninger.

24     (Excused prospective jurors left the jury box.)

25         **THE COURT:**  All right.  So the ten of you will be our

1  jury.

2      And I'm going to ask Ms. Martin and Mr. Jackson, if you all

3  will move down one and Mr. Cornwell can step into the -- yeah,

4  that's good -- get into the jury box.

5      And then, Mr. Richter, yeah, if you would do the same.

6      And, Ms. White, you can move into the jury box and just

7  have a seat.

8      I'll be back to you all in just a minute.  All right.

9      Okay.  So for those of you on the jury panel, I want to

10  thank you for your time and service in this matter.  We will

11  not need you in this case, but I'm not sure what's going on in

12  the criminal case downstairs and so I will ask you to go back

13  to Courtroom 2 -- oh, pardon me.  You need to go to the jury

14  assembly room.  I'm sorry.  That's up on the fourth floor.  All

15  right.  The jury assembly room.  And the clerk's office up

16  there will tell you what needs to happen next and whether

17  you're done with your jury service or need to come back on

18  another day or call back in on another day.  I want to thank

19  you for your service and you're excused to go up to the jury

20  assembly room.

21      (Prospective jurors in the gallery left the courtroom at

22  2:30 p.m.)

23          **THE COURT:**  Okay.  All right.  Good.  We're ready to

24  get started just one day behind because of the weather.

25      The first thing that will happen is that you all will be

1  impaneled to serve as jurors in this particular case, so please

2  listen to the clerk.

3       (The jury was duly impaneled.)

4       **THE COURT:**  All right.  Members of the jury, you've

5  been sworn and impaneled to serve as jurors in this case and at

6  this time I want to tell you a little about how the trial will

7  proceed and some of the rules that apply so you will know

8  what's going on, give you a few instructions about the law that

9  is likely to apply in this case, and also tell you what the

10 rules are that govern your conduct while you serve as a juror.

11 I may also instruct you from time to time while the trial is

12 going on; and at the end of the case, after all of the evidence

13 is in, I will give you detailed instructions on the law that

14 applies in this case.

15      In just a few minutes, we will begin the trial.  The

16 lawyers first have the right to make opening statements.  An

17 opening statement is not evidence and, indeed, nothing that the

18 lawyers say to you is evidence.  The lawyers aren't witnesses.

19 They don't have firsthand knowledge of what happened, but they

20 are allowed at the beginning of the case to give you a broad

21 overview or projection of what they believe the admissible

22 evidence will be.

23      In order to give you that overview, the Plaintiff will go

24 first.  They tell me about 40, 45 minutes.  We'll take a short

25 recess after that; and then when we come back, we'll have the

defense opening statement, which may be about the same length, maybe a bit longer; and then I anticipate we'll stop for the day.  All right.

We'll come back in the morning and start with the evidence itself.  Witnesses will be called to the witness stand and they'll be sworn or affirmed to tell the truth.  They will answer the questions of the lawyers and tell you what they know about this matter.

It is also likely, in fact, I'm sure, there will be exhibits offered into evidence and exhibit -- usually it's a document, but it could be a picture or, you know, in criminal cases, we see guns, things like that.  You're not going to see any of that, but you may see some demonstrative evidence or some physical items as exhibits.  If an exhibit is admitted into evidence, you can consider it, along with the testimony of the witnesses.

In some trials, there are stipulations and I believe you will hear a few in this case.  That means the parties have agreed to a fact so that it is not necessary to put evidence on to prove that fact.  These save a lot of time, as you can well imagine.  So when the parties stipulate to something, you should accept those stipulations as undisputed facts and they should not be given less weight merely because everybody agrees.

The Plaintiff will present his evidence first.  This is

1  because Dr. Krakauer, as the Plaintiff, has the burden of

2  proof.  He must persuade you by the greater weight of the

3  evidence that DISH has violated the TCPA and that he and other

4  class members are entitled to damages.  Because he has the

5  burden of proof he gets to go first in calling his witnesses

6  and offering exhibits.  Counsel for the Defendant may

7  cross-examine his witnesses.  If the Defendant chooses to put

8  on evidence, it will do so after the Plaintiff has closed his

9  evidence; and the Plaintiff, of course, can cross-examine the

10 Defendant's witnesses.  In some cases, the Plaintiff can offer

11 rebuttal evidence after that.

12     Now, during the trial, an attorney may make an objection to

13 a question asked by another lawyer, to an answer given by a

14 witness or to the admission of certain evidence.  When that

15 happens, it merely means that the attorney is asking me to

16 decide whether the testimony or other evidence is proper under

17 the law.  You should not draw any conclusions from such an

18 objection or from how I rule on that or hold it against the

19 parties if the attorneys assert an objection.  They are allowed

20 to do so.

21     If I rule on the objection by saying "sustained," that

22 means you should disregard whatever was objected to, the

23 question, the answer or whatever it was, the exhibit.  On the

24 other hand, if I rule on the objection by saying "overruled,"

25 that means you may consider the evidence.  So "sustained" means

forget it.  "Overruled" means remember it.  And I'll remind you
of that the first time or two those words are used during the
trial if it is not completely clear from the context.

It's also possible, indeed likely, that during the trial I
will need to speak to the lawyers outside your presence.  I
always have to do that at the close of all the evidence and a
few other times during the trial.  And when the need arises, I
may have the lawyers step over to the end of the bench right
there like we did during jury selection.  They'll turn on that
awful white noise so that you can't hear us and we'll whisper
to each other for a little bit.  If it's going to take longer
than, you know, 30 seconds, I may excuse you to go into the
jury room while we talk.

You shouldn't worry or speculate about our discussions.
I'll either be asking them a legal question or a housekeeping
matter like how long is this witness going to take and when
should we go to lunch.  Obviously, you will hear all of the
admissible evidence in the case.

Now, certain things are not evidence and should not be
considered by you.  Statements, arguments, and questions by the
lawyers are not evidence.  Objections are not evidence.  If you
are instructed that an item of evidence is received for a
limited purpose only, you must follow that instruction.  If I
exclude evidence or tell you to disregard evidence, you must
not consider that evidence.

1    Anything, of course, that you see or hear outside the
2  courtroom is not evidence.  You are to decide the case solely
3  on the evidence presented here in the courtroom.  And if you
4  think about that, the reason is obvious.  If you learn
5  something on the Internet or out there in the world, it could
6  be wrong; and the lawyers and the parties have no chance to
7  test that or raise questions about it or demonstrate to you why
8  it's not correct.  It's also not very fair, which we're all
9  about here in the courtroom, so please don't consider anything
10  that you have heard outside the courtroom.
11    Now, as judges of the facts, you must decide which
12  witnesses to believe, which witnesses not to believe, and how
13  much of any witness's testimony to accept or reject.  This part
14  of your responsibility is called determining the credibility of
15  a witness.  Now, witnesses themselves are often not familiar
16  with the rules and sometimes when a party objects to a question
17  the witness goes ahead and answers it anyway.  So if that
18  happens and I say "sustained," then that means the witness
19  should not have answered the question and you should disregard
20  what you have heard.  You should not consider that answer or
21  partial answer in your deliberations.
22    After you have heard all of the evidence, the lawyers get
23  to make closing arguments at the very end, during which they
24  are -- during which time they are allowed to attempt to
25  persuade you to reach a particular verdict.  You'll have the

1  questions in front of you at that point that you're

2  specifically called upon to answer; and after those arguments,

3  I will instruct you fully on the law that applies to this case.

4  Then you'll go to the jury room and deliberate towards a

5  unanimous verdict.

6      Your duty will be to consider all of the evidence fairly

7  and impartially and to find the facts from this evidence.  You,

8  and you alone, are the judges of the facts.  You will then

9  apply the law as I give it to you and attempt to reach a

10  unanimous verdict.

11      Generally speaking, we will start court at 9:30 and you'll

12  need to come from here on out to the jury room that goes with

13  the courtroom.  It's through this door right here and you'll

14  see it in a little bit.  And I'd ask you to be there by 9:20 or

15  so just in case there's any logistical or housekeeping matters

16  and we'll start about 9:30.  We take a morning break every day

17  around 11:00.  We break for lunch around 12:30.  We resume

18  around 1:45.  We take an afternoon break around 3:30 and we

19  leave for the day around 5:00.  That's an approximate schedule,

20  but I don't ordinarily keep you much past 5:00 and you can --

21  you might stay five minutes after that.  The only time you

22  would really stay past 5:00 would be if you are deliberating

23  and you want to stay a bit longer to see if you can reach a

24  verdict.  I may modify this schedule if we fall behind, so

25  please listen, particularly at the end of the day and at the

1  lunch recess, to just be sure you know exactly when you're

2  going to come back.

3      All right.  Now let's turn and talk briefly about some of

4  the law that applies in this case and to the meaning of some of

5  the words you'll hear during the trial.

6      As the presiding judge, I have a number of

7  responsibilities.  The main ones you will see are that I act as

8  a sort of referee.  I will rule on the legal issues and

9  instruct you on the law, but nothing I say or do during the

10  trial is intended to indicate that I have any opinion about

11  what your verdict should be.  It is your exclusive province to

12  find the facts of this case and to render a verdict reflecting

13  the truth as you find it.  I'm in charge of the courtroom

14  logistics, as you have seen, at least when I'm not overruled by

15  the important person there in the clerk's office who tends to

16  be in charge of the housekeeping matters, but I will try to see

17  that your time is used efficiently.

18      I will give you detailed instructions on the law at the end

19  of the case and those will control your deliberations, but I do

20  want to give you an overview to help you follow the evidence of

21  some of the basic legal principles that apply in cases

22  involving the Telephone Consumer Protection Act and this case

23  in particular.

24      You will remember that Dr. Krakauer, the Plaintiff, has the

25  burden of proof on all issues and he must persuade you by the

1  greater weight of the evidence before you can find in his

2  favor.

3      Now, one of the questions you'll be asked to answer is

4  whether the company that made the telephone calls, SSN, was

5  acting as DISH's agent when it made the telephone calls at

6  issue.  DISH is not liable for telephone calls which were not

7  made by it or by its agent, and here the issue is whether SSN

8  was its agent.

9      An agent is a person or company empowered by another person

10 or company to act on its behalf.  The Plaintiff contends that

11 DISH authorized and empowered SSN to make sales calls on DISH's

12 behalf and that SSN acted on behalf of DISH in making those

13 calls.  DISH contends that SSN was an independent contractor,

14 not its agent; and that if SSN was its agent, it acted beyond

15 the scope of its authority.

16     In an agency situation, the person granting the authority

17 to another to act on his behalf is called the principal and the

18 person who is authorized to act on behalf of the principal is

19 the agent.

20     Actual authority exists when the principal has expressly or

21 impliedly authorized the agent to act on the principal's behalf

22 with respect to a particular matter.  It may be granted by the

23 principal by word of mouth or by writing, or it may be implied

24 by conduct of the principal amounting to consent or

25 acquiescence or by the nature of the work the principal has

1  entrusted to the agent.

2      In order for agency to exist, the principal must have the

3  power to direct and control the agent's actions.  When an agent

4  acts on behalf of its principal and within the scope of its

5  authority, then the principal is responsible for the act so

6  long, as I say, the agent has not exceeded his authority.  The

7  act of the agent is treated in law as the act of the principal.

8      However, a principal is not bound by the act of an agent

9  unless that act falls within the scope of actual authority

10  granted by the principal to the agent.  In order to determine

11  the authority of an agent, it is necessary to look to the

12  conduct and statements of the principal, and an agent cannot

13  extend his own authority by his own conduct standing alone and

14  in the absence of conduct or acquiescence by the principal.

15      So you will want to listen carefully to the evidence so

16  you can decide what, if anything, DISH authorized SSN to do on

17  DISH's behalf considering the written contract between DISH and

18  SSN, how that relationship worked in practice, whether DISH had

19  control over SSN's methods, what knowledge, if any, DISH had

20  about whether and to what extent SSN was violating the TCPA,

21  and other relevant evidence.

22      So I know that was all kind of abstract, but as you listen

23  to the evidence, you will get a feel for this and I'll go over

24  the law with you again after you have heard all of the

25  evidence.

1    Now, if you find that SSN did act within its authority as

2  DISH's agent, then you will need to decide if the telephone

3  calls that SSN made violate the TCPA.

4    Now, by way of background, there is a National Do Not Call

5  Registry created by the federal government to give consumers a

6  choice about whether they want to receive telemarketing calls

7  at home.  It allows the consumer to register his or her

8  residential telephone number on the National Do Not Call

9  Registry to avoid receiving those calls.

10    Federal law provides that no person or entity shall

11  initiate any telephone solicitation to a residential telephone

12  subscriber who has registered his or her number on the National

13  Do Not Call Registry.  Such Do Not Call registrations must be

14  honored indefinitely or until the telephone number is canceled

15  by the consumer or removed by the database administrator.

