```
 1                IN THE UNITED STATES DISTRICT COURT
               FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 2

 3
      THOMAS H. KRAKAUER,          *  Case No. 1:14CV333
 4                                 *
                   Plaintiff,      *
 5                                 *
      vs.                          *  Greensboro, North Carolina
 6                                 *  January 11, 2017
      DISH NETWORK, L.L.C.,        *  9:30 a.m.
 7                                 *
                   Defendant.      *
 8    *****************************

 9

10              DAILY TRANSCRIPT OF TRIAL TESTIMONY
            BEFORE THE HONORABLE CATHERINE C. EAGLES,
11            UNITED STATES DISTRICT JUDGE, and a jury.

12

13    APPEARANCES:

14    For the Plaintiff:       JOHN W. BARRETT, ESQUIRE
                               BRIAN A. GLASSER, ESQUIRE
15                             Bailey & Glasser, LLP
                               209 Capitol Street
16                             Charleston, West Virginia 25301

17                             MATTHEW P. MCCUE, ESQUIRE
                               Law Office of Matthew P. McCue
18                             1 South Avenue, Third Floor
                               Natick, MA 01760
19
                               JACOB M. NORRIS, ESQUIRE
20                             The Norris Law Firm
                               1033 Bullard Court, Suite 207
21                             Raleigh, North Carolina 27615

22
      For the Defendant:       PETER A. BICKS, ESQUIRE
23                             ELYSE D. ECHTMAN, ESQUIRE
                               JOHN L. EWALD, ESQUIRE
24                             Orrick Herrington & Sutcliffe, LLP
                               51 West 52nd Street
25                             New York, New York 10019
```

```
 1                                    RICHARD J. KESHIAN, ESQUIRE
                                      Kilpatrick Townsend & Stockton, LLP
 2                                    1001 W. Fourth Street
                                      Winston-Salem, North Carolina 27101
 3

 4   Court Reporter:                  Lori Russell, RMR, CRR
                                      P.O. Box 20593
 5                                    Winston-Salem, North Carolina 27120

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24            Proceedings recorded by stenotype reporter.
          Transcript produced by Computer-Aided Transcription.
25
```

```
 1                          I N D E X
```

**Plaintiff Witnesses:**                                    **Page**

  THOMAS KRAKAUER
      Direct Examination by Mr. Barrett                        6
      Cross-Examination by Mr. Bicks                          30

  AMIR AHMED
      Direct Examination by Mr. Glasser                       52
      Cross-Examination by Ms. Echtman                       197
      Redirect Examination by Mr. Glasser                    240

**PLAINTIFF'S EXHIBITS**

NO.:        DESCRIPTION:                                    ADMIT

PX26                                                        107

PX28                                                        138

PX55                                                         55

PX89                                                         87

PX120                                                       181

PX190                                                       188

PX194                                                       171

PX241                                                       144

PX282                                                        26

PX334                                                        91

PX504                                                       183

PX656                                                       161

PX1160                                                      157

PX1208                                                      104

**DEFENSE EXHIBITS**

| NO.: | DESCRIPTION: | ADMIT |
|------|--------------|-------|
| DX63 | | 36 |
| DX81 | | 32 |
| DX84 | | 233 |

**JOINT EXHIBITS**

| NO.: | DESCRIPTION | ADMIT |
|------|-------------|-------|
| 1 | | 107 |
| 2 | | 140 |
| 3 | | 209 |

1    **P R O C E E D I N G S**

2         **THE COURT:**  Good morning.  Is there anything we need

3    to take up before the jury comes in?

4         **MR. BARRETT:**  Your Honor, one housekeeping matter.  We

5    have a replacement exhibit, PX24, for Your Honor's and the

6    Court's trial exhibit notebooks.  We've provided a copy of this

7    to -- to DISH.  And if I may, perhaps, hand this to

8    Ms. Sanders?

9         **THE COURT:**  All right.

10        **MR. BARRETT:**  I would do whatever you would like.

11        **THE COURT:**  You can.

12        **MR. BARRETT:**  Thank you.

13        **THE COURT:**  Anything else?

14        **MR. BARRETT:**  The only other housekeeping matter, Your

15   Honor, is when I question the witness, I have this portable --

16   may I stand here behind the table and use the ELMO while I

17   question the witness?

18        **THE COURT:**  Yes, you may.

19        **MR. BARRETT:**  Thank you.

20        **THE COURT:**  Anything for the Defendants before the

21   jury comes in?

22        **MR. BICKS:**  Nothing, Your Honor.

23        **THE COURT:**  All right.  You may bring the jury in.

24      All right.  There are some wires, you know, associated with

25   the ELMO.  So anybody walking around the well, please don't

1 | fall.

2 | Is it hot in here?

3 | **MR. BARRETT:** I suppose that brings up another matter.

4 | I may need to spray my throat with this from time to time. I'm

5 | hanging in there.

6 | **THE COURT:** Go ahead. I'm at the tail end of a cold.

7 | The clerk has called to see if they can make it less hot.

8 | (The jury entered the courtroom.)

9 | **THE COURT:** All right. Good morning, ladies and

10 | gentlemen. I'm glad you all made it here safely and that all

11 | of the snow is melting, and we're ready to get started. We

12 | have called about the heat. It's quite warm in here.

13 | Hopefully, it will cool off a little bit to a better

14 | temperature shortly.

15 | I think we're ready to get going, and the Plaintiff can

16 | call its first witness.

17 | **MR. BARRETT:** Thank you, Your Honor. The Plaintiff

18 | calls Thomas Krakauer.

19 | **THOMAS KRAKAUER, PLAINTIFF'S WITNESS, SWORN**

20 | **DIRECT EXAMINATION**

21 | **BY MR. BARRETT:**

22 | Q. Good morning, sir.

23 | A. Good morning.

24 | Q. Could you please tell the jury your name.

25 | A. My name is Thomas Krakauer.

```
 1   Q.  All right.  Dr. Krakauer, where do you live?
 2   A.  I live in Durham County -- northern Durham County in the
 3   township of Bahama.
 4   Q.  And how long have you lived there?
 5   A.  Since 1985.
 6   Q.  Do you work?
 7   A.  I'm retired.
 8   Q.  And retired from what?
 9   A.  I'm retired from the North Carolina Museum of Life and
10   Science.
11   Q.  What was your job there?
12   A.  I was a chief executive officer.
13   Q.  And when did you become chief executive officer at the
14   museum?
15   A.  In 1985, when I moved to North Carolina.
16   Q.  Now, are you a medical doctor?
17   A.  No, I'm a Ph.D.
18   Q.  And what is your Ph.D. field?
19   A.  It's in zoology.
20   Q.  I would like to ask you some questions about this lawsuit.
21   Did you bring this lawsuit on your own behalf?
22   A.  I brought it as an enforcement effort.  The federal Do Not
23   Call List, the TCPA, says that if somebody receives more than
24   two phone calls in a year, they're authorized to bring suit
25   against the company that filed those call -- placed those
```

1 calls.

2 Q.  So on whose behalf did you bring the lawsuit?

3 A.  I brought the lawsuit on behalf of a class of 18,000

4 citizens.

5 Q.  What is your role in this lawsuit?

6 A.  I'm the class representative.

7 Q.  And what does that mean to you, sir?

8 A.  That means three things:  I have to be generally familiar

9 with the progress of the case, I have to participate in events

10 like this trial, and I also -- I think it very important, I

11 have to be loyal and faithful to the rest of the class so that

12 I represent their interests, not my own.

13 Q.  Have you ever been a class representative in a lawsuit

14 before?

15 A.  No, sir, I have not.

16 Q.  Have you -- have you ever brought a lawsuit before?

17 A.  No, sir, I have not.

18 Q.  I'd like to ask you some questions about the Do Not Call

19 law and the Do Not Call Registry.  Are you familiar with the

20 National Do Not Call Registry?

21 A.  Yes, sir, I am.

22 Q.  And what is the Registry?

23 A.  It was established by the federal government because of the

24 outrage of citizens at the uncontrolled proliferation of

25 telemarketing practices.

1    **MR. BICKS:** Your Honor, I would just object to the

2  witness reciting the history. He's not here to do that.

3    **THE COURT:** All right. Well, sustained as to the

4  accuracy of that. He wasn't there, I assume, and doesn't have

5  firsthand knowledge of that. The jury can disregard that.

6    **MR. BARRETT:** Yes, Your Honor.

7  **BY MR. BARRETT:**

8  Q. What does the National Do Not Call Registry allow a person

9  to do?

10    **MR. BICKS:** Your Honor, again, I object. He's not an

11  expert.

12    **THE COURT:** Okay. What are you --

13    **MR. BARRETT:** Just leading to the questions about what

14  he did to join the Registry, put his number on the Registry.

15    **THE COURT:** Okay. Well, you can ask those questions.

16  **BY MR. BARRETT:**

17  Q. Did you place your telephone number on the Do Not Call

18  Registry?

19  A. Yes, sir, I did.

20  Q. And what telephone number is that?

21  A. That was my landline phone number, (919) 471-9459.

22  Q. And when did you first put your telephone number on the

23  Registry?

24  A. It was in July of 2 -- excuse me --

25    **THE COURT:** July when? I missed the year.

1          **THE WITNESS:**  I coughed through the year.  I

2   apologize.  It was in July of 2003.

3   **BY MR. BARRETT:**

4   Q.  Would you like a glass of water?

5   A.  No, thank you.  That will urge me to shorten my testimony.

6   Q.  Sure.  So July of 2003.  How did you place your call on the

7   Registry?

8   A.  I went online and placed it.

9   Q.  Now, about the telephone number that you registered, when

10  did you first get that telephone number?

11  A.  That number was the number I had when I first came to

12  North Carolina in 1985.

13  Q.  And was it a landline telephone number?

14  A.  Yes, sir, it was a landline.

15  Q.  And whose number was it?

16  A.  It was my personal number.

17  Q.  And who paid the bills?

18  A.  I paid the bills.

19  Q.  How long did you have that telephone number?

20  A.  I had that number from 1985 until 2002 -- late 2002 when I

21  decided I just wanted to have a cell phone, and as the

22  expression is, I cut the cord.

23  Q.  Was it 2002 or --

24  A.  I'm sorry.  2012.

25  Q.  When you say "cut the cord," what do you mean?

1  A.  It means I -- I no longer had landline services, but I only
2  paid for a cell phone.
3  Q.  Had your phone number ever been removed from the National
4  Do Not Call Registry until 2012?
5  A.  No, sir, it's not.
6  Q.  I'd like to talk with you about some of the calls that you
7  received in this case.
8      Do you have a -- backing up, do you have a subscription
9  television service in your home?
10 A.  Yes, sir, I do.
11 Q.  Who provides your service?
12 A.  It's DirecTV.
13 Q.  And how long have you had DirecTV?
14 A.  Since early 2003.
15 Q.  And how did you decide on DirecTV?
16 A.  I went to a couple of big-box stores, looked at the
17 promotional material, and thought that the benefits of DirecTV
18 at that time were superior to those of DISH Network.
19 Q.  And how did you sign up for DirecTV?
20 A.  Well, I took the advertising material from the big-box
21 store and called the number that was on it for DirecTV.
22 Q.  Who do you pay for your DirecTV service each month?
23 A.  Yes, sir, I do.
24 Q.  Who do you pay?
25 A.  I pay DirecTV.

1 Q. And has that remained the same since 2003?

2 A. Yes, sir, it has.

3 Q. Have you ever received calls asking you to switch from

4 DirecTV to DISH Network?

5 A. Yes, sir, I have.

6 Q. When is the first call that you can remember?

7 A. It was on a Saturday evening of May the 9th, 2009.

8 Q. And was that on -- what telephone number was that on?

9 A. That was on my landline, so (919) 471-9459.

10 Q. All right. How did that telephone call begin?

11 **MR. BICKS:** Your Honor, I think this could be hearsay

12 if he's asking what somebody said to him. I'm not sure what --

13 **THE COURT:** Is it -- it's not offered for the truth.

14 I assume it's offered to show what was said to him.

15 **MR. BARRETT:** Yes, it was offered to show what he did,

16 what was told to him, and what he did in response.

17 **THE COURT:** Overruled. Go ahead.

18 **THE WITNESS:** The call started with the person -- a

19 gentleman said, "I see you've been a longtime customer of

20 DirecTV, and I think I can save you some money."

21 **BY MR. BARRETT:**

22 Q. Okay. What happened next on that call?

23 A. We talked about the various services I was getting from

24 DirecTV, and at some point, he asked me for the last four

25 digits of my credit card.

1  Q.  Okay.  And what happened next?

2  A.  Well, I gave him those -- those numbers and he put me on --

3  put me on hold.

4  Q.  Did he come back to the call?

5  A.  Yeah, he came back to the call; and at that time he told me

6  that I had some premiums that I was currently getting from

7  DirecTV, and when those premiums expired, he could save me some

8  money.

9  Q.  Save you some money how?

10  A.  As the call progressed, he indicated that he could save me

11  some money by switching to DISH Network.

12  Q.  During the call, did this gentleman tell you that he

13  represented DISH Network?

14  A.  No, sir, he didn't, but I assumed that he represented DISH

15  Network because he wanted me to switch from DirecTV to DISH.

16  Q.  And during the call, did this gentleman give you a name and

17  telephone number?

18  A.  He gave me his name, Ken, and he --

19          **THE COURT:**  His name Ken?

20          **THE WITNESS:**  Ken, K-E-N.  And he gave me the phone

21  number, which I recorded.

22  **BY MR. BARRETT:**

23  Q.  Recorded by -- how?

24  A.  Handwritten on the back of an envelope.

25  Q.  Now, up until that call, May of 2009, had you ever

1  contacted DISH to inquire about DISH subscriptions?

2  A.  No, I had not.

3  Q.  Have you since?

4  A.  No, I have not since.

5  Q.  All right.  So you hung up the phone with this gentleman.

6  You said his name was Ken.  What did you do the next day?

7  A.  The next morning, I first called DirecTV and told them that

8  it appeared as if someone had impersonated me to get

9  information about my DirecTV account.  And they told me to put

10 a password protection on my account, which I did.  And then I

11 talked to a second person, asked if there is a way that I could

12 stop the calls, and I was told that I should call DISH Network,

13 and they gave me a phone number.

14 Q.  And did you call DISH Network?

15 A.  Yes, sir, I did.  I called DISH Network.

16 Q.  And what happened during the call?

17 A.  I escalated the call through several levels until I finally

18 talked with somebody who seemed aware of the situation.

19 Q.  What did you tell this person?

20 A.  I more or less told her what had happened the night before

21 and what could be done about it.

22 Q.  Okay.  Did you, at some point, hear back from the person

23 you spoke with?

24 A.  I called on the 10th, and I got a call -- of May, and I got

25 a call back on the 21st of May, a very brief call.  So, yes, I

1  did hear back.

2  Q.  And what did the representative tell you?

3  A.  She told me that they'd identified the caller and that he

4  was a contractor, and as such, DISH Network was -- I'm sorry.

5  DirecTV was not responsible for his behavior.

6  Q.  Okay.  You said DirecTV wasn't responsible, but --

7  A.  I'm sorry, yes.  I'm getting confused.  I apologize.  I

8  know this is complex and I don't want to confuse you.  But,

9  yes, I was talking with the representative of DISH Network, and

10  she told me that since the -- the caller was a contractor, DISH

11  Network was not responsible for his actions.

12  Q.  After you received the May 9th, 2009 call that you had

13  described, the initial call from Ken, did you take any steps to

14  protect your -- protect yourself?

15  A.  Yeah.  Yes, sir, I did.  That Monday morning, I called the

16  Attorney General's office to protest the fact that somebody was

17  able to call and apparently impersonate me.  Since I had given

18  this gentleman my -- the last four digits of my credit card

19  number, I changed my credit card.  And I also subscribed to

20  Equifax to protect myself from identity theft.

21  Q.  All right.  Now, after you contacted the North Carolina

22  Attorney General's office, did the calls stop?

23  A.  No, sir, they did not.

24  Q.  Did you receive any calls that were similar to the one that

25  you received from Ken?

1  A.  I received a number of calls, so many that I felt it was

2  appropriate for me to reregister my number on the federal Do

3  Not Call Registry.

4  Q.  How would these calls begin?

5  A.  They all began with, I see you've been a long-term --

6  sorry -- a long-term customer of DirecTV and I can save you

7  some money.

8  Q.  Did you receive more than one call in a 12-month period

9  with this similar message?

10  A.  Yes, sir, I did.

11  Q.  And you said that you reregistered your telephone number on

12  the Do Not Call Registry?

13  A.  Yes, sir, I did.

14  Q.  The question is, do you understand if you needed to

15  register your phone again on the Do Not Call Registry?

16  A.  I now know it was not necessary.  Once one registers the

17  number, the -- that registry remains in force.

18  Q.  And approximately when was it that you reregistered your

19  number?

20  A.  I reregistered my number in approximately June of 2011.

21  Q.  Two thousand --

22  A.  2010.

23  Q.  2010.  Now, you said that you contacted the State Attorney

24  General.  I want to ask you about that.  Did you hear back from

25  the Attorney General's office of North Carolina sometime after

1  you had lodged your complaint?

2  A.  Yes, I did.  I got a call asking me if I would be -- attend

3  a deposition with regard to DISH Network's telemarketing

4  practices.

5  Q.  Okay.  And when was the deposition?

6  A.  It was in September of 2011.

7  Q.  And was the North Carolina Attorney General's office

8  present?

9  A.  Yes, sir, they were.

10  Q.  Was DISH Network present?

11  A.  Yes, sir, they were.

12  Q.  And who was there for DISH Network?

13  A.  This is from my memory, but I believe his name was Victor

14  Rao.

15  Q.  And who did Mr. Rao represent?

16  A.  He represented DISH Network.

17  Q.  Did you testify at your deposition September of 2011 about

18  the May 2009 call?

19  A.  Yes, sir, I did.

20  Q.  Did you testify about other calls that you received?

21  A.  Yes, sir, I did.

22  Q.  When you gave your deposition in September of 2011, when is

23  the last time that you received a similar call?

24  A.  I was really struck by the fact that I received a call in

25  September 2011, just shortly before the deposition.  And it

1  started exactly the same way, and the call went to my voice

2  mail.  And I listened to the whole thing, because it -- I found

3  it intriguing that just before I was called to this deposition,

4  I got another call, but I didn't return the call.  Once I

5  listened to it, I deleted it.

6  Q.  At your deposition, were you provided with documents?

7  A.  Yes, sir, I was.

8          **MR. BARRETT:**  Your Honor, it's tab -- I'm sorry,

9  Volume 2, Plaintiff's Exhibit 282 that I would like to show the

10 witness.

11         **THE COURT:**  All right.  Go ahead.

12         **MR. BARRETT:**  I do not have that on my screen.

13         **THE CLERK:**  Oh, sorry.

14         **THE WITNESS:**  I now have it on mine.

15 **BY MR. BARRETT:**

16 Q.  You do.

17 A.  Yes, sir.

18 Q.  All right.  Dr. Krakauer, have you seen Plaintiff's

19 Exhibit 282 before?

20 A.  I saw it during the Attorney General's deposition.

21         **MR. BICKS:**  Your Honor, I don't believe 282 is in

22 evidence, and is it displayed?

23         **MR. BARRETT:**  It --

24         **MR. GLASSER:**  Yes.

25         **THE COURT:**  Was there going to be an objection to it

```
 1   or --
 2           MR. BICKS:  This -- I think if this is the exhibit --
 3           THE CLERK:  I took it down.
 4           MR. BICKS:  Right.  This is an exhibit, Your Honor,
 5   that we had an in limine discussion about, and it wasn't to be
 6   raised until we discussed it with you first.
 7           MR. BARRETT:  May we approach to do so?
 8           THE COURT:  All right.
 9       (The following bench conference was recorded.)
10           MR. BARRETT:  This is an e-mail that Dr. Krakauer
11   received at his deposition --
12           THE COURT:  Yes.
13           MR. BARRETT:  -- at which DISH was present.  And he
14   reviewed this.  And it contains a recitation of a DISH
15   representative the day after he received the May 9 call
16   regarding what Dr. Krakauer reported to the DISH
17   representative.
18           THE COURT:  Uh-huh.
19           MR. BARRETT:  And what I would like to review is the
20   highlighted portions on mine saying who it was from, TCPA, it's
21   got his number, his name.
22           THE COURT:  Yes.  For what purpose?
23           MR. BARRETT:  For the purpose of establishing what she
24   reported -- what he reported to DISH Network, what he told her.
25           THE COURT:  He who?  Dr. Krakauer?
```

1          **MR. BARRETT:**  Yes.

2          **THE COURT:**  Okay.  And your objection?

3          **MR. BICKS:**  The objection is, Your Honor, first of

4  all, the fact that he saw a document at a deposition doesn't --

5  is not relevant.  It doesn't make this in any way admissible.

6  That's number one.

7          Number two, remember the credit issue that we talked about

8  where -- where I told Your Honor they were going to make this

9  argument and he's going to presumably try to say this now, that

10  I found out through this that somebody ran a credit report on

11  me, right?

12          And Your Honor said, I don't see how that's coming into the

13  case, and before that comes up, you need to come over and talk

14  to me.

15          The part of this thing that's highlighted is that you can

16  see here --

17          **THE COURT:**  Okay.  So the only thing you object to is

18  that one reference to get personal credit info?

19          **MR. BICKS:**  Well, if we take that out of this

20  document, then I'm okay with them using this document.  But for

21  him -- a document -- they can ask him what happened on the

22  call.  But for him to be looking at a document from a DISH

23  person, reciting what the DISH person was told by him,

24  that's -- that's not admissible.

25          **MR. BARRETT:**  Your Honor, this establishes what he was

1  told regarding the credit check.  And when Rebecca Dougherty

2  called him back -- Rebecca Dougherty, first of all, says in

3  parentheses:  I did not inform Dr. Krakauer that his credit was

4  run without his knowledge.  So he is still unaware this

5  happened.

6      We're not raising this to say this is a violation of the

7  law.  We're raising this to say that DISH Network protected

8  SSN.

9          **THE COURT:**  Okay.  All right.  You can ask him

10  questions about this e-mail from the DISH person because that's

11  an admission, you know.  In terms of just reading it, I mean,

12  Mr. Bicks is right, it's not relevant just because it came up

13  during a deposition.  But this is -- if this is a DISH person,

14  that's an admission, so it's not hearsay, and it seems to

15  clearly be relevant, so, at least as to that one e-mail, you

16  can go ahead.

17          **MR. BICKS:**  But, Your Honor, you have said the credit

18  reporting issue --

19          **THE COURT:**  Well, I know, but I'm overruling it now in

20  light of the -- his statements, where you questioned his

21  motivation.  And so, there we are.

22          **MR. BICKS:**  Okay.  Just so we're clear, now I'm

23  allowed, right, to go into the meetings and the financial --

24          **THE COURT:**  No, you're not.

25          **MR. BICKS:**  -- arrangements he has in the case?

1    **THE COURT:**  No, you're not.  We'll take this up at the

2  break.

3         **COURT REPORTER:**  Judge, I'm having a hard time hearing

4  Mr. Bicks.

5      (Conclusion of bench conference.)

6         **MR. BARRETT:**  Your Honor, is that also visible on the

7  jury's -- thank you.

8  **BY MR. BARRETT:**

9  Q.  Dr. Krakauer, at your deposition, we were before -- before

10  the discussion with the Court, we were reviewing this, and you

11  were provided with this document at your deposition.  Is that

12  true?

13  A.  Yes, sir, I was.

14  Q.  And what does this document generally represent?

15  A.  This document represents an e-mail chain within DISH that

16  was as a result of my call on May 10th.

17         **MR. BICKS:**  Again, Your Honor, I would object to the

18  witness describing the document, what it represents.

19         **THE COURT:**  All right.  Well, do you dispute that

20  these are e-mails between DISH people?

21         **MR. BICKS:**  No, I do not.

22         **THE COURT:**  Okay.  Overruled.

23  **BY MR. BARRETT:**

24  Q.  Dr. Krakauer, I've highlighted certain portions of the

25  second page of PX 282.

1  A.  Yes, sir.

2  Q.  Do you see at the top it says from Rebecca Dougherty?

3  A.  Yes, sir, I do.

4  Q.  And do you see the date of that, Sunday, May 10, 2009,

5  10:26 a.m.?

6  A.  Yes, sir, I do.

7  Q.  And what was the date of the call you received that caused

8  you to contact DISH?

9      **THE COURT:**  I'm sorry.  Say again.

10  **BY MR. BARRETT:**

11  Q.  Sure.  What was the date of the call that you received that

12  caused you to contact DISH?

13  A.  May the 9th.

14  Q.  So the day before?

15  A.  Yes, sir.

16  Q.  Okay.  Do you see in the subject line:  Subject:  TCPA,

17  TCPA, and that telephone number (919) 471-9459?  Is that your

18  telephone number?

19  A.  Yes, sir, I see that, and that is my telephone number.

20  Q.  Do you see:  Customer information:  And the name Thomas

21  Krakauer?  Do you see that?

22  A.  Yeah, I see that.

23  Q.  And then, the phone number where the call was received.

24  And again, that's your telephone number, correct?

25  A.  Yes, sir, it is --

1  Q.  All right.

2  A.  -- or was.

3  Q.  And it says:  DNC list consumer is on:  And national?

4         **THE COURT:**  I'm sorry.  If you can -- when you look

5  down, it is hard for me to hear.

6         **MR. BARRETT:**  Okay.  Thank you.  Fighting through this

7  cold so --

8  **BY MR. BARRETT:**

9  Q.  The portion stating:  DNC list consumer is on:  National.

10  Do you see that?

11  A.  Yes.  It says I'm on the national Do Not Call List.

12  Q.  On down the page, I'm going to read this to you and ask you

13  some questions about it.

14  A.  Yes, sir.

15  Q.  Thomas Krakauer received a call last night, Saturday May 9,

16  from a retailer sales partner, question mark, who was claiming

17  to be a DirecTV employee.  The phone number the call was

18  received from is 1-800-375-8211, extension 105, caller's name

19  was Ken.  Okay?

20  A.  I see that, yes, sir.

21  Q.  And you said that you had written down Ken's telephone

22  number and name.  Do you believe this to be the name and

23  telephone number that you wrote down?

24  A.  I have no evidence to dispute this.

25  Q.  Okay.  It says, the employee, Ken, right here.  The

1  employee Ken then proceeded to call DirecTV and pretended to be

2  Mr. Krakauer to get information from his account so he could

3  call Mr. Krakauer back and get personal credit info from him,

4  including his SSN and his credit card number. When further

5  into the call, Mr. Krakauer became suspicious. He questioned

6  the agent, who then told him they were from DISH Network and

7  wanted to sell him DISH Network service.

8       And my question to you, does that generally reflect the

9  conversation that you had with the DISH representative that

10 morning?

11 A.  Yes, sir, that generally reflects the conversation.

12 Q.  The next paragraph. I searched Mr. Krakauer's phone number

13 in Echo Admin and found there was a credit check run on him

14 last night. In parentheses: I did not inform Mr. Krakauer

15 that his credit was run without his knowledge, so he is still

16 unaware this happened. The credit score ID is 8172493.

17      And my question to you is, when the DISH representative

18 called you back a few weeks later, a few weeks after the

19 May 9th, 2009 call, did she tell you that DISH had run a credit

20 check on you?

21 A.  No, she did not.

22 Q.  Continuing with this document. Do you see at the top

23 there's an e-mail from Vendor Inquiries sent on May 18th, 2009,

24 3:21 p.m., to Rebecca Dougherty. First of all, do you believe

25 that Rebecca Dougherty is the name of the DISH representative

1  who called you back in May of 2009?

2  A.  The date is May 19th, not the 18th.  But, yes, I do believe

3  Rebecca Dougherty was the person that I communicated with.

4  Q.  Okay.  And it says, Rebecca, based upon the information

5  provided, we are able to identify the retailer.  It has an OE

6  number, 821970.  Contact name:  Alex Tehranchi, Sophie

7  Tehranchi.  Company:  Satellite Systems Network.  Has the

8  address information, and the e-mail address is alex@yourdishtv

9  and sophie@yourdishtv.

10     My question to you, sir, is, when the DISH representative

11  we now know is Ms. Dougherty called you back, did she tell you

12  that SSN was the entity that placed the call?

13  A.  She did not.

14        **MR. BARRETT:**  Your Honor, I would move the admission

15  of PX 282.

16        **THE COURT:**  Did you want to be heard further on your

17  objection?

18        **MR. BICKS:**  No, Your Honor.

19        **THE COURT:**  All right.  Overruled.  And it'll be

20  admitted.

21        **MR. BARRETT:**  I have a clerk copy of that.  Well, I

22  will provide that.

23        **THE COURT:**  Okay.  Go ahead.

24  **BY MR. BARRETT:**

25  Q.  The first time you learned that SSN placed this call on

1 behalf of DISH was when?

2 A.   The first time I learned that DISH had placed this call was

3 upon seeing this material at the Attorney General's deposition.

4 Q.   And at the deposition -- just one second.  Did you receive

5 a letter from Ms. Dougherty back in 2009 telling you about SSN

6 or a credit check or other information pertaining to your

7 complaint?

8 A.   I've had no direct communication from Rebecca Dougherty.

9 Q.   After you provided your deposition, moving ahead, in 2011

10 in the Attorney General matter where DISH was represented by

11 counsel, did you receive any communication from DISH,

12 acknowledging that SSN was responsible?

13 A.   I have not.

14 Q.   Did you receive any letter from DISH stating that it was

15 taking some kind of action against SSN in response to your

16 testimony September of 2011?

17 A.   I've received no letter from DISH.

18 Q.   When did you first learn that you had the right to file a

19 lawsuit against DISH Network under the Do Not Call law?

20 A.   This was in 2014.

21 Q.   And what did you learn about your right to do so?

22 A.   I learned that there was enforcement opportunities under

23 the Do Not Call List and that it wasn't just about me.  It was

24 a class of 18,000 people who had -- who were on the Do Not Call

25 List who had received 51,000 calls on behalf of DISH.

```
 1  Q.  And the year that you filed this lawsuit, this case that
 2  we're here on today, is what?
 3  A.  Say that again, please.
 4  Q.  What year did you file this lawsuit?
 5  A.  I believe it was filed in 2017.
 6  Q.  But this is 2017 now, so --
 7  A.  Okay.  I'm sorry.  It was 2014.
 8  Q.  Okay.  Were you here in the courtroom yesterday for opening
 9  statements to the jury?
10  A.  Yes, sir, I was.
11  Q.  And were you here in the courtroom when DISH's counsel said
12  that the Plaintiff, and that's you, is looking for over
13  $25 million based on five calls lasting 2 minutes and 32
14  seconds?  Were you here for that?
15  A.  I was here for that.
16  Q.  And what do you think of that, sir?
17          MR. BICKS:  Again, objection, Your Honor.
18          THE COURT:  Well, you need to rephrase that question.
19  BY MR. BARRETT:
20  Q.  What do you have to say in response to that?
21          THE COURT:  No, no.  What -- I don't know what you're
22  asking him.  That's --
23          MR. BARRETT:  I would like for him to be able to
24  respond to a statement that --
25          THE COURT:  Are you asking him if that's true?
```

1          **MR. BARRETT:**  Yes.

2  **BY MR. BARRETT:**

3  Q.  Is that true?

4  A.  That is not true.

5  Q.  And why is it not true?

6  A.  I would receive only the same amount as every member of the

7  class, which is set by federal statutes at $500.

8          **MR. BICKS:**  Your Honor, I object.

9          **THE COURT:**  Overruled.  Go ahead.

10  **BY MR. BARRETT:**

11  Q.  I'm sorry.  Were you finished with your response?

12  A.  Yeah, I think what I said was that I would receive only the

13  same amount as all of the other members of the class.

14  Q.  And is this lawsuit based on five calls lasting 2 minutes

15  and 32 seconds?

16  A.  No, sir, this lawsuit is not based upon that.  It's based

17  upon enforcing a federal statute based on the Do Not Call List,

18  and, you know, if no efforts are taken to enforce this, wealthy

19  telemarketers are free to continue to make calls forever.

20          **MR. BICKS:**  Your Honor, I don't think that's proper

21  testimony.  I would object.

22          **THE COURT:**  Well, overruled.  Go ahead.  You can move

23  on.

24          **MR. BARRETT:**  Thank you, Dr. Krakauer.  I have no

25  further questions.

1    **THE COURT:**  Questions for DISH?

2          **MR. BICKS:**  Yes, Your Honor.

3                        **CROSS-EXAMINATION**

4    **BY MR. BICKS:**

5    Q.  First of all, good morning, Dr. Krakauer.

6    A.  Good morning, sir.

7    Q.  Do you prefer I call you doctor or mister?

8    A.  Yes, sir, I do.  If members of Congress feel comfortable

9    about calling me doctor, I would appreciate if you would do the

10   same.

11   Q.  All right.  Happy to do that.  Thank you.

12          And you've been retired since when?

13   A.  2004.

14   Q.  And you're here -- you're a class representative in this

15   lawsuit, right?

16   A.  Yes, sir, I am.

17   Q.  I want to ask you some questions about Satellite Systems

18   Network.  You've heard of Satellite Systems Network?

19   A.  I've -- I've heard about it through the e-mail chain in the

20   deposition.

21   Q.  Do you remember that Satellite Systems Network was the

22   dealer involved in your original purchase of your DirecTV

23   account?

24   A.  What I remember is that I placed DirecTV -- placed a call

25   to DirecTV, and they forwarded that -- that call to SSN, and I

1  had no direct connection with SSN.

2  Q.  You don't remember filling out an application that

3  indicated that SSN was the dealer when you got your DirecTV

4  account?

5  A.  I did not know what the -- you know, the eight-point type

6  on the agreement to take DirecTV service.  So to answer your

7  question briefly, no, I do not remember having any dealings

8  with SSN.

9  Q.  And in connection -- I think you said, as part of your role

10 as a class representative, you're supposed to be generally

11 familiar with what the case -- is on going in the case?

12 A.  Yes, sir, I remember that.

13 Q.  And did you -- before you came here to testify, did you

14 look at documents that you signed in connection with getting

15 your DirecTV account?

16 A.  Yes, I did.

17 Q.  And do you remember the DirecTV Annual Programming

18 Commitment Agreement that you signed on March 6th, 2003?

19 A.  Vaguely.

20 Q.  And -- and do you remember whether or not that indicated on

21 it that the dealer involved was Satellite Systems Network?

22 A.  I believe that when I called DirecTV, they forwarded my

23 call to SSN, and I'm not sure that what took place in 2003 has

24 any relevance to --

25          THE COURT:  Okay.  Well, you don't need to argue with

1  him.  He's just asking you what you remember.

2          **THE WITNESS:**  Okay.

3  **BY MR. BICKS:**

4  Q.  Yeah.  And, sir, let me just ask again.  Do you remember

5  signing a DirecTV Annual Programming Commitment Agreement on

6  March 6th, 2003, that indicates that the dealer involved in

7  your account was Satellite Systems Network?

8  A.  I remember signing a contract for the installation of

9  DirecTV.  I do not remember any mention of SSN.

10         **MR. BICKS:**  So, Your Honor, may I approach the witness

11  and show him DX81?

12         **THE COURT:**  You may.

13  **BY MR. BICKS:**

14  Q.  And, Dr. Krakauer, tell me when you've had a moment to look

15  at that.

16  A.  I have a document called Direct Annual Programming

17  Commitment Agreement, and it's -- I check off whether I am a

18  new DirecTV customer.

19  Q.  And do you see your signature in the middle of that

20  document?

