IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


THOMAS H. KRAKAUER,        *  Case No. 1:14CV333
                             *
           Plaintiff,     *
                             *
vs.                      *  Greensboro, North Carolina
                             *  January 12, 2017
DISH NETWORK, L.L.C.,     *  9:30 a.m.
                             *
           Defendant.     *
*****************************


**DAILY TRANSCRIPT OF TRIAL TESTIMONY**
BEFORE THE HONORABLE CATHERINE C. EAGLES,
UNITED STATES DISTRICT JUDGE, and a jury.



APPEARANCES:

For the Plaintiff:        JOHN W. BARRETT, ESQUIRE
                           BRIAN A. GLASSER, ESQUIRE
                           Bailey & Glasser, LLP
                           209 Capitol Street
                           Charleston, West Virginia 25301

                           MATTHEW P. MCCUE, ESQUIRE
                           Law Office of Matthew P. McCue
                           1 South Avenue, Third Floor
                           Natick, MA 01760

                           JACOB M. NORRIS, ESQUIRE
                           The Norris Law Firm
                           1033 Bullard Court, Suite 207
                           Raleigh, North Carolina 27615


For the Defendant:        PETER A. BICKS, ESQUIRE
                           ELYSE D. ECHTMAN, ESQUIRE
                           JOHN L. EWALD, ESQUIRE
                           Orrick Herrington & Sutcliffe, LLP
                           51 West 52nd Street
                           New York, New York 10019

```
 1                                 RICHARD J. KESHIAN, ESQUIRE
                                   Kilpatrick Townsend & Stockton, LLP
 2                                 1001 W. Fourth Street
                                   Winston-Salem, North Carolina 27101
 3

 4   Court Reporter:               Lori Russell, RMR, CRR
                                   P.O. Box 20593
 5                                 Winston-Salem, North Carolina 27120

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24             Proceedings recorded by stenotype reporter.
           Transcript produced by Computer-Aided Transcription.
25
```

1                          I N D E X

2   PLAINTIFF'S WITNESSES:                              PAGE

3     REJI MUSSO
          Direct Examination by Mr. Glasser             15
4         Cross-Examination by Mr. Bicks                86
          Redirect Examination by Mr. Glasser          148
5         Recross-Examination by Mr. Bicks             152

6     BAHAR TEHRANCHI (Deposition)

7     DAVID HILL (Deposition)

8     TANYA MASLENNIKOV (Deposition)

9     ANYA VERKHOVSKAYA
          Direct Examination by Mr. Barrett            166
10

11

12                  PLAINTIFF'S EXHIBITS

13  NO.:        DESCRIPTION:                           ADMIT

14  PX8                                                  67

15  PX15                                                 26

16  PX18                                                177

17  PX22                                                161

18  PX52                                                 70

19  PX70                                                 84

20  PX191                                                64

21  PX197                                               165

22  PX503                                               117

23  PX607                                                66

24  PX899                                                70

25  PX1048                                               75

| | | |
|---|---|---|
| 1 | PX1294 | 79 |
| 2 | PX2007 | 163 |
| 3 | PX2008 | 175 |

4        **DEFENSE EXHIBITS**

| | | |
|---|---|---|
| 5 | NO.:        DESCRIPTION: | ADMIT |
| 6 | DX1 | 127 |
| 7 | DX2 | 40 |
| 8 | DX5 | 143 |
| 9 | DX6 | 105 |
| 10 | DX8 | 118 |
| 11 | DX9 | 118 |
| 12 | DX13 | 163 |
| 13 | DX15 | 146 |
| 14 | DX22 | 162 |
| 15 | DX26 | 162 |
| 16 | DX28 | 118 |

17

18        **JOINT EXHIBITS**

| | | |
|---|---|---|
| 19 | NO.:        DESCRIPTION | ADMIT |
| 20 | | |
| | 278 | 190 |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | **THE COURT:** Good morning. |
| 3 | **MR. GLASSER:** Good morning, Your Honor. |
| 4 | **THE COURT:** I gave a little thought last night to the |
| 5 | evidence that the jury has heard and may hear more of about |
| 6 | complaints and also about testimony about the witnesses or the |
| 7 | declarant's, if it's in a document, understanding of the law, |
| 8 | and I wrote out a couple of instructions that I think might |
| 9 | help the jury understand that -- how they're to use that |
| 10 | evidence. |
| 11 | You know, I don't think I did a bad job yesterday, but I |
| 12 | think I could do a better job. So I've left a copy for you all |
| 13 | on the table. I can do it when they first come in or I can do |
| 14 | it when the issue next arises, or I cannot do it. You know, |
| 15 | but I wanted to hear if anybody had any thoughts. Does the |
| 16 | Plaintiff have any thoughts about that? |
| 17 | **MR. GLASSER:** I mean, we read it -- I read it, Your |
| 18 | Honor. I think you've given both of these at some points in |
| 19 | the case already. So, I was kind of thinking it would maybe |
| 20 | should just go in the final instructions just like the rest of |
| 21 | them, since they've had limiting instructions like this along |
| 22 | the way. |
| 23 | **THE COURT:** That's certainly an option. I mean, when |
| 24 | I started working on it, I was doing it for the final |
| 25 | instructions, and then I thought, well, I wonder if they're |

1  confused.  So, all right.  So it would be your preference to

2  just wait until the final instructions unless something happens

3  during the trial to cause some confusion about it?

4      **MR. GLASSER:**  Yes, ma'am.

5      **THE COURT:**  Okay.  What does the Defendant say?

6      **MR. BICKS:**  I agree, Your Honor, that there's no need

7  to read it now.  I thought what you did yesterday was

8  appropriate.

9      **THE COURT:**  Oh, good.  I'm getting As.

10     **MR. BICKS:**  And the Court knows that the whole

11 question of knowledge, you know DISH's position, that it's not

12 relevant to agency.  And so I --

13     **THE COURT:**  Right.  Yeah, and, you know, I tend to

14 agree it's not particularly relevant to control, but the whole

15 acting outside the scope, you know, that -- that's a

16 different -- different issue, so -- but in any event, well,

17 I'll hold off on it.  If anything happens today to make me

18 concerned that they're confused or that I need to clarify it

19 with the jury, I may give one or both of these instructions,

20 but I won't do it to begin with.  All right?

21     **MR. BICKS:**  Thank you.

22     **THE COURT:**  Any other housekeeping matters or any

23 other issues we need to take up before the jury comes in for

24 the Plaintiff?

25     **MR. BARRETT:**  Yes, Your Honor.  This morning, from

1  Ms. Musso, you may hear testimony regarding established
2  business relationship.  And you will hear that testimony when
3  we play the video deposition of Ms. Tehranchi.  We had objected
4  to that portion of the designation, and Your Honor had
5  overruled the objections.  But we do propose a limiting
6  instruction regarding EBR.
7      If you recall, at our last pretrial hearing, DISH had
8  stated that we had -- we had worked out the EBR issues.  We had
9  excluded people on the DISH customer list, and so EBR is not an
10  issue in this case.  So I have a proposed limiting instruction
11  that I'd like to hand up to the Court, if I may.
12          **THE COURT:**  All right.
13      **MR. BARRETT:**  And hand to counsel.  One slight
14  modification to what I am handing to counsel, and I can put
15  that on Your Honor's copy.
16      (Documents handed to counsel and the Court.)
17          **MS. ECHTMAN:**  Your Honor --
18          **THE COURT:**  Hold on.  Let me just look at it.
19      (Pause in the proceedings.)
20          **THE COURT:**  All right.  Go ahead, Ms. Echtman.
21      **MS. ECHTMAN:**  Your Honor, this is the first time that
22  we've seen this.  And we're not claiming that Dr. Krakauer had
23  an established business relationship with SSN for the class
24  period 2010 to 2011.  But we heard a lot about this 2009 call.
25  And, in fact, Mr. Glasser said again and again that there would

be more claims in this case if they had more call records.
Well, 2009 is outside the Statute of Limitations period so we
haven't been litigating over that call. And we don't really
appreciate the inference there could be a claim over that call
or any other call other than the calls for which they have call
records.

But in any event, there was an assertion that they had a
business relationship with -- with Dr. Krakauer at the time of
that call. Then they were asked to be put on a Do Not Call
List. That overrides an EBR. So I don't -- I think this is
not appropriate. And I think in terms of the issue of
knowledge and what DISH knew about whether SSN was making calls
in violation of the law, it's very relevant to this case
whether SSN said they had a business relationship with those
people and had the right to call them.

        **THE COURT:** Okay. All right. Well, I mean, this is
kind of one of the things that this instruction I gave you all
about the law --

        **MR. GLASSER:** Right.

        **THE COURT:** -- relates to. You know, I'm not going to
tell them that this testimony has no bearing on the claims in
this case, because if that were true, I would not let the
evidence -- I would not admit the evidence. So, you know, I'm
not going to give the instruction to that extent. I'll just
wait and see how it looks when it comes in. If I need to

1  explain EBR to them, I will, but I might have to -- you all
2  told me it wasn't an issue in the case, and it's not directly,
3  so I have put it out of my mind.  But, I can probably tell them
4  that the statute does, in some circumstances, allow calls when
5  there's an established business relationship, and the specifics
6  of that are not necessarily important in the case, the
7  specifics of that law.

8      But, you know, a lot of times you have to understand what
9  somebody thinks the law is in order to understand their
10  testimony.  And that's why I've let some of that testimony in
11  and why I probably will let some more of it in.  I think both
12  sides have objected to it along the way, but I'm probably going
13  to let it in both ways, because a lot of times, the witness
14  just can't explain what they did if they don't tell why they
15  did it.

16      So I'm not going to give it the way the Plaintiff has asked
17  for it, but I'll keep an ear open for that and consider,
18  depending on how the questions come, you know, I don't want the
19  jury to be confused about it.

20      So if I think there is a reason to give them a special
21  instruction on that when the evidence comes in, I will do it.
22  And you can ask me again, certainly.  The Plaintiff can ask me
23  again when the time comes.  All right.  Anything else?

24          **MR. BARRETT:**  Just two quick matters.

25          **THE COURT:**  Uh-huh.

1    **MR. BARRETT:** Your Honor, do you recall the call

2  category stipulation that the parties have entered into --

3         **THE COURT:** Yes.

4         **MR. BARRETT:** -- that is also tied to the verdict

5  form, at least in its prior iteration that we reviewed.  We

6  would like to -- and Your Honor has, I believe, indicated that

7  you would read that potentially or --

8         **THE COURT:** The stipulation?

9         **MR. BARRETT:** -- communication -- pardon me?

10        **THE COURT:** The stipulation?

11        **MR. BARRETT:** Yes, ma'am.

12        **THE COURT:** Yes.

13        **MR. BARRETT:** And I would like to use that with

14 Ms. Verkhovskaya as a kind of a demonstrative exhibit just to

15 walk her through the challenges, and basically frame -- frame

16 discussion for the challenges.  So I wanted to call that to the

17 Court's attention.

18        **THE COURT:** All right.  So the one I'm looking at is

19 the amended joint stipulation regarding call categories.  Is

20 that the one you want me to read to them?

21        **MR. BARRETT:** Yes, Your Honor.

22        **THE COURT:** All right.  Just whenever you want me to

23 read it to them, just tell me, I'll read it to them.

24        **MS. ECHTMAN:** So, Your Honor, there is a stipulation,

25 but we just want to put an objection on the record.

1  Mr. Verkhovskaya never gave any affirmative opinions about

2  those defenses and, in fact, the document -- the exhibits

3  supporting them have been precluded from this case as those --

4  Exhibit 31, defense exhibits, the Plaintiffs successfully moved

5  to preclude.  So we object to any testimony in

6  Ms. Verkhovskaya's chase in chief about those because they're

7  not part of any opinions she disclosed in this case.

8           **THE COURT:**  About the exhibits.

9           **MS. ECHTMAN:**  About the categories.  She never

10  addressed those categories in any of her work that was

11  disclosed to the Defendants.  We have no idea what she might

12  say about any of them.  She didn't do that work.  And so, we

13  object to that coming in through her direct testimony because

14  we --

15           **THE COURT:**  Okay.  But aren't you just going to ask

16  her -- I mean, I hear what you're saying about the lists.  But,

17  as I recall, and I could be wrong, but as I recall, she did do

18  work about LexisNexis and the various information on these

19  LexisNexis reports.  And so, why can't he ask her questions

20  about that, about her work on, for example, one, two, three,

21  and four and five -- well, all of them are LexisNexis numbers.

22           **MS. ECHTMAN:**  She got a report from LexisNexis.  This

23  is her report that she asked for from LexisNexis.  But she

24  never added up these categories or analyzed it in this way.

25  And so, for her to give opinions about this is outside the

1  scope of anything that she's disclosed.

2          **MR. BARRETT:**  Your Honor, we've stipulated to the

3  numbers.  Those were presented in April of this year.  She gave

4  her deposition probably a year before that.  Her testimony at

5  her deposition was that all of these numbers were residential,

6  and DISH called a couple weeks before the pretrial that we had

7  back then, produced all of these challenged categories.

8          **THE COURT:**  What are you going to be asking her about

9  these categories?

10         **MR. BARRETT:**  First, I'm going to ask her, are the

11  numbers that you had testified in your report, were they

12  residential?  She will say, yes, they were residential based

13  upon the data she reviewed.

14     I will say there are some challenges that the jury will --

15  I may say, if Your Honor lets me, the jury will potentially

16  consider that are in this stipulation of call categories.  Does

17  that change your opinion about whether these telephone numbers

18  were residential?

19     Her opinion has always been the telephone numbers were

20  residential.  What is new is that challenge that they provided

21  to us through those excluded exhibits back in April of this

22  past year.  That's the only thing that's new.

23     She's responding to challenges that have been raised and

24  that are on the verdict form.

25         **THE COURT:**  All right.  Are you intending to do that

1   in her direct testimony or --

2           **MR. BARRETT:**  Yes, Your Honor.

3           **THE COURT:**  So DISH didn't even mention this in

4   opening statement, so I wasn't sure if maybe it had just all

5   gone away.

6           **MS. ECHTMAN:**  It hasn't gone away, but we had more

7   important issues in the case, like agency.

8           **THE COURT:**  Okay.  Because, you know, not every

9   defense gets raised at trial, so --

10          **MR. BICKS:**  Yeah.

11          **MS. ECHTMAN:**  And that's the issue, Your Honor, that

12  these are defenses.  And so, for Ms. Verkhovskaya to now be

13  opining in her affirmative direct testimony it's outside the

14  scope of her affirmative opinions.

15          **THE COURT:**  No.  I mean, how can you say that?  She

16  testified, didn't she, originally that all of these numbers

17  were residential?

18          **MS. ECHTMAN:**  That's what Mr. Barrett's saying.

19          **THE COURT:**  Are you saying that's not so?

20          **MS. ECHTMAN:**  I'm saying she doesn't have sufficient

21  proof of that, but that'll come out during her testimony.

22          **THE COURT:**  All right.  Well, you all can just object

23  when it happens, if it does.

24          **MS. ECHTMAN:**  All right.  Thank you, Your Honor.

25          **THE COURT:**  You know, I thought I asked you all at the

last pretrial, in view of all the stipulations, if there were
going to be any issues with experts and we needed to have more
discovery, and you all told me not. So, I mean, I may not have
asked it quite that explicitly, but I thought I asked if all
these stipulations were going to give rise to any new issues,
but maybe I wasn't clear about that.

      **MS. ECHTMAN:** I'm sorry, Your Honor, I didn't
understand that. I had actually raised that at a pretrial,
that if Ms. Verkhovskaya was going to change her opinions, that
that would have to reopen expert discovery.

      **THE COURT:** All right.

      **MS. ECHTMAN:** And I understood that not to be an
option.

      **THE COURT:** Okay. Well, you know, it depends on what
she says. If she's just saying they're residential, I
understood that she said that before. I mean, she had to say
it before or we would not be here, so, you know, so if she's
just going to say, yeah, these are residential, and, you
know --

      **MS. ECHTMAN:** The issue's going to be if she gives a
new reason why that she hasn't previously disclosed.

      **MR. BARRETT:** I don't think that will be hard because
these have never been presented to her. They were presented in
April, and they were excluded, and then they were incorporated
in a stipulation, and they are not new opinions. They are

1  attacks on her opinion, which they can raise at any time,

2  attacks on her opinion that these are residential numbers.

3  That's always been her opinion.

4        **THE COURT:**  Okay.  Well, we'll just deal with it when

5  it comes up.  Thank you for alerting me.  Anything else for the

6  Plaintiff?

7        **MR. BARRETT:**  No, Your Honor.

8        **THE COURT:**  Anything for the Defendant?

9        **MR. BICKS:**  No, Your Honor.

10        **THE COURT:**  All right.  You can bring the jury in.

11     (The jury entered the courtroom.)

12     Good morning.  I'm sorry we had a little delay in getting

13  you all in here, but I was trying to take care of issues with

14  the lawyers so I wouldn't have to make you all go back and

15  forth.  Thank you for your patience.

16     We're ready to proceed, and the Plaintiff can call his next

17  witness.

18        **MR. GLASSER:**  The Plaintiff calls Reji Musso, Your

19  Honor.

20            **REJI MUSSO, PLAINTIFF'S WITNESS, SWORN**

21                  **DIRECT EXAMINATION**

22        **THE COURT:**  All right.  Go ahead.

23  **BY MR. GLASSER:**

24  Q.  Hello.

25  A.  Good morning.

1  Q.  Can you please tell the jury your name.

2  A.  My name is Reji Musso.

3       **THE COURT:**  Ms. Musso, you're going to need to speak

4  into the mike.  Feel free to move it around.  I know you want

5  to look at the jury.  You may not be able to do it that way,

6  though.  Yeah.

7       **THE WITNESS:**  My name is Reji Musso.

8       **THE COURT:**  That's better.  Thank you.

9  **BY MR. GLASSER:**

10  Q.  Great.  Ms. Musso, I understand that from 2006 through the

11  class period in this case, which is 2011, you served as the

12  compliance manager at DISH over the OE retailers; is that

13  correct?

14  A.  I did.

15  Q.  Also called national sales partners, right?

16  A.  Yes.

17  Q.  And you left that job in the summer of 2003, in the fall?

18       **THE COURT:**  Three?

19       **MR. GLASSER:**  I'm sorry, 2013.  Thank you, Judge.

20       **THE WITNESS:**  I did, yes.

21  **BY MR. GLASSER:**

22  Q.  Okay.  What -- but while you had that job, you were the

23  boss of the compliance function in DISH, having to do with

24  these national sales partners, right?

25  A.  Yes, essentially.

1   Q.  Did you report up to Bruce Werner?

2   A.  I did.

3   Q.  Okay.  How many people reported to you?  What was your

4   staff?

5   A.  I had an average staff of six.

6   Q.  Six people?

7         **THE COURT:**  Okay.  And so now the mike is not picking

8   you up.  So I'm not sure exactly -- you may need to sit up a

9   little closer.

10         **THE WITNESS:**  How about this?  Sit a little closer.

11         **THE COURT:**  Yes.  Thank you.

12   **BY MR. GLASSER:**

13   Q.  Now, from your perspective, you understood that your job

14   was to ensure retailer compliance with the retailer agreement,

15   right?

16   A.  That is correct.

17   Q.  Okay.  And I already went over the retail agreement in

18   detail yesterday with Mr. Ahmed, so we're not going to grind

19   through that with you.

20   A.  Thank you.

21   Q.  You do not believe that the role of compliance manager

22   involved an obligation on the part of DISH to enforce the

23   nation's telemarketing laws; isn't that right?

24   A.  I do not.  I believe that was covered in the retailer

25   agreement and an expectation of the relationship.

1    Q.   Okay.  So in your position as compliance manager, you would
2    get complaints about telemarketing activity from time to time,
3    right?
4    A.   That is correct.
5    Q.   And when a complaint about a national sales partner like
6    SSN came in, you did not see your role as actually deciding if
7    the consumer's complaint was legitimate or not legitimate?
8    A.   That is true.
9    Q.   So DISH had approximately 18,000 employees at this time,
10   right?
11   A.   I -- I guess.
12   Q.   A lot?
13   A.   Fifteen -- about fifteen when I started, so --
14   Q.   Okay.  And you had a compliance staff, as you've described,
15   right?
16   A.   That is correct.
17   Q.   Okay.  But as you sit here today, you don't know if any of
18   the complaints you received about SSN were legitimate or not?
19   A.   I don't think that was my responsibility to determine that.
20   The call was made by a retailer.  The retail -- the information
21   was furnished to the customer or consumer, and then they worked
22   with the retailer and the determination was -- happened at that
23   time.
24   Q.   All right.  So all the way through the time you left in
25   2006 to 2013, because you were in charge of the compliance

1  function, there's not a single individual in DISH devoted to

2  determining if consumer complaints against national sales

3  partners are legitimate?

4  A.  I think we -- I don't think that that was the role.  I

5  think that you could ascertain that there were things that

6  happened that were not within the realm of expectations, but at

7  the same time, it was really up to the retailer to work it out

8  with the consumer and customer.

9  Q.  Now, we looked yesterday at some budgets for national sales

10 partners that basically said that in 2010 and 2011, the

11 expectation at DISH was that they would sign up roughly a

12 million new customers a year, okay?

13 A.  If that's what happened.  It's outside of my realm.

14 Q.  Is that directionally correct in terms of size that you

15 understand, the amount?

16 A.  I can't speak to that.

17 Q.  Okay.  But in any event, do you think it's possible that

18 that could be accomplished, any amount of bringing on a large

19 amount of new consumers without a legitimate consumer

20 complaint?

21 A.  I'm not saying they were -- the complaints were or were not

22 legitimate.  I'm saying that wasn't my role to determine that.

23 Q.  Okay.  And so whatever activity you undertook in response

24 to a complaint ought not be characterized as an investigation

25 to determine legitimacy?  It was an investigation to determine

```
 1  which -- which national sales partner to refer it out to?
 2  A.  Yes.
 3  Q.  All right.  Well, in any event, as compliance manager, you
 4  came into contact with SSN and its owners, Alex and Sophie
 5  Tehranchi, right?
 6  A.  Yes.
 7  Q.  And you also -- your office, and, in fact, I think you're
 8  on the e-mail, handled the complaint of Dr. Krakauer, the
 9  Plaintiff in this case?
10  A.  That is true.
11  Q.  Oh, before I get to that, from 2006 until the end of the
12  class period, it is true that, so far as you know as compliance
13  manager, SSN was never terminated by DISH?
14  A.  No.
15  Q.  Correct, right?
16  A.  That's correct.
17  Q.  Okay.  From 2006 until the end of the class period, so far
18  as you know as compliance manager, DISH never imposed a
19  monetary fine on SSN?
20  A.  Not to my knowledge, but we didn't see any reason to.
21  Q.  Got it.  Okay.  From 2006 to 2011, the end of the class
22  period, so far as you know as compliance manager, DISH never
23  withheld any compensation to SSN as a result of telemarketing
24  activity or any other reason?
25  A.  Not to my knowledge.
```

1  Q.  From 2006 all the way to the end of the class period, so

2  far as you know, as a result of telemarketing issues or

3  anything else, DISH never suspended the right of SSN to

4  telemarket for any period of time?

5  A.  Once again, no, but it's because we didn't deem that

6  necessary based on what was transpiring with SSN.

7  Q.  Okay.  From 2006 all the way until the end of the class

8  period, as compliance manager with DISH, you're not aware of

9  SSN ever being prohibited from doing any telemarketing by DISH?

10 A.  No.

11 Q.  Correct, right?

12 A.  Correct.

13 Q.  Okay.  On the transcript, that "no" might come out no.

14     So from 2006 to 2011, as compliance manager, you're unaware

15 of any specific --

16         **THE COURT:**  Okay.  Maybe you could ask it a little

17 differently.  You're -- the -- ambiguity in the answer flows

18 from the question.

19         **MR. GLASSER:**  Okay.

20         **THE COURT:**  So if you can --

21 **BY MR. GLASSER:**

22 Q.  From 2006 to 2011, so far as you know, DISH never required

23 SSN to --

24         **THE COURT:**  Okay.  I'm asking you to ask a question,

25 did DISH ever require.

1          MR. GLASSER:  Okay.

2          THE COURT:  So do you see what I'm saying?

3  BY MR. GLASSER:

4  Q.  Did DISH ever require SSN to terminate any employee who was

5  violating telemarketing?

6  A.  No, that was not within our expectations.  That was not

7  what we did.

8  Q.  And from 2006 to 2011, did DISH ever specifically require

9  SSN itself to retrain its employees on TCPA compliance?

10          THE COURT:  I'm sorry.  What was the end of your

11  question?

12          MR. GLASSER:  TCPA compliance, retrain.

13          THE COURT:  Compliance.

14          THE WITNESS:  That falls into the expectation of

15  adherence to federal, state, and local laws, which was a

16  provision in the retailer agreement.  That was SSN's

17  responsibility.

18  BY MR. GLASSER:

19  Q.  So the answer is, no, not a specific direction to them to

20  retrain?

21  A.  DISH did not give a specific direction to them.

22  Q.  I understand you no longer work for DISH?

23  A.  I do not.

24  Q.  Okay.  When did you leave DISH?

25  A.  I left in 2013, but I left a lot of my heart there.

1  Q.  Okay.  All right.  Fair enough.  When -- when you left, at

2  that time had SSN been put on hold or terminated in 2013 when

3  you left?

4  A.  It's my understanding that they had been.

5  Q.  Okay.  You -- so are you saying it may have happened after

6  you left?  You just understand now that it happened, or it

7  happened before you left?

8  A.  There was a period of time that I was not involved in the

9  compliance department.  I was working in a different

10 department.  So I don't recall the specific date.  I do recall

11 discussing since -- you know, recently that they had been put

12 on -- they had been put on hold -- their access to the OE tool

13 had been suspended.

14 Q.  But you don't know the reason for it?

15 A.  No, I don't.

16 Q.  And you don't know when they were actually terminated?

17 A.  If memory serves me, I think it was 2014 when the retailer

18 agreement expired.

19 Q.  Oh, expired under its terms.  Okay.  Okay.  When you left

20 DISH, did you sign a severance agreement of some kind?

21 A.  No.

22 Q.  Okay.  So you don't have any contractual relationship with

23 DISH?

24 A.  I have loyalty to DISH.

25 Q.  Okay.  Now, the job of an OE retailer, as I understand it,

1  or a national sales partner is to go out and get a new customer

2  for DISH, right?

3  A.  Marketing, yes.

4  Q.  To sign the customer up, the sales agent is on the order

5  entry system, right?

6  A.  Yes.

7  Q.  Those payments flow directly from the customer to DISH,

8  right?

9  A.  Yes.

10  Q.  And then DISH compensates the national sales partner on a

11  weekly basis for new activations, right?

12  A.  That's my overall understanding, yes.

13  Q.  Is it fair to say that the vast majority of consumer

14  complaints you got while you were working in compliance at DISH

15  were as a result of that process?

16        **MR. BICKS:**  Objection.

17        **THE WITNESS:**  I don't understand the question.

18        **THE COURT:**  All right.  Rephrase since nobody -- the

19  witness doesn't understand.

20  **BY MR. GLASSER:**

21  Q.  Could national sales partners use DISH trademarks and

22  logos?

23  A.  Yes, they were authorized retailers of DISH, and they were

24  allowed to do so.

25  Q.  And could these national sales partners like SSN tell

```
 1  consumers they were authorized retailers of DISH?
 2  A.  Yes.
 3  Q.  In fact, they were required to tell them that they were
 4  authorized retailers of DISH, right?
 5  A.  Yes.
 6  Q.  As compliance manager, you kept files on individual
 7  national sales partners, right?
 8  A.  Yes.
 9  Q.  Called the compliance file for X, right?
10  A.  Yes.
11  Q.  These files relate to the history of those retailer's
12  telemarketing activities on behalf of DISH, so far as you knew,
13  right?
14  A.  When you -- I'm -- I'm confused.
15  Q.  Well, let me say this.  When you have -- like you'd take
16  the SSN compliance file.
17  A.  Uh-huh.
18  Q.  When you wanted to kind of remember something about what
19  had happened before, you could look back through it, and that
20  way it kept a history, right?
21  A.  Initially, we kept paper files, but that became cumbersome.
22  So we kept them -- they were a self copy.
23          THE COURT:  They were what?
24          THE WITNESS:  They were in a server on the -- they
25  were not hard copies.
```

1  BY MR. GLASSER:

2  Q.  All right.  So this compliance file let you, in the

3  compliance department, track the history of that national sales

4  partner, right?

5  A.  To the best of my knowledge, yes.

6  Q.  Sometimes internal communications about the national sales

7  partner are also in those specific files, right?

8  A.  Yes.

9  Q.  You would regard those files as important to your work and

10  your ability to function as compliance manager, right?

11  A.  The information, yes.

12  Q.  And it was your job to supervise keeping those files

13  complete and up to date, right?

14  A.  I oversaw it, yes.

15  Q.  Okay.  Let's look at Plaintiff's Exhibit 15, which I think

16  you'll recognize as the compliance file for SSN.

17        MR. GLASSER:  I move its admission, Your Honor.

18        THE COURT:  It will be admitted.

19        MR. BICKS:  Your Honor, I -- we just -- in terms of

20  our position on that, there's hearsay within hearsay within

21  some of these documents.  So that would be the objection.

22        THE COURT:  Okay.  Well, ladies and gentlemen, we'll,

23  I'm sure, go -- the parties are going to go through this.

24  You're entitled to consider it as evidence of what -- of the

25  information DISH had in its files.  That doesn't necessarily

mean every single thing in there was true.  We'll address that
more specifically as the need arises, and if there's an
objection, if you can make it -- I try to pause, but make it as
quick as you can.  Okay.

        **MR. BICKS:**  Thank you.

        **THE COURT:**  Go ahead.

        **JUROR:**  Excuse me.  The document -- your lamp isn't
on.  There's just shadows on the page.

        **MR. GLASSER:**  Thank you very much.  I appreciate it.

        **THE COURT:**  It's a little better.  There's still
some --

        **MR. GLASSER:**  I'll go -- is that better?

        **THE COURT:**  All right.

**BY MR. GLASSER:**

Q.  There -- if it's easier for you to look sometimes at the
paper copy, I'll also put it up here on the ELMO for you, but
I'm going to look -- on the bottom right-hand corner, there are
these numbers called Bates numbers.

