IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


THOMAS H. KRAKAUER,            *  Case No. 1:14CV333
                              *
             Plaintiff,      *
                              *
vs.                           *  Greensboro, North Carolina
                              *  January 13, 2017
DISH NETWORK, L.L.C.,       *  9:30 a.m.
                              *
             Defendant.      *
*****************************


**DAILY TRANSCRIPT OF TRIAL TESTIMONY**
BEFORE THE HONORABLE CATHERINE C. EAGLES,
UNITED STATES DISTRICT JUDGE, and a jury.



APPEARANCES:

For the Plaintiff:        JOHN W. BARRETT, ESQUIRE
                          BRIAN A. GLASSER, ESQUIRE
                          Bailey & Glasser, LLP
                          209 Capitol Street
                          Charleston, West Virginia 25301

                          MATTHEW P. MCCUE, ESQUIRE
                          Law Office of Matthew P. McCue
                          1 South Avenue, Third Floor
                          Natick, MA 01760

                          JACOB M. NORRIS, ESQUIRE
                          The Norris Law Firm
                          1033 Bullard Court, Suite 207
                          Raleigh, North Carolina 27615


For the Defendant:        PETER A. BICKS, ESQUIRE
                          ELYSE D. ECHTMAN, ESQUIRE
                          JOHN L. EWALD, ESQUIRE
                          Orrick Herrington & Sutcliffe, LLP
                          51 West 52nd Street
                          New York, New York 10019

```
 1                                    RICHARD J. KESHIAN, ESQUIRE
                                      Kilpatrick Townsend & Stockton, LLP
 2                                    1001 W. Fourth Street
                                      Winston-Salem, North Carolina 27101
 3

 4   Court Reporter:                  Lori Russell, RMR, CRR
                                      P.O. Box 20593
 5                                    Winston-Salem, North Carolina 27120

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24            Proceedings recorded by stenotype reporter.
          Transcript produced by Computer-Aided Transcription.
25
```

**I N D E X**

**Plaintiff Witnesses:**                                                    **Page**

  ANYA VERKHOVSKAYA

    Direct Examination by Mr. Barrett                                          8
    Cross-Examination by Ms. Echtman                                          19
    Redirect Examination by Mr. Barrett                                      135
    Recross-Examination by Ms. Echtman                                       142


**Defense Witnesses:**                                                      **Page**

  JAMES DEFRANCO
    Direct Examination by Mr. Bicks                                          150
    Cross-Examination by Mr. Glasser                                         192
    Redirect Examination by Mr. Bicks                                        202
    Recross-Examination by Mr. Glasser                                       204




                        **DEFENSE EXHIBITS**

NO.:      DESCRIPTION:                                       IDENT   ADMIT

DX3                                                                    171

DX16                                                                    64

1          **P R O C E E D I N G S**

2          **THE COURT:**  Good morning.  I think we might still be

3     waiting on a juror or two.

4          **THE CLERK:**  Yes.

5          **THE COURT:**  But I forgot to mention yesterday -- I

6     know we all heard the juror, Ms. Burgess, as she was leaving

7     the courtroom, speak to the witness.  I have never had that

8     happen before, even though the jurors walk, you know, right by

9     the witness stand.  So, I think I'll do two things.

10         One, I'll have the witness step down before the jury steps

11    out going forward through the trial just to prevent that from

12    happening again.  It will add 30 seconds, but that's okay.  And

13    then, I'll just remind the jurors not to talk about the case or

14    speak to any of the witnesses.  So just on that one.  Then

15    that's what I intend to do about that.

16         I went back and looked at my order on the motion in limine,

17    and I, you know, still -- I guess I'm still having a little

18    trouble understanding exactly what DISH is saying about this.

19    That motion and my order were very specific.  It just says:

20    DISH cannot use Exhibits 31A to 31S or testimony related to

21    Dr. Aron's supplemental report.  That's all it says.  So it

22    doesn't prevent DISH from asking the witness questions or

23    showing the witness other documents that were disclosed in

24    discovery and identified as exhibits.

25         So, you know, there's two questions.  One is, you know, how

1  many numbers in each of these buckets?  You all have resolved

2  all of that, so that's one.  And then the other is whether

3  these buckets -- where there's liability for these buckets,

4  and, you know, the Defendant can ask questions about that.

5       So, I don't understand -- I guess I'm having a lot of

6  trouble understanding exactly what the Defendant wants me to

7  do.  It doesn't -- I don't know.  The argument did not seem to

8  actually be consistent with what my order said.

9       So, if I'm misunderstanding something, we can address that

10 at the appropriate time.  But, I did go back and just confirm

11 my memory of that order, and, you know, that's what it says,

12 and I'm not going to change that.  So -- but that is a fairly

13 limited order.  So, certainly, the Defendant can cross-examine

14 the witness otherwise.

15      And I understand they are going to raise all of these

16 issues in the -- that we've been talking about that are in the

17 draft verdict sheet, and, you know, that's entirely

18 appropriate.  And for that reason, I'm going to let the

19 Plaintiff ask some questions about it.

20      It's not new opinions.  That's just the opinions the

21 witness has.  So is there anything else we need to take up

22 before the clerk goes to check on the jurors for the Plaintiff?

23           **MR. BARRETT:**  No, Your Honor.  I just wanted to make

24 clear that the types of questions we would ask the witness

25 about the categories, were, number 1, just to explain what that

1  means.  It's not self-evident what it means to say unknown in

2  the LexisNexis data.

3        **THE COURT:**  Uh-huh.

4        **MR. BARRETT:**  So that's one question.  The second

5  question is -- is, you know, why did you not exclude those

6  numbers from your report, the one that was disclosed?  So I

7  want it to be clear that those are the types of questions I

8  believe consistent with the discussions we had yesterday that I

9  would like to ask.

10        **THE COURT:**  Okay.  Oh, I did see the Defendant -- I

11  forgot this.  I did see the Defendant's motion about calling

12  Ms. McRae as an impeachment expert -- not expert -- fact

13  witness.  Pardon me.  And if the jurors are all here, I would

14  propose to deal with that at the break or at lunch.  If the

15  jurors are not here, we can talk about it now.

16        **MR. EWALD:**  And that's perfectly fine, Your Honor.

17  And we wanted to give you a head's up before filing that

18  yesterday, but when you had to leave -- when you had to

19  leave --

20        **THE COURT:**  Yeah.

21        **MR. EWALD:**  -- we didn't get a chance to raise it.

22        **THE COURT:**  Right.  Well, it's a good thing we

23  stopped -- we let the jury go 10 minutes early because we were

24  in here 25 minutes after that.

25     Okay.  Can you go check on the jurors, and if they're all

1 here, they can come on in.  If they're not, come back and let

2 me know.

3        **MR. BICKS:**  Your Honor, can I just ask on scheduling

4 today in terms of --

5        **THE COURT:**  One second.

6     (Pause in the proceedings.)

7        **THE COURT:**  Okay.  Say again.

8        **MR. BICKS:**  In terms of scheduling today, if we end up

9 ending a little bit early with witness moving around and things

10 like that, is that going to be something --

11        **THE COURT:**  That depends on what a little bit early

12 means.  We're not going to stop at two o'clock --

13        **MR. BICKS:**  Right.

14        **THE COURT:**  -- or three o'clock, but, you know, if

15 it's 4:30, I'm probably not going to jump up and down as long

16 as you assure me we're going to get done with the evidence on,

17 you know, no later than Wednesday.

18        **MR. BICKS:**  Yes.

19        **THE COURT:**  You know, so we'll just see how it goes.

20 I don't have any problem stopping a little early, but, you

21 know --

22        **MR. BICKS:**  Yeah.

23        **THE COURT:**  -- I don't want to keep the jurors.  They

24 all are missing work and other obligations, so -- but we --

25 we've been stopping a little bit early for those kinds of

 1  things.  I have no problem with that.

 2          **THE CLERK:**  They're all here.

 3          **THE COURT:**  All right.  You can tell them to come on

 4  in, or somebody can tell them to come on in.

 5      Is the witness -- where is the witness?

 6          **MR. BARRETT:**  Your Honor, she's outside.

 7      (The witness entered the courtroom.)

 8      (The jury entered the courtroom.)

 9          **THE COURT:**  All right.  Good morning.  Ms. Burgess,

10  are you feeling better?

11          **JUROR NO. 6:**  Yes.  Thank you.

12          **THE COURT:**  Great.  Okay.  The witness can come back

13  up to the witness stand.

14      (The witness returned to the witness stand.)

15          **THE COURT:**  And Mr. Barrett, you can continue with

16  your examination.

17          **MR. BARRETT:**  Thank you, Your Honor.  May the monitors

18  please be turned on?

19                      **DIRECT EXAMINATION (Continued)**

20  **BY MR. BARRETT:**

21  Q.  Good morning.

22  A.  Good morning.

23  Q.  Ms. Verkhovskaya, when we left off yesterday, you were

24  looking at a stipulation, and I believe the funnel that you

25  have testified to, and I'd like to resume questioning on that.

1  But before I do that, you testified that at A.B. Data you had

2  handled somewhere in the range of 1,000 class action data

3  analysis projects; is that right?

4  A.  That's correct.

5  Q.  And you have worked with my firm before?

6  A.  Yes, we have.

7  Q.  On approximately how many of those 1,000 cases?

8  A.  Less than 10, I believe.

9  Q.  And you are being compensated for your work in this case?

10 A.  Not me personally.  My firm.

11 Q.  Okay.  And about how much have you charged to date for your

12 work in this case?

13 A.  Well, it's not just my work.  It's the work of all these

14 people that I've mentioned over the past several years.  I

15 believe the total compensation -- I don't have the exact

16 numbers.  Between 25 and 35,000 for everybody for all these

17 years.

18 Q.  Okay.  I'd like to put the stipulation that we were

19 discussing back on the screen.  But, before I do that, I just

20 want to be clear.  I want to ask you a number of questions

21 about this aspect of the funnel, okay, your removal of 1,393

22 business and LexisNexis business numbers.  Do you see that?

23 A.  Yes, I do.

24 Q.  That's where I want to direct my questioning today.  Now,

25 back to the stipulation.  And for purposes of our record, I was

1  referring to what we've marked as Plaintiff's Exhibit 2008.

2      Now, I'm referring to the amended joint stipulation

3  regarding call categories.  Do you see that?

4  A.  Yes, I do.

5  Q.  And that's the parties, Plaintiff Thomas H. Krakauer and

6  Defendant DISH Network, hereby stipulate and agree as follows.

7  Do you see that?

8  A.  Yes, I do.

9  Q.  Okay.  The next -- I'm want to talk to you about

10 paragraph 1.  And I want to ask you two questions about it.

11 I'm going to explain what the questions are, and then I'm going

12 to ask you to answer.  Okay?

13 A.  Okay.

14 Q.  The first question is what does this -- what does this

15 mean:  Telephone numbers that LexisNexis always identifies as

16 unknown.  That's the first question I'm going to ask you, so

17 you can explain what that means to the jury; okay?

18         **THE COURT:**  Are you asking her now?

19         **MR. BARRETT:**  Not now.  No, ma'am.

20         **THE COURT:**  Okay.  Go on, then.

21 **BY MR. BARRETT:**

22 Q.  And the second question I'm going to ask you is why did you

23 not exclude those numbers from the report that you provided to

24 DISH Network in this case; okay?

25 A.  Okay.

1   Q.   Question number 1 regarding paragraph 1, what does this

2   mean:   Telephone numbers that LexisNexis always identifies as

3   unknown?  And if you could explain that to the jury, please.

4   A.   Sure.  Well, in my original expert opinion, there was no

5   such category as unknown because, in my opinion, that category

6   doesn't exist.  LexisNexis does not really identify any numbers

7   as unknown.

8       In the LexisNexis data, when -- as outlined in my original

9   expert opinion, the categories are business, government, and

10  residential.  There are several -- well, I should say a number

11  of rows that are left blank.

12  Q.   Did you say rows, R-O-W-S?

13  A.   Yes.

14  Q.   And you meant by that -- what do you mean by that?

15  A.   A record.

16          **THE COURT:**   What?

17          **THE WITNESS:**   Or a transaction or a record.

18  **BY MR. BARRETT:**

19  Q.   From the LexisNexis data?

20  A.   Correct.

21  Q.   Okay.  So, LexisNexis, you put a phone number -- you give a

22  phone number to LexisNexis, and LexisNexis provides you with

23  data about that telephone number; right?

24  A.   Correct.  But LexisNexis never identified any telephone

25  number as unknown.

1  Q.  Unknown in category?

2  A.  Correct.

3  Q.  Okay.  And --

4  A.  So, my assumption is that the stipulation here refers to

5  records where LexisNexis does not identify them as businesses

6  and does not identify them as government.  Okay?  However, the

7  standard of LexisNexis database is such that if they don't have

8  a source document that identifies that telephone number as

9  residential, they leave it blank.

10     To give you an example, when LexisNexis downloads credit

11  bureau data, when one fills out an application for a credit

12  card, they sometimes click residential at the phone number on

13  the application.  Unless LexisNexis has that box checked as

14  residential next to the telephone number and they have source

15  to prove it --

16          **THE COURT:**  And they have what?  Can you back away

17  from the mike a little?  There's a little feedback.

18          **THE WITNESS:**  And they have a source to prove that an

19  individual identified that phone number as residential, they

20  leave it blank.  But they don't say it's unknown.  They say

21  it's not business, it's not government, and it's not -- they

22  don't have a source where a consumer or an individual

23  identified that number as residential.  So, they leave it

24  blank, but they never say that it's unknown.

25     In my expert opinion, as I outlined in my original report

right here, all those telephone numbers are more likely or not

residential.

**BY MR. BARRETT:**

Q.   Did you review the LexisNexis data that you received back

when you did your report regarding Dr. Krakauer's telephone

number?

A.   Yes.

Q.   And how is that identified in the LexisNexis data?

A.   In the LexisNexis data, the records for Mrs. Krakauer --

for Mr. Krakauer identified as blank in the field of whether it

is a business or government or residential.  So, it is my

expert opinion that Mr. Krakauer's telephone numbers are

residential.

Q.   And were you here for his testimony yesterday -- I believe

yesterday morning when he -- actually two mornings ago, when he

explained that he had had his number since 1985, and it was his

residential telephone number?

A.   That's correct.

Q.   And so, is that consistent with the information you

received back from LexisNexis?

A.   Yes, it is.

Q.   Is there other information that supports your conclusion

that these telephone numbers -- other information regarding the

facts of this case that supports your conclusion that these

telephone numbers should remain residential?

1  A.  Yes.

2  Q.  And what is that?

3  A.  Well, as we've heard over a period of several days, SSN was

4  focused on selling DISH services to residences, and that's what

5  they are going to be paid for.

6  Q.  And further, you -- just to go back to PX2008, we discussed

7  this yesterday, you removed 1,393 telephone numbers, correct,

8  when you did your report because they were associated with

9  businesses?

10  A.  Correct.  They were associated with businesses on -- there

11  was one category that was associated with businesses in Five9

12  records and another category, all the phone numbers that were

13  identified by LexisNexis as businesses or government.

14  Q.  So just to be clear, Dr. Krakauer's number is one of the

15  telephone numbers that LexisNexis always identified as unknown

16  as reflected on this stipulation?

17  A.  That's correct.

18  Q.  Okay.  Paragraph 2.  I would like to ask you the same two

19  questions.  First, what does this mean:  Telephone numbers that

20  LexisNexis identifies as residential before May 1, 2010, or

21  after May -- August 1, 2011.  Okay.

22      So what -- what does that mean, and then I'll get to why

23  did you not exclude those telephone numbers in your original

24  report and your conclusion that the numbers were residential?

25  But, first, what does that mean?

A.  As outlined in my original report, these -- the bucket of

these telephone numbers is not treated separately in my

original report and in my opinion, because, in my expert

opinion --

Q.  Well, first of all, just, if you will, explain what this

means, telephone numbers that LexisNexis identifies as

residential before May 1, 2010 or after August 1, 2011.  Just

explain what that means.

A.  Sure.  When LexisNexis -- remember, I gave you that example

of an individual going to fill out an application to identify

that the telephone number is residential.  As you may remember,

every time you fill out an application like that, you sign it

and date it.

Well, that date, when you identify a telephone number as

residential, goes onto the LexisNexis database as first seen

date.  That's how they refer to it internally.  So, when

LexisNexis downloads the data, they can only refer to the date

of identification which type of telephone number that is based

on the source date.  So, we obviously cannot have daily

confirmations that the telephone number is residential.  We

have a time frame when LexisNexis first seen a record from the

source date identifying that the telephone number is

residential.  And that first seen and last seen date is

included in my original report, and it shows that I included

that date in formulating my original opinion.

1    So, these numbers of records discussed in number two, that

2  category, have identification of first seen date as residential

3  before the class period of May 1, 2010.  And the reason I

4  included those numbers in my original opinion is because

5  LexisNexis downloads data very frequently, sometimes several

6  times a day from various sources.  And that number or that set

7  of numbers never, ever appeared until the end of class period

8  under any business directory.

9    So, therefore, it is my expert opinion that these numbers

10  more likely or not remained residential throughout the class

11  period.  It's just common logic.

12  Q.  And so, that is what you stated in your report, correct,

13  when you said that 22,232 numbers were residential, right?

14  A.  That is correct.

15  Q.  So you did not exclude telephone numbers that LexisNexis

16  identifies as residential before the class period or after the

17  class period from your 22,232 numbers; correct?

18  A.  That's correct.

19  Q.  Okay.  And you had testified that -- you'd heard the

20  testimony about SSN selling residential --

21  A.  That is correct.

22  Q.  -- not selling commercial numbers?

23  A.  That is correct.

24  Q.  Commercial accounts?  And is that further evidence in

25  support --

1  **THE COURT:**  Okay.  I think you asked that, and she's

2  answered it several times.

3  **MR. BARRETT:**  Okay.

4  BY MR. BARRETT:

5  Q.  Paragraph 3.  Telephone numbers that LexisNexis identifies

6  as unknown in the May 2010 to August 2011 time period, calls

7  were made but identifies differently at other times.  What does

8  that mean?

9  A.  Well, that means -- and I apologize if I sound repetitive,

10  but it does mean the same thing.  In my expert opinion, these

11  numbers were included in my report, and they're part of 22,232

12  numbers because LexisNexis identified them as nonbusinesses and

13  non-government.  However, the date of last seen, first seen was

14  such that, at times, those records were blank, and, at times,

15  those records were identified as residential.  It was and still

16  is my expert opinion that those records are more likely or not

17  residential.

18  Q.  Paragraph 4 of the stipulation.  Telephone numbers -- and

19  if your answer is the same with respect to this, you may say

20  that.

21  A.  Thank you.

22  Q.  If your answer is different, you may explain that.

23  Telephone numbers that LexisNexis identifies as both

24  residential and unknown.  What is that -- what does that mean?

25  A.  My answer is the same.

1  Q.  As with respect to your previous answers?

2  A.  That's correct.

3  Q.  I want to ask you about this, number 5, telephone numbers

4  that LexisNexis always identifies as residential, including in

5  the May 2010 to August 2011 time period that the calls were

6  made.  I think we know what that means.

7  A.  I wrote a big opinion on that.

8  Q.  Yes.

9  A.  My answer is the same.

10  Q.  The sixth paragraph.  Telephone numbers that LexisNexis

11  identifies as cellular and possibly cellular.  Of course, we

12  all know what cellular means, right, cell telephone numbers?

13  A.  Correct.  And, in my original opinion, I did not separate

14  cellular numbers because it has no bearing on whether cellular

15  business or cellular residence.  My answer is the same.  Those

16  cellular numbers are still more likely or not residential.

17      And I just do want to add that if there were any businesses

18  throughout any of those six categories that were removed in

19  prior steps.

20  Q.  And, Ms. Verkhovskaya, the opinions that you have expressed

21  on the witness stand today and yesterday, do you hold those

22  opinions to a reasonable degree of certainly in your field of

23  data analysis?

24  A.  Yes, I do.

25  Q.  Thank you.

1    **MR. BARRETT:**  No further questions.

2    **THE COURT:**  All right.  Questions for the Defendant?

3    **MS. ECHTMAN:**  Thank you.  If I might just have the

4    microphone?  Do you have the microphone?

5    **MR. BARRETT:**  Yes.  Your Honor, may I?

6    **THE COURT:**  Yes, uh-huh.

7    (Portable microphone handed to Ms. Echtman.)

8    **MS. ECHTMAN:**  Can everyone hear me?

9    **THE COURT:**  That appears to be working.

10   **MS. ECHTMAN:**  Great.  Thank you.

11   **CROSS-EXAMINATION**

12   BY MS. ECHTMAN:

13   Q.  Well, good morning.

14   A.  Good morning.

15   Q.  Ms. Verkhovskaya, am I pronouncing your name correctly?

16   A.  Yes.  Thank you.

17   Q.  Terrific.  Okay.  So I just want to go through a few things

18   and make sure we're all on the same page.  You talked a little

19   bit, when you first got on the stand yesterday, about your

20   qualifications, and you said you've worked with data your whole

21   life; is that right?

22   A.  That's correct.

23   Q.  Okay.  And are you self-taught in working with data?  Did

24   you teach yourself?

25   A.  That was part of the process, but over 25 years of intense

1  experience.

2  Q.  But I just want -- you don't have formal training in data

3  analysis, but you've worked with data for a very long?

4  A.  That's correct.

5  Q.  But you haven't taken formal courses of any kind?

6          **THE COURT:**  You mean academic?

7  **BY MS. ECHTMAN:**

8  Q.  Academic or even training seminars.

9  A.  That's correct.

10  Q.  And am I right that you haven't taken statistics courses

11  either?

12  A.  I took statistics in college.

13  Q.  Oh, do you recall saying at your deposition that you hadn't

14  taken any courses relating to statistics?

15  A.  Any additional courses.

16  Q.  Well, I think the question -- well, let's -- can we just go

17  to -- I thought you said at your deposition -- when you were

18  asked, have you ever taken any courses relating to statistics,

19  you said no.  Was that mistaken?

20  A.  As I recall it, that was a conversation about my

21  post-college education, but I did take a course in statistics

22  in college.

23  Q.  Okay.  Okay.  And here what you did is you analyzed

24  telephone records based on criteria given to you by Plaintiff's

25  counsel; is that right?

1    A.   No, that's not correct.

2    Q.   Okay.  Well, did you at deposition identify your area of

3    expertise for this case as analyzing telephone records based on

4    criteria that was given to you by Plaintiff's counsel?

5    A.   Part of the criteria was given to us by Plaintiff's

6    counsel, absolutely.

7    Q.   Okay.  So that's what you had said, right?

8    A.   Correct.

9    Q.   Okay.  All right.  And you talked about -- you do a lot of

10   work on class actions, right?  I think you talked about that,

11   right?

12   A.   Correct.

13   Q.   Okay.  And I think Mr. Barrett asked you.  You've worked on

14   more than a thousand class actions?

15   A.   Correct.

16   Q.   And you're a co-founder, a partner, and chief operating

17   officer of a portion of A.B. Data called A.B. Data Class Action

18   Administration?

19   A.   As I testified earlier today, that was my prior occupation,

20   not current occupation.

21   Q.   Okay.  So when did you make that switch?  Very recently?

22   A.   Very recently, yes.

23   Q.   But you're still affiliated with A.B. Data Class Action

24   Administration?

25   A.   I'm currently consulting with them on a very limited basis

1  to help them to transition.

2  Q.   And so now you're at a new firm called DRRT; is that right?

3  A.   That's correct.

4  Q.   And DRRT is a subsidiary of a law firm?

5  A.   It is a law firm.

6  Q.   Oh, it is a law firm.  Okay.  But you're not a lawyer,

7  right?

8  A.   I'm not.

9  Q.   But A.B. Data Class Action Administration, that's the

10  company that you worked for when you did the work in this case;

11  is that right?

12  A.   That's correct.

13  Q.   And that company's business is class actions, right?

14  A.   That's correct.

15  Q.   And at DRRT, are you going to continue to be doing class

16  action work?

17  A.   It's a securities class action firm, but my job would be to

18  manage the law firm.  I will be the managing director, and I'm

19  going to continue focusing on data work, handling data for

20  various financial clients that we have throughout the world, as

21  well as continue my expert analysis data work.

22  Q.   Okay.  So the more class actions there are, the better it

23  is for A.B. Data Class Action Administration because that's --

24  that's what they do, right?

25  A.   Well, I can't comment on them -- on what they're going to

1  continue doing in the future, but I guess they're in business

2  assisting law firms and being appointed by courts to administer

3  and handle various class actions.

4  Q.   And one of the things that A.B. Data does for class actions

5  and one of the things, when you were there until very recently,

6  they did was they got -- they get hired and paid to send

7  notices to individuals who might be part of a class action,

8  right?

9  A.   That's correct.

10  Q.   And did A.B. Data do that in this case?  A.B. Data handled

11  sending notices to people who might be part of this class?

12          **MR. BARRETT:**  Objection, based upon the Court's prior

13  rulings.

14          **THE COURT:**  Can you step up to the corner here?

15      (The following bench conference was recorded.)

16          **THE COURT:**  Speak closer to the mike.

17          **MS. ECHTMAN:**  I'm not going to get into, you know, who

18  the class matters might be.  I'm going to talk about what she

19  does and what her motivation is and that, you know, basically

20  she -- she makes her living on the plaintiff side --

21          **THE COURT:**  Right.

22          **MS. ECHTMAN:**  -- of class actions.

23          **THE COURT:**  When you talked about prior ruling, I

24  wasn't sure what you are were talking about.  I just went over

25  --

```
 1            MS. ECHTMAN:  I'm not going to get into subscriber
 2   issues.
 3            MR. BARRETT:  -- names.
 4            MS. ECHTMAN:  I'm not going to get into that.
 5            THE COURT:  Well, she can answer that one question.
 6            MR. BARRETT:  Yes.
 7            MS. ECHTMAN:  Okay.
 8       (Conclusion of the bench conference.)
 9            THE COURT:  Go ahead.  You can repeat your question.
10            MS. ECHTMAN:  All right.  Well, can the court reporter
11   read it back?  Is that an option?
12            THE COURT:  Or just rephrase it.
13   BY MS. ECHTMAN:
14   Q.  Okay.  I think my last question was did A.B. Data handle
15   the job of sending out notice to the people who might be in
16   this class?
17   A.  Yes.
18   Q.  And A.B. Data got paid for that, right?
19   A.  Yes.
20   Q.  Okay.  And when you mentioned how much you were paid so far
21   for your expert work, were you including what A.B. Data got
22   paid for sending out the notices?
23   A.  I don't believe so.
24   Q.  And then in terms of what A.B. Data does -- and you worked
25   with A.B. Data for a long time, right?
```

1  A.   Correct.

2  Q.   And if a class action happens to settle, and there's money

3  to be paid to the class, A.B. Data -- one of the things that

4  A.B. Data Class Action Administration does is it handles the

5  distribution of the funds?

6  A.   If we are fortunate enough to be picked and appointed by

7  the court as an administrator, it is a job of an administrator

8  to distribute the funds to the class.

9  Q.   And A.B. Data Class Action Administration gets paid for

10  doing that, right?

11  A.   Yes.

12  Q.   And so in the event that any money might be awarded to

13  class members in this case by the jury here, then A.B. Data

14  could be selected to distribute that money.  That's something

15  that A.B. Data does?

16  A.   I can't foresee the future who will be appointed to

17  administer the case, so I can't comment on that.

18  Q.   Right, but A.B. Data has already done some of that because

19  they sent out the notices, right?

20  A.   Yeah, they sent out the first notice, but it does not mean

21  in any way, shape, or form that the court will appoint A.B.

22  Data to do the next step.

23  Q.   Okay.  But A.B. Data would want that work, right?

24  A.   I no longer work there, but I would hope so.

25  Q.   Yeah, when you worked there and you had this role, you

1  wanted to get that work, right?

2  A.  Yes.

3  Q.  Okay.  And that's called fund distribution, if something is

4  going out to the class, and that's something that you're an

5  expert in, right?

6  A.  That's correct.

7  Q.  And is the amount that gets paid to A.B. Data for fund

8  distribution related at all to how much gets awarded?

9  A.  No.

10 Q.  It's a set amount no matter how many people are involved?

11 A.  We get paid for postage.  We get reimbursed for print and

12 mail costs, and then we charge for a call center -- well, not

13 we anymore.  The claims administrator and fund distributor gets

14 charged for the actual hours that they spent working, but it's

15 not a percentage.  It's not a set cost.  It's just

16 reimbursement of expenses and hours.

17 Q.  But they make money on it, right?  They don't do it just

18 for the cost of doing business?

19 A.  Correct, it's not a non-profit organization.  It is a

20 business.

21 Q.  Okay.  So it's in A.B. Data Class Action Administration's

22 interest for there to be money to distribute to a class because

23 they can get hired for that work, right?

24 A.  Possibly.

25 Q.  Okay.  And you mentioned to Mr. Barrett that you do work

1  for law firms, and you've done other work for Mr. Barrett's law
2  firm, right?
3  A.   That's correct.
4  Q.   And when you do work for private law firms, that's
5  primarily for private law firms representing the plaintiffs,
6  right?
7  A.   Well, if you take overall the percentage of cases who is
8  our primary contact, about 70 percent of cases is plaintiffs
9  who is our primary contact.  About 30 to 40 percent is
10 defendants, but we don't work neither for plaintiffs nor for
11 defendants.  All claims administrators are appointed and fund
12 distributors are appointed by courts to do that work, and
13 that's who we work for.
14 Q.   Okay.  So I'm not talking about when there's a settlement,
15 and you're doing that.  I'm saying -- actually, I'm sorry I
16 wasn't clear.  When you're testifying as an expert and doing
17 what you do here, which is giving an expert opinion in a case,
18 your work is primarily for plaintiff law firms, right?
19 A.   That's correct.
20 Q.   And am I correct that generally you offer opinions to
21 support class certification?
22 A.   That's correct.
23 Q.   And you generally offer opinions to say that a class should
24 win in some respect, right?
25 A.   My opinions are related to data analysis, and I don't

1  express any opinions of who should win.

2  Q.  But they're all on the plaintiff side, right?

3  A.  That's correct.

4  Q.  And you've never offered an expert opinion in any court or

5  any litigation for the defense, have you?

6  A.  Not on the data analysis, no.

7  Q.  And so we talked a bit -- you talked a bit about -- or we

8  both talked about the fact your role in this case, you said,

9  was to analyze telephone records, right?

10  A.  That's correct.

11  Q.  Okay.  And can you tell us when you first did that work?

12  A.  It was a couple of years ago.

13  Q.  Okay.  And so you have your report -- do you still have

14  your report there?

15  A.  Yes, I do.

16  Q.  What's the date of your report?

17  A.  The date of my report I believe is January last year, but

18  may I --

19  Q.  Yeah, sure.  Look at it.  I think it's January 30, 2015.

20  Does that sound right to you?

21  A.  It does, but let me just take a quick look.

22         **THE COURT:**  I keep forgetting it's 2017, too.

23         **THE WITNESS:**  That is correct.  It's January 30th,

24  2015.

25  **BY MS. ECHTMAN:**

1  Q.  Okay.  And so you did your work after the complaint was

2  filed in this case, right?

