IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

THOMAS H. KRAKAUER,     *  Case No. 1:14CV333
                        *
          Plaintiff,    *
                        *
vs.                    *  Greensboro, North Carolina
                        *  January 17, 2017
DISH NETWORK, L.L.C.,    *  9:30 a.m.
                        *
          Defendant.    *
******************************

**DAILY TRANSCRIPT OF TRIAL TESTIMONY**
BEFORE THE HONORABLE CATHERINE C. EAGLES,
UNITED STATES DISTRICT JUDGE, and a jury.


APPEARANCES:

For the Plaintiff:       JOHN W. BARRETT, ESQUIRE
                        BRIAN A. GLASSER, ESQUIRE
                        Bailey & Glasser, LLP
                        209 Capitol Street
                        Charleston, West Virginia 25301

                        MATTHEW P. MCCUE, ESQUIRE
                        Law Office of Matthew P. McCue
                        1 South Avenue, Third Floor
                        Natick, MA 01760

                        JACOB M. NORRIS, ESQUIRE
                        The Norris Law Firm
                        1033 Bullard Court, Suite 207
                        Raleigh, North Carolina 27615


For the Defendant:       PETER A. BICKS, ESQUIRE
                        ELYSE D. ECHTMAN, ESQUIRE
                        JOHN L. EWALD, ESQUIRE
                        Orrick Herrington & Sutcliffe, LLP
                        51 West 52nd Street
                        New York, New York 10019

1                                    RICHARD J. KESHIAN, ESQUIRE
                                     Kilpatrick Townsend & Stockton, LLP
2                                    1001 W. Fourth Street
                                     Winston-Salem, North Carolina 27101
3

4    Court Reporter:                 Lori Russell, RMR, CRR
                                     P.O. Box 20593
5                                    Winston-Salem, North Carolina 27120

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24            Proceedings recorded by stenotype reporter.
          Transcript produced by Computer-Aided Transcription.
25

1                    **I N D E X**

2

3  **Defense Witnesses:**                                    **Page**

4    DEBRA ARON,Ph.D.
         Direct Examination by Mr. Ewald                    24
5        Cross-Examination by Mr. Barrett                   50
         Redirect Examination by Mr. Ewald                  58
6        Recross-Examination by Mr. Barrett                 61

7    ROBERT FENILI, Ph.D.
         Direct Examination by Ms. Echtman                  71
8        Cross-Examination by Mr. Barrett                   99
         Redirect Examination by Ms. Echtman               115

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  **P R O C E E D I N G S**

2  **THE COURT:**  Good morning.  I hope everybody got a few

3  hours off over the weekend.  I would hope you got more time,

4  but I suspect you didn't.  I know we were all busy working

5  away.

6  Let's see.  Just in terms of housekeeping matters before we

7  bring the jury in -- I printed myself a list and then I forgot

8  to bring it in.  I think I ruled on everything except

9  Plaintiff's 2008, which my notes reflected I had deferred.  And

10 I think I entered text orders on everything else.  Anybody have

11 any questions about those?  No?  All right.

12 And I saw the Defendant's notice about what they're

13 expecting in terms of time.  That should work well, assuming we

14 get to about lunchtime or early afternoon and the luncheon --

15 the lunch, obviously, I'm hungry already -- the evidence is all

16 in, then we can send the jury home and work on the instructions

17 this afternoon, have closing arguments in the morning.  If the

18 evidence only takes an hour, I'll revisit that schedule.  We

19 ought to be able to have closing arguments this afternoon, but

20 that's my rough plan about the timing.

21 I know there's probably other things to discuss, but they

22 might can wait till the jury's not here.  But if there is

23 anything anyone wants to address now before the jury comes in.

24 Does the Plaintiff have anything?

25 **MR. BARRETT:**  Yes, Your Honor.  To the extent that the

1  Defendant intends to go beyond Debra Aron's original expert

2  report, I believe that we should take that up now.

3          **THE COURT:**  Uh-huh.

4          **MR. BARRETT:**  Depending on your ruling, the testimony

5  could be very brief, I would think, so --

6          **THE COURT:**  Okay.  What's -- what -- do you anticipate

7  her going beyond that?

8          **MR. EWALD:**  Your Honor, we anticipate that the

9  majority of her testimony will relate to the opinions she

10  offered and her --

11          **THE COURT:**  To what?

12          **MR. EWALD:**  The opinions she offered in her original

13  report.

14          **THE COURT:**  Uh-huh.

15          **MR. EWALD:**  We also intend, as Plaintiffs did, to ask

16  Dr. Aron questions relating to the stipulation of call

17  categories that has been admitted into evidence.  And, as

18  Plaintiffs did, we intend for that to be very brief.  But,

19  other than that, I can't think of anything that is arguably

20  even beyond her original opinions.

21          **THE COURT:**  Okay.

22          **MR. BARRETT:**  Two issues respecting that, Your Honor.

23  The original opinions are irrelevant to the issues here.  The

24  original opinions were four.

25          **THE COURT:**  And I don't have her report in front of

1 me. If you're going to be -- do you have it, Mr. Barrett?

2         **MR. EWALD:** Your Honor, I can provide you --

3         **THE COURT:** Okay.

4         **MR. EWALD:** -- with a copy, if you'd like.

5         **MR. BARRETT:** They're -- I'll wait until you get the

6 report, or I can summarize them, but they're very

7 straightforward.

8     (Document handed to the Court by Mr. Ewald.)

9         **THE COURT:** All right. Go ahead.

10         **MR. BARRETT:** The opinions are as follows. First of

11 all, let me first back up and say that all of the opinions

12 address class certification and the issue of ascertainability

13 of the class.

14     You recall that the other day, I said that the Defendants

15 selected the wrong horse to ride. That's the horse that they

16 rode. They provided an expert report that addressed

17 ascertainability issues that did not address the residential

18 issue at all. And the findings in her report are as follows:

19     The first is that Ms. Verkhovskaya did not identify

20 wireless numbers, cell phone numbers. Okay. We've stipulated

21 to what the wireless numbers are. That is one of our call

22 category stipulations, so that is not relevant.

23     The second opinion that she offers is that Ms. Verkhovskaya

24 doesn't provide a basis for concluding that the DISH -- the

25 customer disposition codes on the Five9 records identify DISH

customers. Essentially, it's an EBR argument. She's saying that the Five9 records, which say DISH customer on them, is not -- they're not sufficient to identify DISH customers. Okay. We carved out all EBR class members in this case. We carved out all DISH customers in this case, so that's not relevant to any claim before the jury.

The third opinion that she offers is that Ms. Verkhovskaya does not provide a complete methodology to identify the names and addresses of the class members, names and addresses. And names and addresses is an issue that Your Honor has stated we would deal with after trial should the need arise.

And then, her final opinion is that Ms. Verkhovskaya does not account for means of providing consent by class members. Recall that when we argued class certification, we spent a lot of time dealing with DISH's argument that consent issues precluded certification. Well, consent is not a defense in this case. And so, none of the original opinions have anything to do with any issue before the Court, and those opinions should not be permitted.

To the extent Ms. Aron wants to address the call category stipulations, the residential issue, notice that none of her original findings had anything to do with the residential issue. She did not say -- Ms. Verkhovskaya did not accurately identify residential telephone numbers. And now, they want to put her on the stand to do that. They had an opportunity to

present this evidence long ago.  Their expert report was done over a year ago.  I believe it was two years ago.  And they had an opportunity to request supplementation of that report by providing testimony on the residential issue, and they never did that.  So, Ms. Aron's testimony is irrelevant and should not be presented.

    **THE COURT:**  Okay.  What does the Defendant say?

    **MR. EWALD:**  Your Honor, both Ms. Verkhovskaya's report and Dr. Aron's report were submitted during the class certification stage, and, certainly, Dr. Aron's report was geared at that time to ascertainability.  But, the primary attack that is summarized in her report is to the methodology that Ms. Verkhovskaya uses at class cert stage, and it was the same methodology that Ms. Verkhovskaya testified to on -- in trial over the last two days of last week.  She attacks the reliability of the two data sets upon which Ms. Verkhovskaya relies.

    **THE COURT:**  Can you direct me to paragraphs?  Is that --

    **MR. EWALD:**  Yes.  For example, Your Honor, on page 17, paragraph 50, what she did -- what this paragraph is summarizing is she conducted a test comparing the Five9 data and the LexisNexis data to assess the accuracy of it, which is what we are attacking in this case with respect to Ms. Verkhovskaya.  And she found that that test calls into

1  question validity of both data sets.  And what we are putting

2  her up to testify about is the tests that she conducted as a

3  data scientist on the two data sets that Plaintiffs are

4  replying on to prove up their residential requirement, and that

5  is clearly disclosed in her report, and --

6          **THE COURT:**  Okay.  I'm not quite following you.  She's

7  talking here about names and about -- I'm not quite following

8  what you're saying about paragraph 50.

9          **MR. EWALD:**  Well, Your Honor --

10         **THE COURT:**  I mean, that is in a section about --

11  headings are -- I know she has more opinions than just what the

12  headings say --

13         **MR. EWALD:**  Yes.

14         **THE COURT:**  -- obviously.  But it is within a heading

15  about names and addresses associated with telephone numbers.

16  And that is what -- I guess I'm not really following what

17  you're saying.  I don't understand.

18         **MR. EWALD:**  Well, Your Honor, understandably, at the

19  class certification stage, Dr. Aron's report was geared towards

20  the ascertainability requirement and name, address information

21  was the focus.

22         **THE COURT:**  You're talking too fast.  You just need to

23  start over on that sentence.

24         **MR. EWALD:**  She focused on the ascertainability

25  requirement and the name, address information was the focus of

the title of her opinions.  But, her attack is on the validity
of the data upon which Plaintiff's expert replies, her
methodology in using that data, and ultimately, what Dr. Aron
will testify to is that it calls into question the validity, as
she says there in paragraph 50, of the entirety of the data
sets, including the residential requirement that Plaintiffs are
focusing on in this case.

I will also note that earlier in that section, another one
of Dr. Aron's opinions relates to how Ms. Verkhovskaya ignored
date range data.

**THE COURT:**  Right.  I can see that, like in
paragraph 45, you're talking about first seen, last seen?

**MR. EWALD:**  Yes, Your Honor, if you see at the bottom
of paragraph 46, which shows up at the top of page 16, in
criticizing her ignoring these fields, she states that the
telephone number could have been under someone else's name or
could have been a business number before that.

What she's talking about is if you look at a date field
that has a begin date after the class period, then
Ms. Verkhovskaya's methodology is ignoring information that
could lead her to a different result, specifically to identify
it as a business number.

**THE COURT:**  Okay.  I understand that argument.  I'm
still not completely sure I understand what you're saying about
paragraph 50.  Okay.  Wait a minute.  The significant number of

1  mismatches, and when she's talking about mismatches there in

2  paragraph 50, she's talking about names and addresses?

3        **MR. EWALD:**  Yes.

4        **THE COURT:**  Okay.  But then she says, "Along with the

5  overlap of date information calls into question the validity of

6  both data sets."  Okay.  Are you going to be asking her

7  questions about names and addresses?

8        **MR. EWALD:**  I'm going to be asking her about the tests

9  that she conducted and that are reflected in this report of the

10  accuracy of the two data sets that Plaintiff's expert is

11  relying on.  She chose to do that by comparing names and

12  addresses.

13     And I know Your Honor has stated that names and addresses

14  are not at issue here with respect to what the jury is going to

15  be deciding.  What Dr. Aron is going to testify to is that the

16  findings of these tests that are reflected in her report give

17  her, as she says here, grave concerns about the validity of the

18  data and that extends to the data as a whole and not just the

19  residential requirement.

20     And if you take one example, if you have conflicting name

21  and address information for two entries, that's the same entry

22  that goes across the line that also includes information

23  relating to the residential requirement.  And Dr. Aron, who has

24  been doing data science for over 20 years and an economist for

25  over 30, will testify that that gives her concern as to the

1  reliability of the data as a whole.

2      I would also note that earlier in her report, when she is

3  talking about Ms. Verkhovskaya's use of disposition codes, she

4  goes on to state that Ms. Verkhovskaya is using data that she

5  doesn't know anything about and that --

6          **THE COURT:**  Say again?  I'm sorry.

7          **MR. EWALD:**  Is using data that she doesn't know

8  anything about.

9          **THE COURT:**  Can you direct me?

10          **MR. EWALD:**  Yes.  It begins on paragraph 27.

11          **THE COURT:**  Okay.  Hold on.  Okay.  And I seem to

12  recall some questions of her about how she did not take out

13  some people with certain disposition codes.

14          **MR. EWALD:**  Yes, Your Honor, and we are not focusing

15  at this stage on the DISH customer example that she gives here,

16  but more broadly on the methodology that she used and that, as

17  a data scientist, she should know what the data is that she is

18  using and analyzing, and she purported to state that she did on

19  the stand last week.

20          **THE COURT:**  Okay.  So if you start at paragraph 27

21  right under the heading B, which is the methodology --

22          **MR. EWALD:**  Yes, Your Honor.

23          **THE COURT:**  -- she says her analysis is based on

24  instructions from counsel, just to summarize that.  Then every

25  remaining paragraph has to do with whether or not somebody is a

1  DISH customer.

2        **MR. EWALD:**  Yes.

3        **THE COURT:**  Now, are you going to be talking about

4  that?

5        **MR. EWALD:**  We will not be talking about the DISH

6  customer disposition code specifically, no.

7        **THE COURT:**  Okay.  So I assume this is not going to

8  take very long, since she only says -- I mean, the objection is

9  she took her information from counsel, not from any --

10        **MR. EWALD:**  Well, as to that specific point, Your

11  Honor, yes, she will talk about what is appropriate data

12  analysis methods and that that is not an appropriate data

13  analysis method.  She also intends to testify about the tests

14  that she conducted on the accuracy of the data that I referred

15  to and will also testify, if permitted, about the stipulation

16  regarding call categories that is in evidence.

17      Her team actually created those categories that are the

18  basis for the stipulation.  She opined, as I pointed out in

19  paragraph 57 -- or actually 46, relating to the residential

20  requirement.  And as a matter, I think, in fairness,

21  Ms. Verkhovskaya did not have anything to do with those call

22  categories or the creation of those call categories and was

23  questioned by counsel on them, and we believe we should have

24  the opportunity to briefly question her as well.

25        **THE COURT:**  I'm sorry.  Direct your -- direct my

1  attention again to where she talks about residential.  I

2  thought you said paragraph 46.

3          **MR. EWALD:**  Yes, Your Honor, at the very end.  I

4  pointed that out a little bit earlier.  She refers, in

5  criticizing the method that Ms. Verkhovskaya used in ignoring

6  data, that is very relevant to the question, and she says one

7  of the reasons it is relevant is it goes to how she is

8  identifying business numbers.

9          **THE COURT:**  Where is that?  I'm sorry.  I'm just

10  not -- I'm not doubting you.  I'm just not seeing it.

11          **MR. EWALD:**  The very last sentence of paragraph 46 at

12  the top of page 16.  She states, "Ms. Verkhovskaya admits in

13  her deposition that if hypothetically the first seen date is

14  after 2011, the telephone number could have been under someone

15  else's name or could have been a business number before that."

16          **THE COURT:**  Oh, okay.  I see.  Thank you.  Okay.  You

17  can finish up your argument.

18          **MR. EWALD:**  All -- I would just proffer that the

19  examination, we plan, only intends to go about 30, 35 minutes.

20          **THE COURT:**  All right.  Rebuttal?

21          **MR. BARRETT:**  Yes, Your Honor.  The Trojan horse issue

22  is the call categories.  Counsel said that he wanted to elicit

23  questions about the call categories that Ms. Aron and her team

24  created.

25      Okay.  Recall that we addressed at one of our pretrials

1  Exhibit 31A through S, and those were the exhibits that were

2  produced to us about a month before the original trial date.

3  We moved to exclude those because they were orphaned exhibits

4  without any witness to testify about them.  They were

5  untethered to any expert reports, and they were late.  Okay.

6  So Your Honor excluded them.

7      Now what they're trying to do is to get that back in

8  through this witness, and that is the Trojan horse issue, Your

9  Honor, that I think we need to be extremely careful of.  These

10 notebooks right here, about 10 of them, are printouts of data

11 that I believe counsel wants to use, and maybe they can address

12 how they intend to use that, but it's very concerning to me

13 because it's not consistent with Your Honor's order.

14     Plus one very important point on names and addresses.  They

15 continually talk about names and addresses in the report, want

16 to talk about names and addresses now to kind of chip away at

17 the credibility of Ms. Verkhovskaya's report.  Okay.  Names and

18 addresses aren't before the jury.  They will have an

19 opportunity after trial, should the need arise, to address name

20 and address issues, as will we.  We don't know how Your Honor

21 would like to address that issue after trial, but they will

22 have an opportunity to do it.  The opportunity should not be

23 now with this jury.

24         **MR. EWALD:**  Your Honor, if I may respond on two

25 points?

1          **THE COURT:** Uh-huh.

2          **MR. EWALD:** First, with respect to the call

3   categories, we do not intend to use any of whatever Mr. Barrett

4   has behind him.  We intend to ask Dr. Aron very similar

5   questions as to which Plaintiffs asked her and --

6          **THE COURT:** Asked who?

7          **MR. EWALD:** Asked Ms. Verkhovskaya.  Apologies.

8          **THE COURT:** Okay.

9          **MR. EWALD:** And as to the second point about the name

10  and address information, there are a lot of different ways that

11  you can test the accuracy of data.

12         **THE COURT:** Okay.  Can you just back up a second?

13         **MR. EWALD:** Sure.

14         **THE COURT:** So what -- when you say same kinds of

15  questions, what do you mean?

16         **MR. EWALD:** Ask her --

17         **THE COURT:** Refresh my memory.

18         **MR. EWALD:** Sure.  Ask her what the category is, what

19  she understands to be contained in that category, and then what

20  conclusion she would draw from the information that is

21  provided.

22         **THE COURT:** Well, she didn't offer any opinions about

23  that, anything close to that in her original report.

24         **MR. EWALD:** Neither did Ms. Verkhovskaya with respect

25  to call categories specifically.  And this is something, Your

1  Honor, that is in evidence.  Dr. Aron has sat in the courtroom,
2  listened to Ms. Verkhovskaya's testimony.  She is a rebuttal
3  expert and should be able to respond.

4          **THE COURT:**  Okay.  But the only reason I let
5  Ms. Verkhovskaya testify about that was because you all were
6  going to be challenging it.  So it can't -- I mean, it's not
7  rebuttal if it -- I mean, it has to be a challenge.  Do you see
8  what I'm saying?  I'm not -- you have to be able to challenge
9  the evidence first.

10         **MR. EWALD:**  Yes.

11         **THE COURT:**  Which I thought you were going to do
12  somehow.

13         **MR. EWALD:**  And this --

14         **THE COURT:**  I mean, it is not admissible as rebuttal
15  if -- because the Plaintiff only got to do it as rebuttal.  I
16  mean, I let the order go that way because I thought it made
17  sense.  Maybe I shouldn't have done that.

18         **MR. EWALD:**  Well, and I did misspeak, Your Honor, when
19  I referred to rebuttal on this issue.

20         **THE COURT:**  Okay.

21         **MR. EWALD:**  Dr. Aron is a rebuttal expert with respect
22  to the opinions that Ms. Verkhovskaya has offered on these
23  challenges.  We do want to have a witness testify for the jury
24  about these challenges and DISH's position on them.  It is a
25  stipulated exhibit that is in evidence.

1          **THE COURT:**  Is she going to testify that she is the
2  person who did this?

3          **MR. EWALD:**  No, no, Your Honor.

4          **THE COURT:**  Okay.  And how -- let's see.  So she
5  clearly in her report talked about paragraph 6, cellular and
6  possibly cellular, right?

7          **MR. EWALD:**  Yes, Your Honor.

8          **THE COURT:**  And she talked about the -- the dates --
9  let me see.  Which paragraph are we talking about?

10         **MR. EWALD:**  That's 46, Your Honor, the last sentence.
11  And on that one, I think that reference is particularly
12  instructive here because the call categories is essentially
13  what Dr. Aron is talking about.  You have dates often described
14  on either side of the class period and what significance do you
15  give those dates.  Ms. Verkhovskaya didn't take into account
16  any of those dates in her report, but then testified at trial
17  about --

18         **THE COURT:**  Okay.  I remember.

19         **MR. EWALD:**  -- DISH challenges.

20         **THE COURT:**  Now -- all right.  Let me ask Mr. Barrett.
21  So we do have the issue with Ms. Verkhovskaya's answers at her
22  deposition, and a lot of -- some -- many of these categories do
23  appear to relate to that.  I mean, maybe not explicitly, but
24  perhaps as clearly as -- you know, we're all kind of dealing
25  with the same situation here.

1    I certainly agree with the Plaintiff that the
2 Defendant's -- would be in a different situation if the
3 Defendant had designated expert testimony in a clearer way, and
4 I don't -- I'm not revisiting my earlier decision.

5    On the other hand, their expert does appear to have
6 addressed some of this stuff.

7         **MR. BARRETT:**  Yes.

8         **THE COURT:**  So what --

9         **MR. BARRETT:**  So what we believe would be fair game is
10 the criticism that Ms. Verkhovskaya did not in her report refer
11 to the date last seen, which is -- which is in Ms. Aron's
12 report.  That's fine.  But to draw a conclusion that that --
13 she is unable to identify residential telephone numbers because
14 of that goes way outside the scope of anything here.

15         **THE COURT:**  Right.  Well, that would seem to be true.
16 Is she going to offer that opinion?

17         **MR. EWALD:**  Yes, we intend to.  And, Your Honor --

18         **THE COURT:**  Well, where is that in the report?

19         **MR. EWALD:**  Well, I would say the same thing about
20 Ms. Verkhovskaya.  She --

21         **THE COURT:**  Okay.  Well, where is anything close to
22 that in the report?  I read Ms. Verkhovskaya's report to be
23 talking about residential versus business.  You know, you --
24 you can argue to the jury that that's not your interpretation,
25 but, you know, given what this case is about, I just don't

1  understand how you can read it any other way.  Can you show me

2  something similar in Dr. Aron's report?

3          **MR. EWALD:**  I would just point the Court back to the

4  last sentence of page -- on page 16, 46.

5          **THE COURT:**  46, that one sentence?

6          **MR. EWALD:**  Yes, Your Honor.

7          **THE COURT:**  Okay.  So what -- what this is, though,

8  obviously, is a challenge to her conclusions and her data

9  analysis, right?  It's not -- I don't read this as positive,

10  affirmative testimony by your expert that numbers were or were

11  not residential.  Right?

12          **MR. EWALD:**  Right.

13          **THE COURT:**  Okay.  So what exact -- how are you going

14  to be asking it?

15          **MR. EWALD:**  Well, I think the primary question asked

16  of Dr. Aron is essentially Ms. Verkhovskaya testified while you

17  were in court last week and said X about this bucket.  What is

18  your opinion?  What is your reaction to that?

19      And I think that is fair game as a rebuttal expert where

20  she is now changing -- in our view, changing the methodology

21  that she said that she did with respect to using and taking

22  into account the numbers, when there is no evidence that is the

23  case.

24      And when she gets on the stand and talks about call

25  categories that are limited by date and says it doesn't make

1 any difference to her analysis, we should have the ability to
2 have our expert, rebuttal expert, talk about what she is
3 testifying to.

4     **THE COURT:** Okay. You keep using the word "rebuttal,"
5 but that testimony only came in because of your challenge, so
6 you can't rebut -- I mean, that's very circular. Perhaps I
7 shouldn't have let it in unless and until you all actually put
8 your evidence on challenging it, but --

9     **MR. EWALD:** It all goes -- they bear the burden of
10 proof, Your Honor, on the residential requirement. She offered
11 opinions regarding -- that the Court held, and our challenge is
12 we don't bear the burden of demonstrating that we can prove
13 those. Those are attacks on Ms. Verkhovskaya.

14     **THE COURT:** Okay. I have no problem with that. I
15 have -- I'm -- I mean, I'm going to let her testify. It seems
16 to me there's a right fair amount she can testify about, but if
17 she gets -- I do not understand this report to be making
18 affirmative, positive statements about what numbers are or are
19 not residential, and I'm not going to let her testify about
20 that.

21    That -- it is absolutely clear in this case that DISH wants
22 to put -- and has wanted for, ever since it became clear this
23 case was going to trial -- has wanted to put on evidence --
24 expert testimony that it did not properly disclose. I'm not
25 going to let you do that, but everything you disclosed that's

1  relevant to the issue before the jury, obviously I want you to
2  put before the jury -- to be able to put before the jury, if
3  you choose.

4      Now, I don't know how to deal with that other than on a
5  case-by-case basis, but I'm not going to let you say to this
6  witness, Ms. Verkhovskaya said X.  What do you think about
7  that?  That is not a proper question.  Okay?  Just first of
8  all.  So you're going to have to address that in a different
9  kind of way because "what do you think about that," you know,
10 that's not helpful.

