IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

THOMAS H. KRAKAUER,               *   Case No. 1:14CV333
                                  *
            Plaintiff,            *
                                  *
vs.                               *   Greensboro, North Carolina
                                  *   January 18, 2017
DISH NETWORK, L.L.C.,             *   9:20 a.m.
                                  *
            Defendant.            *
*******************************

**TRANSCRIPT OF TRIAL**
BEFORE THE HONORABLE CATHERINE C. EAGLES,
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Plaintiff:        JOHN W. BARRETT, ESQUIRE
                          BRIAN A. GLASSER, ESQUIRE
                          Bailey & Glasser, LLP
                          209 Capitol Street
                          Charleston, West Virginia 25301

                          MATTHEW P. MCCUE, ESQUIRE
                          Law Office of Matthew P. McCue
                          1 South Avenue, Third Floor
                          Natick, MA 01760

                          JACOB M. NORRIS, ESQUIRE
                          The Norris Law Firm
                          1033 Bullard Court, Suite 207
                          Raleigh, North Carolina 27615


For the Defendant:        PETER A. BICKS, ESQUIRE
                          ELYSE D. ECHTMAN, ESQUIRE
                          JOHN L. EWALD, ESQUIRE
                          Orrick Herrington & Sutcliffe, LLP
                          51 West 52nd Street
                          New York, New York 10019

```
 1                                    RICHARD J. KESHIAN, ESQUIRE
                                      Kilpatrick Townsend & Stockton, LLP
 2                                    1001 W. Fourth Street
                                      Winston-Salem, North Carolina 27101
 3

 4   Court Reporter:                  Lori Russell, RMR, CRR
                                      P.O. Box 20593
 5                                    Winston-Salem, North Carolina 27120

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24            Proceedings recorded by stenotype reporter.
         Transcript produced by Computer-Aided Transcription.
25
```

1                    **P R O C E E D I N G S**

2          **THE COURT:**  Good morning.

3      Okay.  Over the evening recess, I did read the Defendant's

4  motion for judgment as a matter of law, and I'm going to go

5  ahead and submit the case to the jury.  If the jury comes back

6  in the Plaintiff's favor, we can discuss whether I should just

7  reconsider that or whether the Defendant wants to file a motion

8  for judgment notwithstanding the verdict.  I'm not trying to

9  make the Defendant file another brief if nothing has changed,

10  but, you know, we can discuss the logistics of that, so I'm --

11  I guess I'll just defer ruling on it is probably the simplest

12  way and we can talk about it later, if necessary.

13      So the clerk will reflect the ruling is deferred and that

14  the case will be submitted to the jury.

15      All right.  Anybody find any more typos on the verdict

16  sheet?

17          **MR. BARRETT:**  No, Your Honor.  There is --

18          **THE COURT:**  Wait, wait.  Anything about the verdict

19  sheet?

20          **MR. BARRETT:**  Oh, the verdict sheet.

21          **THE COURT:**  That's all I'm asking about right this

22  second.

23      You're good for the Defendant, the verdict sheet?

24          **MR. BICKS:**  Yes.

25          **THE COURT:**  Madam clerk, here's copies.  At the --

1  when we recess, if you would put one in each juror's seat,

2  okay.

3          **THE CLERK:**  Yes.

4          **THE COURT:**  So each juror will have a copy during your

5  closing arguments.

6      Anything else that we need to take up before closing

7  arguments at 9:30 for the Plaintiff?

8          **MR. BARRETT:**  There's one issue with respect to the

9  jury instructions.

10         **THE COURT:**  Yes.

11         **MR. BARRETT:**  On the top of page 6 of the revision

12 from last night, there is the statement that "all telemarketers

13 are required by law to maintain records of the phone numbers."

14         **THE COURT:**  Yes.

15         **MR. BARRETT:**  We propose that that be deleted.

16         **THE COURT:**  Okay.  I think the Defendants already

17 asked for that to be deleted; is that right?

18         **MS. ECHTMAN:**  That's right, we did ask.

19         **THE COURT:**  So you agree?

20         **MS. ECHTMAN:**  Yes.

21         **THE COURT:**  All right.  If everybody wants me to take

22 it out, I'll take it out.

23      Anything else for the Plaintiff?

24         **MR. BARRETT:**  No, Your Honor.

25         **THE COURT:**  What about the Defendant?  Anything we

1  need to take up before closing arguments?

2  **MR. BICKS:**  No.

3  **THE COURT:**  No.  All right.  Good.

4  My plan, just logistically, is Plaintiff's argument.  That

5  will be about 30 -- I think you said about 45 minutes, no

6  longer.

7  **MR. GLASSER:**  I ran through it last night; and with

8  the time it takes to go through the verdict sheet, it's more

9  like an hour, hour and ten.

10  **THE COURT:**  All right.  We will take, depending on

11  exactly how long, either a -- a short break -- short -- not

12  complete recess, where I just excuse the jury to the jury room

13  for comfort reasons, but I don't let everybody scatter for the

14  full 15 minutes.  And then we would probably do the same after

15  Mr. Bicks' argument and then come back and have any rebuttal

16  and my instructions.  If we take full 15-minute recesses, you

17  know, we -- it -- you know, it extends the time.

18  So I'm -- that's kind of my plan is to take shorter

19  recesses.  I don't think we've got any smokers on the jury who

20  will -- who have been late getting back from break.

21  Sometimes -- they have to leave the building to smoke and

22  hopefully we won't have any problems about that.  That's kind

23  of my tentative plan is to take short breaks, 10 minutes, keep

24  the jury in the jury room where they do have access to

25  facilities, and then -- and take two short breaks during the

1   morning.  And hopefully I would get the instructions before
2   lunch if we do it that way.  That's my tentative plan.
3         **MR. GLASSER:**  Your Honor, I'm going to want to use the
4   butcher paper.  Where do you want it situated?
5         **THE COURT:**  You can put it --
6         **MR. GLASSER:**  I'll be here.  I think I can put it
7   right here.
8         **THE COURT:**  That's fine.  If it blocks defense
9   counsels' view of the jury, then defense counsel are free to
10  move around probably -- you can sit over there where the
11  security officer is if you want to sit in front of the bar or
12  if you -- that first row behind the bar.  Just feel free to
13  move around as you need to to see.
14        **MR. BICKS:**  Thank you.
15        **THE COURT:**  I don't think there's a place to put it
16  that doesn't block somebody's view so -- and I would prefer
17  that you not put it there in front of the court reporter
18  because then I can't see the jury and I need to keep my eye on
19  them and I can't really move so -- okay.
20     Other logistical housekeeping questions?  No?  Okay.  Yes.
21        **MR. BARRETT:**  Just making sure we have this connected,
22  Your Honor.
23        **THE COURT:**  Oh, all right.  We'll take -- we'll be at
24  ease for five minutes and then we'll come back at 9:30 for the
25  closing arguments.  So court will be in recess for five

minutes.

(A recess was taken from 9:25 a.m. until 9:30 a.m.; all parties present.)

**THE COURT:** All right. Top of the ninth. I believe we're ready to proceed. Anything before we bring the jury in?

**MR. GLASSER:** No, ma'am.

**MR. BICKS:** No, Your Honor.

**THE COURT:** All right. Bring the jury in.

You put the verdict sheets in their chairs?

**THE CLERK:** Yes, ma'am.

(The jury entered the courtroom.)

**THE COURT:** Good morning. All right. You have heard all the evidence and it will soon be your duty to find the facts of this case and to apply the law that I will give you to those facts. Once I have instructed you on the law, you'll go to the jury room and begin your deliberations. You will have the duty to decide at least one, and perhaps as many as three, issues and there are some subissues on Question 2 that you may need to answer, all arising out of telemarketing phone calls allegedly made by SSN during the class period May 11th, 2010, through August 1st, 2011.

You have a copy of the verdict sheet in front of you. Each of you has one. It's clearly marked copy. I'll be sending the original verdict sheet back when you begin your deliberations that doesn't say "copy," but you can use that one as you wish,

1  write on it, whatever.

2       Now, I will go over the law with you in some detail after

3  the attorneys argue the case to you.  In their arguments, the

4  lawyers are allowed to review the evidence and to attempt to

5  persuade you to answer the issues in favor of their client.  If

6  their memory of the evidence differs from yours, you should

7  rely on your memory of the evidence because you are the finders

8  of fact, not the lawyers and not me; and, of course, you should

9  consider all of the evidence, not just the evidence mentioned

10  by the lawyers in their closing arguments.

11       Now, I am going to go over the verdict sheet with you

12  briefly before the arguments just to get you oriented.  As you

13  obviously know, the phone calls at issue here were not made

14  directly by DISH and DISH is only responsible for phone calls

15  that violate the Act if SSN was acting on DISH's behalf.  We

16  have been referring to this as the agency issue, which is the

17  first question you will address.  The Plaintiff must prove two

18  things on that issue.  First, that SSN was DISH's agent and,

19  second, that SSN was acting in the course and scope of that

20  agency when it made the telephone calls during the class

21  period.

22       If the Plaintiff proves those things by the greater weight

23  of the evidence, you will answer that first issue "yes" and

24  then you'll turn to the second issue.  If you answer the first

25  issue "no," then you don't answer the remaining issues.  But

1 you have to answer Issue One.  All right.

2      Now, the second issue, if you reach it, concerns whether

3 the Plaintiff has proven that the calls violated the Telephone

4 Consumer Protection Act or the TCPA.  The Plaintiff must prove

5 four things.  First, that the telephone numbers of the class

6 members were listed on the National Do Not Call Registry at the

7 time of the call; second, that after the number had been listed

8 for at least 30 days SSN called the number for -- called the

9 number at least twice during any 12-month period with a

10 telephone solicitation on behalf of DISH; third, that the calls

11 were received; and fourth, that the numbers were residential at

12 the time of the call.

13      The second issue gives you three options.  One, to decide

14 this issue in favor of all class members.  That's yes.  Two, to

15 decide the issue in favor of some class members and against

16 others.  That's "yes except" on the verdict sheet, the one with

17 the subcategory.  Or, three, to decide the issue against all

18 class members by answering "no," which is over on the third

19 page at the end of the subissues.

20      If the Plaintiff has proven and you find that all the

21 repeat calls SSN made to the class members violate the Act, you

22 will answer "yes."  If the Plaintiff has proven and you find

23 that SSN made some calls that violate the Act, but the

24 Plaintiff has failed to prove that all the numbers were

25 residential, then you'll mark that second box "yes except"; and

1 then you'll go through those various categories, marking each

2 according to your findings; and if you find that the Plaintiff

3 has not proven that the phone calls made by SSN violated the

4 Act, you'll answer the second issue "no."

5     Now, if you answer "yes" either in whole or in part, "yes"

6 or what I'm calling "yes except," then you'll turn to the third

7 issue and address damages, the amount each class member would

8 be entitled to recover; and if you answer "no," then you don't

9 answer that third issue.

10    Now, I'm going to repeat what I just said to you when I go

11 over the law with you after the arguments and also go over it

12 with you in more detail, but I wanted to kind of give you a

13 little focus to help you understand the lawyers' arguments.

14    Now, Mr. Glasser will be arguing first on behalf of the

15 class.  Then we'll probably take a short break.  We may not

16 take a full recess.  I may just send you back to the jury room

17 for a few minutes for comfort reasons.  We'll come back.

18 Mr. Bicks is going to argue on behalf of DISH.  We'll probably

19 take another little short comfort break after that.  When we

20 come back, Mr. Glasser has an opportunity to make a short

21 rebuttal argument.  The Plaintiff has the burden of proof, and

22 therefore he gets to go first and last under the court rules.

23 After that I'll give you your instructions on the law.  It will

24 probably be lunchtime around then, but we'll see what time it

25 is exactly as to what we will do next, but that's roughly going

1  to be our schedule and process this morning.  The lawyers have

2  promised me that they'll take no more than -- or an hour and

3  15 minutes each total, maybe 20 minutes each.  So around in

4  there in that time.

5      I think we're ready to start and the jury is with the

6  Plaintiff.

7          **MR. GLASSER:**  Thank you, Your Honor.

8      Ladies and gentlemen of the jury, this is my favorite time

9  of the trial because I finally get to talk right to you, right

10 at you, you know, tell you what I think of the evidence, go

11 through it.  It's also the scary time of the trial because all

12 the years of work that goes into it and you think, oh, man,

13 what if I forget one thing.  But I know there's strength in

14 numbers in a jury and when you're back in the jury room, you'll

15 remember the evidence and you'll point it out.

16     So Dr. Krakauer comes to you today on behalf of 18,000

17 people asking you to enforce the Do Not Call law.  If on the

18 facts you heard in this courtroom DISH skates out of here, this

19 Do Not Call law is worthless.  You heard Sophie Tehranchi's

20 deposition.  She had a four-person boiler room that just called

21 for DISH, four people.  That's no AT&T.  That's no Best Buy.

22 That is a boiler room that is nothing but DISH.  And let me go

23 through the evidence.

24     Sophie Tehranchi made 231,000 connected calls in 15 months

25 and 51,000 of them were to numbers on the Do Not Call List.

1  Any effective system of monitoring or compliance could have

2  caught that, whether you check weekly, monthly, yearly.  I

3  don't care.  Any effective system could have caught that.  And

4  this DISH fishing boat that was fishing illegal waters

5  generated a lot of -- a lot of customers for DISH.  We'll go

6  through some of the evidence on that.  So don't let DISH cast

7  all their sins on Sophie Tehranchi's head, just push that goat

8  into the wilderness.  Don't let them do that.  That's the

9  defense in this case.  It's Sophie, Sophie, Sophie, SSN, SSN,

10  SSN, push the goat into the wilderness.  That's the evidence in

11  this case.

12      The Court will instruct you on the law and she will tell

13  you that an agent is simply a person or company empowered by

14  another person or company to act on its behalf.  That's what

15  SSN did.  It acted on behalf of DISH.  There's no question

16  after 2005 every call SSN made was on DISH's behalf to solicit

17  customers for DISH.

18      Sophie Tehranchi's affidavit is also in evidence.  It's

19  Exhibit 198.

20      Can we look at that, Matt?

21          **THE COURT:**  All right.

22          **MR. GLASSER:**  This is Exhibit 198.  This is paragraph

23  9:  From 2010 through 2011, all calls made through Five9

24  platform were for the purpose of marketing DISH products and

25  soliciting DISH orders by Satellite Systems.  That's the

1    evidence.  These calls were on behalf of DISH.

2        Paragraph 12:  Satellite Systems was an exclusive DISH

3    dealer during 2010 and '11 and as such did not make any

4    telemarketing calls soliciting any products other than DISH.

5        These are DISH calls.  DISH knows that.  So they want to

6    blame SSN and say, oh, they acted outside the course of their

7    agency.  That's what they're telling you in this courtroom.

8    That is not, that is not what they told 46 states Attorneys

9    General in June of 2009 when they signed the assurance of

10   compliance.

11       Let's look at Exhibit 55.  And you will have this back in

12   the jury room.  This is Exhibit 55 at Section 4.7:  DISH

13   Network shall affirmatively investigate complaints regarding

14   alleged violations of the Do Not Call laws and take appropriate

15   action as soon as reasonably practicable.  That's what they

16   promised 46 states in June of 2009.

17       Let's look at paragraph 4.78, Matt.

18       4.78:  DISH Network shall monitor, directly or through a

19   third-party monitoring service, covered marketers -- the

20   evidence is unequivocal SSN was a covered marketer -- and see

21   whether they're complying with the Do Not Call law.  That's

22   what they -- that's what they said they had the power,

23   authority, willingness to do in June of 2009.  That alone

24   annihilates the idea that the actions of SSN were outside the

25   course and scope of this agency because SSN didn't sign this.

1  DISH signed, DISH signed and said, "We have the power.  We have

2  the authority.  We have the will.  We're going to enforce this

3  law.  We're going to make our covered marketers abide by it."

4  That is showing you know the scope of your authority over this

5  marketer.

6      So DISH looked away and because they looked away right

7  after this -- our -- our class period -- because that's the

8  only time when we subpoenaed Five9.  We got those records.  We

9  managed to get 15 months of records.  SSN did not keep records,

10  did not keep their records.  We got lucky on that.  And doesn't

11  that help DISH?  If you don't enforce your policy at DX2 --

12  when you go back, you'll see DX2.  That's the policy on keeping

13  record.  Isn't that convenient when you don't make them keep

14  records of fishing in illegal waters?  That's pretty

15  convenient.

16      But anyway, because DISH looked away -- and the Court will

17  also instruct you on acquiescence; that if you acquiesce, if

18  you condone acts that you know are going on, if you look away,

19  that's also justifying the agency.  That's saying it's in the

20  course.  And because they looked away 51,000 times from

21  May 2010 to August 2011 this law was violated.  I mean, that is

22  in the echo of that assurance of compliance.  It's tight in

23  time to that assurance of compliance.

24      And Reji Musso testified in the most plain terms.  You guys

25  remember her testimony.  She said, "No, we do not investigate

1  complaints to see if they're legitimate."  In the entire seven
2  years she ran the compliance department at DISH, she said she
3  could not -- she did not run down the legitimacy of a single
4  complaint, not one, not even Dr. Krakauer's, not even after he
5  goes to the Attorney General of North Carolina and gives them a
6  formal deposition under oath in September of 2011 telling them
7  what was going on.  Nothing happens to SSN.  SSN -- nothing
8  happens during the class period.

9       Sophie Tehranchi gave her deposition in August of 2013.
10  She testified she was still working for DISH at that time.
11  Sometime after that they now say they -- that they let her go,
12  but Reji Musso said they just let the contract expire in 2014.

13       Now, Reji Musso also testified in the most plain, clear
14  terms that they did not pay the approximately $200,000 it would
15  have taken to actually meet that statement that they will
16  monitor.  Let's look at Exhibit 70.  When you're back in the
17  jury room, please take Exhibit 70 in your hand and read it.  It
18  is one-page long.  Right here at the bottom, Tier 3, compliance
19  certification, it says at "Benefits" that this certification
20  provides thorough review and certification of all federal,
21  state telemarketing and Do Not Calling issues.  DISH would be
22  assured that certified call centers possess the processes and
23  procedures -- can you make that big?  Yeah.  Processes and
24  procedures to meet or exceed regulatory, as well as DISH
25  corporate requirements.  Price:  $4,500 per authorized

1  retailer.

2      Recall that when we talked to Amir Ahmed he said -- let's

3  take up Exhibit 89.  Exhibit 89.  You remember we went over

4  this -- this is Exhibit 89, page 4 -- with Amir Ahmed.  He

5  said, "My budget for indirect activations in the year 2011 was

6  two million.  My OE retailers, my national sales partners," of

7  which they are 45, of which OSN (sic) is one, "are going to get

8  me $1,099,000."  That was the budget.  One million activations,

9  okay.

10      So Exhibit 70 shows us that for $4,500 you could have

11  assured yourself -- per marketer times 45 -- it's just a little

12  bit over $200,000 -- you could have assured yourself -- let's

13  go back to 89 -- that these million activations were clean.

14      Well, DeFranco testified that a customer gives you $80 a

15  month.  Amir Ahmed said 90.  Let's say 80 times one million

16  activations, $80 million a month.  Forty-five OE retailers, 45

17  national sales partners, $80 million of new revenue a month.

18  Twelve months in a year.  $960 million of recurring revenue

19  every single year.

20      What's it cost to keep that channel clean?  $200,000.

21  $200,000.  And somebody well above Reji Musso's pay grade made

22  that call.  Who made that call?  Fortune 200 companies intend

23  what they're doing.  These guys are way too smart for that to

24  slip through the cracks.  $200,000 to clean up a billion

25  dollars in revenue?  That's an accident?  That is the scope of

1    agency.  It's gone.

2        They don't want to put a governor on the fishing boat

3    engine.  They don't want to slow it down.  They want a million

4    activations a year from these telemarketing centers, these

5    outbound centers that are calling only for DISH, selling only

6    DISH, and they want that money.  That's what this case is

7    about.  They didn't put a governor on the engine.  That would

8    have cost $4,500.  Exhibit 70.  Compare Exhibit 70 to

9    Exhibit 89 and you will come to the same conclusion I came to

10   about what they were doing here.

11       And when they get busted, blame the -- blame SSN.  Blame

12   that little four-person boiler room that worked on your

13   computers, didn't have any inventory, used your scripts.

14   Actions speak way louder than words.  You can say whatever you

15   want, but when you don't agree to pay $4,500 to clean up a

16   billion dollars in revenue -- well, 45 times 45, so $200,000 to

17   clean up a billion dollars in revenue, you made an intentional

18   decision that should matter in this courtroom here in

19   North Carolina.

20       The Court will instruct you on the scope and course of

21   authority, and she will tell you conduct matters, course of

22   conduct matters.  The contractual disclaimers that I'm sure

23   they will flash on the screen do not conclude this case.

24   Conduct matters.  Actions speak louder than words.  That's what

25   the law is.  And hiring a third-party monitor for a mere

1  $200,000 to police a billion dollars of revenue is crushing

2  evidence of not intending to govern this system of getting

3  clients.

4      The Court will instruct you on scope of authority; that if

5  the principal does this, even if the conduct is illegal, even

6  if it's illegal, they're responsible for it.  It's not a

7  defense to say, Oh, we didn't -- we didn't consent to illegal

8  conduct.  You knew what you were getting.  We'll go over some

9  of the evidence about the eyes wide open with SSN, but you

10 remember an injunction from North Carolina, an injunction from

11 Florida, assurance of compliance.  I mean, these guys knew what

12 they were getting.  So unenforced written limits on agents'

13 authority don't matter.  Contracts rotting in a desk drawer do

14 not matter.  That's what the law is.

15      A third crushing piece of evidence in this case about how

16 they looked the other way is actually Dr. Krakauer's complaint.

17      Let's look at Exhibit 282, please, Matt.

18      Remember this is the e-mail, you'll have it back there,

19 where Dr. Krakauer first saw this e-mail at his deposition in

20 September of '11 and it said, this is the DISH person:  "I

21 searched Dr. Krakauer's phone number in Echo Admin."  Remember

22 EchoStar is DISH.  Echo Admin is DISH's billing system.

23 "...and found there was a credit check ran on him last night.

24 I did not inform Mr. Krakauer that his credit was run without

25 his knowledge."  Okay.  And then they call him back and they

1  never inform him.

