IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

THOMAS H. KRAKAUER,
on behalf of a class of persons,

    Plaintiff,

                             Civil Action No. 1:14-cv-00333-CCE-JEP

v.

DISH NETWORK, L.L.C.,

    Defendant.

**PLAINTIFF'S CLOSING ARGUMENT REGARDING AN ENHANCED AWARD
FOR WILLFUL AND KNOWING VIOLATIONS OF THE TCPA**

Evidence at trial showed that DISH devised a corporate shell-game to reap the benefits of telemarketing – millions of new subscribers – while shedding the attendant risk of widespread violations of federal telemarketing law, all by relying on toothless, pro forma "compliance" efforts and artfully drafted agency disclaimers. A unanimous ten-person jury repudiated DISH's scheme, and awarded $400 per violation. The same evidence that supported the jury's finding supports this Court's enhancement of the per-violation award to $1200.

Whether the determinative conduct is SSN's or DISH's, the trial evidence satisfies the "low threshold" for assessing whether the TCPA violations were willful or knowing. Willful or knowing conduct does not require bad intent, but only intent to commit the act that caused the violation, and there can be no question that SSN intended to place telemarketing calls. Even if a heightened standard applied, SSN knew it was not

scrubbing its calling lists against the Do-Not-Call Registry, and knew that its failure to do so resulted in calls to people on the Registry, including Dr. Krakauer. DISH too had this knowledge.

But DISH raised its willful or knowing conduct to another level: it knew OE retailers like SSN were breaking the law, and knew that it had the power to monitor and control the violations, but — out of economic self-interest — chose not to do so, even when the cost of compliance was negligible in relation to the business it expected the retailers to generate.

Judged by any standard, the TCPA violations committed here were willful or knowing, and warrant enhancement of the jury's award from $400 to $1200. The overarching purposes of the statute – compensation, punishment for bad conduct, and the deterrence of future violations – all justify the increased award. DISH, and corporations like it, must know that telemarketing laws are important, and demand the sort of serious compliance ethic that DISH has failed to display here.

*Standard for Enhancement*

An enhanced award is justified if the Court finds that violations of the Do Not Call provisions were committed willfully *or* knowingly. 47 U.S.C. § 227(c)(5). This provision sets a "a low threshold." *Charvat v. Ryan*, 879 N.E.2d 765, 771 (Ohio 2007). According to the Federal Communications Commission – the agency statutorily charged with interpreting and enforcing the TCPA – the willful or knowing standard does not require proof of intent to violate the law, but only requires proof that the violator "knew

2

that he was doing the act in question." *In the Matter of Dynasty Mortg.*, L.L.C., 22 F.C.C. Rcd. 9453, 9473 n.86 (2007).[1]

*SSN's conduct determines whether trebling is appropriate*

Because the jury found Dish vicariously liable for the TCPA violations of its agent, SSN, the question before the Court is whether SSN, not Dish, committed a willful or knowing violation of the TCPA. *See, e.g., In re Crawford*, 388 B.R. 506, 522 (Bankr. S.D.N.Y. 2008) (holding that when principal is held vicariously liable for acts of its agent, willful conduct of the agent is imputed to principal).

On this issue, as evidenced by the testimony of Sophie Tehranchi, Tanya Maslennikov, David Hill, Reji Musso, and Anya Verkhovskaya, Plaintiff has demonstrated by a preponderance of the evidence that SSN's violations were willful or knowing. SSN knew it was placing each of the calls at issue; its conduct was not inadvertent or unintentional. This satisfies the low burden under the statute.

---

[1] *See also Bridgeview Health Care Ctr. Ltd. v. Clark*, No. 09 C 5601, 2013 WL 1154206, at *7 (N.D. Ill. Mar. 19, 2013) (a finding of willful or knowing conduct under Section 227(c)(5) simply requires that the act be intentional or volitional, as opposed to inadvertent, and not that defendant must have known that the conduct would violate the statute); *Stewart v. Regent Asset Mgmt. Solutions, Inc.*, 2011 WL 1766018, at *6–7 (N.D. Ga. May 4, 2011) (a knowing violation requires proof "that the defendant knew that it acted or failed to act in a manner that violated the statute, not that the defendant knew that the conduct that the conduct itself constituted a violation of the law"), *adopted by* 2011 U.S. Dist. LEXIS 58600 (N.D. Ga. May 31, 2011); *Sengenberger v. Credit Control Services, Inc.*, 2010 WL 1791270, at *6 (N.D. Ill. May 5, 2010); *Charvat,* 879 N.E.2d at 770–71 (Ohio 2007).

