# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

THOMAS KRAKAUER,

                Plaintiff,

      v.

DISH NETWORK LLC,

                Defendant.

Case No. 1:14-CV-00333-CCE-JEP

**Oral Argument Requested**

## BRIEF IN SUPPORT OF DEFENDANT DISH NETWORK L.L.C.'S RULE 50(b) MOTION FOR JUDGMENT AS A MATTER OF LAW

# TABLE OF CONTENTS

Table of Contents.................................................................................................................i

Preliminary Statement ....................................................................................................... 1

Procedural History.............................................................................................................. 3

Legal Standard.................................................................................................................... 4

Argument ............................................................................................................................ 4

I.      Plaintiff Failed To Present Sufficient Evidence That SSN Was DISH's Agent. ...... 4

     A.     DISH and SSN Never Agreed or Reasonably Understood That SSN Would Act as DISH's Agent. ........................................................................ 5

     B.     DISH Did Not Have Control Over SSN's Telemarketing. ........................... 7

II.     Plaintiff Failed To Present Sufficient Evidence That SSN Acted Within the Scope of Any Authority from DISH. ........................................................................ 8

     A.     DISH Instructed SSN Not To Call Dr. Krakauer. ......................................... 9

     B.     DISH Instructed SSN Not To Call Telephone Numbers on the Registry... 11

     C.     DISH Did Not Consent or Acquiesce to SSN Calling Telephone Numbers on the Registry. ........................................................................... 12

          1.     DISH Never Consented to Do-Not-Call Violations......................... 12

          2.     DISH Specifically Objected to the Five Isolated Do-Not-Call Complaints It Received About SSN................................................. 14

          3.     Evidence of Complaints from Before 2006 Is Irrelevant. ................ 17

     D.     Do-Not-Call Violations Were Adverse to DISH's Interests. ...................... 18

III.    Plaintiff Failed To Present Sufficient Evidence That TCPA Violations Occurred or Caused Concrete Harm. ................................................................... 18

Conclusion ....................................................................................................................... 20

## PRELIMINARY STATEMENT

Based on the trial record, as a matter of law, Defendant DISH Network L.L.C. ("DISH") cannot be held liable for the telephone calls that Satellite Systems Network ("SSN") made to numbers on the National Do Not Call Registry ("Registry"), and judgment should be entered in DISH's favor pursuant to Fed. R. Civ. P. 50(b) notwithstanding the jury verdict in this case. Plaintiff bore the burden to prove at trial with legally sufficient evidence that (i) SSN was DISH's agent and (ii) SSN acted within the scope of authority from DISH when it made the calls at issue. Plaintiff failed to present sufficient evidence to satisfy this burden.

First, Plaintiff did not present sufficient evidence of an agency relationship. All trial evidence pointed to an independent contractor relationship, including the testimony of every witness with personal knowledge of the course of dealing between DISH and SSN and all documents memorializing the terms of the relationship between them. Moreover, Plaintiff presented absolutely no evidence that DISH and SSN mutually agreed or reasonably understood that DISH had the power to control and direct SSN's day-to-day telemarketing activities. Instead, the trial evidence showed that SSN's day-to-day telemarketing activities were controlled by SSN's Vice President, Bahar "Sophie" Tehranchi, and SSN's call center manager, Rehan Quader.

Plaintiff further failed to present any evidence that SSN acted within the scope of authority from DISH when it made the telephone calls at issue. With respect to Dr. Krakauer, DISH unequivocally instructed SSN in 2009 not to call him. SSN

1

committed to DISH that it would not do so.  SSN's calls to Dr. Krakauer during the class period—between May 2010 and August 2011—flatly contravened DISH's express instructions and necessarily were outside the scope of any authority from DISH.  *See Bridgeview Health Care Center, Ltd. v. Clark*, 816 F.3d 935, 939 (7th Cir. 2016) (faxes agent sent contrary to principal's instructions were outside scope of authority).  Thus, Dr. Krakauer's claim against DISH fails as a matter of law, and as a result the rest of the class claims must fail as well.  Doc. 293 (Final Jury Instrs.) at 2 ("Instrs.").

SSN's calls to the other class members also violated DISH's express instructions. All of the evidence shows that DISH specifically and consistently instructed SSN to scrub its lists with industry-leading compliance vendor PossibleNOW.  DISH insisted that SSN comply with the "do-not-call" laws at every turn, in:  letters and emails between DISH and SSN; broadcast Retailer Chats and Facts Blasts; and Retailer Agreements.

