**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

THOMAS KRAKAUER,

        Plaintiff,

    v.

DISH NETWORK LLC,

        Defendant.

Case No. 1:14-CV-00333-CCE-JEP

**Oral Argument Requested**

**DISH NETWORK L.L.C.'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION
FOR POST-TRIAL PROCEDURES**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

I.   DISH Has the Right to Fully Litigate the Individualized
     Subscriber/Recipient Issue ........................................................... 3

     A.   Plaintiff bears the burden to prove the subscriber/recipient
          element for each ostensible class member ....................................... 3

     B.   DISH's proposed post-trial process is reasonable and
          necessary to preserve DISH's rights ................................................ 7

     C.   Plaintiff's proposal does not provide DISH with the res
          judicata protections he claims ....................................................... 10

II.  Plaintiff's Proposed Distribution Plan Is Grossly Irresponsible ............... 13

     A.   Plaintiff conflates approval of a class notice plan with a final
          determination of class membership ................................................ 13

     B.   Plaintiff's proposal guarantees inaccurate distributions ................. 14

          1.  Plaintiff's suggested process does not identify subscribers
          and/or recipients of the phone calls at issue .................................... 14

          2.  Plaintiff lacks reliable address information ............................... 19

     C.   The Fourth Circuit does not allow escheat or fluid recovery in
          litigated judgments ....................................................................... 20

CONCLUSION ................................................................................................ 23

i

# INTRODUCTION

Before trial, the Court ruled that the jury would not decide whether any ostensible class members were the telephone number subscribers or individuals who answered the Satellite Systems Network ("SSN") telephone calls at issue. Doc. 242 at 1. The Court deferred that fact element to a post-trial process. The jury's consideration of telephone numbers was divorced from whether there was any particular individual associated with that number at the time of SSN's calls who might have the right to assert a TCPA claim. Indeed, the Court precluded DISH Network L.L.C. ("DISH") from presenting defenses that Plaintiff had no names or inaccurate names for many ostensible class members, and that thousands of class notice postcards came back as undeliverable. DISH abided by the Court's rulings on the issue and relied on those rulings in determining its trial strategy.

Notwithstanding the ground rules that the Court set for trial, Plaintiff now incredibly argues that the jury decided all the elements of the ostensible class members' TCPA claims in stealth, allowing immediate entry of a final judgment in favor of 18,066 telephone numbers. Doc. 331; Jan. 12, 2017 Tr. at 188:10-15. Tellingly, Plaintiff wants that judgment entered in favor of telephone numbers, not the individuals who owned the numbers when they were called or who may have answered the telephone. Plaintiff neglects to acknowledge at any point that he previously conceded that, post-trial, DISH would be entitled to assert individualized challenges on the subscriber/recipient issue.

Plaintiff's proposal is patently improper. Each ostensible class member has yet to establish at least one element of their claim and the jury did not make an aggregate

1

damages determination. Thus, as a matter of law, final judgment cannot be entered at this time. A telephone number cannot state a TCPA claim or collect on a TCPA judgment. In recognition of that fact, Plaintiff proposes to issue checks to individuals, not telephone numbers. Doc. 331 at 2. Instead of engaging in the required post-trial proceedings to determine which individuals, if any, might prevail on the TCPA claims in this case, Plaintiff proposes a unilateral process where his expert has carte blanche to send a check to any individuals whose name might appear next to a telephone number in the lead data SSN purchased, the LexisNexis data, or Microbilt data, all of which his expert used for class notice purposes. In those instances where the last class notice postcard mailed was returned as undeliverable, Plaintiff wants his expert to have full discretion to select another name and address from additional sources. *Id.* Plaintiff's proposal for immediate entry of judgment in favor of telephone numbers and indiscriminate issuance of checks to people who may or may not have owned those telephone numbers during the class period is not only grossly irresponsible, it violates DISH's and class members' due process and Seventh Amendment rights.

DISH respectfully requests that the Court reject Plaintiff's outlined proposal and implement DISH's proposal set forth in its Motion for Post-Trial Procedures at Doc. 330, which is consistent with the pre-trial understanding of the parties and the Court that the subscriber/recipient issue was deferred to post-trial proceedings, at which time DISH would have the opportunity to challenge Plaintiff's proof on an individualized basis.

# I.    DISH Has the Right to Fully Litigate the Individualized Subscriber/Recipient Issue.

## A.    Plaintiff bears the burden to prove the subscriber/recipient element for each ostensible class member.

Plaintiff's proposed post-trial process is premised on an incorrect statement of the law and a revisionist history of the issues submitted to the jury for decision at trial.

