IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| THOMAS H. KRAKAUER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:14-CV-333 |
| | ) | |
| DISH NETWORK L.L.C., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

Satellite Systems Network, an agent of the defendant Dish Network, made more than 50,000 telemarketing calls on behalf of Dish to phone numbers on the National Do Not Call Registry in 2010 and 2011. These calls violated the Telephone Consumer Protection Act. Despite knowing that SSN had a history of TCPA violations and was calling lists of numbers that it had not "scrubbed" against the Registry, Dish allowed SSN to continue to make telemarketing calls to sell Dish services. While Dish promised forty-six state attorneys general in 2009 that it would enforce TCPA compliance by its marketers, Dish did nothing to monitor, much less enforce, SSN's compliance with telemarketing laws. When it learned of SSN's noncompliance, Dish repeatedly looked the other way.

Consistent with the jury's verdict that these calls violated the TCPA and that SSN was Dish's agent, the Court finds that SSN and Dish willfully and knowingly violated the

TCPA. The Court further concludes that it is appropriate to treble the damages against Dish under 47 U.S.C. § 227(c)(5).

## I. BACKGROUND

Congress enacted the TCPA to curb abusive telemarketing practices that threatened consumer privacy. *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012). Among other things, the TCPA prohibits telemarketers from repeatedly calling people who list their phone numbers on the National Do Not Call Registry. *Hannabury v. Hilton Grand Vacations Co.*, 174 F. Supp. 3d 768, 771 (W.D.N.Y. 2016). *See generally Mainstream Mktg. Servs., Inc. v. FTC*, 358 F.3d 1228, 1234 (10th Cir. 2004) ("The national do-not-call registry is a list containing the personal telephone numbers of telephone subscribers who have voluntarily indicated that they do not wish to receive unsolicited calls from commercial telemarketers."). People may register land-line and wireless numbers on the Registry. *Danehy v. Time Warner Cable Enters.*, No. 5:14-CV-133, 2015 WL 5534094, at *4 (E.D.N.C. Aug. 6, 2015) (Gates, Mag. J.), *adopted by* 2015 WL 5534285 (E.D.N.C. Sept. 18, 2015).

The TCPA creates a private right of action for injunctive and monetary relief for any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the [TCPA] regulations." 47 U.S.C. § 227(c)(5); *see Hannabury*, 174 F. Supp. 3d at 771-72. The protections of the TCPA related to the Registry only apply to residential numbers; calls to businesses on the Registry are not actionable under § 227(c). *See* 47 C.F.R. § 64.1200(c)(2) & (d) (referring to "residential" subscribers).

2

The TCPA is a strict liability statute and so it does not require any intent for liability. *Alea London Ltd. v. Am. Home Servs., Inc.*, 638 F.3d 768, 776 (11th Cir. 2011). Treble damages, however, are available for violations that occur "willfully or knowingly." *Id.*

In 2003, Dr. Thomas Krakauer, the plaintiff and class representative, registered his residential number on the Registry. Trial Tr. Jan. 11, 2017, Doc. 302 at 9:17-10:2 (testimony of Dr. Krakauer).[1] Beginning in May 2009 and over the next two years, SSN called Dr. Krakauer numerous times in an effort to sell him Dish satellite television programming and related services. *See id.* at 12:3-:7, 17:22-18:5; Trial Tr. Jan. 13, Doc. 304 at 107:2-:22 (testimony of Anya Verkhovskaya). The calls continued even after Dr. Krakauer complained to Dish about SSN's sales tactics and after Dish placed Dr. Krakauer on its internal do-not-call list and told SSN to do the same. *See* PX[2] 15 at 7980-81, 8005.

Dr. Krakauer sued Dish in 2014, alleging that calls to him and others violated the TCPA and that Dish was liable as SSN's principal. Doc. 1; *see* Doc. 81 at 7. He sought injunctive and monetary relief on behalf of a class of all persons whose numbers were on the Registry but who nonetheless received multiple telemarketing calls from SSN to

---

[1] All references to the record cite the document number appended by the CM-ECF system. Pin citations are to the page numbers appended by CM-ECF, or, where indicated, to numbered paragraphs in a document. For transcripts, line numbers are also indicated. Trial transcripts are available on the docket at Docs. 301 to 307

[2] PX refers to "Plaintiffs' Exhibit," DX to "Defendant's Exhibit," and JX to "Joint Exhibit."

promote Dish between May 1, 2010, and August 1, 2011.[3] Doc. 1 at pp. 10-11; *see* Doc. 47 at 1. After a class was certified, Doc. 111, and summary judgment was largely denied, Doc. 113, the matter was tried to the jury in January 2017. *See* Minute Entry 01/10/2017. The Court heard the evidence about willfulness at the same time. *See* Doc. 222 at p. 6.

Issues of agency, liability, and damages were submitted to the jury. On the agency issue, the jury was instructed that the plaintiffs must prove two things by the greater weight of the evidence in order to reach an affirmative answer: first, that SSN was Dish's agent, and second, that SSN acted in the course and scope of that agency when it made the calls at issue. Doc. 293 at 4-5. The jury was instructed only on actual authority, including implied actual authority by consent or acquiescence. *Id.* at 6-7.[4] The jury answered the agency issue in favor of the plaintiffs, finding that SSN acted as Dish's agent when it made the calls at issue. Doc. 292.

On the second issue, the plaintiffs had to prove four things by a preponderance of the evidence: first, that the numbers of the class members were listed on the Registry at the time of the call; second, that after the number had been listed for at least thirty days, SSN called the number at least twice during any twelve-month period and made a telephone solicitation on behalf of Dish; third, that the calls were received; and fourth,

---

[3] Dr. Krakauer also sought relief on behalf of persons whose numbers were on internal do-not-call lists of Dish and SSN. This class was initially certified, Doc. 111 at 33-34, but the parties later agreed to dismiss these claims without prejudice in order to simplify issues for trial, as there was almost complete overlap with the Registry class. Doc. 271. Also, by trial, the parties changed the official start date of the class period to May 11, 2010. *See* Doc. 292 at ¶ 1.

[4] The Court earlier granted summary judgment in Dish's favor on the two alternate agency theories, apparent authority and ratification. Doc. 118.

4

that the numbers were residential at the time of the call.  Doc. 293 at 8.  The jury

answered this liability question in favor of plaintiffs for all of the calls.  Doc. 292.

On the third issue, the plaintiffs asked for statutory damages and did not seek

actual damages.  These statutory damages are limited to no more than $500 per violative

call.  47 U.S.C. § 227(c)(5)(B).  The jury awarded $400 for each call.  Doc. 292.

After the verdict, the parties submitted written closing arguments on willfulness.

