IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| THOMAS H. KRAKAUER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:14-CV-333 |
| | ) | |
| DISH NETWORK L.L.C., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

In January 2017, after a six-day trial, a jury returned a verdict finding that the
defendant Dish Network violated the Telephone Consumer Protection Act. Through its
agent, Satellite Systems Network, Dish made over 51,000 telephone solicitations to a
class of plaintiffs on the National Do Not Call Registry, in violation of the Act. Dish
moves for judgment as a matter of law, contending that there was insufficient evidence
SSN acted as Dish's agent, that the plaintiffs' expert was unreliable, and that the
plaintiffs lacked standing. In the alternative, Dish moves for a new trial, contending that
the jury's verdict is against the weight of the evidence and is a miscarriage of justice.
Because the evidence fully supports the jury's verdict and Dish received a fair trial, the
Court will deny the motions.

## I. PROCEDURAL BACKGROUND

The plaintiff, Dr. Thomas Krakauer, filed suit in 2014 alleging that Dish violated
the Telephone Consumer Protection Act, 47 U.S.C. § 227(c)(5), when its agent called

thousands of numbers on the National Do Not Call Registry between 2009 and 2011. *See* Doc. 32 at ¶¶ 25, 47, 54.[1] The Court certified the class, covering the period from May 2010 to August 2011, Doc. 111 at 4, 34, and largely denied summary judgment. *See* Docs. 113, 118, 169.

Trial on class issues began on January 10, 2017. Minute Entry 01/10/2017.[2] On January 19, the jury returned a verdict in favor of the plaintiffs. Doc. 292. The jury found that SSN was Dish's agent and that, for every class member, SSN made "at least two telephone solicitations to a residential number" on the Registry. *See id.* at ¶¶ 1-2. The jury awarded $400 per call. *Id.* at ¶ 3.[3] Dish filed motions for judgment as a matter of law under Rule 50(b) and for a new trial under Rule 59(a)(1)(A). Docs. 318, 320.[4] Briefing is now complete.

---

[1] All references to the record cite the document number appended by the CM-ECF system. Pin citations are to the page numbers appended by CM-ECF, or, where indicated, to numbered paragraphs in a document. For transcripts, line numbers are also indicated. Trial transcripts are available on the docket at Docs. 301 to 307.

[2] At the close of the plaintiffs' case-in-chief, Dish orally moved for judgment as a matter of law under Rule 50(a). Minute Entry 01/13/2017; Fed. R. Civ. P. 50(a). The Court denied the motion. *Id.* Dish again moved for judgment as a matter of law at the close of all the evidence. Minute Entry 01/17/2017; Doc. 290. The Court deferred ruling on the motion. Minute Entry 01/18/2017.

[3] After the verdict, the Court denied Dish's Rule 50(a) motion, without prejudice to a Rule 50(b) motion. Text Order 02/08/2017.

[4] Dish requested oral argument on both motions. Docs. 318, 320. Given the Court's familiarity with this case and the issues it raises, oral argument would not be helpful and the request is denied.

## II.  FACTS

In deciding a motion for judgment as a matter of law, the Court "view[s] the evidence in a light most favorable to the non-moving party and draw[s] every legitimate inference in that party's favor." *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 147 (4th Cir. 2008) (citation omitted).  In deciding a motion for a new trial, the Court is permitted to weigh the evidence and consider the credibility of witnesses. *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998).

The evidence at trial showed that Dish had broad contractual rights to control SSN's telemarketing practices; that it promised forty-six state attorneys general that it would monitor and control the telemarketing practices of its marketers, including SSN; that it was aware SSN had a long history of non-compliance with the TCPA; that it learned just before the class period began that SSN was soliciting people on the Do Not Call Registry and yet it took no action to prevent SSN from making those calls on Dish's behalf; and that during the class period SSN made thousands of phone calls to residential numbers on the Registry attempting to sell Dish products.

The Court further incorporates facts in its May 22, 2017, opinion, which found that Dish's violations of the TCPA were willful and knowing.  Doc. 338 at 3-20.  The Court will discuss additional facts as necessary.

## III.  JUDGMENT AS A MATTER OF LAW

"A court may award judgment as a matter of law only if there is no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party." *Saunders*, 526 F.3d at 147 (citing Fed. R. Civ. P. 50(a)).  Judgment as a matter of law is

3

appropriate only when "the court determines that the only conclusion a reasonable jury could have reached is one in favor of the moving party." *Id.* at 147 (citation omitted).

### a. Agency

To prevail at trial on agency, the plaintiffs had to prove two things by the greater weight of the evidence: first, that SSN was Dish's agent; and second, that SSN acted in the course and scope of that agency when it made the calls at issue. Doc. 293 at 4-5. The Court instructed the jury on actual authority, including implied actual authority by consent or acquiescence. *Id.* at 5, 6-7.[5] Dish contends that the evidence was insufficient to support the jury's finding that SSN was Dish's agent and insufficient to support the jury's finding that SSN acted within the scope of that agency.

### i. Actual authority

For agency to exist, the principal must have the power to direct and control the agent's actions. *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2666 (2013); Restatement (Third) of Agency § 1.01 & cmt. c (2006). An agent acts with actual authority when, at the time of the action, the agent reasonably believes, based on the principal's words or conduct, that the principal wishes the agent to so act. *See Ashland Facility Operations, LLC v. NLRB*, 701 F.3d 983, 990 (4th Cir. 2012). In most cases, "the existence and scope of agency relationships are factual matters." *Metco Prods., Inc. v. NLRB,* 884 F.2d 156, 159 (4th Cir. 1989).

---

[5] The Court earlier granted summary judgment in Dish's favor on the two alternate agency theories of apparent authority and ratification. Doc. 118.

4

The plaintiffs offered substantial evidence that SSN had actual authority to act as Dish's agent when it made telemarketing calls. As set forth in more detail in the Court's opinion on the willful and knowing issue, the SSN-Dish contract gave Dish substantial control over SSN's marketing and gave Dish unilateral power to impose additional requirements about telemarketing on SSN. Doc. 338 at 8-9. Dish periodically imposed requirements on SSN and other OE retailers—i.e., marketers—about telemarketing. These included a requirement that the marketers use PossibleNow, a service that scrubbed phone lists against the Registry, and a requirement that marketers keep records of calls made. DX 2; DX 5.[6] Less than a year before the class period began, Dish represented to forty-six state attorneys general in an Assurance of Voluntary Compliance (the Compliance Agreement) that it had the authority to and would monitor compliance of all its marketers, including SSN, with telemarketing laws. Doc. 338 at 14-15. Dish sent SSN a copy of that Compliance Agreement. *See* Trial Tr. Jan. 11, 2017, Doc. 302 at 73:25-74:10 (testimony by Amir Ahmed). Dish had the power to control and direct SSN's telemarketing activities, it had manifested that intent to and did exercise that power over SSN, and it had given SSN reasonable grounds to believe that Dish wished SSN to act as its agent in its telemarketing activities. *See* Doc. 293 at 6.

