# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

**THOMAS H. KRAKAUER,**
**on behalf of a class of persons**
**similarly situated,**

**Plaintiff,**

**v.**

**Civil Action No. 1:14-cv-00333-CCE**

**DISH NETWORK, L.L.C.,**

**Defendant.**

______________________________/

## SUPPLEMENTAL DECLARATION OF ANYA VERKHOVSKAYA REGARDING THE IDENTIFICATION OF CLASS MEMBERS APPROPRIATE FOR ENTRY OF COMMON JUDGMENT

I, Anya Verkhovskaya, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. The purpose of this Supplemental Declaration of Anya Verkhovskaya Regarding the Identification of Class Members Appropriate for Entry of Common Judgement ("Supplemental Declaration") is to respond to the December 15, 2017 Declaration of Dr. Debra J. Aron ("Dr. Aron's Declaration").

2. Dr. Aron's new declaration is immensely inconsistent with her prior analysis of the existing data. Whereas she had previously identified only a few hundred inconsistencies among the 11,471 class members in the judgment groups I have proposed, she now claims there is inconsistent data for more than 11,000, or approximately 96%, of those same individuals.

3. A number of methodological errors contribute to Dr. Aron's flawed analysis, including that:

- She misinterprets and misapplies the Court's instructions for identifying class members by (a) relying on new data and (b) ignoring the Court's reasonableness standard;
- The new data upon which she relies has no historical timeframe limitation and includes data going back as far as the 1980s, making it difficult to determine whether it has any relevance to the class period;[1]
- She ignores the significance of the Five9 data, which is the only contemporaneous record of who SSN intended to call on Dish's behalf;
- She fails to acknowledge the significance of a familial match; and
- She fails to acknowledge the significance of delivered notice.

4. In this Supplemental Declaration, I address each of these flaws and respond to the specific examples in Dr. Aron's Declaration.

## I. Flaws in Dr. Aron's Methodology

### *Dr. Aron's Declaration is Inconsistent with Her Previous Testimony*

5. During the class notice stage, Dr. Aron submitted a report claiming that "out of the 18,066 unique phone numbers in the class, 3,644 ha[d] name inconsistencies between

[1] For clarity, my processes limited data considered for purposes of class member identification to a reasonable look-back period. The new data utilized by Dr. Aron, however, includes (i) over 300 records that go back prior to 1/1/2000 for ***both*** their first and last seen dates (in the new TransUnion and Microbilt files, and (ii) records without ***any*** date information (in the new Experian file). By contrast, my data included only about a dozen records with first and last seen dates prior to 1/1/2000 and those were not considered in my analysis.

the Five9, LexisNexis, and Microbilt data." (ECF No. 335-1, ¶ 13).

6. In preparing the list of class members suitable for group judgment (Exhibits 1-A and 1-B to my first declaration in support of group judgment, Declaration of Anya Verkhovskaya Regarding the Identification of Class Members Appropriate for Entry of Common Judgement of November 2017 ("Original Declaration")), I considered Dr. Aron's finding and excluded 3,179 of the telephone numbers with "inconsistencies" she identified.

7. If Dr. Aron's most recent analysis were consistent with her prior report, there should be challenges to only 465—or roughly 4%—of the individuals identified on my list.

8. Instead, Dr. Aron has dramatically altered her conclusions, and now says she has identified about 11,250 inconsistencies—more than 98% of the group proposed for judgment.

9. The flawed methods by which Dr. Aron reached such a dramatically different result are explained below.

***Dr. Aron's Declaration Misinterprets and Misapplies the Court's Standard for Identifying Class Members Entitled to an Award***

10. In its July 27, 2017 Order, the Court invited the Plaintiff to seek judgment for any class member who was "identified fully and without contradiction in the ***existing*** data." (ECF No. 351 at 16, 19, 21, 26) (emphasis added).

11. I interpreted this standard in light of the Court's statement that the goal of this process is to identify class members "whose membership in the class—and entitlement to a damages award—cannot ***reasonably*** be disputed." (*Id.* at 19) (emphasis added).

12. As a result, I understand the "existing data" to include only the data that was used to mail notice to the class members; specifically, the Five9 records, and the data from LexisNexis, Microbilt, and the United States Postal Service's (USPS) National Change of Address Database[2] that was provided to Dish as part of the class notice and meet and confer process.

13. I understand that a class member who is "identified fully" is one whose first name or identifying initial(s), last name, and address can be found in the existing data.

