# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

**THOMAS H. KRAKAUER,**
on behalf of a class of persons,

     **Plaintiff,**

                                     **Civil Action No. 1:14-cv-00333-CCE-JEP**

**v.**

**DISH NETWORK, L.L.C.,**

     **Defendant.**


### CLASS COUNSEL'S MEMORANDUM OF LAW IN SUPPORT OF <u>MOTION FOR ATTORNEY'S FEES AND NONTAXABLE COSTS</u>

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................................... 1

Background.................................................................................................................... 2

Argument...................................................................................................................... 5

I.    Class Counsel are entitled to a reasonable percentage of the $61 million judgment
      in favor of the class. ...........................................................................................5

II.   A one-third fee is reasonable...............................................................................8

      A.    Class Counsel achieved an outstanding result for the Class. ..............................9

      B.    Class Counsel took significant risks in prosecuting the class members'
            claims...........................................................................................................11

      C.    The requested fee is reasonable in light of fees awarded in comparable cases
            and supported (though unnecessarily so) by a lodestar crosscheck. ..................15

            1.   A one-third fee is low for a case tried to verdict. .........................................15

            2.   Although a lodestar crosscheck is unnecessary, counsel's time and rates
                 further justify the requested fee. ...............................................................16

III.  Class Counsel's reasonable litigation expenses should be reimbursed from the
      common fund.......................................................................................................19

IV.   Dr. Krakauer should receive an incentive award. ...................................................20

Conclusion...................................................................................................................22

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Abrams & Abrams, P.A.*,
    605 F.3d 238 (4th Cir. 2010) ............................................................. 7, 9, 11

*Barber v. Kimbrell's, Inc.*,
    577 F.2d 216 (4th Cir. 1978) ............................................................. 8, 9, 11

*Blum v. Stenson*,
    465 U.S. 886 (1984) ........................................................................ 6

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980) ........................................................................ 5, 6

*Bussie v. Allmerica Financial Corp.*,
    No. 97-40204, 1999 WL 342042 (D. Mass. May 19, 1999) ........................................ 16

*Cook v. Niedert*,
    142 F.3d 1004 (7th Cir. 1998) ................................................................. 20

*Edmonds v. U.S.*,
    658 F. Supp. 1126 (D.S.C. 1987) ................................................................ 8

*Gascho v. Glob. Fitness Holdings, LLC*,
    822 F.3d 269 (6th Cir. 2016) ................................................................... 6

*Gaskill v. Gordon*,
    160 F.3d 361 (7th Cir. 1998) ................................................................... 5

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995) ..................................................................... 19

*Goldberger v. Integrated Res., Inc.*,
    209 F.3d 43 (2d Cir. 2000) ..................................................................... 11

*In re High-Tech Emp. Antitrust Litig.*,
    No. 11-2509, 2014 WL 10520478 (N.D. Cal. May 16, 2014) ..................................... 21

*Jones v. Dominion Resource Services, Inc.*,
    601 F. Supp. 2d 756 (S.D. W. Va. 2009) ....................................................... 6, 7

ii

*Kay Co. v. Equitable Production Co.*,
    749 F. Supp. 2d 455 (S.D. W. Va. 2010) ................................................................ 7, 20

*In re LandAmerica 1031 Exch. Servs., Inc. I.R.S. 1031 Tax Deferred Exch.*
    *Litig.*,
    No. 09-0054, 2012 WL 5430841 (D.S.C. Nov. 7, 2012) ................................................ 8

*Masters v. Wilhelmina Model Agency, Inc.*,
    473 F.3d 423 (2d Cir. 2007) ................................................................................... 6

*Montague v. Dixie Nat. Life Ins. Co.*,
    No. 3:09-00687, 2011 WL 3626541 (D.S.C. Aug. 17, 2011) ....................................... 5

*In re MRRM, P.A.*,
    404 F.3d 863 (4th Cir. 2005) ................................................................................. 8

*Payne v. Sprint Commc'ns Co. L.P.*,
    No. 11-3434, 2012 WL 13006270 (D. Md. Nov. 30, 2012) ......................................... 6

*Pinto v. Princess Cruise Lines, Ltd.*,
    513 F. Supp. 2d 1334 (S.D. Fla. 2007) ................................................................... 11

*Sanz v. Johny Utah 51 LLC*,
    No. 14-4380, 2015 WL 1808935 (S.D.N.Y. Apr. 20, 2015) ...................................... 21

*Savani v. URS Prof'l Sols. LLC*,
    121 F. Supp. 3d 564 (D.S.C. 2015) .......................................................................... 6

*Smith v. Krispy Kreme Doughnut Corp.*,
    2007 WL 119157 (M.D.N.C. 2007) ......................................................................... 8

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ................................................................................ 21

*Teague v. Bakker*,
    213 F. Supp. 2d 571 (W.D.N.C. 2002) ..................................................................... 7

*United States v. Tobias*,
    935 F.2d 666 (4th Cir. 1991) .................................................................................. 5

*Vizcaino v. Microsoft Corp.*,
    290 F.3d at 1050 n. 5 ............................................................................................ 17

