IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION

THOMAS H. KRAKAUER,
on behalf of a class of persons,

    Plaintiff,

v.                                        Civil Action No. 1:14-cv-00333-CCE-JEP

DISH NETWORK, L.L.C.,

    Defendant.

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF
MOTION FOR ENTRY OF ORDER GOVERNING
DISPOSITION OF UNDISBURSED CLASS FUNDS**

**Summary**

It is adjudicated fact that DISH, through its agent, willfully and knowingly committed 51,119 violations of the Telephone Consumer Protection Act. The harm resulting from DISH's conduct has likewise been ascertained and quantified, and it would be unjust, inappropriate, and inconsistent with the deterrence purposes of the TCPA and the Court's affirmed judgment for DISH to retain any of the judgment funds. For this reason, Plaintiff proposes a hybrid approach to handling funds not distributed through the Court's disbursement order (Doc. 550), with funds to class members identified by name and address going to state unclaimed property funds, and all other funds distributed under the *cy pres* doctrine to entities whose interests align with those of class members in protecting against the scourge of illegal telemarketing.

## Background

For purposes of this motion, there are five categories of Class member payments that will result in undistributed funds:

**Category 1:** Those Class members who submitted approved claims or are on the final list, *see* ECF No. 560-1–560.3, but who do not timely deposit their checks. The precise sum of the funds comprising this category will not be known until the checks are issued and the stale date passed.

**Category 2:** Those Class members who submitted approved claims or are on the final list, *see id.*, but who fail to provide tax identification numbers to the claims administrator, and therefore receive a payment of $595. *See* ECF No. 560 at 5. Again, the sum of the funds comprising this category is unknown.

**Category 3:** Those Class members who did not submit claims and are not on the final list, but who are identified by name and address. There are 4,561 such persons who received 12,402 calls, and are thereby entitled to $10,082,701.98.

**Category 4:** Those Class members who did not submit claims and are not on the final list, and who are not identified by first name, last name, or address in the claims administrator's database. There are 200 such persons who received 516 calls, for which they would be entitled to $419,502.84.

**Category 5:** Those Class telephone numbers for whom claims were submitted, but were denied. There are 108 such persons who received 317 calls, accounting for $257,717.83.

2

**Argument**

1. **The Court has broad discretion to distribute unclaimed class action funds.**

District courts overseeing class actions are broadly authorized to administer them through "orders that determine the course of proceedings." FED. R. CIV. P. 23(d). The Court has considerable discretionary powers, derived in part from Rule 23(d), to shape "equitable decrees involving the distribution of any unclaimed class action funds." *Van Gemert v. Boeing Co.*, 739 F.2d 730, 737 (2d Cir. 1984); *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1307 (9th Cir. 1990).

There are four prevalent ways of distributing unclaimed class action funds: (1) reversion of the funds to the defendant; (2) a *cy pres* award to one or more charitable organizations whose goals are consistent with the underlying claims; (3) escheat to state governments or to their federal counterpart; and (4) pro rata redistribution to class members who filed approved claims. *See* 4 William B. Rubenstein, *et al.*, NEWBERG ON CLASS ACTIONS § 12:28 (5th ed. 2011) [hereinafter *Newberg*]. No party has proposed redistribution. The remaining three options are addressed below.

2. **Reversion disserves the TCPA's deterrent purpose, is inconsistent with the Court's judgment, and would reward DISH for its failure to monitor and control its agent.**

"Congress enacted the TCPA to curb abusive telemarketing practices that threatened consumer privacy." *Krakauer v. Dish Network L.L.C.*, No. 1:14-CV-333, 2017 WL 2242952, at *1 (May 22, 2017). The Court has previously recounted more than 50,000 abuses the jury found by its verdict, all while DISH looked the other way. *See id.* at *10 ("Dish had the power to control SSN's telemarketing; it simply did not care

3

whether SSN complied with the law or not."). In calculating how much to award for each call, the jury was instructed that it "can and should also consider the need to punish companies that violate the Act, and the need to deter future violations." ECF No. 293, *id.* (Jan. 19, 2017) at 13. The Court trebled the jury's award of damages, in significant part, "because of the need to deter Dish from future violations." *Krakauer*, 2017 WL 2242952, at *12.

