# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

THOMAS KRAKAUER, on behalf of     )
a class of persons,     )      CASE NO. 1:14-CV-00333-CCE-JEP
    )
         Plaintiff,     )
    )
         v.     )
    )
DISH NETWORK L.L.C.,     )
    )
         Defendant.     )

**DISH NETWORK L.L.C.'S MEMORANDUM OF LAW IN SUPPORT OF DISH'S MOTION FOR REVERTER OF UNCLAIMED FUNDS AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR APPLICATION OF *CY PRES* AND ESCHEAT**

Defendant DISH Network L.L.C. ("DISH") respectfully submits this memorandum of law in support of DISH's motion for reverter of unclaimed funds and in opposition to Plaintiff Thomas Krakauer's ("Plaintiff") motion for application of *cy pres* and escheat.

## PRELIMINARY STATEMENT

The Court established a post-trial claims process to identify the 18,066 class members. Through that process, the Court identified 13,197 of 18,066 class members. Those 13,197 class members are set to recover $1,200 per-telephone call in damages (with a net distribution of $812.99 per call after attorneys' fees and expenses), so long as they submit the required W-9 forms and cash their distribution checks. The gross damages awarded range from a low of $2,400 for the minimum number of two phone calls to a high of $30,000 for twenty-five telephone calls. These identified class members are collecting significant exemplary damages, and will be more than fully compensated for the inconvenience occasioned by these calls.

However, there remain 4,869 telephone numbers (associated with 13,235 calls) for which no absent class member has been ascertained. The extensive post-trial process to identify class members has concluded, and those absent class members will therefore remain unknown. The portion of the judgment attributable to the calls to those 4,869 telephone numbers has contributed *pro rata* to pay the class's attorneys' fees and expenses, but there remains approximately $10.76 million in net judgment proceeds that no person has a right to claim. The only appropriate disposition for those funds is reversion to DISH.

Reversion – a return of leftover funds to the defendant – is the "superior approach" for unclaimed funds, because "[o]ur adversarial system should not effectuate transfers of funds from defendants beyond what they owe *to the parties*[.]" *Klier v. Elf Atochem North-America, Inc.,* 658 F.3d 468, 482 (5th Cir. 2011) (concurring opinion) (emphasis in original). Here, where no absent class member has been identified with respect to a phone number, there is no party to whom judgment funds are owed. Those leftover funds should be returned to DISH.

Plaintiff argues that reversion would undermine deterrence (Pl.'s Br. at 3-5), but there is no need for further deterrence in this case. Even with reversion, the monetary penalty imposed on DISH remains severe, and each identified class member will recover treble damages. These leftover funds represent only 17% of the total $62.5 million that DISH remitted to the court. Moreover, there is no need for concern about deterring future telemarketing violations. DISH is subject to a permanent injunction entered in *U.S. v. DISH* that sets strict standards for telemarketing activities by both DISH and its retailers that exceed TCPA "safe harbor" standards. Under that injunction, every six months, DISH makes an extensive document production to the federal government and four states documenting its telemarketing compliance, including its monitoring of retailer telemarketing compliance.

In addition, to the extent that individuals identified by the Court post-trial fail to submit W-9 forms or cash their judgment checks, after diligent efforts by the claims administrator to distribute the judgment funds, the leftover funds similarly are unclaimed should revert to DISH. If the claims administrator cannot locate an individual or the

2

individual does not respond to claims administrator outreach within one year, it is appropriate to conclude that any further efforts to distribute the funds would be futile.

Plaintiff's *cy pres* proposal – that unclaimed funds be gifted to some as yet unidentified charities – is contrary to Fourth Circuit law. While *cy pres* has been accepted at times in the settlement context, where the parties expressly agree to a charitable donation, litigated cases without any such agreement are starkly different. *Cy pres* is considered a form of fluid recovery that, pursuant to Fourth Circuit precedent is improper, and it violates the Rules Enabling Act, Article III and Due Process. The Second Circuit has soundly condemned fluid recovery and the Fourth Circuit has emphatically agreed that it is improper. *Cy pres* is not a viable option for the unclaimed judgment funds in this case.