16  Wireless customers are protected too so as long as the cell

17  phone is primarily used for residential and not business

18  purposes.

19    Under the law, a person who has received more than one

20  telephone call within any 12-month period by or on behalf of

21  the same entity, in violation of these regulations, may bring

22  an action to receive up to $500 in damages for each violation.

23    So as to these Do Not Call Registry claims, the Plaintiff

24  must prove by a preponderance of the evidence that he and the

25  class members each received at least two telephone

1  solicitations in any 12-month period, that the numbers called

2  were residential numbers, that the calls were made by or on

3  behalf of DISH Network, and that the calls were made when the

4  telephone numbers had been on the Do Not Call Registry for over

5  30 days.

6     The Plaintiff and the class will offer evidence from a

7  witness who has reviewed information in various databases about

8  who was on the Do Not Call Registry, as well as telephone

9  records about the telephone calls SSN made.  The Plaintiff and

10 the class contend this evidence establishes by a preponderance

11 of the evidence that each class member received calls that

12 violate the TCPA.  DISH contends that the evidence is not

13 reliable and is insufficient to establish that the calls were

14 made.  DISH also challenges some particular subsets of calls,

15 in particular contending that the evidence does not establish

16 that the numbers in these particular subsets were residential

17 numbers.  So you'll want to give all the witnesses who testify

18 about these lists and records your attention.

19    Now, if you decide that SSN made calls that violate the

20 TCPA and that SSN was DISH's agent, you'll need to decide the

21 amount of damages each class member will recover.  The

22 statutory maximum is $500 per call and there will be a place on

23 the verdict sheet for you to write the amount you decide up to

24 $500 if you reach that issue.

25    Now, as I mentioned during jury selection, this is a class

1  action and Dr. Krakauer is suing on behalf of all persons on

2  the Do Not Call Registry who allegedly received these calls

3  during the class period.  The trial will resolve issues common

4  to all class members and subsets of class members, and that

5  decision will be binding on everyone.

6      So I've kind of talked to you a bit about some of the

7  evidence in this case, but all of the evidence is important or

8  you would not be hearing it.  I'm just trying to give you a

9  little context for what the issues are that you'll be deciding.

10  By not mentioning or mentioning a particular piece of evidence,

11  I'm not making any comment on how important it is.  That will

12  be for you all to decide.  You obviously need to listen to all

13  of the evidence.

14      Okay.  I have a few words about your conduct as jurors.

15  These instructions are necessary for a fair trial and I told

16  you some of these things before we went to lunch.

17      First, during the trial, you are to avoid contact with any

18  witness, the Plaintiff, the Defendant's representative, any of

19  the lawyers or anyone who has any interest in this case.  Do

20  not talk or have any communication to them.  Because you may

21  not know whether a person in the courthouse falls into one of

22  these categories, during breaks you should not speak to anyone

23  in the courthouse you do not know.  If anyone tries to talk to

24  you about this case, you will need to bring it to my attention

25  promptly.

1    Second, during the trial, you should not discuss the case

2  with anyone or permit anyone to discuss it with you.  This

3  includes your family, your friends, your coworkers.  And it

4  includes any form of communication, not just talking to people.

5  Don't e-mail, instant message, tweet, post on Facebook or any

6  other website, no Instagram, no blogging.  You know, don't --

7  none of that kind of thing.

8    People -- and, of course, you don't want to hear what

9  anybody else might say about the case too, which is part of the

10  reason you can't even tell anybody what the case is about.

11  People who aren't in the courtroom could easily be mistaken

12  about the evidence.  I don't know about you, but I know people

13  who have opinions about everything, particularly when they

14  don't know the facts, and you don't want to hear those opinions

15  from any of those people.  They may be expressing them based on

16  personal feelings and -- just don't talk about it, don't

17  communicate about it, and don't let anybody communicate with

18  you.

19    Obviously, it's fine to -- you have to -- if you work or

20  have other obligations that are going to be interfered with

21  because of this trial, it's certainly fine to let your employer

22  know "I have been selected for this jury and I will not be able

23  to come to work until it's over and that will be next week

24  sometime."  But don't say what kind of case it is, don't answer

25  any questions about it other than that -- you know, scheduling

1  and logistics, to the extent you have to to make your life

2  work, but nothing about the substance.

3      And if anybody tries to pressure you on that, you just say,

4  "The judge told me I would go to jail if I talked about the

5  case." Okay. Now, I'm making a little bit of a joke about it,

6  but it is really serious and usually if you say that to people

7  they'll back off and not -- you know, you are subject to

8  contempt powers, but usually people back off if you tell them

9  how serious it is.

10      Now, the prohibition about talking about the case includes

11  your fellow jurors, so you cannot talk to each other about the

12  case while it's going on. You have to wait to talk to each

13  other until all the evidence is in, you've heard the closing

14  arguments of the attorneys, and you've heard my instructions on

15  the law. One of the main reasons for this is that discussing

16  the case can lead to forming an opinion and that is not a good

17  idea before you have heard all of the evidence. Sometimes the

18  most important evidence is the very last piece that comes in,

19  so you want to keep an open mind. Even after deliberations

20  begin you may talk about the case among your fellow jurors only

21  when all of you are present.

22      Finally, during the trial -- oh, this is not finally. This

23  is just third. Third, during the trial, you're not to gather

24  information, investigate or do anything else to learn about the

25  case outside the courtroom. Do not look anything up on the

1  Internet, call somebody you know who knows something about the
2  issues in this case, read anything about it, nothing like this.
3  Everything on the Internet is not true and you could look
4  something up and it could be wrong or it could be inaccurate or
5  misleading somehow.

6  You should also avoid exposure to media coverage of the
7  trial, if there is any.  I don't know that we have anybody here
8  that's going to report on the case, but if you do see anything
9  in the newspaper, TV, radio or online about this case, do not
10  read it or listen to it.  Just like tweets and Internet posts,
11  this kind of information is often inaccurate and incomplete,
12  and it is certainly not given under oath with all the parties
13  present or subject to cross-examination.  I know all of us are
14  used to looking things up online, but doing any type of
15  research can cause major problems in a trial and can require us
16  to start over again, so do not do that.

17  Finally, do not form any opinion until all the evidence is
18  in.  Keep an open mind until I tell you to start your
19  deliberations.

20  These rules I have given you are necessary for a fair trial
21  and a violation of these instructions does subject you to
22  punishment as allowed by law for contempt, as I mentioned to
23  you earlier.  I will repeat or summarize these instructions for
24  you throughout the trial, not because you weren't paying
25  attention, but because, in my experience, some of these rules

1  are a little counterintuitive.  I don't know of any other
2  situation in our culture where we ask strangers to sit together
3  watching and listening to something and then we don't let them
4  talk about it.  So I will be reminding you about these things
5  from time to time.  Please remember the reasons I gave you for
6  these rules and let me know if there are any problems with
7  following these instructions either on your own part or by your
8  fellow jurors.

9      Now, while you're in the courtroom, our priority will be to
10  proceed with the testimony and I'll try to avoid delays.  The
11  lawyers are coming in early and staying late with me before you
12  get here and after you leave, so we'll be trying to be as
13  efficient as we can.  That's the reason we start at 9:30 and
14  not 8:30, and I think you will also find that 9:30 to 5:00 is
15  about as much as you can absorb during the day.

16      I'll also ask you not to loiter in the corridors of the
17  courthouse just to avoid any contact with any folks; and if
18  anyone attempts to talk to you about it, you do need to let me
19  know immediately.  Any contact with me needs to be by way of a
20  note.  So you would just write the note indicating what
21  happened and either let the security officer or Ms. Sanders
22  here know that you have something you need to tell me and
23  Ms. Sanders will come collect the note.

24      If you want to take notes during the trial, I will be glad
25  to let you do that.  Ms. Sanders has pencils, legal pads, and

1 envelopes.

2 Are those around?

3 I'm going to let her hand those out in case any of you want

4 to take notes. I'm just going to give them to everybody, but

5 please do not feel like you have to take notes. Some people

6 actually find it very distracting.

7 You can just give everybody one in case they --

8 (Ms. Sanders complied with the request.)

9 **THE COURT:** Ms. White needs one right there.

10 Everybody got one? Okay.

11 So some people find taking notes very helpful. Other

12 people, as I say, find it distracting. You don't want to get

13 so caught up in writing down one thing that you forget to

14 listen to the next thing because, you know, we really don't

15 stop, okay. But that said, I know many people do find it

16 helpful to take notes.

17 Your notes are not evidence and they should not take

18 precedence over your recollection of the evidence; and if you

19 do take notes, don't talk about them with anybody, you know,

20 while the trial is going on. I will let you take your notes

21 back with you during your deliberations, but, you know, they're

22 not more important than the memory of a juror who did not take

23 notes. And, of course, if you don't take notes, you can't turn

24 over the responsibility to somebody who took notes. It's your

25 responsibility to listen, too. We depend on the judgment of

1   all the members of the jury.

2       At every break you'll need to just slide your notes back in

3   the envelope with the pencil and leave them in the chair, and

4   they'll be right there for you when you come back.  So don't

5   take them with you.  At the end of the case I'll let you take

6   them in the jury room when you deliberate, but up until then

7   just slide them back in the envelope and leave them in your

8   chair.

9       Finally, if at any time you cannot hear or understand

10  someone, you need to let me know.  Witnesses mumble sometimes.

11  The door slams or somebody coughs and you don't hear what's

12  said.  I have heard lawyers talk too fast and occasionally I

13  talk too fast.  So if you have any problems with hearing or

14  understanding, you just raise your hand; and if nobody notices

15  you, just say, "Excuse me.  Did he say red or blue?"  Okay.

16  It's very important for you to hear all of the evidence.  I

17  know, you know, this is a beautiful courtroom.  I come in here

18  every day, so it's not intimidating to me, but I appreciate,

19  you know, you may not feel all that comfortable in here.  But

20  please don't hesitate.  If you cannot hear or understand, I do

21  need to know that.

22      All right.  So we are going to start with the Plaintiff's

23  opening statement.  Then we will take a short break and come

24  back with the Defendant's opening statement.

25      And the jury is with the Plaintiff.

1      **MR. BICKS:**  Your Honor, can I just ask one question

2  before we start just because I'm going to be showing graphics?

3  I'm just wondering, the jurors who are all the way in the

4  corner --

5      **THE COURT:**  We'll get it arranged during the break so

6  everybody can see.

7      **MR. BICKS:**  Okay.

8      **MR. GLASSER:**  Does this thing work?  Great.

9      Ladies and gentlemen of the jury, we live in a country that

10  has a rule of law, meaning that its citizens, if we all follow

11  the laws, will hopefully have a better quality of life for

12  everybody.  One, I will call it quality of life, law passed by

13  Congress is this National Do Not Call law and that's the law at

14  issue in the case you're about to hear.

15      I'm sure everyone is familiar with the experience of

16  getting a call from someone you don't want to hear from trying

17  to sell you something you don't necessarily need at a time

18  that's awkward for you.  Now, that law -- now, that experience

19  Congress took account of and they passed a law called -- we

20  call it the National Do Not Call law.  The technical name is

21  Telephone Consumer Privacy (sic) Act.  It covers lots of

22  things, but the things particularly at issue here in this case

23  is going to be that Do Not Call list and calling folks that are

24  on it.

25      Now, officially what the law did is it created a national

1  registry, a big database, and folks can register.  And the idea

2  is that once your number is on there the telemarketers can

3  check and exclude it and not call you.  So the idea is that by

4  this law -- I mean, Congress is passing all these complicated

5  laws.  This one is like -- called, like, the uninterrupted

6  dinner law.  It's just a very simple law.  So you just register

7  your phone.  You can register online.  You can call.  There's

8  various ways to register.  You have a brief waiting period, as

9  the Court said, 31 days, and you're off limits to

10  telemarketers.

11      Now -- so I think of it as the law sets up kind of a no

12  fishing zone.  You can't fish for customers who don't want to

13  be fished for.  They're in this zone, the no-call zone.

14  Telemarketers all know that they can't fish in those prohibited

15  waters.  The evidence will be, this is Telemarketing 101, you

16  can't fish the prohibited waters.

17      Now, DISH, their witnesses will admit they know they can't

18  fish in prohibited waters, but the evidence will be that DISH

19  wants the customers.  DISH wants the fish and so, in this case,

20  they got someone else to fish for them, this company that the

21  Court has told you the name of, Satellite Systems Network.  But

22  DISH will come in here and they will ask you to find them not

23  responsible for that illegal fishing, and we will show the

24  evidence that should make them responsible, in our view, for

25  that fishing and this is what I'm about to preview for you,

1  that evidence.