21  A.  Yes, sir, I do.

22         **MR. BICKS:**  All right.  Your Honor, I'd move to admit

23  DX81 and publish for the jury.

24         **THE COURT:**  It will be admitted.

25

**BY MR. BICKS:**

Q.   Do you have -- you can see this document on the screen,
Dr. Krakauer?

A.   Yes, I can.

Q.   And is that your signature in the middle?

A.   Yes, sir, it is.

Q.   And tell our jury what date you signed this.

A.   The 6th of March, 2003.

Q.   And what's the agreement say at the top?  What kind of
agreement is it?

A.   It's a DirecTV Annual Programming Commitment.

Q.   And do you see the phone numbers that are on there?

A.   The phone number that I -- that I see -- one is my home
phone, and the other is my office phone.

Q.   And which one is your home phone?

A.   The (919) 471-9459.

Q.   And is that the same phone number that Ken called you on
May 9th, 2009?

A.   That is the same phone number.

Q.   And do you see that credit card information on here?

A.   Yes, sir, I do.

Q.   And what name do you see above the credit card information?

A.   I see Satellite Systems Network.

Q.   And that's under dealer name, right?

A.   Yes.

1  Q.  And that credit card, is that your credit card?

2  A.  Yes, sir, it is.

3  Q.  And where do you believe that credit card information came

4  from?

5  A.  I'm sure I gave it when I placed the call to DirecTV to

6  subscribe to DirecTV's service.

7  Q.  And you see here that the dealer involved was Satellite

8  Systems Network?  Did you see that?

9  A.  I did not see that then.  I see that now.

10  Q.  All right.  And do you also remember the -- the company --

11  you got equipment shipped to you, right?  Do you remember that?

12  A.  Yes, I did.

13  Q.  And do you also remember the name of the company that

14  shipped that equipment to you?

15  A.  It didn't seem important to me.  I was getting -- I was

16  getting TV, and, you know, some guys were coming in to install

17  it.  So I do not remember what that document said.  Well, I've

18  seen that document.  I now can say, yes, I've seen this

19  document, but I certainly did not place any importance to it

20  when I purchased my DirecTV in 2003.

21  Q.  Right.  And in connection with your role as being a class

22  representative, you've told our jury that you were to kind of

23  be familiar with what's going on in the case and what it's

24  about, right?

25  A.  Yes, sir.

```
 1   Q.  And did you look through your files to determine the role
 2   of Satellite Systems Network before this case was filed?
 3   A.  Last year when I was -- the brief answer is yes.  Last
 4   year, when I was filling out my federal income taxes, I came
 5   across a folder that was titled "DirecTV," and it had the
 6   documents in question.
 7   Q.  And that was after this lawsuit was filed?
 8   A.  Yes, sir, it was.
 9   Q.  Let me show you DX63.
10            THE COURT:  That's Defendant's Exhibit 63?
11            MR. BICKS:  Yes.
12            THE COURT:  So, ladies and gentlemen, the parties may
13   say "PX," Plaintiff's exhibit, "DX," Defendant's exhibit.
14   You'll get used to the shorthand.
15        Go ahead.
16   BY MR. BICKS:
17   Q.  And you've seen this before, Dr. Krakauer?
18   A.  This is a document that I uncovered in the files and
19   forwarded to my attorneys, and they made it available to you,
20   but between --
21            THE COURT:  Okay.  So what's the question about the
22   document?
23            MR. BICKS:  I'd like to move its admission, Your
24   Honor.
25            THE COURT:  What is it?  I mean, I know it was the
```

```
 1  document you found, but what is it?
 2          THE WITNESS:  It's a document I received that
 3  documented the fact that I was getting a satellite receiver and
 4  that I was getting, you know, DirecTV equipment.
 5          THE COURT:  Okay.  So a document related to equipment
 6  you got back in 2003?
 7          THE WITNESS:  Yes, sir -- I mean, yes, ma'am.
 8          THE COURT:  That's okay.  That happens to me all the
 9  time.
10      It's admitted.
11          MR. BARRETT:  We have no objection to the admission.
12          MR. BICKS:  And may I please -- thank you, Trudy, for
13  displaying that.
14  BY MR. BICKS:
15  Q.  And do you see at the top there who sent you the equipment?
16  Where did it come from?
17  A.  It came from a company called Satellite Systems Network.
18  Q.  And is that your handwriting on this document?
19  A.  Yes, sir, it is.
20  Q.  All right.
21          MR. BICKS:  And can we go back, Trudy, and can you
22  pull up Defendant's Exhibit 81?
23  BY MR. BICKS:
24  Q.  And the credit card information -- do you see that credit
25  card information on here, Dr. Krakauer?
```

1  A.  Yes.

2  Q.  And I think -- remember you told us about that May 2009

3  call where Ken asked you for credit card information?

4  A.  Yes, sir.

5  Q.  And did you give him that credit card information?

6  A.  He asked me for the last four digits of my current credit

7  card, which I gave him, yes, sir.

8  Q.  And on this application from 2003, this contract you

9  signed, you also provided credit card information?

10  A.  I was required by DirecTV to provide credit card

11  information to purchase the satellite service, so the answer is

12  yes, sir.

13  Q.  And you don't dispute, do you, sir, that the dealer

14  involved in your original purchase of DirecTV was Satellite

15  Systems Network, as reflected on the contract you signed?

16  A.  Based upon the contract, that is correct, but I never

17  called SSN.  I called DirecTV to purchase the satellite, and

18  they assigned it to SSN.  So I -- technically, your question --

19  the answer to your question is yes, but I never called SSN.  I

20  called DirecTV to get satellite service, and they assigned my

21  call to one of their at that time dealers.

22         **THE COURT:**  Okay.  I think you've said all that.  So

23  let's move on.

24  **BY MR. BICKS:**

25  Q.  Yeah.  And have you previously testified that there was no

1 printed evidence that SSN was in any way in the loop with your

2 original DirecTV account?

3 A.  I did not find these documents --

4        **MR. BARRETT:**  Objection as to the mischaracterization

5 of the testimony, Your Honor.

6        **THE COURT:**  Well, he can answer.

7     Go ahead.  You can answer.

8        **THE WITNESS:**  I testified at the Attorney General's

9 deposition in 2011, at which time, I was not aware of these

10 documents.  So when I said in 2011 that I was not aware of any

11 documentation linking my DirecTV account to SSN, that was

12 correct.

13 **BY MR. BICKS:**

14 Q.  Uh-huh.  And do you recall that you also said that under

15 oath in the year of 2016?

16 A.  I do not recall that.

17 Q.  Do you recall testifying in 2016 that you have no direct

18 evidence, no printed evidence, that SSN was in the loop when it

19 came to your DirecTV account?

20 A.  Again, my answer is the same.  I had not found these

21 documents until I was working on my federal income tax and

22 found a file in my files titled "DirecTV."  So based upon

23 everything I knew when I gave that testimony, I had no direct

24 evidence that SSN was in any way involved.

25 Q.  All right.  And so -- so then I'm clear and our jury is

1  clear, before the lawsuit was filed that has us in this

2  courtroom, did you go look at your DirecTV file to determine

3  who the dealer was when you bought your original DirecTV

4  subscription?

5  A.  I did not.

6  Q.  All right.  Now, let's talk a little bit about the 2009

7  call.  Are you with me, Dr. Krakauer?

8  A.  Yes, sir.

9  Q.  And you told us that an individual named Ken called you and

10  gave you a phone number, right?

11  A.  I gave him a phone number.

12  Q.  And he also gave you his phone number, right?

13  A.  He gave me -- I asked -- yes, he gave me his phone number.

14  Q.  All right.  And he was polite and forthright on the call?

15  A.  Certainly.

16  Q.  Yeah.  And did you ever on that call tell him not to call

17  you back?

18  A.  I told him I was not interested in DISH Network, and that

19  ended the call.

20  Q.  And did you have any notes of that phone call?

21  A.  The only notes that I took on that call was his name and

22  his phone number on the back of an envelope, which I no longer

23  have.

24  Q.  And what happened to those notes?

25  A.  I threw them out.  I often throw out notes from telephone

1  messages after they no longer seemed important.

2  Q.  And do you recall whether he said that he personally

3  represented DISH Network?

4  A.  He never said that he personally represented DISH Network,

5  but when he told me to switch from DirecTV to DISH, I assumed

6  he had a connection to DISH Network.

7  Q.  Do you recall whether he stated whether he was an employee

8  of DISH Network?

9  A.  He never did.

10  Q.  Do you recall whether he told you he was authorized by DISH

11  Network to call you?

12  A.  He did not tell me.

13  Q.  All right.  And you gave him your credit card information

14  after he asked for it, right?

15  A.  When he started the call and said he could see that I was a

16  longtime supporter of DirecTV, I assumed he represented

17  DirecTV, and so, yes, I did give him the last four digits of

18  the -- of my credit card.

19  Q.  And then -- and he said he could save you money, right?

20  A.  Yes, he did.

21  Q.  And then you spoke to people at DISH, right?

22  A.  Yes, sir.

23  Q.  And someone named Rebecca Dougherty, right?

24  A.  Yes.

25  Q.  When you spoke to Rebecca Dougherty, did you tell her that

```
 1  you had signed your DirecTV Annual Programming Commitment
 2  Agreement that showed that Satellite Systems Network was the
 3  dealer?
 4  A.  I was not aware of that when I talked to Rebecca Dougherty.
 5  So the answer to your question is no.
 6  Q.  And I think you told us DISH, to your knowledge, did an
 7  investigation of what happened, right?
 8  A.  Yes, they did.
 9  Q.  And you spoke with Ms. Dougherty, and she told you that the
10  party that called you was a contractor and that DISH was not
11  responsible for the actions of that contractor, right?
12  A.  More or less, that's what she said.
13  Q.  Did you ask Ms. Dougherty what was the name of the
14  contractor?
15  A.  After she told me that DISH was not responsible for the
16  contractor's name, we terminated the call because I didn't
17  think that it was going to go farther.
18  Q.  So you did not ask for the name of the contractor?
19  A.  I did not.
20  Q.  All right.  And you did eventually find out that it was
21  SSN, right?
22  A.  I found that out -- SSN in 2003 was working for DirecTV,
23  and in 2009, subsequently, they were working on behalf of DISH.
24  Q.  Did you reach out to SSN and tell them that you didn't want
25  to be called?
```

1  A.   I did not.

2  Q.   Did you send a letter, a fax, make a phone call, anything

3  even like that?

4  A.   I did not.

5  Q.   Now, let me ask you some questions about the calls that are

6  at issue in this case.  You understand there's a class period

7  in this case, right?

8  A.   Yes, sir.

9  Q.   And do you know what the class period is?

10  A.   Are you asking what's the start date and what's the end

11  date?

12  Q.   Yes.

13  A.   I believe it is from May of 2010 until the same time in

14  2011.

15  Q.   And do you know how many calls that relate to your phone

16  number that are in play in this case in that class period?  Do

17  you know how many?

18  A.   You know, that's an interesting question and -- because the

19  class period is a calendar year, but there's only a certain

20  shorter period that Satellite Systems Network saved the -- the

21  call records.  So I remember, you know, at least 10, but there

22  are only a smaller number that are in the -- the Five9 records,

23  which is the company that placed the call --

24  Q.   All right.

25  A.   -- the computer system that generated the call.

1  Q.  Do you remember -- you said "10."  You remember you talked

2  about your 2011 deposition?

3  A.  You know, roughly 10.

4  Q.  Yeah, and do you remember what you said at that deposition

5  about how many calls there were?

6  A.  I think I said at least five.

7  Q.  Do you remember you said three to five?  Does that help

8  your memory?

9  A.  I think my -- what I'm saying today is more correct.

10 Q.  Well, let me just show you -- well, let me show you your

11 2011 transcript at 39 to 22, 40 to 5, and I can pull it on the

12 screen so you can see it.  Maybe it will refresh your memory.

13      The question at the bottom was:  "Let me first ask you,

14 would you say that the number of calls was approximately three,

15 more than three, less than three?"

16          **THE COURT:**  Is there something that refers to a time

17 frame?

18          **MR. BICKS:**  I can show the whole thing, Your Honor.

19 I'm telling you, having known the deposition, it was how many

20 calls took place after 2009, and I can --

21          **THE COURT:**  All right.  Go ahead.

22          **MR. BICKS:**  And can you go to the next page, Trudy?

23 **BY MR. BICKS:**

24 Q.  Do you remember being asked those questions?

25 A.  I do.

1 Q. All right. And this was in 2011, presumably when things

2 were a lot fresher in your mind than coming here in 2017,

3 right?

4 A. I -- I think your characterization of what I remember

5 during the deposition in 2011 is somewhat presumptuous. I said

6 three to five, but if I'd only received three to five calls,

7 there would have been no reason for me to refile my phone

8 number on the Do Not Call Registry. So the three to five is

9 probably not complete. I can't recall exactly how many calls

10 there were, but, you know, that's really not the issue.

11         **THE COURT:** Okay. That's good. Do you have another

12 question?

13 **BY MR. BICKS:**

14 Q. That was the testimony that you gave, right, three to five?

15 A. That was the testimony I gave.

16 Q. All right. And on these phone calls, was anybody in any

17 way rude or -- in any way to you in these what you said there

18 was three to five?

19 A. They were not.

20 Q. And a couple of those calls went into your answering

21 machine?

22 A. Yes, sir, they were.

23 Q. And you deleted that, right?

24 A. I did.

25 Q. And is it safe to say that in each of those phone calls

1  from 2010 to 2011 that the only satellite service provider that
2  was mentioned was DirecTV?
3  A.   I think that's correct.
4  Q.   So no other cable provider or satellite service provider
5  was mentioned on any of those calls aside from DirecTV?  That's
6  true, is it not?
7  A.   That is true.
8  Q.   And you don't know the name of the individual who called
9  you during those what you said here was three to five calls?
10  A.   I do not.
11  Q.   Before this complaint was filed in April 2014, did you ever
12  tell anyone at DISH that you received those three to five
13  calls?
14  A.   I did not.
15  Q.   Did you ever send an e-mail, write a letter, or pick up the
16  phone and call anybody at SSN to say that you received these
17  calls?
18  A.   I did not.
19  Q.   Did you write a letter to the Better Business Bureau about
20  these calls?
21  A.   No, sir, I did not.
22  Q.   You know that those calls came from a number associated
23  with Satellite Systems Network, correct?
24  A.   I think my attorneys will present that information.
25  Q.   Do you know that yourself as the class representative with

1  us today?

2        **THE COURT:**  Are you asking him if he has learned that

3  during the course of this litigation?

4        **MR. BICKS:**  Yes.

5        **THE COURT:**  Okay.  You may answer.

6        **THE WITNESS:**  I have learned that through the course

7  of this litigation.

8  **BY MR. BICKS:**

9  Q.  But you didn't sue SSN in this case, did you?

10  A.  I did not.

11  Q.  And you called this an enforcement action; is that right?

12  A.  That is correct.

13  Q.  Do you know -- you're familiar with the complaint, the

14  formal written document that was filed in this case?

15  A.  Which document are you referring to?

16  Q.  The document that started this lawsuit that says what your

17  claims are.

18  A.  Yes, sir, I do.

19  Q.  And do you know how much money in that complaint that

20  you're asking for for yourself?

21  A.  I'm not expecting to get more than $500.

22  Q.  Do --

23  A.  And, you know, this is a class action lawsuit and --

24        **THE COURT:**  Okay.  Just a second.  I think he asked

25  you if -- how much you asked for in the complaint for yourself.

1  So if you can just answer that question.

2  **BY MR. BICKS:**

3  Q.  Do you know what you asked for in the complaint?

4          **THE COURT:**  For himself?

5          **MR. BICKS:**  Yes.

6          **THE WITNESS:**  I do not.

7          **MR. BICKS:**  Can I approach to refresh his memory?

8          **THE COURT:**  All right.

9          **MR. BARRETT:**  Your Honor, may I -- may we approach at

10  the sidebar?

11          **THE COURT:**  Okay.

12      (The following bench conference was recorded.)

13          **THE COURT:**  Now, I know you don't want to be really

14  close because we're all sick, but we have to be close or they

15  can't hear.  So you have to speak right into the mike or the

16  court reporter cannot take it down.  Okay.  So come in closer.

17          **MR. BICKS:**  Okay.  Sorry.

18          **THE COURT:**  Go ahead.  Your objection?

19          **MR. BARRETT:**  Your Honor, this is misleading.  I have

20  no idea what he intends to --

21          **THE COURT:**  Can you show me?

22          **MR. BICKS:**  Yeah, I'm going to show him the formal

23  complaint where he said he wants $1,500.

24          **MR. BARRETT:**  Your Honor, that's the issue of

25  willfulness, which the Court has --

```
 1          THE COURT:  That says willful or knowing.  He's

 2  entitled to that, and if you want me to explain to the jury

 3  that he's entitled to 1,500 if it's willful or knowing, then, I

 4  mean, I guess I can do that.  What's the point?

 5          MR. BICKS:  Because, Your Honor, when the witness gets

 6  up there and says he's asking for $500 and the complaint says

 7  1,500, that's not true.

 8          MR. BARRETT:  That's what he is asking the jury for at

 9  this trial.

10          THE COURT:  You know, it just seems like it gets us

11  into a bunch of confusing stuff.  I mean, I guess if you want

12  to ask him and you want me to explain to the jury about willful

13  and knowing and that that's a question for the Court, but that

14  seems -- that seems not like a good idea to me.

15          MR. BARRETT:  Your Honor, he also said in opening that

16  there's 25 million, I think, at stake here.  That is $500 times

17  the number of class calls.

18          THE COURT:  Okay.  I just think under Rule 403 I'm not

19  going to let you do this.

20      (Conclusion of the bench conference.)

21          THE COURT:  Go ahead.

22  BY MR. BICKS:

23  Q.  Dr. Krakauer, you're asking for money for you in this case,

24  right?

25  A.  I'm asking for the jury to tell DISH that they should not
```

1  be permitted to make uncontrolled telemarketing calls, and if I
2  get a couple of bucks out of it, that is fine; but my
3  motivation is if DISH Network is -- is not liable for
4  something, there will be no reason for them to stop making
5  calls, and in this case, 18,000 people received 51,000 phone
6  calls on behalf of DISH Network.  That's -- that's why --
7  that's why I'm doing it.  It's -- I didn't enter this for the
8  money.  It just seemed that somebody had to step forward and
9  say that -- stop it, you know, or pay a penalty.
10  Q.  Am I right that then this case for you has nothing to do
11  with money?
12  A.  It has nothing to do with it, but -- but --
13      **THE COURT:**  Okay.  That's good.  Just a second.  Stop.
14  Just let him ask you another question.
15      Go ahead.
16  **BY MR. BICKS:**
17  Q.  And you talked about, I think, some discussions -- a
18  meeting you had with lawyers, do you remember that, before this
19  case got filed?
20  A.  It was in the --
21      **MR. BARRETT:**  Your Honor, may we approach?
22      **THE COURT:**  Okay.  Just let him answer the question
23  yes or no, and I'll let him ask just one or two questions in
24  view of the testimony.  So your question is did you meet with
25  lawyers?

1     **MR. BICKS:**  Right, right before this case was filed.

2           **THE COURT:**  Okay.

3           **THE WITNESS:**  Yes, I met with lawyers in 2014 about

4  this trial.

5  **BY MR. BICKS:**

6  Q.  All right.  And just so we're clear, this class period is

7  between, say, 2011, right, and that's when it ends, right?  You

8  know that?

9  A.  I do know that.

10 Q.  And so this case gets filed a little bit over three years

11 after, right, 2011, right?  You know that?

12 A.  Yes, sir.

13           **THE WITNESS:**  Your Honor, may I answer that question a

14 little bit more completely?

15           **THE COURT:**  Your attorneys can ask more questions on

16 redirect, if they wish.

17     Do you have further questions?

18           **MR. BICKS:**  Yes.

19 **BY MR. BICKS:**

20 Q.  And my question is during that time period, say, 2011 to

21 when you filed this case in 2014, did you ever reach out to

22 anybody at DISH Network?

23 A.  I did not.

24 Q.  And you never reached out to anybody at SSN, right?

25 A.  I did not.

1  Q.  And you didn't even think that this would ever be a federal

2  lawsuit until that meeting in 2014, right?

3  A.  I think that's correct.  I -- I didn't realize that a class

4  action suit could come out of this, and I didn't realize the

5  size of the class, the number of people who had received calls

6  and the number of calls they had received; and, you know, if

7  there can't be some enforcement on a federal statute,

8  there's -- there's nothing to keep wealthy companies from

9  continuing to violate the TCPA.

10        **MR. BICKS:**  And, Your Honor, I would move to strike

11  that testimony as not responsive to my question.

12        **THE COURT:**  Well, I think -- it looks like maybe he

13  was explaining his answer, so overruled.  You may ask another

14  question.

15  **BY MR. BICKS:**

16  Q.  And that was information that you heard from lawyers?

17        **MR. BARRETT:**  Objection, Your Honor.

18        **THE COURT:**  Okay.  Well, you know, it's not surprising

19  that people go to lawyers to be informed about what the law is,

20  so move on.

21        **MR. BICKS:**  I've got no further questions, Your Honor.

22        **THE COURT:**  Any redirect?

23        **MR. BARRETT:**  No, Your Honor.

24        **THE COURT:**  All right.  Thank you.  You can step down.

25      (The witness left the stand.)

1        **THE COURT:**  You may call your next witness.

2        **MR. GLASSER:**  The Plaintiff calls Amir Ahmed.

3        **THE COURT:**  Is somebody getting him?

4        **MS. ECHTMAN:**  Yes, Your Honor, we are getting him.

5        **THE COURT:**  All right.  Thank you.

6     So, generally speaking, ladies and gentlemen, the witnesses

7  are out of -- except for the parties, are out of the courtroom

8  during the trial.  So between each witness, there will usually

9  be a short delay while -- they're just right down the hall, but

10  unlike on TV, when these things happen in five -- you know,

11  less than a fifth of a second, we have to wait on the witness

12  to get into the courtroom.

13     And as I mentioned to you yesterday, we will take a short

14  break probably about eleven o'clock.  If at any time my

15  decision about when to take a break is not matching up with how

16  much coffee you drank this morning, just let me know.  It's not

17  an endurance contest.  So if you do need to take a break before

18  I say we're going to take a break, just raise your hand and

19  I'll be glad to accommodate you on that.

20        (Pause in the proceedings.)

21        (The witness entered the courtroom.)

22           **AMIR AHMED, PLAINTIFF'S WITNESS, SWORN**

23                      **DIRECT EXAMINATION**

24        **THE COURT:**  All right.  Go ahead.

25  **BY MR. GLASSER:**

```
 1   Q.  Tell the jury your name, sir.

 2   A.  My name is Amir Ahmed.

 3   Q.  Mr. Ahmed, I understand you're currently senior vice

 4   president at DISH?

 5   A.  That is correct.

 6   Q.  From 2000 -- June of 2009 until August of 2013, I

 7   understand you were the senior vice president at DISH, whose

 8   responsibility was indirect sales; is that correct?

 9   A.  That is correct.

10   Q.  Indirect sales are the sales that include the sales of a

11   company called SSN, an order entry retailer; is that correct?

12   A.  Yes.

13           THE COURT:  And if you could maybe -- Ms. Sanders, can

14   you get the mike a little closer?  The witness is soft-spoken.

15   If you can adjust it.

16           THE WITNESS:  Yes.

17           THE COURT:  Yes, sir.  That's much better.  Thank you.

18      Go ahead.

19           MR. GLASSER:  Sorry, Your Honor, I dropped the --

20   BY MR. GLASSER:

21   Q.  In that capacity, you had principal responsibility for the

22   retailers of DISH services that were not DISH itself; isn't

23   that correct?

24   A.  That's correct.

25   Q.  You reported to a gentleman by the name of Charlie Ergen,
```

1  the owner of the company, or the founder of the company; is

2  that correct?

3  A.  Yes, he was my -- the boss, but I reported to Mr. Jim

4  DeFranco.

5  Q.  Okay.  DeFranco.  And we heard about him.  He's a gentleman

6  on the board of directors of the company and one of the

7  cofounders; right?

8  A.  Yes, sir.

9  Q.  So you are at the apex power group in this company; isn't

10  that fair to say?  You're reporting right to the boss?

11  A.  I'm reporting to, yes, Jim DeFranco, yes.

12  Q.  And everybody who sold -- who was not DISH itself, you were

13  the boss of; isn't that right?

14  A.  Yes, my responsibility was indirect sales, correct.

15  Q.  So we learned in opening arguments from your counsel that

16  there were about 3,500 indirect sales retailers out there in

17  the world.  Is that consistent with your memory about 2011?

18  A.  That's correct.  That's about right.

19       **THE COURT:**  And if I can just -- you're saying

20  "indirect," one word, not "in direct" two words, right?  So

21  we're talking about "indirect," one word, sales, right?

22       **MR. GLASSER:**  Yes, ma'am.  I'll -- I'll say not DISH

23  itself.

24       **THE COURT:**  Okay.  Go ahead.

25  **BY MR. GLASSER:**

```
 1   Q.  Right?
 2   A.  Yes, those are -- we had about 3500 independent satellite
 3   dealers.  We also had other accounts.  Are you including that
 4   we had accounts -- national accounts, or Telco Partners, a lot
 5   of public, private companies, commercial companies, yes.
 6   Q.  You were responsible for all that, too?
 7   A.  That was under me, yes, until 2013.
 8           MR. GLASSER:  I want to approach the witness with
 9   Exhibit 55, Your Honor.
10           THE COURT:  Plaintiff's Exhibit 55?
11           MR. GLASSER:  Yes, ma'am.
12       (Document handed to the witness by Mr. Glasser.)
13   BY MR. GLASSER:
14   Q.  Handing you, Mr. Amir [sic], a document called an Assurance
15   of Voluntary Compliance.  You recognize that document; don't
16   you?
17   A.  Yes, sir.
18           MR. GLASSER:  I move the admission of Exhibit 55, Your
19   Honor, and ask to be able to publish it to the jury.
20           THE COURT:  It will be admitted.
21           MS. ECHTMAN:  Your Honor, we stand on our prior
22   objections.
23           THE COURT:  All right.  Noted and overruled.  This is
24   the redacted one?
25           MR. GLASSER:  Yes, ma'am.
```

| | |
|---|---|
| 1 | **THE COURT:** Okay. It will be admitted. |
| 2 | **MR. GLASSER:** All right. I want to start at the top. |
| 3 | **MS. ECHTMAN:** And, Your Honor, I believe we have |
| 4 | agreement on a limiting instruction for the Court to read about |
| 5 | this particular exhibit. |
| 6 | **MR. GLASSER:** Do you want to do it at the end or the |
| 7 | beginning? |
| 8 | **THE COURT:** We'll proceed with the testimony. I'll |
| 9 | talk to you all about that at the morning break. I will just |
| 10 | note, ladies and gentlemen, this is a very long document, and |
| 11 | the parts that don't matter to this lawsuit we -- have been |
| 12 | blacked out, so there's no confusion on you all's part, and you |
| 13 | don't have to read a 40-page document -- 70-page document. |
| 14 | It's just they've -- we've cut out the parts that don't matter |
| 15 | to this case. So go ahead. |
| 16 | **BY MR. GLASSER:** |
| 17 | Q. All right. So, Mr. Amir [sic], you see at the top there |
| 18 | the title of this document is Assurance of Voluntary |
| 19 | Compliance; is that correct? |
| 20 | A. Yes, sir. |
| 21 | Q. What does the word "assurance" mean to you? |
| 22 | **THE COURT:** In the context of this document? |
| 23 | **BY MR. GLASSER:** |
| 24 | Q. Just in plain English. When you assure somebody something, |
| 25 | what do you tell them? |

1 A.    Agreeing.

2 Q.    And then, here at the bottom, it's kind of the negative,

3 it's a Footnote 1:  This Assurance of Voluntary Compliance

4 shall, for all necessary purposes, also be considered an

5 assurance of discontinuance.  Right?  Do you see that?

6 A.    Yes, sir.

7 Q.    And does the word "discontinue" mean to you, to stop

8 something?

9 A.    It could mean that, yes.

10 Q.    The parties to this Assurance of Voluntary Compliance are

11 Attorneys General; is that correct?

12 A.    Yes, sir.

13 Q.    And DISH Network, LLC; is that correct?

14 A.    Yes, sir.

15 Q.    DISH Network, LLC, is the company for which you are the

16 head of sales at the relevant time period, June of 2009;

17 correct?

18 A.    Yes, sir.

19 Q.    And I think if we count them up, you'll see there are 46

20 separate states that DISH entered this Assurance of Compliance

21 with; isn't that true?

22 A.    I believe so, yes.

23 Q.    Now, the OE retailers that we're going to talk about here,

24 they had a nationwide territorial sales area; isn't that

25 correct?

```
 1  A.  Yes, they could sell around the country.
 2  Q.  So they would be selling into these 46 states; right?
 3  A.  Yes.
 4  Q.  And it's -- and the assurance --
 5          THE COURT:  I'm sorry.  You said OE retailers?
 6          MR. GLASSER:  Yes, ma'am.
 7          THE COURT:  What's that OE?
 8          THE WITNESS:  Order entry.
 9          THE COURT:  Order entry?
10          THE WITNESS:  Yes, ma'am.
11          THE COURT:  Okay.  Go ahead.
12  BY MR. GLASSER:
13  Q.  And here, DISH Network sells and leases to its subscribers
14  such receiving equipment both directly and through authorized
15  retailers; right?
16  A.  Yes.
17  Q.  I don't think this is in dispute in the case, but just to
18  get it in the record, DISH Network does this through a fleet of
19  satellites that orbit the earth that beam the services down to
20  the receivers; right?
21  A.  Yes, sir.
22  Q.  I think I heard in opening there are about 18 of those
23  satellites; is that correct?
24  A.  That's correct.
25  Q.  And I understand from some things I've read that the total
```

```
 1  amount of channels you all are sending is up to 3,500 channels
 2  to somebody's receiver; is that right?
 3  A.   That could be, but --
 4  Q.   A lot?
 5  A.   Yeah, that's not realistic.  I'm saying that's not what the
 6  customer is getting.
 7  Q.   Okay.  Not what?
 8  A.   I don't know exactly what amount.
 9  Q.   What's it cost a month to get this DISH now?
10  A.   You're talking about the --
11  Q.   Like just an average?
12  A.   Average.  The customer average pays about $90 a month.
13  Q.   Okay.  And has that been the case from 2009 to the present,
14  basically, something like $90 a month?
15  A.   In that 80 to 90 range, yes.
16  Q.   Okay.  Now, there's some definitions that I just want to go
17  through because when we get to the later parts of the
18  assurance, the defined terms are used.  So let's just go to the
19  first defined term that I want to talk about, which is "covered
20  marketer."
21            THE COURT:  Paragraph 2.9?
22            MR. GLASSER:  Yes, ma'am.
23            THE WITNESS:  Yes.
24  BY MR. GLASSER:
25  Q.   Are you with me, Mr. Ahmed?
```

```
 1  A.   Yes.

 2  Q.   So a covered marketer means a third-party retailer;

 3  right --

 4  A.   Yes.

 5  Q.   -- capital T, and we'll get to the meaning of that -- who

 6  can directly enter into DISH's Network's order entry

 7  application system, OE retailer.  That's the definition of a

 8  covered marketer; right?

 9  A.   Yes.

10  Q.   And we agree that SSN was a covered marketer; right?

11  A.   Yes.

12  Q.   Okay.

13  A.   They're -- "covered marketer" is defined here as a

14  third-party retailer, yes, as an OE retailer, independent

15  contractor.

16  Q.   Who has the power to enter sales directly into the order

17  entry system of DISH; correct?

18  A.   Yes, that is the system they can enter an order.

19  Q.   Okay.  And so this part of the deal having to do with

20  covered marketers has nothing to do with the 3500 marketers.

21  It has to do with the subset of marketers who have nationwide

22  sales ability and responsibility who are called OE retailers;

23  isn't that true?

24  A.   Yes.  This is referring to third-party retailers and OE

25  retailer, but they're all third-party retailers.  All 3500 are
```

1  third-party retailers.

2  Q.  I get that.  But the definition here is, covered marketer

3  is a third-party retailer.  You know what a Venn diagram is?

4  A.  Yes.

5  Q.  All right.  So we've got a Venn diagram of all the

6  retailers.  There's 3500 in the Venn; right?

7  A.  Yes.

8  Q.  And then there's about -- in 2011, there's about 45 who

9  have that power to enter right into the DISH system; right?

10 A.  That's correct.

11 Q.  All right.

12 A.  Yes.

13 Q.  And those 45 are called the order entry retailers; correct?

14 A.  Yes.

15 Q.  And those 45 have nationwide sales ability; right?

16 A.  Yes.

17 Q.  And those 45 are less than 2 percent of all retailers;

18 correct?

19 A.  That would -- yes, very small percentage out of the 3500,

20 yes.

21 Q.  So there's no point in this case talking about 3500

22 retailers because what we're talking about is one retailer,

23 SSN, which is in the 45; right?

24 A.  Yes.

25        MS. ECHTMAN:  Objection, argumentative.

1    **THE COURT:** Okay. Well, don't argue with the witness.

2    You can ask him a question.

3    **BY MR. GLASSER:**

4    Q.  And then the definition of "third-party retailer" is one or

5    more independent persons, corporation, partnership, or any

6    other type of entity, as the case may be, that is authorized by

7    DISH Network to offer, lease, sell, advertise and/or install

8    DISH Network services and/or DISH Network goods; right?

9    A.  Yes.

10   Q.  So that's the 3500?

11   A.  Yes.

12   Q.  Okay.  Now, the next section of this assurance discusses

13   the application to -- of the assurance to DISH itself and its

14   successors.  Are you with me?

15   **THE COURT:** You're in paragraph 3.1?

16   **MR. GLASSER:** Yes, ma'am.

17   **BY MR. GLASSER:**

18   Q.  Are you with me?

19   A.  Yes, I am.

20   Q.  All right.  I want to go to this.  DISH Network shall

21   provide a copy --

22   **THE COURT:** And excuse me.  When you read --

23   **MR. GLASSER:** Stand up.

24   **THE COURT:** -- talk slower.

25   **MR. GLASSER:** Okay.

1           **THE COURT:**  I'm not trying to make it last longer, but

2    I do want to be able to understand you.  And when you're

3    reading out loud, it's harder.

4           **MR. GLASSER:**  All right.

5    **BY MR. GLASSER:**

6    Q.  So just to summarize, DISH Network is supposed to provide a

7    copy of this assurance to all of its companies and all of its

8    related companies; right?

9    A.  Yes.

10   Q.  Okay.  And all of the officers, directors, employees,

11   shareholders, agents, servants, and assigns who have

12   managerial-level responsibilities in performing the obligations

13   outlined in the assurance; right?

14   A.  Yes.

15   Q.  So DISH was obligated under this deal to disseminate this

16   assurance to all its managers so they would follow it; isn't

17   that right?

18   A.  Yes.

19   Q.  It says here:  DISH Network shall require its third-party

20   realtors -- I'm going to have trouble with that.

21   A.  Retailers.

22   Q.  Retailers to comply with the terms and conditions of this

23   assurance.  Right?

24   A.  Yes.

25   Q.  Everybody's supposed to abide by it; right?  Yes?

1  A.  Yes.

2  Q.  And then, the term of the assurance says:  Upon execution

3  of this assurance, DISH Network shall be bound from directly or

4  indirectly engaging in practices set forth herein and shall be

5  required to directly or indirectly satisfy the affirmative

6  requirements set forth herein.  Do you see that?