A.  Yes.

Q.  Okay.  So I'm going to start talking about the document at
8060.

        **MR. BICKS:**  Say it again.

        **MR. GLASSER:**  8060.

**BY MR. GLASSER:**

Q.  All right.  Ms. Musso, let's just start here at the top of

1  Document 8060.  This is an e-mail that you're on, right,
2  Ms. Musso?  That's you at the top?
3          **THE COURT:**  Keep your voice up, Mr. Glasser.  You're
4  fading off at the end of your sentence.
5  **BY MR. GLASSER:**
6  Q.  That's you at the top right here on this?
7  A.  Oh, yes, uh-huh.
8  Q.  And it has to do with a TCPA complaint of Mr. Thomas
9  Krakauer, right?
10  A.  Correct.
11  Q.  And the date is May 19th, 2009, right?
12  A.  That's correct.
13  Q.  I'm going to the next page behind it.  I want to go down
14  here to the bottom.  So it says, "Thomas Krakauer received a
15  call last" -- well, can you read this to yourself here, and
16  I'll ask you some questions about it, how's that?  From Thomas
17  Krakauer received a call all the way down to the end of this
18  part.  Just look up when you're done reading it.
19      (Pause in the proceedings.)
20  A.  I've read it.
21  Q.  Okay.  So this lady, Rebecca Dougherty, was she one of the
22  ladies who worked with you?
23  A.  She was not.  In fact, she worked in the escalations group
24  in the customer service center.
25  Q.  Okay.

A.   Which is where the TCPA complaints would be initially
received?

Q.   Okay.  And then you track it as a TCPA complaint, right?

A.   Yes.

Q.   Give it a record number, right?

A.   That's the way the system was set up, yes.

Q.   You say the customer is on the National Do Not Call
Registry?

A.   That information comes from the call center, yes.

Q.   All right.  Now, you're aware as the compliance manager
that you can just type on the computer the number and check the
Registry.  Does the center check if he's on the National
Registry or not?  Is that confirmed or just reported by the
customer?

A.   I'm saying that the information that we get on this e-mail
comes from the customer service center, and we record this
information, yes.

Q.   Okay.  But I'm asking a slightly different question, which
is does DISH independently just check the number and see?

            **THE COURT:**  You mean phone number?

            **MR. GLASSER:**  Yes, ma'am.

            **THE WITNESS:**  Whether they're -- well, they did in the
call center, yes.

**BY MR. GLASSER:**

Q.   Okay.  So it's confirmed that it was on the national call

1  center?

2  A.  I would make that assumption, yes.

3  Q.  Okay.  And so the complaint from Dr. Krakauer is that he

4  was called by somebody impersonating DirecTV, right, trying to

5  switch him to DISH?

6  A.  Okay.  I think another point that's very important to

7  understand is when we would get these complaints, the -- the

8  folks in the escalations team were instructed to confirm -- to

9  share that information that the customer gave them as -- as

10 word for word as they could.  So this is exact -- this, to my

11 understanding, is what Mr. Krakauer told Ms. Dougherty.

12 Q.  So the customer, Dr. Krakauer, had reported that somebody

13 impersonating a DirecTV person had tried to switch to DISH; is

14 that right?

15 A.  That was his assessment.

16 Q.  And the guy's name, according to Dr. Krakauer, was Ken,

17 right?

18 A.  Yes.

19 Q.  And that a credit card check was run on him last night is

20 something that Ms. Dougherty independently discovered, right?

21 A.  Yes.

22 Q.  And then Ms. Dougherty tells -- let's see who first got

23 this.  It looks like tells Joshua Slater.  Does he work for

24 you?

25 A.  He does not.  Actually, I think the -- let's see where she

1  -- did she send it --

2  Q.  She sent it --

3  A.  She sent it --

4  Q.  To POE support, retailer escalation?

5  A.  So it can get a little confusing.  There are a lot of

6  different people and departments involved.  David Laslo was on

7  the escalations team.  He was, if memory serves, a coach.  POE

8  Support stands for partner order entry support, and they

9  oversaw any e-mails or activity with the -- with the OE

10  partners.  Retailer escalation was actually another team that

11  really had the relationship with smaller retailers, not the OE

12  retailers, and then TCPA was actually in the call center.  This

13  originally didn't come to vendor inquiries, which would have

14  been -- it eventually did, but at this particular exchange

15  didn't.

16  Q.  Okay.  All right.  But, ultimately, it got up to you?

17  A.  It did.

18  Q.  All right.  So -- but on this part right here where the

19  call center employee, Ms. Dougherty -- I guess she could check

20  on her computer to see if a credit check was run on

21  Mr. Krakauer?

22  A.  There was -- and I didn't do that or -- or my team didn't

23  do that, but, yes, she had the ability to see whether a credit

24  check had been run.

25  Q.  And the --

1    A.   Go ahead.

2    Q.   And that's how she determined -- one of the ways she

3    determined that SSN had keyed that in on the order entry

4    system, right?

5    A.   That's a key point, that SSN was the one who apparently had

6    run this credit check.

7    Q.   Well, no, they had requested on the order entry system that

8    a credit be run?

9    A.   Actually, as I understand it -- and, believe me, I'm no

10   expert on these systems, but as I understand it, SSN puts it

11   in.   SSN gets the information back.   We keep the record.

12   Q.   Because DISH pays for it?

13   A.   That I don't know, and I truly don't know.

14   Q.   All right.   So then do you know why no one at DISH said to

15   Ms. Dougherty or anyone else, tell Dr. Krakauer that a credit

16   check has been run?

17   A.   I'm not sure I could know that.   That's kind of a

18   hypothetical question, but it would be her responsibility, if

19   she felt it prudent, to tell him.   She probably didn't want to

20   upset him.   We care very deeply about our customers, and, you

21   know, she knew that if they ran a credit check without telling

22   him, that that was against all DISH policy, regulation, and

23   expectations.   We even had a Q/A form that it had on there that

24   they had to do that.

25   Q.   Okay.   So then the decision, while it may have been made by

1  a lower-level DISH employee, not to tell Dr. Krakauer about

2  this in a way protected the national sales partner from being

3  found out, right?

4  A.  I don't think that was her intent at all.  I think that --

5  if I had to guess, knowing the relationship that I had with

6  this team of people, she cared very much about his feelings and

7  didn't want to upset him, and, plus, if she did, she didn't

8  have any answers for him.

9  Q.  Okay.  All right.  Now let's go to page 7981.

10  A.  Am I going to need this one again?

11  Q.  So it may get confusing.  Just try and keep them in the

12  right order.  So put it back in the right order.  Keep that

13  clip on it maybe.  Let me try and run it on the ELMO, and then

14  we'll bust that one up if you need it.

15  A.  I'm sorry.  What number did you say?

16  Q.  We're going to go to 7981.  All right.  So here at 7981

17  Serena Snyder -- now, she works for you, right?

18  A.  She did.

19  Q.  All right.  She sends an e-mail to sophie@yourdish.tv.com.

20  That's Sophie Tehranchi, right?

21  A.  Yes.

22  Q.  The sister of the owner of SSN, so far as you know?

23  A.  So far as I know.

24  Q.  DISH did not object and permitted them to use the e-mail

25  address yourdish.tv?  That's part of being able to use the

1  trademarks, right?

2  A.  Yes.

3  Q.  And the -- the notice to Ms. Tehranchi says that "a fax of

4  a notice of alleged complaint, Do Not Call violation, was sent

5  today.  I'm sending a copy of the letter via e-mail.  Please

6  comply with the requirements therein."  Do you see that?

7  A.  Yes.

8  Q.  Okay.  Let's see if the letter's attached.  The letter is

9  not attached, but I think we'll find it later in the file.

10      And then let's go to 7980, which is the very -- the

11  responsive page.  So here is an e-mail back in response on

12  May 28th, 2009, at 3:31 p.m., right?

13  A.  Yes.

14  Q.  It's from patty@yourdish.tv, and it copies Sophie, which

15  you believe to be Sophie Tehranchi, right?

16  A.  Yes.

17  Q.  And it looks like she's sending an e-mail in response to

18  the complaint, right, that we saw prior?

19  A.  Yes, because I signed the letter, so they always put my

20  name on there.

21  Q.  Okay.  Got it.  Okay.  So she tells you that that -- that

22  the first they heard of it was on the 20th, right?

23  A.  Yes.

24  Q.  She tells you that on the 20th, "We've taken Mr. Krakauer's

25  phone number out of our master lead list and put his number on

1  our Do Not Call List," right?

2  A.  Yes.

3  Q.  And then it says:  "Our lead for Mr. Krakauer was generated

4  by us.  We sold him DirecTV back in April of 2003 when we were

5  a DirecTV retailer," right?

6  A.  Correct.

7  Q.  And then she says:  "We do not have a date for scrubbing

8  this lead through PossibleNOW because at the time we are not a

9  PossibleNOW member," right?

10  A.  Yes.  They were doing business, to the best of my

11  understanding, with DNC.com for scrubbing.

12  Q.  Okay.  She doesn't say that -- isn't it true that in this

13  responsive e-mail she doesn't say that she scrubbed it

14  anywhere?

15  A.  And I -- in further discussions about this, they indicated

16  that they had a customer relationship with him and felt it was

17  okay to call him.

18  Q.  All right.  So you see here that the date of this customer

19  relationship was 2003, right?

20  A.  Yes.

21  Q.  Okay.  Now -- but you're not making a judgment about its

22  legitimacy or illegitimacy.  You're simply forwarding the

23  complaint, right, and she said, fine, I'm going to take him off

24  the list, correct?

25  A.  That's true.

1   Q.  You do not ask ever who else are you calling from that

2   unscrubbed list; isn't that true?

3   A.  There was still some investigation to be done.  I was not

4   under the impression that they needed to scrub a list of

5   customers that they already had relationships with, and it

6   wasn't my business to determine whether -- whether that was

7   necessary or not.  We were talking about one issue here.

8   Q.  Okay.  And then -- but they also tell you that the sales

9   representative named Ken is the top employee of the -- of SSN,

10  right, the guy who impersonated DirecTV, Ken, is their top

11  employee?

12          **MR. BICKS:**  Objection, Your Honor, to the --

13          **THE COURT:**  Well, the jury will remember the evidence

14  about that.

15      Go ahead.  You can answer.

16          **THE WITNESS:**  I was not under -- I mean, I don't know

17  that in truth he -- I didn't hear a recording of this phone

18  call, so I don't know that that, in fact, happened.  That's

19  what Mr. Krakauer believed to have happened.

20  **BY MR. GLASSER:**

21  Q.  Okay.  And nobody asked that a recording of the call be

22  uploaded to DISH to check, right?

23  A.  We did not at that time, no.

24  Q.  Okay.  Let's go to page 7983.  This is an e-mail chain from

25  on or about April 2009, right?

1  A.  Forgive me.  What number did you say?

2  Q.  I'm at 7983.

3  A.  I'm sorry.

4  Q.  It's also on your screen there, if that helps.

5  A.  I like to look at the whole --

6  Q.  Okay.  All right.  And this is about two TCPA issues in

7  April of 2009, right?

8  A.  Yes.

9  Q.  Okay.  And -- and this is an e-mail from Sophie Tehranchi

10 in response to -- if you look on the prior page, you guys had

11 asked about the complaints of Angela Schooler and Kitty Fowler,

12 right?

13 A.  Yes.

14 Q.  And you were asking her to follow up on what had gone on

15 with those two people, right, who had called in about TCPA

16 problems, right?

17 A.  Yes.  And since you've highlighted that, I would also like

18 to point out that the complaints that we received from those

19 two people were about frequent and persistent and infrequent,

20 persistent harassment.  They were not Do Not Call complaints,

21 not that that's any less serious, but I would like to make that

22 distinction.

23 Q.  But the telephone -- the Telephone Consumer Protection Act

24 is -- is what your retail agreement says ought to be complied

25 with, right?

1  A.  I understand that, but in our estimation, when a -- two

2  calls to me might seem like a lot.  Two calls to another

3  customer might not.  So a lot of times these particular caveats

4  of the Telephone Consumer Protection Act, in my mind, are in

5  sort of the eye of the beholder.

6  Q.  And I know you just testified that it didn't have anything

7  to do with Do Not Call, but you ask here for the date the leads

8  were scrubbed with PossibleNOW, right?

9  A.  Yes, but that's because that's part of the standard -- the

10  form letters that we use.  That's the excerpt from the form

11  letter.

12  Q.  Okay.  And it says here that the contact for the leads was

13  Jeff Rogers.  "We were with DCN.com.  We were not with

14  PossibleNOW."  Do you see that?

15  A.  That is correct.

16  Q.  All right.  So did you take that answer to be actually it's

17  not been scrubbed with PossibleNOW?

18  A.  No, I did not.

19  Q.  But she's telling you --

20  A.  Well, I didn't -- yes, it wasn't scrubbed with PossibleNOW,

21  but it was scrubbed with DNC.com is how I interpreted it.

22  Q.  Okay.  But I understood that your company wanted people to

23  go scrub their list with PossibleNOW, right?

24  A.  But not at that time.  They're talking about a lead before

25  the requirement.

```
 1  Q.  In 2009?  The calls were on 2008 and 2009.
 2          THE COURT:  What's your question?
 3  BY MR. GLASSER:
 4  Q.  When was the requirement put in place?
 5  A.  Forgive me.
 6  Q.  Okay.
 7  A.  I'm confused.
 8  Q.  So it was during the period of the requirement, right?
 9  A.  Looks to be, yes.
10  Q.  Okay.  And they're telling you they didn't scrub it with
11  PossibleNOW, right?
12  A.  If I understand -- in reading this, if I understand, they
13  got the leads prior to the obligation to be enrolled with
14  PossibleNOW.
15  Q.  When was the obligation to be?
16  A.  It was in October, but they could have gotten a scrub lead
17  list from DNC.com prior to that and used it.
18  Q.  All right.  Now, it says here:  "The outbound dialer was
19  with Five9, but they were too expensive, so we changed about
20  three weeks ago and are with Chase Data.  We have no records of
21  the consumer phone numbers since we're no longer with Five9."
22  Do you see that?
23  A.  I do.
24  Q.  I want to put on the screen Defendant's Exhibit No. 2.
25          MR. GLASSER:  I move it's admission, Your Honor.
```

1  **THE COURT:**  It will be admitted.

2  **BY MR. GLASSER:**

3  Q.  Okay.  This is a facts blast.  It's hard to say that word,

4  F-A-C-T-S blast, facts blast.

5  A.  Do I have that?

6  Q.  No, ma'am.  I'm just putting it up here.  I only have one

7  with me.  Can I approach and you can read it?

8  A.  Please.

9  Q.  Okay.

10     (Document handed to the witness.)

11     So when you're done with it, I just -- just hold it up.

12  I'll come get it, and then I'll put it on the ELMO.

13         **MR. GLASSER:**  I move it's admission, Your Honor.

14         **MR. BICKS:**  Do you want to give her a copy?

15         **MR. GLASSER:**  Oh, great.

16         **THE COURT:**  I think I already admitted it.  Is that

17  right, Ms. Sanders?

18         **THE CLERK:**  Yes, ma'am.

19         **THE WITNESS:**  Thank you.

20  **BY MR. GLASSER:**

21  Q.  So this -- this is -- this is how -- this is one of the

22  ways that DISH imposes what are called business rules on its

23  national sales partners, right, sending these facts blasts?

24  A.  Yes.

25  Q.  And so this is one of those, right?

1  A.   This is one of the methods, yes.

2  Q.   Okay.  And the date of this is November 20 --

3  November 11th, 2006, correct?

4  A.   That is correct.

5  Q.   And this says that they must maintain current Do Not Call

6  documentation, right?

7  A.   Correct.

8  Q.   And they must retain call records.  You should be able to

9  produce documentation for each and every outbound call placed

10 by you or on your behalf by a third party, right?

11 A.   That's correct.

12 Q.   That was the requirement that DISH had in place at the time

13 Ms. Tehranchi wrote back and said that she had no call records,

14 correct?

15 A.   That was the requirement, but it wasn't practical for us

16 to -- to -- to gather all those phone records.  We didn't have

17 the personnel or the ability to go through those phone records,

18 so we didn't, like, collect them.  There was just that

19 requirement that they retain them.

20 Q.   All right.  So on October 8th, 2009, just before the class

21 period in this case, Ms. Tehranchi tells you she's not

22 retaining records because they're not at Five9 any more.  So

23 isn't it true that that made it impossible for you to say,

24 well, just give me the list of people you called last week so I

25 can see you're not calling people on the Do Not Call List?

1   A.   That was not my job to see whether -- as I mentioned, they

2   had a requirement under the retail agreement to abide with all

3   federal, state, and local laws, and one of those laws is not to

4   call people on the Do Not Call List.  We couldn't possibly

5   police all the retailers and whether or not we could look at

6   their call records to see if they bumped up.  That would be

7   like us rescrubbing the list.

8   Q.   Now, I noticed that on page 7484 --

9          **THE COURT:**  Let's see.  We're back in which exhibit

10  now?

11         **MR. GLASSER:**  Exhibit 15.

12         **THE COURT:**  Plaintiff's Exhibit 15?

13         **MR. GLASSER:**  Yeah.

14         **THE COURT:**  And I apologize.  Tell me the page number

15  again.

16         **MR. GLASSER:**  74 -- I'm sorry 7984.

17         **THE COURT:**  7984.

18  **BY MR. GLASSER:**

19  Q.   It looks like -- is the submitted date the date you first

20  asked SSN to respond?

21  A.   That's the date that we got it.

22  Q.   Okay.  Would it be your practice to send along the inquiry

23  to the national sales partner on or near the time you got the

24  complaint?

25  A.   Yes.

1    Q.   So the document should tell us that SSN had not responded

2    for approximately six months or five months, right?

3    A.   I don't see their response in here.

4    Q.   It's on the page -- it's on the next page where we were

5    just looking, which is 7983, where, remember, they said they're

6    not keeping the phone records?  Right here.

7             **THE COURT:**  Are you asking about the response?

8             **MR. GLASSER:**  Yeah, I'm asking about the time period.

9    **BY MR. GLASSER:**

10   Q.   Because they did respond, so -- you said you couldn't

11   recall that they responded, and I'm saying do you agree that

12   this is their response, April 8th, 2009?

13   A.   Yes.  And if you also look at this e-mail, we had done an

14   audit in my group and found out that we had not gotten a

15   response.

16   Q.   Yeah.  Okay.  Great.  Actually, that is.  That's right

17   here.  It says:  "We originally sent these to Alex on 11-20-08

18   and 3-27-09."  You see that?

19   A.   And part of the problem for that was the management of the

20   operation had changed from Alex to Sophie, and we weren't aware

21   of that.  So, you know, once we got that straightened out and

22   we found that missing information, then we sent it out to

23   Sophie.

24   Q.   And, actually, if you turn to 7988, you'll see a copy of

25   the letter that was sent to Mr. Tehranchi about the Angela

1  Schooler complaint, right?  Do you see that?

2  A.  Yes, I do.

3  Q.  I take it this is a form letter?

4  A.  It is.

5  Q.  If we look at all the letters, they'll be the same, right?

6  A.  Well, in this time period, they will be the same.  When we

7  first started, we -- we had one iteration of the letter, but as

8  you get into the middle of processes and managing procedures,

9  you find that things are either not doable, not feasible, so

10  you -- or not really an expectation, so then you just -- so the

11  letter has been modified, but, essentially, it's the same

12  letter.

13  Q.  Okay.  And at the bottom, it always tells them, you know,

14  that additional incidences of this nature may result in

15  disciplinary action up to and including termination?

16  A.  Yes.

17  Q.  Turning to 7991, now, this is another way that business

18  rules can be disseminated to national sales partners, just send

19  them a letter, right?

20  A.  No, this -- this letter, in fact, was sent to initiate a

21  process that evolved into our quality assurance program.  This

22  had not been created as a business rule.  It was more of a

23  notification.

24  Q.  All right.  And so it looks like the date of this letter is

25  February 20th, 2007, right?

1  A.  Yes.

2  Q.  And you're saying that we're going to have live, on-site

3  people at your business, right?

4  A.  Yes.

5  Q.  We're going to have live remote ability to listen in on

6  your phone calls, right?

7  A.  Yes.

8  Q.  We're going to have the ability to record your phone calls

9  remotely, correct?

10  A.  Yes.

11  Q.  We're going to record your phone calls on site, right?

12  A.  That's what it says, but, understand, these were the

13  options that we were trying to make available to us.  They

14  weren't doing all four of them.  Some of their phone systems

15  were limited.  We had smaller retailers, and so we -- we -- we

16  could listen to phone calls side by side and couldn't hear but

17  one side of the conversation.  This was the very initial

18  beginning of a -- of a quality assurance program that evolved

19  into something much different than this.

20  Q.  Okay.  And it was to -- it was to -- I don't think that

21  word is in here.  Subsequent visits will occur biweekly,

22  according to this, right?

23  A.  I'd like to point out also --

24        **THE COURT:**  Okay.  Ma'am, just listen to his question

25  and answer his question, and then you can explain your answer,

1  but first answer the question.

2          **THE WITNESS:**  Thank you.

3          **THE COURT:**  So if you can repeat the question.

4  **BY MR. GLASSER:**

5  Q.  Does the letter inform Mr. Tehranchi that subsequent visits

6  will occur biweekly?

7  A.  It informs that if we choose that option, that the -- we

8  hope that the visits will be biweekly.

9      I'd also like to point out that this was an effort to make

10  sure we were delivering a world-class customer experience,

11  which is in the first paragraph.  So we were trying to work

12  with our retailers to -- to help them share all the terms and

13  conditions with the customers regarding the purchases that they

14  made.  We wanted our customers to have a world-class buying

15  experience, and this was the foundation for that.

16  Q.  Okay.  And all these things have to do with monitoring the

17  substance, what's going on inside the call in the sales

18  process, right?

19  A.  As it relates to terms and conditions, yes.

20  Q.  Well, you don't turn the monitoring device off?

21  A.  But we didn't evaluate, for instance, the sales script or

22  how they marketed.  We -- we listened for terms and conditions

23  and disclosures.

24  Q.  But you heard the entire sale, correct?

25  A.  We could, yes.

1  Q.  And -- and you got recordings of the entire sale, correct?
2  A.  In some cases.
3  Q.  Okay.  But all of these call monitoring initiatives have to
4  do with selling more DISH product better, right?
5  A.  I didn't say more.  Selling what they had and selling it
6  right?
7  Q.  If you sell it right, do you think you'll sell more?
8  A.  I think if you have a good reputation and you provide
9  customers with a good buying experience, that would be the
10 consequence of that.
11 Q.  And does the word "monitoring" mean to you kind of a
12 continuous process of watching?
13 A.  It's a continuous process of listening.
14 Q.  Okay.  And -- well, okay, of listening in this case.  Got
15 it.  But this call monitoring had no aspect that had to do with
16 who's being called, did it?
17 A.  No.  As I mentioned, that was under the expectations of
18 following the letter of the law.  We expected our retailers to
19 do it because it was a requirement.
20 Q.  Okay.  Turning to 7994, this is a communication in the file
21 between you and Mike Oberbillig in May of 2007, right?
22 A.  Yes.
23 Q.  And there's a garnishment issue.  Do you see that?
24 $15,000?
25 A.  I do.

1  Q.  So a garnishment is when a creditor of SSN tells you about

2  their right to money, and then you give it to them, right?

3  A.  In all honesty, I was not involved in this garnishment.

4  Those things came through legal.  I knew about it, but I didn't

5  have anything to do with it.

6  Q.  Okay.  And so you don't know what that was about?

7  A.  I do not.

8  Q.  All right.  Have you -- and then it says:  "Have you talked

9  to Alex about the Spafford case?  What are we doing here?"  Do

10 you see that?

11 A.  I do.

12 Q.  That was a Do Not Call case, right, Spafford?

13 A.  To the best of my understanding, it was a class action suit

14 in the state of Washington.

15 Q.  About Do Not Call?

16 A.  Yes.

17 Q.  That SSN was involved in, right?

18 A.  Yes.  I don't think they had very many calls, though.

19 Something like two.

20 Q.  Two connected or two made?

21 A.  I don't know.  I just -- the two is all I know.

22 Q.  All right.  Then on the next page back, 7996, February 9th,

23 2007, here we have two more customer complaints, a Jeffrey

24 Mitchell and a Gregory Fisher, who have identified Satellite

25 Systems Network, right?

1  A.  To the best of my memory, yes.

2  Q.  And Jeffrey Mitchell was a Do Not Call complaint, right?

3  A.  Jeffrey Mitchell and Gregory Fisher.  I believe these phone

4  calls were made in 2005.

5  Q.  All right.  And they are Do Not Call?

6  A.  Yes, that was the allegation.

7  Q.  And you never determined whether it was true, right?

8  A.  Not my job.  It wasn't my responsibility.

9          **THE COURT:**  I'm sorry.  Keep your voice up.

10         **THE WITNESS:**  It wasn't my responsibility to do that.

11  **BY MR. GLASSER:**

12  Q.  Okay.  Now we go to 7995, and this is you, Ms. Musso, in

13  February of '07, talking to somebody called Robb Origer.  Who

14  is Mr. Origer?

15  A.  He was the director of retail services at the time.

16  Q.  All right.  All right.  So who's Brian who told you that

17  SSN is doing well and going on the incentive trip?

18  A.  I can only assume.  I don't know for sure.  It's been quite

19  a while ago, but I can assume it's Brian Neylon.

20  Q.  All right.  And you say:  "So once again, this is a

21  business decision," right?

22  A.  A business decision for them going on the incentive trip.

23  Q.  Correct.  I guess we just need to let the attorney know

24  that, as far as we know, they have, quote, and it's in quotes,

25  righted the wrongs.  Do you see that?

1  A.   I do.

2  Q.   All right.  Is it true, Ms. Musso, that even -- that you

3  personally, as the compliance manager, did not have the power

4  or authority to terminate a retailer on your own decision?

5  A.   I -- you know, I had a lot of influence, and I -- I had the

6  best relationships with these -- all the folks that I worked

7  with, and I could definitely go to them and let them know if

8  there was a concern that I felt warranted termination, and if I

9  did and showed -- would show them the evidence, they would

10 often agree with me.  So I don't think I didn't have any

11 influence, but I didn't have the final say-so.

12 Q.   All right.  And I understand that Mr. Bruce Werner, who was

13 the head of risk audit, also did not have that power and

14 authority.  The power and authority was in the sales side of

15 the company, right?

16 A.   No, the power and authority was collaborative.  It was with

17 sales and legal and compliance and, you know, the relationship.

18 So it was a collaborative decision.

19 Q.   All right.  So you had to have a committee meeting to

20 determine whether to discipline a business -- national sales

21 partner?

22 A.   I apologize.  I think that makes light of a decision that's

23 very impactful to a lot of people on the retailer side, too.

24 They have businesses and employees and everything.  So we took

25 these decisions very seriously for their benefit as well as our

1   own.

2   Q.   Okay.  Let's start with termination.  To terminate would

3   there have to be numerous people in the room?

4   A.   A collaboration does require other people, yes.

5   Q.   Who are all the required decision-makers to terminate?

6   A.   Sales, legal, compliance, customer service might have a

7   say-so.  It -- people who touch that relationship.

8   Q.   Okay.  There's not a -- you can't give me the -- there's

9   no -- it's kind of -- there's no actual person with whom the

10  buck stops?

11  A.   I would -- I would say the buck stopped at legal.

12  Q.   All right.  So we talked about termination.  What about

13  punishing them by saying, you know, your pay is going to be

14  cut?

15          **THE COURT:**  Say again?

16          **MR. GLASSER:**  Punishing them by changing their pay.

17  **BY MR. GLASSER:**

18  Q.   Is that the same type, kind of massive group of people who

19  would be participating in that decision?

20          **MR. BICKS:**  Objection, Your Honor.

21          **THE COURT:**  Okay.  Sustained as to the --

22  **BY MR. GLASSER:**

23  Q.   Is that the same large number of people that would be

24  participating in such a decision?

25  A.   I think when you have a decision that's serious to make,

1  you do have to find out if there are any ramifications when you

2  make that decision.  So, yes, I think there would still be the

3  same people involved.

4  Q.  Would that answer hold true for each of the types of

5  discipline that we talked about in this case already at the

6  beginning of your testimony?

7  A.  I would say yes.

8  Q.  So in compliance, you did not have the independent power to

9  mete out discipline when you felt it was warranted,

10  independently?

11  A.  I have made recommendations, and the collaboration agreed

12  with me.

13  Q.  Turn to 8002.  This is September 2006.  Okay.  Do you see

14  this?  Reji Musso, and the attachments are 25,500-dollar fine

15  ordered against Vitana in 2004 and consumer complaint with

16  rebuttal by DTV.  You understand DTV is DirecTV, right?

17  A.  I do.

18  Q.  Saying they termed, terminated, right?

19  A.  Yes.

20  Q.  That's what termed means?

21  A.  Yes, that's what it means.

22  Q.  The retailer.doc.  Do you see that?

23  A.  I do.

24  Q.  All right.  And then who is Ron Dufault who sent you this

25  fine ordered against Vitana in 2004 doc and the thing about

1  DirecTV terminating the retailer?

2  A.  Excuse me.

3  Q.  Who is Ron Dufault?

4  A.  Ron Dufault was an employee of Bruce's, but we all -- you

5  know, we had a small group, so we all worked together.

6  Q.  So Ron Dufault is an employee who works in the risk audit

7  department?

8  A.  Yeah, he did research for us.

9  Q.  Okay.  And he said he just cracked it.  It is Satellite

10 Systems Network.  The owner is Alex Tehranchi.  They were fined

11 25,500 by North Carolina in 2004 for TCPA violations, right?

12 A.  That's what it says.

13 Q.  Okay.  All right.  So we've looked in this case already at

14 Plaintiff's Exhibit 186, which is a consent decree, an

15 injunction against Vitana and Satellite Systems Network from

16 North Carolina.

17     Did you, after getting this e-mail, ask legal to go figure

18 out what was going on in North Carolina?