3  A.  Correct.

4  Q.  So the complaint was filed at some point in 2014, and so

5  Dr. Krakauer didn't have your work when the complaint was

6  filed, he did?

7  A.  No.

8  Q.  And the numbers in your report, we talked about, are a

9  little bit bigger than the numbers that we're talking about

10 today in terms of the number of telephone numbers and how many

11 phone calls, right?

12 A.  That's correct.

13 Q.  That's because afterwards Plaintiff agreed to remove some,

14 right?

15 A.  That's correct.

16 Q.  So the specific numbers we're talking about in court today,

17 those are pretty recent.  I think those are actually from a

18 stipulation in 2017 that your lawyer showed you, and you talked

19 about?

20 A.  That's correct.

21 Q.  Okay.  So one of the things that Plaintiff's counsel asked

22 you to do was to check whether certain telephone numbers are on

23 the National Do Not Call Registry, right?

24 A.  That's correct.

25 Q.  Well, that's one of the things that you did, right?

1    A.    Yes.

2    Q.    Okay.  And you said you specifically wanted to know whether

3    they were on the registry for 30 days at the time they were

4    called; is that right?

5    A.    That's correct.

6    Q.    And the calls in this case -- you've got call records from

7    May 1, 2010, to August 1, 2011?

8    A.    That's correct.

9    Q.    And you used a company that -- you said Nexxa.  You used a

10   company called Nexxa to give you the information?

11   A.    That's correct.

12   Q.    And you asked Nexxa -- you said you used Nexxa because they

13   can give you historical information?

14   A.    That's correct.

15   Q.    And you asked Nexxa to let you know whether the telephone

16   numbers were on the National Do Not Call Registry as of

17   April 1, 2010; is that right?

18   A.    That's correct.

19   Q.    And you picked that date because it's how many days before

20   the first telephone call?

21   A.    30 days.

22   Q.    But none of the -- so you checked for April 1, 2010, right?

23   A.    I have to look at my report.  I don't recall whether the 30

24   days was April 1, how many days were in April that year, but I

25   believe so.

1  Q.  Okay.  Do we have the same number of days in April every

2  year?

3  A.  I just want to make sure.

4  Q.  Okay.  Go ahead and look at your report.  I'll try and help

5  you out.  Go to page 9.  I think that might help.

6  A.  Yes, April 1st.  Thank you.

7  Q.  All right.  And I think you -- I'm going to open up your

8  report, too, and you said that you found that 23,625 unique

9  telephone numbers were listed on the National Do Not Call

10 Registry as of April 1, 2010.  That's what you did, right?

11 A.  That's correct.

12 Q.  And -- but the telephone calls were actually made after

13 that date, right?

14 A.  That's correct.

15 Q.  And isn't the standard that they have to still be on the

16 Registry at the time that they were called?

17 A.  Yes.

18 Q.  But you didn't get a report from Nexxa for each of the

19 dates that the telephone calls were made, did you?

20 A.  It was not necessary.

21 Q.  Well, you know that telephone numbers can come off the

22 Registry, right?

23 A.  Yes.

24 Q.  And, in fact, do you know the ways in which telephone

25 numbers come off the Registry?

1  A.   If telephone numbers do come off the Registry, Nexxa would

2  mark that in the data set that they provide us usually.

3  Therefore, that was not something that we worried about because

4  there were no indication that any of the numbers listed in my

5  report came off the do not -- National Do Not Call Registry.

6  Q.   All right.  So did you say that?  We're on page 9 of your

7  report, and I think your report says that it was found that

8  these were listed on the NDNCR as of April 1, 2010.  Do you see

9  that?

10 A.   Yeah, that's correct.  They were.

11 Q.   And you didn't say "and thereafter"?

12 A.   No, I did not.

13 Q.   All right.  But you believe that if it had come off, Nexxa

14 would have told you that?

15 A.   Yes.

16 Q.   Okay.  And did you check for that?

17 A.   That was -- they would -- that would have been identified

18 in my report if they would have -- if the phone numbers would

19 have come off.  I personally did not check every single number,

20 but the report that I received from Nexxa did not specify that

21 any of these numbers came off the Registry.

22 Q.   But you -- you just said, I think, you didn't check?

23 A.   I did not personally go back to National Do Not Call

24 Registry and check it personally, no, I did not.

25 Q.   Okay.  And you didn't get a report from Nexxa for the last

1  day in the class period to make sure you had the numbers on day

2  one and the last day, which would be August 1, 2011?

3  A.  I could not justify that expense because it was not

4  necessary.

5  Q.  And so how -- how would Nexxa tell you in the report that

6  something came off?

7  A.  Since there were no indication on that particular report

8  and there was no field that was filled out that any of those

9  records came off, so it would have been in their original

10  output.

11  Q.  And what field is that?

12  A.  There was no field that was included for that.  That would

13  have been in the e-mail that they would have sent me.

14  Q.  Oh, so it's not actually in their report?  You're saying

15  they would have told you in a separate e-mail?

16  A.  Well, since there was no phone numbers that Nexxa ever

17  indicated that came off National Do Not Call Registry, based on

18  Nexxa's records, there was no special field that was included

19  in the Nexxa output; but they would have informed me if there

20  would be by e-mail or a phone call, or they would have added a

21  field in the report.

22  Q.  Did you -- did you produce in this case an e-mail from

23  Nexxa that might say that?

24  A.  No, since there were no numbers that came off the report,

25  there was no e-mail stating that.

1 Q. All right. Well, but I think you'll agree, numbers can

2 come off, right?

3 A. Oh, yeah, absolutely.

4 Q. And you're saying now that Nexxa would have told you if

5 they did?

6 A. Correct.

7 Q. But if Nexxa -- let's just assume that Nexxa didn't

8 actually give you any of that information and didn't check

9 that, okay. How do numbers come off?

10     **THE COURT:** What do you mean let's assume that? Is

11 your question dependent on that, how the numbers come off? I

12 don't understand what you're asking. I'm sorry.

13     **MS. ECHTMAN:** I'm asking -- I'm asking the witness --

14 I want to talk about how numbers come off.

15     **THE COURT:** Okay. Go ahead.

16     **THE WITNESS:** Well, as far as I know, the process is

17 not ideal. Usually, based on my understanding, which was not

18 really included in my opinion in this case, but based on my

19 understanding, if the numbers are reassigned to a different

20 person, the numbers come off National Do Not Call Registry.

21     If an individual wants to take a phone number of National

22 Do Not Call Registry who registered before, I actually don't

23 know how they would take it off.

24 Q. Okay. So just some background on the National Do Not Call

25 Registry. That's administered by the Federal Trade Commission,

1  right?

2  A.  That's correct.

3  Q.  And the Federal Trade Commission has some subcontractors it

4  hires to do that work, right?

5  A.  That's correct.

6  Q.  Okay.  Do you know one of them is Lockheed Martin?

7  A.  Yes.

8  Q.  And another one is PossibleNOW, right?

9  A.  That's correct.

10  Q.  And you know PossibleNOW is the one responsible for

11  determining if a number has been disconnected and reassigned,

12  it should come off the Registry, right?

13  A.  One of them, yes.

14  Q.  Okay.  And you know that people can take their phone

15  numbers off the Registry by calling an 800 number from the

16  telephone number that they want to take off.  Does that sound

17  familiar to you?

18  A.  It does.  I just don't know where that telephone number is

19  to be found.

20  Q.  Oh, you -- have you ever looked for it on the FTC's

21  website?

22  A.  It's not that easy to find.  Yes, I have.

23  Q.  Oh.  Okay.  I found it.

24  A.  Okay.

25         **THE COURT:**  All right.  Well, the lawyers don't

1  testify, so the jury will disregard that.

2  **BY MS. ECHTMAN:**

3  Q.  All right.  Well -- okay.  And have you also heard that at

4  times telephone numbers have mistakenly come off the Registry?

5  A.  Yes, the Registry is not ideal.

6  Q.  Right.  And, in fact, there was a time in 2008 where

7  PossibleNOW made a mistake, and about 225,000 numbers came off

8  the Registry that shouldn't have?

9  A.  I'm not aware of that.

10  Q.  Okay.  And so you don't know if anything like that would

11  have happened in the class time period that Nexxa wouldn't have

12  known about?

13  A.  My job was to rely on Federal Trade Commission's National

14  Do Not Call Registry and the information on that registry.  I

15  have no comment or opinion how that registry is maintained and

16  what mistakes, if any, might have occurred on the Registry

17  beyond my control.

18  Q.  Okay.  And we talked about the fact that your former

19  company, A.B. Data Class Action Administration, was in charge

20  of giving notice to the class -- the potential class in this

21  case, right?

22  A.  That's correct.

23  Q.  And they did that by sending out postcards to people in the

24  mail?

25  A.  That's correct.

```
1  Q.  Okay.  And are there some people who wrote back and said --
2              THE COURT:  Sustained.
3  BY MS. ECHTMAN:
4  Q.  Did you ever learn through any of the information that A.B.
5  Data got back that some people claimed they were not on the
6  registry?
7              MR. BARRETT:  Objection, Your Honor.
8              THE COURT:  Well, overruled.  She can answer that.
9              THE WITNESS:  I don't recall.
10             MS. ECHTMAN:  Your Honor, may I show the witness
11  something to refresh her recollection?
12             THE COURT:  You may.
13             MS. ECHTMAN:  We have DX78.
14             MR. BARRETT:  Your Honor, objection with respect to
15  this.  May we approach?
16             THE COURT:  Ladies and gentlemen, let me excuse you
17  briefly to the jury room.
18     (The jury left the courtroom.)
19             THE COURT:  Okay.  Defendant's 78?
20             MS. ECHTMAN:  Yes.  So, Your Honor, if you want more
21  information from me, I'll --
22             THE COURT:  I'm just looking at the exhibit.
23     (Pause in the proceedings.)
24     Are there others?
25             MS. ECHTMAN:  I want to use this one.  I mean, the
```

1  first two go directly to whether it's accurate, because she got
2  notice from two people at a time that they were in the punitive
3  class.

4         **THE COURT:** Okay. Just a second. Oh, I see the
5  second page is an e-mail.

6         **MS. ECHTMAN:** It's an e-mail that says -- I just want
7  to look at the first two pages for this question, which is --
8  the first three pages for -- I'm sorry -- up to page 5 for
9  purpose of this question to talk about people who wrote back
10 and said they weren't on the registry.

11        **THE COURT:** So, okay, the handwritten one there on
12 page 1.

13        **MS. ECHTMAN:** And then on page 5, there's an e-mail.

14        **THE COURT:** Okay. And your objection?

15        **MR. BARRETT:** These are opt-out notices, Your Honor.
16 These people are not class members and requested to be
17 excluded. It has no bearing on issues in this case,
18 misleading.

19        **MS. ECHTMAN:** Well, it's actually -- they were
20 admissions by party opponents until the opt-outs were
21 processed.

22        **MR. BARRETT:** They're not parties.

23        **MS. ECHTMAN:** And I'm asking her about what she knew,
24 which goes to the reliability of her work.

25        **THE COURT:** Okay. Well, the first one, the

1  handwritten one, is ambiguous, it looks to me.  Now, the e-mail
2  is not ambiguous on page 5, but that's the only one -- these
3  are the only two, rather, that you're saying --
4          **MS. ECHTMAN:**  Well, there are other ones -- two others
5  that say no one ever called me.  I'm not going to get into
6  those right now.
7          **THE COURT:**  Well, right, we're not going to get into
8  that.
9          **MR. BARRETT:**  Additionally, Your Honor, this is
10 hearsay.  This is --
11         **THE COURT:**  All right.  I'm going to exclude this
12 under Rule 403.  It's just -- it's just a couple, it seems to
13 me, to have the potential to take us down a -- take us down a
14 rabbit hole.
15         **MS. ECHTMAN:**  Well, Your Honor, it's our position
16 those are the only --
17         **THE COURT:**  Did I just rule?
18         **MS. ECHTMAN:**  Yes.
19         **THE COURT:**  All right.  Bring the jury back in,
20 please.
21     (The jury entered the courtroom.)
22         **THE COURT:**  All right.  Ms. Echtman, you may continue.
23 **BY MS. ECHTMAN:**
24 Q.  All right.  So, Ms. Verkhovskaya, just to go back, we've
25 talked about that you used this company, a vendor called Nexxa,

1  to get the information about the national registry, right?

2  A.  Yes.

3  Q.  And am I right that Nexxa has made mistakes plenty of

4  times?

5  A.  I'm not sure.  I don't have an opinion on that.

6  Q.  Okay.  Do you recall being asked at deposition whether

7  Nexxa ever got anything wrong and you said, "I'm sure there

8  were plenty of times"?

9  A.  Well, I'm sure there were, but I can't comment generally on

10 that at this time.  I don't recall specific examples.

11 Q.  And you've never tested the reliability of Nexxa's output

12 to you, have you?

13 A.  We never felt it was necessary.

14 Q.  And so you just didn't do it?

15 A.  Since it is a fair standard used by the entire industry, we

16 did not feel that it was making any business sense to spend

17 time and resources testing the reliability of appropriate and

18 accepted—by—the—entire—industry data.

19 Q.  Okay.  So let's -- let's move on a little bit and talk

20 about this residential question.  You talked about the fact

21 that you reviewed the Five9 call records, and those are SSN's

22 call records, and sometimes those call records identified that

23 they got a business, right?

24 A.  Correct.

25 Q.  And does that show up in a data field called disposition?

1  A.  Correct.

2  Q.  And in your experience in looking at call records, is it

3  your understanding that sometimes that disposition column is

4  entered by the call center representative?

5  A.  Sometimes, but could you please maybe show me what exactly

6  you're referring to?  Can you show me the dataset?

7  Q.  Well, I'm just asking you -- you said you relied on this

8  data field, and you relied on a data field that said business.

9  A.  That's correct.

10  Q.  And that was the disposition field, right?

11  A.  As far as I recall, yes.

12  Q.  And you've looked at a lot of telephone records over the

13  years, right?

14  A.  That's correct.

15  Q.  And a lot of them have a disposition field?

16  A.  Well, some have dozens or hundreds of disposition fields?

17  Q.  Okay.  So how many disposition fields were there in the

18  Five9 records?

19  A.  Well, we -- in the field of data analysis, we call

20  disposition codes -- it's every field that is identified a

21  different disposition.  It could be one or two or three.  There

22  were several files that were produced, and not all files were

23  in the same format.  So if you would like me to comment on the

24  source data and how many fields were in each file of the source

25  data, I would like to take a look at it to affirmatively

1  confirm how many disposition fields were in each dataset.

2  Q.  Okay.  So but just sitting here right now, you can't tell

3  me whether there was only one field in each of the sets labeled

4  "disposition"?

5  A.  There was at least one.

6  Q.  And you said that some of them were in different formats,

7  but do you know whether they had the same fields; they just

8  might have appeared in a different order?

9  A.  I believe some files had less fields and some files

10  appeared in a different order and some files or two had

11  completely different structure and contained completely

12  different data.  So the source data was very different from the

13  format of the data in my report.

14  Q.  All right.  But will you agree with me that generally when

15  you've got call records and you've got a call center, that

16  there's a field that talks about or addresses what might have

17  happened on a call?  Like you talked about fields that you used

18  to decide that they weren't connected, right?  You said no

19  answer, busy.  I'm talking about that field.

20          **THE COURT:**  I'm sorry.

21  **BY MS. ECHTMAN:**

22  Q.  Does that help?

23          **THE COURT:**  I didn't follow the question.  I

24  apologize.

25          **MS. ECHTMAN:**  I'm sorry.

**BY MS. ECHTMAN:**

Q.   But specifically for the business field, do you know how
that information got into the call records?

A.   In Five9?

Q.   In Five9, where you saw something that said it was a
business.

A.   I do not know how the information got into the call
records.  That was not included in my opinion.

Q.   But sometimes information gets into the call records
because a call center representative types it in; is that
right?

A.   It is a possibility.

Q.   They could type it in, or they could use a drop-down and
say business?

A.   It is a possibility.

Q.   And do you know Five9 or how SSN would know that it was a
business?

A.   That was not included in my opinion.  In my opinion, I felt
it would be fair to DISH, regardless of how that information
got into the records, to give them the benefit of the doubt and
exclude those telephone numbers.

Q.   And so when you looked through the call records, you
specifically found 1,275 telephone numbers in SSN's call
records that were identified as business; is that right?

A.   That's wrong.

1  Q.  Okay.  Well, let's look at -- can we pull up Plaintiff's

2  demonstrative 2008?  So let's just talk about where you are in

3  your funnel or sieve.  We're down towards the bottom where you

4  took out the business numbers.  So you had already just looked

5  at which calls you thought connected, and you whittled it down,

6  right?

7  A.  Correct.

8  Q.  And then you looked for how many calls were single calls

9  and you whittled it down?

10 A.  Correct.

11 Q.  And then you looked at how many numbers were not on your

12 report from Nexxa about DNC numbers, right?  Less 34,526

13 non-DNC numbers, right?

14 A.  That's correct.

15 Q.  And then your next step was to take out 1,393, and you said

16 "business and LexisNexis business numbers."

17 A.  That's correct.

18 Q.  And you're saying I'm wrong if I think that 1,275 of those

19 came from the SSN records, those business identifiers?

20 A.  Your previous question was whether there were about 1,200

21 business telephone numbers identified as such in the Five9

22 records, and that's where you were incorrect, because I only

23 looked for a number of telephone records identified as

24 businesses in Five9 records after I already removed over a

25 million five phone calls.  I do not have an opinion and I do

1  not know how many telephone numbers were identified as

2  businesses in the Five9 records in the source altogether.

3  Q.  Okay.  So until you got to this step where you had already

4  gone down to 23,625 numbers, then you checked for business?

5  A.  That is correct.

6  Q.  Okay.  And at that step, you found 1,275 business numbers?

7  Go ahead.  You can take out your report.

8  A.  That number is included in the 1,393 number, so I would

9  like to check in my report to make sure we're on the same page.

10  Q.  Sure.  Go to pages 9 to 10 of your report.

11      (Pause in the proceedings.)

12  A.  So that is correct.  My report states that we identified

13  1,275 unique telephone numbers as being business identified

14  telephone records.

15  Q.  But there could have been more because you didn't check --

16  you only checked those 23,625 phone numbers, right?

17  A.  That's right.

18          **THE COURT:**  There could have been more?

19  **BY MS. ECHTMAN:**

20  Q.  There could have been more business numbers identified in

21  the SSN call records because you only checked the 23,625,

22  right?

23  A.  Correct.

24  Q.  And you don't know how many more business dispositions for

25  telephone numbers there could have been?

```
 1   A.   That is outside of the scope of my opinion.
 2   Q.   And then after you did that -- right, but let me take a
 3   step back.  So you said several times already you -- some of
 4   the evidence you used was that SSN wanted to call residences
 5   because they wanted to sign up residential subscribers for
 6   DISH.
 7   A.   That's correct.
 8   Q.   Okay.  But it looks like just from those phone numbers that
 9   you looked at a lot of times they called businesses, 1,275
10   times.
11   A.   That's correct.
12   Q.   All right.  And so after you did that -- so -- but the SSN
13   call records didn't identify every one of those 23,625 numbers
14   as a business, right?
15        THE COURT:  I'm sorry.  What?
16   BY MS. ECHTMAN:
17   Q.   The SSN call records didn't identify all of the businesses
18   within those 23,625 numbers, right?
19   A.   I'm not sure I'm following you.
20   Q.   All right.  Well, you did another step to find business
21   numbers, right?
22   A.   That's correct.
23   Q.   That's when you went and you got a report from LexisNexis,
24   right?
25   A.   That's correct.
```

1    Q.  And LexisNexis gave you back this report and you found

2    another 118 business numbers in that report from LexisNexis?

3    A.  That's correct.

4    Q.  And so then you removed those?

5    A.  That's correct.

6    Q.  So that's how we get to the 1,393 number that's on this

7    funnel?

8    A.  That's correct.

9    Q.  Am I right that you described the file -- the report you

10   got back from LexisNexis as an output regarding a business

11   telephone number append?  Is that an accurate way to describe

12   it?

13            **THE COURT:**  Could you just say that again?  I didn't

14   understand the last word.

15   **BY MS. ECHTMAN:**

16   Q.  An output regarding a business telephone number append?

17   A.  We don't refer to it that way.  Sometimes we talk about

18   telephone type identification append, but I suppose you can

19   refer to it that way as well.

20   Q.  Okay.  So because I thought you said at your deposition

21   that -- when you were asked what the document was this is an

22   output from LexisNexis regarding business telephone number

23   append.

24   A.  I described it that way.

25   Q.  Okay.  And I think that you -- you said yesterday when

1  you -- for those 118 numbers that you say are business, you

2  included numbers that might be government, right?

3  A.  That's correct.

4  Q.  Okay.  And you talked about there were three columns in the

5  LexisNexis data.  There's one that says "listing type bus,"

6  B-U-S.  And that's business, right?

7  A.  That's correct.

8  Q.  And that's a column where LexisNexis has some evidence that

9  it's a business number, right?

10 A.  That's correct.

11 Q.  And they fill in that column.  And then there's another one

12 that says "listing type gov," G-O-V, right?

13 A.  That's correct.

14 Q.  And you're saying that LexisNexis fills out that column

15 when they have some evidence that it's a business number?

16 A.  That's correct.

17         **THE COURT:**  Government?

18         **THE WITNESS:**  Government.

19 **BY MS. ECHTMAN:**

20 Q.  I'm sorry.  Government number.  And then the third type is

21 "listing type," R-E-S, "res," right?

22 A.  Correct.

23 Q.  And it's your testimony that LexisNexis fills that out when

24 they have some evidence that it's a residential number?

25 A.  That's correct.

1    Q.  And so I think you testified that -- so you looked at the

2    government column and you removed government numbers?

3    A.  Yes.

4    Q.  Are you sure you did that?

5    A.  Yes.

6    Q.  Okay.  Do you recall testifying at your deposition that you

7    didn't look at that field for your work in this case?

8    A.  There were -- there is a possibility.  I did not remember

9    that at that time.  I actually remember that at the time of my

10   deposition I could not recall if there were any government

11   numbers, but as I was reviewing the output and my report for

12   this trial, I came across a few, so I was mistaken.

13   Q.  Okay.  So when your deposition was taken and you testified

14   under oath and you said that you didn't look at that field, you

15   were mistaken?

16   A.  Yes.

17   Q.  But I thought -- I'm a bit confused because I thought you

18   said this is the standard way you do it.  Right?  How -- you do

19   this in a lot of cases, this type of work?

20   A.  Yes, we do.

21   Q.  Okay.  And so how many years had you been doing this type

22   of work when your deposition was taken?

23   A.  20.

24   Q.  And you're talking about there's a standard way to do it,

25   right?

1  A.  Yes.

2  Q.  And you use this LexisNexis data a lot?

3  A.  Yes.

4  Q.  Okay.  But when -- when DISH's lawyer took your deposition,

5  you forgot that you looked at that column?

6  A.  Yes.

7  Q.  Okay.  And, you know, we talked a little bit about a

8  stipulation where DISH and the Plaintiff agreed that the

9  Plaintiff would remove some calls from this case.  And you

10  reviewed that?

11  A.  Yes.

12  Q.  Okay.  And do you recall that that particular stipulation

13  said that there were call -- that there were phone numbers

14  identified as government in the LexisNexis report that hadn't

15  been removed?

16  A.  Can you please refresh my recollection and show that to me?

17  I would appreciate that.

18  Q.  Sure.  Happy to do that.

19      (Document handed to the witness by Ms. Echtman.)

20      (Pause in the proceedings.)

21  **BY MS. ECHTMAN:**

22  Q.  Okay.  So this is the third stipulation regarding the class

23  definition.  If you would just turn to page 4 and look at --

24  there's a column there where it says exhibit number, name of

25  exhibit, number of calls.

1   A.   Yes.

2   Q.   And that's 31E.  Do you see where it says phone numbers or

3   line type designation is business or government at least once

4   in the LexisNexis data, and there's a number of telephone

5   numbers and phone calls in the next column, right?

6   A.   Yep.

7   Q.   And so --

8          **MS. ECHTMAN:**  Can we show this on the screen, Your

9   Honor, just that top column there?

10         **THE COURT:**  Okay.

11         **MS. ECHTMAN:**  Just the top one.  Can we zoom in?

12  Okay.

13         **THE COURT:**  You can't?  Okay.  Well, you can take the

14  screen down.  Maybe you can use the ELMO, if you want.  Just

15  fold it back.

16         **MS. ECHTMAN:**  All right.  I'll -- is this on?  I

17  cannot see it.  I'm sorry.

18  **BY MS. ECHTMAN:**

19  Q.   Okay.  So here we have a column and this is in the

20  stipulation between the Plaintiff and DISH.  And you remember

21  that in this stipulation we took out phone numbers and calls

22  that you had included in your report, right?

23  A.   Yes.

24  Q.   Okay.  And so here this category is phone numbers where the

25  line type designation is business or government, at least once

1  in the LexisNexis data, and they didn't come out and there
2  were -- it shows there were another 115 numbers and 302 calls.
3  A.  I see that.
4  Q.  But you're still sure that you took out all the business
5  numbers -- all the government numbers?
6  A.  We looked at the field and the column, and when analyzing
7  1.6 or -- I don't exactly recall the total number of calls
8  analyzed.  We made a few small omissions in a variety of
9  categories that did not affect my opinion.  We removed
10 government telephone numbers, but -- and business telephone
11 numbers, but it appears we missed 115.
12 Q.  And so let me just talk about -- you said 1.6 million call
13 records, but I think if we go back -- if we can put up your
14 funnel, you said you checked 23,625 numbers to see if they were
15 business, right?
16 A.  Correct.
17 Q.  And so -- and you got a big Excel back from LexisNexis,
18 right?
19 A.  That's correct.
20 Q.  And so when you -- when you review that, nobody is
21 reviewing that visually, are they?
22 A.  No, they're not.
23 Q.  Right.  Someone is going to write code.  You talked about
24 people writing code.
25 A.  That's correct.

1  Q.  And the code is supposed to check every field that you're

2  interested in, right?

3  A.  That's correct.

4  Q.  Okay.  And so then the code shouldn't really miss anything,

5  should it?

6  A.  Well, it depends.  Sometimes we receive data in Excel

7  spreadsheet.  So ideally we don't want the code to miss

8  anything, but, as I testified earlier -- yesterday, that my job

9  was not to produce a hundred percent accuracy and not to verify

10 every single number.  My job was to produce an opinion based on

11 solid methodology and show sort of a big-picture result.

12      You're correct we missed a few numbers, and sometimes the

13 code can miss a few numbers here and there, but those rounding

14 issues do not change my opinion in any way, shape or form.

15 Q.  Okay.  So let me just go back a minute to what we just

16 talked about.  You found originally 118 business identified

17 numbers in LexisNexis, right?

18 A.  That's correct.

19 Q.  Okay.  And your -- I think we know now you missed 115.

20 A.  Yes.

21 Q.  Okay.  So that's a hundred percent more.  Am I right?  Is

22 that a hundred percent more?

23 A.  Well, it depends how you present the number.  We removed

24 1,393 records altogether that were identified as business.  So

25 if you look at it from a big picture, it's about 10 percent.

1    If you look at it from a different perspective, it's about a

2    hundred percent.  It depends how you calculate your numbers.

3    Q.   Right.  So if you calculate the number based on how many

4    you found in the LexisNexis data, you found 118, and you didn't

5    find about close to the same number.  That's -- that's about a

6    hundred percent.

7    A.   If you look at it that way, sure.

8    Q.   Okay.  So now if we just go back for a second -- so after

9    you removed these 1,903 -- 1,393 business numbers, you were

10   left with 22,232 numbers, right?

11   A.   That's correct.

12   Q.   And those are all the numbers that you did not specifically

13   identify as business?

14   A.   That is correct.

15   Q.   And am I right that LexisNexis never guaranteed or

16   warranted to you that it could locate all business numbers for

17   you in the report it gave to you?

18   A.   As I stated earlier, we're producing a methodology based on

19   industry acceptable standards.  Those standards are never a

20   hundred percent.

21   Q.   So LexisNexis -- you don't have any document from

22   LexisNexis that says we can get you just about every business

23   number, do you?

24   A.   I'm sorry.  Your question is very ambiguous.  I don't

25   understand "just about."  Is it just about 50 percent, 1,600?

1  Could you rephrase?

2  Q.  Right.  Well, I think you're going on an assumption here

3  that if you didn't have affirmative evidence from LexisNexis

4  that it was a business number, you're saying then it's a

5  residential number, right?

6  A.  That's correct.

7  Q.  And the premise of that is you think LexisNexis can

8  identify just about every business number; is that right?

9  A.  I think that LexisNexis utilizes sources that identify the

10  majority of business numbers.  That's correct.

11  Q.  Oh, just the majority?

12  A.  Well, they work with the State Departments, various

13  databases where businesses have to be registered.  I think I

14  described those databases before.  The Secretary of State

15  websites, yellow pages, white pages, the directories where the

16  businesses are listed, I think that it is common sense.  And,

17  in addition, it is my experience and expertise over the years

18  that LexisNexis identifies just about all the businesses in

19  their data.

20  Q.  Do you have any document from LexisNexis that says that?

21  A.  We have a document, we have marketing material from

22  LexisNexis that might refer that they offer a product that

23  identifies telephone numbers as businesses.

24  Q.  And you said LexisNexis doesn't do that unless they have an

25  affirmative piece of evidence to let them do it; right?

1  A.  That's correct.

2  Q.  Okay.  And they don't say to you that they have an

3  affirmative piece of evidence for every single -- just about

4  all the business telephone numbers that are out there in the

5  United States; do they?

6  A.  Once again, I don't know what you mean by just about, but

7  based on my interpretation of your meaning of just about, I

8  think they do.

9  Q.  All right.  So, if we look at your funnel, I think you've

10  said that it's your opinion that all of the 20,450 numbers at

11  the bottom of your demonstrative are residential?

12  A.  It is my opinion that they are more likely or not

13  residential.

14  Q.  And that's based on the fact that LexisNexis didn't tell

15  you that they were business numbers?

16  A.  Or government, that's correct.

17  Q.  Okay.  And, am I right that, actually, you didn't get any

18  information back from LexisNexis for some of the numbers

19  included in that 20,000?

20  A.  That's correct.

21  Q.  Okay.  And so, those are more phone numbers that Plaintiff

22  agreed to take out of the case; right?

23  A.  That's correct.

24  Q.  Because you hadn't actually checked LexisNexis for those

25  phone numbers?

```
1   A.   In time for my report, no, I did not.

2   Q.   All right.  So you didn't -- they weren't included in the

3   report you got from LexisNexis?

4   A.   That's correct.

5   Q.   And that was more than 1,000 telephone numbers?

6   A.   That's correct.

7   Q.   All right.  So I'd like to turn to -- in your report --

8   you've given testimony in a lot of cases in federal court;

9   right?

10  A.   Correct.

11  Q.   And, in connection with that, you issue a report; right?

12  A.   Correct.

13  Q.   Okay.  And, am I right, the purpose of the report is to let

14  the other side know what opinions you're going to offer?

15  A.   Correct.

16  Q.   Right.  And so, that report is supposed to contain a

17  complete statement of all of the opinions that you're going to

18  give and the basis for those opinions; right?

19  A.   Correct.

20  Q.   Okay.  And you did that?  You've got a big report there;

21  right?

22  A.   That's correct.

23  Q.   Okay.  And, in your report, did you give a summary of what

24  you found in your analysis?  Do you recall whether in your

25  report you gave a summary?
```

1   A.   Yes.

2            THE COURT:   Excuse me.   Before you get into that,

3   would this be a good place for the morning break?