11     And, plus, you have to put your evidence on.  That evidence
12 was offered so Ms. Verkhovskaya didn't have to come back and
13 testify in rebuttal, and, you know, it's -- you're going to
14 have to put your evidence on in a way that's admissible from
15 your evidence.  And so I may ask you some questions when the
16 witness testifies about which paragraph, but it certainly seems
17 to me she can offer -- she can talk about -- her opinion seems
18 directed at the data and whether the data is reliable.  That is
19 fair game.

20     And I will let you ask a few questions about the name and
21 address.  However, if you do that, I will, of course, explain
22 to the jury that that particular issue is not for them in terms
23 of the merits of it, and that if and when the Plaintiff wins in
24 this case, there will be further proceedings directed to the
25 name and the address and that, you know, they should not be

1   confused by that, because that's not an element of the

2   Plaintiff's case at this point, and I don't want them to think

3   that it is.  But to the extent you're using that to challenge

4   the data -- the reliability of the data itself, I think that's

5   probably fair game if you want to do it.

6           **MR. EWALD:**  Thank you, Your Honor.

7           **THE COURT:**  Okay.  Are we clear?  Anything else we

8   need to address now that we've delayed with the jury for 30

9   minutes?

10          **MR. BARRETT:**  No, Your Honor.

11          **THE COURT:**  No?  Okay.

12          **MS. ECHTMAN:**  Your Honor, I just want to preview that

13  we do have an issue, also, about the scope of Dr. Fenili's

14  testimony.  But if you like, we can address it later.

15          **THE COURT:**  That's a good idea.

16          **MS. ECHTMAN:**  Okay.

17          **THE COURT:**  Thank you.  All right.  You can bring the

18  jury in.  And, Mr. Barrett, you can object with -- along the

19  lines of outside the scope of the Court's previous order, which

20  I will take to be my ruling on the motion in limine, or

21  something like that --

22          **MR. BARRETT:**  Yes, Your Honor.

23          **THE COURT:**  -- that doesn't indicate any opinion of

24  mine about the substance or credibility.

25      (The jury entered the courtroom at 10:03 a.m.)

1      **THE COURT:**  Okay.  Good morning.  I hope everybody had

2  a nice long weekend.  Thank you for your patience.  I was

3  working through some issues with the attorneys about the next

4  couple of witnesses -- the next -- excuse me, the next witness

5  who is going to testify to try to prevent the need for you all

6  going in and out.

7      I will just tell you, on scheduling, we all anticipate that

8  the rest of the evidence is going to come in today, and we'll

9  hear closing arguments tomorrow, this is my expectation,

10  subject to, you know, something happening, and are likely to

11  start deliberation sometime tomorrow afternoon.  That's not a

12  promise to you, but that's where I think we are in the case,

13  just so you'll know.

14      And, again, I'm sorry for keeping you waiting, but we are

15  ready to proceed now.  And DISH can call their next witness.

16      **MR. BICKS:**  Your Honor, just for the Court, Mr. Ewald

17  will handle this witness.

18      **THE COURT:**  All right.  Go ahead, Mr. Ewald.

19      **MR. EWALD:**  And DISH calls Dr. Debra Aron.

20      **THE COURT:**  Go ahead.

21      **DEBRA ARON, Ph.D., DEFENDANT'S WITNESS, SWORN**

22                    **DIRECT EXAMINATION**

23  BY MR. EWALD:

24  Q.  Good morning.  Can you please state your name for the

25  record.

A.   Morning.  My name is Debra J. Aron, A–R–O–N.

Q.   And are you a doctor?

A.   I have a Ph.D. in economics, so I'm that kind of doctor.

Q.   Where do you currently live?

A.   I live in Evanston, Illinois, which is a community outside of Chicago.

Q.   If you can tell the jury a little bit about yourself.

A.   As I said, I live in Evanston, Illinois.  I was born and grew up in Los Angeles, and I have lived in Evanston for most of my adult life with my husband of over 30 years, and I raised my three children there.

Q.   Dr. Aron, where do you work?

A.   I work at a firm called Navigant Economics.

Q.   What is Navigant Economics?

A.   Navigant Economics is a consulting firm.  We do economics and finance-related consulting for businesses that face challenges that require economic analysis or data analysis.

Q.   And what is your current position there?

A.   I'm a managing director.

Q.   What does that mean?

A.   Well, what I do is I provide my expertise to clients who, as I said, can benefit from economic analysis or data analysis in business disputes, or policy disputes where policymakers, regulators, or legislators can benefit from the analysis of the economics and data related to an issue.

1  Q.  Let's talk a little bit about your educational background.
2  Can you give the jury an overview?
3  A.  Sure.  I did my bachelor's degree in economics from UCLA.
4  And then did I my Ph.D. in economics at the University of
5  Chicago.
6  Q.  And your work experience, can you briefly describe that?
7  A.  When I finished my Ph.D. at the University of Chicago, I
8  went to Northwestern University on the faculty full time there
9  where I taught economics for about 10 years.  And then, when I
10 left the academic world full time as a full-time professor, I
11 went into consulting, which is what I do now.

12    I went first to a company called LECG, which is very much
13 like the company I'm with now, Navigant.  And during the time
14 that I was an academic, I spent about a year at the Hoover
15 Institution at Stanford University as a research fellow, and I
16 was also a national fellow of the National Bureau of Economic
17 Research.

18    Since I left full-time academics, I have -- and been
19 working as a consultant, I've also continued to teach at
20 Northwestern, so I teach a course there about every year.
21 Q.  Have you had any training in statistics and data analysis?
22 A.  Yes.  Most Ph.D. programs in economics involve extensive
23 training in data analysis.  In my case, I did course work in
24 probability, statistics, data analytics, and econometrics, both
25 at the undergraduate level and at the Ph.D. level.

1 Econometrics is the science of applying data and data analytics
2 to economic problems and economic data.
3 Q.  And, in your career, have you written articles and
4 publications on data analysis in the telecommunications
5 industry?
6 A.  I have.  For about the last 20 years of my career, I
7 focused on -- a lot of my work on the telecommunications
8 industry.  And so, as part of that, I've conducted research and
9 written articles and other book chapters and so forth that's
10 been published in the professional economic literature.  And
11 that involves questions that are of interest to the
12 telecommunications industry.
13 Q.  You just referred to your experience over the last 20 years
14 in the telecommunications industry.  Can you give some specific
15 examples of that?
16 A.  Well, in the last 20 years, I have, in addition to the
17 academic and research work that I just talked about, I have
18 testified in a number of disputes involving telecommunications
19 companies, both in court, like this one, but also before state
20 regulators and federal regulators in the U.S. and elsewhere, in
21 other countries, on policy issues of importance to the
22 industry.
23     I was the economic witness in two of the largest mergers in
24 the telecommunications industry in the last 20 years, the
25 acquisition by SBC of AT&T, which is now called AT&T, and the

1  AT&T acquisition of BellSouth.  And I have made presentations

2  to the Federal Communications Commission.  They have cited to

3  my work and relied on it in their opinions.

4      I testified here in North Carolina before the state

5  regulatory agency that governs telecommunications in this

6  state, and I coauthored the chapter in the American Bar

7  Association practice guide, the economics chapter on

8  telecommunications and antitrust.

9  Q.  In connection with that work that you just described, have

10 you had occasion to work with telecommunications data?

11 A.  Yes, I have.  Over the course of the last 20 years, I've

12 worked with data from the federal and state agencies.  I've

13 worked with data from the carriers themselves as published in

14 various public records.  And I've also worked with data --

15 proprietary data provided by companies themselves on customer

16 accounts, on their network, and on billing.  So, I have

17 conducted a number of data analyses on telecommunications data,

18 including work that I have published in professional

19 literature.

20      **MR. EWALD:**  Your Honor, at this time, I would move

21 that Dr. Aron be permitted to testify as an expert in the field

22 of data analysis based on her experience, education, and

23 training.

24      **THE COURT:**  Questions about her qualifications?

25      **MR. BARRETT:**  No objections, Your Honor.

1    **THE COURT:**  All right.  You may proceed.

2  **BY MR. EWALD:**

3  Q.  Okay.  Dr. Aron, let's move to your role in this case.  Who

4  retained you?

5  A.  I was retained by the Defendant DISH.

6  Q.  And are you being compensated for your work?

7  A.  My firm is being compensated for my time and my staff's

8  time, yes.

9  Q.  And approximately how much has Navigant billed for that

10  work?

11  A.  I would estimate that for the work we've done related to my

12  testimony here, Navigant has probably billed on the order of

13  $150,000.

14  Q.  Dr. Aron, is your compensation tied in any way to the

15  outcome of this litigation?

16  A.  No.  My compensation is not related to the outcome of the

17  litigation, nor is it related to the opinions that I came to as

18  a result of my analysis and research.

19  Q.  What were you asked to do in this case?

20  A.  I was asked to analyze the methodology provided by the

21  person retained by Plaintiffs in this case, Ms. Verkhovskaya,

22  Anya Verkhovskaya, and assess whether it is reliable.

23  Q.  Dr. Aron, were you asked to provide your own analysis and

24  offer opinions regarding the specific number of calls at issue?

25  A.  No, I was not.  I understand that I was retained to analyze

1  Ms. Verkhovskaya's methodology and reach an opinion on that,
2  and that's what I did.
3  Q.  And did you reach any opinions in this case?
4  A.  I did, yes.
5  Q.  And what are those opinions?
6  A.  My opinion as a data scientist is that Ms. Verkhovskaya
7  failed to apply the proper standards, the accepted standards of
8  data analysis for three reasons.
9      One is she failed to adequately, or actually at all, assess
10 the validity of the data upon which she was relying.  She also
11 failed to consider parts of the data that she had and that
12 should have been material to her opinions and her conclusions
13 that she reached with the data.  And that she made
14 interpretations of the data she had that were not reasonable
15 given the structure of the data.
16     I did conduct an analysis of the validity of the data and
17 concluded that based on a reasonable assessment, the tests I
18 conducted call into question the validity of both of the key
19 data sets that she relied upon.
20 Q.  And, regarding those opinions that you just summarized, did
21 you apply your education, training, and experience as a data
22 scientist over the last 30-plus years?
23 A.  I did, yes.
24 Q.  And what did you review in this case to prepare your
25 opinions?

A.  Well, I began with the deposition given by Dr. Krakauer so
I could understand the context of the case.  And then, the
other important documents and materials that I reviewed were
Ms. Verkhovskaya's reports, her deposition transcript, and, of
course, the data sets themselves that she relied upon.  I also
had access to those data sets and analyzed them.

Q.  Dr. Aron, were you in the courtroom last week during
Ms. Verkhovskaya's two days of testimony?

A.  Yes, I was.

Q.  Now, based on your decades of experience as a data
scientist, is there a fundamental principle that you follow
when analyzing data sets?

A.  There is.  And the fundamental principle is that you can't
get good answers or correct answers from data if you don't have
good data.  If you start with bad data, you may apply
sophisticated or fancy techniques to the data to summarize it
or analyze it, but you're still not going to get the right
answers because you didn't start with the right information.
And that's a fundamental tenet of data science that one has to
follow in developing any methodology.

Q.  Were you in court when Ms. Verkhovskaya testified about her
data analysis process in this case?

A.  Yes, I heard her testimony.

Q.  And, generally, what did you understand that analysis to
be?

1 A.  Well, Ms. Verkhovskaya listed her steps of her analytical

2 approach.  And I've created a demonstrative, if I might ask for

3 it to be shown, that summarizes what she said.

4     And so, what she said is, first, she has to understand what

5 the data is about and talk to the attorneys and look at the

6 data.  Then you design a step-by-step process to analyze the

7 data, turn over the process to, she said, the computer coders

8 to code the process, and perform quality assurance and quality

9 control.

10 Q.  Is there anything missing from Ms. Verkhovskaya's process

11 that she laid out yesterday in your opinion?

12 A.  Yes.  I would say that while I largely agree with those

13 steps, that those are things that a data scientist has to do,

14 she missed a key step, and I've inserted it on the next version

15 of the slide, which is before you design a step-by-step process

16 or any process for analyzing the data, you first have to assess

17 the data and see if you've got useful data to begin with.

18     If you don't have useful data, there's a -- there's a

19 phrase in data science that you may have heard, which is

20 garbage in, garbage out.  If you start with data that really

21 doesn't have useful information, then all of this other

22 computer coding and mechanics that you apply to the data will

23 not give you an answer that's useful.

24     I would just also point out a little difference that I

25 edited in her process.  In the first step, she talked about

1  talking to the lawyers.  In my view as a data scientist, I

2  don't rely on what the lawyers tell me about the data.  I

3  conduct my own research to understand it and look at

4  documentation of the research, depositions about it, or other

5  reliable information.

6  Q.  So let's --

7  A.  No offense to the lawyers, not that you're not reliable.  I

8  just don't rely on lawyers for information about my area of

9  expertise.

10  Q.  No offense taken.  So, let's turn to the specific analysis

11  done by Ms. Verkhovskaya in this case.  Can you begin by

12  describing what data she started with for her analysis?

13  A.  The phone calls at issue in this case were made by a

14  company called Satellite Systems Network, SSN.  It's been

15  referred to here.  And they were placed using a platform by a

16  company called Five9.

17      And the calls that were placed between May of 2010 and

18  August of 2011 were turned over in a data set that we've been

19  calling the SS -- or the -- pardon me, the Five9 data or the

20  dialer data.  And that's the data set that she started with.

21  It lists the calls that were made, and it has fields, or you

22  can think of as columns that give some information about each

23  call.  And those columns have headers like name -- first name,

24  last name, address, disposition, and some other information

25  about the call.

1    Q.   You just mentioned disposition.  Can you tell the jury what

2    you meant by that?

3    A.   Well, there's a column, as I said, in the data called

4    "disposition," and it has a word in it or a phrase like "hang

5    up" or "busy," and that we understand to be information that

6    was provided about what happened on that call, and that is

7    referred to as the disposition.

8    Q.   In general terms, what did you understand Ms. Verkhovskaya

9    did with the Five9 data for her analysis?

10   A.   She started with the big set of calls, and she pulled out

11   of it -- the first thing she did, as she described, is she

12   pulled out of it calls that she determined based on the

13   instructions given by her lawyers, the calls that she believes

14   were not connected, and that was based on, in part, that

15   disposition field, as well as, as she described, the timing of

16   the call.

17        And then she removed -- after she got that smaller set of

18   what she called connected calls, she then looked at the

19   telephone numbers that received only one call and she took

20   those out so that all of the calls -- the phone numbers

21   remaining received two or more calls.

22        At that point, she then removed from that list, as she

23   described, the telephone numbers that, according to that

24   disposition, were identified as business.  And those were the

25   first three steps of her analysis.

1  Q.  You again were referring to disposition codes.  What is

2  your understanding as to how Ms. Verkhovskaya got information

3  about those Five9 disposition codes?

4  A.  She testified at her deposition that she didn't have any

5  information about them other than what her lawyers told her and

6  that she removed the ones that she was instructed by her

7  lawyers to remove, and then she testified here in court that

8  she didn't know how they got there, who put them there.

9  Q.  Did you hear Ms. Verkhovskaya's testimony last week that

10 she did not know how many disposition fields were in the Five9

11 data?

12 A.  I did, yes.

13 Q.  And did that surprise you?

14 A.  I was surprised by that, yes, and the reason is if you open

15 the data and look at it, there is one and only one column for

16 disposition, and that's -- that's actually very important in

17 analyzing the data.

18    It's not just sort of a nit-picky thing.  It's important

19 because that means that there's only one piece of information

20 about the call that was recorded even if there were multiple

21 things that were learned about the call by the agent when the

22 call was made.

23    So, for example, if someone -- if I get a call at my office

24 and the person says, hey, I wonder if you're interested in DISH

25 service, and I say, hey, you've called me at my office.

1  Anyway, I'm already a DISH customer, and I hang up, maybe

2  that's not very polite, but if I did that, there would be three

3  things learned on that call.  One was that was a business, one

4  was this is a person that said they're a DISH customer, and one

5  was that was a hang up.  And all three of those could be the

6  disposition that was entered by that agent, but two of them

7  will not be recorded.  Only one will be recorded.

8      So if it said "hang up," there's no information there that

9  was entered that that was a business number, and you only know

10  that if you look at the data and see that there was one and

11  only one disposition column.

12  Q.  Now, in describing your standard process of analyzing data,

13  you testified about the need to verify the reliability of the

14  data.  Are you aware of any analysis or study that

15  Ms. Verkhovskaya did to attempt to verify the accuracy of the

16  Five9 data?

17  A.  No, I'm not.

18  Q.  In addition to the Five9 data, Ms. Verkhovskaya also used

19  LexisNexis for her analysis, right?

20  A.  She did, yes.

21  Q.  And what is LexisNexis?

22  A.  LexisNexis is a company that is known in the legal

23  profession as providing legal documents for lawyers, but they

24  also have a business where they sell data for things like

25  marketing and debt collection services.

```
1   Q.  Do you recall last week that Ms. Verkhovskaya testified
2   that LexisNexis is the standard data in class action litigation
3   and that she had used them many times?
4   A.  I heard that, yes.
5   Q.  And what is your opinion on Ms. Verkhovskaya's assertion
6   that LexisNexis is the standard data in class action
7   litigation?
8         MR. BARRETT:  Your Honor, objection.  It's outside the
9   scope.
10        THE COURT:  Can you direct me, Mr. Ewald, by
11  paragraph?
12        MR. EWALD:  Your Honor, the -- on paragraph 38,
13  page 13.
14        THE COURT:  Hold on.
15     (Pause in the proceedings.)
16        THE COURT:  All right.  Overruled.  You may answer.
17        THE WITNESS:  May I hear the question again, please?
18  BY MR. EWALD:
19  Q.  Of course.  You recall last week that Ms. Verkhovskaya
20  testified that LexisNexis is the standard data in class action
21  litigation and that she has used it many times?
22  A.  Yes, I heard that.
23  Q.  My question was, what is your opinion on Ms. Verkhovskaya's
24  assertion that LexisNexis is the standard data in class action
25  litigation?
```

1         **THE COURT:**  Okay.  I -- did -- did the witness testify
2  about her experience in class action litigation?  I didn't hear
3  that.
4  **BY MR. EWALD:**
5  Q.  Dr. Aron, have you been a witness in other class actions in
6  federal court?
7  A.  I have.  I have been a witness in a number of class
8  actions, both TCPA, as this one, and in other kinds of class
9  action matters over the course of my career, yes.
10  Q.  So with that experience, what is your opinion regarding
11  Ms. Verkhovskaya's assertion?
12         **MR. BARRETT:**  Your Honor, objection to lack of
13  foundation.  Experience in class actions generally does not
14  equate to her testifying --
15         **THE COURT:**  Overruled.  You can ask her about it on
16  cross.  You may answer.
17         **THE WITNESS:**  I'm not aware of this data being used by
18  anyone other than Ms. Verkhovskaya, but moreover, it is not an
19  official data source.  It's not a data source that comes from
20  and under the auspices of either an agency like the FCC or a
21  state regulatory agency or from the carriers themselves.  So
22  I'm not aware of this being the kind of data that at least I
23  would rely on as an expert in data analytics.
24  **BY MR. EWALD:**
25  Q.  When you referred to carrier, what did you mean?

1  A.   Oh, I meant like a telephone company.

2  Q.   And does Ms. Verkhovskaya's use of a data many times have

3  any significance to you as a data scientist?

4  A.   No, the fact that she's used the data many times doesn't

5  lend it validity or credibility.  It's our responsibility as

6  data scientists or data experts to test the validity of the

7  data in order to determine whether it's applicable for the

8  purpose to which it's being put in a particular case.

9  Q.   What do you know about the sources of LexisNexis data?

10 A.   Well, there is no single official industry directory, you

11 might say, of information about telephone numbers that is

12 relevant to the kind of data that we are talking about in this

13 case.

14      And so for a company like LexisNexis to put together a

15 database for purposes like marketing and, as I said, debt

16 collection, they collect information from a variety of sources,

17 as Ms. Verkhovskaya testified, and that might include scraping

18 websites, obtaining information about subscriptions that people

19 apply for.  It could also include information from the

20 Secretary of State or other agencies, but LexisNexis doesn't

21 disclose how it obtains its information or what it does with

22 it.  It's a proprietary process that LexisNexis says it does

23 not disclose and it does not warrant or guarantee, in other

24 words.

25           **MR. BARRETT:**  Objection, Your Honor, that's hearsay.

1    **THE COURT:** Sustained. I'll disregard that.

2    **MR. EWALD:** Your Honor, if I may, Ms. Verkhovskaya

3  testified very similarly throughout her examination about

4  conversations that she had with LexisNexis and similar --

5    **THE COURT:** Well, I let her say that LexisNexis

6  doesn't disclose the sources. That's sustained. Otherwise,

7  beyond the scope. Go ahead.

8  BY MR. EWALD:

9  Q. So even in light of all the issues you just talked about

10 with the LexisNexis data, did Ms. Verkhovskaya conduct any

11 testing of the accuracy of the LexisNexis data?

12 A. No, she did not. She testified that she did not do so.

13 Q. Well, did you perform any analysis to assess the accuracy

14 of the data sets at issue here?

15 A. I did, yes.

16 Q. And what did you do?

17 A. Well, there were these two data sets, this data set from

18 the dialer, the dialer data, and this data set from LexisNexis,

19 and I looked at them both, and I noticed that both of them

20 contain name and address information; and so my idea was if

21 these data sets are both accurate, then the name information

22 should be the same in both data sets for any given phone

23 number. So I thought that's a simple and reasonable test that

24 one could conduct to see if the data are the same, and if

25 they're not the same, that would call into question certainly

1   the validity of the data.

2   Q.  What did you find about the completeness of the data when

3   you reviewed the information from the LexisNexis and Five9 data

4   sets?

5   A.  Well, it turned out that for the dialer data, taking the

6   full dialer data, about 25 percent of the data had incomplete

7   name and address information.  So that was a red flag.  And in

8   the LexisNexis data, about 22 percent of the phone numbers had

9   no name information at all.  So that's another red flag because

10  if LexisNexis had a comprehensive valid set of data, I would

11  expect them to have data for all of the phone numbers, but a

12  substantial share of the data was missing or incomplete.

13  Q.  Now, for the numbers you had at least some name information

14  for, what did you find when you compared the two sets?

15  A.  I have a demonstrative about that, if I may ask for it.

16          **MR. BARRETT:**  Your Honor, would now be the appropriate

17  time for a limiting instruction?

18          **THE COURT:**  Let me hear the evidence and -- so I can

19  frame it appropriately.  Go ahead.

20          **THE WITNESS:**  Sure.  So I'm showing here a table from

21  my report, and what I've done here is I've limited the data to

22  just those telephone numbers where there is some name

23  information in both data sets, the dialer data and the

24  LexisNexis data.

25      And then I asked, okay, just of that subset of the data, in

how many cases does the name information match, and what I
found is that in almost a quarter of the data, in over
24 percent of the phone numbers, the name information doesn't
match.

**BY MR. EWALD:**

Q.   Did you acquire the names to match exactly?

A.   No, I know that names can be entered with misspellings.  I
know, of course, as I just said, sometimes the information is
incomplete, so I wanted to be as generous to the data, as
forgiving of the data as possible.  So first I allowed what are
fuzzy matches.  The computer can detect if the name is Johnson
in one data set and Johnston in the other or Mary and Maria or
Rodriguez and Rodriques, or something like that, and count it
as a match.

     I also allowed a match to be a match if even the names
matched partially.  So I have here, if you can show it, this is
a blowup of the criteria that I applied to match.  And I won't
go through them all, but the idea is, for example, even if just
the first name matches, but it's in the same city and state, so
if it's James Madison and James Monroe and they're both in
Chicago, Illinois, I counted that as a match.

     So even with that very generous matching criteria, I found
that almost -- almost a quarter of the data doesn't match.

             **THE COURT:**  Okay.  So, ladies and gentlemen, there's
no issue in this case about names and addresses.  That's not

1  something that you all have to decide.  This evidence is

2  offered to assist you in evaluating the -- the remaining

3  evidence and reliability and help you to judge whether it's

4  credible, believable, and how much weight to give it.

5      You don't have to -- there's nothing in this case about

6  names and addresses for you to decide, so you shouldn't

7  consider that, you know, substantively that way, because that's

8  not something that anybody has to prove here in this case.

9      Go ahead.

10 **BY MR. EWALD:**

11 Q.  Dr. Aron, before we move on, to make sure the jury is

12 clear, could you explain the different numbers that show up in

13 this demonstrative and the two different columns of the

14 complete -- or partial match by name and no match by name?

15 A.  Yes.  So let me make this easier to understand.  So first

16 at the bottom there, there's that number 18,149.  That's the

17 number of telephone numbers where I had at least some

18 information about names in both data sets.  So that was the

19 population I started with for my data validation analysis.

20     And then I conducted this matching exercise and asked how

21 many match and how many don't, and of the ones that match

22 either completely or partially by name, there were 13,770, and

23 those with no match by any of these criteria were 4,379.  And

24 so 4,379 is 24.10 percent of the 18,149 phone numbers that I

25 started with for my data validation analysis.

1  Q.  And from this test that you just summarized, what do you

2  conclude about the quality of the data sources as a whole?