2      I ask you, ladies and gentlemen of the jury, if you're

3  covering up -- Reji Musso said that was improper.  She said,

4  this is a moment you must remember in the trial, DISH probably

5  didn't want to, you know, upset Mr. Krakauer because -- I mean,

6  he's a full-grown man.  He is a full-grown man.  They were

7  covering up the improper act of their agent.  When your agent

8  does something wrong and you know it, if you're not standing

9  behind it, why are you covering it up?  Why are you covering it

10  up?  So that action of covering up speaks louder than words.

11  Actions speak louder than words.  They covered it up.

12      Let's go to Exhibit 656, please.  Now, let's go back in

13  time.  This is Amir Ahmed's e-mail.  Remember at the beginning

14  in 2004, 2005 these guys were selling both DISH and DirecTV,

15  and there was a period up till 2005 -- through 2005 when they

16  were selling both and -- and DISH wanted these guys to sell

17  more DISH.  And I love this e-mail.  Amir Ahmed.  "Go get him.

18  Need activations.  Please tell Alex that I have worked my a-s-s

19  off to get him additional economics.  I have also had to deal

20  with all his issues related to sales.  Need incremental

21  activations starting tomorrow."  Whenever I read that e-mail,

22  that a-s-s is like A, dollar sign, dollar sign.  That's what

23  they were thinking.  They're like, "We've got to get these guys

24  on our team.  They can sell."  So that shows you that DISH

25  cares about activations, even if there's issues with sales.

1   DISH wanted the customer.

2       Now, I told you in opening that there would be evidence of

3   DISH approving SSN acting as DISH.  Let's see Exhibit 22.

4   Exhibit 22, 2009 outbound sales script.  Sophie Tehranchi

5   testified in the most clear terms that sales scripts were

6   approved by DISH.  "Hi, my name is, blank, with DISH Network."

7   "My name is, blank.  I'm with DISH Network."  "My name is,

8   blank.  I'm an account manager with DISH Network, the satellite

9   service provider."  "Hello, my name is, blank.  I'm an account

10  manager with DISH Network."  Who in the world on the other side

11  of that phone call knows this isn't DISH?  DISH is hold -- DISH

12  is letting these guys act as DISH.  That's scope of authority.

13      Now, let's look at Exhibit 1294, right in the class period.

14  This is a back-breaking exhibit, Exhibit 1294.

15      Thank you, Matt.  Can you pull up -- okay.  There we go.

16      This is an e-mail dated June 3rd, 2010.  Rehan@yourdish.tv

17  at the top.  That's the guy who works for SSN.  He uses the

18  dish.tv e-mail.  Direct to DISH scripts, Q2 doc.  January,

19  February, March Q1.  April, May, June Q2.  Dr. Krakauer was

20  called on the Direct to DISH campaign.  You recall they were

21  trying to switch him from DirecTV to DISH.  Mr. Campbell, whose

22  complaints you'll find at PX15, in May of 2010 got the same

23  call trying to switch him from DirecTV to DISH.

24      Here it is.  "Folks, here is the sales script for Q2.

25  Please let me know if any changes are warranted.  Stop.  Also,

1  I have some questions before I submit an automated disclosure

2  script." We're talking about two scripts. That's the sales

3  script, just like Exhibit 22. These guys approved the scripts.

4  These scripts were used with Dr. Krakauer and Mr. Campbell. It

5  was trying to switch DirecTV residential customers to DISH.

6  That's what the campaign was that we're here on.

7      There were DISH inspectors -- we've heard this testimony

8  from witness after witness -- listening and grading the calls

9  that use these scripts, live and by recording. Tehranchi

10 clearly testified that DISH representatives came to her call

11 center regularly and listened to the entirety of calls. All

12 the work took place on DISH's own computer system, the OE tool.

13 The website was yourfreedishtv.com. We've already seen the

14 e-mail address. DISH let SSN use its trademarks. DISH gave

15 SSN a list of vendors to call. They say, "We didn't tell them

16 the exact number to call." They told them the vendor to buy

17 the numbers to call from on the Charter campaign, for example.

18 DISH provided the installation, customer service, IT support,

19 all the inventory.

20     And the contract kept SSN on the shortest leash you can

21 imagine. Let's look at section -- Exhibit 26, Section 7.3 of

22 the contract. Here it is. When you're back in the jury room:

23 Retailer shall take all action and refrain from taking any

24 action as requested by EchoStar. First line: Retailer shall

25 comply with all business rules, comma, including without

1  limitation all business rules which govern or are otherwise
2  applicable to promotional programs.  Look at the definition of
3  "business rule" in this contract.  It's whatever we send you.
4  If we send you a blast facts, we send you an e-mail, we send
5  you a letter, whatever we say you must do or refrain from
6  doing.  Can you imagine a shorter leash?
7      And -- and SSN just got weekly activation payments.  They
8  were paid weekly.  Is that a real business, got to get paid
9  every week?
10     I told you in the opening statement that the evidence would
11 be overwhelming that DISH had all kinds of direct knowledge of
12 SSN's illegal telemarketing both before and after the assurance
13 of compliance.  After the assurance of compliance, we know that
14 Dr. Krakauer gave a deposition.  We know he complained.  You'll
15 look at PX15.  You'll see a smattering of complaints going
16 through after the assurance of compliance.
17     Let's go before.  Let's go to Exhibit 503.  This is Amir
18 Ahmed's e-mail in 2004.  This is three days after
19 North Carolina sues them to stop their illegal marketing.
20 Compare the dates on Exhibit 186 to this e-mail.  "I'm hearing
21 a lot of complaints on Satellite Systems on telemarketing calls
22 to consumers," says Amir Ahmed.  On the witness stand, do you
23 know what he said?  He said a lot.  "I really meant a few.  I
24 just said a lot."  What did he -- is it "a few" that he said in
25 court or is it "a lot" he said when he didn't know he was going

1  to be in court.  Which is it?

2      Let's go to the next one, Exhibit 405 -- 504.  I'm sorry.

3  Looks like we have another retailer using telemarketing and not

4  scrubbing their list.  That's in October of '05.

5      Let's look at 194.  "We know that SSN is using autodialers

6  and automessages.  Tehranchi has been warned time and again by

7  me, by you, by the region, by phone, in writing, in person that

8  the activities could violate the law.  Last time Tehranchi

9  blamed a rogue employee who he claimed was terminated, but the

10  activities continue.  Charter knows he's doing it and several

11  state AGs know he's doing it as well."

12      This is after, after the North Carolina AG puts an

13  injunction on him to tell him to stop doing autodialers and

14  automessaging, after they're told to stop calling people on the

15  Do Not Call List, after Florida gives the same sanction.  And

16  Reji Musso said she knew about the sanction.  We'll get to her

17  e-mail that gave her the knowledge.  And -- so these guys --

18  and then the AGs obviously did know because in 2009 these guys

19  signed up with 46 of them to start policing this stuff.

20  Obviously, the AGs found out about it.

21      In opening, Mr. Bicks implied that no one at DISH knew

22  about the North Carolina injunction.  Ms. Musso admitted they

23  knew.  In opening, Mr. Bicks implied no one at DISH knew about

24  the Florida sanction.  Ms. Musso said they knew.

25      And then I asked both Ms. Musso and Mr. Ahmed --

1  "Ms. Musso, at any time from the time you were -- from '06

2  until you left, was SSN ever disciplined in any way?"  I didn't

3  say "terminated."  I went through -- remember I went through

4  every level of discipline in that assurance of compliance.

5  Were they required to retrain?  Were they required to police

6  themselves.  Were they -- let's go to 419, the list of

7  progressive discipline.  I walked through every single one of

8  these progressive disciplines that they testified existed both

9  before and after the assurance of compliance.  It's right here

10 on the bottom.  Were they suspended?  Did you withhold any

11 compensation?  Did you impose any monetary fine?  And there's

12 some on the other page that are even lesser sanctions.  And

13 Ms. Musso said no, none, none of these sanctions ever before or

14 after were ever applied.

15      I asked Mr. Amir, "I know in your e-mails, Mr. Amir, you

16 sometimes say 'we should put them on probation' or 'we should

17 do something.'  Did you ever in fact do it?"  Answer no, no.

18      So there was a -- there was noise about doing something

19 about them, but they never did it.  They had plenty of

20 knowledge of what kind of telemarketer they were getting.  They

21 brought these guys in eyes wide open.

22      Now, what is the benefit to DISH of having a relationship

23 set up this way as an allegedly independent contractor?  Why

24 not just have these extra four people in their own call center

25 making the calls at DISH's headquarters?  Because when you get

1  busted, you can blame them and send them out to the wilderness.

2  That's why.  These people are smart.  These people are smart.

3      Now, let's go -- let's -- I told you in opening that by

4  stark contrast DirecTV -- I would show you that DirecTV dropped

5  these guys.  Let's go to Exhibit 190, Exhibit 190.  So this is

6  when Amir Ahmed is convincing Mr. DeFranco -- DeFranco and

7  Charlie Ergen are on this e-mail, they're both on this email,

8  Exhibit 190.  Amir is saying:  "Satellite Systems is DTV's,"

9  that's DirecTV, "eighth largest independent retailer, six to

10  eight thousand," that's sign-ups, "a month.  They use message

11  broadcasting with DTV as their primary source to generate

12  sales."

13      By the way, that's in June '04 and the injunction that

14  comes from a suit filed three days before this e-mail says

15  that's illegal.  These guys know that.  They're in this

16  business.

17      And you know what he says, it's their eighth largest.  It's

18  DirecTV's eighth largest source of revenue, these guys.

19      Okay.  And now let's go to exhibit, let's see, PX15 at 7 --

20  No.  All right.  On PX15, you will find that Sophie Tehranchi

21  got -- yeah, here it is.  Here it is.  Reji Musso,

22  September 21, '06, $25,500 fine ordered against Vitana.  And

23  you'll see on the complaint that Vitana is SSN.  Consumer

24  complaint with rebuttal by DirecTV saying they termed the

25  retailer.  And she said on the witness stand that meant

1  terminated and her understanding was that retailer was

2  terminated.  Sophie Tehranchi testified after '05 they only

3  sold DISH.

4      So here you have actions are louder than words.  DirecTV

5  takes their eighth largest retailer and says no.  DISH says,

6  I'm going to embrace these guys.  Actions speak louder than

7  words.  These guys get in all this trouble in 2004, in 2005;

8  and all of a sudden DirecTV is like, "We're not touching these

9  guys."  Reji Musso understood it from this e-mail.  DirecTV did

10 the right thing.

11     What are you telling companies if you let DISH skate with

12 all this eyes-open knowledge when their biggest competitor did

13 the right thing and broke ties and got rid of their eighth

14 largest source of revenue because they were doing it wrong?

15 What message are you sending corporate America if you make that

16 decision?

17     I told you in opening that DISH would say, We ordered SSN

18 to sign up for this thing called PossibleNOW and scrub their

19 lists.  And I told you but the facts of the case are they

20 didn't scrub their lists.  I said I bet they use the words

21 "PossibleNOW" a hundred times, maybe a thousand.  I don't think

22 we hit the thousand.  I'm pretty sure we hit the hundred.  I

23 don't have a beef with PossibleNOW.  If they had signed

24 PossibleNOW up for the Exhibit 70, for the compliance, we

25 wouldn't be here.  They would be fine, but they didn't.

1    So now let's look at PX15 at 7980.  This is in the

2  compliance file.  This is after the Krakauer complaint.  "We do

3  not have a date for scrubbing this lead through PossibleNOW

4  because at the time we are not a PossibleNOW member."  So

5  Dr. Krakauer's call.  They tell -- they tell DISH, We did not

6  scrub this lead.  DISH doesn't ask any of the obvious

7  questions:  Who else are you calling?  Scrub now.  Stop calling

8  people unscrubbed.  They don't ask any of those questions.

9  They just go on about their business.

10    And then let's go to PX899, one year later after the

11  Campbell complaint.  May 2010, no, this record was not

12  rescrubbed.  So we got a year later, still no rescrubbing.

13  Again they don't ask the obvious questions:  Are you still

14  calling people who aren't scrubbed?  Stop calling people who

15  aren't scrubbed.  Scrub now.  It's not -- it's a

16  going-through-the-motions complaint system.

17    I am not blaming Reji Musso for that.  Her bosses set it

18  up.  She did the job.  I mean, she probably could have done a

19  different job if they had given her a different job.  I have no

20  doubt.  For these retailers, you probably need Stevonne Smith,

21  Sr., in there with these guys, but anyway -- but the Krakauer,

22  Campbell excuse was the same, not rescrubbed.

23    Now, the Defendants say, "Well, wait a minute.  We have a

24  receipt they scrubbed."  Let's look at it, DX26.  This is the

25  one scrubbing receipt in the entire case.  Look at the date on

1  it:  July 14th, 2008.  It covered 15,000 records.  What does

2  this have to do with this case?  This document has nothing to

3  do with this case.  Why didn't a PossibleNOW witness come in

4  here and spread scrubbing records all over the courtroom floor

5  if these guys were using PossibleNOW?  This is one record from

6  2008.  That's the best DISH can do on their scrubbing with

7  PossibleNOW.  Nothing to do with this case.

8      So Dr. Krakauer brought this lawsuit to put teeth in this

9  law and just make it enforced.  Let's just enforce it.  Let's

10  just enforce the law.

11      Let me walk through the verdict sheet with you, please.

12  All right.  The first question on the first sheet -- can you

13  just blow it up -- is the agency question.  I've talked about

14  that for the last 30 minutes.  I ask you respectfully to mark

15  that question "yes."  They had all the knowledge in the world.

16  I have injunctions from two states.  I've got the assurance of

17  compliance.  I mean, these guys knew.  I have all those e-mails

18  where they had eyes wide open.  That's done.  Yes.  Conduct,

19  actions speak louder than words.

20      Now let's go to the class members and I want to walk

21  through this exhibit with you to talk about answering these

22  questions.  All right.  At the top of -- remember this was the

23  demonstrative used by Anya Verkhovskaya.  At the top we have

24  the 1.6 million calls.  These are the records of Five9.  We

25  subpoenaed them.  It's a giant phone bill.  Okay.  It's a giant

1  phone bill.  There are 1.6 million calls on it to telephone
2  numbers.  Nobody in this case has said it's not the bill and
3  that the -- David Hill testified by video.  I know that was
4  boring.  He said these were the numbers called; and if there's
5  time on the number, it was connected.  It was that short video
6  testimony.
7      Okay.  So we have 1.6 million calls.  1.4 of them were not
8  connected.  They were inbound or they were not connected.
9  There was no time, so we cut them out.  That is fair to DISH.
10 How is that harming DISH?  Fair to DISH.  Cut them out.
11     That leaves 230,000 connected calls, okay.  Not a single
12 DISH witness disputed that.  Ms. Aron came on here.  She talked
13 about names and addresses matching way down here at the bottom.
14 Nobody, not a single witness of theirs, said those calls
15 weren't connected.  So this is undisputed, 230,000 connected
16 calls in this case.
17     Now, then we reduced 65,000 single calls because the law is
18 you have to be called twice.  So if you're only called once, we
19 took it out.
20     Now, if you're an SSN dialer guy and you get somebody on
21 the call and it's a business, you're not going to call them
22 again.  You're going to hang up and you're not going to call
23 them back.  So this 65,000 calls scraped out right there is a
24 material benefit to DISH.  It's taking out every call that was
25 actually connected that SSN figured out who was on the other

 1  end and for whatever reason didn't want to call them back.  And

 2  one big reason would be SSN didn't sell business.

 3      I asked Amir Ahmed, "In all the years you worked with SSN

 4  through the end of the class period, did they sell one

 5  business, one?"  No, no.  It -- DISH has all the records of

 6  every sale that SSN ever did.  Why is this courtroom floor not

 7  full of business sales if they sold to businesses?  They didn't

 8  get paid to sell to businesses.  They got paid to sell to guys

 9  like Dr. Krakauer who own their own home and are going to keep

10  this satellite dish for a long, long time.  So this 65,000

11  calls, that's scraping out businesses and anybody else who may

12  not be a plausible buyer of this product, okay.

13      Now we're down to 58,000 numbers and 164,000 calls.  Then

14  we reduced 34,500 that were not on the Do Not Call list.

15  Obviously, they're not protected because they're not on the

16  list.  DISH never complained, not a single DISH witness.

17  Nobody disputes that we got the right list and that we took the

18  right people off the list.

19      So now we're down to 23,000 numbers.  At this point Anya

20  did something else.  She looked and she went to the LexisNexis

21  database and said, "Okay.  Businesses probably want to be

22  known.  It's more likely than not that if you're in a business

23  you probably want to be called."

24      And the LexisNexis database looks at yellow pages.  I know

25  Dr. Fenili testified there's no database in America that can

1  find businesses.  When you look in the yellow pages and you
2  call a plumber, does a plumber generally answer?  Is the yellow
3  pages a database in America that can generally identify
4  businesses?  I think it is and LexisNexis uses it and
5  LexisNexis used the white pages and the business directories of
6  the Secretary of States' offices where people register their
7  business.  Did LexisNexis catch every business in the world?
8  No, probably not.

9      But we -- you remember there's no dispute in this case
10  about government, so it's binary.  It's either a business or
11  it's a residence.  So what Anya did was she worked to exclude
12  businesses, and she went to obvious sources to try and find
13  evidence of businesses and exclude those.  And so we knocked
14  out another 1,393 business numbers or numbers tagged by
15  LexisNexis to business.

16      Now, why is that number small?  Well, because we're only
17  looking at these numbers.  We've already carved out 1.4 million
18  up here.  We've already knocked out every single single call.
19  We've already knocked out the non-DNC numbers.  And businesses
20  aren't entitled to the protection of the DNC, so why should
21  they sign up?  And we know that SSN only sold residential.  The
22  OE tool was a residential tool.  They're looking at a list of
23  DirecTV customers.  These are residential customers.  That's
24  why there's not a massive number of businesses left in this
25  database when you get to the bottom.

1    And then we took out 1,700 DISH customers that were flagged

2  in the Five9 records as DISH customers.  Again fair to DISH.

3  That got it down to 20,000 numbers and 57,000 calls.

4    Then we gave everything to DISH, that whole thick notebook.

5  We gave it to DISH.  And when they had a complaint that we

6  thought was legitimate, we took it out.  Everything that was

7  close we took out.  6,000 numbers we removed and that got us

8  down to 5,100 (sic) calls and 18,000 numbers.

9    Now, the question for you on Question 2 is is it the

10  greater weight of the evidence -- let me talk about weight of

11  the evidence.  Criminal cases are beyond a reasonable doubt,

12  moral certainty, okay.  That's not this case.  This is a civil

13  case.  In a civil case, the matter of proof is greater weight

14  of the evidence, does the evidence tip -- the judge will

15  instruct you on the law.  She'll say does it tip however

16  slightly in favor of the Plaintiff.  And my question to you is

17  once we've gone through all this work and we're down to these

18  18,000 numbers, is it more likely than not that a number on

19  there is residential?  Answer yes.

20    And we don't have to only rely on LexisNexis.  We relied on

21  all the circumstantial evidence in the case about what it is

22  that SSN was doing.  They were calling residences to get them

23  to switch from DirecTV to DISH.  That's their job.  That's what

24  they got paid to do.  Those are the people they called.  Is it

25  more likely than not?  I mean, why would they waste money

1  calling people they can't sell to?  Why?

2      So they brought in a couple of witnesses to just throw

3  smoke.  Dr. Aron said the Five9 database is not valid.  Well,

4  it's the only call records we have.  How is it not valid?  How

5  is a list of numbers not valid?

6      The judge will instruct you names and addresses have

7  nothing to do with this case at this point.  It is not -- we're

8  trying to figure out if numbers were called.  There's a whole

9  other process once numbers are called to figure out names and

10 addresses and who, if anyone, gets paid.  All that is for the

11 Court later.

12     So she said the Five9 list of numbers called.  She didn't

13 say the numbers weren't called.  She never said the numbers

14 weren't called.  It was classic smoke and mirrors.  She just

15 started throwing smoke.  75 percent of the time LexisNexis'

16 name and address matches Five9 name and address.  Therefore,

17 all Five9 is gone.  It's more likely than not the name and

18 address match.  So please check "yes" on that first one.

19     Let's put the verdict form back up.

20     Just check "yes" here.  Let's just stop the shenanigans.

21 Check "yes."

22     Now, why are there these other boxes down here?  These are

23 challenges DISH raised through their experts, okay.  First one,

24 telephone numbers that LexisNexis always identifies as unknown.

25 That doesn't mean the telephone number is unknown.  It means

1  they didn't mark the person as having evidence in the

2  LexisNexis database they were residential.  Dr. Krakauer is in

3  that box.  Dr. Krakauer is in that box.  Did he suddenly get

4  ejected from his home?

5      Let's go to the next page.  I love this one.  These are all

6  kind of the same, but the next page really shows what I think

7  is kind of -- look at this.  Telephone numbers -- this one down

8  here, the third one -- that LexisNexis always identifies as

9  residential, including during the entire class period.  Numbers

10  that LexisNexis always identifies as residential, including

11  during the entire class period.

12      And then the other one at the top.  Okay.  So they identify

13  a guy in April of '10 that's living in a house.  Is it more

14  likely than not he moved out in May?  I mean, all these are

15  nitpicky quibbling.  We gave them the list of numbers.  Why

16  aren't there a thousand business numbers on the floor in here

17  going business, business, business, business?  Because it's not

18  true.

19      Let's get down to the -- to the enforcement phase of this.

20  At the very bottom we're going to ask you to come up with a

21  number between 0 and $500 for this case per call, okay.  And

22  when Mr. Bicks stands up, if he does what he did in opening, he

23  is going to try and focus on Dr. Krakauer and say, "Well,

24  Dr. Krakauer got -- got only five calls."  And he's going to

25  say this has something to do with how long those calls lasted

 1  or -- or Dr. Krakauer, whether he suffered some grievous bodily

 2  harm.  No, no, no.  This is an enforcement action.

 3      If you put $50 in there, you have green-lighted call

 4  centers all over America, light up America's phones.  If you

 5  put $50 in there, you have said four-person boiler rooms are

 6  just fine, Corporate America, because you might make a billion

 7  dollars off of them.  The most you can put in there is $500.

 8      It's not a criminal statute.  No one goes to jail.  That's

 9  the law.  That's what Congress wrote.  That's the most teeth it

10  has and that's not even a lot of teeth, but it's the best we

11  can do here today, ladies and gentlemen of the jury, and I ask

12  you to do it.  I ask you to do it.  Let's make this good law

13  have some teeth.  Let's sit up and notice.  Let's say for

14  $4,500 you could police this channel.