Although he need not do so, Plaintiff can also satisfy the more stringent test of willfulness applicable in the criminal context. The Fourth Circuit has held that while "a single, or even a few, inadvertent" violations of the law may not constitute willfulness, it may be established through proof of continued errors "in the face of repeated warnings . . . [and] explanations of the severity of the failures[,]" which can show that the defendant "simply does not care" about complying with the law. *United States v. Blankenship*, --- F.3d ---, 2017 WL 218868, *6-7 (4th Cir. Jan. 19, 2017) (quoting *RSM, Inc. v. Herbert,* 466 F.3d 319, 322 (4th Cir. 2006)).

Here, SSN continued to violate do not call laws despite (1) the 2005 North Carolina consent judgment, which expressly prohibited SSN from calling North Carolinians on the Do Not Call Registry such as Dr. Krakauer; (2) the Florida judgment also prohibiting calls to numbers on the Registry; and (3) numerous consumer complaints and even individual lawsuits from 2006 forward. Even after acknowledging that it failed to scrub its calling lists against the DNC Registry when it called Dr. Krakauer in May 2009, SSN called Dr. Krakauer ten more times over the next two-and-a-half years. And what happened to Dr. Krakauer was neither an aberration nor a lesson learned: in April 2010, just days before the class period commenced, SSN admitted that it was *still* not scrubbing its outbound calling lists.

These facts, together with the jury's finding that SSN also placed more than 51,000 additional calls to numbers on the Do-Not-Call Registry from May 2010 to August 2011, establish by a preponderance of the evidence that SSN simply did not care

4

about compliance with the TCPA, even though it could easily scrub its lists to remove registered numbers.

*If DISH's conduct is the relevant consideration, trebling is also warranted*

Even if DISH's conduct were the determining factor, trebling would be warranted. DISH knew for years that SSN was a telemarketing scofflaw, but embraced SSN as an exclusive DISH retailer in 2005, even though SSN had just been investigated and fined by North Carolina and Florida for Do-Not-Call violations.

DISH also embraced SSN even though DISH knew SSN continued to engage in illegal telemarketing, and knew the ramifications of continuing to have SSN telemarket for DISH. In 2005, a Dish attorney admitted that "we know that SSN is using autodialers and automessages," which were prohibited by the TCPA, and a Dish executive acknowledged that Dish had "addressed this with [SSN] many times." (PX 194.) In the same email chain, Dish's attorney reminded Dish that SSN had "been warned time and time again (by me, by you, by the region, by phone, in writing, in person)" that SSN's telemarketing practices could violate the law, and noted that "several state AG's know he's doing it as well." (*Id*.) The attorney further warned that while "[i]n the past, we have successfully resisted the argument that we are responsible for the conduct of independent retailers, SSN is a problem because we know what he is doing and have cautioned him to stop. There is risk in continuing to give warnings without follow-through action." (*Id*.)

Nonetheless, DISH continued to allow SSN to telemarket on its behalf, despite receiving numerous, substantially identical complaints of SSN's Do-Not-Call violations.

5

Dish knew, as of at least May 2009, that SSN was not scrubbing its call lists against the Do-Not-Call Registry, and just days before the class period, learned that SSN was *still* not taking this most basic precaution. (Jan 12, 2017 Tr. 71:22-25).

Not only did DISH continue to embrace SSN, it created an ineffective, *pro forma* "compliance" program that did not affect SSN's illegal telemarketing. DISH compliance director Reji Musso said it was "not [her] job" and it "wasn't [her] responsibility" to ensure that O/E Retailers like SSN were complying with telemarketing laws. (Jan. 12, 2017 Tr. 49:7-8) Thus, from 2006 through the end of the class period, Dish made no effort to determine whether any complaints against SSN were legitimate. (*Id.* at 18:5-8). Nor did Dish require SSN to comply with Dish's policy requiring SSN to maintain call records, which would allow easier enforcement of the TCPA. (*Id.* at 39:18-42:7; DX 2).

Under the terms of the Retailer Agreement between SSN and Dish, SSN was required to comply with applicable telemarketing laws and to "take all actions and refrain from taking any action as reasonably requested by Dish" in connection with SSN's telemarketing. (PX 26 at § 7.3). Despite that power, Dish never compelled SSN to take any action, such as scrubbing its call lists, that would cause compliance with the TCPA.

Indeed, when Dish learned first-hand that SSN had not scrubbed its call lists before calling Dr. Krakauer, it did not:

- Ask why SSN did not scrub its list (Jan. 12 Tr. at 73:2-4);
- Ask whether SSN was *still* calling from the unscrubbed list (*id.* at 72:24-73:1);

6

- Check to see whether the use of the unscrubbed list had resulted in any other calls to numbers on the Do-Not-Call Registry (*id.* at 73:12-14); or
- Require SSN to scrub the list that Dish *knew* contained at least two numbers on the Do-Not-Call Registry, (*id.* at 73:5-8).