All of the evidence further shows that DISH never consented to or acquiesced in calls to telephone numbers on the Registry.  On the five isolated occasions between 2006 and 2011 that DISH received do-not-call complaints about SSN's telemarketing, it specifically objected.  Each time, DISH told SSN that violations of the telemarketing laws were unacceptable and demanded that SSN take concrete steps to prevent them. SSN assured DISH that it was scrubbing its calling lists with either PossibleNOW or DNC.com.  If SSN were not scrubbing its lists, DISH would have expected to receive a staggering number of complaints; that DISH received only five do-not-call complaints— out of the millions of calls that SSN made during that time—strongly indicated to DISH

that SSN was taking reasonable steps to avoid calling telephone numbers on the Registry.

Plaintiff also failed to present reliable evidence that the subject telephone calls violated the TCPA. Plaintiff's expert, Anya Verkhovskaya, failed to check that the numbers were on the Registry on the dates the calls were made. Ms. Verkhovskaya also failed to establish affirmatively that any number was residential. Her supposed "expert work" on the residential issue consisted solely of eliminating numbers flagged as business in SSN's call records or by vendor LexisNexis. Ms. Verkhovskaya asserted, based on nothing more than her own fiat, that this methodology was reliable because LexisNexis can comprehensively identify all business numbers using secret proprietary sources that were unknown to her. That bald assertion, offered for the first time at trial and untethered to any facts or data, cannot support a reasonable jury verdict.

Plaintiff also lacks standing to bring this action. Ms. Verkhovskaya could not testify that any class member heard or answered any of the calls at issue. Dr. Krakauer similarly did not testify that he heard or answered any calls during the class period. Plaintiff therefore failed to show that he or any class member suffered a concrete injury.

## PROCEDURAL HISTORY

The threshold agency question for the jury in this TCPA case was whether SSN was DISH's agent under a theory of actual authority. Doc. 118 (Order). If the jury found an agency relationship, it then had to determine whether SSN acted within the scope of authority from DISH when it made the calls at issue.

DISH moved for judgment as a matter law under Rule 50(a) at the close of

Plaintiff's case in chief, *see* Jan. 13 Tr. at 146:2-149:25, and at the close of all the evidence, *see* Docs. 290, 291. The Court denied DISH's first motion, but expressed skepticism about the sufficiency of the evidence on the scope of authority. *See* Jan. 13 Tr. at 149:21-25; Jan. 18 Tr. at 3:3-14. The Court denied DISH's second motion without prejudice to a subsequent Rule 50(b) motion. Feb. 8, 2017 Text Order. The jury rendered a verdict on January 19, 2017. *See* Doc. 292 (Verdict Sheet).

## LEGAL STANDARD

Judgment as a matter of law is warranted when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-moving] party." Fed. R. Civ. P. 50(a)(1), (b). "A Rule 50(b) motion should be granted if a district court determines, without considering the credibility of witnesses or weighing the evidence, that substantial evidence does not support the jury's findings." *Kane v. Lewis*, 604 F. App'x 229, 234 (4th Cir. 2015); *see also DeMaine v. Bank One, Akron, N.A.*, 904 F.2d 219, 220 (4th Cir. 1990) ("[A] district court should direct a verdict for the defendant if the plaintiff has failed to adduce substantial evidence in support of his claim."). A legally sufficient basis is lacking if a verdict "necessarily will be premised upon speculation and conjecture." *Gairola v. Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985) (citation omitted). A "mere scintilla of evidence" is insufficient. *Id.*; *DeMaine*, 904 F.2d at 220.

## ARGUMENT

### I. PLAINTIFF FAILED TO PRESENT SUFFICIENT EVIDENCE THAT SSN WAS DISH'S AGENT.

DISH could only be held liable for the calls at issue if SSN was DISH's agent at

the time they were made.  Instrs. at 4-5; *see also* Doc. 111 (Mem. Op. and Order) at 20;

47 U.S.C. § 227(c)(5).  Because the Court granted DISH's motion for summary judgment

with respect to Plaintiff's theories of apparent authority and ratification, *see* Doc. 118

(Order), Plaintiff had to present substantial evidence that both: (i) DISH and SSN

mutually agreed, either expressly or tacitly, that SSN would act as DISH's agent, and

(ii) SSN's telemarketing was subject to DISH's day-to-day direction and control.  Instrs.

at 5-6.  Plaintiff failed to present sufficient evidence on either of those essential agency

elements.