As to the law, Plaintiff contends that "*the identity of the subscriber or recipient is not an element of a DNC claim.*" Doc. 331 at 4 (emphasis in original). One would expect such an unequivocal, italicized assertion of the law to be accompanied by supporting citations, yet Plaintiff fails to cite a single authority to support that supposed legal proposition. That failure is not surprising. As DISH showed in its Motion for Post-Trial Procedures, both the statutory language and the case law applying that language make clear that a plaintiff in a TCPA case must establish as an element of his or her claim that he or she was the residential telephone subscriber or active recipient for the calls at issue. Doc. 330 at 2-3.

That legal rule also makes common sense. Assume for the moment that Dr. Krakauer pursued this case only in his individual capacity and not as a class action. Under Plaintiff's mistaken view, in order to make a prima facie case, Dr. Krakauer would not have to establish that *he* owned the phone line at issue or that *he* received the calls on that phone line. That, of course, does not make any sense and it is not the law. Transforming the case into a class action does not—and cannot—transform the underlying substantive law. 28 U.S.C. § 2072(b).

3

Compounding Plaintiff's mistaken statement of the law, Plaintiff erroneously reasons that "the Court instructed the jury on all elements of a DNC claim." Doc. 331 at 3. The jury instructions do not purport to do any such thing. Rather, the jury instructions set forth what "plaintiff must prove by a preponderance of the evidence" to prevail at trial. Doc. 293 at 4. And the Court was unequivocal as to which issues would be—and would not be—tried. The Court excluded any challenges to the subscriber/recipient element of Plaintiff's claim from the final verdict sheet, *see* Doc. 292 (Verdict Sheet), on the stated grounds that "[s]uch issues are not conducive to a class-wide trial and can be resolved post-trial using procedures to be determined later." Doc. 242 (Order) at 1. The Court informed the jury that it would not be deciding anything relating to those issues: "There is no issue for you to decide in connection with names and addresses or the identities of class members. That is something that may be decided down the road in other proceedings." Doc. 293 at 9; *see also* Jan. 18, 2017 Tr. at 114:13-15.

Consistent with the Court's plan to defer deciding the subscriber/recipient element until post-trial, the Court repeatedly precluded DISH from offering evidence that bore on that issue. In particular, the Court prevented DISH from giving a robust presentation of Dr. Debra Aron's opinions on the issue, stating that if Dr. Aron testified at all about the name and addresses, the Court would explain to the jury that "there will be further proceedings directed to the name and the address and that . . . they should not be confused by that, because that's not an element of the Plaintiff's case at this point." Jan. 17, 2017 Tr. at 22:20-23:5. During Dr. Aron's testimony, the Court did give such a

4

limiting instruction, stating that "there's no issue in this case about names and addresses. That's not something that you all have to decide." *Id.* (Aron) at 42:24-43:8.

In blatant disregard of the procedural history, Plaintiff claims that he proved the subscriber/recipient element at trial through Anya Verkhovskaya's testimony that all calls were "connected." Doc. 331 at 3-4. Ms. Verkhovskaya's opinion on "connected" calls was that a dialed call either had a person answer or went through to some type of recording, whether it be (i) an answering machine, (ii) voicemail, (iii) recorded statement that a number is out of service or (iv) dialer error notice that the call cannot be completed. Jan. 13, 2017 Tr. (Verkhovskaya) at 87:21-88:17;[1] 129:9-14 (Are you familiar with a disposition in the Five9 call records called dial error? A. I'm familiar that that disposition was part of the calling records. Q. That's not a disposition that you

---

[1] Q. So you talked about you looked at the duration column to determine whether a call is connected, right?
A. That is correct.
Q. And so if you reached—if you called the number and got a recording that the phone number is no longer in service, there would be time in the duration call, right?
A. It's a possibility.
Q. And you don't know what "abandoned" means in the Five9 records, do you?
A. That's why we removed them.
Q. And you don't know that if a call center representative heard a message saying this phone number is no longer in service that they would mark "abandoned" in the disposition field.
A. I do not have that knowledge.
Q. So you don't know that you actually removed any call that connected to a message that says this number is no longer in service.
A. I do not.
Q. And do you know how many inactive telephone numbers there are in the United States right now?
A. I do not.

excluded?  A. That's correct.").  Ms. Verkhovskaya admitted at trial that she did not know what happened on the other end of the line, she did not know whether someone actually picked up the phone, and she did not even know whether someone heard a phone ring.  *Id.* at 109:2-109:14; 114:3-18 (Q. Okay.  And you don't know for those four calls for 4 seconds each whether anyone heard the phone rang?  A.  I already testified to that. Q.  And you don't know whether anyone ever connected to a person on the other end of the line, right?  A.  That's correct.).  Ms. Verkhovskaya's connected call analysis examined whether the telephone calls went through to some sort of a telephone line, as opposed to merely ringing.  Whether or not any particular individual received a call was not part of the case that was tried or that the Court would permit to be tried.  Plaintiff's counsel has conceded as much, stating:  "based on Your Honor's rulings, . . . we're focusing on telephone numbers and calls."  Dec. 12, 2016 Hr'g Tr. at 81:12-15.