Docs. 308, 312, 313, 317.  Having considered those briefs and all of the evidence, the

Court now enters these findings of fact[5] and conclusions of law as to whether the

violations were willful and knowing.

## II.    FACTS

### A. Overview

Dish Network is a satellite television provider that often uses third-party marketers

to get new customers.[6]  Dish had contractual arrangements with these marketers, many of

---

[5] The Court finds all facts stated in this order from the evidence at trial, based on a preponderance of the evidence standard.  The Court has considered and weighed both direct and circumstantial evidence and has drawn inferences from the credible testimony, the exhibits, and, in some instances, the lack of evidence.  While the Court has considered all of the admissible evidence, it makes no effort to summarize or recite all of the evidence.  Dish objected to the Court's consideration of the summary judgment opinion from *United States v. Dish Network*, an ongoing case in the Central District of Illinois, which plaintiffs offered, PX 2050, for the truth of the facts found in that opinion.  *See generally United States v. Dish Network, LLC*, 75 F. Supp. 3d 942 (C.D. Ill. 2014); Trial Tr. Jan. 13, Doc. 304 at 63:9-:19.  As the Court is satisfied that a finding of willfulness is appropriate without consideration of that order, the Court need not address whether it is admissible.  The Court has also not considered the 10-K report mentioned in Dr. Krakauer's rebuttal brief, Doc. 313 at 8, since it was not identified in his pretrial submissions, *see* Doc. 274 at 2-7, and was not offered as an exhibit at trial.

[6] Dish refers to these marketers as "retailers" and to new customers as "activations."  *See* Trial Tr. Jan. 11, Doc. 302 at 87:24-90:9 (testimony of Amir Ahmed discussing sales and new customers).

whom, including SSN, solicited new customers for Dish through telemarketing calls. SSN was an "Order Entry Retailer" with direct access to Dish's computer system. The OE Retailers collectively generated hundreds of millions of dollars a year in revenue for Dish.

Dish's contract with SSN gave it virtually unlimited rights to monitor and control SSN's telemarketing. In a settlement agreement with dozens of state attorneys general in 2009, Dish confirmed that it had this power over all of its marketers.

On paper, Dish was committed to monitoring its marketers' compliance with telemarketing laws and investigating complaints of violations. In reality, however, Dish repeatedly looked the other way when SSN violated the telemarketing laws and when SSN disregarded contractual duties related to compliance. Dish received numerous complaints about SSN between 2004 and 2010 and was aware of three lawsuits against SSN over its telemarketing calls that resulted in monetary damages and injunctive relief. Dish knew in May 2009 that SSN was not scrubbing all its call lists against the Registry; it knew even earlier that SSN was not maintaining call records. When Dish received complaints about SSN and other marketers, the Dish compliance department did nothing except attempt to identify the marketer that made the call and, in the few cases when the marketer was identified, refer the complaint to the marketer. SSN, for its part, sent all complaints it received to Dish and "wait[ed] for Dish to tell [us] what to do." When individuals complained, Dish disclaimed responsibility for the acts of its marketers, including SSN, and made no effort to determine whether SSN was complying with telemarketing laws, much less to enforce such compliance.

## B. The Relationship Between Dish and SSN

Dish's relationship with SSN dates to 2001, when it first signed an agreement to have SSN market Dish services to new customers. DX 84. Around that time, SSN marketed for both Dish and DirecTV, a Dish competitor. *See, e.g.*, Dep. Tr. of Bahar "Sophie" Tehranchi,[7] Doc. 327 at 72:16-73:12; Trial Tr. Jan. 11, Doc. 302 at 205:7-:9 (testimony of Amir Ahmed). In May 2004, Dish made SSN one of its forty-five OE Retailers. *See* Trial Tr. Jan. 11, Doc. 302 at 60:2-61:14 (Ahmed testimony). As an OE Retailer, SSN could log directly into Dish's ordering system and enroll new customers in Dish services. *Id.* at 60:10-:18. Around 2005, DirecTV terminated SSN and stopped using them as a marketer. *See* Tehranchi Dep., Doc. 327 at 72:16-:22; Trial Tr. Jan. 12, Doc. 303 at 52:13-:21, 55:6-:8 (testimony of Reji Musso).

Dish's contract with SSN[8] characterized SSN as an independent contractor. JX 1 at ¶ 11. Dish did not own SSN or direct its day-to-day operations. Trial Tr. Jan. 11, Doc. 302 at 228:20-229:8 (Ahmed testimony). SSN was a separate business entity with its own payroll and management. *See id.* at 227:4-:14. In practice, Dish did not tell SSN who to market to or require it to do any specific type of marketing, like telemarketing.

---

[7] Selections of Ms. Tehranchi's videotaped deposition were shown to the jury at trial and offered into evidence. Trial Tr. Jan. 12, Doc. 303 at 153:13-161:20. The excerpts presented to the jury are on the docket at Doc. 327. For the Tehranchi deposition only, pin citations refer to the page numbers in the original transcript, not the page numbers appended by CM-ECF.

[8] Citations here are to the contract signed in 2006, which was in effect through at least 2009. *See* JX 1 at ¶ 10.1; Trial Tr. Jan. 11, Doc. 302 at 107:7-:16 (Ahmed testimony). A later contract that was effective beginning December 31, 2010, was essentially identical. *See* JX 2; Trial Tr. Jan. 11, Doc. 302 at 141:15-:22 (Ahmed testimony); *see also* DX 84 (2001 contract).

*Id.* at 226:12-:25; *see also* Trial Tr. Jan. 13, Doc. 304 at 167:9-:12 (testimony of James DeFranco).

Dish did allow SSN to hold itself out as a Dish authorized representative, and SSN could initiate the sales process on Dish's behalf. *See* Trial Tr. Jan. 11, Doc. 302 at 60:2-:18 (Ahmed testimony); Trial Tr. Jan. 12, Doc. 303 at 24:21-25:5 (Musso testimony); JX 1 at ¶ 2.1. Dish paid SSN on a weekly basis for each new customer that SSN signed up for Dish services, once those services were activated. Trial Tr. Jan. 12, Doc. 303 at 23:25-24:12 (Musso testimony). During 2010 and 2011, all of SSN's revenue came from payments from Dish for signing up new Dish customers. *See* Tehranchi Dep., Doc. 327 at 121:17-:20.