Dish points to the SSN-Dish contracts, written communications with SSN, and the testimony of Dish employees, all of which stated that SSN was an independent contractor. Doc. 319 at 7-8. Dish also contends that it lacked control over SSN's

---

[6] PX refers to "Plaintiffs' Exhibit," DX to "Defendant's Exhibit," and JX to "Joint Exhibit."

telemarketing. *Id.* at 9-10. That the contract between Dish and SSN explicitly characterized the relationship as one of independent contractor, JX 1 at ¶ 11, is not binding on third parties. *See, e.g.*, *City of Chicago v. Matchmaker Real Estate Sales Ctr., Inc.*, 982 F.2d 1086, 1097-98 (7th Cir. 1992). As discussed *supra*, there was substantial evidence to the contrary that, if accepted by the jury, showed that SSN acted as Dish's agent. The jury was not required to accept Dish's evidence, and it resolved conflicts in the evidence in favor of the plaintiffs, as was its privilege. *See, e.g.*, *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935) (stating that the jury has the power to determine the facts).

### b. Scope of authority

A principal is not bound by the act of an agent unless that act falls within the scope of actual authority granted by the principal to the agent. Restatement (Third) of Agency § 7.04 (2006). Actions taken against the principal's interest are generally not within the scope of the agent's authority. *United States v. Hilton,* 701 F.3d 959, 970 (4th Cir. 2012); *cf. Tobacco Tech., Inc. v. Taiga Int'l N.V.*, 388 F. App'x 362, 373 (4th Cir. 2010) (unpublished) (agent's knowledge not imputed to principal if agent is acting adversely to principal's interests). If the principal consents or acquiesces in a course of conduct, the agent may reasonably conclude that the conduct is in the principal's best interests. *See Commodity Futures Trading Comm'n v. Gibraltar Monetary Corp., Inc.*, 575 F.3d 1180, 1189 (11th Cir. 2009) (per curiam); Restatement (Third) of Agency § 2.02 cmt. d (2006) ("questions of interpretation that determine whether an agent acted with actual authority have a temporal focus that moves through time as the agent decides how to act"); *id.* at cmt. e ("[a]n agent's understanding of the principal's interests and objectives is an element

6

of the agent's reasonable interpretation of the principal's conduct."). To decide that the principal acquiesced or consented, there must be evidence that the principal knew of earlier similar activities by the agent and consented or did not object to them. *See id.* ("[i]n determining whether an agent's action reflected a reasonable understanding of the principal's manifestations of consent, it is relevant whether the principal knew of prior similar actions by the agent and acquiesced in them.")

The plaintiffs presented substantial evidence that SSN acted within the scope of its authority when it made the telemarketing calls at issue. Obviously Dish benefitted, and SSN knew that Dish benefitted, when SSN made sales on Dish's behalf. Dish knew that government lawsuits and consumer complaints, including a complaint from Dr. Krakauer just a year before the class period began, had demonstrated problems with SSN's compliance with the do-not-call laws. PX 15 at 8060-62; Doc. 338 at 10-17. Dish knew that DirecTV, its primary competitor, had terminated SSN as a marketer. *See* PX 15 at 8002; Trial Tr. Jan. 12, Doc. 303 at 52:13-:21, 55:6-:8 (testimony of Reji Musso). SSN had told Dish that SSN was using a telemarketing list that contained people on the Registry. *See* PX 15 at 7980-81. Dish knew that SSN was not following Dish's instruction to maintain call records or its instruction to use a third-party vendor, Possible Now, to scrub call lists against the Registry. *See* Doc. 338 at 12-14, 16-17.

Despite these red flags, Dish never took disciplinary action against SSN and never threatened to terminate SSN. *See* Trial Tr. Jan. 12, Doc. 303 at 20:11-21:12, 22:4-:21 (Musso testimony). It never investigated whether SSN's conduct violated telemarketing laws. *See id.* at 41:12-42:7, 73:12-74:9, 78:4-:23 (Musso testimony). SSN was aware of

7

the complaints and Dish's lack of monitoring and enforcement; by inference, SSN knew Dish was not going to terminate or discipline SSN for these violations, knew that Dish's compliance requirements were empty words, and knew that Dish placed the financial gains from making sales ahead of TCPA compliance.

Under these circumstances, and based on Dish's words, conduct, and inaction, SSN could reasonably believe that Dish acquiesced or consented to SSN's telemarketing violations, and SSN could reasonably conclude that its telemarketing conduct was in Dish's best interests, because it could result in sales to Dish. *See* Doc. 293 at 6-7. The evidence was well sufficient to support the jury's finding that SSN's actions were within its scope of authority.

Dish maintains that SSN's telemarketing calls to persons on the Registry were beyond its scope of authority. Dish presented evidence that it told SSN not to contact any person on the Registry and to scrub its lists with PossibleNow, and Dish contends that it is not responsible for calls SSN made thereafter to persons on the Registry. Doc. 319 at 13-14.[7] Dish asserts that it never acquiesced to SSN's conduct because it objected to every violation of which it was aware. *Id.* at 14-20. Dish also contends that calls to people on the Registry were outside any scope of authority because those calls were adverse to Dish's interests. *Id.* at 20.

---

[7] In support, Dish cites *Bridgeview Health Care Center, Ltd. v. Clark*, 816 F.3d 935, 939 (7th Cir.), *cert denied*, 137 S. Ct. 200 (2016), a TCPA case where a fax marketer ignored the principal's instructions. Doc. 319 at 10-11. *Bridgeview* is entirely different from the facts here, because it involved a one-time transaction where the principal had no opportunity to acquiesce. *See* 816 F.3d at 937.

8

The evidence to the contrary, however, was significant, and while a jury could have accepted Dish's evidence and contentions, it was not required to do so. *See, e.g.*, *Dimick*, 293 U.S. at 486. Communications between Dish and SSN in response to numerous complaints show that Dish acquiesced to SSN's marketing practices. When SSN twice told Dish that it was, in fact, not scrubbing all its lists with PossibleNow, Dish's only response was to ask SSN to stop calling the specific person who had complained. *See* PX 15 at 7980-81, 8005; PX 52; PX 899 at 1. Dish did nothing to monitor SSN's compliance with these requests or with the telemarketing laws generally. *See* Trial Tr. Jan. 12, Doc. 303 at 41:12-42:7 (Musso testimony). The evidence of Dish's silence about scrubbing *other* numbers on the Registry from SSN's call lists and its failure to monitor in the face of its promises to the state attorneys general, about which SSN knew, were sufficient to support an inference that Dish acquiesced to SSN's practices. For the same reasons, SSN could reasonably assume from Dish's knowledge and failure to object that calls to numbers on the Registry were in Dish's best interests— at least as long as the recipients did not complain, as most did not. *See id.* at 150:16- 152:15 (Musso testimony); Restatement (Third) of Agency § 2.02 cmt. e (2006) (in determining consent, "it is relevant whether the principal knew of prior similar actions by the agent and acquiesced in them").