14. I understand that a class member who is identified "without contradiction" is one for whom there is no contradictory information upon which a class member's identification could reasonably be disputed.

15. My professional expertise is locating and identifying class members, a field in which I have more than seventeen years of experience. In my declarations, I have explained why, based upon this experience, I conclude that certain categories of superficial contradictions do not give rise to a reasonable dispute about a class member's identity.

16. Dish's expert, Dr. Aron, has no experience identifying class members. She states she is an expert in the field of data analytics.

17. Dr. Aron's work ignores the Court's instructions in several regards.

18. First, Dr. Aron did not limit her work to the "existing data." Rather, Dr. Aron's Declaration is based upon new data recently purchased by Dish specifically to rebut my list

---

[2] Additionally, as I stated in my Original Declaration, my team utilized Experian's manual-entry interface for a small number of address updates.

of proposed group judgment members. It was not disclosed in discovery, was not relied upon during the Court approved-notice process, and was neither admitted nor authenticated at trial. It appears to be unlimited in historical scope; that is, there is no indication of the age or date range for any of the records upon which she relies.

19. Second, Dr. Aron has not applied the Court's reasonableness standard. Rather, her "analysis" is limited to identifying any purported data anomaly and claiming that it is a contradiction. As an example, Dr. Aron has challenged a telephone number which existing data shows was identified by Five9 data as belonging to "S[redacted] J[redacted]" and which was identified in my original MicroBilt data as "S[redacted]r, J[redacted]" at the very same address. Similarly, Dr. Aron has challenged a telephone number identified in Five9 data as belonging to "G[redacted] S[redacted] J[redacted] S[redacted]" and which was identified in my original LexisNexis data as "J[redacted] S[redacted]." The Five9 and LexisNexis addresses for the S[redacted] are in the same city and state. In my opinion, these pairs, both challenged by Dr. Aron, are clearly identified without contradiction across the existing data.

20. Dr. Aron makes no effort to—and importantly, would not even be qualified to—take a meaningful look at these alleged contradictions to determine whether or not they give rise to a "reasonable dispute" about the class member's identity.

***The Unvetted New Data in Dr. Aron's Declaration Cannot Reliably be Used to Identify Class Members***

21. Dr. Aron's use of new data not only contravenes the Court's instructions, but renders her methodology and report unusable for the purpose of identifying class members.

22. Dr. Aron tries buttress her report by noting that I have previously testified to the reliability of the data ***sources*** upon which she relies. But the source of the new data is not the problem.

23. The problem is that the new data in Dr. Aron's report has no historical timeframe limitation. Dr. Aron candidly admits that she "did not incorporate the date information provided by the data vendors into the name matching analysis." (ECF No. 393-1 ¶ 37).

24. The lack of any date information in Dr. Aron's Declaration makes it impossible to determine whether the data upon which she relies is relevant to the class period in this case.

25. Dr. Aron also claims that I, too, "did not take date ranges within the data into account." But that is false.

26. On occasion, as Dr. Aron points out, I have relied on data from outside the class period to confirm a class member's identity. For example, as Dr. Aron notes, I used data from 2008 to confirm a class member's phone number and address in 2010. That does not mean that I "did not take date ranges into account" or that that age of a record does not matter. It simply means that, as an expert in the field of class administration, I am confident that information from 2008 is relevant to the identification of a class member in 2010. The process by which I identify class members, and by which I have reviewed challenges made by Dr. Aron, is one which looks at the whole of the data available to me to make reasonable determinations based upon the story the data provides.

27. My common-sense approach, however, is a far cry from Dr. Aron's apparent position—that ***any*** data from ***any*** point of time can give rise to "reasonable dispute" about the class member's identification.

28. For example, Dr. Aron claimed that Dr. Krakauer has not been identified "without contradiction" because Dish's newly purchased data contained an address at which Dr. Krakauer lived nearly thirty years ago.

29. No expert in the field of class member identification would conclude that a decades-old address reasonably contradicts the existing data used to identify Dr. Krakauer during the notice stage, especially considering the fact that notice mailed to that address was delivered and not returned by the USPS. If this were the test, no class member could be identified without contradiction because virtually every person has moved from one address to another over the course of their adult lifetime. Dr. Aron's contention in this regard only highlights the difference between my practical analysis and her blind number crunching.

30. My review of Dr. Aron's Declaration indicates that 59.6% of the telephone numbers with asserted "contradictions" are based solely upon new data. No such objection based upon data without date information should be sustained.