*In re Wachovia Corp. ERISA Litig.*,
    2011 WL 5037183 (W.D.N.C. 2011) ....................................................................... 9

iii

*In re WorldCom, Inc. Sec. Litig.*,
    388 F. Supp. 2d 319 (S.D.N.Y 2005) .......................................................................... 16

**Rules**

Fed. R. Civ. P. 23 ............................................................................................................... 5, 8

**Other Authorities**

Alan D. Wingfield, *TCPA is Not Dead Yet—Court Trebles Eight Figure
    TCPA Award While World Awaits ACA Decision*, INSIDEARM, May 20,
    2017 ................................................................................................................................... 11

Manual for Complex Litig., § 14.121 (4th ed. 2004) .......................................................... 16

Simon van Zuylen-Wood, *How Robo-Callers Outwitted the Government
    and Completely Wrecked the Do Not Call List*, THE WASHINGTON POST,
    January 11, 2018 ............................................................................................................... 10

*You May Be Eilgible for a Cash Award—No, Really, Wait, Don't Hang Up*,
    WALL STREET JOURNAL, April 15, 2018 ........................................................................ 3

iv

## Introduction

Guided by a courageous class representative, Class Counsel achieved an historic result in this case—what is believed to be one of the largest ever trial judgments in a consumer class action. Yet, in return for this extraordinary result, Class Counsel seeks only an ordinary fee—the same one-third cut, plus expenses, that is a market standard for even the most uncomplicated personal injury settlement.

Class Counsel's request is more than reasonable given the risks they faced, the result they obtained, and the time, money, and resources they invested. Counsel's request is consistent with fees awarded in comparable class actions throughout this Circuit and the country, particularly those tried to verdict. It is supported by the affidavit of Professor William Rubenstein—who literally wrote the book on class actions—as well as local practitioners and leading class action lawyers from across the country. For these reasons, and those explained in greater depth below, Class Counsel respectfully requests an Order:

(1) Awarding Class Counsel a reasonable fee of 33.33% of the total judgment amount at the time of distribution, currently totaling $20,445,555.20;[1]

(2) Reimbursing Class Counsel from the common fund for reasonable litigation expenses, in the amount of $481,317.73;

(3) Directing payment of the Claims Administrator's fees from the common fund; and

(4) Awarding Dr. Krakauer a well-earned and reasonable service award of $30,000.00.

---

[1] The Court awarded post-judgment interest, so the total amount of the judgment will grow prior to distribution.

## Background

Class Counsel has been prosecuting the case against Dish's widespread illegal telemarketing since 2011, when they filed a case called *Donaca v. Dish Network, LLC*, in the District of Colorado. (*See* Declaration of John W. Barrett ¶ 8, attached as Exhibit B). Although the plaintiff voluntarily dismissed that case after it was revealed that records reflecting the calls to the class representative had been lost or destroyed, many of the documents and depositions obtained in *Donaca* were later used in the *Krakauer* case, including depositions shown to the jury and the call records identifying Dr. Krakauer himself. (*Id.* ¶¶ 8-9).

Dr. Krakauer filed his complaint in 2014 and, leading up to the trial, the parties engaged in years of hotly contested litigation, including discovery motions, competing expert witnesses, cross-motions for summary judgment, class certification, and an interlocutory appeal to the Fourth Circuit. Much of this litigation included novel issues under the TCPA, as well as the first-impression application of recent precedent, like the Supreme Court's landmark decision in *Spokeo v. Robins*. Throughout, Dish steadfastly refused to engage in settlement discussions.

The trial itself lasted six days spread over two weeks. The jury returned a verdict on the second day of deliberations, finding Dish vicariously liable for more than 50,000 illegal calls placed by its agent, SSN. Although Dish's counsel argued that the violations

2

were worth, at most, $0.40 per call,[2] the ten-member jury agreed to award $400 out of a possible $500 per violation, for a total of more than $20 million.

Ultimately, however, reducing the verdict to judgment would require almost as much effort by Class Counsel as obtaining the verdict itself. (Ex. B ¶ 21). Although the jury reached its decision in January 2017, no judgment would be entered until April 2018. In the intervening fifteen months, Class Counsel and Dish first sparred over, among other things, Dish's motions under Rules 50(b) and 59 (denied), Dish's motion for judgment as a matter of law and remittitur (denied), and Plaintiff's motion for treble damages (granted). The latter motion required Class Counsel to navigate truly uncharted waters—as no federal court had ever confronted the question in the context of a TCPA class action trial—and resulted in a first-of-its-kind order boosting the value of the jury's award to $1,200 per violation.

The last six months or so of post-trial proceedings were devoted to accurately identifying and developing a plan for distributing the jury's award to the members of the class. During this period, Class Counsel focused on refining the class list and devoted hundreds of hours and tens of thousands of dollars reaching out to class members, including hundreds of calls from Plaintiff's lead trial counsel himself. (*Id.* ¶¶ 21-23).[3]

---

[2] (*See* ECF No. 306 at 85) (Dish's counsel: "A couple of bucks is 40 cents a call, 5 calls, $2.40 . . . It shouldn't ever be more than 40 cents, but we believe it's zero").