Just before the class period began and DISH's agent began placing the illegal telemarketing calls, DISH reached an agreement with forty-six state attorneys general to reform its business practices and control its telemarketing dealers, but that agreement "did not change Dish's procedures at all." *Krakauer*, 2017 WL 2242952, at *13. The Court concluded that damages of a full "order of magnitude larger" were justified. *Id.*

In affirming the judgment, Judge Wilkinson's panel opinion lent its imprimatur to this Court's rationale for trebling the jury's award, recognizing that "an increased award was needed" for the sake of deterrence. *Krakauer v. Dish Network, L.L.C.* 925 F.3d 643, 661 (4th Cir.), *cert. denied*, 140 S. Ct. 676 (2019). The opinion discerned "no basis, either with regards to the legal standard or the facts, for disturbing this conclusion." *Id.*; *see also id.* at 656 (noting the "remedial purpose of the TCPA," whose enforcement by a class serves to deter "pernicious and disruptive" activity). If nothing else, this litigation has reinforced the proposition that the Court's trebling of the jury's damage award and resultant entry of judgment shall serve as a deterrent to anyone — including DISH — who may be contemplating a similar scheme to flout federal law.

4

It is that predominant legislative purpose of deterrence that DISH hopes to defeat by seeking reversion of unclaimed, undistributed Class funds. And that money, by virtue of the judgment, is the Class's money. *See* AMERICAN LAW INSTITUTE, Principles of the Law of Aggregate Litigation § 3.07, cmt. b (2010) (proceeding "from the premise that funds generated through the aggregate prosecution of divisible claims are presumptively the property of the class members"). In accord with the ALI, "most courts and commentators" regard litigation proceeds "as the class's money once it leaves the defendant's coffers," a concept that is "especially true of a fund established pursuant to a judgment rather than a settlement." *Newberg* § 12:29.

Indeed, opinion-leader critics of the claw-back mechanism for which DISH advocates "most centrally . . . are concerned that a reversionary fund undermines the deterrent function of the class suit." *Newberg* § 12:29; *accord In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 172 (9th Cir. 2013) ("Reversion to the defendant risks undermining the deterrent effect of class actions by rewarding defendants for the failure of class members to collect their share."). This Court has observed that "Congress designed the TCPA's damages provisions, in part, to deter violations," and found that the "deterrent effect weakens if Dish is off the hook for damages owed to injured class members who cannot be found." *Krakauer v. Dish Network, LLC*, No. 1:14-CV-333, 2017 WL 3206324, at *11 (July 27, 2017) (citation omitted). With respect to the ultimate distribution of unclaimed funds, the Court stated further that "[t]o the extent the decision is an equitable one, Dish's conduct during the claims administration process may be appropriate for consideration." *Id.*

5

It thus serves to recall the Court's comments attendant to its entry of final judgment, which the Fourth Circuit found significant enough to reiterate in its opinion:

> In entering the order, the district court noted that Dish had not participated in the claims process in good faith, instead choosing to "bombard the court with irrelevant and voluminous materials," "repeat arguments the court has rejected many times," and "seek a second bite at the apple when it loses on grounds it could have raised the first time the apple was presented."

*Krakauer*, 925 F.3d at 651.

Moreover, giving money back to DISH would reward DISH for the very sort of conduct that led to the illegal telemarketing in the first place. DISH's own business rules required SSN to maintain records of the telemarketing calls SSN made, but DISH ignored this requirement, and worse, knew that SSN was not complying. *Krakauer*, 2017 WL 2242952, at *6, *11. DISH's failure to require SSN to keep calling records required Plaintiff to take extraordinary measures to identify class members based on records maintained by a third-party calling platform and cross-checked against third-party data sources – a reliable yet imperfect system that resulted in the inability to reach some 5000 class members. Had DISH complied with its own *pro forma* requirements that SSN maintain good calling records, the process of identifying class members would have looked quite different, and likely would have resulted in better identification data. DISH should not benefit from the commissions and omissions that led to tens of thousands of TCPA violations. *Six Mexican Workers,* 904 F.2d at 1306-07 (affirming class action certification over defendant's objection that proceedings were unmanageable, in that "the potential for numerous unlocated class members stems largely from [the defendant's] own failure to record and retain" the statutorily required records).

6

The salient question, then, is not whether DISH should be rewarded with a rebate of Class money because the distribution mechanism is inevitably imperfect. Instead, the question is what deterrent-serving alternative to reversion best approximates perfect distribution to the Class. DISH cannot inform the Court's analysis of that question because it has no cognizable legal interest in the answer. *See, e.g.*, *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1258 (11th Cir. 2003) ("[A] defendant has no interest in how the class members apportion and distribute a damage fund among themselves."); *Six Mexican Workers*, 904 F.2d at 1307 ("Where the only question is how to distribute the damages, the interests affected are not the defendant's but rather those of the silent class members."). A discussion of the alternatives follows.