Plaintiff also proposes that some unclaimed funds associated with unidentified class members escheat to various states' unclaimed property funds for later individual claims to be made. But that proposal improperly circumvents the Court's class member identification procedures and the Court's disallowance of late claims. If the Court has not authorized a person to receive judgment funds, that person may not circumvent the Court and claim them via a state unclaimed property fund. Only those individuals identified through the Court's post-trial procedures may collect judgment money.

For these reasons, and the reasons set forth in more detail below, DISH respectfully requests that the Court order reversion of all unclaimed funds. DISH proposes a two-step approach that is set forth in the proposed order that accompanies this Motion. First, unclaimed funds with respect to telephone numbers where no class

3

member has been identified or ascertained in the amount of approximately $10.76 million (Plaintiff's Categories 3, 4 and 5), should revert immediately. With respect to funds that remain unclaimed as a result of (i) uncashed distribution checks; (ii) undeliverable distribution checks; and/or (iii) failure to provide a W-9 form (Plaintiff's Categories 1 and 2), the funds should revert to DISH after at least one full year of claims administrator exhaustive efforts to distribute the funds to identified class members.

## RELEVANT PROCEDURAL HISTORY IN THIS CASE

The jury verdict in this case held DISH liable for $400 per telephone call for each of the 51,119 calls that SSN made to 18,066 telephone numbers. The Court trebled the damage award to $1,200 per call.

The jury deliberated solely with respect to telephone numbers and did not hear evidence concerning the names of absent class members who might have a right to recover. The Court entered judgment for $61,342,800, plus post-judgment interest, covering all telephone calls, and attached a list of the 18,066 telephone numbers to describe the class. The Court deferred individual class member identification to a post-trial and post-judgment process.

Pursuant to the Court's procedures, Plaintiff moved for judgment in favor of class members whom Plaintiff contended were identified fully and without contradiction in the existing data. In connection with that motion, the Court ruled on the identities of class members for 11,239 telephone numbers. Those names are memorialized in a "Final List" filed with the Court. Doc. 475-1. After the Court decided that motion, 6,827 unidentified class members remained to be determined through claim submissions.

4

Doc. 441 at 1; Doc. 475-1.

The Court allowed seven months for class member claims. *See* March 21, 2018 Text Order. During that time, Plaintiff's counsel and the claims administrator ("KCC") actively encouraged claim submissions (*see* January 15, 2018 Text Order), including through a nationwide media campaign that garnered significant attention. Plaintiff's counsel appeared on national television on CBS This Morning (*Are You Owed $1,200? Maybe, If You Got A DISH Network Telemarketing Call*), with the news picked up by local outlets across the country. An article on the claims process even ran in the Wall Street Journal.

Those robust notice and outreach efforts spurred more than 74,000 claim submissions. Doc. 536 at 3. Ultimately, the Court found 1,958 claims valid. *Id.* at 4. The Court disallowed late claims over Plaintiff's objection that a number of late claims had been submitted by *bona fide* class members and should be allowed. Doc. 515 at 4-5.

To the extent that a class member was not identified through the claims process, that class member remains unknown. There are 4,869 telephone numbers (associated with 13,235 calls) that have no associated known class member. After *pro rata* payment of attorneys' fees and expenses, approximately $10.76 million in net judgment funds related to those phone numbers will be left that no person within the class has a right to claim.

## RELEVANT PROCEDURAL HISTORY IN *U.S. v. DISH*

DISH's responsibility for SSN's improper telemarketing calls also was litigated in the *U.S. v. DISH* case brought by the federal government and four states. Following a

5

bench trial in that action, the district court found DISH liable for calls made by SSN, among others.  Doc. 799 (3:09-cv-03073-SEM-TSH [C.D. Ill.]).  The district court imposed a total monetary award of $280 million[1] and entered a permanent injunction that strictly regulates DISH's and its retailers' telemarketing behavior.  Doc. 822 (3:09-cv-03073-SEM-TSH [C.D. Ill.]).  In accordance with that injunction, DISH was required, *inter alia*, to (i) develop a telemarketing compliance plan (Doc. 829 (3:09-cv-03073-SEM-TSH [C.D. Ill.])); (ii) make a detailed evidentiary showing demonstrating its injunction compliance (*See* Doc. 829-5 (3:09-cv-03073-SEM-TSH [C.D. Ill.])); and (iii) continue to make document productions to the plaintiffs every six months concerning its telemarketing compliance, including its monitoring of retailer telemarketing.  *See* Doc. 822 (3:09-cv-03073-SEM-TSH [C.D. Ill.]).  DISH made its required telemarketing compliance document productions on December 5, 2017, June 5, 2018, December 5, 2018, June 5, 2019, and December 5, 2019, and the government has not raised a single concern arising from them.  DISH is due to make its next document production on June 5, 2020.