2      And the reason -- you know, it's interesting.  The

3  telephone does not actually disappear when you sign up for the

4  Do Not Call list, right, so the law -- you know, the -- the --

5  the rules can still be ignored and so that gets to this -- what

6  we're doing here.  Now, this is not a criminal trial.  The

7  Court told you it's not a criminal trial.  It's not a "beyond

8  the reasonable doubt" trial.  It's a "preponderance of the

9  evidence" civil trial.

10      And so what Dr. Krakauer is is a class representative and

11  he is bringing a private enforcement action saying that he can

12  prove that a company broke the law and looking for the penalty

13  on behalf of all the people who were called in violation of

14  that law.  And the amount the Court told you is a whopping up

15  to $500.  So it's not a lot of teeth in the law, but the

16  question is is it going to be enforced or not, is it -- and

17  that is the question for you at the close of the case.

18      People who bring the enforcement suit, like Dr. Krakauer in

19  this instance, are the class representative.  They stand here

20  for all the thousands of other people who obviously are not

21  going to be here because what happened to them is the same as

22  what happened to others.  It typifies what happened.  That's

23  the meaning of being a class representative.  And so I kind of

24  call it the "strength in numbers" lawsuit.  Maybe nobody in

25  their right mind would bring a lawsuit for a mere $500, but to

1    enforce the law, you will bring a lawsuit.  And Dr. Krakauer,

2    the Court will tell you, does not get to keep the money himself

3    if you award any.  It goes to the class supervised by the

4    Court.  He's treated like the other class members.

5        Dr. Krakauer, who is right here, he lives in Durham,

6    North Carolina.  He is not a medical doctor.  He is a

7    zoologist.  He's studied birds.  He was the director of the

8    Museum of Life and Science in Durham, California --

9    North Carolina, North Carolina Museum of Life and Science.  I'm

10   told it's a fun place to visit.  I've never been there.  He

11   retired from there and now, you know, lives near Durham.

12       From 2009 to 2011, Dr. Krakauer got a bunch of

13   telemarketing calls on behalf of DISH despite the fact that his

14   number is on the Do Not Call list.  Dr. Krakauer has never been

15   a class representative before.  He's never sued anybody before

16   in his life.

17       The Defendant DISH corporation is a large corporation.

18   You'll hear from their lawyers what they do.  Some of you

19   probably know they deliver satellite service to roughly

20   14 million Americans.  I understand it's like 3,500 channels

21   you can choose from.  They have 13 satellites in geosynchronous

22   orbit.  Maybe I didn't say that word exactly right, but

23   stationary orbit above the earth that beam down those channels.

24   They're a large corporation.  The evidence will be you can't --

25   there's no point in all those satellites, there's no point in

1    any of that without sales.  No sales, no DISH.  That's going to

2    be the evidence.

3        Now, Dr. Krakauer got these calls on behalf of DISH even

4    though he complained to DISH.  And this case is about -- not

5    really as much about, in our view, the 5 illegal calls he

6    got -- connected calls after he complained or the 10 calls he

7    got that we have records of -- and I'll get to what we have

8    records of and what we don't have records of -- but it's about

9    the 51,000 other calls made during that same period, which is

10   the period called the class period and I'll get to what that

11   means.  And that's connected calls.  51,000 connected calls in

12   a 15-month period that went twice to people on the Do Not Call

13   period.  Now, obviously, the telemarketer at issue made a lot

14   more calls, and we'll go into this, and later in my opening I

15   kind of walk through how it starts with 1.6 million calls and

16   works down to the class calls, okay.  We'll get into that in a

17   minute.

18       The class period in this case is defined by the time period

19   where we actually have the call records and those call

20   records -- and you'll hear from witnesses.  They will actually

21   be on video because they're from out of state.  We can't bring

22   them in here.  A subpoena secured the call records of this

23   company for a 15-month period.  And so while Dr. Krakauer was

24   first called in a period in 2009, the records that were managed

25   to be kind of frozen in time are from May 1st, 2010, to

1   August 1st, 2011.  So that's the class period where we're

2   looking for the enforcement on the 51,000 calls.

3       It's not us saying those are the only calls.  Obviously,

4   there were calls in 2009, the evidence will show, because

5   that's when Dr. Krakauer complained.  They have his complaint

6   recorded.  We know they were calling before the class period

7   and, you know, after the class period, but the damages in the

8   case have to do with the class period because that's where we

9   have the telephone records for the proof of the damages.

10  Anyway, that's why there's a 15-month window called the class

11  period.

12      Now, this case will also cover and delve into facts in

13  other time periods.  One time period is the summer of 2009,

14  June of 2009.  DISH corporation here entered a settlement

15  agreement in the summer of 2009 with the Attorneys General, the

16  chief law enforcement officer, of 46 states saying it would use

17  its power and control to -- to step up and monitor to determine

18  if its telemarketers were complying with the Do Not Call law

19  and, if they found violations, they would cause compliance by

20  discipline or termination.

21      This agreement that DISH entered with the 46 states was

22  within a month of the first telephone call Dr. Krakauer

23  received in the case; and in this case here, I believe they

24  will stand up and tell you the opposite:  That they have no

25  control over these telemarketers; that the telemarketers are

1  independent, free, independent, not controlled, not under their
2  authority, they can't police them, free as a bird people I
3  believe will be their argument in the case.

4      The telemarketer at issue in this case, SSN, is a
5  telemarketer that DISH paid to make calls on its behalf.
6  DISH -- SSN only were -- in the class period at issue, frankly,
7  from the time 2005 on, but certainly at the time Dr. Krakauer
8  got his call all the way to the end, they only did one thing,
9  sell DISH.  They were branded as a DISH fishing boat because
10  they were able to use DISH trademarks.  They could put DISH
11  logos out there.  The website was my -- yourfreedish.tv or
12  something like that.  The web addresses which you will see
13  were -- had DISH in the name.  In any event, they sold DISH
14  services only.  It was a dedicated company dedicated only to
15  DISH.

16      The -- according to the Assurance that I talked about, that
17  agreement with the 46 states, DISH was to monitor to determine
18  if SSN was complying with the Do Not Call law and if they found
19  violations shall discipline SSN.  The evidence in this case
20  will be overwhelming that both before and after the
21  compliance -- I mean the assurance of compliance agreement, in
22  the summer of '09 that DISH had direct knowledge of SSN's
23  illegal telemarketing ways both before and after they entered
24  the Assurance and both before and after DISH promised that they
25  would use their power and authority to rein in the SSNs of the

1  world and cause SSN to comply with the law or terminate them.

2  They will say, though, probably, that we ought to be suing that

3  little, tiny SSN company.

4      The evidence will show that DISH did not in fact monitor

5  SSN and did not in fact use any of its contractual or practical

6  power over SSN to change SSN's behavior at all even when they

7  heard.  I believe that the evidence will be that despite this

8  agreement with 46 states they get complaints and they send

9  toothless letters to SSN saying, "Hey, we believe there may be

10  a complaint against you."

11      So the evidence will be that in that 15-month window where

12  we got the call records -- that 15 months, that's about a year

13  after the first call with Dr. Krakauer -- one out of five of

14  the calls made by SSN on DISH's behalf were in those off-limits

15  fishing waters on the Do Not Call Registry, one out of five.

16      Our evidence will be that any effective system of

17  monitoring would have stopped that behavior, period.  Our

18  evidence will be that DISH had its eyes wide open when it hired

19  SSN and knew what kind of outfit it was getting.  It learned

20  along the way in the years prior to 2009 what kind of outfit it

21  had and it kept the outfit on the payroll.

22      In fact, the evidence will be that in the early 2000s, up

23  to 2004 and 2005 -- in 2004, the State of Florida sanctioned

24  SSN for illegal telemarketing activity and DISH knew about it.

25  In 2005, the State of North Carolina sanctioned SSN for illegal

1  telemarketing activity, and DISH knew about it and kept them on

2  the payroll.  DirecTV, by stark contrast, did the opposite.  In

3  the early 2000s up to 2005, SSN sold for both DirecTV and DISH.

4  After the events of 2004 and 2005, DirecTV, no, no more.

5  DirecTV dropped SSN.  SSN only sold for DISH after they were

6  sanctioned by Florida and North Carolina.

7      So when DISH had a decision to make, it made a business

8  decision; and DISH in fact after 2005 integrated SSN into its

9  operations in the most comprehensive ways that you can imagine,

10  such that the evidence will be that SSN was effectively nothing

11  but a DISH sales arm.

12      Here's how they integrated them.  They have lots of

13  retailers.  The evidence will be in 2011 they had about 3,500.

14  I say 2011 because it's smack dab in the middle of the class

15  period.  Remember the class period is May of '10 to August of

16  '11.  June of '11 3,500 retailers around the country.  Lots of

17  them are storefront, mom-and-pop, small retailers.  Forty-five

18  of the 3,500 are designated national sales partners.  You

19  guessed it.  SSN is one of those national sales partners.  So

20  national sales partners were the -- less than 2 percent of all

21  the retailers.

22      And the national sales partner SSN had access to an

23  exclusive system called the order entry system and the order

24  entry system is actually DISH's computer system.  So here's how

25  it works.  The telemarketer on the phone, they've got the

1 caller on the phone -- they've got the person on the phone.

2 They're fired up on their computer. They're on DISH's computer

3 servers. They're on DISH's network. They put the order right

4 into DISH's network. The customer gets a DISH installer

5 assigned. The customer gets a DISH bill. The bill says DISH.

6 The customer's credit is checked and the credit check is paid

7 for by DISH. The customer service, if they need customer

8 service, is back at DISH. Technical support is by DISH. The

9 contract is formed between DISH and the customer, not between

10 the retailer and the customer.

11    DISH had trainers come to SSN's call center in person,

12 listen to calls, monitor calls, upload recordings of calls.

13 DISH wrote sales scripts for SSN. Frankly, on the order entry

14 system, the screens would pop up and it was the obligation of

15 the telemarketer to read exactly what DISH wrote, all crafted

16 by DISH.

17    So here you have an independent company that has no sales

18 training capacity it needs of its own, doesn't need it, doesn't

19 need its own inventory of DISH equipment, doesn't need its own

20 installers, doesn't need its own customer service personnel.

21 It's just a DISH telemarketing arm is what our evidence will

22 show.

23    Frankly, the evidence will be that the DISH/SSN contract,

24 while it does say the magic words that they're an independent

25 retailer, is so one-sided and controlling that SSN literally

1  had no legal right to the customers it signed up.  They weren't

2  SSN customers.  They were DISH customers.  They had no right to

3  use the data they got about those customers in any way, shape

4  or form.  There is literally one clause in there, I think it's

5  Clause 7.3, it's -- I call it the absolute power clause.  It

6  literally says:  You, SSN, must do or refrain from doing

7  anything we tell you even if we just send it in a fax or an

8  e-mail.  You must do or refrain from doing anything we tell

9  you.  So our evidence will be that the contract evinces control

10  at the highest level.

11        DISH will stand up in defense and say, "Well, we ordered

12  SSN to sign up for a service called PossibleNOW" -- I believe

13  the words "PossibleNOW" will be used a hundred, maybe a

14  thousand times in this lawsuit as we, you know, proceed during

15  the week -- "and that PossibleNOW was going to scrub out all

16  those bad numbers.  So because we told them to sign up with

17  PossibleNOW, we should not be responsible for the fact that one

18  out of every five calls they made in this 15-month period was

19  to illegal fishing waters."

20        But the evidence is going to be that SSN did not actually

21  run the calls at issue in this case through PossibleNOW scrubs.

22  They just didn't do it and they told DISH that they didn't do

23  it and DISH didn't do anything about it, didn't tell them to do

24  it and didn't care.  That's what the evidence is going to be.

25        So, yes, on the right hand, the evidence will be that DISH

1  ordered them to sign up with PossibleNOW; but on

2  boots-on-the-ground level, the evidence is going to be they

3  didn't do it and DISH knew they didn't do it.  So DISH didn't

4  care enough to make them do it even after having signed the

5  assurance of compliance.  That's what the evidence is going to

6  be.

7      So there's going to be evidence about the difference

8  between telling them to sign up for PossibleNOW and then

9  actually having them sign up for PossibleNOW or having them use

10  PossibleNOW, not sign up and drop, whatever.

11      The contemporaneous e-mail traffic at the time will show

12  that SSN did not scrub the calls at issue in this case through

13  PossibleNOW or any other scrubbing and that PossibleNOW was not

14  the monitoring DISH promised.  The evidence in this case will

15  be that time and again DISH found out about behavior it ought

16  not to have tolerated and let it continue because they wanted

17  the fish.

18      So when Mr. Bicks, my opponent, stands up and shows you --

19  flashes contracts and talks about PossibleNOW, I just urge you

20  to wait, see all the evidence in the case, look at the

21  boots-on-the-ground facts and make your decision at the end of

22  the case about how effective or efficient or realistic some of

23  those things are, because a bedrock fact about this case will

24  always be one in five calls made over this 15-month period were

25  in illegal waters.