7  A.  Yes, I do.

8  Q.  So there's going to be affirmative requirements, things you

9  need to do; right?  That's what "affirmative requirements"

10  means?

11  A.  Okay.

12  Q.  Do you agree?

13  A.  That's what it says, yes.

14  Q.  Do you agree that an affirmative requirement is a thing

15  you're supposed to do?

16  A.  Yes.

17          **THE COURT:**  Okay.  Is that a good stopping point for

18  our morning break?

19          **MR. GLASSER:**  Yes, ma'am.

20          **THE COURT:**  All right.  Ladies and gentlemen, I'm

21  going to excuse you for a 15-minute recess.  Please leave your

22  notes in your chair.  You'll remember during this break, as all

23  breaks, that you won't talk about the case among yourselves or

24  with anyone else.  Don't have any contact with the lawyers,

25  parties, or witnesses.  Don't conduct any independent

1   investigation, or read or listen to anything about the case.
2   And if I forgot to tell you anything else you're not supposed
3   to do, you'll remember from yesterday.
4       Go back through the jury room and please be back in the
5   jury room in about 15 minutes, shortly before 11:15.
6       The jurors are excused.  If everyone else will remain
7   seated while they step out.
8       (The jury left the courtroom at 11:00 a.m.)
9           **THE COURT:**  All right.  And the witness may step down.
10  Thank you.
11      (The witness left the stand.)
12          **THE COURT:**  If I could just ask, Mr. Glasser, if you
13  would refer to the paragraph number.
14          **MR. GLASSER:**  Yes, ma'am.
15          **THE COURT:**  It's not so much for me or the jurors, but
16  the Court of Appeals might appreciate it one day --
17          **MR. GLASSER:**  Yes, ma'am.  No problem.
18          **THE COURT:**  -- for ease of reference to the part that
19  you're referring to.
20          **MR. GLASSER:**  Okay.  No problem.
21          **THE COURT:**  And is there anything the Plaintiff wants
22  to take up before we take our recess?
23          **MR. GLASSER:**  No, ma'am.
24          **THE COURT:**  What about the Defendant?
25          **MR. EWALD:**  Your Honor, there was reference to the

 1  proposed limiting instruction --

 2          **THE COURT:**  Yes.

 3          **MR. EWALD:**  -- related to this document.  And the

 4  parties, I believe, are in agreement, except for one phrase in

 5  one sentence.  And I can show the Court what DISH's proposal

 6  is, if I may approach.

 7          **MR. GLASSER:**  Can I just come to the corner?  I don't

 8  have my copy.

 9          **THE COURT:**  Is it the same one you handed up

10  yesterday?

11          **MR. EWALD:**  No, Your Honor.  The parties conferred and

12  we tried to reach agreement, and we did, except for one little

13  phrase.  I have both parties --

14          **THE COURT:**  All right.  Yeah.

15          **MR. GLASSER:**  Let's just walk up there and talk.

16          **THE COURT:**  Well, it's awfully hard to talk at that

17  corner.  But why don't you all look at it together for a

18  second.  You can put it up on the screen.  I can see it on the

19  screen.

20          **MR. EWALD:**  So I would --

21          **THE COURT:**  Just a second.  Just let me look at it.

22      (Pause in the proceedings.)

23          **MR. EWALD:**  This is Plaintiff's, Your Honor.

24          **THE COURT:**  Okay.  Hold on.

25      (Pause in the proceedings.)

1     **THE COURT:** Okay. Now, let me see the Defendant's.

2         **MR. EWALD:** Your Honor, I bracketed the only differing

3  language. It's really that first part of that sentence.

4      (Pause in the proceedings.)

5         **THE COURT:** Okay. So the Defendants want me to say:

6  The Plaintiffs are offering the assurance as evidence on the

7  question of whether DISH had control over SSN. And you are to

8  consider it only for that purpose and not for any other

9  purpose.

10     And now, can I see the Plaintiff's language again?

11        **MR. GLASSER:** Your Honor, the Plaintiff says: The

12 Plaintiffs are offering the assurance as evidence that DISH has

13 power or control over SSN. And you are to consider it only for

14 that purpose.

15     And the reason we are saying that is the assurance itself

16 obligates DISH to issue business rules causing compliance with

17 the assurance. That's an element of power, Your Honor.

18        **MR. EWALD:** But, Your Honor, I don't think power comes

19 up in any of the agency context. We talked about control. And

20 it's not -- I think it's more proper to say "the question of

21 control" rather than "is evidence that." The Court's

22 stipulation is saying what it's evidence of.

23        **THE COURT:** You spoke awfully quickly.

24        **MR. EWALD:** I did.

25        **THE COURT:** And can you hand them up now and let me

1  look at them together?

2          **MR. EWALD:**  Sure.

3      (Documents handed to the Court.)

4          **MR. GLASSER:**  That's the only difference among the

5  two.

6      (Pause in the proceedings.)

7          **THE COURT:**  Okay.  Well, just looking back at what I

8  told them at the beginning of the case, and I believe this

9  actually was at DISH's request, I said:  The principal must

10 have the power to direct and control the agent's actions.

11     So that is, in fact, what this evidence is being offered

12 towards.  I don't really see a huge amount of difference in

13 this, so --

14         **MR. EWALD:**  Your Honor, the point I was making earlier

15 is that it is one thing to say that there is a question the

16 jury must answer, and that this is being offered by Plaintiffs

17 for that, as opposed to saying this is, in fact, evidence of

18 that.

19         **THE COURT:**  Well, if it wasn't evidence of that, why

20 would I let it in?  I mean, I don't understand what you're

21 saying.

22         **MR. EWALD:**  I was trying to track Your Honor's -- when

23 we discussed this yesterday, that was the manner in which you

24 posed the instruction, and we tried to track that.  I think it

25 just is more appropriate for this context.

1      **THE COURT:**  Okay.  Well, I don't see a huge amount of
2  difference between these two instructions.  So, I'll give the
3  one that DISH has handed up just out of an abundance of
4  caution.  Okay.  So you want me to give that when we come back
5  from the break?
6      **MR. GLASSER:**  Sure.
7      **THE COURT:**  Seems like a good time?
8      **MR. EWALD:**  Yes.
9      **MS. ECHTMAN:**  Thank you, Your Honor.
10      **MR. GLASSER:**  What time is break over?
11      **THE COURT:**  11:15.  So you all need to be real quick.
12  We'll take a 10-minute recess.
13      **MS. ECHTMAN:**  Thank you.
14      (A morning break was taken from 11:05 a.m. until
15  11:15 p.m.)
16      **THE COURT:**  Anything we need to take up before the
17  jury comes in?
18      **MR. GLASSER:**  Just on housekeeping, Your Honor, I
19  wanted to point out, we do have our expert, Anya Verkhovskaya,
20  here.  I understand the sequestration is to fact witnesses.
21      **THE COURT:**  Did you have any objection to her being
22  present?
23      **MS. ECHTMAN:**  No problem.
24      **THE COURT:**  Okay.  Thank you.
25      **MS. ECHTMAN:**  And I assume there's no objection if we

1  bring any of our experts.

2         **MR. GLASSER:**  Correct.

3         **THE COURT:**  Correct?

4         **MR. GLASSER:**  Correct.

5         **THE COURT:**  Okay.  Then the sequestration order only

6  applies to fact witnesses going forward.

7      All right.  We can bring the jury in.

8      (The jury entered the courtroom.)

9         **THE COURT:**  All right.  Good morning again.  Ladies

10 and gentlemen, your -- this document that we're -- the witness

11 is discussing right now, Plaintiff's Exhibit 55, you are

12 hearing testimony about an Assurance of Voluntary Compliance

13 between certain State Attorneys General and DISH Network, LLC,

14 entered in June of 2009.

15     And this assurance was entered by all parties to the

16 assurance to resolve a dispute without trial or adjudication of

17 any issue of fact or any finding of liability against DISH of

18 any kind.  So the assurance does not constitute an admission by

19 DISH for any purpose of any fact or of any violation of any

20 rule, law, or regulation.  So it's not an admission of

21 wrongdoing, and you should not consider it for that.

22     The Plaintiffs are offering the assurance as evidence on

23 the question of whether DISH had control over SSN.  And you are

24 to consider it only for that purpose and not for any other

25 purpose.

1    Of course, you're the judges of the facts, and subject to

2 that limiting instruction, you should consider this assurance

3 just like any other piece of evidence, giving it the weight or

4 importance you think it deserves in light of all the other

5 evidence.  And as I already mentioned, we've redacted the parts

6 that don't have anything to do with this case.  Okay.  Go

7 ahead.

8         **MR. GLASSER:**  Thank you, Your Honor.

9 **BY MR. GLASSER:**

10 Q.  So, Mr. Ahmed, I want to apologize.  I accidently called

11 you Mr. Amir once, my colleague told me.  I'm sorry.

12 A.  That's all right.

13 Q.  Anyway, so I want to go to the next section of the

14 assurance, which concerns telemarketing and Do Not Call.  Are

15 you with me?

16 A.  Yes, sir.

17 Q.  All right.  DISH Network, it says, in section 4.76 --

18         **THE COURT:**  67?

19 **BY MR. GLASSER:**

20 Q.  67, sorry.  Yeah, 4.67:  DISH Network shall comply with all

21 federal, state, and local laws regarding telemarketing,

22 including but not limited to those which prohibit calling

23 consumers who are on any federal, state, or local Do Not Call

24 List, unless otherwise exempted by such laws.  Do you see that?

25 A.  Yes, sir.

1  Q.  Okay.  So that was the undertaking that you guys took;

2  right?

3  A.  Yes.

4  Q.  Now, the next page, and we'll get to some of this, it

5  says -- this is at 4.73, says:  DISH Network shall issue

6  business rules to its authorized telemarketers and covered

7  marketers requiring them to comply with the terms of this

8  assurance.  Do you see that?

9  A.  Yes, sir.

10  Q.  Okay.  So we'll talk about, when we get to the contract,

11  what a business rule is.  But just to preview it, because we

12  don't have the contract in front of us, I can only examine you

13  on one document.

14         **THE COURT:**  If you could slow down.

15  **BY MR. GLASSER:**

16  Q.  To preview it, the contract has a section that provides

17  that DISH has the power to issue business rules; correct?

18  A.  Yes.

19  Q.  And the section says that the retailer must do or refrain

20  from doing whatever it is that DISH tells them in the business

21  rule; right?  Paraphrasing.  Yes?

22  A.  I'd like to -- yes -- I mean, I would like to read exactly

23  what it says.

24  Q.  We'll get to it --

25  A.  Thank you.

1   Q.  -- I just can only kind of show one document at a time.

2   A.  Sure.  Understood.

3   Q.  Okay.  We'll get there.  Now, the next section,

4   Section 4.74, says:  DISH shall affirmatively investigate

5   complaints regarding violations of federal, state, and local

6   laws regarding the telemarketing, including but not limited to

7   those which prohibit calling consumers who are on any federal,

8   state, or local Do Not Call Lists unless otherwise exempted by

9   such laws, and shall take appropriate action as soon as

10  reasonably practicable against any authorized telemarketers and

11  covered marketers it has determined to be in violation of the

12  requirements of this assurance.  Do you see that?

13  A.  Yes, sir.

14  Q.  All right.  Let's talk about some of the clauses in here.

15  First, DISH took on a duty to affirmatively investigate; is

16  that right?

17  A.  Yes.

18  Q.  And -- and then, DISH also agreed that it shall take

19  appropriate action as soon as reasonably practicable when its

20  investigation determined a violation; right?

21  A.  Yes.

22  Q.  And this covers covered marketers, right here, which you

23  agree SSN is one?

24  A.  Yes.

25  Q.  So moving onto Section 4.75, says:  Within 30 days of the

1  date of the execution of this assurance, DISH Network shall

2  provide each authorized telemarketer and each covered marketer

3  with a copy of this assurance and inform them that in order to

4  continue acting as a DISH Network authorized telemarketer or

5  covered marketer, they must abide by the terms and conditions

6  of this assurance; right?

7  A.  Yes.

8  Q.  So the idea was we're going to get this out to the 45

9  covered marketers, and we're going to do what it says?

10  A.  Yes, it was sent out to all the retailers.

11  Q.  4.77 requires DISH Network to require the covered marketer

12  to establish written policies and procedures to comply with the

13  telemarketing laws, including the Do Not Call List; right?

14  A.  Yes.

15  Q.  And then I want to talk about the second duty here at 4.78,

16  okay?  Are you with me at 4.78?

17  A.  Yes, sir.

18  Q.  It says:  DISH Network shall monitor, directly or through a

19  third-party monitoring service approved by DISH, its covered

20  marketers to determine whether they are telemarketing consumers

21  and, if so, to determine whether the covered marketer is

22  complying with all federal state, state, and local Do Not Call

23  laws.  Do you see that?

24  A.  Yes, sir.

25  Q.  All right.  Let's talk about this sentence.  First, it

1  says, "DISH shall monitor," right?

2  A.  Correct.

3  Q.  Second, it says, directly or indirectly, they shall

4  monitor, right?  That's what it's talking about it.  They shall

5  monitor directly or indirectly through a third party, but

6  somebody --

7         **THE COURT:**  I'm sorry?  Where are you saying

8  indirectly?

9  **BY MR. GLASSER:**

10  Q.  So they shall monitor directly through a third party -- oh,

11  they shall monitor directly through a third-party monitoring

12  service approved -- they shall monitor directly or through a

13  third-party monitoring service.  Do you see that?

14  A.  Yes, that I see.

15  Q.  So DISH can do it itself, or it can hire a monitor?

16  A.  Yes.

17  Q.  Okay.  To determine, right, whether they are telemarketing

18  consumers, right?  Are they telemarketing?  Are they calling

19  consumers?

20  A.  Yes.

21  Q.  Okay.  And whether they -- it -- the covered marketer is

22  complying?  Do you see that?

23  A.  Yes, I do.

24  Q.  All right.  So all those verbs, you agree with me, are

25  active verbs?  Shall monitor, that's an active thing, right?

1  A.  Yes.

2  Q.  To determine, that's an active, affirmative act,

3  determining, right?

4  A.  Yes.

5  Q.  Is complying is a continuing thing, is complying, right?

6  A.  Yes.

7  Q.  It does not say in here monitor only after a consumer

8  writes you ten letters, does it?

9  A.  No, it does not say that.

10       **MS. ECHTMAN:**  Objection.

11       **THE COURT:**  Overruled.

12  **BY MR. GLASSER:**

13  Q.  And you agree with me that 4.78 is a separate obligation

14  from the obligation at 4.74 to investigate complaints?

15  A.  Yes, this is to investigate complaints.  Can I see the

16  other one, sir?

17  Q.  Yes.  And this is to monitor and make sure there's

18  compliance?

19  A.  And this is to monitor, yes.

20  Q.  And then at 4.79, it goes into a discipline section, right?

21  A.  Yes, sir.

22  Q.  At 4.79, it says:  DISH Network shall appropriately and

23  reasonably discipline a covered marketer if DISH Network

24  reasonably determines that, in connection with telemarketing --

25       **THE COURT:**  Slow down.

1  **BY MR. GLASSER:**

2  Q.  -- DISH Network goods and/or DISH Network services, the

3  covered marketer has failed to fulfill contract requirements

4  with respect to compliance with federal, state, and local

5  telemarketing laws, right?

6  A.  Yes.

7  Q.  All right.  So that's saying we all know that your contract

8  says they should comply with the law, but if you find out

9  through your investigation, which is that 4.74 duty, that

10 they're not, we're going to do something, right?

11 A.  Yes, that's what it says.

12 Q.  Or, B, violated federal, state, or local telemarketing

13 laws, right?

14 A.  Yes.

15 Q.  Independent of the contract you just -- right?  Agree?

16 It's a separate sentence.

17 A.  Yes.

18 Q.  Okay.  Or failed to comply with the terms of this assurance

19 as they relate to telemarketing and the Do Not Call Section,

20 right?  The third thing, if they don't comply with this deal --

21 if a covered marketer doesn't comply with this deal, we're

22 going to discipline them?

23 A.  That's an option, yes.

24        **THE COURT:**  And just be sure you're asking a question,

25 Mr. Glasser.

**BY MR. GLASSER:**

Q. Okay. You think "shall appropriately and reasonably discipline" is an option?

A. Yes, we have to look at the facts. Those are one of the options that we could do, yes.

Q. And then there's a set of kind of remedies that are -- I guess some are worse and some are less. Termination, right?

A. Yes.

Q. Imposing a monetary fine, right?

A. Yes, sir.

Q. Withholding of compensation, right?

A. Yes, sir.

Q. Suspending the right to telemarket for a period of time, right?

A. Yes, sir.

Q. Prohibiting telemarketing, right?

A. Yes.

Q. Requiring the covered marketer to improve its process or procedures for compliance with the TCPA and other federal, state, and local laws regarding telemarketing?

A. Yes, sir.

Q. Requiring the covered telemarketer to terminate certain employees involved in TCPA violations or other violations of state or local laws, right?

A. Yes.

1   Q.  Requiring the covered marketer to terminate telemarketing

2   affiliates?

3   A.  Yes.

4   Q.  That didn't come up in this case.  Requiring the covered

5   marketer to retrain employees in the TCPA, right?

6   A.  Yes.

7   Q.  Or other appropriate and reasonable discipline under the

8   circumstances, right?

9   A.  That's correct.

10   Q.  And then it says:  In determining what disciplinary action

11   shall be taken, DISH Network shall take into consideration the

12   egregiousness of the covered marketer's conduct, the number of

13   violations, the covered marketer's willingness to cure the

14   problem, and whether DISH Network has previously disciplined

15   the covered marketer.  Do you see that?

16   A.  Yes, sir.

17   Q.  So it's fair to say that history matters in how you're to

18   discipline, right?

19   A.  Yes, you take -- you have to take a look at each

20   circumstance, yes.

21   Q.  So what you know about the covered marketer that arose

22   prior to this deal matters to how you're supposed to treat them

23   going forward, right?

24   A.  Yes, we take every complaint, sir, very seriously, yes.

25   Q.  And then here's a section.  It's kind of similar to what

1    the Court just read:  7.2, this assurance does not constitute

2    an admission by DISH for any purpose of any fact or of a

3    violation of law, rule, or regulation, nor does this assurance

4    constitute evidence of any liability, fault, or wrongdoing.

5    The assurance is entered into without a trial or adjudication,

6    right?

7    A.  Yes, sir.

8    Q.  So it's a settlement agreement?

9    A.  Yes.

10   Q.  So the reason you must have had to have a settlement

11   agreement with 46 states' attorneys general is because there

12   were widespread problems with telemarketing, correct?

13            **MS. ECHTMAN:**  Objection, Your Honor --

14            **THE COURT:**  Well --

15            **MS. ECHTMAN:**  -- 403.

16            **THE COURT:**  Overruled.  You can answer the question.

17   **BY MR. GLASSER:**

18   Q.  In general.

19   A.  This is a customer protection piece.  It is.  It is

20   about -- it is about making sure we do agree with the -- with

21   the states on telemarketing laws, on terms and conditions,

22   on -- there was specific other markets, to make sure we're

23   doing everything accurately ourselves and our retailers to

24   explain consumer promotions on the terms and conditions and

25   exactly what the laws are in telemarketing, yes.

1    Q.   Okay.  And it says here on page -- on Section 7.3:  DISH

2    Network shall comply with the terms of this assurance within 90

3    days following execution, right?

4    A.   Yes.

5    Q.   It says here on 8.1 that DISH Network understands --

6    represents -- well, represents and warrants that it's a

7    voluntary and free act to enter into this deal, right?

8    A.   Yes, that's what it says.

9    Q.   And is the result of good faith negotiations, right?

10   A.   Yes, sir.

11   Q.   And DISH represents and warrants that the signatories to

12   the assurance have the authority to act for and bind DISH,

13   right?

14   A.   Yes.

15   Q.   Okay.  And nothing in this assurance relieves DISH of the

16   obligations to comply with all state and federal law.  Do you

17   see that?

18   A.   Yes, sir.

19   Q.   And then it says:  Within 30 days of this assurance, DISH

20   Network shall submit a copy of this to each of its officers,

21   directors, and any employee necessary to ensure compliance.  Do

22   you see that?

23   A.   Yes, sir.

24   Q.   And right here it says:  Nothing in the assurance shall be

25   construed to affect, restrict, limit, waive, or alter any

1 private right of action that a consumer may have against DISH

2 Network.  Do you see that?

3 A.  Yes, I do.

4 Q.  And that's a case like the one we have here today, right,

5 private right of action?

6 A.  Yes.

7 Q.  So I understand, Mr. Ahmed, that you were the person who

8 kind of invented in DISH the concept of having OE retailers,

9 right?  You were kind of the founder of that program; is that

10 correct?

11 A.  The founder meaning --

12 Q.  The person who kind of dreamed it up and thought it would

13 be a good idea?

14 A.  No, the program existed for other accounts, yes, and then

15 we included certain retailers into the OE program, yes.

16 Q.  Got it.  Okay.  But weren't you one of the originators of

17 the starting of it and getting it started and getting it fired

18 up and then for -- in the early years?

19 A.  As it relates to the OE retailers?

20 Q.  Yes.

21 A.  Yes.

22 Q.  Okay.  And because you were the president of sale -- or

23 vice president of sales -- senior vice president of sales, you

24 had ongoing responsibility for it.  I think we should probably

25 point out you worked --

1   A.   Vice president of sales.

2   Q.   When did you start working for DISH?

3   A.   I started 1993 of June, sir.

4   Q.   '93.  Okay.  And then you worked up until sometime in 2006.

5   Can you give me the month?

6   A.   Yes, January 31, 2006.

7   Q.   All right.  So in the beginning of 2006, January 31st,

8   2006, you left, went to work somewhere else, and then you came

9   back right at the time this assurance of compliance was

10  entered, right?

11  A.   Yes.  I came back on May 31st, 2009.

12  Q.   Okay.  So you have personal knowledge of what happened up

13  'til January 31st, 2006, inside DISH and then from May 31,

14  2009, up to the present?

15  A.   Yes, I'm aware of some of those, yes.

16  Q.   So I'm going to approach you with Exhibit 89.

17          **THE COURT:**  Plaintiff's?

18          **MR. GLASSER:**  Yes, yes, ma'am, Plaintiff's Exhibit 89.

19          **MS. ECHTMAN:**  Your Honor, we have objections to this

20  exhibit under Rules 802, 401, 403, and 404.

21          **MR. GLASSER:**  Can I lay some foundation?

22          **THE COURT:**  Hold on just a second.  Let me get it in

23  front of me.  You can ask some preliminary questions.

24  **BY MR. GLASSER:**

25  Q.   All right.  So just -- let's look -- look through it to

1  yourself.  In particular, I want to draw your attention to

2  page 3.

3  A.  Yes.

4  Q.  The information contained on page 3 in this presentation is

5  generally accurate about your position in the company; isn't

6  that true?

7  A.  Yes, in --

8  Q.  As of June --

9  A.  -- 2011, June 6th.

10 Q.  Which is the date, right?

11 A.  Yes.

12 Q.  I'd like you to turn to page 4.  Page 4 has data about the

13 budget for sales for OE retailers for 2011, the class period in

14 this case; isn't that right?

15 A.  Yes.

16 Q.  This budget would have been in place as of June 2011 for

17 you to be -- it to be discussed inside the sales force team at

18 DISH; isn't that right?

19 A.  Yes.

20 Q.  Turning to page --

21       **THE COURT:**  Okay.  Excuse me just one second.

22   Ladies and gentlemen, let me excuse you to the jury room

23 for a moment while I talk to the lawyers about this exhibit.

24 Just leave your notes in your chair.

25   (The jury left the courtroom.)

1    **THE COURT:**  Okay.  If I can first just ask DISH,
2  Ms. Echtman, I don't understand the hearsay objection.  This
3  appears to be a DISH document.

4    **MS. ECHTMAN:**  It is a DISH document.  The question is
5  relevance, and it's got a lot of information --

6    **THE COURT:**  Okay.  Stop.  You said Rule 802, and
7  that's a hearsay rule.  So is that -- do you not have a hearsay
8  objection?

9    **MS. ECHTMAN:**  I believe that there is hearsay embedded
10 in the document, Your Honor, and that's why we made a hearsay
11 objection.

12   **THE COURT:**  Okay.  All right.  And what is the
13 Plaintiff offering it to prove in terms of relevance?

14   **MR. GLASSER:**  It's relevant because it shows the
15 importance of the OE retailers on a relative basis.  They were
16 more than 60 percent or more than 50 percent of sales -- it's
17 relevant to show where Mr. Ahmed is in the organization, which
18 he's testified to, but this shows a graph.  It's relevant to
19 show the sales expectations internally for OE retailers in
20 2011, the class period.  It's relevant to show the sales that
21 were accomplished by OE retailers in 2010.  It's relevant to
22 show the relevant amount of OE retailers compared to general
23 retailers, and it's relevant to show that internally they used
24 the moniker "National Sales Partners."

25   **THE COURT:**  All right.  And for the Defendant on your

1  objection?

2       **MS. ECHTMAN:** Your Honor, generally, what they're

3  trying to do with this is trying to show that DISH is a wealthy

4  company, which is not an appropriate item here. They want to

5  show total sales of other retailers. We've objected to

6  evidence about other retailers. This is about SSN. This is

7  not about DISH's entire retailer channel. If they want to show

8  information about SSN's activations and sales, that's one

9  thing; but to go into the whole channel just to show that DISH,

10  you know, has a big retailer budget that makes a lot of money,

11  I think that's prejudicial.

12       **THE COURT:** All right. Well, assuming you can do this

13  in not very much time --

14       **MR. GLASSER:** Yeah, it's fast.

15       **THE COURT:** -- I will overrule the objection.

16  Obviously, the Defendant's concerns are legitimate if you spend

17  too much time on it.

18       **MR. GLASSER:** Yes, ma'am.

19       **THE COURT:** So that would hit the Rule 403 level, or

20  if you attempt to use it for any sort of improper purpose like

21  you got to hold DISH liable because they're a big company, you

22  can't make that argument. Go ahead.

23       **MS. ECHTMAN:** Right, and this case is not about

24  penalties. It's about damages. It's not about punishing. The

25  penalty phase is for Your Honor. So emphasis on wealth is

1  inappropriate.

2          **MR. GLASSER:**  I'm going to use it for --

3          **THE COURT:**  I think -- just a second.  I'm ruling in

4  your favor, so you don't have to argue further.  The points

5  that the Plaintiff said they are offering it for, those are, in

6  fact, relevant, and so long as the questions are appropriate

7  and we don't spend too much time on it, I'll let you do it.  If

8  I have Rule 403 concerns, I'll start objecting for the

9  Defendant myself.

10         **MS. ECHTMAN:**  Thank you, Your Honor.

11         **THE COURT:**  Go ahead.  Or the Defendant can object

12  again at any point.  Go ahead.  Oh, wait, the jury.

13         **MR. GLASSER:**  The jury.

14         **THE COURT:**  Sorry.  I'm forgetting the most important

15  people.

16     You can bring the jury in.

17     Don't tell anybody I did that.  That would be embarrassing.

18     (The jury entered the courtroom.)

19         **THE COURT:**  All right.  Go ahead.

20         **MR. GLASSER:**  I move the admission of Plaintiff's

21  Exhibit 89, Your Honor.

22         **THE COURT:**  It will be admitted.

23  **BY MR. GLASSER:**

24  Q.  Okay.  Mr. Ahmed, this is a presentation about indirect

25  sales in June of 2011.  Do you agree with me?

1  A.  Yes, sir.

2  Q.  Turning to page 3, this shows at a high level your position

3  in respect of the sales operations at DISH at the top; is that

4  right?

5  A.  Yes.

6  Q.  Turning to the next page, page 4, this shows the 2011

7  indirect activation's budget; isn't that right?

8  A.  Yes, sir.

9  Q.  All right.  And for the OE retailers, the expectation was a

10  little bit over 1 million activations in 2011; is that right?

11  A.  Yes, sir.

12  Q.  All right.  And as you can tell from the relative size of

13  the pie, the OE retailer portion was more than half of the

14  2 million new activations that your sales force was trying to

15  get in that year, 2011; is that right?

16  A.  Yes, that was the OE budget.

17  Q.  All right.  And the OE retailers are also called National

18  Sales Partners; isn't that true?

19  A.  Yes.

20  Q.  So when it says here on the right side of Exhibit 89

21  "National Sales Partner, OE tool," that's the slice of the

22  retailers that SSN is in, right?

23  A.  Yes.

24  Q.  And just quickly, these full-service retailers are the

25  other 3,500 retailers we've discussed in this case, right?

1  A.   That is correct.

2  Q.   Which are expected to bring in about, it looks like,

3  670,000 activations, right?

4  A.   Yes, that's the budget.

5  Q.   And then I don't actually know what Alliance Partner is?

6  A.   Those are Telco Partners, telephone companies, like

7  Windstream, TDS, and Frontier at that time.

8  Q.   And national accounts, I take it, are probably like deals

9  with Marriott or whatever?

10 A.   No, that would be -- national accounts would be Costco,

11 would be Sears, would be RadioShack?

12 Q.   Okay.  Great.  Turning to page 14, this has the data for

13 what happened in 2010, isn't that right, 2010 summary?

14 A.   Yes.

15 Q.   And the OE tool retailers, the National Sales Partners,

16 brought in about 1,052,000 new activations, right?

17 A.   Yes, sir.

18 Q.   And the other 3,500 retailers brought in, it looks like,

19 something like 630,000?

20 A.   Yes, sir.

21 Q.   So it's pretty clear -- we've talked about, you know, the

22 company.  It came up in opening.  It's come up with you.  It

23 has satellites in space.  It has all these other things, but at

24 the end of the day, it's depends on customers; isn't that

25 right?

1  A.  It's all about the customers, yes, sir.

2  Q.  It depends on new activations every year, right?

3  A.  Yes, that's important to us.

4  Q.  And your compensation, in part, depends on new activations

5  every year because you need to hit your sales budgets, right?

6  A.  Sir, I'm a sales guy.  I'm responsible for sales.  Yes, I

7  want new activations, but it's very important for you to know

8  that it's about quality activations, long-term customers.  It's

9  just not about any activations.

10  Q.  And the OE tool is designed to get quality long-term

11  customers like Dr. Krakauer, who happens to be DirecTV, but own

12  their own home.  That's good, right?

13  A.  Yes, it is.

14  Q.  Are likely to be on for a long time because they're in a

15  residence, right?

16  A.  We want happy customers for a long time.  That's exactly --

17  that's what we need to do.

18  Q.  But the OE tool was not designed to sell to commercial

19  customers.  It was for individual customers, right?

20  A.  Right, not commercial, right.

21  Q.  Noncommercial?

22  A.  Yes.

23  Q.  And so the typical person you're looking for -- you prefer

24  people who own their own home, for example, to people who live

25  in apartments who are more migratory, right?

1  A.   Yes.

2  Q.   And there was a separate sales organization away from the

3  OE tool retailers to sell to businesses, wasn't there?

4  A.   Yes, it's a commercial division.

5  Q.   As a person who worked with and managed the OE retailers

6  for a long time, you'll be able to tell the jury how the OE

7  tool worked, right, generally?

8  A.   I think there's others that can do it better, but, yes, I

9  can generally talk about it.

10 Q.   All right.  I'm showing you an OE, order entry, tool

11 training agenda.  Would that help you -- that would probably

12 help you explain it to the jury; isn't that right?

13 A.   Sure.  When was this -- when is this from, sir?

14 Q.   I don't know the answer to that.

15        MS. ECHTMAN:  Mr. Glasser, if you could just do me a

16 favor and let us know what exhibit number this is.

17        MR. GLASSER:  334.  I move the admission of

18 Exhibit 334, Your Honor.

19        THE COURT:  Well, I'm --

20        MS. ECHTMAN:  I don't believe we have any objections

21 to this exhibit.

22        THE COURT:  All right.  It will be admitted.

23     And if the witness needs to see the entire document --

24        MR. GLASSER:  Oh, I'll take it to him.

25        THE COURT:  -- you know, since he indicated he wasn't

1  completely sure of the time frame.

2      (Copy of exhibit handed to the witness.)

3  **BY MR. GLASSER:**

4  Q.  So, Mr. Ahmed, I just want to generally talk the jury

5  through how the OE tool works in general, okay?

6  A.  Sure.

7  Q.  All right.  I want to turn to page 3.  How does the OE tool

8  work?  It says here that the OE tool interfaces with CSG

9  EchoStar's billing system for account creation and gives the

10  user a realtime DISH Network Service's calendar for the

11  earliest available installation date.  Do you see that?

12  A.  Yes, sir.

13  Q.  All right.  CSG -- so at all relevant times, which is the

14  end of the class period, 2011, the OE tool interfaced with -- I

15  know, EchoStar, DISH, same thing, right?

16  A.  Yes.

17  Q.  -- the DISH billing system, correct?

18  A.  Yes, all the platforms interface with CSG.

19  Q.  All right.

20  A.  You have to know where to bill the customer.

21  Q.  Got it.  And DISH Network Service -- it also calendared and

22  sent out installers.  It automated the process, right?

23  A.  Yes.  The customer can choose when they would like it

24  installed, and, yes, they would get installed at that point.

25  Q.  Turning to page 4, this is a discussion of the relevant

1  benefits of using the OE tool to the OE retailer, correct?

2  A.  Yes.

3  Q.  Okay.  So you tell -- the idea is that an OE retailer

4  doesn't have to buy equipment or purchase inventory, DISH's

5  equipment, DISH's hoppers, DISH's whatever; DISH has all that,

6  pays for all that inventory, and then ships it right to the

7  place where it's installed, right?

8  A.  Yes, we deliver it to the customer with the installer.

9  Q.  Right.  So this is not a retailer -- the OE retailer is not

10  a retailer like, say, a General Motors dealer who has actual

11  cars on the lot that are sitting there that the dealer bought.

12  The cars are at DISH -- the DISH equipment is at DISH, and it's

13  delivered straight to the customer?

14  A.  Yes.

15  Q.  Inventory is with DISH all the time?

16  A.  Yes.

17  Q.  DISH balance sheet, DISH money pays for all the inventory,

18  right?

19  A.  That's correct.

20  Q.  Okay.  The OE retailer has no need to have its own

21  installation guys, right, because DISH provides the

22  installation guys, correct?

23  A.  Yes.

24  Q.  The OE retailer doesn't actually have to handle any money

25  from the customer, right, because when the deal goes through,

1   the customer's billing is straight on the DISH billing system,

2   and DISH gets the credit card payment and DISH gets the

3   subsequent payments, right?

4   A.  Yes, we have to bill the customer for the services we're

5   providing.

6   Q.  Okay.  And on customer returns, DISH handles all returned

7   equipment and refunds with the customer directly, right?

8   A.  Yes.

9   Q.  So you don't have to have a staff that deals with returns

10  if you're an OE retailer, right?

11  A.  There are hopefully not a lot of returns, but, yes.

12  Q.  Okay.  And all these things were true at all relevant times

13  to this case up through the end of 2011 about OE retailers,

14  right?

15  A.  Yes, that's the program.

16  Q.  And the customer will see DISH on their credit card

17  statement, right?

18  A.  Yes, it's our billing.  We bill the customer.  They're

19  getting our service.

20  Q.  There are some limitations to the OE tool I think we

21  discussed.  No commercial, right?  It doesn't sell

22  commercially?  It's not for commercial sales?

23  A.  Yes.  That's why I asked.  This is an old document.  At

24  that time, no.