19 A.  Sir --

20         **MR. BICKS:**  Again, Your Honor that would be

21 privileged, I think.

22         **MR. GLASSER:**  Not what she asked.

23         **THE COURT:**  Well, sustained as to what she asked

24 legal?

25         **MR. GLASSER:**  I don't want their advice.  I just want

1  to know if she tasked legal to go figure out --

2          **THE COURT:**  Well, sustained.

3  **BY MR. GLASSER:**

4  Q.  Did you task anyone to go figure out what happened in

5  North Carolina?

6  A.  So if I may point out, this happened -- this exchange

7  happened, like, a month after I got there.  So when I -- when I

8  was doing my on-the-job training, there was no download about

9  anything about the SSN relationship with DirecTV, and at

10  that -- when I took over the position -- and then I have

11  subsequently found out that this had to do with prerecorded

12  calls, and they no longer engage -- SSN no longer engaged in

13  that type of marketing.  So there -- there really wasn't any

14  reason to download me, in my opinion, on that past experience

15  because their business model had changed, and now we were

16  evaluating them based on their new business model, which was

17  telephone marketing without the prerecorded --

18          **THE COURT:**  So that means your answer is no?

19          **THE WITNESS:**  That means my answer is no.  Thank you,

20  Your Honor.

21  **BY MR. GLASSER:**

22  Q.  But you did find out in that process that the State of

23  Florida had also sanctioned them, which is the fine in 2004,

24  right?

25  A.  For the same type of business practice.

```
1   Q.  All right.  So the State of Florida, just like the State of
2   North Carolina, had ordered Alex Tehranchi to stop using
3   automessages and autodialers in violation of Telephone Consumer
4   Protection Act?
5   A.  They were under a court order, yes.
6   Q.  And you understood, at least from this e-mail, that DirecTV
7   terminated them around this time?
8   A.  Yes.
9   Q.  The second page of the e-mail shows Alex Tehranchi's
10  website, which is yourfreedish.tv.  Do you see that?
11  A.  Yes.
12  Q.  All right.  He was able to use the website yourfreedish.tv
13  because DISH consented to his using of their trademarks, right?
14  A.  And he had the authorized retailer logo on the website.
15  Q.  Okay.  Now I'm on 8005.  This is actually the Thomas
16  Krakauer letter that you sent to the Tehranchis.  Do you see
17  this one?
18  A.  Yes.
19  Q.  And it's the exact same form letter, isn't it, that was
20  sent in the prior instance, the Schooler instance?
21  A.  Yes.
22  Q.  You don't know if Dr. Krakauer was even ever told that it
23  was SSN in 2009, right?
24  A.  The responsibility for communicating with Dr. Krakauer fell
25  in the area of the -- that was under the umbrella for the
```

1  executive resolutions team.  My team did not communicate with

2  customers and consumers.

3  Q.  Oh, okay.  So you're saying in this whole thick file,

4  your -- you and your six people never once in all -- from 2006

5  until the time you left in 2013 talked to an actual consumer?

6  A.  It wasn't -- that wasn't our responsibility.  Our

7  responsibility, if I could delineate, was the complaint would

8  come from the escalation resolutions team, which was known as

9  ERT.  We would get the complaint through that process that we

10 set up that sent the e-mail from TCPA, which stood for,

11 obviously, the Telephone Consumer Protection Act, and then to

12 vendor inquiries, which was our inbox.  We would then research

13 and investigate the claim by the consumer.  We would

14 communicate if we could identify who it was, and more often

15 than not, we couldn't identify these complaints.  We would

16 share that information with the retailer, and then we would

17 also share that with the call center.  The call center's

18 responsibility was to call the consumer back and handle it with

19 them, and then the retailer we encouraged to reach out to them.

20 Q.  But as far as you know, no process was ever put in place to

21 actually send a letter with the potential culprit's name on it

22 to Dr. Krakauer or any other consumer?

23 A.  I -- I don't want to sound like I don't care about

24 Dr. Krakauer and his complaint or any complaint by any

25 consumer, but that -- the call center was very strict about

1    managing the relationship with the individuals.  So I wouldn't

2    know if they ever sent a letter to Dr. Krakauer.

3    Q.   So here's a March -- I'm on page 8006 of the complaint

4    filed -- or the compliance file.  This is the Kitty Fowler

5    complaint, the Kitty Fowler complaint, March 2009, right?

6    A.   Right.

7    Q.   Same form letter to Alex Tehranchi, right?

8    A.   Yes.

9    Q.   I'm now on page 8009 of the file, and this is Jeffrey

10   Mitchell's garnishment against DISH for $15,000.  Do you see

11   that?  You can look through the file.  It's a multipage

12   document.

13   A.   I see the document.

14   Q.   And you understood that Mr. Mitchell had gotten a judgment

15   against SSN for TCPA Do Not Call violations in the amount of

16   $15,000, right?

17   A.   That's what it says, yes.

18   Q.   Okay.  At page 8035, November 2007, there's a complaint

19   from Ms. Jeanette Payne, right?  And she believes her calls

20   were in violation of Telephone Consumer Protection Act, right?

21   A.   That was the standard -- yes, that's correct, and that's

22   the standard phraseology in the form letter.

23   Q.   All right.  And this looks like it was an earlier version

24   of the form letter?

25   A.   Yes, yes.

1  Q.  So here, January 17th, 2007, it looks like another

2  complaint from Mr. Mitchell?

3          **THE COURT:**  What page is that?

4          **MR. GLASSER:**  This is on page 8037.

5  **BY MR. GLASSER:**

6  Q.  Do you see that?

7  A.  I do.

8  Q.  Okay.

9  A.  If I might offer up, Mr. Mitchell appeared quite frequently

10  in our -- in our records.  He and -- we had -- we had several

11  consumers who tended to make a living placing TCPA complaints,

12  and while -- so -- so Mr. Mitchell did come up for a number of

13  different retailers and a number of different complaints.

14  Q.  And he won his case, right?

15  A.  Well, he's -- he's what we refer to as a harvester or

16  frequent flyer.  Now, what I also want to add about that is

17  even though we saw his name a lot, we still thoroughly

18  investigated all of the allegations, but he was one of many

19  folks who had multiple phone numbers and --

20  Q.  But -- I know you just said that you thoroughly

21  investigated, but didn't we establish right when you took the

22  witness stand that you did not see your role as investigating

23  to determine legitimacy?

24  A.  Right, but we investigated to identify the retailer.

25  Q.  Okay.  So identifying the retailer is, in your mind,

1  thoroughly investigating?

2  A.  In my mind, it is.

3  Q.  Okay.  December 28th, 2006, Mr. Gregory Fisher believes he

4  was called in violation of the telephone consumer --

5          **THE COURT:**  Did you say what page that was?

6          **MR. GLASSER:**  Yes, ma'am.  It's page 8042.

7  **BY MR. GLASSER:**

8  Q.  That's another complaint in December of 2006, right?

9  A.  I'm sorry.  What page did you say?

10 Q.  8042, ma'am.  Gregory Fisher.

11 A.  Yes, that's what this letter is about.

12 Q.  And, again, it's the same process of getting a complaint,

13 identifying a retailer, and sending the form letter to the

14 retailer, right?

15 A.  That is correct.

16 Q.  Turning to 8055, this is a letter from 2006 to

17 Mr. Tehranchi, right?

18 A.  Yes.

19 Q.  And this -- this is the beginning of the monitoring of

20 inbound and outbound phone calls, the content of phone calls

21 from the phone center, right?

22 A.  This is the -- this is similar to the earlier letter we had

23 that had the four options in it.  This was the precursory

24 letter to him about that, and it's about monitoring for terms

25 and conditions of the sale.

1  Q.  Okay.  So even though you're saying you monitored for terms

2  and conditions, the person from DISH hears the whole call,

3  don't they?

4  A.  It depends on whether or not the phone system allows that.

5  As I mentioned, they had different -- I don't know about

6  Mr. Tehranchi's phone system at this time.

7  Q.  Now I'm turning to the next page, 8056.  This is that

8  Schooler complaint and the identification.  It's almost the --

9  it's the same type of e-mail we saw with Dr. Krakauer.  It's

10  the process -- you've identified the retailer, and this is the

11  precursor internally to sending the form letter, right?

12  A.  If I could have a moment, please.

13  Q.  Actually, this is Kimble and Schooler.

14     (Pause in the proceedings.)

15  A.  Yes.

16  Q.  And the date of this is October 2008, right?

17  A.  That is correct.

18  Q.  Page 8063, this is the March 2009 complaint of Kitty

19  Fowler, right, and Satellite Systems is identified?  This is

20  the precursor to the Kitty Fowler form letter, right?

21  A.  Yes.

22  Q.  And then the rest of the file is the retailer agreement

23  we've gone through, right?

24        **THE COURT:**  Well, she wasn't in here when we went

25  through it.

1  BY MR. GLASSER:

2  Q.  Yeah.  Okay.  We're at the back.  So at the back, I'm at

3  8008104.  These are the -- you don't use EchoStar anymore,

4  right?

5  A.  No.

6  Q.  But these are the trademarks they were entitled to use

7  under the contract?

8  A.  From a long time ago.  They've had other iterations since

9  then.

10  Q.  Okay.

11          THE COURT:  Is this a good time to stop for the

12  morning break?

13          MR. GLASSER:  Yes, ma'am.

14          THE COURT:  All right.  Ladies and gentlemen, I'm

15  going to give you a 15-minute break.  Please remember not to

16  discuss the case among yourselves or with anyone else.  Don't

17  have any contact with the lawyers, parties, or witnesses.  Keep

18  an open mind and come back to the jury room at 11:15.  The

19  jurors are excused.  Leave your notes in your chair.

20      (The jury left the courtroom at 10:58 a.m..)

21          THE COURT:  Okay.  So are you done with questions

22  pre --

23          MR. GLASSER:  Of this -- of this exhibit, yes, ma'am.

24          THE COURT:  All right.  Okay.  Anything else before we

25  take our morning recess for the Plaintiff?

1      **MR. GLASSER:**  No, ma'am.

2           **THE COURT:**  For the Defendant?

3      **MR. BICKS:**  Nothing, Your Honor.

4           **THE COURT:**  All right.  We'll take a 15-minute recess.

5      (A morning recess was taken from 10:58 a.m. until

6  11:15 a.m.)

7           **THE COURT:**  All right.  Anything we need to take up

8  for the Plaintiff?

9      **MR. GLASSER:**  I don't think so, Your Honor.

10          **THE COURT:**  For the Defendant?

11     **MR. BICKS:**  No, Your Honor.

12          **THE COURT:**  I am trying to give you all enough time --

13  you know, when one party says we move the admission of exhibit

14  whatever, I'm trying to pause and give you enough time; but,

15  you know, if I'm not seeing any movement, I'm assuming there's

16  no objection, but, you know, I prefer for you to object before

17  I go ahead and say it's admitted.  I admit it if I don't hear

18  an objection.  So please speak up quickly if there's an

19  objection.  Okay?

20     **MR. BICKS:**  Yes, thank you.

21          **THE COURT:**  I believe we're ready for the jury.

22     (The witness returned to the witness stand.)

23     (The jury entered the courtroom.)

24          **THE COURT:**  All right.  Mr. Glasser, you may resume

25  your questions.

1  BY MR. GLASSER:

2  Q.  I'm approaching you, Mrs. Musso -- is it Ms. or Mrs.?

3  A.  Ms.

4  Q.  Ms. Musso, with Exhibit 191.

5          THE COURT:  Plaintiff's exhibit?

6  BY MR. GLASSER:

7  Q.  Plaintiff's Exhibit 191.  Just read it for yourself, just

8  the first paragraph.  It's a press release from the Florida

9  Department of Agriculture and Consumer Services, right, dated

10 November 2004?

11 A.  Yes.

12 Q.  And it discusses that 25,500-dollar civil penalty against

13 -- that we were just discussing before we broke, right?

14 A.  It does.

15 Q.  And I think before we broke, you had said that you believed

16 the Florida sanction against SSN was only for autodialing and

17 automessaging and not Do Not Call, right?

18 A.  I believe that, yes.

19 Q.  All right.  So now that you've reviewed the press release

20 from the Florida Department of Agriculture and Consumer

21 Services, has it refreshed your recollection that it was Do Not

22 Call violations?

23 A.  I see that in the first paragraph, yes.

24          MR. GLASSER:  I move the admission of PX191, Your

25 Honor.

1            **MR. BICKS:**  Objection, Your Honor, as hearsay, remote

2  in time, and irrelevant.

3            **THE COURT:**  Overruled.  It will be admitted.

4  **BY MR. GLASSER:**

5  Q.  So it's the Florida Department of Agriculture and Consumer

6  Services.  The date is 11-4-2004, and it says the Florida

7  Agriculture and Consumer Services Commissioner has obtained a

8  25,500 civil penalty against the company for violations of the

9  State's Do Not Call List, and it goes on to identify the

10  company, right?

11  A.  That's what it says.

12            **MR. BICKS:**  But he didn't read --

13            **THE COURT:**  All right.  Let's move on.

14  **BY MR. GLASSER:**

15  Q.  Now, I'm approaching with three -- I need 656, too.

16       Okay.  Ms. Musso, I'm approaching with three exhibits that

17  were admitted yesterday in the examination of Mr. Ahmed.

18  They're dated -- they're Plaintiff's Exhibit 656, Plaintiff's

19  Exhibit 503, and Plaintiff's Exhibit 504, and each of them are

20  an e-mail that was forwarded to your boss, Bruce Werner, on

21  January 30th, 2007.  Can you take those?

22  A.  I can.

23  Q.  And can you take the compliance file and confirm for the

24  jury that none of those exhibits are in the compliance file?

25            **THE COURT:**  You want her to look through the hundreds

1  of pages?

2          **MR. GLASSER:**  It's not hundreds, Your Honor.

3          **THE COURT:**  Which exhibit is the compliance file?

4          **MR. GLASSER:**  15.

5  **BY MR. GLASSER:**

6  Q.  Have you looked before we came here today to see?

7  A.  No.

8  Q.  Okay.  Have you ever seen any of those three e-mails

9  before?

10  A.  I'll need a minute, please.

11  Q.  Okay.

12      (Pause in the proceedings.)

13      And by "before," I mean, why don't we be specific, before

14  the end of the class period, August of 2011, before this

15  litigation.

16          **MR. BICKS:**  I would object to this as irrelevant.

17          **THE COURT:**  Well, you're asking her if she had seen

18  them before the end of 2011?

19          **MR. GLASSER:**  Yes, ma'am.

20          **THE COURT:**  All right.  Overruled.

21          **THE WITNESS:**  These do not look familiar to me.

22  **BY MR. GLASSER:**

23  Q.  Okay.  I'll take them back.  Thank you.

24      So far as you know, these three e-mails that Mr. Oberbillig

25  sent to Bruce Werner having to do with SSN, all on

1  January 30th, 2007, with no comment were never forwarded onto

2  you?

3  A.  That's correct.

4  Q.  And in January or February of 2007, I take it, you don't

5  recall any briefing from Bruce Werner about anything --

6          **THE COURT:**  Anything?

7  **BY MR. GLASSER:**

8  Q.  -- having to do with SSN?

9  A.  It's a long time ago.  I don't recall.

10  Q.  I'm approaching you with Plaintiff's Exhibit 607, which has

11  not been previously admitted.

12          **MR. GLASSER:**  I move the admission, Your Honor,

13  Plaintiff's Exhibit 607.

14          **THE COURT:**  It will be admitted.

15  **BY MR. GLASSER:**

16  Q.  So this is a fourth e-mail sent by Mr. Oberbillig to Bruce

17  Werner on January 30th, 2007, right, Ms. Musso?  Do you agree?

18  A.  Yes, I do, except can I just read, please?

19  Q.  Sure.  Take your time.

20      (Pause in the proceedings.)

21  A.  Okay.

22  Q.  All right.  So if we go to this page, the underlying e-mail

23  is --

24          **THE COURT:**  All right.  What's your question for this

25  witness about --

1  **BY MR. GLASSER:**

2  Q.  The underlying e-mail is about SSN, right?

3  A.  Yes.

4  Q.  Okay.  And --

5         **THE COURT:**  First you need to establish this witness

6  knows something about this.

7         **MR. GLASSER:**  I moved its admission as a party

8  opponent's admission.

9         **THE COURT:**  I admitted it, but --

10         **MR. GLASSER:**  Okay.

11         **THE COURT:**  -- there's nothing to indicate this

12  witness --

13  **BY MR. GLASSER:**

14  Q.  Did you ever get this e-mail forwarded to you by Bruce

15  Werner, to your knowledge?

16  A.  I did not.

17  Q.  Okay.  Turning to Plaintiff's Exhibit 8 --

18         **MR. GLASSER:**  I move the admission of Plaintiff's

19  Exhibit 8, Your Honor.

20         **MR. BICKS:**  Can I just quickly look at it, Your Honor?

21         **THE COURT:**  All right.

22      (Pause in the proceedings.)

23         **MR. BICKS:**  No objection.

24         **THE COURT:**  It will be admitted.

25  **BY MR. GLASSER:**

1  Q.  Plaintiff's Exhibit 8, Ms. Musso -- here, I'll approach you

2  with one so you can have it.

3          **THE COURT:**  Keep your voice up, Mr. Glasser.

4      (Document handed to the witness.)

5  **BY MR. GLASSER:**

6  Q.  -- is another consumer complaint.  It's dated May 4th,

7  2010, right, and it went to you?  Do you agree?

8  A.  Yes, that's correct.

9  Q.  It's a TCPA complaint by a gentleman named Richard

10  Campbell, okay?

11  A.  Yes.

12  Q.  I didn't see it in the compliance file.  Do you think it --

13  do you know why this complaint was not in the compliance file?

14  It's in May of 2010.

15  A.  You mean in this paper file?

16  Q.  Yes, ma'am.

17  A.  So, as I stated, we also had electronic copies.  We didn't

18  make hard copies of everything.  So it's conceivable that

19  it's -- I would assume it's in the electronic file.

20  Q.  Okay.  And this complaint says that "As stated in the

21  Attorney General's complaint, the issue was rude behavior."

22          **THE COURT:**  If you can slow down, please.

23  **BY MR. GLASSER:**

24  Q.  Okay.  "The agent appears to be a sales partner agent, as

25  he told the customer he worked for DirecTV."  Do you see that?

```
1  A.  I do.
2  Q.  "And then proceeded to try and get the customer to switch
3  from DirecTV to DISH."  Do you see that?
4  A.  I do.
5  Q.  Okay.  So you agree that this complaint in May of 2010,
6  about a year after Dr. Krakauer's May 2009 complaint, is the
7  same subject matter, a person pretending to be DirecTV trying
8  to switch him to DISH?
9        MR. BICKS:  Objection, Your Honor.  It's
10 argumentative.
11        THE COURT:  Well, overruled.
12        THE WITNESS:  It seems to be the same context, yes.
13 BY MR. GLASSER:
14 Q.  Okay.  And then the internal process says that the consumer
15 is on the national Do Not Call List, right?
16 A.  Yes, it does.
17 Q.  And identifies Satellite Systems as the national sales
18 partner responsible for this call, right?
19 A.  Yes, it does.
20 Q.  I'm approaching you with Plaintiff's Exhibit 52.  Maybe I
21 can just do it here on the ELMO.  Do you recognize Plaintiff's
22 Exhibit 52 --
23        MR. GLASSER:  I move the admission of 52, Your Honor.
24        THE WITNESS:  It's our -- yes, it's our standard
25 letter that we send.
```

1        **MR. GLASSER:**  I move the admission.

2        **THE COURT:**  All right.  It will be admitted.

3        **MR. BICKS:**  Your Honor, we've -- the same objection we

4   made to these types of document I would just have on the

5   record, but Your Honor has already addressed it.

6        **THE COURT:**  All right.  Overruled.

7   **BY MR. GLASSER:**

8   Q.  So this is Mr. Richard Campbell.  It's May of 2010, and

9   this is the same person of the exhibit we just looked at who

10  said -- who was talking about the impersonation of -- or trying

11  to move him from DirecTV to DISH by saying he worked for

12  DirecTV.  Got it, right?

13  A.  Yes.

14  Q.  And the same form letter goes to SSN, right?

15  A.  It does.

16  Q.  Turning to Exhibit 899 -- I'm approaching you with

17  Exhibit 899.  Do you recognize Plaintiff's Exhibit 899 as an

18  e-mail from you to a gentleman named Rehan who works at

19  Satellite Systems Network?

20  A.  I do, yes.

21       **MR. GLASSER:**  I move the admission of Plaintiff's

22  Exhibit 899, Your Honor.

23       **MR. BICKS:**  No objection.

24       **THE COURT:**  It will be admitted.

25  **BY MR. GLASSER:**

1  Q.  Okay.  So the complaint of Mr. Campbell -- this has to do
2  with Mr. Campbell's complaint, right?
3  A.  Yes.
4  Q.  It's dated May 172, 2010, right?
5  A.  Yes.
6  Q.  The complaint of Mr. Campbell came in through the
7  Pennsylvania Attorney General, right?
8  A.  Yes.
9  Q.  All right.  And at the bottom here, Rehan from Satellite
10 Systems -- at your -- from Satellite Systems, e-mails and says
11 that "We'd previously done business with the customer.  We've
12 added the phone numbers to the DNC," right?
13 A.  Yes.
14 Q.  All right.  "Let me know if you have more questions or
15 concerns," right?
16 A.  Right.
17 Q.  And you ask:  "Did you rescrub the number?"  Do you see
18 that?
19 A.  I did.
20 Q.  And he says:  "No, this record was not rescrubbed," right?
21 A.  That is correct.
22 Q.  So with respect to Dr. Krakauer's complaint in 2009, they
23 said they hadn't scrubbed it, and they say the same thing here,
24 right?
25 A.  They did.

1   Q.   And then you say:  "Long time ago, Sophie will remember,

2   when I first came over to retail services, there were some

3   issues, but not again until now.  PossibleNOW can help you or

4   help your own legal counsel, particularly if you're calling

5   nationwide.  A complaint is an allegation, not necessarily a

6   violation.  We just want to encourage you to be cautious."  Do

7   you see that?

8   A.   I do, and the sentence about the existing business

9   relationship, which is --

10  Q.   But you know that there are very specific and special rules

11  on that, and you have no reason to believe, based on the

12  evidence in this e-mail, that such a relationship existed, do

13  you?

14  A.   I do not, but I wanted to caution my retailer, as was my

15  responsibility, that they needed to be aware of all of the

16  parameters surrounding that in every state in the country.

17  Q.   So you had no reason to believe that it was correct that

18  they had one with Dr. Krakauer, nor in this instance, correct?

19  A.   That is correct.

20  Q.   So -- so now we have the -- the two complaints,

21  Dr. Krakauer and Mr. Campbell.  They both -- in response to

22  both, Satellite Systems has told you no scrubbing, right?

23  A.   That's -- yes, that's correct.

24  Q.   All right.  You did not ask them, did you, are you still

25  scrubbing people from this unscrubbed database?

1  A.   I did not.

2  Q.   You didn't ask them why they're still calling people from

3  this unscrubbed database, did you?

4  A.   I did not.

5  Q.   You did not require them to run the list of people through

6  this -- of this unscrubbed database through PossibleNOW, did

7  you?

8  A.   I did not, no.

9  Q.   Even though the exact same complaint came in with the exact

10  same excuse, right?

11  A.   That is correct.

12  Q.   You did not ask them to upload a month's worth of call

13  records to PossibleNOW for auditing and checking, did you?

14  A.   I did not.  It's impractical.  There was no way I could

15  manage having that done.

16  Q.   DX2, which we looked at, which was the records retention

17  policy, requires them to maintain records, right?

18  A.   It does.

19  Q.   You could have had your field service representative

20  spot-check those records against some Do Not Call, couldn't

21  you?

22  A.   Again, that did not fall under the purview of my team, nor

23  of DISH.  They are independent contractors, and they need to be

24  the ones familiar with their marketing practices and the laws

25  as they relate to those.

1    Q.  So even as late as May 2010, your group within the company

2    was just not set up for that kind of affirmative investigation,

3    correct?

4    A.  That's correct, but not -- not only were we not set up,

5    that was not our understanding of the relationship.

6    Q.  And as late as May 2010, your group was not set up for that

7    kind of affirmative monitoring, right?

8    A.  No, we were not.  We did our monitoring proactively in our

9    investigations.

10   Q.  Obviously, the choice about the ambit of your job and

11   authority was set by people above you, right?  You were given

12   the job; you did it, right?

13   A.  I had input into what I could do, yes, but they --

14   Q.  But --

15   A.  Yes, of course, I had a job description.

16   Q.  And that's what you've described to the jury today, right?

17   A.  That's correct.

18   Q.  I'm approaching you with Plaintiff's Exhibit 1048, which I

19   move the admission of.

20        **MR. BICKS:**  Can we just look at it, Your Honor?

21        (Pause in the proceedings.)

22        Your Honor, I would object because this applies to a

23   different retailer and a bunch of different ones as well,

24   consistent with what Your Honor has ruled.

25        **THE COURT:**  All right.

1          **MR. GLASSER:**  Let me maybe lay a little foundation,

2   Your Honor.

3          **THE COURT:**  Okay.

4   **BY MR. GLASSER:**

5   Q.  Can you turn to page 10487?

6          **THE COURT:**  10487, which is where?

7          **MR. GLASSER:**  10487, it's about 7 pages into the

8   exhibit, Your Honor.  It's at the bottom of the page, Your

9   Honor.

10  **BY MR. GLASSER:**

11  Q.  Ms. Musso, do you recognize that -- the questions -- the 46

12  questions to be answered on this page 7 are the quality

13  assurance questions that were routinely administered or checked

14  at each national sales partner as part of the quality assurance

15  process in sales?

16  A.  This was the -- yes, this was the quality assurance form

17  that had several iterations due to changes in promotions and

18  programming.

19          **MR. GLASSER:**  And, you know, I can move the admission

20  of just this one page, Your Honor.  I just want to use an

21  example of what was going on.

22          **THE COURT:**  All right.  Any objection to that page?

23          **MR. BICKS:**  No, Your Honor.

24          **THE COURT:**  All right.  So page 7 of Plaintiff's 1048

25  will be admitted as Plaintiff's 1048.

**BY MR. GLASSER:**

Q.   All right.   It's hard to see each of these, but, basically,

do you agree, Ms. Musso, that the Q/A process, which we've

talked about in general, was just a series of checks on the

sales process and a series of questions that are answered each

week where the national sales partner is graded on each of

these items?   For example -- let's just pick one.   Did the

agent inform the customer that they can check their balance,

make payments, and find information on dishnetwork.com, for

example?

A.   These are the terms and conditions of the sale, yes.

Q.   And so what this is, it's a list -- when we've said in this

case you're listening on phone calls, you're listening to

recording of phone calls, these are the things that those field

service representatives are scoring the national sales partner

against, these 45 categories, right?

A.   No, that's not correct.

Q.   Okay.   Tell me --

A.   As I mentioned early on, when we looked at the different

options, this particular -- by the time we had this form, we

actually had the national quality assurance team of the call

center, their vendor, listen to these phone calls.   So it

wasn't FSDRs.   It wasn't employee -- some -- some were listened

by employees, but mostly a vendor listened to it, and they

listened specifically for this.   They had no knowledge of, you

1 know, anybody's sales or scripting or anything like that. It

2 was particularly for these things.

3 Q. Right. And these 45 or 46 items do not include any

4 monitoring for Do Not Call violations, correct?

5 A. That is correct.

6 Q. And that's true at any time up until when you left the

7 company, right?

8 A. That is correct.

9 Q. So what aspects of quality were policed in a granular way

10 was a decision made by people elsewhere in the company other

11 than compliance, right?

12 A. No, I would -- I was completely involved in the whole

13 process of developing these forms and working with the

14 retailers to implement, to make sure that they adhered to

15 the -- you know, we were looking at their Q/A scores. We

16 really wanted the customers to have an informed buying decision

17 because these were complicated promotions with a lot of ins and

18 outs, commitment periods, and so forth. So based on -- at the

19 time I left, we had about 68 of these things because the

20 promotions would get -- you know, depending on the promotion

21 they bought, the disclosure would apply.

22 Q. I take it then it was an iterative process over the years

23 of what would be in the quality assurance program and what

24 would not be?

25 A. There were some basics, but, yes, we had the basics, and

1  then we would modify certain things based on -- terms would

2  change, you know, equipment would change, programming would

3  change, so we did that based on the marketing.

4  Q.  All right.  At any time after June of 2009, at any of the

5  meetings you were involved in, having to do with choosing what

6  to monitor at your national sales partners, did anyone at any

7  time ever suggest monitoring for Do Not Call compliance?

8  A.  No, sir.  And I do believe that that would be because it's

9  impossible to do.  We would have to rescrub their lists, as I

10 understand it, to know whether they were calling someone on the

11 Do Not Call List.  I don't see how that could be practical.

12 Q.  Couldn't you just scrub a week's worth and see how many

13 errors are in there?

14 A.  It's not practical for us to do that.  It's their

15 responsibility to abide by the law.

16 Q.  So -- okay.  I think you've said two things.  On the

17 practical standpoint -- I mean, you've got a company that's

18 already looking at them on 68, as you said, by the end items

19 and has 18 satellites in space.  As a practical matter, can you

20 not compare one list of numbers for a week against a Do Not

21 Call List, as a practical matter?

22 A.  It wasn't -- no, it wasn't our responsibility.  I don't see

23 how we could have done that.

24 Q.  Okay.  So is it -- is your position a practical one or just

25 we're just not going to do it?

```
1   A.   It's more -- it's more practical.
2   Q.   Let's go to 1294.
3              THE COURT:   That's Plaintiff's Exhibit 1294?
4              MR. GLASSER:   Yes, ma'am.
5   BY MR. GLASSER:
6   Q.   I'm approaching you with Plaintiff's Exhibit 1294.
7              MR. GLASSER:   I move the admission of it, Your Honor.
8              MR. BICKS:   Let me just look at it, Your Honor.
9        (Pause in the proceedings.)
10             MR. BICKS:   No objection, Your Honor.
11             THE COURT:   It will be admitted.
12  BY MR. GLASSER:
13  Q.   All right.   So this is Plaintiff's Exhibit 1294.   It's an
14  e-mail from Rehan, the same gentleman -- this is in June 2010,
15  right?
16  A.   Yes.
17  Q.   All right.   This is the same Rehan that sent the e-mail
18  that we just looked at in the Campbell case, which was May of
19  2010, right?
20  A.   Yes.
21  Q.   Sends it to Bruce Werner and you, right?
22  A.   Yes.
23  Q.   And this says:   "Q2 sales script," right?
24  A.   Yes.
25  Q.   "Direct to DISH script, Q2."   Do you see that?
```

1   A.   Yes.

2   Q.   All right.  The Campbell complaint was in the second

3   quarter of 2010, right, May?