4            MS. ECHTMAN:   Sure.

5            THE COURT:   Or do you have a couple more questions

6   that would take us to a better stopping point?

7            MS. ECHTMAN:   I just have -- just a few more questions

8   on that.

9            THE COURT:   All right.   Go ahead.

10  BY MS. ECHTMAN:

11  Q.   Okay.   And so, in your summary, you generally try to say,

12  like, this is a summary of what my opinions are going to be;

13  right?

14  A.   That's correct.

15  Q.   Okay.   And so, you gave a summary here, right?   And I'll

16  direct you to page 10 of your report.   And, in fact, your

17  summary says -- and so, it's your opinion here that you've said

18  a few times that you've got an opinion to a reasonable degree

19  of certainty that all these 20,450 numbers are residential;

20  right?   That's what you've testified.

21  A.   Well, my opinion includes a little more information than

22  that, but --

23  Q.   Okay.

24  A.   -- that is included in my opinion.

25  Q.   That's your ultimate opinion right now on the stand?

1 A.   That's part of my opinion, yes.

2 Q.   Okay.  But your summary doesn't say that; does it?

3      (Pause in the proceedings.)

4 A.   Yes, it does.

5 Q.   Can you show me where it says that?  I'm looking on pages

6 10 to 11.  Show me in your summary where it says that you've

7 got an opinion to a reasonable degree of certainty that these

8 are residential numbers.

9 A.   Well, I state that they were not identified as businesses.

10 Q.   Okay.  Did you state anywhere in this summary that the fact

11 that you didn't affirmatively identify them as business leads

12 you to believe that they're residential?

13 A.   Well, it's throughout my report.  It is assumed.

14 Q.   It's assumed?

15 A.   Well, to me, it is clear that if they're not businesses,

16 that they're residential.

17 Q.   But does it say that in your report?

18           THE COURT:   Are you asking now about the whole entire

19 report or the summary?

20           MS. ECHTMAN:   We can take a break and she can check

21 her report.  This might be a good time for the break so she can

22 show us where it says that.

23           THE WITNESS:   Well, then, I'm not going to have a

24 break.

25           THE COURT:   Well, if you can answer the question, go

1  ahead.

2  **BY MS. ECHTMAN:**

3  Q.   And your report's thick, but it's not -- most of it's

4  charts, right, of -- of telephone numbers?

5  A.   Correct.

6  Q.   Right.  So not everything in your binder is your report.

7  The actual report is 16 pages of written words.

8       (Pause in the proceedings.)

9       **THE COURT:**  Okay.  Well, we'll go ahead and take the

10  break so the witness can do -- can look at the report while

11  we're on a recess.

12      So, ladies and gentlemen -- if I can ask the witness to

13  step down.  You can take your report with you if you need to.

14      **THE WITNESS:**  Okay.  Thank you.

15      (The witness left the stand.)

16      **THE COURT:**  So I can see all of the jurors.  Ladies

17  and gentlemen, I'll ask you to leave your notes in your chair.

18  And, just a reminder, you should not have any contact with the

19  lawyers, parties, or witnesses, so don't speak to any of the

20  witnesses should you see them in the hallways or in the

21  courtrooms during the proceedings.  And you do need to keep an

22  open mind about the testimony of all the witnesses until you

23  hear, you know, all of the evidence, as I think I mentioned to

24  you all earlier.

25      Again, don't have any independent investigation, and don't

1  communicate about the case with anyone, including with each

2  other, about the case or about any of the witnesses.  And

3  you'll remember all my instructions that I usually give you.  I

4  just try to emphasize different parts at different times to be

5  sure everybody remembers.

6      Come back in 15 minutes.  That will be 11:20, all right?

7  The jurors are excused.  If everyone else will remain seated.

8      (The jury left the courtroom.)

9          **THE COURT:**  Okay.  Anything we need to take up before

10 we take our break?  I would propose to deal with the question

11 about Ms. Taber at the lunch recess.

12         **MR. GLASSER:**  Okay.

13         **MS. ECHTMAN:**  Your Honor, I just might -- I want to

14 preview that the opinions that the witness gave yesterday and

15 today are actually not set forth in her written report.  She

16 just said it's assumed.  Well, that's not how an expert

17 discloses their opinions, that you need to assume her opinion

18 is that if it's not a business to a reasonable degree of

19 certainty, it's got to be a residence.  It doesn't say that in

20 her report.

21         **THE COURT:**  You can talk to the jury about that.  I

22 don't -- I mean --

23         **MS. ECHTMAN:**  Well, I think it's a basis to strike the

24 opinion.

25         **THE COURT:**  Well, we'll let her answer the questions.

1  I don't -- you know, I don't know what -- I don't have the
2  report in front of me, so if somebody wants to hand it up, I'll
3  take a look at it over the break.  I don't believe the
4  Plaintiff offered it in evidence.  Did you?
5          **MR. BARRETT:**  We did not, Your Honor.
6          **THE COURT:**  Okay.
7          **MS. ECHTMAN:**  Reports don't generally come into
8  evidence, but we're happy to give Your Honor a copy of it.
9          **MR. BARRETT:**  If you would like, also, the four-hour
10 deposition that Ms. Verkhovskaya gave in response to DISH's
11 attorney's questioning, we can provide that as well.
12         **THE COURT:**  I'll just wait until somebody moves to
13 strike, and you can hand up whatever you think I need at that
14 point.
15    All right.  We'll take a 15-minute recess.
16    (A morning recess was taken from 11:07 a.m. until
17 11:22 a.m.)
18         **THE COURT:**  Okay.  I think we're still waiting on one
19 juror.  Just for planning purposes, what's your expectation on
20 how long your cross will continue?  I'm not trying to put any
21 pressure.  I'm just asking.
22         **MS. ECHTMAN:**  I expect I'll be done by lunch at the
23 very latest.  I hope.
24         **THE COURT:**  All right.
25         **MR. GLASSER:**  And I believe we'll be resting, Your

1  Honor.  We will have one -- I can do it right now.  I want
2  to -- for the evidence for willing and knowing is outside the
3  presence of the jury.  We're just going to ask the Court to
4  take judicial notice of the Myerscough summary judgment
5  opinion.  And I have a certified copy of it for the Court
6  record.  So there's no additional witnesses for that and -- and
7  we'll probably be resting after Ms. Verkhovskaya.

8          **THE COURT:**  All right.

9          **MR. BICKS:**  Just for the record, Your Honor, this is
10 the first I've heard of the Judge Myerscough's opinion, but
11 that's not going to be evidence in this case.

12         **MR. GLASSER:**  No, that's willful and knowing, Your
13 Honor.  The stuff you asked me to talk about if you thought we
14 had separate willful and knowing, you asked me to make you
15 aware of it outside the presence of the jury.

16         **MR. BICKS:**  My point is, Your Honor, whether it's a
17 jury trial or a bench trial -- if it were a bench trial, it
18 would have to be evidence presented to the Court, not an
19 opinion from another court.

20         **THE COURT:**  Okay.  Well, I'll let them put it in
21 subject to your objection.  And if I have to deal with that
22 down the road, I'll deal with it down the road.  I don't know
23 that I need to hear detailed argument from you on that.

24     Okay.  Are you anticipating -- well, I know she hasn't
25 finished her cross.  Are you anticipating significant redirect?

1    **MR. BARRETT:**  Very briefly, Your Honor, just a couple

2  of minutes.

3         **THE COURT:**  So you wanted to mark this opinion as

4  Plaintiff's Exhibit --

5         **MR. GLASSER:**  Whatever we're up to.  Let's go to 2050.

6         **THE COURT:**  2050?

7         **MR. GLASSER:**  Yes, ma'am.

8         **MR. BICKS:**  And, Your Honor, while you're looking at

9  that, I was told by our team that I should have moved --

10 officially moved in Defendant's Exhibit 16 and --

11        **THE COURT:**  Which one is that?

12        **MR. GLASSER:**  I don't think we have an objection to

13 that.

14        **THE COURT:**  All right.  What is it?

15        **MR. BICKS:**  I'll check, Your Honor.

16        **MR. GLASSER:**  No objection.

17        **THE COURT:**  All right.  Whatever it is, there's no

18 objection, so it's admitted.

19        **MR. BICKS:**  All right.

20        **THE COURT:**  Okay.  I will make Plaintiff's 2050 part

21 of the record.

22     It is not an exhibit that would go to the jury,

23 Ms. Sanders.

24     It is for the Court's consideration only, and that is

25 subject to the Defendant's objection, which I note for the

record, and I'll, you know -- should it become necessary, I'll

hear from you on that after a verdict on liability, if you

remind me.

        **MR. GLASSER:**  Yes.

        **MR. BICKS:**  And, Your Honor, can I also just note for

the record the issue with Juror No. 6 that Your Honor raised?

I have read over that transcript and am concerned about it in

the sense that the transcript at 182 indicates that there was a

conversation between Juror No. 6 and the witness.  And what

concerned me about that, frankly, Your Honor, was it was

probably 15 seconds after you expressly said don't talk to a

witness.

        **THE COURT:**  Well, I mean, this happened yesterday.  I

didn't -- I don't remember the witness saying anything.  Now,

possibly that happened, but what I remember the juror saying to

the witness, "Good afternoon, you're a smart lady," some words

to that effect.  She was the last juror going out.  Obviously,

she shouldn't have done that.

        **MR. BICKS:**  Right.

        **THE COURT:**  So that's why I addressed it this morning.

        **MR. BICKS:**  Right.

        **THE COURT:**  I looked around.  Everybody -- maybe you

didn't hear it, Mr. Bicks, but clearly everybody heard it, or

most people heard it, from what I could see on people's faces.

        **MR. BICKS:**  Actually, those of us sitting over here

 1  didn't.  We can't -- it's hard to hear from back here and we

 2  didn't know about it until I saw it in the transcript last

 3  night.

 4       **THE COURT:**  Well, I looked over there and that was not

 5  my impression from people's faces, but -- well, I mean, I've

 6  done what I've done about it.  If you want me to do something

 7  else, you're going to have to move for it.  We'll take that up

 8  and anything else at lunch.

 9     I'm sure we must have all the jurors by now.  I don't want

10  to keep them waiting.  The clerk can check.  If we have them

11  all, you can bring them in.

12       **THE CLERK:**  Yes, they're all here.

13       **THE COURT:**  All right.  They can come on in.

14     (The jury entered the courtroom.)

15       **THE COURT:**  And the witness can come back up to the

16  witness stand.

17     (The witness returned to the witness stand.)

18       **THE COURT:**  All right.  I believe there was a question

19  pending when we took the break and the witness was examining

20  her report.  Did you want to repeat your question, just to get

21  us back on track, Ms. Echtman?

22  **BY MS. ECHTMAN:**

23  Q.  Sure.  Before we broke, the question was:  Can you show us

24  anywhere in the 16 pages of the text of your report that you

25  say that it's your opinion, to a reasonable degree of

1  certainty, that all of these 20,450 telephone numbers are

2  residential numbers?

3  A.   Those are not the verbiage that I used, but it is my

4  opinion then and it is my opinion now, since it cannot be

5  anything else, that's what it states, that's what it means.

6  Q.   Does it say anywhere in your report that it's not

7  identified as business, it cannot be anything but residential?

8  A.   Those words are not part of my opinion, but, as I stated

9  earlier and am stating it now, it is my opinion that's what it

10  means.

11  Q.   Could we bring up page 10 to 11 of the report so we can

12  just look at what you actually said?

13  A.   Sure.

14  Q.   Page 10, bottom of page 10 to the middle -- let's start at

15  the bottom of page 10.  You say:  "In summary, my analysis of

16  the source data reveals that 20,450 unique," and then if we go

17  to page 11, the top -- go further down -- "numbers were on the

18  NDNCR as of April 1, 2010, at least 30 days prior to any

19  connected calls."  That's part of your opinion, right?

20  A.   Correct.

21  Q.   And that's express, right?  It says "received more than one

22  connected call in any 12-month period."  Do you see that?

23  A.   Yes, I do.

24  Q.   Okay.  And it says "were not identified as business

25  telephone numbers."

1  A.  Correct.

2  Q.  "And did not receive a connected call dispositioned to a

3  DISH customer, based on the information from the source data."

4  Right?

5  A.  Correct.

6  Q.  And then you give a chart and your chart shows, you

7  know -- part of your file is shown in this chart.

8  A.  Correct.

9  Q.  And you didn't say anywhere in here that you have an

10 affirmative opinion that these numbers, to a reasonable degree

11 of certainty, are residential.

12 A.  Well, the way I read it, I state that they're

13 nonbusinesses; and in my expert opinion, it cannot be anything

14 else but residential.

15 Q.  Is that -- your report doesn't say that anywhere in your

16 expert opinion; that if it's not business, it has to be

17 residential.

18 A.  As I stated earlier, I did not use those words.

19 Q.  Did you use anything similar to those words to state that

20 general idea?

21 A.  Yes, they are nonbusinesses.

22 Q.  So just by saying they are nonbusinesses you were

23 meaning --

24 A.  It cannot be anything else.  So I use a negative to show a

25 positive.  It is an approach that I used in my report.

1  Q.  All right.  So you'll agree with me that you just used the

2  negative?

3  A.  Correct.

4  Q.  All right.  And you don't say anywhere in your report that

5  the LexisNexis data that you used can identify -- is complete

6  in its ability to identify business numbers.

7  A.  Well, I state in my report that LexisNexis -- I don't --

8  let me read it to you, what I say about LexisNexis.

9      (Pause in the proceedings.)

10  A.  "In cases brought under the Telephone Consumer Protection

11  Act, TCPA" --

12  Q.  I'm sorry.  Can you tell me what page you're on?

13  A.  Oh, yes, sure.  It's page number 3 of my report.  "47

14  U.S.C. Section 227, A.B. Data routinely analyzes call records

15  to identify class members.  In analyzing the call records, A.B.

16  Data regularly partners with reputable vendors, such as

17  LexisNexis, Experian, Nexxa Group, Nexxa and others,

18  collectively data processors.  A.B. Data has longstanding

19  relationship and prior experience with the data processors.

20  The data processors are able to provide information where

21  access to numerous records and data sources.  Nexxa provides

22  information from the National Do Not Call Registry, including

23  data registry.  Experian provides skip tracing services to

24  identify the most recent address of an individual based upon a

25  combination of name, address, history and/or telephone number.

1  LexisNexis provides information from public and proprietary

2  records, including information regarding whether a particular

3  phone number was associated with a business or residence and

4  telephone number subscriber information."

5  Q.  Okay.  That's what you said about LexisNexis?

6  A.  That's correct.

7  Q.  All right.  And so we talked a little bit -- you talked a

8  little bit about the reasons why you think LexisNexis can

9  identify a lot of business numbers, right?

10  A.  That's correct.

11  Q.  Okay.  And you said one reason is because businesses have

12  to register with the Secretary of State and they have to

13  provide a telephone number.

14  A.  That's correct.

15  Q.  And how many telephone numbers does a business have to

16  provide to the Secretary of State?

17  A.  At least one.

18  Q.  Right.  They just have to provide one number where they can

19  be contacted, right?

20  A.  That's correct.

21  Q.  And will you agree with me that a lot of businesses have

22  many more numbers than just one?

23  A.  That's correct.

24  Q.  If you take a big company like we've talked about, AT&T,

25  AT&T has -- within that company has a lot of phone numbers,

1  right?

2  A.  That's correct.

3  Q.  But only one would be with the Secretary of State?

4  A.  That's correct.

5  Q.  And you said the Secretary of State information is

6  available online; right?

7  A.  I don't recall stating that.  I stated that LexisNexis

8  utilizes the Secretary of State information as one of many of

9  their sources.

10  Q.  And you said that they also use, I think, is it the white

11  pages, like the telephone directories?

12  A.  They have literally tens of thousands of sources, and those

13  directories are included in those sources.

14  Q.  You don't know what all of their sources are?

15  A.  It's a proprietary database, so there is no public listing

16  of their sources.

17  Q.  Okay.  And you haven't done any testing on the reliability

18  of all of their sources?

19  A.  Since I -- nobody knows what they are, they cannot be

20  tested.

21  Q.  Okay.  So, for any particular data point in LexisNexis, you

22  don't know what their particular source is?

23  A.  That's correct.

24  Q.  And so, you can't say that it comes necessarily from a

25  reliable source?

1  A.  Yes, I can.

2  Q.  Even though you don't know what it is?

3  A.  That's correct.

4  Q.  And you also mentioned business directories; right?

5  A.  That's correct.

6  Q.  And you said that companies will list their phone numbers

7  in business directories; right?

8  A.  Correct.

9  Q.  And -- but you wouldn't expect a company to list all of

10  their telephone numbers in a business directory; would you?

11  A.  Well, that's why many sources are utilized.  And that's why

12  my opinion states that it's more likely than not in the vast

13  majority.

14  Q.  You think the vast majority of business numbers are in

15  business directories?

16  A.  In various sources are identified as businesses; that's

17  correct.

18  Q.  Okay.  Well, aren't there some numbers that businesses may

19  have that they don't want to be available to the public, like

20  some phone numbers they don't want anyone to be able to call?

21  A.  Look, there are one-offs, and you can have all kinds of odd

22  case scenarios, but those rounding issues don't change my

23  opinion.

24  Q.  So there might be major executives who have very high

25  profile jobs, and they might not want the general public to get

1  their direct dial phone number at work to be able to call them?

2  A.  How would SSN get that phone number?

3  Q.  Well, how did SSN get any of its phone numbers; do you

4  know?

5  A.  Based on my review of the material in this case, they were

6  primary [sic] calling residential telephone numbers.

7  Q.  Where did they get the telephone numbers to call?

8  A.  That is outside of the scope of my opinion.

9  Q.  So, your opinion is that they were primarily calling

10  residential telephone numbers, but you don't know how they

11  obtained those numbers?

12  A.  I do not know how they obtained those numbers.

13  Q.  And you don't know whether they may have bought those

14  numbers from some type of lead generation company?

15  A.  It's a possibility, but I just stated that I don't know

16  that.

17  Q.  And you don't know, if they bought the numbers, where the

18  company who sold them the numbers might have gotten them?

19        **THE COURT:**  Okay.  She said she didn't know.

20        **MS. ECHTMAN:**  Okay.

21  **BY MS. ECHTMAN:**

22  Q.  And you know they wanted to call -- you think they wanted

23  to call residences, but their own call records showed that at

24  least 1,275 times, they reached businesses.

25  A.  I already stated that that's correct.

```
 1  Q.  So you think it's a one-off if LexisNexis couldn't have a
 2  number -- a business number?
 3          THE COURT:  I'm sorry.  What?
 4  BY MS. ECHTMAN:
 5  Q.  You think it's a one-off if LexisNexis couldn't identify a
 6  business number?
 7  A.  As I stated, yes, those rounding issues do not change my
 8  opinion.
 9  Q.  Well, would you agree with me that if LexisNexis thought
10  that any number that it didn't identify as either residential
11  or government must be residential, wouldn't they, then, have
12  checked that residential field?
13          THE COURT:  Sustained as to what somebody else would
14  have done.
15          THE WITNESS:  Um --
16          THE COURT:  You don't need to answer.
17          THE WITNESS:  Thank you.
18          MS. ECHTMAN:  Well --
19          THE COURT:  I mean, if -- you may be able to rephrase
20  that, but --
21          MS. ECHTMAN:  Okay.
22  BY MS. ECHTMAN:
23  Q.  Wouldn't you think if the people over at LexisNexis who
24  collect this data know how they collect it, if they consider --
25  if they were to have considered every number that was not a
```

1  business or not a government to be a residence, shouldn't you
2  expect that the residence field would be checked?
3  A.   That would be an absolutely inappropriate step in the field
4  of data analysis, and I don't think any reputable data vendor
5  would ever consider doing that.
6  Q.   But you've effectively done that.  You're checking that box
7  for this case.
8  A.   I am not a data vendor provider.  I don't compile data.  I
9  analyze data.  So, I work in a very different field than
10  LexisNexis.  LexisNexis, as I testified earlier, can only mark
11  a telephone number belonging to a residence.  It's their
12  standard.  I had numerous conversations about it with
13  LexisNexis.  It is their standard, and -- I'm sorry.  I repeat
14  it three times already.  I'm going to repeat it one more time.

15       It is the standard that they have to have a source and a
16  date of that source stating that the number is residential in
17  order to market as such.  Everything else, if it's not business
18  from the business directory, if it's not government from the
19  government directory is left blank.  It is their standard.

20       My job is to look at that data as someone who's worked with
21  that data for 20 years and analyze it and provide an opinion.
22  And that's what I did in this case.
23  Q.   So, as part of A.B. Data's work, you got also a report from
24  another source in connection with the notice function; right?
25  Did you get a report from something called Microtrace?

1  A.   No.

2  Q.   No, you never saw a report from Microtrace?

3  A.   No.

4  Q.   Okay.  You're not aware of anyone who worked for you at

5  A.B. Data getting a report from Microtrace?

6  A.   No.

7  Q.   And when -- oh, I'm sorry.  MicroBilt.

8  A.   MicroBilt, yes.

9  Q.   Okay.  I'm sorry.  I used the wrong name.

10 A.   That's okay.  I was confused for a second.

11 Q.   I apologize for that.  So, A.B. Data got a report at some

12 point from MicroBilt?

13        **MR. BARRETT:**  Your Honor, objection.  May we approach?

14        **THE COURT:**  All right.

15     (Bench conference.)

16        **MR. BARRETT:**  The MicroBilt data was used in

17 connection with sending class notice, not in connection with

18 her expert report.  It was used to aid in locating class

19 members, names, and addresses.  It's not relevant.

20        **MS. ECHTMAN:**  But it identified businesses associated

21 with phone numbers that LexisNexis did not identify as

22 businesses and that she did not know about.  She said about 25

23 times LexisNexis can find everything.  Microtrace had

24 businesses associated -- in her own company's report that they

25 obtained had businesses associated with more phone numbers, and

they agreed to take them out of the case.  She keeps saying
LexisNexis has everything.  This is improper impeachment.  She
knows and she's seen other sources that identify phone numbers.

**THE COURT:**  Okay.  Well, you can ask her why she used
other sources and why she didn't use other sources.  There's no
problem with that.

**MS. ECHTMAN:**  Well, can I ask her whether, in this
case, the report that her company obtained showed more
businesses that she didn't pick up from LexisNexis?

**MR. BARRETT:**  And that is the rabbit hole problem that
leads us down towards names and addresses.

**MS. ECHTMAN:**  I'm not getting into names and
addresses.

**THE COURT:**  Okay.  Well, you can ask her why she
didn't use other reports and that she has, you know, and we'll
just see where we go from there.  I don't know what her answers
are going to be.

**MS. ECHTMAN:**  But can I impeach her on the fact that
she had a report --

**THE COURT:**  Well, first, you have to -- you have to
start at the beginning, so I don't know.  I mean, you just have
to get started on it.  You know, I'm indicating it's a subject
for impeachment, but --

**MS. ECHTMAN:**  Okay.

**THE COURT:**  -- you know, you need to start at the

1  beginning, and not the confusing part.

2          **MS. ECHTMAN:**  I'm sorry.

3          **THE COURT:**  Okay?  All right.

4          **MR. BARRETT:**  And be sure to use MicroBilt.

5          **MS. ECHTMAN:**  I'm sorry.

6          **MR. BARRETT:**  That's okay.

7      (Conclusion of the bench conference.)

8          **THE COURT:**  Okay.  Go ahead.

9  **BY MS. ECHTMAN:**

10  Q.  Okay.  So Ms. Verkhovskaya, at some point, in connection

11  with other work in this case, A.B. Data obtained a report from

12  a company known as MicroBilt; right?

13  A.  That's correct.

14  Q.  And it ran some of the telephone numbers in this case

15  against that report?

16  A.  That's correct.

17  Q.  And, are you aware that MicroBilt showed business names for

18  some of those phone numbers that hadn't been shown in your

19  LexisNexis report?

20  A.  Yes, I am.

21  Q.  And that's another category where Plaintiff removed numbers

22  from the case?

23  A.  That's correct.

24  Q.  Okay.  So for those, MicroBilt showed that they were

25  businesses, and LexisNexis had missed it; right?

1   A.   That's correct.

2   Q.   All right.  I'd like to show the witness DX25.

3        (Document handed to the witness by Ms. Echtman.)

4   **BY MS. ECHTMAN:**

5   Q.   Okay.  We've talked a bunch about a company called

6   PossibleNOW.  And I believe that everyone heard that

7   Mr. Glasser said we're going to talk about PossibleNOW a lot.

8        Well, I'm showing you something that's a PossibleNOW --

9   PossibleNOW is a company in this industry, right?  We talked

10  about the fact that it -- it helps manage the Registry for the

11  federal government; right?

12  A.   That's correct.

13  Q.   Okay.  And it also helps -- works on scrubbing of lists,

14  right?  It scrubs lists for companies against the National Do

15  Not Call Registry; right?

16  A.   Correct.

17  Q.   Okay.  And PossibleNOW does a lot of things in this whole

18  TCPA field; right?

19  A.   That is correct.

20  Q.   Okay.  So I'd like you to look at this report from

21  PossibleNOW.

22            **MS. ECHTMAN:**  And if Trudy could bring the title up,

23  the first page up of DX25.

24  **BY MS. ECHTMAN:**

25  Q.   If you look at this, do you see that this is an analysis of

1  the phone numbers on the National Do Not Call Registry that

2  PossibleNOW prepared for the Federal Trade Commission?

3  A.  In 2009.

4  Q.  In 2009.  So, this report's actually dated March 31, 2009;

5  right?

6  A.  That's correct.

7  Q.  Okay.  So that's about a year before the class period in

8  this case?

9         **THE COURT:**  Are you asking?

10         **MS. ECHTMAN:**  I'm asking.

11         **THE COURT:**  Oh, okay.

12  **BY MS. ECHTMAN:**

13  Q.  Do you agree that's about a year before the class period in

14  this case that starts in May 2010?

15  A.  That's correct.

16  Q.  Okay.  And you see from this, the Federal Trade Commission

17  asked PossibleNOW to give it an analysis of the different types

18  of phone numbers that you might find on the National Do Not

19  Call Registry?

20  A.  I don't see that --

21  Q.  Okay.

22  A.  -- but if that's what you say, that's what it is.

23  Q.  Okay.  Well, turn to page 2, where it says background.

24  Where it says:  The National Do Not Call Registry has recently

25  grown to include more than 175 million phone numbers.  The FTC

1  is interested in understanding more about the makeup of the
2  Registry in terms of the types of phone numbers that have been
3  entered on the Registry.  You see that?
4  A.  Yes, I do.
5        **MS. ECHTMAN:**  Okay.  Your Honor, I move to admit this
6  document into evidence under Federal Rule of Evidence
7  803(8)(A)(iii) as a record of a public office setting out
8  factual findings from a legally authorized investigation.
9        **MR. BARRETT:**  Objection, Your Honor, under 402, 403 as
10 well.
11       **THE COURT:**  Well, maybe we could take that -- can you
12 all step up to the corner for just a second?
13     (The following bench conference was recorded.)
14       **MS. ECHTMAN:**  Your Honor --
15       **THE COURT:**  Just a second.  What did you say, 803
16 what?
17       **MS. ECHTMAN:**  It's -- I'll show you.  Here it is.
18 803, public office -- public records.  A record or statement of
19 a public office --
20       **THE COURT:**  Okay.  I don't -- 803(8)?
21       **MS. ECHTMAN:**  (8).
22       **THE COURT:**  All right.
23     (Pause in the proceedings.)
24       **THE COURT:**  Okay.  Has this witness ever seen this
25 document before?

1   **MS. ECHTMAN:** I don't know. It's been produced in
2 this case.

3   **MR. BARRETT:** No, Your Honor.

4   **MS. ECHTMAN:** And it's actually along the lines
5 materials that form (unintelligible).

6   **COURT REPORTER:** Judge, I can't hear Ms. Echtman.

7   **THE COURT:** Okay. Well, first, before we -- okay. I
8 don't know how to say it any other way. You have to be very
9 close to this mike or the court reporter cannot pick your voice
10 up, okay? So you -- I can hear you, but she can't. So it
11 won't be in the record if she can't hear you. Okay?

12   **MS. ECHTMAN:** Okay.

13   **THE COURT:** All right. As to whether you can ask her
14 questions about it, if she's never seen it before, don't you
15 need to connect that first?

16   **MS. ECHTMAN:** Well, it's also -- falls under learned
17 treatise because it's a study by another company that's an
18 expert in the industry. And they actually endeavored to find
19 out what types of numbers -- different numbers were, and they
20 couldn't figure it out.

21   **THE COURT:** All right. Well, let me put aside the
22 question of whether it's admissible, but I'm going to let you
23 ask her questions about it to at least to a certain extent,
24 okay?

25   **MS. ECHTMAN:** Okay.

1      **THE COURT:**  And we'll take that up at the lunch break

2   or this afternoon.

3      (Conclusion of the bench conference.)

4      **THE COURT:**  All right.  You can go ahead and ask her

5   some questions about the exhibit.

6   **BY MS. ECHTMAN:**

7   Q.  Okay.  Ms. Verkhovskaya, have you seen this document

8   before?

9   A.  No.

10  Q.  So I'll represent to you it's a document that DISH produced

11  in this case.  So Plaintiff's counsel didn't give it to you?

12  A.  No.

13  Q.  But you see that it's a document where PossibleNOW went

14  about trying to identify -- figure out whether it could

15  identify the different types of numbers for the FTC that are

16  actually on the Do Not Call Registry; right?

17  A.  I have not had the time to read, review, and form any

18  opinions about this document, so I don't know what it says.

19  Q.  Okay.  But PossibleNOW is another company in the field that

20  does this type of work; right?

21  A.  Correct.

22  Q.  And, in fact, they do it for the federal government; right?

23  A.  Federal government is one of their vendors, and a lot of

24  private companies as well.

25  Q.  And so, in this particular document, PossibleNOW was trying

1  to see for the federal government if they could figure out what

2  category different types of numbers fall into.

3          **THE COURT:**  Okay.  Counsel, you need to ask questions,

4  and you all -- I fussed with Mr. Glasser about this, so, you

5  know, the lawyers need to ask questions.  The questions aren't

6  evidence.  It's the answer of the witness that is the evidence.

7  All right.  So --

8  **BY MS. ECHTMAN:**

9  Q.  Okay.  So I'm going to show you the document.  Let's look

10 up the background of what PossibleNOW is doing here, okay?  So

11 it says here in the background section on page 2 that the FTC

12 is interested in understanding more about the makeup of the

13 Registry in terms of the types of phone numbers that have been

14 entered on the Registry.  Do you see that?