3  A.  Well, it calls into question the validity of both of these

4  data sets.  This is not a very good grade for data.  It's far

5  from what I would use in data analysis, and, moreover, we don't

6  know which data set in any these cases that are mismatched is

7  right.  In fact, we really don't know if either one is right

8  because we don't know where those -- we don't know where the

9  data came from in either case.  So where they match, we can't

10 conclude that data are correct, but where they mismatch, we can

11 conclude something that is wrong in at least one of the

12 databases, and we don't know which one.

13 Q.  Now, earlier in your testimony when you were summarizing

14 your opinions, you said that Ms. Verkhovskaya ignored certain

15 parts of the data.  What did you mean by that?

16 A.  Well, as I said in my report and I'll say here, she

17 testified that she did not look at either the residential

18 designation, or there are columns in the data that identify the

19 dates at which the observation by LexisNexis was first seen and

20 last seen.  So, in other words, those pieces of the data, those

21 columns in the data delimit, or you could say limit, the time

22 period for which the information in that row of the data is

23 relevant or applies.  She didn't -- she didn't use that --

24 those columns for anything.

25      I heard her say here in court that she testified at her

1  deposition that she didn't use them, but she had forgotten that

2  she considered them, and so she may have considered them, but

3  she didn't use them.  You know, based on her actual analysis, I

4  can see that she did not apply them or use them in any way.

5  Q.  And why, in your opinion, are those date limitations

6  important for the analysis that Ms. Verkhovskaya conducted in

7  this case?

8  A.  Well, if you look at the data, what you find is that for a

9  given phone number -- first of all, there can be multiple rows

10 of data for a given phone number and some of that information,

11 according to the date delimits -- like there are cases where

12 the last time LexisNexis had an observation on that phone

13 number associated with that person was back in 2001.  The --

14 the class period here starts in 2010, and people change phone

15 numbers with significant frequency in the United States.  There

16 are also observations in the data where the first time the

17 phone number was observed by LexisNexis with that information

18 was in 2015, and the class period ended in 2011.

19      So there are observations where there's a significant

20 distance in time between when that information in the data was

21 observed by LexisNexis and what they're delimiting as the

22 applicability of that observation and the time period at issue

23 here.  And so as a data scientist, one has to consider that

24 information.  If the information about a phone number isn't in

25 the relevant time period, I wouldn't apply it to that time

period.

Q.   Now, you referred a number of times to observations in the
data.  Can you explain what you mean by that?

A.   The way the data looks is that there are a whole bunch of
rows.  And so now I'm talking about the LexisNexis data.  For
each phone number, there may be multiple rows, and so it might
be here's the phone number and then here's a name and these
other columns associated with the line type designation that
people have been talking about, business and residential and
government, and then the date delimiters.  And so it may have a
date range of, like, 2001 to 2003 for that phone number with
the name Jane Smith.  And then there may be another row with
the same phone number and the date range of observations is --
falls in 2008 to 2011 and there may be no name in that one or
there may be a different name in that one or there may be other
different information in that one and there may be other rows
like that as well.  So to interpret that, to understand what
part of that you should be using, if any, it's important to
look at the date information that LexisNexis provided.

Q.   Did you conduct analysis of this date issue that you've
been referring to?

A.   I did, yes.

Q.   And what did you do?

A.   Well, I -- if I can pull up that exhibit we just looked at
a moment ago, you'll recall that there were 18,000 and a few

additional -- 18,149 phone numbers that had at least some name
information in both data sets. Well, I limited that to just
the phone numbers that had name information during the same
time period as the dialer data, which is that class period
2010-11 period, and asked of those observations how many match.

And what I found is that of those 18,149 phone numbers
fewer than half of them match by name in the relevant time
period and so that is -- you know, further calls into question
whether the data that Ms. Verkhovskaya is relying on in this
case is valid for use in this case, which is limited to a
particular time period.

Q.  Dr. Aron, I just want to ask you a couple questions
regarding an amended joint stipulation regarding call
categories that's been admitted into evidence.

        **MR. EWALD:**  Can you put it up on the screen, Trudy?

        **THE COURT:**  I missed the last thing you said.  They
were admitted into evidence.

        **MR. EWALD:**  Yes, I asked Trudy to put it on the screen
for us.

Q.  Have you seen this document before, Dr. Aron?

A.  Yes, I have.

Q.  And what do you understand it to be?

A.  I understand this to be a list of buckets of phone numbers
with different characteristics in the data.

Q.  Now, if you can turn to paragraph 2.  What do you

1  understand this category of calls to include?

2  A.  This is a category of, as it says, 5,118 telephone numbers

3  where, if you look at the data as I just described it, the

4  LexisNexis data identifies that phone number as residential

5  only outside of the class period; that is, those observations

6  are applicable only either before the class period started or

7  after the class period ended.

8  Q.  And in instances like this where there's no information

9  about a phone number during the class period, can you draw any

10  inferences from that lack of data?

11  A.  If I don't have data about a feature of the phone number

12  that I'm trying to understand, I cannot draw an inference about

13  it, no.

14  Q.  And this goes back to, I think, the discussion you just had

15  about date limitations.  And what is the significance of date

16  limitations in a data set like this?

17  A.  Well, as I said, LexisNexis puts into the data the time

18  periods for which it has made the observations about that phone

19  number, and so that's what -- when I read that data, I say

20  that's the time period for which that data is relevant.

21      I can't speculate around the data, make -- you know, apply

22  intuition.  This isn't an intuitive exercise.  I rely on what

23  the data tell me, and if the data don't tell me information in

24  the time period, then I don't have information that I can reach

25  an opinion about that phone number.

1    **MR. EWALD:**  Let's turn to paragraph 4, Trudy.  Thank

2  you.

3  Q.  What do you understand about this category of calls?

4    **MR. BARRETT:**  Your Honor, I think we're outside the

5  scope.

6    **THE COURT:**  Yes, sustained.  This doesn't have

7  anything to do with the dates, so --

8    **MR. EWALD:**  Your Honor, it goes to conflicting

9  information in the data sets upon which --

10    **THE COURT:**  Okay.  But in her report where?

11    **MR. EWALD:**  She talks about a conflicting --

12    **THE COURT:**  Which paragraph?

13    **MR. EWALD:**  On the date issue -- I can't point you to

14  it, Your Honor.  We're talking about conflicting information

15  and what inferences can be drawn from that.

16    **THE COURT:**  All right.  Well, sustained if it's not in

17  her report.

18    You can remove that from the screen.

19  Q.  Dr. Aron, in your opinion, can you draw any conclusions

20  from the LexisNexis data based on the testing that you did in

21  this case?

22  A.  In my opinion as a data scientist and a researcher, I would

23  not rely on the LexisNexis data, given the tests that I have

24  performed on it.  The tests demonstrate that one has to

25  question the validity of the LexisNexis data, as well as the

1  dialer data; and we don't have enough information based on what
2  has been provided in this case to know which, if either one, is
3  correct in any given circumstance or for any given phone
4  number.
5  Q.  And more broadly than the LexisNexis data, what is your
6  overall opinion of Ms. Verkhovskaya's analysis in this case?
7  A.  My opinion is that she failed to conduct an analysis that
8  implements a methodology that's reliable because she missed
9  that key step of assessing whether she was relying on data that
10 can be relied upon in a court of law for purposes of reaching a
11 professional opinion about the information in that data set.
12 Q.  And do you hold all the opinions you testified about today
13 to a degree of reasonable certainty in the field of data
14 analysis?
15 A.  I do, yes.
16 Q.  Thank you, Dr. Aron.
17         **THE COURT:**  All right.  Questions?
18         **MR. BARRETT:**  Yes, Your Honor.  May I get the
19 microphone from counsel?
20         **THE COURT:**  You may.
21     (Pause in the proceedings.)
22                     **CROSS−EXAMINATION**
23 **BY MR. BARRETT:**
24 Q.  Good morning, Dr. Aron.
25 A.  Good morning, sir.

1  Q.  I'm John Barrett, one of the attorneys here.  We've not met

2  before.

3  A.  We have not.

4  Q.  You -- your report in this case was completed in March of

5  2015, correct?

6  A.  That sounds about right, yes.

7  Q.  And you testified that you were paid or your firm was paid

8  around 150,000, I believe it was, for work in connection

9  with -- for your work, correct?

10 A.  For the work of my staff and myself in preparing my report

11 and preparing for trial.

12 Q.  And how much has DISH Network paid your firm for its work

13 altogether in this and other matters in the last two years?

14 A.  I -- sorry, I don't know the answer to that.

15 Q.  Well, is there work that you've done associated with this

16 particular case that is not included in your assessment of

17 $150,000 billed today?

18 A.  Yes.  My staff performed quite a lot of data analysis that

19 I understand resulted in those stipulations.

20      **THE COURT:**  Okay.  Stop.  I think he just asked you a

21 yes or no question, so --

22 Q.  How much was your firm paid for the work that you were

23 referring to?

24 A.  I don't know the answer to that.

25 Q.  Would it be more than $500,000?

1  A.  I can't imagine that that would be the case, but I wasn't
2  supervising that work.
3  Q.  And your hourly rate here for testimony is what?
4  A.  My hourly rate today is $780.
5  Q.  And that's the rate that you had charged more or less for
6  all of your work in this case, correct?
7  A.  Back in the time frame when I was doing my report, it was
8  $760, I believe.
9        **MR. BARRETT:**  Ms. Sanders, will you please turn on the
10 monitors.
11 Q.  Before I get to that, have you, Dr. Aron, ever been
12 appointed by any court to administer a class action settlement?
13 A.  No, I haven't.
14 Q.  Okay.  So you would defer to one who has been appointed by
15 courts to administer class action settlements with regard to
16 the valid use of data sets to obtain information about class
17 members; is that correct?
18       **MR. EWALD:**  Objection, relevance, Your Honor.
19       **THE COURT:**  Overruled.  You may answer.
20 A.  I haven't studied the information requirements associated
21 with administering a class.  My analysis and my testimony here
22 relates to the validity of the data used for purposes that
23 Ms. Verkhovskaya put the data in this case.
24 Q.  I'd like to place in front of you what has been marked as
25 Plaintiff's Exhibit 2008.  Can you see that, Dr. Aron?

1  A.  Yes, I see that.

2  Q.  Do you understand this to be, as it says down at the bottom

3  left, a summary of Ms. Verkhovskaya's process for identifying

4  class telephone numbers and telephone calls?

5  A.  Right, I see that.

6  Q.  Okay.  So in your report -- first of all, you had

7  Ms. Verkhovskaya's report when you performed your report in

8  this case, correct?

9  A.  I did, yes.

10  Q.  And when you performed your report -- when you wrote your

11  report, you did not dispute Ms. Verkhovskaya's conclusion that

12  there were 230,121 connected calls in the Five9 data, correct?

13  A.  Well, I did comment on that in the sense that I pointed out

14  that the way she got to that number is by removing calls

15  according to disposition codes that were given to her by the

16  lawyers rather than via her own understanding of the data and

17  analysis of the dispositions.

18  Q.  But you didn't come up with your own number of connected

19  calls, correct?

20  A.  I did not come up with my own number.  As I said -- I mean,

21  I'm addressing the methodology as a whole; and so if you are

22  relying on improper data, then fixing the mechanics is not

23  going to solve the problem.

24  Q.  And when you performed your report -- wrote your report in

25  March of 2015, you did not assert that it was incorrect for

1  Ms. Verkhovskaya to remove 65,627 single calls, did you?

2  A.   That's right, I did not.

3  Q.   And you did not when you wrote your report assert that

4  Ms. Verkhovskaya was wrong to reduce the number of telephone

5  numbers by 34,526 because those numbers were not on the Do Not

6  Call Registry, correct?

7  A.   That's correct.

8  Q.   And you did not in your report dispute Ms. Verkhovskaya's

9  finding that 1,393 business and LexisNexis business telephone

10  numbers were appropriately removed, correct?

11  A.   I did comment in my report on the fact that she relied on

12  the dispositions, that she doesn't know where they came from or

13  what they mean, to remove business designations from the dialer

14  data and that she relied on the LexisNexis data to remove

15  additional numbers that were designated as business, but that

16  she, as I said in my report, didn't look at the residential

17  column in that data.  And all of that -- just to reiterate, all

18  of these numbers rely on her first step of removing unconnected

19  calls, which was based on disposition codes about which she

20  didn't have information and was simply instruction from

21  counsel.

22  Q.   But you didn't say that number should be something

23  different, right, 1,393 business and LexisNexis business

24  numbers, correct?

25  A.   That's right, I did not give a different number.

1   Q.  And you didn't assert a different number than

2   Ms. Verkhovskaya when she removed from the class from her

3   report 1,782 DISH customers, correct?

4   A.  I didn't offer a different number, although I did have a

5   section in my report about the failings in her methodology by

6   which she got to that number.

7   Q.  And in your report, you did not conclude that some other

8   number than 20,450 numbers received two or more calls while

9   they were on the Do Not Call Registry and while they were

10  residential numbers, correct?

11  A.  I didn't offer a different number.  As I said, I addressed

12  her methodology and the fact that if you start with data that

13  doesn't pass muster you will not get answers that you can rely

14  on no matter how carefully you do or do not conduct the

15  mechanical part of removing numbers.

16  Q.  But you could have offered a different number, correct?

17  A.  No, I could not have offered a different number with the

18  data that she provided because it was my opinion that the data

19  she provided wasn't suitable for this exercise to begin with.

20  Q.  You could have listened to additional testimony that had

21  been presented to this jury to come up with a different number,

22  correct?  You could have done that?

23  A.  My opinion is that if one were to conduct an exercise like

24  this to come up with telephone numbers that satisfy all these

25  criteria, including that they're residential numbers, one

should go to useful data with which to do that data that is
reliable, that is official, and that I could manipulate the
mechanics of how one pulls things out of these data.

    I could apply a more refined technique that applies the
date fields, for example, and that looks more carefully at the
line type fields.  But, I will still have the garbage in and
garbage out problem because I'm starting with data that I've
already demonstrated to not pass muster as a data scientist.

Q.  You understand that with respect to these connected calls,
Ms. Verkhovskaya began with 1.661 million telephone calls at
the top; right?

A.  That's right.

Q.  And then, she removed 1.431 million inbound, unconnected,
fax, et cetera, calls; correct?

A.  She removed 1.4 and some change million calls that she
asserted to be unconnected, et cetera, based on the
instructions that I believe you gave her.

Q.  And you would agree with me there's nothing unfair to DISH
about removing these calls; correct?

A.  I'm not offering an opinion on what's fair or not fair,
but -- so, no, I don't have an opinion that it's unfair.

Q.  You don't have experience, outside of this case, analyzing
telemarketing call logs; do you?

A.  Telemarketing what?

Q.  Call logs.  Call records.

1  A.  I have analyzed telemarketing call records in a number of

2  cases.

3  Q.  And have you analyzed disposition codes in those cases?

4  A.  I have, yes.

5  Q.  You understand that the sole source of call records, call

6  logs in this case is the Five9 data?

7  A.  Yes.

8  Q.  I'd like to talk with you about this demonstrative exhibit.

9  Now, this top line, 75 percent, right, that's where the Five9

10 data and the LexisNexis data match or partially match; correct,

11 regarding the names?

12 A.  So, just to be clear, it's of the subset of records where

13 there is any name matching -- name information at all.  So I've

14 already thrown out of this analysis the records where the data

15 are so incomplete that the analysis cannot be conducted.  Of

16 those records, 75.9 percent have some match according to these

17 generous criteria, yes.

18 Q.  So, you would agree with me that of those records that you

19 did analyze, it's more likely than not that there is a partial

20 or complete name match between the LexisNexis data and the

21 Five9 data, correct, 75 percent more likely than not?

22 A.  If you are asking if I were to take a phone number at

23 random from the 18,149 where there is name -- some name

24 information in both data sets, and without looking at it, was

25 asked what is the probability that there would be a match

1  between them, I would know it because I have done this analysis

2  that it would be 75.9 percent.

3  Q.  And you agree with me that 75.9 percent makes something

4  more likely than not; correct?

5  A.  Yes.

6          **MR. BARRETT:**  No further questions, Your Honor.

7          **THE COURT:**  Redirect.

8          **MR. EWALD:**  Yes.

9          **MR. BARRETT:**  Can I give the microphone to counsel?

10         **THE COURT:**  Oh, yes.  How long is your redirect going

11  to be?

12         **MR. EWALD:**  Very short, Your Honor.

13         **THE COURT:**  Okay.

14                    **REDIRECT EXAMINATION**

15  **BY MR. EWALD:**

16  Q.  Dr. Aron, do you recall questions you were asked from

17  Mr. Barrett about class administration?

18  A.  I do recall that, yes.

19  Q.  Have you ever sought to be a class administrator?

20  A.  No, that's not my area of business.

21  Q.  And would you testify in a case as an expert and also allow

22  your firm to be involved in potential class administration in

23  the same case?

24  A.  I don't think my firm would allow that because that would

25  be considered a conflict.

1  Q.  Why?

2  A.  As an expert witness, I am only allowed and I would only

3  choose to testify in a case where --

4          **MR. BARRETT:**  Your Honor, may I object?

5          **MR. EWALD:**  He interrupted her, Your Honor.

6          **THE COURT:**  Just a second.  The short version?

7          **MR. BARRETT:**  May I approach?

8          **THE COURT:**  All right.

9      (The following bench conference was recorded.)

10         **MR. BARRETT:**  He was suggesting a conflict because

11 Your Honor had appointed A.B. Data to administer the class

12 notice.

13         **THE COURT:**  All right.  Well, she's never been a class

14 administrator, so I don't understand how she can testify about

15 what would be a conflict or not.

16         **MR. EWALD:**  She wouldn't be a class administrator in

17 this case.  He opened the door trying to suggest she doesn't

18 know what she's talking about and she's entitled to answer the

19 question.

20         **THE COURT:**  Well, you can ask her how she knows what

21 she's talking about, but not -- that's not what you're asking

22 her.

23         **MR. EWALD:**  Also, Plaintiffs have opened the door on

24 this question of conflict by suggesting that she should play a

25 similar role here as -- as Plaintiff's asking her.

1          **THE COURT:**  Okay.  All right.  Rule 403 is sustained.

2      (End of the bench conference.)

3          **THE COURT:**  All right.  We'll move along.

4  **BY MR. EWALD:**

5  Q.  Dr. Aron, you were asked at the end of your testimony by

6  being questioned by Mr. Barrett about the more likely than not

7  scenario.  Do you recall that?

8  A.  Yes.

9  Q.  And, in your opinion, based on the testing of the data in

10  this case, can you draw any conclusions about specific calls

11  that are based on these two data sets?

12          **MR. BARRETT:**  Your Honor, objection.  This is outside

13  the scope.

14          **THE COURT:**  Well, overruled.  She can answer that

15  question.  Go ahead.

16          **THE WITNESS:**  No.  One cannot reach a conclusion that

17  the data upon which Ms. Verkhovskaya is relying is more likely

18  than not accurate or that any particular conclusion is more

19  likely than not true.  That is why we conduct data analysis on

20  valid data.

21      If one wants to make a probabilistic statement, one has to

22  conduct an actual analysis of that fact that you're trying to

23  assign a probability to.  That wasn't done in this case.

24          **MR. EWALD:**  Thank you.

25          **THE COURT:**  Anything else on those limited questions?

```
 1          MR. BARRETT:  Very brief, Your Honor.  Very briefly.
 2          THE COURT:  Oh, okay.
 3                       RECROSS-EXAMINATION
 4  BY MR. BARRETT:
 5  Q.  Dr. Aron, we reviewed PX2008; correct?
 6  A.  Correct.
 7  Q.  And we went down to the bottom and identified 20,450
 8  telephone numbers; do you recall that, that Ms. Verkhovskaya
 9  had identified as receiving the calls in question?
10  A.  I didn't memorize the number, but that's roughly correct as
11  my recollection.
12          MR. EWALD:  Objection, Your Honor, outside the scope.
13          THE COURT:  Well, I assume you're moving to something
14  within the scope.
15  BY MR. BARRETT:
16  Q.  In your report, did you identify any telephone numbers on
17  this list that were not on the Do Not Call Registry?
18  A.  No.  That wasn't part of the analysis that I conducted.
19          THE COURT:  Okay.  And you do need to limit your
20  questions to the topics he covered in redirect.
21          MR. BARRETT:  Yes, Your Honor.  Nothing further.
22          THE COURT:  Say again.
23          MR. BARRETT:  Nothing further.
24          THE COURT:  All right.  Thank you.  You can step down.
25          THE WITNESS:  Thank you, Your Honor.
```

1       (The witness left the stand.)

2           **THE COURT:**  All right.  Ladies and gentlemen, we'll

3   take a short break.  I might need to talk to the lawyers

4   briefly about the next witness, so I'm going to ask you all to

5   come back in 20 minutes.

6       Please remember not to discuss the case among yourselves or

7   with anyone else.  Keep an open mind.  Leave your notes in your

8   chair.  Come back in 20 minutes to the jury room.

9       (The jury left the courtroom.)

10          **THE COURT:**  Okay.  Are we going to have any objection

11  to Dr. -- is it Fenili?  Are you going to be objecting to that

12  in advance?

13          **MR. BARRETT:**  Yes, Your Honor.

14          **THE COURT:**  All right.  Let's -- I need a break.  So,

15  let's take a short break and we'll come back and do that in a

16  minute.  Is there other housekeeping matters to take up before

17  we take our break?

18          **MR. BICKS:**  I don't have a housekeeping matter, Your

19  Honor, but just a question on the table.  I do want to get

20  guidance from you about use of transcripts in closing.

21          **THE COURT:**  Yeah, we'll talk about that later.

22          **MR. BICKS:**  Understood.

23          **THE COURT:**  Yeah, just help me remember when the jury

24  is not waiting on us.

25          **MR. BICKS:**  Understood.

1    **MR. GLASSER:**  Your Honor, I do think the limiting

2  instruction about names and addresses should be a little more

3  full and say that names and addresses are not at issue in the

4  case because the Court will handle that if it's necessary down

5  the road.

6    **THE COURT:**  Okay.  We can talk about that during the

7  charge conference, too.  Let's shoot for, you know, maybe 12

8  minutes or so.  So let's take a 12 minute recess.

9    (A morning recess was taken from 11:13 a.m. until

10  11:25 a.m.)

11    **THE COURT:**  Okay.  What's your objection as to

12  Dr. Fenili?

13    **MR. BARRETT:**  Your Honor, the objection is relevance.

14  The Registry itself, the Do Not Call Registry, is not on trial.

15  What is on trial is whether telephone calls were placed to

16  these class telephone numbers.  What Dr. Fenili has to say

17  about the overall reliability about the Registry itself is

18  immaterial.  It's not something the jury needs to resolve.

19    Also, his report is based on a hearsay report from

20  PossibleNOW, which Your Honor has previously excluded based

21  upon the ruling the other day.

22    **THE COURT:**  I don't have his report.  Do you -- you

23  know, I can't possibly keep everything that's been filed in

24  this case in front of me up here.  You all have more room than

25  I do.

1        **MS. ECHTMAN:**  Your Honor, just to make it easier.

2        **THE COURT:**  Thank you.

3     (Document handed to the Court by Ms. Echtman.)

4        **MS. ECHTMAN:**  Your Honor, if I could respond, or do

5   you want to first read the report?

6        **THE COURT:**  Just a second.  Give me a moment to get

7   his report back in my mind.  I know I looked at it along the

8   way several times.

9     (Pause in the proceedings.)

10        **THE COURT:**  Okay.  So if I can just be sure,

11   Mr. Barrett, your objection is relevance and --

12        **MR. BARRETT:**  He's relying upon a hearsay PossibleNOW,

13   excludable, unreliable, unsigned, unsolicited by the FTC

14   report.

15        **THE COURT:**  Okay.

16        **MS. ECHTMAN:**  Your Honor, first of all, I'd just like

17   to remind you that Mr. Barrett -- the Plaintiff moved in limine

18   to exclude Dr. Fenili's opinions based on relevance, and the

19   Court specifically found they were relevant to the case.

20     In addition, the Court specifically found in its ruling on

21   the PossibleNOW report that it was relevant.  The Court ruled

22   it could not come in under the particular hearsay exception

23   that we cited, but there were additional hearsay exceptions

24   that it could come under, specifically --

25        **THE COURT:**  I assume he's going to get up there and

1    say this is the kind of thing he relies upon in his field.

2            **MS. ECHTMAN:**  Yes.

3            **THE COURT:**  Okay.  I'll overrule the objection.

4            **MS. ECHTMAN:**  All right.  I also want one

5    clarification.  When Plaintiff moved to exclude Dr. Fenili on

6    relevance grounds, Your Honor denied the motion.  But, in the

7    course of that decision, the Court said to the extent

8    Dr. Fenili's testimony concerns whether a number is a cell

9    number, however, the motion is granted as such evidence has

10   limited probative value and significant -- if I could just

11   summarize.

12       The Court seemed to say that Dr. Fenili could not talk

13   about cell phones.  Now, we would respectfully request that

14   Your Honor reconsider that.  Ms. Verkhovskaya testified that

15   cell phones, she believes that they're in the directories, and

16   that you can ascertain whether a cell phone is business or

17   residential.  Dr. Fenili's report and the PossibleNOW report

18   show that you actually -- it's a very difficult task to do

19   that.  And so, it's relevant in terms of whether the Plaintiff

20   has met the burden of proof to show that a cell phone is

21   primarily used for residential purposes.