15      All right.  Well, that's it.  I have to sit down now and

16  Mr. Bicks gets to talk.  I really appreciate the time and

17  attention you've given.  You know, the jury system is what sets

18  this country apart.  It lets us have some justice on a really,

19  you know, local level.  It's awesome.

20      And I appreciate the Court, Ms. Russell, Ms. Sanders,

21  everyone for giving us the time and attention.

22      And John Barrett, John and I have been friends since we

23  were 14 years old, grew up together in West Virginia, so really

24  enjoyed trying the case with John.

25      Appreciate the time you have given us.  All right.  See you

1  guys.

2      **THE COURT:**  Okay.  Ladies and gentlemen, I'm going to

3  give you a short break so that everybody is able to fully

4  attend to the next closing argument.  I'll excuse you to the

5  jury room for five or ten minutes.  Don't leave the jury room,

6  okay, and don't talk about the case.  Keep an open mind.  The

7  jurors are excused to the jury room.

8      (The jury left the courtroom.)

9      **THE COURT:**  Okay.  We'll shoot for five minutes.  It

10  might take us a minute or two longer than that so everybody

11  here can have a comfort break.

12      **MR. BICKS:**  Your Honor, can I just raise something?

13      **THE COURT:**  Yes.

14      **MR. BICKS:**  Can I ask -- an exhibit was shown that was

15  Plaintiff's.  It was Exhibit 198.  I want to ask the clerk if

16  that was admitted in evidence in this case, Plaintiff's

17  Exhibit 198.

18      **THE COURT:**  It might take her a minute to go through

19  the list.  Which one was that?

20      **MR. BICKS:**  Exhibit 198.

21      **THE COURT:**  No, I meant what was it.

22      **MR. BICKS:**  It was a declaration from Sophie

23  Tehranchi.

24      **THE CLERK:**  No, I don't believe it was.

25      **MR. BICKS:**  I don't believe it was admitted in

evidence, Your Honor, and the document was displayed to the
jury that was not admitted in evidence. I saw it. I had to
then double-check while he was giving his opening, but
displaying to a jury a document that's not admitted in evidence
is a serious issue.

**THE COURT:** Okay. Let's see. Where -- was she -- was
that after Ms. Musso? Was that where her testimony was? Yeah,
here it is.

**MR. BARRETT:** Yes, Your Honor. That was -- after we
played the deposition of Sophie Tehranchi, we moved to admit
that is my recollection.

**MR. BICKS:** That was not moved into evidence.

**MR. BARRETT:** It was Deposition Exhibit 1. It was
referred to in the deposition that was played for the jury. It
was her affidavit. She was asked, Is it -- is it -- is that
your affidavit? She said yes.

**THE COURT:** Right. I mean, I remember that reference.
I'm not showing -- I'm just looking at my notes for her
testimony. And it was marked, you say, as Plaintiff's 198?

**MR. BICKS:** Yep.

**MR. BARRETT:** Yes, Your Honor.

**THE COURT:** Okay. Well, we'll take a quick -- during
the break, if you all can check. I'm not showing it and the
clerk is not showing it, but we'll all double-check and then
you all can -- we'll talk about what to -- if that is in fact

1  correct, we can talk about what needs to be done about that.

2          **MR. BICKS:**  Thank you.

3          **THE COURT:**  So let's take a 5-minute recess.

4      (A brief recess was taken from 10:22 a.m. until 10:30 a.m.;

5  all parties present.)

6          **THE COURT:**  Okay.

7          **MR. GLASSER:**  Your Honor, I checked the transcript and

8  I agree with the Defendants.  I made a mistake and I apologize

9  to the Court.  Exhibit 198 was not admitted.  It was my

10 mistake.  I will say that the witness testified that everything

11 in her deposition -- in her affidavit was true and she did

12 testify to the things I told the jury, but I ought not have

13 shown the jury Exhibit 198.  I think a limiting instruction

14 that that won't be going back to the jury room, it wasn't

15 admitted, they should disregard the evidence of -- in

16 Exhibit 198 is appropriate.  I apologize to the Court for our

17 mistake.

18         **THE COURT:**  Okay.  What would the Defendant ask me to

19 do?

20         **MR. GLASSER:**  Oh, I do, Your Honor --

21         **MR. BARRETT:**  Your Honor, I went back and reviewed the

22 transcript.  The affidavit was referred to during the

23 deposition designation.  We played the deposition.  We had the

24 situation with the juror.  We came back in.  We had moved to

25 admit one of the documents that was referenced in the

deposition. We did not move to admit the one that was played
to the jury. We would ask that we be permitted to do that now.
It was referred to, you know, in the deposition designation.
It was also a part of our pretrial disclosures. It is PX198
and we ask that oversight be excused under the circumstances.

**THE COURT:** Okay. Mr. Bicks.

**MR. BICKS:** The affidavit is hearsay, Your Honor. It
was not moved into evidence. It was all -- the only thing that
happened at the deposition was somebody said, "Is that an
affidavit?" She said, "Yes." She wasn't even questioned on
it. It's clearly inadmissible. It was improperly shown to the
jury.

A very stern instruction should be issued by the Court
saying, "I've told you, ladies and gentlemen, numerous times
that all you're to consider is the evidence in the case and a
document was shown to you, Exhibit 198, a reference to
Ms. Tehranchi. It should not have been shown to you. It was
not admitted in the case and it's a serious thing."

I don't know what else to say. I -- I have not seen that
before.

**THE COURT:** All right. I'm not going to allow it into
evidence. Have -- I think it was Ms. Tehranchi's deposition
when we had the issue with the juror becoming ill. I
completely understand, but, you know, ordinarily I don't let
affidavits in for the reasons that Mr. Bicks stated so -- and

1  I'm not going to admit it late here.

2      So I'll just instruct the jury that it was not admitted

3  into evidence and that on the -- I think it was two paragraphs,

4  if I recall correctly, that Mr. Glasser referred to in that

5  affidavit and I'm not going to repeat what those two paragraphs

6  were about because I don't want to draw attention to that.

7          **MR. BICKS:**  Right.

8          **THE COURT:**  But I will tell them that that affidavit

9  was not admitted into evidence and they should disregard

10 those -- the parts of the affidavit that were shown to them and

11 not -- and, as the Plaintiff has suggested, it won't be sent

12 back with them.  So I will tell them that and instruct them.

13     Okay.  Anything else we need to take up before the jury

14 comes in?

15         **MR. BICKS:**  No, Your Honor.

16         **THE COURT:**  All right.  You can bring the jury in.

17     And it was Plaintiff's --

18         **MR. GLASSER:**  198.

19         **THE COURT:**  -- 198.

20     (The jury entered the courtroom.)

21         **THE COURT:**  All right.  Good morning again, ladies and

22 gentlemen.  During his closing argument to you, Mr. Glasser

23 referred to Plaintiff's Exhibit 198 and showed you a couple of

24 paragraphs.  That was Sophie Tehranchi's affidavit.  That

25 affidavit was not admitted into evidence, so those paragraphs

1  should not have been shown to you and you should disregard the

2  paragraphs or the parts of Ms. Tehranchi's affidavit which were

3  shown to you during that closing argument.  You can consider

4  her testimony.  Obviously, that was before you, but as to the

5  parts of her affidavit which were shown to you, you should

6  disregard that and that affidavit will not be going back to you

7  as an exhibit.  It was not admitted into evidence and

8  Mr. Glasser was mistaken about that, which he agrees.  All

9  right.  So please disregard that and I instruct you to

10  disregard it.

11      We'll turn now to the Defendant's closing argument and the

12  jury is with Mr. Bicks.

13            **MR. BICKS:**  Thank you, Your Honor.

14      And good morning, ladies and gentlemen.  I'm excited to

15  talk to you all and I'm excited to make this closing argument.

16  You may have heard a saying that if the facts are on your side,

17  you argue the facts; and if the law is on your side, you argue

18  the law; but if you don't have either, you pound on the table.

19  and that's what you heard for 45 minutes, maybe close to an

20  hour.  I'm not going to do that.  I'm going to talk to you

21  about two things, the law and the evidence.

22            **THE COURT:**  The law and --

23            **MR. BICKS:**  And the evidence.

24            **THE COURT:**  Okay.  Pardon me.

25            **MR. BICKS:**  Before I do that, I do want to say thank

1  you.  You all have taken time away from your lives, your jobs

2  to hear this case; and for myself, my team, and Mr. Dodge,

3  Mr. Katzin from DISH, thank you for doing that.  This is one of

4  the greatest parts of our country in this system and I'm proud

5  to be a part of it and I appreciate it.

6      So I want to start with some really simple things that we

7  need to focus on and this is from the judge's instructions that

8  you'll get and it says that in this courtroom we can only focus

9  on testimony and evidence that was presented.  And that's very

10  important and it just relates to something the judge just said.

11  Something was suggested to you, shown to you, but it's not even

12  evidence in the case.  And that's what we need to focus on,

13  what the witnesses said and what the documents show, not what a

14  lawyer suggested in a question, not what's up on a flip chart

15  that shows big numbers.  That's not evidence.

16      And this is a case, as you know -- and the Plaintiffs made

17  a big deal about it.  DISH is a successful company.  They are

18  and I'm proud of them and I'm proud to speak for them.  They

19  are successful and they've got good people.  They employ a lot

20  of people and they make a lot of good things.  It's real

21  important to remember that in this courtroom everybody is

22  treated the same, even if it's an individual bringing a case

23  against a company.  Everyone is the same.  And the reason is

24  because a company, it's people.  So everyone is treated the

25  same and I thank you for that oath because that's very, very

1  important.

2      Now, the burden of proof in this case is very, very

3  important.  We don't have to prove anything, but we did.  And

4  it's not just that Dr. Krakauer has the burden.  He has it on

5  each element and the elements are important.  They're like

6  steps of a stairwell.  If you don't get over one step, you

7  don't go to the next.  And he's got several steps that he's got

8  to climb and it can't be with pounding on the table.  It's got

9  to be with evidence.  And what this says from the judge's

10  instructions is that if he fails to establish any essential

11  part of his claim then you must find in favor of DISH and

12  that's what I will ask you to do when I am done speaking with

13  you this morning.

14      This was a graphic that I showed in my opening statement

15  because it puts things in context, that DISH has more than

16  3,000 retailers around the country; and that's how it sets up

17  its business, which, as you heard from the founder,

18  Mr. DeFranco, it's a good and successful business.

19      And this is important because you just heard, on the

20  butcher chart over there, all these huge numbers, but this

21  isn't a case about any other retailer of those over 3,000.

22  It's a case about one.  It's a case about SSN and the evidence

23  showed in this case that SSN accounted for a tiny part of

24  DISH's business, less than a half of 1 percent, and

25  Mr. DeFranco said that and Mr. Ahmed said that and that's the

1  context.

2      And what Mr. DeFranco said -- and he came here because this

3  case was important and I think that was an important moment,

4  for the founder of this company from 1980 to come here and talk

5  to you about his story and be subject to cross-examination so

6  you could see was he telling the truth and what was the truth.

7  These were the four points that he made.

8      One of the greatest things about this system is each and

9  every one of you has so many different great traits, but one is

10 common sense and that's always how I think about this case.

11 Does this make sense that a company this successful, with the

12 people you met, would idly sit by if somebody was doing

13 something that would harm their business?  Could they be where

14 they are today if that's how they ran their business?

15     And what Mr. DeFranco said was that the reputation of DISH

16 on a long-term basis is the key to its success; and that calls

17 like the ones that are alleged, and I say alleged, to have

18 taken place in this case harm DISH's reputation.  And you can

19 rest assured, when you saw Mr. DeFranco when he started out

20 with Charlie Ergen and Cantey Ergen with $60,000 on the table

21 and put that at risk and to get where he is today with that

22 company, that that reputation is their hallmark.  It's what he

23 spent his whole life putting together and he told you right on

24 the stand that DISH does not risk its reputation with customers

25 for short-term gain.

1    And the fourth point he made, which is so critical, is that

2  DISH did not profit from SSN calls to numbers on the Do Not

3  Call Registry.

4    And you probably remember Ms. Tehranchi. Plaintiff's

5  counsel kind of attacked her. I didn't really think that was

6  fair. You heard her say that they only had a few activations,

7  exactly like what Mr. DeFranco said. They were small and they

8  weren't doing a lot of sales and DISH didn't profit from any of

9  those sales and they didn't put in any evidence to the

10 contrary.

11    So when I see numbers written up on a butcher board that

12 are not evidence, it brings me back to where I started, law and

13 evidence. And there's no evidence of what's on that butcher

14 board. This is the evidence when it relates to SSN and, of

15 course, it's the truth.

16    There was a claim and a suggestion, an attack on Reji

17 Musso, that compliance wasn't taken seriously. She came here,

18 you all saw her, from Michigan to testify, not paid, not

19 connected to DISH. She was proud of what she did and she was

20 loyal and she told you that honestly and that's why she was

21 here, because they're attacking her job. And she told you that

22 compliance was a serious matter for DISH. And this is what the

23 evidence was. This Retailer Chat -- what I did, ladies and

24 gentlemen, so you know, I wrote exhibit numbers, typed them on

25 my screen. So if there's something you want to see that says

1  DX3, DX2, those are exhibit numbers; and I tried to put them on

2  here so if you follow and you see something, you want to check

3  what I say, and you should, this is what the exhibit is.

4      EchoStar script, a Retailer Chat, which is DISH

5  communicating to its retailers about the importance of

6  telemarketing compliance.  And then the statement here that "we

7  work with law enforcement officials."  And it's not just in

8  this script.  It's in this Facts Blast at the bottom.  You all

9  learned about Facts Blasts.  It's the way that DISH

10  communicates with retailers.

11      And this is important because Ms. Tehranchi said she got

12  these Facts Blasts in her deposition and they came into

13  evidence.  She got them from DISH.  This was the message DISH

14  was communicating.

15      Both Mr. DeFranco and Ms. Musso explained how DISH works

16  with law enforcement if there are any issues relating to

17  compliance.  Why?  Because it's the key to the success of the

18  company.

19      So the argument and suggestion to you without evidence that

20  compliance is toothless and Ms. Musso didn't do anything, this

21  is what the evidence is.  DISH was proactive on compliance.

22  Why would it be working with law enforcement if it didn't care

23  about what was going on with compliance?  This is what the

24  evidence was.

25      And this is what Ms. Musso said.  These are three key

1  points:  That she and her compliance group -- and she told you

2  about Serena Snyder and the rest of the folks, the six people

3  who worked with her -- that they were proactive in reaching out

4  and conveying the importance of compliance to retailers,

5  including SSN; and that they dedicated significant resources to

6  investigations.  You saw the evidence about the investigations

7  that were done and I'll talk about them.  And they even went so

8  far to do sting operations where it was sometimes tough for

9  DISH to find where calls were coming from because numbers can

10  be spoofed or disguised and they would have to sometimes do

11  sting operations to identify retailers responsible for sales.

12      You were shown an exhibit by the Plaintiffs, a brochure of

13  possible services that could be purchased; and the suggestion

14  was and all those figures were worked out that DISH, you know,

15  cut corners and didn't -- didn't do what it was supposed to do.

16  But the evidence was that DISH brought on PossibleNOW in this

17  case and PossibleNOW was working with retailers.  What you saw

18  there was a price sheet, a sales sheet for PossibleNOW, but you

19  know the whole story because the evidence was that PossibleNOW

20  was working with DISH and PossibleNOW was working with

21  retailers and PossibleNOW trained SSN, as we'll talk about in a

22  moment.  So it's important to keep your eye on the ball and

23  watch the evidence because that's what the evidence was, not

24  something that was on a sales brochure where you can pay for

25  this to do something.  PossibleNOW was engaged.  They were

1  working with SSN.  And you heard Ms. Musso.  She was trained

2  with PossibleNOW.  PossibleNOW came to retailer summits.  She

3  told you about Team Summits and they were there to train

4  retailers and that was on DISH's nickel and that is what the

5  evidence showed.

6      Now, this is the question on the verdict sheet that you all

7  are going to have to answer:  Was SSN acting as DISH's agent?

8  That's the first question.  The evidence will show that they

9  were not; and if you answer this question "no," you skip the

10  other questions, you sign the verdict sheet, and you don't have

11  to get into all the questions about the evidence about whether

12  calls were made and so on and so forth.  But this is the first

13  question.  When I come back to my stairs and am counting up the

14  stairs, this is the first step.

15      And it's very important, you'll see from the instructions,

16  that this question actually has two questions.  One question,

17  two steps and here are what the steps are.  This is from the

18  judge's jury instructions:  In order for DISH to be liable for

19  any TCPA violations committed by SSN -- and I say SSN.  It was

20  never explained to you all why Dr. Krakauer didn't sue SSN.

21  They made the calls and I think common sense tells us why they

22  didn't go after SSN, because they want to go after the deep

23  pocket and that's really what this case is about.  But to get

24  to that, they've got to prove this, two things.  Was SSN DISH's

25  agent, that's the first step; and if they can show that, and

1  they can't, the second step is was SSN acting in the course and

2  scope of that agency.  Two steps, one question on the first

3  question you have to answer.

4      So what I'm going to do now, ladies and gentlemen, I'm

5  going to walk through the evidence on these two questions and

6  the judge's jury instructions have provided a guide as to what

7  we look at.

8      Now, first question, has Dr. Krakauer met his burden of

9  proof that SSN was DISH's agent?  And the answer will be no.

10 This is what I would call a show-stopper.  It happened quickly

11 in the trial when I was questioning Dr. Krakauer -- and that's

12 the beauty of a closing.  I get to hit things that maybe came

13 out quick and I didn't maybe make it as clear when I questioned

14 him.  You all know now that he's here as the class

15 representative for everybody.  His case doesn't stand, no other

16 case stands; and we know, as I told you in the opening, that

17 he's here because he got five calls over about a year period

18 that were 2 minutes and 32 seconds, 2 minutes and 32 seconds.

19     I asked him on the stand.  No TV provider other than

20 DirecTV was ever mentioned on any of those five calls to

21 Dr. Krakauer.  He said, "That's right."  DISH was never even

22 mentioned.  Now, this is not the May 2009 call.  These are the

23 five calls that are in this case.  And as the Court said and as

24 I showed you in the beginning, this has to be based on evidence

25 and there's no evidence that whoever it was -- and we don't

1  even know -- who called Dr. Krakauer those five times, we don't

2  even know if DISH came up on those calls.  In fact, he said the

3  only thing that came up was DirecTV.

4      That, ladies and gentlemen, is an issue and it's a problem

5  and it's a hurdle and it's a serious one because why didn't

6  they bring in evidence of the person who made the call.  Where

7  was that person?  It's not our burden.  We've got to present no

8  evidence.  We don't know what exactly was going on in that

9  call, no tape recordings, no notes.  Because what Mr. Krakauer

10 said at the time of the calls is he didn't think there was

11 going to be a case and it wasn't a big deal.  "It wasn't

12 important" were actually his words, but we have to have

13 evidence in a case like this, particularly when you're here

14 asking for $25 million and this is what the evidence is.

15     Now, this is from the instructions about agency:  The

16 Plaintiff must prove that DISH and SSN agreed or reasonably

17 understood that DISH had the power to control and direct SSN's

18 telemarketing activities.

19     This is what it means to be an agent.  It's not just that

20 you're going to do something for me.  You've got to look at

21 what happened between the two people and the two companies,

22 what the contracts say, what happened.  And this is very

23 important because it's like two sides to a coin.  There's the

24 DISH side and there's the SSN side.

25     And you saw what Ms. Tehranchi said.  You heard her

1   testimony and you didn't hear her say, "I was an agent."  You

2   didn't hear her say, "DISH controlled me."  You needed to be

3   shown evidence from SSN that they believed that DISH could tell

4   them how to market.  In fact, the evidence showed the exact

5   opposite.

6        These are the four kind of categories of evidence and,

7   again, I keep talking about evidence:  Contracts, other

8   writings, conduct, and statements.  When you get the jury

9   charge -- when I'm done and the Plaintiff's counsel gets to say

10  a few words, you'll hear these four categories mentioned; and

11  these are the categories of evidence to look at to answer that

12  question did SSN believe and agree that DISH could control and

13  dictate its telemarketing activities and did DISH believe, do,

14  and agree to the same.  We're going to look at these four

15  categories of evidence in the case and every one of these

16  categories will show that Plaintiff cannot meet its burden that

17  SSN was an agent.

18       The first thing is the contract and contracts are

19  important.  I don't need to tell you folks that.  This is how

20  DISH runs its business.  Words are the bond of the parties who

21  sign this.  And these are sophisticated companies.  There was a

22  comment about a boiler room.  I don't know what evidence there

23  is of a boiler room.  Four people?  If you actually look at the

24  records in this case, the phone records, there were over 20

25  people at SSN.  It wasn't four and I don't know what this

1  boiler room is all about.

2      I know that a contract was signed between two companies and

3  that contract right up in the beginning, in the introduction,

4  says that SSN is an independent contractor of DISH.  That's

5  what the parties agreed to, and that's how they acted, and a

6  third party can't come in and try to upset what two businesses

7  agreed to because that's the way the business world works.

8  People put their deals in writing because they know that what

9  they have to do and what they don't do and that's how

10 businesses work.  Contracts are important.  This isn't just a

11 piece of paper.  Everybody signed it.

12     So we start with the contract and the contract is important

13 and you heard it from all three witnesses -- Mr. Ahmed,

14 Ms. Musso, Mr. DeFranco -- that this is a nonexclusive

15 contract, which is very, very important because what it means

16 is any retailer can work with whoever they want.  They don't

17 have to just sell DISH.  Many of them don't.  Most of them

18 don't and you heard that from Mr. DeFranco.  The retailer and

19 SSN can work with whoever they want to work with.

20     And I come back to the contract because the contract,

21 ladies and gentlemen, answers the question.  The contract says

22 that SSN was not an employee or agent of DISH.  And this is in

23 paragraph 10 of 2001.  I told you there were three contracts.

24 You'll have them all.  In 2006 it's paragraph 11 and then the

25 same in 2010.  Every part of the contract, and it has a

1  separate section, that the parties agreed to that they're an

2  independent contractor and that SSN is not DISH's agent.

3  That's what the parties agreed to and nobody came in the

4  courtroom from SSN and said, "Oops, that's not what I agreed

5  to.  I didn't know."  Or "Oops, we changed the contract.  This

6  is what the contract says."

7      And words are people's bonds when it comes to business and

8  this is what it says.  And you'll see that the Plaintiff really

9  didn't talk about this provision much because it almost

10  really -- I think it begins and ends the question right here.