Further, in June 2009, Dish entered into an "Assurance of Voluntary Compliance" with 46 State Attorneys General. (PX 55). Pursuant to the AVC, Dish represented that it had the power and authority to (i) monitor its O/E retailers, (ii) adequately investigate all complaints, and (iii) "appropriately and reasonably discipline" any such third-parties who did not comply with applicable telemarketing laws. (*Id.* at §§ 4.74; 4.76; 4.78).

Notwithstanding its description of the power and authority it would exercise over its OE retailers, both before and after the AVC, Dish never punished SSN for any of its known TCPA violations. Not only did Dish fail to terminate SSN, Dish never:

- Suspended SSN;
- Imposed any monetary fines;
- Withheld any compensation;
- Required SSN to terminate any employee for violating telemarketing laws; or
- Required SSN to train its employees on telemarketing compliance.

(*Id.* at 20:11-22:20).

Finally, in October 2009, shortly after entering into the AVC, Dish obtained a quote from PossibleNow for various compliance services. For $4,500 PossibleNow would have performed on-site audits and other services sufficient that "Dish would be

assured that [SSN] posses[ed] the processes and procedures to meet or exceed regulatory as well as Dish Network corporate requirements." (PX 70).

Dish, however, declined to purchase PossibleNow's compliance services, nor did it require SSN to do so.

*Conclusion*

DISH has shown complete disregard for the TCPA at every turn. This requires a substantial award in order to serve the TCPA's twin goals of compensation for past harm and deterrence to avoid future violations.

DISH knew what it was doing when it constructed its shell-game system of relying on tightly-controlled telemarketing dealers to sell millions of DISH subscriptions, and then, when some of those telemarketing dealers violated federal telemarketing laws, falling back on self-serving agency disclaimers so DISH could retain the benefits of illegal telemarketing while bearing none of the responsibility for violating the law.

Rather than spurn SSN as its competitor DirecTV did in 2005 after SSN's troubles with North Carolina and Florida regulators, DISH welcomed SSN that same year as an exclusive DISH dealer.

Rather than establish an effective compliance program to investigate telemarketing complaints, DISH's compliance team sent toothless letters to dealers like SSN who used illegal telemarketing. And not once did DISH's compliance department run down a single complaint to determine if it was legitimate.

8

Rather than use its considerable contractual power and authority to control its telemarketing dealers – as evidenced by the "absolute power" clause in its Retailer Agreements and its assurances of control made in the Assurance of Voluntary Compliance – DISH claimed it was powerless to take even modest steps to avoid violations.

And rather than spend around $200,000 on TCPA compliance audits of the O/E retailers DISH expected to generate at least $960 million in gross revenue for DISH in 2011 alone, DISH chose instead to continue to perpetuate its ineffectual compliance program, and to look away from the manifest evidence that its retailer SSN was breaking federal telemarketing laws on DISH's behalf.

A finding of knowledge or willfulness would be consistent with the jury's finding that SSN placed the telemarketing calls as DISH's agent. When it so found, the jury necessarily concluded that DISH had knowledge of and consented to SSN's illegal conduct. As the Court correctly instructed the jury, an agent may reasonably conclude that certain conduct is in the principal's best interests "[i]f the principal consents or acquiesces in the conduct," which in turn requires a finding "that the principal knew of prior similar activities by the agent and consented or did not object to them." (Final Jury Instr. at 6-7, ECF No. 293.) In short, by finding that SSN was DISH's agent, the jury necessarily found that DISH knew of SSN's illegal telemarketing, and acquiesced to it. Such evidence constitute knowledge, and justifies the enhanced award the Plaintiff seeks.

9

**Respectfully submitted,**

*/s/ John W. Barrett*
John W. Barrett
Brian A. Glasser
**Bailey & Glasser LLP**
209 Capitol Street
Charleston, WV 25301
Telephone: (304) 345-6555
jbarrett@baileyglasser.com
bglasser@baileyglasser.com

*/s/ J. Matthew Norris*
J. Matthew Norris
**Norris Law Firm, PLLC**
1033 Bullard Court, Suite 207
Raleigh, NC 27615
(919) 981-4775
(919) 926-1676 *facsimile*
jmn@ncconsumerlaw.com

Matthew P. McCue
**The Law Office of Matthew P. McCue**
1 South Ave., Third Floor
Natick, MA 01760
(508) 655-1415
Telephone: (508) 655-1415
mmcue@massattorneys.net

10

## **CERTIFICATE OF SERVICE**

The foregoing was filed electronically on February 6, 2017. Notice of this filing will be sent to all parties registered with the Court's electronic filing system by operation of the Court's system. Parties may access this filing through the Court's electronic filing system.

/s/ John W. Barrett