### A.  DISH and SSN Never Agreed or Reasonably Understood That SSN Would Act as DISH's Agent.

The Retailer Agreement that SSN signed with DISH—not once but three times,

*see* JTX-1; JTX-2; DX-84—expressly states that SSN was an independent contractor, not

DISH's agent.  The SSN Retailer Agreement begins, "Retailer, *acting as an independent*

*contractor*, desires to become authorized on a non-exclusive basis to market, promote and

solicit orders for Programming," JTX-1 at 1, ¶ B (emphasis added); *see also* JTX-2 at 1,

¶ B; DX-84 at 1, ¶ B, and goes on to state that "[t]he relationship of the parties hereto is

that of independent contractors. . . .  Retailer has no right or authority to make any

representation, warranty, promise or agreement or take any action for or on behalf of

EchoStar or any Affiliate of EchoStar," JTX-1 at 21, ¶ 11; *see also* JTX-2 at 22, ¶ 11;

DX-84 at 8, ¶ 10.  Such an express disclaimer of an agency relationship "flies directly in

the face of the classic definition of common-law agency."  *Keating v. Peterson's Nelnet,*

*LLC*, 615 F. App'x 365, 372 (6th Cir. 2015); *see also* Instrs. at 7.  Neither DISH nor SSN

could have reasonably understood that language to permit an agency relationship.

Plaintiff presented no affirmative evidence of agency from any of the testifying witnesses with personal knowledge of the relationship between DISH and SSN, including DISH co-founder Jim DeFranco, DISH Senior Vice President Amir Ahmed, former DISH Compliance Manager Reji Musso, and SSN Vice President Sophie Tehranchi.  All of the witnesses who worked at DISH testified that the relationship between DISH and SSN was that of an independent contractor—not just in writing, but also in practice. Jan. 11 Tr. (Ahmed) at 219:1-221:1, 229:15-21; Jan. 12 Tr. (Musso) at 144:12-145:7; Jan. 13 Tr. (DeFranco) at 163:2-11.  Ms. Tehranchi similarly testified that DISH and SSN were separate companies.  Tehranchi Dep. Tr. at 90:16-24.

The evidence also showed that DISH repeatedly underscored to SSN that it was an independent contractor.  DISH sent SSN Facts Blasts in 2006 and 2007 reminding SSN that "your relationship with EchoStar is that of an independent contractor," DX-2 at 2, and that "Retailers are not agents or employees of EchoStar," DX-1 at 7.  DISH reiterated SSN's independence in a 2007 Retailer Chat as well, stating that "your relationship with EchoStar is that of an independent contractor.  Retailers are not agents or employees of EchoStar . . . ."  DX-3 at 47.  SSN never once suggested that it understood itself to be DISH's agent.  *See* Jan. 12 Tr. (Musso) at 128:24-129:3; Jan. 13 Tr. (DeFranco) at 163:12-17.  Even Plaintiff admitted that, in the 2009 call he received from SSN, the caller did not claim to represent DISH.  Jan. 11 Tr. (Krakauer) at 13:12-14, 40:2-12.

The parties' written agreement and actual practice, combined with DISH's

6

repeated reminders of independence and the complete lack of any statement to the contrary from SSN, show that neither party agreed to an agency relationship nor reasonably understood that one existed. Dr. Krakauer—who was not a party to the agreement between DISH and SSN and has no personal knowledge of that relationship— cannot retroactively foist an agency relationship on DISH and SSN when all evidence from both companies shows that no such relationship existed.

### B. DISH Did Not Have Control Over SSN's Telemarketing.

The unrebutted testimony of every witness from DISH with involvement in the SSN relationship was that DISH never instructed SSN on whether or how to conduct telemarketing, and did not have the power to do so. *See* Jan. 11 Tr. (Ahmed) at 225:18-226:25; Jan. 12 Tr. (Musso) at 146:23-25; Jan. 13 Tr. (DeFranco) at 161:16-21. SSN wrote its own sales scripts, which retailers like SSN considered proprietary and refused to share. Jan. 11 Tr. (Ahmed) at 215:8-19; Tehranchi Dep. Tr. at 66:11-14. Indeed, DISH could not force SSN to share its sales scripts, even when they were requested by DISH's CEO. JTX-3; Jan. 11 Tr. (Ahmed) at 213:6-215:22. SSN and other retailers competed with DISH for activations, Jan. 11 Tr. (Ahmed) at 215:8-16; Jan. 12 Tr. (Musso) at 145:13-23, Jan. 13 Tr. (DeFranco) at 159:25-161:1, and were "not open to providing their formulas for success in their local markets and how they promote their products," Jan. 13 Tr. (DeFranco) at 160:24-161:1.