Indeed, Plaintiff's assertion that all TCPA elements have been finally determined by the jury is belied by his proposal for his expert to engage in additional discovery and generate expert work product to determine whom, if anyone, might be associated with telephone numbers in the case.  Plaintiff has already engaged in improper self-help in this regard, having Ms. Verkhovskaya perform additional expert work to supplement class notice efforts with additional undisclosed LexisNexis and Experian data, which was contrary to the class notice order's terms.  *Id.* at 77:1-78:13.  In response to DISH's demand that this additional class notice expert work product be produced pre-trial, because it has bearing on whether there is "a residential subscriber associated with th[e]

telephone number," the Court responded: "We're not going to be trying those issues." *Id.* at 78:14-80:7.

Plaintiff's proposal for post-judgment expert discovery is all the more improper considering that this court ruled all discovery closed in this case long before trial began. Doc. 17 (Order) at 1. Plaintiff successfully precluded DISH from supplementing fact and expert discovery with its deposition offer for Holly Taber McRae and the Exhibit 31 data summaries, notwithstanding that the trial adjournments allowed ample time for it. Doc. 209 (Order) at 18-19; Doc. 222 (Order) at 3. Plaintiff should be judicially estopped from requesting a one-sided reopening of expert discovery post-trial, especially when he claims that all issues have already been litigated to conclusion. *Guinness PLC v. Ward*, 955 F.2d 875, 899 (4th Cir. 1992) ("That an estoppel can arise because of a prior inconsistent claim or position taken in a judicial proceeding is clear. A party cannot have its cake and eat it too. . . . [J]udicial estoppel, or preclusion against inconsistent positions, is designed to protect the integrity of the courts and the judicial process.").

### B. DISH's proposed post-trial process is reasonable and necessary to preserve DISH's rights.

DISH must be afforded the opportunity to litigate the subscriber/recipient issue, and its proposal as to how that litigation might be conducted post-trial is completely reasonable without presenting any undue burden to Plaintiff or absent class members. Plaintiff attacks DISH's motives in advocating for a claims process, yet ignores that a claims process is the norm in the overwhelming majority of class actions. *See Gascho v. Global Fitness Holdings, LLC*, 2014 WL 1350509, at *28-29 (S.D. Ohio 2014), *aff'd* 822

7

F.3d 269, 289 (6th Cir. 2016) (noting testimony of claims administrator that of the 3,000 settlements he has administered, only 10-20 of them have not required claim form filing."). And *in this case*, Plaintiff agreed with the Court that a claims process would be necessary before changing course post-trial. The most brazen aspect of Plaintiff's brief is that it does not even acknowledge any of Plaintiff's previous representations, or any of the Court's statements for that matter, that a post-trial claims process would be required if the jury ruled in Plaintiff's favor. Indeed, the brief simply ignores that:

- Plaintiff's counsel agreed with the Court when it asked "You still can't win until you say, this was my phone number. Right? I mean this was my telephone that was ringing." Sept. 8, 2016 Hr'g Tr. at 64:3-6.

- Plaintiff's counsel represented to the Court that "I think what you would have is, you would have a claims process where people would file a declaration or affidavit saying this was my number at this time and [DISH] would have the right to challenge that, probably so." *Id.* at 68:2-7.

- The Court: "It sounds to me like the plaintiff is kind of coming around to thinking maybe you do need a claims process, at least for people where you don't have any names, or you have names that maybe are not consistent, assuming you get past the jury on that one." Plaintiff's Counsel: "That's right. I don't think we have anything to add, Your Honor, apart from what is in our submission and what we've already said here today." *Id.* at 118:11-18.

Plaintiff was correct then, not now, that absent class members should be required to submit claims to show that they owned the telephone numbers at the time of the calls and that DISH has the right to challenge those claims. Based on the Court's decision to defer the subscriber/recipient issue to post-trial proceedings and the related exclusion of evidence, DISH is entitled to contest post-trial the proof offered on the

8

subscriber/recipient element.  Additionally, for the reasons stated in its Opening Brief, DISH is guaranteed that opportunity to challenge the subscriber/recipient evidence under the Rules Enabling Act, the Seventh Amendment, and the Due Process Clause.  Doc. 330 at 6-9.

Plaintiff's own cited sources confirm that a claims process is *necessary* where class members must provide some information to establish eligibility for relief, even though some class members may choose not to participate.  *Newberg on Class Actions* § 12.18 (5th ed.) ("A claims process may also be necessary where the defendant has records, but is uncertain of their accuracy."); National Ass'n of Consumer Advocates, *Guidelines for Litigating and Settling Consumer Class Actions*, 255 F.R.D. 215, 263 (2009) (Claims forms are necessary "when class members cannot be adequately identified from the defendant's records").  As explained below, a claims process is necessary here, among other reasons, because the reliability of Plaintiff's class notice data is highly questionable.  *Infra* at 15-20.