The terms of the contract between Dish and SSN showed that Dish had the power to exercise complete control over SSN's telemarketing and sales calls. The contract required SSN to "take all actions and refrain from taking any action, as requested by [Dish] in connection with the marketing" of Dish services. JX 1 at ¶ 7.3. Dish had absolute control over the type and cost of programming packages that SSN could market. *See id.* at ¶¶ 4-5. All the internal records SSN created while conducting marketing on behalf of Dish were "the sole and exclusive property" of Dish, even after the Dish-SSN agreement ended. JX 1 at ¶ 7.4. SSN was required to "continuously and actively" promote Dish's products, and failure to do so was grounds for termination. *Id.* at ¶¶ 2.3, 10.4. Dish had absolute discretion to change SSN's compensation at any time. *Id.* at ¶ 6.1.1; Trial Tr. Jan. 11, Doc. 302 at 114:5-:16 (Ahmed testimony). While SSN bought bulk customer data to develop lists of people to call on behalf of Dish, Dish controlled

8

the companies from which SSN could buy this data. *See* Tehranchi Dep., Doc. 327 at 55:5-:14.

The contract also gave Dish nearly unlimited power to impose additional requirements on SSN via "business rules." Dish could issue these business rules to SSN at any time, for any reason, merely by sending an email or fax. JX 1 at ¶ 1.7. If SSN failed to follow a business rule, Dish could terminate the contract. *See id.* at ¶ 10.3.

Via these business rules, Dish imposed several requirements related to TCPA compliance. *E.g.*, DX 1 at 7; DX 2; DX 3 at 47. Dish required that marketers maintain records of the telemarketing calls they made. *E.g.*, DX 2. Dish could require SSN to submit sales scripts to Dish for pre-approval, and Dish monitored sales calls to be sure SSN was offering Dish services on terms authorized by Dish. *See* Tehranchi Dep., Doc. 327 at 66:7-67:1, 67:13-68:5 (discussing script submitted to Dish and referring to PX 22); PX 22; PX 15 at 7991, 8055 (notice that Dish would monitor SSN's calls). Beginning in October 2008, Dish required that all marketers "scrub" their call lists of numbers on the Registry and maintain scrubbing records, using a service from another business, PossibleNow. DX 5. When Dish traced a complaint to a marketer, it routinely asked for the date that SSN had scrubbed the number. *E.g.*, PX 15 at 7988.

In 2010, the OE Retailers as a whole enrolled over a million new Dish customers per year. Trial Tr. Jan. 11, Doc. 302 at 89:12-:17 (Ahmed testimony); *see* PX 89 at 14. The average customer pays Dish about $80 per month, *see* Trial Tr. Jan. 13, Doc. 304 at 193:25-194:2 (DeFranco testimony), meaning that the new customers enrolled by OE Retailers created in the ballpark of $960 million in new annual Dish revenue per year.

9

Neither Dish nor the plaintiffs offered evidence of the specific number of activations that resulted from SSN's sales calls or of Dish's net sales or profits from those new customers, though SSN appears to have produced only a small percentage of Dish's activations. Trial Tr. Jan. 11, Doc. 302 at 199:14-:18 (testimony by Mr. Ahmed that SSN accounted for "less than one-tenth of a percent" of Dish's 2011 budget for new customers); Trial Tr. Jan. 13, Doc. 304 at 177:15-:20 (similar testimony by Mr. DeFranco).

### C. History of Complaints and Lawsuits

From early on in the relationship with Dish, SSN's telemarketing was a recurring source of TCPA complaints and compliance problems. Dish received TCPA complaints about SSN numerous times: about illegal prerecorded calls in 2005; violations of do-not-call lists in 2009 and 2010; and other, unspecified complaints in 2005, 2006, and 2008. *See, e.g.*, PX 15 at 7988, 8005, 8006, 8035, 8037, 8046; PX 52.

In addition to the specific complaints in the record, Dish managers themselves repeatedly characterized SSN as a compliance problem. In July 2004, Amir Ahmed, Dish's national sales manager, told others at Dish that he was "hearing a lot of complaints on [SSN] on telemarketing calls to customers." PX 503 at 1. Just a few months later, however, Mr. Ahmed told a subordinate to recruit SSN to sell more of their products and less of DirecTV's, noting that he "[n]eed[s] activations" and had gotten "additional economics" for SSN, despite "issues related to sales." PX 656 at 1. About a year later, in September 2005, Dish's corporate counsel acknowledged in an internal email that SSN was a problem:

> We know that SSN is using autodialers and automessages. [SSN's owner] has been warned time and again . . . that these activities could violate the law. Last time, Teranchi [sic] blamed a "rogue employee," who he claimed was terminated, but the activities continue. . . . SSN is a problem because we know what he is doing . . . .

PX 194 at 1.

Dish was also aware that telemarketing by SSN and its predecessor was the target of legal action. In 2004, Florida fined Vitana, a d/b/a of SSN, *see* Trial Tr. Jan. 11, Doc. 302 at 164:15-:18 (Ahmed testimony), for telemarketing to people on Florida's do-not-call registry, and a Florida court issued a permanent injunction. PX 191. In March 2005, the North Carolina Attorney General settled a lawsuit against SSN with a permanent injunction enjoining SSN from using prerecorded calls and from calling people in North Carolina on the National Do Not Call Registry. PX 186.[9] In 2006, after the manager of Dish's compliance office learned of the two injunctions, *see, e.g.*, PX 15 at 8002, she did not do any follow-up investigation on or monitoring of SSN and "didn't have any reason to be concerned" because she purportedly believed SSN had stopped using prerecorded calls. Trial Tr. Jan. 12, Doc. 303 at 98:18-99:10, 133:20-134:5 (Musso testimony). She ignored the fact that the injunctions addressed calls to persons on state or federal do-not-call registries.

---

[9] Dish witnesses testified that they believed this lawsuit concerned calls made on behalf of DirecTV, not Dish, *e.g.*, Trial Tr. Jan. 12, Doc. 303 at 98:18-:25 (Musso testimony), but the injunction was not limited to calls made on behalf of DirecTV. *See* PX 186. DirecTV, Dish's primary competitor, had terminated SSN as a marketer around this time, a fact Dish knew. Trial Tr. Jan. 12, Doc. 303 at 52:13-:21, 55:6-:8 (Musso testimony); *see* Tehranchi Dep., Doc. 327 at 72:16-:22.

In February 2007, Dish's compliance staff discussed an ongoing class action lawsuit against SSN. *See id.* at 48:12-:19 (Musso testimony); PX 15 at 7995. Again, Dish's compliance staff was unconcerned and did not investigate. *See* PX 15 at 7995. ("Brian tells me that they are doing well and going on the incentive trip . . . so, once again, this is a business decision. . . . *[A]s far as we know,* they have 'righted the wrongs[.]'" (emphasis added)). Dish also knew that its payments to SSN were being garnished by court order in 2007 as a result of a judgment entered in a TCPA do-not-call action against SSN. *See id.* at 8009-13; Trial Tr. Jan. 12, Doc. 303 at 57:9-:17 (Musso testimony).