Dish also contends that it instructed SSN not to call Dr. Krakauer again and that SSN disobeyed this instruction. Doc. 319 at 11-13. Contrary to Dish's suggestion, a reasonable jury could find that SSN's later calls to Dr. Krakauer in 2010 and 2011 were within the scope of the agency relationship. The instructions to stop calling Dr. Krakauer

came in communications from Dish's compliance department.  PX 15 at 7980-81, 8005.

SSN knew from experience that instructions from the compliance department were

window dressing that SSN could safely ignore.  *See* Doc. 338 at 17-18, 24-26.

Furthermore, SSN had, in response to the 2009 complaint from Dr. Krakauer, indicated to

Dish that it was using a call list that was last scrubbed in 2003.  *See* Trial Tr. Jan. 12,

Doc. 303 at 35:3-36:7, 38:16-39:17 (Musso testimony).  This suggests that anyone Dish

had told SSN not to call in the intervening *six years* was still on SSN's call lists in 2009,

and that Dish acquiesced to this practice by not objecting to it.  Dish did nothing to

monitor or check on whether SSN complied with its instructions about scrubbing, even

though it knew SSN had ignored such instructions in the past.  SSN could reasonably

assume that Dish was just going through the motions and that its words meant nothing, so

that calling Dr. Krakauer again was still within the scope of SSN's actual authority.

### c.  Plaintiffs' expert

Dish maintains that there was insufficient evidence that the calls at issue violated

the TCPA, because the plaintiffs' expert, Anya Verkhovskaya, gave unreliable testimony

that was "wildly speculative."  Doc. 319 at 20-22.  Specifically, Dish challenges Ms.

Verkhovskaya's testimony that the class members' phone numbers were on the Registry

at the time of the calls and that they were residential numbers.

Ms. Verkhovskaya testified that she had worked for eighteen years at a data

analysis organization that manages data for class action lawsuits.  Trial Tr. Jan. 12, Doc.

303 at 166:21-167:9, 172:4-:25.  She has worked on more than a thousand class actions,

Trial Tr. Jan. 13, Doc. 304 at 21:13-:15, including several large international cases.  Trial

Tr. Jan. 12, Doc. 303 at 171:2-:25. She testified that her analysis of the call data was based on her experience in the data industry and her understanding of the practices of several data vendors on whose data she regularly relies. *See, e.g.*, *id.* at 179:18-180:18, 182:2-:22.

Ms. Verkhovskaya began her analysis with an examination of call records for the class period from Five9, a software service used by SSN to make calls and connect them with SSN's call center. *See id.* at 167:15-168:4; Dep. Tr. of David Hill, Doc. 332 at 15:25-16:5.[8] These call records, which Ms. Verkhovskaya received in electronic form, showed the number called, date, time, length of the call, and other information. Trial Tr. Jan. 12, Doc. 303 at 174:3-:13, 176:13-:21. After downloading the records into a database, she determined that SSN made 1.6 million calls during the class period. *Id.* at 175:11-:14.

Ms. Verkhovskaya testified that she first removed inbound calls and calls that were not connected. *Id.* at 177:3-178:5. This left approximately 230,000 connected, outbound calls. *Id.* at 178:6-:8. She then removed calls to numbers that SSN called only once, since a TCPA violation requires more than one call. *Id.* at 178:11-:17; 47 U.S.C.

---

[8] The Five9 records were admitted into evidence at trial with no objection after they were authenticated by Five9 employees David Hill and Tanya Maslennikov, who testified by video deposition. *See* Hill Dep., Doc. 332 at 8:10-:13, 11:22-:25, 12:4-:14; Dep. Tr. of Tanya Maslennikov, Doc. 333 at 17:17-:20, 20:25-21:3; PX 2007 (Hill affidavit); PX 197 (Maslennikov affidavit). For these two depositions and the deposition of Bahar "Sophie" Tehranchi, Doc. 327, pin citations refer to the page numbers in the original transcript, not the page numbers appended by CM-ECF.

§ 227(c)(5). This left approximately 164,500 calls to 58,150 numbers. Trial Tr. Jan. 12, Doc. 303 at 178:21-179:3.

Next, she removed calls to numbers that were not on the Registry as of 30 days before the class period began, or April 1, 2010. Trial Tr. Jan. 13, Doc. 304 at 30:15-:21. She obtained information about what numbers were on the Registry from Nexxa, which she testified was an "industry standard." Trial Tr. Jan. 12, Doc. 303 at 179:18-180:6.[9] She also testified that the data from Nexxa would indicate if a number had later come off the Registry. Trial Tr. Jan. 13, Doc. 304 at 32:1-33:21. After comparing the numbers, she removed 34,526 numbers that were not on the Registry, Trial Tr. Jan. 12, Doc. 303 at 179:14-:17, leaving 66,468 calls to 23,625 numbers. *See* PX 2008; Trial Tr. Jan. 13, Doc. 304 at 31:7-:11.

Ms. Verkhovskaya then took several steps to remove any numbers from the list that were not residential. She testified that she used data from LexisNexis and from the call records to determine whether the numbers called were residential.[10] She removed all numbers that the Five9 call records themselves marked as "business." Trial Tr. Jan. 12,

---

[9] Ms. Verkhovskaya testified that the Registry has agreements with some companies, including Nexxa and PossibleNow, to provide bulk information about who is on the Registry, but that it will not provide such bulk information without special agreements in place. Trial Tr. Jan. 12, Doc. 303 at 180:7-:18.

[10] Ms. Verkhovskaya testified about the reliability of the LexisNexis database at several different points in her examination and cross-examination. For example, early on she explained that LexisNexis is a large public company that the legal industry has used for many years and that LexisNexis maintains a database of business and government phone numbers that identifies "the majority of business numbers." Trial Tr. Jan. 12, Doc. 303 at 182:2-183:7; Trial Tr. Jan. 13, Doc. 304 at 54:15-56:8; *see also* Trial Tr. Jan. 13, Doc. 304 at 15:5-16:11, 69:4-72:17, 75:8-:19.

12

Doc. 303 at 181:10-182:1.  She also used the LexisNexis database to remove additional

business and government numbers from the class.  *See id.* at 191:2-:9.

Ms. Verkhovskaya testified that based on her experience, once business and

government numbers were eliminated, the remaining numbers must be residential.  *See,*

*e.g., id.* at 190:25-191:6.[11]  She also considered that SSN was focused on selling Dish to

residences, which suggested that most of their calls would be to residential numbers.

*E.g.*, Trial Tr. Jan. 13, Doc. 304 at 13:22-14:5.  As a result of this review, she removed

1,393 business numbers, leaving calls to 22,232 numbers that she concluded were

residential.  Trial Tr. Jan. 12, Doc. 303 at 181:10-:17, 183:8-:10.  Finally, she

removed numbers that the Five9 data identified as existing Dish customers, leaving

57,900 calls to 20,450 numbers.[12]  *Id.* at 183:11-:23.