***Dr. Aron Ignores the Significance of the Five9 Data***

31. Much of Dr. Aron's work is based on the flawed premise that the Five9 calling data is not reliable.

32. The Five9 calling data is the original source SSN used to contact class members. Although counsel has referred to the Five9 records as "leads data," most of the

information in the Five9 data came from SSN's customer list. Dr. Krakauer, for example, was in the Five9 data because he was a former customer of SSN when SSN sold for DirecTV.

33. The Five9/SSN data has been uniquely important to my identification of class members because it is the only contemporaneous record of who SSN intended to call during the class period. It contains the name of the consumer SSN intended to call, the number that SSN intended to call, and indicates how many times each consumer was called.

34. Dr. Aron claims that the Five9/SSN data is not reliable and claims that I have admitted as such. That is not so.

35. I have previously stated that, because I had no prior experience verifying the accuracy of Five9 data, particularly this specific set of Five9 data, I could not opine as to its reliability ***standing alone***. That is why I used trustworthy third-party data sources as a supplement and to confirm accuracy and reliability. Throughout the process of the notice administration and the extensive back-and-forth on class member identification I have found the Five9 data to be highly reliable.

36. The fact that notice was successfully delivered to about 75% of the class members whose names and numbers originally appeared in the Five9/SSN data also confirms that the data is reliable.

37. Dr. Aron and Dish contend that I "arbitrarily" chose the Five9 data to begin my "waterfall" analysis, and that beginning with a different data source would have yielded different, more contradictory results. But there is a very good reason for beginning my

analytical "waterfall" with the Five9 data: it is the only contemporaneous record of the individuals whom SSN intended to call.

***Dr. Aron Fails to Acknowledge the Significance of a Familial Match***

38. Contrary to Dr. Aron's assertion, I did not arbitrarily choose one member of a family or household to receive a payment.

39. As I explained in my prior declaration, my identification of a class member is strengthened, not contradicted, by the existence of other individuals sharing the same name and phone number.

40. In its brief, Dish misapprehends my declaration to have asserted that any member of a household associated with one of the class numbers can receive an award. That is not the case.

41. Once again, Dish ignores the unique importance of the Five9 records.

42. Where the Five9 data indicates that Dish intended to call a particular person, and third-party data shows one or more persons with the same last name (most likely that not a family member) associated with that number, that corroborating evidence only strengthens, rather than contradicts, my conclusion that the person identified in the Five9 data is member of the class entitled to an award.

43. For example, the Five9 data associates Dr. Krakauer with the number XXX-XXX-9459, because Dr. Krakauer's name and number were contained in SSN's customer records. The fact that LexisNexis also associates his wife, Janet Krakauer, with the same number does not create confusion about whether Dr. Krakauer has been properly identified;

rather, when multiple family members are associated with the same telephone number during the same time period, it is strong evidence that the person identified in the Five9 records is the person who had the number that SSN called.

***Surname Changes are Common***

44. In my prior declaration, I explained that when reliable third-party data showed an individual with the same first name, but a different (or differently-spelled) last name associated with the same number, it was highly likely, and certainly more-likely-than-not, to be the same person.

45. Nothing in Dr. Aron's report or Dish's brief changes my conclusion.

46. Although name changes as a result of marriage or divorce are most common, there are additional reasons why a woman or man might change his or her name. It is also possible that a name misspelling or alternate spelling could be the result for the name "difference."

47. Although, as Dish contends, it is ***plausible*** that two different people with the same first name would truly share a phone number during the same time period, it is, as a matter of simple probability, not very likely. It is much more likely that the data reflects the same person going by a different last name.

48. The vast majority of Dr. Aron's surname challenges are women for whom, when reviewing the full picture of the data, it is reasonable to conclude have changed their name due to marriage. As an example of one of the telephone numbers that Dr. Aron challenges, "B[redacted] F[redacted]" is the name identified in the Five9 data and the LexisNexis

data has provided the names "B[redacted] T[redacted]" and "C[redacted] F[redacted]r" at the same address. A reasonable person would conclude not that there are two different persons named B[redacted] using the same telephone number during the relevant timeframe, and living at the same address, but that B[redacted] has had a name-change event following her marriage to C[redacted] F[redacted]r.

### *Dr. Aron Ignores the Fact That Every Individual on My List Received Notice at the Address Listed*

49. Dr. Aron claims that a class member is not identified "without contradiction" if the data contains more than one potential address.