[3] Class Counsel's extra efforts to reach out to class members led to a front-page story in the Wall Street Journal on April 15, 2018, entitled "*You May Be Eligible for a Cash Award—No, Really, Wait, Don't Hang Up.*" The article was also picked up by many other media outlets, and was the subject of a story on the CBS Morning News. This "earned media" provided a valuable supplement to the already-extensive class notice

3

Dish, on the other hand, spent this time showing a "lack of respect" for the Court's orders, "obfuscat[ing] the issues," "confus[ing] the record" and, at one point, even filing a motion to reconsider the Court's order on a prior motion to reconsider. (ECF Nos. 407, 450).

Finally, on April 5, 2018, the Court entered a final judgment in favor of the class in the amount of $61,342,800.00, triggering the attorney fee petition now before the Court.

Notably, Class Counsel's fee petition is supported by the declaration of William Rubenstein, Sidley Austin Professor of Law at Harvard Law School and, since 2007, the sole author of the leading national treatise on class action law, *Newberg on Class Actions*. (*See generally* Decl. of Prof. William Rubenstein, attached as Exhibit A). Professor Rubenstein has testified about the propriety of attorneys' fee requests in nearly 100 complex class action and MDL cases, and has created and maintained a database containing statistics on more than 1,000 class action lawsuits, giving his testimony a strong empirical grounding. (*Id.* ¶¶ 8-9). He is no "hired gun," having been retained by plaintiffs, defendants, objectors and the judiciary alike, and having *opposed* fee requests in some of the most significant class actions litigated this decade. (*Id.* ¶ 8). Nonetheless, Professor Rubenstein offers a full-throated defense of Class Counsel's fee petition in this case, which he describes as "an advertisement for the model class action." (*Id.* ¶ 2).[4]

---

program. (Ex. B ¶ 22 & n.2).

[4] Class Counsel's petition is further supported by a number of other national and local experts on complex litigation, including:

**Argument**

**I.  Class Counsel are entitled to a reasonable percentage of the $61 million judgment in favor of the class.**

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). The Supreme Court has "recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *United States v. Tobias*, 935 F.2d 666, 667 (4th Cir. 1991) (explaining equitable basis of the "common fund" doctrine). The common fund doctrine, though often applied to funds created by settlements, is also a basis for recovering fees from a fund created by a litigated judgment. *See, e.g.*, *Boeing Co.*, 44

---

- Elizabeth Cabraser, founding partner of Lieff Cabraser Heimann & Bernstein, LLP, a national leader in class action and multi-district litigation. (*See* Declaration of Elizabeth Cabraser, attached as Exhibit C). Ms. Cabraser teaches at Columbia and Berkeley Law Schools, and recently served on the Advisory Committee tasked with developing proposed amendments to Rule 23.

- Dan Bryson, managing partner of the Greensboro office of Whitfield Bryson & Mason LLP. (*See* Declaration of Daniel Bryson, attached as Exhibit D). Mr. Bryson has devoted his thirty-year career to litigating complex cases in the state of North Carolina and throughout the country.

- Nathan Duggins, managing partner of Tuggle Duggins PA, a Greensboro firm that represents business clients in commercial disputes of all sizes, including class actions. (*See* Declaration of Nathan Duggins III, attached as Exhibit E).

5

U.S. 472; *Gaskill v. Gordon*, 160 F.3d 361 (7th Cir. 1998); *Montague v. Dixie Nat. Life Ins. Co.*, No. CIV.A. 3:09-00687, 2011 WL 3626541 (D.S.C. Aug. 17, 2011).

Although the Fourth Circuit has not required a particular method for calculating attorney's fees in common fund cases, "[w]ithin this Circuit, the percentage-of-recovery approach is not only permitted, but is the preferred approach to determine attorney's fees." *Savani v. URS Prof'l Sols. LLC*, 121 F. Supp. 3d 564, 568 (D.S.C. 2015) (citing cases); *see also Jones v. Dominion Res. Servs., Inc.*, 601 F. Supp. 2d 756, 759 (S.D. W. Va. 2009) ("The percentage method has overwhelmingly become the preferred method for calculating attorneys' fees in common fund cases.").

Under the percentage method, the court awards attorney's fees as a percentage of the common fund "as a whole" that is used to pay class members' claims. *Boeing Co.*, 444 U.S. at 478 (citing a line of decisions dating to *Trustees v. Greenough*, 105 U.S. 527 (1882)); *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984) ("[T]he calculation of attorney's fees under the 'common fund doctrine,' . . . is based on a percentage of the fund *bestowed on* the class[.]") (emphasis added). In practical terms, it is "appropriate to base the percentage on the gross cash benefits available for class members to claim, plus the additional benefits conferred on the class[.]" *Payne v. Sprint Commc'ns Co. L.P.*, No. 11-3434, 2012 WL 13006270, at *2 (D. Md. Nov. 30, 2012) (citing *Boeing Co.,* 444 U.S. at 479).