3. **For Category 3, distribution of $595 to each class member's state unclaimed property fund is appropriate.**

All fifty states and the District of Columbia have enacted unclaimed property laws that "require 'holders' of various types of intangible property to report and remit such property to the state after it has remained unclaimed by its owner for a specified period of time[.]" Ethan D. Millar and John L. Coalson, Jr., *The Pot of Gold at the End of the Class Action Rainbow*, 70 U. PITT. L. REV. 511, 515 (2009). Essentially, these laws allow the state to "stand in the shoes" of the missing owner and hold the property on the owner's behalf until the owner collects it. *Id.* at 516. While the principal objective is to assist owners in reclaiming their property, a secondary objective is to give the state the benefit of the use of the property until the owner reclaims it. *See id.* at 517.

7

Case 1:14-cv-00333-CCE-JEP   Document 578   Filed 04/20/20   Page 7 of 14

The statutes vary from state to state, and are based generally on four model statutes prepared by the National Conference of Commissioners on Uniform State Laws. *See* Miller & Coalson at 515-16. Although all statutes generally provide for the holding of unclaimed property, thirteen states have laws that expressly authorize the holding of "property received by a court as proceeds of a class action, and not distributed pursuant to the judgment." *Id.* at 519.

The Court has appointed Kurtzman Carson Consulting ("KCC") to serve as Claims Administrator, authorizing it to hold and disburse the allocable proceeds of judgment, and to undertake all necessary steps incidental to its mission. *See* ECF Nos. 523, 560. It is well within KCC's demonstrated competence to receive from the Court the Category 3 Class funds, and to transfer those funds to the proper authorities in the states and the District of Columbia in alignment with the last known address for the respective Class members in that category.

Because the claims administrator will not possess executed IRS Form W-9s for Category 3 Class members, it makes sense that the amounts paid to the unclaimed property funds for each be $595, a notch below the threshold requiring completion of a Form W-9. The amount in excess of $595 to which any Category 3 Class member would have been entitled had a claim been filed may be distributed *cy pres*, as explained *infra*.

4. ***Cy pres* distribution is proper for categories 1, 2, 4, and 5, and for Category 3 funds not distributed to state unclaimed property funds.**

As the name implies, distribution *cy pres comme possible* ("as near as possible") is the alternative best approximating a perfect class distribution process. The equitable

8

doctrine of *cy pres* traces to the law of trusts and estates, with the paradigmatic example of the March of Dimes Foundation being permitted to expand its charitable outreach more generally to childhood diseases upon development of the vaccine against polio — the Foundation's mission. *See generally Newberg* § 12:32 (citing *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784 (7th Cir. 2004)).

As the leading treatise on class actions explains, "The alternative in trust law is that the funds would revert, and so *cy pres* enacts the idea that the settlor would have preferred a modest alteration in the terms of the trust to having the corpus revert to his residuary legatees." *Newberg* § 12:32 (citation omitted). In the class action context, the court "is simply redirecting money from one set of beneficiaries (absent class members) to an entity whose interest lie 'as near as possible' to that group — namely, a charity working on issues related to the group's underlying causes of action — rather than have the monies revert to the defendant." *Id.*

*Cy pres* distribution is particularly apt in cases like this one, where the defendant's liability to the class has been adjudicated and the extent of its liability determined, as opposed to being negotiated through settlement. In *Fogie v. Thorn Americas, Inc.*, No. 3-94-359, 2001 WL 1617964 (D. Minn. Mar. 9, 2001), the district court had previously entered summary judgment for the class on its claim that the defendants, responsible for the operation of various Rent-A-Center stores, had violated a state statute prohibiting the imposition and collection of usurious interest rates. With respect to unclaimed class funds totaling almost $150,000, the Court observed that "Defendants were ordered to place monies received from illegal usurious rent-to-own contracts in an escrow account

9

because it would be inappropriate to allow Defendants to benefit from [their] illegal conduct." *Id.*at *2. In particular, "allowing Defendants to retain such ill-gotten gains is ***completely contrary to the final judgment of this Court***, and the goals of Minnesota's Usury Statute, which is to deter business entities from charging excessive interest rates to consumers." *Id.* (emphasis added) (citing *Six Mexican Workers*).