---

[1] The Seventh Circuit vacated the district court's measure of damages on March 26, 2020, remanding to the district for further proceedings consistent with the court's opinion.  *U.S. v. DISH Network, L.L.C.*, No. 17-3111 (7th Cir.), Doc. 83 at 16.

# ARGUMENT

## I. REVERSION IS THE ONLY APPROPRIATE OPTION FOR UNCLAIMED FUNDS

Reversion is the superior, and the only appropriate, disposition for the unclaimed funds in this case. "In the ordinary case, to the extent that something must be done with unclaimed funds, the superior approach is to return the leftover [] funds to the defendant. . . . Our adversarial system should not effectuate transfers of funds from defendants beyond what they owe *to the parties*[.]" *Klier*, 658 F.3d at 482 (concurring opinion) (emphasis in original); *see also id.* at 477 (the defendant has "a greater claim to the funds than a charity, however worthwhile the charity, absent a contrary directive from [a] property-interest-defining settlement agreement") (majority opinion).

Reverter of unclaimed funds to the defendant has been expressly endorsed in common fund cases. In *Boeing Co. v. Van Gemert*, the Supreme Court found that the judgment in the action had created a "common fund," such that attorneys' fees and expenses should be allocated across the entirety of that fund, regardless of whether absent class members submitted claims for their portions of the judgment. 444 U.S. 472, 482 (1980). Notwithstanding the common fund, the Supreme Court noted that "Boeing did have an interest [in the judgment money], arising from its colorable claim for the return of excess money." *Id.* at 482 n.7. Following remand, the district court ordered reverter of $2.7 million in unclaimed funds to Boeing. *Van Gemert v. Boeing Co.*, 739 F.2d 730, 733 (2d Cir. 1984). The Second Circuit affirmed, firmly rejecting the argument that the lower court had "incorrectly applied equitable principles in returning a

7

judgment fund to a defendant who had been adjudicated liable for improper conduct." *Id.* at 736. The Second Circuit held that, in a private class action, as opposed to a government action brought in the public interest, "a defendant should not be obligated to pay more than the amount claimed." *Id.* at 737.

In *Augustin v. Jablonsky*, a case involving illegal strip searches, a district court ordered reverter in advance of knowing the amount of unclaimed funds. 819 F.Supp.2d 153, 177 (E.D.N.Y. 2011). The court entered an aggregate judgment against the defendant county based upon a damages award of $500 per strip search multiplied by the number of qualifying strip searches. *Id.* at 177. The court ruled at the same time that "any unclaimed funds will revert to the defendant." *Id.* The district court noted that any other result "is inconsistent with the general legal ten[et] that compensatory damages should do no more than compensate a victim for their injury." *Id.*

Reverter also has been found appropriate in the settlement context, even in instances where the defendant had contractually relinquished any interest in the money. In *Wilson v. Southwest Airlines, Inc.*, the Fifth Circuit reversed a district court's decision that unclaimed settlement funds should go to charity through *cy pres*. 880 F.2d 807 (5th Cir. 1989).[2] Notwithstanding that the defendant had agreed to a non-refundability provision in the settlement, the court found the defendant's claim to unclaimed funds "compelling" because it "turned over its money in the clear and reasonable expectation

---

[2] In *Wilson*, the parties entered into a consent decree after a trial on liability in which the court ruled in favor of the class.

that the money was required for the specific purpose of compensating the class." *Id.* at 814. After the class members who had submitted valid claims had been paid in full (*id.* at 812-13), the settling defendant had a superior claim to the remaining funds (*id.* at 816). The district court abused its discretion in directing the remainder to charity through *cy pres*. *Id.*; *see also Willcox v. Lloyds TSB Bank, plc,* No. CV 13-00508 ACK-RLP, 2017 WL 487018, at *3-4 (D. Haw. Feb. 6, 2017) (rejecting *cy pres* and reverting unclaimed funds to defendant).