1    And the evidence will also be that DISH acquiesced in,

2  allowed, and benefited from all this illegal fishing; and at

3  the end of the case, you'll have to make the call whether the

4  existence of SSN -- and Sophie Tehranchi will testify about it,

5  the owner, she'll describe what it is -- ought to be a

6  get-out-of-responsibility card in this case.

7    **THE COURT:**  Okay.  If you'll just limit yourself to

8  the evidence rather than argument.

9    **MR. GLASSER:**  At the end of the class period, SSN was

10  only selling DISH.

11    Now, let me talk about the calls.  The calls that we got

12  the records on are 1.6 million calls.  So the evidence will be

13  that SSN's telemarketers were calling a little over a hundred

14  thousand numbers a month.  They were using computers, so the

15  computers could call a lot of people and then, when there's a

16  connection, shoot it through to a telemarketer.  So connections

17  are materially less than calls.  This is not a case about

18  calls.  The 1.6 million calls are kind of the top of the

19  funnel.  231,000 connections, connected calls.

20    And then we further take out the calls that don't qualify

21  because there was only one call in a 12-month period or the

22  number was not on the Do Not Call list or the number was a

23  business, and so we get down to the calls at issue in the case,

24  which are 51,000 calls.  So there will be some evidence about

25  that.

1    So you'll hear from Dr. Krakauer.  He'll talk about how he

2  got the first call back in 2009 on behalf of DISH.  He called

3  DISH and told them he was on the Do Not Call Registry.  Then in

4  the class period alone he got ten more calls, five of which

5  connected.

6    You will also hear from a series of witnesses who work for

7  DISH and SSN.  These are witnesses who will not want to help

8  our case, but obviously we represent a citizen.  We don't know

9  what goes in -- on inside of DISH or SSN without calling their

10 witnesses, so we'll be calling what are called adverse

11 witnesses, that is, we call the other side's witnesses.  We put

12 them on the stand and we ask them questions.  Those witnesses

13 will try and cast what they did in a light that makes them look

14 better.  So you have to think about that when you're observing

15 their testimony.

16    One of them is Sophie Tehranchi.  She is the leading crew

17 member on that SSN boat I told you about.  She is the sister of

18 the owner, Alex Tehranchi.  He's known in the e-mail traffic as

19 Alex.  You'll see e-mail with Alex.  That's Alex Tehranchi, the

20 brother of Sophie Tehranchi.

21    Sophie Tehranchi will explain that SSN sold only DISH at

22 the relevant time periods for this case after 2005 and

23 certainly at 2009 on, that all its money came from DISH, that

24 it used scripts DISH had okayed, that the telemarketing reps

25 would call people like Dr. Krakauer.  When they did that, they

1  were logged on to DISH's computers with a DISH password, and

2  all the money from the DISH subscriptions they were selling

3  went straight to DISH.  SSN got paid for activations only, so

4  they got paid when people activated on DISH.

5      The evidence will be that SSN, the national sales partner,

6  had no power to vary the price, the terms or the conditions of

7  the DISH sale.  So no pricing power, no terms and conditions

8  power, no -- no power like that to talk about.  They sold

9  exactly what DISH told them to sell at the price DISH told them

10 to sell it on the terms set by DISH.  That's the evidence from

11 Sophie Tehranchi.

12     You'll hear from her how DISH would sometimes have people

13 in their call center actually listening in on those calls and

14 score them to see if they made the sales calls exactly the way

15 DISH wanted.  That DISH person physically present on the boat

16 would check anything that person wanted.

17     You will hear that DISH had the right to audit the company,

18 audit its books and records, but, you know, the evidence will

19 be that DISH never monitored, audited or checked compliance

20 with the Do Not Call.  They never said, "Hey, why don't you

21 just upload the calls you made in the last 10 days and we'll

22 just check them against the DNC."  Never happened.  They never

23 spot-checked or audited that area of compliance at SSN at all.

24     Another one of the witnesses who will testify is Amir

25 Ahmed.  He's here in the courtroom.  He'll tell you about how

1  DISH set up the sales system and how it works and how when he

2  recruited SSN he had full knowledge that they had telemarketing

3  issues, consumer complaint issues, AG raising issues, and yet

4  recruited them anyway.

5      You'll hear from Reji Musso, who is present in the

6  courtroom here, who was in charge of compliance at DISH.  She

7  was the person who would get these complaints and she would

8  send form letters back to SSN about these complaints.  And

9  you'll be the judges of the fact of the effectiveness or the

10 realistic power that these form letters had and whether they

11 were -- what message they were really sending is what you'll

12 have to decide in this case.

13     DISH had SSN completely beholden to it.  All SSN's money

14 came from DISH and their sales operations are on DISH

15 computers, and the evidence will be that in fact DISH takes

16 none of the obvious steps that they could have taken to reform

17 the behavior of their telemarketing.  So instead of using its

18 power and authority and control to actually monitor compliance

19 with the Do Not Call list, DISH would get complaints and they

20 would send a toothless form letter.  As a matter of fact, DISH

21 sent one of those toothless letters to Dr. Krakauer when he

22 complained and it didn't stop anything.  I'm sorry.  Sent one

23 of those letters not to Dr. Krakauer but to SSN.  They actually

24 didn't send a letter to Dr. Krakauer.

25     Now, you will hear the evidence is that DISH had a written

1   policy that SSN keep its call records, but, no surprise, DISH

2   never enforced that contractual obligation.  The evidence will

3   be that they learned that SSN was not keeping its call records

4   and they didn't do anything about it.  And so you will have to

5   judge at the end of the case whether -- why DISH chose not to

6   enforce the policy about keeping written call records.

7        At the end of the case, our expert will talk about the

8   process of going through the 1.6 million call records and how

9   you whittle it down to the 51,000 and taking the Five9 -- oh,

10  by the way, maybe I didn't say that before.  The name of the

11  computer -- the software company that connected the calls was

12  called Five9.  Five9's computer brain kept the records of the

13  calls made in the 15-month class period.  Those are the

14  1.6 million calls that our expert looks at and says, okay,

15  there's 1.6 million calls.  Now let's check it against

16  databases that have records of who is on the Do Not Call list,

17  check it against databases of businesses to remove businesses.

18  Let's whittle this thing down to the 51,000 calls.  So you'll

19  hear all that evidence.  And you'll hear from our expert that

20  one out of every five connected calls were made to those

21  numbers on the Do Not Call list.

22       So I'm getting to the end.  It's not that complicated a

23  case actually from our perspective.  It's a case about a

24  company that basically used another company to do what it knew

25  it couldn't do.  At the close of the case, we will ask you to

1 put real teeth into the telemarketing law and enforce this law.

2     My name is Brian Glasser.  I'm from Charleston, West

3 Virginia, originally, and I appreciate your time and your

4 effort in this case and the time you give me.  Thanks a lot.

5     **THE COURT:**  Okay.  Thank you, Mr. Glasser.

6     We'll take a short break and come back for the Defendant's

7 opening statement.  If you'll slide your notes in your envelope

8 and leave them in the chair.  I'm going to have the clerk -- if

9 you all will be seated, please.  Everybody sit down.  I'm

10 talking to the jury.  Don't get ahead of yourselves.

11     I'm sorry.  They distracted me when everybody kind of stood

12 up there.  I'm going to have the clerk take you back here into

13 the jury room and show you the jury room that goes with this

14 courtroom.  From now on that's where you'll come and go from.

15 You don't have to go to Courtroom 2.  You don't have to go to

16 the jury assembly room unless there's some unusual thing going

17 on.

18     So during the break, you're free to stretch your legs.  You

19 can walk around.  I'll just remind you not to have any contact

20 with any of these folks in the courtroom.  Don't talk about the

21 case among yourselves or with anyone else and keep an open

22 mind.  You've only heard one opening statement and you haven't

23 heard any evidence yet, so don't talk about it or form any

24 opinion.

25     And we will come back at 3:45.  Ms. Sanders will come get

1  you and bring you back into the courtroom at that time.  So you

2  can leave your notes in your chair.

3      And, Ms. Sanders, if you will take the jurors into the --

4  show them where they're supposed to go.

5      Everybody please remain seated while the jury steps out.

6      (The jury left the courtroom.)

7          **THE COURT:**  Okay.  So I appreciate in some courtrooms

8  folks, judges like people to stand when the jurors come and go,

9  but I actually find it distracting.  So I'll ask everybody to

10  please, particularly because we have a lot of people in the

11  courtroom, if you'll just remain seated.

12      Anything we need to take up before the jury -- before we

13  take our recess?

14          **MR. GLASSER:**  Not from the Plaintiff, Your Honor.

15          **THE COURT:**  And if it's not set up the way you want,

16  Mr. Bicks --

17          **MR. BICKS:**  Well, it's set up fine.  I was just saying

18  the two jurors up against the wall I don't think will be able

19  to see the screen.  Since there were two seats open to the

20  right, I was just trying to make sure folks could see.  That's

21  what I was saying.

22          **THE COURT:**  I see.  I'll ask the clerk to check on

23  that and we can easily move them.  They might prefer not to be

24  next to the wall anyway.

25          **MR. BICKS:**  Right.  That's why I raised it.

1       **THE COURT:**  Thank you for that.

2      Any other logistical, housekeeping matters?  No.

3      We'll take a 15-minute recess.

4      (An afternoon recess was taken from 3:31 p.m. until

5  3:45 p.m.; all parties present.)

6       **THE COURT:**  All right.  I know there's a couple of

7  questions about people who want to bring their phones in.

8  We'll take that up after the jury is gone for the day.  Is

9  there anything we need to do before the jury comes in?

10      All right.  If you can get the jurors.

11      I think it probably is a good idea -- well, I'll just tell

12  them after they get in their seats I'm going to move them down

13  one.  I think that was a good suggestion for both visibility

14  and ease.

15      You can bring them in.

16      (The jury entered the courtroom.)

17       **THE COURT:**  Okay.  Before you get too comfortable, I'm

18  going to ask you to stand up and move -- everybody just move

19  down one.  I think you'll be able to see the screen better

20  and -- yeah.  And also be -- that corner can get a little

21  squished feeling.  Okay.  So this is your new seat and we'll

22  stay in these seats from here through the rest of the trial.

23  All right.

24      If at any time you can't see -- is the screen down there?

25  Oh, there it is.  If you can't see an exhibit, it's just like

1  not being able to hear.  You know, raise your hand.  Those of

2  you on the back row can stand up without permission, but if

3  anybody has any problems, just let me know.

4      We're ready now for the Defendant's opening statement and

5  the jury is with DISH.

6          **MR. BICKS:**  Thank you, Your Honor.  Could I just ask

7  to have the system on and -- thank you.  Excellent.

8      Good afternoon, everyone.  My name is Peter Bicks and I'm

9  hear to talk for DISH and I want to thank you before I give my

10  opening statement for the time that you all have taken to be

11  here.  We know we've taken you away from your lives, your

12  families, your jobs, and we appreciate it.  We know the weather

13  is tough.  So thank you.

14      You probably heard the expression that there are two sides

15  to every story.  Well, in this case, there are two sides to

16  every story and you just heard one side and now it's my turn to

17  tell you the other side so you can hear the whole story.

18      What's the case about?  Well, it involves some telephone

19  calls that were made in 2010, that time period.  They were made

20  by a company called SSN.  They were not made by DISH, so we're

21  going to have to look real careful at what the evidence is on

22  those calls.

23      It's also a class action.  Dr. Krakauer is the

24  representative of the class.  The case will rise or fall on the

25  facts that relate to his situation, so I'm going to ask you all

1  to listen carefully to the facts as they relate to

2  Mr. Krakauer.  The evidence will show that DISH acted

3  professionally and responsibly when it came to the facts

4  relating to Mr. Krakauer.  Not once did Mr. Krakauer tell DISH

5  about the calls that are at issue in this case and not once did

6  he even talk to SSN, even though he knew SSN made the calls and

7  he bought his DirecTV from SSN, and that's what the evidence

8  will show.

9      Let me talk to you a little about the burden of proof and

10  what some of the questions are going to be, and let's talk a

11  little bit about timing.

12      On this graphic, there are some important dates.  I have up

13  there 2010 to 2011 because those are the time period during the

14  calls to Dr. Krakauer and there were five calls that are at

15  issue in this case.  On those five calls, you will hear no

16  evidence that DISH was even mentioned during those calls, no

17  evidence.  The calls lasted in total 2 hours -- 2 minutes 32

18  seconds, 2 minutes and 32 seconds.  And you'll hear evidence

19  about those calls, a couple messages left on an answering

20  machine, somebody was polite, and DISH actually never came up

21  during any of those calls.  Two minutes and 32 seconds.