25  Q.  And when did it become available for commercial sales?

1  A.  For public-private commercial establishments, I believe

2  they can do that today.

3  Q.  Today.  But when did that happen?

4  A.  I don't have the exact date.

5  Q.  You do not believe it happened through the end of the class

6  period, 2011, do you?

7  A.  I'm not certain of that, sir.  We did include

8  public-private into the tool.  A lot of retailers wanted to

9  sell to businesses.

10 Q.  So as the head of sales, you don't know what day?

11 A.  I don't know.

12 Q.  You don't know what year?

13 A.  I'm not certain.  It could -- I'm not certain when it

14 happened, no.

15 Q.  And you don't know if SSN ever sold more than one

16 commercial deal to a business ever?

17 A.  I don't know that.

18 Q.  There is support provided to the OE retailers, right?

19 A.  Yes, sir.

20 Q.  I'm sorry.  Wrong page.  Let's see.  I need to be on

21 page 6.  Here we go, page 6.  So let's walk through the

22 elements of support.  There's field sales development, which

23 provides weekly sales training on promotions, et cetera, and

24 consistent localized support, right?

25 A.  Yes, that's what it says.

1  Q.  So these are field sales training representatives across

2  the country that go into the OE retailers stores and train

3  them, right?

4  A.  On our consumer promotions.  It says weekly.  I don't know

5  how often we did that.  It's a document, and this actually

6  looks like because of the -- because of the logo, this is

7  probably about 10, 11, 12 years old.  So I don't know exactly

8  how often they went, but, yes, on the consumer promotions, yes,

9  we provided training.

10 Q.  But whether it was weekly or monthly, at all relevant times

11 to this case, DISH field service development -- or field sales

12 development personnel were made available, put into the OE

13 retailers' offices, and trained them on DISH products and

14 sales?

15 A.  The training on the consumer offer, yes, it's our

16 responsibility to do that.

17 Q.  Okay.

18 A.  Make sure they're doing things correctly as it relates to

19 the consumer offer and understanding our technology and our

20 promotions.

21 Q.  Okay.  DNS means DISH Network Service, right?

22 A.  That's correct.

23 Q.  All right.  And -- and this is just kind of repeating the

24 idea that they'll handle installations and customer complaints

25 or adjustments arising out of installations through the DISH

1   Network Services, right?

2   A.  Yes.

3   Q.  CSC I think is the billing section of DISH, right?

4   A.  The Customer Service Center.

5   Q.  Customer Service Center.  Okay.  So is this saying that,

6   hey, our customer service center will deal with customer

7   complaints or customer service needs?

8   A.  No, this is if the platform would go down, that the retail

9   had an opportunity to contact using exceptions line so we can

10  bill the account and not have the customer waiting or losing

11  the customer.

12  Q.  Okay.  If the system went down?

13  A.  Yes, and it frequently went down.

14  Q.  And then IT is Information Technology, right?

15  A.  Yes.

16  Q.  And DISH provides 24/7 maintenance of the OE tool

17  performance and operations, right?

18  A.  Yes.

19  Q.  And DISH is responsible for the creation, development, and

20  implementation of enhancements to the OE tool, right?

21  A.  Yes, there's always enhancements.

22  Q.  And was that IT support function for DISH Corporate true

23  the whole -- all the relevant time of this case through the end

24  of the class period?

25  A.  For all platforms, it's a system.  You have to have IT

1  support to make sure it's functioning.

2  Q.  Okay.  So now let's go to page 9.  We'll just walk through

3  kind of what it is.  So it's basically a computer like the one

4  you have in front of you where the screens pop up and the

5  telemarketer walks through the screens with the customer on the

6  phone, right?

7  A.  The retailer.

8  Q.  Okay.  The person on the phone -- okay.  The retailer is --

9  A.  Sales agent, yes.

10 Q.  Sales agent, great.  Okay.  The sales agent walks through

11 the screens as they pop up on the computer, right?

12 A.  That's correct.

13 Q.  A lot of drop-down menus and checking of boxes, right?

14 A.  Yes, that's very important.

15 Q.  All right.  And so to get to it, you just type in

16 salespartners.dishnetwork.com/partners/logon.do.  Do you see

17 that?

18 A.  Yes.

19 Q.  And then this is kind of hard to see.  I have another

20 version that's a little easier to see, but there's a login ID

21 and a password, right?

22 A.  Yes.

23 Q.  So the National Sales Partner, in this case SSN, will have

24 its own passwords to get in?

25 A.  That's correct.

1   Q.   Then there's some buttons you click to create new

2   customers, right?

3   A.   Yes.

4   Q.   Okay.   Reschedule customer installation, right?

5   A.   Yes.

6   Q.   Okay.   And that's true at all relevant times of this case,

7   right?

8   A.   Yes, you have to put the customer information into the

9   platform.

10  Q.   Turning to page 12, there are -- and I'll try -- I've got

11  another one we can quickly go through that's a little easier to

12  see on the drop-down menus, but, basically, there's

13  fill-in-the-blanks, right, where you get the customer phone

14  number, the address, the city, state, residence, those things,

15  right?

16  A.   Yes, that's relevant.   That's very important.

17  Q.   And then the price is calculated by the machine, right?

18  A.   Yes, based on what the customer is purchasing, yes.

19  Q.   So DISH sets the price for DISH products, not the sales

20  agent?

21  A.   Right, it's our promotion, it's our offer and, yes, we set

22  the price.

23  Q.   All right.   And the machine -- and that's true at all

24  relevant times in this case?

25  A.   Yes, it's our product.

1  Q.  Then the next page of the computer, which is hard to see,

2  but it basically figures out what the customer is qualified for

3  and what the customer can get, right?

4  A.  That's correct.

5  Q.  And that was true at all relevant times of this case?

6  A.  Right, there are certain promotions for certain customers

7  based on their qualification.

8  Q.  Page 16, again, it has to do with the drop-down screen and

9  some clicking and filling in of -- of fields, but, basically,

10  what happens is the machine sets up and runs a credit check on

11  the customer for their -- if they want to buy DHA or FFA?

12  A.  Yes, every customer for DISH, every customer.

13  Q.  Okay.  So every customer, the sales agent has them on the

14  phone, they take their data, DISH runs a credit check on them?

15  A.  That's correct.

16  Q.  And DISH keeps the results of the credit check?  Well, DISH

17  owns the credit check.  DISH paid for it?

18  A.  We ran the credit check, yes.

19  Q.  And you paid for it?  The sales agent's company didn't pay

20  for it, correct?

21  A.  We ran the credit check.  Yes, I believe that could be

22  right.

23  Q.  And then I'll go through the next pages pretty fast because

24  there's a lot of them, but it's basically the idea of figuring

25  out how many receivers you have, and there's a bunch of

1  clicking and picking, right?

2  A.   That's very important because we need to know what the

3  customer is requesting.

4  Q.   Okay.  Basic program packages that can be available,

5  clicking and picking, right?

6  A.   Exactly.  We need to know what the customer wants in terms

7  of programming, what their needs are.

8  Q.   Picking the local and network channels they want, clicking

9  and picking, right?

10  A.   Same thing.  We ask them if they want locals.

11  Q.   Deciding on their premium programming, clicking and

12  picking, right?

13  A.   Sure.

14  Q.   And then it recalculates the price.  It's not up to the

15  sales agent?

16  A.   No.  We need to be accurate with what the customer is

17  purchasing so we can give them the correct price.

18  Q.   So these sales agents aren't independent in the sense of

19  negotiating anything, right?

20  A.   It's our promotion, and we can't have 35 -- you just

21  mentioned 3,500 retailers.  Can you imagine 3,500 retailers --

22  if we didn't do this, they would all come up with the wrong

23  pricing.  You can't do that.

24  Q.   But, of course, we know that there are only 45?

25  A.   Or 45.

1  Q.  Okay.  So the next five pages are basically the same type

2  of stuff, you agree?  Just look through.  It's different types

3  of programming, different clicking and picking, right?  I'm up

4  to page 26 now.

5  A.  Yes, sir.

6  Q.  Do you agree with me?

7  A.  I'm at 26, yes.

8  Q.  Okay.  But do you agree with me that the next five screens

9  are virtually the same as what we were talking about before?

10  A.  Yes, broadband installation date, yes.

11  Q.  Then DISH takes the credit card payment, right?  And then

12  additional disclosures will display what you must read to the

13  customer before moving forward, correct?

14  A.  Yes.

15  Q.  And so to make sure that they were reading them correctly,

16  DISH had a field representatives who would listen in on calls,

17  right?

18  A.  Yes, we could do that.

19  Q.  Upload recordings of calls to the DISH system every week

20  for quality review -- quality assurance review; right?

21  A.  When we'd be requested, we could do that, yes.

22  Q.  Okay.  And this was true at all relevant times of this

23  case, DISH physically could listen in to calls, and did; right?

24  A.  Yes, yes.

25  Q.  And DISH took recordings of the calls regularly and did

1  review those; right?

2  A.  Yes.  And you just showed me the terms and conditions,

3  which is so critical because it is about the customer.  I need

4  to say that.  You need to make sure what the customer is

5  requesting, that it is explained to them accurately.  You can't

6  tell them your price is $29 when it's 49.  It's -- so you have

7  to take care of the customer --

8  Q.  I got it.

9  A.  -- okay?  I just wanted to --

10  Q.  So what's going to happen here is I'm going to ask you my

11  questions --

12  A.  I'm sorry.  Okay.

13  Q.  -- and then your lawyer gets to stand up and ask you

14  anything you want, and you get to say whatever --

15          **THE COURT:**  Okay.  Well, he can explain his answers.

16  Go ahead.

17          **THE WITNESS:**  Okay.  I'm sorry.

18          **THE COURT:**  No, that's all right.

19  **BY MR. GLASSER:**

20  Q.  So -- and then, like you said, the terms and conditions are

21  read, and they all pop up automatically; right?

22  A.  Yes, sir.

23  Q.  Okay.  Let's just quickly go through a similar order entry

24  tool manual that just had some screens that are easier to read.

25          **THE COURT:**  Which --

1    **MR. GLASSER:** Plaintiff's Exhibit 1208.  I'll approach

2 the witness with it.

3        (Document handed to the witness.)

4        **THE COURT:** Any objection to this one?

5        **MS. ECHTMAN:** Let me just check.  I don't believe so.

6 No.  No objection.

7        **THE COURT:** All right.

8        **MR. GLASSER:** Okay.  I move the admission of

9 Plaintiff's Exhibit 1208.

10        **THE COURT:** It will be admitted.

11 BY MR. GLASSER:

12 Q.  So what we have here, Mr. Ahmed, is just another kind of

13 manual on the order entry tool that has a few different pieces

14 of info, so I want to quickly go over that.

15     All right.  On the first page, the order entry tool is the

16 essential application you will be using to place customer

17 orders for DISH Network equipment and services.  That's pretty

18 true for OE retailers; right?

19 A.  Yes.

20 Q.  Okay.  You just access the tool from your web browser by

21 clicking on the DISH Network logo on your screen.  Do you see

22 that?

23 A.  Yes.

24 Q.  So did you guys install software that connected directly to

25 this network on the OE retailer's computer systems?

A. I don't know exactly how it worked. We didn't -- I don't

believe we put any software into the retailers' organization.

We had a platform and they had the ability to access it based

on the fact that we attached a log-in so it could be tied to

the retailer.

        **THE COURT:** And platform, you just mean some --

        **THE WITNESS:** The OE platform.

        **THE COURT:** -- internet out there?

        **THE WITNESS:** Our order entry platform at DISH.

**BY MR. GLASSER:**

Q. Okay. And then, on page 3, it says here at the top: Enter

customer information. Define if your customer owns their

residence or not. And down at the bottom, it's: Does your

customer own the residence? If no, the customer must have

written approval by the owner of the installation. Do you see

that?

A. Yes.

Q. That's because the order entry tool was focused on

residential sales; isn't that true?

A. No. We wanted to make sure that there's provisions out

there. There are certain condominium units or apartment units

that the owners would not allow a satellite DISH, so we wanted

to make sure that we had the right information.

Q. And then, again, they get the credit card payment and it

goes straight to DISH; right? Is that right?

1  A.  Yes, we bill the customer.

2  Q.  And then, at the end here, page 15.

3          **MS. ECHTMAN:**  Mr. Glasser, I'm sorry to interrupt you,

4  but could you just -- I need you to just say the page number,

5  because it's very hard for me to follow you.

6          **MR. GLASSER:**  Yeah, sorry.

7          **MS. ECHTMAN:**  Thank you.

8  **BY MR. GLASSER:**

9  Q.  At page 15, the order summary, congratulations and welcome

10  to DISH Network; right?

11  A.  Yes.

12  Q.  I'm approaching you with Plaintiff's Exhibit 26.

13      (Document handed to the witness by Mr. Glasser.)

14  **BY MR. GLASSER:**

15  Q.  Do you recognize Plaintiff's Exhibit 26 as an EchoStar

16  Retailer Agreement in this case for Satellite Systems Network;

17  right?

18  A.  Yes, sir.

19          **MR. GLASSER:**  Move the admission of Plaintiff's

20  Exhibit 26, Your Honor.

21          **MS. ECHTMAN:**  Your Honor, I believe we've replaced

22  this with a joint exhibit, so this is one of the JXs.  It's JTX

23  1.  And there's, of course, no objection.

24          **THE COURT:**  Okay.

25          **MR. GLASSER:**  So I'd move the admission of Plaintiff's

1 | 26 and JTX1, Your Honor.

2 |     **THE COURT:** It will be admitted.

3 | **BY MR. GLASSER:**

4 | Q. All right. So I want to go over the -- you asked about the

5 | contract with SSN, so I want to go over it with you, sir; okay?

6 | A. Yes, sir.

7 | Q. All right. This is the EchoStar Retailer Agreement

8 | effective as of December 31, 2006. Do you see that?

9 | A. Yes, I do.

10 | Q. All right. So, we know in this case that Dr. Krakauer was

11 | called in 2009 for the first time, so this is the agreement

12 | that was in effect at the time he was called; right? I've got

13 | another one for 2010 I'm going to show you in a minute.

14 | A. Okay.

15 | Q. Do you agree?

16 | A. Sure.

17 | Q. Okay. And you saw -- your lawyer went through the

18 | different agreements in opening; right? And this is the part

19 | that your lawyer pointed out in opening, that they're acting as

20 | an independent contractor and desire to become authorized to

21 | market and promote DISH; right?

22 | A. Yes.

23 | Q. Now, I want to focus on some terms and conditions. I'm at

24 | Section 1.7. Do you see it down there, "Business Rules"?

25 | A. Yes, I do.

Q.  All right.  So business rule, you'll recall, in the

Assurance of Compliance, there was that paragraph that said

DISH shall issue business rules.  Do you recall that?

A.  Yes.

Q.  All right.  So now, we're looking at the definition of

"business rule," right?

A.  Yes.

Q.  It means a term, requirement, condition, condition

precedent, process, or procedure associated with a promotional

program or otherwise identified as a business rule by EchoStar,

which is communicated to retailer by EchoStar or an affiliate

of EchoStar either directly, including without limitation via

e-mail, or through any method of mass communication reasonably

desired -- sorry -- directed to EchoStar's retailer base,

including, without limitation, retailer chat, e-mail, facts

blast, or posting to EchoStar's retailer website; right?

A.  Yes.

Q.  All right.  So that's a mouthful, but basically, DISH has

the power to issue SSN a business rule by sending them an

e-mail?

A.  Business rules were sent via e-mails and also posted on the

retailer care site, yes.

Q.  All right.  And retailer agrees that EchoStar has the right

to modify any business rule at any time, defined term, in its

sole discretion, a defined term; right?

1   A.   Yes.

2   Q.   Turning to page 5, it says here:   EchoStar hereby appoints

3   retailer as a nonexclusive authorized retailer to market,

4   promote, and solicit orders for programming, subject to all the

5   terms and conditions of this agreement and all business rules.

6   This is at Section 2.1.   Do you see it up here at the top?

7   A.   Yes, I do.

8   Q.   Which are hereby incorporated into this agreement by

9   reference in their entirety.   So the business rules issued by

10  DISH are part of the contract; right?

11  A.   Yes.

12  Q.   Okay.   Territory, in this case, is the United States;

13  right?

14  A.   Yes.

15  Q.   So SSN had the power to sell across the United States;

16  right?

17  A.   Yes.

18  Q.   And one of the meanings of it being nonexclusive is your

19  other 44 national sales partners in 2011 likewise had the power

20  to sell across the United States; right?

21  A.   Can you repeat that?   Did you say nonexclusive?

22  Q.   Yes.   So, SSN did not have the exclusive right to sell in

23  the United States to the exclusion of your other 44 national

24  sales partners.   They also had the right to sell in the United

25  States; correct?

1  A.  Yes.  And they could sell any other product, also, not just
2  DISH.
3  Q.  I'll get to that.
4  A.  Okay.
5  Q.  But you agree that that is a meaning of this contract, that
6  SSN cannot say, hey, wait a minute, DISH, I have the right
7  exclusively to the United States of America?
8  A.  That's correct.
9  Q.  Okay.  And then, "Acceptance," here in 2.3 basically says
10  that:  The retailer accepts its appointment as an authorized
11  retailer and agrees to use its best efforts to continuously and
12  actively advertise, promote, and market programming and to
13  solicit orders therefore, subject to and in accordance with all
14  the terms and conditions of this agreement; right?
15  A.  Yes.
16  Q.  Retailer understands that it may hold itself out to the
17  public as an authorized retailer of EchoStar only after
18  fulfilling and for so long as it continues to fulfill all the
19  duties, obligations, requirements, and other terms and
20  conditions in this agreement; right?
21  A.  Yes.
22  Q.  I forgot to go to the definition of, "sole discretion," so
23  let's go back to 1.64 -- I'm sorry 1.46, on page -- on page 4.
24  Do you see that?
25  A.  Yes, sir.

1  Q.  "Sole discretion" means a person's sole and absolute
2  discretion for any reason or no reason; right?
3  A.  Yes.
4  Q.  So when the part about business rules said DISH could
5  change its business rules anytime in its sole discretion, that
6  was saying, in plain English, that DISH can change any aspect
7  of this contract it wants at any time for any reason or no
8  reason; right?
9  A.  Business rules pertaining to our consumer promotions, yes.
10 Q.  Okay.  Turning to Section 5 of the contract on page 9, this
11 just says that EchoStar shall determine the retail prices for
12 programming at any time in its sole discretion; right?
13 A.  Yes.
14 Q.  Retailer will only solicit orders for programming at the
15 retail prices set by EchoStar from time to time; right?
16 A.  Yes.
17 Q.  EchoStar may increase, decrease, or otherwise modify those
18 prices at any time in its sole discretion; right?
19 A.  Yes.
20 Q.  Any price charges shall be effective immediately upon
21 notification by EchoStar.  Okay.  Then we go down to
22 "incentives," which is what you call the pay for the OE
23 retailer; right?
24 A.  Yes.
25 Q.  Okay.  There are -- it says here:  In consideration of

1  retailer's continuing efforts to market, promote, solicit

2  orders for programming and retailer's continuing efforts to

3  provide DISH Network subscribers after an initial activation,

4  retailer may be eligible to receive the following, and, you

5  know, the pay; right?

6  A.  (Nodding head.)

7  Q.  So there are monthly residential incentives; right?

8  A.  Uh-huh.

9      **THE COURT:**  And if the witness could just answer out

10  loud.

11      **THE WITNESS:**  I'm sorry.  Yes.  I'm sorry, Your Honor.

12      **THE COURT:**  That makes me a little dizzy.

13  **BY MR. GLASSER:**

14  Q.  I'm at Section 6.1.  EchoStar expressly reserves the right

15  to change applicable business rules at any time and from time

16  to time in its sole and absolute discretion for any reason or

17  no reason, upon notice to the retailer; right?

18  A.  Yes, sir.

19  Q.  All right.  EchoStar shall determine from time to time in

20  its sole and absolute discretion for any reason or no reason

21  whether a particular DISH Network subscriber is a new

22  residential subscriber account eligible for payment of monthly

23  residential incentives hereunder.  EchoStar's calculation and

24  payment of monthly residential incentives shall be presumed

25  conclusively and irrebuttably correct absent a timely notice of

1  claim by the retailer pursuant to Section 15, which we'll get

2  to.  You see that?

3  A.  Yes.

4  Q.  All right.  So, because in their sole discretion, for any

5  reason or no reason -- well, DISH can change the price that --

6  the pay they're going to pay for any reason or no reason in

7  their sole discretion anytime; right?

8  A.  We can adjust the pay, yes, just like we can adjust the

9  programming packages, yes.

10  Q.  And that statement about DISH being able to change the pay

11  at any time for any reason or no reason appears in the monthly

12  residential MDU incentives, right, right here at Section 6.12?

13  A.  Yes.

14  Q.  In the monthly commercial incentives in 6.13; right?

15  A.  Can you just tell me -- I just want to make sure.  I'm sure

16  you're telling it accurately, but --

17  Q.  No.

18  A.  -- I just want to make sure I can see it.

19  Q.  Well, I'll tell you what.

20  A.  I apologize.

21  Q.  No, it's fine.  Totally fine.

22  A.  I just want to see that -- exactly that right language is

23  in there.

24  Q.  Right here.

25           MS. ECHTMAN:  Does Mr Ahmed have a copy of the whole

1    document?

2            **MR. GLASSER:**  Yes.

3            **THE WITNESS:**  What page are we on, sir?

4    **BY MR. GLASSER:**

5    Q.  All right.  So, basically, my question is -- let's just do

6    this a little faster.  There are a series of incentives that

7    can be paid.  There are monthly incentives; right?

8    A.  Correct.

9    Q.  There are additional residential incentives; correct?

10   A.  Correct.

11   Q.  There are -- and in each of those incentives, for

12   everything DISH pays, DISH can change what it wants to pay at

13   any time in its sole discretion for any reason or no reason;

14   right?

15   A.  Yes, we can change that based on the competitive nature of

16   the business, yes.

17   Q.  I got it.  So not only is the price set by DISH, but all

18   the pay is set by DISH and can be changed every day if DISH

19   wants?

20   A.  That's not realistic, we would change it every day.  I

21   think some of it probably didn't change for a couple of years,

22   but --

23   Q.  No, I get it.  I understand.  But I'm saying --

24   A.  But that's not realistic.

25   Q.  But the contract --

1  A.   Yes.

2  Q.   I agree -- so it's a pretty one-sided contract; right?

3  A.   We can change the pricing on the programming and the

4  incentives.

5  Q.   So these retailers -- this OE retailer has signed up for a

6  pretty one-sided deal in your view, since a completely

7  unrealistic price changes could happen every day under this

8  contract; right?

9             MS. ECHTMAN:   Objection, argumentative.

10            THE COURT:   Well, the witness can answer, but he can

11  explain.   He's not limited to "yes" or "no."

12            THE WITNESS:   I mean, how it's written.   But, again,

13  you know, you have to look at the context of everything.

14  That's not how a business is run.

15  BY MR. GLASSER:

16  Q.   So, there are things about this contract that are written

17  in here that boots on the ground level never really are true;

18  right?

19  A.   Well, you can't change pricing every day on programming

20  packages, right?   Customers sign two-year agreements.   You just

21  can't change the package pricing.   That's what I'm saying, it's

22  not realistic.

23  Q.   But you have the legal power to do so; right?

24  A.   The agreement says that, yes.

25  Q.   In your view, that holds the retailer on a fairly tight

1  leash; doesn't it?

2  A.  Meaning?

3  Q.  If I can change your pay -- let's say you work for me, and

4  I can change your pay every day, anytime I want for any reason

5  or no reason even though you have a written contract.  Isn't

6  that contract a pretty short leash for you?

7  A.  Not if the retailer -- no.  I mean, that's what they're

8  agreeing with and that's what we pay them, based on, you know,

9  whatever our payment is to all the retailers.

10  Q.  Okay.  Now, there's some other things that the retailer

11  acknowledges and agrees.  I'm on page 11, if you want to look

12  at the one in your hand or on the screen.  Page 11.

13      Retailer -- and it's Section 6.25.  Retailer acknowledges

14  and agrees that page -- Section II, EchoStar may at any time

15  and from time to time, in its sole and absolute discretion --

16  see those words again -- for any reason or no reason, add,

17  discontinue, substitute, modify, or otherwise alter any or all

18  of the terms and conditions of any promotional program

19  involving the payment of additional incentives.  Do you see

20  that?

21  A.  Yes, sir.

22  Q.  That's what we were just talking about; right?

23  A.  Yes.

24  Q.  Let's go to Section 6.4, "Payment."  It says:  Subject to

25  the terms of this Section 6.4, all incentives paid to retailers

1  shall be made by EFT.  I think that's electronic funds

2  transfer.

3  A.  That's correct.

4  Q.  And that's generally how these retailers were paid; right?

5  A.  Right.

6  Q.  And Sophie Tehranchi -- well, it's your understanding this

7  was a weekly pay?

8  A.  That's correct.

9  Q.  But it was paid on activations?

10 A.  On activations, correct.

11 Q.  Okay.  Now, I'm turning to Section 7.3, which is on

12 page 17.  And this is under a section called, "Orders."  Do you

13 see that?

14 A.  Yes, sir.

15 Q.  These are orders from DISH; right?

16 A.  Yes.

17 Q.  Section 7.3:  Retailer shall comply with all business

18 rules, including without limitation all business rules which

19 govern or are otherwise applicable to any promotional program

20 in which retailer participates --

21         **THE COURT:**  Okay.  Just --

22         **MR. GLASSER:**  Too fast.

23         **THE COURT:**  Slow, and it -- you know, if you can ask

24 questions rather than just read.

25         **MR. GLASSER:**  Okay.  All right.

1  **BY MR. GLASSER:**

2  Q.  All right.  Here's the part I really want to see.  All

3  right.  See this section here, where it says:  Retailer shall

4  take all action and refrain from taking any action as requested

5  by EchoStar in connection with the marketing, advertisement,

6  promotion, and/or solicitation of orders for programming, or

7  the sale, lease, or other transfer of DISH systems.  And

8  retailer shall cooperate by supplying EchoStar with any

9  information arising from or relating to those actions as

10  EchoStar reasonably requests.  Okay?

11  A.  Yes, sir.

12  Q.  All right.  So this clause covers two possible things,

13  things you ask them to do, they must do; right?

14  A.  As it relates to orders, the consumer promotion terms and

15  conditions, yes.

16  Q.  All right.  Let's read it.  I know you're trying to limit

17  -- let's read it.  Retailer shall take all action -- refrain

18  from taking any action as requested by EchoStar in connection

19  with the marketing, advertising, promotion, and/or solicitation

20  of orders.  We've just gone through the OE tool; right?

21  A.  Yes.

22  Q.  That's all we're doing.  We're marketing, soliciting

23  orders.  Isn't that true?

24  A.  This section, 7.3, it's clear, it's about orders, correct;

25  and, no, it's about the orders, sir, and it is about exactly

1  explaining what the customer is getting, the importance of the

2  terms and conditions, and they must follow that so we know the

3  customers are happy, and they know exactly what they're

4  getting, and they're honestly being informed of what they're

5  getting.  That's what this is about.

6  Q.  All right.  So we looked at the Assurance of Compliance;

7  right?

8  A.  Yes.

9  **THE COURT:**  Okay.

10  **BY MR. GLASSER:**

11  Q.  And the Assurance of Compliance said that DISH would issue

12  business rules causing adherence to that Assurance of

13  Compliance; right?

14  A.  Yes.

15  Q.  And that Assurance of Compliance required ongoing

16  monitoring.  We already discussed that; right?

17  A.  These business rules about the consumer promotion.

18  Q.  So, this is the section of the contract that DISH was

19  relying on to tell 46 States Attorneys General that it could

20  cause compliance; isn't that true?

21  A.  Sir, I think you're taking that out of context.  This is --

22  you have to look at the entire agreement as a whole.  The

23  entire agreement references independent contractors and the

24  sole responsibility to be compliant and follow the law.  This

25  is specifically about orders and the consumer order which is so

1  relevant to us because we need to make sure we're processing

2  what the customer wants.  That's what this is about, orders.

3  Q.  Find the part in the contract, then, that gives DISH the

4  power to impose the Assurance of Compliance if it's not

5  Section 7, and point it out to me.

6  A.  Sir, it's never, ever that I know ever been used more

7  broadly than what it says, which is the orders and compliance

8  on the orders.  That's what this is about.

9  Q.  So you think that DISH was faking out the 46 Attorneys

10  General and didn't, in fact, have the power to impose a

11  business rule causing compliance?

12  A.  No.  I'm just saying, this is about specific orders, about

13  the consumer order.  When they purchase something, we need to

14  let them know exactly what they're purchasing.  And we want to

15  make sure the retailer is explaining the terms and conditions

16  and the disclosures to the customer.  That's what this is

17  about.

18  Q.  And you want to say that a section of a contract that says,

19  we can order you to take any objection or refrain from taking

20  any action does not give the power to make them comply with the

21  Assurance of Compliance?

22  A.  You have to look at the whole agreement as a whole.  I see

23  where you're taking that, but that's not what it's ever used --

24  I've never used it that way.  I don't think anyone's ever used

25  it that way.

1  Q.  Okay.  7.4 says:  Retailer hereby acknowledges and agrees

2  that the relationship, contractual or otherwise, between

3  EchoStar and each DISH Network subscriber is as between

4  EchoStar and its retailer for the sole and exclusive benefit of

5  EchoStar.  Do you see that?

6  A.  Yes.

7  Q.  All right.  So that's a section saying when the sales agent

8  signs up a customer, that customer is signed up for the sole

9  and exclusive benefit of DISH; right?

10  A.  Yes, that customer is in a relationship with DISH.  They're

11  getting our services, our equipment, and, yes, they're paying

12  for the programming to DISH.

13  Q.  Okay.  And then, the next sentence:  EchoStar may

14  conduct -- I'm at 7.4 still -- EchoStar may conduct such

15  relationship in any manner that it sees fit at any time in its

16  sole discretion without incurring any liability whatsoever to

17  the retailer or any of its affiliates; right?

18  A.  Yes.

19  Q.  So that's basically saying once -- once the sales agent

20  presses click and congratulations, welcome to DISH, that's

21  solely a DISH customer, not an SSN customer?

22  A.  This -- it's a DISH subscriber.  Yes, they're purchasing

23  our services.

24  Q.  All right.  It says here:  Retailer acknowledges and agrees

25  that all records created or maintained by or on behalf of

1  EchoStar relating to any DISH Network subscriber are the sole

2  and exclusive property of EchoStar, and EchoStar shall not have

3  any obligation whatsoever to give or allow retailer access to

4  such information, even if authorized or requested by such DISH

5  Network subscriber; right?

6  A.  Yes.

7  Q.  So, had Dr. Krakauer been signed up for DISH and known it

8  was SSN, and then later, SSN calls in and says, we'd like to

9  see Dr. Krakauer's records, DISH could say no?

10         **MS. ECHTMAN:**  Objection.  This is a hypothetical

11  question for a fact witness.

12         **THE COURT:**  Well, he can explain what the contract

13  means.  Overruled.

14         **THE WITNESS:**  I think if there was any complaint that

15  came in --

16  **BY MR. GLASSER:**

17  Q.  That's not what I asked.

18  A.  If there was a complaint that came in, I know what it says.

19  If a complaint that came in, we would take care of the customer

20  because it's all about the customer.  We would identify what

21  the issue is and work with the retailer to identify the issue.

22  Q.  I didn't ask you about a complaint.  I'm saying -- I'm

23  saying the books, records, the records, the -- the fact of the

24  customer's personal information, where the customer lives, what

25  the customer watches on TV, all that stuff is the complete,

1  total, exclusive property of DISH and has nothing to do with
2  the retailer --
3  A.  The retailer --
4  Q.  -- right?
5  A.  The retailer sold the customer, they have that information,
6  but that is our subscriber.  And, yes, we have all that
7  information.  We're billing them.  They're getting our service.
8  We need to know where they live.
9  Q.  And even if the subscriber knew the identity, was best
10 friends with the OE retailer that signed him up, and the OE
11 retailer wanted the information, you could say no because
12 that's not the OE retailer's stuff.  It's your stuff?
13 A.  The OE retailer would have that information, also, right.
14 They sold to the customer.  They would have that information.
15 But, yes, that's our customer as we're billing them.
16 Q.  Well, you say that, but they click on the machine and it
17 goes away, and then they go to the next one; don't they?
18 A.  They could -- any business retailer, they could keep that
19 information; right.
20 Q.  What, they would --
21 A.  We have to have a platform to process the order so we know
22 what we're installing, where we're sending the signal for the
23 service, where we're billing the customer, right?  We have to
24 do that, or how are you going to get a subscriber to watch TV?
25 Q.  So is your theory that the OE retailer -- you know, sales

1  agent, telemarketer keeps some butcher paper on the side?

2  A.  Not butcher paper.  If they're organized, they would have

3  that information, yes.  They have a system, they know who they

4  sold to.

5  Q.  But, in any event, under the contract, the records are

6  DISH's, and SSN doesn't even have the legal right to look at

7  them; right?

8  A.  That's what the contract says.

9  Q.  Page -- page 18, Section 9.1, I think we saw this in

10  opening argument.  The retailer promises to abide by the law;

11  right?

12  A.  Yes, sir.

13  Q.  Okay.  Let's go to page 9 point -- page 19, Section 9.5, to

14  save reading at least, can you just familiarize yourself with

15  Section 9.5, and then I'll ask you some questions about it?

16  A.  I'm going to look at it up here, sir.  Some of it's not

17  coming through.  Yeah, that's a little bit better.  Thank you.

18  Q.  Just look up when you're comfortable, you remember what

19  this covers.

20      (Pause in the proceedings.)

21  A.  Okay, sir.

22  Q.  All right.  So you agree that under Section 9.5 of the

23  contract, SSN had no right to make use of any list of past or

24  current DISH Network subscribers, whether delivered by the

25  retailer or obtained by EchoStar for any reason?  I'm at

1   Subsection A, 9.5, Subsection A.  Right here.

2   A.  Yeah, that's what I'm trying to -- it says -- yes, make use

3   of any lists of past or current DISH Network subscribers.  Yes.

4   Q.  All right.  So, if the retailer had the butcher paper and

5   wrote down the names and addresses and then wanted to go sell

6   some other product, they had no legal right to use that

7   information; isn't that correct?

8   A.  Yes.  We're protecting the customer there.  We don't want

9   them using that list for whatever reason.

10  Q.  So there's no --

11          **MS. ECHTMAN:**  Objection, relevance on this whole line.

12          **THE COURT:**  Okay.  Well, let's move along.  You can

13  proceed, but let's --

14  **BY MR. GLASSER:**

15  Q.  You can't use any information for the direct or indirect

16  benefit of any other entity; right?  Right?

17  A.  Yes.  That's protecting the customer for sure.

18  Q.  Got it.  You can't solicit these customers for any other

19  services offered by any other person or entity; right?

20  A.  Right.  We don't want -- no, we don't want a retailer to

21  bring us a subscriber and then take that customer and sell them

22  a competing product.

23  Q.  Okay.  I got it.  So, in this case, from May of 2010 to

24  August of 2011, the evidence will be that there are 231

25  connected calls -- 231,000 connected calls.  The information

1 that SSN gleaned from those calls if they signed up a customer,

2 was solely for DISH's use; right?

3          **MS. ECHTMAN:**  Objection, lacks foundation.

4          **THE COURT:**  Well, the jury will take the evidence

5 about the numbers from witnesses, not from counsel, but you can

6 answer the question.