4   A.   Yes.

5   Q.   And this e-mail is about the Q2 sales script for moving

6   people from Direct to DISH, isn't it?

7   A.   That's what it says.  I don't know that's what it meant.

8   Q.   And it says:  "Here's the sales scripts for Q2," right?

9   A.   That's what it says.

10  Q.   "Please let me know if any changes are warranted," right?

11  A.   That is correct.

12  Q.   "I also have some questions before submit an automated

13  disclosure script."  Do you see that?

14  A.   I do.

15  Q.   So it's clear from this e-mail that this is not a script

16  for automatic disclosure because he has questions before he

17  submits that script; isn't that right?

18  A.   No, that is not right.

19  Q.   Okay.

20  A.   What the --

21  Q.   So even if this e-mail says --

22          **MR. BICKS:**  Your Honor, he interrupted the witness.

23          **THE COURT:**  You can ask another question.  She

24  answered the question.  Go ahead.

25

**BY MR. GLASSER:**

Q.  All right.  So when he says sales script for Q2 in the first sentence and then says he has some questions before he gives the automated disclosure script, you don't believe those are two different things?

A.  I don't.  I believe that there's a misunderstanding about this e-mail.  So in our processes, in those Q/A disclosures, there were some that could be recorded in an automated disclosure script.  The rest of them could be contained -- they needed to be delivered to the customer verbally.  So they would incorporate these disclosures into their sales script, which we didn't evaluate for sales.  We were only looking to check off that they mentioned each of the caveats that needed to be verbally required.  He submitted that first so then he would know what he could have -- what he could put into the recording.  I actually sent out e-mails that said this has to be verbal.  This has to be recorded.  So that's what that meant.

Q.  All right.  But it is the case that you knew and DISH knew that they were calling a series of people, a list of people, trying to move them from Direct to DISH at this exact time, right?

A.  I -- I didn't take it as that, no.

Q.  Well, the Campbell complaint, which was probably two weeks before this, was about a Direct-to-DISH sales pitch, wasn't it?

1  A.  Yes.

2  Q.  Okay.  And Dr. Krakauer's complaint was about a

3  Direct-to-DISH sales pitch, right?

4  A.  It was.

5  Q.  And we know from the responsive e-mails from Satellite

6  Systems that the list wasn't scrubbed, right?

7  A.  That it wasn't rescrubbed.

8  Q.  Okay.  And -- and -- and so this continued calling was

9  pursuant to a script that had been approved, right?

10  A.  We didn't approve the script, sir.  I've mentioned that

11  several times.  We looked for the containment of the

12  disclosures within the context of the sales script as it

13  related to whether they were verbal disclosures or recorded

14  disclosures.

15  Q.  So the complaint -- the exact complaint from Dr. Krakauer

16  and from Mr. Campbell was that these guys were pretending to be

17  somebody else to do this switcheroo, right?

18  A.  To the best of my knowledge, that's what the complaint

19  said.

20  Q.  I take it because you never decided whether they were

21  legitimately complaining, you never asked SSN to stop?

22  A.  They were in charge of their own marketing practices.  I

23  did not ask them to stop.

24  Q.  So, just to summarize, in all the years you worked in

25  compliance, no one was ever told to check who SSN -- whether

1  SSN was calling on the Do Not Call List physically?

2  A.  Not to my knowledge.

3  Q.  And in all the years you were the compliance manager, no

4  one was ever told to look at SSN's calling documentation to

5  compare it to the Do Not Call?

6  A.  Not to my knowledge.

7  Q.  And this decision had to do with what to do or not do, that

8  was set above you?

9  A.  That had to do with what we believed to be covered in the

10  retailer agreement.

11  Q.  I'm approaching you with Plaintiff's Exhibit 70.

12          **MR. GLASSER:**  And I move its admission.

13          **MR. BICKS:**  I'm looking at it, Your Honor.

14      (Pause in the proceedings.)

15          **MR. BICKS:**  Objection on relevance, Your Honor.

16          **THE COURT:**  All right.  Well --

17          **MR. GLASSER:**  I can lay a foundation before we show

18  it?

19          **THE COURT:**  All right.  Go ahead.

20  **BY MR. GLASSER:**

21  Q.  Ms. Musso, you recognize this as an e-mail you got from Guy

22  Caldwell of PossibleNOW on or about October 12th, 2009,

23  correct?

24  A.  Yes.  I need a minute, please.

25  Q.  Oh, okay.

1       (Pause in the proceedings.)

2   A.   Could you repeat the question, please?

3   Q.   You recognize it as an e-mail you received from an employee

4   of PossibleNOW to you, right?

5   A.   I do.

6   Q.   In it, PossibleNOW is making a business proposal about

7   different levels of compliance, surveying, assessment, or

8   certification that could be rolled out to national sales

9   partners, correct?

10  A.   That is correct.

11          **MR. GLASSER:**  I move it's admission, Your Honor.

12          **MR. BICKS:**  Objection again, Your Honor, on relevance

13  grounds, hearsay.

14          **THE COURT:**  Overruled.

15  **BY MR. GLASSER:**

16  Q.   Okay.  And so, just to bring it home before we get to the

17  exact suggestions, at the end of the day, DISH decided not to

18  do this with the national sales partners, right?

19  A.   So the -- they didn't make them do that.

20  Q.   Exactly.

21  A.   But if I could elaborate?

22  Q.   Let me ask you a few questions, and you can elaborate maybe

23  during that or as your counsel asks you some, okay?

24       So part 1 was just a compliance survey, and it would be

25  $1,000 per authorized retailer, right?

1  A.   That's what it says.

2  Q.   And for this compliance survey, they would just go on in

3  and gauge the call center's knowledge of federal, state and --

4  laws and guidelines from DISH, right?

5  A.   That's what it says.

6  Q.   And the effectiveness of this program would be augmented by

7  performance of a periodic Do Not Call data audit, right?

8  A.   Yes, that's what it says.

9  Q.   Then they offered a Tier 2 compliance assessment that would

10 cost $2,500 per authorized retailer that would be, you know,

11 one step higher, kind of provide a more comprehensive Do Not

12 Call review, right?

13 A.   Yes, that's what it says.

14 Q.   And then they offered a Tier 3 where they'd actually

15 certify compliance of the national sales partner, right?

16 A.   That's what it says.

17 Q.   And that would be $4,500 per authorized retailer, right?

18 A.   That's what it says.

19 Q.   And this is a program that DISH declined to pay for or to

20 order the national sales partners to participate in; isn't that

21 true?

22 A.   DISH did not require the partners to participate in it.

23        **MR. GLASSER:**  I don't have any further questions, Your

24 Honor.

25        **THE COURT:**  All right.  Questions for DISH?

1    **MR. BICKS:**  Thank you, Your Honor.

2                          **CROSS-EXAMINATION**

3    **BY MR. BICKS:**

4    Q.  And good afternoon, Ms. Musso.

5           **THE COURT:**  Still morning, 10 minutes.

6    Q.  I should say good morning.  To put things in context for

7    us, let's focus on the time period, say, 2006 to 2010.  Are you

8    with me?

9    A.  I am.

10   Q.  And if you had to estimate, how many calls during that time

11   period would you think a retailer like SSN would make?  Is it

12   in the millions?

13   A.  Absolutely.

14   Q.  All right.  And you were asked questions for a couple

15   hours, and we'll go through some of the complaints, but I

16   counted less than 10.  If you see less than 10 complaints, as a

17   person involved in retailer compliance, against a background of

18   millions of calls, what does that tell you about the nature of

19   whether there is a telemarketing Do Not Call problem?

20   A.  It tells me that there's not a red flag for that OE

21   retailer.

22   Q.  And there were questions about roles and responsibilities.

23   Do you remember that?

24   A.  I do.

25   Q.  Did you turn a blind eye to what was going on with SSN?

1  A.  No, not at all.  I didn't turn a blind eye to any of the

2  retailers.

3  Q.  And you were shown a handful of complaints, and I'll ask

4  about those.  Did you investigate every one of those

5  complaints?

6  A.  We did.

7  Q.  And describe just generally the kind of steps that you and

8  folks working with you would do in evaluating those complaints.

9  A.  When we got the information from the call center, we would

10  take the complaint.  We would research the phone number.  We

11  would research -- sometimes the consumer would provide a name.

12  We would research the name.  We would look at whether the

13  Caller ID that they provided, if they provided one, appeared

14  anywhere in our documentation.  We would sometimes Google, you

15  know, or do an Internet search to try to determine if we could

16  find any information.  So in my opinion, we did a very thorough

17  investigation with the information we had available to us to

18  try to determine the retailer responsible.

19  Q.  And does that apply to the retailer that we're talking

20  about here, which is SSN?

21  A.  Yes, it does.

22  Q.  And as a consequence of the investigations that were

23  performed, did you make judgments about the right way to act?

24  A.  The right way for the retailer to act?

25  Q.  The right way for DISH to act, the right steps to take?

1  A.  Oh, absolutely.  I had a -- or thought I had a fairly clear

2  understanding of, you know, what the expectations were with

3  respect to DISH and my direction.

4  Q.  And when you see a complaint, is a complaint something that

5  is different from a confirmed telemarketing violation?

6  A.  Yes, it is.

7  Q.  And can you share with our jury some of the challenges

8  involved in determining whether there's something really behind

9  a complaint?

10  A.  Well, most often, when a customer appeared on a Do Not Call

11  List and we got a complaint, it was -- there had been an

12  opt-in.  In fact, the retailer in question didn't do

13  telemarketing.  They did Internet opt-in -- Internet sales, and

14  there was an opt-in that the customer would sign.  In other

15  words, they would check a box and say it's okay to give me a

16  call.  And then, you know, the customer would not often

17  remember that they had asked for that -- you know, that

18  contact.  So in those cases, we would ask for the opt-in, and

19  most often, we would get it, but we -- there were also mistakes

20  sometimes.  You know, they -- humans load the list and humans

21  download the list, so sometimes there can be some mistakes,

22  but, you know, we -- the thing was we took each issue and

23  evaluated it on its own on the basis of that one and would run

24  into just different types of things.

25  Q.  And in evaluating whether or not to terminate a retailer,

1  is that a serious consequence of terminating a retailer?

2  A.  Oh, yes.

3  Q.  And what can be the consequences to a retailer like SSN if

4  they are terminated?

5  A.  Well, I think I mentioned earlier that we have to take into

6  consideration, first of all, whether there's -- there's a

7  pattern of ill behavior, whether it's egregious, whether there

8  are -- you know, whether or not we get responses from the

9  retailer, and then we also have to think about the ripple

10  effect, which is the business that they run that has employees

11  and -- so they'll lose a revenue stream.  The employees lose

12  their jobs.  So we think about all of that when we make those

13  determinations.

14  Q.  And those factors that you've talked about, the number of

15  the violations, the egregiousness of them, and things like

16  that, are those all factors that you took into account when you

17  were dealing with Satellite Systems Network?

18  A.  Yes, that was.

19  Q.  And what did you conclude and judgments did you make based

20  on that information that you had at the time?

21  A.  Based on that information and knowing the number of phone

22  calls they had probably made and knowing that we had gotten

23  less than 10 complaints over that period, there was nothing

24  egregious looking about it, there was no ill pattern of

25  behavior, I didn't -- I didn't think there was any reason at

1  all to terminate them.

2  Q.  And is it in DISH's interest if a consumer is called when

3  that consumer doesn't want to be called?

4  A.  No.  In fact, I -- I mean, I think we've all gotten a call

5  from somebody we didn't want to hear from, and the first thing

6  we say is I will never do business with those people again.  So

7  if you get that call, you know, we've got thousands of

8  customers who don't want to ever do business with us, we've

9  lost -- essentially we've lost money.

10 Q.  And you were asked questions about is it practical for you

11 to start rescrubbing lists that a retailer like SSN has

12 indicated were scrubbed.  Remember those questions?

13 A.  I do.

14 Q.  Can you explain to our jury, when a company like DISH has

15 3,500 retailers around the country, why that is impractical?

16 A.  There's no way we could have the staff, the time, the

17 systems to -- to manage all of those lists even on a weekly or

18 daily basis and could check that -- could check to see if these

19 phone numbers were scrubbed.

20 Q.  And our jury has heard PossibleNOW.

21 A.  Right.

22 Q.  Can you tell our jury what PossibleNOW was, that company?

23 A.  PossibleNOW is a -- actually a very respected vendor in the

24 business who scrubs Do Not Call Lists.  So they also are the

25 repository for DISH's internal Do Not Call List, and we did

1  business with them for -- for that particular purpose, and the

2  reason our retailers were required to sign up with them was so

3  they could load any consumer or customer numbers into that

4  list.

5  Q.  And was SSN using PossibleNOW?

6  A.  Yes, they were.

7  Q.  And do you know whether they started using them in or about

8  October of 2008?

9  A.  Yeah, that's what I recall.

10  Q.  And the class period in this case is 2009 and 2010 moving

11  forward.  As a compliance trained employee, what comfort, if

12  any, does the retention of a firm like PossibleNOW provide to

13  you when you're making compliance decisions?

14  A.  They were a great resource for me.  I actually formed a

15  relationship with them about 2007, and when I was -- when I

16  was -- you know, I was new to the compliance world and got a --

17  got great training through legal and -- and then through my own

18  research, but I also used PossibleNOW for -- if something came

19  up that I wasn't clear about, I would -- I would call them.  I

20  also used our legal department, but PossibleNOW also provided

21  webinars that, you know, I participated in or I listened to

22  about laws and changing laws, and they also provided that same

23  possibility -- if the retailers were signed up with them, they

24  could get that training from them as well.  So they're a good

25  company.

1    Q.   And given that the class period in this case, 2010 into

2    2011, when SSN is signed up with PossibleNOW since

3    October 2008 --

4    A.   Yes.

5    Q.   -- what comfort, if any, does that provide you about SSN

6    and what they're doing?

7    A.   That they were scrubbing numbers through PossibleNOW at

8    that time.

9    Q.   And do you have any ability on a day-to-day basis to be at

10   PossibleNOW's offices in Irvine, California, to double-check

11   what they're doing with PossibleNOW?

12   A.   You mean SSN in Irvine?

13   Q.   SSN.

14   A.   No, not at all.

15   Q.   Would that be possible with 3,500 retailers around the

16   country?

17   A.   No.

18   Q.   All right.  Now, you were asked some questions about

19   e-mails that were sent to Mr. Werner, and you were asked did

20   you see those e-mails.  Do you remember that?

21   A.   I do.

22   Q.   Were you on those e-mails?

23   A.   No, sir.

24   Q.   Describe for our jury the nature of the relationship you

25   had with Mr. Werner and how often you all worked together to

1  try to deal with compliance issues.

2  A.   Bruce and I were -- Mr. Werner and I were -- he hired me.

3  He and Robb Origer hired me, and we talked -- well, we always

4  talked on a daily basis unless one of us was out of the office

5  and quite often more frequently than that.  So we were

6  constantly keeping each other in the loop on things going on.

7  So there were some things that I didn't -- I didn't know

8  because I was -- there was no need for me to know them, but he

9  was very good about keeping me informed, and I thought I was

10  very good about keeping him informed.

11  Q.   And you were asked questions about the retailer file and

12  whether certain documents were in them, right?

13  A.   Right.

14  Q.   Can you explain to our jury -- the suggestion might have

15  been that you didn't see a complaint or it should have been in

16  that stack over there; is that fair?

17  A.   You know, I don't -- I don't think so because we really

18  did -- when we started -- when I first started, the paper file

19  seemed like a reasonable thing to do, but as we went on with

20  multiple retailers, it didn't seem practical at all to maintain

21  paper copies when we could keep electronic copies.  So we

22  had -- the paper file is probably limited.  The -- the

23  electronic file has -- is probably more complete, and there may

24  be some duplication in there, you know.

25  Q.   And let me just back up a little bit -- a little bit on

1  your background.  Tell us where you grew up and where you went
2  to school.
3  A.  I was born and raised in Columbia, South Carolina.  I went
4  to Newberry College in Newberry, South Carolina.  Actually, I
5  went to -- I went to my first three years in Charlotte,
6  North Carolina, grammar school so -- and after I graduated from
7  college -- do you want me to go on?
8  Q.  Yeah, just tell us a little about your employment history
9  after you got out of college.
10  A.  I was a branch manager for South Carolina National Bank.  I
11  then was a stay-at-home mom for about 12 years, which was one
12  of the hardest jobs I had.  And then -- and then I went to work
13  for United Artists Cable, part of the cable industry, as a --
14  in customer service and eventually worked up to dealing with
15  consumer and customer complaints for the executives at TCI.  So
16  not to be long-winded, after that, I went to Moen Incorporated
17  and did the same thing.  I've always been in customer and
18  consumer services so -- and, ultimately, I ended up at DISH,
19  and I spent 13 years there.  So --
20  Q.  And are you being paid in any way to come here today?
21  A.  No.
22  Q.  And you have no ongoing business -- you're not employed by
23  DISH anymore?
24  A.  Sadly, I don't even have any stock anymore.
25  Q.  So tell our jury why you're here.

1  A.   It's kind of like -- it's kind of like a child.  You know,
2  you -- you have this entity and then you want to protect it and
3  take care of it, and that's how I feel about this.  I -- you
4  know, I built this department.  We weren't perfect by any
5  stretch of the imagination.  We learned a lot along the way,
6  but I will tell you that I was passionate about it.  I loved
7  that job more than any job I ever had, and I felt like it was
8  really important for me to get to tell my story.
9  Q.   And speak to the caliber and quality of the people who you
10 hired on your compliance group.  Tell our jury about that.
11 A.   They stayed with me virtually the whole time I was there.
12 We had a very cohesive group.  We flowed very well.  We could
13 have somebody go on FMLA, and I didn't even have to get any
14 extra help because we could all pick it up and take care of the
15 situation.  So I think we had a great group, a small group, but
16 it was a good one.
17 Q.   And tell our jury a little bit about the folks who work
18 with you, how many people, who were they, and what did they do.
19 A.   I had six people as an average, and they all -- we -- I was
20 a firm believer in cross-training people, not just because it
21 was prudent from a -- you know, if somebody was out on FMLA,
22 but also because it helped them understand more about what was
23 going on, so it made sense to do that, but, yeah, they were
24 good.
25 Q.   And tell the jury just a little bit who they -- what the

1  names of some of them were and what they did with you.

2  A.  Let's see.  Serena Snyder was like my right hand.  She was

3  -- she could work.  She was amazing.  And then I had Dylan

4  Monasmith, Lorraine Winkler, Kathleen Donnelly.  I had Jennifer

5  Pacher.  I had Joel Ebel.  A couple of those left, but, yeah,

6  it was good.

7  Q.  And tell our jury what steps you personally took to

8  familiarize yourself with telemarketing laws so you could do

9  your job.

10 A.  Well, when I got over to compliance -- I took the position

11 primarily because I had a history -- because I worked for DISH

12 for 13 years.  So prior to that, I was in the installation side

13 of the business.  So I had kind of a history of building

14 processes and procedures for new things that needed to be taken

15 care of.  So that's why they initially -- you know, that's one

16 of the reasons they hired me.

17     So when I -- when I got over there, I was -- it's

18 overwhelming because the laws -- there's a lot of caveats to

19 the law, but I actually did print out the TCPA, which is about

20 this thick, and I did read it.  I mean, I couldn't tell you I

21 understood everything, but I did read it.  Then the TSR, which

22 is the Telemarketing Sales Rule, I read that, too.  As I

23 mentioned, I got great downloads from our legal department.  I

24 worked with them real closely at the outset just to make sure I

25 had my arms around what was expected of me and then also with

1    our -- with Bruce and the rest of our team.

2       But the -- to be clear, though, the complaints were being

3    handled.  It's just that, you know -- because DISH took TCPA

4    very seriously and -- but what happened was we needed a central

5    repository so we would have one point of contact and there

6    wasn't one here and one there, and that way we could keep, you

7    know, information about them all.  So --

8    Q.  And can you describe just the attitude of the folks you

9    worked with in all these different departments to deal with

10   compliance in trying to solve problems?

11   A.  Well, we were all very passionate about it.  It's -- you

12   know, it's a -- I had -- I had customer service involved.  We

13   had -- and we wrote a process that worked very well.  In fact,

14   when we initially started that in 2006, the process is still

15   pretty much the same today for sharing those complaints, and,

16   you know, we -- we tried to keep everybody up to speed and

17   the -- I had sales involved, I had legal involved, I had CSC

18   involved, field representatives.  We were all focused on

19   minimizing these complaints.

20   Q.  And did you ever take training yourself on telemarketing

21   issues?

22   A.  Oh, with PossibleNOW.  You know, I worked with them and

23   took webinars, and I also -- you know, I did my own research.

24   Q.  And let's talk a little about SSN.  Who did you deal with?

25   A.  Primarily Sophie.

1    Q.  And tell our jury who Sophie Tehranchi is.  Her videotaped
2    deposition will be shown.
3    A.  She's the sister of the owner of the company.
4    Q.  And did you interact with her brother, Alex Tehranchi?
5    A.  Just early on, and then he turned over the -- or I assume
6    he did.  Subsequently, she took over the operation of the
7    company, and that's who I dealt with.
8    Q.  And so during the time period when you were compliance
9    manager, say 2006 forward, 2010 and 2011, in those two years,
10   who were you primarily dealing with?
11   A.  With Sophie Tehranchi.
12   Q.  And what was your general impression based on those
13   dealings of SSN and how it was dealing with telemarketing
14   issues?
15   A.  She took them very seriously.  She responded quickly.  She
16   had plausible responses, and I didn't have any issues with her
17   at all.
18   Q.  And you were asked about a North Carolina injunction.  Do
19   you remember that?
20   A.  I do.
21   Q.  And did you become aware of that?
22   A.  I did after I took the position and after it had all
23   transpired, yes.
24   Q.  And was that related to calls involving DISH or DirecTV?
25   A.  DirecTV.

1  Q.  And did that cause you to be concerned about SSN's

2  telemarketing compliance?

3  A.  Well, by the time I found out about it -- I mean, I found

4  out about the Vitana thing, but all of it together, I had --

5  you know, I had some dealings with SSN, so I didn't have any

6  reason to be concerned; and as I tried to say and maybe I

7  didn't, but the people that handled all this prior to my

8  arrival were very competent.  So when I was downloaded, that

9  wasn't one of the things I was downloaded, and that was because

10  it had been handled.

11  Q.  And did that injunction that you talked about, did that say

12  that SSN couldn't telemarket?

13  A.  The injunction, no.

14  Q.  And did that involve -- the jury has heard again about

15  prerecorded calls, right?

16  A.  Right.

17  Q.  Did the -- to your knowledge, did the issues with SSN and

18  DirecTV in 2004 and 2005, did that involve prerecorded calls?

19  A.  Yes.

20  Q.  Is that something different from a call to the Do Not Call

21  Registry?

22  A.  Yes.

23  Q.  And during your entire time period that you were the

24  compliance manager, 2006 until the time that SSN was

25  terminated, did you ever see any issue involving a prerecorded

1  call?

2  A.  No, sir.

3  Q.  When you became the compliance manager, did you see every

4  single complaint about a retailer?

5  A.  Every single TCPA complaint, yes.

6  Q.  And did consumers always identify the retailers to you?

7  A.  Sometimes they did, yes.

8  Q.  And were there other times where you did not know the

9  retailer?

10  A.  Yes, the information provided to us from the consumers or

11  customers wouldn't have any information or it wouldn't have any

12  information that we could confirm.  You know, the customers

13  didn't -- you know, they gave us what they had.  Sometimes they

14  didn't have very much.

15  Q.  And with respect to the handful of complaints involving

16  SSN, did DISH follow up on every single one?

17  A.  Yes.

18  Q.  And was SSN generally responsive when you asked for

19  information?

20  A.  Yes.

21  Q.  Did you ever have the sense that they were misleading you

22  or keeping information from you?

23  A.  I never had that sense.

24  Q.  Are there red flags when someone like you in compliance

25  sees that gives you pause to concern about when a retailer is

1  doing certain things?

2  A.  Yes.  They're -- when we were looking for -- looking at our

3  information that we retained, we would look at the frequency,

4  so how often you saw this -- this phone number or this retailer

5  pop up.  The volume was certainly impactful, and then we would

6  look at whether or not the retailers were responsive, when we

7  were able to identify them, and reached out.

8  Q.  So you were shown Dr. Krakauer's complaint May of 2009.  Do

9  you remember that?

10  A.  I do.

11  Q.  And then the next complaint you were shown was a year later

12  in May of 2010.  Do you remember that?

13  A.  That is correct.

14  Q.  Did you see any complaints in that interim year?

15  A.  Not that I recall.

16  Q.  And what does that tell you, as someone in compliance, when

17  a year goes by, millions of calls are being made, and you don't

18  see one complaint?

19  A.  It tells me that they are following the letter of the law,

20  and they're not -- they're not initiating any complaints.

21  Q.  Have you seen situations as a compliance manager when, even

22  though lists are scrubbed, there can be mistakes in the

23  scrubbing process?

24  A.  Yes.

25  Q.  And can you explain to our jury, based on your experience

1  in compliance, what you've seen in that respect?

2  A.   There are, as I mentioned earlier, human error for uploads,

3  human error for downloads.  Excel spreadsheets have a lot of

4  columns on them.  You can shift them out.  I didn't see a lot

5  of those, but those were some of the explanations that I would

6  get.  I also -- you know, you'd have -- you'd have some

7  employee who fat-fingered a number, and it was -- it was

8  somebody on the Do Not Call List.  There were any number of

9  innocent ways to create violations that were not egregious or,

10 you know, balking at the law.

11 Q.   So I want to show you -- you spoke about PossibleNOW.   I

12 want to show you an Exhibit DX28.

13        **MR. BICKS:**   Your Honor, I have a couple of documents

14 in a notebook.  If I could approach?

15        **THE COURT:**   All right.

16     (Notebook handed to the witness by Mr. Bicks.)

17        **MR. GLASSER:**   No objection to 28, Your Honor.

18        **THE COURT:**   All right.  Did you want to --

19        **MR. BICKS:**   If I could publish it, Your Honor.

20        **THE COURT:**   You may.

21        **MR. BICKS:**   Can we bring in and put it up, and, Trudy,

22 if you can go to page 2?

23        **THE CLERK:**   I'm sorry.  Is it not on?

24        **THE COURT:**   Okay.  Is it up?

25        **MR. BICKS:**   Yes.

**BY MR. BICKS:**

Q.   Do you see page 2, Ms. Musso?

A.   I do.

Q.   And do you see there's reference there -- it says:  "Jim

and Erik have mentioned compliance with all laws."  And do you

know who Jim and Erik is referring to?

A.   Jim DeFranco is the founder of the company, and Erik

Carlson has a new title.  I think he's president now.

Q.   And was telemarketing compliance taken seriously by the

people who were at the top of the company?

A.   Absolutely.

Q.   And did you see that yourself firsthand while you were

there?

A.   I did.

Q.   And describe for the jury kind of what you saw in terms of

what people like Jim and Erik were doing.

A.   They were constantly reinforcing the adherence to laws

on -- so a retailer chat, which is what this is a deck for, was

a video chat that the owner and -- sometimes the owner, but

executives, would have for our retailers, and they would use

that forum to share important things with the retailers, and

one of them was compliance with laws, and, yes, I -- I had

access to everybody I needed.  I could knock on any door.

There was -- you know, and I got -- I always had my phone calls

returned.  Most of the time they answered, so, yes.

1    Q.  And what was the purpose of this presentation?  Do you
2    know?
3    A.  This particular one -- well, there were a lot of things
4    that were presented, but this one was about PossibleNOW and
5    giving the retailers some kind of heads-up if they were going
6    to be contacted by this company so that they could -- so that
7    they could form a relationship to upload the internal Do Not
8    Call List.  At the same time, they were available to work with
9    the retailers with respect to the -- the particular business
10   model that the retailer had on how to fully support adherence
11   to the laws.
12   Q.  And if we can go to page 3, we'll see reference there to
13   something called DNC Solutions.  Do you see that?
14   A.  Yes.
15   Q.  And tell our jury what that is.
16   A.  DNC Solutions is the interface that PossibleNOW had for the
17   retailers to upload calls into the Do Not Call List.
18   Q.  And if you see it, page 4, the third bullet point, do you
19   see that?
20   A.  Yes.
21   Q.  And what is the benefit of PossibleNOW offering these
22   various kinds of solutions?
23   A.  There were a lot of retailers with a lot of different
24   marketing, so you had everything from, as I mentioned earlier,
25   the Internet opt-in to when the retailer has an Internet page

1  and it pops up and you decide you want somebody to call you,

2  or, I mean, we had everything to retailers who did the Iowa

3  State Fair, so they got leads in a fish bowl.  You know, you

4  still want to be careful with those.  The business models that

5  the retailers use just ranged, and PossibleNOW would have a

6  solution for every one of them.

7  Q.  And if we can go to page 5, do you see the reference to

8  PossibleNOW will have a booth at Team Summit in Nashville?

9  A.  Yes.

10  Q.  Tell our jury what's that about.

11  A.  So PossibleNOW, when we worked together, I had asked them

12  if they would come to our Team Summit, which is an annual

13  conference that DISH has for the retailers, and set up a booth

14  so they could explain to retailers face to face what they did.

15  Q.  And let me show you Defendant's Exhibit 6.  Do you remember

16  whether or not SSN actually was trained on PossibleNOW?

17  A.  Defendant's 6?

18  Q.  Yeah -- putting aside -- was SSN trained by PossibleNOW?

19  A.  Oh, yeah.  Yes, they were.  They -- they signed up with

20  them and, shortly after, had their training.