15 A.  That's what it says.

16 Q.  So -- and it says that PossibleNOW maintains a current copy

17 of the Registry, and it also maintains a number of databases

18 that can be used to analyze the makeup of the Registry.  Do you

19 see that?

20 A.  Yes, I do.

21         **MR. BARRETT:**  Your Honor, we object to the questioning

22 regarding a document the witness has not previously seen.

23         **THE COURT:**  Okay.  Well, as to what the document

24 actually says, that's sustained.

25 **BY MS. ECHTMAN:**

1  Q.  But you can see now that this is an analysis done by

2  another company as to whether or not they could identify

3  certain numbers as residential, government, or business?  Do

4  you see that?

5  A.  No, I don't.

6  Q.  You don't see that?  Can you look further into the

7  document?

8        **MR. BARRETT:**  Your Honor, we also object under Rule

9  602 based on the witness's lack of personal knowledge.

10       **THE COURT:**  Okay.  Sustained as to what the document

11 says.  So, I mean, you can ask --

12 **BY MS. ECHTMAN:**

13 Q.  Well, in fact, Ms. Verkhovskaya, PossibleNOW -- are you

14 aware that there are certain numbers called direct inward dial

15 numbers?

16 A.  Are you referring to 2009?  Today?  What's the time frame?

17 Q.  Okay.  I'm just asking you, at any time, are you aware of

18 something called a direct inward dial number?

19 A.  Yes.

20 Q.  And that's a type of business number; right?

21 A.  Correct.

22 Q.  And direct -- you agree with me that direct inward dial

23 numbers are not listed in the white pages; right?

24 A.  I would disagree with that as a general statement.

25      To give you an example, A.B. Data has many of those

telephone numbers, and direct inward dial number at A.B. Data
was assigned to the main number for our sales department. It
was listed on our website and was listed in white pages.

Can I make a general statement that all businesses don't
list it? No, I can't, but it is outside of the scope of my
opinion.

Q. Well, some businesses may have, like AT&T, very, very many
direct inward dial numbers, right?

A. Possibly.

Q. And they won't necessarily list all of those numbers in a
business directory or the white pages, will they?

A. I wouldn't know what they do.

Q. You also said that there are -- you thought there were
three different types of numbers. You said that they're either
residential, business or government, right?

A. Correct.

Q. And are there also numbers that are just disconnected and
invalid?

A. At the point of my report where I describe three types of
telephone numbers that help me form my opinion, all of the
disconnected telephone numbers from Five9 source data were
removed.

             **THE COURT:** You can take the document down.

**BY MS. ECHTMAN:**

Q. You're saying that all of the disconnected numbers were

1  removed?

2  A.  That's correct.

3  Q.  Okay.  At what step in your analysis did you remove those

4  numbers?

5  A.  The first.  If you look at the funnel, the first step was

6  removal of all of the unconnected phone numbers.  So if the

7  phone number is disconnected, it means there is no one picking

8  up the phone and connecting it.

9  Q.  But if it's an inactive phone number that's been

10  disconnected, you can get a recording that says this phone

11  number is no longer in service, can't you?

12  A.  Yes, you can.

13  Q.  And then that would -- that would show it's connected,

14  wouldn't it?

15  A.  Well, if the phone number is disconnected by the phone

16  company, that would not show as a connected.  If that phone

17  number is part of a business, that will probably show up on a

18  Five9 record as abandoned because the call would drop, and

19  those were removed as well, even though the duration was a few

20  seconds.

21  Q.  So you talked about you looked at the duration column to

22  determine whether a call is connected, right?

23  A.  That's correct.

24  Q.  And so if you reached -- if you called the number and got a

25  recording that the phone number is no longer in service, there

1  would be time in the duration call, right?

2  A.  It's a possibility.

3  Q.  And you don't know what "abandoned" means in the Five9

4  records, do you?

5  A.  That's why we removed them.

6  Q.  And you don't know that if a call center representative

7  heard a message saying this phone number is no longer in

8  service that they would mark "abandoned" in the disposition

9  field.

10  A.  I do not have that knowledge.

11  Q.  So you don't know that you actually removed any call that

12  connected to a message that says this number is no longer in

13  service.

14  A.  I do not.

15  Q.  And do you know how many inactive telephone numbers there

16  are in the United States right now?

17  A.  I do not.

18  Q.  And so you did not include that as one of your categories.

19  A.  The date of 2017 is not relevant to my opinion.

20  Q.  Well, you didn't check whether a number might have been

21  inactive in 2010 to 2011, did you?

22  A.  No, I did not.

23  Q.  And it was never part of your project in this case,

24  Ms. Verkhovskaya, to look for affirmative evidence that a

25  telephone number was residential at the time of the call,

1  right?

2  A.   Can you please describe "affirmative evidence"?

3  Q.   Well, you said, for example, LexisNexis doesn't mark

4  something as residential unless they have a piece of evidence,

5  right?

6  A.   That's correct.

7  Q.   And so you did not ever look for similar pieces of evidence

8  that a phone number was residential at the time of the call.

9  A.   As I stated, I analyzed the entire data set to create a

10  methodology and did not engage in claims process where the

11  person who has the phone number actually sends me back a piece

12  of a claim form saying that they have that phone number.

13  Q.   Let's look back at the stipulation regarding the call

14  categories that Mr. Barrett showed you.  I think that -- has

15  that been marked as PX278?  Do you have that there?

16  A.   Yes, I do.

17  Q.   Now, let's go to paragraph 3.  Do you see that?

18  A.   Which page, please?

19  Q.   It's the first page, paragraph number 3.

20  A.   I'm sorry.  I don't have paragraph 3 on the first page.

21  Q.   Amended joint stipulation regarding call category.  Are you

22  on the other stipulation?

23  A.   Oh, yes, I am.

24  Q.   Okay.  We'll hand that up to you.

25       (Document handed to the witness by Ms. Echtman.)

1    **THE WITNESS:**  Thank you.

2  **BY MS. ECHTMAN:**

3  Q.  Okay.  So for paragraph 3, this is the one where it says

4  telephone number -- oh, I'm sorry.  I'd like to go to

5  paragraph 2.  Okay.  Let's bring it up, please.

6    Paragraph 2.  So this one is telephone numbers where

7  LexisNexis identifies them as residential before May 1, 2010,

8  or after August 1, 2011, right?  And it says that they're

9  reflected on Exhibit 31A and there are 5,118 telephone numbers

10  and 14,519 calls.  Do you see that?

11  A.  Yes.

12  Q.  So I believe you said that you looked at the residential

13  column as part of your work in this case.

14  A.  Yes.

15  Q.  Okay.  And if -- if it was residential before May 2010, you

16  didn't exclude it because you thought it probably didn't

17  change, right?

18  A.  That's correct.

19  Q.  Okay.  But then there are also some that were only

20  residential after August 1, 2011, in the LexisNexis report,

21  right?

22  A.  That's correct.

23  Q.  Okay.  And you didn't exclude those either.

24  A.  That's correct.

25  Q.  Okay.  But for those LexisNexis didn't have any data point

1  at any earlier time to show that it was a residential number.

2  A.   Neither did they have any data point to show that they're

3  businesses.   Therefore, I had no reason to exclude them in my

4  original opinion.

5  Q.   Okay.  And your testimony here for the jury is that in

6  connection with your original opinion that you gave in

7  January 2015 you considered this residential column, right?

8  A.   Correct.

9  Q.   And you also considered the date ranges that you got in the

10  LexisNexis data.

11  A.   Yes, I did.

12  Q.   Okay.  So I'd like to show you, Ms. Verkhovskaya, what you

13  said about that at your deposition.

14          **MS. ECHTMAN:**  If we could play clip VT512.

15          **THE COURT:**  Okay.  I don't think I can hear.  Is it

16  possible to turn that up?

17      (Portion of deposition played, not reported by reporter.)

18  **BY MS. ECHTMAN:**

19  Q.   Do you see at your deposition you said you didn't analyze

20  that column for this case?

21  A.   I believe I was referring to last seen, first seen date.

22  Or can you show me which column I was referring to?

23  Q.   Well, it's one called listing type --

24          **THE COURT:**  Okay.  You need to show her the

25  deposition.  I don't --

1     **MS. ECHTMAN:** Can we play --

2          **THE COURT:** I couldn't really follow what was being

3     said in the video. I'm sorry. If you're going to ask her

4     about her testimony and she's looking at a document in her

5     testimony, she's asking for the document.

6          **MS. ECHTMAN:** Okay. Why don't we pull up the

7     document. I think we've got the LexisNexis data and we can

8     pull that up on the screen. It's TX what -- DX38 in native

9     form. Or even in PDF form. Okay. So can we scroll over?

10    **BY MS. ECHTMAN:**

11    Q. There's a lot of different columns here. Do you see that?

12         **MS. ECHTMAN:** Can we scroll over? Okay. Scroll over

13    again.

14    Q. Okay. Here you see there is a column that says listing

15    type B-U-S, listing type R-E-S and listing type G-O-V.

16         **MS. ECHTMAN:** Can we play that testimony back again on

17    clip VT512?

18      (Portion of deposition played, not reported by reporter.)

19    **BY MS. ECHTMAN:**

20    Q. Do you understand what column we're talking about now?

21    A. Yes, I do.

22    Q. And we've talked about that column for a while, right?

23    A. That's correct.

24    Q. And so when you were talking about the output that you got

25    from LexisNexis and you talked about whether LexisNexis

 1  identified something as residential, you were talking about

 2  that column, right?

 3  A.  That's correct.

 4  Q.  But you said at your deposition you didn't analyze it for

 5  this case.

 6  A.  I did not.  I said I was not sure, and it looked like I had

 7  a difficult time reading it.  But it is my testimony today and

 8  it is my opinion in the report that that was one of the columns

 9  that was analyzed.

10  Q.  Well, let me just read back your exact answer.  "Yep,

11  that's not the column we analyzed for this case."  Is that what

12  you said?

13  A.  Can you play --

14  Q.  Sure we can play that.

15  A.  Because I don't think you're reading everything --

16          THE COURT:  Could you show it to her rather than

17  playing it again?  Could you give her the written transcript?

18          MR. GLASSER:  We don't know what page and line.

19          MS. ECHTMAN:  Page 110, line 7 to 16.

20     (Document handed to the witness by Ms. Echtman.)

21          MR. BARRETT:  The page number?

22          THE COURT:  Page 110.

23          THE WITNESS:  So I said, "I'm not sure this is the

24  case in this matter."  So at that time I was not sure whether

25  it was analyzed or not, but I am now.

**BY MS. ECHTMAN:**

Q.  Well, the question, I think, was whether you know what that

column means from work on prior matters or no, and your answer

was:  "It refers to confirmation whether it is a residential or

non, but I'm not sure whether this is the case in this matter."

A.  What is your question?

Q.  My question is:  Weren't you saying that in response to a

question of what the column means?  And we could look at more

context in the deposition if we look at more of the page.  I

believe you were being asked what the different columns meant.

A.  So I was not sure at that time.  I am sure now.

Q.  Okay.  So you're --

A.  I'm not sure what you want me to say here.

Q.  Well, you just told us that you did specific work and you

relied on this column.

A.  That was one of the columns I relied on, yes.

Q.  Okay.  And when we had your deposition in this case, you

said you didn't rely on that column and you didn't know what

that column meant in this particular report.

A.  I said I was not sure.  So I was confused by page 110

during the deposition.  I've testified a number of times here

today that I considered that column.  It is outlined in my

report that I considered that column.

Q.  Okay.  So let's also -- and so you're saying now also that

you considered date ranges that LexisNexis provided in its

1  report, right?

2  A.  Correct.  And I can sort of tell you that in my deposition

3  there was the same issue of confusion where I said that I

4  personally did not consider date ranges.  That's because my

5  data team loads it for me.  But we can go through this exercise

6  and go to that page in my deposition where I was not clear

7  about that as well.

8  Q.  Okay.  So what was in front of you at that deposition was

9  the LexisNexis report you got back that you premised a lot of

10  your opinion here today on, right?

11  A.  That's correct.

12  Q.  Okay.  And so DISH's lawyer showed you that report and

13  asked you questions about specific fields that you're now

14  giving an opinion about, right?

15  A.  It's the same opinion I produced in my report, yes.

16  Q.  Right.  And asked you what did you do with -- what does

17  this column mean and did you use it.  And you said, "I didn't

18  use it and I don't know what it means."  Let's pull it back up.

19  A.  Yes, we can do that.

20  Q.  Okay.  But now I want to move on.  So we talked about --

21  you said that for the residential column.  Now we're going to

22  talk about dates.  You're saying now that you relied on date

23  columns, right?

24  A.  Well, as I stated earlier, it was loaded for me by the data

25  team based on the date range of first seen, last seen date.

1 | Yes, I did rely on that.

2 | Q. So at this same deposition when DISH's lawyer asked you

3 | what does date first seen and date last seen mean in the

4 | LexisNexis data, you didn't know.

5 | A. I couldn't recall at that time, yes.

6 | Q. Okay. You said you don't know what that column means at

7 | that time.

8 | A. I just testified I couldn't recall at that time.

9 | Q. And did you also say -- and let's pull up page -- so

10 | everyone knows what we're talking about, let's play VT516.

11 |       **THE COURT:** Where?

12 |       **MS. ECHTMAN:** Page 106, lines 3 to 25, VT516, if we

13 | could play that so everyone can see.

14 |    (Portion of deposition played, not reported by reporter.)

15 |       **MS. ECHTMAN:** Can you stop that? I gave you the wrong

16 | one.

17 |       **THE COURT:** It's really, really hard to hear and we

18 | can't make it any louder.

19 |       **MS. ECHTMAN:** Okay. We'll pull up the transcript.

20 | And I actually mean page 116 at line 20 to page 118 at line 18.

21 | Lets pull that up, please.

22 | **BY MS. ECHTMAN:**

23 | Q. Okay. So starting here, the question is: "How about the

24 | next column? It looks like the next two columns, DT first seen

25 | and DT last seen, were those used in your analysis here?" Do

1  you see that?

2  A.  Yes, I do.

3  Q.  Okay.  And your answer was:  "Those are the dates that

4  LexisNexis utilizes for their internal use, but we did not use

5  those."

6       If you go to the next page, dates.  Do you see that?

7  A.  Yes, I do.

8  Q.  Okay.  And then, DISH's lawyer gives you an example of one

9  particular line where it says that for one particular phone

10  number, there was a date first seen of June 5, 2012, and a date

11  last seen, I think -- well, June 5, 2012 is the date first

12  seen, and he shows you that; right?

13  A.  That's correct.

14  Q.  And then he says:  But it doesn't have a business -- and

15  your answer is:  "But he doesn't have a business identifier, so

16  we didn't look at his record at all."  Is that what you said at

17  your deposition?

18  A.  That's what I said in my deposition.

19  Q.  Okay.  Was that right?

20  A.  As you just misspoke a few minutes ago what was -- what

21  page number that was, I could not recall the details of those

22  two fields during my deposition.

23  Q.  Okay.  And you had an opportunity after your deposition was

24  taken to provide corrections; is that right?

25  A.  It was few hours after my deposition, yes.

1  Q.  No.  But, when you have your deposition taken, you get a

2  copy of the transcript back, and you get an opportunity to

3  correct anything that was wrong.

4  A.  I don't recall if we did in this case.

5  Q.  Okay.  So you don't recall if you went back and gave DISH

6  information that what you had said at the deposition was wrong?

7  A.  I don't recall if we went through errata sheet on this

8  case.

9  Q.  But you know when you have your deposition taken, you get

10  an opportunity to fill out an errata sheet where you can fix

11  anything that you got wrong?

12  A.  We don't do it all the time.

13  Q.  But when you gave this testimony at your deposition, you

14  gave it under oath; right?

15  A.  That's correct.

16  Q.  And you're not aware that you did anything to correct the

17  statements that you're now saying are wrong?

18  A.  I'm doing it now.

19  Q.  Okay.  But before we got to trial, you didn't do it?

20  A.  No, I did not.

21  Q.  Okay.  And so, if you go to another section of the

22  LexisNexis data, another section of this stipulation, there's

23  this whole piece where -- in paragraph 1, there's a lot of

24  numbers where LexisNexis doesn't fill out any of those three

25  columns we're talking about; right?

1  A.  Correct.

2  Q.  And so, there -- the parties stipulated that there are

3  5,258 telephone numbers and 14,815 telephone calls where

4  LexisNexis doesn't have any evidence that it's either business,

5  residential or government; right?

6  A.  That's correct.

7  Q.  And now, you said that Dr. Krakauer's number falls within

8  that; right?

9  A.  That's correct.

10  Q.  Okay.  But here, the only way we know that Dr. Krakauer had

11  a residential number is he came to court and he told us; right?

12  A.  That's correct.

13  Q.  And you didn't do any other test against these LexisNexis

14  unknowns for this case of any other telephone numbers?

15  A.  That's correct.

16  Q.  All right.  And then, in paragraph 3 of this stipulation,

17  there are telephone numbers that LexisNexis identifies as

18  unknown or can't fill the columns in the May 10 -- 2010 to the

19  August 2011 time period, but, at other times, it identifies

20  differently.  So, at some point, it might say it's residential,

21  but it doesn't say it for the time period in this case; right?

22  A.  Correct.

23  Q.  All right.  And so, paragraph 4, that's a category where,

24  again, sometimes LexisNexis will check the residential box, but

25  sometimes it won't.

1   A.   Correct.

2   Q.   And in paragraph 5, that's a situation where LexisNexis is

3   actually consistent and says it's residential; right?

4   A.   That's correct.

5   Q.   Okay.  And what you testified at your deposition is you

6   didn't know at that time whether, for this case, that

7   particular report actually indicated that LexisNexis thought it

8   was residential?  We can bring back up that testimony.

9   A.   Um --

10  Q.   Let's look at page 110.

11          **THE COURT:**  Wait just one second.

12          **THE WITNESS:**  That category was not discussed

13  separately until I saw the stipulation.

14  **BY MS. ECHTMAN:**

15  Q.   Okay.  But what you said at your deposition when DISH's

16  lawyer asked you:  What does the residential column mean?  You

17  said:  I'm not sure for this case.

18          **THE COURT:**  This is what you already went over with

19  her?

20          **MS. ECHTMAN:**  Yes.

21          **THE WITNESS:**  As I stated numerous time earlier, at

22  the time of my deposition, I could not recall that.

23  **BY MS. ECHTMAN:**

24  Q.   All right.  And then, there's also category number 6, and

25  those are telephone numbers that LexisNexis identifies as

1  cellular and possibly cellular.  Do you see that?

2  A.  Yes, I do.

3  Q.  Okay.  And that's 3,005 telephone numbers and 8,326 calls.

4  Do you see that?

5  A.  Yes, I do.

6  Q.  Okay.  And you didn't -- you testified at deposition that

7  you didn't look at the cell phone field for purposes of this

8  case; right?

9  A.  Correct.

10  Q.  And do you know how LexisNexis might go about -- will you

11  agree with me that cell phone numbers are not listed in

12  telephone directories also known as the white pages?

13  A.  I disagree.  They're listed.

14  Q.  You disagree that they're listed?

15  A.  No, I disagree that they're not listed.

16  Q.  Okay.  So, in the white pages or 411, you think cell phone

17  numbers are listed?

18  A.  They could be.  Why wouldn't they be listed?  If I have a

19  business that only has a cell phone number, that's how I'm

20  going to register my business.

21  Q.  Okay.  Well, I'd like you to look at DX25, the PossibleNOW

22  report.  And if you go to page 2, there's a discussion there.

23          **THE COURT:**  Okay.  Sustained.  She already said she'd

24  never seen this report.

25  **BY MS. ECHTMAN:**

1  Q.  All right.  But you're just assuming now that cell phones
2  are listed in 411?
3  A.  I have no opinion one way or another, but I'll just -- I
4  have no opinion one way or another.
5  Q.  Okay.  So, if LexisNexis might think that a cell phone is
6  residential or business or government, you don't know where
7  LexisNexis gets that information?
8  A.  It is -- identification of cell phone numbers falls outside
9  of the scope of my opinion and my analysis of this case.  I
10  only identified which telephone numbers were businesses,
11  government or residential.  Whether they're cell phone or not,
12  it's not the work that I did.
13  Q.  Well, just hypothetically, if I have a cell phone that I
14  primarily use for business, and I don't have it listed in the
15  white pages, and it's not on any of my company directories, and
16  I don't give it out to people other than those people I really
17  want to hear from, LexisNexis would never know what my cell
18  phone is used for; would it?
19  A.  I have no opinion.  I can't comment on that in any way,
20  shape, or form.
21  Q.  Okay.  Do you have any opinion as to whether a lot of
22  people use cell phones primarily for business?
23        **THE COURT:**  Okay.  She's already said she doesn't have
24  any opinions about cell phones, so let's move on.
25        **MS. ECHTMAN:**  Okay.

BY MS. ECHTMAN:

2  Q.  So -- but, in this case, you're saying that for all those

3  cell phone numbers, you think they're more likely than not

4  residential, even though --

5  A.  Well, I didn't form the opinion that they're cell phone

6  numbers.  I formed an opinion that these records were

7  residential.

8  Q.  And you didn't look specifically about -- at that column in

9  LexisNexis data about cell phones?

10 A.  No, I did not.

11 Q.  And do you know whether there are sources that can tell you

12 whether a phone number is a cell phone?

13 A.  Yes, there are.

14 Q.  And if LexisNexis is listing them as cell phones, do you

15 expect that LexisNexis is using a reliable source?

16 A.  I have no opinion how they used that data in this

17 particular report in this particular case.  It was outside of

18 the scope of my opinion.  My work was focused on businesses

19 numbers, residential numbers, and government.

20 Q.  So let's move on to a different topic.  I want to talk a

21 little bit about the Five9 call records; okay?  And if we could

22 go back to your funnel, you looked at call records that had a

23 total of 1,661,318 calls; right?

24 A.  That's correct.

25 Q.  Okay.  And your opinion here today is that SSN made 51,119

1  connected calls, correct, to 18,066 telephone numbers on the

2  Registry; right?  Is that your opinion?

3       **THE COURT:**  Where are you getting those numbers?

4  **BY MS. ECHTMAN:**

5  Q.  After you -- let's go to the second page, after you take

6  out the -- everything that Plaintiff agreed not to pursue.

7  A.  No, that's not my opinion.  My opinion is on the first

8  page.

9  Q.  Okay.

10 A.  This page is what you agreed with Plaintiff's attorneys and

11 I was not part of that process.

12 Q.  You were not part of that process.  But, you reviewed the

13 stipulation and you saw the different categories and the

14 reasons why Plaintiff's counsel agreed to remove them?

15 A.  Correct.

16 Q.  And some of them is because you missed some things; right?

17 A.  I don't have an opinion on that.

18 Q.  You didn't check.  All right.  So, can you tell me out of

19 the 1 point --

20      **THE COURT:**  Okay.  If you're going to ask her a

21 question, you need to let her answer.  You said you didn't

22 check.  Was that a question?

23 **BY MS. ECHTMAN:**

24 Q.  You didn't check?

25 A.  I didn't check what?

```
 1  Q.  The columns in that stipulation that Plaintiff's counsel
 2  showed you about the reasons why that they agreed to remove
 3  some numbers in this case that had been included in your
 4  opinion.
 5  A.  I personally did not check.  I was actually -- during this
 6  process, I was on vacation out of the country.
 7  Q.  Okay.  Did you think it might be important to check before
 8  you came here to testify?
 9  A.  To check whether the stipulation that you two agree -- that
10  both parties agreed upon is accurate?  I'm sorry.  What is your
11  question?
12  Q.  To check whether there are numbers in that stipulation that
13  result from mistakes that you made or things that you missed.
14  A.  It would have been great to check if I had time.
15  Q.  All right.  And you've been here for how long before you
16  got on the stand to testify?
17  A.  I've been here for a few days, since Saturday.
18  Q.  Since Saturday.  Okay.  And so, during that time, from
19  Saturday through to today, you didn't have time to check?
20  A.  No, because in order to check this properly, you have to
21  load all that data into Sequel Database, which I don't have
22  here with me, and the computing power that is necessary to go
23  through proper process, I don't have it here.  It actually took
24  me over 45 hours to get here from my vacation.  And then, I got
25  very ill, so even if I didn't get sick, I would not have the
```

1  equipment here to do a proper check.

2      Plus, since both parties already agreed, I didn't feel that

3  I needed to involve my stuff -- my staff, sorry, to go through

4  the process of doublechecking every single phone number on the

5  stipulation.

6  Q.  So did you ever -- so can you tell us, out of the

7  1.66 million calls, what percentage of those calls are in your

8  opinion here?  What percentage of 1.66 million is 20,450?

9  A.  You want me to do the math?

10  Q.  It's a small percentage, isn't it?

11  A.  It is a small.

12  Q.  All right.  And doing your work, I think you said that you

13  sought to exclude calls made by SSN that didn't connect; right?

14  A.  That is correct.

15  Q.  And so, the way you did that is you excluded things with a

16  zero duration; right?

17  A.  That's correct.

18  Q.  And you excluded other things based on the disposition

19  code; right?

20  A.  That is correct.

21  Q.  Okay.  And you excluded things that looked like inbound

22  calls; right?

23  A.  Correct.

24  Q.  And so, after you did all that, you had 230,121 remaining

25  calls that you analyzed; right?

1  A.  That is correct.

2  Q.  And you talked a little bit about the calls to

3  Dr. Krakauer.  I'd like to bring up PX16, which is a document

4  that Plaintiffs, I think, put together showing a summary of the

5  calls to Dr. Krakauer on the Five9 logs.  Do you recognize --

6  do you recognize this?  I can hand it up to you.  There's two

7  pages actually.

8  A.  Yeah, I was going to say I think it's missing some.

9  Q.  It's two pages.  Okay.  So this is --

10        **THE COURT:**  All right.  I think the question is, do

11  you recognize it?

12        **THE WITNESS:**  Yes, I do.

13  **BY MS. ECHTMAN:**

14  Q.  Okay.  Did you prepare this or someone who works for you

15  from the Five9 logs?

16  A.  I'm not sure who prepared it.

17  Q.  Okay.  But you recognize this as a list of the 10 calls to

18  Dr. Krakauer?

19  A.  Yes, I do.

20  Q.  Okay.  And these were all in the Five9 call records for

21  this case; right?

22  A.  Correct.

23  Q.  And you eliminated five of them because, in your opinion,

24  they didn't connect?

25  A.  And one of them was -- had a disposition call abandoned,

1  though it did have --

2  Q.  Well, second page, I think, has your duration --

3  A.  Thank you.

4  Q.  -- if that's what you're looking for.  Yeah.

5  A.  Sorry.  I -- I can't -- I have to count the lines because

6  there are no line numbers.

7        **THE COURT:**  You can pull the staple apart if that

8  would help you.

9        **THE WITNESS:**  Yeah.  Thank you.

10     So, the duration of the abandoned call was three seconds,

11  but we removed it as well, as I testified earlier, just out of

12  abundance of caution.

13  **BY MS. ECHTMAN:**

14  Q.  And you removed those calls because you don't know that

15  Dr. Krakauer ever knew those calls were made; is that why, if

16  they weren't connected?

17  A.  We removed those calls as part of our process to remove

18  unconnected calls and other types of calls based on disposition

19  that we thought should not be included.

20  Q.  All right.  And you thought that they should not be

21  included because the person might never know that call was

22  made, because on a busy signal, the call never rang; right?

23  A.  Well, that was -- in the field of data analysis, we look at

24  data.  We don't consider what people think on the other line --

25  on the other side of the phone call, so, no, we did not

1  consider what people thought.

2  Q.  Okay.  So you don't know, for any of the calls based on

3  your analysis, whether anyone ever heard the phone ring.

4  That's not part of the work you did.

5  A.  No.

6  Q.  And so, for the connected calls or what you consider not to

7  be connected calls, you don't know whether the phone ever rang?

8          **THE COURT:**  I'm sorry.  What?

9  **BY MS. ECHTMAN:**

10  Q.  For the connected calls and the nonconnected calls, you

11  don't know whether anyone ever heard a phone ring?

12  A.  I don't know if people have their phones on silence.  I

13  don't know if they have dinner at that time.  I don't know what

14  they were doing.

15  Q.  And do you have any -- can you tell us why you eliminated

16  calls that didn't connect?  Is there a particular reason you

17  eliminated calls that didn't connect?

18  A.  Yes.  We felt that -- there are several reasons.  First,

19  when we prepare these types of reports, we always eliminate

20  calls that don't connect from our analysis or set it aside in a

21  special category, just like we remove abandoned calls, because

22  we want to create a fair report.  And that was part of our

23  process and part of our thinking.

24  Q.  And in the duration column -- if you go to the second page

25  of this, will you agree with me that in the duration column,

1  all of the calls that Dr. Krakauer is suing on come to a total

2  of about two and a half minutes of time?

3  A.  Approximately.

4  Q.  And if you go back to the first page, there's a disposition

5  code called "recycle."  Do you see that?

6  A.  Yes, I do.

7  Q.  And you don't know what that disposition code means, do

8  you?

9  A.  Well, in Five9 records, when we received the original

10  source data, we did not have a description of that.  From my

11  experience in prior cases, I have some thoughts on that, but I

12  don't think it's relevant for this case.  For this case, I

13  never received a detailed description from Five9 or SSN stating

14  what they meant by this particular disposition code.

15  Q.  So, again, you just don't know -- you don't know what

16  happened on that call because you don't know what that

17  disposition code means.

18  A.  I don't have a description from Five9 defining that code.

19  Q.  And I just want to show you some samples from the Five9

20  data about some particular calls, and you don't know how long a

21  call that might be labeled "recycle" would necessarily have

22  last -- lasted, do you?

23  A.  That is outside of the scope of my analysis.

24  Q.  So I want to ask you about one particular telephone call

25  with recycle, and I'll show you an example of what the call

1  records look like for that call.

2          **MS. ECHTMAN:**  DX208.

3          **THE COURT:**  I'm sorry.  What is it, did you say?

4          **MS. ECHTMAN:**  It's DX208.  I'll give it out.

5      (Document handed to the witness.)

6  BY MS. ECHTMAN:

7  Q.  So just to make things easier, because the Five9 records

8  are voluminous, what we did here is we took out -- like you did

9  for Dr. Krakauer, we took out all of the Five9 records and put

10  this on this piece of paper for the phone number (203)

11  685-7296.  Do you see that phone number in the DNIS column?

12  A.  This is the first time I'm seeing this particular

13  spreadsheet.

14          **THE COURT:**  So you're saying this is not a page from

15  the Five9 records; it's some information you created from those

16  records?

17          **MS. ECHTMAN:**  We took out of the Five9 records all of

18  the data about this phone call and put it right here at this

19  exhibit so we could see it in one place.  So I can show the

20  witness that this phone number -- it's a demonstrative.

21          **THE COURT:**  I understand.  Go ahead.

22  BY MS. ECHTMAN:

23  Q.  And I can show you this is a phone number in the case,

24  (203) 685-7296.  Okay.  Do you see that under DNIS?

25  A.  Yes.

1  Q.  Do you understand that in the Five9 records that DNIS is

2  the number that was called?

3  A.  Yes, I do.

4  Q.  Okay.  And for this particular phone number, this shows

5  that that number was called four times, right?  We gave you

6  four phone records?