22           **THE COURT:**  I thought she said -- I'm not looking at

23   my notes or anything, but I thought she said she just didn't

24   think whether it was a cell phone number or not made any

25   difference.  That's very different from what you're saying she

1  said.

2       **MS. ECHTMAN:**  What I'm saying is Dr. Fenili can say

3  that it does make a difference because cell phones are

4  particularly hard to ascertain whether they're business or

5  residential because there is no directory assistance data for

6  cell phones.  And Ms. Verkhovskaya didn't know whether there

7  was that data or not.

8       And when she talked and provided a lot of hearsay about

9  what types of data points might be in the LexisNexis data, she

10  claimed that LexisNexis could identify just about all

11  businesses because they had access to directories and access to

12  Secretary of State information.

13      Now, Dr. Fenili did a study and tried to examine whether

14  numbers on the registry were business, residential.  And

15  PossibleNOW did a similar study specifically for the FTC and

16  could not categorize cell phones, specifically because they are

17  very difficult to categorize.  There is no telephone carrier,

18  directory listings for cell phones.

19      And so, we believe that's very relevant to whether

20  Ms. Verkhovskaya could or anyone could opine to a reasonable

21  degree of certainty that a cell phone is residential or not.

22       **THE COURT:**  Okay.  Let me just -- I mean, I remember

23  ruling on this, but let me find what I wrote about that, which

24  order.  Let's see.

25       **MS. ECHTMAN:**  And if Your Honor would like me to hand

1  up the ruling.

2          **THE COURT:**  If you just tell me the date.

3          **MS. ECHTMAN:**  The date is August 15, 2016, and I

4  believe it's page 2 of that opinion.

5          **THE COURT:**  For some reason, I don't have that one.

6  August 5th.  I know I just recently read it.

7          **MS. ECHTMAN:**  Your Honor, I can hand the opinion up.

8          **THE COURT:**  I apologize.

9      (Document handed to the Court by Ms. Echtman.)

10         **THE COURT:**  I thought I had all of my orders, but that

11  one somehow slipped through the cracks.

12     (Pause in the proceedings.)

13         **THE COURT:**  Okay.  Well, as I recalled, and as is

14  clear here, I had his report in front of me and heard from you

15  all fully, and, apparently, I thought it was confusing and was

16  concerned it was going to get us, you know, down some rabbit

17  holes.  So I have no real reason to -- she said it didn't

18  matter, but that was, again, in response to -- you know, you

19  can certainly argue to the jury she didn't consider it and she

20  should have considered it.  But, I'm going to -- I ruled it was

21  excluded on cell phones.  I'm going to stick with that.

22  Anything else?

23         **MR. BARRETT:**  No, Your Honor.

24         **THE COURT:**  All right.  We should have all of the

25  jurors.

1            **MR. GLASSER:**  One thing, Your Honor.

2            **THE COURT:**  Yes.

3            **MR. GLASSER:**  Because he's going to rely on the

4  hearsay PossibleNOW report as an expert thing, that doesn't

5  mean, in my view, that he should be able to show and publish it

6  to the jury because it's not, itself, admissible.

7            **MS. ECHTMAN:**  Your Honor, if I might respond.

8  Actually, the Rule says -- the learned treatise rule says you

9  can actually read it to the jury, and you can otherwise

10  describe it.  So there is no limitation on showing the document

11  to the jury when you're using either Rule 703 or the Rule 803

12  exception for learned treatises.  And I will --

13            **MR. GLASSER:**  It is certainly not a learned treatise,

14  Your Honor.

15            **THE COURT:**  Okay.  Well, you know what?  I think it

16  can -- hold on.  703 says:  If the facts or data would

17  otherwise be inadmissible, the proponent may disclose them to

18  the jury only if their probative value outweighs their

19  prejudicial effect.

20       Okay.  I'm going to let the Plaintiff -- you know, under

21  703, I'm going to let the Defendant show, assuming Dr. Fenili

22  testifies it's the kind of thing experts rely on, I'll let you

23  show it to the jury.  I don't know if it's a learned treatise

24  or not.  If you want to establish that, you can ask him

25  questions and -- because I don't know that -- I don't think

1  learned treatises self-authenticate. So, that's just not

2  something I can really decide without hearing some evidence

3  about it. Let me find learned treatise. That's 804?

4        **MS. ECHTMAN:** Yeah. It's 803(18), statements in a

5  learned treatise, periodical, or pamphlet.

6        **THE COURT:** All right. Hold on.

7     (Pause in the proceedings.)

8        **THE COURT:** Yeah, okay. You know, I don't know if

9  it's going to fall under that category or not. So, we'll just

10 have to wait to see what his answers are about that.

11       **MS. ECHTMAN:** So, Your Honor, if I could have a

12 further clarification about what we can do. There are tables

13 in Dr. Fenili's report where he breaks out telephone numbers

14 into different categories, and those are very important to

15 understanding the percentages of different types of phone

16 numbers on the registry. One of those percentages is cell

17 phone numbers.

18       **THE COURT:** Okay. If -- I'm not going to prohibit you

19 from putting the chart up there. I just don't want to get into

20 it, okay? He's going to have to redo his charts. You know,

21 the numbers are what they are, but I'm not -- just no questions

22 about it. But you don't have to redo the charts.

23       **MS. ECHTMAN:** Your Honor, based on this, can we have a

24 moment to confer?

25       **THE COURT:** All right.

1    **MS. ECHTMAN:**  If we could have a short recess -- to

2  confer whether we're going to call the witness.

3        **THE COURT:**  I didn't give the Plaintiffs that.  It's

4  okay.  You can confer.  You can take a minute or two or three.

5      (Pause in the proceedings.)

6        **THE COURT:**  Ready?

7        **MS. ECHTMAN:**  All right.  Your Honor, we're ready.

8        **THE COURT:**  And you all are just keeping a list about

9  all these things I've told you we're going to talk about later,

10  because I'm happy to talk about them when the jury isn't

11  waiting on us.

12      Anything else that affects the next matter in front of the

13  jury?  All right.  You can bring the jury in.

14      Is the Plaintiff anticipating rebuttal evidence?

15        **MR. GLASSER:**  Yes, Your Honor, but it's just reading

16  some prior testimony of Mr. DeFranco in the U.S. v. DISH trial.

17        **THE COURT:**  Okay.

18        **MS. ECHTMAN:**  What?  We missed that.

19        **THE COURT:**  All right.  Well, I'll give you a moment

20  then.  I believe he said it was Mr. DeFranco's testimony in

21  another proceeding.  Well, I'll give you a minute before they

22  call him.

23        **MS. ECHTMAN:**  I don't know what Mr. Glasser is going

24  to do with that.

25        **THE COURT:**  Well, I said I'll give you a minute.  I'm

1  not asking you to deal with it now.  We'll go ahead and finish

2  up DISH's evidence, and then I'll excuse the jury briefly.  We

3  can take that up if and when Plaintiff decides to offer it.  I

4  appreciate the preview.

5      (The jury entered the courtroom.)

6          **THE COURT:**  All right.  Ladies and gentlemen, we're

7  ready to proceed.  And DISH can call its next witness.

8          **MS. ECHTMAN:**  We call Dr. Robert Fenili.

9          **ROBERT FENILI, Ph.D., DEFENDANT'S WITNESS, SWORN**

10                  **DIRECT EXAMINATION**

11         **THE COURT:**  Go ahead, Ms. Echtman.

12  **BY MS. ECHTMAN:**

13  Q.  Would you please introduce yourself to the jury.

14  A.  My name is Robert Neil Fenili, F-E-N-I-L-I.

15  Q.  Dr. Fenili, where do you currently work?

16  A.  I work with an economic consulting firm in Washington,

17  D.C., called Georgetown Economic Services.

18  Q.  What does Georgetown Economic Services do?

19  A.  Well, we basically do economic analysis, data analysis,

20  international trade analysis.

21  Q.  If you could please share your educational background with

22  the jury.  What particular degrees do you hold?

23  A.  I have a bachelor's degree in economics from Illinois State

24  University.  I have a master's in economics from Illinois State

25  University and I have a Ph.D. from Virginia Tech.

1  Q.  Are you formally trained at all in data analysis?

2  A.  Yes, I am.

3  Q.  How are you trained in data analysis?

4  A.  Well, economics is a quantitative field.  In order to get a

5  Ph.D., I had to take statistics and econometric classes.  I've

6  also done computer programming and probability theory.

7  Q.  And what, if any, teaching have you done in the course of

8  your career?

9  A.  Well, when I was going to -- when I was getting my Ph.D., I

10  taught at Illinois State University for a year and then I

11  taught at Virginia Tech.

12  Q.  What coursework did you teach?

13  A.  At Illinois State, I taught statistics and operations

14  research.  At Virginia Tech, I taught managerial economics and

15  principles of economics.  Then when I started working in

16  Washington, D.C., I taught for Central Michigan University.

17  They had coursework within the Washington, D.C., area, and I

18  taught there for about 15 years.

19  Q.  So you mentioned when you started working in Washington,

20  D.C.  Can you tell the jury about what that work was?

21  A.  Yeah.  I started work in Washington, D.C., after I received

22  my Ph.D.  I started with the Federal Trade Commission.

23  Q.  Is that familiarly called the FTC?

24  A.  Yeah, the Federal -- I'm sorry, that's the FTC.

25  Q.  What was your position at the FTC?

1  A.  I was an economist in the Bureau of Economics.

2  Q.  What did you do as an economist at the Bureau of Economics

3  at the FTC?

4  A.  My primary job when I started there was to -- I would

5  receive newspaper clippings of various mergers, acquisitions,

6  joint ventures that were being announced in the newspaper and I

7  was asked to use whatever public information I could to

8  recommend whether the Federal Trade Commission should undertake

9  an investigation into those -- into those mergers.

10  Q.  How long were you at the FTC?

11  A.  Just a little over a year.

12  Q.  And why did you leave?

13  A.  Well, it was during the energy crisis in the '70s, and

14  my -- my boss recommended that I take a job at the General

15  Accounting Office doing work on energy work.

16  Q.  Is the General Accounting Office another federal agency?

17  A.  Yes, it is.  Back when I was working there, it was called

18  the General Accounting Office and I think today it's called the

19  Government Accountability Office.

20  Q.  And what did you do at the General Accounting Office?

21  A.  I -- I did a study on the coal industry.  At that time

22  energy -- petroleum companies were buying coal industries and

23  there was a concern that that was anticompetitive.  I spent one

24  year and wrote a report to Congress assessing competition.

25  Q.  And how long were you at the General Accounting Office?

1  A.   A little over a year.

2  Q.   Why did you leave there?

3  A.   My boss left and went to the Department of Energy, and he

4  asked me to follow him there.

5  Q.   And so you went with him to the Department of Energy?

6  A.   Yes, I did.

7  Q.   And what did you do there?

8  A.   I worked in two positions.  The first position was in an

9  office called the Energy Information Administration where we

10  developed a database called the financial reporting system.

11  Q.   And did you have any other jobs or work that you did at the

12  Department of Energy?

13  A.   Yes, the second job was to head a -- to work in something

14  called the Office of Competition, which -- where I basically

15  conducted an investigation of gasoline marketing, competition

16  in gasoline marketing, that took over three years and resulted

17  in two reports to Congress assessing the state of competition.

18  Q.   How many years did you spend in total working as an

19  economist for the federal government?

20  A.   About six and a half.

21  Q.   In what year did you leave the government?

22  A.   1982.

23  Q.   And what did you do next?

24  A.   I affiliated with a company named Synergy.

25  Q.   What type of work did Synergy do?

```
1  A.   Synergy did economic analysis for the federal government.
2  Q.   And after Synergy, what did you do next?
3  A.   Then I went to the -- well, then I took a position at
4  Georgetown Economic Services.
5  Q.   How many years have you been at Georgetown Economic
6  Services?
7  A.   In October it will be 30.
8  Q.   And what is your current position at Georgetown Economic
9  Services?
10 A.   I head up the economic analysis group.
11 Q.   As head of that group at Georgetown Economic Services, what
12 type of work do you do on a daily basis?
13 A.   On a daily basis, it's data analysis, economic modeling,
14 consulting with the regulatory -- consulting on litigation and
15 regulatory matters with attorneys.
16 Q.   And have you ever done anything called an impact study?
17 A.   Yeah, I basically -- I mean, every day of my career
18 basically is doing what I generically would call economic
19 impact studies, which would mean look at events or look and see
20 how those events affect consumers, prices, firms, whatever the
21 unit of analysis is.
22 Q.   And in the course of your career, have you ever provided
23 expert testimony at trial in civil litigation like this one?
24 A.   Six times.
25 Q.   And was that work for the plaintiff's side or the defense
```

1  side or was it a mix?

2  A.  It was three times for the plaintiffs and three times for

3  the defendants.

4       **MS. ECHTMAN:**  Your Honor, I move to qualify Dr. Fenili

5  as an expert in economics and data analysis.

6       **THE COURT:**  Do you have questions about his

7  qualifications?

8       **MR. BARRETT:**  Your Honor, subject to our prior

9  objections, we have no further objections and no need for

10  additional questioning.

11       **THE COURT:**  All right.  Go ahead.

12  Q.  Dr. Fenili, did there come a time when you were retained to

13  work in this case?

14  A.  Yes.

15  Q.  And who retained you?

16  A.  DISH counsel.

17  Q.  Are you being compensated for your work in this case?

18  A.  Yes, I am.

19  Q.  What is your hourly rate?

20  A.  Well, I think in my report it was $560 per hour.  It may be

21  a little higher today.

22  Q.  And do you have any knowledge of how much Georgetown

23  Economic Services has been paid to date in connection with your

24  testimony in this case?

25  A.  Well, I would estimate in the neighborhood of 50,000.

1  Q.   What was your assignment for purposes of this case?

2  A.   My assignment was to essentially estimate the composition

3  of the Do Not Call Registry.

4  Q.   And what do you mean by -- when you say "composition of the

5  Do Not Call Registry"?

6  A.   It was to look at the phone numbers in the Do Not Call

7  Registry and estimate how many of the numbers were business

8  numbers, how many were residential, and how many were inactive

9  or unknown.

10 Q.   And did you do that for any particular time period?

11 A.   Well, the -- I did it for the time period 2003 to 2012.

12 The attorneys were interested in the period 2010 and '11.

13 Q.   And based on the work that you did, did you reach any

14 opinion estimating the composition of the registry over time?

15 A.   Yes, I did.

16 Q.   Okay.  So I'd like to bring up Fenili 1, the demonstrative.

17          **MS. ECHTMAN:**  If I could just --

18      (Document handed to opposing counsel.)

19 Q.   If you look at the Table 1a that's been pulled up --

20 A.   Yes.

21 Q.   -- can you explain to the jury how this relates to your

22 opinions?

23 A.   Okay.  Well, let's look at the highlighted -- this -- this

24 highlighted area basically shows my opinion about the

25 composition of the registry for 2010 and 2011.

Q.   Okay.  And so can you just walk through the Registry -- for

the jury, walk through what you found in terms of the

composition of the Registry for the year 2010, please?

A.   Sure.  The FTC indicated that since its inception,

201.5 million people had signed up for the Registry.  And in --

and there are now 192.9 million numbers actually listed in the

Registry.  So I estimated that the FTC purged essentially

8 point -- purged 8.6 million from the Registry.

     So then in 2010, there were 192.9 million numbers in the

Registry, of which I estimate that 57.7 of them are active

residential landlines.  Then I estimate that 24.3 million of

them are active business landlines.  12.5 percent are inactive

landlines that have not been purged from the Registry.

     So that's a total of -- well, the inactive unpurged

landlines are -- these are really numbers that have been

disconnected, but the FTC -- but the FTC will not remove a

disconnected number from the Registry unless they have a high

degree of confidence that that number has not been reassigned.

     So the FTC would look -- what the FTC will do is look to

see has that number -- if that number has been disconnected.

If they find that number in the future and that it -- and it's

been assigned to someone with a different name and at a

different address, then they will purge that number from the

directory; but until that number has been reassigned to a

different household, the number stays in the directory.

1    So for landlines, I estimate there were 94.5 numbers in the

2  Registry that were landlines and the remaining numbers in the

3  directory are wireless numbers that are unknown by type.

4  Q.  And so when you said total landlines listed, that's -- is

5  that 94.5 million that you're referring to?

6  A.  Yes.

7  Q.  And, Dr. Fenili, can you walk the jury through what you

8  found in your model of the Registry for the year 2011, please?

9  A.  Okay.  For 2011, if we go over to the fourth column, you

10  see that there were 200 -- there are now 200.5 million numbers

11  in the Registry, of which I estimate 57.4 million are active

12  residential landlines, 24.9 million are active business

13  landlines, 14.7 numbers are inactive landlines that have been

14  unpurged, and there are 103.5 wireless numbers that are unknown

15  by type.

16  Q.  And in this chart, is everything expressed in millions?

17  A.  Yes, it is.

18  Q.  Dr. Fenili, did you also endeavor to express this

19  information in percentages?

20  A.  Yes, I did.

21     **MS. ECHTMAN:**  If we could bring up Fenili 2, please.

22  Q.  Can you walk the jury through what you found in

23  percentages?

24  A.  Sure.  So Table 1b here is essentially table -- the same

25  data that's in Table 1a, but instead of looking at them in

1  absolute numbers, we now look at them in proportions.

2      So in 2010, I estimate that 29.9 percent of the Registry

3  are active residential landlines, 12.6 percent are active

4  business landlines, 6.5 percent are the inactive unpurged

5  landlines, and the remaining 51 percent are unknown wireless

6  numbers.

7  Q.  And what percentages did you find for 2011, Dr. Fenili?

8  A.  For active business -- residential landlines in 2011,

9  comprise 28.6 percent of the Registry.  Active business

10 landlines comprise 12.4 percent of the Registry.  Inactive

11 landlines unpurged comprise 7.3 percent of the Registry and

12 unknown as to type wireless numbers comprise approximately

13 51.6 percent of the Registry.

14 Q.  And if we could bring back up Fenili 1, there was a number

15 in here where you input the total numbers -- total number of

16 telephone numbers that were listed in the Registry in 2010 and

17 2011.  Can you tell the jury where you got that information?

18 A.  I got -- the listed in Registry numbers were from the

19 federal -- directly from the Federal Trade Commission's data

20 books.

21 Q.  And it says on this --

22          **THE COURT:**  I'm sorry.  Directly from the FTC's what?

23          **THE WITNESS:**  The FTC data books.

24          **THE COURT:**  Data books, okay.

25 Q.  What are the FTC's data books?  If you could describe those

1  to the jury, please.

2  A.   Sure.  Each year the FTC publishes a -- a little summary of

3  the Do Not Call List.  They summarize how many people signed up

4  that year, how big their -- and -- or how large -- how many

5  active registrations there are, and they discuss where the

6  telephone numbers come from by state.  So it's a little summary

7  that sort of at least gives you a feel for the size of the

8  directory.

9  Q.   And you call this in Table 1a model of DNCR composition.

10 Do you see that?

11 A.   Yes.

12 Q.   And is that what you did, you constructed a model?

13 A.   Yes.

14 Q.   Is that something you do as an economist?

15 A.   Yes.

16 Q.   So let's talk about -- you can take that down.

17     What other information did you use to construct this model?

18 A.   Well, first I used the report from the -- that was prepared

19 for the FTC in 2009.

20 Q.   Okay.  And I'd like to hand up to the witness a document

21 that's been marked as DX25, please.

22     (Notebook handed to the witness by Ms. Echtman.)

23 Q.   So, Dr. Fenili, if you could take a look at DX25, and can

24 you tell us whether that is the report that you relied upon?

25 A.   Yes, it is.

1  Q.  Okay.  And so can you tell us what that -- tell the jury

2  what that report is that was prepared for the FTC.

3  A.  This was a report that was prepared in 2009 for the FTC

4  that is an analysis of the composition of the Do Not Call

5  Registry as of March of 2009.

6  Q.  And who prepared that report for the FTC?

7  A.  It was prepared by a company called PossibleNOW.

8  Q.  And is PossibleNOW a company that you are familiar with?

9  A.  Yes, it is.

10 Q.  Do you know what PossibleNOW does?

11 A.  Well, I know that it's -- the one thing it does is it

12 maintains the Registry for the Federal Trade Commission.

13 Q.  And how do you know, Dr. Fenili, that this report was

14 prepared for the Federal Trade Commission?

15 A.  Well, it says so right on the cover of the report.  I also

16 know from reading testimony from PossibleNOW's chief operating

17 officer that it was prepared -- that this report was prepared

18 for the Federal Trade Commission.

19 Q.  And how did you rely on the PossibleNOW report?

20 A.  Well, it gave me what I was looking for for March of 2009.

21 I used those -- I used that information in my model.

22 Q.  And is this PossibleNOW report the type of report that

23 economists in your field would reasonably rely upon in making a

24 model like the one that you made?

25 A.  Yes.

1  Q.  And why is that?

2  A.  Well, first, it was a report that was -- that contained

3  information that I -- I wanted to use in my model.  Second, it

4  was a report that was done by the people who maintain the

5  Registry, and I'm -- you know, I found -- I found that this

6  report was very authoritative.

7  Q.  And did you do anything to review the methodology that was

8  used in this report?

9  A.  Yes, I did.  First I went through all the numbers and put

10 them in Excel spreadsheets to make sure that I thought they

11 were accurate.  I looked at each of the data sources that were

12 outlined in the report to learn about what they were and if

13 they were accurate.  I reviewed the testimony of the COO to see

14 what he had to say.  And there was a section in the report

15 where they did some analysis, and I reviewed that and came to

16 the conclusion that I thought this report was very good.

17 Q.  Okay.  So let's talk about the type of -- the type of data

18 that PossibleNOW relied upon.  All right.  Well, first of all,

19 when you said that PossibleNOW looked at the composition of the

20 Registry, did they look at it in the same way that you did in

21 terms of the different categories that numbers were broken down

22 into?

23 A.  Well, yes, they did.

24 Q.  So let's talk about the data that PossibleNOW relied upon.

25        **MS. ECHTMAN:**  If we could bring up Fenili 7, please.

1   Q.  Can you describe this particular data point, the National

2   Directory Assistance database?

3   A.  Sure.  The national data -- the National Directory

4   Assistance database essentially contains all or virtually all

5   of the published landline numbers in the United States.  If you

6   thought of it as a telephone book, it would be a giant

7   telephone book of the United States, but it's obviously in data

8   form.

9   Q.  And is it effectively a compilation of lots of telephone

10  books?

11  A.  Right.

12  Q.  And also have you heard of the phrase "411"?

13  A.  Yes.

14  Q.  Okay.  Does this have any relationship to 411 information?

15  A.  Yes.  I mean, if you called 411, the 411 operator would be

16  basically querying the National Directory Assistance database.

17  Q.  And would be querying it to do what?

18  A.  Would be querying it to find a number.  So if I called up

19  and said, I'm looking for, you know, Joe Smith's number in

20  Cleveland, Ohio, they may ask for your address and they would

21  return a number.

22  Q.  And in your experience, do you consider this to be a

23  reliable database?

24  A.  Yes, I did.

25  Q.  And why do you consider it to be reliable?

1  A.  Well, essentially this database -- I mean, if you read --

2  it basically contains 99.97 percent of the numbers that should

3  be published in the database.  So they have a very small error

4  rate in terms of how many people's numbers should have been

5  published and were not.

6  Q.  And where does the National Directory Assistance get that

7  information about the telephone numbers?

8  A.  They -- this -- this edition of the national assistance

9  data directory obtains the data from each of the individual

10  telephone companies.

11  Q.  And how did PossibleNOW use this National Directory

12  Assistance database data in its report?

13  A.  Well, it took -- it took a list of the -- it took a list of

14  all the numbers in the directory and it compared it to all the

15  numbers that -- sorry.  It took a list of all the numbers in

16  the Registry, in the Do Not Call List, and it compared it to

17  the numbers in this directory.

18          **MS. ECHTMAN:**  And if we could bring up Fenili 4,

19  please.

20  Q.  Can you walk the jury through how PossibleNOW did that, how

21  they did that comparison?

22  A.  Well, if you look at this chart, if you go down to the --

23  to the -- about -- almost to the end, there is a row saying

24  "numbers matching residential numbers on the NDA."  So what

25  PossibleNOW was able to do was find that there were 46 million

1  numbers in the Registry that matched numbers on the NDA.  And
2  then if you look at the next line, there were 3.7 -- or
3  3.8 million numbers in the Registry that matched business
4  numbers in the NDA.

5       The NDA basically allows one to know whether the number is
6  a residential number or a business number.  So when this -- so
7  the -- initially they found about 46 million residential
8  numbers matching and 3.8 business numbers that matched.
9  Q.  Okay.  And were there any numbers that PossibleNOW was not
10 able to match to the NDA?
11 A.  Yeah, right below -- excuse me.  Yeah, the numbers right
12 below there of 38,814,612 numbers they could not match.

13      Let me back up.  After -- after PossibleNOW matched the
14 40 -- the 46 and 3.8 million numbers, they had a database -- if
15 you look at the top line, there's a data -- there were
16 175.4 million numbers in the Registry.  So after they matched
17 the 46 and 3, they still had a ways to go.