11  This is what they agreed to.

12      And it also is important in this section that it's not that

13  they just say, "You're -- you're not our agent."  They say,

14  "Don't go out and tell people that you're DISH.  You can't do

15  that."  And this is what's in the contract.  This is what they

16  agreed to.  Paragraph 11 and it says:  "Don't even imply to

17  people out there that you are DISH.  You are a retailer and you

18  can sell DISH products, but you are not DISH."  And this is

19  what the contract says and nobody came in here from SSN, when

20  it's their burden, and came in and said, "Oh, we changed the

21  contract.  That's not what it means."  This is what the

22  contract says, so we start with the contract.

23      So I put this up.  It's a bull's eye because I listened to

24  a lot of the questioning of our witnesses and I sat on the seat

25  and I said to myself, "When is the Plaintiff going to ask one

1   of our witnesses about the provision that says they're not an

2   agent?  Surely they will."  Never.  What happened?  They threw

3   darts at a board and started talking about all these

4   provisions, except the one that says that they're an

5   independent contractor and not an agent.  Didn't even ask our

6   witness about it.  You throw a dart and you hit the middle of

7   the board -- it's paragraph 11 -- and they acted as if that

8   wasn't there.

9      There's something you all probably heard about a red

10  herring, where somebody throws something out to kind of

11  distract someone from really what's going on, and you never

12  heard any mention of paragraph 11, which is where these parties

13  said that SSN wasn't an agent.

14     And it's not just this contract.  The Plaintiffs kept

15  talking about this voluntary compliance agreement with 46

16  Attorney Generals and you heard from DISH that the purpose of

17  that agreement, the focus of that was for consumer protection

18  to make -- to focus on terms and conditions of their programs;

19  and the Court told you in an instruction that that's not an

20  admission of any liability and it's actually a good thing if

21  parties reach agreements like this.

22     But there are two very, very important definitions in here

23  that I showed Mr. DeFranco and these definitions show that all

24  of these state Attorney Generals recognize that DISH's

25  relationship with a retailer like SSN is an independent

1  relationship.  So these are the two definitions.  One is an

2  authorized telemarketer and that is somebody that is hired by

3  DISH to conduct telemarketing on DISH Network's behalf.  That's

4  one group of people.  The second group is a third-party

5  retailer and that's one or more independent persons and it goes

6  on.  SSN was a third-party retailer and Mr. DeFranco explained

7  to you all that an authorized telemarketer -- that DISH

8  actually works with authorized telemarketers, that DISH will

9  give its calling lists to a telemarketer.  But that's not what

10  this case is about.  This case is about third-party retailers

11  and that's what SSN was.

12      So this is yet another contract which shows exactly what

13  the contracts between the parties shows.  Very important piece

14  of evidence, these definitions, because it's not just that the

15  contracts say that SSN was independent, it's this Attorney

16  General agreement as well, these definitions.

17      And remember I said the four categories.  You look at the

18  contracts and the judge's instruction.  It will say "other

19  writings."  So what were the other writings?  You've got the

20  Facts Blasts.  Facts Blasts were in SSN's files and it says

21  right here, right at the top, independent retailers.  Second,

22  no retailer is permitted to represent itself as DISH and then

23  it says, "The retailer agreement clearly provides that your

24  relationship with EchoStar is an independent contractor."

25      And you'll see when you get the instruction that one of the

1  things kind of is does the evidence add up, is it consistent;

2  and what I'm showing you now is evidence that always says the

3  same thing, that the retailer is an independent contractor.

4  And Mr. DeFranco, Mr. Ahmed explained why, because these are

5  businesses who make their own decisions and invest their own

6  money, and they're the ones who have the skin in the proverbial

7  game.  It's their money.  If things go well, they lose their

8  money.  And that's why they set up business relationships where

9  they're not going to let one company tell them what to do,

10  because it's their money, and particularly if they have the

11  ability to work with other companies.  There's a business

12  reason that this arrangement is set up this way.

13      And it wasn't just in the Facts Blasts that this is said.

14  This was really something because this was a script from a

15  Retailer Chat and Jim DeFranco, he's the cofounder and he's on

16  these chats himself.  This isn't a type of situation where

17  some -- a company is saying, "Oh, we didn't know what was going

18  on.  Somebody, you know, in a mailroom did something and we

19  weren't a part of it."  He stepped up.  He said, "I delivered

20  this message.  I'm the cofounder of the company."  And he

21  issues this message to retailers, retailers are not agents or

22  employees of EchoStar.

23      Again, what the Court will say in the instruction is you

24  look at contract, you look at writings, and you look at

25  statements.  Here's a statement right here:  SSN is not an

1  agent.  It says it right here.

2      And so I prepared a little bit of a kind of a graphic to

3  explain what this control is all about and how it works because

4  it's what the evidence showed.  The first point, and Mr. Ahmed

5  said it and Mr. DeFranco said it, is a retailer decides what

6  their marketing strategy is; and you probably saw in some of

7  the evidence, one of the e-mails early, where it was said that

8  SSN was doing 1 percent telemarketing and doing mailings,

9  newspaper, and other stuff.  That's their decision.  That's the

10  money they're spending.  So all of these decisions of how to

11  market, those are SSN's decisions.  And remember the question

12  is does DISH control all of this and does SSN let DISH control

13  all of this.  That's really what the question is and the

14  evidence was the exact opposite, that DISH doesn't and SSN

15  doesn't want DISH to.  But those are all the things that SSN

16  controls.

17      So let's say they telemarket.  They decide what markets to

18  target.  Ms. Tehranchi said that.  They decide how to get

19  leads.  She said that.  They decide what type of dialer to use.

20  The Five9 dialer and the people from Five9, DISH didn't have

21  anything to do with Five9.  SSN went out and made an

22  arrangement with Five9 to do their dialing for them.  That's

23  all within their control.  How to scrub, that's under their

24  control working with third parties.  DNC.com was a reputable

25  company that they worked with and then they worked with

1  PossibleNOW, but DISH doesn't control how the scrubbing is

2  done.  DISH is proud of the fact that they recommended and

3  encouraged people to use PossibleNOW.  That's a good thing.

4  PossibleNOW is the market leader in telemarketing compliance

5  and this is what was going on here and you saw that from the

6  e-mails.  Who makes the calls?  That's all SSN.  That's not

7  DISH.

8      And then there's the sales pitch at the end where somebody

9  decides I want to sign up; and it is true, ladies and

10  gentlemen, that DISH does have some role in that sales pitch.

11  DISH does want to make sure that whether you're in

12  North Carolina, California, and Maine that if you're going to

13  buy the Hopper or you're going to buy Sling or any of those

14  products that you're told truthful information about the price

15  and what those products can do, but that has nothing to do with

16  telemarketing compliance.  That's a responsible company making

17  sure that its bread and butter is taken care of, and that's --

18  when I put that box up, that's all SSN.  And remember the

19  question is did DISH direct and control this and did SSN want

20  it.  The answer is no.  They haven't met their burden.

21      And that's what Reji Musso explained to you.  What Reji

22  said was the quality assurance program related to the accuracy

23  of disclosures and that quality assurance happens after

24  somebody is signing up for a sale.  It's not during the whole

25  process of let me figure out if I'm going to telemarket, let me

1   decide who I'm going to call, let me hire Five9.  SSN does all

2   of that and that's their responsibility and that's how the

3   parties set up their arrangement.

4        And you heard the practical aspect of it, ladies and

5   gentlemen.  DISH is based out of Colorado.  Yes, it has a lot

6   of people who work for it, but DISH isn't going to send its

7   people into 3,500 businesses around the United States to be in

8   there every day running dialers for them.  They wouldn't be in

9   business if they'd do that and they don't do it and they didn't

10  do it here.  And what Ms. Musso told you was that quality

11  assurance thing to protect consumers, that's not control over

12  SSN's telemarketing, all those other things that I was talking

13  about, and that's what the evidence was.

14       All of these witnesses.  It's not just the contract.  It's

15  not just the Facts Blasts.  It's not the Retailer Chats.  This

16  is what these witnesses all said, all said the same thing:

17  DISH did not control SSN's marketing activities and DISH did

18  not consider SSN to be an agent.  So those are the statements,

19  that other category the Court has said in the instruction to

20  look at.  All the witnesses said the same thing.

21       And this is important because Ms. Tehranchi also said the

22  same thing.  You all will remember she used the word "we're

23  separate businesses."  And you would have thought, by the way,

24  that she would have wanted to come in and say, "Ooh, DISH told

25  me everything to do.  I didn't do anything wrong.  DISH told

1  me."  She said the opposite, that they were independent

2  businesses.

3      The other thing to look at is conduct.  What happened,

4  right?  What happened?  Did -- what are examples of really the

5  real world and control?  This was one of my favorites and I

6  mentioned it in the opening.  Mr. Ahmed talked about it.  DISH

7  wanted a marketing script and SSN said no.  Charlie Ergen, the

8  chairman, wanted to see a script.  Remember the evidence when

9  he got called at home at his farm and he liked the pitch and he

10  told Mr. Ahmed, "Go get me the script."  You all saw Mr. Ahmed.

11  He's a forceful guy.  You know, you'd think he'd have a shot at

12  getting it.  He couldn't even get the script for the chairman

13  of DISH from the folks at SSN.  They said no.

14      What better example that the contract which says that

15  they're independent and that they're not an agent and all of

16  the other documents, what better example than this, that the

17  chairman couldn't get a script.  They didn't have control over

18  their marketing.  They certainly would have been able to get

19  the script if they wanted it.

20      And remember this evidence from Ms. Musso that DISH wanted

21  to get in to help do the quality control, right, the quality

22  assurance to make sure when a sale was made that the terms and

23  conditions were being disclosed.  They were not even letting

24  DISH in to their facility.  Another practical example of

25  separate businesses.  They didn't want DISH in there for

obvious reasons. They didn't want DISH seeing because, to some extent, as you all learned, they compete with each other because DISH also sells directly to folks like all of us, like consumers. DISH deals directly. They're competitors. But yet this is the conduct. This is what happened in the case.

So -- and then Dr. Krakauer told us that when he spoke to DISH about his call that Ms. Dougherty at DISH told him that SSN was independent. That's what was said and the reason I point that out is everybody is saying the same thing. It's in the contract. It's in every document. It's what all the witnesses said. The evidence all is consistent on this question where they have the burden of proof and that's what Dr. Krakauer told us. Dr. Krakauer told us that DISH said, "You got called by an independent contractor. We are not responsible for them." And he figured out it was SSN. He knew it was SSN and they didn't go after SSN. They went after DISH because they're a deep pocket.

Ms. Tehranchi. SSN is an independent business. She said that. She was shown that provision. Remember the independent contractor provision. And she said, "That's an independent. We're a separate business from them." That's what she said under oath. She also said the following: That DISH did not provide SSN with phone numbers to call, that DISH did not provide SSN with any contact information, that DISH did not provide SSN's telephone lines, own its buildings, equipment,

1  employees, benefits, any of that.  They're separate businesses

2  and that's what an independent contractor is all about.  That's

3  the opposite of what an agent is all about and that's what the

4  evidence was in the case.

5      So you look at all of these categories -- contracts, other

6  writings, conduct, and statements -- and, ladies and gentlemen,

7  each one of these shows no agency.  That's all the evidence

8  that I just went through.  Every single bit of that evidence

9  shows no agency and that's just the first step.  They don't get

10 beyond that and they can't get beyond the contract that the

11 parties agreed to.  A third party who doesn't know anything

12 about the contract can't come in and say, "I know you

13 businesses agreed that's how you're going to conduct

14 yourselves, but I don't really think that's what the contract

15 means."

16     What's the second question?  First is that they're not the

17 agent and the evidence shows no.  And remember what I said,

18 that there are two steps to that question.  They don't get by

19 the first step.  The second step is the one about scope of

20 authority, right?  First is was DISH -- was SSN DISH's agent

21 and the second is was SSN acting in the course and scope of

22 that agency.  That's the second question.

23     They don't meet their burden on the first for all the

24 evidence that I showed you and now I want to talk to you about

25 the evidence on this very, very important second question.  And

1    I don't think you get to it, but if you do, Plaintiff can't

2    meet its burden and, ladies and gentlemen, he didn't come close

3    on this.

4        This is very important because what the Court will tell you

5    in the instructions is that a principal is not bound by the act

6    of an agent unless it's within the scope of actual authority.

7    In other words, what was the person supposed to do even if

8    they're an agent and did they do it?  What were the rules?

9    What were the boundaries?  What was the boundary line that they

10   were supposed to stay within and not go over?  And this was

11   very important because what the Court says in its instructions

12   is that, generally speaking, actions taken against the

13   principal's interests are not within the scope.  Because if

14   you're my agent, you and I are going to be doing things that

15   are in our common interest, but when you start doing things

16   that are against my interests, you've gone outside of the

17   scope.

18       And you heard the evidence from Mr. DeFranco, Ms. Musso,

19   and Mr. Ahmed that the calls that are alleged to have taken

20   place here are against DISH's financial interest and DISH

21   didn't profit from the calls.  You heard Mr. DeFranco.  "This

22   is against our interests.  We don't want to get involved in

23   lawsuits over things like this.  We don't want to have people

24   upset with how our business operates."

25       Word travels fast.  And all three of these witnesses

1    testified to this, all consistent; and there's no evidence to

2    the contrary, no evidence to the contrary that DISH profited

3    from this less than one-half of 1 retailer for these calls that

4    were apparently made, according to the Plaintiffs -- and I'll

5    show that their evidence really didn't meet much -- who didn't

6    even want to be called.  That's not in DISH's interests and the

7    law says that when you act outside of the interests of the

8    so-called principal that you have acted outside of the scope of

9    authority.

10        This was an interesting part of the trial because -- I want

11   to focus on the facts relating to Dr. Krakauer because remember

12   I said in my opening, and I'll say it again, the case rises or

13   falls with him.  And this was the application that he signed

14   for DirecTV and you all remember that on this application SSN

15   was the dealer.  And I don't fault Dr. Krakauer.

16        Remember he was on the stand and I said, "Remember you --

17   SSN was the dealer, right?"

18        "No, I didn't have any documentary proof of that."

19        I said, "Are you sure?  I think you signed a contract that

20   said they were the dealer."

21        "I don't really know.  I don't remember that."

22        I said, "Well, I can forgive that except if you're the

23   plaintiff in a lawsuit where the request is $25 million and you

24   say to the jury that 'my job as the plaintiff is to know what's

25   going on.'"

1    And this was the contract that he signed.  And, look, not

2  all of us read contracts, but when you sign it and you're the

3  plaintiff, you should know what's in it, particularly when you

4  don't go after the company that made the calls and you're

5  acting like in the courtroom "we don't really know who they

6  are."  "We're not sure who SSN was."

7    SSN was the dealer, and he gave SSN in his application his

8  credit card information and other personal information.  They

9  had his phone number back in 2003 and he signed it.  That was

10 his signature.  And he also got the equipment shipped to him

11 from SSN.  They knew all along that SSN was the dealer that

12 sold him DirecTV and SSN had all of his information because

13 they were the dealer that sold his DirecTV to him.

14    This timeline, ladies and gentlemen, is very, very

15 important because what it shows is that SSN acted directly

16 against what DISH said and what SSN told DISH they would do.

17 It is outside of the scope even if you get to kind of what I

18 call the second step.  This evidence is very, very important.

19    The call was on May 9th of 2009.  And remember that's not

20 the call in the class period, which is May 2010 to August 2011.

21 This is before, may of 2009.  And we know that on May 10th,

22 2009, that DISH compliance group starts an investigation.  And

23 when we again come back to the comment that DISH didn't really

24 do anything, you know, they didn't really care, they're doing

25 an investigation to try to figure out what happened.

1        And you heard this piece of evidence, which was from

2   Rebecca Dougherty's e-mail where she wanted to assist

3   Mr. Krakauer to figure this out.  DISH was as frustrated as he

4   was and this is what was said in that e-mail:  "Please help me

5   to assist Mr. Krakauer."  They're trying to figure out what

6   happened with this call to them -- to him because DISH doesn't

7   know who SSN is calling.  DISH doesn't have their calling list.

8        And let me say something for a moment about the credit

9   check.  There is no claim in this case about a credit check.

10  But what do we know?  We know this, that Dr. Krakauer filled

11  out an application on March of 2003 and on that application he

12  had his credit card information, his phone number, and that he

13  had a long-term relationship with DirecTV and presumably the

14  dealer SSN that sold him his DirecTV.

15       And when he had that phone call May of 2009, Ken from SSN

16  says to him, "I know you've got DirecTV, but I think I can save

17  you some money.  Are you interested?"

18       He says, "I am."

19       And Ken says, "I need some information from you.  I need

20  your credit card."

21       And he gives it to him.  We don't know whether or not he

22  gave him his social security number.  He wasn't quite sure.

23  But we know that SSN had his information.  He puts him on hold.

24       He said, "Let me check and see if I can save you some

25  money."

1        Probably what happened was he put him on hold with the
2   personal information that Dr. Krakauer gave him, some of which
3   he probably already had because SSN had all of that
4   information, and he ran a credit check.  We don't know --
5   although it's in DISH's rule that he was supposed to say and
6   tell him that he was running a credit check, we don't know if
7   that happened.  Ken wasn't here.  But Dr. Krakauer gave him the
8   information to see if information -- if he could save him money
9   because he was interested in it.  I probably would have been
10  interested in it.  But that information was given to SSN to run
11  a credit check.
12       And you heard Ms. Musso.  If there was any question about
13  whether or not he should have been told, he should have been
14  told, no question about it, but -- and we don't know exactly
15  what happened.
16       But this case is not about a credit check other than to try
17  to make DISH look bad is really what that's all about, to try
18  to distract you from what this case is really about.  It's got
19  nothing to do with a credit check.  And you know what?  These
20  lawyers, who are good lawyers, if they had a claim for a credit
21  check problem, we would be in this courtroom discussing it, but
22  we're not.
23       So I ask you to keep focus on the law and the evidence and
24  not by a little bit of a side detour to try to make you not
25  like DISH.

1    But you heard Ms. Musso.  If he didn't know, then that

2  wasn't right.  But he gave them his personal information to try

3  to save money and that's really what happened.

4    But the point of this is that DISH writes a letter to SSN

5  and says:  "Don't call Mr. Krakauer again."  And this is on

6  May 27th.  "Please immediately insure that that phone number

7  has been added to your internal Do Not Call Registry."  And

8  they're reminded, "You've got to comply with the law."  DISH

9  says directly, "Don't call him.  Put him on your Do Not Call

10  Registry."  And remember the question is did they do something

11  they weren't supposed to do.  DISH told them, "Put him on your

12  internal Do Not Call List."

13    And what do they say back?  This is an important document.

14  It's Defendant's Exhibit 8.  Ms. Tehranchi writes back and she

15  says, "That very same day we took Mr. Krakauer's phone number

16  out of our entire master lead list and we put it on our DNC

17  list.  Our lead to Mr. Krakauer was generated by us when we

18  sold him DirecTV back in April of 2003.  Prior to this

19  complaint, we did not know that Mr. Krakauer wanted off of our

20  list."

21    This is such important evidence, ladies and gentlemen,

22  because SSN is telling DISH -- and put yourself in Reji Musso's

23  chair.  You get this e-mail back.  "We've taken him off our

24  list.  He's not on our master list.  We had a business

25  relationship with him and we're not going to call him again and

1  we've deleted him from our database."  And that's what DISH

2  thought because that's what they were told and that's what

3  common sense would say SSN would want to do.  Why would SSN

4  want to call somebody again when they said they're not

5  interested, but that's what the evidence was.

6     And this is what Ms. Musso said about this.  She wanted to

7  make sure Dr. Krakauer didn't get any additional calls.  They

8  were investigating to try to solve a problem and that she

9  believed that SSN had taken Dr. Krakauer out of their database

10  and he wouldn't get another call because that's what the

11  documents say.

12     And that's what the rules required them to do because it

13  was SSN's job in three contracts to comply with the law and

14  they were solely responsible.  I said in my opening and I'll

15  say it in my closing, "solely" means one and the one was SSN.

16  They agreed in the contract to comply with the telemarketing

17  laws and to be solely responsible, and that comes to the

18  question of acting outside of the scope.

19     If the boundary down the floor is complying with the law

20  and you step over, you've acted outside of the scope; and

21  that's -- if what they're claiming actually happened -- and we

22  can't be sure because of some of the problems with the calls --

23  they went outside of the express scope defined in their

24  contract where they were solely responsible for complying with

25  the laws.  And again this is very important because

1  Ms. Tehranchi said that she agreed that the contract required

2  her to comply with the laws.

3      So you've got what I said, the two-sided coin.  You've got

4  DISH saying that they're responsible and them saying, It's our

5  job.  And if that's what the evidence is -- and that's what it

6  is -- and they didn't do their job, then they crossed the

7  boundary.  They were outside of the scope.  And if they're

8  outside of the scope, the law says that DISH is not

9  responsible; and that makes common sense because if you're

10 going to do something you agree to do and you don't do it, you

11 did it, not DISH; and they should be responsible for that, not

12 DISH.

13     And that's what the law is and Ms. Tehranchi recognized it.

14 And she also said that they had an internal Do Not Call policy

15 and that's in that e-mail where she writes back.  "We have an

16 internal Do Not Call policy.  We've added him to our list.  He

17 won't get called again."

18     You heard a lot about this North Carolina injunction.  Back

19 in 2005 it's to DirecTV.  It didn't even involve anything for

20 DISH.  And there are two interesting parts of this that I have

21 on this screen.  One is that SSN agrees that it is going to

22 follow the law and it's actually under a court order here to do

23 that going back to 2005.  And then down in the second part,

24 they agree that they're going to get to the North Carolina

25 Attorney General in 30 days an entire written plan to make sure

1 that they're following the law. They weren't said here, You

2 can't telemarket. They said, You've got to get us a report in

3 30 days to make sure you're good to go and you're under a court

4 order no improper telemarketing stuff. And this is what this

5 is. But it's back in 2005.

6 DISH didn't know about it in 2005. They did find out about

7 it later, I think in late 2006, 2007. They didn't know about

8 it at the time. They did find out about it. But it says right

9 in it that SSN is to get a whole written plan to the

10 North Carolina Attorney General and there was no evidence in

11 this case -- and you can rest assured with these good lawyers,

12 if they had it, they would have presented it. They would have

13 come in and said, "Oh, SSN they never ever did that." There

14 was no evidence of that. This is the evidence that you have

15 that they had to get a plan to the North Carolina Attorney

16 General, a written plan. No evidence that that didn't happen.

17 Facts Blasts again echoing to SSN about the importance of

18 compliance, just like in that North Carolina injunction. This

19 in 2007, you must follow the laws. And this is important

20 again, because if they don't do it, it's outside of the scope.