SSN was firmly in control of its own telemarketing practices. SSN determined what numbers it would call, what its agents would say, and even whether it would engage

in telemarketing at all. Jan. 11 Tr. (Ahmed) at 217:12-218:9, 226:12-20-227:3; Jan. 12 Tr. (Musso) at 148:2-7; Jan. 13 Tr. (DeFranco) at 162:11-14; Tehranchi Dep. Tr. at 92:11-25, 93:20-22. SSN paid for and managed its own employees, equipment, and office space, and would not have been willing to give DISH control over those risks and investments. Jan. 11 Tr. (Ahmed) at 202:12-21, 217:12-218:9, 227:4-18, 228:7-19; Jan. 12 Tr. (Musso) at 148:10-12; Tehranchi Dep. Tr. at 93:1-16.

## II. PLAINTIFF FAILED TO PRESENT SUFFICIENT EVIDENCE THAT SSN ACTED WITHIN THE SCOPE OF ANY AUTHORITY FROM DISH.

Even if Plaintiff had established an agency relationship, Plaintiff also had to show "that SSN was acting in the course and scope of [any] agency when it made the phone calls at issue." Instrs. at 4-5. Plaintiff failed to present sufficient evidence to support a verdict that SSN acted within the scope of any authority from DISH when it made the calls to Dr. Krakauer and the other class members.

"A principal is not bound by the act of an agent unless that act falls within the scope of actual authority granted by the principal to the agent." *Id.* at 6. The scope of an agent's authority is determined by "the conduct and statements of the principal." *Id.* With respect to written limits on SSN's authority, the issue is "whether SSN reasonably understood it was authorized to act differently than the written limits stated." *Id.* at 7.

The Seventh Circuit recently addressed scope of authority in the TCPA context in *Bridgeview Health Care Center, Ltd. v. Clark*, 816 F.3d 935, 939 (7th Cir. 2016), holding that a seller was not liable for faxes sent by a telemarketing company to certain recipients contrary to the seller's instructions. In *Bridgeview*, the seller instructed the telemarketer

8

to send 100 faxes to businesses within a 20-mile radius of Terre Haute, Indiana, but the telemarketer sent 4,849 faxes to businesses across three states. *Id.* at 937. The Seventh Circuit determined that the faxes sent beyond the 20-mile radius specified by the seller were not within the scope of the telemarketer's actual authority. *Id.* at 939. The same is true here—SSN's calls to Dr. Krakauer and other telephone numbers on the Registry "expressly contradicted [DISH's] actual instructions" and were adverse to DISH's interests. *Id.* Therefore, those calls were outside the scope of any authority from DISH.

### A. DISH Instructed SSN Not To Call Dr. Krakauer.

Because Plaintiff tethered the class claims to Dr. Krakauer's individual claim, the class cannot prevail if Dr. Krakauer's individual claim fails. The verdict sheet did not give the jury an option to find against Dr. Krakauer but in favor of the rest of the class. *See* Doc. 292. And the Court instructed the jury that "[i]f . . . Dr. Krakauer fails to establish any essential part of his claim by a preponderance of the evidence, then you should find against him and the class and in favor of Dish." Instrs. at 2. Plaintiff's counsel explicitly recognized that "this is a representative action, it's a class action where the plaintiff's claims have found [sic] to be typical of the other class members' claims, so we are willing to go forward strictly on, yes, as to Dr. Krakauer and all class members." Dec. 12, 2016 Hearing Tr. at 5:12-6:2. Because the unrebutted evidence shows that SSN's calls to Dr. Krakauer during the class period flatly contravened DISH's written instructions not to call him, Dr. Krakauer's claim and the class claims fail as a matter of law.

In 2009, before the class period, Dr. Krakauer complained to DISH about a call from SSN, which prompted DISH to give SSN express, written instructions not to call Dr. Krakauer again. In a May 27, 2009 letter, Ms. Musso informed SSN that Dr. Krakauer's telephone number "has been on the National DNC list since September 7, 2003" and explicitly instructed SSN to "[p]lease immediately insure that [Dr. Krakauer's] phone number has been added to your internal DNC registry." DX-9. Ms. Musso testified that DISH did not want SSN to call Dr. Krakauer again and any subsequent calls by SSN would "not at all" have been in DISH's interests. Jan. 12 Tr. (Musso) at 115:5-7.

All of the evidence demonstrated that SSN understood DISH's instructions not to call Dr. Krakauer again, and committed to honor them. SSN responded to Ms. Musso's letter within a day, which Ms. Musso testified showed "[a] sense of urgency for sure." *Id.* at 110:13-16. SSN represented to DISH that:

- "We *always comply with National Do Not Call Policies* and even our dialer has a[n] internal Do Not Call list that we put all customers that do not want to be contacted again and *those customers will not be called again*." DX-8 at 2 (emphasis added).

- "We take Do Not Call violations very seriously that is why when someone contacts us and tell[s] us that they want to be put on our Do Not Call *we do it at that moment*." *Id.* (emphasis added).