Plaintiff argues that the recovery here for successful class members is so minimal that they should not be burdened with a claims process.  But the potential recovery in this case provides ample incentive for ostensible class members to complete and send in claim forms.  The jury awarded $400 per phone call, with a minimum of two phone calls per telephone number.  Plaintiff calculates that the average award per telephone number is more than $1,000 before subtracting attorneys' fees and expenses.  Doc. 331 at 5.  This is not a consumer class action settlement where recovery is limited to coupons or a few

9

dollars. Consumers file their own TCPA lawsuits in small claims court and other courts on a regular basis to collect up to $500 per call. *See, e.g.*, *Local Baking Prod., Inc. v. Westfield Rental Mart, Inc.*, No. A-4852-12T4, 2014 WL 2807536, at *3 (N.J. Super. Ct. App. Div. June 23, 2014) ("[T]he statutory award under the TCPA was 'considerably in excess of any real or sustained damages,' as well as '[t]he cost of litigating for an individual' [and] . . . the TCPA's design and New Jersey's procedures were very conducive to bringing such claims on an individual basis."). Indeed, a number of individuals make a career out of filing TCPA lawsuits. *See, e.g.*, *Forbes*, Filing TCPA Lawsuits: "It's What I Do," Says Professional Plaintiff with 35 Cell Phones (Aug. 25 2016), *available at* https://www.forbes.com/sites/legalnewsline/2016/08/25/filing-tcpa-lawsuits-its-what-i-do-says-professional-plaintiff-with-35-cell-phones/#2a9a2d442265.

### C. Plaintiff's proposal does not provide DISH with the res judicata protections he claims.

Plaintiff asserts—incorrectly—that the only interest DISH has at this stage is an interest in obtaining a *res judicata* bar against any future claims by absent class members for SSN's calls. Doc. 331 at 4-5. But, Plaintiff's proposal even fails to protect that interest. Plaintiff is wrong that simply listing phone numbers in a judgment protects DISH from future claims with respect to those telephone numbers. No court can "predetermine the *res judicata* effect of its own judgment." 7AA *Wright & Miller*, Fed. Practice & Procedure § 1789 (3d ed.), Effect of a Judgment in a Class Action—In General. If an absent class member shows that she was not adequately represented and was deprived of an award rightly due to her based upon a grossly irresponsible and

10

inaccurate distribution process, the award may still be vulnerable to collateral attack, however the order may be worded. *Carrera v. Bayer Corp.*, 727 F.3d 300, 310 (3d Cir. 2013); *see also Gonzales v. Cassidy*, 474 F.2d 67, 75 (5th Cir. 1973) (denying *res judicata* effect of class award after holding that absent class members were inadequately represented because counsel failed to "vigorously and tenaciously protect[] the interest of the class"). Accordingly, fair procedures must be implemented to ensure that damages are awarded only to those people entitled to such an award.

Plaintiff also fails to acknowledge DISH's interest in not paying out awards for fraudulent or inaccurate claims. *Carrera*, 727 F.3d at 310 (finding inability to challenge "unreliable affidavits" harms defendant's interest in "ensuring it pays only legitimate claims"); *In re Processed Egg Prod. Antitrust Litig.*, 312 F.R.D. 124, 138–39 (E.D. Pa. 2015) ("[A] defendant must be able to challenge class membership."); *Lilly v. Jamba Juice Co.*, 308 F.R.D. 231, 239–40 (N.D. Cal. 2014) (A defendant "has a similar, if not the same, due process right to challenge the proof used to demonstrate class membership as it does to challenge the elements of a plaintiff's claim."). In recognizing this right, courts have regularly rejected measures like those Plaintiff proposes—including monetary ceilings, self-serving affidavits (or more specifically in this case, self-serving negotiation of checks), and various methods to weed out unreliable affidavits—for being inadequate replacements for a defendant's active participation in challenging claims. *Carrera*, 727 F.3d at 309-110 (rejecting assertion that defendant has no interest in participating in claims process because defendant's records can be used to determine the

monetary ceiling of class recovery); *In re Processed Egg Prod.*, 312 F.R.D. at 138-39 ("Plaintiffs are instead offering indicia that, on the whole, most of the claims will be legitimate, but these indicia do not allow Defendants to identify and challenge false claims, as is . . . their due process right.").