In late 2008, Dish's emails to SSN about complaints went unanswered for more than four months; SSN responded only when Dish sent a follow-up email about a more recent complaint. PX 15 at 7983-87. In April 2009, responding to that complaint, SSN told Dish it did not have records of calls made on the dates at issue, nor did it provide scrub dates for the calls at issue. *Id.* Despite knowing that SSN was not complying with business rules requiring it to maintain this information, *see, e.g.*, *supra* p. 9; Trial Tr. Jan. 12, Doc. 303 at 39:8-:17 (Musso testimony), Dish did not take any action to monitor or oversee SSN's compliance with its contractual duties or with telemarketing laws. Trial Tr. Jan. 12, Doc. 303 at 41:20-42:7 (Musso testimony). This was true even though SSN's missing information conveniently made it harder for Dish's compliance department and complaining consumers to trace violations to SSN.

Despite its knowledge of these complaints and lawsuits, Dish continued its relationship with SSN, allowing SSN to market and sell Dish's products and services.

Dish never restricted SSN's authority to act on Dish's behalf and never investigated to see whether SSN had actually solved its compliance problems. *Id.* at 20:11-:16, 21:1-:12, 78:4-79:1, 82:24-83:6.

### D. Lead-Up to the Class Period

During the year before the class period began, Dish received two specific, independent complaints from which it learned that SSN was calling people on the Registry—the exact type of violation at issue in this case. In between those complaints, Dish represented to and promised forty-six state attorneys general that it would require its marketers to comply with telemarketing laws and would affirmatively investigate complaints against those marketers.

### i. Dr. Krakauer's Complaint

In May 2009, Dr. Krakauer called Dish to complain about a telemarketing call he received on Dish's behalf by a man who identified himself only as "Ken." Trial Tr. Jan. 11, Doc. 302 at 13:16-14:21 (Krakauer testimony). Dish learned that SSN had made the call and that Dr. Krakauer was on the Registry. PX 15 at 8060-62. Dish informed Dr. Krakauer only that a "contractor" had made the call and that Dish was not responsible for the contractor's actions. Trial Tr. Jan. 11, Doc. 302 at 14:22-15:11 (Krakauer testimony).

In Dish's follow-up with SSN, SSN admitted it was using an old customer list that had not been scrubbed by PossibleNow. PX 15 at 7980-81. Dish understood SSN to mean that the list was scrubbed six years earlier in 2003. *See* Trial Tr. Jan. 12, Doc. 303 at 35:3-36:7, 38:16-39:17 (Musso testimony). SSN told Dish that the call was made by "our top employee" who "sells the most and has the least amount of cancellations." PX

13

15 at 7980.  Dish did not ask for a recording of the call, Trial Tr. Jan. 12, Doc. 303 at

36:21-:23 (Musso testimony), and Dish did not tell SSN to stop using the old list without

a current scrubbing.  *See id.* at 36:1-:7.

Dish did tell SSN to put Dr. Krakauer on a do-not-call list and not to call him

again.  PX 15 at 8005.  Afterwards, however, Dish did not use any of the contractual

tools at its disposal to investigate or monitor SSN's TCPA compliance generally or as to

Dr. Krakauer.  *E.g.*, Trial Tr. Jan. 12, Doc. 303 at 82:24-83:6 (Musso testimony).  Nor did

Dish follow up to see if SSN complied with earlier instructions.

### ii.  The Compliance Agreement

In the summer of 2009, Dish signed an agreement about TCPA compliance with

forty-six attorneys general.  PX 55.  In this agreement, entitled "Assurance of Voluntary

Compliance" (the Compliance Agreement), Dish represented that it had control over its

third-party marketers, including OE Retailers like SSN.  *See* Trial Tr. Jan. 11, Doc. 302 at

80:8-:25 (Ahmed testimony).  Dish agreed to supervise its marketers, determine if they

were complying with federal do-not-call laws, and discipline or terminate them if they

failed to take steps to prevent violations of the law.

Specifically, the Compliance Agreement stated that Dish "shall affirmatively

investigate" do-not-call complaints and "take appropriate action . . . against any

[marketer] it has determined to be in violation of the requirements of this Assurance."

PX 55 at ¶ 4.74.  The Compliance Agreement required Dish to "monitor, directly or

through a third-party monitoring service . . . its Covered Marketers . . . to determine

whether the Covered Marketer is complying with all applicable federal, state, and local

do-not-call laws." *Id.* at ¶ 4.78. Dish was required to issue business rules to its marketers to require them to comply with the Compliance Agreement. *Id.* at ¶ 4.73. If a marketer violated do-not-call laws, the Compliance Agreement stated that Dish "shall appropriately and reasonably discipline" that marketer, and that discipline "shall include" at least one of: termination, fines, withholding payment, suspension, prohibiting telemarketing, requiring the marketer to change its procedures/employees/affiliates/training, or "other appropriate and reasonable discipline." *Id.* at ¶ 4.79.

The Compliance Agreement required Dish to affirmatively require "Covered Marketers"—like SSN—to comply with the terms of the agreement. *Id.* at ¶¶ 2.9, 2.15, 3.3; *see also* Trial Tr. Jan. 11, Doc. 302 at 63:19-64:16 (Ahmed testimony). The Compliance Agreement stated that Dish "shall be bound from directly or indirectly engaging in the practices set forth herein and shall be required to directly or indirectly satisfy the affirmative requirements set forth herein." PX 55 at ¶ 4.

Beyond sharing the terms of the Compliance Agreement with its marketers, Trial Tr. Jan. 11, Doc. 302 at 73:25-74:10 (Ahmed testimony), the record is silent about any efforts Dish undertook to comply with the promises and assurances it made. According to Dish's co-founder, the Compliance Agreement changed nothing: "This is how we operated even prior to the agreement as it related to telemarketing." Trial Tr. Jan. 13, Doc. 304 at 168:17-169:6 (DeFranco testimony). That, however, is patently inaccurate, as Dish's compliance department never investigated whether a marketer had violated telemarketing laws. *See* discussion *infra* pp. 17-19.