Ms. Verkhovskaya provided clear, cogent testimony explaining her methodology

and the bases for her opinions.  To the extent there was conflicting evidence that

---

[11] Ms. Verkhovskaya testified that LexisNexis affirmatively identifies numbers as residential in its database only if it has "affirmative evidence" they are residential.  *See, e.g.*, Trial Tr. Jan. 13, Doc. 304 at 15:5-16:11.  She considered phone numbers with no business, residential, or government designation to be residential.  *Id.* at 11:1-13:2.  These were the "unknown" designations referenced in Issue 2 of the verdict sheet.  *See* Doc. 292 at ¶ 2.

[12] In the lead-up to trial, the parties stipulated to remove some of these numbers from the class for various reasons.  *See* Doc. 264.  The parties also stipulated as to which phone numbers fell into certain buckets of proof to facilitate jury decision-making about whether these phone numbers were residential.  *See* Doc. 277; *see infra* at p. 22 & note 18.  These buckets included, for example, numbers that LexisNexis identified as residential, but only outside the class period, Doc. 277 at ¶ 2, and numbers that LexisNexis identified as cellular or possibly cellular.  *Id.* at ¶ 6.

questioned the validity, credibility, and weight of Ms. Verkhovskaya's opinions, the jury weighed that evidence and rejected Dish's evidence.[13]

Dish contends that Ms. Verkhovskaya's analysis was flawed because she did not check to see if class members' numbers were on the Registry on the actual date that SSN called. Doc. 319 at 21. Dish suggests that some of the numbers could have come off the Registry between April 1, 2010, and the date of the call. However, Dish points to no evidence that any identified phone number actually did come off the Registry after April 1, and Ms. Verkhovskaya testified that Nexxa would have removed those numbers from the list it provided her. Trial Tr. Jan. 13, Doc. 304 at 32:1-33:21. This evidence was sufficient to support the jury's finding that the numbers of the class members were on the Registry at the time the calls were made.

Dish asserts that Ms. Verkhovskaya was speculating when she testified that the class numbers were residential. Doc. 319 at 21-22. As Dish points out, Ms. Verkhovskaya could not identify all of the sources of data LexisNexis uses to classify numbers as residential or business. Trial Tr. Jan. 13, Doc. 304 at 71:10-:23; *see* Trial Tr. Jan. 17, Doc. 305 at 39:9-:22 (testimony of Dr. Debra Aron that LexisNexis uses many sources in a proprietary process). That, however, is not the test. *See* Fed. R. Evid. 702.

---

[13] Dish's expert witness, Dr. Debra Aron, testified at some length that Ms. Verkhovskaya "failed to apply the proper standards, the accepted standards of data analysis." Trial Tr. Jan. 17, Doc. 305 at 29:19-50:15. Even if the Court agreed that Ms. Verkhovskaya's evidence was shaky, which it does not, Dish had a full opportunity to contest it and took advantage of that opportunity. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993) (noting that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence").

Moreover, Ms. Verkhovskaya considered the Five9 records and SSN's telemarketing goals along with the LexisNexis data to conclude that the numbers were residential, as discussed *supra* p. 13. She also used the LexisNexis data in a neutral way by *removing* numbers that LexisNexis said were business numbers from the class list, an action that benefited Dish. *Supra* p. 13.

The jury evaluated Dish's challenges to Ms. Verkhovskaya's testimony and was not persuaded. Viewing the evidence in the light most favorable to the plaintiffs, there was a sufficient evidentiary basis to show that the calls were made to numbers on the Registry and that those numbers were residential.

### d. Standing

Finally, Dish contends that Dr. Krakauer lacked standing to bring these claims because there was no evidence that he, or any other class member, heard or answered any of the calls at issue. Doc. 319 at 22. In support, Dish cites *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547-49 (2016) and *Romero v. Dep't Stores Nat'l Bank*, 199 F. Supp. 3d 1256, 1262 (S.D. Cal. 2016).

To the extent Dish asserts that the plaintiffs lack standing because of *Spokeo*, this contention has no merit for the reasons stated in the Court's previous order. *See* Doc. 218 at 1-4.

The recent *Romero* decision is neither applicable nor persuasive. In *Romero*, the court held that there was no standing under § 227(b)(3) of the TCPA for calls that were auto-dialed but never heard or answered. 199 F. Supp. 3d at 1262 ("Plaintiff does not offer any evidence of a concrete injury caused by the use of an ATDS [or automated

telephone dialing system], as opposed to a manually dialed call.").  The injury here, under § 227(c)(5), is to the privacy of the persons called, and it is not based on the method by which calls were dialed.  *See, e.g.*, *Maryland v. Universal Elections, Inc.*, 729 F.3d 370, 376-77 (4th Cir. 2013) (recognizing that the TCPA "protects residential privacy").  Furthermore, the evidence is that the calls here were actually connected, because the plaintiffs' data expert excluded calls with a zero or negligible duration.  Trial Tr. Jan. 12, Doc. 303 at 177:3-178:5 (Verkhovskaya testimony).

### e.  Conclusion

The evidence at trial easily supports the jury's findings.  Dish's motion for judgment as a matter of law will be denied.

## IV.    NEW TRIAL

A district court should grant a new trial under Rule 59(a)(1)(A) when: "(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of { "pageset": "Sf7" } justice, even though there may be substantial evidence which would prevent the direction of a verdict."  *Gentry v. E. W. Partners Club Mgmt. Co.*, 816 F.3d 228, 240-41 (4th Cir. 2016) (quoting *Cline*, 144 F.3d at 301).  None of these circumstances exist here.

### a.  Clear weight of the evidence

Dish contends that the verdict is against the clear weight of the evidence for the reasons stated in its motion for judgment as a matter of law.  Doc. 321 at 4.  For the reasons stated *supra* pp. 3-15 and stated in the Court's decision on willfulness, Doc. 338,

the evidence fully supports the jury's verdict. The verdict is not against the clear weight of the evidence.

### b. Evidentiary rulings

Dish contends that some of the Court's evidentiary rulings were incorrect and resulted in a miscarriage of justice. In particular, Dish asserts that the Court allowed plaintiffs' counsel to overemphasize SSN's 2004 and 2005 TCPA violations related to prerecorded calls, Doc. 321 at 4-7, and the enforcement actions against Dish and other marketers. *Id.* at 8-9. Dish contends the evidence of SSN's credit check on Dr. Krakauer was erroneously admitted and improperly used by the plaintiffs. *Id.* at 9-11. Dish also disputes the exclusion of two fact witnesses, Kenneth Sponsler and Holly Taber McRae. *Id.* at 11-12.