50. It is common, however, for people to change addresses, and third-party data will reflect these changes. In fact, the historical data processes that I use in my work are expected to provide a full address history, by default, based upon the very nature and objective of the data process.

51. Dish claims that if an address shows up in the data as associated with the class member that differs from the address found in the Five9 data, that is a conflict that prevents the entry of judgment in favor of the consumer.

52. Of course, people will move from time to time. Critically, however, every single class member on my list ***received notice at the address I have identified.*** As a result,

the existence of other addresses in the data does not give rise to a reasonable dispute about the class member's identity.[3]

***The Fund Distribution Process is Not Equivalent to Mailing Cash***

53. Dr. Aron does not have experience in large-scale funds distribution. This is made abundantly clear by her implied suggestion that mailing a judgment check would be equivalent to mailing cash to a class member. This exposes a fundamental misunderstanding of the process or a disingenuous concern.

54. In my more than 17 years' experience, I have administered distribution of more than a billion dollars to hundreds of thousands of individuals. As an expert in this field, I am familiar with the processes that a distribution agent would use in effectively coordinating a judgment distribution process.

55. Checks that are issued by distribution agents are issued with numerous fraud-prevention features, which strengthen the reliability of the distribution process, in addition to the standard check-clearing regulations and requirements of all banks and check cashing agencies. Take the "B[redacted]" example from Paragraph 48: if a check were issued to a "B[redacted] F[redacted]r" who truly is an individual other than "B[redacted] T[redacted]," bank regulations

[3] Dish claims that I do not have "evidence" that these consumers received notice. In my more than seventeen years as a class action administrator, I can attest that when a consumer whose address is confirmed and updated via the USPS National Change of Address Registry is mailed notice via First-Class Mail, and such is not returned as undeliverable by the USPS, it is more likely than not that the class member received the notice. The standard has been utilized in every one of the hundreds of class actions I have administered (of all types) in numerous jurisdictions over more than a decade.

and the positive-pay recipient-matching system utilized by distribution agents would prevent the "wrong" B[redacted] from cashing the check. Only the "right" B[redacted] would be able to cash the check at her bank by providing them with necessary name-change documentation or by requesting a check be reissued with an updated name after providing name-change documentation to the distribution agent.

## II. Response to Dr. Aron's "Examples"

***Dr. Aron's Criticisms of the Illustrative Class Members in My Report Are Unfounded***

56. In her report, Dr. Aron raises challenges to nine specific individuals and telephone numbers from the Plaintiff's proposed judgment groups. I respond to each challenge below.

i. **A[redacted] Q[redacted]** – Dr. Aron's challenge to the identification of Mr. Q[redacted] relies solely upon her review of new data;

ii. **E[redacted] A[redacted]** – V[redacted] and N[redacted] A[redacted] (from existing LexisNexis data) are familial matches. In fact, N[redacted] may be a nickname for E[redacted], and even Dr. Aron's new challenges show familial matches (also for V[redacted] and N[redacted] A[redacted] and, newly, for R[redacted] A[redacted]). The fact that there are a number of addresses for these individuals over a period of time that goes back to the late 1980's (from Dish's new TransUnion data) is neither surprising nor relevant;

iii. **J**[redacted] **A**[redacted] – Dr. Aron's challenge to Mr. A[redacted]'s identification are based entirely upon new data and only confirm familial matches in all but one instance (even in that case, J[redacted] G[redacted] could be spouse who chose to maintain her maiden name);

iv. **T**[redacted] **B**[redacted]**t** – Dr. Aron's challenges are based entirely upon new data, apart for the "M[redacted] B[redacted]t" (i.e., spelling) challenge, and Dr. Aron appears to affirm that M[redacted] B[redacted] is a familial match. Further, of the three names that Dr. Aron identifies with the new data sources, two appear to be familial matches (M[redacted]e, as already discussed, and a W. or W[redacted] B[redacted]t);

v. **A.C. S**[redacted] – Dr. Aron's challenges are based solely upon new data;

vi. **A**[redacted] **J**[redacted] – Dr. Aron's challenges are based solely upon new data;

vii. **W**[redacted] **H**[redacted] – Dr. Aron's challenges are based solely upon new data;

viii. **E**[redacted] **B**[redacted] – except for one, Dr. Aron's challenges are based entirely upon new data. The one challenge based upon "existing data" indicates a name-change event, given that E[redacted] B[redacted]a and E[redacted] R[redacted] had the same address during the timeframe;[4]

ix. **C**[redacted] **A**[redacted] – Dr. Aron's challenge utilizes new data and "existing

[4] As with the "B[redacted]" example, if the "wrong" E[redacted] were to receive a judgment check, she would be unable to negotiate it without providing some sort of name-change documentation to the bank or the distribution agent.

data," and, after additional review and consideration, I agree with her challenge to K[redacted] L[redacted] as matched to C[redacted] A[redacted].