Other circuits have reiterated Supreme Court authority "recognizing that class plaintiffs' 'right to share the harvest of the suit upon proof of their identity, whether or not they exercise it, is a benefit in the fund created by the efforts of class representatives

6

and their counsel.'" *Gascho v. Glob. Fitness Holdings, LLC*, 822 F.3d 269, 282 (6th Cir. 2016) (quoting *Boeing Co.*, 444 U.S. at 480); *see also Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 437 (2d Cir. 2007) (holding that a district court abused its discretion by calculating fees strictly based on the dollar amount paid to approved claimants, and expressly rejecting the idea that basing an award on the benefit available to the class would create a windfall for class counsel). As the Second Circuit reasoned in *Masters*, "[t]he entire Fund, and not some portion thereof, is created through the efforts of counsel at the instigation of the entire class. An allocation of fees by percentage should therefore be awarded on the basis of the total funds made available, whether claimed or not." *Id.*

The Court should award fees based on the percentage-of-fund method. First of all, the percentage method "better aligns the interests of class counsel and class members because it ties the attorneys' award to the overall result achieved rather than the hours expended by the attorneys." *Kay Co. v. Equitable Prod. Co.*, 749 F. Supp. 2d 455, 461 (S.D. W. Va. 2010). It provides a strong incentive to plaintiffs' counsel to obtain the maximum possible recovery in the shortest time possible under the circumstances, by removing the incentive, present under the lodestar method, for class counsel to "over-litigate" or "draw out" cases in an effort to increase the number of hours used to calculate their fees. *See Jones*, 601 F. Supp. 2d at 759; *see also Teague v. Bakker*, 213 F. Supp. 2d 571, 584 (W.D.N.C. 2002) ("[A]n award of attorneys' fees from a common fund depends on whether the attorneys' specific services benefited the fund—whether they tended to create, increase, protect or preserve the fund."). Finally, the percentage of fund approach

7

eliminates the burden on the court to engage in a detailed review and calculation of attorneys' hours and rates. *See In re Abrams & Abrams, P.A.*, 605 F.3d 238, 246 (4th Cir. 2010). "It is also viewed as the preferable method in cases such as this one, where the Plaintiff[] agreed to pay counsel on a contingency fee basis." *In re LandAmerica 1031 Exch. Servs., Inc. I.R.S. 1031 Tax Deferred Exch. Litig.*, No. 09-0054, 2012 WL 5430841, at *2 (D.S.C. Nov. 7, 2012).

## II. A one-third fee is reasonable.

An award of attorney's fees in a class action must be "reasonable." Fed. R. Civ. P. 23(h). Although the Fourth Circuit has not yet identified factors for district courts to apply when assessing the reasonableness of a proposed percentage award, it has, in at least one case, utilized a set of factors identified and employed by the Fifth Circuit. *See Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 & n.28 (4th Cir. 1978). Accordingly, many district courts employ these so-called *Barber* factors,[5] an approach the Fourth Circuit has affirmed. *In re MRRM, P.A.*, 404 F.3d 863, 867–68 (4th Cir. 2005) (holding that the district court reasonably applied the *Barber* factors when assessing a common fund fee award). The *Barber* factors include:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed

---

[5] *Smith v. Krispy Kreme Doughnut Corp.*, 2007 WL 119157, at *1 (M.D.N.C. 2007) (applying *Barber* factors to a percentage award); *Edmonds v. U.S.*, 658 F. Supp. 1126, 1143 n.37 (D.S.C. 1987) ("The [*Barber*] factors . . . can be used in analyzing a fee either based on the percentage method, or the lodestar method.").

by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

*Barber*, 577 F.2d at 226 & n.28. At bottom, the twelve *Barber* factors focus the Court's analysis on three main issues: the value of counsel's work and the results obtained (factors 3, 8, and 9); the risks and obstacles counsel faced (factors 2, 4, 6, 7, and 10); and quantitative inputs like time and labor expended, the customary fee for like work, and other awards in similar cases. (factors 1, 5, and 12).[6]

### A.    Class Counsel achieved an outstanding result for the Class.

The Fourth Circuit has repeatedly held that "the most critical factor in determining the reasonableness of a fee award is the degree of success obtained." *In re Abrams & Abrams, P.A.*, 605 F.3d at 247 (internal quotation marks omitted). If that is true, Class Counsel's fee request is plainly reasonable. There are many ways to view the outcome of Dr. Krakauer's suit, but from any angle, it was a tremendous success.

The economics alone would be sufficient. Professor Rubenstein, armed with the knowledge of a thousand class actions, opines that the jury's $61 million verdict is "likely one of the largest *trial* judgments in a TCPA case or plausibly any consumer class

---

[6] Recognizing that *Barber* is not a common fund case, some other district courts in this Circuit have instead looked to the seven-factor test adopted by the Third Circuit in *In re Cendant Corp. Prides Litigation* to determine the amount of a reasonable percentage award. *See In re Wachovia Corp. ERISA Litig.*, 2011 WL 5037183, at *3–4 (W.D.N.C. 2011) (citing cases). Under either set of guidelines, however, the Court's reasonableness analysis would focus on the three broad categories described above.

action case in American history." (Ex. A ¶ 28). Spread among 18,066 class members—not one of whom was excluded from the judgment—that means real, significant money in class members' pockets. The highest single share of the jury's award is $30,000, which is more than a year's salary for a full-time, minimum wage worker. But even the lowest share is $2,400, or, put differently, about two weeks' income for the average American household. (*Id.*). Thanks to Class Counsel's efforts, many class members will not even need to file claims, but the money will arrive as more than just a happy surprise in class members' mailboxes. That kind of cash could be used to pay for a year of college, buy a car, or—in at least one case—help a family go to a Chicago Bears game. (Ex. B ¶ 23).