In a similar vein, the Fourth Circuit has affirmed an arbitrator's class award of punitive damages under the federal Credit Repair Organizations Act "to two *cy pres* recipients, namely, the National Consumer Law Center and the National Association of Consumer Advocates." *Jones v. Dancel*, 792 F.3d 395, 400 & n.6 (4th Cir. 2015). In so doing, the court approved in practice the arbitrator's reasoning that, once modest incentive awards were granted to the class representatives, distribution of the roughly $2 million award to almost 500,000 class members would result in *de minimis* parsing that was "'neither practical nor required.'" *Id.* Of course, *cy pres* distribution remains common in class actions resolved by settlement, and such awards have been upheld even in cases where no class members have been identified or paid. *See, e.g., In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 328 (3d Cir. 2019) (considering objector's appeal of $5.5 million class settlement, inclusive of attorney fees: "[W]e see no reason why a *cy pres*-only (b)(2) settlement . . . could not 'belong' to the class *as a whole*, and not to individual class members as monetary compensation.").

Here, the unclaimed sums will likely exceed the combined class damages in *Jones* and *Google*, but the principle is nonetheless sound: under the proper circumstances, even a one hundred percent *cy pres* award may satisfy the class action strictures. Assuming,

10

*arguendo*, that the unclaimed funds in this case may exceed $10 million, that sum would yet be less than one-quarter of the total award for Class disbursement.

While hardly an exhaustive exposition on the issue, *Jones* is consistent with the weight of authority, as "[c]ourts in every circuit, and appellate courts in most, have approved the use of *cy pres* for unclaimed class action awards." *Newberg* § 12:32 & n.25 (collecting cases). Though other alternatives to reversion are occasionally employed, *cy pres* is "likely the most prevalent method for disposing of unclaimed funds." *Id.* § 12:32 & n.24 (allowing that "[t]here is no empirical data on this point, but it appears that *cy pres* and *pro rata* redistribution are used frequently; reversion and escheat, far less so"); *accord Google*, 934 F.3d at 327 ("*Cy pres* is generally preferable to escheating funds to the state or reverting them to the defendant because it "preserve[s] the [class action's] deterrent effect . . . [and] (at least theoretically) more closely tailor[s] the distribution to the interests of class members." (quoting *Baby Prods.*, 708 F.3d at 172)).

As the court in *Six Mexican Workers* remarked, "*cy pres* distribution of unclaimed funds does not subject defendants to greater liability or alter their substantive rights." 904 F. 2d at 1307. To the contrary, "[w]here the only question is how to distribute the damages, the interests affected are not the defendant's but rather those of the silent class members." *Id.* Here, a *cy pres* award of the residuum to one or more deserving entities would work only the "modest alteration" addressed in the *Newberg* treatise of the preferred distribution to the whole, serving the interests of the Class as near as possible.

11

## Conclusion

For these reasons, Plaintiff respectfully requests the Court grant his motion and rule in substantial conformance with Plaintiff's proposed order.

THOMAS H. KRAKAUER<br>
By Counsel

/s/ John W. Barrett
John W. Barrett
Brian A. Glasser
Benjamin J. Hogan
Bailey & Glasser LLP
209 Capitol Street
Charleston, WV 25301
Telephone: (304) 345-6555
jbarrett@baileyglasser.com

/s/ J. Matthew Norris
J. Matthew Norris
Norris Law Firm, PLLC
1033 Bullard Court, Suite 207
Raleigh, NC 27615
(919) 981-4775
(919) 926-1676 facsimile
jmn@ncconsumerlaw.com

Matthew P. McCue
The Law Office of Matthew P. McCue
1 South Ave., Third Floor
Natick, MA 01760
Telephone: (508) 655-1415
mmcue@massattorneys.net

12

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that the foregoing was filed through this Court's CM/ECF system, and that all attorneys of record will be sent a copy of the same electronically through that system.

/s/ John W. Barrett
John W. Barrett

Dated: April 20, 2020

## CERTIFICATION OF WORD COUNT

      Pursuant to Local Rule 7.3, the undersigned verifies that, using the Microsoft Word count tool, the word count for Plaintiff's Memorandum in Support of Motion For Entry of Order Governing Disposition of Undisbursed Class Funds is 2,965 words. This word count does not include the caption, signature lines, certificate of service, cover page, table of contents or table of authorities.

                                          Respectfully submitted**,**

                                          /s/ John W. Barrett
                                          John W. Barrett