Reverter of unclaimed funds is the only viable option in a litigated class action, because the class action device established under Fed. R. Civ. P. 23 "must be interpreted in keeping with Article III's constraints, and with the Rules Enabling Act, which instructs that rules of procedure 'shall not abridge, enlarge or modify any substantive right.' 28 U.S.C. § 2072(b)." *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 613 (1997).

Article III provides that only injured parties have the right to receive judgment funds. If there is no identified injured party entitled to recover, then the remaining money must revert to the defendant. Permitting awards to go to non-injured parties would violate the requirement of Article III that those who recover must "personally ha[ve] suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State*, 454 U.S. 464, 472 (1982). "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not. The Judiciary's role is limited 'to provid[ing] relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm.'" *Tyson Foods, Inc.*

*v. Bouaphakeo*, 136 S. Ct. 1036, 1053 (Roberts, C.J., concurring) (*quoting Lewis v. Casey*, 518 U.S. 343, 349 (1996)).

In addition, consistent with the Rules Enabling Act, DISH should pay damages only to those individuals who succeeded in carrying the burden of proving their claim. In a single-plaintiff private TCPA action, where a plaintiff fails to establish his or her claim, the defendant is not required to pay the plaintiff—and is not required to pay a charity or the government as a consolation. That does not change merely because the claim was brought on behalf of a class. To hold otherwise would ignore the Rules Enabling Act's instruction that the use of the class device cannot "enlarge . . . any substantive right." 28 U.S.C. § 2072(b); *see Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 332, 345 (4th Cir. 1998) ("It is axiomatic that the procedural device of Rule 23 cannot be allowed to expand the substance of the claims of class members"). Similarly, forcing DISH to pay for calls when no individual has demonstrated that he or she received them violates the Seventh Amendment and, given DISH's interest in only paying legitimate claims, its due process rights. The jury here found that DISH was liable to individuals who were injured because they received at least two violative phone calls during the class period. DISH cannot, consistent with the Seventh Amendment and due process, be made liable for individual claims that never were established.

The unclaimed funds in this case include the $10.76 million associated with unidentified class members, as well as the undetermined amount of funds that will be leftover after diligent attempts are made to distribute net judgment proceeds to

10

individuals identified post-trial.[3]  *See* 4 Newberg on Class Actions § 12:28 (5th ed.) (observing that "[f]unds may remain undistributed for a variety of reasons," including class members' failure to submit claim forms and cash checks).  Any individual who neglects to cash a check or fill out a W-9 form, after ample opportunity to do so, has not made a claim to collect from the judgment.  Furthermore, the Article III, Seventh Amendment, and due process concerns discussed above apply with equal force to funds that remain for failure to (i) submit a W-9; (ii) cash a check; or (iii) successfully deliver a check.  If an identified injured party fails to take steps to obtain the full award to which he is entitled, no *un*injured individual or entity may step up to receive his award.  *See* pp. 9-10, *supra.*

Further, there can be no legitimate question that the TCPA has been robustly enforced in this case and that any deterrent policy of the TCPA is satisfied, even if unclaimed funds revert.  A reverter provides DISH with no "reward," considering the size of the overall judgment in this case as well as the judgment and permanent injunction entered in *U.S. v. DISH*.  The concern that reversion might undermine the deterrent function of a class action stems from the notion that "[m]ost class actions involve small claims, and, therefore class members are generally unlikely to come forward to claim their recoveries."  Newberg on Class Actions § 12:29.  But, this is not a

---

[3] By proposing that leftover funds should be given to charity through *cy pres* following KCC's and plaintiff's exhaustive efforts to make distributions to identified class members, Plaintiff effectively concedes that these funds are properly considered "unclaimed" by the class members at that point and can be redirected elsewhere.  For the reasons set forth herein, *cy pres* is not a legitimate option for these unclaimed funds, and the funds should revert to DISH.

case that involves small claims, and more than 70,000 people came forward seeking to claim recovery. In addition, based on the level of participation in the claims process, it is reasonable to expect that virtually all identified individuals will fill out W-9 forms and cash their distribution checks to claim their recoveries.