22      Mr. Krakauer has had his deposition taken, so we knew ahead

23  of time what he would say.  And he said, "Frankly, I did not

24  expect this to be a federal case."  And that's what the

25  evidence will be.  Three years 3 months went by, not a peep,

1  not a letter to DISH, not a phone call to DISH, not even an

2  e-mail.  Same as to SSN.  No evidence.  Three years 3 months go

3  by.  Mr. Krakauer meets with a team of lawyers and a lawsuit

4  gets filed.  Never ever did anyone reach out to DISH about any

5  of these calls to see if there was a problem and if it could be

6  corrected and the same as to SSN.

7      Mr. Krakauer will tell you that he's bringing this case to

8  make things right, it's not about the money; but the evidence

9  will be that he didn't sue the company that did things wrong,

10 SSN, even though he bought his DirecTV subscription from SSN.

11      Ladies and gentlemen, at the end of this case, the evidence

12 will be that the Plaintiff is trying to seek a windfall for a

13 phone call; and at the end of the case, we will ask you to find

14 out, based on the evidence, that that doesn't make common

15 sense.  Mr. Krakauer has got the burden of proof and that's

16 what the judge said.  He will not meet his burden of proof.

17      So what's going to be the questions we're going to talk

18 about?  The Court laid it out in some of the things that were

19 said to you.  I want to talk about the evidence on these

20 questions.  The first question is was SSN DISH's agent at all

21 times.  And the word "agent" is going to have specific legal

22 meaning in this case.

23      **THE COURT:**  Okay.  You'll need to limit your argument

24 to the evidence, not the law.

25      **MR. BICKS:**  Yes.

1    And the Court is going to instruct on what that means.

2    The next question is going to be was SSN acting within the

3  scope of actual authority and then the third question is going

4  to be are the damages in this case warranted.

5    On the first question, was SSN DISH's agent at all times,

6  the evidence will show that Mr. Krakauer will not meet his

7  burden of proof.  He will not meet his burden of proof.

8    Was SSN acting within the scope of actual authority?  The

9  evidence on this will be absolutely critical.  DISH told SSN,

10  "Do not call Mr. Krakauer."

11    SSN told DISH, "We will not call him.  We've taken him off

12  our list."

13    The evidence will show that the calls that took place,

14  those five, the 2 minutes and 32 seconds, were outside of the

15  scope of any authority.

16    And then are the damages warranted.  This case, ladies and

17  gentlemen, for those 2 minutes and 32 seconds of calls, adds up

18  to over $25 million; and at the end of this case, we will say

19  that that's not fair.

20    So let me tell you a little bit about DISH Network, a

21  little history of the company, so you have things in context.

22  DISH started about the 1980s.  Three folks were involved.

23  They're on the screen:  Charlie Ergen, Cantey Ergen, and Jim

24  DeFranco.  Charlie is the CEO of DISH.  Cantey is his wife and

25  she's on the Board; and Jim DeFranco, who will be a witness in

 1   this case, was one of the three cofounders.  These folks got

 2   together in about 1980 and had an idea and their idea was to

 3   bring TV to places in rural America and other places.  They

 4   started out with the idea of using a satellite, and here's a

 5   picture of Charlie and Cantey with one of the first DISH

 6   satellites.  They pooled together $60,000 to start a company

 7   and they had a dream of competing against General Motors and

 8   that dream became a reality.

 9       What were they trying to do?  They were trying to use a

10   satellite to get up into orbit so that signals could come to

11   places where it would be hard to get the signals, in the

12   mountains and other places.  You couldn't get cables through

13   the mountains and the old-fashioned rabbit ears would get

14   the -- the signals wouldn't work.  So they had an idea of

15   launching satellite so the signals could come down.

16       Here is a picture of one of the first satellites, and

17   that's Jim DeFranco there in the plaid shirt and the jeans.

18   He's got dark hair.  When he testifies, he'll have white hair

19   because that was a long time ago.

20       That satellite -- they almost lost that satellite and that

21   was pretty much almost their entire investment.  It fell off

22   almost on the side of a truck.  But they made some progress and

23   they launched a rocket -- the first rocket up into space and

24   this past December I think they launched either their

25   eighteenth or nineteenth rocket up into space to serve almost

1  13 million customers around the United States.

2      Some of their products you may have heard from.  They

3  started with that $60,000.  Today they've got over 13 million

4  subscribers.  Here are pictures of some of their products that

5  you all may have heard of.  They were really one of the

6  pioneers of the DVR technology we use and kind of accept as

7  something that's out there, but DISH was one of the leaders

8  there.  One of their great products is something called the

9  Hopper, which allows you to watch eight shows at once from room

10  to room with only one DVR box.  AutoHop, that little kangaroo

11  you can see, allows you to skip commercials, which many

12  consumers like.  The Tailgater, that white thing over there on

13  the side, is a device that allows you to watch TV when you're

14  traveling, a football game or something like that.  But these

15  are some of the products that DISH came out with.

16      And I mention these because customers like them and DISH

17  has done very, very well with consumers.  And I say that

18  because one of the things that was mentioned early is common

19  sense and I want to put a commonsense idea out now.  DISH's

20  lifeblood is its relationship with customers.  That's why the

21  company does well and it's got great customer ratings because

22  of those products.  There's nothing that DISH would -- values

23  more than customer relations.

24      So ask yourself does it make common sense that DISH would

25  want people who don't want to be called and aren't interested

1  in DISH's products and receiving telemarketing calls to be

2  called.  The evidence will show that DISH does not want that

3  and DISH does everything that it can to prevent it from

4  happening.  Word travels fast; and when word gets out that

5  things have happened, it's not good for DISH's business.

6      DISH markets its products using independent retailers and

7  there were during this time period approximately 3,500

8  retailers around the United States and many of those retailers

9  you've -- you've probably heard of:  Places like Sears,

10 RadioShack, Amazon, and companies like that.  But there are

11 also smaller retailers.  SSN is one of those retailers.  Ladies

12 and gentlemen, SSN counted for less than one-half of 1 percent

13 of subscriptions for DISH.  They were -- if you want to talk

14 about fishing, they were a minnow in an ocean and that's what

15 the evidence will be.

16     Now, here's some of the witnesses and you'll hear from

17 them.  Jim DeFranco I mentioned.  There you see he's got white

18 hair and he's the cofounder of DISH and he's going to testify.

19 He's going to testify towards the end of the case.

20     Amir Ahmed, he's going to testify.  I think he'll be the

21 second witness and he's over here.  Mike Mills.  Mike is here

22 and Mike will be -- he'll be also testifying in the case.  Mike

23 and Amir, they're on the sales side; and you'll hear from them

24 about why retailers are independent and not agents and how

25 that's important to DISH's business, because the retailers are,

1  to some extent, competitors of DISH.  DISH also sells directly

2  to consumers and retailers do too, and it's a tricky

3  relationship because when retailers have their own marketing

4  strategies they don't always want DISH to know about them

5  because they're worried because they're competitors.  And

6  they'll talk to you about how DISH uses retailers and how

7  things worked with SSN and how they were less than one-half of

8  1 percent, and you'll hear that evidence.

9      Reji Musso.  Reji is here.  It's Reji Jo Musso.  We call

10 her Reji.  She was very important in compliance and she's going

11 to be a witness in the case.  And Bruce Werner, who is over

12 here as well.  Bruce and Reji worked together in compliance and

13 they're going to be very important witnesses because they were

14 dealing with SSN on compliance issues, and what you will hear

15 from them is that they took proactive steps with SSN to do

16 everything possible to make sure that SSN was doing things

17 right, and the information they had was that SSN was doing a

18 pretty decent job.

19     They had some indication of a complaint here or there, but

20 what you'll learn in this case, ladies and gentlemen, is that

21 when you're involved in any kind of telemarketing that you're

22 talking about huge, huge numbers of calls.  You heard

23 1.7 million calls.  So if you see a complaint -- one or two

24 complaints in that kind of volume of calls, it's important when

25 you hear the evidence to put things in context.  And they'll

1  talk to you about the steps that they took when it came to

2  dealing with SSN and I think, ladies and gentlemen, the

3  evidence will show that they acted responsibly and DISH did a

4  pretty good job.

5      So those are going to be some of the five key witnesses on

6  the DISH side and what I think you all should remember is the

7  Plaintiff goes first.  He's got the burden of proof and he's

8  going to cross-examine our witnesses first and so our story

9  won't come out until it's our turn to ask them questions.  So I

10  ask that you be patient, remembering that there are two sides

11  to every story and we don't get to tell our side until they go

12  first.

13      So those are five key folks from DISH.  They're all here.

14      I'll say one thing about Reji.  She's retired from DISH and

15  she doesn't get paid by DISH.  She lives in Michigan and she

16  came here for this case because what was said about how DISH

17  handled things goes directly to what she did and she wanted to

18  come here.  She's got no dog in the fight because she's not

19  even with DISH anymore, but I want you to hear that evidence

20  and we look forward to telling that story.

21      So the first question I said is was SSN DISH's agent at all

22  times.  And if not, then that's going to be important, but

23  that's going to be the first question, were they the agent.

24      I want to start with a contract because SSN had a contract

25  and the contracts are important in this business.  This is the

1   way these companies divide up who's responsible for what.  And

2   there was a contract here and you all will have the contract.

3   If it's a little tough to read on the screen, don't worry

4   because you're going to have it, but I want to talk a little

5   bit about it because these parties had a contract and that's

6   where they set out who was agreeing to what.

7       And the contract makes clear that SSN was an independent

8   contractor.  It's right up in the beginning right in the

9   introduction to the contract, independent contractor.  And it's

10  also important that the contract says it's a nonexclusive

11  contract and what that means is that SSN can sell other

12  products if it wants to.  It doesn't have to sell DISH.  It can

13  sell other company's products.  And SSN was selling DirecTV.

14      And I heard comments made by Plaintiff's counsel.  Ask

15  yourself are you going to hear from a witness in this case from

16  DirecTV who's going to come in here and testify.  I don't think

17  you're going to hear anybody from DirecTV about why or why not

18  SSN didn't deal with them anymore.  So be very careful about

19  what the evidence is, not what a lawyer says.  What I'm showing

20  you here is a contract in the case.  This is going to be what

21  the evidence is, nonexclusive basis.

22      Now, there was an entire section in the contract on

23  independent contractor and it wasn't something that was kind of

24  buried somewhere else in the contract.  It's right there all as

25  plain as can be.  SSN says that they are an independent

1  contractor and that's what DISH says as well.  That's what both

2  parties agreed to.  And it wasn't just that it was there once.

3  There were three contracts:  2001, 2006, and 2010.  Each of

4  those contracts says that SSN is an independent contractor.

5      They are not employees or agents and one of the questions

6  that you're going to have to answer is was SSN an agent.  The

7  contract says that SSN was not an agent and that's what the

8  evidence is going to be, black and white, right in the

9  contract.

10      So you may be saying, What's the difference between an

11  independent contractor and an agent?  Companies --

12          **THE COURT:**  Okay.  Well, you're not going to tell them

13  about the law.  I'll tell them about that.

14          **MR. BICKS:**  I'm not going to tell them about the law.

15          **THE COURT:**  Okay.

16          **MR. BICKS:**  If you go to an Apple store -- when you

17  walk into Apple up at Friendly in the shopping plaza, Apple has

18  people who wear "Apple" on their shirt.  You buy a product, you

19  want to get a business card, it's going to say "Apple" on it.

20  If you have a problem with an Apple product, you talk to Apple.

21  That's the way Apple runs.  Best Buy is different.

22          **THE COURT:**  Okay.  Move on.  As to all this Apple and

23  Best Buy, who aren't here, there's not going to be any evidence

24  about Apple and Best Buy.

25          **MR. BICKS:**  Yes, Your Honor.

1    **THE COURT:**  Move on.

2    **MR. BICKS:**  You will see the retailer agreement in

3  this case and you will hear how DISH deals with its retailers

4  and you will see in all the contracts every time they are

5  independent contractors.  And not only does it call them

6  independent contractors, but the contract makes it clear that

7  someone like SSN, it's in their contract, can't go out and say

8  that "We are DISH".  It's very, very clear in the contract and

9  this is what this provision says.  So there's detail about what

10  an independent contractor means in this contract and, as I say,

11  you'll have the contract.

12    You've heard the expression "actions speak louder than

13  words" and what you will see in this case is that it wasn't

14  just in the contract that DISH made it clear that SSN was an

15  independent contractor, but there were communications from DISH

16  to its retailers that made that clear several different times.

17    One of them was something called a Facts Blast.  Facts

18  Blast is how DISH communicates with its retailers.  And in this

19  Facts Blast that you'll see in this case, it says right up in

20  the front:  Important reminder to independent retailers.