7 **BY MR. GLASSER:**

8 Q.  Are you following me?

9 A.  No.

10 Q.  All right.  I guess what I'm trying to say is, you have

11 said on the witness stand and your lawyer said in opening that

12 this -- that this -- this independent retailer had this power

13 to market to all these other people.  And I'm saying if all the

14 marketing you're doing for more than a year is only DISH and

15 only DISH products, and you're under this contract, you can't

16 legally use that information for anything.  So how are you

17 going to practically go do something else?

18          **THE COURT:**  You're talking about -- when you say

19 "you," you mean SSN?

20          **MR. GLASSER:**  SSN.

21          **THE WITNESS:**  You're telling me they're not selling

22 any other product or --

23 **BY MR. GLASSER:**

24 Q.  I'm just saying practically speaking, all the work you've

25 done.

1  A.   Uh-huh.

2  Q.   All the customers, all the contact info, all the data,

3  everything is DISH's, on a very concrete, practical level,

4  that's another really short leash, isn't it, Mr. Ahmed?

5  A.   Ahmed, yes.  Yes, our customers, we have information, and

6  the retailer can have the information, also.

7  Q.   They can have it, but they can't use it.  It's illegal

8  under the contract.  It's not contractually allowed; right?

9  A.   If they have the information of the customer, yes, we want

10  to protect the customer.  We don't want the customer to be

11  harassed or sold a DISH -- a competing product.

12  Q.   Right.  You don't want them going and selling, switching

13  that guy back to DirecTV next month; right?

14  A.   Financially, it does not make sense, no.

15  Q.   I agree.  It's for DISH's benefit, right?

16       **THE COURT:**  Okay.  So don't argue or agree.

17  **BY MR. GLASSER:**

18  Q.   Okay.  It's for DISH's benefit, then; correct?

19  A.   Yes.  They're our subscribers.  We want to protect our

20  subscribers.

21  Q.   You said -- the part where you said this is DISH's data,

22  DISH's people, it's for DISH's benefit, this secrecy and this

23  locking down of the retailer's ability to, in fact, market to

24  somebody else is for DISH's benefit; right?

25       **MS. ECHTMAN:**  Objection, argumentative, especially for

1  the characterizations, and repetitive.

2          **THE COURT:**  Okay.  If you can ask shorter questions

3  that are less argumentative.

4  **BY MR. GLASSER:**

5  Q.  What you were talking about when you said --

6          **THE COURT:**  Okay.  So ask -- ask it as a question.

7  **BY MR. GLASSER:**

8  Q.  Okay.  What thing were you saying benefited DISH?

9  A.  Sir, we're spending close to $1,000 to acquire a customer.

10  We're investing a tremendous amount.  Our break-even is close

11  to 3-1/2, 4 years.  They're our subscribers, and we want to

12  make sure they're going to last with us a long time and they're

13  happy.  It's very important to us.  We're not making -- that's

14  what I was saying earlier.  It's not about any acquisition.

15  It's about a long-term customer.

16  Q.  All right.  So you said a lot of things there, so let's

17  break it down.

18  A.  Yes, sir.

19  Q.  You told me a minute ago or at the beginning of your exam

20  that it was about $90 a month for a customer; right?

21  A.  That's correct.

22  Q.  All right.  And $90 a month is something over $1,000 a

23  year; right?

24  A.  Yes, sir.

25  Q.  Okay.  And you just told me it costs $1,000 to get a

1  customer; right?

2  A.  Yes, sir.

3  Q.  So your payback is not three or four years, it's one year

4  on the math you gave me?

5  A.  Sir, may I correct you on that?  Not -- nothing in business

6  is 100 percent profit.  Let's look at this.  You just

7  challenged me.  Yes, average customer pays us $90.  That's the

8  facts, right, when you look at our earnings call.

9      You have to pay the programmers, ESPN, CNN, HBO.  They

10  don't give us programming free.  Networks, ABC, NBC, CBS, FOX,

11  you have to pay them.  That's 50 percent of your cost.  You're

12  paying commissions, like you mentioned.  You sent -- rolling a

13  truck to do installation.  Okay.  You've got operational costs,

14  satellite that you mentioned.  You've got billing costs.

15  You've got service calls.  There -- and I can go on and on.

16      So it's not -- you're saying they're paying $90 in 12

17  months, you made your money.  No.

18      What I'm saying is when you break that down, you might be

19  making a very small -- and then that is why the break-even is

20  3-1/2, 4 years.

21  Q.  That's why it's important to DISH and beneficial to DISH to

22  lock those customers down by not letting SSN go sell them

23  something else; right?

24  A.  I just explained that we want to take care of our

25  customers.  They want our service.  Of course we want to take

1   care of our customers.  We want happy customers.

2   Q.  Okay.  Let's go to --

3   A.  We're in the customer service business.

4   Q.  Let's go to Section 9.7.  9.7 says that:  In the event the

5   retailer derives an economic benefit, in any form, from a

6   violation of its obligations under Section 9 -- and that

7   ownership of the customer is in Section 9, you agree; right?

8   A.  Yes.

9   Q.  All right.  Then that economic benefit is actually the

10  property of EchoStar; right?  Do you see that in Section 9.7?

11  A.  Yes, I do.

12  Q.  All right.  So if they had the gumption to go out and sell

13  some DirecTV, you could just seize the money; right?

14  A.  No.  It's not exclusive.  They can sell DirecTV.

15  Q.  I know you keep saying it's not exclusive, but if they use

16  any of the business they've -- they've done for the last five

17  or six years to sell this other product, it's for your benefit?

18          **THE COURT:**  That's not a question.

19  **BY MR. GLASSER:**

20  Q.  So how is it -- how is it practically, practically

21  possible?

22          **MS. ECHTMAN:**  Objection.

23          **THE COURT:**  That's not a question.

24          **THE WITNESS:**  I don't understand the question, sir.

25          **MR. GLASSER:**  I'll move on.

1          **THE COURT:**  You're not asking a clear question.  What

2    are you asking?

3          **MR. GLASSER:**  I'll move on to the next.  All right.

4          **THE COURT:**  Okay.  So, maybe that's a good time,

5    actually, to stop and go to lunch.  All right.

6        Ladies and gentlemen, I'm going to excuse you until 2:00.

7    That will give you about an hour and 15 minutes to get

8    something to eat, stretch your legs.  I suggest to you that you

9    not eat too much so you'll be all right this afternoon.  Lay

10   your notes in your chair.  Don't talk about the case or have

11   any contact with anyone or form any opinion, and come back at

12   2:00.  Jurors are excused.  If everyone will remain seated

13   while they step out.

14       (The jury left the courtroom at 12:45 p.m.)

15         **THE COURT:**  Okay.  So, Mr. Glasser, you're going to

16   have to stop arguing with the witness.  The witness --

17         **MR. GLASSER:**  I'll move on.

18         **THE COURT:**  -- is not even disagreeing with you.  I'm

19   having a little trouble understanding exactly why you're

20   arguing with him, because about the relevant points, he's not

21   even disagreeing with you that I heard.

22         **MR. GLASSER:**  I'll go quicker through the rest of

23   this.

24         **THE COURT:**  So we just need to move a little

25   differently through that.  And just, if I can remind you, ask a

1  question, don't make a statement.  And, you know, I tolerate a

2  little bit of making statements and then saying, right, or,

3  correct, but at some point, you know, that's really not

4  helpful.

5          **MR. GLASSER:**  Okay.

6          **THE COURT:**  And then, if I can also just ask all

7  counsel, if there's something happening and you need to say

8  something about it, please direct your comments to the Court,

9  not to opposing counsel.  So, you know, if you're having

10  trouble, you don't have an exhibit, just direct your comments

11  to me so that lawyers are not talking to each other in the

12  courtroom in front of a jury, because that's -- that has the

13  potential to kind of get out of control, so -- all right?

14  Anything else we need to do before we take our recess?

15          **MR. GLASSER:**  Not from us, Your Honor.

16          **MS. ECHTMAN:**  No, I just want to know for planning

17  purposes so we know when to have our next witness ready.

18          **MR. GLASSER:**  I mean, I'm getting to the end of the

19  exam.  I mean, it's not going to be -- what time do we come

20  back?

21          **THE COURT:**  2:00.

22          **MR. GLASSER:**  I mean, I think your next -- you'll be

23  able to take --

24          **THE COURT:**  Say again.  I can't hear you.  Talk to me.

25          **MR. GLASSER:**  I think she'll be able to take the

1  witness by three.

2        **THE COURT:**  All right.  So you anticipate another hour

3  on direct?

4        **MR. GLASSER:**  Maybe less.

5        **THE COURT:**  Maybe less.  All right.

6        **MS. ECHTMAN:**  Your Honor, I just want to also bring up

7  the point that we made our Rule 403 and 404 objection to

8  certain evidence about other retailers, and we were told that

9  they would not bring it up about telemarketing complaints,

10 violations by other retailers.  We were assured that wasn't

11 going to happen, and that it would only be potentially if DISH

12 opened the door.

13      Now, we did not open any door because we haven't done

14 anything yet, and they put on the Assurance of Voluntary

15 Compliance and said, this must have been because there were

16 widespread problems.

17      **THE COURT:**  Exactly.  I heard the question.  The

18 witness, however, denied that.  So there is no evidence in

19 front of the jury of widespread problems, and the Plaintiff

20 will not make any argument to that effect, because the

21 statement by counsel is not evidence.  So, the witness denied

22 it.

23      You know, if you want to ask a few more questions about

24 that when it comes your time, you can, but there -- as far as

25 I'm concerned, there is no evidence of that, and the Plaintiff

should not argue about that.  And having asked that one
question, I wouldn't anticipate any other questions about that
from Plaintiff's counsel.

        **MR. GLASSER:**  Okay.

        **THE COURT:**  Right?

        **MR. GLASSER:**  Yes, ma'am.

        **THE COURT:**  Unless there's something I'm missing.
Okay.

        **MS. ECHTMAN:**  Thank you.  And, Your Honor, going
forward, I will direct the Court -- I just have to say it's
been very hard to follow because Mr. Glasser is shuffling
through papers, and I know he's not doing it intentionally.
But, he's quickly mentioning an exhibit, I've got to find it in
the binders I have.  And when he's shuffling through, I don't
know what page he's on.

        **THE COURT:**  Right.  And he's doing better, I will say.
So, it is very helpful both -- for everybody's purposes to cite
the page and paragraph number, and I think he is doing better
about that.  So, just continue for all of our sakes.

        **MS. ECHTMAN:**  Thank you.

        **THE COURT:**  Anything else?

        **MR. GLASSER:**  No, ma'am.

        **THE COURT:**  All right.  We'll be in recess until 2:00.

   (A noon recess was taken from 12:50 p.m. until 2 p.m.; all
parties present.)

```
1         THE COURT:  I think we were short a juror or two the
2   last time the clerk checked.  Is there anything the Plaintiff
3   wants to take up?
4         MR. GLASSER:  No, ma'am.
5         THE COURT:  Defendant?
6         MS. ECHTMAN:  No, thank you, Your Honor.
7         THE COURT:  The clerk tells me that -- they're all
8   back?  Okay.  The clerk tells me that one of the jurors has a
9   family member who's bringing them back and forth to court who
10  has been in the courtroom some, and so I just want to -- let's
11  see.  Is that --
12        THE CLERK:  Yes, that's Mr. Burgess.
13        THE COURT:  Mr. Burgess, is that you back there?
14        MAN IN AUDIENCE:  Pardon.
15        THE COURT:  Are you Mr. Burgess?  Are you Mr. Burgess?
16        MAN IN AUDIENCE:  No, ma'am.
17        THE CLERK:  Oh, no, he went back downstairs.
18        THE COURT:  Pardon me.  I apologize.
19     In any event, apparently, Ms. Burgess' husband had been in
20  here a little bit.  So I'm just going to give them an extra
21  caution about that.  You know, it's not unusual to have the
22  person driving the juror to and from to be here.  So I have had
23  to deal with that before.  I'll mention it explicitly.
24     All right.  You can bring the jury in.  And let's see.  The
25  witness -- yes, you can come on back up.  You may have to wait
```

1  if the jurors start coming in before you get up there.  No, it

2  looks like you can come on.

3       (The witness returned to the witness stand.)

4            **THE COURT:**  It's a tight squeeze there.

5       (The jury entered the courtroom.)

6            **THE COURT:**  All right.  Before we get started, let me

7  just ask all the jurors -- and tell you that you should not

8  come into the courtroom during any of the breaks or before

9  court starts in the morning.  The lawyers are talking to each

10  other about the case.  Things could be going on in here.  So,

11  you know, if you need something that's in the courtroom and

12  it's during a break, please ask one of the security officers or

13  Ms. Sanders to help you so that you're not coming in and out of

14  the courtroom except with the jurors as a whole.

15       And I know from time to time jurors ride to court with, you

16  know, a family member and that person is around the courthouse,

17  and that's -- there's no problem with that.  I just want to,

18  you know, make sure that there's no conversation about the case

19  going on even with a spouse who might be here.  I will say

20  there's a trial going on downstairs.  So anybody looking for

21  something to do could go down there and watch the other case

22  rather than being in here.  We just don't want to have any

23  conversation about that with anyone between a juror and anyone

24  else.

25       And I believe we're ready to continue with direct

1  examination.  So you may proceed.

2          **MR. GLASSER:**  Thank you, Your Honor.

3  **BY MR. GLASSER:**

4  Q.  I think we're still on the ELMO.  Thanks.  So I'm at

5  Section 10.2.  I'm on page 20, and this is how either party can

6  terminate the contract.

7          **THE COURT:**  And just to get me back on, this is the

8  2006 contract between SSN and DISH?

9          **MR. GLASSER:**  Yes, ma'am, Exhibit 26.

10          **THE COURT:**  All right.  Go ahead.

11          **MR. GLASSER:**  Plaintiff's Exhibit 26.  I may need to

12  turn that down a little.

13  **BY MR. GLASSER:**

14  Q.  So, Mr. Ahmed, do you agree that either party could, for

15  its own convenience, terminate this arrangement on 60 days'

16  notice?

17  A.  Yes.

18  Q.  Turning to the next page at Section 11, this is the section

19  that you were present for opening that Mr. Bicks went over

20  about the relationship to the parties hereto is that of an

21  independent contractor.  Do you see that?

22  A.  Yes, sir.

23  Q.  So that is in the contract as well, right?

24  A.  Yes, sir.

25  Q.  Okay.  We're going to turn next to Plaintiff's Exhibit 28.

1       **MR. GLASSER:**  Any objection to putting this right on

2  the ELMO?  It's the OE.

3           **THE COURT:**  Okay.

4       **MR. GLASSER:**  Your Honor, I wonder -- I move the

5  admission of Exhibit 28.

6           **MS. ECHTMAN:**  No objection.

7       **THE COURT:**  All right.  It will be admitted.

8  **BY MR. GLASSER:**

9  Q.  Okay.  This is only a couple pages long, so I'm not going

10 to bother to come up there and give you one.  This is the OE

11 retailer amendment to the EchoStar retailer agreement, also

12 dated in 2006.  Do you see that?

13 A.  Yes, sir.

14          **THE COURT:**  With SSN?

15      **MR. GLASSER:**  Yes, ma'am, with Satellite Systems

16 Network here in the top.

17 **BY MR. GLASSER:**

18 Q.  So this, together with the document that we just looked at,

19 forms the contract with SSN, right?

20 A.  Yes, yes.

21 Q.  Okay.  Now, right here in the middle at Section 1.44,

22 there's a whole section on residential subscriber accounts.  Do

23 you see that section?

24 A.  Yes, I do.

25 Q.  And that's because the main purpose of the OE retailer was

1 to sign up residential subscribers, right?

2 A.  Yes, that's one of our goals to residential subscribers,

3 yes.

4 Q.  And then this is the agreement that actually lets them, at

5 Section 1.56, have access and use the OE tool, the order entry

6 tool, that we went over at length with the jury on how it

7 works, right?

8 A.  Yes.

9 Q.  And then, just like the monthly incentives that we talked

10 about before with the main part of the contract, these

11 residential incentives are paid under applicable business

12 rules, right?

13 A.  That's correct, for qualifying activations, correct.

14 Q.  Okay.  So it's clear from this contract that the business

15 rules also cover pay, isn't it?

16 A.  Yes, it says, "Additional residential incentives shall be

17 paid to retailer," yes.

18 Q.  I'm approaching you with Plaintiff's Exhibit 29, which is

19 the 2010 version of the contract.  Do you recognize it?

20          **MR. GLASSER:**  I move its admission.

21          **THE WITNESS:**  Yes, sir.

22          **MR. GLASSER:**  It's Plaintiff's Exhibit 29.

23          **MS. ECHTMAN:**  This has actually become JTX2?

24          **THE COURT:**  The Joint Exhibit No. 2.

25          **MS. ECHTMAN:**  It's Joint Exhibit No. 2, and there's no

1   objection.

2           **THE COURT:**  It will be admitted.

3   **BY MR. GLASSER:**

4   Q.   Okay.  So this, Mr. Ahmed, is the December 10 -- I mean,

5   December 2010 version of the contract with SSN, right?

6   A.   Yes, sir.

7   Q.   Okay.  Business rules -- I'm not going to go through this

8   whole thing, but business rules are still defined as "any term,

9   requirement, condition, precedent, process, or procedure

10  associated with a promotional program or otherwise identified

11  as a business rule by DISH which is communicated to the

12  retailer by DISH or an affiliate of DISH," right?

13  A.   Yes, sir.

14  Q.   All right.

15          **THE COURT:**  And that's paragraph 1.7?

16          **MR. GLASSER:**  Yes, ma'am.

17  **BY MR. GLASSER:**

18  Q.   So at paragraph 1.7, it says, "associated with a

19  promotional program or otherwise identified as a business

20  rule."  Do you see that?

21  A.   Yes, I do.

22  Q.   So would you agree that in plain English it's both those

23  rules associated with promotional programs or those rules

24  otherwise identified as a business rule?

25  A.   Yes, business rule for promotional programs.  It's what it

1  says.

2  Q.  Okay.  So your answer to me was, yes, business rules for

3  promotional programs, which creates an endless loop, and I'm

4  asking you, do you see there are two things there:  One, rules

5  with respect to promotional programs, and, two, or rules

6  otherwise identified as a business rule?

7  A.  Yes, that's what it says.

8  Q.  So it is not an endless loop.  It is both, correct?

9        **MS. ECHTMAN:**  Objection, argumentative.

10        **THE COURT:**  Sustained.

11 **BY MR. GLASSER:**

12 Q.  Now I'm at Section 1.46.  The definition of sole discretion

13 is the same as before, right?

14 A.  Yes.

15 Q.  Okay.  And, you know, I don't want to grind through a whole

16 other contract for an hour.  So is there any part of this

17 second contract that you believe changed from the first

18 contract that we ought, in fairness, to look at?

19 A.  No.

20 Q.  I don't know of any.

21 A.  I don't know of any either.  The retailer is still an

22 independent contractor.

23 Q.  Okay.  I'm going to show you Exhibit 241.

24        **MR. GLASSER:**  And I move its admission.

25        **THE COURT:**  Plaintiff's Exhibit 241?

1    **MS. ECHTMAN:**  Yes, we have an objection to this.  This

2   does not pertain to SSN.  We have a relevance objection.

3          **MR. GLASSER:**  Then I'll lay a foundation, Your Honor.

4          **MS. ECHTMAN:**  And this applies overall to that general

5   objection about information with respect to other retailers, if

6   you look at the last page.

7          **THE COURT:**  Okay.  You can ask a few questions

8   directed to showing its relevance.

9   **BY MR. GLASSER:**

10  Q.  So the document I've handed you is an example of a fairly

11  typical promotional program as rolled out to OE retailers, in

12  this instance, an OE retailer other than SSN, right?

13  A.  Yes, this went out to all the OE retailers.

14         **THE COURT:**  I'm sorry?  It went out to who?

15         **THE WITNESS:**  To the OE retailers.

16  **BY MR. GLASSER:**

17  Q.  So just because it happens to have the attachment for the

18  exact pricing for one OE retailer, the pricing might be unique

19  to an OE retailer, but the content of the promotional program

20  is common to the OE retailers, correct?

21  A.  That's correct.  We're providing the economics that we pay

22  on specific products.

23  Q.  And the qualifying procedure and just how the promotion is

24  going to run, right, under Exhibit 241, Plaintiff's

25  Exhibit 241?

1   A.   And the, yes, qualifying promotion.

2         **MR. GLASSER:**   I move the admission of Plaintiff's

3   Exhibit 241, Your Honor, just as an example of a typical

4   promotional program.

5         **THE COURT:**   Can counsel step up to the bench briefly?

6      (The following bench conference was recorded.)

7         **THE COURT:**   Speak directly into the microphone for the

8   court reporter.   Why is this relevant?

9         **MR. GLASSER:**   It just shows how they roll out each

10  promotional program.   They do millions over six months --

11        **THE COURT:**   Yeah, but why do we care?

12        **MR. GLASSER:**   Because it shows sole and complete

13  discretion on every item ten times in two pages of DISH, just

14  every single thing about sole and complete discretion ten times

15  in two pages, and so I'm saying every time they roll out a

16  program, they roll it out under their sole and complete

17  discretion.   It just goes to power and control, and I would use

18  the one with SSN if they had produced one with SSN, but they

19  just didn't.

20        **THE COURT:**   Okay.

21        **MS. ECHTMAN:**   Well, Your Honor, can we just remove the

22  last page if it's going to go to the jury because it's got

23  rights for a different retailer?

24        **THE COURT:**   All right.   We'll remove the last page.

25  That makes sense.

1    **MS. ECHTMAN:**  That's fine with me.

2    **THE COURT:**  Good idea.

3    (End of bench conference.)

4    **THE COURT:**  All right.  We're going to remove the last

5    page, which has to do with another retailer, not this retailer,

6    not SSN, and with that deletion, Plaintiff's Exhibit 241 will

7    be admitted.

8    **BY MR. GLASSER:**

9    Q.  All right.  So let's go quickly through this.  Would you

10   agree with me that Exhibit 241 is just kind of generally how

11   different -- example of how a promotional program is rolled

12   out?

13   **THE COURT:**  Is what?

14   **BY MR. GLASSER:**

15   Q.  Rolled out to the OE retailer?

16   A.  Any promotional program, consumer program, or changes in

17   programming, anything, we do send out a business rule

18   explaining exactly what the program is.

19   Q.  All right.

20   A.  So every retailer knows.

21   Q.  Okay.  And I just want to go through it quickly and say

22   that on the first -- second paragraph, do you see that sole and

23   absolute discretion, EchoStar's sole and absolute discretion?

24   A.  Yes.

25   Q.  And then it gives a program overview, right, at the next

1   statement?

2   A.   Yes.

3   Q.   Right above that, it says that EchoStar determines whether

4   you can participate in their sole and complete discretion,

5   right?

6   A.   Yes.

7   Q.   On the program overview, again, EchoStar's sole and

8   complete discretion comes up, right?

9   A.   Where is that, sir?

10  Q.   Right where my finger is.

11  A.   Yes.

12  Q.   Okay.   On the qualifying promotions, they reserve the right

13  in their sole and complete discretion to change it for any

14  reason or no reason.   Do you see that?

15  A.   Yes.

16  Q.   On the residential incentives, what you're going to get

17  paid here at the bottom, they reserve the right to change it in

18  their sole and complete discretion at any time, right?

19  A.   Yes.

20  Q.   On the next page, on chargebacks or how chargebacks are

21  going to be handled for returns, EchoStar retains the right in

22  its sole and complete discretion to figure that out however

23  they want, right?

24  A.   That's correct.

25          **THE COURT:**   Doesn't it say absolute?   I don't know

 1  that that's different.

 2          **THE WITNESS:**  Absolute discretion.

 3          **MR. GLASSER:**  You're right, sole and absolute

 4  discretion.

 5  **BY MR. GLASSER:**

 6  Q.  And then call monitoring here at the bottom:  The retailer

 7  acknowledges that EchoStar shall have the right, but not the

 8  obligation, at any time and from time to time in its sole and

 9  complete discretion to monitor, record, or otherwise access,

10  whether electronically or otherwise and in all cases, at

11  EchoStar's election any and all telephone or other similar

12  communications made between the retailer, and a long list of

13  people, including their own employees.  And I'm sure the

14  customer.  Is that correct?

15  A.  I don't know about the customer, but, yes, that's what it

16  says there.

17  Q.  Well --

18  A.  This is -- this is a business rule, and if I can comment on

19  it --

20  Q.  I haven't asked you a question yet.

21  A.  I'm sorry.  I'm sorry.

22  Q.  Okay.  So -- yeah, it says -- it says, they can call

23  monitor between the employees, agents, subagents of the

24  retailer and any prospective or actual customer.  Do you see

25  that?

1      **THE COURT:**  Consumer?

2      **THE WITNESS:**  Yes, sir, I do.

3  **BY MR. GLASSER:**

4  Q.  All right.  And so that's what we discussed earlier when we

5  said that DISH field service representatives could go in and

6  listen to whatever they wanted to listen to, right?  Correct?

7  A.  Yes, we could require the calls.

8  Q.  You also had an audit service run by Bruce Werner that

9  could come in and audit their books and records, right?

10  A.  We have a compliance group, that Bruce Werner works there,

11  yes.  Bruce Werner is employed in the compliance group,

12  correct.

13  Q.  And we already talked about the taping that goes on, the

14  taping of the calls that were uploaded on a regular basis for

15  review.  Remember that?

16  A.  Sure, yes.

17  Q.  Okay.  This is the business rule that allows that access by

18  DISH, right?

19  A.  Yes.

20  Q.  Okay.

21  A.  Now can I comment, sir?  I'm just saying it's -- this is

22  important.  No, it's very important because, again, we do want

23  to listen to calls to make sure that our promotions are

24  accurately explained to the customer because there's so many

25  facets on the promotion.  That's important.  It's competitive.

1  Business rules have to change.  Promotions have to change based
2  on what the competition is doing, whether it's DirecTV, whether
3  it's the cable companies.  So they have to change, and we have
4  to control that because it's our promotions.  That's what this
5  is.  Competition changes based on what they pay out, the
6  economics.  Market conditions change so we have to control the
7  economics.  That's what this is.
8  Q.  Okay.  And so under this call monitoring business rule,
9  after the assurance of compliance, couldn't you have said we'd
10  like you to upload to us everyone you called last week so we
11  can see if they're on the Do Not Call List?
12  A.  I cannot answer that.  We required certain calls to be
13  uploaded, and we're making sure that all the terms and
14  conditions are accurately represented.  That's very important
15  for us.
16  Q.  Okay.  Then there's a couple more instances of sole and
17  complete discretion.  So I've got a two-page document here, and
18  I counted ten instances of sole and absolute discretion on the
19  part of DISH.
20  A.  Yes.
21  Q.  That's fairly common in the communications with the
22  retailers, right?
23  A.  It's our consumer offer.  We have to protect the customer
24  to make sure that what we're offering as a service is
25  accurately represented to that customer.  That's what's

1  important.

2  Q.  Okay.  All right.  So now we've covered the assurance of

3  compliance, how the OE tool works --

4  A.  Yes, sir.

5  Q.  -- and the contract.  I want to turn to Satellite Systems

6  itself, okay?

7  A.  Yes, sir.

8  Q.  I want to turn to the time period before you left in 2006,

9  so roughly 2004 to 2006.  Are you with me?

10  A.  Yes.

11  Q.  At that time you were still vice president in charge of

12  indirect sales, as we established right when you took the

13  stand, right?

14  A.  Yes, sir.

15        **MR. GLASSER:**  I have Exhibit 1160.  I move the

16  admission of it.

17        **MS. ECHTMAN:**  Your Honor, if I might have a moment to

18  see what it is?

19        **THE COURT:**  All right.

20     (Pause in the proceedings.)

21        **MS. ECHTMAN:**  We've got multiple objections to this

22  one.

23        **MR. GLASSER:**  So maybe I could lay a foundation?

24        **MS. ECHTMAN:**  May I state my objections?

25        **THE COURT:**  Okay.  Just a second.  Hold on.

1    (Pause in the proceedings.)

2    **THE COURT:** All right. Ladies and gentlemen, let me

3 just excuse you to the jury room for a moment. Leave your

4 notes in your chair.

5    (The jury left the courtroom.)

6    **THE COURT:** What's your objection?

7    **MS. ECHTMAN:** Your Honor, there's -- there's hearsay

8 in here. They're saying there's a lot of complaints about SSN.

9    As we've talked about earlier, and it's covered by one of

10 our motions in limine, this is about an earlier time period.

11 It's about different types of issues. This is not about Do Not

12 Call issues. This is a time period where we said this is prior

13 to -- 2005 and prior, and it's improper attempt to use

14 character evidence from a completely different time period,

15 from 2005, which is years before Dr. Krakauer got his call, and

16 we have relevance, unfair prejudice, improper character.

17    **THE COURT:** I don't understand your hearsay objection.

18    **MS. ECHTMAN:** I've got the other objections. I'll

19 withdraw the hearsay objection.

20    **THE COURT:** All right.

21    **MS. ECHTMAN:** Other than it has a conversation -- it

22 repeats a conversation with Alex Tehranchi.

23    **THE COURT:** Okay. For the Plaintiff?

24    **MR. GLASSER:** Well, Your Honor, in the opening and

25 again in the cross-examination of Dr. Krakauer, they covered

1  this period of time.  The witness has already testified that

2  under the assurance of compliance the history of SSN is

3  relevant.  This 2000 --

4          **THE COURT:**  I'm sorry.  Say again.

5          **MR. GLASSER:**  The history, what they know about SSN

6  historically is relevant to the progressive discipline set

7  forth in the compliance.  This shows the story of how they were

8  working with both DISH and Direct for a while and then weaned

9  from Direct to only DISH.  So it makes that point.  It shows

10 how you pay them.  It's completely relevant to this case, and

11 then was forwarded again by Mike Oberbillig to Bruce Werner in

12 the risk audit department in 2007.  So I just -- I mean, this

13 is the heart of the case.

14         **THE COURT:**  All right.  Overruled.

15         **MR. GLASSER:**  Now, there are a few more -- this is

16 kind of the -- one of the farthest back in time, but we kind of

17 march forward on a few of these.  In each instance, it's

18 Mr. Amir's own e-mail.

19    Should we -- I mean, I'm happy to lay the foundation every

20 time, I mean, if we're going to object to all of them.  How do

21 you want to handle it?  Can I give it to the witness, lay the

22 foundation without showing it, they can object, or do you want

23 to do a side --

24         **THE COURT:**  Well, I'd prefer to keep the jury -- not

25 have the jury go in and out, in and out.  It's just I'm having

1  some difficulty with the system -- the sidebar sound system,

2  and the court reporter is having trouble hearing us during

3  those sidebars, so I'm trying to minimize them.

4      What are your next exhibits?

5          **MR. GLASSER:**  Well, they're the same.  They're e-mails

6  between Mr. --

7          **THE COURT:**  Well, which -- what are your next

8  exhibits?

9          **MR. GLASSER:**  Oh, okay, yeah.  The 656, which is an

10  e-mail in -- later in 2004, in September, where they're

11  giving --

12          **THE COURT:**  Okay.  Just tell me what the numbers are.

13          **MR. GLASSER:**  656 --

14          **THE COURT:**  Uh-huh.

15          **MR. GLASSER:**  -- where additional economics are being

16  given to SSN and Mr. DeFranco.

17          **THE COURT:**  Okay.  I'm -- I believe I asked you to

18  just give me the numbers.

19          **MR. GLASSER:**  656.

20          **THE COURT:**  Yes.

21          **MR. GLASSER:**  1160.

22          **MS. ECHTMAN:**  1160 is what we're on right now, isn't

23  it?

24          **THE COURT:**  Yes.

25          **MR. GLASSER:**  Oh, yeah.  194, which is the --

1          **THE COURT:**  Okay.  I see.

2          **MS. ECHTMAN:**  194 -- do you want me to wait?

3          **THE COURT:**  Yes, I'm trying to get a list.

4          **MR. GLASSER:**  504.  Oh, no, not --

5          **THE COURT:**  All right.  504.

6          **MR. GLASSER:**  Yeah, 504.  I think that's it for his

7  e-mail, Your Honor.

8          **THE COURT:**  Okay.

9          **MR. GLASSER:**  They're all Amir Ahmed e-mail.

10         **THE COURT:**  And is your objection the same on all of

11  those?

12         **MS. ECHTMAN:**  Well, we have different objections.  The

13  one specifically with 194, that is actually an incomplete

14  document.  504 is a longer version of the same one.  Both of

15  those documents start out with someone forwarding an e-mail

16  that was not written by anyone at DISH.  It is a specific

17  complaint that's been forwarded to people at DISH, and that

18  particular complaint we have a hearsay objection on.

19     This is also the Scott Novak --

20         **THE COURT:**  I'm totally confused by what you just

21  said.  You are complaining that they have excluded a hearsay

22  complaint.

23         **MS. ECHTMAN:**  No, we're objecting -- okay.  I wasn't

24  clear.  I'm sorry.  Let me back up.

25         **THE COURT:**  Okay.

1    **MS. ECHTMAN:** Okay. So 194 and 504 are different

2    versions of the same e-mail. The version at 194 is incomplete.

3    504 is a longer version -- a more complete version of that

4    e-mail. So that's -- that's one issue is that 194 is

5    incomplete.

6         **THE COURT:** Okay. Is there some reason not to use

7    504?

8         **MR. GLASSER:** I am using 504. I called it out.

9         **MS. ECHTMAN:** They're both actually -- I'm sorry.

10   They're both incomplete. There's another e-mail that they have

11   that has more on that chain. This is the famous Scott Novak

12   e-mail that Your Honor has a limine instruction about. So I'm

13   sorry, Your Honor. Both 194 and 504 -- oh, gosh. I'm confused

14   now. I'm sorry. Okay. 194 is an incomplete version of

15   another e-mail. 504 is a completely different e-mail.

16        **THE COURT:** Okay.

17        **MS. ECHTMAN:** I apologize for my confusion on that.

18   Five -- so let's start with 194. That one starts with a

19   complaint from the Indiana Attorney General, and that complaint

20   is hearsay.

21        **THE COURT:** It -- where is that?

22        **MS. ECHTMAN:** That's at 194-003. That original e-mail

23   is from Margaret Sweeney, msweeney@atg.state.in.us. So that

24   complaint is hearsay.

25      And then later on, it -- there's a description of another

1  complaint at the top of that page, again is hearsay, and the

2  document itself --

3       **THE COURT:** Okay.

4       **MS. ECHTMAN:** -- is incomplete.

5       **THE COURT:** And it's incomplete?

6       **MS. ECHTMAN:** It's incomplete because there's a longer

7  version of this with more back-and-forth that's highly

8  relevant.

9       **THE COURT:** Okay. Well, you can ask him whatever you

10  want about other e-mails; but, you know, to the extent there

11  are complaints in there, I'll be glad to tell the jury that

12  they're offered to show that the complaint was received, not

13  that the complaint was true and accurate, since the complainer

14  isn't here under oath.

15       **MS. ECHTMAN:** Okay.

16       **THE COURT:** I have no problem with doing that.

17  Subject to that, you can go ahead.

18     These are obviously fairly old, so I would hope we could

19  move through them quickly. To some extent, that depends on the

20  witness. So -- and, you know -- but we can go ahead with this,

21  and I'll overrule the objections, as I -- subject to the

22  limiting instruction that I just mentioned. So --

23       **MR. GLASSER:** Just to be clear on how we're going to

24  handle it, I'll go ahead and use them and give them a moment to

25  state an objection and then move on?