21  Q.  And if we look at Defendant's Exhibit 6 --

22        **MR. BICKS:**  I don't believe there's objection?

23        **MR. GLASSER:**  No objection, Your Honor.

24        **THE COURT:**  It's admitted.  Okay.

25        **MR. BICKS:**  If we can blow that up, Trudy, the top

1  paragraph.

2  **BY MR. BICKS:**

3  Q.   Do you see the reference there in the second sentence that

4  says:  "We got PossibleNOW on 10-23-2008 and did the training

5  on 10-27-2008?"  Do you see that?

6  A.   Yes, that's what it says, yes.

7  Q.   And as a compliance manager, when you receive information

8  like that, what does that tell you about SSN and their focus on

9  telemarketing compliance issues?

10  A.   It tells me that they're up and running and using the

11  system.

12  Q.   And is it a good thing, do you think, to do that

13  PossibleNOW training?

14  A.   Yes, I think it's imperative.

15  Q.   And how thorough -- having done some of that training

16  yourself, how thorough is that training?

17  A.   I can't specifically speak to what -- how theirs worked,

18  but in respect to me, it was very thorough, very knowledgeable

19  and, you know, they're experts.

20  Q.   And is PossibleNOW the company that the Government uses to

21  keep the national Do Not Call List together?

22  A.   I do believe that is.

23  Q.   And in your experience in compliance, do you know of any

24  other company that is more expert than PossibleNOW?

25  A.   No.  I looked around.  No.

 1  Q.  And were you one of the people involved in bringing them on

 2  board?

 3  A.  I was the -- I managed the relationship, yes.

 4  Q.  And how much homework did you do to try to determine if

 5  they were the best?

 6  A.  I -- I looked at their list of clients.  I also had

 7  knowledge that they had worked with another pretty big company,

 8  some firsthand knowledge, and then -- and then I didn't find

 9  anything bad about them, so -- but, yeah.

10  Q.  Let me ask you some questions about Dr. Krakauer's

11  complaint.

12          **MR. BICKS:**  And if we can bring up DX9, the May 27th,

13  2009, letter.

14          **MR. GLASSER:**  No objection.

15  **BY MR. BICKS:**

16  Q.  This is a letter that has got your signature on it, is it

17  not?

18  A.  Yes, it does.

19  Q.  And are you informing SSN here of Mr. Krakauer's complaint?

20  A.  Yes, I am.

21  Q.  And you say in the letter -- right up front, it says:  "A

22  complaint was filed against DISH," right?

23  A.  Correct.

24  Q.  And what do you mean by a complaint was filed?

25  A.  That the customer had called in to the call center and

1  advised our escalations team that he had a complaint against

2  DISH, which we subsequently found out was SSN, but it wasn't

3  like a formal complaint.

4  Q.  And in this letter, the sentence in that paragraph, the

5  second one, says:  "Please immediately ensure that this phone

6  number has been added to your internal Do Not Call Registry."

7  Do you see that?

8  A.  Yes, I do.

9  Q.  And why did you request that that be done?

10  A.  Because we wanted to make sure Mr. Krakauer didn't get any

11  additional calls.

12  Q.  And you were asked questions -- this was called a form

13  letter.  Do you remember the questions about the form letter?

14  A.  Yes.

15  Q.  Is, in fact, the actual letter adjusted depending on the

16  facts, who the consumer may be, phone number, things of that

17  nature?

18  A.  Well, it has to be, yes, for those pertinent pieces of

19  information, yes.

20  Q.  And from your perspective, is this an important

21  communication when it's sent out?

22  A.  Yes.

23  Q.  And can you tell our jury why?

24  A.  It advises the retailer that we are aware that a customer

25  is unhappy with something they did and gives them the

1  information that we have, however limited, and sometimes we

2  have more.  And then it asks them for certain specific things

3  to -- to share with us relative to that complaint.

4  Q.  And the letter refers to something called an internal Do

5  Not Call Registry?

6  A.  Yes.

7  Q.  Tell our jury what that is, please.

8  A.  The internal Do Not Call Registry is something that a

9  retailer needs to maintain under the law for their own

10  business.  Each business is required to retain one, and then we

11  need to have one for DISH as well.

12  Q.  And did SSN, to your knowledge, have an internal Do Not

13  Call Registry?

14  A.  Based on the references in Sophie's return e-mails, yes.

15  Q.  And then at the bottom of this letter, you ask for certain

16  information, do you see that, within five days?

17  A.  I do.

18  Q.  And is -- did you get that information from SSN in response

19  to this letter?

20  A.  To the best of my knowledge, I did.

21  Q.  And when a retailer responds promptly to a request like

22  this, what, if anything, does it tell you about their attitude

23  toward dealing with these kinds of issues?

24  A.  That they take -- they take it seriously.

25  Q.  Were you, in this kind of a communication, trying to help

1  get to the bottom of Dr. Krakauer's issue?

2  A.   That's certainly how I saw it.

3  Q.   And let me show you Defendant's Exhibit 8, which was SSN's

4  response.  Are you familiar with this?

5          **MR. GLASSER:**  No objection.

6          **THE COURT:**  Okay.

7          **THE WITNESS:**  Yes, I am.

8  **BY MR. BICKS:**

9  Q.   And this is May 28th of 2009; right?

10  A.   That's correct.

11  Q.   And your letter was dated one day before; right?

12  A.   I believe so, yes.

13  Q.   And so, when you get a response one day later, what does

14  that tell you about the seriousness with which this is being

15  taken?

16  A.   A sense of urgency for sure.

17  Q.   And if you look at this letter, I want to talk to you a

18  little bit about it.  The first sentence says:  We first heard

19  of this issue with Mr. Thomas Krakauer on the 20th when

20  Terrence advised us of the Do Not Call violation.  Do you see

21  that?

22  A.   I do.

23  Q.   And tell our jury who Terrence is.

24  A.   Terrence Rukas was one of our sales managers --

25          **THE COURT:**  Terrence who?

1    **THE WITNESS:**   Rukas, R-U-K-A-S.  Was one of our sales
2    managers, and he had a relationship with possible -- I mean,
3    excuse me, with Satellite Systems Network.  And it was -- it
4    was standard operating procedure, if you will, for me to pick
5    up the phone and call when there were situations similar to
6    this one and advise the sales manager so, you know, he could
7    get with the retailer and they could discuss what happened.
8    Q.   And so you see the -- the e-mail is the 28th, and there's
9    an indication that Terrence Rukas had reached out on the 20th,
10   right?
11   A.   Yes, sir.
12   Q.   What did you think when you saw that he had advised SSN
13   about this eight days prior to this written letter?
14   A.   I was glad.  You know, it meant that Terrence also took it
15   seriously.
16   Q.   And is that kind of what you would expect and what you
17   would hope for for your compliance team to do?
18   A.   Absolutely.
19   Q.   And you see in the second sentence, it says:  That same
20   day, we took Mr. Krakauer's phone number out of our entire
21   master lead list and put his phone number on the Do Not Call
22   List.  Do you see that?
23   A.   I do.
24   Q.   And what is the significance of that information when
25   you're making compliance judgments?

A.  It leads me to believe that Mr. Krakauer won't get another

phone call because they've taken away all the contact

information.

Q.  And do you see the reference here that:  Our lead for

Mr. Krakauer was generated by us.  We sold him DirecTV back in

April of 2003 when we were a DirecTV retailer.  Do you see

that?

A.  Yes, sir, I do.

Q.  And to you, in compliance, what is the significance when

you receive information like that?

A.  That in this particular instance, SSN assumed that they had

a business relationship or existing relationship with this

customer and felt like it was okay to reach out to him.

Q.  And did DISH give SSN Mr. Krakauer's phone number to call?

A.  No.

Q.  Did you or anyone to your knowledge at DISH authorize the

call to Mr. Krakauer before it was made?

A.  No, sir.

Q.  Did you know ahead of time that SSN would be placing that

call?

A.  No.

Q.  And, overall, how did you consider SSN's response to this

complaint when you get this information?

A.  I felt like it was very responsive.  They took it

seriously.  They were concerned, and that they had no intention

1  of doing it again.

2  Q.  And, for example, if you scroll up and -- to the bottom of

3  this document, you see this screenshot there.  This is

4  information they're providing you to show exactly what had

5  happened, who they called and when they did it?

6  A.  Yes.

7  Q.  And how -- is that kind of information important to you?

8  A.  Well, it -- well, first of all, it says they did it, so,

9  you know, it wasn't like they were trying to say they didn't,

10  and so -- which lends credibility to SSN.

11  Q.  And there's reference in this letter --

12          **MR. BICKS:**  If we can go back to the top, Trudy, and

13  can we blow up the first paragraph there?

14  **BY MR. BICKS:**

15  Q.  Do you see the time where they say -- it's in the bottom of

16  the first paragraph:  We do not have a date for scrubbing this

17  lead through PossibleNOW because we were at that time not a

18  PossibleNOW member.  Do you see that?

19  A.  I do.

20  Q.  And they became a member of PossibleNOW on October of 2008?

21  A.  Yes.

22  Q.  And so, what does this tell you about what had happened

23  with this scrubbing, to the best you can determine when you see

24  this?

25  A.  Well, the way I read this was that they didn't scrub the

1  number through PossibleNOW; that they had scrubbed it back in
2  2003 when they had Dr. Krakauer as their customer and they felt
3  that it was still a sufficient scrub.
4  Q.  And you know from information in e-mails that they were
5  also, prior to PossibleNOW, they were using something called
6  DNC.com?  Do you remember that?
7  A.  Yes.
8  Q.  And tell our jury again, what is DNC.com?
9  A.  DNC.com is another company that does scrubs against federal
10 and state lists.
11 Q.  And describe for our jury, as someone in compliance, what
12 is their reputation in this business?
13 A.  If they're still in business, they have a good reputation.
14 Q.  All right.  And at the time of May 28th, 2009, when you get
15 this, after they're signed up with PossibleNOW in
16 October 2008 --
17 A.  Uh-huh.
18 Q.  -- did you believe that they were scrubbing their lists?
19 A.  That was my assumption.
20 Q.  And as somebody in compliance, if millions of calls are
21 made, and there's no scrubbing at all, how many complaints do
22 you think you would get?
23 A.  It would be a staggering number.
24 Q.  And tell our jury why.
25 A.  Because, you know, based on my relationship with

PossibleNOW, the -- when you scrub lists, because the Do Not

Call List is so big, what you get returned is -- is 50 percent

of those -- at least 50 percent, it's probably more, are going

to be on the Do Not Call List.

Q.  If SSN made any calls to Mr. Krakauer after this May 2009

call, would that be in DISH's interests?

A.  No, not at all.

Q.  And when you get this complaint, do you believe that this

complaint from Dr. Krakauer and the explanation that you've

gotten here from SSN, do you believe that would be a basis to

terminate SSN?

A.  No, sir.

Q.  And tell our jury why not.

A.  Primarily because there was not a pattern of egregious

behavior that had been established.  As we mentioned, we hadn't

had a volume of complaints on them.  They -- they were always

very responsive.  You know, I didn't -- I didn't even have a

sense that they were mistruthful.  I didn't have any concerns

about them.  I was certainly -- I'm always concerned about a Do

Not Call complaint, but I wasn't concerned about SSN.

Q.  And you write a letter to SSN and you say:  Ensure that

he's on your Do Not Call List.

     They then communicate back in writing --

          **THE COURT:**  Excuse me just a second.  Did you need

something?

1    **JUROR NO. 6:**  Can I be excused for a minute?

2    **THE COURT:**  We'll just go ahead and take a lunch break

3  if that's what you all need.

4     All right.  Ladies and gentlemen -- did you need something

5  else?

6    **JUROR NO. 9:**  No, ma'am, just trying to get your

7  attention.

8    **THE COURT:**  All right.  I'm sorry, I apologize, I

9  didn't notice.  We'll go ahead and take the lunch break, and

10  I'll ask you to come back at 10 minutes till 2.  Don't talk

11  about the case or form any opinion.  Have no contact with

12  anyone, no communications, and come back at 10 minutes till 2.

13     (The jury left the courtroom at 12:36 a.m..)

14    **THE COURT:**  All right.  I'm sorry, but I noticed the

15  juror was trying to get the security officer's attention.  I

16  felt like I needed to interrupt.

17    **MR. BICKS:**  Totally understandable.

18    **THE COURT:**  About how much longer do you anticipate

19  your cross or your questions, approximately?

20    **MR. BICKS:**  I'm saying maybe 45 minutes, in that

21  range.

22    **THE COURT:**  And any redirect or short --

23    **MR. GLASSER:**  So far, no.

24    **THE COURT:**  Okay.

25    **MR. GLASSER:**  Just one or two questions.

1          **THE COURT:**  You're anticipating the video depositions

2     after that still?

3          **MR. GLASSER:**  Yes, ma'am.

4          **THE COURT:**  All right.  Anything else we need to do

5     before we take our lunch recess?

6          **MR. GLASSER:**  Not for the Plaintiffs, Your Honor.

7          **MR. BICKS:**  Nothing, Your Honor.

8          **THE COURT:**  Okay.  We'll come back, then, at 10

9     minutes till 2:00.

10       (A noon recess was taken from 12:40 p.m. until 1:50 p.m.)

11         **THE COURT:**  Good afternoon.  Anything for the

12    Plaintiff before the jury comes in?

13         **MR. GLASSER:**  Just a housekeeping item, Your Honor.  I

14    apparently neglected to move the admission of Plaintiff's

15    Exhibit 503, which is the e-mail we went over with Amir Ahmed

16    yesterday about a lot of complaints to Satellite Systems on

17    telemarketing calls to consumers, and also showed to Ms. --

18         **THE COURT:**  Also what?

19         **MR. GLASSER:**  And also showed to Ms. Musso this

20    morning.  I move the admission of Plaintiff's 503.

21         **MR. BICKS:**  We had objected to it, Your Honor,

22    already.

23         **THE COURT:**  All right.  It'll be admitted.

24         **MR. BICKS:**  And, Your Honor, was Defendant's

25    Exhibit 8, 9, and 28.  So 8, 9, and 28 I should formally move

```
 1   in.  There wasn't an objection and I used them with Ms. Musso,
 2   but I forgot to formally admit them.
 3             MR. GLASSER:  No objection.
 4             THE COURT:  Okay.  No objection.  Those will be
 5   admitted.
 6        Any other housekeeping matters?
 7             MR. BICKS:  No.
 8             THE COURT:  No?  All right.  You can bring the jury
 9   in.
10        (The jury entered the courtroom.)
11             THE COURT:  All right.  Good afternoon.  I'm so sorry
12   this morning I missed the signals that you all needed a break.
13   I apologize.  If that happens, you know, just really wave at
14   me.  I'm sorry I missed the more subtle ones you were sending.
15   Okay.
16        I think we're ready to continue.  Mr. Bicks, I believe you
17   were questioning.
18             MR. BICKS:  Yep, thank you, Your Honor, and good
19   afternoon.  Welcome back, Ms. Musso.
20   BY MR. BICKS:
21   Q.  Before we broke, we were talking about Dr. Krakauer's
22   May 2009 complaint to DISH.  I'd like to come back to that.
23             MR. BICKS:  Trudy, can we bring up 282?
24             THE COURT:  Is that the Defendant's or Plaintiff's?
25             MR. BICKS:  It's Plaintiff's 282, Your Honor.  And go
```

1  to that second page, please.  And I think -- could I ask the

2  Court to turn on the switch for the screen?

3        **THE COURT:**  Can the jurors see it?  Is it up?  Okay.

4  **BY MR. BICKS:**

5  Q.  And could we just -- we've got that paragraph at the top.

6  Do you see it, Ms. Musso, on your screen?

7  A.  Yes.

8  Q.  Okay.  And do you see the statement -- and this is Ms. --

9  just to orient our jury, this is Ms. Dougherty writing this?

10 A.  Yes.

11 Q.  Rebecca Dougherty?

12 A.  Right.

13 Q.  All right.  And so, she says here:  Mr. Krakauer phoned

14 today to see what the status was on his DNC issue.  I advised

15 him, as of yet, there is no definite response, but I would send

16 this e-mail to all of you again.  Please help me to assist

17 Mr. Krakauer with the appropriate information or answers to

18 satisfy his concerns about the call he has received.  He's

19 expecting to hear something back on Thursday.  Do you see that?

20 A.  I do.

21 Q.  And the statement in here about Ms. Dougherty:  Please help

22 me to assist Mr. Krakauer with the appropriate information.

23 Remember, you were asked questions about who reached out to

24 Mr. Krakauer and did he get a letter and things like that?

25 A.  Yes, I do.

1  Q.  All right.  Can you tell our jury what this -- this kind of

2  a reaction, what it informs us about the attitude of the folks

3  at DISH who were working on this?

4  A.  Specifically, this young lady, as I mentioned earlier, was

5  an employee of the Executive Resolutions Team, and they really

6  were very passionate about taking care of customers.  And

7  Rebecca was persistent and made sure that this didn't get

8  overlooked because that's what they did.

9  Q.  And was an investigation performed here?

10 A.  Yes, there was.

11 Q.  And was the results of that communicated to Mr. Krakauer?

12 A.  It was communicated to the call center, and they would have

13 communicated with Mr. Krakauer.

14 Q.  And you were not here when Mr. Krakauer testified about his

15 conversations with Ms. Dougherty?

16 A.  No, I was not.

17 Q.  All right.  Now, I want to ask you about the bottom part of

18 this e-mail and -- and the -- the thing under "Comments."  Do

19 you see that?

20 A.  Yes.

21 Q.  Now, is that information that Dr. Krakauer had provided to

22 DISH; in other words, his memory of what he thought happened?

23 A.  That's what the -- the representatives there were

24 instructed to do was to communicate exactly what the customer

25 had so we had a flavor of how the customer was feeling, and

1  what they perceived it to be.

2  Q.  All right.  Okay.  And there's reference in this about a

3  credit check being run; right?

4  A.  Yes, there is.

5  Q.  All right.

6      **MR. BICKS:**  Can we go to Plaintiff's Exhibit 1048 at

7  007 and blow that up?  007, Trudy, and I'm looking for item 18,

8  the question No. 18.  And if you can blow that up so our jury

9  can see it.

10 **BY MR. BICKS:**

11 Q.  It's a little hard to read, but remind us, Ms. Musso, what

12 is this again?

13 A.  This is the quality assurance form, one of the earlier

14 versions, where we evaluated the sales representative's

15 performance as it related to the expectations for disclosing

16 information to a customer.  And No. 18 is did you -- do you

17 want me to read that, Mr. Bicks?

18 Q.  Yeah.

19 A.  Did the agent obtain customer consent to run a credit check

20 against their Social Security Number?  That was a requirement.

21 Q.  All right.  And in a typical situation like this, would the

22 credit check have been done by SSN or DISH?

23      **THE COURT:**  Like what?

24      **MR. BICKS:**  Like this case, Mr. Krakauer's situation,

25 what's in this e-mail, 282.

**BY MR. BICKS:**

Q.  In a typical situation where a retailer, like SSN, if a credit check is run, who typically does that?

A.  The -- in this case, it was SSN.  They were the retailer requesting the credit check.

Q.  And, in order to run a credit check, what information do you need?

A.  A Social Security Number and a credit card number.

Q.  All right.  And where would that information come from?

A.  The customer, usually.

    **THE COURT:**  I'm sorry?  Speak up.

    **THE WITNESS:**  I'm sorry.  The customer, usually.

**BY MR. BICKS:**

Q.  All right.  Now, I want to come back to the -- the dealings with SSN as it relates to Dr. Krakauer.  Remember, we had talked about the letter that you wrote asking that SSN put Dr. Krakauer on its internal Do Not Call List.  Remember?

A.  Yes, I do.

Q.  And then we saw the letter back to you where SSN says: We've put him on our internal Do Not Call List and deleted him from our master calling list.  Do you remember that?

A.  I do.

Q.  Did you believe that to be true?

A.  Yes, I did.

Q.  Can you think of any reason why a retailer who has been

1  told that the customer doesn't want a call, to not take that

2  number off the list?

3          **MR. GLASSER:**  Object.  Asked and answered like three

4  times.

5          **THE COURT:**  Well, she can answer it again.  Overruled.

6          **THE WITNESS:**  I'm sorry, Mr. Bicks.

7  **BY MR. BICKS:**

8  Q.  I'm sorry about that.  My question to you is, in your

9  experience in retailer compliance, can you see any common sense

10 reason when DISH directs a retailer to take a name off an

11 internal list, and they respond back and say, we're going to do

12 it, we're not going to call them, can you think of any reason

13 why they wouldn't do that?

14 A.  No.

15 Q.  And once SSN told DISH that it added Mr. Krakauer to its

16 internal Do Not Call List, what were your expectations about

17 whether SSN would call him in the future?

18 A.  That they would not.

19 Q.  Did you receive complaints of any further calls made to

20 Dr. Krakauer?

21 A.  No, sir.

22 Q.  Did SSN ever indicate to you that they made any subsequent

23 calls to Mr. Krakauer?

24 A.  No, they did not.

25 Q.  Did you get -- ever get a --

1    **MR. GLASSER:**  Objection.

2         **THE COURT:**  I'm sorry?

3         **MR. GLASSER:**  Leading.

4         **THE COURT:**  Well, I think you have covered a bunch of

5    this already.  If you'll wrap that part up.

6         **MR. BICKS:**  Thank you.

7    **BY MR. BICKS:**

8    Q.  If there was a call by SSN after this May 2009 incident,

9    would that be contrary to your instruction?

10   A.  Yes, it would.

11   Q.  Would that be contrary to the retailer agreement?

12   A.  Yes, it would.

13   Q.  Let's look, please, at Joint Exhibit 2.  It's in evidence,

14   and it's the 2010 retailer agreement.  I'm going to -- I have a

15   copy of it here, Ms. Musso.

16        **MR. BICKS:**  May I approach, Your Honor?

17        **THE COURT:**  You may.

18      (Document handed to the witness.)

19        **THE WITNESS:**  Thank you.

20        **MR. BICKS:**  And if we can go to paragraph 9.1.  And if

21   you can blow that up for us, Trudy.

22   **BY MR. BICKS:**

23   Q.  And tell us again for our jury what is this provision,

24   Ms. Musso?

25   A.  Essentially, this establishes that the retailer is

responsible for adhering to all federal, state, and local laws,

and they cannot engage in activity or business transactions

contrary to that.

Q.   And this last sentence says:  "Solely responsible."  Do you

see that?

A.   I do.

Q.   And what is your understanding of when it says "solely

responsible"?

A.   That if they do it, they are the ones that are responsible

for it.

Q.   And does the compliance with the law, does that include the

telemarketing laws?

A.   Yes, it does.

Q.   And in your role as compliance manager, did you make an

effort to see that SSN was aware of this provision?

A.   Yes, I did.

Q.   And how did you communicate that?

A.   Through various things.  We had important notices, facts

blast reminders, and in conversations with them, we would

remind them that they were responsible for these things.  There

were any number of ways that they -- even on the retailer

chats, they would talk about the adherence to federal, state,

and local laws, compliance with the laws.

Q.   And were you directly involved in those efforts?

A.   Yes, I was.

1  Q.  And what was your purpose in communicating that

2  information?

3  A.  To remind the retailers so that they didn't forget.

4  Q.  And let's look at Defendant's Exhibit 2, which, I believe,

5  is in evidence.  And it's up on the screen, Ms. Musso.  Do you

6  see that?

7  A.  I do.

8  Q.  And remind our jury what this is.

9  A.  This is a facts blast, which is a communication that is

10  sent from the corporate office out to all retailers regarding a

11  specific subject.  In this case, it starts with prohibiting

12  retailers from violating any applicable laws.

13         **MR. BICKS:**  And can we blow up, Trudy, the first third

14  of that document?

15  **BY MR. BICKS:**

16  Q.  This is referring to telephone marketing and sales; right?

17  A.  Yes, it is.

18  Q.  And it refers to the retailers as independent.  Can you

19  explain your understanding of what that means?

20  A.  An independent contractor, in the case of DISH at least, is

21  one who has their own business, their own building, their own

22  phone system, their own employees to whom they play -- pay, and

23  that they, in turn, work with -- they market for us, but that

24  we're not responsible for their behaviors.

25  Q.  And who is responsible for the compliance with the

1  telemarketing laws?

2  A.  They are.

3  Q.  All right.  And the reference here, it says:  "The EchoStar

4  retailer agreement prohibits retailers from violating any

5  applicable laws, including federal and state marketing and

6  telemarketing laws."  Right?

7  A.  Yes, it does.

8  Q.  And what was the purpose of communicating the telemarketing

9  laws to a retailer like SSN?

10 A.  Well, specifically, retailers use the telephone, and we

11 wanted to make sure that they were aware of the laws as it

12 related to that.

13 Q.  And was this the only way that this information was

14 communicated and the only time?

15 A.  No.

16 Q.  And was this the only way that this information was

17 communicated and the only time?

18 A.  No.

19 Q.  All right.  Let's look at Defendant's Exhibit 1, which is a

20 April 16th, 2007 facts blast.

21         **MR. BICKS:**  And I would move this into evidence, Your

22 Honor.

23         **MR. GLASSER:**  No objection, Your Honor.

24         **THE COURT:**  It will be admitted.

25 **BY MR. BICKS:**

1  Q.  Do you see this, Ms. Musso?

2  A.  Yes, I do.

3  Q.  And this is an April 16th, 2007 facts blast.

4  A.  Yes, it is.

5          **MR. BICKS:**  All right.  And I want to go to the

6  reminder about telemarketing, Trudy, which, I think, is up

7  there at the top.  Can we look at that?

8  **BY MR. BICKS:**

9  Q.  Do you see this, Ms. Musso?

10  A.  Yes, I do.

11  Q.  And there's a statement that -- at the top about the

12  retailer agreement.  Do you see that?

13  A.  I do.

14  Q.  And there's a second -- a bullet point that talks about

15  authorized retailers who engage in telemarketing should

16  familiarize themselves with applicable federal, state, local,

17  and other laws.  Do you see that?

18  A.  I do.

19  Q.  Can you explain your purpose in communicating this

20  information?

21  A.  Well, throughout the course of business, we would -- we

22  would acquire new retailers.  So, it was important to advise

23  them and also remind the other retailers to do the same thing.

24  Q.  Did you ever hear, ever, in any time with SSN that they

25  felt that they were anything other than an independent

1  contractor responsible for complying with the telemarketing

2  laws?

3  A.  No, sir.

4  Q.  In your e-mail communications that we went through some of

5  them, when a complaint would come up, and you would have back

6  and forth, did you -- in those dealings, did you get a sense of

7  what they thought their role was?

8          **MR. GLASSER:**  Objection.  That's a question about --

9          **THE COURT:**  Sustained.  Sustained.

10 **BY MR. BICKS:**

11 Q.  In those back and forths with SSN, you dealt with

12 Ms. Tehranchi a lot; right?

13 A.  I did.

14 Q.  Did you ever get the impression that she didn't get the

15 message here?

16 A.  No.

17 Q.  And in those responses, did you get a sense, in words or

18 substance, that they were taking responsibility for their

19 telemarketing issues?

20 A.  I did.

21 Q.  All right.  Now, on this facts blast, you were asked some

22 questions on direct kind of about DISH's approach to

23 telemarketing compliance.  Remember that?

24 A.  Yes.

25 Q.  And did you come up and perform something called sting

1  operations?

2  A.  I didn't perform them myself, but I worked with the call

3  center.  Yes, they did.

4  Q.  Yeah.  And tell our jury what that was.

5  A.  Well, a sting can be initiated by either the call center or

6  by the customer, if they're willing, and they -- they set up an

7  account with the person who's calling them so that we can have

8  some concrete information to identify the retailer.

9  Q.  And what's the purpose of that?

10  A.  Primarily, so we can identify the retailer, and then we can

11  take recourse -- take it up with the retailer who's responsible

12  for making these calls.

13  Q.  And is it sometimes difficult to find out where calls come

14  from?

15  A.  It is.  Not as difficult when you're doing a sting; that

16  made it easier to do.  But, in the -- in the other part of the

17  world, when we would get complaints, it could often be very

18  difficult to identify the caller.

19  Q.  And whose resources and how much was being devoted for

20  these kinds of efforts?

21  A.  DISH's.

22  Q.  And describe for our jury how -- how much effort was put

23  into this process.

24  A.  We exhausted all -- all areas of research, trying to

25  determine who they were, and the sting was one part of that

1  when it could be accomplished.

2  Q.  And on this -- the facts blast, there's a third bullet

3  point down that says:  EchoStar takes telemarketing violations

4  very seriously.  We work with law enforcement officials at all

5  levels to identify those in violation of this policy.

6  A.  Correct.

7  Q.  Is that true?

8  A.  That is true.

9  Q.  And can you share with our jury what that's all about?

10 A.  We were engaged with all the Attorneys General and their

11 staffs as it related to any complaints they would get.  We

12 worked with local -- Colorado locally, so yes, we were involved

13 with them.

14 Q.  And why did DISH do that?

15 A.  Because it was prudent to have a good relationship with --

16 with the people governing the laws, and it was -- and it -- it

17 was an expectation.

18 Q.  And did SSN, in any of your dealings, ever question whether

19 it had to follow the telemarketing laws?

20 A.  No.

21 Q.  Did you believe that you were responsible for ensuring that

22 SSN followed the telemarketing laws?

23 A.  That I was personally responsible?

24 Q.  Yes.

25 A.  Absolutely not.

1  Q.  Whose responsibility did you believe it to be?

2  A.  SSN.

3  Q.  Did that mean that you didn't do anything when you saw a

4  complaint?

5  A.  No.

6  Q.  Was it important to you personally that SSN comply with the

7  telemarketing laws?

8  A.  It was -- I was passionate about it.

9  Q.  Why?

10 A.  Because it was a reflection of the performance of my team.

11 It was -- it could create bad blood with consumers and be a

12 damage to our brand.  I mean, there were any myriad of reasons

13 that it was important to try to minimize these risks to our

14 business and theirs.

15 Q.  Let me show you -- I want to ask you some questions about

16 the e-mails that you were shown.  And this was in the 2007,

17 2008 time period.  Are you with me?