7  A.  Well, I -- if you say so.  I have not had the chance to

8  review it.

9  Q.  Okay.  Well, I can show you -- did you put together a

10  document that shows all of the phone numbers in the case and

11  how many times each one of them was called?

12  A.  Not as part of my original opinion.

13  Q.  Okay.  Did you do it later in preparation for trial?

14  A.  It was done.  I reviewed that document.  It was part of one

15  of the -- I don't think it was done in all Five9 records

16  actually.

17  Q.  Or just for the ones that are part of what you consider to

18  be the class in this case, right?

19  A.  That's correct, yes.

20  Q.  Right.  So you put together an exhibit that says what phone

21  numbers and how many calls, right?

22  A.  That's correct.

23  Q.  Okay.  But your counsel didn't use that with you in your

24  direct examination?

25  A.  That's correct.

1   Q.  Okay.  But do you want me to show that to you so you can

2   check --

3   A.  Yes.

4   Q.  -- whether this phone number is in the case, and it was

5   called four times?

6   A.  Yes.

7   Q.  So let's do PX2000.

8       (Document handed to the witness.)

9   A.  Thank you.

10  Q.  Okay.  And I'll tell you, if you go to PX2000 and you look

11  at page 5 on the top left --

12          **MS. ECHTMAN:**  Yeah, if you could bring that up,

13  PX2000.

14  **BY MS. ECHTMAN:**

15  Q.  Go to page 5 on the top left.  You can find this phone

16  number, which is (203) 685-7296, because you put the numbers in

17  order, right?  (203) 685-7296 on page 5, please, on the left.

18  It's one, two, three, four, five, six -- about eight or nine

19  down.  Okay.  Do you see that?

20  A.  Yes, thank you.

21  Q.  And you see that in this class, there are four calls to

22  that number, right?

23  A.  That's correct.

24  Q.  Okay.  So what we did here is took those four calls and put

25  them up on DX208.

1    **MS. ECHTMAN:**  If you could bring that up, please.

2   **BY MS. ECHTMAN:**

3   Q.  Okay.  And so you see here that the disposition for those

4   four calls is three recycles and one disconnect, right?

5   A.  Yes.

6   Q.  And those are all dispositions that you included as

7   connected calls, right?

8   A.  Correct.

9   Q.  Okay.  And you see that the duration for each of those

10  calls is 4 seconds?

11  A.  Yes, that's what it says.

12  Q.  Okay.  And so that shows that for that particular phone

13  number in the class, there were four calls for 4 seconds each,

14  right?

15  A.  That's what it states.

16  Q.  Okay.  And you don't know for those four calls of 4 seconds

17  each whether anyone ever heard the phone rang?

18  A.  I already testified to that.

19  Q.  And you don't know whether anyone ever connected to a

20  person on the other end of the line, right?

21  A.  That's correct.

22  Q.  And you didn't exclude calls with a duration of less than 5

23  seconds, did you?

24  A.  No.

25  Q.  Okay.  So I want to show you another example.

1    **MS. ECHTMAN:** I'd like to move DX208 into evidence,
2  Your Honor.
3         **MR. BARRETT:** Your Honor, I object on foundation
4  grounds.
5         **THE COURT:** All right. Well, we'll talk about that at
6  the lunch break.
7  **BY MS. ECHTMAN:**
8  Q. All right. So now I'd like --
9         **THE COURT:** How much longer are your questions for
10 this witnesses? Normally, we would go to lunch now. Is this a
11 good time?
12        **MS. ECHTMAN:** I'm almost done. If I could have no
13 more than 10 more minutes?
14        **THE COURT:** I think we'll do that after lunch
15 because --
16        **MS. ECHTMAN:** Okay.
17        **THE COURT:** Well, I mean, they're going to have
18 redirect, too. I just don't want to impose any unreasonable
19 burden on the jury here. It's a quarter of one.
20     So ladies -- I'll ask the witness to step down, please.
21     (The witness left the stand.)
22        **THE COURT:** Okay. Ladies and gentlemen, I'm going to
23 excuse you all for the lunch recess. Please come back at
24 two o'clock. Remember not to have any contact with the
25 lawyers, parties, or witnesses. Don't form any opinion and

1  keep an open mind and come back at two o'clock.

2      (The jury left the courtroom.)

3      All right.  Your objection to Defendant's -- let's see.  I

4  think I withheld ruling on a number of different objections I

5  probably, over the lunch break, ought to go through.

6  Defendant's 208 that was just mentioned and then I think there

7  was another one earlier, I'll try to look at that over the

8  lunch break; but as to 208, what's your objection?

9          **MR. BARRETT:**  Lack of foundation.  The witness is

10  being presented with this document and told what it is based

11  upon counsel's statement about what it is, so there's no

12  foundation.  That's number one.

13      Number two is I think what Ms. Echtman had referred to in

14  one of our pretrials as onesies, twosies, threesies process of,

15  you know, as she said, chipping away at the edges of the call

16  records rather than addressing the methodology and reliability,

17  which she has had ample opportunity to address.

18          **THE COURT:**  Okay.

19          **MS. ECHTMAN:**  So, Your Honor, I believe that you ruled

20  that it's our right to do onesies, twosies.  I only have about

21  a few more minutes of it.  What we've done here is try to make

22  it easy for the jury to understand what we're talking about and

23  to see an example.  They can compare it against the call

24  records and make sure it's there.  It would just be a very

25  laborious process.  I just have a few of those examples just to

1  give a flavor, and we have the right -- I think we have the

2  right to do that, and the Court said we could, although you

3  wouldn't put it on the verdict form that we could do this type

4  of cross.

5          THE COURT:  All right.  Well, I don't have any problem

6  with the questions.  I'll let you ask her the questions, but as

7  to the foundation of the exhibit, I mean --

8          MS. ECHTMAN:  I can walk through and pull up the call

9  records and walk her through all of them.  I think it would be

10 much --

11         THE COURT:  Well, that's up to you.  They've objected

12 on foundation grounds, and I'll sustain that.

13      All right.  The other objection I think was to this report

14 from PossibleNOW.

15         MS. ECHTMAN:  PossibleNOW.

16         THE COURT:  You know, I'm not saying I'm not going to

17 let it in ever, but I'm not going to let it in now.  If you've

18 got somebody who's seen it and who -- you know, and it's

19 relevant, you know, but this witness has nothing to say about

20 it.  So I don't see really at this point that it should be

21 admitted.  We can talk about that again if there's --

22         MS. ECHTMAN:  Well, Your Honor --

23         THE COURT:  -- somebody else who is going to testify

24 about it.

25         MS. ECHTMAN:  -- I think we've established with the

witness enough foundation to get it into evidence as, one, a
report prepared for the FTC to analyze something that the FTC
requested to be analyzed under one provision of the rule, and
it also falls under the treatise exception.  This is another
company in her line of business that she conceded that did an
analysis to see if they could identify types of numbers, and
they couldn't do it.  So that's all fair impeachment.

**THE COURT:**  She testified as to nothing about this
document.  She had never seen it before.  She didn't say it was
the kind of document on which she would rely.  She didn't say
it had any relevance to her decision, and you have not
presented any evidence yet from anybody else to indicate that.
I'm just having -- I mean, they objected on this ground, so I'm
having a little trouble with that at this point.

**MR. BARRETT:**  They have an expert witness --

**THE COURT:**  Say again?

**MR. BARRETT:**  They have an expert witness, I believe,
who will address this document, so they will have an
opportunity to present it.

**THE COURT:**  I mean, if you've got somebody who is
going to talk about the document, then, we can -- you know --

**MS. ECHTMAN:**  Well, Your Honor, also we -- I think we
laid a foundation under exceptions to the hearsay rule to get
the document in and of itself, and then we can publish it to
the jury.

1          **THE COURT:**  It has to be relevant.

2          **MS. ECHTMAN:**  The relevance is that you can't often

3    identify the nature of telephone numbers, which is completely

4    contrary to a new opinion that Ms. Verkhovskaya just gave now

5    at trial.

6          **THE COURT:**  Okay.  Can you remind me of the exhibit

7    number?  I apologize.

8          **MS. ECHTMAN:**  25.

9          **THE COURT:**  Well, I'll take a look at it again to see

10   if I can tell that in and of itself and it doesn't need a

11   witness to explain it, but it seems to me it's the kind of --

12   she has not said that this is the kind of document that's

13   important or relevant or the kind of thing -- you know, all of

14   that is the basis of her opinion, and I don't -- so I'll look

15   at it again, but at this point, I'm not inclined to let it in.

16         **MS. ECHTMAN:**  Okay.  Your Honor, just to be clear, our

17   position is it's fair impeachment to her opinion that she

18   always knows what type of number -- she can tell to a

19   reasonable degree of certainty what type of telephone number

20   something is because she didn't consider this.  She doesn't

21   know anything about it.  It's something that she should know if

22   she's going to offer this type of opinion, and, in fact, Your

23   Honor, we move to strike because --

24         **THE COURT:**  Okay.  Well, you didn't ask her any of

25   those questions.  I don't -- I mean, you didn't ask her if it

1  was the kind of thing she would normally consider.  I didn't

2  hear that.  Did you?

3          **MS. ECHTMAN:**  But it should come in substantively,

4  Your Honor, as well.

5          **THE COURT:**  Okay.  And you were doing something

6  that -- you changed topics to do something else.

7          **MS. ECHTMAN:**  So we'd also like to move to strike

8  Ms. Verkhovskaya's opinions because they were not disclosed in

9  her report.  I think we've handed up her report.  Nowhere in

10 her report does she affirmatively say the things she said on

11 the witness stand, and under the federal rules, you have to

12 state your specific opinions and the basis for them.  They

13 can't be by implication or assumed.

14     Nowhere in her report does it say that it's her opinion

15 that anything that's not identified as business is residential,

16 and nowhere in her report does it say that she expects

17 LexisNexis to be able to identify every business number, and by

18 implication, everything else is residential.  We heard that

19 opinion, and that was the summary of her opinion, which they

20 elicited numerous times, is nowhere in her report, and it

21 should be stricken because it was not disclosed in connection

22 with the federal rules.  It was not disclosed before trial.

23     There's a supplementation obligation under 26(e).  She said

24 things that are contrary to her deposition testimony.  Under

25 both the rules about errata and under 26(e), experts have a

1  duty to supplement --

2        **THE COURT:**  Okay.  So about the errata, the only thing

3  you can correct on an errata sheet is a typo or a clerical

4  error.  You cannot make substantive changes to your deposition

5  in an errata sheet.  I mean, that is -- I believe, now unless

6  they've changed the rule on me, but, you know, if a witness

7  says the answer is yes at the deposition, they can't come back

8  and say, oh, wait, I was mistaken; it's no.  You can only say

9  the court reporter took it down wrong, or it was 534 and not

10  532.  The court reporter heard it wrong.  You know, that --

11  that's not -- I do not believe that that is correct, but

12  putting that little very small problem aside, you know, if you

13  can finish your argument --

14        **MS. ECHTMAN:**  Yes.  I would like --

15        **THE COURT:**  -- without repetition.

16        **MS. ECHTMAN:**  I would like to direct Your Honor to

17  Rule 26(e)(2) on supplementing disclosures and responses, and

18  it says:  "For an expert whose report must be disclosed under

19  Rule 26(a)(2)(B), the parties' duty to supplement extends both

20  to information included in the report and to information given

21  during the expert's deposition.  Any additions or changes to

22  this information must be disclosed by the time of the parties'

23  pretrial disclosures under Rule 26(a)(3)."

24        **THE COURT:**  All right.

25        **MS. ECHTMAN:**  Those were due a long time ago.  She

1  gave us a lot of information and contradicted her deposition

2  testimony, and she testified she never corrected it and she

3  never disclosed that she was going to say something different

4  at trial, and all of that should be stricken.

5         **THE COURT:**  All right.

6         **MR. BARRETT:**  Your Honor, page 1 of her report -- I

7  can put it on the ELMO so you can read it.

8         **THE COURT:**  I looked at it during the morning recess,

9  but you can put it up there again.

10         **MR. BARRETT:**  It's quite clear in the highlighted

11  paragraph.  "A.B. Data understands that Plaintiff alleges in

12  Count One of the complaint," which is this count, "that he and

13  imputed class members, whose residential telephone numbers were

14  listed on the NDNC, received two or more telemarketing calls

15  from SSN promoting the sale of DISH Services during a 12-month

16  period.  I directed an analysis of the call records to identify

17  persons who received such calls, residential" -- it's all

18  there, two or more.

19      And, you know, they -- you know, so it's right there.  We

20  were going to clear that up on redirect.  It's not in her

21  summary, but it's right there on page 1.

22         **MS. ECHTMAN:**  Your Honor, I have to say that's not at

23  all clear.  Such calls are the calls that were made -- that are

24  the telemarketing calls from SSN, and she said, "I analyzed

25  whether they are on the NDCR for at least 30 days" --

1    **THE COURT:**  You have to slow down if you're going to

2  read out loud.

3    **MS. ECHTMAN:**  So when you see such calls, such calls

4  are the telemarketing calls from SSN, which she claims to be

5  promoting the sale of DISH Services.  "I directed analysis of

6  the call records to identify persons who received such calls.

7  My interpretation of such calls are the telemarketing calls

8  from SSN," and she said she looked at whether they were on the

9  list for at least 30 days, and she looked at which telephone

10  numbers were identified as business.  Nowhere in this report

11  does she affirmatively say, in any of the words she used on

12  that witness stand that it's her opinion to a reasonable degree

13  of certainty that these are residential.

14    **MR. BARRETT:**  They did not ask the questions that they

15  are asking how.  Her opinion was then and is now that these are

16  residential telephone numbers.  It has not changed.  There is

17  no new opinion.  She doesn't ask herself the questions.  That's

18  not the way the process works.  They ask questions.  They took

19  her deposition, and after that, they had the opportunity to

20  submit expert reports.

21    They chose -- they rode the wrong horse.  They chose two

22  experts who are testifying only about -- well, one who is

23  testifying only about class certification, ascertainability,

24  and Your Honor certified the class.  The other testified about

25  something that has nothing to do with Ms. Verkhovskaya's

opinions, and, in fact, the name Verkhovskaya does not even

appear in his responsive report.

    Had they done an analysis that Ms. Verkhovskaya did, we

would not be muddling through DX208 and dealing with

authentication -- foundational issues.  They would have their

own expert, but they never did that because they rode the wrong

horse.

        **MS. ECHTMAN:**  And, Your Honor, if I might say,

Plaintiff has the burden of proof, and if we look at an expert

report and it doesn't offer an opinion on the ultimate

question, then it's clear to us; we don't have to get up and

rebut it.  We -- the obligation under Rule 26 is to make an

affirmative disclosure, not to sandbag, to put ultimate

opinions in the report.

        **THE COURT:**  All right.  Motion to strike is denied.

Anything else?

        **MR. BARRETT:**  No, Your Honor.

        **THE COURT:**  All right.  We'll be in recess until

two o'clock.

    (A noon recess was taken from 1 p.m. until 2 p.m.)

        **THE COURT:**  All right.  I know we did not take up the

question of Ms. Taber McRae at the lunch break, because I

forgot, and you all didn't remind me, but don't let me forget.

I will do it.

        **MR. EWALD:**  We won't.  We wanted you to eat your

1  lunch.

2          **THE COURT:**  I appreciate that.  And you all need to

3  eat, too, but we can, if nothing else, stop 10 or 15 minutes

4  early and do it then.

5     Is there anything else for the Plaintiff we need to take up

6  before the jury comes in?

7          **MR. BARRETT:**  No, Your Honor.

8          **THE COURT:**  For the Defendant?

9          **MS. ECHTMAN:**  No, Your Honor.

10         **THE COURT:**  All right.  I did look over Plaintiff's 25

11 in more detail.  I think it was the first time I've seen that.

12 Maybe I saw it somewhere along the way.  I'm still

13 contemplating that, particularly the part that says -- I think

14 it's under "Analysis," and it says 20 percent plus of the

15 numbers on the Do Not Call Registry are business numbers.  I

16 take it that's the primary thing the Defendant is interested

17 in.

18         **MS. ECHTMAN:**  Well, actually, for this particular

19 witness, the primary thing we're interested in is that there

20 were so many numbers -- you know, we're -- it's hard.  We're

21 having this argument while the witness is in the courtroom.

22         **THE COURT:**  I'm not asking you about this witness.

23         **MS. ECHTMAN:**  Okay.

24         **THE COURT:**  So, I mean, I've already said I'm not

25 going to let you ask this witness questions about a document

1 she's never seen before, at least until we can somehow

2 establish through her that that's appropriate.  But what I'm

3 asking you -- you want to admit it substantively you have told

4 me.

5          **MS. ECHTMAN:**  Yes.

6          **THE COURT:**  So my specific question is, other than

7 that one thing I just said, 20-plus percent of the numbers are

8 business numbers, is there other specific -- I'm sure you would

9 call them facts, plaintiff probably wouldn't -- but

10 information, in any event, in that report you are specifically

11 interested in?

12          **MS. ECHTMAN:**  Yes.  There are 38 million telephone

13 numbers on the Registry where PossibleNOW, another company

14 that's an expert in the industry, couldn't figure out what they

15 were; and they say that means that they were unknown, so they

16 assume that they must be direct dial business numbers,

17 voice-over IP numbers and unlisted numbers.  And those are just

18 landlines.  And they don't try to categorize cell phones and

19 all, and that's about 50 percent of the numbers on the

20 registry.  So PossibleNOW tried to tell --

21          **THE COURT:**  I'm not asking you for any argument.  I'm

22 just asking you to identify the specific parts you are

23 interested in substantively having admitted.

24          **MS. ECHTMAN:**  Yes.

25          **THE COURT:**  Is that it?

1    **MS. ECHTMAN:** Those are the general sections about

2  what information was available to them and what they could not

3  know and that there are a lot of business numbers on the

4  registry.

5    **THE COURT:** All right. Thank you. We'll talk about

6  this again. I just wanted to have in my mind exactly the

7  part -- I mean, there's a lot in there, you know, that doesn't

8  really have anything to do with the case, so I wanted to be

9  sure I had everything in mind.

10    Okay. Are we ready for the jury?

11    **MR. BARRETT:** Yes.

12    **THE COURT:** Yes. All right. Bring the jury in.

13    I think I said Plaintiff's 25, but I meant Defendant's 25,

14  the document we were just discussing, the PossibleNOW report

15  for the FTC.

16    (The jury entered the courtroom.)

17    **THE COURT:** All right. The witness can return to the

18  witness stand.

19    (The witness returned to the witness stand.)

20    **THE COURT:** All right. Go ahead, Ms. Echtman.

21  **BY MS. ECHTMAN:**

22  Q.  Okay. I'd like to show the witness, please, another call

23  record sample. It's DX209.

24    (Document handed to the witness by Ms. Echtman.)

25    **THE WITNESS:** Thank you.

1  **BY MS. ECHTMAN:**

2  Q.  So, Ms. Verkhovskaya, this is a document about phone

3  number (209) 369-6048.

4        **MS. ECHTMAN:**  If you can bring it up, please, on the

5  screen.

6        **THE COURT:**  Marlene.

7        **MS. ECHTMAN:**  May we please have permission --

8        **THE CLERK:**  I'm sorry.

9        **MR. BARRETT:**  Your Honor, object on lack of foundation

10 grounds.

11       **THE COURT:**  Okay.  Well, it's not been admitted,

12 right?

13       **MR. BARRETT:**  Correct.

14       **THE COURT:**  Okay.  You can take it off the screen.

15 **BY MS. ECHTMAN:**

16 Q.  I'm going to ask you questions about a particular phone

17 number that's within the claimed class within the scope of your

18 opinion, and that number is (209) 369-6048.  And let -- if you

19 still have PX2000 there, which is a list of all the telephone

20 numbers in the class, if you could take that; and if you look

21 on page 11 of 64 in the middle of the page, I think you'll find

22 that phone number (209) 369-6048.  Do you see that?  And

23 there's -- that says there's two calls in the class to that

24 number.  Do you see that?

25 A.  Yes, I do.

1  Q.  Okay.  So that's one of the telephone numbers and telephone

2  calls that you're offering an opinion on here, right?

3  A.  Correct.

4  Q.  Okay.  So if you could look at our Exhibit 209, this is a

5  document where we summarized for you the call records about

6  that particular phone number, just the two lines from that SSN

7  Five9 call records.  Okay.  And then I'll tell you that for

8  these two the disposition is dial error.

9      Are you familiar with a disposition code in the Five9 call

10  records called dial error?

11  A.  I'm familiar that that disposition was part of the calling

12  records.

13  Q.  And that's not a disposition that you excluded?

14  A.  That's correct.

15  Q.  And in addition to having a disposition dial error, one of

16  them has a duration of 3 seconds and another has a duration of

17  2 seconds.  Did you exclude calls that were less than 4

18  seconds?

19  A.  As I testified a number of times earlier and as stated in

20  my report, I only included calls that were connected based on

21  excluding duration of 00, 00, 00.

22  Q.  So what you're saying is that, yes, even if it was 3

23  seconds or 2 seconds, you included it?

24  A.  That's correct.

25  Q.  So even if there were two calls that were a total of 5

1  seconds and had a disposition of dial error, that would be

2  included in the class?

3  A.  I was retained here to offer an opinion on two or more

4  calls within a class period of telephone numbers that were on

5  Do Not Call List -- National Do Not Call List 30 days or

6  greater that were nonbusiness telephone numbers.  So whether

7  it's two or more, as long as they were connected, that's what

8  my opinion is all about.  The length of connection was not

9  considered in my report as long as it was greater than zero.

10 Q.  And so the answer to my question is, yes, that would be

11 included in the class?

12 A.  Correct.

13 Q.  And you said in connection with your connected call

14 analysis, when I asked you why you did that, you said because

15 you didn't think it would be fair to include calls with zero

16 duration, right?

17 A.  That's correct.

18 Q.  And you didn't think it would be fair to include calls that

19 were abandoned and had less than a certain number of seconds,

20 right?

21 A.  Correct.

22 Q.  Okay.  So you thought it would be fair to include calls for

23 2 seconds?

24 A.  Absolutely.

25 Q.  Okay.  And you thought it would be fair to include calls

1  for 3 or 4 seconds?

2  A.  Yes.  It's less -- it takes less than 2 seconds to say,

3  Please do not call me, and hang up.  So it is fair to include

4  connected calls that lasted greater than zero seconds.

5  Q.  Okay.  But you don't actually know for any of these calls

6  that anyone said, Please do not call me, and hung up.  We've

7  already established that.

8  A.  That's correct.  I'm just explaining to the jury why, in my

9  expert opinion, it was fair to include calls greater than zero

10  seconds.

11  Q.  And I just want to clarify a few things about what you're

12  not saying, okay, just so we're clear.  You're not offering an

13  opinion that just because a number -- that a number is

14  residential because it happens to be on the National Do Not

15  Call Registry; is that right?

16  A.  That is correct.

17  Q.  Because anyone can go online and put any number into the

18  FTC system and it will go onto the National Do Not Call

19  Registry, right?

20  A.  That's correct.

21  Q.  And the FTC doesn't check whether it's a business number, a

22  government number or a residential number.

23  A.  That is correct.

24  Q.  And we talked -- a little bit before I called some numbers

25  direct inward dial numbers and I think that might have been

1  confusing.  I just want to say I was talking about a direct
2  dial number where you could punch in a phone number and go
3  directly to someone's desk in an office.  Did you understand
4  that was what I was talking about?
5  A.  Yes.
6  Q.  You don't have to go through a switchboard, right?  A
7  direct dial number you don't go through a switchboard.  You
8  dial directly to someone's desk.
9  A.  Well, in today's technology, some switchboards are
10 automated and you can -- switchboards are used differently.
11 That methodology is used differently in various call center
12 setups, so if you could rephrase.
13 Q.  Sure.  Let me give you an example.  So my office -- I work
14 at a law firm.  We've got a lot of people that work there and
15 the main number ends in five digits.  It's 5000.  That goes to
16 our receptionist, okay, in my office.  If someone wants to dial
17 me, they can just dial the last four numbers, 3753, and it will
18 go directly to my desk.  That's what I'm talking about.  They
19 don't have to talk to the receptionist first.
20         **THE COURT:**  Okay.  And what's your question?
21 **BY MS. ECHTMAN:**
22 Q.  Do you understand that's a direct dial number that goes
23 directly to someone's desk?
24 A.  Yes, I do.
25 Q.  You understand that's not going through a switchboard.  In

1  your view, that's going through a switchboard?

2  A.  You're referring to sort of an old-fashioned way when

3  switchboard picks up the phone and connects you.  It rarely

4  exists these days.  But your direct telephone number would

5  still be listed on the website as a phone number.  Therefore,

6  it could be listed in the directory as a business phone number.

7  Q.  If my firm put my phone number on the website, it could be

8  listed, but if we didn't choose to do that -- say where it's a

9  big company like AT&T, there are a lot of people sitting at

10  their desks who have their own individual phone numbers, those

11  are not necessarily going to be on the website, right?

12  A.  Correct.  But I still can't comment whether they would list

13  their phone number as a work phone number on any other

14  paperwork throughout the employment with AT&T, so I can't

15  comment one way or another.

16  Q.  Right, because you don't know.  All right.  I just want to

17  go through a few more things.  Ms. Verkhovskaya, do you think

18  it's important when you're preparing an opinion for a legal

19  case that's ultimately going to be presented to a jury to do

20  your work carefully?

21  A.  Yes, I do.

22  Q.  Okay.  And do you think it's important that you do your

23  best to get things right?

24  A.  Yes, I do.

25  Q.  And do you think it's important if you find mistakes that

1  you try to figure out what went wrong so that those mistakes

2  don't happen again?

3  A.  Yes, I do.

4  Q.  And do you think it's important if you find mistakes that

5  you correct them?

6  A.  Yes, I do.

7  Q.  Okay.  And do you think it's important that if you're

8  writing code that the code can accurately pick up what's in

9  every particular field that it's designed to look at?

10 A.  It is important.

11 Q.  And do you think it's important when you're giving a

12 deposition under oath in connection with a lawsuit where you're

13 giving an expert opinion that you prepare before you go to

14 answer questions?

15 A.  Yes, I do think it's important.

16 Q.  Okay.  And do you think it's important when you're

17 answering questions at a deposition to know what you did in

18 your work and to answer those questions accurately?

19 A.  I understand where you're taking it and my apologies.

20 There was a long number of questions I was asked over many

21 hours.  I was not sure when I was answering to one and I could

22 not recall the information correctly when I was answering the

23 second question.  My apologies.

24 Q.  And do you think it's important if you make a mistake under

25 oath at a deposition and you realize you made a mistake to

1  correct it and let folks know that you were confused and you

2  didn't understand the question?

3  A.  That's what I did here today.

4  Q.  Okay.  Do you think it's important to do that before you

5  get up on the witness stand?

6  A.  I can't answer that question.

7       **MS. ECHTMAN:**  All right.  Thank you, Ms. Verkhovskaya.

8       **THE COURT:**  Redirect?

9       **MR. BARRETT:**  Your Honor, may I obtain the microphone

10  from Ms. Echtman?

11       **THE COURT:**  Yes.  You would think we would have two.

12                    **REDIRECT EXAMINATION**

13  **BY MR. BARRETT:**

14  Q.  Ms. Verkhovskaya, you were asked a number of questions

15  about the summary page of your report.  Do you recall those

16  questions?

17  A.  Yes, I do.

18  Q.  And there were a number of questions regarding that summary

19  page having to do with whether you offered opinions about

20  whether certain telephone numbers were residential telephone

21  numbers.  Do you recall that?

22  A.  Yes, I do.

23  Q.  I would like to show you page 1 of your report.  Do you

24  recognize that?  Page 1 down there at the bottom?

25  A.  Yes, I do.

Q.  Could you -- there was a suggestion Ms. Echtman made that
you do not opine in your report about whether those telephone
calls that you identified in your report were residential,
right?

A.  Correct.

Q.  Okay.  Would you please read to the jury the second
paragraph of the first page of the report that you provided to
DISH Network in this case?

A.  "A.B. Data understands that Plaintiff alleges in" Court
"One of the complaint" -- Count One, sorry -- "in Count One of
the complaint that he and putative class members whose
residential telephone numbers were listed on the National Do
Not Call Registry, NDNCR, received two or more telemarketing
calls from SSN promoting the sale of DISH services during a
12-month period.  I directed analysis of the call records to
identify persons who received such calls were not on NDNCR at
least 30 days prior to the first call and whose telephone
numbers were not identified as business telephone numbers or
numbers associated with DISH customers, per the SSN data."

Q.  Okay.  When you say, "I directed analysis of the call
records to identify persons who received such calls" --

A.  Yes.

Q.  When you say "such calls," what calls were you referring
to?

A.  Calls that Plaintiff -- Plaintiff alleges in Count One of

1  the complaint that he and putative class members, whose

2  residential telephone numbers were listed on the National Do

3  Not Call Registry, NDNCR, received two or more telemarketing

4  calls from SSN promoting the sale of DISH services during a

5  12-month period.

6  Q.  So did you state on page 16 of your report that your

7  analysis was directed to identifying residential telephone

8  numbers?

9  A.  Yes.

10        **MS. ECHTMAN:**  Objection.  Leading.

11        **THE COURT:**  Overruled.

12  **BY MR. BARRETT:**

13  Q.  You also testified regarding your deposition and

14  Ms. Echtman asked you a number of questions about some of your

15  answers.  I would like to ask you a couple of questions about

16  what has been marked as Plaintiff's 2008, down there at the

17  bottom 20,450 numbers, 57,900 calls.  The question is:  Were

18  those the numbers and calls that you identified in your written

19  report before you gave your deposition to DISH Network's

20  attorney?

21  A.  Yes.

22  Q.  And as a result of agreements between the Plaintiff's

23  counsel, between us and DISH, calls were removed from the class

24  list, correct?

25  A.  That's correct.

1  Q.  Okay.  And the total was brought down with respect to

2  numbers.  It looks like it's about 2,000 numbers were removed,

3  right?

4          **THE COURT:**  We can't see the bottom of the -- if

5  you're trying to show us -- there you are.

6  **BY MR. BARRETT:**

7  Q.  You go from 20,450 numbers before you sat for your

8  deposition, right?

9  A.  Correct.

10  Q.  And now there are 18,066 numbers, correct?

11  A.  That's correct.

12  Q.  So that's about a 2,000 number removal from what you

13  provided -- what you testified to at your deposition, correct?

14  A.  That's correct.

15  Q.  As a result not of your opinions, but as a result of an

16  agreement between Plaintiff and DISH, correct?

17  A.  That's correct.

18  Q.  I believe that you testified in response to some of

19  Ms. Echtman's questions that the calls on the Five9 call

20  records began May 1, 2009.  Do you recall that testimony?  I'm

21  sorry.  2011.

22  A.  2010.

23  Q.  2010.

24          **THE COURT:**  It's been a long week.  Why don't you

25  start over again.

1  **BY MR. BARRETT:**

2  Q.  Okay.  I believe that you testified in response to some

3  questions from Ms. Echtman that the telephone calls on the

4  Five9 records that you reviewed began May 1, 2011.  Do you

5  recall that testimony?