18      So what PossibleNOW was able to do was to -- to determine
19 how many numbers in the Registry were wireless, okay.  So then
20 they took -- they set those -- those wireless numbers aside and
21 now they were left with just 38.8 million numbers that they
22 could not match.
23 Q.  You're saying they couldn't match it to any of their
24 databases?
25 A.  No, they couldn't match it to any of the numbers in the

NDA, which are virtually all landline numbers, and they

couldn't match it to -- to wire -- to wireless numbers.

Q.   And you talked about the number at the top, 175 million

total phone numbers on the registry.  Do you have an

understanding as to whether PossibleNOW had access to those

telephone numbers?

A.   Yes, they did.

Q.   How did they have access to it?

A.   Again, they maintain the Registry.  The FTC basically asked

PossibleNOW to provide a report on the composition of those

numbers in the Registry.

Q.   Okay.  And then at the bottom, it was the 38.8 million

number that PossibleNOW was not able to match?

A.   That's correct.

Q.   And did PossibleNOW have an understanding of the types of

numbers that would fall into those 38.8 million?

          **MS. ECHTMAN:**  If we could bring up Fenili 8, please.

Q.   What was PossibleNOW's understanding of the types of

numbers that fit into that 38.8 million numbers that it

couldn't match to the National Directory Assistance database or

to identify as wireless?

A.   Well, PossibleNOW basically estimated or -- estimated that

there were four buckets of numbers that these 38.8 million fit

into and --

Q.   And can you describe those buckets for the jury?

1   A.   The first bucket would have been nonpublished residential

2   lines.   The national data directory publishes all residential

3   numbers unless the customer opts out.   In other words, the

4   customer says, I want my phone to be unlisted.   So

5   PossibleNOW -- so unlisted residential numbers would not be in

6   the NDA.

7   Q.   What's the next type that says VOIP?   Can you describe that

8   to the jury, please?

9   A.   Sure.   The VOIP numbers are numbers that are -- well, VOIP

10  stands for voice over Internet protocol.   So these are

11  customers that, instead of using the traditional telephone

12  companies, would use the Internet for their phone service.   We

13  may read -- like Vonage or someone like that.   So you hook up

14  your phone to the Internet.

15       Now, in the national data assistance directory that

16  PossibleNOW used, they went out and they tried to find VOIP

17  numbers and they -- they were able to get about 75 percent of

18  all VOIP numbers put into the National Directory Assistance

19  database, but that left about 25 percent of the numbers -- of

20  VOIP numbers unaccounted for.   So that would be the second

21  bucket, VOIP numbers that are not in the National Data

22  Assistance directory.

23  Q.   Okay.   And then the next type of number that PossibleNOW

24  identifies are business DID numbers.   Would you explain to the

25  jury what those are?

A. DID stands for direct inward dialing. When these --

business DID numbers are essentially business numbers that

typically are for their employees or at various workstations or

even fax lines so that -- in the National Data Assistance

directory, the business may list its one headquartered number,

but they would not list all their employee numbers or their fax

numbers or their workstation numbers, numbers in conference

rooms.

Q. And do businesses have a lot of those numbers?

A. Yes.

Q. And then the last one is inactive phone numbers. Do you

see that?

A. Yes.

Q. Okay. And did you describe those already to the jury, what

an inactive phone number is?

A. Well, that's a disconnected phone number.

Q. And did PossibleNOW try to figure out how those unmatched

38.8 million phone numbers break down between the four

categories that we discussed?

A. Yes, they did.

    **MS. ECHTMAN:** Okay. If we could bring up Fenili 5,

please.

Q. What did PossibleNOW estimate as to the breakdown of those

phone numbers?

A. Okay. Well, PossibleNOW estimated that 8 million of the

1  38.8 million numbers were on the unlisted phone numbers, you

2  know, numbers that were not published because the customer

3  wanted his number -- his or her number not listed.

4  Q.  And what type of unpublished phone numbers, specifically

5  the 8 million was --

6  A.  Of residential.

7  Q.  Okay.  And what else did PossibleNOW estimate?

8  A.  Well, they estimated another 2.5 million residential lines

9  that were VOIP lines, and so those were part of that 25 percent

10  that were not captured in the National Directory Assistance

11  database.

12  Q.  And what about the remaining numbers of 28.3 million?

13  A.  The PossibleNOW estimated that 28 -- that the 28.3 million

14  were either business DID numbers or disconnected numbers.

15  Q.  And so of these 38.8 million unmatched numbers, what

16  percentage did PossibleNOW estimate to be nonresidential?

17  A.  About 10.5 million divided by 38.8 million or about

18  25 percent.

19  Q.  So I think you just gave me the --

20  A.  Backwards.

21  Q.  Backwards.  What percentage did they estimate to be

22  nonresidential?

23  A.  About 75 percent.

24  Q.  And so for any one of the 38.8 million unmatched numbers in

25  the PossibleNOW report, can you say whether it is more likely

1  than not residential?

2  A.  Well, more likely nonresidential.

3  Q.  And then what were the final conclusions that PossibleNOW

4  reached about the composition of the Registry?

5  **MS. ECHTMAN:**  If you could bring up Fenili 6.

6  Q.  What were the final conclusions that PossibleNOW reached in

7  its report to the FTC on the composition of the Registry?

8  A.  That about 86.7 million, or 49.4 percent of the Registry,

9  were comprised of wireless numbers that they could not break

10  down by type.

11  Q.  Okay.  And what was the next conclusion?

12  A.  56.6, or 32.3 percent of the Registry, were residential

13  landlines.  And that included both published numbers in the

14  DNA, nonpublished numbers in the DNA, and those missing VOIP

15  numbers.

16  Q.  Okay.  And what was the next conclusion?

17  A.  That business landlines, which would include the numbers

18  published in the DNA and nonpublished DID numbers, comprised

19  about 22.8 million numbers or 13 percent of the directory.

20  Q.  And what did they find for inactive phone numbers?

21  A.  These are the inactive phone numbers that are in the

22  Registry, so they're unpurged.  They're still not purged, and

23  that would -- accounted for 9.4 million or about 5.3 percent of

24  the Registry.

25  Q.  Okay.  When you're saying the DNA, can you just remind the

1  jury what that is?

2  A.  Data -- the NDA, the national data assistance directory.  I

3  probably mixed that up.  I'm sorry.

4  Q.  And so that's what PossibleNOW was able to find when it

5  reported back to the FTC?

6  A.  Yes.

7  Q.  And I think you were here last week when Ms. Verkhovskaya

8  provided an opinion that the LexisNexis database can identify

9  just about all business numbers.  Did you hear that?

10  A.  Yes, I did.

11  Q.  Does that make sense to you?

12  A.  No, it does not.

13         **MR. BARRETT:**  Objection.  Outside the scope.

14         **MS. ECHTMAN:**  Your Honor, if we could have a sidebar.

15         **THE COURT:**  All right.

16     (The following bench conference was recorded.)

17         **MS. ECHTMAN:**  Your Honor.

18         **THE COURT:**  Just a second.  I apologize.  I tried to

19  get something for you to stand on because you have the same

20  thing I have.

21         **MS. ECHTMAN:**  I'm short, and I'm trying to be mindful

22  of personal space for everyone, so I'll do my best to talk into

23  the microphone.

24     Ms. Verkhovskaya testified for the first time at trial that

25  it was her opinion that the LexisNexis database could identify

1   just about all business landlines.  It has been disclosed in
2   this case from the get-go that Dr. Fenili was going to offer an
3   opinion that you cannot identify a lot of the numbers, and so
4   this is very fair rebuttal.

5          **MR. BARRETT:**  Dr. Fenili has offered no opinions, nor
6   has he even mentioned in any of his reports the LexisNexis
7   data, and that is what she is asking him to testify about, data
8   that has not been disclosed, he has not reviewed, and that's
9   not right.

10         **MS. ECHTMAN:**  Well, he's got opinions about what
11  reliable databases are and how you would go about doing it, and
12  those are what he relied upon.  So I think it's perfectly fair
13  and within the scope for him to comment on the fact that if you
14  can't find it in the National Directory Assistance database
15  there is no reasonable way to know how they could do that.

16         **MR. BARRETT:**  LexisNexis does not appear in that
17  report.  He cannot opine about that.  That is way outside the
18  scope.

19         **THE COURT:**  Okay.  Sustained.

20      (Conclusion of the bench conference.)

21  **BY MS. ECHTMAN:**

22  Q.  Dr. Fenili, based on the work that you've done in
23  estimating the composition of the telephone numbers on the
24  national Registry, are you aware of a database that could
25  identify just about all business numbers in the United States?

1     **MR. BARRETT:**  Your Honor, objection.

2     **THE COURT:**  Just a second.

3     (Pause in the proceedings.)

4     **THE COURT:**  Are you asking him about the -- I want to

5  say DNA, which is not right -- NDA?

6     **MS. ECHTMAN:**  I'm asking him whether generally in his

7  work, where he endeavored to model the types of numbers on the

8  Registry, whether he's aware of a database that could account

9  for just about all of the business -- reliably account for just

10  about all of the business numbers in the United States.

11     **THE COURT:**  Okay.  If there's other databases he could

12  have used but didn't, is that what you mean?

13     **MS. ECHTMAN:**  Correct.

14     **THE COURT:**  Okay.  He can answer that question.

15  A.   There is no other databases.  There's no such thing as a

16  National Directory Assistance database for wireless numbers.

17  Q.   Dr. Fenili, if I could just repeat my question for you,

18  please.  Based on the work that you've done in estimating the

19  number -- the types of numbers on the National Do Not Call

20  Registry over the years, are you aware of any databases that

21  would be available that could reliably identify just about all

22  business numbers?

23  A.   There are no reliable databases available.

24  Q.   And why is that?

25  A.   Well, there's -- every -- there's no -- there's no

1  comprehensive database that lists all wireless phone numbers by

2  type.

3          **THE COURT:**  I think she's asking you about business.

4          **THE WITNESS:**  There's no -- there's no reliable

5  database that provides business wireless numbers.

6  Q.  And is there any reliable database that would provide all

7  direct dial numbers?

8  A.  No.

9  Q.  So going back to the 2009 PossibleNOW report, how did you

10  use that report for your work in this case?

11  A.  Well, I used it to populate the cells for March of 2009.  I

12  used that information in my model directly.

13  Q.  Okay.  And is there any other data or information that you

14  used in your model from other sources?

15  A.  Yes, I basically reviewed -- I reviewed all the FTC site,

16  the Federal Trade Commission's website.  I looked for

17  information on whatever I could find on the Registry in terms

18  of the composition of the Registry.  I reviewed a number of

19  electronic libraries.  In my youth, I would have been over at

20  the library going through books.  Today I can go on my computer

21  and look through what I call e-libraries.  And I also did

22  even -- I did Google searches trying to find any information I

23  could on the information that would enable me to understand the

24  composition of the Registry.

25  Q.  And so what other information did you find that you used as

1  an input in your report?

2  A.  Well, as I -- the two -- one thing I found was a study in

3  2004 that examined the composition of the type of customer --

4  of the users, of the people who listed their phones in the

5  Registry, what type of people -- what were the demographics of

6  the people who registered their phones.

7  Q.  Okay.  And how did you use that information from that

8  report?

9  A.  Well, I -- that report provided me with information on the

10  number of wireless numbers on the Registry and the number --

11  and the number of landlines on the Registry in 2003.  So

12  that -- those -- that would have been numbers -- some numbers I

13  used.

14  Q.  Okay.  And so did you -- and you used that to extrapolate

15  in your model?

16  A.  Yes, I did.

17  Q.  And so in your work to try to break down the composition of

18  different types of numbers on the Registry, what different

19  categories or buckets did you find that numbers could fall

20  into?

21          **MS. ECHTMAN:**  And I'll ask you to bring up Fenili 3,

22  please.

23  Q.  If you could list for the jury the different types of phone

24  numbers that you found in your work to model the composition of

25  the Registry.

1  A.  Well, I found base -- we can just read through there:

2  Confirmed listed residential landlines, unconfirmed

3  nonpublished residential landline numbers, confirmed listed

4  business landline numbers.  Those would be the numbers that

5  would be in the Directory Assistance.  Unconfirmed nonpublished

6  business landline numbers, those would be the DID numbers.

7  Unconfirmed as to type wireless numbers, inactive numbers that

8  have not been purged.  And there's a category invalid numbers

9  that -- these would be basically numbers where, say, the number

10  in the Registry contains an area code, but that area code has

11  never been issued.  So it's sort of a number that couldn't be

12  possible -- you know, doesn't really -- is not -- it's not

13  disconnected.  It's not really a number.

14  Q.  And can invalid numbers be found on the Registry?

15  A.  Yes, a small number can.

16  Q.  Okay.  And as far as you're aware, does the FTC or

17  PossibleNOW do anything to purge invalid numbers from the

18  Registry?

19  A.  No.

20  Q.  What are the circumstances in which a number is actually

21  removed from the Registry?

22  A.  The circumstance, as I described before, was it would be a

23  landline number only.  The -- if -- if a disconnected number on

24  the Registry was to reappear -- to appear in a later direct --

25  National Directory Assistance database, they would look to see

does that number contain the same name that was associated with
the number before it was disconnected.  If it contains the same
name, then it stays in the directory.  If it has a different
name, then the next test is is the address changed.  If the
address changes and it has a different name, then it's purged.
So if the name stays the same, but the address changed, it
stays.  If the name changes, but the address is the same, it
stays.

Q.  Okay.  So, Dr. Fenili, just to sum up, let's bring up
Fenili 2 again, which is your table that has the percentages
from your model.

     And so based on the estimates from your model, did you
reach an opinion about the approximate percentage of
residential numbers on the Registry in 2010 and 2011?

A.  Yes.

Q.  And what is that opinion?

A.  That approximately 30 percent of the Registry is active
residential landlines and the remaining 70 percent are -- are
not confirmed residential landlines.

Q.  And what makes up the remaining 70 percent?

A.  There would be business landlines, inactive landlines and
wireless -- unknown as to type wireless numbers.

Q.  Thank you very much, Dr. Fenili.

          **THE COURT:**  For the Plaintiff?

          **MR. BARRETT:**  Thank you, Your Honor.  May I get the

1 | microphone?

2 |         **THE COURT:** Yes, sir.

3 |         **MS. ECHTMAN:** I actually think the battery is dead.

4 |         **THE COURT:** If it is, you may either need to really

5 | speak up or use the table mike.

6 |         **MR. BARRETT:** I will.

7 |                 **CROSS-EXAMINATION**

8 | **BY MR. BARRETT:**

9 | Q. Dr. Fenili, the company that you work for is owned by

10 | Kelley Drye & Warren, correct?

11 | A. That's correct.

12 | Q. And Kelley Drye & Warren is a Washington, D.C.-based law

13 | firm, correct?

14 | A. Yes.

15 | Q. It has got about 300 lawyers, correct?

16 | A. Well, it's actually a New York City-based law firm.

17 | Q. Your office is in Washington, D.C., correct?

18 | A. Correct.

19 | Q. You share office space with the firm?

20 | A. We have offices in the same building.

21 | Q. And your address is the same as the law firm's address in

22 | Washington, correct?

23 | A. We're in the same building, yes.

24 | Q. And the law firm Kelley Drye & Warren receives millions of

25 | dollars in attorneys' fees from defendants in TCPA illegal

1  telemarketing lawsuits, correct?

2  A.  I think they were in one lawsuit with DISH before this that

3  I know of.

4  Q.  And that -- in that lawsuit, your law firm, the law firm

5  that owns your company, received in excess of $10 million in

6  attorneys' fees?

7  A.  I have no idea.

8  Q.  You share space with the firm, correct?

9  A.  I -- I'm -- we're a wholly owned subsidiary of KDW.  I

10  don't know "share space."  We have offices in the same

11  building.

12  Q.  Do you have any reason to disagree with the statement that

13  the law firm received in excess of $10 million for defending

14  DISH in that case?

15        MS. ECHTMAN:  Objection.  Foundation.

16        THE COURT:  He can answer if he has any idea.  If he

17  doesn't, then there's no evidence before the jury.

18  A.  They don't share their billables.  They don't share their

19  accounts receivable information with me.

20  Q.  Would you agree with me that DISH is a major client of the

21  law firm that owns your company?

22  A.  It's a client.

23  Q.  Major client?

24  A.  I don't know if it's -- by "major," do you mean -- I mean,

25  it's a big client.  I don't know if it's a top-10 client, but

1  I'm not saying it's not insignificant.

2  Q.   And I believe you testified that you were paid

3  approximately $50,000 for the report that you prepared in this

4  case, right?

5  A.   And the testimony.

6  Q.   Okay.  And you also provided the same report in another

7  case for DISH Network, correct?

8  A.   A similar report, yes.

9  Q.   How much did your firm owned by Kelley Drye bill DISH for

10  that work?

11  A.   Well, Georgetown Economics sent a bill to DISH, so I can't

12  remember.  It would probably be in the neighborhood of $50,000.

13  Q.   And you also provided testimony in that case?

14  A.   No, I did not.  I mean --

15  Q.   You provided deposition testimony?

16  A.   I testified at deposition.  That's correct.

17  Q.   You're not testifying that it's okay for telemarketers to

18  call telephone numbers listed on the Do Not Call Registry, are

19  you?

20  A.   That it's -- I'm not testifying that it's okay or not okay,

21  I guess.

22  Q.   You understand that it's unlawful for telemarketers to call

23  numbers on the Do Not Call Registry?

24          **MS. ECHTMAN:**  Objection.  Outside the scope and he's

25  not a lawyer.

1  **MR. BARRETT:** He's testifying as to the composition of

2  the National Do Not Call Registry. I think it's a fair

3  question.

4  **THE COURT:** Well, we'll go over the elements of the

5  claim -- of the issue when we get to the jury instructions,

6  but, you know, you can answer the question generally if you

7  have any understanding.

8  A. Well, I think -- I mean, my understanding, it's probably

9  not okay.

10  Q. Okay. And you're not saying that it's difficult for

11  telemarketers to scrub against the Do Not Call Registry, to

12  remove numbers on there, and not call them, right?

13  A. Could you repeat that question?

14  Q. Sure. You're not saying it's difficult for telemarketers

15  to scrub the National Do Not Call Registry and remove numbers

16  that they want to call that are listed on the Registry, kick

17  them out, not call them?

18  A. Am I testifying that it's difficult to do that?

19  Q. Yes, sir.

20  A. No, I'm not testifying whether it's difficult or not

21  difficult.

22  Q. And you're not testifying about whether it would be

23  difficult for DISH Network to scrub the Do Not Call Registry

24  and kick out telephone calls placed to sell DISH subscriptions,

25  are you?

1    **MS. ECHTMAN:**  Objection, relevance.

2        **THE COURT:**  Well, he can answer the question.  Just be

3  clear about what he's saying.  Go ahead.

4  A.  I don't know if it's difficult or not difficult.  I'm not

5  testifying about the difficulty of scrubbing numbers.

6  Q.  And you would agree with me there's no reason why a

7  telemarketer would want to place a telemarketing call to a

8  disconnected telephone number?  Is that correct?

9  A.  I guess if you place a number [sic] to a disconnected

10  number, it would just be a waste of time.  Is that what you're

11  saying?

12  Q.  Yes, sir.

13  A.  All right.

14  Q.  And you understand also that if a telemarketer can only

15  sell products to residences there's no reason that the

16  telemarketer would want to call business numbers, is there?

17  A.  Well, on that one, I -- you know, I walk into a lot of

18  taverns, see TVs.  They're being powered by a provider.  DISH

19  sells those type of services, so I don't -- I guess -- if I was

20  selling products to businesses, I would make a call to a

21  business.

22  Q.  Okay.  And I think you answered a slightly different

23  question than the one I asked.  The telemarketer can only sell

24  to residences.  If a telemarketer can only sell to residences,

25  do you agree with me there is no reason it would call business

1  telephone numbers to try to make sales?  Correct?

2  A.  Okay.

3  Q.  You agree with that?

4  A.  Well, that seems to be a definition of your -- by

5  definition, okay.

6  Q.  And also you did no analysis of the Five9 call records in

7  this case, correct?

8  A.  That's right.

9  Q.  So you did no analysis to determine if calls were

10  connected?

11  A.  No.

12  Q.  And in your report that you prepared in this case, you

13  don't even mention the name Anya Verkhovskaya, correct?

14  A.  No, I do not.

15  Q.  So you don't address her opinions and rebut them

16  specifically in any way, do you?  Correct?

17  A.  In the report, no.

18  Q.  Yes.  Would you agree with me that the National Do Not Call

19  law is the most popular consumer protection statute in American

20  history?

21  A.  I -- I don't know that.  I wouldn't agree with that.

22  Q.  You reviewed the Federal Trade Commission's reports --

23  correct?

24  A.  Yes.

25  Q.  -- about the Do Not Call Registry?

1   A.   Yes.

2   Q.   And in 2012, approximately how many telephone numbers were

3   on the National Do Not Call Registry?

4   A.   I think I testified -- I mean --

5   Q.   North of 200 million?

6   A.   Over 200 million.

7   Q.   You're not aware of any other federal consumer protection

8   law that has more than 200 million participants who are -- have

9   registered to receive the protections of the law, correct?

10  A.   You know, I don't know one way or the other.  I'm not --

11  you know, when you say -- I mean, I guess you -- I just don't

12  know.

13  Q.   And you would agree with me that the Federal Trade

14  Commission has characterized the statute in one of their

15  reports as -- the law as wildly popular among consumers.  Do

16  you agree with that statement?

17  A.   I don't know.

18  Q.   I could show you the report if -- if -- do you disagree

19  with it?

20  A.   I mean, I don't know.  I haven't seen the report.  Do you

21  want to show it to me?  I mean --

22  Q.   I can put it on the ELMO.

23          **THE COURT:**  You might just hand it to him so he can

24  look at it.

25      (Document handed to the witness by Mr. Barrett.)

1      **THE COURT:**  Do you need to show him the whole report?
2  You just gave him one page.
3          **MR. BARRETT:**  I beg your pardon?
4          **THE COURT:**  You just gave him one page?
5          **MR. BARRETT:**  Yes, Your Honor.
6  Q.  The question for the witness is:  Do you recognize this to
7  be a report, publication from the Federal Trade Commission?
8  A.  I don't know if I'd call it a report.  It's a page probably
9  from a web page from the FTC.
10 Q.  And you have no reason to dispute whether that was actually
11 published on the Federal Trade Commission's website, correct?
12 A.  No.
13 Q.  And will you please read -- just read the first paragraph
14 of that.
15 A.  "Since 2003, Americans have been able to opt out of
16 receiving most telemarketer calls by putting their phone
17 numbers on the National Do Not Call Registry, and millions of
18 them have done so.  The Registry has now more than 221 million
19 telephone numbers on it, giving these consumers a little more
20 peace and quiet during their dinner hour.  Not only is the Do
21 Not Call program wildly popular with consumers, but it also
22 helps telemarketers operate more efficiently by screening out
23 customers who do not want to be connected."
24         **MS. ECHTMAN:**  Objection, Your Honor, having the
25 witness continue to read, hearsay.

1          **THE COURT:**  Well, that's the part you were asking him

2     about earlier.

3          **MR. BARRETT:**  Yes.

4          **THE COURT:**  Do you have other questions?

5     Q.  Would you agree with me that the Federal Trade Commission

6     has characterized the Do Not Call law as wildly popular with

7     consumers?

8     A.  Do I agree with you that the FTC has characterized it?

9     Well, they've written this.  That's what they wrote on this

10    page.

11    Q.  Do you agree with me that consumers who sign up for the

12    Registry and receive telemarketing calls can bring private

13    action lawsuits against the entity responsible for the call?

14         **MS. ECHTMAN:**  Objection.

15         **THE COURT:**  Okay.  Sustained.

16    Q.  You were an expert witness and you testified in another

17    matter alleging that DISH itself made millions --

18         **MS. ECHTMAN:**  Objection, Your Honor.  Can we have a

19    sidebar?

20         **THE COURT:**  Ladies and gentlemen, let me excuse you to

21    the jury room for a moment.  Please don't talk about the case.

22         (The jury left the courtroom.)

23         **THE COURT:**  The record will reflect that the jury is

24    not present in the courtroom.

25         Just ask your question so I know what we're talking about

1 and then I'll hear from you.

2 Q.  You were an expert and you wrote a report in another case

3 alleging that DISH itself made millions of telemarketing calls

4 to numbers on the Do Not Call Registry, correct?

5 A.  You know, could I -- could I see my testimony?

6           **MS. ECHTMAN:**  Your Honor, can we discuss the objection

7 now?

8           **THE COURT:**  No.  I want to hear what he's going to say

9 because I don't know how to rule on it if I don't hear what

10 he's going to say.

11           **MS. ECHTMAN:**  Thank you, Your Honor.

12           **THE COURT:**  The jury is not present.  I assume we can

13 do it pretty quickly.

14           **MR. BARRETT:**  Yes, Your Honor.

15           **THE COURT:**  So go ahead.

16 Q.  So you were a witness and testified in another case,

17 correct, in which DISH itself was alleged to have violated the

18 Do Not Call law millions of times?

19 A.  I don't know if I said that.  Could you just show me my

20 testimony?