21 And it's not just that it's in the contract, but it's in all of

22 these retailer chats, there as well.

23 PossibleNOW, a Retailer Chat -- remember I asked

24 Mr. DeFranco about that, Jim. Jim is actually talking to the

25 retailers about using PossibleNOW. The cofounder of the

1  company is speaking to the retailers and saying, "Compliance

2  with all laws is important.  We want to introduce you to

3  PossibleNOW so you can work with them.  They're the best.

4  They're the gold standard."  That's what a responsible company

5  does and that's what Jim did right here.

6      Now, this is important evidence.  I've got three pieces of

7  evidence.  The first is this whole question of scrubbing.

8  Ladies and gentlemen, that's SSN's job to do that scrubbing.

9  DISH isn't running their dialers.  DISH isn't overseeing what

10 they're doing with Five9.  Ms. Tehranchi testified that the

11 lists loaded in the Five9 dialer were scrubbed by PossibleNOW.

12 That's what she said.  That was the evidence.

13     And they were suggesting to us that we had to bring in

14 evidence for something, we had to bring in receipts to show

15 that they didn't -- they scrubbed or they didn't.  No, no, no,

16 no, no.  The burden of proof is on the Plaintiff.

17     We didn't have to present any evidence; but this is the

18 evidence that was presented, testimony under oath from

19 Ms. Tehranchi that the lists loaded were scrubbed and then an

20 e-mail where SSN tells DISH that it's scrubbing and it gets

21 something called a San number, which is a subscription number

22 to get the Do Not Call list.  You actually have to pay for it,

23 buy it, and then you get the Do Not Call list you heard about

24 from Mr. -- Dr. Fenili.  And it's to scrub.  They're buying the

25 list to scrub with PossibleNOW and they say that they've done

1  the training on October 2008.  There's no evidence that they

2  didn't do the training.  They said they did it.  They didn't

3  bring in any evidence that didn't happen, but this is what DISH

4  is told.  And then a scrub receipt.  "We scrubbed 15,000

5  records."  That's what the evidence is, an example of what they

6  do.  But this is three pieces of evidence of what they're

7  saying.  This is what the evidence was.

8      So back to my timeline, again very important, because I

9  said this in my opening, that we had to look at this in three

10  chapters; and you saw in the Plaintiff's opening that he

11  referred to some 2004 and 2005 e-mails, but this case is about

12  what happened in 2010 and 2011.  And there's no question -- and

13  I told you in the opening that SSN had some issues in 2003,

14  2004, 2005, primarily with automated dialing calls, which is

15  not what this case is about.  It was after that that DISH had

16  Reji on board.  She got hired six people and they really

17  improved their compliance situation.  We're dealing with a time

18  period after all that takes place.  But this is really

19  important when you're in a business and you're making

20  decisions.  It's not in a courtroom where people put -- string

21  things together.  It's kind of realtime.

22      And what was going on here is after this complaint with

23  Mr. Krakauer an entire year goes by with not one problem, not

24  even one complaint.  And when you're making millions of calls,

25  which is likely what happened, you all saw the evidence, and

1  you don't get any complaint for a year, the indication to you,

2  if you're Reji Musso sitting at her compliance desk with her

3  team, is that things are looking pretty good and that's what

4  the evidence was.  A complaint came in one year later after the

5  Dr. Krakauer complaint and there was this claim about dialer

6  records and that there are these records missing.

7      The evidence actually was, whenever DISH would ask SSN what

8  happened, they would give them information about the actual

9  call that was made, which has happened with this Campbell

10  complaint, a 6-second call.  They respond and they say, "We had

11  previously done business with this customer, according to our

12  records, and," they say, "we never had a complaint like this

13  before with an EBR."

14      And you heard that, established business relation.  The

15  judge will explain in her instructions that the defense in the

16  case is not that an established business relationship exists

17  with any of these people who are claiming things now.  This is

18  important evidence to show that this is what DISH was told and

19  this is what DISH thought at this time.

20      And this individual, Mr. Campbell, I don't believe he's in

21  this class, but this is the one complaint that DISH got and

22  this is what they're told, an established business relationship

23  with this individual and here is our records.  One complaint.

24  And if you have an established business relationship, you can

25  call somebody.

1    So this is real important.  Mr. DeFranco and Ms. Musso said
2  that any call by SSN to Dr. Krakauer after May of 2009 would be
3  contrary to DISH's instructions.  This is very important on
4  scope of authority.  DISH says, Don't do it.  SSN says, We
5  won't.  If, in fact, it happened, these witnesses said it would
6  be outside of authority and would be outside of what the
7  contract says.  Ladies and gentlemen, this is outside of the
8  scope.

9    Here are the five calls that I talked about, the 2 minutes
10  and 32 seconds:  July 2010 -- July/August four of them, and
11  then one in January 2011.  And that's -- that's the 2 minutes
12  and 32 seconds.  And what do we know about those calls?  Very
13  important.  One, DISH was never mentioned, I told you that
14  before, only DirecTV; that Dr. Krakauer never complained to
15  DISH or SSN that he received any calls after 2009 before filing
16  this lawsuit.  He had some story about in 2011 he was at a
17  deposition.  I'm not sure exactly what evidence that was, but
18  he never wrote a letter, sent an e-mail, filed a complaint, did
19  anything with DISH until this lawsuit got filed.

20    And he didn't keep any notes.  And I'm not saying he should
21  have kept any notes.  God, we all throw stuff out.  And who
22  hits delete when you get a thing on your answering machine?
23  Most people do.  But he said he didn't think it was important
24  and that's what the evidence was.  It wasn't important until
25  about three years later where I asked, "And you met with a

1  group of lawyers and then you're the plaintiff in a $25 million

2  case, but it wasn't important at the time."

3      So this is really a summary of the evidence on outside of

4  the scope of authority and I -- I know, folks, I've been

5  talking for a while and I know it can be -- I'm trying to keep

6  it interesting.  I can see and I appreciate your staying with

7  me, but this is real, real important.  This is what SSN told

8  DISH, that it would not call Dr. Krakauer; and what Plaintiff

9  is saying now is that they called Dr. Krakauer after DISH asked

10  them not to do it.

11      And we, again, are not really sure on the evidence because

12  only DirecTV was mentioned.  Was that a call for DISH?  We

13  don't know.  We don't know.  We don't know if those calls were

14  calls because Dr. Krakauer had some problems with his

15  equipment.  We don't know if SSN was trying to sell a home

16  theater or something.  We can't be sure.  But they've got to

17  have evidence about what happened and DISH wasn't even

18  mentioned.

19      But they say now that this happened, so let's say it did.

20  If it did, it's outside of the scope.  They told DISH they were

21  scrubbing their lists, were signed up with PossibleNOW.

22  They've got a scrub receipt and they're saying now they didn't

23  properly scrub it and we don't even know that because

24  Ms. Tehranchi actually said that they did do it.  The Five9

25  person wasn't even asked about it.  But we don't even know

1  that, but I think that's what they appear to be saying.  They

2  told DISH that they complied with the law; and if they did what

3  happened and what's alleged here, if they could prove it, they

4  didn't; and if all that happened, it would be outside of the

5  scope.  Again on my second step.

6      So what are the red herrings?  I put this up hopefully to

7  make things a little more interesting for us, but I kind of

8  like the red herring thing.  You all probably know what a red

9  herring is.  It's something that is intended to distract you

10  from what the case is about.

11      So what are some of the red herrings that you heard?  We

12  know in this case that Dr. Krakauer said on any of these

13  calls -- and I asked him pointblank, "Dr. Krakauer, nobody ever

14  told you on any of these calls that they were authorized by

15  DISH or that they were employed by DISH."  And he said, "That

16  is true."

17      So you heard this evidence about this script, remember the

18  evidence, Plaintiff's counsel, this script.  But that's not

19  what this case is about.  There's no evidence that somebody

20  called and said, "I'm DISH."  In fact, the evidence is the

21  exact opposite.  A draft script is sitting in SSN's file.  We

22  don't even know if anybody used it.  She said it was a test or

23  something.  But it's got nothing to do with this case because

24  in this case the evidence is that nobody ever said they were

25  employed by DISH or authorized by DISH.  So they're putting

1  before you a script that has nothing to do with what the case
2  is about.  That is a red herring designed to take you away from
3  what the evidence is.

4      Dialer records is something else that kind of was suggested
5  again that they didn't have some records.

6      But this document right here was the response to
7  Dr. Krakauer's complaint and it's a screenshot of the phone
8  calls that were made to him that was given to DISH.  And then
9  in Mr. Campbell's complaint, the one that took place a year
10  later, they're giving him all the call information.  And that's
11  what the evidence is.  They're responding and giving
12  information on the calls.  That one on the top is a little hard
13  to see.  You'll see it in the jury room, but you'll see it's a
14  screenshot of the actual call to Mr. Krakauer.

15      So that's a red herring about the call records, that
16  somehow they don't have some documents.  They've got all the
17  call records that they're trying to prove their case for and
18  that's what this case is about.  But that, again, is a red
19  herring.

20      This was a good example of a red herring when you saw
21  Mr. Novak's memo, the lawyer; and Plaintiff's counsel made a
22  big deal about it.  But it wasn't until a long time that it was
23  brought out that -- it was turned out to didn't involve SSN.
24  It was a retailer called United Satellite.  It was a little bit
25  of a red herring, but it came out through Mr. Ahmed.

1    And then you've got this of the order entry system and
2  there was all this questioning that DISH has an order entry
3  tool.  It's a computer system.  Ladies and gentlemen, if you
4  all get stuff on Amazon or stuff like that, you know you type
5  in your name, you give your information, and that's kind of how
6  people -- a lot of people do business.  It used to be you would
7  have an order form, filled out your name, filled out your
8  information, you faxed it, you mailed it.  The OE system, this
9  order entry system, is just like something that replaces that
10  order form process that is the way businesses used to work and
11  this is exactly what it says.  It's an easy way to place
12  customer orders for DISH equipment and services.  It's a way
13  that an order can be processed.

14    So the instruction is and the claim here was that DISH
15  acquiesced, DISH consented and was fine with all this
16  happening.  You would have to find here that DISH knew of prior
17  similar activities by SSN and consented or did not object.
18  Ladies and gentlemen, you saw the evidence.  DISH hears a
19  complaint.  They write back to them "don't do it."  They send
20  PossibleNOW.  "You've got to work with PossibleNOW."  There's
21  no consent here.

22    And did not object?  DISH did the opposite.  To the handful
23  of complaints over, like, five years, they write a letter
24  saying, "You can't do that.  Don't violate the law.  It's your
25  job.  Clean it up.  Get it right."  There's no evidence of

1   acquiescence and I made sure when all of our witnesses were
2   here to ask them that, did DISH ever acquiesce or agree to SSN
3   violating the law, and every one of these witnesses said no,
4   every single one.  And that was what the evidence was.

5       And it was up to them to bring Ms. Tehranchi into the
6   courtroom and say to you whether it was on that video "DISH
7   told me I could go ahead and violate the law," "DISH said it
8   was okay."  This isn't acquiescence.  Acquiescence means you
9   say, "Go ahead, yeah, do it.  We don't care."  But that's not
10  what the evidence is and that's not what common sense is and
11  you heard it from the founder to the lady who ran the
12  compliance team.

13      So that's acting in the course and scope, and those are the
14  two key questions.  They don't get over those hurdles, ladies
15  and gentlemen, and so you don't need to get to the question of
16  counting up these calls and figuring out if they met their
17  burden.  But if you do, it's my responsibility to talk about
18  it, but they don't get past those two steps.  They're not even
19  close to getting up those steps.

20      So let me talk for a moment -- and that's what the verdict
21  is on number one.  That's what we would ask you that you fill
22  out.  It will be up to you based on the evidence, but they
23  don't get up under either of those steps and they have to get
24  over both for Question 1 and they don't make it.  They don't
25  make it.

1    So now we're into the question of did they show a

2  telemarketing violation within the right period of time, did

3  they meet their burden of proof -- and, again, it's theirs to

4  show -- that all of these calls were made to residential

5  numbers.  And then there are other requirements.  This is the

6  first question and the answer is no, did they prove it.

7    And what was the evidence?  I know it was kind of tedious.

8  At least for me it's a tougher part of the case because it's

9  technical and it involves pretty complicated data, but it is

10  important here and they've got the burden of proof.  And I come

11  back to this because again, when you're asking for $25 million,

12  you'd better come in here with the proof.  You can't be

13  throwing stuff around and saying maybe it happened, it could

14  have, it would have because it's $500 a call that they're

15  talking about.  And it's pretty easy to figure out by reaching

16  out to somebody if they actually got a call rather than trying

17  to do all this data stuff, but they didn't do any of that and

18  this is the way they choose to prove it.

19    And their expert, I've got to say this, she was an

20  impressive person.  That story was really incredible.  I heard

21  that and it was an incredible story what Ms. Verkhovskaya had

22  gone through, but that's not what the case is about.  The case

23  is did she do her homework and did she do things in a careful

24  way to come into a court and try to get $25 million, and there

25  were mistakes that were made.

1    The first one is the Registry changes all the time.

2  Numbers are coming on and off, so you've got to check it when

3  the class starts and you've got to keep checking to see if the

4  numbers change.  They start only as April 1st.  The class was

5  May 11th and they look at the -- they don't even look at the

6  right date.  That was a problem and there was no reason for it.

7  It could have been done more carefully.  It would have taken

8  more time.

9    **THE COURT:**  You've got about five minutes left,

10  Mr. Bicks.

11    **MR. BICKS:**  Thank you, Your Honor.

12    And you learn that the telephone numbers were removed from

13  the Registry.  They're disconnected, reassigned, canceled.  All

14  of these things happen on the Registry.

15    There's all this issue about no reliable residential

16  evidence.  SSN's own dialer records show it called a lot of

17  businesses and no one knows where SSN got the numbers to call.

18  And the LexisNexis data, you heard all about that, how

19  unreliable it was.  And you heard Dr. Aron come in here and she

20  was experienced in this space.  This is her life, data, and she

21  talked to you about the unreliability of the approach and

22  that's their burden.  So the answer to this second question is

23  no.

24    And you remember Dr. Aron.  I don't have to go too much

25  through her stuff, but this was a summary of what she said.

1  And you all heard her background.  I don't need to repeat it.

2  But she said that there were some unwarranted assumptions and

3  some mistakes that were made, and a data scientist would have

4  done her homework a little bit differently.  She said, "Garbage

5  in, garbage out.  It was for me an easy way to get it.  If you

6  don't put in the right data, you don't get the right results."

7  And there were problems with the call records and the

8  LexisNexis data, and she missed -- as she pointed out,

9  Dr. Verkhovskaya -- Ms. Verkhovskaya missed an important step

10 because she didn't really validate the data.  She didn't

11 validate the input.

12     And then you heard from Mr. Fenili, who told us that

13 70 percent of the numbers on the Registry -- you remember all

14 the skirmishing about PossibleNOW -- that 70 percent of the

15 numbers on that Registry were not identifiable as residential.

16 It's a list that's got a lot of stuff on there that's not even

17 residential.

18     And you heard from Ms. Verkhovskaya when Ms. Echtman

19 examined her.  And the Court will tell you if your testimony

20 changes between when you have your deposition taken and your

21 trial testimony that you all can consider that.  So you heard

22 what happened here.  At her deposition she didn't consider that

23 residential column in the records, and when she came here, she

24 did.  She didn't consider the government column at her

25 deposition, and when she came here, she did.  And she didn't

1  consider the date ranges, and when she came here, she did.  And

2  you all can consider that and evaluate it.  And there were

3  others.  She was unfamiliar with the LexisNexis data at her

4  deposition and she was very knowledgeable on it when she was

5  here.  She didn't know what date fields mean when she had her

6  deposition shown to her, and when she came here, she did.  She

7  was unsure about the residential column then and here she

8  understood it.  That's what the evidence was.

9      The LexisNexis did not check the residential box.  And this

10 goes through some of the categories on the verdict sheet and

11 this is pretty important.  LexisNexis had information when they

12 would check the residential box and they didn't do it here

13 because they didn't have the information.  And when things are

14 called "unknown," ladies and gentlemen, they're unknown.  We

15 don't know them.  It can't be made up and it can't be guesswork

16 when you've got a burden.

17     And to all of these questions on the verdict sheet, here is

18 a situation where they were either looking at things before the

19 class period or other wrong times here and they didn't have the

20 right information on the residential box.  That's what it said

21 here.  Numbers are disconnected and they were looking at the

22 wrong time periods and they have to have the right information

23 for the relevant time periods.  And then they had inconsistent

24 information when it came to unknowns and LexisNexis data.  It

25 was inconsistent and you all heard that evidence.

1  And then not -- on the cell phones, not any evidence that

2  they were in the class and they were used for residential

3  purposes.  Again problems with the data sources.  You heard

4  Dr. Aron talk about that, garbage in, garbage out.  How could

5  LexisNexis know if there was a mistake?  They couldn't.

6          **THE COURT:**  So you need to wrap things up.

7          **MR. BICKS:**  I'm going to.  Thank you.

8  This is an interesting thing about Dr. Krakauer's own

9  application.  He got his home and work numbers mixed up.

10 They're the exact opposite when you look at it, exact opposite,

11 which goes to show you how careful you have to be and how

12 mistakes can be made.  The number he indicated here for daytime

13 would be his work, right?  Typically you think your daytime is

14 your work job.  It was his home number.

15 And so at the end I don't believe you get to the question

16 of the damages here.  It's 0 to 500.  I asked if this was a

17 case about money and he said, "If I get a couple of bucks out

18 of this case, that's fine for me.  It's not about money."  A

19 couple bucks is 40 cents a call, 5 calls, $2.40.  We believe

20 the answer should be zero and you can award zero.  But that was

21 his testimony.  It shouldn't ever be more than 40 cents, but we

22 believe it's zero.

23 So now it's my time to stop.  I just want to say one or two

24 things before I do.  I sit down now.  I don't have a chance to

25 respond.  Plaintiffs get to talk and I don't get to respond,

1  but you know that I would want to.  And if you get back in the
2  jury room and you hear something, I hope you'll say, I bet DISH
3  had a response to that, because I would.
4      And so I say to you not just thank you for your time -- and
5  I said that in the beginning and I am thankful for that, as is
6  our client -- but thank you for the oath that you took to
7  follow the law and listen to the evidence and treat us just
8  like Dr. Krakauer.  Even though we're a company, we're a
9  company of people.  I've enjoyed presenting this case and you
10 all have been so attentive and we all appreciate it.  So thank
11 you.  The case for us is in your good hands and we appreciate
12 it.  Thank you very much.
13     **THE COURT:**  All right.  Thank you, Mr. Bicks.
14     We'll take a -- just a short break again before we come
15 back and have the rebuttal argument and hopefully the
16 instructions.
17     Keep an open mind.  Don't talk about the case with each
18 other.  I'm going to send you back to the jury room.  Don't
19 leave the jury room.  And we'll get back to you 5, 10 minutes,
20 as quick as we can get back in the courtroom after a comfort
21 break.  The jury is excused.
22     If everyone will remain seated while they step out.
23     (The jury left the courtroom.)
24     **THE COURT:**  Anything before we take a short break?
25     **MR. GLASSER:**  No, ma'am.

1          **THE COURT:**  No.  Let's -- we'll all shoot for 5

2   minutes.  That may not quite be possible, but we'll take a

3   5-minute recess.

4      (A recess was taken from 11:54 a.m. until 12 p.m.; all

5   parties present.)

6          **THE COURT:**  Okay.  Is there anything we need to take

7   up before the jury comes back in?

8          **MR. GLASSER:**  No, ma'am.

9          **THE COURT:**  No?

10         **MR. BICKS:**  No.

11         **THE COURT:**  Officer, just be sure they're ready; and

12  if they are, you can bring them back in.  If they need another

13  minute or two, we'll of course wait on the jury.

14     We'll see just how long Mr. Glasser's argument is.

15         **MR. GLASSER:**  It won't be that long.

16         **THE COURT:**  Okay.  I'll make a final decision about

17  whether to go ahead and instruct them at that point or whether

18  to give them a short lunch break before I instruct them.  My --

19  you know, the heart is willing, but sometimes the stomach and

20  the seating apparatus --

21         **MR. GLASSER:**  How many pages are your instructions,

22  Your Honor?

23         **THE COURT:**  They're about 20.

24         **MR. GLASSER:**  So about 20 minutes?

25         **THE COURT:**  Yeah, maybe a hair longer.

1    **MR. GLASSER:** If you do instruct them, do they come

2  straight back to the jury room in your court or do you bring

3  them back to court and then send them to the jury room?

4         **THE COURT:** I'm sorry. Say again.

5         **MR. GLASSER:** After you instruct the jury and they

6  begin deliberation, do you typically just have them go straight

7  to the jury room or do you bring them back every time?

8         **THE COURT:** Yeah, I usually just let them go straight

9  to the jury room.

10        **MR. GLASSER:** So instructing them is great, right?

11        **THE COURT:** Yeah. I mean, I hope to instruct them

12 before we go to lunch, but I'm going to look at them and -- I'm

13 going to look at them and evaluate their attention spans.

14    (The jury entered the courtroom.)

15        **MR. GLASSER:** Ms. Sanders, I'm going to want to use

16 the ELMO for this. Thanks.

17        **THE COURT:** Okay. We've hit the afternoon barely, so

18 good afternoon. As I mentioned to you earlier, Mr. Glasser

19 gets a rebuttal argument since the Plaintiff has the burden of

20 proof. Everybody is seated.

21    Okay. The jury is with the Plaintiff.

22        **MR. GLASSER:** Okay. Ladies and gentlemen of the jury,

23 I was sitting there listening to Mr. Bicks and a book popped

24 into my head and I'm sure some of you have read it or seen the

25 movie. It's *1984.* It's written by George Orwell and it

1   basically describes a world where some of the things you say

2   are just not what they mean or they're just -- kind of the

3   whole world is a little off-kilter.

4       That book popped into my head when Mr. Bicks said, quote,

5   and I wrote it down, Dr. Krakauer had some story about a

6   deposition he gave in 2011.  Some story about a deposition he

7   gave in 2011.  When Dr. Krakauer was on the witness stand, they

8   put the transcript of the deposition up.  A DISH lawyer was

9   there.  It was September 2011.  But in our courtroom today,

10  it's "some story," we don't even know if Dr. Krakauer was even

11  there at his deposition.  That's -- I mean, it's like we're

12  passing through this prism where the world just goes (noise)

13  and just changes a little bit.  Some story that Dr. Krakauer

14  even attended his own deposition.