- "[W]e took Mr. Krakauer [sic] phone number out of our entire master lead list and *put his phone number on our DNC list*." *Id.* at 1 (emphasis added).

Ms. Musso testified that SSN's quick and definitive response showed her that SSN "took it seriously" and "had no intention of doing it again." Jan. 12 Tr. (Musso) at 112:22-113:1. SSN gave Ms. Musso the understanding that Dr. Krakauer "won't get another

phone call because they've taken away all the contact information." *Id.* at 111:19-112:3.

All of the evidence shows that DISH meant what it said—SSN should not call Dr. Krakauer again—and SSN understood that. Accordingly, Dr. Krakauer's claim fails and so do all of the class members' claims.

**B.     DISH Instructed SSN Not To Call Telephone Numbers on the Registry.**

DISH also instructed SSN not to call any other telephone numbers on the Registry. Thus, all calls to class members with numbers on the Registry contravened DISH's express instructions and exceeded the scope of any authority from DISH.

In October 2008, DISH began requiring retailers, such as SSN, that chose to conduct outbound telemarketing to scrub their calling lists with PossibleNOW. Jan. 12 Tr. (Musso) at 38:22-39:17; DX-5 (notice to DISH retailers with over a certain threshold of activations that participate in telemarketing that "you were required to sign up for PossibleNOW service on or before September 30, 2008"). Mr. DeFranco testified that a failure by SSN to scrub calling lists with PossibleNOW would have been against DISH's direction. Jan. 13 Tr. (DeFranco) at 182:1-15.[1] SSN confirmed to DISH that it had signed up with PossibleNOW, trained with PossibleNOW, and was scrubbing its calling lists against the Registry. DX-6 at 1; Jan. 12 Tr. (Musso) at 105:15-106:11; Tehranchi

---

[1] DISH also warned SSN about relying on EBRs. Ms. Musso told SSN in a May 2010 email that "[t]here are some limitations on EBRs and that relationship is getting even more problematic," and cautioned SSN "to be cognizant of the EBR . . . some states do not even honor it." DX-16 at 1. She also advised that "PossibleNOW can help or your own legal counsel—particularly if you are calling nationwide." *Id.*

Dep. Tr. at 76:22-77:10.  Thus, to the extent that SSN failed to remove (or scrub) telephone numbers on the Registry from its calling lists, SSN exceeded the scope of any authority from DISH, and DISH may not be held liable for SSN's actions, as a matter of law.

### C. DISH Did Not Consent or Acquiesce to SSN Calling Telephone Numbers on the Registry.

To show that DISH consented or acquiesced to any do-not-call violations by SSN, Plaintiff had to present substantial evidence that DISH "knew of prior similar activities by [SSN] and consented or did not object to them" and that "SSN reasonably understood it was authorized to act differently than the written limits stated."  Instrs. at 7.  Consent is an "agreement, approval, or permission regarding some act or purpose."  *Consent*, Black's Law Dictionary (10th ed. 2014).  Thus, Plaintiff had to show that DISH either affirmatively approved of prior do-not-call violations by SSN or failed to object to them. But the evidence at trial showed that DISH never affirmatively approved of do-not-call violations and objected to every one of the five isolated do-not-call complaints it received about SSN between 2006 and 2010.  As a result, Plaintiff's claims fail as a matter of law.

### 1. DISH Never Consented to Do-Not-Call Violations.

The trial evidence demonstrated that DISH consistently and firmly instructed SSN that DISH expected it to comply with the telemarketing laws and that DISH had no tolerance for telemarketing violations.  For example, a 2007 Facts Blast stated that:

> Your Retailer Agreement prohibits you from violating any applicable laws, including without limitation in connection with the telemarketing of DISH Network products and services.  Authorized Retailers who engage in

telemarketing should familiarize themselves with applicable federal, state,
local and other laws, including without limitation state "No-Call" statutes
and Telephone Consumer Protection Acts.

DX-1 at 7. That Facts Blast went on to say that "EchoStar takes telemarketing violations

very seriously." *Id.* DISH gave the same instruction in a 2006 Facts Blast as well:

If a Retailer is engaged in any form of telemarketing sales of DISH
Network AT A MINIMUM, it must: Comply with all applicable state and
federal "Do Not Call" laws, including, but not limited to, the Telemarketing
Sales Rule [and] the Telephone Consumer Protection Act . . . .

DX-2 at 1. Mr. DeFranco repeated this message yet again in a 2007 Retailer Chat

broadcast to all retailers, stating that telemarketing violations could lead to termination of

their Retailer Agreements and civil and criminal liability. DX-3 at 47; Jan. 13 Tr.