Plaintiff fails in his attempt to analogize this case to *Barfield v. Sho-Me Power Electric Cooperative*. 309 F.R.D. 491, 494 (W.D. Mo. 2015). Notwithstanding that *Barfield* should not be given any precedential weight because the Eighth Circuit vacated the damages award and allocation plan in their entirety,[2] *Barfield* involves a very different situation than here. In that case, the jury issued its verdict on the only remaining issue to be tried, which was damages, while here, the subscriber/recipient element of each class member's claim has been deferred to post-trial proceedings. Furthermore, the jury in *Barfield* determined an aggregate damage calculation, awarding a total of $79 million to the entire class. That is not what occurred here. The jury verdict did not establish a total damages award; instead it set the amount of damages to be awarded on a per-call basis for any violation that can be fully proven. *See* Doc. 292 (Verdict Sheet). As set forth in more detail in DISH's Motion, the Court refused to include a total damages award on the verdict sheet precisely because the scope of DISH's liability was deferred to post-trial proceedings. *See* Jan. 17, 2017 Tr. at 158:23-159:12; Doc. 242 at 1. Accordingly, Plaintiff's assertion that it "is equally true in this case" that "the jury's

---

[2] *See Barfield v. Sho-Me Power Elec. Coop.*, 852 F.3d 795, 805 (8th Cir. 2017).

verdict determined the total damages due to the class" (Doc. 331 at 8) is demonstrably wrong.

Far more analogous is the factual situation in *Allapattah Servs., Inc. v. Exxon Corp.*, which involved 10,000 Exxon dealers that were overcharged by the defendant for fuel. 333 F.3d 1248, 1251 (11th Cir. 2003), *aff'd sub nom. Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005). The jury's damages award did not include an aggregate amount, and the Eleventh Circuit affirmed that the defendant was entitled to a process by which it could contest claims on an individual basis. *Id.* at 1258-59.

## II. Plaintiff's Proposed Distribution Plan Is Grossly Irresponsible.

### A. Plaintiff conflates approval of a class notice plan with a final determination of class membership.

Plaintiff starts with a fundamental misunderstanding of what is necessary for this stage of the litigation. In arguing in favor of his plan, Plaintiff contends that he will use "reliable class member identification methods similar to those the Court authorized at the class notice stage." Doc. 331 at 1. Plaintiff's assumption that what was sufficient for class notice is sufficient to prove entitlement to relief is incorrect. There is a significant distinction between the need to notify potential class members of a pending class action and the need to finally determine who is entitled to entry of judgment in their favor. Class notice is often intentionally over-inclusive. *In re Nexium Antitrust Litig.*, 777 F.3d 9, 19-20 (1st Cir. 2015); *Lilly v. Jamba Juice Co.*, 308 F.R.D. 231, 239 (N.D. Cal. 2014). That over-inclusiveness is permitted because in granting class certification, the court is

supposed to ensure that there will be a process to distinguish those who can recover from those who cannot. *Id.*

Furthermore, the adequacy of a process is assessed under different standards depending on the stage of the litigation. The adequacy of class notice depends on whether class notice reaches a large percentage of the class. *Federal Judicial Center*, Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide, 2010, *available at* https://www.fjc.gov/sites/default/files/materials/2017/NotCheck.pdf. However, unlike in the notice process, for payment on a judgment, you must have "sufficient safeguards in place to deter waste, fraud, and/or abuse." *Id.* at 7. The claims process, claim form, and claims administrator should ensure "that approved claims are **valid claims**, so that payments go to class members **who meet the criteria**." *Id.* Plaintiff's process does not come close to identifying which individuals are the true class members in this case, and offers no procedural safeguards.

Plaintiff contends that he does not need any procedural safeguards. He can simply ask ostensible class members to verify, by the mere act of cashing a check, that they are entitled to the funds. But Plaintiff cannot reasonably expect that a deposited check can satisfy his burden of proof or DISH's right to challenge that proof.

## B.     Plaintiff's proposal guarantees inaccurate distributions.

### 1.     Plaintiff's suggested process does not identify subscribers and/or recipients of the phone calls at issue.

Because ostensible class members have not proven every element of their TCPA claim and the jury did not make an aggregate damages award, final judgment cannot be

entered at this time and Plaintiff's proposal must fail as a matter of law. Furthermore, Plaintiff's suggested process for distributing funds to putative class members is wholly inappropriate and fails to provide the necessary procedural safeguards. First, Plaintiff contends that he can simply mail checks to any name and address for which a class notice postcard was not returned as undeliverable. Doc. 331-1 ¶ 6. Then, for the remaining 27% of telephone numbers,[3] Plaintiff proposes to search credit reporting agency databases to locate names and addresses, with checks sent to identified individuals (without any explanation of how that identification would be done). Doc. 331-1 ¶¶ 7-10.[4]

The problems with Plaintiff's proposed process are manifold. Plaintiff's proposal never addresses the questions that actually need to be answered here: for each phone number, (1) who was the subscriber between May 2010 and August 2011, or (2) who personally answered two or more telemarketing calls from SSN promoting DISH's pay television services between May 11, 2010 and August 1, 2011. None of the three data sources that Plaintiff used for class notice, nor the two additional databases that Plaintiff proposes to use post-trial, shows the subscriber or recipient of the telephone calls during

---

[3] Ms. Verkhovskaya incorrectly reports that 77% of ostensible class members had postcards delivered to them. However, she calculated that percentage incorrectly. The correct percentage, based on Ms. Verkhovskaya's analysis is 73% with 27% of ostensible class member postcards returned as undeliverable. Ex. A at ¶ 4 and n.3.