### iii. Mr. Campbell's Complaint

In early May 2010, Richard Campbell made a complaint to Dish that was virtually identical to Dr. Krakauer's complaint from a year earlier. *See* PX 8; Trial Tr. Jan. 12, Doc. 303 at 69:5-:19 (Musso testimony). Dish traced the call to SSN and confirmed that Mr. Campbell's number was on the Registry. PX 52. Just days after the class period began on May 11, SSN again told Dish that it was using an old list without a new scrub against the Registry. PX 899 at 1. Despite the business rule requiring SSN to scrub all lists with PossibleNow and Dish's knowledge that SSN was using unscrubbed lists, Dish continued to allow SSN to sell Dish products as a Dish authorized retailer. *See* Trial Tr., Jan. 12, Doc. 303 at 72:20-74:9 (Musso testimony). Despite the promises Dish made to the attorneys general in the Compliance Agreement, *see* PX 55 at ¶ 4.74, Dish did not further investigate or monitor SSN's telemarketing or scrubbing practices. In fact, Dish did nothing beyond telling SSN to use caution and to remove the individual complainants from its call lists. *See* PX 52; PX 899 at 1. It never checked to be sure SSN had complied with this instruction as to Dr. Krakauer, even after it received the second identical complaint from Mr. Campbell. As noted *supra* p. 3, Dr. Krakauer continued to receive unwanted calls from SSN on Dish's behalf.[10]

---

[10] At trial, Dish blamed Dr. Krakauer for this, saying that he never complained about the recurring violations during the class period. *See* Trial Tr. Jan. 10, Doc. 301 at 102:4-:8 (Dish's opening statement); Trial Tr. Jan. 12, Doc. 303 at 123:19-:21, 143:20-:23 (Musso testimony); Trial Tr. Jan. 18, Doc. 306 at 75:9-:19 (Dish's closing argument). It is difficult to understand why Dr. Krakauer would have wasted his time in making a second complaint to Dish; Dish had disclaimed responsibility for the first SSN call and Dr. Krakauer's first complaint had not stopped the calls about Dish products. Nothing in the TCPA requires a consumer who receives violative calls to complain. *See* 47 U.S.C. § 227(c).

Despite these complaints, lawsuits, and violations of federal and state law, Dish never disciplined SSN at any point between 2006 and 2011. *See* Trial Tr. Jan. 12, Doc. 303 at 20:11-21:12, 22:4-:21 (Musso testimony). SSN continued to sell Dish products.

### E. The Compliance Department

When it came to OE Retailers, the division of Dish that responded to customer complaints was a compliance department in name only. It operated on "relationships of trust" with marketers. Trial Tr. Jan. 12, Doc. 303 at 145:10-:12 (Musso testimony). It never investigated the legitimacy of customer complaints alleging that SSN violated the TCPA; in the words of the compliance manager in charge of the department, that task was simply "not my job." *Id.* at 41:12-42:7.[11]

The standard Dish response to a customer complaint was to (1) identify the marketer who made the call, if it could, (2) ask the marketer for call records and proof that the number had been scrubbed, and (3) regardless of the response—or lack of response—to ask the marketer not to call that specific person again. *See id.* at 19:23-20:2, 43:24-44:12, 56:3-:19, 58:20-59:2; PX 15 at 7988 (example of form letter). For the majority of complaints, the compliance department was unable to trace the call back to a specific marketer. Trial Tr. Jan. 12, Doc. 303 at 149:6-150:12 (Musso testimony).

---

[11] This reality was in contrast with characterizations of the compliance department by Dish's upper management. The vice president of sales testified that Dish "had a very, very strong management team overseeing the OE retailers" during the class period. Trial Tr. Jan 11, Doc. 302 at 191:14-:17 (Ahmed testimony). He also testified that "[w]e had a very good compliance team . . . that was put together headed by Reji Musso and Bruce Werner . . . ." *Id.* at 237:23-238:6. The co-founder testified that the compliance department "affirmatively investigated" complaints to see if they were "legitimate." Trial Tr. Jan. 13, Doc. 304 at 193:20-:24 (DeFranco testimony). Ms. Musso's testimony was directly to the contrary.

When SSN received complaints, it forwarded them to Dish and then would "wait for Dish to tell [them] what to do." Tehranchi Dep., Doc. 327 at 41:24-42:17. The result was a circular and ineffective compliance program.

The Dish compliance department believed TCPA compliance "was really up to the retailer," and Dish's department was not set up to monitor marketers for Registry compliance. Trial Tr. Jan. 12, Doc. 303 at 18:17-19:8 (Musso testimony). The compliance department never looked at SSN's call records or checked behind SSN to confirm that SSN was scrubbing its lists. *See id.* at 41:12-42:7, 73:12-74:9, 78:12-79:1 (Musso testimony). As is obvious from the number of violations shown at trial, SSN was not scrubbing its customer lists when it bought customer data from some sources. Tehranchi Dep., Doc. 327 at 122:6-:25, 123:12-:22.

Several Dish employees, including the compliance manager, testified that it was not feasible for Dish to monitor compliance of its marketers. Trial Tr. Jan. 12, Doc. 303 at 41:12-42:7 (Musso testimony); Trial Tr. Jan. 13, Doc. 304 at 174:24-175:7 (DeFranco testimony); *see* Trial Tr. Jan. 11, Doc. 302 at 228:20-229:14 (Ahmed testimony). This testimony is not credible. First, in the Compliance Agreement, Dish had agreed to monitor and enforce compliance. PX 55 at ¶¶ 4.78-4.79. Second, in 2009, PossibleNow offered to audit Dish's marketers for TCPA compliance for a fee of $1,000 to $4,500 per marketer. PX 70. Dish did not buy any of these options for any marketer or force any marketer to buy it themselves. Trial Tr. Jan. 12, Doc. 303 at 85:19-:22 (Musso testimony). Nor did Dish take any other steps to comply with the provision of the Compliance Agreement that it would "monitor, directly or through a third-party

18

monitoring service . . . its Covered Marketers . . . to determine whether the Covered Marketer is complying with all applicable federal, state, and local do-not-call laws."  PX 55 at ¶ 4.78.

The Dish compliance department dismissively referred to people who filed TCPA lawsuits or who regularly complained about TCPA violations as a type of "harvester" or "frequent flyer" who "tended to make a living placing TCPA complaints."  Trial Tr. Jan. 12, Doc. 303 at 58:1-:19, 134:13-135:8 (Musso testimony).  This derisive attitude existed even though Dish's compliance department was aware that some of these "harvester" complaints stated legitimate violations of federal law.  *Id.* at 135:13-:21.

## F.  Agency

The evidence at trial persuasively demonstrated that SSN was acting as Dish's agent and was acting in the course and scope of that agency when it made the calls at issue, and the jury so found.  Doc. 292 at ¶ 1; *see* Doc. 293 at 4-8 (jury instructions on agency).  As noted *supra* pp. 8-10, 14-16, Dish had substantial contractual rights to control SSN's telemarketing activities and Dish represented to forty-six state attorneys general that it had such control.  Dish was aware of SSN's long history of TCPA violations.  *Supra* pp. 10-13.  Within a year of the beginning of the class period and again at the beginning of the class period, Dish knew SSN was calling numbers on the Registry and that SSN was using lists of numbers that it had not scrubbed.  *Supra* pp. 13-14, 16-17.  It took no action to monitor Dish's compliance with telemarketing laws, *supra* pp. 17-19, and effectively acquiesced in SSN's use of unscrubbed lists.