As explained in the Court's order on the willfulness issue, evidence about SSN's 2004 and 2005 violations and the enforcement actions against SSN was relevant to the agency question and therefore was properly before the jury. Doc. 338 at 10-13, 19. It would be strange if the Court did not allow plaintiffs' counsel to draw the jury's attention to admissible evidence that supports their theory of the case. In any event, plaintiffs' counsel spent relatively little time on this evidence in his closing argument and focused more on Dish's absence of meaningful compliance procedures. *See generally* Trial Tr. Jan. 18, Doc. 306 at 11:8-36:1.[14]

---

[14] Dish contends that the Court's decision not to allow counsel to quote from the trial transcript during closing argument "compounded" these purported errors. Doc. 321 at 7 n.3. Dish cites *United States v. Kuta*, 518 F.2d 947, 954 (7th Cir. 1975) in support, but that case

Dish contends that the plaintiffs violated evidentiary rulings by referring to other marketers' TCPA issues and to the enforcement actions against Dish. Doc. 321 at 8-9. None of Dish's cited references violated the Court's pretrial ground rules, which, in relevant part, (1) prohibited any mention that the United States had sued Dish, and (2) limited any description of the settlement aspects of the Compliance Agreement in opening statements. *See* Doc. 222 at 5; Doc. 316 at 22:10-:24. The other relevant ground rule established by the Court was that "Dish may object at trial and the Court will deal with the objections as they arise," *e.g.*, Doc. 222 at 4-5, which is exactly what happened as to all the other statements or lines of questioning Dish identifies in its brief. The plaintiffs did not violate the Court's evidentiary rulings.

To the extent Dish contends that the use of the evidence of the unauthorized credit check conducted by SSN violated a pretrial ruling, Doc. 321 at 9-11, that is not correct. At a pretrial conference, the Court expressed some Rule 403 concerns and directed the plaintiffs not to mention the credit check in front of the jury without approval by the Court. Doc. 260 at 61:9-:13 (stating that "[i]f and when the plaintiff gets ready to ask questions about [the credit check], you just let me know . . . and I'll hear from you"). The Court also noted that if Dish questioned Dr. Krakauer's motives for bringing suit, then his knowledge of the credit check might become relevant. *See id.* at 62:3-:10. Dish did exactly that in its opening statement. *See* Trial Tr. Jan. 10, Doc. 301 at 102:22-

---

unambiguously says that "it is also within the discretion of the trial court whether to permit counsel to read from the trial transcript during closing argument." *Kuta* provides no support for Dish's motion.

103:13 ("Mr. Krakauer will tell you that he's bringing this case to make things right, it's not about the money; but the evidence will be that he didn't sue the company that did things wrong . . . . [T]he Plaintiff is trying to seek a windfall for a phone call.").

When the matter came up during testimony, the credit check evidence in PX 282 was originally shown to the jury on an electronic screen before it had been admitted. *See* Trial Tr. Jan. 11, Doc. 302 at 18:8-19:8. This was obviously an administrative mistake—plaintiffs' counsel had asked to show PX 282 to the *witness*—and the clerk quickly turned off the screen visible to the jury. *See id.* At the bench conference that followed, plaintiffs' counsel then asserted that the credit check evidence was relevant to show that Dish "protected SSN." *Id.* at 20:25-21:8. Over Dish's objection, the Court allowed plaintiffs' counsel to question Dr. Krakauer about the credit check because it was relevant to Dr. Krakauer's motivation.[15] *Id.* at 21:9-:21.

Dish also challenges the plaintiffs' later use of the credit check evidence to show that Dish ignored and covered up SSN's misdeeds. *E.g.*, Trial Tr. Jan. 18, Doc. 306 at 18:15-19:11 (closing argument). Dish contends that the Court had precluded any use of the credit check evidence other than to show Dr. Krakauer's motivations. Doc. 321 at 9-11. However, the Court never affirmatively adopted any such limitation, and Dish did

---

[15] Dr. Krakauer testified that Dish never informed him about the unauthorized credit check. Trial Tr. Jan. 11, Doc. 302 at 25:12-:21, 27:4-:8. His testimony indicated that he first learned of the credit check when his deposition was taken by the North Carolina Attorney General's office in 2011 in another case, when he was shown internal Dish documents discussing the credit check. *See id.* at 16:23-17:9, 18:18-:20, 26:25-27:3. The unauthorized credit check evidence suggested a motive for why Dr. Krakauer filed suit and rebutted Dish's contention that he was only interested in money.

not ask at trial for a limiting instruction about the use of this evidence.[16]  In any event, while initially admitted by the Court as relevant to Dr. Krakauer's motivation for filing suit, it became clear during the trial that the credit check evidence ultimately had wider relevance.  The credit check incident corroborated Dish's broader pattern of ignoring misconduct by SSN, which was relevant to agency.[17]  *See* Doc. 338 at 10-14, 16-17; Doc. 293 at 6-7 (final jury instructions stating that the lack of enforcement of written limits on behavior is relevant to consent and acquiescence).  The plaintiffs' use of the credit check evidence did not violate any evidentiary rulings.

Finally, the Court made the decisions to exclude Ms. McRae and Mr. Sponsler as fact witnesses after briefing and a full opportunity to be heard.  *See* Doc. 222 at 3-4.  Dish did not disclose these persons as potential fact witnesses during the discovery process, *id.*, and nothing happened at trial to raise grounds for changing that decision.

### c.  Verdict sheet

Dish maintains that the verdict was a miscarriage of justice because the verdict sheet did not have a separate question asking whether SSN acted within the scope of any

---

[16] PX 15, which contained the same credit check evidence as PX 282, *see* PX 15 at 8060-62, was generally subject to a limiting instruction that the jury should use it as evidence of what Dish knew, not necessarily as the truth of what the documents asserted.  Trial Tr. Jan. 21, Doc. 303 at 26:22-27:4.  The plaintiffs' use of the credit check evidence was consistent with this instruction.

[17] The evidence indicated that Dish knew SSN's employee had violated Dish's rules governing the running of credit reports in connection with a telemarketing complaint made by Dr. Krakauer a year before the class period began.  *See* PX 15 at 8061; Trial Tr. Jan. 12, Doc. 303 at 31:18-32:24 (Musso testimony).  Other evidence indicated that Dish did nothing to stop SSN from misusing Dish's access to credit reports, *see* PX 15 at 7980-82, 8005 (not mentioning credit reports), or to discipline SSN.  *See* Trial Tr. Jan. 12, Doc. 303 at 20:11-21:12 (Musso testimony).

20

authority it had been given by Dish. Doc. 321 at 13-14. A separate question was unnecessary. The Court clearly and repeatedly instructed the jury that scope of authority was part of the agency question on the verdict sheet. When the court's instructions fully inform the jury of the applicable law, special interrogatories on every element of a claim or defense are not needed. *E.g.*, *Talkington v. Atria Reclamelucifers Fabrieken BV*, 152 F.3d 254, 266-67 (4th Cir. 1998); *see Gentry*, 816 F.3d at 238-39; *Bristol Steel & Iron Works, Inc. v. Bethlehem Steel Corp.*, 41 F.3d 182, 190 (4th Cir. 1994) (holding that "[t]he use of special verdicts rests with the discretion of the district court, and the exercise of this discretion extends to the language used in the form" (citations omitted)).