***Additional Responses to Dr. Aron's Other Specific Criticisms***

57. Dr. Aron makes additional criticisms in Paragraphs 21 and 35 of her Declaration. Each of the specific examples are discussed briefly, as follows:

i. **D[redacted] H[redacted]** – Dr. Aron's challenge utilizes only new data to identify non-familial matches and I have addressed the manner in which I utilize the full picture of the data to assess whether a record was matched as based upon "existing data;"

ii. **L[redacted] I[redacted]** – Dr. Aron's challenge utilized new data in addition to "existing data," and after additional review and consideration, I agree with her challenge; this and all other similar challenges based upon "existing data" have been removed;

iii. **J[redacted] D[redacted]** – Dr. Aron's challenge is based upon "existing data" but has disregarded the importance of a familial match in addition to a name-confirming match;

iv. **D[redacted] S[redacted]** – Dr. Aron's challenge utilizes new data and "existing data," and, after additional review and consideration, I agree with her challenge; this and all other similar challenges based upon "existing data" have been removed;

v. **W[redacted] M B[redacted]** – Dr. Aron's challenge utilizes new data and "existing data," and fails to acknowledge the relevance of the familial name match;

vi. **T[redacted] and C[redacted] M[redacted]r –** Dr. Aron's challenge appears to be based upon the record containing names of the likely spouses who I reasonably conclude are the shared users of a given telephone number;

vii. **D[redacted] O'[redacted] –** Dr. Aron's challenge to the matching of D[redacted] O'[redacted] to D[redacted] O[redacted] at the same address is indicative of the difference between her data crunching and my analysis; this is more likely than not an instance of an imperfectly captured surname rather than the bizarre coincidence of a D[redacted] O[redacted] and a different person named D[redacted] O[redacted] at the same address being associated with the same telephone number;

viii. **M[redacted] R M[redacted]** – Dr. Aron's challenge to the matching of M[redacted] R M[redacted] to M[redacted] W[redacted], at the same address, fails to account for the commonality of name-change events;

ix. **C[redacted]** – Dr. Aron's challenge here is to partial or incomplete names; a check could be issued to a "C[redacted]," whereupon the recipient would have to request check reissuance from the distribution agent after providing additional information.

58. Based upon my review of Dr. Aron's new data and the contested records, it appears that, in the vast majority of instances, rather than seeking to provide clarity to the process of class member identification, her "analysis" was designed to confuse, obfuscate, and further complicate the process at hand.

## III. A Small Number of Individuals Should be Stricken from My List.

59. The Court instructed the parties to meet and confer regarding any dispute about the names on Plaintiff's proposed list of class members whose entitlement to an award cannot reasonably be disputed.

60. Although I have done my best to thoroughly analyze the existing data, when working with lists of thousands of class members, a small number of data handling and processing errors are inevitable.

61. Given Dr. Aron's prior testimony that there were only 465 contradictions among the 11,471 individuals on my list, I assumed that the parties would be able to work together to review the names in dispute to weed out any errors.

62. Unfortunately, Dish's decision to use new data to challenge more than 98% of the names on my list made it impossible for such a process to occur. Dr. Aron has provided exhibits which include nearly 260,000 new lines of data.

63. In the time since my initial report, I have identified 191 names that should not have been included in my list of class members whose entitlement to an award cannot reasonably be disputed. A list of these telephone numbers and names is attached as

Exhibit 1. I understand that class counsel intends to modify its request to reflect the exclusion of these names.

64. To be clear, I do not concede that these 191 individuals are not class members. I simply believe that they do not meet the Court's standard for entry of judgment or distribution of an award at this time.

I declare under penalty of perjury that the foregoing is true and correct.

/s/ Anya Verkhovskaya

January 3, 2018

# EXHIBIT 1

| Phone | Name |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

| | | |
|---|---|---|
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |
| | [redacted] | |

| | |
|---|---|
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |

| | |
|---|---|
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |
| | [redacted] |