The jury's award was not only historically large, but a rare success in many other ways as well. About 98.7% of class actions settle, typically for only a fraction of the face value of the claims. (Ex. A ¶ 28; Ex. C ¶ 5). But this case was the one-percenter that made it all the way to judgment, requiring much more work from class counsel, and resulting in a payout that was 80% of the absolute, best-case statutory maximum. Getting there required Class Counsel to meet the high burden of proving that Dish's conduct was willful, and persuading the Court that trebling was appropriate. That too, was rare, if not entirely unprecedented. (*Id.*).

Finally, it is worth noting that the benefits of Class Counsel's labor will be felt by more than just the members of the class. The TCPA is one of the most popular consumer statutes in history, but the government is woefully under-equipped to enforce it. The FTC receives 19,000 complaints *per day* from people on the Do Not Call Registry, but does not have a single full-time employee policing unwanted calls. *See* Simon van Zuylen-

Wood, *How Robo-Callers Outwitted the Government and Completely Wrecked the Do Not Call List*, THE WASHINGTON POST, January 11, 2018. In effect, only private enforcement of the TCPA, financially underwritten and laboriously undertaken by lawyers like Class Counsel, stands a chance of stemming the growing tide of illegal telemarketing. The result obtained by Class Counsel in this case sent a warning not only to Dish, but also to others throughout the business world. *See, e.g.,* Alan D. Wingfield, *TCPA is Not Dead Yet—Court Trebles Eight Figure TCPA Award While World Awaits ACA Decision,* InsideARM, May 30, 2017 ("From a compliance perspective, this was a costly lesson for Dish, but one from which others can learn."). In assessing the value of the outcome achieved by Class Counsel in this case, the Court should also take into account this important, deterrent impact.

**B.      Class Counsel took significant risks in prosecuting the class members' claims.**

The second category of *Barber* factors assesses the risks counsel faced. Courts have recognized that an attorney's risk is a "foremost factor" in determining an appropriate fee award. *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 54 (2d Cir. 2000); *In re Abrams*, 605 F.3d 238, 246-47 (holding that district court's failure to consider substantial risks when awarding fee was error); *Pinto v. Princess Cruise Lines, Ltd.*, 513 F. Supp. 2d 1334, 1339 (S.D. Fla. 2007) (surveying cases).

Here, as Professor Rubenstein points out, both TCPA cases (given the combination of small damages and lack of attorneys' fees) and trials (for obvious reasons) are inherently risky. (Ex. A ¶ 26). A TCPA trial, it follows, is exponentially

more perilous. For Class Counsel, the risk of non-payment, or at least a substantial loss, was very real. Prior to trial, Dish could have won total victories on summary judgment or class certification. During the trial, Dish could have won on vicarious liability or the merits of the underlying claims. Just as tough, the jury could have found in favor of the class, but only awarded $1 per call. Even after the verdict, the Plaintiff withstood a motion for new trial, a motion for judgment as a matter of law, and a motion to dismiss and decertify the class based on res judicata. For Class Counsel, this case was like building a house of cards, one careful and critical step at a time; for Dish, victory was as simple as removing a single spade.

At the same time, the issues themselves were complicated. (*Id.*). The agency issues added degrees of difficulty both theoretical and practical, such as conducting discovery involving an ephemeral, third-party dealer. Likewise, Class Counsel confronted complex and often novel legal issues, such as the application of the Supreme Court's *Spokeo* decision, the res judicata questions posed by Dish's post-trial motion to decertify, and the application of the TCPA's trebling provisions to a party held vicariously liable. And since this was the first Do Not Call class action ever tried before a jury in federal court, every aspect of trial preparation and management required Class Counsel to navigate uncharted waters.

Further stacking the odds, Class Counsel litigated against an exceptionally well-funded defendant represented by a huge, well-respected, international law firm. (*Id.*). Dish is number 186 on the Fortune 500 list, with roughly $1.5 billion in profit each year. (*Id.*). As noted below, Class Counsel invested between $5-10 million of their own time

and money in this case; Dish makes more than that in profit by January 3 of the year. (*Id.*). Dish's trial counsel, Orrick, Herrington & Sutcliffe, employs over 1,000 lawyers in 25 locations worldwide, and brought at least ten of them to trial. (*Id.;* Ex. B. at 13). The Plaintiff, on the other hand, was represented by one small (50-ish lawyer) firm, a two-lawyer partnership, one solo practitioner and a solo local counsel. In the words of Professor Rubenstein, "it would not be a stretch to label this litigation something of a David and Goliath clash." (Ex. A ¶ 26).