The jury returned a significant verdict by awarding $400 per call. Doc. 292 at 2. The jury was instructed that it "should consider the need to punish companies that violate the [TCPA] and the need to deter future violations," so it is evident that the jury's per-call award already carries a deterrent component. With damages trebled to $1,200 per call, the payments to identified class members will exceed any actual injury regardless of whether the unclaimed funds revert, which is a significant deterrent. *See Krakauer v. Dish Network L.L.C.*, No. 1:14-CV-333, 2017 WL 2242952, at *13 (M.D.N.C. May 22, 2017) (observing that TCPA's damages provision is designed to be disproportionate, in part, to deter violative conduct). DISH also has been punished for the same SSN phone calls in the *U.S. v. DISH* case.

Moreover, there is no meaningful risk of future violative telephone calls that would require any additional deterrence. DISH and its retailers are subject to a strict permanent injunction in *U.S. v. DISH* that requires best telemarketing practices in excess of TCPA "safe harbor" standards. The governmental plaintiffs in *U.S. v. DISH* have continuing monitoring and enforcement rights, including through receipt of substantial telemarketing compliance document productions from DISH at six-month intervals.

Finally, DISH's involvement in the claims process assisted in ensuring that invalid claims were not "rubber-stamped" as valid. DISH cooperated with plaintiff's counsel by

12

consenting to extensions of time for claim submissions. Doc. 417. In addition, DISH has undertaken diligent efforts to ensure that class member lists submitted to the Court are consistent with the Court's rulings on class member identification. Plaintiff's assertion that DISH might somehow be responsible for a lack of reliable class membership data by failing to enforce SSN's contractual responsibility to maintain call records is misguided. (Pl.'s Br. at 6.) Plaintiff has Five9 call records for all of the calls at issue in this case. But, call records do not necessarily reliably identify the actual call recipient. There are discovery options to obtain more reliable information, including subpoenas to telephone providers, that Plaintiff elected not to pursue. DISH cannot be blamed for the fact that call records, which show the numbers called, do not reliably identify individual call recipients.

## II.    PLAINTIFF'S *CY PRES* REQUEST CONTRAVENES ESTABLISHED FOURTH CIRCUIT PRECEDENT REJECTING FLUID RECOVERY

Plaintiff improperly proposes that the vast majority of unclaimed funds go to a yet-to-be identified charity through the application of *cy pres*. (Pl.'s Br. at 8-11.) *Cy pres* is a form of "fluid recovery," which the Fourth Circuit has ruled impermissible outside of the settlement context. Because Plaintiff's proposal violates foundational constitutional principles (*see* pp. 9-11, *supra*) and contravenes established Fourth Circuit precedent disapproving of fluid recovery, it should be rejected.

*Cy pres* originated in the area of trusts law. *Klier,* 658 F.3d at 473-74. The doctrine operates to save charitable testamentary gifts that otherwise would fail, allowing the court to find another suitable charity that approximates the gift's original purpose. *Id.*

Case 1:14-cv-00333-CCE-JEP   Document 581   Filed 05/04/20   Page 14 of 24

at 474. In the context of class action settlements, *cy pres* distributions developed as a way to put unclaimed settlement funds to use for the aggregate, indirect, prospective benefit of the class, based upon the agreement of the settling parties and approval by the court. *Id.*

*Cy pres* is considered a subset of fluid recovery. Fluid recovery is "'defined as a distribution of an aggregate class recovery or an unclaimed portion thereof under cy pres principles to the next best class of persons.'" *Augustin*, 819 F.Supp.2d at 177 (quoting Newberg on Class Actions § 10:5 n.3 (4th ed. 2002)); *see also Democratic Cent. Comm. of D.C. v. Washington Metro. Area Transit Comm'n*, 84 F.3d 451, 455 & n.2 (D.C. Cir. 1996) (noting that *cy pres* is characterized as "fluid recovery"). Although Chief Justice Roberts has expressly cast doubt on the legitimacy of *cy pres*, *see Marek v. Lane*, 571 U.S. 1003 (2013) (concurrence in *certiorari* denial) (recognizing "fundamental concerns surrounding the use of [cy pres] remedies in class action litigation, including when, *if ever*, such relief should be considered" (emphasis added)), several courts have blessed it in the context of negotiated settlements, *see infra*.