21  Second, no retailer is permitted to represent itself as DISH

22  Network.  And then it says:  The retailer agreement clearly

23  provides that the relationship is that of an independent

24  contractor.  So this is one way that, when you look at how the

25  parties dealt with each other, DISH reminded SSN you are an

1  independent contractor and this was in a Facts Blast.

2      There will also be evidence of what are called Retailer

3  Chats, where DISH would communicate with its retailers about

4  their relationship and what DISH expected.  And here's an

5  example of a Retailer Chat where DISH reminds SSN that

6  retailers are not agents or employees of EchoStar.  You'll hear

7  the name EchoStar.  That was an earlier name related for DISH,

8  so that for this case is really the same thing as DISH.  So

9  here it is in this Retailer Chat that, again, DISH is making it

10 clear to SSN that they are not agents or employees of EchoStar

11 and they're independent contractor.  And this is the course of

12 how the parties dealt with each other, clear communication from

13 DISH on this point.

14     And you'll also hear evidence from SSN in the case.  Here

15 is Sophie Tehranchi.  She's going to be testifying by videotape

16 deposition and so we know what she's going to say because we

17 have the testimony.  And she's going to say, when asked did

18 DISH Network ever provide Satellite Systems with any phone

19 numbers to call -- and the answer is no.  Did DISH provide you

20 with any contact information of any kind for people to call?

21 And the answer is no.  And you will hear that evidence from the

22 SSN witness herself, Ms. Tehranchi.

23     You will also hear kind of practical, commonsense evidence

24 about how the parties dealt with each other; and the question

25 for you all will be was SSN the agent and what was the level of

1  control and what happened.

2      Well, here's an interesting example, ladies and gentlemen,

3  of evidence you're going to hear.  This is an e-mail from

4  Charlie Ergen.  I mentioned who Charlie is.  Charlie's the CEO.

5  And it's kind of an interesting story.  Charlie got a call at

6  his home in Colorado and Charlie got a call from SSN trying to

7  sell Charlie DirecTV.  So the CEO of DISH got a call from SSN

8  trying to sell him DirecTV.  He liked the script.  He liked the

9  message on his answering machine and he wanted to get it.  So

10  he asks his sales guy, Amir Ahmed, "Can you get that script

11  from SSN?"  He wanted it.  He liked it.

12      SSN said, "No, we're not going to give you that script that

13  you want."

14      That will be evidence, practical evidence.  The CEO of DISH

15  asks for a script from SSN and he doesn't get it and common

16  sense would think -- when a CEO of DISH is trying to get

17  something from a retailer, you would think the retailer would

18  probably lean on trying to get something if the CEO wanted it,

19  but it didn't happen here.

20      So that's kind of the practical evidence of how these

21  parties dealt with each other.  DISH didn't want to control SSN

22  and SSN didn't want to be controlled by DISH because they were

23  an independent retailer who had their own marketing strategies

24  and this is an example of that.

25      This will again be testimony you'll hear from Sophie

1  Tehranchi.  Did DISH Network ever provide Satellite Systems

2  Network with any telephone lines to make calls on?  The answer

3  is no.  Does DISH Network own the building where SSN's offices

4  are?  The answer is no.  Did DISH Network own any of SSN's

5  equipment?  The answer is no.  They're separate companies.

6      And then here's another practical example.  Because it's

7  SSN's facilities and they own things, DISH had trouble getting

8  into their facilities when DISH wanted to make sure that

9  communications about DISH's products are accurate.  DISH is

10 proud of the fact that when it deals with consumers it wants

11 consumers to get accurate information.  If you want to get the

12 Hopper and you're in North Carolina, DISH wants that price to

13 be the same price that somebody up in Maine is being told about

14 the Hopper and DISH really wants people to get accurate product

15 information.  SSN wouldn't let DISH into its building to make

16 sure that that was happening.

17     Again another practical example of how these parties

18 related to each other and that will be one of the questions

19 that you all will have to decide, independent contractor or an

20 agent.  The evidence will show, evidence like this, that

21 Plaintiffs can't meet their burden of proof.

22     The next question is was SSN acting within the scope of

23 their authority, did they do what they agreed to do and what

24 DISH asked them to do or did they go outside.  That will be one

25 of the questions.  What will be the evidence on that?

1    We start with the contract and here it is again three

2  times.  SSN agrees in writing that it is solely responsible for

3  complying with the telemarketing laws.  And I underlined the

4  word "solely."  "Solely" means one and the one was SSN and this

5  is what the parties agreed to in writing.

6    And you'll hear that there's a commonsense reason for that.

7  If you have 3,500 retailers around the United States –– and the

8  reason there are that many retailers is because the markets are

9  different and the marketing strategy that may work in

10  North Carolina is not going to be the same marketing strategy

11  that's going to work up in the northern parts of Maine, for

12  example.

13    And when you look at the contract that I showed you, when

14  it says they're an independent contractor, it says they're an

15  independent contractor for marketing, not telemarketing,

16  because the independent retailer decides what kind of marketing

17  that they want to do.

18    What will work right around here, again, will not work in

19  some other jurisdiction.  Use of radio, use of television, use

20  of telemarketing, which is legal, is going to be different when

21  it comes to how effective it is depending on where you're

22  marketing; and it's that independence which is one of the most

23  important things of these marketing relationships for DISH; and

24  that's why the contracts say that the retailer is solely

25  responsible for complying with the telemarketing law.

1    The evidence will show that DISH does not operate SSN's

2  phone systems.  DISH does not choose what individuals a

3  retailer will call.  It practically would be impossible to do

4  that even if DISH wanted to and it doesn't and the retailer

5  doesn't want that to happen either because that's their

6  business that they run.  And this is what the contract says not

7  just once but, the evidence will be, three times.

8    So I want to start -- and I've kind of divided this part of

9  my presentation into three chapters because it's important in

10  this case to keep track of time.  This case, as I said,

11  involves really 14 months, 2010 to 2011; and you'll hear

12  evidence from the Plaintiff that goes all the way back to 2003.

13  But I think it's going to be important to break things out and

14  you'll see why.

15  2003 Mr. Krakauer signs up with DirecTV through SSN.  He

16  signed up through SSN and that's how SSN had his phone number,

17  because he signed up with them.

18    The National Registry comes out.  That's in 2004.  That's

19  that Do Not Call list.  And companies like DISH and many

20  companies were scrambling, I think it's fair to say, to come up

21  with procedures to deal with this new law because it changed a

22  lot.

23    SSN, while it was working for DirecTV, had some issues with

24  prerecorded calls and it also had some issues with some DISH

25  calls using prerecorded calls, ladies and gentlemen.  That's

1  using a telephone system to send a message out, like a robot's

2  voice, not a person.  And SSN was doing that and DISH told them

3  to stop.  This case, ladies and gentlemen, is not about those

4  prerecorded calls that happened in 2004.  You'll hear about

5  that.  There were a handful, not a huge amount, but there were

6  some issues.  And SSN had some issues with DirecTV, too.  But

7  not one person who got a prerecorded call is bringing a claim

8  in this lawsuit.  That's not what this case is about.

9       DISH took some steps to improve its compliance to deal with

10  a bunch of issues but -- including some of these prerecorded

11  calls, and it centralized its compliance -- and you'll hear

12  from Bruce and Reji about that -- within the retail services

13  department and it made some changes.  Reji actually wasn't even

14  hired at this point in time.  So if you hear evidence of 2003,

15  2004, it's not really what this case is about.  And DISH took

16  steps to deal with that.  That's kind of 2003 to 2004, '5, in

17  that time period.

18       2006 to 2009, that's the time period leading up to the

19  calls that are important in this case.  DISH hires Reji Musso

20  to step in and help with compliance.  She builds out a staff of

21  about six people to deal with compliance issues all coming off

22  of the 2004 change in the law and to improve procedures at

23  DISH.

24       DISH has a way to investigate complaints, a formal process.

25  And you can imagine with this amount of telemarketing and other

1  marketing activities a company does get complaints, and they

2  have to have a way to investigate them, and DISH set up a whole

3  system and took proactive measures to deal with that.  They

4  sent out Fact Blasts, the things I talked about, to tell

5  retailers about telemarketing issues, the TCPA.  That's what

6  the statute is called.  And DISH sent out that kind of

7  information.

8      They had the Retailer Chats on telemarketing compliance

9  where very senior people, including the cofounder, Jim

10 DeFranco, were talking to retailers about the importance of

11 following the telemarketing laws.  And you'll hear evidence of

12 this and I think it's going to be important evidence because it

13 shows you that DISH was paying attention to this from the top

14 of the company all the way down.  The cofounder was on Retailer

15 Chats with telemarketers and also with other retailers and

16 saying, "You've got to follow the laws."

17     Compliance training.  You'll see something here, Team

18 Summits.  That's when DISH would get together with its

19 retailers.  It had compliance training at those summits and it

20 invited PossibleNOW to come in.  You heard Plaintiff's counsel

21 talk about PossibleNOW.  He said I was going to mention it, I

22 don't know, thousands of times.  I'm not going to mention it

23 thousands of times, but I'm going to say a little bit about it

24 because it's important.

25     PossibleNOW is a company that is probably the leader in the

 1  market at making sure Do Not Call lists are scrubbed.

 2  "Scrubbed" means you take a Do Not Call list and you compare it

 3  to the National Registry list and you mesh them together and

 4  you do computer stuff on them and you make sure that the

 5  numbers that are not supposed to be called are scrubbed out.

 6  So when you hear the phrase "scrubbing," that's what that's all

 7  about.

 8      DISH started working with PossibleNOW in about 2006 and

 9  strongly encouraged its retailers to use PossibleNOW to make

10  sure that there weren't telemarketing issues, and PossibleNOW

11  came to Team Summit retailer meetings to help retailers see how

12  important it was to follow compliance and to work with them.

13      You'll hear from Reji and Bruce, and this is what they will

14  testify:  That they educated and assisted SSN with compliance,

15  including explaining PossibleNOW's role as a resource.

16  PossibleNOW is the market leader.  They're the ones who keep

17  track of the National Do Not Call Registry for the government.

18  They're hired to do that.  They're the best in the business.

19      They will say that DISH investigated complaints to identify

20  retailers responsible for those complaints.  And the evidence

21  will be that it is hard a lot of times -- you can imagine, if

22  you get a call that you don't want, it's hard a lot of times to

23  figure out where that call comes from; and DISH had set up a

24  way to investigate; and it's not as easy as it may seem.  If

25  somebody says, "I got a call from an 800 number," it's not

1 easy.  It takes a lot of work, and you'll hear from Reji and

2 Bruce about the kind of work that they put in on these

3 investigations.

4     And then when there were complaints relating to SSN -- and

5 there were a handful over a several-year period -- you will

6 hear the information DISH got and how they reacted to that; and

7 the evidence will show that they acted both professionally,

8 quickly, responsibly, and reasonably.

9     I mentioned these Fact Blasts and where DISH would tell

10 retailers how important it was to follow the telemarketing

11 laws.  Here is an example and the statement down at the bottom

12 that EchoStar takes telemarketing violations very seriously.

13 For obvious reasons, it's bad for their business when customers

14 get ticked off and they reinforce that message because it's

15 important to the company.

16     Important reminders.  "Here are the telemarketing laws.

17 Make sure you follow them."  Because remember the evidence is

18 that the contract said that SSN has to comply with the

19 telemarketing laws and here is DISH reinforcing how important

20 that is.

21     PossibleNOW they brought on and it's very important timing,

22 ladies and gentlemen, because the calls, again, here took place

23 in 2010, 2011.  DISH brings on PossibleNOW 2008.  SSN signs up

24 with PossibleNOW in October of 2008.  Here's an important

25 message coming out from DISH to its retailers:  Enroll with

1  PossibleNOW.  And you'll see this highlighted sentence.  It

2  says:  To facilitate retailer scrubbing of customer leads

3  against lists.  And that's what PossibleNOW does.  That's what

4  their business is.  So DISH is getting the word out to use

5  PossibleNOW.

6      This is a communication with SSN and DISH, and SSN is

7  saying to DISH that they are working with PossibleNOW October

8  of 2008.  This is before the calls that are even at issue in

9  this case.  DISH is being told, "We're using PossibleNOW."  And

10  this is evidence of that that you'll see.

11     This is April of 2009.  DISH -- somebody says to DISH

12  somebody shouldn't have called me.  DISH reached out to SSN.

13  "What's going on here?"

14     And they're saying, "We're using PossibleNOW.  We're

15  scrubbing our lists."