1          **THE COURT:**  Right.  They can repeat their objection,

2   as we -- as has been stated here and -- in summary form.

3          **MS. ECHTMAN:**  Your Honor, if I might clarify?  PX120

4   is the complete version of PX194.  Just so I know what the

5   ruling was on 194 on the completeness issue.

6          **THE COURT:**  Okay.  Well, completeness in an e-mail

7   chain, you know, I -- you're just going to have to ask the

8   witness about that.  I don't know of any requirement that every

9   single e-mail in an e-mail chain be in front of a jury.  If you

10  think there's an e-mail that's left out, I'm glad for you to

11  ask questions about that and put in your -- you know, refer to

12  Plaintiff's Exhibit 120.  That's totally fine.  I just think

13  it's easier to deal with it that way.

14      All right.  Bring the jury in.

15         **MS. ECHTMAN:**  And, Your Honor, again, also the 194,

16  we've got the Novak limiting instruction.

17         **THE COURT:**  Beyond --

18         **MS. ECHTMAN:**  The fact that --

19         **THE COURT:**  Just a second, Officer.  I'm sorry.

20         **MS. ECHTMAN:**  So the issue in 194 -- and I'm sorry.

21  Let me just remind the Court, please, before he brings the jury

22  in, there's a statement by one of DISH's lawyers, and it's

23  actually on page 1 of 194, that says:  "In the past, we've

24  successfully resisted the argument that we're responsible for

25  the conduct of independent retailers.  However, SSN is a

1  problem because we've cautioned them to stop."  And Your Honor

2  had agreed to give an instruction that the jury is not to

3  consider the legal analysis contained in the e-mail as an

4  accurate and appropriate explanation of the law in this case.

5          **THE COURT:**  Okay.  Thank you for reminding me.  All

6  right.  I'll do that, too --

7          **MR. GLASSER:**  All right.

8          **THE COURT:**  -- when we get to it?

9          **MS. ECHTMAN:**  Thank you very much, Your Honor.

10         **THE COURT:**  Thank you.  Okay.  Now we can bring the

11 jury in.

12         **MS. ECHTMAN:**  I've forgotten what exhibit we're on.

13         **MR. GLASSER:**  1160.

14         **MS. ECHTMAN:**  Thank you.

15     (The jury entered the courtroom.)

16         **THE COURT:**  All right.  Go ahead for the Plaintiff.

17         **MR. GLASSER:**  Your Honor, I move the admission of

18 Plaintiff's Exhibit 1160.

19         **THE COURT:**  It will be admitted.

20 **BY MR. GLASSER:**

21 Q.  So, Mr. Ahmed, you recognize your name here on Plaintiff's

22 Exhibit 160 (sic), which is an e-mail chain from July 19, 2004,

23 at 7:51 in the evening; is that right?

24 A.  Yes, sir.

25 Q.  Some of the other people on this -- we've heard about Mike

1  Mills.  What does he do in the company at this time?

2  A.  Mike Mills would have been the account manager.

3  Q.  Okay.  And what is Jim -- how do you even say that?

4  A.  Jim Spreitzer.

5  Q.  Who is he?

6  A.  He was the director of the Sacramento office for the West

7  Coast Region.

8  Q.  And that's -- the West Coast is where SSN was, in

9  California, right?

10 A.  Yes, sir.

11 Q.  And Mike Oberbillig -- how do you say that?

12 A.  Mike Oberbillig.

13 Q.  And what --

14 A.  He reports to Jim, and he would be the regional sales

15 manager for that office.

16 Q.  Regional sales manager.  Great.

17     It says, "Please call Alex in the morning and give them

18 some good news.  We are increasing Satellite Systems OE

19 activation payment from $150 to $175 effective immediately."

20 Do you see that?

21 A.  Yes, sir.

22 Q.  And then a 25-dollar bonus for other type of activations,

23 right?

24 A.  Yes, sir.

25 Q.  And then a 15-dollar bonus for another type of commitment,

1  right?

2  A.  Yes, sir.

3  Q.  All right.  And -- and then some other pay increases

4  basically down here at the bottom of the e-mail, right?

5  A.  No, that's -- that's the same -- I'm just sending that to

6  retail services because they need to change the amount in the

7  system.

8  Q.  Okay.  So Eric Miller is to put it in the system about what

9  they're going to get paid?

10 A.  Yes.

11 Q.  "And the idea is to get Alex excited.  I want a minimum of

12 2,500 activations in August."  That's you, right?

13 A.  Yes.

14 Q.  The Alex being discussed in this e-mail is Alex Tehranchi,

15 the owner of Satellite Systems Network, right?

16 A.  That's correct.  And if I could mention that -- you

17 mentioned the 25 and 15.

18 Q.  Yes.

19 A.  That was across the board for every retailer, not just

20 Mr. Tehranchi.

21 Q.  Okay.  And then later in the e-mail chain, Mr. Amir -- I

22 mean, Mr. Ahmed, you and Mike Mills and Oberbillig talk some

23 more about Satellite Systems, right?

24 A.  Yes.

25 Q.  And you say, "You guys need to spend time with Alex on the

1  whole program," right?

2  A.  Yes.

3  Q.  "Make sure he understands the exception process," right?

4  A.  Yes.

5  Q.  "Make sure he does not give us just -- just give us

6  apartment sales," right?

7  A.  Correct, yes, sir.

8  Q.  Because you prefer residential sales, right?

9  A.  Apartment sales, yes, they -- again, we talked about the

10  break even.

11  Q.  And you say, "I'm hearing a lot of complaints on Satellite

12  Systems on telemarketing calls to customers."  Do you see that?

13  A.  Yes, sir.

14  Q.  Okay.  This is July 29th, 2004, right?

15  A.  That's correct.

16  Q.  And then Mr. Oberbillig on Tuesday, January 30th, 2007,

17  forwards this e-mail to Bruce Werner, right?

18  A.  In 2007?

19  Q.  Yes, do you see that at the top?

20  A.  Yes, sir.

21  Q.  Bruce Werner is the head of risk audit function at DISH

22  retail sales services, right?

23  A.  Yes, he's in our risk and audit department.

24  Q.  There's no comment on the e-mail, though, and you were not

25  in the company in January of 2007, so I take it you don't know

1  the reason why in 2007 Mr. Oberbillig thought Mr. Werner, the

2  head of risk audit, ought to see this e-mail?

3  A.  Yes, I don't have any knowledge of that.

4  Q.  Turning to Exhibit 656, Plaintiff's Exhibit 656.

5          **MR. GLASSER:**  I move its admission, Your Honor.

6          **THE COURT:**  It will be admitted.

7  **BY MR. GLASSER:**

8  Q.  So let's start at the back.  This is an e-mail between you

9  and Mr. Jim DeFranco -- let's see.  The last one was in July.

10  So this is September.

11  A.  Correct.

12  Q.  So two months later.  And Mr. DeFranco is the man -- he's

13  on the board of directors of DISH, right?

14  A.  Yes, he is.  He's also my boss.

15  Q.  He was -- and, actually, we talked about him earlier when

16  you took the stand?

17  A.  Yes, sir.

18  Q.  All right.  And so you e-mailed Jim, and you say,

19  "Satellite Systems Network is averaging 350 activations per

20  month on the OE tool."  That's for you guys, right?

21  A.  That's what it says, yes.

22  Q.  That's DISH's tool, right?

23  A.  That's correct.

24  Q.  "However, they are averaging 9,000 activations per month

25  for DTV"?

1  A.  That's -- yes.

2  Q.  That's DirecTV, your competitor, right?

3  A.  That would be DirecTV.

4  Q.  So at this point in time in 2004 is the point in time we've

5  talked about in this case where Satellite Systems Network sold

6  for DirecTV and they sold for DISH, right?

7  A.  Correct.

8  Q.  Okay.  "After speaking to" -- say that name.

9  A.  Spreitzer.

10  Q.  -- "Spreitzer, increasing their activation payment from 175

11  to" --

12          **THE COURT:**  Slow down, please.

13  **BY MR. GLASSER:**

14  Q.  -- "from 175 to $200 until January 31st, 2015, will get us

15  incremental 2,500 to 3,500 activations per month starting

16  October."  Do you see that?

17  A.  Yes, sir.

18  Q.  "I'm requesting the same economics as we provide," and you

19  list some more OE retailers, right?

20  A.  Correct.

21  Q.  And Mr. DeFranco approves that, right, "proceed"?

22  A.  Correct.  So can I comment?

23  Q.  When I ask you a question.

24  A.  Okay.

25  Q.  So -- and then you have a private e-mail a little later in

1  the night, a little -- I think Mr. DeFranco's e-mail was at

2  7:23 p.m., and at 9:24, you email privately to Jim, right?

3  A.  To Jim Spreitzer, correct.

4  Q.  "Go get him."  You want to recruit Alex to sell more DISH,

5  right?

6  A.  Yes, I want more DISH activations.

7  Q.  "Need activations.  Please tell Alex that I worked my A-S-S

8  off to get him additional economics."  Do you see that?

9  A.  Yes, sir.

10  Q.  "I have also had to deal with all his issues related to

11  sales."  Do you see that?

12  A.  Yes, I do.

13  Q.  And then he says he's out hiring -- Jim replies he's out --

14      **THE COURT:**  I'm sorry?  What?

15  **BY MR. GLASSER:**

16  Q.  Jim replies that he, being Alex, is out hiring people for

17  DISH this week, expanding the program.  Do you see that?

18  A.  Yes, sir.

19  Q.  And, again, in January of 2007, Mr. Oberbillig forwards

20  this e-mail to risk audit for reasons you don't know, right?

21  A.  That's correct.

22  Q.  Again, with no comment, right, no comment from

23  Mr. Oberbillig?

24  A.  That's all I see there, what you're showing me, sir.  I

25  don't know -- I don't have knowledge of that.

1  Q.  I'm approaching you with Plaintiff's Exhibit 186.

2          **MR. GLASSER:**  Your Honor, I have a certified copy of

3  Exhibit 186, and I move its admission.

4          **MS. ECHTMAN:**  Your Honor, we stand on our prior

5  objections on rule -- on PX186, and subject to a motion in

6  limine, 802, 401, 403, and 404.

7          **THE COURT:**  All right.  Overruled.  Go ahead.

8  **BY MR. GLASSER:**

9  Q.  Plaintiff's Exhibit 186 is a judgment by consent and

10 stipulated permanent injunction; is that correct?

11 A.  Correct.

12 Q.  It was entered in the state of North Carolina in the County

13 of Wake, right?

14 A.  Yes, sir.

15 Q.  And it -- it governs a thing called Vitana Financial Group,

16 a California corporation doing business as Satellite Systems

17 Network, right?

18 A.  Yes.

19 Q.  And this gentleman we've just been discussing, Mr. Alex

20 Tehranchi, right?

21 A.  Yes.

22 Q.  And the date is March 21st, 2005, right?

23 A.  Yes, sir.

24 Q.  And the date that the case started and the attorney -- I'm

25 sorry -- the State of North Carolina's Attorney General sued

1  Satellite Systems was June 25th, 2004, right?

2  A.  That's what it says, yes.

3  Q.  Let's turn to page 5 of this document, and it puts a

4  permanent injunction in place.  It says, "The Defendants" --

5  and we already remember that we looked at that, Satellite

6  Systems Network and Mr. Tehranchi, right?

7  A.  Yes, sir.

8  Q.  -- "are hereby permanently restrained and enjoined" -- that

9  means they need to stop, right?

10  A.  Yes.

11  Q.  -- "under North Carolina law from engaging in,

12  participating, making, causing to be made, or assisting in any

13  manner or any capacity whatsoever, whether directly or

14  indirectly, in concert with others, or through intermediary,

15  third party, business entity, or device, telephone solicitation

16  to telephone subscribers in the state of North Carolina who are

17  signed up on the National Do Not Call Registry or who

18  previously communicated a desire to receive no further

19  telephone solicitations from the Defendants," right?

20  A.  Yes, that's what it says.

21  Q.  So your OE retailer is after March 25th, 2005, legally

22  ordered by the State of North Carolina to stop calling people

23  on the Do Not Call Registry, right?

24  A.  Yes, based on this document.  Obviously, I'm not aware of

25  it at that time, but, yes, what you're showing me.

1  Q.  And then it says, "Moreover, Defendants are hereby

2  permanently restrained and enjoined from engaging in,

3  participating in, making or causing to be made, whether

4  directly or indirectly, in concert with others, telephone

5  solicitations via automatic dialing and recorded message

6  players without the express consent of the residential

7  telephone subscriber."

8      That's what you're -- in opening, you were present and

9  Mr. Bicks talked about automessaging and autodialing problems.

10 That covers that, right?

11 A.  Yes.

12 Q.  Okay.  And it's signed by a Superior Court judge, right, in

13 Wake County, North Carolina?

14 A.  Yes.

15 Q.  And I think you said you didn't know about it.  I heard

16 that.

17     Dr. Krakauer gave a deposition on September 28th, 2011,

18 that we talked about this morning with the North Carolina

19 Attorney General and a DISH lawyer named Victor Rao.  Are you

20 saying that no one told you about that?

21          **THE COURT:**  Told him about the deposition?

22          **MR. GLASSER:**  Yes.

23          **MS. ECHTMAN:**  Objection, Your Honor.

24          **THE COURT:**  Well, what --

25          **MR. GLASSER:**  I'm laying a foundation.

1          **THE COURT:** What's your question? Can you just ask --
2    no one told him about that. I don't think I understand what
3    you're asking.
4          **MR. GLASSER:** Let me back up and ask him.
5    **BY MR. GLASSER:**
6    Q. You're saying you didn't know -- I think you're saying -- I
7    don't know. Are you saying you didn't know that the
8    North Carolina Attorney General told SSN to stop this?
9    A. I was saying at that time. You're referring -- you're
10   going back to my career in 2004, '5, sir. At that time I did
11   not know about this at all.
12   Q. All right. Now, let me say, when did you learn about it?
13   A. I learned about this last year.
14   Q. Last year, which is 2006 -- 16?
15   A. Yes, sir.
16   Q. All right. So you're telling me that there's some -- well,
17   we know -- do you -- do you dispute that the legal department
18   at least had knowledge of Dr. Krakauer's complaint in 2011, not
19   2016?
20         **MS. ECHTMAN:** Objection. The legal department's
21   knowledge?
22         **THE COURT:** You're --
23         **MR. GLASSER:** So --
24         **THE COURT:** You're moving from this consent judgment
25   to Dr. Krakauer's complaint? You're talking about two

1   different things?

2           **MR. GLASSER:**  Well, I'm going to link them up.

3           **THE COURT:**  Okay.  He can answer if he knows.  If

4   you'll repeat your question.

5   **BY MR. GLASSER:**

6   Q.  Okay.  I guess I'm just saying when you're --

7           **THE COURT:**  Asking.

8   **BY MR. GLASSER:**

9   Q.  Did the legal department ever tell you that they were

10  having depositions with people who were saying SSN was calling

11  them on the Do Not Call List in 2011?

12          **THE COURT:**  Well, sustained as to what he was told.

13  That would seem to be privileged.

14  **BY MR. GLASSER:**

15  Q.  If you didn't know about any interaction with Dr. Krakauer

16  and the Attorney General's office in 2011, it must be the case

17  that you did not receive a briefing.

18          **THE COURT:**  Well, I haven't heard him say that.

19  **BY MR. GLASSER:**

20  Q.  Well, did you?

21  A.  I don't remember in 2011.  I learned about this last year.

22  Q.  Okay.  Did you know about Dr. Krakauer's interaction with

23  the Attorney General's office in 2011?

24  A.  No, sir.

25  Q.  2012?

1  A.  I learned about it last year, sir.

2  Q.  Okay.  So I take it that means that in 2011 the sales

3  department had no system in place to get notification from the

4  legal department about complaints to Attorney Generals'

5  offices?

6  A.  I can't comment on that, sir.  Our compliance group are

7  overseeing it.  I'm sure they're handling everything correctly.

8  It didn't get to me.  I apologize for that.

9  Q.  Are you aware of any formal system of notification when

10  compliance gets a problem to tell sales?

11  A.  There were individuals that were overseeing the OE channel

12  at that time responsible for it.  After conferencing them --

13  and I'm sure if -- if compliance had a major issue, they would

14  go to them.  It did not come to me, sir.

15  Q.  Okay.  I'm not asking about major issue.  I'm just saying

16  are you personally aware as the head of sales function in this

17  company of any process by which it should come to you?

18  A.  I believe every complaint we take seriously and it would

19  have come to the specific individual that was running the OE

20  channel responsible for it that I gave the authority to run.

21          THE COURT:  That you what?

22          THE WITNESS:  That I gave the authority to oversee or

23  run the channel.

24          THE COURT:  When you say "channel," I don't think I

25  know what a channel is?

1      **THE WITNESS:**  I'm sorry, ma'am -- Your Honor.  It's --

2   I call a channel -- independent satellite dealers a channel.

3   National accounts is a channel.  The organization -- our

4   organization channels our specific -- just like we looked into

5   that spreadsheet, national accounts.  It's a channel of

6   retailers, satellite dealers -- independent satellite dealers,

7   we call it as a channel?  Telco group is a channel.  OE is a

8   channel.  That's all.

9      **MS. ECHTMAN:**  Your Honor, I just want to object to

10  this entire line.  We've already established that Mr. Ahmed

11  left in 2006.  He wasn't there for three years and Mr. Glasser

12  seems to be asking about what was going on in that interim.

13      **THE COURT:**  Okay.  Well, if you can --

14      **MR. GLASSER:**  That was my last question --

15      **THE COURT:**  All right.  Then good.  Go ahead.

16      **MR. GLASSER:**  -- on that.

17  **BY MR. GLASSER:**

18  Q.  So you agree with me, though, that we can tell from the two

19  e-mails that we just looked at, Exhibit 1160, where you said

20  you were hearing a lot of customer complaints -- remember 1160?

21  A.  Sure.

22  Q.  And then -- which was in July of 2014.  And then

23  Exhibit 656, which was "all his issues related to sales"

24  e-mail, that was in 2014.  "All Alex issues related to sales,"

25  do you see that?

1  A.  Yes, sir.

2  Q.  Okay.  We know that they were selling both DISH and DirecTV

3  around the time of this -- see, it was filed in June of 2004

4  and it was entered in March of 2005.  These e-mails are inside

5  that window, right?

6  A.  Yes.

7  Q.  Okay.  So it is perfectly possible, in fact likely, that

8  some of these violations had to do with DISH products, wouldn't

9  you agree?

10        **MS. ECHTMAN:**  Objection, hypothetical for a fact

11  witness.

12        **THE COURT:**  Okay.  Well, sustained.

13  **BY MR. GLASSER:**

14  Q.  Let's go to Exhibit 194.

15  A.  Can I comment on those two?

16  Q.  Your lawyer will get to ask you questions when he or she

17  stands up.

18  A.  Thank you.

19        **MR. GLASSER:**  I move the admission of Exhibit 194,

20  Your Honor.

21        **MS. ECHTMAN:**  We object for the reasons previously

22  stated, Your Honor, and just want to note the limiting

23  instruction.

24        **THE COURT:**  All right.  Overruled.  It will be

25  admitted.

1    Ladies and gentlemen, in this exhibit and maybe in others,

2  you may hear someone in an e-mail talk about what the law is

3  that governs the Do Not Call Registry and such.  You're to take

4  your instructions on the law from me.  These are not being

5  offered for the accuracy or inaccuracy of what people say about

6  what the Do Not Call Registry laws are, but, you know, you're

7  entitled to consider that kind of as background or context,

8  what the witness or what the person talking understood the law

9  to be, but it's not offered to show you what the law is.  I'll

10 be telling you what the law is at the appropriate time.

11        **MS. ECHTMAN:**  And, Your Honor, might I also ask for

12 the limiting instruction on complaints?  And can I hand up the

13 specific instruction that Your Honor had previously entered?

14        **THE COURT:**  Yes.

15        **MS. ECHTMAN:**  Your Honor, if I might hand this up.

16        **THE COURT:**  Okay.

17    (Document handed to the Court by Ms. Echtman.)

18        **THE COURT:**  This is proposed.  I'm sorry.

19        **MS. ECHTMAN:**  Oh, it complies with the decision --

20        **THE COURT:**  Well, I think I just told them this.

21        **MS. ECHTMAN:**  Okay.

22        **THE COURT:**  And also, ladies and gentlemen, you may

23 hear some evidence about complaints; and, you know, if the

24 person who made the complaint isn't here in front of you

25 telling you about the complaint, then you're not to consider it

1  as true.  It's not being offered to prove to you that these

2  things happened.  It's being offered to prove, among other

3  things, that the complaint was made, all right, not that the

4  complaint was true or that anything -- any laws have been

5  violated.

6      All right.  Go ahead.

7  **BY MR. GLASSER:**

8  Q.  Okay.  So I want to start at the back of the e-mail here on

9  September 23rd, 2005.  Okay.  It's an e-mail from Marguerite

10 Sweeney at the Indiana State Attorney General's office, okay.

11 A.  Yes.

12 Q.  And Scott Novak is a lawyer inside of DISH, right?

13 A.  That's correct.

14 Q.  He handled work having to do with OE retailers and

15 compliance, right?

16 A.  He was one of the attorneys there, many responsibilities,

17 I'm sure.

18 Q.  It says:  One of my co-workers writes:  I just received an

19 auto dialer call at the house and pressed "1" with a

20 representative --

21     **THE COURT:**  Okay.  I don't really understand.  Can we

22 just not summarize that this is complaint?  I mean, the details

23 of it aren't really important, are they?

24     **MR. GLASSER:**  Actually, the detail in this case does

25 relate to another e-mail later, but I'll go quicker.

**BY MR. GLASSER:**

Q.  Just an autodialer complaint, right?

A.  That's correct.

Q.  All right.  And then Scott Novak writes to her that it "sounds like some rogue outfit masquerading as us," right?

A.  Correct.

Q.  "We will verify that we don't use 'push 1 to speak to someone live' outbound marketing," right?

A.  Yes.

Q.  Okay. and then it says Scott and Amy and then -- oh, okay. And then -- oh, then Ms. Marguerite Sweeney, the Attorney General lady, e-mails back two days later and says:  We received a similar complaint from a consumer who provided the number, called Satellite Promotions.  Okay.  And then it looks like internally it finally gets to you, right?

A.  Yes, sir.

Q.  All right.  And you were talking to Oberbillig and Mike Mills, right?

A.  Yes.

Q.  And Scott thinks it may be Alex Tehranchi and Satellite Systems Network, and he says "again," right?

A.  Yes.

Q.  Mike Mills says, yes, it is Satellite Systems, right?

A.  Correct.

Q.  You say:  Apparently we could not convince Alex.  You're

1  tired of this BS, right?

2  A.  Yes.

3  Q.  "I will deal with Novak and let legal handle it," right?

4  A.  Correct.

5  Q.  Oberbillig says:  We have addressed this with him many

6  times.  Do you see that?

7  A.  Yes.

8  Q.  "As recently as last week in person in LA."  You forward

9  the e-mail chain to Scott Novak, the lawyer, right?

10  A.  Correct.

11  Q.  On September 26th at 11:43 a.m., right?

12  A.  Correct.

13  Q.  And Scott Novak replies to you:  We know that SSN is using

14  autodialers and automessages.  Right?

15  A.  Correct.

16  Q.  Okay.  Now, when we looked at the permanent injunction from

17  the Attorney General from March of 2005, it enjoined

18  autodialers and automessaging.  It said stop that, right?

19  That's Exhibit 186?  Correct?

20  A.  That's the North Carolina one?

21  Q.  Yes, sir, which we read -- I showed you page 5.

22  A.  I understand.  Yes.  At that time I did not know about

23  that, but you showed me that, yes.

24  Q.  But this company was banned from doing this --

25          THE COURT:  Okay.  Ask the witness about what he

1  knows.

2  **BY MR. GLASSER:**

3  Q.  Okay.  "Tehranchi has been warned time and again by me."

4  That's Mr. Novak, right?

5  A.  Correct.

6  Q.  By you.  You're the recipient of this e-mail, right?

7  A.  Correct.  And I never spoke to Mr. Tehranchi about this.

8  Q.  So Scott Novak is wrong that you had warned Mr. Tehranchi?

9  A.  Yes, he's making a statement, yes.

10 Q.  By the region.  Who is the region on this e-mail?  Which

11 human being on this e-mail is the region?

12 A.  That would be Mike Oberbillig there.

13 Q.  Okay.  By phone.  So it wasn't you.  It had to be somebody

14 else in this e-mail by phone, right?

15 A.  Yes.  The region could have talked to him.

16 Q.  In writing, right?

17 A.  Yes, we sent a letter to him.

18 Q.  In person, right?

19 A.  Yes.

20 Q.  That these activations could violate the law?

21         **THE COURT:**  Activities.

22 **BY MR. GLASSER:**

23 Q.  Activities could violate the law.

24 A.  Yes, could violate the law.

25 Q.  "Last time Tehranchi blamed a rogue employee who he claimed

1  was terminated, but the activities continue."  Do you see that?

2  A.  Yes.

3  Q.  "Charter knows he's doing it, and several state AG's know

4  he's doing it as well."  Do you see that?

5  A.  Yes.

6  Q.  Was North Carolina one of those?

7  A.  I don't know, sir.

8  Q.  Was Florida one of those?

9  A.  I don't know, sir.

10  Q.  "In the past, we have successfully resisted the argument

11  that we are responsible for the conduct of independent

12  retailers.  However, SSN is a problem because we know what he

13  is doing and have cautioned him to stop."  Do you see that?

14  A.  Yes.

15  Q.  And it is true that while you had not done it, you were

16  aware that at least the region, Mr. Novak, and others by phone

17  and in writing had told the man to stop, right?

18  A.  A couple of complaints came to me, without a doubt, over

19  the previous few years and, yes, we -- at each instance when we

20  received a complaint, we contacted him through the region or

21  through compliance or through legal and told him to absolutely

22  stop, we do not want that type of business.  Each time he told

23  us he is following the laws, he's scrubbing the lists, he's

24  doing everything in compliance with the law.

25  Q.  Okay.

1  A.  As a matter of fact, are you going to --

2          **THE COURT:**  Go ahead.  You can finish your answer.

3          **THE WITNESS:**  As a matter of fact, I believe in this

4  e-mail chain Mr. Oberbillig will contact Mr. Tehranchi.

5  Mr. Tehranchi is adamant that it is not him, he follows

6  everything by the law, he only does voice telemarketing, he's

7  not -- that's not his focus on the DISH business.  That's what

8  he's telling him.  He's telling him it's not him.  He would

9  like to speak to Mr. Novak and explain how he telemarkets by

10 the law.  Mr. Oberbillig takes initiative, and on this specific

11 e-mail and complaint, we find out that it was not SSN.  It was

12 another retailer that caused the complaint.

13 **BY MR. GLASSER:**

14 Q.  And we'll get to all that.  We'll walk through all that,

15 but for right now I don't want to concentrate on what happened

16 next.  I'm concentrating on this e-mail at this moment in time

17 when you haven't run down his defenses yet or what he's arguing

18 or whether or not somebody else --

19          **THE COURT:**  Okay.  Ask him a question.

20          **THE WITNESS:**  This is Mr. --

21          **THE COURT:**  Just a second.  Stop, stop, stop.

22 **BY MR. GLASSER:**

23 Q.  And I'm asking --

24          **THE COURT:**  Stop.  You ask a question.

25      And then you answer the specific question that he asks you.

1   And then we'll kind of go back and forth, but you all stop

2   arguing with each other.

3           **THE WITNESS:**  I'm sorry.

4   **BY MR. GLASSER:**

5   Q.  I'm asking you at this moment in time what Mr. Novak said,

6   that this man -- we know that he's violating the law, okay, was

7   true at that time with respect to other activity, not this

8   specific complaint.  I'm not -- I don't care about this

9   specific complaint.  We'll get to that.

10          **MS. ECHTMAN:**  Objection, misstates the document, which

11  says "could."

12          **THE COURT:**  Overruled.  Go ahead.  You can answer the

13  question.

14          **THE WITNESS:**  Yes, it says "could violate the law."

15  **BY MR. GLASSER:**

16  Q.  "We know that SSN is using autodialers and automessages.

17  Tehranchi has been warned time and again by me, by you, by the

18  region, by phone, in writing, in person that these activities

19  could violate the law."

20          **THE COURT:**  What's your question?

21  **BY MR. GLASSER:**

22  Q.  Did he -- do -- we just showed you a --

23          **THE COURT:**  Okay.  Stop.

24          **THE WITNESS:**  Sir --

25          **THE COURT:**  Stop.  If you don't have a question,

1  I'm -- you can conclude your examination.

2  **BY MR. GLASSER:**

3  Q.  All right.  Did you tell him to stop doing that?

4  A.  We never wanted that business.  We told him to always be

5  compliant and follow the laws.  That's the only way we want to

6  do business.  And every time he said that, yes, he was

7  following the laws, correct.

8  Q.  And you preferred -- you wanted to put him on a 30- or

9  60-day probation, right?

10  A.  I believe Mr. Novak recommended probation and I agreed with

11  him on 30 to 60 days, correct.

12  Q.  And then we'll get to the next e-mail, but once he objected

13  and made his argument back, you ended up not putting him on

14  probation, right?

15  A.  I did not put him on probation, sir.

16  Q.  And then again in January of 2007, Mr. Oberbillig sends

17  this e-mail chain to risk audit, right?

18  A.  That's what I see there.  I was not there.  That's what

19  you're showing me, yes.

20  Q.  And the part of the e-mail we haven't got to yet is

21  Mr. Novak was warning that there is a risk in continuing to

22  give warnings without follow-through action.  "Eventually

23  someone will try and use that against us."  Right?

24          **MS. ECHTMAN:**  Your Honor, I object.  We're spending a

25  lot of time on a document from a very long time ago.

1        **THE COURT:** Well, he's entitled to go through the

2  document. I am going to require you all to stop arguing with

3  each other so we can get through this and get to a more

4  relevant time frame.

5     Go ahead. Finish up. What's your question about that last

6  part you just read?

7  **BY MR. GLASSER:**

8  Q. That's what Mr. Novak warned you?

9  A. That's what he wrote.

10 Q. Let's go to Exhibit 120.

11       **MR. GLASSER:** Move the admission of Plaintiff's

12 Exhibit 120, Your Honor.

13       **MS. ECHTMAN:** Your Honor, all the same objections

14 previously stated: 802, 401, 403, 404. And the same limiting

15 instruction applies to this.

16       **THE COURT:** Overruled. You can proceed.

17    And, ladies and gentlemen, you'll remember what I said to

18 you about complaints and -- I'm not sure if there's anything in

19 here about what the law is on agency or on --

20       **MR. GLASSER:** It's just a continuation of the same

21 e-mail, Your Honor.

22       **THE COURT:** Okay. Go ahead.

23 **BY MR. GLASSER:**

24 Q. So this is the continuation e-mail you wanted to talk

25 about, right?

1  A.  Yes.  Thank you.

2  Q.  All right.  And what happened after -- so there's

3  Mr. Novak's statement here about, you know, if we keep doing

4  this without follow through we've got a problem.

5         **MS. ECHTMAN:**  Your Honor, could I as the Court to ask

6  Mr. Glasser to let us know what page he's on?

7         **MR. GLASSER:**  I'm about to get there.

8         **THE COURT:**  Yes, that would be helpful.

9         **MR. GLASSER:**  I'm on page 3 of 120, right here.  Okay.

10 **BY MR. GLASSER:**

11 Q.  And in this -- okay.  Here it is.  I found it.  Page 2.

12 Mr. Oberbillig says later in September that Alex claims it's

13 not him, any telemarketing he does is by the law, right, and

14 they've only called people who call into their center.  He

15 wants to talk to Scott Novak so he can be open about how they

16 telemarket, right?

17 A.  Yes, sir.

18 Q.  That's what you told me?

19 A.  Yes, sir.

20 Q.  It was as a result of this and then you guys linked it to

21 another one called United Satellite and you decided not to put

22 him on probation; is that right?

23 A.  Sir, I did not put him on probation.

24        **THE COURT:**  I'm sorry.  What?  I can't really hear.

25

1 BY MR. GLASSER:

2 Q.  I said you -- after his defense to this one complaint, you

3 linked it to United Satellite and decided not to put him on

4 probation, right?

5 A.  Yes.  This complaint was a different retailer.  It was not

6 Mr. Tehranchi, SSN.  I did not put him on probation.

7 Q.  Okay.  And that's September of 2005, right?

8 A.  Yes, sir.

9 Q.  All right.  Now let's go to Exhibit 504.

10          MR. GLASSER:  Move the admission of Exhibit 504.

11          THE COURT:  Plaintiff's 504.

12          MS. ECHTMAN:  Your Honor, we have multiple objections.

13 There's also one where this has a complaint.

14          THE COURT:  Okay.  Well, I've explained to the jury

15 about these complaints and how they're not to take them for the

16 truth of the matter, unless the complainer is here to -- to

17 admit it or unless it's an admission.  So let's just see if we

18 can't move through this quickly.

19     Go ahead.

20 BY MR. GLASSER:

21 Q.  Okay.  So now we're in October of 2005, right?  It's one

22 month after the e-mail chain where Scott Novak talks about you,

23 me, the region, everyone warning him, right?

24 A.  Yes.

25 Q.  And a guy name Jeff Lichtenstein e-mails to Erik Carlson.

1  Who is Erik Carlson?  He's fairly high up in DISH, right?

2  A.  At that time he was in retail services.

3  Q.  What was his job?

4  A.  Overseeing retail services, our organization.

5  Q.  So a boss of you?

6  A.  No, he's not.  He's not.

7  Q.  Okay.

8  A.  It's a different department.

9  Q.  Okay.  And Mr. Lichtenstein is basically saying, hey, I

10 just got a call from a company Satellite Promotions and I was

11 under the impression that telemarketing was prohibit,

12 especially recorded messages.  You see that?

13 A.  Yes, sir.

14 Q.  Do you happen to know who Mr. Lichtenstein is?

15 A.  I don't know of him, no.

16 Q.  All right.  And then this complaint about telemarketing

17 likewise runs up the chain and gets to you, and you ask

18 somebody to figure out who it is, right, in October?

19 A.  That's correct.  Yes, sir.

20 Q.  And Leslie Fiedler does figure out who it is.  She

21 identifies Alex's call center -- Tehranchi's call center,

22 Satellite Systems Network, right?

23 A.  That's correct.

24 Q.  So this is one month after the one where you thought it was

25 them and this is another one, right?

1    **MS. ECHTMAN:** Objection to the --

2    **THE COURT:** Sustained.

3  **BY MR. GLASSER:**

4  Q. Mr. Oberbillig says: The last time this issue came up it

5  was not SSN but United. Do you see that?

6  A. Yes.

7  Q. "I will call both accounts and verify," right?

8    **MS. ECHTMAN:** Objection to discussions of other

9  retailers that don't have anything to do with this case.

10    **MR. GLASSER:** I'm just putting it in context.

11    **THE COURT:** Overruled.

12  **BY MR. GLASSER:**

13  Q. And, Mr. Ahmed, you say either way both accounts are yours.

14  "I need it fixed." Okay. And then --

15    **THE COURT:** Okay. You need to ask a question, please.

16  I'm about to stop you. This is your last warning.

17  **BY MR. GLASSER:**

18  Q. Then Mr. Oberbillig verifies to you it's SSN, right?

19  A. That's correct.

20  Q. All right. In this instance in October, it is verified

21  it's SSN, DISH internally verifies them. And my question to

22  you is you likewise did not impose any sanction on Satellite

23  Systems in October of 2005; isn't that true?

24  A. I did not put them on probation, if that's what you're

25  asking.