18 A.  I am.

19 Q.  All right.  And you were shown Plaintiff's Exhibit 15.

20         **MR. BICKS:**  And can we bring that up, Trudy?  I

21 think -- can you go to the next page?  It's the page 18.  And

22 can you -- can you pull that up, Trudy, the middle e-mail?

23 **BY MR. BICKS:**

24 Q.  This is an e-mail you wrote; right?

25 A.  It is.

1  Q.  All right.  And it says you've only gotten two allegations.

2  You say "only," right?

3  A.  Right.

4  Q.  Can you explain in context what, at the time, you were

5  seeing?

6  A.  At the time, we were seeing a number of TCPA complaints.

7  But, as it related to SSN, I had only gotten two.

8  Q.  And what did you make of that, only two?  What did that

9  tell you?

10 A.  Based on the volume?

11 Q.  Yeah.

12 A.  It wasn't very many.

13 Q.  And when you say "the volume," the volume of what?

14 A.  The volume of complaints.

15 Q.  Does that mean you didn't investigate these two?

16 A.  No, not at all.

17         **THE COURT:**  Okay.  I'm hearing some repetition.

18         **MR. BICKS:**  All right.  Well, I'm sorry, Your Honor.

19 **BY MR. BICKS:**

20 Q.  There's reference there to -- you say "righted the wrongs."

21 Do you see that?

22 A.  I do.

23 Q.  And can you explain what you meant by that?

24 A.  By this time, I had knowledge about those preexisting

25 issues that had been with the Vitana thing and the

1  North Carolina AG, and had understood that to be about

2  prerecorded calls. And so, compared to -- you know, compared

3  to the current activity and those two complaints, I felt that

4  they had -- they had honored the Court order and they were no

5  longer doing prerecorded calling.

6  Q. All right. And this e-mail is February 2007?

7  A. Yes.

8  Q. What were the dates of the calls that we're dealing with

9  with Fisher and Mitchell?

10 A. 2005.

11 Q. So two years before this time period?

12 A. Yes, sir.

13 Q. All right. And you mentioned something called harvester on

14 questioning by Plaintiff's counsel.

15 A. Yes.

16 Q. Can you tell our jury, as somebody in compliance, what that

17 meant to you?

18         **MR. GLASSER:** Objection.

19         **THE COURT:** Well, overruled. You may answer.

20         **THE WITNESS:** Harvester was an individual who would

21 appear frequently in our call lists with different retailers.

22 So -- and they would often reach out directly to the retailer

23 in legal to get financial compensation by sending a letter and

24 saying, okay, if you'll settle this with me, I'll give you a

25 certain amount of money. And when we kept seeing these same

1  people over and over again, these are two of several, many, we

2  tab them the name harvester.

3      Having said that, we still investigated the complaint.

4  And, quite often, we would find that they would lead us to

5  issues in the retailer's process that could be rectified and

6  remedied, and then they wouldn't get any more of these

7  harvester complaints.  But, yes, they -- they were regular

8  complaintiffs [sic].

9  Q.  And would they sign up, have multiple phone numbers?

10 A.  Oh, yes, they did.  We had one who had four.

11          **THE COURT:**  They would have what?

12          **THE WITNESS:**  Multiple phone numbers.

13          **THE COURT:**  Is it okay to call them illegally just

14 because they have multiple phone numbers --

15          **THE WITNESS:**  No, ma'am.

16          **THE COURT:**  -- and they complain?

17          **THE WITNESS:**  No, ma'am.  But, in our research, we

18 would determine that they had -- they had sometimes opted in

19 and gotten calls based on that.  They weren't always

20 legitimate, but we still -- but they weren't not, either.  I

21 mean, there was -- there were a portion of them that weren't.

22          **THE COURT:**  All right.  Go ahead.

23 **BY MR. BICKS:**

24 Q.  And I want to show you a couple e-mails that, again, you

25 went through.  If we could look at Plaintiff's Exhibit 15 at

1  page 6.  Do you remember this, and we can pull it up on the

2  screen.  This was the Schooler and Fowler complaints.  Do you

3  remember that?

4  A.  Yes.

5        **MR. BICKS:**  And can we go to that, Trudy?  I think

6  it's on page 2.  Can you pull that up?

7  **BY MR. BICKS:**

8  Q.  And you were shown this; right?

9  A.  Yes.

10  Q.  And it says the complaint type is frequent and persistent;

11  right?

12  A.  It does.

13  Q.  And is that different than a Do Not Call issue?

14  A.  It's different only in the sense that the -- it doesn't

15  look like their phone numbers were on the Do Not Call List, and

16  that's not what the customer was complaining about.

17  Q.  But did you, nevertheless, investigate those situations?

18  A.  It's still part of the law.

19  Q.  And on to this particular -- this Schooler and Fowler

20  issues.  Did SSN respond to you?

21        **THE COURT:**  To?

22  **BY MR. BICKS:**

23  Q.  To DISH on this.

24  A.  I believe they did, yes.

25        **MR. BICKS:**  Yeah.  And can we look at Plaintiff's 15

1    at page 7?  You see at the top there?  And can we blow that up,

2    Trudy?  It's tricky with these e-mails because you've got to go

3    bottom to top.

4    **BY MR. BICKS:**

5    Q.  Do you see this up at the top, Ms. Musso?

6    A.  I do.

7    Q.  And, it's a little hard because not all the words are

8    perfect there, but it says:  First of all, this is the first

9    time -- it looks like -- we got any e-mail in regards to this

10   matter.  We have checked our database, and both of these

11   numbers were taken out last year.  And then it says:  As soon

12   as anyone asks to be put on the DNC, we take them out of our

13   database right away.  I hope this answers your -- the question,

14   right, the consumer complaints.  Do you see that?

15   A.  I do.

16   Q.  And what kind of information is that communicating to you

17   in compliance when you get that?

18   A.  That anytime they get a customer complaint, not just from

19   us, but from anybody talking to them, and they -- they request

20   to be removed from their Do Not Call List, they -- and put on

21   their Do Not Call List, they do.

22   Q.  And do you have any reason to think this didn't or wouldn't

23   happen?

24   A.  No.

25   Q.  Would you consider something like this, here, a reason to

1  terminate a retailer like SSN?

2  A.  No.

3  Q.  Why not?

4  A.  Because it's not a pattern.  It didn't last -- I mean, they

5  didn't do it like 100 times; it was two.  Oftentimes, two can

6  be a mistake.  And SSN was always responsive, and the only

7  delay in this response was because they hadn't received the

8  information.  We sent it to the wrong person.

9  Q.  All right.  So these complaints -- this is 2008, one in

10 2008, one in 2009; right?

11 A.  Yes, sir.

12 Q.  All right.  And I then want to focus on, right, the class

13 period in this case.  Are you with me?

14 A.  I am.

15 Q.  And just so we orient ourselves, it's May 2010 to

16 August 2011, that 14-month time period?

17 A.  Yes, sir.

18 Q.  All right.  Were you shown, to your memory, during your

19 examination by Plaintiff's counsel any complaint that reflected

20 a call made during that 14-month class period?

21 A.  I don't recall making that connection.

22 Q.  I want to show you an e-mail that you were shown, which was

23 DX16, at pages 2 to 3.  Do you see that?

24 A.  Yes.

25 Q.  And this -- and you see -- remember, you were asked

1  questions?

2      **MR. BICKS:**  If we can blow up kind of the middle about

3  that, about phone records.

4  **BY MR. BICKS:**

5  Q.  You were asked questions, did SSN have phone records?

6  A.  Yes, I was.

7  Q.  What does this on the screen reflect about phone records?

8  A.  That they were able to get some.

9  Q.  And do you see here when it talks about how long the call

10 at issue is in this -- in this complaint?

11 A.  Six seconds.

12 Q.  And I want to show you again what SSN responded to this.

13     **MR. BICKS:**  And this is at pages 1 to 2 at the top, if

14 you can go to that, Trudy, where you were to the top of the

15 document.

16 **BY MR. BICKS:**

17 Q.  Is this SSN's response to this complaint?

18 A.  Yes, it is.

19 Q.  And do you see the reference there that says:  We had

20 previously done business with the customer according to our

21 records?

22 A.  I do.

23 Q.  And this is from somebody named Rehan; right?

24 A.  Yes.

25 Q.  And tell our jury who Rehan was.

A.   Rehan was their call center manager, operations manager at
SSN.

Q.   Did you deal with him from time to time?

A.   I did.

Q.   And what was your impression of his competence and the
seriousness with which he took the laws?

A.   He -- he was always willing to help, and he never balked at
having to do so.

Q.   And did he provide to you phone records?

A.   He did.

Q.   Okay.  And, when he says that they had previously done
business with the customer according to our records, and they
have immediately added both phone numbers we had for the
customer to the Do Not Call List, what does that convey to you
and what does it make you think is going on?

A.   That they -- they didn't want to reach out to that customer
again.  They took the complaint seriously.  They added them to
their list, and that they wouldn't ever call them again.

Q.   And as somebody who deals with compliance, is it
significant to you that they communicate that they had
previously done business with that customer?

A.   It is.

Q.   And tell our jury why, please.

A.   Because SSN felt that they had a customer relationship with
them, and they were allowed to call.

1  Q.  And did you follow up, even after hearing that, to ask for

2  more information?

3  A.  I think I did.

4          **MR. BICKS:**  All right.  Let's look at DX16, at page 1,

5  please.  And we're looking at the bottom.  And can you blow

6  that up?

7  **BY MR. BICKS:**

8  Q.  It says -- you're asking, after being told that they have a

9  business relationship and they remove the person, you then went

10 and said:  Did you rescrub?

11 A.  Yes, I did.

12 Q.  Why did you take that extra step?

13 A.  Because I had become aware that EB -- existing business

14 relationships were -- some of the laws had changed.  Some of

15 the states didn't necessarily recognize them, and I thought it

16 was prudent that they seek some additional legal advice.

17 Q.  Were you providing that legal advice to them?

18 A.  No.

19 Q.  And you suggest here and you talk about the limitations;

20 right?

21 A.  Yes.

22 Q.  And you communicate that information; right?

23 A.  Yes.

24          **MR. BICKS:**  And if we can go to page 1 and go up,

25 Trudy.

**BY MR. BICKS:**

Q.  You were shown this.  This is the top of the e-mail chain.
And you say:  When I first came over to Retail Services, there
were some issues, but not again until now.  Right?

A.  Correct.

Q.  All right.  When did you come to Retail Services?

A.  In August of 2006.

Q.  And this e-mail is being written when?

A.  May 17th, 2010.

Q.  So, give or take, about four years?

A.  Correct.

Q.  All right.  And you're communicating here what about
exactly what you had seen during that four-year time period?

A.  That I hadn't had any additional issues with them that
caused me any concern.

Q.  All right.  And you go ahead and you point out to them to
be cognizant of the EBR and to caution them; right?

A.  I did.

Q.  What was your purpose in making a statement like that?

A.  Because sometimes, I found with our retailers that they
weren't always clear on the law, and I wanted to make sure that
they got clear direction as it related to their particular
business model.

Q.  And is somebody, like PossibleNOW, is this their area of
expertise?

1  A.  Absolutely.

2  Q.  And you say in this e-mail that:  PossibleNOW can help you

3  or your legal counsel, particularly if you are calling

4  nationwide.  Do you see that?

5  A.  I do.

6  Q.  And what was your expectation when you provide that kind of

7  information?

8  A.  That they would seek out the clarification.

9  Q.  All right.  And I want to just show and move into

10  evidence -- can you look -- Defendant's Exhibit 5.  It's a 2008

11  facts blast.  It's in your binder.

12          **MR. BICKS:**  I'd like to offer that and move it into

13  evidence.

14          **MR. GLASSER:**  No objection, Your Honor.

15          **THE COURT:**  It will be admitted.

16  **BY MR. BICKS:**

17  Q.  Now, if we can go back to Defendant's Exhibit 16.  This is

18  May 17th, 2010, right?

19  A.  Yes.

20  Q.  And we've gone through the complaints, but the one that --

21  the only one you had received going back in time, the last one,

22  was the complaint from Dr. Krakauer in May of 2009, right?

23  A.  That is correct.

24  Q.  As a compliance manager with experience in this space, when

25  a year goes by and you don't see a complaint, what does that

1  tell you?

2  A.   That SSN is following the law and creating good business,

3  and they're -- there's no reason for me to have any red flags

4  about them.

5  Q.   As a compliance manager, you dealt with SSN, right?

6  A.   Yes.

7  Q.   Did you consider SSN to be DISH's agent?

8  A.   No.

9  Q.   What did you consider them to be?

10 A.   An independent contractor, just as the retailer agreement

11 specifies.

12 Q.   And that's in Joint Exhibit 2, paragraph 11, if we can pull

13 that up.  And the jury has seen this.  It says:  "The

14 relationship of the parties hereto is that of independent

15 contractors."  Do you see that?

16 A.   Yes.

17 Q.   And was that your understanding of how these parties worked

18 together and what their relationship was?

19 A.   Yes.

20 Q.   Did SSN ever, in the entire time period you worked with

21 them, come to you and ask to change this agreement?

22 A.   No.

23 Q.   As a compliance manager, was it ever your goal to control

24 the day-to-day activities of SSN?

25 A.   Absolutely not.

1  Q.  Why not?

2  A.  There were not enough hours in the day, and it was not

3  something that was under my umbrella, and I never even -- it

4  was never even a thought.  It wasn't practical.  You know, they

5  had their own employees.  They were in California.  I was in

6  Colorado.  It just -- it's not practical, and there was no

7  action I could take anyway.

8  Q.  In dealing with retailers, how do you think they would

9  react if you tried to do that?

10  A.  Well, I can honestly say when I first came on board, it

11  took a little while to build relationships of trust.  So they

12  would not have liked it.

13  Q.  Did you ever see in any of your dealings that a retailer

14  like SSN felt their information -- their marketing things were

15  proprietary to them?

16  A.  SSN did.  All the retailers did.

17  Q.  And tell me as it relates to SSN what you saw.

18  A.  I -- when I -- when we started our Q/A monitoring process,

19  they were very reluctant to let the FSDRs in because they

20  didn't want anyone to have information about, you know, their

21  actual sales script and how they were -- you know, how they

22  were selling.  So they didn't want us in there, you know, in

23  the middle of their business.

24          **THE COURT:**  Well, I don't know what an FSDR is.

25          **THE WITNESS:**  I'm sorry, Your Honor.  It's one of

1   our -- field sales development representative is the acronym.

2           **THE COURT:** All right. Go ahead.

3   **BY MR. BICKS:**

4   Q. And is this actually documented in an e-mail that you sent?

5   A. I believe it is, yes.

6   Q. All right. Let's look at Defendant's Exhibit 15.

7           **MR. BICKS:** And I move it into evidence.

8           **MR. GLASSER:** No objection.

9           **THE COURT:** It will be admitted.

10           **MR. BICKS:** If we can blow this up a little, Trudy, so

11   we can see it a little bit better. Thank you.

12   **BY MR. BICKS:**

13   Q. Tell us, Ms. Musso, what is this?

14   A. We mentioned starting a call monitoring process early in

15   20 -- early in 2007, I think it was, and Alex -- I had gotten

16   some information that he was a little reluctant to let anyone

17   in his offices, so I reached out to him.

18   Q. And the sentence that says "I've heard from the field sales

19   team that you have been reluctant to allow us access to your

20   customer service call center," is that what you're talking

21   about?

22   A. Yes.

23   Q. And what does that tell you about whether or not DISH could

24   control the day-to-day marketing activities of SSN?

25   A. That we couldn't.

1  Q.  You were asked questions about quality assurance and making
2  sure customers get accurate information about DISH's products.
3  Do you remember that?
4  A.  I do.
5  Q.  And is that important to DISH?
6  A.  Yes, it is.
7  Q.  And tell our jury why.
8  A.  First of all, you don't want the customer -- you want to
9  make sure that they have an informed buying decision so when
10 the installer gets there to do the installation, there are no
11 surprises.  When they get their first bill, they know what it's
12 going to look like, and as they continue to watch their
13 programming and use the purchase, that they don't -- they're
14 happy with the purchase, and, primarily, that's because you
15 want the customers to stay with you.  You know, you don't want
16 them to leave because of something you've missed in that sales
17 process.
18 Q.  And you described a little bit on questioning from
19 Plaintiff's counsel DISH's quality assurance of, from time to
20 time, listening to calls to make sure that accurate program
21 information was disclosed.  Do you remember that?
22 A.  Yes, I do.
23 Q.  Does that have anything to do with whether or not SSN
24 decided to do telemarketing, newspaper adds, radio, or the
25 details of any of that?

1  A.  No.

2  Q.  Is -- the decision and how to market and whether to use

3  telemarketing, phones, radio, newspaper, flyers, who makes that

4  decision?

5  A.  The retailer.

6  Q.  And is DISH able to control that?

7  A.  No.

8  Q.  Does DISH even want to control that?

9  A.  To the best of my knowledge, no.

10  Q.  And who actually makes the investments and pays the money

11  to do all that marketing?

12  A.  The retailer themselves.

13  Q.  All right.  And in any of the calls that were listened to

14  for purposes of quality assurance, did you ever hear anything

15  and was it ever brought to your attention that there was any

16  issue on a telemarketing compliance problem?

17  A.  Not to the best of my knowledge.

18          **MR. BICKS:**  All right.  Thank you.  That's all I have.

19          **THE COURT:**  Redirect?

20                          **REDIRECT EXAMINATION**

21  **BY MR. GLASSER:**

22  Q.  Ms. Musso, you testified a couple of times in your

23  examination from Mr. Bicks that you didn't believe that the

24  North Carolina complaint had to do with Do Not Call; it had to

25  do with automessaging.  Do you recall that testimony?

```
 1  A.  And I think I admitted to you that I was mistaken, that I
 2  had assumed that.
 3  Q.  Okay.  So it did enjoin them to stop them from violating
 4  the Do Not Call?
 5  A.  Yes.
 6  Q.  Okay.  You said in response to questioning from Mr. Bicks,
 7  and I wrote it down, that it was often very difficult to
 8  identify the call.  In other words, you get a complaint, and it
 9  was very difficult to identify the retailer?
10  A.  That is correct.
11  Q.  Okay.  And so the vast majority -- so the majority of
12  complaints that you got you couldn't actually pin on any of the
13  retailers, right?
14  A.  I couldn't make them responsible, no, sir.
15  Q.  So would it be fair to say that at least 75 percent of the
16  complaints that came in you couldn't put on any retailer?
17          MR. BICKS:  Again, Your Honor, I would just ask that
18  this be directed to SSN.
19          MR. GLASSER:  The question --
20          THE COURT:  Well, I think there were some general
21  questions asked.  Go ahead.  You can answer.
22          THE WITNESS:  To be perfectly honest, I don't recall
23  the percentage, but it was a large number.
24  BY MR. GLASSER:
25  Q.  All right.  So it could have been even 80 percent?
```

1  A.  I don't know what percentage it was.

2  Q.  But the majority or even the vast majority of complaints

3  received you could never figure out which of the retailers had

4  done it, right?

5  A.  Or if a retailer had done it.

6  Q.  Okay.  So the mere fact that Mr. Bicks has pointed out that

7  you got two -- you got Dr. Krakauer and Mr. Campbell, and you

8  did see that those Direct-to-DISH campaigns generated those two

9  complaints, doesn't mean there weren't other problems during

10 that exact same period, right, because the vast majority of

11 complaints you can't link up, right?

12 A.  That's true.

13 Q.  And Mr. Bicks asked you about millions of calls.  Do you

14 remember those questions?

15 A.  Uh-huh, yes, I do.

16 Q.  And he said, you know, during this whole big period.

17 Aren't complaints -- anybody who's dialed but not connected is

18 unlikely to complain.  Do you agree?

19 A.  I do to a degree.  However, I think in -- if it was

20 Mr. Campbell's record we were looking at, the complaint -- he

21 had a number of complaints that happened relatively quickly.

22 Q.  Right, but he was talked to.  Somebody tried to switch him.

23 Somebody pretended they were Direct and tried to switch him to

24 DISH.  That's different than -- like if you're never connected,

25 how do you even know to call -- if no one ever picks up the

1 phone, they are not going to call and complain, are they?

2 A.  We did have frequent and persistent phone calls from

3 customers who would see on their Caller ID that a certain

4 number had called them, and they would find out that it was

5 about a DISH sale, and they would call and complain.

6 Q.  Okay.  So let me back it up then.  Is it fair to say,

7 though, that most complaints would arise out of an actual

8 connected call?

9 A.  I would say yes.

10 Q.  And so because some people are called more than once, the

11 number of connected calls is materially, materially lower than

12 the amount of attempted calls by any marketer in any reasonable

13 period of time, wouldn't you agree?

14 A.  Say that again, please.

15 Q.  Okay.  So let's say your marketer tried 1.6 million calls

16 and only connected 231,000.  The connected calls are a

17 materially lower number than the attempted calls?

18          **MR. BICKS:**  Objection, Your Honor.

19          **THE COURT:**  Well, are -- I don't know what you're

20 asking her.

21          **MR. GLASSER:**  She asked me to clarify what I was

22 meaning.

23          **THE COURT:**  You need to ask a different question.

24 That was not clear.

25

1    BY MR. GLASSER:

2    Q.  When a telemarketer tries to make a call, they often do not

3    connect?

4    A.  That's true.

5    Q.  Okay.  Connected calls generate the vast majority of

6    complaints?

7    A.  I would say that was true.

8    Q.  And connected calls often go twice, three, or even four

9    times to the same person.  So actual called numbers is an even

10   lower number, right, than connected calls?

11   A.  If you put it like that, yes.

12   Q.  And that's the group that's most likely to complain, that

13   group at the bottom that actually connected and talked to

14   someone, right?

15   A.  And they would have been the most offended.

16   Q.  Right.

17          MR. GLASSER:  I don't think I have any further

18   questions, Your Honor.

19          THE COURT:  Anything else on those limited topics?

20          MR. BICKS:  Yes, thank you.

21                      RECROSS-EXAMINATION

22   BY MR. BICKS:

23   Q.  You were asked about you get information, and then there

24   may be some things that you can't ever figure out, right?

25   A.  That's true.

1    Q.   When you do your daily job, and you've worked in compliance

2    for however many years, do you act on information that you

3    know, or do you make decisions about things that you have no

4    idea about?

5    A.   On information that I know.

6    Q.   Thank you.

7              **THE COURT:**  Anything else?

8              **MR. GLASSER:**  No, ma'am.

9              **THE COURT:**  All right.  Thank you.  You may step down.

10             **THE WITNESS:**  Thank you, Your Honor.

11        (The witness left the stand.)

12             **THE COURT:**  You can call your next witness.

13             **MR. BARRETT:**  Your Honor, we have a video deposition

14   of Bahar Tehranchi and ask that defense counsel please play

15   that video.

16             **THE COURT:**  All right.  You all have it set up; is

17   that right?

18             **MR. BICKS:**  Yes.  I was just --

19             **THE COURT:**  First, ladies and gentlemen, let me just

20   tell you what a deposition is.  You've heard mention of it, I

21   think.  A deposition is a pretrial opportunity to take

22   testimony from a witness.  The witness is under oath.  Lawyers

23   are present for both sides.  This is an opportunity to ask

24   questions.  And, you know, not everybody nationwide can be

25   required to come to court here in North Carolina to testify, so

1 sometimes, you know, people go to them, or there's other

2 reasons that the testimony is done by deposition. So what

3 you're about to see is deposition testimony given under oath,

4 and you should receive it just as if the witness was sitting

5 right there on the witness stand and testifying live in front

6 of you, to the extent that you can.

7     Was there a housekeeping issue?

8         **MR. BICKS:** Your Honor, one of the jurors had a

9 question.

10         **JUROR TWO:** What was the name of the person you said

11 just now was going to be on the video monitor?

12         **MR. BARRETT:** Bahar Tehranchi, Sophie Tehranchi.

13         **JUROR TWO:** Oh, Sophie Tehranchi. Thank you.

14         **THE COURT:** Sophie. Is there a housekeeping issue?

15         **MR. BICKS:** Well, just -- I was wondering if the

16 Court -- the deposition has both sides' information on it, both

17 sides' designations.

18         **THE COURT:** Yeah, play it all.

19         **MR. BICKS:** Yeah.

20         **THE COURT:** Right. Do we need to talk about this?

21         **MR. BICKS:** No, no, no. I just wanted the Court to

22 know.

23         **THE COURT:** Okay. We're ready if it's -- if the

24 miracles of technology can occur.

25     (The video deposition of Bahar Tehranchi was played for the

1   jury, not reported by reporter.)

2           **THE COURT:**  Excuse me.  Can you stop it?

3       Ms. Burgess?

4       I think Ms. Burgess has dosed off on us here.

5       Are you all right, Ms. Burgess?

6           **JUROR SIX:**  I think so.

7           **THE COURT:**  Do you need a minute?

8           **JUROR SIX:**  I had an episode earlier, and it must have

9   took my blood down.

10          **THE COURT:**  Do you need a break?

11          **JUROR SIX:**  I might.

12          **THE COURT:**  All right.

13          **JUROR SIX:**  It may have dropped my iron.

14          **THE COURT:**  All right.  Why don't we go ahead and take

15  the afternoon recess, and we'll come back and start right here.

16      So please remember during the break not to talk about the

17  case or form any opinion.  I think there's some food back

18  there, Ms. Burgess, and you can have a snack, and we'll come

19  back in 15 minutes.  Jurors are excused.  You all can remain

20  seated.

21      Do you need some help?

22      (The jury left the courtroom at 3:04 p.m.)

23          **THE COURT:**  Okay.  So, I mean, when I looked over, I

24  thought she was asleep, but I'm not now sure that that's what

25  was going on.  She may have just had her eyes closed since she

1 did respond pretty quickly, but something clearly was not

2 exactly right.

3          **MR. GLASSER:**  I mean, she's white as a sheet, Your

4 Honor.

5          **THE COURT:**  Yeah, so, anyway, we'll come back, and

6 I'll check on her to be sure she's going to be able to

7 continue.  We fortunately have plenty of jurors, so if she's

8 not, we can still go forward.

9          **MR. GLASSER:**  Can we roll the tape back about 10

10 seconds?

11          **THE COURT:**  Yeah, we'll roll it back.  Is that

12 possible?  I say that.

13          **MR. GLASSER:**  I'm sure it is.

14          **THE COURT:**  Maybe we can –– if you all can investigate

15 that, and maybe if we could go back a minute or two just –– I

16 don't think it happened very long.  I was keeping an eye on

17 them.  So I don't think she –– to the extent she did miss

18 anything, I don't think it was much.

19          **MR. GLASSER:**  Just in the confusion, it was still

20 running when everything was going on.

21          **THE COURT:**  Exactly, so I do think it's a good idea,

22 if we can, to back it up a little bit.  I'll just ask you all

23 to check on that.

24       And I think I may need to clarify.  I said what I usually

25 say, which is the deposition was taken in this case, which is

1  obviously not true of this particular deposition.  So I'll
2  clarify that with them.  I'm sorry about that.  I wasn't -- I
3  was saying what I usually say.
4      All right.  Is there anything else we need to take up
5  before we take a break?
6          **MR. GLASSER:**  No, ma'am.  When did you want us back?
7          **THE COURT:**  I'm sorry?
8          **MS. ECHTMAN:**  I just want to clarify.  Ms. Harris is
9  going to see what she can do.  You can't just rewind with this
10 like you could do with an ordinary videotape.  So she's going
11 to work on it while we're on a break and see what we can do.
12         **THE COURT:**  That's great.  Just let me know.
13 Hopefully, we can back it up or you all -- I say "we."  That's
14 the royal we.  If you all can back it up a bit.  Just let me
15 know when we all get back.  Thank you for attempting that.
16     We'll give her a few extra minutes.  Let's come back at
17 3:20.
18     (An afternoon break was taken from 3:07 p.m. until
19 3:25 p.m.)
20         **THE COURT:**  I know it's going to be another minute or
21 two before our -- we get to the right place in the deposition.
22     Ms. Sanders has checked with the juror and -- who indicates
23 this is an unexpected health problem.  She appears to be
24 better, and Ms. Sanders asked her if she thought she could
25 continue.  She said she thought she could.  So I figure we'll

1  give it another try.  If she has further problems, I may --

2  I'll ask her if she would prefer to sit on the front row there

3  near the edge.  I don't know that that's going to be any

4  better, but it's at least easier to get in and out.  So I'll

5  inquire of her about that when -- when she comes in.

6      And while we're waiting on the system to get to the right

7  place, you know, I know I had given you all a time limit.

8  Nobody is really expecting that you're going to approach that.

9  So I'm just going to ask the clerk not to keep time on these --

10  on these depositions because the clerk doesn't know who

11  designated what.

12          **MR. BICKS:**  Judge, we can split it.

13          **THE COURT:**  Is that all right?

14          **MR. BICKS:**  Yeah, that's fine.

15          **THE COURT:**  Half and half?

16          **MR. BICKS:**  Yeah.

17          **THE COURT:**  Great.  It probably doesn't matter at this

18  point because I'm relying on you all to finish in time.

19          **MR. BICKS:**  Yes.

20          **THE COURT:**  And the other just housekeeping matter I

21  think she's covered with you all is at some point I just need,

22  for the record, an exhibit that's the hard copy of the

23  transcript that is played to the jury or read to the jury

24  because the court reporter isn't going to take it down again.

25  You know, it's already been taken down again.  I would not

anticipate sending that back to the jury with the other

exhibits, but the Court of Appeals might need it if you all go

up to visit them after this is over.  So that's the easiest

way, I think, to make it part of the record.

**MR. BARRETT:**  Yeah.

**THE COURT:**  Just at some point when the jury is not

present mark those, and we'll put them into evidence.

**MR. BICKS:**  Can I ask, Your Honor, just thinking on

the jury instructions timing, what would be your practice in

terms of how we would deal with that?

**THE COURT:**  Well, you know, when things go well, I

have a rough draft ready for you at the close of all the

evidence, and I send the jury, you know, home or to a long

lunch or whatever makes sense, given our timing, and then we

have a charge conference on the record working off of my draft.