6          **THE COURT:**  20 --

7          **MR. BARRETT:**  Gosh, I did it again.

8  **BY MR. BARRETT:**

9  Q.  Okay.  I want to show you page 8 of your report.  I'll put

10 it up on the screen.  You state on page 8 -- I'm sorry, page 7,

11 that you were provided with the following data files

12 representing 1.6 million and change calls placed by SSN.  Do

13 you see that?

14 A.  Yes.

15 Q.  And then you list the data files that you had reviewed.

16 Did you see that?

17 A.  Yes.

18 Q.  You state in the next paragraph these file names and the

19 calls included in them indicate that the files include calls

20 dated May 11, 2010, to August 1, 2011.  Do you see that?

21 A.  Yes, I do.

22 Q.  So my question is:  After reviewing this portion of your

23 report, do you believe that the Five9 records show calls that

24 began on May 11, 2010?

25 A.  Yes, I do.  I apologize.

1  Q.  And finally, Ms. Echtman asked you a number of questions

2  about the MicroBilt data.  Do you recall that questioning?

3  A.  Yes, I do.

4  Q.  And the questioning was directed at whether the MicroBilt

5  data identified some telephone numbers as being business, but

6  LexisNexis did not.  Do you recall that testimony?

7  A.  It included some business names, yes.

8  Q.  A little bit of a difference between the MicroBilt data and

9  the LexisNexis data with respect to some numbers, correct --

10 A.  Correct.

11 Q.  -- on whether those numbers were business, correct?

12 A.  That's correct.

13 Q.  And you were asked about whether -- I believe you were

14 asked about whether you -- whether later on some of those

15 numbers that were identified in the MicroBilt data as business

16 numbers were removed from the class.  Do you recall that?

17 A.  Yes, I do.

18 Q.  Okay.  What I would like to show you is exhibit -- well,

19 this is the third stipulation regarding the class definition

20 and it has been reviewed with you by Ms. Echtman.

21 A.  Yes.

22 Q.  I'll put it up on your screen.  Do you see a chart here

23 with highlighted 31G that says:  "Numbers where line type

24 designation is always unknown for all records associated with

25 the number in the LexisNexis data and listing name in the

MicroBilt data appears to be a business by key words listed."
Do you see that?

A.  Yes, I do.

Q.  Is this indicating some difference between the MicroBilt
data about whether a telephone number was business and the
LexisNexis data about whether the telephone number was
business?

A.  Yes.  It shows that five records were identified with such
discrepancy.

Q.  Five telephone numbers.

A.  Five telephone numbers.

Q.  And fifteen calls?

A.  That's correct.

Q.  And then next there's a similar category.  Again, reading
31G(b), tell me if that is generally regarding the difference
between the MicroBilt data that you did not rely on for your
report and the LexisNexis data that you did rely upon for your
report.

A.  Those are the numbers that were line type designation as
residential at least once in LexisNexis data and listing name
in MicroBilt data appears to be a business by key words listed.

Q.  Okay.  So that's a total of 12 telephone numbers where this
discrepancy between the MicroBilt data and the LexisNexis data
existed, correct?

A.  That's correct.

1  Q.  And that's twelve numbers out of how many?  I'm showing you

2  Plaintiff's Exhibit 2008.  Twelve numbers out of --

3  A.  20,450 numbers and 57,900 calls.

4          **MR. BARRETT:**  Thank you.  I have no further questions.

5          **THE COURT:**  Any questions on the matters covered in

6  redirect?

7          **MS. ECHTMAN:**  Yes.  Just a few, please.

8                          **RECROSS-EXAMINATION**

9          **MS. ECHTMAN:**  If I could have the microphone.

10          **MR. BARRETT:**  Yes.

11          **THE COURT:**  Yes.

12      (Pause in the proceedings.)

13          **MS. ECHTMAN:**  Just going back to the MicroBilt issue,

14  if I could go to the --

15          **THE COURT:**  You may.

16          **MS. ECHTMAN:**  And put that stipulation back on -- will

17  you turn on the screen?  Okay.

18  **BY MS. ECHTMAN:**

19  Q.  So if you look at -- Mr. Barrett showed you 31G, right?

20  A.  That's correct.

21  Q.  Okay.  And then 31F is also a column that deals with

22  MicroBilt data, right?

23  A.  That is correct.

24  Q.  Okay.  And that says records from MicroBilt data where the

25  listing name appears to be a business, based on key words as

1 listed. Do you see that?

2 A. Yes, I do.

3 Q. Okay. And there it's 52 numbers, right?

4 A. Correct.

5 Q. Okay. And those numbers all came out after your 20,000,

6 correct?

7 A. That's correct.

8 Q. Now also, Ms. Verkhovskaya, you'll recall that before the

9 lunch break I asked if you could find where in your report it

10 affirmatively said that you had offered an opinion that -- to a

11 reasonable degree of certainty, that numbers were residential.

12 You had a break to review your report, and after you came back

13 from that break, you did not show us that paragraph that

14 counsel just showed you, right?

15 A. I was focusing on rereading the summary that you pointed

16 out and I did not have sufficient time to review my entire

17 report.

18 Q. Your entire report is 16 pages, right?

19 A. That's correct.

20 Q. And you wrote it.

21 A. That is correct, quite some time ago.

22 Q. Okay. And I think we broke for maybe a half an hour,

23 right?

24 A. I don't know.

25 Q. Okay. I think the record will reflect that we broke from

1  about 11 to about 11:30; is that right?

2  A.  That's correct.

3  Q.  Okay.  And I had asked you to read your entire report.

4  That's why you did it during the break, right?

5  A.  That's correct.

6  Q.  Okay.  And when you came back, you didn't identify that

7  paragraph as saying that, right?

8  A.  As I stated earlier, my focus was on rereading the summary

9  several times.

10  Q.  Okay.  And that summary was just a few paragraphs and you

11  read that several times.

12  A.  Yes, I did.

13  Q.  Okay.  But you didn't read the rest of your report like I

14  asked you to?

15  A.  I did and I missed that paragraph.

16  Q.  Okay.  So you didn't look at the introduction on your scope

17  of work.

18  A.  I did.  I just did not pick it out.

19  Q.  All right.  So you read it and you didn't read it the way

20  Mr. Barrett just read it to you when you read it during your

21  break?  You didn't interpret it the same way as Mr. Barrett

22  just did when you read it during our break because you didn't

23  identify it for us.

24      **THE COURT:**  Are you asking a question?

25  **BY MS. ECHTMAN:**

1 Q. I'm asking a question. Is that right?

2 A. Can you restate your question, please?

3 Q. Are you saying -- during the break you read that second

4 paragraph of your report that Mr. Barrett just had you read; is

5 that right?

6 A. Correct.

7 Q. Okay. And when you came back from the break, you didn't

8 identify that paragraph as affirmatively saying that it was

9 your opinion that these were residential telephone numbers.

10 A. I just stated I missed it.

11 Q. All right. Thank you.

12        **THE COURT:** Anything else?

13        **MR. BARRETT:** No, Your Honor.

14        **THE COURT:** All right. Thank you. You may step down.

15     (The witness left the stand.)

16        **THE COURT:** Further evidence for the Plaintiff?

17        **MR. BARRETT:** No, Your Honor. The Plaintiff rests.

18        **THE COURT:** All right. Ladies and gentlemen, that's

19 the end of the Plaintiff's evidence. At this time in every

20 case I always have to confer briefly with the lawyers, so I'm

21 going to ask you to go into the jury room for a few minutes.

22 Please don't talk about the case or form any opinions since you

23 haven't heard the defense evidence.

24     (The jury left the courtroom.)

25        **THE COURT:** Does the Defendant want to be heard at the

1   close of the Plaintiff's evidence?

2           **MR. BICKS:**  We do, Your Honor, and we would like to

3   move for judgment as a matter of law under Rule 50.  I'm

4   prepared to handle that in any fashion that the Court wants,

5   including filing a motion, which we can do on Tuesday, or I can

6   articulate right now the basis for the Rule 50 motion.

7           **THE COURT:**  If you could tell me now, that would be

8   great.

9           **MR. BICKS:**  Your Honor, the basis for the motion is,

10  that the Plaintiff has the burden of proof in this case to

11  prove that SSN is an agent of DISH's; and that if any calls

12  were made when SSN was an agent of DISH, that they were made

13  within the scope of authority of that agency.

14      And focusing in particular on the question of scope of

15  authority, the testimony in this case was unrebutted that DISH

16  instructed SSN in writing not to call Dr. Krakauer again; that

17  SSN responded in writing that it would not; and that accepting

18  the evidence and argument of the Plaintiff that subsequent

19  calls were made, that would be clearly and undisputedly outside

20  of the scope of authority; and that is not just based on those

21  clear instructions that are undisputed and the written

22  communications.  It's outside of the scope based on the

23  contract, which expressly imposes on SSN the duty to follow the

24  laws.

25      Your Honor heard the testimony of Ms. Tehranchi, which was

undisputed where she acknowledged under oath that it was SSN's
duty to follow the law.  And, as we've let into the case, Your
Honor characterized the theory of the Plaintiff as somehow,
there was a wink and a nod, and that express written
instructions to follow the law were overridden by some side
discussions, or winks and nods and things like that.  There was
no testimony or even inference to that.

And I really have to focus the Court's attention on
Ms. Tehranchi's deposition, because that was questioning by
Plaintiff's counsel in -- a prior Plaintiff's counsel, but
they're stepping into their shoes, where a lot of that
questioning was asked by them.  And there is no reasonable
inference that could go to a jury that, somehow, what SSN did
was within the authority that was granted to it by DISH.  So
that's the evidence on scope of authority.

Backing up to the question of agency, the fundamental
question would be has the Plaintiff met his burden of proof to
prove that DISH had control over the marketing campaigns that
were at issue in this case?

And the evidence has been, particularly through
Ms. Tehranchi, that SSN entered into an arrangement with a
company called Five9.  And what SSN did with Five9 was
completely outside of the control of anything relating to DISH.
That is made clear in the contracts, which SSN and DISH, the
parties to the contract, both agreed were independent

contractor relationships, not creating an agency.  Both parties
to the contract have now said that.  And, there is no evidence
to show that DISH had the authority to control the marketing
campaigns that are at issue in the case.

     And when you, then, look at the facts where DISH was -- had
a contractual and clear direction that lists be scrubbed by
PossibleNOW, and now the evidence was that SSN got that
direction, and if there was any scrubbing that was not done, it
was expressly outside of that clear direction.

          **THE COURT:**  All right.

          **MR. BICKS:**  And that's the -- that's the basis for the
motion.

          **THE COURT:**  Thank you.  For the Plaintiff?

          **MR. BARRETT:**  Your Honor, the standard that we have to
meet is a low one.  The Court must find that a reasonable jury
would not have a legally sufficient evidentiary basis to find
for us.  Based upon the evidence that has been presented, there
is a legally sufficient evidentiary basis to find for us, and
this is a jury question.

     Agency, itself, is fundamentally a fact-sensitive question.
There is abundant evidence of what Mr. Bicks referred to as
wink and a nod evidence.  In terms of the Court's preliminary
instructions, I believe, and the pattern instructions in
North Carolina, which the Court has reviewed, the term is
acquiescence.  Has DISH acquiesced in the conduct of its

dealer, SSN? The evidence to support that is that SSN -- I'm
sorry -- DISH was aware of this particular marketing campaign
and these particular marketing tactics, aware that SSN was not
scrubbing. And, critically, the year before these class calls
began, as stated in the Assurance of Voluntary Compliance, that
it had the authority to control its dealers' telemarketing and
undertook to do so.

And what it responded with was what Ms. Musso described as
identifying the retailer. That was their method of complying
with the Assurance of Voluntary Compliance, to identify the
retailer. That's not hard to do, nor is that consistent with
the power and control that it stated that it had in the
Assurance of Voluntary Compliance.

So, all of that evidence, as well as other testimony,
reviewing the scripts for SSN, having DISH staff present, as
Ms. Tehranchi said, daily -- and I realize DISH has contrary
evidence, but Ms. Tehranchi said daily -- the uploading of
telephone calls, the monitoring of telephone calls, all of that
evidence forms a legally sufficient evidentiary basis to find
for the Plaintiff, and the motion should be denied.

**THE COURT:** All right. I'm going to deny it. I think
the evidence is well sufficient on agency, generally. It's a
bit closer on the scope, you know, acting within the scope of
authority issue. And I'll hear from you all again at the close
of all the evidence, but we'll go forward at this point.

1        I take it there will be evidence from DISH?

2            **MR. BICKS:**  Yes.  We have Mr. DeFranco, who is here,

3    Your Honor.

4            **THE COURT:**  All right.  You're ready to go forward?

5            **MR. BICKS:**  We are ready, Your Honor.

6            **THE COURT:**  All right.  Bring the jury in, please.

7    And just to be clear, I've denied the motion.  I'll hear from

8    you when you renew it at the close of all the evidence, but I'm

9    not taking it under advisement.

10           **MR. BICKS:**  Understood.

11       (The jury entered the courtroom.)

12           **MR. BICKS:**  Your Honor, should Mr. DeFranco take the

13   stand?

14           **THE COURT:**  Just stand right there for a second.

15       All right.  Ladies and gentlemen, you've heard the evidence

16   from the Plaintiffs.  As I mentioned to you at the beginning of

17   the case right after you were impaneled in this matter, DISH

18   gets a turn next.

19       So DISH can call its first witness.

20           **MR. BICKS:**  DISH calls Mr. James DeFranco.

21           **JAMES DEFRANCO, DEFENDANT'S WITNESS, SWORN**

22                    **DIRECT EXAMINATION**

23   **BY MR. BICKS:**

24   Q.  So Mr. DeFranco, you have a microphone there.  And if you

25   can get it --

1    A.   Testing.  Can you hear me?

2             **THE COURT:**  The sound system is very persnickety, so

3    if we can't hear, I'll let you know.

4             **MR. BICKS:**  Thank you.

5    Q.   Can I ask you, Mr. DeFranco, to please introduce yourself

6    to our jurors.

7    A.   My name is Jim DeFranco.

8    Q.   And tell us where you live, sir.

9    A.   I live in Castle Rock, Colorado.

10   Q.   And are you one of the founders of DISH?

11   A.   I am.

12   Q.   And tell our jury when you started DISH.

13   A.   November of 1980.

14   Q.   And tell us who the other founders were.

15   A.   Charlie Ergen and his current wife, Cantey Ergen, at that

16   time.  They weren't married yet, so it was Cantey McAdam.

17   Q.   And tell us who they are.

18   A.   Good friends of mine.  We knew each other for a few years

19   before we got the idea to start EchoStar, which was the name of

20   the company then.

21   Q.   And how long have you known Charlie and Cantey Ergen?

22   A.   About 40 years.

23   Q.   And tell our jury what your job is at DISH today?

24   A.   I'm executive vice-president, and I'm also on the board of

25   directors at DISH.

1  Q.  And tell us what parts of DISH have you managed since you

2  founded the company in 1980?

3  A.  Over the years, I've had responsibility for most areas of

4  the company, but my emphasis has been in the sales, marketing,

5  and distribution and relation -- as well as relationships with

6  the retailers.

7  Q.  And going back to the year 1980, tell our jury what

8  inspired you to create DISH.

9  A.  Well, at that time, they didn't have small dishes like we

10  know today, so they were the big 10- or 12-foot antennas.  And

11  I worked for a wholesale wine and liquor company, actually, in

12  Dallas at the time, and that's where Charlie and I met.

13      And so, we were -- I was going over to a mutual friend of

14  ours to watch a football game on a Sunday, and in the

15  neighborhood, there was one of these big dishes on a trailer.

16      And Charlie and I had discussed previously about, you know,

17  what do we think the next opportunity is in business.  He

18  actually worked for Frito Lay at the time, and we thought it

19  would be something in the communications industry.

20      So I saw this dish.  I had never seen one up close, so I

21  stopped the car and went.  And a gentleman was in the van,

22  there was -- a trailer was behind the van, and the dish was

23  pointed at the sky, and he was actually watching a football

24  game off of satellite.  And so, he was thrilled that I stopped.

25  He had just -- that was his first system that he had ever

1  gotten, and he was going to sell these systems in the state of

2  Texas.

3      And so I asked him, and we probably spent 30 or 45 minutes

4  together.  And, you know, he showed me how the system worked.

5  It was like a little living room set up in the van, and so we

6  sat, watched a little football, and he showed me how it worked

7  and everything.  I thought it was pretty school.

8      I asked him where the headquarters was.  He said it was in

9  Sarasota, Florida.  So anyway, I went -- finished, went over to

10 our friend's house and watched the game, and called Charlie --

11 that was a Sunday.  Tuesday, I called Charlie and told him what

12 I saw.  I said, I think we should go to look at this thing in

13 Florida.  Thursday, we flew to Florida.

14         **MR. GLASSER:**  Your Honor, objection.  I think some

15 background is fair, but if we go at this pace, from 1980 --

16         **THE COURT:**  I assume we'll go faster.

17         **MR. BICKS:**  We're going to go faster.

18         **THE COURT:**  All right.  Go ahead.

19 Q.  And was there a particular community you ended up focusing

20 on for this idea?

21 A.  Well, these were expensive at the time.  They ran about

22 eight to $12,000.  And naturally, it wasn't something everybody

23 could afford and that everybody needed.  So we -- we knew that

24 this was a product for rural America where there was poor TV

25 reception.

1  Q.  And I want to show a demonstrative I showed the jury in my

2  opening and pull that up.  It's the satellite photo that I

3  showed to the jury.  And I have a notebook, Mr. DeFranco, if

4  you can't see it.

5      Can you briefly describe for our jury what this is?  And is

6  that you, by the way?

7  A.  That's me.  That was a long time ago, and this was an

8  installation -- one of our first installations probably in the

9  first six months that we were in business.  And this would have

10 been out in rural Colorado.

11 Q.  And how much money did you start the company with?

12 A.  Our total -- the three of us, in total, started the company

13 with $60,000.

14 Q.  And if we can show a demonstrative, DeFranco 2, I showed

15 this to our jury.  And tell us what this is briefly.

16 A.  This is Charlie and Cantey, and this is a smaller antenna.

17 As I recall, this was probably a couple years later.  And they

18 were evaluating how small an antenna that we could use and

19 still get a good signal for customers.

20 Q.  And because antenna, to me, always makes me think of one

21 those kind of thin things.

22 A.  Dish.

23 Q.  Is that also, when you talk about a dish, is that also the

24 same thing as an antenna?

25 A.  Probably for today, yes.

1  Q.  And when you started DISH, who did you dream of competing

2  against?

3  A.  Well, when we started, we really just were trying to

4  survive.  But by the mid to late '80s, we had seen that the --

5  as the DISH size came down in size, that the market grew

6  substantially.

7       And we also had some experience in the late '80s in Europe

8  where they used a smaller antenna, not as small as here today,

9  but a smaller antenna and the market was much larger.  So, we

10  actually applied for a license to be able to launch a DBS

11  service, like we have today.  And we saw that Hughes also

12  applied for a license.

13  Q.  And is Hughes connected to a company that many of us have

14  heard about?

15  A.  Yes.  Hughes -- well, it was actually DirecTV was Hughes,

16  and then Hughes was a division of General Motors at the time.

17  Q.  And if we can show a demonstrative of Mr. DeFranco 3.  I

18  showed this to our jury in the opening.  And tell us what this

19  is.

20  A.  This our first launch, which had the first satellite on top

21  of it.

22  Q.  And how many launches have there been since?

23  A.  We just did our 19th launch last month.

24  Q.  All right.  And let's talk about DISH today.  How large is

25  DISH today compared to when it started?

1   A.   Well, we started with three people, obviously, when we
2   got -- started.  Today, we have about 16,000 employees and
3   we're a Fortune 200 company.
4   Q.   And how many customers do you have today?
5   A.   About 13-1/2 million.
6   Q.   And how important are customer relations to DISH?
7   A.   It's the most important.  Obviously, if customers aren't
8   happy with our service, they have at least one choice.  In
9   rural America, they could go to DirecTV.  And in most cases in
10  suburban and urban America, they have multiple choices, either
11  through their cable provider, DirecTV, us, other new services
12  that are launching, like AppleTV, so on and so forth.
13  Q.   And can you describe to our jury briefly what DISH's
14  business is today?
15  A.   Our DISH -- our business today is primarily to provide
16  television service to the U.S. states and its territories.
17  That would be number one.
18       And number two is to design and develop product that --
19  that's in the consumer's home that enhances the customer's
20  experience in watching that service.
21  Q.   And I showed this to our jury in openings, DeFranco
22  Exhibit 4, if we can bring that in, and briefly describe for
23  our jury some of DISH's products.
24  A.   Well, our newest primary receiver is the hopper that has a
25  hard drive in it, so it allows you to record your programming.

Our newest receiver allows you to program up to 16 different
things at once, believe it or not.  So it's -- we call it
conflict-free TV so the rest of the family doesn't have to, you
know, argue about who's going to get to record.

     Additionally, it allows you to watch anything that you
would have either on your home unit or live programming from
your home anywhere you can get an Internet connection in the
world.  So, if you travel, either domestically or
internationally, you actually -- and you have programs
recorded, you can do that.

     This little thing that -- that that hand is holding there
is called HopperGO.  So that actually is a little unit that
allows you to wirelessly transmit some stuff from your hard
drive to that.  Then you can actually take it with you when you
don't have an Internet connection, so you could take that on
the road, in the car, kids could watch programming in the back
seat so you don't have to have DVDs and those type of things.

Q.  Let's talk about retailers.  This case is about a retailer
called SSN.  When did DISH begin working with retailers?

A.  About six months after we started the company, so in 1981,
we started working with retailers.

Q.  And how many retailers does DISH work with?

A.  Several thousand.

Q.  It sounds like a lot.  Why so many?

A.  Because we really need representation in every part of

1  America, right?  And, obviously, it's a big country.  You know,
2  consumers understand -- in general, they understand the
3  programming.  They understand what ESPN and CNN and HBO is, but
4  it's really, since most other providers have similar channels,
5  certainly, the most watched channels are common.  Then, really,
6  what differentiates us from the competition is how the unit
7  works in your home and whether it's easy to use for you and
8  whether it has the functionality that you like.

9      So, it's really something that's much better demonstrated
10  face to face than it is just talking to somebody on the phone
11  or seeing an ad in the newspaper.
12  Q.  And can you give our jury a few examples of retailers that
13  sell DISH's products and services?
14  A.  From a national retailer perspective, a company like Best
15  Buy.  From an Internet perspective, Amazon carries some of our
16  product.

17      And then, from there, you can -- you know, you have
18  regional retailers.  You have -- you know, I didn't actually
19  look to see where our local retailers are here, but I'm sure we
20  have some local people that may just focus on satellite.  They
21  may do satellite and home security or home theater or home
22  automation or appliances or -- in fact, I would say probably
23  the local furniture and appliance place here may very well
24  carry DISH.
25  Q.  And does DISH require that any of its retailers market only

1  DISH products?

2  A.  No.

3  Q.  Do other satellite television companies use retailers?

4  A.  Yes.

5  Q.  And you mentioned earlier you manage many different

6  departments.  Does that include retailer operations?

7  A.  Yes.  I probably spent the most time --

8  Q.  And during the time --

9          **THE COURT:**  Wait.  I'm sorry.  I didn't hear the

10 answer, and if you'd be sure to let him finish before you start

11 your question.

12         **MR. BICKS:**  I'm sorry, Your Honor.

13         **THE COURT:**  What was your answer?

14         **THE WITNESS:**  Yes.  And I would say that's where I

15 spent most of my time over the years is working with retailers

16 and our distribution.

17 Q.  And focusing on the time period 2010 and 2011, did you have

18 any involvement with retailers?

19 A.  Yes.

20 Q.  And the jury has heard testimony about marketing by

21 retailers.  Did DISH do its own marketing in 2010 and 2011?

22 A.  Yes, we -- yes.

23 Q.  And did that include telemarketing?

24 A.  Yes.

25 Q.  Does DISH compete with retailers for new customers?

1  A.  We do.

2  Q.  And why is it that DISH and its retailers are in

3  competition with each other?

4  A.  Well, while we have several thousand retailers, they don't

5  sell everywhere necessarily.  Some do.  Some that choose to

6  market nationally can.  There isn't anything that prevents them

7  from doing it.  But from a geographic perspective, the --

8  the -- historical large number of our retailers are, you know,

9  typically brick and mortar in local communities or regions of

10  the country.  Obviously, we want to make sure when we advertise

11  and we have a service that's available everywhere in the

12  country that we're able to provide that service.  So -- so --

13  and then from an umbrella perspective, we advertise, you know,

14  on major networks; and a typical retailer wouldn't be able to

15  run TV -- you know, run TV advertising.  So it's a combination

16  that has worked out well over the years.

17  Q.  And does the competition between DISH and its retailers

18  have any affect on retailers willingness to share marketing

19  strategies with DISH?

20          **MR. GLASSER:**  Objection.  It's somebody else's mind.

21          **THE COURT:**  Well, he can testify about how the

22  business works.  Move along.  Go ahead.  Overruled.

23      You may answer.

24          **THE WITNESS:**  Generally speaking, retailers are not

25  open to providing their formulas for success in their local

1  markets on how they promote their products.

2  Q.  And remind us again, how long have you worked with

3  retailers at DISH?

4  A.  35-plus years.

5  Q.  And did DISH have any control -- let me back up.  Do you

6  know of SSN as a retailer?

7  A.  Correct.

8  Q.  And did you have any involvement with SSN, particularly in

9  the beginning phases?

10  A.  I certainly -- I'm sure that I met the folks from SSN and,

11  if I saw them, I might recognize them, but I can't picture Alex

12  today.

13  Q.  And you said Alex.  Alex is who?

14  A.  He would be the principal of SSN.  Tehranchi.  I'm sorry,

15  his last name is Tehranchi.

16  Q.  Yes.  Did DISH have any control over the marketing strategy

17  of SSN?

18  A.  No.

19  Q.  And what about the day-to-day operations of SSN?  Did DISH

20  ever have any control over day-to-day operations?

21  A.  No.

22  Q.  Did DISH ever want to control the day-to-day operations of

23  SSN?

24  A.  No.

25  Q.  Can you explain to our jury why not?

1   A.  Well, it would have been impractical for us to be able to

2   manage SSN -- I mean, if it was only SSN, then it may have been

3   possible, but, again, we had thousands of retailers and so to

4   have the staff to say, oh, we can manage every facet of their

5   business on a day-to-day basis is not practical.  We had a --

6   Q.  And from your perspective, 36 years working in retail, who

7   did you think was best able to manage the day-to-day operations

8   of SSN?

9   A.  SSN or any of the retailers were best to manage their own

10  business.

11  Q.  And as -- as one of the founders of the company, did you

12  ever believe that you had the power to tell SSN what phone

13  numbers to call?

14  A.  No.

15  Q.  And did you ever believe that you had the authority to tell

16  SSN to call Mr. Krakauer?

17  A.  No.

18  Q.  Did you consider SSN to be DISH's agent?

19  A.  No.

20  Q.  And did DISH ever communicate that in writing to SSN that

21  it was not DISH's agent?

22  A.  Yes.

23  Q.  And our jury has seen Joint Exhibit 2, the retailer

24  agreement.  In your 30-plus years, is that an agreement you've

25  had a lot of contact with?

1  A.  Yes.

2  Q.  And I'd like to pull up paragraph 11 for our jury.  It's a

3  heading that's called "Independent Contractor."  Do you see

4  that?

5  A.  Yes, I do.

6  Q.  And did you consider SSN to be an independent contractor of

7  DISH?

8  A.  Yes.

9  Q.  And in practice, is that how the relationship between DISH

10  and SSN actually worked?

11  A.  Yes.

12  Q.  All right.  And did you ever hear -- and when you say Alex

13  Tehranchi, did you ever receive any information from SSN where

14  it indicated to you that it had a different understanding and

15  thought -- and said to you that they thought they were DISH's

16  agent?

17  A.  No.

18  Q.  And was it important to DISH that a retailer like SSN be an

19  independent contractor?

20  A.  Yes.

21  Q.  And can you tell our jury why?

22  A.  Well, again, we started as a retailer, so we understood

23  the -- you know, what -- what type of an environment as a

24  retailer was important to us and that's one of the reasons we

25  were successful in -- in training and recruiting retailers over

1   the years, was to help them understand the product.  In the
2   early days -- well, I shouldn't say that.  Even if it's smaller
3   DISH's, we certainly showed them how to do installations and
4   those type of things.

5       But as an independent business person, they are
6   entrepreneurs and they have an interest of what they feel is
7   the right way to market and sell product.  And I won't go into
8   all the methods of possibilities, but you see advertisements
9   everywhere, whether it's billboards, TV, radio, through the
10  mail or whatever; and a lot of retailers focus on particular
11  things, special events, county fairs, those kind of things.  So
12  really, it depends -- they know their market better than we do
13  and so it's up to them to choose how they market the product
14  and the other elements of their business.
15  Q.   And our jury has heard about a document called the
16  Assurance of Voluntary Compliance.  Do you know what that is?
17  A.   Yes.
18  Q.   And was telemarketing the primary focus of that?
19  A.   No, that was a small part of the agreement.
20  Q.   And what was the primary focus?
21  A.   The primary focus was the overall terms and conditions that
22  consumers were committing to in the course of signing up with
23  DISH Network.  So, you know, some of that is terms in our
24  agreement.  Some of it might be -- and it was important to us,
25  very important to us.  In fact, most of what was in that

agreement we were doing well in advance of actually making the

agreement.  But it was important to us that the consumer also

understood.

So it was -- as an example, when you see an ad in the

newspaper and there's some fine print there that says it's a

two-year commitment, so that would be a term and condition.  We

wanted to be sure that it was clear on what those terms and

conditions should be when a customer signed up with us.

Q.  And when it comes to consumers, as the founder -- cofounder

at DISH, do you believe it's a good idea for folks to know

about the details of the products offered?

A.  Definitely.

Q.  And can you tell us why?

A.  Well, I think even as a consumer, you know, you understand

why, because you have to know what it is -- unless it's a

simple, you know, buying some chewing gum over-the-counter, you

know what that is.  You know, our industry got to a point where

in most cases there was a commitment period because we invest

so much money to put the equipment in someone's home and so it

might have been a one- or two-year commitment.  Well, if you

didn't understand what the -- what you were committing to,

then, you know, you might not be happy; and obviously, if

you're not happy, you're going to tell your friends you're not

happy; and not only that, you're going to call us and be upset;

and it doesn't make for a good relationship.

1  Q.  Let me pull up the exhibit -- Plaintiff's Exhibit 55.

2          **MR. BICKS:**  And if we can go to page 004 and blow that

3  up.

4  Q.  I want to ask you about a couple of definitions.

5          **MR. BICKS:**  Trudy, one is paragraph 2.3, authorized

6  telemarketer.

7          **THE COURT:**  Plaintiff's 55 is?

8          **MR. BICKS:**  It's the Voluntary Compliance Agreement,

9  Your Honor.

10          **THE COURT:**  All right.

11  **BY MR. BICKS:**

12  Q.  Can you see, that Mr.  DeFranco?

13  A.  I can.

14  Q.  And for our jury, this is 2.3 of Plaintiff's Exhibit 55.

15  Can you read this to us, Mr. DeFranco, and explain to us what

16  this is talking about?