21           **THE COURT:**  I don't think he's saying you said it.  I

22 think he's saying DISH was charged with making calls that

23 violated the TCPA.  He's just asking if you testified.

24           **THE WITNESS:**  Oh, okay.  Yes.

25 Q.  Yes.  And you are aware that -- that the judge in that

1  case, that's U.S. v. DISH -- the jury is not here -- Federal

2  Trade Commission versus DISH Network, you are aware the judge

3  in that case issued a ruling finding that DISH itself was

4  liable for more than 1.7 million telemarketing calls from 2007

5  to 2010 that it made to telephone numbers on the Do Not Call

6  Registry?

7  A.  Well, you made me aware of it just now.  I wasn't aware of

8  that ruling.  I know that there was a -- excuse me.  Your

9  Honor, I'm not trying to --

10      THE COURT:  No, that's okay.  Just go ahead and answer

11 the question.

12      THE WITNESS:  I'm aware that, you know, there was a

13 ruling against DISH.  I don't know -- what you read I never saw

14 before.

15      MR. BARRETT:  Your Honor, may I approach the witness

16 and show him the opinion from the Court?

17      THE COURT:  Okay.  No.  I'll sustain the objection.

18      MS. ECHTMAN:  Thank you, Your Honor.

19      THE COURT:  I just don't see how this witness can

20 testify about something he's never seen before and doesn't know

21 about.  If you have other questions that you want to ask him

22 about DISH's -- you know, along those same lines, we can go

23 into that now before the jury comes in, but if not --

24 Q.  You don't know the exact number of telemarketing calls that

25 the judge concluded DISH itself was liable for placing to

1 | people on the Do Not Call Registry, correct?

2 | A. That's correct.

3 | Q. Do you believe that number to be in excess of 1 million

4 | calls?

5 | A. No, I don't. I mean, you read that to me. I'm -- I mean,

6 | I -- I know there was an adverse ruling against DISH. I don't

7 | know -- I don't know the particulars.

8 | Q. And have you read the adverse ruling?

9 | A. No.

10 | **THE COURT:** Okay. I'll sustain the objection to those

11 | questions.

12 | **MS. ECHTMAN:** So, Your Honor, just to clarify, all of

13 | the questions about U.S. v. DISH, they already asked about work

14 | for DISH, that's come in, but --

15 | **THE COURT:** I'm sustaining it to the part that has

16 | just been asked and answered outside the presence of the jury.

17 | I'm not ruling on anything the jury already heard.

18 | **MS. ECHTMAN:** Thank you.

19 | **THE COURT:** So anything -- can we bring the jury back

20 | in?

21 | **MR. BARRETT:** Yes, Your Honor.

22 | **THE COURT:** Okay. How -- just curious. How much

23 | longer is your cross?

24 | **MR. BARRETT:** I believe that's it.

25 | **THE COURT:** Are you going to have redirect?

1          **MS. ECHTMAN:** No, Your Honor.

2          **THE COURT:** Well, I'll let the jury hear all of that.

3    Do you have additional evidence?

4          **MR. BICKS:** No.

5          **THE COURT:** No. Okay. And you have -- are

6    anticipating the one thing?

7          **MR. GLASSER:** Yes, ma'am.

8          **THE COURT:** How long -- if -- how long would it take

9    to read it to the jury?

10         **MR. GLASSER:** It's about two pages.

11         **THE COURT:** Just so I don't have to send the jury in

12   and out and we don't have to take care of this after lunch,

13   could you show it?

14         **MR. GLASSER:** Yep.

15      (Document handed to defense counsel.)

16         **THE COURT:** I'm going to let the jury -- I'd rather

17   just let them go home for the day rather than make them go to

18   lunch and then come back for two minutes.

19         **MR. GLASSER:** Here you go, Your Honor.

20         **THE COURT:** If you'll just be patient with us, Doctor.

21   This doesn't have anything to do with you.

22         **MR. GLASSER:** And, Your Honor, we would offer it as

23   substantive evidence. It's an admission of a party. This is a

24   managerial agent of the company. It's Mr. DeFranco.

25      And the Fourth Circuit in the case of *Community Counseling*

*Service against Reilly,* 317 F.2d 239, held that whether or not
the witness has testified these type of statements may be
substantively read to the jury.

And the Court ruled that the door was opened by his
testimony about DISH taking care of its own issues.

**THE COURT:** Okay. Who is speaking?

**MR. BICKS:** I am, Your Honor.

**THE COURT:** Go ahead, Mr. Bicks.

**MR. BICKS:** We would object to this as not appropriate
rebuttal evidence, as prejudicial and irrelevant. And you
recall that we discussed this topic when Mr. DeFranco was here
and he was a witness on the stand, and if this was an issue
that was to be raised, as irrelevant as it is, it should have
been raised while he was here. So it's not appropriate
rebuttal evidence, and they had the full opportunity to
cross-examine him.

And DISH's calls are not relevant in this case. DISH is
not being sued under the statute that was at issue here and
this isn't about DISH's calls. And so it's clearly irrelevant
and it's not appropriate rebuttal evidence.

**THE COURT:** All right. For the Plaintiff?

**MR. GLASSER:** Your Honor, under -- it's certainly
allowed under Fourth Circuit precedent, which I've cited. And
under the rules, it can be used at any time. The Court will
recall that when the door was opened I was thinking of

1    questioning him.  Defense counsel was saying that it wasn't so,

2    that the ruling wasn't upheld about the 1.7 million calls.  I

3    didn't know at the time.  I didn't want to inject error in the

4    case.

5       I went out this weekend, read the reconsideration order.

6    The 1.7 million calls were sustained by the court.  It didn't

7    change.  And I found this relevant testimony from Mr. DeFranco

8    that is on point.  It doesn't get to the exact numbers, but it

9    makes the point that DISH itself had violations of the list.

10   And I think it's relevant and appropriate.

11           **THE COURT:**  All right.  I'll overrule the objection.

12   It's fairly short.  I think it was appropriate rebuttal to

13   Mr. DeFranco's testimony which painted the company in a very

14   positive light, and it's not unfairly prejudicial in light of

15   how short it is and the lack of specifics that it goes into.

16       All right.  Are we ready for the jury to come back in?

17           **MR. BARRETT:**  Yes, Your Honor.  I have about two

18   questions for this witness about the PossibleNOW report and

19   that's it.

20           **THE COURT:**  Okay.  You can bring the jury back in.

21           **MR. BICKS:**  Your Honor, I -- I have not had an

22   opportunity to review the entirety of this testimony, so I need

23   an opportunity to determine whether or not I have to read

24   anything in to counter any of this.

25           **THE COURT:**  That's a good point.  We'll do -- we'll do

1    the rebuttal evidence after lunch.  Thank you, Mr. Bicks.

2    That's a very good point.  We'll finish this witness and we'll

3    all go to lunch and I'll have the jury come back after lunch.

4    All right.

5         **MS. ECHTMAN:**  Your Honor, there is one housekeeping

6    thing I would like to do, which is formally move into evidence

7    DX25 under Rule 703.

8         **THE COURT:**  I don't think 703 makes it admissible.

9    That says whether or not it can be shown to the jury.  Are you

10   talking about 803?

11        **MS. ECHTMAN:**  I'm talking about 703 says you can show

12   it to the jury unless --

13        **THE COURT:**  Right, but that's different from being

14   admissible.  The jury is coming in, so --

15        **MS. ECHTMAN:**  Okay.

16       (The jury entered the courtroom.)

17        **THE COURT:**  Okay.  You can ask your next question.

18        **MR. BARRETT:**  Thank you, Your Honor.

19   BY MR. BARRETT:

20   Q.  Dr. Fenili, regarding the PossibleNOW report that you

21   referenced, you're not testifying that that is a Federal Trade

22   Commission report, are you?

23   A.  No, sir.  It's a report to the Federal Trade Commission.

24   Q.  So it was not done by the Federal Trade Commission,

25   correct?

1  A.  Well, the Federal Trade Commission asked PossibleNOW to do

2  the report.

3  Q.  You're not testifying that the report itself was adopted by

4  the Federal Trade Commission for any regulatory purpose, are

5  you?

6  A.  I don't know.

7          **MR. BARRETT:**  Thank you.  No further questions.

8          **THE COURT:**  Redirect?

9          **MS. ECHTMAN:**  Yes.  If everyone can hear me, I think I

10  can do this without the microphone.

11          **THE COURT:**  You may need to use the table mike.

12                    **REDIRECT EXAMINATION**

13  **BY MS. ECHTMAN:**

14  Q.  Dr. Fenili, I think you provided testimony about six and a

15  half years that you spent working as an economist for the

16  federal government; is that right?

17  A.  Yes.

18  Q.  In that time that you were at the FTC and General

19  Accounting Office and Department of Energy, were there times

20  when outside consultants did reports for you?

21  A.  Yes.

22  Q.  And when you received those reports, were you comfortable

23  relying upon them in your work?

24  A.  Yes.

25  Q.  And did you rely upon them as if the federal government had

1  done them itself?

2  A.  Yes.

3          **MS. ECHTMAN:**  Thank you.  No further questions.

4          **THE COURT:**  Anything else?

5          **MR. BARRETT:**  No, Your Honor.

6          **THE COURT:**  All right.  Thank you.  You can step down.

7      (The witness left the stand.)

8          **THE COURT:**  All right.  Ladies and gentlemen, I think

9  we have a little bit more evidence for you all possibly after

10  lunch, so I'm going to let you go to lunch.  And it's a quarter

11  of one:00, so let me ask you to come back at 10 minutes till

12  two, all right, just to -- I want to be sure we do get the

13  evidence finished today and the lawyers and I have time to do

14  after that what we need to do.

15      So over the lunch break, even though we're getting close to

16  the end of the evidence, you still -- there still may be some

17  more.  You should keep an open mind about the matter.  You

18  haven't heard closing arguments or my instructions.

19      Continue to avoid contacts with lawyers, parties, or

20  witnesses.  Don't speak to any of them.  Don't read or listen

21  to any news reports or conduct any independent investigation.

22  And don't talk to each other about the case.  Leave your notes

23  in the chair.  Please come back at ten minutes -- well, now

24  five minutes till two, five minutes till two.

25      (The jury left the courtroom.)

1    **THE COURT:** All right. Defendant's -- you've offered

2  Defendant's Exhibit 703 into evidence -- excuse me, Defendant's

3  Exhibit 25 into evidence.

4    **MS. ECHTMAN:** Exhibit 25.

5    **THE COURT:** So Rule 803(18) says, if admitted, the

6  statement may be read into evidence, but not received as an

7  exhibit. So there's that. And then 703 says if the facts or

8  data would be inadmissible, the proponent may disclose them.

9  Okay. So this is a little funny. It's admissible, it seems

10 like, under 803(18), but not received as an exhibit. 703, it's

11 disclosable.

12   **MS. ECHTMAN:** Yeah, so the way I read 703 is it can

13 actually come in as an exhibit under 703 even if it would just

14 be read under Rule 803.

15   **THE COURT:** All right. Let me take a look at that

16 over the lunch break just to see if I can find anything exactly

17 on that point, which I don't think was covered exactly by you

18 all's briefing over the weekend. That was addressed to other

19 things. So let me take a look at that. I don't want to mess

20 it up on -- I may have made many mistakes, but I don't want to

21 do them without at least looking into it.

22   **MS. ECHTMAN:** Your Honor, in any event, I think the

23 relevant portions were conveyed to the jury, but I think it

24 would be neater to have it in the record.

25   **THE COURT:** So beyond Defendant's 25, do you have

1  other evidence you're going to offer?

2      **MS. ECHTMAN:**  No, Your Honor.

3      **THE COURT:**  All right.  Subject to my ruling on

4  Defendant's 25.

5      Now, the Plaintiff wants to offer this testimony from

6  Mr. DeFranco on January 29, 2016, that you've handed up.  And

7  it looks -- as I say, it looks to me to be admissible.  I will

8  give the Defendant a chance to see if there's any

9  counter-designations that, in fairness, you would need -- you

10  would want to present to the jury.  And you can take the lunch

11  recess to do that.

12      **MR. BICKS:**  And, Your Honor, I'd also just like to

13  have an opportunity to discuss this further because I had just

14  seen this right before it was to be used.  And I'm going to

15  evaluate it over the lunch break, but I'd like an opportunity

16  to be heard on it after we've had an opportunity to look at

17  this testimony in detail.

18      **THE COURT:**  All right.  If you want to make an

19  argument different from what you've already made, I'll give you

20  a brief opportunity -- I'll certainly give you an opportunity

21  to do that since it was just handed to you.  If you're just

22  going to repeat what you've already said to me, there's really

23  no point in that.  If you have something new or different, I'll

24  be glad to hear from you.

25      So they're coming back at five minutes till two.  How about

1  if we come back -- other than this, these two issues, and 2008,

2  you know --

3          **MR. GLASSER:**  Let's bang through and finish it.

4          **THE COURT:**  Right.  I'm just trying to think about

5  those demonstrative exhibits.  Is there anything else -- do you

6  all want to be heard further on 2008?

7          **MR. BARRETT:**  Yes, Your Honor.  We believe it is

8  admissible under 1006 as a summary of evidence --

9          **THE COURT:**  Uh-huh.

10          **MR. BARRETT:**  -- based on voluminous writings that

11  cannot be conveniently examined in court.

12          **THE COURT:**  Right.  I think that's the argument you

13  made to me earlier.  Is that right?  That's what I recall it

14  being.

15          **MR. BARRETT:**  Yes.

16          **MS. ECHTMAN:**  And we don't believe it qualifies as a

17  summary under 1006 and we don't think it should come in.  But,

18  Your Honor, in the event that you will be taking

19  demonstratives, then we would like to have on the record the

20  demonstratives we used with our witnesses as well.  So subject

21  to the Court's ruling on 2008.

22          **THE COURT:**  Right.  And I mean, I guess that's what I

23  was really thinking about was, you know, it -- I'm trying to be

24  helpful to the jury here, and if these demonstratives are

25  helpful, which -- you know, maybe we should just let them have

1    them.

2          **MR. GLASSER:**  Except I think the ones that she's

3    talking about, you know, get into the rabbit hole wireless,

4    which is a whole --

5          **THE COURT:**  Well, yeah, but they just talked about the

6    number of wireless calls.  That's a fair matter.  I didn't let

7    them get into, you know, opinions about the rest of it, but the

8    numbers of wireless, that's just -- that was -- there was

9    nothing wrong with that.  So beyond that, did you have any

10   concerns about theirs?

11         **MR. GLASSER:**  No, ma'am.

12         **THE COURT:**  I'm kind of inclined to just let them see

13   the demonstratives just because they all seem to really

14   summarize numbers.  This is a numbers case.  They all seem to

15   summarize numbers.  It's pretty clear when these witnesses

16   testified.  You know, all the facts are in.  They just kind of

17   are written summaries of what the witness said.

18         **MR. BARRETT:**  Right.

19         **THE COURT:**  I don't know.

20         **MR. BARRETT:**  I think there's two kinds of summary

21   exhibits that they are talking about.  Are you talking about

22   the Fenili?

23         **THE COURT:**  How about this.  Over the lunch break --

24         **MR. BARRETT:**  We'll talk.

25         **THE COURT:**  -- let me get the Defendant to identify

which demonstratives they would want to offer if I were to let
Plaintiff's 2008 in.  And when you come back from lunch, show
them -- when everybody comes back from lunch, if defense
counsel would show those to Plaintiff's counsel and you all
talk about it for a second, all right, and then I'll take it up
when we come back.

So with all of that to do, how about if we just take a
45-minute lunch break and all get indigestion and, you know, I
just want to be sure we get the evidence in and then all of us,
you know, have time to -- I'll let the jury go as quick as I
can and then we have time to deal with the charge.

So if you all take 45 minutes, come back in.  I'll give you
a few minutes to talk to each other and then I'll come on back
in and we'll try to knock through all of these things before
the jury comes back.  All right.  We'll be in recess until
1:40.

(A noon recess was taken from 12:55 p.m. until 1:40 p.m.)

**THE COURT:**  Let me get the Defendant to identify which
demonstratives they would want to offer if I were to let
Plaintiff's 2008 in.  And when you come back from lunch, show
them -- when everybody comes back from lunch, if defense
counsel would show those to Plaintiff's counsel, and you all
talk about it for a second, all right, and then I'll take it up
when we come back.

So with all of that to do, how about if we just take a

1 45-minute lunch break and all get indigestion.  And, you know,

2 I just want to be sure we get the evidence in and then all of

3 us, you know, have time to -- I let the jury go as quick as I

4 can, and then we have time to deal with the charge.

5  So, if you all take 45 minutes, come back in.  I'll give

6 you a few minutes to talk to each other and then I'll come on

7 back in and we'll try to knock through all of these things

8 before the jury comes back.  All right?

9  We'll be in recess until 1:40.

10  (A noon recess was taken from 12:55 p.m. until 1:40 p.m.)

11  **THE COURT:**  Give me one moment here.  I had a little

12 trouble with my Westlaw.

13  (Pause in the proceedings.)

14  **THE COURT:**  It was working and then it wasn't.

15  **MR. EWALD:**  We've all been there.

16  **THE COURT:**  All right.  One second.  I think I've got

17 what I need here almost.

18  (Pause in the proceedings.)

19  **THE COURT:**  Okay.  So, in looking at the issue of

20 Mr. DeFranco's testimony in front of the -- Judge Myerscough,

21 something Mr. -- I can't remember who addressed this when it

22 came up, whether it was Mr. Bicks or Ms. Echtman.  But whoever

23 it was said something that caused me to go look at Rule 613(b).

24 And the clerk, I think, gave you all a head's up that I had

25 looked at this.

1    And that has caused me to revisit whether it is appropriate

2  to let Mr. DeFranco's testimony before Judge Myerscough be read

3  to the jury.  It is extrinsic evidence, yes.  It is a prior

4  inconsistent statement, yes.  However, the witness has not been

5  given opportunity to explain or deny.  Do you want to be heard

6  about that?

7       **MR. GLASSER:**  Yes, ma'am.  I don't think that the

8  exclusion in section (b) applies when the -- it is a statement

9  of an opposing party under Section 801(d)(2), Your Honor, and

10 that's the exact situation we have here.

11      **THE COURT:**  Okay.  Because?

12      **MR. GLASSER:**  Because he's a managing agent of the

13 Defendant, and it was a matter within the scope of his, you

14 know, authority.  And so, it's classic 801(d)(2).  It's made by

15 the party.  He was in a representative capacity.  He manifested

16 and adopted the belief it was true.  It was made by a person

17 with whom the party authorized to make the statement, and it

18 was the party's agent on a matter within the scope of that

19 relationship while it existed.  So it's 801(d)(2) exception to

20 613(b), Your Honor.

21      **THE COURT:**  All right.  You all are making me like

22 have a law review class here.  All right, Mr. Bicks?  I'm not

23 complaining.  I'm -- really, I was just kidding.

24      **MR. BICKS:**  There are a couple -- there are multiple

25 issues here, Your Honor, and let me just start from the top.

1  First of all, this is not a prior inconsistent statement,

2  number one.  The issue that we were dealing with when

3  Mr. DeFranco here was testimony that was given at 174 of the

4  transcript.  And I asked him the question:

5     Did DISH make SSN responsible for telemarketing to shield

6  itself from responsibility?  Okay?  As the Court knows, this is

7  a case about SSN as a retailer.  The answer was, no.

8          **THE COURT:**  All right.  But that's not --

9          **MR. BICKS:**  May I be heard on the record?

10         **THE COURT:**  Well, yeah, but that's not the only

11 testimony it's offered to rebut.  I mean, you can be heard on

12 the record, but I understood it to be offered more generally

13 than that to -- to rebut more than just that one they're --

14         **MR. BICKS:**  I want to just go on the record of what

15 was said when we were before you.

16         **THE COURT:**  Okay.  I'm trying to give you an

17 opportunity to be heard about what I understood their argument

18 to be.

19         **MR. BICKS:**  Right.

20         **THE COURT:**  You know, because if you don't address it,

21 then I don't know what your position is.

22         **MR. BICKS:**  Well, I'm going to address it in a moment,

23 because I do believe that -- that Rule 613 does apply because

24 Mr. DeFranco did not have an opportunity to address this.  So,

25 I think the Court is correct about that.

1    But I want to back up because I don't believe it is a prior
2    inconsistent statement.  I've gone back to look at what
3    happened when we were before you.  And I asked him the question
4    about SSN and shielding responsibility, and he said:

5    We took responsibility for our telemarketing, but it was
6    impossible for us to operate within their four walls.  So he
7    was distinguishing between DISH calls and SSN calls, and that's
8    what he was saying.

9    I didn't ask him ever about tell me whether or not DISH
10   ever has violated the telemarketing laws.  In which event, had
11   I asked him and he said no, DISH never did, then it could have
12   been brought in, well, wait a minute, what about in this case?
13   I didn't ask him at any point in his direct about DISH's
14   telemarketing.  I didn't even ask him about that.

15   Then we got to the ruling by the Court, which said, well --
16   where Mr. Glasser brought out the decision by Judge Myerscough.
17   And Your Honor said, well, he's entitled to cross-examine.  And
18   then he didn't cross-examine him when he was here.  And so, had
19   he done that -- and now I'm looking at this and I can tell Your
20   Honor because I'm involved in that case, and as well as some of
21   the lawyers on the other side, including Mr. McCue, who sat
22   there for this entire trial, and these lawyers know everything
23   that happened in that case.

24   This statement here that he would be cross-examined is not
25   inconsistent with anything that he said.  I didn't even get

into that. This transcript that they want to read was a
cross-examination done where he was asked questions about
DISH's telemarketing and whether or not -- and talking about
three million calls, and cross-examination here that that was a
summary judgment ruling by Judge Myerscough.

First of all, it was not three million calls. It was, I
believe, 1.7 million calls. Okay? So that's factually
incorrect right off the bat. The second thing is -- and I'm
handling that case, so I know this. This is not a final
adjudication. And we have before Judge Myerscough the question
of whether or not these calls are even violative of a
completely different statute. That has not even been
determined by the judge. And we've asked that -- that this be
reconsidered. So this is not even a factual finding that has
any effect as well. So, that is another fundamental problem
here.

The real problem I have, Your Honor, is had Mr. DeFranco
been here, I would have pointed out some of the things that was
in Judge Myerscough's decision, that there were 435 million
calls that were reviewed in that case. And the issue that was
being litigated over was DISH's responsibility for
1.7 million --

**THE COURT:** If I say that I'm inclined to rule against
you, do you still want to -- to rule in your favor, do you
still want to keep talking?

1    **MR. BICKS:**  No.

2        **THE COURT:**  Okay.  I'm inclined to rule in your favor

3    on that and to change my mind under Rule 613(b).  It just seems

4    to me to raise a can of worms, and I -- I disagree with

5    Mr. Bicks about the narrow focus of the prior inconsistent

6    statement.  Nonetheless, I think 613(b) applies, and I'm going

7    to exclude it.

8        **MR. GLASSER:**  So, Your Honor, then, I would -- then

9    the Plaintiffs would propose to call Mr. Stan Dodge, who is the

10   general counsel over here, and ask him some questions about

11   whether between 2007 and 2010, DISH, in fact, called 1.7

12   million people on the Do Not Call Registry.  DISH itself.

13       **MR. BICKS:**  He's not listed as a witness, and he's the

14   general counsel of the company, Your Honor.

15       **THE COURT:**  Yeah, okay.  I'm not going to let you do

16   that.

17       All right.  Now, let's turn to 25.  It appears, as best I

18   can tell in my extensive research over the last, you know, 45

19   minutes, and I'm sure you all had -- did anybody find a case

20   before I start talking about what I found?  Okay.

21       There is a Seventh Circuit case which seems to indicate

22   not -- you don't give it to the jury.  That's *Baumholser*,

23   B-A-U-M-H-O-L-S-E-R, 630 F.2d 550.  And there is a case out of

24   the Southern District of Alabama just six weeks ago, *Kirksey*,

25   K-I-R-K-S-E-Y, 2016 Westlaw 7116223, which also seems to

indicate you don't give the hearsay materials that are the

basis for an expert's opinion to the jury as an exhibit.

So -- and that appears to be consistent with what I see.
There's an Eleventh Circuit case which, in a footnote not
addressing this point, said -- used the word admissible, but
that's the *Garcia* case from 2015, but that doesn't seem -- they
weren't really deciding it.

So it seems to me that, especially since I -- the Defendant
had full opportunity to designate somebody from PossibleNOW as
an expert or as a fact witness, did not do so.  I excluded
that.  It's not admissible under a hearsay exception, that I
should not let that report be admitted as an exhibit which
could go to the jury.  All right.  So that's my ruling on that.

Now, then, the only thing left is 2008 and the
demonstratives.  Did you all consult about that?

**MR. BARRETT:**  So perhaps I could short-circuit that.
We do not propose to admit that into evidence and send that
back into the jury room.

**THE COURT:**  All right.  So you're withdrawing your
request?

**MR. BARRETT:**  Yes, Your Honor.

**THE COURT:**  All right.  Well, then, that does short
circuit and simplify.  So, as to Defendant's 25, the
PossibleNOW report, you know, the Defendants are well --
completely allowed to refer to that report as the basis for

1  Dr. Fenili's opinion, but not as -- not for the truth of what

2  the report said itself.  But, you know, they can -- to the

3  extent the jury is going to hear that distinction, you know,

4  that's where we are.  Okay.