15      Here's the timeline he showed you in opening.  He said he

16  was going to prove that there were three years and three months

17  where they never heard from Dr. Krakauer.  This is from his

18  opening argument.  Now, the Court will instruct you in a minute

19  on the law, and she will tell you Dr. Krakauer and nobody on

20  the DNC, the Do Not Call List, had any duty whatsoever to call

21  and complain to DISH.  It was DISH's duty not to call them.

22  There's no duty on the part of the person who's protected by

23  the law.  When a thief comes into your house and takes your

24  jewelry, do you have a duty to call his mother?  It's

25  ridiculous.

1      But here are the facts.  This is what they showed you in

2  opening and it wasn't true.  They said first complaint by

3  Dr. Krakauer.  That I agree with.

4      Well, they left out the assurance of compliance right there

5  in June 2009.  That wasn't on any timeline they showed you in

6  this case.

7      They left out Exhibit 70, which was October 12th, 2009.

8  Why was DISH looking at Exhibit 70, that proposal by

9  PossibleNOW to actually have compliance October 12th, 2009?

10  Because in June 2009 they said they would monitor.

11      When he showed you the definitions from Exhibit 55, the

12  assurance of compliance, he didn't show you the definition of

13  "covered marketer."  When you get back in the jury room, please

14  read the definition of "covered marketer."  It says OE

15  retailers.  We know OE retailers.  There are 45 of them.  There

16  are not 3,500 of them.  He didn't even show you that

17  definition.

18      And then Dr. -- then Mr. Campbell gives his complaint about

19  the same thing, the Direct to DISH switcharoo campaign; and

20  then Dr. Krakauer gives testimony at a formal deposition

21  attended by their lawyer, Victor Rou.  None of that was on

22  their timeline, none of it.

23      The second Orwellian moment, this was wild, they said

24  basically we don't even know if there were Five9 calls.

25  Remember that?  Well, here's their opening from -- here's their

1  slide in opening.  They have the date of the call and the

2  number of seconds at the call.  Where did those records come

3  from if not Five9?  You can't have it both ways, DISH.  What do

4  you mean we don't know if there were phone calls?  Not one of

5  their expert witnesses said those numbers weren't connected,

6  not one; and they used the connection and the connection times

7  to argue about how small the damages ought to be in this case

8  or how little the penalty should be for violating this law.

9  You can't have it both ways.

10      They said, "We don't know if Dr. Krakauer was called."

11  Anya Verkhovskaya testified there were ten calls to

12  Dr. Krakauer in the call records and they put five of them that

13  were actually -- and five were connected, and they put those

14  five on their opening statement and talked about their length

15  to you.  How do we not know if those calls were made?  The

16  level of proof in this case is beyond a reasonable doubt.  Just

17  puffing up little, like, worries about this and that, that's

18  not fair.  We proved these calls.  We have the records.

19  Dr. Krakauer testified to them.  They said Dr. Krakauer doesn't

20  know if DISH called him.  Well, why did he call DISH to

21  complain?

22      Oh, this is important.  They said I don't have any evidence

23  for this $960 million.  Remember that?  They said no evidence.

24  Okay.  The Court will tell you you do not have to check your

25  common sense at the door.  This exhibit, Exhibit 89, look at

1  page 4 and page 14.  Page 14 says that in 2010 the OE retailer

2  signed up 1,000,052.  So we'll just call that 1 million.

3  That's at page 14.  Times $80, another $960 million in 2010.

4      So let me talk about circumstantial -- let me talk about

5  evidence.  So we have from the mouths of their witnesses they

6  get $80 a week -- a month.  Sorry.  And we have from here

7  exactly how many these OE covered marketers signed up.  It is

8  evidence -- you have the power as the jury to say, okay, common

9  sense, $80 times the number of sign-ups, that's the number.

10 That is evidence.

11     You know, it's so funny.  They say -- let me talk about

12 circumstantial evidence.  People want to denigrate

13 circumstantial evidence.  This is circumstantial evidence they

14 got a billion dollars.  What is circumstantial evidence?  Let's

15 say you're in your bed at night and you hear something outside

16 your window and it's the last week when there was snow on the

17 ground.  In the morning you go out and there's fingerprints on

18 your window and there's boots and there's some footprints

19 leading up to your window.  Okay.  You did not see the guy

20 peeking in your window.  You're pretty sure somebody peeked in

21 your window.  That's circumstantial evidence and it's just as

22 good -- the Court will tell you it's just as good as every

23 other kind of evidence.  It's commonsense evidence.

24     Mr. Bicks never ever explained to you why it was okay to

25 keep these guys dialing for dollars after they were sanctioned

1  by North Carolina and Florida.  He pointed to something in

2  there about they were supposed to turn in a plan.  Read

3  Exhibit 186.  The word "DirecTV" is not in there.  These

4  guys -- if you look at those e-mail that I talked about,

5  there's a book of, like, five e-mail that were forwarded along

6  to risk audit on January 30th, 2007.  If you read those e-mail,

7  you'll see at the time of these sanctions by these two states

8  these guys were selling both DISH and DirecTV.

9      I showed you a couple of slides that I thought were un -- a

10 little -- were interesting.  Here's a slide they showed you in

11 opening and I think they showed again in closing, but he

12 highlighted the stuff above.  That highlighting there is their

13 highlighting from opening.  He didn't say, "We have no records

14 of the consumer phone numbers since we are no longer with

15 Five9."  That's what we were talking about when they said they

16 didn't keep the records.  It's right there.  This is DX6.

17     He showed you this EchoStar Retailer Chat.  Remember I

18 asked Mr. DeFranco about this.  It was in '07.  I said, "Was

19 SSN even there?"

20     He said, "I don't know."

21     They showed you this DX2, this plan that you're supposed to

22 keep all your call records.  Not enforced.  You just saw the

23 e-mail.

24     There's no evidence in this case that any single OE

25 retailer was actually disciplined.  Where are the discipline

1  letters?  Where is the choking back of any one of those 45

2  national sales partners?  Where is that evidence?

3  He asked you why did we not sue SSN.  I'm going to tell

4  you, because it wouldn't matter.  It's a shell game.  It's a

5  defunct little four-person company.  It's irrelevant.  That's

6  like chewing on Godzilla's toe.  That's what that is.  It's

7  about as useful as those "Hey, be cautious out there" letters

8  that you can just turn into a paper airplane and fly off the

9  roof of DISH.

10  I was thinking about it when he was talking.  An employee

11  under the employment law would have more rights than SSN under

12  that contract.  Read that contract.  They can change everything

13  anytime for any reason no matter what they want.  An employee

14  at DISH has more rights than SSN under that contract.

15  They keep wanting to focus on this idea that they had 3,500

16  retailers.  They had 45 retailers bringing in a million

17  sign-ups a year.  Those were the telemarketers.  Those were the

18  only ones I care about in this trial.

19  Read Exhibit 22 and ask yourself is that holding out as

20  DISH or not.

21  Here's another one.  They did show this one just now in

22  closing and they did the same cropping.  They showed you this

23  part, but they cropped out this part that said:  "We do not

24  have a date for scrubbing this through" -- and if you finish

25  the sentence -- "PossibleNOW."  When you're in the jury room,

1  look at DX8.  You'll see it says that.  They're cropping out

2  the stuff they don't like.  It's a little bit of an Orwellian

3  universe.  We're going to pass through a prism of, like, an

4  alternative reality here.

5      The Court will tell you that even if an act is illegal, if

6  it's condoned, if it's not disciplined, if it's allowed, if it

7  continues, they're responsible.

8      The Five9 contract is in evidence.  You'll have it in the

9  jury room.  If you look at it, you'll see that Five9

10  specifically says, "We do not scrub.  We do not scrub.  That's

11  your responsibility."

12      Mr. Bicks said, "Oh, don't look at those e-mail from 2004,

13  2005, those injunctions, those sanctions they got in 2005,

14  because, okay, they used to have some issues, but now they

15  don't."  Well, they used to steal jewelry.  Now they steal

16  cars.  They used to break the law by automessaging and

17  autodialing.  Now they break it by another means.  You're on

18  notice.  Your eyes are wide open.

19      The judge will tell you, I may have mentioned this,

20  Dr. Krakauer, no person had a duty to complain, period.

21      The bedrock fact here is in this case one out of five calls

22  made by this shop were out of bounds.  These guys were not

23  running with chalk on their ankles down the sideline.  They

24  were out of bounds 20 percent of the time.

25      This is a Musso e-mail.  This is after the -- this is from

1  their opening again.  This is after the Campbell complaint.

2  It's DX16.  She doesn't say, "Stop calling."  She doesn't say,

3  "Scrub your list."  She doesn't say, "Go for retraining."  She

4  says, "We encourage you to be cautious."  Is this *Hill Street*

5  *Blues*?  You guys remember that?  "You boys be cautious out

6  there."

7       Now, let's talk about Anya Verkhovskaya for a second.  Anya

8  said we have an obligation to say were they on the list 30

9  days.  The reason she looked at April 1st is the class starts

10 May 11th.  So if they're on April 1st, they're definitely on

11 more than 30 days by the time you get to April -- May 11th.

12 And then she said, "The report I asked for, if they had been

13 removed, they would be kicked out of that report."  So we

14 covered that issue.  That was a red herring.

15      DISH has not pointed to a single number not on the DNC.  We

16 gave them all the numbers.  We gave them all the lists.  Show

17 me one number in this case not on the Do Not Call Registry.

18      You saw Anya's testimony.  I think she was fair with them.

19 I think she was fair with them.  She pulled out everything

20 there was an argument about and then we pulled out more.  So

21 the argument about whether or not these are residential is a

22 footprints-in-the-snow discussion.  The LexisNexis augments the

23 other evidence we have in the case.

24      The evidence in the case is it was a Direct to DISH

25 campaign.  Guys like Krakauer, maybe even Campbell, that used

1  to be signed up for DirecTV they were trying to switch to DISH.

2  So who was the focus of the calls?  That's the residential

3  issue.  Who did they get paid to call?  Residences.  They don't

4  get paid to call businesses.  And when I walked you through how

5  the funnel worked, I showed you all the different places the

6  businesses went out.

7      So, yes, Anya was not trying to include residences.  She

8  was trying to exclude businesses and government because that's

9  the Venn diagram.  If they're not business and government,

10 they're residential.  The question is is it more likely than

11 not that these numbers are residential.  The Court will tell

12 you this is not a name-by-name, person-by-person determination.

13     Okay.  That's it.  Appreciate all your time and effort in

14 the case.  I know you'll do the right thing back there.  Thanks

15 a lot.

16     **THE COURT:**  Okay.  Ladies and gentlemen, I just want

17 to check in with you about your energy levels here.  My

18 instructions to you will take somewhere between 20 and 30

19 minutes, okay.  I can send you to lunch now and we can come

20 back and I can do that.  If everybody is good, we'll proceed

21 now.  Everybody is good.  Everybody -- you all are nodding at

22 me.  Okay.  Anybody need to stand up where you are?  Okay.  If

23 you do -- all right.  We're good.

24     Now, you have heard the evidence and it will soon be your

25 duty to find the facts of this case and to apply the law that I

1  am about to give you to those facts.  Once I have instructed

2  you on the law, you will go to the jury room and select your

3  foreperson.  We'll probably go to lunch then, but when we come

4  back, you will start your deliberations very soon thereafter.

5  You will have the duty to decide at least one, and perhaps as

6  many as three, issues with some subissues on Question 2 that

7  you may need to answer, all arising out of telemarketing phone

8  calls allegedly made by SSN.

9      You must make your decision only on the basis of the

10 testimony and other evidence presented here in this courtroom

11 during the trial; and you are not to be influenced in any way

12 by bias, sympathy or prejudice for or against any of the

13 parties, or by anything that you have heard or read outside the

14 courtroom.

15     You must follow the law as I explain it to you, whether you

16 agree with it or not, and you must follow all of my

17 instructions as a whole.  You should not single out or

18 disregard any of the Court's instructions on the law.  If I do

19 not specifically define a word or a term, then you should apply

20 the ordinary, everyday meanings of those words.

21     Now, in a civil lawsuit, the person who makes the claim

22 bears the burden of proving those claims by a preponderance of

23 the evidence.  This means that the plaintiff who brings a

24 lawsuit, here Dr. Krakauer on behalf of the class, has the

25 burden of proving each essential element of his claim and the

1  claims of the class by a preponderance of the evidence.

2       To prove something by a preponderance of the evidence means

3  that you prove the facts supporting the claim are more likely

4  than not.  A preponderance of the evidence refers to the

5  persuasiveness of the evidence, not to the number of witnesses

6  who testified or the number of documents or other exhibits

7  presented.  In other words, a preponderance of the evidence

8  means such evidence that, when compared to the evidence opposed

9  to it, has more convincing force, and produces in your minds

10 the belief that what is sought to be proved is more likely true

11 than not.  This standard does not require proof to an absolute

12 certainty.  That's seldom possible in any case.  If you find

13 the scales tip, however slightly, in favor of Dr. Krakauer and

14 the class, then you should find in their favor.  If, however,

15 Dr. Krakauer fails to establish any essential part of his claim

16 by a preponderance of the evidence, then you should find

17 against him and against the class and in favor of DISH.

18      From time to time I may say "the greater weight of the

19 evidence."  That's the same thing as "the preponderance of the

20 evidence."

21      You may remember some of my instructions from the beginning

22 of the case.  If anything you remember from those instructions

23 is different from what I'm telling you now, go by my

24 instructions that I'm giving you now after all the evidence.  I

25 think they're the same, but if you heard anything differently,

 1  go by what I'm telling you now.  They're much more detailed and
 2  we've heard all the evidence now.

 3      Now, as you will remember, the Do Not Call Registry was
 4  created by the federal government to give consumers a choice
 5  about whether to receive telemarketing calls at home.  It
 6  allows a consumer to register a telephone number on the
 7  National Do Not Call Registry to avoid receiving telemarketing
 8  calls.

 9      Federal law provides that no person or entity shall
10  initiate any telephone solicitation to a residential telephone
11  subscriber who has registered his or her number on the National
12  Do Not Call Registry.  Such Do Not Call registrations must be
13  honored indefinitely, or until the telephone number is canceled
14  by the consumer or removed by the government database
15  administrator.  Wireless customers are protected too, so long
16  as the cell phone is primarily used for residential and not
17  business purposes.

18      Now, under the law, a person whose residential number is on
19  the National Do Not Call Registry and who receives at least two
20  telephone calls within any 12-month period by or on behalf of
21  the same entity may bring an action to recover and receive up
22  to $500 for each violation.  Dr. Krakauer contends that he and
23  each class member had their residential numbers on the National
24  Do Not Call Registry, that he and the class members each
25  received at least two calls within a 12-month period from SSN,

and that SSN was acting on behalf of DISH when it made these
calls.  DISH contends that the Plaintiff's evidence is
insufficient to prove that the class members were on the
Registry at the relevant time and/or to prove that the numbers
were residential.  DISH also contends that SSN was not its
agent and not acting in the course and scope of any agency.

Basically, the Plaintiff must prove by a preponderance of
the evidence that he and the class members each received at
least two telephone solicitations in any 12-month period, that
the numbers called were residential numbers, that the calls
were made by or on behalf of DISH Network, and that the calls
were made when the telephone numbers had been on the Registry
for over 30 days.

You will decide the issues in this case by answering the
questions on the verdict sheet, which you have in front of you
and which we will go over now.  You must answer Issue One about
agency and then, depending on your answer to that issue, there
are other questions you may need to answer.

So let's start with Issue One.  Was SSN acting as DISH's
agent when it made the telephone calls at issue from May 11th,
2010, through August 1st, 2011?

It is undisputed in this case that DISH itself did not make
the telephone calls at issue.  SSN did.  In order for DISH to
be liable for any TCPA violations committed by SSN, the
Plaintiff must prove two things by the greater weight of the

1  evidence:  First, that SSN was DISH's agent; and second, that
2  SSN was acting in the course and scope of that agency when it
3  made the phone calls at issue, which were made from May 11,
4  2010, to August 1st, 2011.

5      Now, when an agent acts on behalf of its principal and
6  within the scope of its authority, then the principal is
7  responsible for the act.  If Dr. Krakauer proves to you by the
8  greater weight of the evidence that SSN was acting on behalf of
9  DISH in connection with its telemarketing, that is, that SSN
10  was DISH's agent and was acting in the course and scope of that
11  agency, then you would answer this issue "yes."  If
12  Dr. Krakauer fails to so prove both of those things, then you
13  would answer this issue "no."

14      Now, an agent is a person or company empowered by another
15  person or company to act on its behalf.  The person granting
16  the authority to the agent to act on its behalf is called the
17  "principal."  This should sound familiar from the beginning of
18  the case.  In deciding whether SSN was DISH's agent and acted
19  within the scope of that agency in connection with the
20  telemarketing at issue in this case, you may consider direct
21  evidence and circumstantial evidence.

22      Now, actual authority exists where the principal has
23  expressly or impliedly authorized the agent to act on the
24  principal's behalf as to a particular matter.  Authority may be
25  expressly granted by the principal by word of mouth, or by

writing, or it may be implied from the circumstances, such as

when the principal's reasonably interpreted words or conduct

would cause an agent to believe that the principal consents to

having an act done on its behalf.  This could arise from

conduct of the principal amounting to consent or acquiescence.

An agent acts with actual authority when, at the time of the

action, the agent reasonably believes, based on the principal's

words or conduct, that the principal wishes the agent to so

act.

In order for agency to exist, the principal must have the

power to direct and control the agent's actions.  It is not

necessary that the power actually be exercised.

In determining whether SSN was DISH's agent in connection

with its telemarketing activities, you should consider all the

evidence.  This includes the contracts between SSN and DISH, as

well as other writings between the parties and other conduct

and statements by DISH and SSN.  The parties' characterization

of their relationship as one of independent contractor is not

binding or controlling, though you may consider it, along with

other evidence in the contract and elsewhere, as to whether

DISH and SSN agreed or reasonably understood that DISH had the

power to control and direct SSN's telemarketing activities.

Now, a principal is not bound by the act of an agent unless

that act falls within the scope of actual authority granted by

the principal to the agent.  In order to determine the scope of

1  the agent's authority, it is necessary to look again at the
2  conduct and statements of the principal.  An agent may not
3  extend its authority by its own conduct standing alone.

4      Now, the act of the agent is treated in law as the act of
5  the principal and for that reason an agent is expected to act
6  for the benefit of the principal.  Generally speaking, actions
7  taken against the principal's interest are not within the scope
8  of the agent's authority.  The agent's determination that an
9  action is in the principal's interest must be reasonable and
10 based on its reasonable understanding of the principal's
11 interests, as expressed by the principal.  If the principal
12 consents or acquiesces in the conduct, even if the conduct or
13 act is illegal, then the agent may reasonably conclude that the
14 conduct is in the principal's best interests.  To decide that
15 the principal acquiesced or consented, you must find that the
16 principal knew of prior similar activities by the agent and
17 consented to them or did not object to them.

18     So written limits on SSN's authority are relevant, but they
19 are not necessarily conclusive or binding.  You need to
20 evaluate those written limits, as well as DISH's actions and
21 inactions, its conduct, and its other writings and statements
22 to decide whether DISH's conduct was consistent with written
23 limits and whether SSN reasonably understood it was authorized
24 to act differently than the written limits stated.

25     So in determining whether SSN acted within the course and

1   scope of its authority, just as with the question of whether

2   agency existed, you'll need to examine and consider the written

3   documents and agreements between the parties, as well as other

4   statements and actions by DISH and SSN and prior dealings

5   between the parties.  In other words, you should consider all

6   of the evidence, direct and circumstantial, in evaluating

7   whether SSN acted within the course and scope of any agency

8   relationship it had with DISH.

9       So as to Issue One, if you find by the greater weight of

10  the evidence that SSN was DISH's agent for purposes of

11  telemarketing and that SSN acted within the course and scope of

12  that agency when making the telephone calls to the class

13  members, then you would answer this issue "yes," in favor of

14  DISH.  Excuse me.  I said that backwards.  Then you would

15  answer the issue "yes," in favor of Dr. Krakauer and the class.

16  If you do not so find or are unable to say as to either or both

17  of these elements, then you would answer the issue "no," in

18  favor of DISH.  So since I misspoke there, let me just be sure

19  I'm clear.  If you answer it "yes," that's in favor of

20  Dr. Krakauer.  If you answer it "no," that's in favor of DISH.

21  The Plaintiff, Dr. Krakauer, has the burden of proof to prove

22  those two things and he has to prove those things before you

23  can answer "yes."  All right.

24      Now, if you answer "no," you do not need to answer Issues

25  Two or Three.  You would date and sign the verdict sheet, the

 1  foreperson would, on the next page and let us know you've

 2  reached a verdict.  I'll talk about the logistics of that at

 3  the end.  If, however, you do answer "yes," then you need to

 4  move on to Issue Two and answer it.

 5      So Issue Two is:  Did SSN make and class members receive at

 6  least two telephone solicitations to a residential number in

 7  any 12-month period by or on behalf of DISH, when their

 8  telephone numbers were listed on the National Do Not Call

 9  Registry?  And, again, we're talking about the calls between

10  May 11, 2010, and August 2011.

11      As I mentioned, this second issue concerns whether the

12  Plaintiff has proven that the class members were on the

13  registry, whether they were residential at the time of the

14  calls, and that at least two calls were made during that

15  12-month period.

16      On this issue, the burden of proof is on Dr. Krakauer to

17  prove by a preponderance of the evidence four things:  One,

18  that the telephone numbers of the class members were listed on

19  the National Do Not Call Registry at the time of the call; two,

20  that after the number had been listed for at least 30 days, SSN

21  called the number at least twice during any 12-month period

22  with a telephone solicitation on behalf of DISH; three, that

23  the calls were received; and four, that the numbers were

24  residential at the time of the call.

25      So before I again go over these elements with you, let me

1  mention two things that Dr. Krakauer does not have to prove.