(DeFranco) at 170:15-172:21. This message was "meant to be strong . . . to make sure

retailers knew . . . we took it seriously." Jan. 13 Tr. (DeFranco) at 174:6-16.

Moreover, the Retailer Agreement—the foundation for the relationship between

DISH and SSN—required SSN to comply with all laws. The Retailer Agreement stated:

Retailer shall comply with all applicable governmental statutes, laws, rules,
regulations, ordinances, codes, directives, and orders (whether federal,
state, municipal, or otherwise) ("Laws"), and Retailer is solely responsible
for its compliance with all Laws . . . .

DX-84 at 6-7, ¶ 8.1. This clear instruction persisted in all later versions of the Retailer

Agreement and throughout the class period. *See* JTX-1 at 18, ¶ 9.1; JTX-2 at 18, ¶ 9.1.

Ms. Tehranchi agreed that this provision contractually obligated SSN to comply with the

law. Tehranchi Dep. Tr. at 89:10-90:5.

In addition, DISH developed a retailer compliance team, led by Reji Musso,

charged with addressing telemarketing compliance issues with retailers. All of these actions sent one message—that DISH did not consent to do-not-call violations.

### 2. DISH Specifically Objected to the Five Isolated Do-Not-Call Complaints It Received About SSN.

The evidence showed that each time DISH received a do-not-call complaint about SSN, DISH notified SSN of the complaint, objected to any violation of the telemarketing laws, and reiterated SSN's obligation to comply with all applicable laws.

Specifically, on December 28, 2006, DISH notified SSN of a do-not-call complaint from Gregory Fisher about a telephone call that took place in 2005. PX-15 at DISH-Paper-008042; Jan. 12 Tr. (Musso) at 134:8-10. DISH objected to the potential violation by SSN and discussed the complaint on the telephone with SSN's outside counsel. PX-15 at DISH-Paper-007979, 8040, 8042. On January 17, 2007, DISH notified SSN of a do-not-call complaint from Jeffrey Mitchell about a telephone call that took place in 2005. *Id.* at DISH-Paper-008037; Jan. 12 Tr. (Musso) at 134:8-10. DISH sent SSN a letter objecting to the potential violation. PX-15 at DISH-Paper-008037. On November 7, 2007, DISH notified SSN of a do-not-call complaint from Jeanette Payne about a telephone call that took place in 2006. *Id.* at DISH-Paper-008035, 8057-58. DISH objected in writing to the potential violation. *Id.* On May 10, 2009, DISH received a do-not-call complaint from Thomas Krakauer. PX-282. DISH's response to that complaint is addressed in detail above. *See supra* at 9-11. On April 30, 2010, DISH received a do-not-call complaint from Richard Campbell. PX-8. DISH objected to the potential violation in writing, and recommended that SSN consult with legal counsel or

PossibleNOW about EBR exceptions.  DX-16 at 1; Jan. 12 Tr. (Musso) at 141:8-23.

Plaintiff did not present evidence of a single instance in which DISH failed to object to a complaint about any potential do-not-call violations by SSN.  While Plaintiff may pejoratively characterize these written objections as "words" and not "actions," they in fact show consistent objections to every instance of a potential do-not-call violation by SSN.  Those written objections defeat Plaintiff's claims as a matter of law.

Plaintiff also did not present any evidence that the do-not-call complaints DISH received provided knowledge of actual violations.  The testimony was unrebutted that receipt of a complaint about SSN did not mean SSN had violated a do-not-call law.  *See* DX-16 at 1; Jan. 12 Tr. (Musso) at 88:4-6.  There are many reasons why a complaint may not show a violation; for example, the consumer may have forgotten that she opted in to receive calls.  Jan. 12 Tr. (Musso) at 88:7-18.  DISH's receipt of five unverified complaints about SSN is not substantial evidence that DISH knew SSN had violated a do-not-call law.  *See* Instrs. at 17-18 ("[I]f someone complained outside of court and claimed that SSN made phone calls that violated the telemarketing laws, that out-of-court statement is not admissible to prove that SSN did in fact violate the TCPA.").

Indeed, the evidence showed that DISH reasonably understood that SSN was taking steps to avoid calling numbers on the Registry.  SSN represented that it was scrubbing its calling lists with either PossibleNOW or, before that, DNC.com.  DX-6 at 1; Jan. 12 Tr. (Musso) at 90:23-91:6, 106:3-11, 114:4-10.  Ms. Musso testified that at least half the numbers on a typical unscrubbed calling list were on the Registry, so if SSN

were not scrubbing, DISH would have expected "a staggering number" of complaints.
Jan. 12 Tr. (Musso) at 114:14-115:4. That DISH received only five complaints between
2006 and 2010 showed that "there[] [was] not a red flag for" SSN. *Id.* at 86:14-21.