[4] DISH understands that Plaintiff will be making a motion at a later date for appointment of a class administrator. DISH will respond to that motion at the appropriate time. However, DISH objects to Ms. Verkhovskaya, A.B. Data or DRRT having any role in post-trial class administration.

the class period.  Ex. A at ¶ 17 (Declaration of Debra Aron, dated May 10, 2017); *also see e.g.* Ex. B at ¶ 7 (Declaration of Laura Dozois; Doc. 56-13).

For class notice, Ms. Verkhovskaya prioritized data sources using a waterfall approach.  First and foremost, she relied upon the names and addresses within the Five9 call records.  In any situation where names and addresses conflict, the class notice postcards use addresses from the Five9 call records.  Ex. A at ¶ 14.  As Plaintiff's counsel acknowledged on the record, those names and addresses represent lead data that SSN purchased from unknown sources, and should not be expected to accurately represent subscribers or recipients for this case.  Sept. 8, 2016 Hr'g Tr. at 52:15-24 ("Five9 data was basically the lead information . . . Those are leads.  There are companies out there that sell sales leads, large bits of data.")

To the extent that the Five9 call records might not have a name and address associated with a telephone number, then Ms. Verkhovskaya used names and addresses she obtained from LexisNexis.  However, LexisNexis itself disclaims that its data will show the subscriber to a telephone number.  Ex. B at 2, ¶ 7 ("The LexisNexis data does not purport to identify the subscriber to the telephone number.").  And the names and addresses in the LexisNexis data often conflicted with the names and addresses in the Five9 call records.  Sept. 8, 2016 Hr'g Tr. at 52:15-24 ("that's not cross-checked, to our knowledge against LexisNexis . . . . So, there are some discrepancies in the names between the Five9 data and the LexisNexis data, which isn't surprising.")  Furthermore, much of the LexisNexis data that Ms. Verkhovskaya relied upon was dated outside the

16

class time period. Jan. 13, 2017 Tr. (Verkhovskaya) at 15:5-16:18; 97:8-18; 99:16-22. Moreover, the LexisNexis data itself might show multiple names associated with a single telephone number, Ex. A at ¶ 16, yet Plaintiff provides no basis for determining which person should be treated as the class member for payment purposes.

To the extent that LexisNexis provided no names and addresses for a telephone number, then Ms. Verkhovskaya used Microbilt as a data source for class notice. Microbilt created more conflicts with the Five9 data and LexisNexis data. For 3,664 numbers, there is different (and contradictory) name information listed across Five9, LexisNexis, or Microbilt. Ex. A at ¶ 13.

Even with these three data sources, approximately 5,000 postcards came back as undeliverable, and there remained at least 2,613 ostensible class members for whom Plaintiff had no names, had incomplete names, or had no address. Ex. A at ¶ 10. Plaintiff asserts that his remailing efforts reduced the returned postcards to approximately 3,000. However, he improperly relied upon additional data pulled from LexisNexis and Experian to effectuate that remailing, in violation of the class notice order. Doc. 153 at 2, n. 2; Ex. C, Email from J. Barrett to E. Echtman, dated Sept. 24, 2016. Plaintiff has refused to produce that additional LexisNexis and Experian data, preventing DISH's experts from evaluating the applicable time periods for the data and whether it further contradicts any of the other data sources.

Post-trial, Plaintiff wants to add even more untested data to the mix, from Experian and from TransUnion. Doc. 331-1 ¶¶ 7, 9. Plaintiff does not even try to justify

17

why the Court should trust these additional database outputs in the event that the first three databases failed to identify anyone associated with a given telephone number. Doc. 331 at 2; Doc. 331-1 ¶¶ 6-10. As with LexisNexis and Microbilt, information in the Experian and TransUnion databases is compiled from thousands of proprietary sources and the entities do not warrant the accuracy of their data. Ex. A at ¶¶ 21-22.

Plaintiff's proposed process is not designed to reasonably ensure that the right person receives compensation; rather, the only conclusion that can be drawn from the proposed five-database waterfall process is that Plaintiff is trying to identify *anyone* possibly associated with the phone numbers at issue, not the actual subscriber or recipient of the SSN calls. Just like with the original data from Five9, LexisNexis and Microbilt, Plaintiff is not interested in comparing whether the Experian or TransUnion data conflicts with the data Plaintiff is relying on from the other three databases to "successfully identify" ostensible class members. Instead, Plaintiff is only interested in the new data if it in some way associates a name or address with a phone number so that a piece of mail will not be returned as undeliverable. Doc. 331-1 at ¶ 7.