### G. The Calls at Issue

The evidence at trial persuasively demonstrated that SSN made thousands of telephone solicitations during the class period to persons whose numbers were on the Registry. The plaintiffs' expert, Anya Verkhovskaya, reviewed and analyzed records showing all the calls placed by SSN in the class period. *See generally* Trial Tr. Jan. 12, Doc. 303 at 174:3-184:8. Her testimony established that SSN made 51,119 outbound calls to 18,066 numbers on the Registry, that each number got at least two calls within a twelve-month period, and that these numbers were highly likely to be residential. *See id.* at 188:14-:18; PX 2008.[12] This included five connected calls to Dr. Krakauer's number. Trial Tr. Jan. 12, Doc. 303 at 189:16-:19 (Verkhovskaya testimony).

The jury rejected challenges by Dish to the validity of Ms. Verkhovskaya's overall analysis and to subgroups where Dish contended the evidence was insufficient to show the numbers were residential. *E.g.*, Trial Tr. Jan. 13, Doc. 304 at 51:19-52:11, 98:21-99:15 (Verkhovskaya testimony). The Court agrees with the jury's factual findings.

## III. DISCUSSION

To recover treble damages, the plaintiffs must show that Dish "willfully or knowingly violated" the relevant provisions of the TCPA and must persuade the Court, acting in its discretion, that trebling is appropriate. 47 U.S.C. § 227(c)(5). While a

---

[12] Ms. Verkhovskaya's report identified 57,900 calls to 20,450 numbers; additional calls were removed by stipulation of the parties just before trial. *See* Trial Tr. Jan. 12, Doc. 303 at 183:21-184:8, 187:19-188:13 (Verkhovskaya testimony); PX 278. Ms. Verkhovskaya also identified thousands of other calls to numbers on the Registry, which she excluded from the class for various reasons. *See generally* PX 2008 at 1.

finding of willfulness does not require bad faith, it does require that the caller "have reason to know, or should have known, that his conduct would violate the statute." *Texas v. Am. Blastfax, Inc.*, 164 F. Supp. 2d 892, 899-901 (W.D. Tex. 2001); *Maryland v. Universal Elections, Inc.*, 862 F. Supp. 2d 457, 463 & n.7 (D. Md. 2012) (applying *American Blastfax* standard), *aff'd on other grounds*, 729 F.3d 370 (4th Cir. 2013); *Adamcik v. Credit Control Servs., Inc.*, 832 F. Supp. 2d 744, 754-55 (W.D. Tex. 2011) (same).

### A. Willful and Knowing Violations

Over the course of approximately fifteen months, SSN made tens of thousands of calls to numbers on the Registry. *Supra* pp. 20-21. SSN knew it was using lists that had not been scrubbed in any relevant time period to remove numbers on the Registry. Tehranchi Dep., Doc. 327 at 122:6-:25, 123:12-:22. It called Dr. Krakauer, repeatedly, even though it knew he was on the Registry and knew he had asked not to receive any more calls on behalf of Dish. *See* PX 15 at 8005; Trial Tr. Jan. 13, Doc. 304 at 107:2-:22 (Verkhovskaya testimony). It has a long history of acting in disregard of the requirements of the TCPA. *See supra* pp. 10-13. SSN willfully and knowingly violated the provisions of the TCPA when it made the calls at issue here.

Dr. Krakauer contends that because the jury found that SSN acted as Dish's agent and SSN's conduct is imputed to Dish, the determinative question is whether SSN, and

not Dish, acted knowingly or willfully. Doc. 308 at 3. Neither party has identified a case presenting this specific issue in the TCPA context.[13]

While the concept is phrased differently in different jurisdictions and in different contexts, it appears well-established that at a minimum, a principal is liable for the willful acts of his agent committed within the scope of the agent's actual authority. *See, e.g.*, *Bosh v. Cherokee Cty. Bldg. Auth.*, 305 P.3d 994, 998 (Okla. 2013) ("Under the common law doctrine of *respondeat superior* a principal . . . is generally held liable for the willful acts of an agent . . . acting within the scope of the employment in furtherance of assigned duties."); Restatement (Third) of Agency § 7.04 (2006) (stating that a principal is liable for tortious conduct of an agent when the agent's conduct is within the scope of the agent's actual authority). Here, the jury explicitly found that SSN was acting within the scope of its authority from Dish when it made the calls at issue. Doc. 292 at ¶ 1. The Court agrees with that factual finding. *Supra* p. 19. Applying the traditional rule, Dish is responsible for any willful or knowing violation of the telemarketing laws by SSN.

---

[13] Dr. Krakauer relies on *In re Crawford*, 388 B.R. 506, 522 (Bankr. S.D.N.Y. 2008), in which the court held that an agent had willfully violated a stay and that the violation was attributable to the principal. The cases that Dish cites address whether the actual knowledge of an agent can be imputed to a principal to satisfy an element or an affirmative defense, which is not the question here. *See* Doc. 312 at 19 (referring to Doc. 310-2 at ¶¶ 39-40 (citing *Martin Marietta Corp. v. Gould, Inc.*, 70 F.3d 768, 770, 773 (4th Cir. 1995) (statute of limitations defense); *Thomas v. N.A. Chase Manhattan Bank*, 1 F.3d 320, 324-26 (5th Cir. 1993) (justifiable reliance element); *Wycoff v. Motorola, Inc.*, 502 F. Supp. 77, 93 (N.D. Ill. 1980) (patent invalidity defense), *aff'd*, 688 F.2d 843 (7th Cir. 1982))). These holdings do not dispute the fundamental concept that principals can be liable for the conduct of their agents. *See* Restatement (Third) of Agency § 7.04 & cmt. b. (2006). Neither do they distinguish between the intent of the agent and the intent of the principal for that liability.

The result is the same even if one only looks at the willfulness of Dish's conduct. Dish knew that SSN had committed many TCPA violations over the years. It had received many complaints and knew of at least three lawsuits, one of which resulted in a money judgment and two of which resulted in injunctions. *Supra* pp. 11-12. It knew SSN's uncorroborated and conclusory explanations—that violations were inadvertent or the product of rogue employees—were not credible. *See* PX 194. It knew SSN was not scrubbing all its lists or keeping call records. *Supra* pp. 12-14, 16-17. It ignored SSN's misconduct and, despite promises to forty-six state attorneys general, it made no effort to monitor SSN's compliance with telemarketing laws. *See supra* pp. 14-16, 17-19. Dish had the power to control SSN's telemarketing; it simply did not care whether SSN complied with the law or not. *Cf. United States v. Blankenship*, 846 F.3d 663, 673 (4th Cir. 2017) (holding that "not caring about adherence to legal requirements amounts to criminal willfulness" (internal quotation marks omitted)). Dish knew or should have known that its agent, SSN, was violating the TCPA, and Dish's conduct thus willfully and knowingly violated the TCPA.