The Court's initial jury instructions, before the evidence, mentioned scope of authority three times. *See* Trial Tr. Jan. 10, Doc. 301 at 70:9-71:21. The final instructions explained scope of authority in detail and mentioned scope of authority more than a dozen times. *E.g.*, Doc. 293 at 5-7. When reviewing the verdict sheet at the end of the instructions, the Court instructed the jury that a "Yes" answer on the agency question required finding (1) that there was an agency relationship and (2) "that SSN was acting in the course and scope of that agency when it made the telephone calls during the class period." Trial Tr. Jan. 18, Doc. 306 at 8:17-:24. These instructions adequately addressed the scope of authority issue by incorporating it into the agency question.

### d. Expert testimony

Dish contends that the Court should have excluded parts of Ms. Verkhovskaya's testimony and should have allowed Dish's experts to testify more fully. Doc. 321 at 14-19. The testimony at issue concerned whether or not the phone numbers at issue were

21

residential and whether they were on the Registry on the relevant date. Dish's assertions must be evaluated in context.

As noted *supra* p. 12, Ms. Verkhovskaya used, *inter alia*, data from LexisNexis to remove business numbers and to conclude that the remaining numbers were residential. Dish pointed out that the data from LexisNexis came in several different forms, some of which was stronger than others. For example, some phone numbers were affirmatively identified in the LexisNexis data as residential, while others were not affirmatively identified as falling into any category. *See supra* note 11. Among those affirmatively identified as residential by LexisNexis, some were given that designation during the class period, while others were designated as residential only before or after the class period. Dish also contended that many of the numbers were cellular numbers, and LexisNexis identified some as cellular or possibly cellular. *See* Trial Tr. Jan. 13, Doc. 304 at 18:10-:19 (Verkhovskaya testimony). Dish asserted that these numbers were less likely to be residential.

In order to fairly and efficiently allow Dish to contest whether certain phone numbers were residential, the parties reviewed the data, divided the numbers into categories, or "buckets," based on the information from LexisNexis, and stipulated as to which phone numbers were in which buckets.[18] Doc. 277; *see also supra* note 12. The

---

[18] In proceedings before the originally-scheduled trial date, the Court was concerned about managing the presentation of the residential issue on the all-or-nothing basis advocated by the plaintiffs and felt it would be fairer to Dish to give the jury the opportunity to make different findings based on differences in the evidence. *See generally* Doc. 204. Thereafter, the Court and the parties spent substantial time figuring out the most manageable way for this defense to be

verdict sheet broke out all of these buckets so the jury could decide, bucket by bucket, whether the plaintiffs' proof that the numbers were residential was sufficient. Doc. 292 at ¶ 2. These buckets would allow the jury to decide that the evidence was sufficient as to all of the numbers, some of them, or none of them.[19]

While Dish has contended since the class certification stage that the evidence that the numbers were residential was not reliable, it never identified its own expert to testify that any numbers were or were not residential. *See* Doc. 233 at 7 & n.5. As the case moved towards trial, well after discovery had closed, Dish repeatedly tried to fill in this this and other gaps in its pretrial preparations by attempting to call witnesses at trial who it had not disclosed or designated to testify.[20] *See id.* at 7-8, 19-20 (numerous exhibits and witnesses); Doc. 222 at 3-4 (Ms. McRae, Mr. Sponsler); Doc. 183 at ¶ 10 (unnamed Microbilt representative).

---

decided by the jury, and the stipulations were part of the solution. The word "buckets" was adopted by the parties and the Court as a colloquial way to refer to these categories.

[19] As it happens, the jury accepted the plaintiffs' evidence as to every bucket and rejected all of Dish's challenges. *See* Doc. 292 at ¶ 2.

[20] Rule 26 requires expert witnesses to submit a written report containing, among other information, "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). "The purpose of the rule is to avoid unfair surprise to the opposing party." *Heller v. Dist. of Columbia*, 801 F.3d 264, 270 (D.C. Cir. 2015) (quotation omitted), *reh'g en banc denied*, 814 F.3d 480 (2016). "The purpose of [expert] reports is not to replicate every word that the expert might say on the stand. It is instead to convey the substance of the expert's opinion . . . so that the opponent will be ready to rebut, to cross-examine, and to offer a competing expert if necessary." *Walsh v. Chez*, 583 F.3d 990, 994 (7th Cir. 2009); *see also Gay v. Stonebridge Life Ins. Co.*, 711 F. Supp. 2d 165, 167 (D. Mass. 2010) (denying motion for new trial and stating that an expert report "need not include the precise language that the expert will employ at trial"), *aff'd*, 660 F.3d 58 (1st Cir. 2011).

### i. Ms. Verkhovskaya

At trial, Ms. Verkhovskaya testified that all of the phone numbers remaining in the class were residential. Trial Tr. Jan. 12, Doc. 303 at 191:13-:17. She also explained why she had not removed from the class the numbers in the various buckets during her analysis and why she still believed the numbers were residential. *E.g.*, Trial Tr. Jan. 13, Doc. 304 at 10:2-14:17, 90:3-91:4.

Dish contends that Ms. Verkhovskaya did not disclose in her report or at her deposition that she would testify that all the phone numbers were residential and that it was error to allow her to so testify.[21] Dish's objections are based on an unduly narrow reading of her report. In her report, Ms. Verkhovskaya explained how she removed business numbers from the data set and stated that the remaining numbers "were not identified as business numbers," *see* Doc. 48-2 at 10-12, which in the context of this case is based on the obvious need to prove the remaining numbers are residential. *See* § 227(c)(5). Her testimony was simply another way of saying the same thing. *See Walsh v. Chez*, 583 F.3d 990, 994 (7th Cir. 2009). Dish should not have been surprised.[22]

---

[21] Dish also made this argument in an oral motion to strike at trial. *See* Trial Tr. Jan. 13, Doc. 304 at 120:7-124:16.

[22] The Court allowed Dish to fully explore this asserted inconsistency before the jury. On cross-examination, Dish pushed Ms. Verkhovskaya to acknowledge that her expert report did not actually say that the numbers were residential. In response, she testified that her opinion was based on an assumption that all non-businesses numbers are residential. Trial Tr. Jan. 13, Doc. 304 at 58:15-59:16 ("Well, to me, it is clear that if they're not businesses, that they're residential.").