And Dish employed its superior resources to great effect, defending the case "so vigorously . . . that it was far riskier than a standard contingent fee case." (*Id.*). Dish never made a settlement offer and never conceded an inch of ground. Indeed, "if this case had a title it would be, *Everything Was Contested*, but even that would be an understatement as nearly everything was contested more than once." (*Id.*). Defense counsel's tactics even caused the Court to warn that "In making future decisions . . . the Court will take into account Dish's lack of respect for the terms of the Court's [orders], its continuing repetition of long-rejected arguments, and its attempt to obfuscate the issues, confuse the record, and shift arguments and facts." (ECF No. 407 at 12).[7]

---

[7] (*See also* ECF No. 438 at 2 ("Dish has failed to suggest appropriate and efficient means for resolution of its purported identity issues, instead choosing to halfheartedly participate in meet-and-confer requirements, to bombard the Court with irrelevant and voluminous materials in connection with the plaintiff's motion for judgment; to repeat arguments the Court has rejected many times; to seek a second bite at the apple when it loses on grounds it could have raised the first time the apple was presented; and to continue to offer only cumbersome and inefficient methods of resolving purported challenges to class member identity that go well beyond identity disputes.")).

13

Dish's scorched-earth litigation drove up the time and cost required to prosecute the class claims, highlighting another important factor increasing Class Counsel's risk: this case has been expensive. (Ex. A ¶ 26). As explained in greater detail below, Class Counsel have poured close to $8 million of their own time and money into the fees and expenses of the class's case. "[I]n other words . . . Class Counsel have loaned the class $8 million—and risk losing every penny of it on the outcome of this case." (*Id.*). According to Professor Rubenstein, "[i]t is very rare that you see attorneys investing this level of money in a client's case, particularly with such an uncertain outcome." (*Id.*).

Finally, the class and Class Counsel are not out of the woods yet. On May 4, Dish filed a notice of appeal to the Fourth Circuit, indicating its intent to challenge, among other rulings, the Court's orders granting class certification, denying Dish's motion to dismiss or decertify on standing grounds, trebling damages, denying Dish's post-trial motions under Rules 50(b) and 59, denying Dish's motion for judgment as a matter of law and remittitur, and establishing post-trial procedures. (ECF No. 456). A win on any one of those issues, or others, could expose Class Counsel to the risk of total non-payment.

Thus, the risks counsel faced in prosecuting the class claims justify the reasonable fee requested.

**C.** **The requested fee is reasonable in light of fees awarded in comparable cases and supported (though unnecessarily so) by a lodestar crosscheck.**

**1. A one-third fee is low for a case tried to verdict.**

Class counsel seek one-third of the common fund. While this is slightly above the average for all class actions in the Fourth Circuit (27.7%) and for consumer class actions nationwide (28.8%), it is well below the average for tried cases. (Ex. A, ¶¶ 2, 19). Of the more than 1,100 cases in Professor Rubenstein's database, just 15 were tried to verdict, only 11 of which contain relevant fee data. (*Id.* ¶ 19). In those 11, the average award was 36%, with 5 cases over 38.9% and three cases awarding fees in excess of 40% of the common fund. (*Id.*). The median fee *plus* costs in the 11 tried cases was 45%; here, when Class Counsel's expenses (discussed *infra*, section III) are factored in, the total fee and cost request is but 34.1% of the common fund. (*Id.*). Thus, the empirical data strongly suggest that the amount counsel seeks is eminently reasonable under the circumstances.

Awarding an above-average fee in tried cases only makes sense. (*See* Ex. C ¶ 11-15 ("Because Dish chose to not to settle, but to fight . . . a percentage award at the higher levels of the benchmark range would be appropriate here."). Trying a case is typically more difficult, more expensive, and far riskier than the average scenario. Thus, as compared to cases that settle before a trial, Class Counsel's one-third request "fairly compensates for the extra work and ongoing cost and risk of taking the case through trial and defending it on appeal." (*Id.* ¶ 13). Moreover, a slightly elevated award in a tried case is also consistent with the general practice in private fee agreements. (Ex. A ¶ 19). The leading empirical study shows that while a majority (57%) of contracts employ a flat

15

fee of 33.3%, those that use a variable rate structure apply fees of up to 50% in cases that are tried or taken up on appeal. (*Id.* (citing Herbert M. Kritzer, *Seven Dogged Myths Concerning Contingency Fees*, 80 Wash. U. L. Q. 739, 758 (2002)).[8] These data provide further market support for the requested fee.

### 2. Although a lodestar crosscheck is unnecessary, counsel's time and rates further justify the requested fee.

As stated earlier, the percentage-of-fund method is the "preferred" approach in the Fourth Circuit, and comports with class action practice nationwide, where the "vast majority" of courts of appeal now direct or permit district courts to award a percentage from the common fund. Manual for Complex Litig., § 14.121 (4th ed. 2004). The percentage method provides "appropriate financial incentives" necessary to "attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so." *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 359 (S.D.N.Y 2005). In addition, "from a public policy standpoint, the [percentage] method of calculating fees more appropriately aligns the interests of the class with the interests of class counsel—the larger the value of the settlement, the larger the value of the fee award." *Bussie v. Allmerica Fin. Corp.*, No. 97-40204, 1999 WL 342042, at *2 (D. Mass. May 19, 1999) (internal quotation marks and citations omitted).