Whatever the propriety of *cy pres* distributions in negotiated settlements, such distributions are entirely improper in a litigated action. Indeed, "most [] federal courts … have ruled that fluid recovery is impermissible under Rule 23, unless it is part of distribution arising out of a settlement." 7AA Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, Federal Practice and Procedure Civil § 1784; *see also In re Baby Prod. Antitrust Litig.*, 708 F.3d 163, 172 n.7 (3d Cir. 2013) ("In contrast with *cy pres* distributions agreed to by the parties as part of a settlement, courts of appeals have

14

greeted with more skepticism *cy pres* distributions imposed by trial courts over the objections of the parties."); *In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24, 34 (1st Cir. 2009) ("Court-mandated *cy pres* distributions, as opposed to court-approved settlements using *cy pres*, are controversial."); *Van Gemert v. Boeing Co.*, 573 F.2d 733, 736 (2d Cir. 1978) ("Fluid class recovery concepts have been adopted by a number of courts in actions which have terminated in settlement . . . . However, precedents involving settlements are of little help when a case has been litigated through trial to judgment."). A *cy pres* distribution in a litigated action would allow uninjured parties to recover, thereby violating principles of Article III standing, as well as the defendant's Seventh Amendment and Due Process rights. *See* pp. 9-11, *supra.*

Moreover, the Fourth Circuit found fluid recovery impermissible in *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 72 (4th Cir. 1977), which adopted the Second Circuit's holding in *Eisen v. Carlisle & Jacquelin*, 479 F.2d 1005, 1018 (2d Cir. 1973), *vacated on other grounds*, 417 U.S. 156 (1974), where the court soundly condemned fluid recovery in litigated class actions.

*Eisen* was a putative antitrust class action brought on behalf of odd-lot investors in stock on the New York Stock Exchange, who alleged that the defendant brokerage firms had monopolized the odd lot market and extracted excessive surcharges on trades. 479 F.2d 1005. Only one-third of the putative class members could be identified and damages would be very difficult to determine on an individualized basis. *Id.* at 1009-10. As a work-around, the district court decided that it might establish a class fund that "would be distributed to future odd-lot traders rather than to the specific class members

15

who were actually injured." *Id.* at 1009-10. The Second Circuit rejected the district court's proposal for a "fluid recovery" for non-class members "as an unconstitutional violation of the requirement of due process of law." *Id.* at 1018. The court was particularly troubled by the district court's suggestion that aggregate damages could be assessed on behalf of "the class as a whole," prior to the filing of individual claims, noting that the resulting imposition of "enormous" damages untethered to individual claims raised serious due process concerns. *Id.* at 1010, 1014, 1018.

The Fourth Circuit adopted *Eisen*'s rejection of fluid recovery in *Windham*. In *Windham*, the Fourth Circuit affirmed the district court's denial of certification in a putative class action brought on behalf of a class of approximately 2,000 tobacco growers alleging violations of the Sherman Act. The court held that the suit could not be maintained as a class action because, among other reasons, proof of individualized damages cannot be overcome by the use of "fluid recovery"—a method that the Fourth Circuit found to be "appropriately branded as 'illegal, inadmissible as a solution of the manageability problems of class actions and wholly improper.'" *Windham*, 565 F.2d at 72 (quoting *Eisen*, 479 F.2d at 1018).

The impropriety of fluid recovery not only prohibits judgment payments to non-class members, it also prohibits excess recovery for identified class members. *See, e.g.*, *Van Germert v. Boeing Co.*, 553 F.2d 812, 816 (2d Cir. 1977) (distributing unclaimed portion of damage award to claiming class members constitutes improper fluid recovery under *Eisen*); *Augustin*, 819 F.Supp.2d at 177 (entering aggregate judgment but, based on *Eisen*, ordering that any unclaimed funds must revert to the defendant). Accordingly,

16

the *Eisen* rationale dictates that *cy pres* is impermissible, because it directs money to non-class members, and confers an excess benefit that constitutes fluid recovery.