16     And here's evidence of actually a receipt out of the files

17  of SSN that you'll be able to see in this case.  They scrubbed

18  1,500, it looks like, 62 records.  And then you'll see there at

19  the bottom 108 were Do Not Call.  They had actually receipts

20  that they were scrubbing these phone numbers and here is an

21  example.  They were in fact scrubbing.  But one of the things

22  you'll learn in this case is mistakes happen when there are

23  very, very large groups of data that are being scrubbed against

24  each other, but this is evidence that DISH had that SSN was in

25  fact scrubbing.  So that's what was kind of going on in 2006 to

1  2009.  I will call that Chapter 2 in the case.

2      So now let's talk about Chapter 3, which are the calls that

3  we're talking about here.  DISH receives two consumer

4  complaints about SSN and investigates them, because one of the

5  questions that probably will come through your mind in the case

6  is why didn't DISH terminate SSN earlier than it did.  DISH did

7  end up terminating SSN.  And the people who were responsible

8  for making the calls at the time had this kind of information.

9  There were two consumer complaints during this time period

10  about SSN and they were investigated by DISH.  SSN was put on

11  hold in August of 2013.  And you'll hear evidence about what

12  DISH found out when it did that investigation, and there were

13  good explanations for how that -- for how that could happen

14  when it comes to scrubbing and other things, but it's important

15  to put that in perspective.

16      Let me talk about the timeline of Mr. Krakauer's complaint

17  to DISH.  This is what the evidence will show because, again,

18  the timing is very important.  I told you when I first stood up

19  that this shows that DISH acted responsibly and professionally.

20  So what exactly will the evidence show on the timeline?  2003,

21  that's when Mr. Krakauer signs up for DirecTV.  May of 2009,

22  it's May 9th, he got a telemarketing call from SSN.

23      And remember SSN was the company that sold him his DirecTV.

24  They had his information and they thought that they had a

25  business relationship with him, which you'll hear about, an

1  established business relationship, which in telemarketing can

2  allow a telemarketer call you if they have this business

3  relationship.

4        **MR. GLASSER:**  Objection.

5        **MR. BICKS:**  This is what they say they thought.

6        **THE COURT:**  As to what the law is, you'll take that

7  from me.

8        **MR. BICKS:**  Absolutely.

9        **THE COURT:**  Go ahead.

10       **MR. BICKS:**  So on May 9th, Mr. Krakauer gets a call

11  and he reaches out and he says something to DISH.  DISH

12  investigates.  The compliance group looks at that.  They're

13  undertaking an investigation.  They confirm and they determine

14  that SSN called Mr. Krakauer.

15     They reach out to SSN the day after they conclude that that

16  call came from SSN.  They reach out and they say, "We found out

17  about this.  We investigated it.  We concluded it came from

18  you.  Don't do it."  Day after.

19     They send a letter following up saying that -- telling them

20  about Mr. Krakauer's complaint and asking for specific details:

21  Scrubbing the list, where did it come from, so on and so forth.

22  And this is important because this is what the letter said:

23  "Immediately ensure that this phone number has been added to

24  your internal Do Not Call list."  This is what DISH says to

25  SSN.

1     And remember the question did SSN act outside of what it
2   was supposed to do.  DISH says, "Add this list to your internal
3   list."  And it says, talking about the contract, you're
4   required to comply with the applicable laws.  That was the part
5   of the contract I spoke about.  And it also said there could be
6   disciplinary action if this isn't done.  And this is what DISH
7   communicated.

8     SSN responds immediately.  This is important because SSN,
9   when there were a couple of these complaints, would immediately
10  respond to DISH, wouldn't be sitting there waiting for months.
11  They would get back.  And they responded to this and they said,
12  "We think it was a mistake and we've put Mr. Krakauer on our Do
13  Not Call list.  We didn't know that he didn't want to be called
14  by us.  We had dealt with him before," going back to 2003.  And
15  they said that they would not call him again.

16    And this is the letter, you'll see it, where they
17  responded.  They put him on their list the same day that DISH
18  asked them not to do it and they say here -- right here in the
19  second paragraph, "Prior to this complaint, we did not know
20  that Mr. Krakauer wanted off of our calling list."  And they
21  say they always comply with the laws and they say that they
22  take this seriously.  They respond the same day saying, "We've
23  put him on our list.  We thought we could call him because we
24  had dealt with him before and we've put him on the list."  And
25  then they had deleted his name from their database.  That's the

1  information that DISH had.

2      So this is then what the evidence will show on this set of

3  facts because it's so important to the case on one of the key

4  questions, outside of the scope.  One, SSN did call

5  Mr. Krakauer.  DISH investigated and determined that SSN made

6  the call.

7      Step two, DISH says to SSN, "Add Mr. Krakauer's number to

8  your Do Not Call Registry and do not call him again."

9      SSN says to DISH, "We have already deleted his number and

10 will not call him again."

11     That's what the evidence will show on this important

12 question did SSN do what DISH said and did they do what they

13 said they would do.

14     And then what it turns out in this case, 14 months later --

15 go by, and SSN called Mr. Krakauer five times for the 2 minutes

16 and 32 seconds, and DISH did not know about that.  That's what

17 the evidence will be.  But this, ladies and gentlemen, evidence

18 will show that SSN went directly outside what DISH said.

19 That's what these facts are, outside of the scope.  That's what

20 the evidence will be, not following specific instructions that

21 DISH gave.

22     After these calls -- it's important because a year goes by,

23 right, and DISH -- after this May 2009 call, the letters I just

24 showed and not one thing happened.  DISH had no information

25 that there were any issues from SSN.

1    Here's an e-mail you'll see from Reji Musso to the folks at

2  SSN where they say:  "A long time ago -- Sophie will remember,

3  when I first came on to retail services" -- that's 2006 --

4  "there were some issues, but not again until now."  And they

5  see a call.

6    And there's a discussion here, you'll see the evidence,

7  about did this call -- did it have an established business

8  relationship and Reji says:  "Make sure you check with your

9  legal counsel about whether or not you had an established

10 business relationship," and reminds them, "You should use

11 PossibleNOW."

12   And she makes the comment that a complaint is not always --

13 is an allegation and it's very important -- you'll hear in this

14 case that a lot of times DISH will get a complaint on a

15 telemarketing issue like that and it turns out that the person

16 did -- what -- did deal with DISH or did reach out to DISH and

17 that happens here and that will be the evidence on this point.

18   The evidence will be that SSN's overall compliance to DISH

19 looked in pretty good shape at this time.  That was the

20 information that they had.

21   And this is important because Plaintiff's counsel said that

22 there were millions of calls made in 2010 and 2011, millions.

23 I think the evidence, ladies and gentlemen, will be in this

24 case 1.7 million calls were made by SSN, okay, but DISH had two

25 indications of a complaint during this time period, two out of

1  1.7 million.

2      And you'll see those two little red dots.  They're probably

3  hard to see.  But when you're in telemarketing compliance and

4  you know that somebody makes millions of calls and you only

5  hear two complaints to people whose job this is, that shows

6  things are in pretty good shape and that's what they -- the

7  information that they had at the time.

8      So this lawsuit is filed in April 2014.  DISH learns about

9  these five calls to Dr. Krakauer, the 2 minutes 32 seconds, and

10  they find out about those calls.  And ultimately SSN -- SSN is

11  actually put on hold in August 2013 before this case is filed;

12  and when you're put on hold, you're shut off, okay.  So DISH

13  shut them off.  They're ultimately formally terminated after

14  that, but during that time period between August 2013 and their

15  retailer agreement being terminated, they weren't allowed to do

16  any sales with DISH.

17      And this is the sequence of those calls, the 2 minutes and

18  32 seconds, and the evidence will show that Mr. Krakauer never

19  reached out to DISH about those calls and that DISH actually

20  wasn't even mentioned during any of those calls.  There were a

21  couple calls to his answering machine that I think the evidence

22  will be that he deleted.  And that's -- that's what the

23  evidence was at this time, and the evidence will be that DISH

24  didn't know this until much later, and that's the 2 minutes and

25  32 seconds.

1    So the evidence on this will be important that SSN told
2    DISH then that it would not call Mr. Krakauer.  It told DISH it
3    was scrubbing the lists -- and you saw some of the -- a
4    receipt, I showed you one -- and that it complied with the law.
5    We do know now that they called Mr. Krakauer after that 2
6    minutes and 32 seconds, and it must be that they failed to
7    scrub properly all lists.  We don't know that for sure, but
8    clearly it wasn't 100 percent scrubbed right, but there can be
9    mistakes in scrubbing.
10   But the evidence is that SSN didn't properly scrub and that
11   SSN didn't comply with the law, and the evidence will be that
12   they acted outside of the scope because the clear instruction
13   was that they were supposed to do that.
14   So are the damages warranted?  I told you, ladies and
15   gentlemen, that this is a case where the Plaintiffs, when you
16   add up those numbers, are -- it's over $25 million based on
17   those 2 minutes and 32 seconds.
18           **THE COURT:**  Well, I think that's a bit misleading
19   so --
20           **MR. BICKS:**  I don't want to be misleading, Your Honor.
21           **THE COURT:**  If you're talking about 51,000 calls, it
22   can't -- this is 5 calls you're talking about 2 1/2 minutes.
23           **MR. BICKS:**  Yeah.  And based on these five calls and
24   the allegations of the class, the witness who will be there
25   talking about the five calls to him, and the statistics that

1  will be put on these other calls, which are -- we will show

2  have some questions with them, and you won't hear any other

3  witness come in this courtroom and talk about any call, that

4  the amount of recovery here is over $25 million.

5      And at the end of the case, we will say that that's not

6  going to be fair and that the evidence is going to show here

7  that SSN was not DISH's agent in the case, that SSN acted

8  outside the scope of any authority, and that the damages that

9  are sought in this case are not warranted.

10      So I thank you for your time.  I know I went on, but that's

11  kind of a road map of what the evidence is going to be.  So

12  thank you very much.

13          **THE COURT:**  Okay.  Thank you, Mr. Bicks.

14      All right.  Ladies and gentlemen, we'll start in the

15  morning at 9:30 with the first witness in the case.  Even

16  though you've heard the opening statements, of course, as I

17  told you, that's not evidence and you'll need to hear the

18  evidence from the witnesses and the exhibits themselves.  So

19  we'll start at 9:30.

20      Over the evening recess, please do not discuss the case

21  among yourselves or with anyone else.  Don't have any contact

22  with the lawyers, parties or witnesses.  Do not conduct any

23  independent investigation.  No tweeting, no Instagramming, no

24  blogging.  And don't talk to any of your family members or

25  coworkers or neighbors about the case beyond, you know, the

1  logistics of saying that you're here and what your schedule is.
2  No comment or discussion about the substance.

3      Also, this is an old building.  Sometimes it's cold,
4  sometimes it's hot.  There are ways in which I have a lot of
5  power, but I cannot seem to have any power over the heat, so I
6  do suggest to you you bring a coat and a sweater and be
7  prepared for some fluctuations in the temperature over the
8  course of the trial.

9      And if any of you have a cold or you need water in the
10 courtroom while the trial is going on, please bring one of the
11 bottles with a lid because stuff gets spilled.  Please don't
12 bring anything in an open top and don't bring anything other
13 than water because they don't replace the carpet very often,
14 okay.

15     All right.  Thank you all for your time.  Leave your notes
16 in your chair.  You're excused to your jury room and you can
17 leave from the hallway there.  We'll see you in the morning at
18 9:30.

19     (The jury left the courtroom.)

20         **THE COURT:**  Okay.  What do we need to take up before
21 we stop for the day other than these two telephone requests,
22 smartphone requests?  Anything for the Plaintiff?

23         **MR. BARRETT:**  Your Honor, there are a couple matters.
24 We felt that the opening statement really intruded
25 significantly into statements about the law and we would ask

1  the Court consider an appropriate limiting instruction

2  regarding the law.  Scope of actual authority is a matter that

3  came up in the opening, as well as EBR, so we believe that

4  there needs to be some clarification that the law will come

5  from Your Honor and not from counsel.

6        **THE COURT:**  All right.  Well, certainly there was a

7  little more about the law than would have been preferable, but

8  I do think I interrupted a couple of times and told them that

9  thing, just that.  I don't think I need to do anything else.

10  If there's particular aspects of the law that need to be

11  addressed, I can do that during the course of a witness's

12  testimony if it would be helpful.  You all can -- either side

13  can draft something up.  You know, I would prefer to do it at

14  the end of the case, but I did not cover EBR in my initial

15  instructions, so I don't know if there's -- I'll just leave

16  that for another day.

17      So anything else for the Plaintiff?

18        **MR. BARRETT:**  Yes, Your Honor, there is another

19  matter.  You recall the motions in limine.  We moved to exclude

20  a couple of letters that were written to Dr. Krakauer back in

21  2014 advising him that he had certain rights and inviting him

22  to contact counsel, and Your Honor had excluded that in the

23  motion in limine ruling, those two letters.