1  Q.  Or hold money, right?

2  A.  I did not, sir.

3  Q.  Or order them to retrain their employees, right?

4  A.  I personally did not.

5  Q.  Okay.  But you personally received -- and you're not aware

6  of anyone else doing any of that in 2005 either, are you,

7  Mr. Ahmed?

8  A.  Any complaint we immediately went to them to make sure

9  that, again, no complaints, make sure everything is compliant,

10  you are following the laws.  That is exactly what we are

11  telling Mr. Tehranchi.  We don't want that business.

12  Q.  So when I looked at the Exhibit 194, which was Scott Novak

13  saying, you know, me, you, the region, that e-mail, it looked

14  like Scott Novak was proposing, hey, we've got to do something

15  here.  Now you have a verified one.  Why did you not make the

16  decision, it's only a month later, to sanction them in some way

17  or order them to change in some way?

18  A.  This e-mail, he -- I believe he's claiming that, you know,

19  they're going to contact, he's got a relationship with existing

20  DirecTV customers, they're scrubbing the lists with these

21  customers, he feels he has the right to contact these

22  customers.  And we're saying that's fine.  We're not interested

23  in that.  Don't do it.  I believe all the issues pretty soon

24  after that stopped.  He finally got it and he stopped.

25  Q.  Well, you weren't at the company from 2006 to 2009, so you

1  don't have any personal knowledge of what stopped or didn't

2  stop.

3  A.  Before I left I think it stopped, yes.

4  Q.  All right.  So what you just testified to is this part of

5  the e-mail, right?

6  A.  Yes, that's what it says.

7  Q.  That the customer was a past customer of SSN and had

8  purchased DirecTV, SSN had recently started outbound calls to

9  all their 155,000 past DirecTV customer sales, these customers

10  are scrubbed against the most recent Do Not Call Lists.  Right?

11  A.  That's what he's telling us, yes.

12  Q.  And you're aware that Dr. Krakauer is a DirecTV person?

13  A.  Right.  And we're telling him we don't want that; that's

14  against DISH policies, guidelines; we don't want you calling

15  anyone.  That's what it says in the next paragraph.

16  Q.  And, again, on January 30th, 2007, Mr. Oberbillig sends

17  this e-mail chain to risk audit, right?

18  A.  Yes.  That's what it says.

19  Q.  Now, after 2005, DirecTV -- I mean, SSN did not -- sold

20  only DISH and didn't sell DirecTV.  Okay.

21         **THE COURT:**  Are you telling him or asking him?

22  **BY MR. GLASSER:**

23  Q.  Do you agree with me?

24  A.  I was not aware when they stopped selling -- seriously, I

25  was not aware when they stopped selling DirecTV.

1  Q.  Do you know at some point they stopped selling DirecTV?

2  A.  That's what I heard, yes.

3  Q.  When did you believe it was?

4  A.  I don't know exactly when.  I was gone from '06 to 2009

5  so --

6  Q.  When you came back, they were not selling for DirecTV,

7  right?

8  A.  I believe they were not selling DirecTV.  Not for certain,

9  but I believe they were not selling DirecTV.

10 Q.  So sometime before 2009 the SSN-DirecTV relationship

11 severed, right?

12         **THE COURT:**  Well, he already answered that, that he --

13 move on.  He's already answered that.

14 **BY MR. GLASSER:**

15 Q.  Go to PX190.

16         **MR. GLASSER:**  I move the admission of PX190.

17         **MS. ECHTMAN:**  No objection.

18         **THE COURT:**  It will be admitted.

19 **BY MR. GLASSER:**

20 Q.  This is the e-mail that Mr. Bicks showed in opening from

21 Charlie Ergen.  Do you remember this e-mail, Mr. Ahmed?

22 A.  Yes, sir.

23 Q.  All right.  And this is back June 28th, 2004, Charlie Ergen

24 e-mailing Jim DeFranco and you about how he got this message on

25 his answering machine and wanted to find out more about SSN,

1  right?

2  A.  He's inquiring about -- he received a message.  He liked

3  the script and he's inquiring about who this might be, yes.

4  Q.  All right.  And do you remember from the North Carolina

5  complaint the date that North Carolina sued to stop what SSN

6  was doing was three days before this e-mail?

7          **THE COURT:**  Okay.  Sustained.  I believe I already

8  instructed you to ask this witness about things he knows about.

9  He's testified several times he didn't know about this then.

10  **BY MR. GLASSER:**

11  Q.  All right.  So this is Satellite Systems that Mr. Ergen

12  wants to find out about and copy their technique, right?

13  A.  He wants to find out who the call came from and we respond,

14  after doing some research, that it was Satellite Systems

15  Network.

16  Q.  Okay.  And in January 2009, Mr. Oberbillig --

17  A.  2007.

18  Q.  2007, sorry.  Sends this e-mail chain to risk audit, right?

19  A.  That's what it says there.

20  Q.  All right.  Mr. Ahmed, from the e-mail we've just reviewed

21  in 2004 and 2005, it seems like a couple things were going on.

22  First, you were trying to get them to sell more DISH and less

23  Direct.  Is that fair to say?

24  A.  Yes, we wanted -- we wanted them to sell DISH Network.

25  Q.  Second, they had been elevated in the -- I guess in your --

1  you know, they had come to the attention of the very owner of

2  the company, right, through this e-mail chain we just looked

3  at?

4  A.  That's correct.

5  Q.  All right.  And you had gone to a very important person in

6  the company, Jim DeFranco, and worked your a-s-s off to get

7  them more economics.  You remember that e-mail, right?

8  A.  Yes, I did, just like any other retailer, yes.

9  Q.  And you obviously are having these other e-mails with

10 Mr. Novak and others where there are issues around

11 telemarketing coming up.  Do you agree with me?

12 A.  There's issues on prerecorded calls that have come to me;

13 and every single one of them responsibly I addressed,

14 immediately went to the account, to legal, and compliance to

15 make sure they know and for them to abide by the law and make

16 sure that they correct everything that they are doing and they

17 follow the laws; and they responded yes, they are.

18 Q.  So you don't feel -- do you felt -- did you feel like there

19 was some tension in your own mind between -- you know, the big

20 boss has kind of said, Let's go do what these guys are doing.

21 But you're getting these problems?  I mean, did you feel

22 tension over that?  Like, you didn't want to tuck your tail

23 between your legs and just --

24          **THE COURT:**  Okay.

25          **THE WITNESS:**  Excuse me.

| | |
|---|---|
| 1 | **THE COURT:** Stop. |
| 2 | **BY MR. GLASSER:** |
| 3 | Q. Did that cause consternation in your mind that they were |
| 4 | having these issues when the bosses were interested in signing |
| 5 | them up? |
| 6 | A. No, not at all, sir. I didn't feel like there any |
| 7 | issues. They're addressing that they've got one or two issues |
| 8 | that has come to me that they have resolved and they are |
| 9 | compliant. |
| 10 | Q. So now I want to just take you to the class period. You |
| 11 | came back to the company. You've already testified about a lot |
| 12 | of this. So in that period, which is 2010 to 2011, SSN still |
| 13 | was providing weekly uploads of calls made to consumers, right? |
| 14 | A. That's what you're telling me. I was not engaged. They |
| 15 | were not on my radar. I was not paying any attention to them. |
| 16 | We had a very, very strong management team overseeing the OE |
| 17 | retailers. I had many other responsibilities, sir. |
| 18 | Q. Do you have any reason to believe that -- well, that's |
| 19 | fine. Do you have any reason to believe that -- no, that's all |
| 20 | right. So, I take it you yourself were not involved in any |
| 21 | disciplinary action having to do with SSN's compliance or |
| 22 | uncompliance after you came back in 2009? |
| 23 | A. No, I was not directly involved. |
| 24 | Q. Do you agree that DISH had a records retention policy that |
| 25 | required OE retailers to keep their call records? |

 1  A.  At one point -- at some time, yes, we wanted them to

 2  keep -- I don't know when, but I believe the decision was made

 3  that they need to keep call recordings.

 4  Q.  All right.  And so if there are no records of calls after

 5  August 2011 in this case, SSN did not comply with that policy,

 6  right?

 7          MS. ECHTMAN:  Objection.

 8          THE WITNESS:  I don't know when we required that, sir.

 9          THE COURT:  All right.  So again, ladies and

10  gentlemen, you'll remember questions are not evidence.  The

11  answers are the evidence.

12  BY MR. GLASSER:

13  Q.  Well, let me ask you this.  In this case, we have call

14  records from May of 2010 to August of 2011, okay?  Are you with

15  me?

16          MS. ECHTMAN:  Objection.  Mr. Glasser is testifying

17  about --

18          MR. GLASSER:  Just setting the time frame.

19          MS. ECHTMAN:  -- something completely outside the

20  purview of anything.

21          THE COURT:  The purview of anything?  These are the

22  class records.  What do you mean outside the purview?

23          MS. ECHTMAN:  These are SSN call records.  He's

24  talking about what was produced in the case.

25          THE COURT:  Well, the jury is going to see these

1 records at some point.  So if you're just -- if you want to ask

2 him a question, obviously the jury will take the evidence when

3 the evidence comes in, but --

4          **MR. GLASSER:**  All right.

5          **THE COURT:**  But if you'll get to your question.

6 BY MR. GLASSER:

7 Q.  So we have call records in a window 2010 to 2011.  You know

8 that Dr. Krakauer was first called in May of 2009.  Isn't it

9 true that you have no reason to believe that between May of

10 2009 and the first record in this case SSN changed their ways?

11 A.  I don't understand the question, sir.  Changed their ways?

12          **THE COURT:**  Okay.  I don't understand the question

13 either.  Do you have any other questions?

14          **MR. GLASSER:**  I'm almost done, Your Honor.

15     (Pause in the proceedings.)

16          **MR. GLASSER:**  I think I'm done with this witness.

17          **THE COURT:**  All right.  We'll stop there then and come

18 back for cross-examination after the afternoon break.

19     Ladies and gentlemen, please don't talk about the case

20 among yourselves or with anyone else.  Keep an open mind and

21 don't form any opinion about the matter and leave your notes in

22 your chair.  Come back to the jury room in 15 minutes.

23     (The jury left the courtroom.)

24          **THE COURT:**  The witness can step down.

25     (The witness left the stand.)

1          **THE COURT:**  Okay.  So we're not going to have closing

2   argument in questions to witnesses.

3          **MR. GLASSER:**  Yes, ma'am.

4          **THE COURT:**  And I don't like to fuss with lawyers in

5   front of the jury, but you really gave me no choice,

6   Mr. Glasser, and I'm not -- you know, particularly when we get

7   to these areas that are not the crux of the case, not the most

8   relevant time frame, if you're going to argue with the witness,

9   if you're going to use your colorful language in your

10  questions, you know, we're going to have a problem.  All right.

11         **MR. GLASSER:**  Yes, ma'am.

12         **THE COURT:**  I'm trying to, you know, let you put your

13  case on, but the Defendant has some very good points here about

14  Rule 403 and I'm -- you know, you cannot do this.  All right?

15         **MR. GLASSER:**  Yes, ma'am.

16         **THE COURT:**  Okay.  Anything else we need to take up

17  before the jury comes in?  I mean before we take our break.

18  Excuse me.  I've gotten turned around again.  No?  All right.

19  15-minute recess.

20      (An afternoon recess was taken from 3:30 p.m. until 3:45

21  p.m.; all parties present.)

22         **THE COURT:**  All right.  Anything we need to take up

23  before the jury comes in?

24         **MR. GLASSER:**  We do have one matter, Your Honor.  On

25  Saturday night, we were delivered a couple of documents.  One

was, I think, a blast fax, or something like, that showed the
assurance of compliance was sent out, and the other was a
similar document.  Since we only got them on Saturday, they
were late disclosed and ought not be allowed to be used.  I
will note the witness already testified he did disseminate it.
So they got the evidence in, but I don't think they should be
able to use documents we've never seen until Saturday night.

        **THE COURT:**  These are Defendant's --

        **MR. GLASSER:**  85 and 86, Your Honor.

        **MS. ECHTMAN:**  Your Honor, it's not exactly accurate to
say they've never seen them.

        **THE COURT:**  I'm sorry?  Say again.

        **MS. ECHTMAN:**  It's not exactly accurate to say they've
never seen them.  These are all documents that they've produced
in the case.

        **THE COURT:**  They produced?

        **MS. ECHTMAN:**  That we produced in the case.  They've
had them the whole time.  They made a very big deal about this
AVC in their opening and with Mr. Ahmed.  It's been a
centerpiece, and so we think, in all fairness, we should be
allowed to use it.

    We had moved to exclude the AVC.  It's come in.  We should
be permitted to provide context around it and show that we --
they're going to claim they didn't need to comply with it, and
we're showing that we did.

1           **THE COURT:**  So you intend to just show it to the
2   witness and ask one or two questions about it?  Is that what
3   you're saying?

4           **MS. ECHTMAN:**  I'm not going to show it to this
5   witness.  We will likely show it to another witness and ask one
6   or two questions about it to confirm, yes, that it was sent.

7           **THE COURT:**  I couldn't hear the last thing that you
8   said.

9           **MS. ECHTMAN:**  I just wanted to be clear.  I don't
10  believe I'm going to show it to this witness, but we should --
11  but we will be showing it to a witness and ask one or two
12  questions about it, yes.

13          **THE COURT:**  Okay.  In that case, we'll take it up
14  later, and the witness can return to the witness stand.

15      Anything else as to this witness?

16          **MR. GLASSER:**  No, ma'am, not from us.

17          **THE COURT:**  All right.  You can bring the jury in.

18      (The witness returned to the witness stand.)

19          **THE COURT:**  And just be sure you're speaking into the
20  microphone.  It's a beautiful courtroom, but if you're not
21  speaking into the mike, it's hard to hear.

22          **MS. ECHTMAN:**  All right.  I hope I'm all wired up now.

23          **THE COURT:**  All right.

24          **MS. ECHTMAN:**  This battery light is red.  Does that
25  mean anything?

1    **MR. GLASSER:**  I think it means it's on actually.

2    **THE COURT:**  We'll hope for the best.  If it doesn't

3  work, you can use the --

4    **MS. ECHTMAN:**  Is it working?

5    **THE CLERK:**  I thought I could hear it.  Try it again.

6  I'm sorry.

7    **MS. ECHTMAN:**  I don't know.

8    **THE CLERK:**  Push the button again just to see.

9    **MS. ECHTMAN:**  Can you hear me now?  Can you hear me

10  now?

11    **THE COURT:**  That seems to be working.

12    (The jury returned to the courtroom.)

13    **THE COURT:**  All right.  We're ready for

14  cross-examination, and the witness is with the Defendant.

15    **MS. ECHTMAN:**  And, Your Honor, just to clarify, this

16  is going to be a direct examination of Mr. Ahmed.

17    **THE COURT:**  Okay.  Well, proceed with your questions.

18                    **CROSS-EXAMINATION**

19  **BY MS. ECHTMAN:**

20  Q.  Good afternoon, Mr. Ahmed.

21  A.  Good afternoon.

22  Q.  So Mr. Glasser asked you a number of questions today.  I'm

23  going to follow up with some more questions, and sometimes I

24  might orient you as to some of the prior questions you were

25  asked just to make sure you and the jury understand the

1  context, okay?

2  A.  Sure.

3  Q.  Now, Mr. Glasser showed you a document from 2011 that

4  talked about the indirect sales channel.  Do you recall that?

5  A.  Yes.

6  Q.  All right.  So that was a DISH document from 2011 about the

7  indirect sales channel?

8  A.  That's correct.

9  Q.  And can you describe for the jury what's encompassed within

10  that indirect channel?

11  A.  Yes.  My -- you mean my responsibilities or?

12  Q.  Yeah, what type of business that DISH does that's

13  considered indirect?

14  A.  Indirect is channels that are not sold directly by DISH?

15  Q.  Okay.  And so that includes --

16  A.  Yes, that would be the OE retailers, our telephone

17  partners, Telco -- it's called Telco --

18          **THE COURT:**  And if you can just slow down just a

19  little because -- especially when you're saying things that we

20  haven't heard before.  It's hard to take that part in.

21          **THE WITNESS:**  Yes, Your Honor.  Our OE partners, our

22  Telco Partners, our independent satellite dealers, our national

23  account partners, and I believe in there was also our broadband

24  division called Liberty-Bell.

25          **THE COURT:**  Called what?

1        **THE WITNESS:** Liberty-Bell.

2 **BY MS. ECHTMAN:**

3 Q. Okay. Mr. Glasser asked you about, in 2011, how many

4 activations had there been in the OE retailer channel. Do you

5 recall that?

6 A. Yes, it was about the budget in 2011 on that presentation.

7 Q. Okay. And do you recall what the size of the budget was

8 for all of the OE retailers?

9 A. The OE retail budget was, I believe, a little over a

10 million -- a million ninety nine, I believe.

11 Q. And can you tell us -- can you come closer to the mike,

12 please?

13 A. Yes, ma'am.

14 Q. Thank you. And can you tell the jury about the size of SSN

15 in 2011 and where it fit in the scheme of that overall budget?

16 A. I don't have exact numbers, but what I do know is that they

17 were extremely small, and they would be less than one-tenth of

18 a percent of that budget.

19 Q. Now, you also used the word Telco Partners. Can you tell

20 me what companies fit within that Telco Partners description?

21 A. Yes, that would be Windstream, Frontier Communications, and

22 TDS Telecom.

23 Q. And are those independent businesses from DISH, those three

24 companies you just mentioned?

25 A. Yes, they are.

1  Q.  So I think Mr. Glasser also asked you questions about
2  calling the OE retailer partners.  Do you remember that?
3  A.  Yes.
4  Q.  Is that a word you tend to use sometimes internally at
5  DISH?
6  A.  We -- I've always referred to them as OE retailers, but I
7  believe in there it said National Sales Partners.
8  Q.  Okay.  Mr. Glasser also asked you a bunch of questions
9  about an Assurance of Voluntary Compliance.  Do you recall
10  that?
11  A.  Yes, ma'am.
12  Q.  Okay.  Could you take out PX55?  Do you still have that
13  there?
14  A.  No, I do not.
15  Q.  We'll bring it up on the screen, if we can.  And I want to
16  specifically direct your attention to the definition of a
17  covered marketer on page 6 at 2.9.
18  A.  Yes, I see it.
19  Q.  Now, Mr. Glasser asked you about part 1 of this definition
20  of a covered marketer.  Do you recall that?
21  A.  Yes.
22  Q.  Okay.  But he didn't ask you any questions about part 2.
23  Can you tell the jury what part 2 says about the companies that
24  are included as covered marketers?
25  A.  Yes, that is anyone that is doing over 51 DISH Network

1  activations per month.

2       **THE COURT:** Slow down.

3       **THE WITNESS:** I'm sorry. That is any retailer doing

4  over 51 DISH Network activations per month. So that would be

5  independent satellite dealers, Telco Partners, national account

6  partners, the way I read that.

7  **BY MS. ECHTMAN:**

8  Q. So Mr. Glasser had said a covered marketer is -- has got to

9  be an OE retailer under Section 1, right?

10 A. That's correct.

11 Q. Okay. But if you look, is there an or there and then

12 there's a Number 2?

13 A. That's correct.

14 Q. And Number 2 is broader than the OE retailers, right?

15 A. That is correct.

16 Q. Okay. And if you also then go on and look, there's a

17 definition in here of a third-party retailer; is that right?

18 If you go to page 8, Section 2.15, and what does it say here

19 about the nature of the relationship between DISH and a

20 third-party retailer?

21 A. It says, "Third-party retailer shall mean one or more

22 independent persons, a corporation, a partnership, or any other

23 type of entity, as the case may be, that is authorized by DISH

24 Network to offer, lease, sell, service, advertise, and/or

25 install DISH Network services and/or DISH Network goods."

1  Q.  Okay.  And, specifically, there's the word "independent" in
2  there, right?
3  A.  Yes, ma'am.
4  Q.  Does that tell you anything about the nature of the
5  relationship between DISH and the third-party retailers?
6  A.  Yes, they're independent business owners.
7  Q.  Thank you.  Now, Mr. Glasser also asked you questions about
8  your role at DISH and what you were the boss of in 2011.  In
9  2011, did -- were you the supervisor or boss of a number of
10  people at DISH in that time period?
11  A.  Yes, I was.
12  Q.  Now, for SSN, who is the boss of the people who worked at
13  SSN in 2011?
14  A.  That would be -- SSN, I would assume it would be Sophie
15  Tehranchi.
16  Q.  At that time it was Sophie Tehranchi.  Do you understand
17  she's Alex Tehranchi's sister?
18  A.  Yes, that's my understanding.
19  Q.  You weren't the boss -- were you ever the boss of the
20  people who worked at SSN?
21  A.  No.
22  Q.  Okay.  We also -- Mr. Glasser asked you questions about
23  being -- about whether you were the founder of the OE tool.
24  Are you a computer programmer?
25  A.  I'm sorry.  No, I'm not very talented in IT.

1  Q.  Can you explain for the jury exactly what the OE tool or

2  the OE platform is?

3  A.  From its origination?

4  Q.  Where did it come from, how did it develop, just give them

5  some background, please.

6  A.  The OE tool was developed when we did a partnership with

7  AT&T.  They were selling our video services back in 2002, and

8  so we developed a program where we can -- they can process an

9  order for a customer, and we would do the installation; but

10  from its inception, the OE tool has always existed because that

11  is the platform for any channel to process an order.  It's just

12  little variations.  Do we do the install or does someone else

13  do the install?  There's -- the platform has always been there

14  to process an order.

15  Q.  So when you say the platform has always been there, when

16  you talk about the independent satellite retailers, the 3,500,

17  do they use a similar platform to the order entry platform?

18  A.  It's almost identical.  It's just called R Connect.  The

19  only difference is -- same platform, same order entry, step by

20  step on the terms and disclosures, equipment, the programming,

21  the fees.  The only difference is the independent satellite

22  retailer does their own installation.  The OE tool gives the

23  option to the customer or the retailer the availability of an

24  installation date because we perform the installation.

25  Q.  So the difference is scheduling an installation through the

1  tool?

2  A.  Yes, ma'am.

3  Q.  But -- so the independent satellite retailers, they can use

4  the Internet to access DISH's billing system to input an order?

5  A.  Yes, it's called R Connect.  It's a similar tool.  They

6  process the same order.

7  Q.  And you said this particular tool was developed for AT&T,

8  and so why was it specifically developed for AT&T?

9  A.  Because AT&T was the first retailer of ours, partner of

10  ours that we did the installations for on a national scale.

11  They did not want to carry inventory.  This is a telephone

12  company.  So we created a program for them, took our current

13  program that -- the R Connect, let's just say, and we said,

14  okay, we can go out there.  Once we have an installation

15  capability, we can build a calendar in it so we can deliver the

16  hardware for AT&T, service the customer, install the customer.

17  Q.  And is AT&T an independent company from DISH?

18  A.  It's AT&T, yes.

19  Q.  Do you direct and control the day-to-day activities of

20  AT&T?

21  A.  No.

22  Q.  And are you still doing that business with AT&T?

23  A.  Not today, no.  They purchased DirecTV.

24          **THE COURT:**  I'm sorry?  What?

25          **THE WITNESS:**  I'm sorry.

1  **BY MS. ECHTMAN:**

2  Q.  Go ahead.  I'm sorry.  I interrupted you.

3  A.  No, we were not doing business with AT&T.  They acquired

4  DirecTV.

5  Q.  So today AT&T owns DirecTV?

6  A.  Yes, they do.

7  Q.  And I think we talked a lot -- DirecTV is your biggest

8  competitor?

9  A.  Yes, to this day.

10  Q.  But you have other competitors, too, right?

11  A.  Cable companies, and today is totally different.  You've

12  got Netflix, Amazon, the OTT platform, many competitors.

13  Q.  What is OTT, just for the jury?

14  A.  That's over-the-top.  So those are companies like Netflix,

15  Amazon, Hulu, YouTube, Sony Television, Sling, those companies.

16  There's different video providers now.

17  Q.  You mentioned Sling.  Is that -- Sling TV, is that a DISH

18  Network over-the-top service?

19  A.  Yes, it is.

20  Q.  All right.  So let's just go back.  So you developed this

21  particular type of tool for AT&T.  Did you use it for any other

22  big companies like AT&T?

23  A.  Yes.  We were doing a lot of business with RadioShack and

24  Sears.  RadioShack was the second one that we put on the

25  program, and it was important for them.  RadioShack had close

1  to 5,500 independent stores.  They carried the hardware -- DISH

2  Network hardware in all the stores.  We have multiple skews of

3  the hardware, meaning different types of receivers, and they

4  were using a third-party installation arm to do all the

5  installations.  So you can imagine the amount of hardware they

6  had to carry, how many skews they had to carry, the

7  distribution that they had, the returns.

8      So when we developed this installation program for AT&T, we

9  came to RadioShack, and we said, guess what, we can take you

10  out of the hardware business, and all you have to do is talk to

11  the customers in the store.  We'll give you a tool to qualify

12  them, to sell them on our promotions, schedule an installation,

13  and we'll perform the installation for you.  We did that for

14  RadioShack.  We also launched Sears on that program.

15  Q.  So, now, are RadioShack and Sears independent companies

16  from DISH?

17  A.  Yes.

18  Q.  Does DISH ever control the day-to-day activities of

19  RadioShack and Sears?

20  A.  No, ma'am.

21  Q.  But you said they used a tool just like the one you

22  provided to SSN; is that right?

23  A.  That's correct.

24  Q.  And so at what time did -- what time, if any, did you allow

25  retailers to use this similar tool?

A.   This was the latter part of 2003.  We started with some
large independent satellite dealers.  The -- at that time there
were more than 3,500, but these were independent satellite
dealers that worked in their specific communities.  They're
mom-and-pops across the country.  I'm sure there's many in
North Carolina, one in Greensboro, and they -- there's some
that were very large.  They did tremendous amount of
advertising in their community, in their area.

And our idea was that if you can go and figure out how to
advertise -- as an example, in Houston, which was one of our
first retailers on it, in Houston, you'd know how to market via
television, newspaper ads, direct mail adds.  Then why can't
you take that type of advertising and go to a different city.
The issue was for them to go to a different city, they didn't
have the operations.  They didn't have the infrastructure.
They didn't have the installation capability.  They had to hire
vans, installers, open up facilities.

So we said, look, if you know how to market, you know how
to drive calls, we've got something for you.  We can help you
expand your business, and so we launched some independent
satellite dealers on the OE tool.  What they did was where they
had their current operation, they would still be an independent
dealer.  They would do the installation, service their
customer, because that's in their community, but outside that,
we would do the installation.

1  Q.  And at some point, I think it was in 2004 you testified

2  earlier, SSN came onto the OE tool and became an OE retailer?

3  A.  Yes, I believe it was around May of 2004.

4  Q.  But prior to that, SSN had already been a retailer with

5  DISH, right?

6  A.  That's correct.  They're an independent satellite dealer.

7  Q.  Did the development of this OE tool, this OE platform, have

8  anything to do with outbound telemarketing?

9  A.  No.

10  Q.  Why not?

11  A.  Didn't know too much about it.  Not a good form, in my

12  opinion, to do business.  Again, I think we talked about it

13  earlier.  It's about getting an educated customer.  What I mean

14  by educated is a customer, when they see an add, they make a

15  decision.  They know who their provider is.  They know how much

16  they're paying, what their content needs are, meaning

17  programming, and then they're making a decision that maybe DISH

18  Network is a better option for me, and then they take the

19  initiative and inquire and they call.  So that's a better form

20  of advertising and getting a long-term customer.

21  Q.  And as we discussed, there was just a slight difference

22  between the OE tool and the tool that every other retailer was

23  using, and that relates to the scheduling of the installations?

24  A.  That is correct.

25  Q.  All right.  Now I'm going to show you another document that

1  you looked at with Mr. Glasser, but I'm going to ask you a few

2  questions about it that Mr. Glasser didn't ask you.

3         **THE COURT:**  Okay.

4         **MS. ECHTMAN:**  We have it marked as JTX3, and just for

5  ease of reference, Your Honor, is it all right if we bring a

6  small notebook up to the witness?

7         **THE COURT:**  Yes.  And I'm sure you all have figured

8  out that JTX just means joint trial exhibit.

9         **MS. ECHTMAN:**  Your Honor, this has already been

10 admitted into evidence.  If I might publish it?

11        **THE COURT:**  What exhibit is it?

12        **MS. ECHTMAN:**  This is the e-mail chain involving

13 Mr. Ergen from June -- that starts on June 28, 2004.

14        **THE COURT:**  Okay.  Any objection to that?

15        **MR. GLASSER:**  No, ma'am.

16        **THE COURT:**  It will be admitted.  At some point,

17 somebody needs to tell the clerk the Plaintiff's exhibit number

18 just for her records.  Go ahead.

19 **BY MS. ECHTMAN:**

20 Q.  So I want you to take a look, please, at page -- page --

21 the last page of this exhibit.

22 A.  Okay.

23 Q.  And on that page, Mr. Ergen -- can you tell everyone who

24 Mr. Ergen is?

25 A.  Yes, CEO chairman, co-founder of DISH Network.

1  Q.  On that e-mail -- on Monday, June 28th, 2004, at 2:14 p.m.,

2  Mr. Ergen sent an e-mail to Jim DeFranco, and we talked about

3  who Jim DeFranco is.  Co-founder of DISH, correct?

4  A.  Yes.

5  Q.  Michael Kelly -- can you tell everyone who Michael Kelly

6  is?

7  A.  Yes, Michael Kelly was at that time head of the call center

8  installation group.

9  Q.  And that's DISH's internal call center?

10 A.  Yes.

11 Q.  It went to you and also somebody named Michael Schwimmer.

12 Can you tell everyone who Michael Schwimmer is?

13 A.  Yes, Michael Schwimmer was head of programming.

14 Q.  And you already talked about this before.  Mr.Ergen said he

15 had a call on his answering machine at the ranch over the

16 weekend, right?

17 A.  Correct.

18 Q.  And does Mr. Ergen say anything about what he did after he

19 got that call?

20 A.  Yes, he called back the 800 number, and they -- he says, "I

21 called, and they tried to sell me DirecTV."  When I asked I --

22 "When I said I lived in an apartment, well, they said they

23 could sell me DISH Network since DirecTV does not sell to

24 apartments."

25 Q.  And then he goes on to say, "Check them out."  Is that

1  right?

2  A.  That's correct.

3  Q.  Okay.  And he wanted to know who is it, and "what's their

4  churn with us"?

5  A.  That's correct.

6  Q.  Can you tell the jury what churn is?

7  A.  Churn is -- that is -- when a customer disconnects, we call

8  that as churn.

9  Q.  And do you know why Mr. Ergen was concerned about churn?

10 A.  Yes.

11        **MR. GLASSER:**  Objection.  Another person's mind.

12        **THE COURT:**  Well, you can rephrase the question.

13 **BY MS. ECHTMAN:**

14 Q.  Mr. Ahmed, how many years have you worked with Mr. Ergen?

15 A.  Since 1993.

16 Q.  Do you know what Mr. Ergen's concerned about in running

17 DISH's business?

18 A.  Yes, it's my concern also.  It's churn, and, basically,

19 what's happened here is he contacted them back.  They tried to

20 sell him DirecTV.  He immediately said, but I live in an

21 apartment, and they pitched him on DISH; and like we discussed

22 earlier, we do sell to apartments, but, again, apartment --

23 apartment customers tend to be more transient.  They move a

24 little bit more often than customers that own single-family

25 homes.  There are other issues, such as landlord permission.

1   There are issues as it relates to the satellite being mounted.

2   The satellite has to be mounted southeast -- facing southeast

3   to face the satellites.  So there are some issues on that, too,

4   in terms of sites.  So, obviously, in his mind, if they only

5   tried to sell DISH to apartments, then the churn would be

6   higher, higher disconnect for customers.

7   Q.  Because someone might disconnect when they move?

8   A.  That's correct, at a much faster rate.

9   Q.  And did Mr. Ergen actually live in an apartment?

10  A.  No, he does not.

11  Q.  And so Mr. Ergen wanted to know who it was?

12  A.  That's correct.

13  Q.  And did you find out for him?

14  A.  Yes, I did.

15  Q.  And then you told him it was Satellite Systems Network,

16  right?

17  A.  That's correct.

18  Q.  And you told him that they were a DirecTV retailer?

19  A.  Yes, I did.

20  Q.  Okay.  And then Mr. Ergen said, "Why don't we just copy

21  their techniques."  Do you see that?

22  A.  Yes.

23  Q.  Okay.  And did Mr. Ergen, when he talked about -- when he

24  sent you an e-mail about the answering machine message, ever

25  say anything about a prerecorded message?

1  A.  No, he did not.

2  Q.  Did you have any indication in this e-mail that Mr. Ergen

3  received a prerecorded message on his answering machine at his

4  ranch?

5  A.  No.

6  Q.  Okay.  And based on your many years of experience working

7  with Mr. Ergen, what was your understanding about what he

8  wanted to know about their techniques and what he might have

9  wanted to copy?

10  A.  I believe when they -- when he called them, they called --

11  he called them, their pitch on DISH was pretty good, and he

12  wanted the entire script.  I think the way they tried to

13  qualify him in terms of what his needs are, this is the

14  benefits of DISH, even though he said apartment, I think he was

15  interested in that.

16  Q.  And why would he want to copy them?

17  A.  He --

18  Q.  If they're selling DISH, why does he want to copy them;

19  they're already selling DISH?

20  A.  He liked the script, and we just wanted to see if there's

21  something in there that we could learn in terms of our script

22  when we tried to qualify a customer and pitch them on DISH

23  Network.

24  Q.  Does DISH do its own pitching on DISH Network?

25  A.  That's correct.

1  Q.  And so what did you do in response to Mr. Ergen's e-mail?

2  A.  I contacted, it looks like, Mike Oberbillig, who's the

3  account manager, and asked if he can get ahold of the script.

4  Q.  And did Mike try to get ahold of the script?

5  A.  Yes, he said he talked to Alex, and Alex would not provide

6  the script.

7  Q.  So that was Alex Tehranchi at SSN.  Mike Oberbillig, who

8  worked for you, had a conversation with him, and he said, no,

9  can't have the script?

10  A.  That's correct.

11  Q.  And --

12         **THE COURT:**  And just -- I'm sorry.  This is a script

13  about DirecTV, correct?

14         **THE WITNESS:**  It could be both.  I believe they

15  pitched him on DirecTV and DISH.  I don't know exactly, but I

16  believe he was more interested in the DISH script.

17         **THE COURT:**  All right.  Go ahead.

18  **BY MS. ECHTMAN:**

19  Q.  And were you asking for the message that was left on Mr.

20  Ergen's answering machine?

21  A.  No.

22  Q.  What were you asking for?

23  A.  For the entire script and how they qualified and promoted

24  DISH to him in terms of the benefits and why he should be a

25  DISH subscriber.

1  Q.  Is that something you consider a sales pitch?

2  A.  That is a sales pitch.

3  Q.  And then you learned that Mr. Tehranchi said, no, he

4  wouldn't give Mike Oberbillig the script?

5  A.  That's correct.

6  Q.  What, if anything, did you do next?

7  A.  I probably dropped it, didn't do anything.

8  Q.  Did you have -- did you tell Mike Oberbillig to go back and

9  tell Mr. Tehranchi he's got to give us the script?