You know, you all have submitted your instructions.  If

anybody is going to want me to give anything different or

additional, you know, you need to give it to me.  I know

trials -- trials are not a hundred percent predictable.  So if

you're going to be changing what you're asking me to do or if

something comes up that, you know, just didn't occur to you

pretrial, you know, and you want me to do something specific, I

really need for you to give it to me in writing.  If you try to

make up a jury instruction orally during the charge conference,

my experience is that's not very helpful, in addition to not

1  really being allowed by our rules.  So you do need to give it

2  to me in writing, but I don't know exactly when we'll get to

3  the close of the evidence.  I'm hoping, you know, it might work

4  out maybe close of business Tuesday or Wednesday.

5          **MR. BICKS:**  Yeah, that was my thinking.

6          **THE COURT:**  And, you know, that we would be able to

7  take care of it at that point.

8      Are we ready?  Yes.

9          **MR. BARRETT:**  Your Honor, on the deposition

10  designations, the transcripts, we may work on that tonight and

11  bring that in tomorrow morning.

12          **THE COURT:**  Yeah, that's fine.  It doesn't have to be

13  done today.

14      Yes.  Okay.  All right.  Can you bring the jury in, and you

15  can ask Ms. Burgess if she'd rather sit there on the front

16  row -- well, just bring them in and have them sit in their

17  ordinary seats.  I'll fix it later if she would rather move.

18      (The jury entered the courtroom at 3:30 p.m.)

19          **THE COURT:**  Okay.  You feeling better, Ms. Burgess?

20          **JUROR SIX:**  Yes.

21          **THE COURT:**  Ms. Sanders, I believe, asked if you

22  thought you were able to continue, and you feel like --

23          **JUROR SIX:**  I can.  I know I can.  I don't know how

24  that happened so fast.

25          **THE COURT:**  Well, you know, I was watching, and it did

1  happen very fast.  So I'm glad you're feeling better, and if
2  you feel anything coming on again, I bet Ms. Miller won't
3  object --

4          **JUROR SIX:**  I didn't feel that happen.  I'm, like,
5  what.

6          **THE COURT:**  We'll keep an eye on you.

7          **JUROR SIX:**  I was seeing that lady talking on there
8  and then --

9          **THE COURT:**  Part of the reason we were a little slow
10  getting back to you is we have backed it up just to be sure
11  that nothing got missed, and I know it was continuing to play a
12  little bit when you first became ill.  So we have backed it up
13  here, and that was part of what took us a little bit longer,
14  and we are ready to proceed.

15      Everybody else is okay?  All right.  Good.

16      All right.  We'll resume then Ms. Tehranchi's testimony.

17      (Continuation of the playing of the video deposition of
18  Sophie Tehranchi, not reported by reporter.)

19          **THE COURT:**  Okay.  That's the end.  All right.  Go
20  ahead.

21          **MR. BARRETT:**  Your Honor, I move the admission of
22  PX22, which was referenced in the video clip as Exhibit 136.

23          **MR. EWALD:**  No objection.

24          **THE COURT:**  It will be admitted.

25          **MR. EWALD:**  And, Your Honor, DISH would offer for

1  admission DX22 and DX26.

2       THE COURT:  You just moved DX22?

3       MR. BARRETT:  I did, PX22.

4       THE COURT:  Oh, PX.  Okay.  I heard D.  So Plaintiff's

5  Exhibit 22 is the one that was referenced as Exhibit 136?

6       MR. BARRETT:  Yes, Your Honor.

7       THE COURT:  All right.  That's admitted.

8    And you're moving Defendant's 22 and 26?

9       MR. EWALD:  Yes, Your Honor, and Defendant's 26.

10      MR. BARRETT:  No objection.

11      THE COURT:  They'll be admitted.  And those are

12 documents referenced in the deposition we just listened to?

13      MR. EWALD:  Yes, Your Honor.

14      THE COURT:  All right.  They'll be admitted.  You can

15 call your next witness.

16      MR. BARRETT:  Your Honor, the Plaintiff calls David

17 Hill by videotape.

18      THE COURT:  Did you say Hill?

19      MR. BARRETT:  Yes.

20      THE COURT:  This one is a good bit shorter, right?

21      MR. BARRETT:  Yes.

22      THE COURT:  Ms. Burgess, you doing okay?

23      JUROR SIX:  Yes, thank you.

24      THE COURT:  All right.  You can proceed.

25    (Video deposition of David Hill played for the jury, not

1 | reported by the reporter.)

2 | **THE COURT:** Okay.

3 | **MR. BARRETT:** Your Honor, the Plaintiff would move the

4 | admission of that affidavit, which is identified in the

5 | transcript as Hill 1 and, for purposes of trial, PX2007.

6 | **MR. EWALD:** No objection.

7 | **THE COURT:** It will be admitted.

8 | **MR. EWALD:** And, Your Honor, DISH would offer DX13,

9 | which is the Five9 contract referenced in the deposition.

10 | **MR. BARRETT:** No objection.

11 | **THE COURT:** All right. It will be admitted.

12 | **MR. BARRETT:** Your Honor, we call by reading of the

13 | transcript Tanya Maslennikov.

14 | **THE COURT:** I'm sorry? Say again.

15 | **MR. BARRETT:** Tanya Maslennikov,

16 | M-A-S-L-E-N-N-I-K-O-V, with Five9.

17 | **THE COURT:** All right.

18 | **MR. BARRETT:** And I would ask that Matt Norris be

19 | permitted to take the witness stand to read the transcript.

20 | **THE COURT:** Okay. You can come on up.

21 | Ladies and gentlemen, I think earlier I told you that these

22 | depositions had been taken in this case, and you can see from

23 | the dates they were earlier than that. So -- but they were

24 | taken by folks with the same or similar interests, and so you

25 | should still consider them just like you would as if the

1  witness were present.

2      And Mr. Norris is going to read Ms. Maslennikov's answers,

3  correct?

4          **MR. BARRETT:**  Yes, Your Honor.

5          **THE COURT:**  All right.  Go ahead.

6          **MR. BARRETT:**  This is the deposition of Tanya

7  Maslennikov.

8          **MR. NORRIS:**  Yes, correct.

9      (Portion of deposition of Tanya Maslennikov read for the

10  jury, not reported by reporter.)

11          **JUROR TWO:**  What's this lady's role?  What's her

12  title?

13          **THE COURT:**  I assume they are going to tell us that.

14          **JUROR TWO:**  I'm sorry.

15          **MR. BARRETT:**  This is in an exhibit that I will move

16  into --

17          **THE COURT:**  It's in the exhibits?

18          **MR. BARRETT:**  Yes, yes.  And the declaration, which is

19  PX1997.  It's a declaration that she stated she reviewed during

20  the deposition.

21          **THE COURT:**  Okay.  So you're going to find that out?

22          **MR. BICKS:**  Your Honor, I don't have any trouble

23  briefing if he wants to just tell them who it is, if it would

24  be helpful.

25          **THE COURT:**  Okay.

```
 1          MR. BARRETT:  Tanya Maslennikov is an employee of
 2    Five9.
 3          THE COURT:  All right.  Go ahead.
 4       (Continued of reading of Tanya Maslennikov deposition for
 5    the jury, not reported by reporter.)
 6          MR. BARRETT:  Your Honor, no further questions.
 7          THE COURT:  All right.  Were there any?  No.  Okay.
 8    Thank you.
 9          MR. BARRETT:  Plaintiffs would move the admission of
10    PX197.
11          MR. EWALD:  No objection.
12          THE COURT:  It'll be admitted.
13          MR. BARRETT:  That's it for the depositions we will
14    read or play.
15          THE COURT:  Okay.
16          MR. BARRETT:  We have another witness.
17          THE COURT:  All right.  Go ahead.
18          MR. BICKS:  Your Honor, Ms. Echtman is going to handle
19    the next witness.
20          THE COURT:  Okay.
21          MR. BARRETT:  The Plaintiff calls Anya Verkhovskaya.
22          THE COURT:  If I can just ask counsel -- come on up --
23    if and when you all show any of these exhibits that were moved
24    into evidence during the depositions to the witness, if you'd
25    just flag that for the jury this was moved into evidence during
```

the testimony of whatever witness it was, because, you know, we

didn't see them during the deposition, so I think that might be

helpful to us to -- to the jury and me.

        **MR. BICKS:**  Will do.

        **THE COURT:**  All right.  Go ahead.

        **ANYA VERKHOVSKAYA, PLAINTIFF'S WITNESS, SWORN**

                **DIRECT EXAMINATION**

**BY MR. BARRETT:**

Q.  Good afternoon.

A.  Good afternoon.

Q.  Please tell the jury your name.

A.  Anya Verkhovskaya.

Q.  And, Ms. Verkhovskaya, how are you?

A.  I'm getting over a cold, but I'm better.  Thank you.

Q.  You've been here for a while?

A.  Yes, since Saturday.

Q.  Where is home for you?

A.  Currently, it's in Milwaukee, Wisconsin.

Q.  And do you have children?

A.  Yes, I have three children.

Q.  Where do you work?

A.  I currently work at DRRT and A.B. Data.

Q.  DRRT, is that a new job?

A.  Yes, it is.

Q.  All right.  What is A.B. Data?

A.  A.B. Data is data processing and claims -- class action

claims administration company.

Q.  And what work did you do there?

A.  I was the partner and chief operating officer for nearly 18

years.

Q.  And are you still employed there?

A.  I work there as a consultant at this time.

Q.  And how long were you at A.B. Data?

A.  Nearly 18 years.

Q.  And do you like your work there?

A.  Very much so.

Q.  What did you like about it?

A.  I like working with data.  I've been working with data my

entire life and that's what I enjoyed.

Q.  What work were you asked to do in this case?

A.  In this case, I was asked to analyze Five9 records.

Q.  And the jury has just seen and you were present in the

courtroom for some discussion of the Five9 records, correct?

A.  That's correct.

Q.  And did you analyze those records and are you here to

testify regarding their content?

A.  That's correct.

Q.  Okay.  What I'd like to do -- specifically what were you

asked to do with respect to the Five9 records?

A.  Sure.  I was asked to analyze those call records to

1  determine how many phone numbers were on the not call

2  registry -- National Do Not Call Registry for 30 days and

3  greater, received two phone calls within 12-month period, and

4  were nonbusiness numbers, as well as non-DISH customers.

5  Q.  And, Ms. Verkhovskaya, you have an accent?

6  A.  Yes.

7  Q.  I'm going to ask you some questions about your background.

8  Where did you grow up?

9  A.  I was born and grew up in Moscow, then former Soviet Union.

10  Q.  And how did you get to the United States?

11  A.  I came to the United States as a political refugee.

12  Q.  And how old were you?

13  A.  I was 20 years old.

14  Q.  What were the circumstances of your becoming a political

15  refugee?

16  A.  Well, then the former Soviet Union was still a Communist

17  country and I was always a fighter for human rights and I was

18  not -- my political views did not align with Communist views of

19  human rights and I was active in various movements, plus being

20  Jewish did not help the entire process.

21  Q.  And so you were 20 years old when you got to the United

22  States, right?

23  A.  That's correct.

24  Q.  Did you speak English?

25  A.  No, I did not.

1  Q.  Did you come alone?

2  A.  I came with some people I knew, but no family.

3  Q.  What did you do when you got to the United States?

4  A.  Well, very quickly I realized that in order to be

5  successful I have to go to college, so it was in less than four

6  weeks I enrolled into college.

7  Q.  What college did you attend?

8  A.  Molloy College.

9  Q.  And why Molloy College?

10  A.  Well, that was the only college that would allow me to

11  study English and graduate with bachelor's of science degree in

12  expedited manner.

13  Q.  And why were you interested in graduating quickly?

14  A.  Well, as a political refugee, I didn't have a lot of money

15  and I wanted to support myself in a better way.

16  Q.  And so Molloy College is in New York, correct?

17  A.  That's correct.

18  Q.  And what was your degree in?

19  A.  I graduated in degree -- with degree in pediatric oncology.

20  I was a nurse.  And pediatric oncology means that I worked with

21  children who had cancer.

22  Q.  And what did -- how long did you work as a nurse?

23  A.  A little over a year.

24  Q.  And after working for a year, what did you do next for

25  work?

1  A.  Well, I read an article that a film director, Steven

2  Spielberg, just finished filming a movie called *Schindler's*

3  *List*.  He made quite a bit of money on that film, but could not

4  take that money and he established a foundation that focused on

5  collecting data on survivors and witnesses of the Holocaust

6  throughout the world, and I wanted to work for that

7  organization.

8  Q.  And what did you do for that organization?

9  A.  Well, I started working for that organization as a

10 volunteer, and few months later I realized that they can

11 improve their data processor, and I came up with a number of

12 proposals and asked them to hire me, and they did.

13 Q.  And did you compile and analyze data for that work?

14 A.  Yes, I did.

15 Q.  What did that position lead you to?

16 A.  Well, very shortly they offered me to move to Los Angeles

17 and a few years later I was running the entire organization in

18 most of the world.

19 Q.  And what did that work in turn lead to?

20 A.  I work on compiling data, analyzing data, and recording

21 stories of disparate group of Holocaust witnesses and survivors

22 in various countries around the world, whether they were Jewish

23 survivors, Jehovah Witnesses, Romanese, gypsies, and many other

24 groups of people.

25 Q.  And so from the Spielberg Foundation and that work, where

1  did you go next?

2  A.  Well, I worked there for a number of years.  And at that

3  time in 1999, there was a class action settlement that involved

4  Swiss banks; and basically Swiss banks kept the data and the

5  money that Holocaust survivors put in those banks before the

6  war; and after the war, Swiss banks did not distribute the

7  money back to rightful owners.  So in 1999, there was a class

8  action settlement, and I was reached out to by a judge who

9  presided over the settlement in the Eastern District of New

10 York who asked me if I would assist in administration and data

11 handling and data management of that class action settlement.

12 Q.  And for how long did you do that work?

13 A.  For about four or five years.

14 Q.  And where did that lead you?

15 A.  Well, the administration of the settlement was very

16 successful.  I was the director of data management, data

17 analysis, and data handling for that settlement through various

18 stages of the settlement.

19     I was then approached by the German government, the Swiss

20 government, U.S. Justice Department and various other programs,

21 including at that time former Chairman Eagleburger was

22 appointed to handle International Commission on holocaust Era

23 Insurance Claims; and I was asked to handle data management and

24 data processing, as well as data analysis, for all of these

25 reparation restitution class action cases.

1  Q.  And what year did you join A.B. Data?

2  A.  I moved to Milwaukee, Wisconsin, full-time in 2001.

3  However, I did join A.B. Data a little bit before that.

4  Q.  And you testified as to your position at A.B. Data.  What

5  was your responsibility at A.B. Data?

6  A.  I worked with data.  Over the past 18 years, we handled

7  over 1,000 data sets related to various class action cases,

8  billions and billions of transactions; and my job was to create

9  systems, processes, procedures, analyze the data, and produce

10  reports to attorneys in various formats for those cases.

11  Q.  You said billions and billions of transactions.  And can

12  you please explain what a transaction is in the context of your

13  work?

14  A.  Sure.  So to give you an example if we have a class action

15  related to a credit card company, a transaction would be all of

16  the different charges related to a particular class period to a

17  particular card.  That would be one transaction.

18      In a content of a TCPA settlement or a TCPA case, a

19  transaction would be all of the different dates of a phone

20  number and all of the different fields related to that phone

21  number that are on the call record.  That would be one

22  transaction.

23  Q.  And you said that you annually handled the analysis of data

24  involving billions of transactions.

25  A.  That is correct.

1    **MR. BARRETT:**  Your Honor, I move that Ms. Verkhovskaya
2  be permitted to testify as an expert in the field of data
3  analysis based upon her experience and training.

4    **THE COURT:**  Do you have questions about her
5  qualifications?

6    **MS. ECHTMAN:**  No, Your Honor.

7    **THE COURT:**  All right.  You may proceed.

8    **MR. BARRETT:**  Thank you.

9  Q.  What I would like for you to do is walk through first on a
10 big-picture level the steps that you took in analyzing data in
11 this case.

12 A.  Well, first and most important I need to understand what
13 data is about.  Every data set tells me a story; and in order
14 for me to understand that story and analyze it, I need to
15 understand what the data is.  So I talk to the attorneys.  I
16 look at the data.  I understand what the matter is all about.
17 That's my first step.

18    Then in plain English I design a step-by-step process on
19 what needs to be done to analyze that data.

20    And then the next step is I turn it over to the coders who
21 code that logic that I design into a computer code because
22 that's the only way you can really analyze accurately such vast
23 amount of data.

24    And then eventually, once we go through process of quality
25 control and quality assurance, I receive the results and I

1  create a report that states what my opinion is about data

2  analysis.

3  Q.  Just before you took the witness stand, the jury had seen

4  some video evidence and some not terribly explanatory reading

5  evidence regarding the Five9 call records.  Just generally what

6  do the Five9 call records show?  What are some of the fields

7  that are present in those records, such as duration,

8  disposition, and so on.

9  A.  Well, Five9 records show a date of the call, then the time

10  the call was made, whether the call was connected or not, the

11  duration or how long the call lasted, the campaign, the agent

12  that was taking part in that campaign.  And there are a few

13  other fields as well.

14        **MR. BARRETT:**  Your Honor, may the video screens be

15  turned on?

16        **THE COURT:**  Yes.  It's not on.  Oh, there we go.

17  Q.  Ms. Verkhovskaya, what are we looking at on the screen

18  right now?

19  A.  This is a visual description of the process of elimination,

20  sort of a sifting through process that we went by analyze -- we

21  went through when analyzing Five9 call records.

22  Q.  And does it accurately summarize the work that you

23  performed?

24  A.  Yes, it does.

25        **MR. BARRETT:**  Your Honor, I would move its admission

into evidence as PX2008.

**MS. ECHTMAN:** Your Honor, we object. Demonstratives
don't get admitted into evidence.

**THE COURT:** Well, I'll admit it for purposes of the
record, but not for the jury.

Q. Ms. Verkhovskaya, can you -- this is essentially a funnel,
correct?

A. That is correct.

Q. Or a sieve?

A. Yes.

Q. And what's up there at the top of the funnel or the sieve?

A. That is the number of calls that we started with when
reviewing Five9 records and that is a little over 1.6 million
phone calls.

**THE COURT:** I didn't hear the dates.

Q. Yes. And the date range of the phone call data that you
reviewed?

A. It was May 2010 to August 2011.

Q. And these, again, are the Five9 calling records?

A. That is correct. Those are Five9 calling records made by
SSN.

Q. Was it difficult for you to obtain and download into a
database the Five9 call records?

A. Not at all.

Q. Was it costly?

1  A.  No.

2  Q.  And -- all right.  So starting at the top, you have

3  1.6 million calls -- a little more than 1.6 million calls.  All

4  right.

5  A.  Correct.

6  Q.  And you also have -- let me back up a bit.  You have also

7  reviewed the deposition testimony and affidavit of David Hill,

8  who testified by video just a few moments ago?

9  A.  That's correct.

10  Q.  And he was -- he was testifying with respect to the content

11  of the call records, correct?

12  A.  Correct.

13  Q.  And have you reviewed and obtained those call records in

14  the form of a thumb drive?

15  A.  That is correct.

16  Q.  By thumb drive I mean these are the actual records

17  themselves in native format?

18  A.  That is correct.

19  Q.  What is native format?

20  A.  It means that that is the format that Five9 used to make

21  those phone call.

22  Q.  And is this the thumb drive that you had reviewed marked

23  PX18?

24  A.  Yes.

25  　　　　　**MR. BARRETT:**  Your Honor, I would move the admission

1  of PX18.

2          **THE COURT:**  It will be admitted.

3  Q.  Let's walk through this chart.  Up at the top you have the

4  1.6 million calls and then you may -- what is depicted on the

5  next line?

6  A.  Well, the next line describes the process that we used to

7  remove all of the phone calls that were not connected.  It

8  included unconnected calls, fax, busy, abandoned, as well as we

9  removed all of the records that had inbound disposition.

10 Q.  And you said that you removed the unconnected calls.  How

11 do you know calls were not connected?

12 A.  We looked at the duration; and if the duration was 00, 00,

13 00, that means 0 seconds, that we concluded that those were not

14 connected calls.

15 Q.  And so the jury has just heard the read deposition

16 testimony of Tanya Maslennikov, correct, and you were here?

17 A.  That's correct.

18 Q.  And did you rely upon information from that deposition in

19 determining whether calls were connected?

20 A.  I relied on that testimony, as well as my experience and

21 expertise.

22 Q.  So if the Five9 call records show a duration of zero, you

23 determined that the calls were not connected?

24 A.  That's correct.

25 Q.  If the call records showed a connection time of 30 seconds,

 1  1 minute, 2 minutes, you determined that those were connected

 2  calls, correct?

 3  A.  Correct.  But to be fair to DISH and give the process a

 4  benefit of the doubt, if the call had a few seconds and had a

 5  disposition abandoned we removed those as well.

 6  Q.  So that left you with 230,121 connected calls out of the

 7  1.6 million, correct?

 8  A.  That's correct.

 9  Q.  Is that the next line on your funnel?

10  A.  Yes, it is.

11  Q.  Then you made another cut, correct?

12  A.  Yes, that's correct.

13  Q.  And what was that cut?

14  A.  We removed a little over 65,000 phone calls that were

15  called to a phone number just once, meaning that we left all

16  connected calls in who received two or more calls within

17  12-month period.

18  Q.  And that's what you were initially asked to do for your

19  work in this case, correct?

20  A.  That's correct.

21  Q.  That left you with 58,151 numbers this says.  That means

22  telephone numbers, correct?

23  A.  That is correct.  Those are unique telephone numbers?

24  Q.  "Unique" meaning separate.  There's 58,151 separate

25  telephone numbers?

1  A.  That is correct.

2  Q.  And 164,494 calls, do you see that?

3  A.  Yes, I do.

4  Q.  Why is that number so much higher than the 58,151 numbers?

5  A.  Because those are the telephone numbers that we received

6  two or more calls within a 12-month period.  So some calls --

7  some phone numbers could have received three, four, five phone

8  calls.

9  Q.  Within a 12-month period in what time frame?

10  A.  Anywhere from May 2010 to August 2011.

11  Q.  And you understand that to be the class period in this

12  case?

13  A.  Yes, I do.

14  Q.  And then you made a further reduction.  Let's talk about

15  that.  What was your next reduction?

16  A.  The next reduction was a removal of 34,526 numbers that

17  were not on National Do Not Call Registry.

18  Q.  How did you determine that those telephone numbers were not

19  on the National Do Not Call Registry?

20  A.  We use on a routine basis an industry standard process, a

21  database called -- from a third-party vendor who is our data

22  processing vendor called Nexxa and they maintain data on

23  consumers who are or who were on National Do Not Call Registry.

24  So we worked with them to -- what's been referred here, to

25  scrub the list and identified all of the telephone numbers who

1  were on National Do Not Call Registry for 30 days or greater

2  prior to the first call.

3  Q.  So is -- the Nexxa third-party provider, is that a resource

4  upon which you rely in your field of data analysis?

5  A.  That is correct, but it's not just me relying on Nexxa.  It

6  is an industry standard.

7  Q.  And why can't you just get that information about numbers

8  on the Do Not Call Registry directly from the Do Not Call

9  Registry itself?

10  A.  National Do Not Call Registry, the reason they use

11  PossibleNOW, DNC, and Nexxa is because they do not allow

12  companies like A.B. Data, many others, without special

13  agreement with National Do Not Call Registry to look up numbers

14  in bulk.  Anybody can go to National Do Not Call Registry and

15  look up one number at a time, but when you're dealing with tens

16  of thousands of records and when you go -- need to go back

17  historically, it's not something that National Do Not Call

18  Registry allows anybody to do.

19  Q.  And so you wanted to identify the date on which a telephone

20  number was on the Do Not Call Registry; is that correct?

21  A.  That's correct.

22  Q.  And why is that significant?

23  A.  Because we -- part of my opinion was to identify telephone

24  numbers that were on National Do Not Call Registry 30 days or

25  greater prior to receiving the first phone call of two or more

1  was in any 12-month period.

2  Q.  And why 30 days?

3  A.  Because TCPA allows grace period for telemarketers and 30

4  days is the grace period.

5  Q.  So if one were to register their telephone number tomorrow

6  on the Do Not Call Registry, telemarketers would have another,

7  I guess, 30 days to contact that person without penalty,

8  correct?

9  A.  That is correct.

10 Q.  And now you've got a fourth cut and let's talk about that.

11 Less 1,393 business and LexisNexis business numbers.  The first

12 question is why did you eliminate the -- well, first tell us

13 what that elimination is.

14 A.  Sure.  First we removed all telephone numbers that were

15 marked as businesses by DISH.  The next sub-step in this group

16 of elimination was removal of all business numbers that were

17 identified as business by LexisNexis.

18 Q.  Okay.  You said they were identified as business numbers by

19 DISH.  Did you mean by DISH or by SSN?

20 A.  Well, it was identified, so in the records I'm actually not

21 sure who made the identification.

22 Q.  But they were in the Five9 call records?

23 A.  That is correct.

24 Q.  There was actually a code in one of the categories that

25 would say "business"?

1  A.   That is correct.

2  Q.   And tell me a little bit about LexisNexis.  Why did you use

3  LexisNexis and what again did you use LexisNexis for?

4  A.   LexisNexis is yet another database that is used by legal

5  industry for nearly a hundred years now.  It's a very large

6  public company and they compile data, analyze data.  They built

7  proprietary linking methodology to support legal, financial,

8  and many other industries in the field of data analysis; and

9  one of the products that LexisNexis has is the directory of all

10 businesses.

11      As you may know, all businesses are required to register

12 with the Secretary of State and then there are all kinds of

13 business directories and all legitimate businesses want to be

14 listed because they want to have customers contact them.  So

15 LexisNexis compiles all that data into their telephone business

16 directory; and in the class action data industry for nearly two

17 decades, we've been using LexisNexis database to what we refer

18 as scrub our list against LexisNexis' database to identify

19 which telephone numbers belong to businesses.  So that's

20 exactly the process that we went through here; and once we

21 identified four numbers that belong to businesses, we removed

22 them from the list as well.

23 Q.   And you wanted to remove businesses because businesses are

24 not covered by the "do not call" provisions of the TCPA,

25 correct?

1  A.  That's correct.

2  Q.  Now that brings us to -- it's only residential numbers that

3  are covered by the Do Not Call Registry, correct?

4  A.  That's correct.  I just want to point out that when we

5  refer to removal of businesses, it also includes removal of all

6  numbers that belong to government and it follows the same

7  logic.

8  Q.  Now, that brings us down to, after that reduction for

9  businesses, 22,232 numbers.  Do you see that?

10  A.  Yes, I do.

11  Q.  And then you made one more reduction.  And what is that?

12  A.  We removed all of the telephone numbers that belonged to

13  DISH customers.

14  Q.  And DISH -- belonged to DISH customers as identified in

15  what source?

16  A.  Five9 call records.

17  Q.  So the call records that you obtained from Five9 also had a

18  data field showing whether a telephone number belonged to a

19  DISH customer; is that right?

20  A.  That's correct.

21  Q.  And that brings you down to the bottom:  20,450 numbers,

22  57,900 calls.  Do you see that?

23  A.  Yes, I do.

24  Q.  These are numbers that would have received two or more

25  telephone calls on the DNC Registry, right?

1  A.  Correct.

2  Q.  On the Registry for how long?

3  A.  For 30 days or greater prior to the first phone call.

4  Q.  Over what period of time?

5  A.  May 2010 to August 2011.

6  Q.  And those two or more calls occurred during a 12-month

7  period; is that correct?

8  A.  Correct.

9  Q.  Let's look up here, come back up to this.  Do you see

10 51,151 -- I'm sorry.

11          **THE COURT:**  I can't see that on the screen.

12 Q.  Okay.  Back to that.  Did you locate Dr. Krakauer -- his

13 telephone number on the Five9 call records?

14 A.  Yes, I did.

15 Q.  And what did the records show with respect to Dr. Krakauer?

16 A.  That there were ten phone calls placed to him.

17 Q.  During the class period?

18 A.  May I ask you for a glass of water?

19 Q.  Certainly.

20 A.  Sorry.  I'm getting over the cold.

21     Five9 data records showed that Dr. Krakauer was placed ten

22 telephone calls from May 2010 to August 2011.

23 Q.  And of those ten calls, how many were connected calls?

24 A.  Five.

25 Q.  And were there two or more calls that he received during a

1  12-month period?

2  A.  Yes.

3  Q.  Now, regarding your total number here 20,450 numbers and

4  57,900 calls, you described your process.  When you were doing,

5  this work, were you supported by staff at A.B. Data?

6  A.  Yes, I was.

7  Q.  And can you please tell the jury about that?

8  A.  Sure.  Well, I work very closely with my colleague and

9  assistant, Christina Peters-Stasiewicz.  Her job was to record

10  the entire process and document it, as well as she served as a

11  liaison between various vendors and myself, and she coordinated

12  the work.  I also worked with a team of computer programmers

13  who coded my logic into a computer database.  We refer to it as

14  sequel or SQL.  And I also worked, in addition to computer

15  programmers, with a team of quality control, quality assurance

16  professionals whose job is nothing else but to check the

17  accuracy of the process, the logic, and the data.

18  Q.  And now when you completed this analysis, you prepared a

19  report, right?

20  A.  That's correct.

21  Q.  And that was provided to DISH in this case, correct?

22  A.  That's correct.

23  Q.  And you have your report with you and it's that thick

24  binder?

25  A.  Yes, it is.

1   Q.  And did you give a deposition at which DISH's lawyer was

2   present?

3   A.  That's correct.

4   Q.  And the DISH lawyer asked you some questions?

5   A.  Yes.

6   Q.  All right.  And then DISH had an opportunity to do its own

7   expert report, correct?

8   A.  Correct.

9   Q.  And they could dispute your findings?

10  A.  They could have.

11  Q.  Did DISH produce an expert report saying that the numbers

12  that you say were on the Do Not Call Registry in fact were not?

13          **MS. ECHTMAN:**  Objection.  Your Honor, DISH doesn't

14  have the burden of proof here and there was only class

15  certification expert discovery in the case so --

16          **THE COURT:**  All right.  Well, overruled.