17  A.  Well, it says:  "'Authorized Telemarketer' shall mean a

18  business or other entity that is hired by DISH Network to

19  conduct telemarketing on DISH Network's behalf in connection

20  with the offer, sale and/or lease of DISH Network goods and/or

21  DISH Network services."

22      And what that pertains to, that would be companies that we

23  would hire to actually do our telemarketing.  Sometimes they

24  would actually operate out of our building and we would

25  typically give them the numbers to call.  So it would be up to

1  us to let them know what group of phone numbers to call.

2  Q.  And our jury has heard the phrase "OE retailer" and that

3  SSN is an OE retailer.  Is that -- is that your understanding?

4  A.  SSN is an OE retailer.

5  Q.  And is an OE retailer an authorized telemarketer as is

6  described there?

7  A.  No.

8  Q.  Can you explain why not?

9  A.  Because the OE retailers, including SSN, would make their

10  own determination on who should call and what numbers they

11  should call and they'd be operating out of their own facilities

12  and basically control their own operation.

13  Q.  And if we can look at the definition on page 8, 2.15.

14        **MR. BICKS:**  And highlight that for us, if you will,

15  Trudy.

16  **BY MR. BICKS:**

17  Q.  Mr. DeFranco, do you have that in front of you?

18  A.  I do.

19  Q.  And can you read that to our jury and explain to us what

20  this is referring to?

21  A.  So "'Third-Party Retailer' shall mean one or more

22  independent persons, a corporation, a partnership or any other

23  type of entity, as the case may be, that is authorized by DISH

24  Network to offer, lease, sell, service, advertise, and/or

25  install DISH Network services and/or DISH Network goods."

1  Q.  All right.  And you see the -- does that refer to a

2  company, a retailer like SSN?

3  A.  This does refer to SSN and other retailers, yes.

4  Q.  And there's a word in there called -- it says

5  "independent."  Do you see that in the first line?

6  A.  I do.

7  Q.  And can you explain to us the purpose of that here and how

8  it applies to an OE retailer like SSN?

9  A.  Similarly to what we talked about earlier, they are the

10  business owner.  They run their own business.  They make their

11  own decisions on who they hire, who they fire, how they market,

12  basically everything within their business that relates not

13  only to how they market DISH products, but other products and

14  how they choose to run their business.

15  Q.  And in practice, is that how things worked?

16  A.  Yes.

17  Q.  All right.  And if we can go back to paragraph -- I think

18  you mentioned this.

19        **MR. BICKS:**  4.79 of this, Trudy.

20  Q.  It talks about discipline.  Do you see that, 4.79?  It

21  talks about a whole series of things.  Do you see that?

22  A.  I see that.

23  Q.  And prior to this agreement, were those forms of discipline

24  the kinds of things that were permitted in the way that DISH

25  did business with its OE retailers?

A.  Yes.  I mean, when you say "permitted," this was our
process prior to this agreement.

Q.  Yeah.  And what I mean is, is this the way a business
worked in the real world?

A.  Yes.  This is how we operated even prior to the agreement
as it related to telemarketing.

Q.  Does DISH's agreement consider these different types of
discipline mean to you that DISH had control over a retailer
like SSN and how they marketed?

A.  No.

Q.  Can you explain why not?

A.  Well, basically, you know, this would be a category that --
obviously, as I mentioned earlier, the customer is very
important.  We have to make sure that the customer is, you
know, being treated fairly and communicated with properly and
that their installation is done correctly for the retailers
that are doing installations and so on and so forth because
ultimately they're going to look to us, meaning the consumer,
for their satisfaction and so on and so forth.

And while we had this process here in this agreement for a
list of ways to -- to investigate and -- and actions to take
with retailers, it was their choice on whether they wanted to
do that or not.  I mean, if they -- if we had discussions with
them and said, "We think that in this case that you, you know,
should retrain your employees," as an example, or any number of

things, and they said, "No, I don't want to do that," then
their alternative would be not to do business with us.  But, it
was their choice.

Q.   And when it came to the telemarketing laws as between DISH
and SSN, who was responsible for making sure that SSN complied
with the telemarketing laws?

A.   SSN.

Q.   And did DISH ever communicate that to SSN?

A.   Yes.

Q.   And how was that communicated?

A.   One way was through the retailer agreement.

Q.   And did DISH ever remind SSN of that obligation beyond the
retailer agreement?

A.   Yes.

Q.   And the jury has heard about fact blasts already, but tell
our jury what retailer chats are.

A.   Retailer chats were another way for us to communicate with
our retailers.  And, again, we had the technology to be able to
broadcast, so we would authorize their showroom units so they
could receive a closed broadcast, so to speak, so our consumers
wouldn't be able to tune to a channel and see it; and that way
we could have live communication with the retailers.  They
could call in and ask questions, and we would talk about either
our new promotions or new procedures or whatever was happening
in the business as it related to the retailers.

1  Q.  Did you -- well, did SSN have access to retailer chats?

2  A.  Oh, absolutely.

3  Q.  And did you ever appear in these retailer chats yourself?

4  A.  I did for quite some time.

5  Q.  And I want to show you Defendant's Exhibit 3, a retailer

6  chat script.

7          **MR. BICKS:**  I'd move it into evidence.

8          **MR. GLASSER:**  No objection, Your Honor.

9          **THE COURT:**  It will be admitted.

10  **BY MR. BICKS:**

11  Q.  If we can pull that up.  Do you recognize this document,

12  Mr. DeFranco?

13  A.  Yes, this is a retailer chat script.

14  Q.  And did you actually appear yourself in this retailer chat?

15  A.  I did.

16  Q.  And tell our jury when it took place.

17  A.  January 16th, 2007.

18  Q.  And does this script accurately reflect what you said

19  during that chat?

20  A.  I expect that it does, though I don't have it all in front

21  of me here.

22  Q.  All right.

23          **MR. BICKS:**  Can we go to page 47 of the script?

24  Q.  And so we're clear what this is, this is actually when

25  you're actually on -- are you on a script where people see you

1  live or are you talking and they hear you without seeing you?

2  A.  No, it's audio and video.

3  Q.  And on page 47, you see that there's reference there at the

4  top -- if we can blow that up, Trudy.

5     It talks about the telemarketing laws, right?

6  A.  Correct.

7  Q.  And can you tell us what your purpose is as one of the

8  founders to be on a retailer chat communicating this

9  information?

10  A.  Well, this was very important to us and, as we also knew,

11  very important to the retailers, though some may have

12  understood it more than others at the time.  But we wanted to

13  make sure all retailers understood it even if they weren't in

14  the -- in the -- you know, hadn't chose to do telemarketing as

15  one of their acquisition approaches.  But in case they did,

16  they needed to make sure that they understood how serious we

17  are about following the laws as it related to telemarketing.

18     So this -- actually, this top part here is a slate that we

19  would have put up kind of like you did on this screen that they

20  would have been able to see and then the talking points are

21  underneath that on how we talked about each of the items.

22  Q.  And as one of the founders, is -- is compliance with the

23  telemarketing laws by the retailer, is that something that was

24  important to you?

25  A.  Very important.

1   Q.  And tell our jury why.

2   A.  Again, it goes back to the consumer.  If a consumer is on a

3   Do Not Call Registry, went out of their way to actually

4   register that they didn't want to get a phone call, then

5   immediately when they got a sales call for any product they

6   weren't going to be -- that wasn't going to be a productive

7   call or likely to be a productive call.  So, you know, we

8   believe that our first impression is very important with a

9   customer and that's not the right way to start a relationship.

10          **MR. BICKS:**  And if we can scroll down, Trudy, to the

11  fifth bullet point.  It says here -- and maybe we can make it a

12  little easier for our jury to read.

13  Q.  EchoStar -- and tell our jury again EchoStar and its

14  relationship to DISH.

15  A.  DISH is the brand, and today, DISH is the actual company.

16  EchoStar was the company at the time.

17  Q.  All right.  And it says here that EchoStar takes

18  telemarketing violations very seriously, and we work with law

19  enforcement officials at all levels to identify those in

20  violation of this policy.

21      Was this true?

22  A.  Absolutely.

23  Q.  And tell our jury why this is here and what kind of things

24  were done.

25  A.  Well, I mean, any -- any times that we would hear about any

1  kind of a problem relating to telemarketing, regardless if it

2  was from -- directly from a customer or if it was from a law

3  enforcement agency, we would make sure that we determined what

4  caused that, where it came from, invest -- you know, did an

5  investigation.

6  Q.  And the next bullet point says:  Failure to comply with

7  applicable laws could, among other things, lead to termination

8  of your retailer agreement, subject you to criminal and civil

9  liability, and obligate you to defend and indemnify EchoStar in

10  any civil or criminal lawsuit.

11     This seems like a strong message.  What's going on here and

12  why is this being conveyed?

13  A.  It was a strong message because it was meant to be strong.

14  We actually did terminate retailers as a result of it, and we

15  wanted to make sure retailers knew that, you know, that -- that

16  we took it seriously.

17  Q.  And did you, as one of the cofounders, ever consent in any

18  way to SSN violating the telemarketing laws?

19  A.  No.

20  Q.  And did DISH make SSN responsible for telemarketing

21  compliance to shield itself from responsibility?

22  A.  No.

23  Q.  And explain why not.

24  A.  Well, we took responsibility for our -- we did

25  telemarketing, and we took responsibility for our

1  telemarketing.  But, it was impossible for us to operate within

2  their four walls or through whoever they chose to do business

3  with to assist them if -- if, at all, they chose to do

4  telemarketing.  But if they did, then they needed to understand

5  what the local, state, and federal laws were and make sure that

6  they were adhering to them.  I mean, I guess that's the answer

7  there, yeah.

8  Q.  And are you familiar with something called the Robocall

9  Task Force?

10  A.  Yes.

11  Q.  Our jury has heard in other -- from other witnesses,

12  automated dialers, Robo calling.  Explain to our jury what the

13  Robocall Task Force is and DISH's role.

14  A.  Last year, the FCC recognized that it's a big problem, and

15  that it's not just a domestic problem, that many of these calls

16  come from other countries.

17         **MR. GLASSER:**  Objection, relevance.  Last year?  The

18  year 2016?

19         **THE COURT:**  Yeah, okay.  Sustained.

20         **MR. BICKS:**  I'll move on.

21  **BY MR. BICKS:**

22  Q.  Based on your experience, Mr. DeFranco, what is the effect

23  of calls like the ones that SSN is claimed to have made in this

24  case on DISH's reputation with customers?

25  A.  Not good.

1  Q.  And was DISH's reputation important in 2010 and 2011?

2  A.  Yes.

3  Q.  And how does DISH's reputation affect its ability to

4  compete for new customers?

5  A.  Again, it goes back to the consumer.  I mean, if -- if we

6  were to have a reputation from any respect that wasn't -- if we

7  continued to try and improve every day in every area of our

8  business of customer service, and, obviously, always follow

9  whatever regulations and laws are in place, but, from a service

10 perspective, the better our reputation is with the consumer,

11 the more likely they are to tell their friends, neighbors,

12 relatives about us and have us -- have them choose us versus

13 the competition.

14 Q.  Would DISH and was DISH willing to risk its reputation with

15 consumers to increase activations?

16 A.  No.

17 Q.  And why not?

18 A.  Because everything we do is from a long-term thinking

19 perspective.  And that would be a very short-term -- you know,

20 if you said, oh, gee, I don't care, I want to, you know,

21 increase activations in the month of July, well, maybe you

22 could increase activations in the month of July.  But, the same

23 people that started the company run the company today.  And

24 everything that we've done historically is always thinking

25 about not what's important just next week or next month, but

1 | five years from now.

2 |     And that's when a reputation really matters is, as an

3 | example, I mean, going from big dishes to small dishes.  I

4 | mean, if we didn't have a good reputation in the big dish

5 | business, we wouldn't have been successful in the small dish

6 | business.

7 |     As we launch other new products, if we have a bad

8 | reputation in the DBS video business, then it's not likely a

9 | customer would want to do business with us in whatever that

10 | other business might be.

11 | Q.  And based on your experience in 2010 and 2011, did DISH

12 | profit from SSN's telemarketing calls marketing DISH services

13 | to individuals on the Do Not Call List?

14 | A.  I don't believe so.

15 | Q.  And do you know how many of DISH's new activations in 2010

16 | and 2011 came from SSN?

17 | A.  I have a general idea.

18 | Q.  And tell us what that is.

19 | A.  It was a small percentage of the total activations, so, you

20 | know, a fraction of one percent.

21 | Q.  And based on your experience, was someone who puts their

22 | telephone number on the National Do Not Call List, but receives

23 | a telemarketing call from SSN trying to sell DISH service, are

24 | they likely to sign up with DISH?

25 |         **MR. GLASSER:**  Objection.  There's absolutely no

1  personal knowledge for that question.

2      **THE COURT:**  Well, he can testify based on his

3  experience and the jury will evaluate it.  You all can talk

4  about it in closing argument.  Go ahead.

5  **BY MR. BICKS:**

6  Q.  And I don't mean to ask the direct question.  Is this

7  something that you know based on 35 years experience?

8  A.  It certainly is, yes.

9  Q.  And is there any element of speculation or guesswork in the

10 answer to that question?

11 A.  No.

12 Q.  What's the answer?

13 A.  Overall, the company would not profit from calls that were

14 made to consumers who chose not to get phone calls.  I mean --

15 Q.  And if a consumer whose number is on the National Do Not

16 Call List received a call from SSN and signs up, is that likely

17 to be profitable for DISH?

18 A.  Again, from an overall perspective, not likely.

19 Q.  And why does it cost DISH money when a new customer signs

20 up?

21 A.  We have the expense of going out to the home and putting

22 the equipment in the home.  Used to be years ago, in the late

23 '90s, when DirecTV and us first started, the consumer actually

24 purchased hardware.  But, realistically, to complete with

25 cable, cable didn't charge for hardware on an upfront basis.

1  So, the business evolved to where, basically, today and in that
2  time frame, if you signed up for DISH Network or DirecTV, we
3  would put DISH Network -- in my case, DISH Network, we would
4  put DISH Network hardware in your home.  We'd have to pay an
5  installer to come out and actually do the installation.

6      And then, usually, there was some type of an introductory
7  promotion.  And, certainly, there was value to that.  In many
8  cases, it had to do with discounts in the programming.  So it
9  might cost an extra few hundred dollars to -- for the
10 programming discounts.
11 Q.  And what happens if someone signs up for DISH and they
12 terminate their services in a year or two later?
13 A.  If they term -- it typically takes us about three years to
14 break even on a customer who signs up.  So, if it was less than
15 three years, we'd lose money.  If it was more than three years,
16 we'd make, you know, a little bit of incremental money each
17 month if they continue.
18 Q.  And in 2010 and 2011, did DISH view telemarketing calls,
19 like the ones SSN allegedly made in this case, as good for its
20 business?
21 A.  No.
22 Q.  And can you give an example of how telemarketing violations
23 hurt DISH's business?
24 A.  Well, the fact that we're here today is --
25          **THE COURT:**  I'm sorry.  Say again.

1        **THE WITNESS:**  The fact we are here today in a

2  courtroom, Your Honor, is one reason.

3  **BY MR. BICKS:**

4  Q.  And in your experience in dealing with retailers, like a

5  retailer like SSN, if you see a handful of complaints over a

6  year or two, is that typically a basis to terminate a retailer?

7  A.  Well, it depends on the purpose of the -- you know,

8  where -- what -- what the -- what the issue was around the

9  complaints.  If -- you know, if there were -- there are many

10 factors that go into an investigation and what action should be

11 taken with the retailer.

12 Q.  And does DISH -- and are you aware of whether or not DISH

13 investigates complaints and did so when it related to SSN?

14 A.  Definitely.

15 Q.  And tell our jury how you think DISH handled things.

16 A.  Well, you take the information, which is the complaint, and

17 in some cases -- well, in most cases, it wasn't simple, meaning

18 that you had to -- you know, the customer who complained

19 typically got a phone call, may have wrote down who it was

20 from.  But, sometimes, people making those calls didn't

21 represent themself as who they were, so -- and then, sometimes,

22 the Caller ID didn't necessarily represent where it came from.

23 So they might write down the Caller ID number, but that might

24 not relate to the actual place where it happened.

25        So -- but in any event, to try and get through this, I

1  mean, you'd have to really do a thorough investigation.  So

2  you'd have to start with where did the complaint come from, how

3  much information do we have?  Sometimes, we would have to call

4  the consumer back and talk to them about the issues relating to

5  that, and then work down the line to figure out what happened.

6      And to take it to its full extreme, sometimes, we would

7  actually have to have one of our employees call the number,

8  sign up as a customer, and then, at that point, we knew who the

9  retailer was, because at that point, we know that they actually

10  inputted an order.  And that, we had no problem tracking.  But

11  if it was just a phone call, it was more difficult to find out

12  how that call was initiated and who initiated.

13      So was that thorough enough?

14  Q.  That's for the jury, not for me.  You testified earlier

15  about the retailer agreement, facts blast, retailer chats in

16  which DISH says that telemarketers like SSN were responsible

17  for complying with telemarketing laws.  Do you remember that,

18  generally?

19  A.  Yes.

20  Q.  All right.  If SSN called Mr. Krakauer or any other

21  consumer whose number was on the National Do Not Call Registry,

22  would that have been consistent with DISH's direction?

23  A.  Quite the contrary.  If they were on the Do Not Call List,

24  we would have not wanted a retailer to call someone on the Do

25  Not Call List.

1  Q.  And the jury has heard that SSN has signed up with

2  PossibleNOW.  Do you know what PossibleNOW is?

3  A.  I do.

4  Q.  And just tell our jury who they are.

5  A.  PossibleNOW is a company that was recognized as the leader

6  as it related to the Do Not Call Registry and being able to

7  have an accurate database and being able to, you know, scrub

8  phone numbers against that registry.  And so, we actually

9  recommended to retailers that they use PossibleNOW, and we used

10 PossibleNOW, if they were going to do any telemarketing as a --

11 as a mechanism to scrub phone numbers for the Do Not Call List.

12 Q.  And if a retailer like SSN was not using PossibleNOW, would

13 that have been against DISH's direction?

14 A.  We did suggest that people use PossibleNOW, that's correct,

15 to all -- SSN and other retailers.

16 Q.  And you, in 35 years, have had to deal with difficult

17 situations of terminating retailers; right?

18 A.  Yes.

19 Q.  Is the decision to terminate a retailer one that you, as

20 one of the founders, take lightly?

21 A.  Not at all.

22 Q.  And tell us why.

23 A.  These are, again, as I talked earlier, they vary in size,

24 but the majority, the volume of them are independent -- well,

25 they're all independent, but are small independent business

```
 1    people that may carry other products but may not carry other
 2    products besides DISH.  So -- but, certainly, if they were
 3    making an effort to market DISH, typically, I mean, unless it
 4    was, obviously, a company like Best Buy or Amazon that has, you
 5    know, many other products, we're a very small fraction of what
 6    they do.  But, in the years that we're talking about and in the
 7    categories of the volume of retailers that we're talking about,
 8    it would have had an impact on their business.
 9        And we -- we cared about our retailers, very much so.  And
10    so, we wanted to make sure that we were making the right
11    decisions and that we took the proper steps and communicated
12    with them on what they were doing in any way that we could, you
13    know, give them some knowledge in how to do better.
14              THE COURT:  How much longer?
15          MR. BICKS:  I'm done.
16              THE COURT:  Oh.  All right.  Then we'll take our
17    afternoon recess.
18          MR. GLASSER:  Yes, ma'am.
19              THE COURT:  The witness can step down.
20        (The witness left the stand.)
21              THE COURT:  All right.  Ladies and gentlemen, I'll
22    excuse you for the afternoon break.  Please remember not to
23    discuss the case among yourselves or with anyone else.  Don't
24    form any opinion about the matter.  Keep an open mind and don't
25    have any contact with the lawyers, parties, or witnesses.
```

1    Come back to the jury room in 15 minutes, about 3:45.

2       (The jury left the courtroom.)

3          **THE COURT:** I wasn't trying to rush you.  I was just

4  trying to find a good time to take a break, but you were done?

5          **MR. BICKS:** Yes, I was done.

6          **THE COURT:** Okay.  And how long are you anticipating

7  the cross?

8          **MR. GLASSER:** We'll be done with him today, Your

9  Honor.

10         **THE COURT:** Say again.

11         **MR. GLASSER:** We will be done with him today,

12  half-hour.

13         **THE COURT:** Half-hour or so?  All right.  Who is your

14  next witness going to be?

15         **MR. BICKS:** He's really our last one that we have here

16  now.

17         **THE COURT:** Okay.

18         **MR. BICKS:** I mean, I figured he's going to go until

19  4:15ish.

20         **THE COURT:** All right.  Anything before we take our

21  recess?

22         **MR. BICKS:** Not from me, Your Honor.

23         **MR. GLASSER:** No, ma'am.

24         **THE COURT:** No?  Take a 15 minute recess.

25      (An afternoon recess was taken from 3:35 p.m. until

1  3:45 p.m.)

2          **THE COURT:**  Okay.  I think we have all the jurors; is

3  that right?

4          **THE CLERK:**  Yes, ma'am.

5          **THE COURT:**  Anything before they come in?

6          **MR. GLASSER:**  Yes, ma'am.  I would like to just go

7  over two items to get a court ruling in advance.  The first is,

8  obviously, the witness has approximately $207 million worth of

9  stock that he beneficially owns, and I believe that goes to

10  bias, so I'm going to get into that.

11          **MR. BICKS:**  I would object to that, Your Honor.

12          **THE COURT:**  Based on?

13          **MR. BICKS:**  Its relevance and prejudice.  I've already

14  said he's on the board.  He's one of the founders of the

15  company, and it's -- it's --

16          **THE COURT:**  All right.  Well, you can certainly ask

17  him if he owns stock, and I don't know that the specific amount

18  is -- is relevant.  If you'll -- you can ask him some general

19  question like many millions.

20          **MR. GLASSER:**  All right.

21          **THE COURT:**  But I don't know that the specific amount

22  is necessarily --

23          **MR. GLASSER:**  The reason, Your Honor, I think the

24  specific amount should be admissible is that he basically came

25  in and just, you know, at a very high level came over and just

blessed DISH and blessed, you know, their own operations and
said these retailers are out there in the world and purported
to have a lot of personal knowledge about SSN's operations that
I don't think -- that I think his bias goes to why he might
have said those things, and so I think it's classic bias.

**THE COURT:** I don't disagree with you. I mean, I'm
going to let you ask him.

**MR. GLASSER:** Okay.

**THE COURT:** I just don't know that the specific amount
is particularly relevant, and that does have the potential to
be a bit unfair, but you can -- you can ask him about it and
get a general range from him.

**MR. GLASSER:** Second, Your Honor, the witness
testified that they take responsibility for their own TCPA
violations, and, of course, from 2007 to 2010, Judge Myerscough
found that they had 1.7 million violations of their own in the
same exact period leading up to what's issued here -- there's
some overlap in the class period -- and then also 2.3 million
other violations, so about 4 million violations.

So I think I should be able to ask him a few questions on
that because it follows from the fact that DISH itself was not
policing itself as well as it should, that it might not be
policing its retailers as well as it should, and he opened the
door.

**MR. BICKS:** First of all, Your Honor, you've ruled

1  that that was inadmissible.  Second of all --

2       **THE COURT:**  Well, yeah, that was before he came in

3  here and told me and the jury that they don't violate the law.

4       **MR. BICKS:**  The second -- well, he said they take

5  responsibility.  The second thing is Judge Myerscough hasn't

6  made a final determination about those violations, whether

7  they're knowing violations under the telemarketing clause.  So

8  there's no basis to examine him about that.

9       **THE COURT:**  Which order of hers are you talking about

10  asking him about?

11       **MR. GLASSER:**  He said on direct that they take

12  responsibility for their own TCPA violations.  So I'm going to

13  say, so you take responsibility for the 1.7 million violations

14  your company was found to have committed from 2007 to 2010 in

15  this time period; isn't that right?

16       **MR. BICKS:**  Right, and that's even -- that's actually

17  a different claim in that case as well, Your Honor, and it's

18  not a final determination on that particular point.  So I was

19  pointing him to parts of a contract and how they're different,

20  and that part of the contract that I was actually talking about

21  has to do with a completely different issue, by the way, than

22  the one that is at issue in Illinois.  It's not a final

23  determination, among other things.

24       **THE COURT:**  So -- so what is it, Mr. Glasser --

25       **MR. GLASSER:**  So he said he takes responsibility for

his own violations.  I'll ask him.  He can either take
responsibility or he can back -- he can crab-back on his
testimony.

**MR. BICKS:**  DISH isn't even alleged in this case to
have violated the telemarketing laws.  It's a completely
different issue.  This is an issue involving SSN as an agent,
and that's what this case is about.  He's talking about
something completely different, which is not a final
determination, and it's a different statute.  That's what we
were trying in Illinois.  It hasn't even been determined, and
regardless of what would happen, it'll likely be appealed and
it's --

**THE COURT:**  I guess I'm just having a little trouble,
Mr. Glasser, understanding exactly why the -- I mean, the way
you are telling me you want to do it --

**MR. GLASSER:**  So the witness will say, yes, I take
responsibility, DISH does, or the witness will say, no, DISH is
still fighting about that, in which case, it's not true that
they want to take responsibility; they want to fight about all
their own violations or alleged violations.  Either way, I
don't care what the answer is, that what he said on the witness
stand is either true or not true, either they take
responsibility or they don't, and he can have it either way he
wants it.

**THE COURT:**  Okay, but the under -- the underlying

1  premise of how many violations there are --

2       **MR. GLASSER:**  -- has already been found by a court and

3  was not disputed by DISH that those calls were made, and he can

4  say we're going to appeal that or whatever he wants.

5       **THE COURT:**  Where are you -- I thought I asked you

6  this.  Where is that in her order?

7       **MR. GLASSER:**  It's on page -- it's on page 3, Your

8  Honor.

9       **THE COURT:**  Is that the same order you already handed

10  up to me?

11       **MR. GLASSER:**  Yes.

12       **THE COURT:**  I don't know what happened to it,

13  Ms. Sanders.

14       **THE CLERK:**  He looked at it.  He needed it.

15       **THE COURT:**  Oh.

16     (Document handed to the Court by Mr. Glasser.)

17     (Pause in the proceedings.)

18       **MR. GLASSER:**  I'm not proposing to show the jury the

19  opinion.

20       **THE COURT:**  I'm sorry?  Say again.

21       **MR. GLASSER:**  I'm not proposing to show the jury the

22  opinion or anything.

23       **MR. BICKS:**  Your Honor, again, you've now been shown

24  one page out of about a 280-page ruling, and I can tell you

25  that that case does not involve -- that claim right there does

1  not involve the TCPA.  It involves something called the TSR,
2  and we're litigating in that case whether or not there was any
3  kind of a knowing finding; in which event, there may not even
4  be any kind of a penalty, and that's what we're litigating.
5  That's under adjudication before Judge Myerscough, but under --
6          **THE COURT:**  Okay.  I mean, I remember -- I mean, I've
7  kept up with that litigation, obviously, but it's --
8          **MR. GLASSER:**  They're both Do Not Call violations,
9  Your Honor.
10         **THE COURT:**  They're Do Not Call violations, and it's
11 specific -- she's specifically saying calls to telephone
12 numbers on the National Do Not Call Registry.
13         **MR. GLASSER:**  Yeah.
14         **THE COURT:**  I guess, you know, he has come in here and
15 painted this picture, and the Plaintiff is allowed to go -- to
16 cross-examine him about that.  I'm a little concerned about
17 exactly how you're proposing to do it.
18         **MR. BICKS:**  And, Your Honor, just again, in terms of
19 what he said -- and we can pull up the transcript.  He said
20 that he takes responsibility for DISH's telemarketing.  He
21 didn't say anything about telemarketing violations and --
22         **THE COURT:**  I'm -- I mean, don't you think that's -- I
23 mean, we were all sitting here.  We all heard his testimony.
24 He -- as Mr. Glasser says, he paints a glowing picture.  You
25 can parse it however you want.  He's entitled to cross-examine

1  him about it.

2      **MR. BICKS:**  Right, but you can't -- Your Honor, you

3  already ruled --

4      **THE COURT:**  Well, I ruled on it before somebody --

5  before he came in here and said, we don't violate the

6  telemarketing laws and we take responsibility -- you know, I

7  don't know -- I don't remember his words.

8      **MR. BICKS:**  Well, he didn't say that.

9      **THE COURT:**  I remember his message.  His message is we

10  take it seriously.  We don't violate the laws.  You know,

11  that's basically what said.  So, you know, they're entitled to

12  undermine that to some extent.  I -- you know, I'm going to let

13  you ask some questions about it if it -- but --

14      **MR. GLASSER:**  Okay.

15      **THE COURT:**  -- you're going to need to be careful

16  about how you do it because I do think there's some potential

17  for unfair prejudice about that.

18      **MR. GLASSER:**  We have nothing else, Your Honor.

19      **THE COURT:**  All right.  Anything else?

20      **MR. BICKS:**  No.

21      **THE COURT:**  All right.  You can bring the jury in.

22      **MR. BICKS:**  Your Honor, I should also just -- as folks

23  are pointing out to me something, Judge, that there's a

24  reconsideration motion on that has changed some of that.  I'm

25  just saying -- I'm just alerting the Court he doesn't know what

1  happened in that case.  I'm just telling you, and I've told you

2  it was a different statute; and if we start to get into that,

3  it's going to be inaccurate.

4          THE COURT:  It's going to be what?

5          MR. BICKS:  Inaccurate.

6          THE COURT:  Well, the witness can correct if we -- I

7  would hope that Mr. Glasser would do it in a way that's

8  reasonable.  If not, you can correct it.

9      (The jury entered the courtroom.)

10         THE COURT:  All right.  The witness can come back up

11 to the witness stand.

12     (The witness returned to the witness stand.)

13         THE COURT:  Okay.  Go ahead.

14                    **CROSS-EXAMINATION**

15 BY MR. GLASSER:

16 Q.  Mr. DeFranco -- oh, is this on?  Mr. DeFranco, isn't it

17 fair to say that DISH Network is personally very important to

18 you?

19 A.  Yes.

20 Q.  You've spent many years building DISH Network yourself,

21 right?

22 A.  Yes.

23 Q.  You have a great deal of personal wealth tied up in DISH

24 Network, right?

25 A.  Yes.

1  Q.  You have millions of shares of stock in DISH Network,
2  right?
3  A.  Yes.
4  Q.  And that amounts to millions and millions of dollars,
5  doesn't it?
6  A.  Yes.
7  Q.  So it's fair to say that you're biased in favor of DISH
8  Network?
9  A.  That hasn't affected my testimony.
10  Q.  Okay.  You don't think that when you look at a problem,
11  say, telemarketing violations, you like to see it through the
12  best DISH prism that you can?
13  A.  No.  If we have any kind of an issue that's negative to
14  DISH, I try and look at it on its face and take corrective
15  action.
16  Q.  Okay.  You talked a little bit on direct examination about
17  your understanding of investigations in the compliance
18  department.
19  A.  Yes.
20  Q.  Do you remember that testimony?  So is it your belief that
21  your compliance department affirmatively investigated consumer
22  complaints against national sales partners to determine if they
23  were legitimate?
24  A.  Yes.
25  Q.  What does a consumer pay on average for a DISH subscription

1    in a month?