5     I believe DISH told me they did not have additional

6  evidence; is that right?

7        **MR. BICKS:**  That's correct.

8        **THE COURT:**  Does the Plaintiff have other additional

9  evidence now that I've -- I'm not going to let you offer what

10 you wanted?

11       **MR. GLASSER:**  No, ma'am.

12       **THE COURT:**  No.  Okay.  So here's what I propose to

13 do.  Bring the jury in.  I'm going to tell them they can leave

14 for the day.  And I'm going to have them come back in the

15 morning with the understanding and expectation that we will do

16 what we need to do today so that closing arguments will start

17 tomorrow morning at 9:30, and that's what I'm going to tell

18 them.  All right?

19    Okay.  Bring the jury in.

20       **MR. GLASSER:**  Is there any hope we could just go

21 straight through and close today?

22       **THE COURT:**  No.

23       **MR. GLASSER:**  Okay.

24       **THE COURT:**  How long do you think your closing

25 argument is going to take?

1    **MR. GLASSER:**  It's 37 pages -- the opening statement

2  was 31 minutes, so I would say this would probably be about 45

3  on the first part, just because I'll have some more stuff to go

4  over.

5        **THE COURT:**  Right, yeah, I'm not going to give you any

6  grief about that.

7        **MR. GLASSER:**  Hey, I'm well under my 20 hours.

8        **THE COURT:**  Yeah, you all have done great.  So I'm not

9  going to give grief about that.  What are you expecting,

10  Mr. Bicks?

11        **MR. BICKS:**  I would think about an hour and 15

12  minutes.

13      (The jury entered the courtroom.)

14        **THE COURT:**  Don't get too comfortable.  All right.

15  Ladies and gentlemen, while you all were at lunch, the lawyers

16  and I worked through a number of different things remaining in

17  the case.  And the upshot is that you have heard all of the

18  evidence; all right?  There is no additional evidence from the

19  Defendant, and the Plaintiff will not be presenting any

20  rebuttal evidence, so you have heard all the evidence in the

21  case.

22      The next -- you may remember from last week, the next thing

23  that happens as far as you're concerned is the closing

24  arguments of the attorneys.  And then after that, I'll give you

25  your instructions on the law.  After that, you'll go and start

1  your deliberations.

2      Now, before the lawyers can make their closing arguments, I

3  have to meet with them.  We have to finalize the verdict sheet,

4  which has the exact wording of the exact issues you'll be

5  called upon to answer.  We have known what they are for the

6  most part, but we're going to finalize that.  And I'm also

7  required by law to consult with them about the law that I am

8  going to instruct you on just to make sure I don't leave out

9  anything important.  All right.

10      Now, that process takes a while; okay?  And the attorneys'

11  arguments -- closing arguments in the case are going to take --

12  you know, they'll take 45 minutes or an hour each, maybe a

13  little longer, to go over the evidence with you, and then I'll

14  be instructing you.

15      So the upshot is I'm going to let you all go home for the

16  day while we work through everything that has to be done.  And

17  when you get here at 9:30, you be will be in the courtroom and

18  we will start with closing arguments at 9:30 and you will not

19  have to sit around and wait.  I'm just concerned, it's likely

20  to take us an hour-and-a-half or two hours, and then, you know,

21  we can't do all the -- you don't care about all the logistics.

22  It just seems to me that's the most efficient way to go about

23  it and the fairest way to all the parties.

24      So, even though you have heard all the evidence, you

25  haven't heard their closing arguments, you don't have the exact

1  issues in front of you, you haven't heard my instructions, so

2  don't make up your mind.  You also haven't talked it over with

3  your fellow jurors, and that's an important fact.  Keep an open

4  mind.  Don't have any contact with anybody.  You're going to be

5  leaving and we're going to be staying, so that's unlikely to

6  happen, but, you know, still, in the morning as you come into

7  the courthouse, avoid everybody.

8      Let me just remind you one more time, don't conduct any

9  independent investigation.  Don't look anything up on the

10 Internet.  Don't call up your buddy who you think might know

11 something about this.  That's not fair to the parties.  You

12 could be getting inaccurate information, so no independent

13 investigation.

14     I don't think there's been any media coverage of the case,

15 but if there has been, don't read it or listen to it and don't

16 look up anything online about the laws at issue here, et

17 cetera.  All right.  Don't talk to each other as well and

18 continue not to talk to your family members, co-workers, and

19 others about the matter.

20     So, even though you will be getting the case for your

21 deliberations tomorrow, I don't know how long it's going to

22 take you, so don't make any firm plans for Thursday; okay?  You

23 know, you all -- that's going to be -- you want to leave

24 yourself time for those -- for your deliberations.  You may be

25 able to reach a verdict tomorrow, but if you need to come back

1  on Thursday, that's not going to be a problem.

2      So, having given you the same instructions I've given you

3  many times, but specific to this point in the case, I'm going

4  to let you go home for the day.  Please be back tomorrow

5  morning about 9:20, 9:25, and we will start with closing

6  arguments at 9:30.

7      The jury is excused.  If everyone else will remain seated

8  while they step down.

9      (The jury left the courtroom at 2:05 p.m.)

10          **THE COURT:**  Does the Defendant want to be heard at the

11  close of all the evidence?

12          **MR. BICKS:**  We do, Your Honor.  And it would be me

13  moving, again, under Rule 50 as I had discussed with the Court

14  before.  We'll be filing a written motion, I believe, today on

15  that.  And I'm happy to make my argument now, as the Court

16  pleases.

17      I had articulated my basis before.  The one thing I should

18  add that I hadn't stated expressly before is the question of

19  willfulness, I know, is reserved for the Court.  But, I believe

20  that that would also be covered by our motion.  And I believe

21  that that, as well as the agency questions, based now that the

22  evidence is closed, there would be no reasonable inference or

23  evidence in any way to support any kind of a willfulness

24  finding by the Court.

25      And so, for the reasons that I had articulated, and I'm

happy to expand on -- on the basis for our motion if the Court wishes, but I can tell the Court that we'll be filing a written motion under Rule 50. And I can probably get a written copy of that and get it for the Court, but that motion will be filed.

And I guess I probably should also state that to the extent Rule 52 is involved, and maybe that is also a basis for the motion. But in any event, that's where we are.

**THE COURT:** All right. I expect to deny that. If you're going to file a written motion, I'll obviously take a look at it before I rule on it.

**MR. BICKS:** Right.

**THE COURT:** But I expect to deny it, so we'll proceed. Okay?

**MR. BICKS:** Okay.

**THE COURT:** Now, this is how I propose that we go forward. I have a -- just tiny, tiny minimally revised verdict sheet from what we talked about earlier. I propose to hand that out and have any objections or have any discussion about the issues.

I know the Defendant wants me to submit two issues on agency, and, you know, I'm glad for everybody to make their record on whatever I'm doing that you all don't like. And so, I propose we do that first.

Then, I propose that we take a short recess so that I can go read through my instructions, my draft instructions that

1  I've been working on now that all of the evidence is in, and

2  then make copies, and then give you all -- distribute them to

3  you all and give you some time, obviously, to read it.  And

4  that we have, you know, as I mentioned, sometimes an

5  off-the-record discussion makes the record clearer for the

6  appellate court and also results in a product that you -- with

7  you all having a more recent draft of my instructions when you

8  actually argue the case to the jury.  So, I would propose that

9  we do that if you all feel comfortable.

10     Obviously, we will have a charge conference on the record

11  after we talk informally and I make any changes that, for

12  example, everybody agrees I should make, that kind of thing.

13  And you know, so that's kind of what I'm proposing.  Yes,

14  Mister --

15         **MR. GLASSER:**  That's fine with the Plaintiff, Your

16  Honor.

17         **THE COURT:**  Okay.  Mr. Bicks, is that all right?

18         **MR. BICKS:**  Yes.

19         **THE COURT:**  Okay.  Here is the draft -- oh.  One other

20  housekeeping matter while she's handing out a draft.  There's

21  one for Joe, Marlene.  I'll direct the clerk to make

22  Defendant's Exhibit 25 part of the record for appellate

23  purposes and Mr. DeFranco's testimony before Judge Myerscough,

24  which we'll mark as Plaintiff's Exhibit --

25         **MR. GLASSER:**  I marked it 2015, Your Honor.

1     **THE COURT:**  -- 2015 part of the record for appellate
2  purposes.

3     Is there anything else I excluded that anybody wants me --
4  you know, if there is -- if there's anything else I need to do,
5  you all can look through everything tonight, and I'm not going
6  to give you a hard time about that.  If you offered something
7  and I excluded an exhibit, you know, I'm happy for the Court of
8  Appeals to take a second look at that; all right?  So just
9  be -- but I would like you to do that so we can handle it
10 tomorrow while the jury's deliberating.

11    All right.  Everybody got the verdict sheet?  The only
12 change I made to the draft that you all had seen earlier and
13 that we had worked through was to question 1, which, in the
14 previous version, said, was SSN DISH's agent?

15    And what I have changed to it, was SSN acting as DISH's
16 agent, because that, I think, while it doesn't go through
17 everything the Plaintiff has to prove, which is not the
18 function of the issue anyway, it does -- it is fairer to the
19 Defendant in light of the positions that they've taken in this
20 case.

21    So, does the Plaintiff have objections to the issues as
22 phrased on this draft verdict sheet?

23    **MR. BARRETT:**  No, Your Honor.  I do want to just do
24 one last check to make sure.

25    **THE COURT:**  If you all need another minute, I'm happy

1  to sit here for a second.  I'm totally fine.  Take your time.

2  The jury's not waiting, so I become immediately more patient.

3      And, Ms. Sanders, would you take one of those copies and

4  mark it as Court Exhibit 1.  You can -- you may have to use

5  Mr. McLean's.

6      Just for purposes of the record, the draft verdict sheet

7  that we are about to discuss is marked Court Exhibit 1.

8          **MR. BICKS:**  Judge, while we're looking at it, would it

9  be appropriate for me to ask about the use of the transcripts

10 in the closing, or should we wait?

11         **THE COURT:**  No, we'll just wait so everybody can

12 participate in all the discussions.

13         **MR. BICKS:**  All right.  Thank you.

14     (Pause in the proceedings.)

15         **THE COURT:**  I'm pretty sure I only changed those two

16 words.  Did I change something else?

17         **MR. BICKS:**  To us, it appears that there were some

18 other changes.

19         **THE COURT:**  Oh, really?  Okay.  Pardon me.

20     (Pause in the proceedings.)

21         **THE COURT:**  Everybody ready?  Is the Plaintiff ready?

22         **MR. BARRETT:**  Yes, Your Honor.

23         **THE COURT:**  Is the Defendant ready?

24         **MR. BICKS:**  Yes.

25         **THE COURT:**  Okay.  Does the Plaintiff have objections

1  to this --

2          **MR. BARRETT:**  No, Your Honor.

3          **THE COURT:**  -- in Court Exhibit 1?  What about the

4  Defendant?

5          **MR. EWALD:**  Yes, Your Honor.  As you noted, we do

6  object to having only one question on agency.  The reasons that

7  we've stated in the past, and I think Your Honor had withheld

8  decision on this pending the evidence, and the evidence seemed

9  robust in our mind and acknowledged in some respects by Your

10 Honor in ruling on the Rule 50 motion.

11         **THE COURT:**  Yes.  And let me just be clear.  I intend

12 to instruct the jury on, you know, was there agency; and,

13 second, was it within the course and scope.  I intend to do

14 that.  Those would be the two things the Plaintiff would have

15 to prove by the greater weight of the evidence, that there was

16 agency, and that the actions were taken in the course and scope

17 of authority.  But, I'm not trying to persuade you otherwise,

18 but I do want to make that clear to you.

19         **MR. EWALD:**  And we appreciate that.  We do think they

20 are two separate parts of the test.  And they are, obviously,

21 bound together in some respects, but are distinct and have

22 different evidence that goes to them.  If -- and so we do

23 object without a separate outside-the-scope question.

24    If Your Honor is not inclined to do that, we would also

25 suggest combining them into one question, something to the

effect of, was SSN DISH's agent when it made the telephone

calls at issue, and were those calls within the scope of actual

authority granted to it by DISH when SSN placed those calls.

**THE COURT:** Okay. All right.

**MR. EWALD:** And, Your Honor, if I may also, I'm not

sure if Plaintiffs will object to this one. We think that with

so many time periods discussed during this trial, that when we

were talking about the telephone calls at issue, it would be

helpful to the jury and alleviate confusion to say the

telephone calls at issue in 2010-2011 to orient the jury as

to --

**THE COURT:** From May, is it 1st, 2010 --

**MR. EWALD:** Yes.

**THE COURT:** -- to August 31st? Is that right? First?

Sorry. August 1st. I don't have any real problem putting the

class dates in that first issue. Does the Plaintiff object to

that?

It would read as it says: The telephone calls -- instead

of saying, at issue, I could say just say, when it made the

telephone calls from May 1st, 2010 through August 1, 2011, or I

could say, at issue from May 1st, 2010 through August 1st,

2011.

**MR. BARRETT:** I think that's fine.

**THE COURT:** Okay. I think that's probably a good

suggestion. So I will say, at issue from, and then add the

class dates.  All right.  Any other suggestions about the
verdict sheet?  I'm going to overrule your -- or deny your
request for two issues on the agency issue.  I think that -- I
believe I will adequately cover it in the instructions.

**MR. EWALD:**  Your Honor, we also, just to make the
record clear, stand on our previous objections -- or objections
to the verdict form that we've asserted in previous filings, in
particular, that we had requested subscriber recipient be a
element of Plaintiff's proof at trial.  And Your Honor
determined that the name and address information was going to
be put to a later -- post-trial if the Plaintiffs prevailed.
I'm just not sure if there was ever a point in time where we
were able to then say, you know, we actually object after Your
Honor made that ruling.

**THE COURT:**  Okay.  I don't, at this point, remember,
either, but I'm happy for you to make that record.  I have so
ruled and you did object at the time.

**MR. EWALD:**  And we also want to -- it's not
necessarily an objection to the way the verdict sheet is
phrased, but as Your Honor may recall with the buckets that
show up on pages 1 and 2, there is overlap and there needs to
be a way to calculate that overlap.  And what do we do with
potentially inconsistent rulings within the buckets?  And I
guess I raise that for --

**THE COURT:**  Okay.  If that happens, I'll deal with

1  that, and I will give you a full opportunity to be heard should

2  we get an -- something that is inconsistent.  I don't really --

3  I don't know how that might happen, but I don't know that I

4  need to figure that solution out at this point.  Do I?

5       **MS. ECHTMAN:**  Your Honor, and just -- I think it's

6  something that actually, when Your Honor reads the stipulation

7  to the jury, if Your Honor is going to read it, just to let

8  them know that the numbers add up to more than the phone

9  numbers at issue because there is overlap between the buckets.

10      **THE COURT:**  Oh, okay.

11      **MS. ECHTMAN:**  So, I mean, we think -- you know, and we

12 had put in prior verdict sheets where we wanted the jurors to

13 do the math so they could know how many violations they're

14 finding so they could know the overall damages that they're

15 finding if they're going to do it just per call.  So, they need

16 to have some sense, directionally, of where they're going to

17 come out because just saying how much per call, they need to be

18 able to multiply and get a sense of how many violations they

19 might be finding and what the overall damages are as opposed to

20 just saying X dollars per call.

21      **THE COURT:**  Okay.  Well, you all can make a suggestion

22 to me for the instructions and we can maybe work through that.

23 It does occur to me that I never did actually read the amended

24 joint stipulation to the jury.

25      **MR. GLASSER:**  We could read it in the instructions

1  phase, Your Honor.

2        **THE COURT:**  Okay.  I'll do that.  I'll find -- look

3  through there and figure out an appropriate place.

4        **MR. GLASSER:**  I am concerned, Your Honor, about

5  putting those dates in the first question.  It kind of implies

6  that the scope has to be re-established in this case.  I think

7  the law is that, you know, the scope could be established by

8  conduct that precedes the dates.

9        **THE COURT:**  That's true.

10        **MR. GLASSER:**  So I actually don't think the dates

11  should go in there.  I think it's lifting the burden of proof

12  for when the scope was -- had been established, and I liked it

13  better before.  So, the Plaintiff respectfully requests that we

14  leave it the way the Court originally wrote it because I think

15  it unfairly cabins when the scope of authority could have been

16  established.

17        **THE COURT:**  Okay.  Well, it says, was SSN acting.  So

18  that -- I'm -- I'll let -- I'll leave the dates in.  I think

19  that's a fair request on the Defendant's part and not likely to

20  cause the problems Plaintiff is concerned about.  All right.

21  Any other problems about the verdict sheet?

22     All right.  Here's what I propose, then.  As I said, we'll

23  take a short break.  It will probably take me 5 or 10 minutes

24  to -- I'm not going to read every single word of my draft in 5

25  or 10 minutes, but I will skim back through it just to make

1  sure I haven't left anything out or I don't need to add

2  anything.

3      We'll make some copies. Ms. Sanders will bring them in to

4  you all. They'll clearly be marked. And after -- I'll give

5  you -- I would think you'd probably want 20 or 30 minutes to

6  look through them. And then, I'll check in with you at

7  around -- around 20 or 30 minutes after I send the draft in.

8      And if you all don't want to have an informal charge

9  conference at that point, just let me know, and we'll do it on

10  the record. But if -- I'm hoping we can work through some of

11  the stuff that, you know, there's not going to be as much of a

12  fuss about a little more informally, and then get a cleaner

13  draft for purposes of the charge conference. Okay? And we

14  will then be at ease.

15      (Court was at ease beginning at 2:20 p.m. until 4:39 p.m.)

16          **THE COURT:** I just want to note, totally unrelated to

17  anything, we have four jury trials going on in this courthouse

18  this week, this week. This -- nobody can really -- nobody can

19  really remember when that has happened before, but that's part

20  of the reason everybody else in the building is a little -- a

21  little crazy.

22      Okay. So the record will reflect that I had an informal

23  charge conference with the attorneys, very productive, and I

24  think it will simplify the charge conference on the record and

25  I intend to give everybody a full chance to be heard.

1    I'll give the clerk a copy of the draft instructions and
2  mark -- ask her to mark those as Court Exhibit 2.  These are
3  the instructions that I provided to counsel before our informal
4  conference and from which we worked.  And I'll be making some
5  notes about some agreed-upon changes and some other changes I
6  made in response to requests, not all of which was agreed upon.
7    Before we turn to that, I will turn to the verdict sheet.
8  I have changed at the parties' requests -- the date on there
9  was May 1st in two different places, Issue One and at the very
10 bottom of page 2, and I changed that to May 11th.
11   And I have changed on page 3 the instruction in italics
12 right above Issue Three.  That now reads:  If you answer yes in
13 whole or in part, also answer Question 3.  If you answer no to
14 Question 2, skip Question 3 and sign the verdict sheet.
15   So I have deleted the reference to Question 1 there as the
16 parties have requested.
17   And are there other -- any other comments or objections
18 that the Plaintiff wishes to make about the verdict sheet?
19        **MR. BARRETT:**  No, Your Honor.
20        **THE COURT:**  The Defendant?
21        **MR. EWALD:**  Your Honor, as we indicated during the
22 informal conference, we object to the manner in which
23 Question 2 is currently structured.  We believe that it is
24 confusing as it is currently structured and believe that the
25 first question that should be answered on 2 is no; that for the

jury's ease, to have each of the three sections identified with
A, B, and C to delineate the different questions and to -- and
to remove the -- under the first question, "Yes as to
Dr. Krakauer and all class members," remove the Italicized
sentence below that:  If yes, continue to Question 3 and skip
the following questions.

          **THE COURT:**  All right.  I'll overrule those
objections.  I do have revised verdict sheets for counsel.
There's four for the Plaintiff and four for the Defendant and
an extra one for the court reporter.  And I'll have an original
tomorrow for the jury that does not say "copy" on it like this
one.

     Now turning to the instructions, working off of Court
Exhibit 2, I have changed -- I will change the date from
May 1st to May 11th there in paragraph -- the very first
paragraph.

     Ms. Sanders, I seem to have lost my red pen.  Do you have
one?

     These initial instructions will be given before the
argument through page 3 -- the middle of page 3 and then
beginning there on page 3 where it says "Draft Final Jury
Instructions," those will be given after the jury
instruction -- after the arguments.  So no other changes on
page 1.

     On page 2 in the third full paragraph beginning "The second

issue," when I list the elements, I will say the Plaintiff must

prove four things.  First, that the telephone numbers of the

class members were listed on the National Do Not Call Registry

at the time of the call, dot, dot, dot; and, fourth, that the

telephone numbers were residential at the time of the call.

On page 3, I will tell the jury that the Plaintiff gets to

go first and last in making closing arguments, and each lawyer

will take no more than an hour and fifteen minutes.

Are there objections, corrections or additions to those

instructions for the Plaintiff?

**MR. BARRETT:**  Your Honor, I believe on page 3, it's

the first full paragraph, my recollection from the charge

conference is you were going to -- and I may have

misremembered, but you were going to change "damages" to some

other verbiage, such as "the penalty."

**THE COURT:**  I recall that.  I believe what I said was

that I would not change it there, but there were some other

places that I have agreed to take it out.  I don't think

damages -- I'm going to explain the definition of damages to

them, so I don't see any need to change it there, but I'll note

your objection.

What about the Defendant in those instructions?

**MR. EWALD:**  Your Honor, on page 2, the second

paragraph, DISH had objected to the language referring to, in

the first sentence, "if SSN was acting on DISH's behalf," and

1  had suggested to the Court instead of "acting on DISH's behalf"

2  that it be "as DISH's agent."

3      **THE COURT:**  Yes.  And I'll overrule that objection.

4  That language is from the regulations and I explain the agency

5  issue next.  Other objections to that section for the

6  Defendant?

7          **MS. ECHTMAN:**  No.

8          **MR. EWALD:**  I'm sorry, Your Honor.

9          **THE COURT:**  No.  All right.  Now, turning to the

10 instructions that will come after closing arguments and going

11 from page -- middle of page 3 through near the bottom of page 6

12 where the heading "Issues" is, let me just run through the

13 changes I've agreed to make.

14     On page 5, the third full paragraph beginning "as you will

15 remember" in the second sentence, I will delete "his or her

16 residential" and that sentence now reads:  It allows a consumer

17 to register a telephone number, et cetera.

18     In the sentence -- last -- the last paragraph at the bottom

19 of page 5, beginning "under the law," it carries over onto

20 page 6 there, and I will delete the phrase "in damages" so that

21 it just says a person may bring an action to receive up to $500

22 for each violation.

23     And in -- the last two sentences in that paragraph are

24 modified to read as follows:  DISH contends that the

25 Plaintiff's evidence is insufficient to prove that the class

members were on the Do Not Call Registry at the relevant time
and that the numbers were residential.  DISH also contends that
SSN was not its agent and that SSN was not acting in the course
and scope of any agency.

So I've added "and scope" to that last sentence.  I added
"at the relevant time" and I deleted the phrase "and that the
class members received at least two calls," since that's really
not been disputed here, just to simplify.

Does the Plaintiff have other -- have objections to the
instructions as drafted and modified from the middle of page 3
through the bottom of page 6?

            **MR. BARRETT:**  No, Your Honor.

            **THE COURT:**  What about the Defendant?

            **MR. EWALD:**  Your Honor, page 5, the fourth paragraph
beginning with "federal law provides," the final sentence in
that paragraph, "All telemarketers are required by law to
maintain records of the phone numbers they call in connection
with telephone solicitations," DISH objects to that on
relevance and prejudice grounds.

            **THE COURT:**  Okay.  Can I just get the Plaintiff to
respond to that?

            **MR. BARRETT:**  On relevance and which ground?

            **MR. EWALD:**  Prejudice.

            **MR. BARRETT:**  Prejudice grounds.

            **THE COURT:**  I believe there was a specific exhibit you

1 all were talking about and it -- it seemed to --

2       **MR. GLASSER:** In PX15, Your Honor, there is an e-mail

3 where DISH asked SSN about one of the complaint calls and SSN

4 admits they don't keep the records. And then there's DX2,

5 which is the policy that Mr. DeFranco testified about, saying

6 they must keep the records. And so we had colloquy with him

7 about whether they ought to discipline people who don't. So I

8 think it's relevant and it's in the case.

9       **THE COURT:** Yeah, because the contract requires them

10 to comply with the law.

11       **MR. GLASSER:** Yes.

12       **THE COURT:** All right. And -- and I also felt like it

13 had -- was a good thing to tell the jury in connection with

14 some of the defense expert testimony, so I'll overrule that

15 objection.

16   Anything else for the Defendant in that particular section?

17       **MR. EWALD:** No, Your Honor.

18       **THE COURT:** Turning to the issues, which Issue One

19 starts -- it doesn't really start at the bottom of page 6, but

20 it says "Issue One" there and then it goes through about the

21 middle of page 10. I've changed the date there in Issue One to

22 May 11th. I've deleted the second sentence of the first

23 paragraph, the sentence that begins "DISH is only responsible."