2  First, you have heard some evidence that SSN told DISH it

3  thought it had an established business relationship with

4  Dr. Krakauer and others who had bought DirecTV through SSN in

5  the past.  This evidence was admitted to show the course of

6  conduct between DISH and SSN, and in connection with DISH's

7  contention that it believed SSN was complying with the law and

8  acting within the scope of the written agreement between SSN

9  and DISH.  However, this case does not concern the Established

10 Business Relationship defense, and there has been no showing

11 that in fact Dr. Krakauer or any class member had an

12 established business relationship with SSN or DISH during the

13 class period and no showing that any such relationship meant

14 that the telephone solicitation calls at issue were allowed by

15 law.  In other words, there is no Established Business

16 Relationship defense to the calls at issue in this case, and

17 you should not consider the evidence about SSN's statements to

18 DISH about established business relationship as a reason, by

19 itself, to rule against Dr. Krakauer or the class.  You should

20 only consider that evidence as you evaluate the agency issue,

21 the first issue that we already talked about.  Dr. Krakauer

22 does not have to prove that the class members did not have

23 relationships with DISH.

24     Now, second, you've heard some evidence about whether names

25 and addresses match up in the data used in this case.  There is

1  no issue for you to decide in connection with names and

2  addresses or with the identities of class members.  That is

3  something that may be decided down the road in future

4  proceedings not involving you.  Your job is to decide whether

5  the telephone numbers called were residential numbers on the

6  DNC list at the time of the call and if so, whether SSN made at

7  least two solicitation calls to those numbers.  You may

8  consider the evidence about names and addresses in evaluating

9  the reliability of the data underlying the Plaintiff's

10  evidence, but you should not consider it for any reason other

11  than that.  Dr. Krakauer does not have to prove here whether

12  names or addresses match up with phone numbers.

13      Okay.  Now, turning to the things that Dr. Krakauer does

14  have to prove -- that the telephone numbers were on the Do Not

15  Call Registry; that after they've been there 30 days, SSN

16  called the number at least twice during the 12-month period

17  with a telephone solicitation on behalf of DISH; that the calls

18  were received; and the numbers were residential -- let me give

19  you these instructions and definitions.

20      Once a person places a phone number on the Do Not Call

21  Registry, it remains there indefinitely.  It does not expire

22  and it does not have to be removed.  It remains until the

23  registration is canceled by the customer or removed for some

24  reason by the Registry database administrator.  It is not

25  necessary for anyone on the Do Not Call Registry to complain to

1  the telemarketer or anyone else in order to be protected and
2  covered by the TCPA.  Registration is all that is required.
3  Dr. Krakauer does not have to prove that he or anyone
4  complained to DISH.

5      As to the timing, Dr. Krakauer must prove that after the
6  number had been listed for at least 30 days SSN called the
7  number at least twice during any 12-month period.  And all of
8  those words just have their ordinary meaning.

9      The calls must have been telephone solicitations, which
10 means a telephone call or message for the purpose of
11 encouraging the purchase of goods or services, such as
12 satellite television products.

13     A call is received if the telephone call goes through and
14 is connected so that the phone rings or the call is otherwise
15 capable of being answered.  A call can be received in any
16 number of ways.  Certainly if the call is answered by a person
17 or picked up by an answering machine, the call is received.  A
18 call is also received if the ringing phone is heard by a person
19 or if a person receives any other indication that there's a
20 phone call available to be answered, such as a beep on call
21 waiting or visual notification from a caller ID service, for
22 example, even if the person does not actually answer the call.
23 In other words, it is not necessary that the call be answered
24 by a live human being or by an answering machine.  And it is
25 not necessary that the call be of any particular duration.  It

 1  is not necessary that a conversation occur between the caller

 2  and the recipient.

 3      Now, this section of the TCPA does not prohibit calls to

 4  business or government numbers, only to residential numbers on

 5  the Registry.  In determining whether a number is a residential

 6  number, you should just consider the ordinary English meaning

 7  of that phrase.  For example, if the number is for a landline

 8  associated with a home, whether that's an apartment, a

 9  condominium or any other kind of dwelling place, or if it is a

10  cell phone primarily used for personal calls the way you'd use

11  a residential landline, then it would be a residential number.

12  The fact that a number may be used for some business calls, as

13  well as personal purposes, does not necessarily mean it is not

14  residential, so long as the phone associated with the number is

15  primarily used as a residential number.

16      So if you find by the greater weight of the evidence that

17  the telephone numbers of Dr. Krakauer and the class members

18  were listed on the National Do Not Call Registry at the time of

19  the call; that after the number had been listed for at least 30

20  days, SSN called the number at least twice during any 12-month

21  period with a telephone solicitation on behalf of DISH; third,

22  that the calls were received; and that the numbers were

23  residential at the time of the calls, then you would answer

24  this second issue "yes," as to Dr. Krakauer and all the class

25  members, and check the first box there under Issue Two.  If you

1  do not so find or are unable to say, then you'd check the third

2  box on page 2, "no."

3      Now, if you find that some categories of phone numbers as

4  to which -- let me start over.  If you find that there are some

5  categories of phone numbers as to which Dr. Krakauer has proven

6  all of the elements but there are others where he has failed to

7  prove that the numbers are residential, then you'll need to

8  check that middle box, "Yes as to Dr. Krakauer and all the

9  class members except."  And then all the subissues, you would

10  check that box if that is your finding.  If he has proven the

11  number is residential for a particular category, then do not

12  check that subbox.  Any class members in those subcategories

13  that you check will not receive the award of any money damages.

14      Now, you will recall that the parties have entered into

15  some stipulations about the number of calls that enter into

16  those categories and you're to accept those stipulations as

17  proven as they are stated.  You have seen and heard these

18  stipulations throughout the trial a few times, but let me read

19  them to you now in full.  You will have this in writing in

20  front of you back in the jury room.

21      The telephone numbers included within the category

22  described as "Telephone numbers that LexisNexis always

23  identifies as unknown" are reflected on an attached

24  Exhibit 31D, showing 5,258 telephone numbers and 14,815

25  telephone calls.

1    The telephone numbers included within the category

2  described as "Telephone numbers that LexisNexis identifies as

3  residential before May 1st, 2010, or after August 1st, 2011,"

4  are reflected on the attached Exhibit 31A, showing 5,118

5  telephone numbers and 14,519 telephone calls.

6    The telephone numbers included within the category

7  described as "Telephone numbers that LexisNexis identifies as

8  unknown in the May 2010 to August 2011 time period that the

9  calls were made but identifies differently at other times" are

10 reflected on Exhibit 31K, showing 276 telephone numbers and 792

11 calls.

12   The telephone numbers included within the category

13 described as "Telephone numbers that LexisNexis identifies as

14 both residential and unknown" are reflected on Exhibit 31X,

15 showing 1,770 telephone numbers and 5,031 calls.

16   The telephone numbers included within the category

17 described as "Telephone numbers that LexisNexis always

18 identifies as residential, including in the May 2010 to

19 August 2011 time period that the calls were made" are reflected

20 on Exhibit 31U, showing 5,801 telephone numbers and 16,491

21 calls.

22   The telephone numbers included within the category

23 described as "Telephone numbers that LexisNexis identifies as

24 cellular and possibly cellular" are reflected on Exhibit 31L,

25 showing 3,005 telephone numbers and 8,326 calls.

1    So those are the stipulations.

2    I will point out to you that there is a good bit of overlap

3  between these categories, so some of the telephone calls fall

4  within more than one category.  That's why if you add them up

5  they are more than the totals here.

6    Now, if you find that Dr. Krakauer has proved his case as

7  to some but not all class members, you would check that second

8  box, and then check the boxes beside each category as to which

9  Dr. Krakauer has not proven the number is residential.  If he

10  has proven the number is residential for a particular category,

11  don't check that category box.

12    If you answer this second issue "yes," in whole or in

13  part -- so if you check the first box "yes" or if you check

14  "yes except" -- then you do need to answer the third issue,

15  which is the damages issue.  If you answer the second issue

16  "no," then you skip the third issue.

17    The third issue:  What amount, up to $500, do you award for

18  each call made in violation of the TCPA, Telephone Consumer

19  Protection Act?

20    The Act provides that up to $500 can be awarded for each

21  call made in violation of the Act.  You can award any amount

22  from $0 up to $500 per call.  The overall purpose of the Act is

23  to prevent unwanted telephone calls to those on the Do Not Call

24  Registry and to reduce the invasion of privacy these calls

25  cause.  In determining the appropriate amount, you can consider

1  the severity or minimal nature of the violation, as you decide

2  in light of the total number of unlawful calls made, the

3  duration of those calls and in total -- individually and in

4  total, and the nature of the privacy invasion that results from

5  the unlawful calls generally.  You can and should also consider

6  the need to punish companies that violate the Act, and the need

7  to deter future violations, as well as any other relevant

8  circumstances.  Dr. Krakauer is not required to prove that he

9  or the class members suffered monetary loss as a result of the

10 violations, though as I stated you can consider the nature of

11 the injury suffered in determining an appropriate award, along

12 with the other things I told you to consider.

13     There will be additional proceedings in the case which

14 won't involve you, where the Court and parties will involve

15 (sic) any individual issues, such as the names and addresses,

16 as I mentioned, so -- and that's also why I'm not asking you to

17 determine the total amount of damages.  You're just deciding

18 each call that violates, what's that amount.

19     If you reach this issue, you should write the amount you

20 find, by the greater weight of the evidence, to be an

21 appropriate sum for each class member to receive for each call

22 that violates the Act.  So those are the issues.

23     In reaching your verdict on these issues, you must consider

24 only the evidence in the case.  The term "evidence" includes

25 the sworn testimony of the witnesses, the exhibits admitted,

1   and the stipulations.  Remember that anything the lawyers said

2   is not evidence.  A question to a witness is not evidence.  It

3   is the witness's answer that is the evidence in the case.  Your

4   own recollection and interpretation of the evidence is

5   controlling and if I have excluded any evidence or instructed

6   you to disregard any evidence, then you should follow that

7   instruction and not consider it.

8       Also, nothing that I have said is evidence.  You should

9   take what I say about the law and follow it, but you are the

10  sole judges of the facts.  The law, as indeed it should,

11  requires the presiding judge to be impartial.  You should not

12  draw any inference from any ruling I have made, expression on

13  my face, inflection in my voice, or anything I have said or

14  done that I have any opinion about what your verdict should be.

15  It is your exclusive province to find the facts of this case

16  and to render a verdict reflecting the truth as you find it.

17  From time to time during the trial, I may have fussed at a

18  lawyer or encouraged somebody to move along.  That's just

19  housekeeping, okay.  All of that stuff, that doesn't reflect

20  any opinion about what your verdict should be and you should

21  not consider it for that.

22      In considering the evidence, you should apply your reason

23  and common sense.  You may consider the direct evidence and the

24  circumstantial evidence.  "Direct evidence" is the testimony of

25  one who asserts actual knowledge of a fact, such as an

eyewitness.  "Circumstantial evidence" is proof of a chain of

facts and circumstances indicating that a fact has or has not

been proved.  The law makes no distinction between the weight

you give to direct and circumstantial evidence.  Both can be

important and either can be sufficient as a basis for your

decision.

Now, in saying that you must consider all of the evidence,

this does not mean that you must accept all of the evidence as

true or accurate.  You have to decide whether you believe each

witness's testimony and how much importance to give that

testimony.  In making those decisions, you may believe or

disbelieve any witness in whole or in part.  And as I mentioned

earlier, the number of witnesses testifying concerning any

particular matter is not controlling.

Now, in deciding whether to believe a witness, I suggest

that you ask yourself a few questions:  Did the witness impress

you as someone who was telling the truth?  Did the witness have

any particular reason not to tell the truth?  Did the witness

have a personal interest in the outcome of the case?  Did the

witness seem to have a good memory?  Did the witness have the

opportunity and ability to observe accurately the things he

testified about?  Did the witness appear to understand the

questions clearly and answer them directly?  And did the

witness's testimony differ from the testimony of other

witnesses?  You know, evaluate what the witness says, but you

1  also look at his or her demeanor as they appeared in front of

2  you.

3      In this case, you have heard from witnesses who testified

4  as expert witnesses.  The law permits expert testimony if it

5  concerns scientific, technical, or other specialized knowledge

6  that will help you understand or resolve a fact at issue.

7  Experts are allowed to give opinions about these matters.  You

8  should evaluate their testimony just as you do the testimony of

9  other witnesses, with additional consideration given to the

10 expert's education and experience and the basis and reason for

11 the expert's opinions.

12     You should consider the opinions of these expert witnesses,

13 but you are not bound by them.  It is up to you to decide

14 whether to accept those opinions and how much weight to give

15 those opinions, considering the witness's education and

16 experience, the basis and reasons given for the opinions, and

17 all the other evidence in the case, along with the usual

18 demeanor, consistency, things that you would evaluate about any

19 witness.

20     You heard some witnesses -- some testimony from witnesses

21 who testified by deposition.  These witnesses were questioned

22 under oath and you should consider their testimony as if they

23 had been present in the courtroom, to the extent that you can.

24     You also heard some of the witnesses who appeared in front

25 of you live had their depositions taken before trial.  If in

 1  that deposition you find that the witness gave testimony
 2  different from the witness's testimony in court and if you
 3  think those differences are material, you can consider those
 4  contradictions in evaluating the witness's credibility.

 5      If you decide you believe a witness, it is still up to you
 6  to decide how important that testimony is.  Some testimony may
 7  be credible, but not important.  Other -- so you just have to
 8  evaluate that yourself.  As I mentioned, you should not simply
 9  count up the number of witnesses.  You must weigh the evidence.

10      In addition to the testimony, you have -- you will have
11  before you the exhibits admitted into evidence.  You may
12  consider them as well.  They are neither more important nor
13  less important than the testimony just because they are in
14  writing.  Each piece of evidence should be evaluated, and if
15  you find it is trustworthy and credible, it is up to you to
16  decide how important it is.  I will be sending the exhibits in
17  to the jury room for your use during your deliberations, but as
18  I say, that doesn't make them more important than the
19  testimony.  I encourage you not to get bogged down in the
20  minutia of every single exhibit.  Use them as you find helpful
21  and relevant in your decision-making.  Certainly read whatever
22  you want.  I'm not trying to discourage you from reading them,
23  but you need to evaluate that.

24      Finally, there are stipulations.  I read them to you and
25  you should consider those as proven since the parties have

agreed to those facts.

You've heard some evidence that complaints were made to DISH about SSN. Much of the evidence about complaints is admitted on the issue of agency, and you may consider that evidence in evaluating whether DISH's response to those complaints showed that SSN was or was not DISH's agent and, if it was, whether SSN acted or did not act within the scope of that agency. Otherwise, as I mentioned during the trial, an out-of-court statement is not admissible for the truth of that statement, so if someone complained outside of court and claimed that SSN made phone calls that violated the telemarketing laws, that out-of-court statement is not admissible to prove that SSN did in fact violate the telemarketing laws. If, however, DISH employees made statements in which they admitted the accuracy or truth of the complaint, then you may consider that admission as proof that SSN made telephone calls that were complained of and that they violated the Act.

In some of the exhibits and some of the testimony, folks have made statements about their understanding of the law. Some of these statements may be about the TCPA, some may be about agency. You know, you'll take your instructions on the law from me. You may, however, consider those statements as to what the person understood the law to be as providing context or explanations for other statements, acts, or admissions by

1 the person.

2     Your deliberations are to be based only on the evidence.

3 Do not look anything up online or in dictionaries.  If you have

4 questions about the meanings of any of the words I have used in

5 my instructions, please ask me.  As I say, words are used in

6 their ordinary English meaning, unless I have given you a

7 specific definition.  If you aren't clear, let me know rather

8 than conducting an independent investigation.

9     I remind you that not everything on the Internet and in the

10 news media is true, and it is not fair to the parties to

11 consider information which was not presented in the courtroom

12 because the parties have not had a chance to test that

13 information for truthfulness and accuracy and they've not had a

14 chance to point out any problems with that information for your

15 consideration.

16     While you are deliberating, should there be any breaks or

17 recesses, don't talk about the case during those breaks and

18 continue to avoid contact with the lawyers, parties or

19 witnesses.  Don't read anything about the case or communicate

20 about the matter in any way with anyone other than the ten of

21 you in the jury room while you are deliberating.

22     You should treat the parties the same without regard to

23 whether they are individuals or businesses, and all parties are

24 entitled to equal justice and fairness.

25     Any verdict you reach must be unanimous.  In other words,

1  to return a verdict, you must all ten agree.

2      During your deliberations, don't talk with anyone other

3  than your fellow jurors and, I repeat, because it's really

4  important, don't look anything up online.  Don't talk or

5  communicate about it with anyone else or conduct any

6  independent investigation.

7      Now, it's 10 minutes till 1:00.  I'm going to let you go in

8  to the jury room and do two things:  One, select a foreperson

9  to lead you in your deliberations.  That person presides over

10  deliberations and will speak for you in court and will sign the

11  verdict sheet.  All right.  Two, I want you to talk about how

12  long you want your lunch recess to be.  All right.  This is

13  going to be your first exercise in decision-making together.

14  You know, normally I give an hour and fifteen minutes.  That's

15  in large part because we have work to do, but we're all done,

16  okay.  So if you all want a 30-minute break, an hour, whatever.

17  I'm going -- you all go back there.  Let me know.  And then

18  I'll bring you back into the courtroom.  You all can tell me

19  what you want to do about lunch and that's what we'll do.

20      When we come back from lunch, you'll go straight in to the

21  jury room.  The clerk will give you the original verdict sheet

22  and all the exhibits.  Take your notes with you when you go in

23  a second.  And then you start your deliberations.

24      When you reach a unanimous verdict, your foreperson fills

25  in the appropriate places, checks the appropriate boxes as you

1   unanimously agree, dates, and signs it.  Today is the 18th of

2   January.  Then you will notify the security officer that you

3   have a note.  If you -- knock on the door, is that what they

4   do?

5            **THE CLERK:**  Yes.

6            **THE COURT:**  Yes.  And don't tell the security officer

7   or Ms. Sanders or anybody what your verdict is.  Just say,

8   "We've reached a verdict."  I'll get you back into the

9   courtroom and you'll tell me what your verdict is.

10      If you have a question or you need to communicate with me

11  about anything, you write your question down.  You tell the

12  security officer, "I've got a note for the judge."  Don't tell

13  them what the question is.  Ms. Sanders will come get the note.

14  She'll give it to me.  I'll talk to the lawyers.  I'll see if I

15  can help you.

16      Don't tell me about any numerical division.  You know, if

17  you've voted on it and you're -- don't tell me that you're

18  eight-two, six-six.  Don't tell me that.  Well, you wouldn't be

19  six-six because there aren't twelve of you.  Six-four,

20  five-five.  Don't tell me that.

21      You'll take your notes with you, but you will remember that

22  the notes of one juror are not evidence and they are not more

23  important than the memory of another juror.

24      Discuss it only in the jury room and only when all ten of

25  you are present.  So when you come back from lunch and you are

1 gathering, don't talk about it until all ten of you are there.

2     At any time during your deliberations if you want to take a

3 break, I'll be glad to let you do that, but don't just leave.

4 Send a note in:  We want to take a 10-minute recess, 20-minute

5 recess, whatever you want.  We'll handle it that way.

6     We'll be glad to let you all stay late tonight if you need

7 that or you just tell me whenever you're ready to go home for

8 the day.  If you want to come back tomorrow, if that's where we

9 are, just let me know.  I'll check in with you about five

10 o'clock if I haven't heard from you.

11     All right.  Thank you for your patience and service.

12 Please retire to the jury room, select your foreperson, and

13 talk about lunch; and I'll bring you back in in a minute.

14     Yes, sir.

15         **JUROR FOUR:**  I'm sorry.  Can I ask you again to go

16 over the part about agency?  Is that possible?

17         **THE COURT:**  Yes, and I will be glad to do that.  In

18 view of attention spans, do you want me to do it now or do you

19 want me to do it after lunch?

20         **JUROR TWO:**  Can you just give us a copy of what you

21 said or no, you have to articulate it?

22         **THE COURT:**  If during your deliberations you need a

23 copy of it, you ask me for it.  Okay.  How about this.  You all

24 go back and pick your foreperson and decide about lunch; and

25 when you come back, before you go to lunch, I'll just run over

1 | the agency instructions again.

2 |     All right.  You may retire and select your foreperson, talk

3 | about lunch.  I'll bring you back in in just a moment.

4 |     (The jury left the courtroom.)

5 |         **THE COURT:**  You need not repeat your objections from

6 | yesterday to the instructions if you objected yesterday.

7 | That's -- that's for the record.

8 |     But are there additional objections, corrections or

9 | additions to the charge as given for the Plaintiff?

10 |         **MR. GLASSER:**  No, ma'am.

11 |         **THE COURT:**  No.  What about the Defendant?

12 |         **MR. BICKS:**  No, Your Honor.

13 |         **THE COURT:**  No.  Okay.  I'm going to give them a

14 | moment; and since they have specifically asked and there was

15 | more than just Mr. Richter who appeared to be interested in

16 | hearing those agency instructions again, I'll just read those

17 | again on Issue One.  It's not that long, though I did a very

18 | bad job of estimating how long it would take me to give those

19 | instructions.  I'm sorry about that.

20 |         **MR. BICKS:**  May I ask a question?

21 |         **THE COURT:**  Yes.

22 |         **MR. BICKS:**  Where would you prefer that we be once the

23 | deliberations start?  In other words, should we be -- should

24 | one of us be here or how would -- what's the best way for us

25 | to communicate?  We're all at the Marriott.

```
 1              THE COURT:  Oh, I don't want you to leave the
 2  courthouse.
 3              MR. BICKS:  Okay.
 4              THE COURT:  Yeah, you don't have to stay necessarily
 5  in the courtroom, but I would ask you to be -- somebody needs
 6  to be accessible.  I think -- don't you all each have a room
 7  here in the courthouse?
 8              MR. BICKS:  Yeah.
 9              THE COURT:  Somebody -- I would assume that one on
10  each side would be in the courtroom or in that space so that
11  Ms. Sanders can find you promptly.  But, yeah, please don't
12  leave.  I don't like to make the jury wait for 30 minutes while
13  you all come back from offices or hotels.
14              MR. BICKS:  Thank you.
15              THE COURT:  Yeah.
16              MR. GLASSER:  Your Honor, away from --
17              THE COURT:  Here they are.  They are ready.  Bring
18  them back in.
19      (The jury returned to the courtroom.)
20              THE COURT:  That didn't take long.  That's a good
21  sign.  All right.  Who is your foreperson?
22              FOREPERSON OF THE JURY:  I am, Your Honor.
23              THE COURT:  Okay.  That's Mr. Martin.
24              FOREPERSON OF THE JURY:  No, Jackson.
25              THE COURT:  Jackson.  You're Ms. Martin.  I'm so
```

1  sorry.  Mr. Jackson.  You all moved a seat and I apologize.