The unrebutted evidence showed that what DISH knew about SSN's pre-class
period telemarketing activities—that SSN scrubbed its calling lists to avoid making calls
to telephone numbers on the Registry, and generated roughly one complaint of a potential
do-not-call violation per year—was the exact opposite of the widespread and systematic
misconduct alleged. Plaintiff therefore failed to present sufficient evidence that DISH
knew of prior activities by SSN similar to the do-not-call violations alleged in this case.

Plaintiff also failed to present any evidence that DISH had reason to suspect SSN
did not take its objections seriously, making Plaintiff's argument that both DISH and
SSN did not mean what they very clearly said entirely speculative. The evidence showed
that SSN repeatedly assured DISH that it was taking actions to address any complaints.
*See* Jan. 12 Tr. (Musso) at 86:10-21, 89:19-90:1, 101:16-20, 143:20-144:4. Each time
DISH received a complaint about SSN, SSN responded promptly, and told DISH that it
would remove the number from its database and add the number to its do-not-call list.
*See* DX-6 at 2 ("As soon as anyone asks to be put on the DNC, we take them out of our
data base right away."); DX-8 at 1 ("That very same day [that SSN received
Dr. Krakauer's complaint] we took Mr. Krakauer [sic] phone number out of our entire
master lead list and put his phone number on our DNC list."); DX-16 at 2 ("We have
immediately added both phone numbers, we had for this customer, to our DNC list.");

Jan. 12 Tr. (Musso) at 98:12-17, 111:19-112:13, 137:7-24. DISH's clear and consistent objections and SSN's prompt and substantive responses showed that DISH did not approve of SSN calling numbers on the Registry. Plaintiff presented no evidence to the contrary.

### 3. Evidence of Complaints from Before 2006 Is Irrelevant.

Plaintiff's presentation of evidence concerning complaints that DISH received about SSN before 2006 was a complete distraction. Most of the complaints DISH received about SSN prior to 2006 were about the use of prerecorded message broadcasting, not do-not-call violations. *See* Jan. 11 Tr. (Ahmed) at 190:9-17. And the record does not even contain evidence that those calls violated the TCPA. Prior to 2013, the TCPA permitted prerecorded calls to customers with an established business relationship. *See* 47 C.F.R. § 64.1200(a)(2)(iv) (2005). SSN's use of potentially compliant prerecorded message broadcasting in 2005 has no connection to—and certainly is not similar to—the do-not-call violations alleged to have occurred half a decade later.

Even if one considers the evidence concerning pre-2006 complaints, it does not show consent or acquiescence; instead, it shows that DISH contacted SSN about each complaint it received in that period as well, and instructed SSN to stop any telemarketing that raised even the possibility of a violation. *See* PX-504 at 1 ("I informed Alex [Tehranchi] that he must STOP using message broadcasting and leaving messages even if he has followed do not call lists, and even if he has a prior relationship with that customer, and is following Federal telemarketing guidelines."); Jan. 11 Tr. (Ahmed) at

177:15-24 ("[A]t each instance when we received a complaint, we contacted [Mr. Tehranchi] . . . and told him to absolutely stop, we do not want that type of business."). The evidence concerning pre-2006 complaints showed that DISH's objections worked. By late 2005, SSN had stopped using prerecorded message broadcasting. Jan. 11 Tr. (Ahmed) at 186:12-187:3; Jan. 12 Tr. (Musso) at 99:23-100:2.

### D. Do-Not-Call Violations Were Adverse to DISH's Interests.

"[A]ctions taken against the principal's interest are not within the scope of the agent's authority." Instrs. at 6. An agent's determination of whether an action is in the principal's interest "must be . . . based on its reasonable understanding of the principal's interests, as expressed by the principal." *Id.* In short, the scope of an agent's authority is determined by a reasonable understanding of the principal's expression of its interests.

As described above, DISH expressly instructed SSN: not to call Dr. Krakauer again; not to call numbers on the Registry; to comply with the TCPA's do-not-call provisions; and to scrub its calling lists using PossibleNOW. The only reasonable understanding of these statements, which were unrebutted, was that DISH considered calls to Dr. Krakauer or to other numbers on the Registry to be against DISH's interests.