Plaintiff also offers no justification (because there is not one) for beginning the waterfall analysis with the Five9 call records and ending it with TransUnion, nor is there any justification for the order of those databases that fall in between.

Based on the analysis done by Dr. Aron at the class notice stage, if the order of the waterfall was changed and LexisNexis data was used first instead of Five9 data, then different individuals would be in the class. Doc. 129-1 at 7, ¶ 17. The number of

contradictions in the data will be even higher than 3,664 when two more databases (TransUnion and Experian) are added to the mix.

Where the databases offer conflicting names, Plaintiff offers no justification why one name is chosen over the others because that is not something that A.B. Data appears to have cared about in the past, and Ms. Verkhovskaya does not address that critical issue in her affidavit. *See generally* Doc. 331-1. Even within a single database, there are myriad instances where a number of different names are associated with the same phone number. Ex. A at ¶ 16. Plaintiff offers no justification as to how Ms. Verkhovskaya chose who should receive notice at the class certification stage and who, under Plaintiff's proposal, would now receive a check in the mail. The individuals who receive compensation should not be dependent on the vagaries of the order upon which Plaintiff's expert happened to search different databases or which name the expert happened to choose from a number of different possibilities.

### 2. Plaintiff lacks reliable address information.

It would also be irresponsible to put checks in the mail without a litigated claims process because Plaintiff lacks reliable addresses for the ostensible class members. Plaintiff has tried to identify the address of ostensible class members as of 2010-2011, not the present day, and that means that a significant number of people have likely moved in the ensuing 5+ years. The United States Census Bureau has reported that in the year 2013-2014 alone, one in nine people moved—a rate consistent with 2010, 2011, and 2012. *U.S. Census Bureau Press Release,* U.S. Mover Rate Remains Stable at About

12% Since 2008, Census Bureau Reports (Mar. 18, 2015), *available at* https://www.census.gov/newsroom/press-releases/2015/cb15-47.html.  Additionally, the National Change of Address Database will not satisfy all of these concerns, as it only keeps moving information dating back two years meaning anyone who moved before that will not be captured in its data.  Ex. A at ¶ 23.

Plaintiff relies on the absence of an undeliverable returned class notice postcard to assert that an ostensible class member was successfully reached, claiming that class notice reached 77% of class members (or 73%, adjusting for Ms. Verkhovskaya's calculation error).  In reality, the absence of a returned postcard does not mean that the intended recipient was successfully located, let alone that the intended recipient is the telephone number subscriber or telephone call recipient.  Ex. A at ¶ 5; 8.  Moreover, Plaintiff has a questionable history with returned postcards.  None of Plaintiff's claims on notice statistics should be credited when Plaintiff has refused to share notice data and subject it to testing.

## C. The Fourth Circuit does not allow escheat or fluid recovery in litigated judgments.

As the final component of Plaintiff's proposed process, Plaintiff requests that the Court rule out reverting "unclaimed" funds to DISH, and instead order that they either be distributed as *cy pres* or escheat to the government.  Doc. 331 at 8-9.  Again, Plaintiff mischaracterizes the jury verdict.  The jury verdict did not set out an aggregate liability amount, so there can be no litigation fund, and no "unclaimed" awards from that fund.  Doc. 330 at 13-14.  Plaintiff also asserts that DISH is arguing for reversion because "it

wants the money back." Doc. 331 at 6. But, again, Plaintiff's argument is based on the mistaken assumption that a common fund exists, which it does not. None of the ostensible class members have demonstrated their entitlement to the $400 per call awarded by the jury, so there is no money for DISH to ask to be returned. Accordingly, the doctrines of *cy pres*, escheat, and reversion have no role to play in this case.

In any case, escheat is disfavored in the Fourth Circuit and Plaintiff offers no support from this Circuit for the proposition that escheat can be used in the class action context. *United States v. 198.73 Acres of Land, more or less, in Loudoun Cty., Va.*, 800 F.2d 434, 435 (4th Cir. 1986) ("The law does not favor escheat") (citing cases). Furthermore, the Fourth Circuit disallows the use of fluid recovery or *cy pres* to distribute funds in litigated judgments. *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 72 (4th Cir. 1977); *see also Haywood v. Barnes*, 109 F.R.D. 568, 583 (E.D.N.C. 1986) ("[T]his circuit bars the use of a 'fluid recovery' arrangement."). A Court order that directs funds to some entity other than the claimant who has been judged entitled to them raises serious due process questions. *See Eisen v. Carlisle & Jacquelin*, 479 F.2d 1005, 1018 (2d Cir. 1973), *vacated on other grounds*, 417 U.S. 156 (1974) ("Even if amended Rule 23 could be read so as to permit any such fantastic procedure, the courts would have to reject it as an unconstitutional violation of the requirement of due process of law."). This prohibition extends to additional distributions to identified class members, as such a distribution "necessarily results in an undeserved windfall for those plaintiffs." *In re*

*Lupron Mktg. & Sales Practices Litig.*, 677 F.3d 21, 35 (1st Cir. 2012) (internal quotation omitted).