### B. Dish's Arguments

Dish contends its conduct was not willful or knowing for several reasons, none of which are persuasive. Dish first contends that its actions were not willful because it instructed SSN to comply with the law and, specifically, to scrub its lists with PossibleNow. *See, e.g.*, DX 1 at 7; DX 2; DX 3 at 47; DX 5. While there was evidence of this, the evidence also revealed that these were empty words. For instance, when SSN told Dish's compliance department that it was, in fact, *not* using PossibleNow to scrub

customer lists in 2009, and again in 2010, Dish did nothing. *Supra* pp. 13-14, 16-17. In context, Dish only paid lip service to compliance.

Dish also contends that it investigated every consumer complaint. Doc. 312 at 7. While it does appear that, for each complaint, Dish tried to identify the telemarketer who made the call, that can hardly be called a full investigation. Dish did not try to determine if the telemarketer had followed the TCPA or broken the law. *See* Trial Tr. Jan. 12, Doc. 303 at 41:12-42:7, 73:19-74:5 (Musso testimony).

Dish asserts that SSN's telemarketing violations from 2005 and earlier are irrelevant because these were about prerecorded calls, not do-not-call violations, and because all issues were resolved, in part as a result of Dish's actions. Doc. 312 at 11-12. First, there was evidence that these earlier violations did, in fact, involve do-not-call violations, *supra* pp. 11-12, and it seems more likely that the prerecorded calls stopped as a result of legal action and injunctions, not Dish's actions. *See* PX 186; PX 191. Moreover, and contrary to Dish's assertions, these violations are relevant because the earlier violations established the framework for the relationship between Dish and SSN in the years to come: Dish would turn a blind eye to any recordkeeping lapses and telemarketing violations by SSN; any lawsuits brought against SSN were SSN's problem, not Dish's; and Dish would not modify or terminate its contract with SSN as a result of TCPA violations, recordkeeping breaches, lawsuits, or complaints. *See, e.g.*, PX 15 at 7995 ("Brian tells me that they are doing well and going on the incentive trip . . . so, once

again, this is a business decision. . . . *[A]s far as we know,* they have 'righted the wrongs[.]'" (emphasis added)).[14]

Dish maintains that by calling Dr. Krakauer in 2010 and 2011, SSN disobeyed direct instructions from Dish. Doc. 312 at 16-18. This is true, but it does not disprove willfulness or knowledge. Dish was aware that SSN disregarded other instructions from Dish about telemarketing compliance, as discussed *supra* pp. 12-13, but Dish took no disciplinary action against SSN, did not monitor SSN's compliance, and allowed SSN to keep selling Dish products by telemarketing. *See* Trial Tr. Jan. 12, Doc. 303 at 20:11-21:12, 22:4-:21, 78:4-79:1, 82:24-83:6 (Musso testimony). Furthermore, Dr. Krakauer's complaint in May 2009 put Dish on notice that SSN was calling people on the Registry. *See supra* pp. 13-14. A year later, when Mr. Campbell complained at the very beginning of the class period, they knew that SSN was still calling people on the Registry. *Supra* pp. 16-17. Dish's only response was to ask SSN to stop calling the specific person. *See, e.g.*, PX 52; PX 899 at 1. The evidence shows that Dish cared about stopping complaints, not about achieving TCPA compliance.

Dish contends that the complaints received about SSN were few in number and insufficient to put it on notice that there were widespread violations, and that everyone involved at Dish believed that SSN was complying with telemarketing laws. Doc. 312 at 13-19. First, the testimony that Dish thought SSN was in compliance is not credible and

---

[14] SSN's behavior corroborates this understanding of the relationship. When asked about Dr. Krakauer's complaint, SSN responded that the call in question was made by their "top employee" who "sells the most." PX 15 at 7980.

is controverted by Dish's own documents. *See generally* PX 15. Second, even if some Dish employees did think this, that belief was only possible because Dish ignored the facts and failed to investigate and monitor SSN's compliance.[15] Dish knew that SSN was not scrubbing its customer lists and knew that SSN had actually called people on the Registry: Dr. Krakauer in 2009, and Mr. Campbell in 2010.[16] *See supra* pp. 13-14, 16-17. It knew that it was often difficult to determine whether a complaint was attributable to a particular marketer, Trial Tr. Jan. 12, Doc. 303 at 149:6-150:12 (Musso testimony), and that SSN made this even harder because it did not keep complete records of the calls it made. *See supra* p. 12. Given the tens of thousands of violative calls SSN made in a span of just over a year, even a cursory investigation or monitoring effort by Dish would

---

[15] This belief was also based on unwarranted assumptions. For instance, Ms. Musso testified that if a year went by without seeing any complaints about SSN, then SSN must be following the law. Trial Tr. Jan. 12, Doc. 303 at 101:16-:20. This overlooks that most people on the Registry who receive calls do not complain, *see id.* at 150:16-152:15, that Dish was unable to trace the vast majority of the complaints to a marketer, *id.* at 149:6-150:12, and that the SSN telemarketers here initially told both Dr. Krakauer and Mr. Campbell that they worked for DirecTV, not Dish. PX 8 at 2; PX 15 at 8061.

[16] Dish mentions that SSN "assumed" and "felt" it had an established business relationship (EBR) that allowed it to call people on the Registry like Dr. Krakauer, to whom it had previously sold DirecTV. Trial Tr. Jan. 12, Doc. 303 at 112:4-:13 (Musso testimony). First, there is no evidence that Dish evaluated the legitimacy of this purported EBR; rather, Dish simply accepted what SSN said without any monitoring or oversight, despite its promises to forty-six state Attorneys General in the Compliance Agreement. *See, e.g., id.* at 35:12-36:7, 72:1-:19; DX 16 at 1 (email by Ms. Musso to SSN saying "we just want to encourage you to be cautious" about EBRs). Second, this purported EBR defense appears to be baseless. DirecTV had ended its relationship with SSN by 2005, Tehranchi Dep., Doc. 327 at 72:16-:22, a fact that Dish knew, and an EBR would be valid, at the longest, for eighteen months from that point or from the last communication with Dr. Krakauer. *See* 47 C.F.R. § 64.1200(f)(5). Any EBR between SSN and Dr. Krakauer or other DirecTV customer would therefore have long since expired by 2009. Finally, EBR is an affirmative defense, and to the extent SSN's belief was based on some other list than SSN's DirecTV list from 2003, there is no evidence that an EBR existed for any of those calls.

have uncovered the violations. Under these circumstances, what Dish calls a mistaken belief is actually willful ignorance.