To the extent Dish challenges the decision to allow Ms. Verkhovskaya to testify about the buckets on direct examination, that decision was within the Court's discretion to manage the order of evidence. *See* Fed. R. Evid. 611(a) (allowing courts to "exercise reasonable control over the mode and order of examining witnesses and presenting evidence" to make the trial "effective for determining the truth" and to "avoid wasting time"). Dish stated that it would cross-examine Ms. Verkhovskaya on the same topics, Trial Tr. Jan. 12, Doc. 303 at 198:16-:20, and it was clear that Dish intended to call experts who would testify about some of these buckets. *See id.* at 199:21-:23. The Court allowed Ms. Verkhovskaya to testify about the buckets on direct in order to reduce confusion, *see id.* at 199:1-:20; 202:18-:25, and to prevent the need for Ms. Verkhovskaya to testify again during the plaintiffs' rebuttal evidence. *See* Trial Tr. Jan. 17, Doc. 305 at 22:11-:15.[23] An expert who testifies at trial is allowed to explain why criticisms of her work are mistaken or unwarranted, even if those explanations are not in her original report.[24] *See Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th

---

[23] Dish points to a couple of places in the record where the Court expresses some doubt about whether it had made the right decision to let Ms. Verkhovskaya testify about the stipulated buckets on direct. *See* Trial Tr. Jan. 17, Doc. 305 at 17:14-:17, 21:4-:8. These comments were made in the course of evaluating the plaintiffs' evidentiary challenges to Dish's expert, Dr. Aron, and were not findings that the Court had done it wrong; they were reflections on some of the problems caused by Dish's efforts to offer evidence through experts that it had failed to disclose before trial. The Court allowed Dish's experts to testify fully when they had been properly disclosed and overruled objections by the plaintiffs on this point. *Id.* at 37:5-38:16, 60:9-:15. The Court is satisfied that the way it handled the matter did not result in any unfairness to Dish.

[24] Ms. Verkhovskaya's testimony may have actually been helpful for Dish because she explained the contents of the buckets to the jury. Ms. Verkhovskaya's testimony, Trial Tr. Jan. 13, Doc. 304 at 10:2-18:19, 90:6-103:19, was the only testimony by any witness about most of those buckets.

Cir. 2006) (holding that Rule 26(a)(2)(B) "contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report").

Dish also objects to Ms. Verkhovskaya's testimony that all of the class members' numbers had remained on the Registry during the time that SSN called them. Doc. 321 at 15-16; *see* Trial Tr. Jan. 12, Doc. 303 at 183:24-184:5; Trial Tr. Jan. 13, Doc. 304 at 31:18-33:21. This testimony was based on her understanding of the Nexxa data, which Ms. Verkhovskaya discussed in her pretrial report and at her deposition. Doc. 48-2 at 10; Doc. 103 at 40, 154:9-156:21. She was not required to forecast her testimony word-for-word, *see Walsh*, 583 F.3d at 994, nor was she required to anticipate every challenge to her opinions and include her responses to such challenges in her report. There was no unfair surprise to Dish. *See Heller v. Dist. of Columbia*, 801 F.3d 264, 270 (D.C. Cir. 2015), *reh'g en banc denied*, 814 F.3d 480 (2016).

Finally, Dish contends that Ms. Verkhovskaya gave new testimony that contradicted her deposition and formed new opinions. Doc. 321 at 18 & n.7. At a few points, Ms. Verkhovskaya gave different answers from her deposition testimony about whether she had used certain columns of information from LexisNexis in her analysis. *See* Trial Tr. Jan. 13, Doc. 304 at 48:8-49:16, 92:24-94:16, 95:20-97:22. She also admitted at trial that she was, at times, confused at her deposition. *See id.* at 49:8-:12, 94:20-:23, 95:2-:7, 97:20-:22.

A few minor misstatements or errors, corrected at trial, do not constitute new opinions. *See Walsh*, 583 F.3d at 994. Even if they did, the admission of a few statements does not constitute a miscarriage of justice requiring a new trial. *See Perrin v.*

*O'Leary*, 36 F. Supp. 2d 265, 267 (D.S.C.) (holding that the new trial requires more than

"minor evidentiary errors" (quotation omitted)), *aff'd*, 165 F.3d 911 (4th Cir. 1998). Dish

cross-examined Ms. Verkhovskaya at length about these discrepancies, *see* Trial Tr. Jan.

13, Doc. 304 at 49:1-50:6, 91:5-98:20, and the jury found them of no consequence. *Cf.*

*Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary

evidence, and careful instruction on the burden of proof are the traditional and

appropriate means of attacking shaky but admissible evidence.").

### ii.  Dr. Aron

Dish contends that the Court improperly prevented Dr. Aron from offering

testimony to rebut the "new opinions" in Ms. Verkhovskaya's testimony. Doc. 321 at 17.

As noted *supra* p. 24, Ms. Verkhovskaya did not offer new opinions and no one should

have been surprised that Ms. Verkhovskaya testified that the class members' numbers

were residential and were on the Registry at the relevant time.

Dish also contends that "the Court required DISH's counsel to provide page and

paragraph cites from Dr. Debra Aron's report for every bit of testimony [she] offered"

before her testimony could be admitted. Doc. 321 at 17. That is not an accurate

statement of the record.

Before trial, the Court granted a motion to exclude all testimony about a

supplemental report Dr. Aron prepared addressing the plaintiffs' proposed method of

class notice, both because she had not been properly disclosed and for Rule 403 reasons.

Doc. 233 at 19-21 (excluding Doc. 129-1 (supplemental report)).[25]  At trial, it became

clear that Dish intended to ask Dr. Aron some questions about topics that did not appear

in her original report.  *E.g.*, Trial Tr. Jan. 17, Doc. 305 at 16:22-:23 ("[S]he didn't offer

any opinions about that, anything close to that in her original report."), 19:10-:22 ("Well,

where is anything close to that in the report?").[26]  By asking Dish questions, the Court

was giving Dish an opportunity to help the Court understand why Dr. Aron's testimony

might fall outside the confines of the ruling on the motion in limine.  Consistent with its

pretrial ruling, the Court ruled that Dr. Aron's testimony should be limited to the matters

in her original report, as Dish had not disclosed Dr. Aron as an expert on any other topic.

*Id.* at 21:14-23:5.  The limitations placed on Dr. Aron's testimony were appropriate and

did not result in a miscarriage of justice.

To the extent Dish asserts that the Court imposed different standards on Dish than

it did on the plaintiffs when evaluating whether expert opinions were outside the scope of

those disclosed pretrial, Dish is comparing apples to oranges.  As stated in the Court's

pretrial evidentiary order, "Dish did not disclose that Dr. Aron or any other expert

witness would offer opinions at trial about specific categories of class members and

phone numbers that purportedly do not meet the elements for liability."  Doc. 233 at 12-

13.  The ultimate reason the Court did not allow Dr. Aron to testify about these buckets

---

[25] The plaintiffs did not seek to exclude Dr. Aron's testimony about issues raised in her original report.  That report opposed class certification and challenged Ms. Verkhovskaya's analysis.  Doc. 56-12.