Despite the advantages and popularity of the percentage-of-fund method, however, some courts employ what is known as a lodestar crosscheck—analyzing the value of

---

[8] *See also* Ex C ¶ 13 ("In the individual contingent fee realm, plaintiffs typically agree in advance to fees that will increase from 1/3 at the outset, to 40% or more shortly before trial.").

counsel's work in relation to their hours and hourly billing rates—to confirm the reasonableness of the percentage award. Although such analysis is unnecessary and, in some respects, problematic,[9] a lodestar crosscheck in this case only provides further support for Class Counsel's requested fee. (*See* Ex. A. ¶¶ 14, 18, 20-25).

Class Counsel spent approximately 8,500 hours on this case through April 17, 2018; if relevant time from the *Donaca* case is included, the total climbs to about 13,500 hours.[10] (Ex. B ¶¶ 10, 14). Class Counsel's blended hourly rate in this case is $550.16/hour, and $536.10/hour in the *Krakauer* and *Donaca* cases combined (*Id.* ¶¶ 15-18; Ex. A. ¶ 21); these rates are "fully consistent with the average rates that courts have approved in dozens of recent class action cases." (Ex. A. ¶ 21).[11] Multiplying Class Counsel's hours by its hourly rates yields a total lodestar ranging from $4,659,761.80 for

_____

[9] In many respects, the lodestar crosscheck reintroduces the same bad policy and perverse incentives that the increasingly popular percentage-of-fund method has overcome. If class counsel believe that courts will limit their fee to some multiple of their lodestar, then they will have the same imperfect incentives they would if courts used the lodestar method alone: to be inefficient, perform unnecessary projects, delay results, and overbill and overstaff work in order to run up their lodestar. *See Vizcaino v. Microsoft Corp.*, 290 F.3d at 1050 n. 5 ("The lodestar method is merely a cross- check on the reasonableness of a percentage figure, and it is widely recognized that the lodestar method creates incentives for counsel to expend more hours than may be necessary on litigating a case so as to recover a reasonable fee . . . ."). The lodestar crosscheck also caps the amount of compensation class counsel can receive, thereby misaligning their incentives from those of class, and reducing their rational incentive to achieve the largest possible award for the class.

[10] *See* Ex. A, ¶ 20 n.24 (explaining the legal and factual bases for including time spent on the *Donaca* case in the lodestar calculation for *Krakauer*).

[11] Class Counsel's rates are also consistent with normal hourly rates in the Greensboro market (Ex. E ¶ 8), and less than the average hourly rates that Bailey & Glasser charges clients who pay by the hour. (Ex. B ¶¶ 15-18).

time spent, through April 17, 2018, on *Krakauer* alone, to $8,605,766.85 when factoring in conservative projections for time to be spent on appeal and class administration, plus time spent on the *Donaca* case that contributed directly to the outcome in *Krakauer*. (*Id.* ¶ 22).

The final step in the lodestar crosscheck is to calculate the "lodestar multiplier"; *i.e.,* to divide the sum of the percentage fee requested by the lodestar amount. (*Id.* ¶ 14). Counsel's one-third fee request amounts to $20,445.555, yielding the following potential lodestar multipliers:

- 4.39, for time spent, through April 17, 2018, on *Krakauer* alone;

- 3.73, for time spent, through April 17, 2018, on *Krakauer* alone, plus a projected 1,500 hours litigating the case on appeal;

- 3.39, for time spent, through April 17, 2018, on *Krakauer* alone, plus a projected 1,500 hours litigating the case on appeal, plus a projected 1,000 hours spent administering the judgment, should it be affirmed on appeal; and

- 2.38, for time spent, through April 17, 2018, on *Krakauer* alone, plus a projected 1,500 hours litigating the case on appeal, plus a projected 1,000 hours spent administering the judgment, should it be affirmed on appeal; and including time spent on the *Donaca* case that contributed directly to the outcome in *Krakauer.*

(*Id. ¶* 22).

Regardless of the configuration upon which the Court would rely, these lodestar multipliers are consistent with that which courts have approved in comparable cases. (*Id.* ¶ 23). Indeed, Professor Rubenstein has supplied a list of more than 50 cases with a lodestar multiplier of more than 3.5, 48 of which have multipliers of 4.0 or higher, and 31

of which have multipliers of 5.0 or higher. (*Id.* ¶ 24).[12] Though Professor Rubenstein's

list is neither exhaustive nor representative (Class Counsel is not aware of any list that is),

it demonstrates that in appropriate circumstances—such as the high risks faced and

extraordinary outcome achieved in this case—courts regularly approve percentage

awards that embody multipliers much higher than that which Class Counsel seeks here.

(*Id.*).

### III. Class Counsel's reasonable litigation expenses should be reimbursed from the common fund.

Courts universally recognize that lawyers "whose efforts create, discover,

increase, or preserve a fund to which others also have a claim, [are] entitled to recover

from the fund the costs of [the] litigation…." *In re Gen. Motors Corp. Pick-Up Truck*

*Fuel Tank Prods. Liab. Litig*., 55 F.3d 768, 820 n.39 (3d Cir. 1995) (citation omitted).