Plaintiff incorrectly argues that the Fourth Circuit approved *cy pres* in *Jones v. Danacel*, 792 F.3d 395 (4th Cir. 2015). (Pl.'s Br. at 10.) The Fourth Circuit did not approve *cy pres* in that case. *Jones* addresses an attack on a portion of an arbitrator's award, to the extent that the arbitrator denied the plaintiffs compensatory damages and found the attorneys' fees request unreasonable. *Id.* The opinion mentions *cy pres* in a footnote describing the arbitrator's punitive damages award (*id.* at 400 n.6), which was not challenged on appeal. The Fourth Circuit expressed no opinion on the legality of the arbitrator's use of *cy pres*.

The only cases that Plaintiff cites that approve *cy pres* in litigated matters are not controlling here. (Pl.'s Br. at 9-10) (citing *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301 (9th Cir. 1990); *Fogie v. Thorn Americas, Inc.*, 2001 WL 1617964 (D. Minn. 2001)). In *Six Mexican Workers*, the Ninth Circuit unpersuasively sought to distinguish *cy pres* from fluid recovery, which that court had previously criticized. 904 F.2d at 1305-06. But other courts and commentators have correctly recognized that *cy pres* is a form of, and, indeed, synonymous with, fluid recovery, *see, e.g.*, *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784 (7th Cir. 2003) ("the 'cy pres' remedy (badly misnamed, but the alternative term—'fluid recovery' – is no less misleading) is purely punitive"), and inappropriate in litigated actions, *see* pp. 14-15, *supra*. The other cases that Plaintiff cites involve agreed-upon settlements, where the parties have contracted for *cy pres* disposition of unclaimed funds. (Pl.'s Br. at 10, 11)

17

(citing *In re Baby Prod. Antitrust Litig.*, 708 F.3d 163; *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316 (3rd Cir. 2019)).

Because *cy pres* distributions in litigated actions violate core constitutional principles, and because the Fourth Circuit has rejected fluid recovery—which encompasses *cy pres*—this Court should reject Plaintiff's *cy pres* proposal.

Even if *cy pres* were appropriate for a litigated case, the Court should reject it for the additional reason that Plaintiff has not identified any *cy pres* beneficiary for unclaimed funds. A *cy pres* recipient must be one whose interests approximate those being pursued by the class. *See In re Lupron Marketing & Sales Practices Litig.*, 677 F.3d 21, 33 (1st Cir. 2012); *see also Six Mexican Workers*, 904 F.2d at 1308 ("Even where *cy pres* is considered, it will be rejected when the proposed distribution fails to provide the 'next best' distribution."). If the proposed *cy pres* distribution does not meet the interests of the class, it must be denied. *See Nachshin v. AOL, LLC*, 663 F.3d 1034, 1039-40 (9th Cir. 2011). Without any identified *cy pres* beneficiary, the Court cannot evaluate and approve the propriety of a *cy pres* distribution in this case.[4]

---

[4] To the extent Plaintiff expects the Court to select a *cy pres* beneficiary, that is improper, and provides yet another reason to reject *cy pres*. *See In re Lupron Marketing & Sales Practices Litig.*, 677 F.3d at 38 (expressing concern "that district courts are given discretion by parties to decide on the distribution of cy pres funds," rather than requiring parties to identify a recipient); *id.* ("[H]aving judges decide how to distribute *cy pres* awards both taxes judicial resources and risks creating the appearance of judicial impropriety."); *Nachshin*, 663 F.3d at n.2 (noting that the "the American Law Institute has adopted a rule for *cy pres* awards requiring parties 'to identify a recipient whose interests reasonably approximate those being pursued by the class.'")