24      The statements in opening about three years going by, 2014

25  until Dr. Krakauer filed his lawsuit, treads pretty close to

issues that are presented in that letter and will require some

clarifying testimony from Dr. Krakauer about why he filed the

lawsuit and what he learned, which, of course, intrudes closely

again to the letter that he received back in 2014 that Your

Honor has excluded.

It's kind of a perilous path for us to direct questioning

on that point. We want to ensure that we do not open any doors

with respect to that issue, but we do need to clarify what

Dr. Krakauer learned about his rights and when, and we do not

want to intrude upon Your Honor's ruling. We also don't want

to intrude upon any advice or information that Dr. Krakauer

received from us at that time.

So I'm raising that kind of as a precautionary issue. We

do not want to open the door. We do intend to elicit that

testimony in response to opening statement and we simply wanted

to bring that matter before the Court.

**THE COURT:** All right. Thank you for letting me know.

**MR. GLASSER:** So I guess the question is if we ask him

why did -- why did you not sue prior to when you sued and he

says, "Because I didn't know about class actions until 2014 and

that this had happened to lots of people," does the Court

believe that would open the door and undermine the motion in

limine and bring in all this other stuff? I feel like we've

been baited to do that and we should be able to respond to the

idea that he just sat around.

1    **THE COURT:**  Well, I mean, I don't know exactly what

2  he's going to say so I can't really rule in advance, but, you

3  know, I don't have any problem with him explaining his

4  motivation.  You know, that -- that seems like a fair thing

5  so --

6    **MR. BICKS:**  Well, first of all, Your Honor, your in

7  limine ruling said we could not introduce into evidence written

8  communications with his counsel.  I didn't show any of those

9  letters.

10    **THE COURT:**  Right.

11    **MR. BICKS:**  All I said was a meeting took place and a

12  lawsuit got filed.  That's all that I said.  And so, first of

13  all, I was mindful of your in limine rulings and that's why I

14  didn't publish or even refer to letters or communications.  I

15  just said a meeting took place so people can see on a timeline

16  when the case got filed compared to the calls.

17    So I -- I have told -- Your Honor, I don't know what, you

18  know, Mr. Krakauer is going to say about his motivations, but I

19  had mentioned to Your Honor, you know, that if he starts

20  getting into why, you know, he brought the lawsuit and he

21  starts opening things up, you know, I will deal with what would

22  be permissible on cross at that point.

23    **THE COURT:**  Right.  I mean, I'm not sure I can really

24  rule on it.  I mean, certainly an inference one could draw from

25  the opening statement would be that he was motivated to sue

because he met with some lawyers.  Now, there are other ways to
interpret that argument as well -- that opening statement as
well.  So, you know, I don't know how to rule on it until I
hear what he says.

        **MR. GLASSER:**  Okay.

        **THE COURT:**  You know, just general questions about his
motivation that don't lead to long speeches, you know, we
shouldn't have any problems.

        **MR. GLASSER:**  Thank you, Your Honor.  That's it for
the Plaintiff.

        **THE COURT:**  Anything the Defendant wants to address
before we stop for the day?

        **MS. ECHTMAN:**  Your Honor, when we spoke on Friday, I
mentioned that we had an issue about some expert exhibits and
this relates directly to motions in limine as well.  Your Honor
will recall that Plaintiff moved in limine to exclude all of
the defense Exhibit 31 data summaries and Your Honor ruled that
we could not use those exhibits in our affirmative case, in
cross-examination for any purpose.

    Since that time we have had some back and forth about those
defense categories and there's a stipulation that's now been
entered into and that the Court, I believe, will be reading to
the jury.

    Recently, within the last two weeks, Plaintiff's counsel
gave us some new exhibits that they want to use with their

expert and they are portions of our old Exhibit 31 summaries

that were precluded for all purposes.  And so we said, "If

you're going to use them, then we want to use the rest of

them."  And the response we got was no.

So, you know, this gets back to the goose-gander.  They

can't add new exhibits and use them with their expert when they

were not produced as part of expert discovery.  They were

actually precluded based on their own motion; and if you're

going to let them use it, then we've got to be able to use our

summaries for all purposes with our witnesses as well.  We

think it's got to be a level playing field here.  They can't

come out with new expert exhibits to elicit new expert

testimony that we've never heard before based on our exhibits

that Your Honor precluded based on their motion.

**THE COURT:**  Okay.  Is this the --

**MS. ECHTMAN:**  So it's not what's attached to the

stipulation actually.  They made their own new versions and

they want to use them affirmatively with their expert.  We have

no idea what their expert is going to say about that.

**THE COURT:**  In connection with Ms. Verkhovskaya.

**MS. ECHTMAN:**  Verkhovskaya's affirmative testimony.

There are several exhibits.  One is called -- I believe it's

PX2000 and what that is -- it's got a cover sheet that says

there are approximately -- you know, it's got the number of

telephone numbers, and it's got the number of phone numbers,

and then there's an attachment that lists every phone number and how many calls to each of those phone numbers. I think that's fair because that lets everyone know what the scope of the class is. Right, those are the phone numbers that they're suing on that are left in the class and we whittled them down.

But on top of that, they have an exhibit that they want to use with their expert that relates to every one of the call buckets that are in the stipulation and they want to have their expert affirmatively testify about those when they were never part of that expert's opinions. They're actually exhibits that we developed in rebuttal, and now they want to make them part of the case in chief and won't let us use other portions that we think are relevant that have the supporting data for those exhibits.

THE COURT: All right. What's the Plaintiff say?

MR. BARRETT: Your Honor, that's not correct. Exhibits 2001 through 2007 consist of nothing more than the telephone numbers that are within the call categories that the jury is going to have to resolve, the call categories that Your Honor developed for the verdict form. So they are particular challenges. For example, did the LexisNexis data show that this telephone number is unknown at a certain point in the class period and should that preclude the jury from finding that that was a residential number.

It's not new analysis. It's the telephone numbers that are

1 in the stipulations that we reached with DISH several months

2 ago and that -- actually several weeks ago and that Your Honor

3 has adopted and approved. So it's telephone numbers and it's

4 call counts.

5      So, first of all, I don't think there was an accurate

6 description of what these are. It's the telephone numbers that

7 we've all agreed to filed with the Court regarding the

8 categories, the categorical challenges that would be on the

9 verdict form. It's a summary document that shows nothing more

10 than the numbers, as I said, the call counts, but also it

11 totals up the calls and the numbers precisely as the

12 stipulation did. So it's the stipulation. It's not something

13 new.

14      But beyond that, Your Honor, this is premature. This

15 issue -- we have not presented this evidence. They do not

16 know -- you know, we don't have to disclose exactly how we are

17 going to present this evidence. We have to disclose the

18 exhibit, which we did last week or sooner than that, to allow

19 them to check it for accuracy. They checked it for accuracy.

20 They actually alerted us to some inaccuracies, and we revised

21 the exhibit and sent it back to them, so there's nothing

22 inaccurate. It's a summary of voluminous information that our

23 expert might use on the witness stand.

24           **MS. ECHTMAN:**  Your Honor, if I just might respond to

25 the assertion that what I informed you of was inaccurate. It's

1  not.  It's actually the Plaintiff taking our work, our data

2  summaries that they said were expert work and weren't merely

3  summaries, because each of them are a portion of what was

4  originally in our Exhibit 31s before we started working

5  collaboratively to narrow them and refine them and make sure we

6  agreed on what was fairly in them.  Now --

7        **THE COURT:**  So what -- what would you want to do

8  beyond what's --

9        **MS. ECHTMAN:**  So all they have are the phone numbers

10  and the call counts in each one, and what I was ready to try to

11  talk to Mr. Barrett about is if you want to use these that just

12  have the phone numbers and the call counts, then we also want

13  to use all of the LexisNexis data that supports it.

14     And we provided them with excerpts from the LexisNexis

15  data, just exactly pulled from those files that relate to all

16  of those phone numbers, and similarly all of the Five9

17  telephone records that relate to those phone numbers and said,

18  "If you're going to use that with your expert, we want to use

19  the rest of it with our expert."

20     And the answer was, "No, you can't."

21        **THE COURT:**  What would it -- I guess I'm not really

22  understanding exactly what -- for what purpose the Plaintiff

23  would use it, nor am I understanding for what purpose the

24  Defendant would use it.  I mean, you're describing it to me,

25  but you're not telling me why it's relevant or why it's going

1  to be helpful to the jury.  I mean, I don't really --

2  **MS. ECHTMAN:**  And we don't know for what purpose the

3  Plaintiff is going to use it because the Plaintiff's expert

4  never gave any opinions on these particular defensive challenge

5  buckets; and if they want their expert to give new opinions on

6  them, we need to know what that's going to be.  We've had no

7  information from their expert about what she might possibly say

8  about these things because it's not part of the work that she

9  did with respect to their case in chief.  And they currently

10 have a ruling that our expert, Debra Aron, can't testify about

11 any of this.  So it's very lopsided here where now they want to

12 use these --

13 **THE COURT:**  I am not following.  I mean, I -- you

14 know, I am -- I mean, I hear what you're saying, but I can't --

15 I'm not really following why -- what -- I mean, I'm not

16 disagreeing with you.  I just am not understanding because --

17 and you're obviously not going to be able to explain to me why

18 the Plaintiff wants to use this evidence.  So I'm just going to

19 wait because I don't understand and I -- I'm going to wait and

20 see what they want to use it for; and, you know, if they open

21 some door, we'll -- you know, we'll talk.

22 **MS. ECHTMAN:**  All right.  So our position is they

23 haven't disclosed what their expert's opinions might possibly

24 be about these summaries that were originally precluded -- that

25 we were precluded from using and if they're going -- we object

to their expert using them and giving any new opinions about them that haven't been disclosed; and just for the record, if the Court is inclined to let them do it, which we don't think the Court should --

**THE COURT:** I'm not saying that one way or the other. I'm pretty sure what I just said was I don't know enough about it to rule, so you're going to have to repeat your objections when I do know enough about it to rule in light of what I then do know.

I mean, you can keep talking if you want to right now, but it's really -- it's not being that helpful to me because I don't understand and I don't think I can understand until this is presented to me in some different kind of way. So I'm just not really getting what the Plaintiff might use it for and how this might come up. So when we get there, just object and we'll take it up at that point.

**MS. ECHTMAN:** Thank you, Your Honor.

**THE COURT:** Okay. Glad to deal with it then.

What else do we need to deal with today?

**MR. GLASSER:** Nothing from the Plaintiff, Your Honor.

**THE COURT:** Anything else from the Defendant?

**MR. BICKS:** No, Your Honor.

**THE COURT:** All right. So let's see. We have a couple of folks who wanted to bring their smartphones in. Are these Mr. Dodge and -- I don't know if it's Mr. or Ms. Kitei.

1       **MR. BICKS:**  Kitei.

2       **THE COURT:**  They're both lawyers?

3       **MR. BICKS:**  Yes, Mr. Dodge is DISH's general counsel.

4    He's right here.  This is Mr. Dodge.

5       And Mr. Kitei is one of the DISH lawyers who has been

6    working on the case.

7       **THE COURT:**  All right.  Well, that's -- as long as

8    they fill out the form, that's fine.  I don't, you know --

9    don't use your phone in the courtroom while court is in

10   session.  That's my main rule for everybody and even if you're

11   sitting, you know, in the back because it's obvious when that

12   happens, and it's distracting to me and the jurors.  So I just

13   repeat that for everybody.  They can do that.  I don't know if

14   our IT people are still here.

15      But, Ms. Sanders, you can communicate with them about that.

16      All right.  Anything else?  No?  All right.  Good.

17      I have not reduced the time, but obviously we aren't going

18   to finish by next Friday if you all use all of the time.  The

19   time was calculated when I thought we had an internal Do Not

20   Call issue, which is gone.  So, you know, I'm assuming you all

21   are -- we're going to finish and you all told me last week on

22   the phone that we would, so I'm not really going to make any

23   adjustments.  I'm just going to rely on you to do it within --

24   you know, within that schedule, unless I start having some

25   concerns about it.  But it sounded like you all have been

1  communicating about that and nobody had any real worries.

2      Okay. Anything else?

3      She is going to keep -- continue to keep time.

4      All right. We'll be in recess until 9:30 tomorrow morning.

5          (Proceedings concluded at 5 p.m.)

6

7                    **C E R T I F I C A T E**

8      I, LORI RUSSELL, RMR, CRR, United States District Court
Reporter for the Middle District of North Carolina, DO HEREBY
9  CERTIFY:

10      That the foregoing is a true and correct transcript of the
proceedings had in the within-entitled action; that I reported
11  the same in stenotype to the best of my ability and thereafter
reduced same to typewriting through the use of Computer-Aided
12  Transcription.

13

14  *Lori Russell*

15  Lori Russell, RMR, CRR          Date:  1/25/17
Official Court Reporter
16

17

18

19

20

21

22

23

24

25