10  A.  No.

11  Q.  Why not?

12  A.  Because of two reasons:  We're not legally bound to get the

13  script, it's his sales script, it's proprietary, and I don't

14  believe he would have given us the script regardless because

15  we're his competitor also.  We're competing for the same

16  household.

17  Q.  And why wouldn't Mr. Tehranchi just give you his script?

18  A.  We're not legally bound, and it's his script.  It's his

19  sales script.

20  Q.  And as a matter of practice, did you think you had any

21  right to demand that he give you the script?

22  A.  No.

23  Q.  When Mr. Glasser asked you questions about later in the

24  2009 time period when you came back to DISH and folks at DISH

25  were reviewing recordings of phone calls from SSN, at that

1  point did DISH have access to an SSN script?

2  A.  Yes, but if we got a script, we were interested in the

3  terms and disclosures of the script to make sure our product is

4  represented correctly.

5  Q.  How did you get Alex or Sophie Tehranchi agree to let you

6  have access to the script later on?

7  A.  If any retailer gave us a script, we -- it's proprietary to

8  them.  We cannot use it.  We probably told them we cannot use

9  it.  We will not share it with anyone else.  It's the

10 retailer's script.

11      **MR. GLASSER:**  Objection.  Move to strike.  We probably

12 told them?  This witness has no personal knowledge.

13      **THE COURT:**  All right.  The jury can take that into

14 account in evaluating the weight.

15      Go ahead.

16 **BY MS. ECHTMAN:**

17 Q.  Okay.  And in Mr. Oberbillig's e-mail to you on June 30,

18 2004, did he tell you anything about the marketing methods that

19 SSN was using?

20 A.  Yes, he's saying that he's doing -- all his telemarketing

21 is live, but he's focusing more -- that telemarketing is going

22 to be less than -- close to less than 1 percent of his

23 business.  He's focusing all his business towards TV,

24 newspaper, and aggressive direct mail campaigns.

25 Q.  And what, if anything, did you think about that particular

1 marketing plan?

2 A.  Liked it.  That's what I'm used to.  That's where the

3 advertising was.

4 Q.  Okay.  And he says that his telemarketing is going to be

5 what percent of his business?

6 A.  Less than 1 percent.

7 Q.  And does he say anything about whether he's using

8 prerecorded messages to make telephone calls?

9 A.  No, he does not.

10 Q.  How does he describe his telemarketing?

11 A.  That it's all done live.

12 Q.  And did SSN have the ability to decide what type of

13 marketing methods it wanted to use?

14 A.  Yes, it's their responsibility to decide what marketing

15 they want to use.

16 Q.  Did -- did you or anyone else at DISH ever tell them they

17 had to do a particular type of marketing?

18 A.  No.

19 Q.  Why not?  You said you liked particular marketing.  Why

20 wouldn't you just tell them to do that type?

21 A.  We -- we could have, but it's their responsibility.

22 They're an independent contractor.  They're the ones that are

23 spending the dollars.  It's their exposure.  So it's their

24 responsibility based on what marketing they want to do.  As

25 long as they're doing it correctly, that's good; but, yes, I'm

1  sure the field told them this is a good way.  I'm glad you're

2  going to direct mail, newspaper, and television adds.  That's

3  good.

4  Q.  But direct -- but the field couldn't tell them you have to

5  do direct mail?

6  A.  No.

7  Q.  Could the field tell them how they're going to spend their

8  marketing dollars?

9  A.  No, they could not.  No, they could not.

10  Q.  I'd like to -- you to turn to JTX1, which is the 2006

11  retailer agreement that Mr. Glasser asked you a bunch of

12  questions about.

13  A.  Yes.

14  Q.  And, specifically, I want to direct your attention to

15  paragraph B of the introduction here.

16  A.  Okay.

17  Q.  Can you read that particular paragraph, please?

18          **THE COURT:**  Slowly.

19  **BY MS. ECHTMAN:**

20  Q.  Slowly.

21  A.  "Retailer, acting as an independent contractor, desires to

22  become authorized on a nonexclusive basis to market, promote,

23  and solicit orders for programming, as defined below, an

24  authorized retailer, in accordance with and subject to the

25  terms and conditions of this agreement."

1  Q.  Can you tell me why is that statement right up there,

2  paragraph B of the introduction, on the first page of the

3  agreement?

4  A.  Because they're independent businesses.  They own and

5  operate and manage their own business.

6  Q.  And Mr. Glasser asked you a lot of questions about the term

7  "nonexclusive," and he asked you about whether or not exclusive

8  meant they didn't have any exclusive DISH territory.  Does

9  nonexclusive mean anything else with respect to the retailer?

10 A.  Yes, that they could sell other competing products or any

11 product.

12 Q.  And so they're allowed to sell your main competitor,

13 DirecTV?

14 A.  Yes.

15 Q.  And could they sell any other competitors?

16 A.  Yes, they could sell cable products, any video product,

17 yes.

18 Q.  And could they sell products that have nothing to do with

19 DISH's line of business?

20 A.  Yes, of course.

21 Q.  Okay.  I'd like you to turn to paragraph 11 of the

22 agreement, and that's on page 21.

23 A.  Yes.

24 Q.  Mr. Glasser showed you only the first line of this

25 particular paragraph.

| | |
|---|---|
| 1 | **THE COURT:** Okay. Well, just move to what you want to |
| 2 | ask him about. |
| 3 | **BY MS. ECHTMAN:** |
| 4 | Q. All right. Can you tell me what the first two lines of |
| 5 | this paragraph address? |
| 6 | A. Yes, that they're independent contractors, and they are not |
| 7 | agents or employees of DISH. |
| 8 | Q. And SSN agreed to that provision in this 2006 retailer |
| 9 | agreement? |
| 10 | A. Yes, they did. |
| 11 | Q. And then at -- can you tell me what the last two lines of |
| 12 | this paragraph say, which weren't previously shown to you? |
| 13 | A. Would you like me to read it? |
| 14 | Q. Please read what the last two lines of the paragraph say. |
| 15 | A. "This agreement does not constitute any joint venture or |
| 16 | partnership. It is further understood and agreed that retailer |
| 17 | has no right or authority to make any representation, warranty, |
| 18 | promise, or agreement or take any action for or on behalf of |
| 19 | EchoStar or any affiliate of EchoStar." |
| 20 | Q. Did SSN agree to that as well? |
| 21 | A. Yes, they did. |
| 22 | Q. Can you explain to the jury what the purpose of these |
| 23 | provisions is? |
| 24 | A. Yes, they're an independent contractor, meaning they're |
| 25 | independent businesses. They own, operate, and manage their |

1  own business.

2  Q.  And if you look at the sixth line of this agreement,

3  starting with the word "notwithstanding," does this -- does it

4  say anything about whether SSN is allowed to use DISH Network's

5  name or represent itself to be DISH?

6  A.  No, it does not.

7  Q.  Does it say --

8  A.  They cannot use DISH's name or represent themselves as DISH

9  Network.

10 Q.  And why not?  Why can't they say that they're DISH Network?

11 A.  Because, again, they're an independent business.  They're

12 not DISH.

13 Q.  Okay.  And it specifically says they can't hold themselves

14 out to the public or represent that they are EchoStar or an

15 employee, subcontractor, affiliate, agent, or subagent of

16 EchoStar or any EchoStar affiliate.  Do you see that?

17 A.  Yes.

18 Q.  And as we discussed previously, EchoStar is DISH, correct?

19 A.  That's correct.

20 Q.  And does this paragraph say who's in charge of SSN's

21 employees?

22 A.  That would be SSN.

23 Q.  Now, I want to turn to paragraph 7 of the retailer

24 agreement, and I'll take you to the page -- or Section 7.

25 That's on page 17, please.

1  A.  Yes.

2  Q.  Can you tell us, what's the title of paragraph 7?

3  A.  "Orders."

4  Q.  What are orders?

5  A.  Orders are the DISH services that the customer is

6  purchasing.

7  Q.  So is an order something like an activation at all?

8  A.  No, it's the -- just like any order, like you order

9  something off a restaurant, but it's to put all the hardware,

10  programming, all those things in a specific order, which is in

11  our platform, right.

12  Q.  You said it's like a menu when the customer says these are

13  the particular DISH services that I want?

14  A.  Right.

15  Q.  Is that correct?

16  A.  That's correct.

17  Q.  I think that's easier to understand.  Thanks.  Let's go --

18  is there any difference between an order and a sales pitch?

19  A.  Yes, this is specifically about what product and services

20  the customer is purchasing.

21  Q.  So let's look at Section 7.3.  Section 7.3 mentions

22  promotional programs.

23  A.  Yes.

24  Q.  Can you explain what a promotional program is?

25  A.  Sure.  That is a consumer promotion that we have in the

1  market for the customers to purchase.  So we usually would --

2  at that time we would change it to two to three times a year,

3  and that is the offer that we made to the customers for DISH

4  Network.

5  Q.  And where this section mentions business rules, can you

6  tell me how business rules relate to promotional programs?

7  A.  Yes.  We need to have business rules to explain each

8  consumer promotion or the promotional programs because you need

9  to explain what it constitutes, meaning what programming

10 packages are available, what hardware is available, what the

11 pricing is, are there additional fees.  All those are our

12 business rules explaining the consumer promotion.

13         **THE COURT:**  We're getting a little feedback on the

14 mike there.

15         **THE WITNESS:**  I'll step back.

16         **THE COURT:**  Apparently, there's a sweet spot.  You

17 might be just a little too close.

18         **THE WITNESS:**  Thank you.

19 **BY MS. ECHTMAN:**

20 Q.  From time to time, does DISH change its promotional

21 program?

22 A.  Yes, at least twice a year.

23 Q.  And are there a lot of details about each of those

24 promotional programs and how they work?

25 A.  Yes, they're very detailed.

1  Q.  And so when you were asked questions about training on

2  promotional programs, can you explain what that training is

3  about?

4  A.  Sure.  First of all, it depends on what equipment is

5  included in the promotion because it varies based on who the

6  consumer is and what they qualify for.  There's different types

7  of equipment.  There are charges for specific equipment, such

8  as DVR fees.  Some do not have DVR fees.  Some have high

9  definition fees.  Some do not.  There are programming packages

10  with a variety of costs.  There are additional charges as it

11  relates to additional equipment, as an example, meaning if a

12  customer needs four, five, or six receivers, there might be

13  some additional costs.  So it's very detailed, and you have to

14  make sure you match those up and you understand exactly what

15  each of the consumer promotions are so it's accurately

16  explained to the customer.

17  Q.  And so when you saw the document that explains the OE tool,

18  there was a section with some things that needed to be read.

19  Did those relate to the details of the different promotional

20  programs that are available?

21  A.  It's based on the offer that we have.  It would explain key

22  promotional -- or key terms and disclosures on it.

23  Q.  And why did you want a retailer who might be using the OE

24  tool to read off what the details are of the promotional

25  program?

1  A.  Because everything is about customer service.  It's about

2  the customer.  If you're advertising a special promotion, you

3  have to accurately explain it to the customer, and that's what

4  it is.  It's a promotion.  So if I can elaborate a little bit

5  more?  Whether it's us or the competition, there's always going

6  to be a promotional price.  Okay.  And if you don't explain, as

7  an example, that your price is just for the first 12 months,

8  it's discounted, month 13, your bill is going to go up.  You

9  have to explain that.  If the customer is buying a DVR

10  receiver, you have to let them know that there's a charge for

11  the DVR receiver or the customer might think it's free.  If

12  they're -- if the agreement is for two years, the customer

13  needs to understand that it's for two years, and there's some

14  charges if they disconnect and do not return the equipment.  So

15  I can go on and on, but it's very important for the customers

16  to understand exactly the terms and conditions and the

17  retailers to explain it.

18  Q.  So separate and apart from the terms and conditions of

19  programming packages and what a customer needs to know when an

20  order is being taken, I want to talk about a sales pitch.  Have

21  you ever considered in practice that DISH had the right to

22  control SSN's sales pitch?

23  A.  No.

24  Q.  And why not?

25  A.  Because the -- the retailers feel that they understand it

better than us, to be honest.  They feel that they have better

marketing expertise.  It's their dollars that they're spending,

and we just -- you know, we're concerned about providing a

great consumer offer, that the customers hopefully do want to

purchase DISH, and we want to make sure that the terms and

conditions are accurately represented honestly to the customer.

Q.  Are terms and conditions sales pitches?

A.  No, they're not.

Q.  And so, in practice, did DISH have control over SSN's

marketing sales pitch strategies?

A.  No, we did not.

Q.  Who decided whether SSN would use the TV, the newspaper, or

direct mail, or telemarketing?

A.  That would be SSN.

Q.  And did DISH ever require SSN to invest in a particular

type of marketing?

A.  No.

Q.  And did DISH ever have the power to require SSN to invest

in a particular type of marketing?

A.  No.

Q.  Who paid for SSN's marketing?

A.  SSN would.

Q.  To your knowledge, did DISH ever tell SSN that it should

telemarket?

A.  No.

1  Q.  To your knowledge, did DISH ever provide SSN with telephone

2  numbers to use in any marketing?

3  A.  No.

4  Q.  And who decided how many employees SSN might have in its

5  call center?

6  A.  That would be SSN.

7  Q.  And who decided what time SSN's employees should show up at

8  SSN's offices?

9  A.  SSN would.

10  Q.  And who decided what time SSN's employees should go home?

11  A.  SSN.

12  Q.  Who selected SSN's management team?

13  A.  That would be SSN.  I assume the owner at that time, Alex

14  or Sophie.

15  Q.  And who made arrangements for SSN's office space?

16  A.  SSN would.

17  Q.  Did SSN have its own office space?

18  A.  Yes.

19  Q.  Did you ever have an opportunity to go to SSN's office?

20  A.  Yes, I did, once in 2004.

21         **THE COURT:**  In two thousand what?

22         **THE WITNESS:**  I'm sorry.  2004.

23  **BY MS. ECHTMAN:**

24  Q.  And that was SSN's office?

25  A.  That's correct.

```
 1  Q.  And in 2004, when you went there, who did you meet?
 2  A.  I met Alex Tehranchi for about 30 minutes in a
 3  meet-and-greet.
 4  Q.  Other than that conversation you had with Alex Tehranchi in
 5  2004, did you ever have any other conversations with him?
 6  A.  No, I did not.
 7  Q.  And who arranged for all the equipment that might have been
 8  in SSN's offices when you were there?
 9  A.  SSN would.
10  Q.  Who paid for that equipment?
11  A.  SSN.
12  Q.  Who decided what that equipment would be?
13  A.  SSN.
14  Q.  And who obtained SSN's telephone systems?
15  A.  SSN would.
16  Q.  Who obtained SSN's website, if they had one?
17  A.  SSN.
18  Q.  And who obtained -- who maintained SSN's website?
19  A.  SSN would.
20  Q.  And who managed SSN's day-to-day operations?
21  A.  I assume it would be Alex.
22  Q.  Did DISH ever want to control the day-to-day operations of
23  SSN?
24  A.  No.
25  Q.  And even if you had wanted to, as a practical matter, could
```

1  you have ever controlled the day-to-day operations of SSN?

2  A.   No.

3  Q.   Why not?

4  A.   One, they wouldn't let us.  They're -- they were their own

5  business, but it's not SSN.  We're talking about they're an

6  independent contractor and do better business.  We have

7  thousands of them.  We couldn't manage or control thousands of

8  businesses.  It's impossible, not that we would want to either.

9  Q.   Did you have resources to send someone to SSN every day?

10 A.   That's not possible.

11 Q.   And based on your experience of working with retailers over

12 the years, how do you think SSN would have reacted if DISH

13 tried to control its day-to-day operations?

14 A.   They would resist.  That would not happen.

15 Q.   Did you -- did DISH put this -- ever think that this

16 Section 11 in -- about independent contractor in the retailer

17 agreement had anything to do with avoiding responsibility for

18 anything?

19 A.   No.

20 Q.   Was it about what you understood the relationship to be?

21 A.   Yes, they're independent contractors.

22 Q.   I want you to turn to paragraph 9.1 of the agreement on

23 page 18.

24 A.   Yes.

25 Q.   Okay.  What is paragraph 9.1 about?

```
 1   A.   It's compliance -- compliance with laws.
 2   Q.   And if you look specifically at the last sentence of this
 3   paragraph, whose responsibility is it to comply with the law
 4   under this contract with SSN?
 5   A.   The retailer, which would be SSN.
 6   Q.   Was it ever okay with DISH for SSN to violate the law in
 7   any way?
 8   A.   Never, no.
 9   Q.   Did you ever, at any time, acquiesce in SSN violating the
10   law?
11   A.   No.
12   Q.   What did you do if you found out that there was a complaint
13   about a potential violation of the law?
14   A.   Immediately contacted Retail Services & Compliance, the
15   account management team; at times, legal, to contact the
16   retailer and make sure there's a complaint came in and for them
17   to immediately fix it and comply with the laws.
18   Q.   If you'd please look at paragraph 17.5, and I'll give you a
19   page number.  That's on page 27.
20   A.   Yes.
21   Q.   Do you see that paragraph?
22   A.   Yes.
23   Q.   Okay.  And so, that paragraph says that this is the entire
24   agreement.  Do you see that?
25   A.   Yes.
```

1  Q.  Okay.  And it specifically says here that the parties --

2  and the parties to this are DISH and SSN; right?

3  A.  That's correct.

4  Q.  The parties specifically acknowledge that there are no

5  unwritten side agreements or oral agreements between them which

6  alter, amend, modify, or supplement the agreement.  Do you see

7  that?

8  A.  Yes.

9  Q.  Okay.  And did you understand that to be accurate, that

10 there were no unwritten side, oral agreements between DISH and

11 SSN?

12 A.  That's correct.

13 Q.  Did DISH ever, to your knowledge, have any unwritten side

14 agreements with SSN?

15 A.  No.

16 Q.  So, the writings are the whole contract?

17 A.  That's, yes, the entire agreement.

18 Q.  Now, I want to bring your attention back to another

19 provision on page 19, Section 9.5.  Do you see that?

20 A.  Yes.

21 Q.  In that provision, the title is, "Subscriber Information."

22 Do you see that?

23 A.  Yes.

24 Q.  Now, Mr. Glasser asked you questions about whether this

25 might have applied to all of the telephone calls that SSN made

1  when it was telemarketing.  Does this apply to every phone call
2  that SSN ever made?
3  A.  No.  This is specific to subscribers.  When they activate
4  and become our subscriber, we want to protect that consumer's
5  information.  I think that's the right thing to do.
6  Q.  Okay.  So this only applies to people who have actually
7  signed up for DISH's services?
8  A.  Yes.
9  Q.  It doesn't apply to every person that SSN might have called
10  on the telephone?
11  A.  That's correct.
12  Q.  All right.  So now, I want to show you -- you also looked
13  at JTX -- another retailer agreement with Mr. Glasser from
14  2010.  I'm not going to walk through that.  Is that the same in
15  all material respects?
16  A.  Yes.
17  Q.  Okay.  And so now, I want to show you -- I want you to look
18  at DX84, which is in your binder.
19      **MS. ECHTMAN:**  And, Your Honor, I want to move this --
20  first I'll ask you.
21  **BY MS. ECHTMAN:**
22  Q.  Do you recognize DX84, please?
23  A.  Yes.  It's a retailer agreement.
24  Q.  Okay.  And who are the parties to this retailer agreement?
25  A.  SSN and DISH.

1    **MS. ECHTMAN:**  Your Honor, I'd like to move this --

2  **BY MS. ECHTMAN:**

3  Q.  What's the date of this particular retailer agreement?

4  A.  March 7, 2001.

5         **MS. ECHTMAN:**  Your Honor, I'd like to move this

6  particular agreement into evidence, please.

7         **MR. GLASSER:**  No objection.

8         **THE COURT:**  It will be admitted.

9  **BY MS. ECHTMAN:**

10  Q.  Okay.  So now, I want to take your attention back -- you

11  can put that aside.  I'd like to bring you back to the

12  Assurance of Voluntary Compliance, PX55, that you talked about

13  for a few minutes.  Now, you were asked a lot of questions

14  about words, and so I want to show you something at the top

15  here.  It says "voluntary."  Do you see that?

16  A.  Yes.

17  Q.  What does "voluntary" mean?

18  A.  Exactly what -- it's voluntary.  You can help me with the

19  explanation, but --

20  Q.  It means nobody forced this on them?

21  A.  Yes, it's voluntary, yes.

22  Q.  And under the retailer agreement, SSN already had to comply

23  with the law; right?

24  A.  Yes.

25  Q.  Okay.  You can put that aside.

1  A.  Okay.

2  Q.  Okay.  I also want to show you -- we're going to go back to

3  PX186, which is that North Carolina court document that you saw

4  earlier.  If you could bring that up, PX186.

5  A.  Yes.

6  Q.  Now, I want you to look at the title on that.  There's a

7  word there.  It says, "Judgment by Consent," and "Stipulated

8  Permanent Injunction."  Do you see that?

9  A.  Yes.

10 Q.  Do you see the word "consent"?

11 A.  Yes.

12 Q.  What does "consent" mean to you?

13        **THE COURT:**  Okay.  Well --

14 **BY MS. ECHTMAN:**

15 Q.  Does this show you that SSN agreed to this particular

16 injunction, because it's on consent?

17 A.  I believe they agreed to it.  Is that -- I --

18 Q.  Okay.

19 A.  Legal words -- legal language based on judgment and

20 stipulation, but, they're consenting to this agreement, which

21 is they're agreeing to it, I guess.

22 Q.  Okay.  And I'd like you to turn to page 6, please.  On

23 page -- on pages 5 to 6, you saw some language earlier about

24 making -- using recorded messages --

25 A.  Yes.

1  Q.  -- do you see that?  And it specifically says that they're

2  not going to use recorded messages without the express consent

3  of the residential telephone subscriber receiving such call.

4  Do you see that?

5  A.  Yes.

6  Q.  And there was some back and forth about discussions people

7  at DISH had with SSN about its telemarketing.  And when you

8  folks asked SSN about its telemarketing, what did SSN tell you?

9        MR. GLASSER:  Objection.  Witness has clearly

10  testified he only had one conversation with Alex about this in

11  2004.

12        THE COURT:  Okay.  Well, do you want to --

13        MS. ECHTMAN:  Well, there's the information in the

14  e-mails that Mr. Glasser showed him where people who worked for

15  him --

16        THE COURT:  All right.  Go ahead.

17        MS. ECHTMAN:  -- reported on what their response was.

18        THE COURT:  He can answer.

19  BY MS. ECHTMAN:

20  Q.  What was reported to you?

21  A.  That he is compliant, he's following all the laws, he is

22  scrubbing his customers on the Do Not Call List.

23  Q.  And, in fact, in the e-mail involving Mr. Novak where he

24  wanted to have a chance to talk to him, do you recall what

25  Mr. Tehranchi wanted to tell Mr. Novak about his calling, his

1  telephone calls?

2  A.  He wanted to speak to him on how he telemarkets, and he's

3  saying that he's following all the laws and he's compliant.

4  Q.  And do you recall that he said anything about whether these

5  people had gone to his website and he was calling them back?

6  A.  I would like to --

7  Q.  Let's look at PX120, please.

8  A.  If you could put that up, please.

9  Q.  And if you go to the second page, there's an e-mail from

10 Mike Oberbillig to you and a number of other people on Friday,

11 September 30, 2005, at 8:43 a.m.  And it says:  Team, he -- and

12 that's Alex Tehranchi -- claims it is not him and that any

13 telemarketing he does is done by the law, and they have only

14 called people who called into his center.  Do you see that?

15 A.  Yes, that's correct.

16 Q.  And do you understand that Mr. Tehranchi's saying he

17 believes he's got the legal right to call these people?

18 A.  That's what he believes, yes.

19 Q.  And, in fact, that injunction refers to consent; do you

20 recall that?

21 A.  Yes.

22 Q.  At another time, did he tell you he was calling -- did he

23 tell Mike Oberbillig he was calling his own customers?

24 A.  Yes.

25 Q.  And do you understand that under some circumstances,

1 telemarketers can call their own customers?

2 A.  Yes.  I believe there are laws where they can call their

3 customers.

4 Q.  Okay.  Mr. Ahmed, did there come a time when you left DISH

5 in early 2006?

6 A.  January 31, 2006.

7 Q.  Did you leave for personal reasons?

8 A.  Yes, I did.

9 Q.  And do you mind just sharing them with the jury?

10 A.  Sure.  I actually moved to Dallas.  We were based out of

11 Denver.  We moved to Dallas early part of 2005.  My daughter,

12 she was 11 at that time.  Her name was Ella.  She was diagnosed

13 with an illness called High-Altitude Pulmonary Syndrome, and

14 she could not live at high altitude, which was Denver.  So, we

15 moved to Dallas, which was at sea level, and so it was for

16 personal reasons.  And, basically, I was commuting back and

17 forth on a weekly basis to Denver from Dallas.

18 Q.  But there came a time in 2009 when you came back?

19 A.  Yes, May 31 of 2009.

20 Q.  And I think you said that when you came back, was SSN on

21 your radar at all?

22 A.  No, they were not.

23 Q.  And why wasn't SSN on your radar?

24 A.  I had many other responsibilities.  We had a VP overseeing

25 the OE retailers, Brian Neylon, who had worked for me for about

1  12 years and was overseeing the OE retailers while I was gone.

2  We had Mike Mills as the director overseeing the OE retailers.

3     We had a very good compliance team while I was gone that

4  was put together headed by Reji Musso and Bruce Werner, and

5  they were a very, very small retailer.  They just were not on

6  my radar at all.

7  Q.  And does it benefit DISH in any way if a retailer, SSN, is

8  making calls that violate the law?

9  A.  No.

10  Q.  Why not?

11  A.  Costly.  It's bad reputation.  It's bad customer service.

12  We're in the customer service business, and it does not make

13  sense.

14  Q.  You also saw an e-mail earlier about a lot of -- a lot of

15  issues; do you recall that?

16  A.  Yes.

17  Q.  Do you know what you were referring to when you talked

18  about these issues regarding sales?  And I'll ask -- it's

19  PX656.

20     And, Trudy, if you could bring that up and go to the e-mail

21  at the bottom of the first page.

22     I have also had to deal with all his issues related to

23  sales, et cetera.  Do you see what you said there?

24  A.  Yes.

25  Q.  Do you know what you were referencing in that e-mail from

1  back in 2004 about Mr. Tehranchi's issues related to sales, et

2  cetera?

3  A.  Yes.  At that time, this is referencing -- it was not just

4  them -- other retailers.  Our system would go down and the OE

5  tool would go down, and the retailers were having a problem

6  qualifying the customers or getting on it, and so there were

7  sales issues.  And I had to go out there and try to figure out

8  from IT how to fix it.  And it was a lot of meetings with IT

9  just trying to figure out what we need to do to make it more

10  stable.

11  Q.  So it didn't have anything to do with telemarketing when

12  you were talking about issues regarding sales?

13  A.  No.

14  Q.  Then there was another e-mail, which is PX1160, and in this

15  one, if you just bring it up, and, Trudy, the e-mail at the top

16  there from July 29, 2004, at 1:41 p.m.

17      You're saying, make sure -- you say "he," meaning Alex

18  Tehranchi; right?

19  A.  Yes.

20  Q.  Make sure he understands the exception process.  Can you

21  tell us what the exception process is?

22  A.  Sure.  This is relating to that other e-mail, too.  Again,

23  the tool would go down.  When they would go down, the

24  customers, obviously, are stuck on the phone.  So, we figured

25  out how at that point to contact DISH so we could help them

process an order, and there was an exceptions line when the

tool would go down, meaning the platform.

Q.  And here, you say in this last sentence:  I'm hearing a lot

of complaints on Sat Systems on telemarketing calls to

customers.  Do you see that?

A.  Yes.

Q.  Had you, in fact -- do you know for a fact that you had

received a lot of complaints at that time?

A.  This is me.  I am being aggressive on this e-mail.  There

was a complaint that came to me.  There were probably one or

two complaints that I might have heard about, but this is --

this is how I acted.  I am being aggressive.  I am sending a

very strong message to the account management team that I've

heard about a few complaints.  Please make sure that they

understand they need to be compliant, do everything correctly.

We want no issues at all.  That's all I'm doing here.

Q.  And why are you doing that?  Why are you being aggressive

there on this e-mail where you just got them some more money?

A.  Because I do not -- one complaint is too many to me.  I do

not want a complaint on my desk or an issue with a customer.

Q.  And I think you said something earlier about the fact that

you were commuting from Dallas at one point.  So, at one point,

you were commuting from Dallas.  And then January 31, 2006, you

actually left DISH?

A.  That's correct.

1  Q.  And what did you do when you left DISH in 2006?

2  A.  I -- when I left DISH, I figured out how to go pick up the

3  kids at school because I had never done that in my life; my

4  kids were 11 and 13.  I went to volleyball practices.  I spent

5  time with them.  We went on a spring break for the first time

6  in four years together as a family, and we spent the summer.

7  We went to Italy.  We spent a month-and-a-half in Hawaii with

8  friends.  That's what I did.  I became a good dad and a good

9  husband.

10       **MS. ECHTMAN:**  Thank you, Mr. Ahmed.  I don't have any

11  further questions at this time.

12       **THE COURT:**  Redirect?

13       **MR. GLASSER:**  I really think I only want to follow up

14  on that last point.

15                    **REDIRECT EXAMINATION**

16  **BY MR. GLASSER:**

17  Q.  So you're saying that you didn't get to do any of those

18  things that you just described when you were working at DISH,

19  but after you left, you had that freedom to do those things

20  with your family that you wanted to do?

21  A.  Sir, I was living in Dallas, and I was commuting every

22  single week, sometimes twice a week on flights because we're

23  based out of Denver.  That's what I did for nine straight

24  months.  As a matter of fact, I would miss most of the weekends

25  because we would have meetings on Saturdays.  Yes.

1  Q.  So DISH was a pressure environment to work in?

2  A.  I think I like the pressure.  I think I like to work hard.

3  I want to do the right thing.  Yes.  And that's -- that's who I

4  am.  That's correct.

5  Q.  But it's one reason it grew so fast, right, because it --

6  it had a lot of pressure?

7  A.  Sir, we had a phenomenal technology just as DirecTV.  We

8  came out with a technology that had never been out in the

9  industry.  It was just the cable companies that had analog

10 video, we came out with digital, inter -- excuse me, high --

11 high definition that no one had ever seen at a price that was

12 about 30 percent lower than cable.  Yes.  Just like you have

13 any new product, whether it's an iPad or iPhone, it explodes.

14 That's what the technology was, yes.

15      **MR. GLASSER:**  I don't have any further questions, Your

16 Honor.

17      **THE COURT:**  All right.  Anything else on those limited

18 topics?

19      **MS. ECHTMAN:**  No, Your Honor.

20      **THE COURT:**  All right.  Thank you.  You can step down.

21   (The witness left the stand.)

22      **THE COURT:**  I think, we still have 10 minutes,

23 technically, but we probably can't get much done in 10 minutes,

24 so we'll stop for the day here.

25   Ladies and gentlemen, please remember not to discuss the

1 case among yourselves or with anyone else. Don't communicate

2 about it in any form, words, written, Internet, no tweeting,

3 you'll remember, no snap chats, et cetera. Keep an open mind

4 since you have not heard all the evidence about the matter, and

5 continue to avoid any contact with the lawyers, parties, or

6 witnesses should you see them in the hallways or on the

7 elevators.

8    We'll start back tomorrow morning at 9:30. Please leave

9 your notes in your chair, and the jurors are excused. If

10 everyone else will remain seated while they step out.

11    (The jury left the courtroom at 4:50 p.m.)

12         **THE COURT:** All right. So, for planning purposes,

13 tomorrow your witnesses will be?

14         **MR. GLASSER:** Reji Musso, Your Honor, will be the

15 first witness. And then I think we will go to some video.

16         **THE COURT:** Okay. And for Ms. Musso, you anticipate

17 most of the morning?

18         **MR. GLASSER:** Yeah. It won't cover the morning, but

19 it will be shorter than Mr. Ahmed.

20         **THE COURT:** Okay. All right. And the video

21 depositions.

22         **MR. GLASSER:** Are all fairly short. I think the sum

23 total of three might be under an hour.

24         **MR. BARRETT:** And one will be read, Your Honor.

25         **THE COURT:** Okay. All right. So we could even get to

1   your expert tomorrow afternoon.

2       **MR. GLASSER:**  We could if we don't need to call any

3   more DISH witnesses, which we'll make that call once we see

4   what evidence comes in through Ms. Musso.

5       **THE COURT:**  All right.

6       **MS. ECHTMAN:**  So, Your Honor, I just want to clarify

7   whether Mr. Glasser was changing his order of the witnesses,

8   because, originally, what we got in the Court filing was that

9   it was going to be Ms. Verkhovskaya before we got to Mr. Mills

10  or Mr. Werner.

11      **MR. GLASSER:**  Yeah, that's still my plan.  That's

12  still my plan.  But, I guess what I'm saying is it's possible

13  that all the evidence we need will be in by the end of Musso.

14  I'm just not sure.

15      **THE COURT:**  Okay.  All right.  Well, you all just keep

16  communicating about that.  So, I know you -- except for the

17  video -- so the depositions, you don't know exactly what

18  somebody's going to say or how they're going to say it, so

19  that's shown true for both sides.

20      All right.  But, in any event, you think you're well in

21  line to finish your case if not -- well, it would be unlikely

22  to be tomorrow because your expert would presumably take a

23  little bit of time, right?  But probably sometime on Friday?

24      **MR. GLASSER:**  Yes, ma'am.

25      **THE COURT:**  Okay.

1          **MR. GLASSER:** Housekeeping. Two items. One, PX241,
2   the last page needs to be removed from the Court binders or
3   whatever. And then the cross-reference for that exhibit you
4   were looking for was PX190.
5          **THE COURT:** Thank you. All right. Did you get that?
6   That was Joint Exhibit 3. All right.
7          **MS. ECHTMAN:** Okay. Thank you.
8          **THE COURT:** I think that makes Ms. Sanders' life
9   easier. Okay. Anything else for the Plaintiff before we
10  recess for the day?
11         **MR. GLASSER:** No, ma'am.
12         **THE COURT:** What about for the Defendants?
13         **MR. BICKS:** I would just alert the Court one thing.
14  Mr. DeFranco, you know, is coming into town. And we're really
15  hoping, you know, we can get him done by Friday just because
16  he's got scheduling issues. And so, hopefully, we can -- it
17  looks like we'll meet that, but I just wanted to alert the
18  Court that, you know, if we need some flexibility, hopefully,
19  we can work it out.
20         **THE COURT:** It doesn't sound like that'll be a problem
21  for him to get on the witness stand on Friday.
22         **MR. GLASSER:** I don't think so.
23         **THE COURT:** No. Okay, good.
24         **MR. BICKS:** Thank you.
25         **THE COURT:** All right. Anything else? No? Okay.

1   We'll be in recess until 9:30 tomorrow morning.

2       (Proceedings concluded at 4:54 p.m.)

3

4

5                    **C E R T I F I C A T E**

6       I, LORI RUSSELL, RMR, CRR, United States District Court
    Reporter for the Middle District of North Carolina, DO HEREBY
7   CERTIFY:

8       That the foregoing is a true and correct transcript of the
    proceedings had in the within-entitled action; that I reported
9   the same in stenotype to the best of my ability and thereafter
    reduced same to typewriting through the use of Computer-Aided
10  Transcription.

11

12  *Lori Russell*

13  Lori Russell, RMR, CRR          Date:  1/11/17
    Official Court Reporter
14

15

16

17

18

19

20

21

22

23

24

25