17      You can answer.

18  A.  They did not.

19  Q.  They did not.  Did DISH Network produce a report saying

20  that the numbers that you say received more than one call in a

21  12-month period in fact didn't?

22          **MS. ECHTMAN:**  Your Honor, objection again.  DISH has

23  burden here and there is no obligation -- he's trying to shift

24  the burden of proof with these questions and it's

25  inappropriate.

1      **THE COURT:**  Well, the jury understands -- I told them

2   at the beginning of the case that Dr. Krakauer has the burden

3   of proof, so -- and I'll repeat that to them now, but I'll

4   allow him to ask the question.

5        Go ahead.

6   Q.  So the question again is did DISH Network produce a report

7   saying that the numbers that you say received one or more calls

8   in a 12-month period didn't?

9   A.  They did not.

10  Q.  What has DISH disputed about your report?

11  A.  The dispute is which numbers are nonbusiness telephone

12  numbers.

13  Q.  Residential numbers?

14  A.  Correct.

15  Q.  Did they produce a report contesting your findings that

16  these numbers -- 20,450 numbers were something other than

17  residential numbers?

18  A.  No, they did not.

19  Q.  Nonetheless, there were some additional telephone numbers

20  that were removed, correct, from this 20,450 number?

21  A.  That's correct.

22  Q.  And these numbers were removed from the class.  Is that

23  your understanding?

24  A.  That is my understanding.

25  Q.  Okay.  And who was it that made the decision to remove the

1  telephone numbers?  Was that your call or was that not your

2  call?

3  A.  That was not my call.

4  Q.  That was as a result of an agreement between DISH and

5  Plaintiff?

6  A.  That is correct.

7  Q.  You say that based upon your review of the stipulation that

8  the parties reached?

9  A.  That is correct.

10  Q.  This next page of this exhibit shows that -- can you read

11  that?

12  A.  Yes, I can.  DISH and Krakauer agreed to exclude some

13  telephone numbers and calls.

14  Q.  And that left a total of what?

15  A.  Leaving a total of 51,119 calls to 18,066 numbers.

16  Q.  And those are the telephone calls, telephone numbers that

17  are in this class before this -- in this court, correct?

18  A.  Correct.

19      **MR. BARRETT:**  Your Honor, I also move the admission of

20  this page of this exhibit.

21      **MS. ECHTMAN:**  Objection.

22      **THE COURT:**  Does it have a number?

23      **MR. BARRETT:**  I would like to make this exhibit one --

24  PX2008.

25      **THE COURT:**  And that's just that one page that

1  you're --

2         **MR. BARRETT:**  The two pages.  So it's a two-page

3  exhibit.

4         **THE COURT:**  What's the other page?

5         **MR. BARRETT:**  The first page is the funnel.

6         **THE COURT:**  Okay.  I thought you already marked that

7  one as 2009.  The first page, right?

8         **MR. BARRETT:**  Yes, Your Honor.  I think we can -- we

9  can do this as one exhibit or two.

10         **THE COURT:**  Okay.  All right.  Well --

11         **MR. BARRETT:**  I would propose one.

12         **THE COURT:**  Yes, let's -- there's an objection.  I'll

13  discuss that with you all after the jury leaves.  Don't let me

14  forget.

15  **BY MR. BARRETT:**

16  Q.  So is Dr. Krakauer among the -- his telephone number, the

17  five calls that you mentioned, is that among the remaining

18  51,119 calls to the 18,066 numbers?

19  A.  Yes.

20  Q.  Okay.  Now, you understand that there are certain

21  categories of calls that remain disputed?

22  A.  I do have that understanding.

23         **MR. BARRETT:**  Okay.  And, Your Honor, I would like to

24  show the witness Document 278, which is the amended joint

25  stipulation regarding call categories, and I would move its

1  admission as the first -- first five pages of that stipulation.

2      **MS. ECHTMAN:**  Your Honor, I'd like that with the

3  caveat that all the calls are disputed.

4      **THE COURT:**  Okay.  All right.  So exhibit -- yes, I

5  understand DISH disputes everything.  The jury, I'm sure, will

6  hear more about that.

7    So this exhibit is the joint stipulation, 278?

8      **MR. BARRETT:**  Yes, Your Honor.

9      **THE COURT:**  All right.  That will be admitted.

10   And as I think I mentioned to you, ladies and gentlemen, at

11 the beginning of the case, stipulations are agreements by the

12 parties.  They save time.  If everybody agrees on a fact, we're

13 usually pretty happy about that because they write it down,

14 everybody agrees, and you should accept it.

15   And you're going to go over them with the witness?

16     **MR. BARRETT:**  Yes, Your Honor.

17     **THE COURT:**  You can put them into evidence that way.

18     **MR. BARRETT:**  Okay.

19 **BY MR. BARRETT:**

20 Q.  And I will get to that, and we'll walk through that

21 briefly.  So DISH is contesting that the numbers you say are

22 residential are something other than residential.  That's what

23 they're saying, right?

24 A.  That's my understanding.

25 Q.  All right.  Generally speaking, how many categories of

1  telephone numbers are there in terms of type?

2  A.  There are three categories that we consider in the field of

3  Telephone Consumer Protection Act data analysis.  It is a

4  telephone number that belongs to a business, a telephone number

5  that belongs to a Government, and a telephone number that

6  belongs to an individual or residence.

7  Q.  And you said that you used the LexisNexis data to identify

8  business and Government telephone numbers, correct?

9  A.  That's correct.

10 Q.  Does LexisNexis track those three categories of telephone

11 number types?

12 A.  Yes, they do.

13 Q.  To a reasonable degree of certainty, do you believe that

14 this number, 51,119 calls to 18,066 numbers, consists of

15 residential numbers only?

16 A.  Yes, I do.  I do believe that more likely than not those

17 18,066 numbers are residential numbers.

18 Q.  And you had testified that you relied upon the LexisNexis

19 data, correct?

20 A.  Correct.

21 Q.  And the SSN call records comments about whether they were

22 business numbers in the call records, correct?

23 A.  Correct.

24 Q.  And what other information did you rely upon to reach the

25 conclusion that these numbers, the 18,066 numbers, are

1   residential?

2   A.  Well, an additional piece of information that I considered

3   was the fact that SSN was selling DISH services to residential

4   telephone -- residences.  Therefore, that was an additional

5   piece of information that I considered, understanding that they

6   were only paid for a sale made to residents.

7   Q.  And were you present in the courtroom yesterday where there

8   was testimony to that effect?

9   A.  Yes, I was.

10  Q.  And today as well?

11  A.  Correct.

12  Q.  Are you a hundred percent certain that all of these numbers

13  are residential?

14  A.  Well, when you analyze such large data set, as a data

15  analyst, my job is to establish fair and reliable methodology,

16  and I did not go number by number when I analyzed over

17  1.6 million records.  What I did is established a solid

18  methodology that complies with industry standards and my

19  experience and expertise where I can say with a high degree of

20  certainty that these numbers are more likely than not

21  residential.

22          **THE COURT:**  Is that a good place to stop for the day?

23          **MR. BARRETT:**  I'm almost done.

24          **THE COURT:**  You're almost done?  All right.  Go ahead.

25  We still have a few minutes.

1   **BY MR. BARRETT:**

2   Q.   I want to hand you the stipulation, the amended joint

3   stipulation regarding call categories, or put it up here on the

4   screen.

5       You understand that DISH has raised certain challenges,

6   correct?

7           **MR. BARRETT:**   We may not be able to do this in 5

8   minutes.  It may take 15, 20.

9           **THE COURT:**   Okay.  Well, let's stop and do that in the

10  morning.

11      Ladies and gentlemen, I'm going to excuse you all for the

12  day.  Please -- we're on track, according to our schedule, so

13  we're making good progress.  Please remember not to discuss the

14  case among yourselves or with anyone else.  Don't have any

15  contact with the parties, lawyers, or witnesses.  Keep an open

16  mind about the matter and don't communicate about the case in

17  any way or read or listen to anything that may be out there

18  about the case.  Leave your notes in your chair.  Come back

19  tomorrow morning, and we'll start at 9:30.

20      The jurors are excused.  If everyone else will remain

21  seated.

22      Ms. Burgess, are you okay?

23          **JUROR SIX:**   Yes.

24          **THE COURT:**   Take your time.  There's no hurry.  I hope

25  you feel better.

1          **JUROR SIX:**  (Talking to witness) It's nice to meet

2   you.  You're so smart.

3      (The jury left the courtroom at 4:50 p.m.)

4          **THE COURT:**  All right.  You can step down.

5      So just -- I thought we might need a few minutes for

6   housekeeping matters.  Since it seemed like a good stopping

7   point, I let them go 7 minutes early.

8      Now, Plaintiff's Exhibit 2008 was the demonstrative

9   Exhibit, two pages long, that you were showing to the jury

10  while she went through the funneling, correct?

11         **MR. BARRETT:**  Yes, Your Honor.

12         **THE COURT:**  All right.  And I think I may have to go

13  look the rule up on this because I just can't remember about

14  demonstrative exhibits not going back to the jury.

15         **MR. GLASSER:**  I think, Judge, it could be qualified as

16  a 106 exhibit because it summarizes voluminous data that is

17  completely impossible to review, and it would be really helpful

18  to the jury to know the numbers and how they were arrived at,

19  but the Court can decide.

20         **THE COURT:**  Okay.

21         **MR. GLASSER:**  That would be the rule I would look at.

22         **THE COURT:**  All right.  And what does the Defendant

23  say?

24         **MS. ECHTMAN:**  I don't believe this fits as a data

25  summary, and generally data summaries have to -- we need a

1  chance to review it and its accuracy, but I don't believe that

2  this fits within the rule on data summaries.  They used the

3  demonstrative.  It's not evidence.  She testified orally.

4  Generally, you get data summaries in advance.  They summarize

5  large data sets.  This just walks through her opinions.  It's

6  not a data summary.

7          **THE COURT:**  All right.  I'm going to -- I say I'm

8  going to admit it.  I'm going -- in order for the record to

9  make sense, this document probably needs to be part of the

10  record, okay, because it might be difficult to follow her

11  testimony without it.  So I'm going to admit it for that

12  purpose, and I'll just defer the question of whether the jury

13  can take it back there as a trial exhibit and -- or see it

14  during their deliberations, but things may -- things may

15  change, and I'll evaluate that if and when we send the exhibits

16  back to the jury.  Okay.

17      Now, the next thing that we're getting to is you're going

18  to go through these stipulations with the witness, and I take

19  it you're going to ask her -- let me see if I can lay my hands

20  on the stipulations.

21          **MR. BARRETT:**  I can put it on the screen, Your Honor.

22          **THE COURT:**  Here we go.  You're going to ask her about

23  these categories?

24          **MR. BARRETT:**  I was going to ask her about the

25  challenges and whether those challenges change her opinions,

1 Your Honor, that the telephone numbers are residential, which

2 is the issue that all of these challenges on the stipulation

3 regarding call categories raise.

4     **THE COURT:** Okay. So what do you mean you're going to

5 ask her about the challenges? How do you --

6     **MR. BARRETT:** All right. So on the verdict form that

7 we've crafted --

8     **THE COURT:** No, just tell me what you intend to ask

9 her, just ask the question.

10     **MR. BARRETT:** Sure. The question is: There is an

11 assertion here that telephone numbers that LexisNexis always

12 identifies as unknown are not residential. Is that true? And

13 if -- and she will explain that. She will explain why they

14 remain residential despite the fact that LexisNexis identifies

15 the telephone number as unknown.

16     **THE COURT:** All right. So essentially you're asking

17 her why she didn't remove unknown?

18     **MR. BARRETT:** Yes, right.

19     **THE COURT:** Or --

20     **MR. BARRETT:** Right.

21     **THE COURT:** -- or the dates?

22     **MR. BARRETT:** That's right.

23     **THE COURT:** Okay. All right.

24     **MR. BARRETT:** Same with the next category. So it's

25 defending the LexisNexis data and defending her work.

**THE COURT:** All right. And the objection -- is there an objection to that?

**MS. ECHTMAN:** Yes, the objection is that opinion was never disclosed in expert discovery, and, generally, I've got a problem, as I noted, Your Honor, when I objected that they're trying to shift the burden of proof. DISH has no obligation to put on a witness. DISH has no obligation to put on an expert. DISH's expert opinions are not evidence unless and until we offer someone to testify to them. So by asking did DISH put in an expert report to try to bolster their witness on certain subjects is completely improper because they have the burden of proof, and we dispute they can meet any element of their burden of proof on these phone numbers.

In addition to that, we were not allowed to put in the supporting documentation and analysis that went into these call counts because they said it was late-disclosed expert work, and that it -- and Your Honor ruled it wasn't a fair data summary because they didn't get it in advance, and they didn't get a chance to review it. So now they're trying to preempt our defenses with opinions we haven't heard before, and so we would -- it's unfair to have her respond to a defense that hasn't even been posed.

**THE COURT:** I don't understand what it is that you want to put in that you say I have not -- I'm not going to let you put in. I mean, you've agreed on all the numbers, and

1  that's what we were talking about back when I precluded the

2  evidence.  So what do you need to put the numbers in for if

3  you've agreed on the numbers?

4          **MS. ECHTMAN:**  We have agreed on the numbers based on a

5  report that she cited and relied upon, that her report

6  undercuts her own analysis, but for her now to give opinions

7  about these, then our expert has to be allowed to give opinions

8  about them, too, because those have never been disclosed to us

9  before.  This is our -- they're -- she's coming up with new

10 opinions that were never disclosed, and they're trying to shift

11 the burden of proof here.

12         **THE COURT:**  I guess I'm just having a little trouble

13 understanding.  I don't -- I don't understand what you're

14 saying you can't put into evidence.  I mean --

15         **MS. ECHTMAN:**  Put that aside --

16         **THE COURT:**  How are -- what are you -- how are going

17 to challenge these numbers?  I mean, what you're telling me is

18 you can't challenge these numbers.

19         **MS. ECHTMAN:**  Well, I'm going to challenge them with

20 her on cross-examination.

21         **THE COURT:**  Okay.

22         **MS. ECHTMAN:**  And -- but she's never before offered

23 any opinions to say that she considered these buckets, and this

24 is the reasons why she kept them in, even though her own data

25 says it doesn't know what it is in the time period at issue.

1           **THE COURT:** Okay. Well, if you're going to ask her

2     about them, then why can't they ask her about them? I don't

3     understand how you think that you should be able to ask

4     questions about this and they can't. So what -- I don't

5     understand what you're saying to me.

6           **MS. ECHTMAN:** Okay. And so, Your Honor, I'm asking

7     for permission for our expert to be able to address it as well.

8           **THE COURT:** To address --

9           **MS. ECHTMAN:** These call buckets.

10          **MR. BARRETT:** Your Honor, I think their expert has

11    never addressed those call buckets. They've never provided a

12    report that had anything to do with any of these issues.

13          **MS. ECHTMAN:** And neither has theirs.

14          **MR. BARRETT:** That's why they were excluded.

15          **THE COURT:** Okay. Well, he can ask questions of his

16    expert as to why the expert thinks these numbers are

17    residential. The expert has offered opinions that these

18    numbers are all residential. I can think of no reason why they

19    can't go through why these numbers are residential. You -- I

20    mean, plus, you've already said you're going to do it.

21          **MS. ECHTMAN:** I am. So, Your Honor, basically, I'm

22    asking for permission to make sure that our expert can address

23    these as well.

24          **THE COURT:** Okay. Well, that is not our problem for

25    tomorrow. I'm -- right? We're just -- I just am talking right

1　now about this witness.  I'll -- you know, I'll decide that

2　after I've heard this witness' testimony and all the rest so I

3　have a little bit better context for what you all are saying,

4　but I -- and --

5　　　　　　**MS. ECHTMAN:**  All right.  Your Honor, we can visit

6　this after Ms. Verkhovskaya testifies.

7　　　　　　**THE COURT:**  You agree that your expert never submitted

8　a report on the topics that you're now asking for your expert

9　to testify on; is that right?

10　　　　　　**MS. ECHTMAN:**  No, I'm not admitting that.

11　　　　　　**THE COURT:**  Okay.  So what is the report?

12　　　　　　**MS. ECHTMAN:**  Our expert addressed generally the

13　reliability of the LexisNexis data and has issues with it, but

14　Your Honor had precluded us from using the information that

15　underlies these call buckets in any way, right.  We were

16　precluded from -- we had done certain data summaries that

17　created these buckets, and we were told we couldn't use them

18　affirmatively and we couldn't use them on cross, and now

19　they're using them affirmatively in their case.  This was in

20　Your Honor's decision on their motion in limine to preclude our

21　Exhibit 31 data summaries.

22　　　　　　**THE COURT:**  The buckets were the numbers, and now you

23　all have stipulated to the numbers.  That's the -- that's why

24　I'm just really not following what you're saying.

25　　　　　　**MS. ECHTMAN:**  But now they're going to get to tell

their story about the numbers, and we're not -- we're not going

to get to rebut their story of the numbers because we've been

precluded from using our summary.  So we're just at least

asking for permission for our expert to rebut their new story

about these call buckets.

        **THE COURT:**  But your summaries are summaries of the

numbers that you've stipulated to; is that not right?

        **MS. ECHTMAN:**  They are.

        **THE COURT:**  Well, what do you need them for if you

stipulated to them?

        **MS. ECHTMAN:**  Well, there's more information that

underlies them.  This doesn't have all the information that

underlies where these numbers came from and what the LexisNexis

data actually shows because it's got lines and lines of data.

So this is -- this is just an ultimate summary, but it doesn't

give the underlying information about how we got there and all

the issues that are in the LexisNexis data that undermine her

work.

        **THE COURT:**  Okay.  I guess I'm just still having a

little trouble understanding this.  So this is my order.

You're talking about the one that was entered back in July

regarding Plaintiff's motion in limine and then --

        **MS. ECHTMAN:**  Yes.  Your Honor, we had --

        **THE COURT:**  And then I guess I reconsidered a bit

about the EBR in a September order, though it doesn't sound

1 like that's really necessarily at issue.  Those are the orders

2 that you're talking about; is that right?

3     **MS. ECHTMAN:**  Those are the orders that we're talking

4 about, and they had moved to preclude these buckets, and we

5 were originally supposed to go to trial in June.  Since that

6 time -- and Your Honor was struggling with and we're all

7 struggling with how is this case going to get tried as a class

8 action when we have all of these texts on individual call

9 records, right, and so Your Honor wanted to know how we're

10 going to go about getting stuff on the verdict sheet so that

11 the jury -- we had proposed that the jury do all or nothing.

12     **THE COURT:**  I mean, I remember all of that.  I guess I

13 just am not really understanding -- well, in any event, let me

14 go back and look at all of this, and we'll talk about your

15 expert further, but in any -- we can go forward tomorrow with

16 this testimony subject to, you know, objections to the form of

17 the question.

18     I -- you know, I think Plaintiff's counsel has to be

19 careful about what they say characterizing the Defendant's

20 objections because it's easy to not say it exactly the way the

21 Defendant would say it; but as long as the Plaintiff is asking

22 about the expert's opinion that these numbers are residential,

23 that seems to me to be well within the bounds of them proving

24 their case and within the bounds of her previously expressed

25 opinion that the numbers are residential.

1    **MS. ECHTMAN:** And so another question is has

2  Ms. Verkhovskaya done more work on this issue since the time

3  her expert opinions were disclosed, which was back in early

4  2015, and I know --

5    **THE COURT:** Well, I don't know the answer to that, but

6  you can certainly ask her on cross-examination.

7    **MS. ECHTMAN:** I know the folks at A.B. Data did, and I

8  guess that will come out in cross-examination. We're just

9  looking for fairness, Your Honor, because she's going to draw

10 inferences and do other things; and if she's going to be able

11 to add opinions about this, we would like our expert to be able

12 to address it as well, but I think it will be clearer after

13 cross-examination, and we can certainly revisit this, Your

14 Honor.

15   I also would like Your Honor to consider a caution to

16 Plaintiff's counsel and a limiting instruction to stop trying

17 to shift the burden on this to DISH because DISH has the right

18 to challenge whether their expert has actually, with these

19 opinions, supported any element of their claims.

20   **THE COURT:** Well, I haven't heard them do anything

21 that shifts the burden of proof, and, plus, I've told the jury

22 at least -- I've told them many times the Plaintiff has the

23 burden of proof. So I'm not going to do that.

24   Okay. Any other housekeeping matters before we stop for

25 the day?

1    **MR. GLASSER:**  Yes, ma'am.  Can we talk to the expert

2  tonight so that we can make sure that the examination tomorrow

3  doesn't touch any touchstones that you don't want --

4        **THE COURT:**  That what?

5        **MR. GLASSER:**  In other words, is the witness

6  sequestered tonight since cross hasn't started so that we can

7  prepare for how to do this right tomorrow, or do you want us

8  not to talk to her, and does DISH care?

9        **MS. ECHTMAN:**  Well, I care if you are going to be

10  coaching her to say she didn't do any additional work.

11        **THE COURT:**  Well, she's sitting right there.  She's

12  heard the discussion.

13        **MS. ECHTMAN:**  I guess so.

14        **THE COURT:**  I don't really see any reason for you to

15  have any additional conversation with her tonight.  I mean, I

16  certainly want everything to go smoothly tomorrow without

17  unnecessary delays, but I don't -- I feel pretty sure about --

18  pretty confident about that, so I don't see any reason for

19  additional witness prep tonight.

20        **MS. ECHTMAN:**  I have one more thing I want to raise.

21  So Plaintiff's counsel elicited questions about Plaintiff and

22  DISH stipulating to remove calls from the class and said that

23  she had reviewed that stipulation.

24        **THE COURT:**  She had?

25        **MS. ECHTMAN:**  She had reviewed that stipulation.  Now,

1  that's a separate stipulation about carve-outs to the class,

2  and it goes through certain categories.  DISH reserved its

3  right to use that stipulation at trial, and in the stipulation

4  itself, Plaintiffs say they object to it.  Now they've just

5  used it.  So I want to be clear that we'll be allowed to use

6  it.

7          **THE COURT:**  Okay.  Let me see if I've got that one in

8  front of me.

9          **MS. ECHTMAN:**  I believe I have a copy of it with me

10 without the -- mine is written on.

11         **THE COURT:**  And the reason you would want to ask her

12 questions about that stipulation?

13         **MS. ECHTMAN:**  If the witness leaves the room, I'll

14 tell you, and if her support people leave the room.

15         **THE COURT:**  All right.  Well, that's probably

16 appropriate.  I'll ask the witness and any folks here with her

17 to step out.

18     (Ms. Verkhovskaya and her assistant left the courtroom.)

19     (Document handed to the Court by Ms. Echtman.)

20         **MS. ECHTMAN:**  So this stipulation actually shows that

21 Ms. Verkhovskaya made mistakes in the work she did, that she

22 didn't remove things she said she removed and that she missed

23 things that in her own data show are categorized as business or

24 Government among other things.  So I think it's fair if she

25 reviewed this.  They brought it up.  They gave up on these

1  claims because she got them wrong, and she just testified she

2  removed everything that was business or Government.

3       **THE COURT:**  All right.  And what does the Plaintiff

4  say?

5       **MR. BARRETT:**  Your Honor, these people and -- these

6  telephone numbers, rather, are not in the class.  So if they're

7  not in the class, I don't understand the relevance --

8       **THE COURT:**  I'm sorry.  Speak up.

9       **MR. BARRETT:**  Excuse me.  If they are not in the

10  class, they have been excluded, and that has been approved by

11  court order, and there will be notice going out within the next

12  couple of weeks on that.  If they are not in the class, that is

13  not an issue that is before this jury that this jury would need

14  to resolve or decide.

15       **MS. ECHTMAN:**  Well, Your Honor, if I might respond?

16  It goes to whether she did her work right and whether there may

17  have been other mistakes in her work and whether she did

18  everything.  It's fair impeachment as to what she said she did

19  and whether she did it in accordance with industry standards

20  and whether her code got things right and whether she

21  considered everything.  I mean, she --

22       **THE COURT:**  Okay.  I don't have any problem with you

23  asking her questions about numbers -- let's see.  Are you

24  talking about paragraph 9?

25       **MS. ECHTMAN:**  I'm talking about the chart in paragraph

1 | 9 where there's a stipulation where Plaintiff doesn't contest

2 | certain challenges, such as, if you look at on page 4, 31E,

3 | phone numbers where line type designation is business or

4 | Government at least once in her own LexisNexis data where she

5 | said she removed everything.  This shows they conceded and

6 | stipulated to carve out 115 numbers, 302 calls.  Then you've

7 | got 31 --

8 |     **THE COURT:**  Okay.  No, I understand what you're

9 | saying.  Okay.  And what do you say to their argument that

10 | these people are no longer in the class?

11 |     **MS. ECHTMAN:**  Well, they're no longer in the class.

12 | She wouldn't put them in the class.  We pointed out errors that

13 | she made to Plaintiff's counsel, and they agreed to remove them

14 | in the class.  It shows she got them wrong.  I want to know

15 | what she knows about whether she got them wrong.

16 |     **THE COURT:**  Okay.  Well, I can't really see any reason

17 | not -- that they can't do that subject to Rule 403 and

18 | spending, you know, way too long on it.  I mean, she already

19 | testified she did not go through line by line.  So, I mean, we

20 | all know what she's going to say.  She didn't go through line

21 | by line, but -- or at least that's my guess as to what she's

22 | going to say, but I can't think of any reason you can't ask her

23 | a few questions about that.  It's not so much -- I mean, I

24 | don't want -- there's a lot of other stuff in this stipulation

25 | that is not relevant to what you are talking about.

1          **MS. ECHTMAN:**  I will limit it to the things that are
2   relevant to what I'm talking about.
3          **THE COURT:**  So I'm not sure I really want this
4   stipulation in -- you know, at least in full in evidence in
5   front of the jury, but --
6          **MR. BARRETT:**  Your Honor, the basis for the
7   questioning about whether she reviewed that is to come up with
8   the total number, right, the total number.  After DISH and
9   Krakauer agreed to exclude telephone numbers and calls, what
10  was the total number.
11         **THE COURT:**  I'm sorry.  Say again.  I'm sorry.  You're
12  talking too fast, and I could not understand you.
13         **MR. BARRETT:**  Sure.  DISH has said many times they
14  want in front of the jury the total number of calls, and the
15  jury has to know that.  This is the way that the jury can know
16  that.  It's not an opinion.  She was asked, did you make the
17  call about whether to remove these?  She said no.  So what does
18  it have to do with her opinions?
19     We do believe under Rule 403 would be -- it would take a
20  lot of time and be extremely confusing for the jury.
21         **THE COURT:**  Well, there certainly -- it could be done
22  in a very confusing way.  I will agree with you about that.  I
23  also think it's possible it can be done in a not confusing way.
24  So I'm going to give Ms. Echtman a chance to do it in a not
25  confusing way, and, you know, the problem is not so much the

1 stipulation, but, I mean -- and she can only answer what she

2 can answer. So, you know, we'll just have to wait and see what

3 she says.

4 I think this is your copy, Ms. Echtman. Ms. Sanders, if

5 you will give that back to her.

6 **MS. ECHTMAN:** Thank you.

7 **MR. BICKS:** Your Honor, could I ask Plaintiffs to

8 preview where we're going? There are a couple of witnesses who

9 are up in the air in terms of tomorrow's schedule.

10 **THE COURT:** I have to leave. Okay. So just give me,

11 like, the one-minute version. I don't have time -- if we need

12 to come back early in the morning to talk about anything else,

13 I'll do that, but I have someplace I have to be.

14 **MR. GLASSER:** I believe we will rest after Anya

15 Verkhovskaya, and so I would actually like to know who they are

16 going to call.

17 **THE COURT:** Okay. So you have about 15 more minutes,

18 you anticipate, with this witness?

19 **MR. GLASSER:** Something like that, and we'll probably

20 rest.

21 **THE COURT:** All right. And then cross and some

22 redirect, and you don't anticipate calling other witnesses?

23 **MR. GLASSER:** I do not at this precise moment, Your

24 Honor. I don't think -- I mean, 95 percent chance no.

25 **THE COURT:** All right. And so it looks like you all

1  need to be ready with your witnesses possibly even in the

2  morning.  He hasn't taken that long on direct.  I don't know

3  how long cross will take.

4          **MR. BICKS:**  Right, we will.

5          **THE COURT:**  And who do you anticipate --

6          **MR. BICKS:**  Mr. DeFranco is here, and then we'll have

7  to figure out now that -- they were going to call two of our

8  witnesses.

9          **THE COURT:**  Well, he previewed the other day that they

10  might not call those, so that's not a surprise.

11          **MR. BICKS:**  It's not a surprise, but --

12          **THE COURT:**  Okay.  Well, as soon as you know, if you

13  all will just communicate informally about that.

14          **MR. BICKS:**  We will.

15          **THE COURT:**  But you would anticipate at the least

16  calling Mr. DeFranco?

17          **MR. BICKS:**  Yes.

18          **THE COURT:**  Because you already told us you wanted to

19  get him on and off.

20          **MR. BICKS:**  Yes.

21          **MR. GLASSER:**  Well, if it's the case --

22          **THE COURT:**  Okay.  Stop.  I already said I have to

23  leave.  So you all talk about this, and, you know, everybody

24  needs -- if that means somebody makes a telephone call tonight

25  at seven o'clock -- everybody is working except maybe me, so,

1  you know, just talk about this, all right, so you all can get

2  it straightened out.

3      We'll be in recess until 9:30 tomorrow morning.

4      (Proceedings concluded at 5:15 p.m.)

5

6

7                    **C E R T I F I C A T E**

8      I, LORI RUSSELL, RMR, CRR, United States District Court
   Reporter for the Middle District of North Carolina, DO HEREBY
9  CERTIFY:

10     That the foregoing is a true and correct transcript of the
   proceedings had in the within-entitled action; that I reported
11 the same in stenotype to the best of my ability and thereafter
   reduced same to typewriting through the use of Computer-Aided
12 Transcription.

13

14 _Lori Russell_

15 Lori Russell, RMR, CRR        Date:  1/12/17
   Official Court Reporter
16

17

18

19

20

21

22

23

24

25