2    A.   On average, about $80.

3    Q.   Okay.  So Amir Ahmed said 90.  Was he right, or are you

4    right?

5    A.   Well, it depends on when you -- you know, what the timing

6    is of the question, but we do --

7    Q.   From 2010 to 2011?

8    A.   I don't recall exactly what it was in 2010 to 2011.

9    Q.   Directionally around 80s?

10   A.   Yes.

11   Q.   And I understand from an exhibit in this case that in 2011

12   there were 45 national sales partners on the OE tool.  Is that

13   directionally consistent with your memory?

14   A.   It sounds about in the vicinity, yes.

15   Q.   Okay.  And your lawyer showed you this Assurance of

16   Voluntary Compliance.  Do you remember that?

17   A.   Yes.

18   Q.   And he asked you to look at a couple of definitions, right?

19   A.   Yes.

20   Q.   I want to show you another definition.

21           **THE COURT:**  Can you just restate the exhibit number?

22           **MR. GLASSER:**  It's Exhibit 55, Your Honor.  I'm on

23   page 6.  Oh, may I publish to the jury?  It's been admitted.

24           **THE COURT:**  Yes.

25

1  Q.  It says here at Section 2.9, that there's a third -- you

2  know, not authorized telemarketer, not --

3          **THE COURT:**  Slow down.

4  Q.  There's a third definition called covered marketer.  Do you

5  see that definition?

6  A.  I do.

7  Q.  All right.  And a covered marketer, do you agree with me,

8  is a third-party retailer who can directly enter sales into

9  DISH's order entry application system, OE retailer, right?

10 A.  That's one category, correct.

11 Q.  And that's those 45 retailers of which Satellite Systems

12 Network was one, correct?

13 A.  Correct.

14 Q.  I'm showing you Exhibit 70, which is an e-mail that we went

15 over yesterday with Reji Musso.  Okay.  And it says here that

16 PossibleNOW was offering a Tier 1 compliance survey of federal,

17 state, and DISH Network corporate compliance guidelines at a

18 thousand dollars per authorized retailer.  Do you see that?

19         **MR. BICKS:**  Your Honor, I would object on foundation.

20 There's no foundation.  He's not --

21         **MR. GLASSER:**  It's admitted already.

22         **THE COURT:**  Don't interrupt each other.

23         **MR. BICKS:**  I was saying there's no foundation for

24 questioning of him on this document.

25         **THE COURT:**  Okay.  You may need to lay a foundation,

1 don't you think?

2 Q.  Well, on direct examination, you said that you were -- that

3 your area of expertise in the company was retailers, right?

4 A.  Yes.

5 Q.  You said that you did most of your work on the retail side,

6 right?

7 A.  Among other things, but over the years, yes.

8 Q.  You said you met SSN's Alex Tehranchi, right?

9 A.  I believe I did.

10 Q.  You offered some opinions about how people would react to

11 SSN calling them, right, which are opinions about retailer

12 performance on direct examination, right?

13 A.  Yes.

14 Q.  So it's -- so I'd like to ask you about the costs of the

15 Tier 1 compliance survey for authorized retailers, okay?

16        **MR. BICKS:**  Your Honor --

17 Q.  Were you involved in the decision not to do this?

18        **MR. BICKS:**  Objection, no foundation.

19        **THE COURT:**  Well, he can answer, if he was involved or

20 not.

21 Q.  Were you involved in the decision not to pay this?

22 A.  I mean, you're pointing at one line.  I have to look at the

23 larger document to understand -- you know, to try and get a

24 frame of reference here.

25        **THE COURT:**  Do you want to hand him the whole copy so

1  he can take a look at it if you're going to ask him about it?

2  Q.  So Reji Musso talked about this yesterday and said that

3  DISH declined to do it.  I'm asking you, were you involved in

4  that decision?

5        **MR. BICKS:**  Your Honor, I object to describing what

6  somebody else said.  He wasn't here.

7        **THE COURT:**  Okay.  Well, the jury will remember the

8  testimony.

9      (Document handed to the witness by Mr. Glasser.)

10     (Pause in the proceedings.)

11       **THE WITNESS:**  Okay.  I understand better what it is.

12 Q.  All right.  Were you involved in the decision not to do

13 this, not to accept this bid?

14 A.  I was not.

15 Q.  Okay.  Were you aware of the decision not to implement this

16 plan?

17 A.  Not as I recall today.

18 Q.  All right.  Would you agree with me that the Tier 3 plan

19 here proposed a certification program for certification of

20 compliance with Do Not Call for $4,500 per retailer?  Do you

21 see that?

22       **MR. BICKS:**  Objection, Your Honor, foundation.

23       **THE COURT:**  Well, I -- what are you -- it says what it

24 says.  I mean, what's your question about it?

25 Q.  So 45 national sales partners times $4,500, a little bit

1  over $200,000, right?

2  A.  Well, I don't -- I don't think that's necessarily the case.

3  I think that if you're referring to -- is this -- I'm not sure.

4  I mean, again, I don't have a context for the whole --

5  Q.  Okay.

6  A.  -- picture.

7  Q.  So you weren't -- so even though you came in and testified

8  to the --

9       **THE COURT:**  Okay.  Now, Mr. Glasser, you'll remember

10  not to argue with the witness or make closing argument to the

11  jury in the form of a question.

12  Q.  So whatever your -- so the level of your involvement with

13  the retailer side was not sufficient to have been involved in

14  this decision, correct?

15  A.  The people who were involved in these things did ultimately

16  report up to me at the time, but I don't recall, as I sit here

17  today, having a discussion with anybody about this

18  specifically.

19  Q.  Mr. Bicks showed you this retailer chat page dated -- it

20  looks like the chat was on January 16th, 2007.  Do you agree

21  with that?

22  A.  Yes.

23  Q.  I take it you have no personal knowledge whether anybody

24  from SSN actually attended this chat?

25  A.  No, we can't determine whether someone actually watches the

1  chat.

2  Q.  So you don't know if anybody even watched the chat?

3  A.  Well, I know people called in and asked questions, so we

4  did have people watch the chat; and then we followed the chat

5  up with a blast facts that outlined what was discussed on the

6  chat, and that goes to all retailers.

7  Q.  Okay.  It says right here:  "Do not represent yourself or

8  your company as DISH Network or a DISH Network employee."  Do

9  you see that?

10  A.  I do.

11  Q.  All right.  I'm showing you what's been admitted into

12  evidence in Sophie Tehranchi's deposition, which is an outbound

13  sales script dated February 1st, 2009.  Do you see it?

14  A.  I see it.

15  Q.  Okay.  And the first line says:  Hi, my name is blank with

16  DISH Network.  Do you see that?

17  A.  I see that.

18  Q.  Okay.  Can you think of any way in which Exhibit 22

19  actually conforms to this rule?

20  A.  It doesn't look like it conforms, and that wouldn't make me

21  happy.

22  Q.  Okay.  I understand from some witnesses in this case that

23  DISH Network personnel were regularly at SSN's office listening

24  to these calls.  Would they, therefore, be in a position -- a

25  better position than you to know if SSN was holding itself out

1  as DISH itself?

2  A.  If they listened to the calls and they used this script,

3  then they would have actually heard it actually happening, and,

4  yes, they would have had a better idea of whether it was

5  happening or not.

6  Q.  So you weren't close enough to whatever relationship

7  existed with SSN to know how this happened, even though it was

8  against policy, right?

9        **MR. BICKS:**  Objection, no foundation.

10        **THE COURT:**  Well, overruled.  You can answer.

11        **THE WITNESS:**  Could you repeat the question, please?

12  Q.  You didn't have close enough contact with SSN in 2009, '10,

13  and '11 to have any way to answer how this happens without

14  being inconsistent with policy?  You don't have personal

15  knowledge sufficient to deal with it, right?

16  A.  Well, it shouldn't have happened.  I mean, I have enough

17  knowledge to know that when we lay out guidelines, the

18  retailers are supposed to conform to those guidelines, and if

19  they don't, then, you know, our people would -- would have a

20  discussion with them and figure out why and then take whatever

21  was appropriate action.

22  Q.  Okay.  Here's another policy of DISH that's been put into

23  evidence, Defendant's Exhibit 2, which is a policy about

24  retaining call records, okay.

25        Were you close enough to the SSN situation, Mr. DeFranco,

1  to know if they were abiding by this policy?

2  A.  I don't know if SSN was properly retaining their call

3  records.

4  Q.  Okay.  If it were the case that your compliance staff found

5  out that they were not retaining call records, would you expect

6  them to take appropriate disciplinary action?

7  A.  Yes.

8  Q.  You were not close enough to the situation on the ground

9  with SSN to know if they were, in fact, following the policy

10  that they ought to scrub with PossibleNOW, right?

11  A.  I'm sorry.  Could you repeat the question again?

12  Q.  You do not have enough personal knowledge of SSN to know

13  whether they were, in fact, scrubbing their call lists, as you

14  wished them to?

15  A.  No, I didn't know.

16  Q.  All right.  If your compliance staff had actual knowledge,

17  was told by SSN, that they were not scrubbing, you would have

18  expected them to take action, right?

19  A.  Yes.

20  Q.  Do you agree that actions sometimes speak louder than

21  words?

22  A.  Well, I think it depends.  Words are action, or can be.

23  Q.  Are empty words action?

24  A.  Well, I don't know what you mean by "empty words."

25  Q.  Do you believe breaking the law ought to have consequences?

1    A.   Yes.

2    Q.   Would you be more likely to speed if you were getting

3    10-dollar tickets or 500-dollar --

4            **THE COURT:**  Well, sustained about speeding.  Nobody in

5    the room wants to talk about speeding.

6            **MR. GLASSER:**  Let me consult with cocounsel.  I might

7    be done.

8            **THE COURT:**  All right.

9            **MR. GLASSER:**  Can we take a little break, 5 minutes?

10           **THE COURT:**  No.  I mean --

11           **MR. GLASSER:**  Okay.

12       (Pause in the proceedings.)

13           **MR. GLASSER:**  Your Honor, I'm finished with this

14   witness.

15           **THE COURT:**  All right.  Redirect?

16           **MR. BICKS:**  Yeah, can we just pull up 0070 for a

17   minute?

18           **THE COURT:**  Are you -- is this Defendant's Exhibit 70?

19           **MR. BICKS:**  I think it's Plaintiff's.

20           **MR. GLASSER:**  Plaintiff's Exhibit 70.

21           **MR. BICKS:**  The exhibit he showed.

22                         **REDIRECT EXAMINATION**

23   **BY MR. BICKS:**

24   Q.   Mr. DeFranco, you were asked about this.  You had never

25   seen it before, right?

1   A.   Not that I recall.

2   Q.   You've seen in your career sales pitches that companies

3   come out with to try to sell services?  Have you seen that

4   before?

5   A.   Yes.

6   Q.   Does this look like a sales pitch?

7   A.   I don't know.

8   Q.   And you see the pricing at the bottom of some of these

9   activities.  Do you know whether that's a pricing that was for

10  a retailer to pay as opposed to DISH?

11  A.   I don't know.

12  Q.   Can I show you Exhibit 22, that draft script, Plaintiff's

13  22 that was pulled up?  You were shown this script.  Do you see

14  this?  Do you know, in your position, if anyone actually ever

15  even used this script?

16  A.   I don't think this is the same one that I saw.  Is it?

17  Q.   Yeah, blow -- I was intending it to be.

18           **THE COURT:**  He looked at the top of it.

19  Q.   Do you see it?

20           **THE COURT:**  It's hard to read on the screen.

21           **THE WITNESS:**  Where it says, hi, my name is?

22  Q.   Yeah.

23  A.   I see that.

24  Q.   Right.  Do you know if anyone ever even used this script?

25  A.   I don't.

1  Q.  And if somebody used this script and DISH had said not to

2  do it, would this be contrary to DISH's instructions?

3          **THE COURT:**  I'm sorry?  If they used it and DISH said

4  don't do it?

5          **MR. BICKS:**  Yeah, would that be contrary?

6          **THE COURT:**  That's implicit in the question.  You

7  need --

8          **MR. GLASSER:**  Objection.

9  Q.  Well, did DISH make it clear to retailers to not represent

10  themselves as DISH?  Was that one of the things that you all

11  tried to do?

12  A.  This would have been incorrect based on direction we gave

13  to retailers if they used this script.

14          **MR. BICKS:**  Thank you very much.

15          **THE COURT:**  Anything else for the Plaintiff?

16          **MR. GLASSER:**  Just one -- one thing.

17                         **RECROSS-EXAMINATION**

18  **BY MR. GLASSER:**

19  Q.  You say you're familiar with the contract right?

20  A.  Yes.

21  Q.  And so you're familiar with --

22  A.  The retailer agreement, is that --

23  Q.  Yes, that's the contract?

24  A.  Yes.

25  Q.  So you're familiar with the parts that set the incentives

1 and the pay, right? And I can pull it up if you want to look
2 at it.
3 A. I think if you're going to ask me about it, I would like to
4 see it, but, yes, I was involved in creating it.
5       **MR. BICKS:** Your Honor, this goes beyond the scope.
6       **MR. GLASSER:** No, it goes right to his question.
7       **THE COURT:** What?
8       **MR. GLASSER:** Your Honor, it will go right to the
9 exact question he raised.
10       **THE COURT:** I don't know what you mean by this
11 question that he raised.
12       **MR. GLASSER:** He raised the question about who would
13 pay this.
14       **THE COURT:** Oh, okay. Well, the witness said he
15 didn't know, so sustained.
16 Q. Well, let me say this. Didn't DISH have the power in the
17 contract to make the retailers pay this?
18 A. No, we can't make the retailers pay that.
19 Q. So if the contract says you can change the price in your
20 sole and absolute discretion, you don't believe you could shave
21 $4,500 off each retailer?
22 A. The price of the programming?
23 Q. The price of the incentives paid to the retailers?
24       **THE COURT:** I'm sorry. I'm not following your
25 question.

1 Q.  In the contract, doesn't it say we will pay you what we

2 want to pay you, and we can change it at any time in our soul

3 and absolute discretion?  Does it say that?

4 A.  You'll have to show me the section.

5          **MR. BICKS:**  Your Honor, this --

6          **THE COURT:**  Okay.  You need to limit your questions to

7 the two documents that he asked about on redirect.  So I'm not

8 following --

9          **MR. GLASSER:**  I'm fine.  I don't have anything

10 further.

11          **THE COURT:**  Nothing.  Okay.

12      You can step down, Mr. DeFranco.

13          **THE WITNESS:**  Thank you, Your Honor.

14          **THE COURT:**  Any other matters we can take care of

15 shortly in front of the jury for the Defendants today?

16          **MR. BICKS:**  I don't believe so, Your Honor.

17          **THE COURT:**  Okay.  Ladies and gentlemen, it's been a

18 long week.  I think the next witness may take a little bit.

19 We're just going -- I'm just going to let you go home a little

20 early today, let you out of school early, but we are making

21 good progress.  We're not going to fall behind as a result of

22 letting you leave at 4:15.

23      Now, this is a long weekend.  Monday is a holiday, so don't

24 come on Monday.  Wait until -- come back on Tuesday.  We will

25 start Tuesday morning at 9:30.  Over the weekend, I would ask

you and suggest to you that you just put the case out of your

mind, think about other things, go about your business.

But particularly, you know, there is sort of a human

tendency to start forming an opinion once you start -- once

you've heard some facts and some evidence about a case. Please

resist that. You do have some more evidence to hear. You have

the closing arguments. You have my instructions on the law.

So over the weekend just try to put it out of your mind.

Should there be anything in the news media about the case

or on the Internet, don't read it or listen to it. If you run

into any of these folks in the parking lot or the grocery store

or anything like that, don't speak to them. They're not going

to speak to you if they see you outside the building. They're

not being rude. There's just not supposed to be any contact

between parties, lawyers and witnesses and jurors. Don't talk

to each other about the case. Keep an open mind and come back

Tuesday morning at 9:30.

All right. Leave your notes in the chair and I'll see you

all Tuesday morning.

(The jury left the courtroom.)

**THE COURT:** Okay. So the matters to take up at the

moment are -- I guess I can hear -- well, first let's take up

this question about Ms. McRae. What's her -- is that her last

name?

**MR. EWALD:** Tabor McRae.

1     **THE COURT:**  Taber McRae.  So I read the brief that the

2  Defendant filed and I understand your position.  I would -- I'm

3  just going to let the Plaintiff speak first because I got your

4  position.

5     **MR. EWALD:**  Sure.

6     **THE COURT:**  I would be inclined to let -- well, let me

7  just say to both of you all I would be inclined to let the

8  witness testify very specifically and narrowly about the

9  specific questions asked of Ms. Tehranchi and her answers.

10  Well, the witness wouldn't be asked about Ms. Tehranchi's

11  testimony, but the witness could be asked her own testimony

12  about those matters which came up in Ms. Tehranchi's testimony

13  which you identified in your brief, but, you know, not to go

14  beyond that like we would with an ordinary witness about the

15  larger responsibilities of a witness, larger views, et cetera,

16  about the case or facts or evidence.  But in terms of six or

17  seven questions, I'm not sure I really have a problem with

18  that, but I'll be glad to hear from you all further from the

19  Plaintiff as to whether that's agreeable.  And then if the

20  Defendant is seeking to do anything different than that,

21  they'll have to let me know go ahead.

22     **MR. BARRETT:**  Your Honor, we do not believe the

23  witness should be permitted to testify for the following

24  reasons.

25     One, she was excluded as a witness based on DISH's failure

1 to comply with Rule 26 by disclosing her in a timely fashion

2 and you had stated in your order correctly that she may be

3 called solely for impeachment purposes.  Because it's very

4 important to comply with Rule 26, as the Court's orders have

5 stated, solely for impeachment is a very narrow exception to

6 the Rule 26 obligation and what that means is -- solely for

7 impeachment means just that.  You cannot use a witness solely

8 for impeachment to bolster your case substantively.  There's

9 abundant authority for that.

10     And the reason they want to use her is to bolster their

11 case substantively on an issue on which they've already been

12 heard by several witnesses, including Ahmed and Musso, and they

13 both testified that DISH did not review the scripts.  Okay.

14 This is not solely for impeachment.  Solely for impeachment

15 would be putting someone on the stand to rebut Mr. DeFranco's

16 testimony about DISH's -- you know, the seriousness with which

17 DISH takes its own personal telemarketing obligations.  Okay.

18 That would be a solely for impeachment witness.  This is

19 bolstering the case substantively, not solely for impeachment.

20     And the case that I would cite that addresses this, one is

21 from the District of Maryland.  It's called *Newsome* and it's

22 437 F.Supp.2d 431 from 2006.

23         **THE COURT:**  437 F.Supp.2d.

24         **MR. BARRETT:**  431.

25         **THE COURT:**  431.  Who was the judge?

1    **MR. BARRETT:** I do not. District of Maryland.

2       **THE COURT:** Well, there is a judge up there who used

3 to be a magistrate judge and now he is a district judge. His

4 name is slipping my mind, but if you said it, I would remember,

5 and he's really good at this kind of stuff, so I just was

6 wondering if it was that judge.

7       **MR. BARRETT:** I hope it is, yes.

8       **THE COURT:** Okay.

9       **MR. BARRETT:** What that opinion holds is that

10 impeachment evidence which also possesses a substantive quality

11 cannot be said to fit the "solely for impeachment"

12 classification.

13    This is substantive evidence. They've known for years that

14 we have this evidence about script reviews. This is their

15 employee. They never disclosed this person and Your Honor

16 correctly excluded the witness because they never disclosed

17 this person. This person is not being offered solely for

18 impeachment, but it's instead a third witness that DISH wants

19 to bring it in that it never properly disclosed to support

20 Ahmed and Musso. Ms. Taber she should be excluded and should

21 not be permitted to testify.

22       **THE COURT:** All right.

23       **MR. EWALD:** Your Honor, your order seemed to clear to

24 me that Ms. Taber McRae can be brought solely for use of

25 impeachment. I think this is a classic impeachment by

contradiction. Ms. Tehranchi says X; and as we laid out in our

brief, Ms. Taber McRae will say, no, that isn't the case. And

we are planning to bring her to testify on those limited issues

and I would only add probably just to introduce who she is, why

she is here to the point of the juror with the Five9 witness by

depo designation who he didn't know who it was, so we would

need to give some context. But there are some specific

statements which Ms. Taber McRae will say are wrong, and

they're about her and what she observed. So I think it is well

within Your Honor's order and we are only attempting to provide

it on a limited basis, 15-minute testimony or so.

And I would note too that Ms. Taber McRae is in Nevada and

is, as far as we know, willing to come. Her husband was

recently diagnosed with cancer and she was not able to come

this week because she is in treatment with him. We are hopeful

she'll be able to show up on Tuesday.

**MR. BARRETT:** Your Honor, one thing I neglected to

mention is that they're claiming surprise based upon deposition

testimony that was taken in 2013. Okay. This is

Ms. Tehranchi's deposition testimony. Their lead counsel in

this case, Eric Salad (phonetic), previous to this firm, took

that deposition. So how can they claim to be surprised and in

need of an impeachment witness for someone they deposed almost

four years ago.

**MR. EWALD:** I did not claim surprise, Your Honor.

1  They put this evidence into trial by designating that

2  deposition and therefore, under Your Honor's order, we believe

3  we have the right to call Ms. Taber McRae to impeach those

4  specific statements that we cite in our brief.

5          **THE COURT:**  All right.  Okay.  Well, let me take a

6  look at it tomorrow morning; and because I have some skills

7  with our electronic docket, but not others, the best you're

8  going to get from me is a text order because I don't actually

9  know how to file a paper order, I'm happy to say, but I do know

10  how to do a text order.  So what I would anticipate is if

11  I'm -- if I find it fairly simple, I'll let you know tomorrow;

12  and if it takes me a little more time or thought, I'll let you

13  know sometime Sunday; and that's what I will commit to you --

14          **MR. EWALD:**  Thank you, Your Honor.

15          **THE COURT:**  -- is that you will have a ruling by close

16  of what would be the business day if Sunday were a business

17  day.  I'll try to do it tomorrow, though.  Okay.  But I feel

18  like I need to read the case that the Plaintiffs have directed

19  my attention to and shouldn't decide before I do that.  All

20  right.

21          **MR. EWALD:**  Thank you.

22          **THE COURT:**  Now, the only other thing I have on my

23  radar as undecided is Defendant's Exhibit 25.  That's the P --

24  the PossibleNOW report.  Is there anything else that I have

25  tabled that I have forgotten about that the Plaintiff wants to

1 remind me of?

2      **MR. BARRETT:** I don't think so.

3      **MR. GLASSER:** No, Your Honor.

4      **THE COURT:** Okay. What about the Defendant? Have I

5 forgotten anything else?

6      **MR. BICKS:** I'm not -- no.

7      **THE COURT:** Okay. So now I've heard a right fair

8 amount about this, obviously, today and I'm going to think

9 about it a little bit further, but I want to be sure I give --

10 I don't want -- I'm not trying to get you to repeat what you've

11 already told me, but if I have not given you a chance to say

12 everything about it that you want to say, because you know,

13 we've been at it kind of haphazard, I want to be sure I give

14 you that -- you know, that I've given everybody a chance to say

15 what they want to about that.

16    Does the Plaintiff have anything else they want to say

17 about that?

18      **MR. BARRETT:** No, Your Honor.

19      **THE COURT:** No. Okay. The Defendant?

20      **MS. ECHTMAN:** I just want to add one more thing. I

21 made all the arguments about why I think it should come in

22 substantively on its own and I think it actually could help

23 streamline our case because if Your Honor admits that we can

24 drop one of our experts because I think that will make a point

25 we want to be able to make in closings to the jury.

1          **THE COURT:**  Okay.

2          **MS. ECHTMAN:**  It will help streamline the case and

3   otherwise it should come in.

4          **THE COURT:**  Well -- all right.  I'm going to do the

5   same thing about this one and -- did you want to say anything

6   in response?

7          **MR. GLASSER:**  Yes, ma'am.  Could we have time to file

8   a quick brief on this one because I don't think it's going to

9   hit any of the foundation requirements for the hole they're

10  trying to put it through.

11         **THE COURT:**  Okay.  Since I have a lot of work to do

12  this weekend on this and other matters, tomorrow at five

13  o'clock?

14         **MR. GLASSER:**  Yes, ma'am.

15         **THE COURT:**  Okay.  And any response Sunday at

16  two o'clock?

17         **MR. EWALD:**  Yes, Your Honor.

18         **MS. ECHTMAN:**  Sure.

19         **THE COURT:**  Okay.  We'll all work all weekend.  You

20  all would have been working all weekend probably anyway, but

21  I'm happy -- you can file it electronically.  It will pop up by

22  the miracles of technology on my computer screen and I will

23  read it.

24      What is the Defendant's anticipation as to where we're

25  going to be on Tuesday?  I just -- you know, one of the things

1  I'm going to be doing this weekend is working on my jury

2  instructions; and if you are going to rest your case Tuesday

3  morning at eleven o'clock, I need to know that now.

4        **MR. BICKS:**  Yeah.  We're shooting, Your Honor, to be

5  done by the close of business Tuesday.

6        **THE COURT:**  Okay.

7        **MR. BICKS:**  And if it leaked into Wednesday, it's a

8  shot.  As you know, lawyers are notoriously bad at time

9  estimate.  I put myself at the top of the list.  But I think

10 the goal is we're trying to get done at the end of the day

11 Tuesday.

12       **THE COURT:**  Okay.  Often, it's my experience,

13 lawyers -- maybe it's because I have a heavy thumb, but, you

14 know, sometimes people take less time than they say they're

15 going to.  And who are you anticipating calling?  I know

16 there's this issue about an expert that you may or may not call

17 depending on the ruling on Defendant's 25.

18       **MR. BICKS:**  Right.  So we've got Debra Aron, who is

19 the rebuttal to their expert Ms. V, and then we've got Mike

20 Mills, who was here.  He went home for his daughter's birthday.

21 He's going to come back Monday.  Bruce Werner is a short

22 witness.  I'm trying to decide if we really need him.  He's up

23 in the air.  I'll tell these folks when we figure it out.  And

24 then we've got Ms. Taber, you know, 15 minutes.  So -- and then

25 there's this fellow Dr. Fenili who talks about the PossibleNOW

1    report and that's prettily much the focus.

2         **THE COURT:** And Dr. Fenili is the one you might not

3    need if the report comes in?

4         **MR. BICKS:** Yeah, we would probably drop him if we got

5    that.

6         **THE COURT:** All right. Well, yeah, that ought to

7    even -- that's going to take most of the day Tuesday it sounds

8    like.

9      All right. Good. Well, I will try to have as much as I

10   can, not having heard all of the evidence, jury instructions

11   ready so that I will not be the cause of any delay in the

12   charge conference. I did print out the last proposed

13   instructions, which were filed in August -- at the end of

14   August. That's what I'm looking at. Has there been anything

15   since then? Did I miss something? It's entirely possible.

16   That's what I have in my hand, but I don't have the whole file

17   in front of me.

18        **MR. BICKS:** I'm looking to Mr. Ewald.

19        **THE COURT:** There's always somebody in charge of this

20   kind of thing.

21        **MR. BICKS:** It's not me.

22        **MR. EWALD:** Your Honor, I believe that is the last one

23   that was filed. We had -- well, two things I would add. One

24   is we had made some comments in the pre-instruction back and

25   forth --

1          **THE COURT:**  Right.

2          **MR. EWALD:**  -- where we told Your Honor if you're

3     inclined to go with the North Carolina standard jury charge

4     that we had a different proposal for you than what Plaintiffs

5     had.

6          **THE COURT:**  Yes.  Okay.  That -- thank you.  I do

7     remember that.  So you're directing me to the -- I'm calling it

8     briefing.

9          **MR. EWALD:**  If you give me one second, Your Honor, I

10    can tell you the ECF number.

11         **THE COURT:**  This was when I sent out my rough draft

12    preliminary instructions and you all gave me some comments back

13    is what you're talking about.

14         **MR. EWALD:**  Yes, Your Honor.  We filed that on

15    December 8th --

16         **THE COURT:**  Okay.

17         **MR. EWALD:**  -- and it's our response to the Court's

18    proposed summary of applicable law.

19         **THE COURT:**  And both sides filed something I remember,

20    so I'll definitely take a look at that again.

21         **MR. EWALD:**  Your Honor, one other thing.  We had

22    filed -- it all runs together now, but I believe it was after

23    Friday's teleconference we filed a --

24         **THE COURT:**  I saw that supplemental authority, some

25    very long opinion from one of my colleagues in West Virginia --

1        **MR. EWALD:**  Yes, Your Honor.

2        **THE COURT:**  -- who talked about lots of stuff, but

3  some of it was actual authority.

4        **MR. EWALD:**  Yes.

5        **THE COURT:**  Okay.  So that's good.

6     Now, if anybody has anything else that they want to me to

7  consider -- you know, I know the evidence isn't all in, but,

8  you know, just, you know, go ahead.  Don't wait if it's

9  something you can do now.  I know, you know, you may want to

10  hand it up at the close of all the evidence, but I'm not

11  promising to consider it if you wait that long, especially if

12  it's something that has -- we already know about now.  So if

13  there's specific language that's not already in front of me

14  about anything in terms of the jury instructions, I would

15  greatly appreciate hearing about it this weekend so I can take

16  it into account.  I mean, I'll be up here every day so -- at

17  least part of the time.

18        **MR. BICKS:**  Sorry, Judge.

19        **THE COURT:**  That's okay.  I like trials.  I'm happy to

20  be figuring out some jury instructions.

21     Anything else we need to do before we stop for the day for

22  the Plaintiff?  No.  For the Defendant?

23        **MR. BICKS:**  No, Your Honor.

24        **THE COURT:**  Okay.  If we do finish all the evidence on

25  Tuesday, I would ask counsel to be available to stay late.  You

know, one of the things we could do is have a -- like an

informal charge conference off the record and work through some

things; and then we could come in Tuesday morning, have the

jury come a little bit late, do a formal charge conference on

the record that might be less confusing for the appellate court

after we work through some things. So I just would ask -- I

mean, you all aren't local. You're not going to be doing

anything Tuesday night anyway, but I just would ask you to, you

know, keep that in mind. Or at least most of you, with two

exceptions, aren't local. You know, at least some of you would

be available Tuesday night in case that timing works out.

All right. I appreciate you all's efficiency. I'll see

you Tuesday morning at 9:30.

(Proceedings concluded at 4:35 p.m.)

1      **C E R T I F I C A T E**

2          I, LORI RUSSELL, RMR, CRR, United States District Court
Reporter for the Middle District of North Carolina, DO HEREBY
3    CERTIFY:

4          That the foregoing is a true and correct transcript of the
proceedings had in the within-entitled action; that I reported
5    the same in stenotype to the best of my ability and thereafter
reduced same to typewriting through the use of Computer-Aided
6    Transcription.

7

8    _Lori Russell_____

9    Lori Russell, RMR, CRR          Date:  1/13/17
Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25