24 I had put that in there for DISH's benefit and DISH asked me to

25 take it out, so I took it out.

1    The end of the second paragraph, "second, that SSN was

2    acting in the course and scope," at the very end of that

3    paragraph I will add "which were made from May 11th, 2010,

4    through August 1st, 2011."

5    On page 8, in the carryover paragraph, the middle of that

6    paragraph, beginning "this could arise," I will delete the

7    phrase "or by the nature of the work that the principal has

8    entrusted to the agent," as that does not really seem to apply.

9    So that that sentence reads:  This could arise from conduct of

10   the principal amounting to consent or acquiescence.

11   And then I have a typo in the next sentence where the word

12   "that" is repeated side by side, so I'll take the unnecessary

13   "that" out.

14   In the next -- in the paragraph beginning "in determining

15   whether SSN was DISH's agent," I will change the second

16   sentence to read:  This includes the contracts between SSN and

17   DISH, as well as other writings between the parties and other

18   conduct and statements by DISH and SSN.

19   And in the next sentence, I'll change the concluding phrase

20   to read:  Though you may consider it, along with other evidence

21   in the contract and elsewhere as to whether DISH and SSN agreed

22   or reasonably understood that DISH had the power to control and

23   direct SSN's telemarketing activities.  So adding "agreed or

24   reasonably" into that.

25   On the next page, 9, the first full paragraph, the sentence

beginning "if the principal consents," I will change it and the
next sentence to read as follows:  If the principal consents or
acquiesces in the conduct, even if the conduct or act is
illegal, then the agent may reasonably conclude that the
conduct is in the principal's best interests.  To decide that
the principal acquiesced or consented, you must find that the
principal knew of similar -- of prior similar activities by the
agent and consented or did not object to them.

      And in the last paragraph beginning at the bottom of
page 9, I make a similar change to one made earlier.  So where
it says "as well as DISH's other statements and actions" in the
first sentence, that will now read "as well as other statements
and actions by DISH and SSN."

      And those are all the changes I will be making from
pages -- on Issue One.

      What objections do the Plaintiffs have -- does the
Plaintiff have as to those proposed instructions as I've just
revised them?

          **MR. GLASSER:**  At page 8 in the first full paragraph,
which is a short two-sentence paragraph --

          **THE COURT:**  Yes.

          **MR. GLASSER:**  -- I would add -- after it says "it is
not necessary that the power be exercised, acquiescence may be
proved by" -- I want to say, you know, overlooking no conduct
or looking away from known conduct.  Do you see what I'm

1  saying?  Acquiescence is also looking the other way.

2  Acquiescence is like a five-syllable word.  I'm looking for

3  something common sense.  Looking away is acquiescence.

4  Somewhere in this instruction just that, acquiescence can be

5  proved by looking the other way.

6          **THE COURT:**  Right.  I understand what you're saying.

7  You can argue that to the jury, but I am not going to put those

8  words into the instructions, but I think that is a fair

9  interpretation of the instructions and you can argue that to

10  the jury.

11         **MR. GLASSER:**  Okay.  The second one, Your Honor, at

12  page 9 where you said "activities by the agent," I'm at the end

13  of the first full paragraph and did not object.  You just

14  discussed --

15         **THE COURT:**  Yes.

16         **MR. GLASSER:**  We would rather that say "activities by

17  the agent and what action or inaction DISH took in response."

18         **THE COURT:**  Okay.  I'll overrule that objection.

19     Mr. Glasser has sat down.  Objections for the Defendant?

20         **MR. EWALD:**  Your Honor, on page 8, the second full

21  paragraph beginning with "in determining whether SSN," we

22  objected to the use in the third sentence of the word -- well,

23  it begins "the parties' characterization of their relationship

24  as one of independent contractor is not binding or

25  controlling."

1    **THE COURT:**  Oh, right.  You wanted me to say --

2    **MR. EWALD:**  Not conclusive on this question.

3    **THE COURT:**  Not conclusive, which is what I said on

4  page 9.

5    **MR. EWALD:**  Yes.

6    **THE COURT:**  Right.  I'll overrule that.  I think

7  that's just a different way of saying the same thing.  It might

8  help the jury understand.

9    **MR. EWALD:**  And then at the top of page 9, the first

10  paragraph, the last sentence that you had already modified

11  relating to acquiescence and consent, we believe that one of

12  the required elements of acquiescence is that the principal

13  here, DISH, accept the benefits of the activities that are at

14  issue, and so object to the absence of benefits from the

15  instruction.

16    **THE COURT:**  All right.  I understand that to be an

17  alternative way, so I'll overrule that objection.

18    **MR. EWALD:**  And then the next paragraph beginning with

19  "written limits on SSN's authority," I had objected to that

20  paragraph as duplicative -- unnecessarily duplicative of the

21  discussion on the previous page about the impact of the

22  agreement between SSN and DISH -- or the contract, rather.

23    **THE COURT:**  Yes.  Okay.  Well, it's in there twice,

24  once as to agency and once as to course and scope, but it's

25  said a little -- it's said a little differently just to help

1  them understand that.  I'll overrule that objection.  I think

2  it's substantively the same.  Okay.  That's it on Issue One?

3          **MR. EWALD:**  That's all, Your Honor.

4          **THE COURT:**  All right.  Issue two.

5          **MR. GLASSER:**  Your Honor, before we leave that issue,

6  I have one final thing.  On page 8 in the middle where it says

7  "in determining whether," that paragraph, Your Honor.

8          **THE COURT:**  Yes.

9          **MR. GLASSER:**  It says "This includes the contracts

10 between SSN and DISH, as well as other writings between the

11 parties," and then you talk about other conduct and statements

12 by SSN and DISH.

13         **THE COURT:**  Yes.

14         **MR. GLASSER:**  That does not actually cover the other

15 evidence in the case, like the call script or the assurance

16 compliance.  I would like to add "and all the other evidence in

17 the case."  That just talks about bilateral evidence between

18 them, not the inferences from all the other evidence.

19         **THE COURT:**  Okay.  Well, I hear what you're saying.  I

20 think "other conduct and statements by DISH and" --

21         **MR. GLASSER:**  But then you added --

22         **THE COURT:**  Yes, I don't read that as necessarily

23 being bilateral.  You can certainly argue to the jury DISH's

24 conduct expressed to others as being consistent with your

25 arguments about their agreements and conduct with SSN.  I think

1  I said that the right --

2  **MR. GLASSER:**  Yes, ma'am.

3  **THE COURT:**  Anything else on Issue One for anybody?

4  **MR. EWALD:**  No.

5  **MR. GLASSER:**  So I take it that's overruled.

6  **THE COURT:**  Yes, sorry.  Overruled.  I'm normally

7  pretty good about that.

8  Issue Two, which starts a little more than halfway down

9  page 10 and goes through near the bottom of page 15, I will add

10 in at the appropriate places "at the time of the call," which

11 as -- in the very first sentence, as I mentioned, the second

12 issue concerns whether the Plaintiff has proven that the class

13 members -- the class numbers, rather -- I'm changing that to

14 "numbers" -- were on the DNC Registry and were residential at

15 the time of the call.  So that "at the time of the call" refers

16 to both being on the Registry and being residential.

17 On the top of page 11, when I'm listing the first element,

18 first that the telephone numbers of the class members were

19 listed on the National Do Not Call Registry at the time of the

20 call, adding "at the time of the call" and also adding "at the

21 time of the call" to the end of the fourth element.  Fourth,

22 that the numbers were residential at the time of the call.  I

23 have a typo there on the second element.  I'll change that

24 semicolon to a comma.

25 Turning to page 12, the sentence actually begins at the

bottom of page 11.  I will change the -- the two sentences

there as follows:  There is no issue for you to decide in

connection with names and addresses or the identity of class

members.  That is something that may be decided down the road

in other proceedings.

    And then the next sentence is modified:  Your job is to

decide whether the telephone numbers called were residential

numbers on the DNC list at the time of the call; and, if so,

whether SSN made at least two solicitation calls to those

numbers.

    In the paragraph at the bottom of the page beginning "once

a person places," in the third sentence, I'm deleting the

phrase "the phone number is deactivated," as that's not in the

statute.

    And then in the very last sentence on that page,

"Dr. Krakauer does not have to prove that he or anyone

complained to DISH or SSN."  So adding the words "he or."

    Turning to page 14, the last sentence in the carryover

paragraph, changing the word "generally" to "primarily."  So it

would read with the -- so long as the phone number associated

with the number is -- excuse me.  So long as the phone

associated with the number is primarily used as a residential

number.

    I'll add "at the time of the call" in -- in that paragraph

beginning "so if you find by the greater weight of the

1  evidence" with the two elements where it needs to be, the

2  residential and being on the Registry.  So adding it in both

3  places there.

4      At the bottom of page 14, the last sentence -- the second

5  sentence in that last paragraph beginning at the bottom:  You

6  are to accept these stipulations as they are stated as proven.

7  So adding that phrase "as they are stated" and then changing

8  "hears" to "heard" because that's a typo in the next sentence.

9  And those are the changes I will plan to make on Issue Two.

10     Does the Plaintiff have objections to the instructions as I

11  have just revised them?

12          **MR. BARRETT:**  No, Your Honor.

13          **THE COURT:**  What about the Defendant?

14          **MS. ECHTMAN:**  Your Honor, I just want to -- on the

15  bottom of page 11, as we stated in the conference, we prefer

16  that the last sentence that carries over that you do not need

17  to -- just say you do not need to decide the identity of class

18  members, period.

19          **THE COURT:**  Yes.  Okay.  That's overruled since

20  Dr. Aron's testimony referred to names and addresses, but I

21  note your objection.

22          **MS. ECHTMAN:**  And then on the stipulations at the

23  bottom of page 14, we prefer it states:  You are to accept

24  these stipulations as stated, period.

25          **THE COURT:**  Okay.  I don't have any trouble with that,

1  if the Plaintiff is okay with that.

2         **MR. GLASSER:**  Stipulations are proven, Your Honor.

3  It's just a matter of law.  It's correct.

4         **THE COURT:**  Well, I'll leave it then as I proposed it.

5  Other issues or objections for the Defendant on Issue Two?

6         **MR. EWALD:**  No, Your Honor.

7         **THE COURT:**  All right.  Turning to Issue Three.  Both

8  parties wanted me to delete the reference to "a nominal sum" in

9  the second sentence there in the paragraph at the bottom of

10  page 15, so I'm deleting that.

11      And in the last sentence carrying over -- let's see.  In

12  the paragraph carrying over onto page 16, the last sentence,

13  I'm modifying the last phrase:  Though as I stated, you can

14  consider the nature of the injury suffered in determining an

15  appropriate award for each violation.

16      So that's one of the places I've taken out the word

17  "damages" as the Plaintiff suggested and then I changed "class

18  member" to "violation" because that's what the verdict sheet

19  says.  And that -- those are the changes on Issue Three.

20      Does the Plaintiff have objections to those instructions?

21         **MR. GLASSER:**  No, ma'am.

22         **THE COURT:**  What about the Defendant?

23         **MS. ECHTMAN:**  As we stated during the conference, we

24  believe that the jury should be determining the total amount of

25  damages and should be considering that.

1   **THE COURT:** And when you say "total," you mean, you

2   know, 18,000 calls by -- you know, you want 25 million or total

3   like that. That's what you mean?

4   **MS. ECHTMAN:** Correct, I mean that they should

5   understand how many calls they're finding and what they would

6   be multiplying it by so that they are actually -- even if

7   they're writing in a number per call, that they know the total

8   amount of damages that they were awarding.

9   **THE COURT:** Okay. Yeah, I'm not going to make them do

10  that. There are some post -- there are some issues that may

11  have to be decided after this, and so that I think that number

12  would be meaningless. And I also think it would be very

13  difficult for them to do if they were to decide Issue Two yes

14  as to -- yes except, because I'm not sure the overlap between

15  all of those categories is -- has been presented in such a way

16  that they could do it.

17  But that's not the primary reason. The primary reason is

18  we'll have some posttrial proceedings of some sort so that

19  Defendant can present any individual issues and so we can also

20  figure out, you know, who gets the money, and so I'm not going

21  to have them determine the total amount. But that said, you

22  certainly can argue to the jury the total amount based on your

23  calculations, so long as you don't say they want $25 million

24  for five telephone calls.

25  **MS. ECHTMAN:** There's two more things I would like to

clarify further to this topic.  While the Court has determined
that the jury will not be determining the identity of class
members, it has been our position and it remains DISH's
position that the identity is an element of the claim, that
they must prove that the class member was a subscriber or
recipient of the call.  So we are not in any way, shape or form
waiving that and DISH believes that should be an element for
the jury to decide.

    **THE COURT:**  All right.  Overruled.  I'm not saying
we're not going to deal with that down the road, but we're not
going to deal with it in this trial.

    **MS. ECHTMAN:**  It's also DISH's position and it's been
our consistent position that the figures associated with each
bucket should be on the verdict sheet itself so the jury
understands the magnitude associated with each bucket.  And we
had proposed that for each bucket, on the verdict sheet it say
how many calls and how many phone numbers are at issue, with
the understanding that the jury would be told that there is
overlap between those buckets.

    **THE COURT:**  Okay.  I think I did add in on Issue Two
something about overlap.  Let me just be sure I did that.  You
all had raised that earlier today.

    **MR. GLASSER:**  They're going to have the stipulation
back in the jury --

    **THE COURT:**  Yes, they will.

1      **MR. GLASSER:**  -- room as an exhibit?

2          **THE COURT:**  I'm not going to change the verdict sheet

3   the way they were asking.  I just was going back to make

4   sure --

5          **MR. EWALD:**  Your Honor, on page 15.

6          **THE COURT:**  Oh, I did say it.  Okay.  I just was

7   making sure I had added the "overlap" language, which I did.

8   Good.  Now, we've been through Issue Three.

9          **MS. ECHTMAN:**  If I could add one more clarification

10  just to preserve for the record, DISH maintains all objections

11  previously filed with the Court relating to the jury

12  instructions that the Court has overruled to date.

13         **THE COURT:**  Okay.  Well, I mean, that's not very

14  helpful, but if there's anything specific in here you think

15  that's inaccurate or that I haven't given that you want me to

16  give, I don't -- you know, I think I have given what's

17  relevant.  I may not have used the exact words everybody has

18  asked for, but if I have left something out that you want me to

19  give, you need to tell me now because while I went back through

20  everything, I think I got everything.  You know, it's -- I

21  could have overlooked something.  So if there's something not

22  in here that you want me to give, you need to say that now.

23  No.  Okay.

24      All right.  Evidence -- the evidence section --

25         **MR. GLASSER:**  Your Honor, the Plaintiff has no

1    objections for the rest of the instructions.

2         **THE COURT:**  Instructions.  And I don't think I have

3    made any changes based on our informal charge conference.  No

4    objections for the Plaintiff.

5      What about for the Defendant?

6         **MR. EWALD:**  No, Your Honor, not for DISH.

7         **THE COURT:**  All right.  Good.  As I say, I will revise

8    these and will get a clean copy out to you all sometime tonight

9    for your use tomorrow.

10     I do expect to start with opening statements promptly at

11   9:30 and to -- I would like you all to be here at 9:15 and I'll

12   come in here at 9:15 just to double check that there's nothing

13   we need to do.  All right.  And then we will start the

14   arguments at 9:30.

15     Mr. Bicks has reminded me several times and I have not

16   dealt with the issue of the transcript -- the use of trial

17   transcripts during closing arguments.  As I had Ms. Sanders

18   communicate to you all over the weekend, what brought this to

19   mind was something somebody submitted was a page from the daily

20   transcript.  So I don't like lawyers to quote from the trial

21   transcript because it -- to obviously quote, you know, to say,

22   I am reading from the trial transcript and this is exactly what

23   it says, because it -- it causes several things to tend to

24   happen during -- with the jury.

25      They -- first, they realize there is a transcript and they

1  ask for it and then I have to deal with, okay, well, how much
2  of a -- the transcript of the particular witness's testimony do
3  I give them.  Do I give -- is that an unfair emphasis on one
4  witness's testimony, do -- then they want -- sometimes they
5  even want the entire trial testimony and then they get bogged
6  down reading through every single word.  And there's ten of
7  them and they have one copy of the transcript.

8      And you all say, well, this will never happen.  I am
9  telling you I have seen this happen.  They get bogged -- they
10 can get bogged down in it.  It also can cause them to forget
11 that a witness's demeanor and tone of voice is also very
12 important.  So it's just my -- and if you quote from the
13 transcript and you don't give it to them, then they feel like
14 they don't have everything that they need.

15     Now, it's one thing if they come in here and say, we need
16 the transcript of -- you know, can we get a transcript of
17 something.  And then, you know, if that happens, then we'll
18 deal with it, but there's no reason to complicate the
19 proceedings.  Everybody has been here.  We only had four days
20 of evidence.  That's right, four days of evidence.  Nobody
21 should have any trouble remembering it.  And I -- you know,
22 you're welcome to tell them your recollection of the jury -- of
23 the testimony of the witnesses, but, you know, I have told them
24 many times it's their -- they are the judges of the find -- of
25 the facts, and it's their recollection of the evidence that

1　governs.  And I just don't like PowerPoints that pick out

2　selected parts of the testimony, so you can't do that.

3　　　Is that -- I tried to tell you why you can't do it so you

4　kind of understand where I'm going from.  I don't -- you can

5　say whatever you want.  I mean, it has to be accurate or, you

6　know, a reasonable interpretation of the evidence.  John Smith

7　said A, B, C, D.  You know, I'm not talking about that.  You

8　can obviously do that.  I just don't want you to say and hold

9　up a transcript or what appears to be -- and read it question

10　X, answer Y.  That's what I don't want you to do, either on a

11　PowerPoint or verbally as if quoting from a transcript.  You

12　know, you can tell them your memory of the evidence,

13　absolutely.

14　　　Is that clear, Mr. Bicks?

15　　　**MR. BICKS:**  Yeah, it is.  I would just say that, Your

16　Honor, I'm not -- I have certified copies of the transcript,

17　and I've gone back and read federal cases on this and all the

18　ABA commentaries, and every single court who has addressed this

19　issue has said that it's a better practice to use certified

20　copies of a transcript to -- rather than a lawyer trying to

21　describe what a lawyer believes a witness actually said.  And

22　that's what the cases say in federal court.  And there were a

23　couple state courts that had different rules, but they're

24　criticized by circuit courts and --

25　　　**THE COURT:**  If you want to give me the cases, I'll be

1  glad to read them and see if I am willing to change my mind.

2      **MR. BICKS:**  My challenge on that, Your Honor, is from

3  the beginning of the case our team had -- in cooperation with a

4  very hardworking court reporter, had requested daily and to get

5  certified copies with the clear understanding that I was going

6  to be using it in the closing statement.

7      **THE COURT:**  Okay.  Can you give me your case cite?

8      **MR. BICKS:**  The case cite is *Burns versus the United*

9  *States,* 327 F.2d 825 at page 840, where the court says a

10  reading of the reporter's transcript is the only safe way to be

11  accurate.  And there are numerous Bar Journal commentaries on

12  this topic, but that case is directly on point and there -- you

13  know, there are additional cases which are to that effect.

14      I'm not -- I know judges do things completely differently.

15  I have tried a ton of cases in federal court, and every single

16  time I've done a closing I've used a transcript, and all the

17  judge -- and I'm not talking about a rough draft or anything

18  like that.  And all that's said to the jury -- I've never --

19  the judge just says to the jury, you're not getting a copy of

20  the transcript, and that's how it's dealt with.

21      But the alternative for me to have, like, PowerPoints

22  saying -- summarizing testimony, I'm -- I'm quoting.  I'm not

23  ellipsing.  I'm not sticking stuff in.  And, frankly, I've

24  prepared it already and I -- I don't -- I'm not taking things

25  out of context.  I asked very clear questions with the view of

1  putting it into a closing statement and I -- I don't know what
2  else to say.
3          THE COURT:  Okay.
4          MR. BICKS:  It just means I have to go back and redo
5  all the stuff that I've put together, and -- and that's why I
6  had asked the Court -- I thought what you were talking about
7  when I got the e-mail over the weekend was using, like, rough
8  transcripts, which I had never intended to do.  But I've never
9  seen a case in federal court where someone said you can't use a
10 certified transcript in a closing.  If I make a mistake, that's
11 at my peril.  A good lawyer like this, he'll say I'm taking
12 something completely out of context, so I -- I don't know what
13 to say.
14         THE COURT:  What does the Plaintiff say?
15         MR. GLASSER:  Once I got the e-mail, I immediately
16 abandoned using any transcript and went straight to -- so I've
17 got two days of preparation of not using it, so I would like to
18 not yo-yo on the issue just because it would be backbreaking
19 for me to try and read the whole trial transcript.
20         THE COURT:  I think -- first, the court reporter only
21 agreed to provide the dailies fairly late in the process.  I
22 just don't think this is a problem.  I don't know.  I've tried
23 hundreds of cases where jurors -- where lawyers recall the
24 evidence to the jury, and this seems to me to be the better
25 approach.

1    It -- dealing with trial transcripts, we all know just

2  today when I almost let in the testimony of Mr. DeFranco from

3  the first trial -- from the other trial, the defense wanted the

4  lunch break to look over that to see if they needed

5  counter-designations.  I just think it's a very difficult

6  process to manage and prefer that people not do it.  So I

7  don't -- I am unaware of this being weird.  And if it is, I'm

8  still doing it my way based on what will be 24 years of

9  experience as a trial court as of April 27th, but who's

10  counting.  So, you know, overruled.

11      **MR. BICKS:**  And does that, Your Honor -- for example,

12  in my opening, without an objection, I used clips from Sophie

13  Tehranchi's deposition.  I showed them to the jury, question,

14  answer, under oath.  I've shown them to the jury.

15      **THE COURT:**  Uh-huh.  So -- so what are you asking?

16  Can you do that in your closings?

17      **MR. BICKS:**  Yes, things that I've already shown.

18      **THE COURT:**  I don't --

19      **MR. GLASSER:**  I think the answer should be no.  It's a

20  transcript.  It was read to the jury.  It should be the same.

21      **THE COURT:**  You know, I -- the jury -- this is not a

22  complicated case.  There's four days of evidence.  We're not

23  taking about a three-week trial here.  It is -- I just think

24  it's better for the lawyers to review the evidence with the

25  jury and not do -- not pick and -- you know, pull the pieces

1   out.  The jury saw it in your opening.  I have no problem.

2   They've -- they saw the deposition.  You know, they remember it

3   and you can -- you can refer to it.  None of them were very

4   long.

5           **MR. BICKS:**  So then can I -- Your Honor, again,

6   because I don't -- what happened in my opening, I had exchanged

7   my graphics with the other side, as you had asked beforehand,

8   and all my graphics have been cleared.  I've ended my opening

9   and the Court objected to my graphics, a couple of them that

10  they had indicated was fine.  So I'm asking these questions

11  because I want to avoid objections.

12          **THE COURT:**  Right.  Well, I appreciate that.

13          **MR. BICKS:**  So can I then do a summary graphic of

14  witness testimony, without quoting, but para -- you know, just

15  saying this person hit the following four points?

16          **THE COURT:**  Yeah, you can do that.  You can summarize

17  the evidence.  You can state your --

18          **MR. BICKS:**  Right.

19          **THE COURT:**  You know, you're --

20          **MR. BICKS:**  Understood.

21          **THE COURT:**  The problem -- what I'm trying to avoid is

22  Q -- question, answer, question, answer, quoting from what

23  obviously is a transcript.  Summarizing the evidence, that's

24  well within your purview.

25          **MR. BICKS:**  Just again, I don't want -- I presume that

1   I'm permitted to quote from the jury charge.

2             **THE COURT:**  Yeah, you can do that.

3         **MR. BICKS:**  Okay.  And the final thing, I talked to

4   Mr. Glasser about this, but two witnesses, Mr. Mills and

5   Mr. Werner, they wanted them in their case.  I had them here.

6   They didn't call them, and he agreed with me he wasn't going to

7   say, you know, DISH didn't call these people, they should have,

8   et cetera, et cetera.  He said that, but I didn't want to --

9             **MR. GLASSER:**  I agree with that.  I'm not going to

10  beat him over the head for not calling those witnesses.

11            **THE COURT:**  What else?  Have I forgotten anything

12  else?  I know there are lots of balls in the air.  If I have

13  forgotten something, I don't want to prohibit anybody from

14  bringing it to my attention.

15      All right.  So we'll start -- you all will be here at 9:15.

16  We'll open court, just have a quick check to be sure everything

17  is okay, and then we'll start closing arguments at 9:30.

18      All right.  Court is in recess until 9:15.

19      (Proceedings concluded at 5:22 p.m.)

20

21

22

23

24

25

1          **C E R T I F I C A T E**

2          I, LORI RUSSELL, RMR, CRR, United States District Court
Reporter for the Middle District of North Carolina, DO HEREBY
3    CERTIFY:

4          That the foregoing is a true and correct transcript of the
proceedings had in the within-entitled action; that I reported
5    the same in stenotype to the best of my ability and thereafter
reduced same to typewriting through the use of Computer-Aided
6    Transcription.

7

8    *Lori Russell*

9    Lori Russell, RMR, CRR          Date:  1/17/17
Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25