2      Mr. Jackson, how long do you all want to take for lunch?

3          **FOREPERSON OF THE JURY:**  One hour.

4          **THE COURT:**  One hour.  All right.  Fine.

5      Now, I've been asked to go over the instructions on agency

6  again.  Let me do that for you here before you go to lunch.

7      When an agent acts on behalf of its principal and within

8  the scope of its authority, then the principal is responsible

9  for the act.  If Dr. Krakauer proves to you by the greater

10 weight of the evidence that SSN was acting on behalf of DISH in

11 connection with its telemarketing, that is, that SSN was DISH's

12 agent and was acting in the course and scope of that agency,

13 then you would answer the issue "yes."  And if Dr. Krakauer

14 fails to so prove both of those things, you would answer "no."

15     An agent is a person or company empowered by another person

16 or company to act on its behalf.  The person granting the

17 authority to the agent to act on its behalf is called the

18 "principal."  In deciding whether SSN was DISH's agent and

19 acted within the scope of that agency in connection with the

20 telemarketing at issue in this case, you may consider direct

21 and circumstantial evidence.

22     Actual authority exists where the principal has expressly

23 or impliedly authorized the agent to act on the principal's

24 behalf as to a particular matter.  Authority may be expressly

25 granted by the principal by word of mouth, or by writing, or it

may be implied from the circumstances, such as when the

principal's reasonably interpreted words or conduct would cause

an agent to believe that the principal consents to have an act

done on its behalf.  This could arise from conduct of the

principal amounting to consent or acquiescence.  An agent acts

with actual authority when, at the time of the action, the

agent reasonably believes, based on the principal's words or

conduct, that the principal wishes the agent to so act.

In order for agency to exist, the principal must have the

power to direct and control the agent's actions, but it is not

necessary that that power be exercised.

In determining whether SSN was DISH's agent in connection

with its telemarketing activities, you should consider all of

the evidence.  This includes the contracts between SSN and

DISH, as well as other writings between the parties and other

conduct and statements by DISH and SSN.  The parties'

characterization of their relationship as one of independent

contractor is not binding or controlling, though you may

consider it, along with other evidence in the contracts and

elsewhere, as to whether DISH and SSN agreed or reasonably

understood that DISH had the power to control and direct SSN's

telemarketing activities.

A principal is not bound by the act of an agent unless that

act falls within the scope of actual authority granted by the

principal to the agent.  In order to determine the scope of an

1   agent's authority, you should look at the conduct and
2   statements of the principal.  An agent may not extend his
3   authority by his own conduct standing alone.

4        The act of the agent is treated in law as the act of the
5   principal and for that reason an agent is expected to act for
6   the benefit of the principal.  Generally speaking, actions
7   taken against the principal's interest are not within the scope
8   of the agent's authority.  The agent's determination that an
9   action is in the principal's interest must be reasonable and
10  based on a reasonable understanding of the principal's
11  interests, as expressed by the principal.  If the principal
12  consents or acquiesces in the conduct, even if the conduct or
13  act is illegal, then the agent may reasonably conclude that the
14  conduct is in the principal's interests.  To decide that the
15  principal acquiesced or consented, you must find that the
16  principal knew of prior similar activities by the agent and
17  consented or did not object.

18       Written limits on SSN's authority are relevant, but, again,
19  not necessarily conclusive or binding.  You will need to
20  evaluate those written limits as well as DISH's actions and
21  inactions, its conduct, and its other writings and statements
22  to decide whether DISH's conduct was consistent with any
23  written limits and whether SSN reasonably understood it was
24  authorized to act differently than the written limits imposed.
25       So in determining whether SSN acted within the course and

scope of its authority, just as with the question of whether
agency existed, you'll need to examine and consider the written
documents and agreements, as well as other statements and
actions by the parties and their prior dealings. In other
words, consider all of the evidence, direct and circumstantial,
in evaluating whether SSN acted within the course and scope of
any agency relationship it had with DISH.

So on Issue One, if you find by the greater weight of the
evidence that SSN was DISH's agent for purposes of
telemarketing and that SSN acted within the course and scope of
that agency when making the telephone calls to the class
members, you would answer "yes," in favor of Dr. Krakauer and
the class. If you do not so find or are unable to say as to
either or both of these elements, you would answer the issue
"no," in favor of DISH.

All right. So my instructions are on here. I'm reading
them off the computer. They're not necessarily all that
pretty. I'll work on getting them pretty for you; and if you
do need them in writing, you know, just ask. I'll be glad to
accommodate you. You can ask on a particular topic or all of
them. It might take me a little longer to get all of them
prettied up for you, but I know it's a lot of information. If
you don't need them -- or you can always come back in and ask
me to just give them to you again here in court. Just send a
note in, like I said.

1    So I want you to take everything with you out of the
2  courtroom, your notes and such, because you will not be coming
3  in after lunch.  All right.  It's five after 1:00.  So I want
4  you to come back five after 2:00.  You'll go into the jury
5  room.  When all of you are there, let Ms. Sanders know.  She'll
6  give you the original verdict sheet and the exhibits, and at
7  that point you'll start your deliberations, okay.  You're
8  excused for a one hour lunch break.  Thank you for your
9  service.

10    (The jury left the courtroom at 1:05 p.m.)

11    **THE COURT:**  Okay.  Over the lunch break, Ms. Sanders
12  will be getting the exhibits together, so I would ask you all
13  to please be back about 10 minutes early so you can go over --
14  look at those exhibits with her and be sure all of that is
15  organized and arranged.  We will resume in here at five after
16  2:00 to send the original verdict sheet and the exhibits back,
17  but I want you all back beforehand to go over the exhibits with
18  her.  All right.

19    I would ask also that you proofread the instructions that
20  we sent you last night.  I will delete that one sentence.  If
21  you saw any typos -- a couple places I said "his" when I was
22  referring, I can't remember, to DISH or SSN.  I'll try to
23  change that to "its."  I believe I changed it when I was
24  instructing.  That's the only thing that I saw.  But if I
25  missed a typo or anything, I'll be glad to hear from you all

1  after lunch.  I'm guessing from looking at them that they'll
2  want the written instructions, okay.
3     Anything else we need to handle?
4        **MR. GLASSER:**  Your Honor, just because I'm not sure if
5  we'll be back together, can I be excused from court tomorrow?
6  I have plenty of lawyers to leave.
7        **THE COURT:**  As long as somebody is here to speak for
8  the Plaintiff or the Defendant.  You know, I would appreciate
9  it if it was somebody who has been asking questions.
10       **MR. GLASSER:**  Yeah, it will be John.
11       **THE COURT:**  All right.
12       **MR. GLASSER:**  Thank you.
13       **THE COURT:**  And the same is true for any DISH lawyer
14  who needs to leave or wants to wait elsewhere.
15    Anything else?
16       **MR. BICKS:**  No, Your Honor.
17       **THE COURT:**  I just want to say to all the lawyers in
18  the case I appreciate a well-tried case.  I like trials.  I
19  like juries, and you all have done a really good job trying
20  this case and giving the jury the evidence that they need, so I
21  just want to thank you as well.
22       **MR. GLASSER:**  Your Honor, I'd like to say too that our
23  colleagues from DISH were great to work with in this case and I
24  appreciate their professionalism.  It's been really fun doing
25  the case with them.  It's rare these days.

         1          **THE COURT:**  Yeah, you all have gotten along pretty

         2    well.  It's been pretty impressive.

         3       All right.  We will be in recess until five minutes after

         4    2:00.

         5       (A noon recess was taken from 1:07 p.m. until 2:05 p.m.;

         6    all parties present.)

         7          **THE COURT:**  It's 2:05.  Ms. Sanders, were all the

         8    jurors back?

         9          **THE CLERK:**  He was going to check.

        10          **THE COURT:**  All right.  And you have all the exhibits

        11    ready?

        12          **THE CLERK:**  Yes.

        13          **THE COURT:**  And the lawyers conversed with you about

        14    that?

        15          **THE CLERK:**  Yes, ma'am.

        16          **THE COURT:**  And here is the original verdict sheet.

        17    As soon as we confirm the jurors are back and ready, we will

        18    send that back in.

        19       Over the lunch break I skimmed back through the

        20    instructions.  I corrected "his" to "its."  There was one

        21    place.  Mr. McLean is going to proofread it one more time and

        22    then print out a copy for you.  Did anybody see any typos that

        23    I needed to fix?  I'm sort of anticipating they'll ask, so that

        24    way we'll have it and we can already have looked through it

        25    just to be sure it's the same as we've been working from all

1 the way along.

2 **COURT SECURITY OFFICER:** One is still downstairs.

3 **THE COURT:** One is still downstairs. Okay. We'll
4 just pause for a second.

5 **MR. GLASSER:** While we're on the record, can the
6 record reflect we've returned the Court's adopter?

7 **THE COURT:** Somebody would have come after you. Yes.
8 Off the record.

9 (Discussion off the record.)

10 **THE COURT:** Okay. The record will reflect then that
11 all ten jurors are present, and I will instruct the clerk to
12 hand in the original verdict sheet and all the exhibits, and we
13 will be at ease. All right. Thank you.

14 (Ms. Sanders left the courtroom to handed the verdict sheet
15 and exhibits to the jury and subsequently returned.)

16 **THE CLERK:** Judge, they are asking to use the flip
17 chart.

18 **THE COURT:** Yeah, you can tear off the pages and take
19 it to them.

20 Officer, would you just flip through and make sure there
21 isn't something written on the other pages? I don't think
22 there should be. Okay. It's good.

23 (Flip chart taken to the jurors.)

24 (Court was at ease awaiting the jury's verdict beginning at
25 2:10 p.m.)

1    (The Court returned to the bench at 2:45 p.m.; all parties
2  present.)

3    **THE COURT:**  All right.  The jury sent in a note, which
4  I believe the clerk has shown to counsel.

5    Can you hand it to me, Ms. Sanders, the note?

6    **THE CLERK:**  Oh, I'm sorry.  It's up here.

7    **THE COURT:**  Oh, here it is.  I'm sorry.  It says:
8  "Dear Judge Eagles, may we please have a hard copy of your
9  instructions concerning agency?  Thank you.  Foreperson."

10    So I separated that out and printed it out.  I would
11  propose to give you all copies just for you to do a final
12  proofread on it.

13    And in the meantime, if I can bring them back in and say,
14  "Okay.  I'm going to send that in to you.  It will just take us
15  a few minutes while we do a final proofread."  Or if you -- if
16  it's okay with you, Ms. Sanders can just go back there and tell
17  them, "She's working on it.  You'll have it shortly."

18    **MR. BICKS:**  Yeah, I would tell them so they know.

19    **THE COURT:**  Say again.

20    **MR. BICKS:**  I would tell them.

21    **THE COURT:**  Yes, that's -- is it --

22    **MR. GLASSER:**  The Plaintiff is perfectly fine with
23  Ms. Sanders going back and telling them.  We do suggest, Your
24  Honor, you just send the entire instructions back.

25    **THE COURT:**  All right.  Well, they just asked for

1 agency.

2      Is it all right with the Defendant if Ms. Sanders tells

3 them or do you want me to bring them in court?

4           **MR. BICKS:**  No, that's fine if Ms. Sanders tells them.

5           **THE COURT:**  Why don't you give them the agency

6 instructions right now and we'll go -- we were working on

7 getting the entire thing -- I was just having Mr. McLean do a

8 final proofread.

9      You tell them.

10      So Ms. Sanders is going to tell them we're working on that

11 and they'll get them in a little bit.

12      (Copies of agency instructions handed to counsel.)

13      (Ms. Sanders left the courtroom and subsequently returned

14 courtroom.)

15           **THE COURT:**  I'll let you all proofread that.  When

16 you're done, tell Ms. Sanders and I'll come back in here; and

17 if there's anything that needs to be fixed, you can let me

18 know.  We're not talking about substance now.  We're just

19 making sure I don't have anything different from what we talked

20 about earlier.

21      And in the meantime, I will have Mr. McLean continue to

22 finish his proofreading of the entire document so that if they

23 end up needing it they can ask for it.  I'm not sure they'll

24 need the rest of it.  There was, relatively speaking, little

25 time spent on the rest of the issues in closing so -- but, you

1    know, they may want it.  So if they do, certainly I'll give
2    them to them.
3        All right.  We'll be at ease.  Just tell Marlene --
4    Ms. Sanders when you're done proofreading.
5        (Court was at ease.)
6        (The Court returned to the bench at 2:54 p.m.; all parties
7    present.)
8            **THE COURT:**  Anything needed to be corrected on the
9    draft I handed to you all?
10           **MR. BARRETT:**  No, Your Honor.
11           **MR. BICKS:**  No, Your Honor.
12           **THE COURT:**  All right.  I'll hand one copy to the
13   clerk marked Court Exhibit 3 just in case the jury writes on
14   the one I hand in to them.  So that will be Court Exhibit 3,
15   which the clerk will keep for the record, and then I'll give
16   her another copy which she can hand in to the jury.
17       Anything else we need to do?
18           **MR. BICKS:**  No, Your Honor.
19           **THE COURT:**  No.  All right.  We'll be at ease.
20       (Document handed to the jury by Ms. Saunders.)
21       (Court was at ease at ease awaiting the jury's verdict at
22   2:55 p.m.)
23       (The Court returned to the bench at 3:50 p.m.; all parties
24   present.)
25           **THE COURT:**  All right.  The jury just says:  May we

have a break until 4 p.m.?  So I'm just going to bring them in,
remind them not to talk about the case during the break and
give them the recess.

     All right.  Everybody ready?

          **MR. BICKS:**  Yes.

          **THE COURT:**  All right.  Bring them in.  Tell them, if
you will, officer, leave everything in the jury room, all their
papers.

          **MR. GLASSER:**  You ought to give them a little longer
than eight minutes.

          **THE COURT:**  Yeah, I'll give them a couple more
minutes, though they just sent the note in a minute ago.  So
they apparently don't want a very long break.

     (The jury entered the courtroom.)

          **THE COURT:**  All right.  Good afternoon.  I have you
all's note asking for a break.  That's great.  I'm glad to give
you a recess.

     I just brought you back into the courtroom to remind you
that all of your discussions and deliberations are to take
place in the jury room and only when all ten of you are
present.  So as you take your break, if you walk down the hall
with one other juror, don't talk about the case; and, of
course, you should continue to avoid any contact with the
lawyers, parties or witnesses during the recess.  Leave all of
your material in the jury room.

1    When you come back from your break, wait until all ten of
2  you are present to resume your deliberations.  I'm not going to
3  bring you back in the courtroom before you resume.

4    And then I'll check -- if you all have not reached a
5  verdict or told me otherwise about scheduling -- you know, at
6  this point I'm kind of with you all on the schedule.  I'll
7  check back in with you a little bit after five o'clock to see
8  what you want to do about scheduling.

9    All right.  You all want a 10-minute recess?

10       **FOREPERSON OF THE JURY:**  Yes.

11       **THE COURT:**  Ten-minute recess.  The jurors are
12 excused.

13    If everyone else will remain seated.

14    (The jury left for a recess at 3:54 p.m.)

15       **THE COURT:**  All right.  If I could just ask you all --
16 you know, here we are at the end.  We don't want any problems
17 during the recess.  If you all just stay out of the hall.
18 Either be in your space or stay in the courtroom so that we
19 just don't run any risk of any problems.

20    Anything else we need to do?

21       **MR. GLASSER:**  No, ma'am.

22       **THE COURT:**  The -- the clerk will just check in with
23 the jury in about 10 minutes and as soon as she -- she'll
24 confirm they're all there.  She'll just note on the record
25 they've resumed deliberations without us coming back into

1    session, if that's all right with everybody.

2         **MR. GLASSER:**  That's fine with the Plaintiffs.

3         **MR. BICKS:**  Yes.

4         **THE COURT:**  All right.  That's how we'll do it then.

5    And you all are at complete ease for 10 minutes and then I need

6    you to be available should the jury need us.

7         We'll take a 10-minute recess.

8         (An afternoon recess was taken from 3:55 p.m. until

9    4:05 p.m.)

10        (Court was at ease awaiting the jury's verdict.)

11        (The Court returned to the bench at 5:05 p.m.; all parties

12   present.)

13        **THE COURT:**  Okay.  So it's 10 after 5:00.  I can do --

14   I can inquire of the jury a couple of different ways.  I can

15   bring them in and say, "Do you all want to keep going for a

16   while or you want to stop or what do you want to do?"  I can

17   ask Ms. Sanders to stick her head in and say, you know, "You

18   all want to keep going for a little while?"

19        Anybody have a preference?

20        **MR. BARRETT:**  I think that's fine, Your Honor, for

21   Ms. Sanders to check on them.

22        **THE COURT:**  Is that all right?

23        **MR. BICKS:**  Yes.

24        **THE COURT:**  I mean, if they start to have a

25   conversation with you, Ms. Sanders, we'll bring them in, but if

1  they just say -- if they just give you an answer, you know,

2  that's fine.  All right.  We'll just sit here while you go

3  inquire.

4      (Ms. Sanders left the courtroom.)

5      **THE COURT:**  We should be able to hear them maybe if

6  she leaves the door open, but she's shutting it so --

7      (Pause in the proceedings.)

8      (Ms. Sanders returned to the courtroom.)

9      (Discussion between the Court and Ms. Sanders.)

10     **THE COURT:**  The jury apparently tells Ms. Sanders they

11  would like 30 more minutes.  So I'm -- well, I think we're all

12  prepared to stay for 30 more minutes.  So unless anybody has

13  anything else, we'll be at ease until about 5:40.  At which

14  point I'll check in with you all, unless they've reached a

15  verdict by then.

16     All right.  We'll be at ease.

17     (Court was at ease awaiting the jury's verdict.)

18     (The Court returned to the bench at 5:28 p.m.; all parties

19  present.)

20     **THE COURT:**  All right.  The jury has sent in this

21  note:  "Dear Judge, we would like a break for the evening.  We

22  would like your full directions to us.  Can we start at 9 a.m.

23  tomorrow?"

24     So I will take this to mean they want my instructions in

25  writing, all of the written instructions.  I'll confirm that

1  with them when I bring them in.  I have no problem starting at
2  9:00.

3      Is that okay with everybody?  Anybody have any problems?
4  No.

5      All right.  So I will propose to bring them in, confirm
6  that I understand what they're saying, that they want the
7  instructions in writing.

8      Did anybody have any corrections to the draft I gave you
9  all earlier?

10             **MR. GLASSER:**  No, ma'am.

11             **THE COURT:**  No.  No.  So I'll just print out a copy
12  for them to have in the morning and I'll let them go until nine
13  o'clock.

14      Okay.  You can bring the jury in.  Tell them to leave
15  everything in the jury room.

16      I'm just going to stand up for no -- no meaningful reason,
17  other than I'm a little tired, as I'm sure you all are.

18      (The jury entered the courtroom at 5:30 p.m.)

19             **THE COURT:**  Like I'm sure you all are, I'm a little
20  tired of sitting, so I'm just standing.

21      I have your note asking to stop for the day and to come
22  back tomorrow morning at 9:00.  That's great.  We'll be glad to
23  start at nine o'clock.  I'll ask you to leave all of your
24  notes, all of the exhibits -- do you take the exhibits,
25  Ms. Sanders, over the evening?

1      **THE CLERK:**  No, I leave them.

2      **THE COURT:**  Leave everything in there, leave the

3   verdict sheet in there, leave all your copies of the verdict

4   sheet, just leave everything in there over the evening recess;

5   and we'll start back tomorrow morning at 9:00.

6      When you come back at 9:00, I won't bring you back into the

7   courtroom.  You'll just gather in the jury room.  And when all

8   ten of you are there, let Ms. Sanders know, "We're all here and

9   we're starting," and you all can proceed.

10      Over the evening recess, do not talk about the case among

11  yourselves in small groups as you walk to and from your cars.

12  Don't have any contact with the lawyers, parties or witnesses,

13  no independent investigation, no communicating about the case

14  with anyone and no blogging, tweeting, et cetera.

15      I also see that you want -- you say you would like my full

16  directions, so I take it you mean you want a complete set of

17  all my instructions on the case, right?  Everybody is nodding

18  yes.  I'll have that ready for you in the morning at nine

19  o'clock; and when you tell Ms. Sanders that all ten of you are

20  here, she'll give you a copy of it.  I hope that will assist

21  you in your deliberations.

22      Everybody good?  All right.  Thank you for your service.

23  You're excused.  We'll see you tomorrow morning.

24      (The jury left the courtroom.)

25      **THE COURT:**  When I asked if everybody was good, they

1  all nodded and smiled, which I took to mean I had responded to

2  their inquiries and they didn't have anything else they needed

3  from me at the moment.

4      How about you all?  Nothing?  Everybody is good?  Okay.

5  You are excused then and I'll just ask at least one lawyer for

6  each side to be back at nine o'clock in the morning and we will

7  await the jury's verdict so --

8          **MR. BICKS:**  Your Honor, can I just -- can I see the

9  note?

10          **THE COURT:**  Sure.  It actually looks like one of the

11  other jurors wrote it, not the foreperson.  Mr. Richter.

12      (Note handed to Mr. Bicks by Ms. Sanders.)

13          **THE COURT:**  Okay.  You all are welcome to see the

14  note.  I'd read it to you.

15          **MR. GLASSER:**  That's fine, Judge.  We're good on the

16  note.

17          **MR. BICKS:**  Great.  Thank you.

18          **THE COURT:**  Anything else before we break for the

19  evening?

20          **MR. BICKS:**  No.

21          **THE COURT:**  I hope you all have a relaxing evening.

22      And, Mr. Glasser, you're leaving?

23          **MR. GLASSER:**  Yes, ma'am.  I really appreciate your

24  hospitality.

25          **THE COURT:**  Yes.  Nice working with you.

1    Court is adjourned until 9:30.  Excuse me.  Nine o'clock in

2  the morning.

3    (Proceedings concluded at 5:33 p.m.)

4

5

6                **C E R T I F I C A T E**

7    I, LORI RUSSELL, RMR, CRR, United States District Court
   Reporter for the Middle District of North Carolina, DO HEREBY
8  CERTIFY:

9    That the foregoing is a true and correct transcript of the
   proceedings had in the within-entitled action; that I reported
10  the same in stenotype to the best of my ability and thereafter
   reduced same to typewriting through the use of Computer-Aided
11  Transcription.

12

13  *Lori Russell*

14  Lori Russell, RMR, CRR        Date:  1/25/17
   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25