## III. PLAINTIFF FAILED TO PRESENT SUFFICIENT EVIDENCE THAT TCPA VIOLATIONS OCCURRED OR CAUSED CONCRETE HARM.

To establish a violation of the TCPA's do-not-call provisions, Plaintiff had to present sufficient evidence that, among other things, calls were made to a residential telephone number on the Registry for more than 30 days at the time of the calls. Instrs. at 3-4. The testimony of Anya Verkhovskaya—the only evidence Plaintiff offered to satisfy

these requirements—suffered from several critical flaws making it insufficient to support a verdict in Plaintiff's favor.  Plaintiff also failed to present any evidence of concrete injury to himself or any class members, and therefore lacks standing to bring this action.

Ms. Verkhovskaya checked the telephone numbers against the Registry as of April 1, 2010, and not at the time the calls were made.  Jan. 13 Tr. (Verkhovskaya) at 30:15-21, 32:25-33:4.  Yet, she admitted that numbers can be removed or dropped from the Registry.  *Id.* at 31:21-23, 35:14-19.  And while she believed that the company that provided the list somehow would have notified her if any numbers were removed during the class period, she admitted that she never received any email saying so.  *Id.* at 33:5-25.  Ms. Verkhovskaya did not check, and did not know, whether any of the telephone numbers were on the Registry on the dates the calls at issue were made.

Ms. Verkhovskaya's testimony that numbers were residential at the time the calls were made also is unreliable.  Ms. Verkhovskaya's report did not purport to conclude that any telephone numbers were in fact residential, only that they "were not identified as business telephone numbers" by SSN in its call records or by vendor LexisNexis.  Doc. 48-2 (Verkhovskaya Report) at 1.  Contrary to Rule 26(e), Ms. Verkhovskaya improperly testified at trial for the first time that, to a reasonable degree of certainty, any telephone number that LexisNexis did not flag as business was, in fact, residential, because LexisNexis could identify virtually all business numbers.  She claimed this to be so, even if LexisNexis failed to categorize the number as residential.  And she made this assertion without knowing the secret proprietary sources that LexisNexis relies upon to

classify telephone numbers as business, government, or residential. Jan. 13 Tr. (Verkhovskaya) at 71:10-23. Ms. Verkhovskaya's testimony is too wildly speculative to be credited. Moreover, the testimony is flatly contradicted by DISH expert witness Robert Fenili's study of the Registry's composition, which showed that a significant percentage of business numbers are not listed in any telephone directories, and cannot be positively identified as business numbers. Jan. 17 Tr. (Fenili) at 85:20-89:10, 94:17-95:8.

Furthermore, Ms. Verkhovskaya admitted that she did not know whether any of the class members heard their telephones ring. Jan. 13 Tr. (Verkhovskaya) at 109:2-14 ("I don't know if people have their phones on silence."). Dr. Krakauer also never testified that he heard or answered any of the calls he received during the class period. *See* Jan. 11 Tr. (Krakauer) at 44:14-24 (admitting that some calls went to his answering machine). Standing requires proof of "an injury in fact" that is "concrete and particularized," not a "bare procedural violation, divorced from any concrete harm." *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547-49 (2016). In the TCPA context, there is no standing for calls that the plaintiff did not hear ring, or heard but did not answer. *Romero v. Dep't Stores Nat'l Bank*, 2016 WL 4184099, at *4 (S.D. Cal. Aug. 5, 2016). Plaintiff offered no evidence that he or any other class member heard or answered any of the calls at issue, and therefore lacks standing to bring these claims.

## CONCLUSION

For the foregoing reasons, DISH respectfully requests that the Court grant judgment as a matter of law in DISH's favor on all counts.

Dated:  March 7, 2017

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP


By:  /s/ Peter A. Bicks
Peter A. Bicks
Elyse D. Echtman
John L. Ewald

51 West 52nd Street
New York, NY 10019-6142
Telephone:  (212) 506-5000
pbicks@orrick.com
eechtman@orrick.com
jewald@orrick.com


 /s/ Eric Larson Zalud
Eric Larson Zalud
BENESCH, FRIEDLANDER, COPLAN &
ARONOFF LLP
200 Public Square, Suite 2300
Cleveland, OH 44114
Telephone:  (216) 363-4588
ezalud@beneschlaw.com


 /s/ Richard J. Keshian
Richard J. Keshian
North Carolina Bar No. 10681
KILPATRICK TOWNSEND & STOCKTON
LLP
1001 West 4th Street
Winston-Salem, NC 27101
Telephone:  (336) 607-7322
rkeshian@kilpatricktownsend.com

*Attorneys for Defendant DISH Network L.L.C.*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 7, 2017, I electronically filed the above document

with the Clerk of Court using the CM/ECF system, which will send notifications of such

filing to all counsel of record.


/s/ Peter A. Bicks
_____

Peter A. Bicks
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
Telephone:  (212) 506-5000
pbicks@orrick.com

*Attorneys for Defendant DISH Network L.L.C.*