The majority of cases that support a theory of fluid recovery discuss distribution of a settlement fund; Plaintiff has not cited any decision from any federal court in any circuit successfully ordering *cy pres* over a defendant's objection in a non-settlement context. As the comments to Rule 23 note, because class actions cannot be used to create a remedy, a litigated judgment usually had to have "a reversionary feature." *Advisory Committee on Civil Rules*, Rule 23 Subcommittee Notes at 305-06 (April 9-10, 2015), *available at* http://www.uscourts.gov/sites/default/files/fr_import/CV2015-04.pdf ("[C]y pres is probably necessarily confined to the settlement context"). Indeed, there is not a single case in the Fourth Circuit approving of the use of fluid recovery outside the settlement context. *Manual for Complex Litigation* (2004) § 21.662 n.1001 (fluid recovery is "disfavored in a fully tried class action . . . .").

Even in circuits that allow *cy pres* distributions—for example, in the cases Plaintiff references—courts have set them aside for (1) failing to benefit class members with "reasonable certainty," or (2) failing to advance the "objectives of the underlying statute. *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1307-08 (9th Cir. 1990); *see also In re Lupron Mktg.*, 677 F.3d at 33 (recipients must be those "whose interests reasonably approximate those being pursued by the class," including consideration of "the purposes of the underlying statutes"). A growing number of circuit courts have observed that "the specter of judges" dealing in the distribution and

solicitation of large sums of money "creates an appearance of impropriety." *See, e.g.*, *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1039 (9th Cir. 2011); *S.E.C. v. Bear, Stearns & Co. Inc.*, 626 F. Supp. 2d 402, 415 (S.D.N.Y. 2009).  Indeed, *Lupron* expressed concern that "district courts are given discretion by parties to decide on the distribution of cy pres funds."  *In re Lupron Mktg.*, 677 F.3d at 38.

DISH is entitled to require proof that each class member is entitled to damages under the TCPA.  Plaintiff should not be allowed to merely substitute another entity to claim the damages of phantom class members who never existed.  If the amount ultimately claimed is less than what Plaintiff's counsel anticipated, the fault lies in Plaintiff's proof, not with DISH.

## CONCLUSION

For the foregoing reasons, DISH respectfully requests the Court reject Plaintiff's proposed procedures.

Dated: May 10, 2017

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP


By:  /s/ Peter A. Bicks
Peter A. Bicks
Elyse D. Echtman
John L. Ewald

51 West 52nd Street
New York, NY 10019-6142
Telephone:  (212) 506-5000
pbicks@orrick.com
eechtman@orrick.com
jewald@orrick.com


  /s/ Richard J. Keshian
Richard J. Keshian
North Carolina Bar No. 10681
KILPATRICK, TOWNSEND & STOCKTON,
LLP
1001 West 4th Street
Winston-Salem, NC 27101
Telephone:  (336) 607-7322
rkeshian@kilpatricktownsend.com

*Attorneys for Defendant DISH Network L.L.C.*

24

## CERTIFICATE OF SERVICE

I hereby certify that on May 10, 2017, I electronically filed the above document with the Clerk of Court using the CM/ECF system, which will send notifications of such filing to all counsel of record.

/s/ Peter A. Bicks

Peter A. Bicks
ORRICK, HERRINGTON & SUTCLIFFE
LLP
51 West 52nd Street
New York, NY 10019-6142
Telephone: (212) 506-5000
pbicks@orrick.com
eechtman@orrick.com
jewald@orrick.com

*Attorneys for Defendant DISH Network L.L.C.*

25

# WORD COUNT CERTIFICATION

Peter A. Bicks, an attorney of record in the above captioned matter, hereby

certifies that the foregoing brief contains 6,478 words, in compliance with the Court's

word limitations as set forth in Local Rule 7.3(d), as calculated by the word count

function of the word processing system used to prepare the foregoing brief.


  /s/ Peter A. Bicks
──────────────────────────────────
Peter A. Bicks
ORRICK, HERRINGTON & SUTCLIFFE
LLP
51 West 52nd Street
New York, NY 10019-6142
Telephone:  (212) 506-5000
pbicks@orrick.com
eechtman@orrick.com
jewald@orrick.com

*Attorneys for Defendant DISH Network
L.L.C.*