Finally, Dish contends that the TCPA requires proof that Dish itself knew that each and every call was made and violated the TCPA. Doc. 312 at 5-6. Dish relies on *Lary v. Trinity Physician Fin. & Ins. Servs.*, 780 F.3d 1101, 1107 (11th Cir. 2015). A standard that required the defendant to know that its conduct as to each individual call actually violated the law would be significantly higher than the standard applied in criminal cases involving willful conduct. *See Blankenship*, 846 F.3d at 672-73 (holding that "reckless disregard and plain indifference can constitute criminal willfulness" (internal quotation marks omitted)). It would not be reasonable to apply such a high standard to telemarketing calls, which almost by definition are made in high volume.[17]

In any event, SSN had to know it was routinely violating the TCPA. It was not scrubbing all its lists against the Registry, it received—through Dish's compliance department—at least two complaints about this type of call shortly before the class period began, and it made over 50,000 calls to persons on the Registry during the class period. There is no evidence that these calls were inadvertent or accidental, and the number of calls by itself is inconsistent with accident or mistake.

---

[17] The exact definition of "willfully or knowingly" in the TCPA is debated. *E.g.*, *Echevvaria v. Diversified Consultants, Inc.*, No. 13 Civ. 4980, 2014 WL 929275, at *9 (S.D.N.Y. Feb. 28, 2014) (Peck, Mag. J.) (acknowledging "a split of authority"). The *Lary* court appears to be on one end of the spectrum. *See* 780 F.3d at 1107. Courts on the other end have held that calls are willful merely if the act of placing a call was intentional or volitional, as opposed to inadvertent. *Bridgeview Health Care Ctr. Ltd. v. Clark*, No. 09 C 5601, 2013 WL 1154206, at *7 (N.D. Ill. Mar. 19, 2013) (Valdez, Mag. J.), *aff'd on other grounds*, 816 F.3d 935 (7th Cir. 2016). The Fourth Circuit has not weighed in on the issue.

Dish knew SSN was using unscrubbed lists as a result of the Krakauer and Campbell complaints and it knew SSN had a long history of violations of both the TCPA and Dish's business rules related to TCPA compliance. Dish easily could have discovered the full extent of the violations with a minimal monitoring effort, which it had promised forty-six state Attorneys General it would undertake. Dish's conduct was willful.

### C. Are Treble Damages Appropriate?

Even where willful or knowing violations are found, courts have discretion on whether to treble damages. 47 U.S.C. § 227(c)(5). For example, in *Bridgeview Health Care Center Ltd. v. Clark*, No. 09 C 5601, 2013 WL 1154206, at *7-8 (N.D. Ill. Mar. 19, 2013) (Valdez, Mag. J.), *aff'd on other grounds*, 816 F.3d 935 (7th Cir. 2016), the court found that the conduct was willful but did not treble the damages because a marketer had cold called the defendant—a naïve small business—and convinced it to join in the marketer's ongoing practice of illegal fax advertising.

The Court concludes that treble damages are appropriate here because of the need to deter Dish from future violations and the need to give appropriate weight to the scope of the violations. The evidence shows that Dish's TCPA compliance policy was decidedly two-faced. Its contract allowed it to monitor TCPA compliance, *supra* pp. 8-9, and it told forty-six state attorneys general that it would monitor and enforce marketer compliance, *supra* pp. 14-16, but in reality it never did anything more than attempt to find out what marketer had made a complained-about call. *Supra* pp. 17-19. It never investigated whether a marketer actually violated the TCPA and it never followed up to

see if marketers complied with general directions concerning TCPA compliance and or with specific do-not-call instructions about individual persons.  *Supra* pp. 12-13, 17-19.  Dish characterized people who pursued TCPA lawsuits not as canaries in the coal mine, but as "harvester" plaintiffs who were illegitimately seeking money from the company.  *See supra* p. 19.  The Compliance Agreement did not cause Dish to take the TCPA seriously, so significant damages are appropriate to emphasize the seriousness of such statutory violations and to deter Dish in the future.

In the years leading up to the class period, Dish disregarded multiple warnings that SSN was calling people on the Registry.  *See supra* pp. 10-14, 16-17.  As a result, SSN made over 50,000 calls on Dish's behalf to people on the Do Not Call Registry.  Trial Tr. Jan. 12, Doc. 303 at 188:14-:18 (Verkhovskaya testimony).  This case does not involve an inadvertent or occasional violation.  It involves a sustained and ingrained practice of violating the law.

Dish did not take seriously the promises it made to forty-six state attorneys general, repeatedly overlooked TCPA violations by SSN, and allowed SSN to make many thousands of calls on its behalf that violated the TCPA.  Trebled damages are therefore appropriate.

Dish contends that the Court should not treble the damages because the existing damages are material to Dish and will be adequate to deter.  Doc. 312 at 21-22.  This appears unlikely.  Dish is a large company with 13 million subscribers.  Trial Tr. Jan. 13, Doc. 304 at 156:4-:5 (DeFranco testimony).  It paid a nearly $6 million fine as part of the Compliance Agreement in 2009, PX 55 at ¶ 6.1, yet Dish's co-founder testified that the

Compliance Agreement did not change Dish's procedures at all. *See* Trial Tr. Jan. 13, Doc. 304 at 168:17-169:6 (DeFranco testimony). A damages award that is an order of magnitude larger is warranted here.[18]

Dish also contends that the harm caused was only a "minor nuisance" and "inconvenience." Doc. 312 at 21-22. Dish's description has left out "illegal," not to mention "infuriating." Dish's argument shows a failure to recognize the purpose of the law and is demeaning to consumers who put their names on the Do Not Call Registry and who are entitled by law to have their privacy respected. It also reflects a lack of appreciation for the seriousness of the violations found by the jury: over 50,000 connected calls to over 18,000 private individuals. Trial Tr. Jan. 12, Doc. 303 at 188:14-:18 (Verkhovskaya testimony). In any event, "[t]he reality is that the TCPA's damages provision is specifically designed to be disproportional to the harm suffered; such disproportion both deters the violative conduct and encourages victims to bring suit to redress violations." *Hannabury*, 174 F. Supp. 3d at 776 (quotation omitted).

## IV.    CONCLUSION

The Court finds that Dish Network willfully and knowingly violated the TCPA and that treble damages are appropriate to deter Dish and to give suitable weight to the seriousness and scope of the violations Dish committed. The Court will treble the jury's

---

[18] Because of the age of the case, there may be a significant number of class members who have moved and who the parties will not be able to locate in order to provide them their damages award. The Court defers to another day what should happen to any such unclaimed damages.

damage award under 47 U.S.C. 227(c)(5) and increase the damages from $400 per call to $1,200 per call.

This order does not speak to the issues raised by the parties' briefing on post-trial procedures.

**SO ORDERED**, this the 22nd day of May, 2017.

UNITED STATES DISTRICT JUDGE