[26] The issue of Dish attempting to use undisclosed expert testimony was a recurring problem. *See supra* p. 23.

was that Dish did not disclose her as an expert—and she reached no affirmative opinions—about whether class members' numbers met the standards for liability. *See* Trial Tr. Jan. 17, Doc. 305 at 19:1-:4, 21:14-22:3; Fed. R. Civ. P. 26(a)(2)(A), (B)(i). In contrast, the plaintiffs properly identified Ms. Verkhovskaya as an expert before trial. Ms. Verkhovskaya affirmatively analyzed the elements of liability, both in her report and in her testimony. *See generally* Doc. 321-1. Dish repeatedly attempted to avoid the consequences of its pretrial failure to identify witnesses, *see supra* p. 23, and it was appropriate for the Court to keep tabs on this throughout the trial.

Moreover, the Court allowed Dish to present extensive testimony from Dr. Aron about the methods Ms. Verkhovskaya used to reach her conclusions and about the purported unreliability of the underlying data. *See* Trial Tr. Jan. 17, Doc. 305 at 29:19-50:15. The Court overruled objections by the plaintiffs to much of this testimony. *Id.* at 37:5-38:16, 60:9-:15. Dish had a fair opportunity to rebut Ms. Verkhovskaya's opinions.

### iii.  Dr. Fenili

Finally, Dish contends that the Court should have allowed Dr. Robert Fenili to testify about cellular numbers on the Registry. Doc. 321 at 19-20. The Court granted a motion in limine and excluded Dr. Fenili's testimony about cellular numbers. Doc. 222 at 2. As previously stated, that evidence was of limited probative value and had a significant risk of confusion. *Id.* Nothing happened at trial to change the Court's Rule 403 evaluation of that evidence. The exclusion of that testimony was appropriate and not a miscarriage of justice.

29

### e. Closing argument

Dish asserts that the verdict was a miscarriage of justice because Dr. Krakauer's counsel referred in closing argument to PX 198, an affidavit of Bahar "Sophie" Tehranchi, which was not in evidence. Doc. 321 at 20-21.

The mistaken reference by plaintiffs' counsel to an exhibit not in evidence was a harmless error. The plaintiffs' closing argument only briefly discussed the affidavit, using it to show that all of SSN's calls through the Five9 platform in 2010 and 2011 were to market Dish products. *See* Trial Tr. Jan. 18, Doc. 306 at 12:18-13:10. These were background facts not legitimately in dispute, because the Ms. Tehranchi testified to these same facts in her video deposition, which was in evidence. *See* Dep. Tr. of Bahar "Sophie" Tehranchi,[27] Doc. 327 at 18:21-:23, 23:3-:15, 26:15-27:7, 72:16-:22, 121:17-:20.

When Dish brought the error to the Court's attention, it asked only for a limiting instruction, not a mistrial. Trial Tr. Jan. 18, Doc. 306 at 38:18-40:15. The Court immediately gave the requested instruction, telling the jury to disregard the paragraph of the affidavit shown to them and to rely only on Ms. Tehranchi's testimony. *Id.* at 40:21-41:10. That instruction cured any error. *See Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 501 (4th Cir. 2001) ("[T]here is an 'almost invariable assumption of the law that jurors follow their instructions.'" (quoting *Richardson v. Marsh*, 481 U.S. 200, 206-07

---

[27] Selections of Ms. Tehranchi's video deposition testimony were shown to the jury at trial and offered into evidence.

(1987))); *cf. United States v. Mason*, 344 F. App'x 851, 853-54 (4th Cir. 2009) (per curiam) (unpublished) (finding that an instruction to the jury to rely on its own recollection of the evidence was adequate to cure misconduct in a closing argument). There was no miscarriage of justice resulting from plaintiffs' counsel's reference to the unadmitted exhibit.

####    f.    Calculation of damages

Dish maintains that the format of the damages calculation violated Dish's substantive due process rights and was a miscarriage of justice. Doc. 321 at 21-22. In particular, Dish contends that it was a miscarriage of justice that the Court did not permit the jury to award different damage amounts for different phone calls. Doc. 326 at 11.

Courts have routinely found that the statutory damages set by the TCPA are constitutional, including in class actions with representative plaintiffs. *Pasco v. Protus IP Sols., Inc.*, 826 F. Supp. 2d 825, 835 (D. Md. 2011) (citing a "complete non-existence of cases" finding TCPA damages unconstitutional); *see, e.g.*, *City Select Auto Sales, Inc. v. David/Randall Assocs., Inc.*, 96 F. Supp. 3d 403, 427-28 (D.N.J. 2015) (awarding TCPA damages on summary judgment in class action); *Centerline Equip. Corp. v. Banner Pers. Serv., Inc.*, 545 F. Supp. 2d 768, 777-78 (N.D. Ill. 2008) (rejecting due process challenge to TCPA damages at the motion to dismiss stage); *Accounting Outsourcing, LLC v. Verizon Wireless Pers. Commc'ns, L.P.*, 329 F. Supp. 2d 789, 808-10 (M.D. La. 2004) (same).

Dish makes only a passing argument on this point.[28]  It cites no TCPA cases in support of its position.  The two Fifth Circuit cases Dish cites are distinguishable: The class members in those cases suffered varied personal injuries based on exposure to toxic substances over varying time periods.  *See In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1017 (5th Cir. 1997) (crude oil waste contaminated drinking water in a residential neighborhood); *In re Fibreboard Corp.*, 893 F.2d 706, 710 (5th Cir. 1990) (asbestos-related cases).  The plaintiffs here did not seek individualized damages, and the harm each class member experienced was essentially the same as other class members.  *See generally* Doc. 111 (order granting class certification).

### g.  Damages amount

Dish asserts that the damages award of $400 per call was excessive in light of the evidence, Doc. 321 at 22, but makes only a cursory argument in support of this claim. The damages award is within the $500 range permitted by statute, *see* § 227(c)(5), and the plaintiffs were not required to prove any economic loss or out-of-pocket expenses in order to recover damages.  Doc. 293 at 13-14.  TCPA violations result in invasions of privacy, unwanted interruptions of and disruptions to time at home, tied-up phone lines, and wasted time spent answering unwanted solicitation calls or listening to unwanted

---

[28] When Dish raised this argument in pretrial filings, *e.g.*, Doc. 228 at 21-22, it clarified that its "main point is [that] the jury needs to know how much it is awarding in the aggregate," Doc. 231 at 101:24-102:24, indicating that Dish was primarily concerned about the format of the damages question on the verdict sheet.

voice messages. *See, e.g.*, *Universal Elections*, 729 F.3d at 376-77. It was within the jury's discretion to award damages of $400 for each such violation.

## V.   CONCLUSION

The plaintiffs offered credible evidence that SSN made thousands of telemarketing phone calls on Dish's behalf and as Dish's agent to residential numbers on the Do Not Call Registry in violation of federal law. Dish had a full opportunity to dispute the plaintiff's evidence and there was no miscarriage of justice.

It is **ORDERED** that Dish Network's motion for judgment as a matter of law, Doc. 318, and motion for a new trial, Doc. 320, are **DENIED**.

This the 6th day of June, 2017.

_____
UNITED STATES DISTRICT JUDGE