Thus, in addition to a one-third attorneys' fee, Class Counsel also request reimbursement

from the common fund for $481,317.73 in reasonable litigation expenses. (Ex. B. ¶¶ 19-

20). Based on the exercise of billing judgment, Class Counsel are not requesting

reimbursement for the cost of meals, Westlaw research, or certain other expenses. (*Id.* ¶

20). Details supporting this request are attached as Exhibit 1-A to the Declaration of John

Barrett. These expenses are not only reasonable, but downright economical, given the

scope of the litigation and the outcome achieved. They increase the total amount of the

award requested by less than 1%, a substantially lower ratio than in comparable cases.

(Ex. A ¶ 19).

---

[12] (*See also* Ex. D. ¶ 18 (observing that state and federal courts in North Carolina
regularly award multipliers between 2 and 4 in class actions)).

In addition to these fixed expenses, Class Counsel note that the costs required to administer the judgment are ongoing and will not be fully known until the jury's award has been completely distributed. Moreover, the Court has left open the question of which party should bear these expenses and to what extent. Accordingly, Class Counsel ask the Court to approve the payment of reasonable administration costs and fees from the common fund, if necessary, in an amount to be determined by the Court at the earliest possible time.

## IV. Dr. Krakauer should receive an incentive award.

Incentive awards are "routinely approved" in class actions to "encourage socially beneficial litigation by compensating named plaintiffs for their expenses on travel and other incidental costs, as well as their personal time spent advancing the litigation on behalf of the class and for any personal risk they undertook." *Kay Co.*, 749 F. Supp. 2d at 472. Serving as a class representative "is a burdensome task and it is true that without class representatives, the entire class would receive nothing." *Id.* at 473. Although the Fourth Circuit has not fashioned its own standard, the Seventh Circuit applies a three-factor test to assess the reasonableness of an incentive award: (1) the actions the plaintiff has taken to protect the interests of the class; (2) the degree to which the class has benefited from those actions; and (3) the amount of time and effort the plaintiff expended pursuing the litigation. *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998).

Few class representatives have done more to serve, expended more time and effort, or secured a better outcome for their fellow class members than Dr. Krakauer has in this case. His initial persistence in gathering information to support his individual

20

claim was the foundation upon which more than 18,000 other claims were built. He remained instrumental in prosecuting the class claims throughout: reviewing and providing input on dozens of documents, helping prepare and respond to discovery requests, giving a deposition, testifying in the *U.S. v. Dish* case, participating in numerous in-person meetings with Class Counsel, attending pretrial hearings, and actively participating in trial preparations. He attended every minute of the trial (driving back-and-forth from Raleigh in blizzard conditions), withstood tough cross-examination by Dish's counsel, and provided valuable input as the trial progressed. Perhaps most importantly, Dr. Krakauer's genuine testimony connected with the jury in a way that helped them see the class claims not as the "windfall" Dish made them out to be, but as an important cause that affected real people.

For his invaluable service to the class, Class Counsel requests that Dr. Krakauer be granted an incentive award of $30,000. The requested incentive award is within a normal and acceptable range if the Court balances "the number of named plaintiffs receiving incentive payments, the proportion of the payments relative to the settlement amount, and the size of each payment." *Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003). It is an amount equal to the largest award Dr. Krakauer helped earn for any single class member, but represents only about 0.04% of the total judgment, in line with the ratio other courts have found appropriate. *See, e.g., In re High-tech Emp. Antitrust Litig.*, No. 11-2509, 2014 WL 10520478 (N.D. Cal. May 16, 2014) (incentive service awards amount to 0.4% of total recovery were "modest"); *Sanz v. Johny Utah 51 LLC*, No. 14-

4380, 2015 WL 1808935 (S.D.N.Y. Apr. 20, 2015) (combined payments representing less than 1% of overall settlement recovery a "small size").

### Conclusion

For the foregoing reasons, Class Counsel's motion should be granted.

**Respectfully submitted,**

/s/ John W. Barrett
John W. Barrett
Brian A. Glasser
**Bailey & Glasser LLP**
209 Capitol Street
Charleston, WV 25301
Telephone: (304) 345-6555
jbarrett@baileyglasser.com
bglasser@baileyglasser.com

/s/ J. Matthew Norris
J. Matthew Norris
**Norris Law Firm, PLLC**
1033 Bullard Court, Suite 207
Raleigh, NC 27615
(919) 981-4775
(919) 926-1676 facsimile
jmn@ncconsumerlaw.com

Matthew P. McCue
**The Law Office of Matthew P. McCue**
1 South Ave., Third Floor
Natick, MA 01760
Telephone: (508) 655-1415
mmcue@massattorneys.net

**CERTIFICATE OF SERVICE**

I hereby certify that on May 7, 2018, I electronically filed the above document with the Clerk of Court using the CM/ECF system, which will send notifications of such filing to all counsel of record.


/s/ John W. Barrett
John W. Barrett

23

# CERTIFICATION OF WORD COUNT

Pursuant to Local Rule 7.3, the undersigned verifies that, using the Microsoft Word word count tool, the word count for the foregoing document is 6,212 words. This word count does not include the caption, signature lines, certificate of service, cover page, table of contents or table of authorities.

Respectfully submitted,

/s/ John W. Barrett
John W. Barrett
Bailey & Glasser LLP
209 Capitol Street
Charleston, WV 25301
Telephone: (304) 345-6555
jbarrett@baileyglasser.com

24