18

# III. PLAINTIFF'S ESCHEAT REQUEST CONTRAVENES THIS COURT'S ORDERS PROHIBITING LATE CLAIMS

Plaintiff proposes that some money, in his "Category 3," be directed to state unclaimed property funds, via escheat, to allow later individual claims for recovery. But, the individuals in Plaintiff's Category 3 are not among the individuals who have been identified through the claims process. Notwithstanding that the claims process has closed, and the Court has not allowed late claims, Plaintiff asserts that certain individuals are sufficiently identified in the existing data for them to collect a judgment award. For each of these individuals (who are not named in his current motion), he asks that the Court authorize KCC to distribute $595 in judgment funds to state unclaimed property funds, where they could be claimed by these individuals at a later date—a suggestion similar to ones that the Court already considered and rejected. *See* Doc. 515 at 4-5 (overruling Plaintiff's objections and disallowing untimely claims); Doc. 560 at 3-4 (denying Plaintiff's request to permit certain claimants whose claims were found invalid by the Special Master to submit new objections after the Special Master process had concluded). This is a wrongful end-run around the post-trial process for class member identification. Individuals who were not identified through the claims process have not established injury and class membership, and thus may not collect from the judgment, whether directly from KCC or indirectly from a state's unclaimed property fund.

Moreover, Plaintiff offers no authority for funds to be disbursed pursuant to state escheat laws in a federal class action lawsuit. The only authority he cites—a law review article—addresses settlements and, even then, it concludes that "in a federal class action,

19

federal law rather than state law should apply to the disposition of [] proceeds[.]" (Pl.'s Br. at 7) (citing Ethan D. Millar and John L. Coalson, Jr., *The Pot of Gold at the End of the Class Action Rainbow*, 70 Pitt. L. Rev. 511, 511 (2009)). That same authority makes clear that to qualify as abandoned property subject to escheat, there must be an 'unqualified' obligation to pay the property to its alleged owner." *Id.* at 520. The federal escheat statute is premised on a similar notion, that the funds are held for "its rightful owners." 28 U.S.C. §§ 2041 and 2042. But, the Category 3 funds for which Plaintiff proposes escheat have no rightful owners within the class. Further, escheating funds, whether to the U.S. Treasury or to certain states, when no class member has been timely identified in connection with those phone numbers, raises the same constitutional concerns that Plaintiff's *cy pres* approach faces. *See* pp. 9-11, *supra*.

Finally, it bears noting that in *Van Gemert*, escheat was rejected for unclaimed class action funds without regard to whether class member identities were known. 739 F.2d at 732-33. The Second Circuit held that the unclaimed funds associated with absent class members that the special master had not located were not required to remain deposited with the U.S. Treasury, pursuant to federal escheat (28 U.S.C. § 2042), and were not subject to state escheat. *Id.* 737 (holding that "the fact that certain private plaintiffs had failed to come forward to collect on their judgment should not entitle the states to a windfall").

## CONCLUSION

For the foregoing reasons, DISH respectfully requests that the Court enter an order authorizing reverter of all unclaimed funds.

20

Dated:  May 4, 2020                    Respectfully submitted,

                                        ORRICK, HERRINGTON & SUTCLIFFE LLP


                                        By: /s/ Elyse D. Echtman
                                        Peter A. Bicks
                                        Elyse D. Echtman
                                        51 West 52nd Street
                                        New York, NY 10019-6142
                                        Telephone:  (212) 506-5000
                                        pbicks@orrick.com
                                        eechtman@orrick.com


                                        /s/ Richard J. Keshian
                                        Richard J. Keshian
                                        North Carolina Bar No. 10681
                                        KILPATRICK TOWNSEND & STOCKTON
                                        LLP
                                        1001 West 4th Street
                                        Winston-Salem, NC 27101
                                        Telephone:  (336) 607-7322
                                        rkeshian@kilpatricktownsend.com

                                        *Attorneys for Defendant DISH Network L.L.C.*

## CERTIFICATE OF SERVICE

I hereby certify that on May 4, 2020, I electronically filed the above document with the Clerk of Court using the CM/ECF system, which will send notifications of such filing to all counsel of record.

/s/ Elyse D. Echtman
Elyse D. Echtman
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
Telephone: (212) 506-5000
eechtman@orrick.com

*Attorney for Defendant DISH Network L.L.C.*

## WORD COUNT CERTIFICATION

I hereby certify that the foregoing motion contains 5,561 words, in compliance

with the word limitation set forth in the Court's April 5, 2018 Order on Claims

Procedures (Doc. 441 at 11), as calculated by the word count function of the word

processing system used to prepare the foregoing memorandum of law.

/s/ Elyse D. Echtman
Elyse D. Echtman
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
Telephone: (212) 506-5000
eechtman@orrick.com

*Attorney for Defendant DISH Network L.L.C.*