IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION

THOMAS H. KRAKAUER,
on behalf of a class of persons,

    Plaintiff,

v.                                      Civil Action No. 1:14-cv-00333-CCE-JEP

DISH NETWORK, L.L.C.,

    Defendant.

**PLAINTIFF'S REPLY IN SUPPORT OF
MOTION FOR ENTRY OF ORDER GOVERNING
DISPOSITION OF UNDISBURSED CLASS FUNDS**

*Introduction*

In its Final Judgment, this Court incorporated the jury's finding that all "class members receive[d]" calls from DISH's agent in violation of the TCPA. (Doc. 439.) DISH challenged the jury's finding on appeal, arguing that class members failed to establish injury-in-fact under Article III. The Fourth Circuit rejected those arguments, found Article III standing, and affirmed the judgment. *See Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 653-54 (4th Cir. 2019) ("In enacting § 227(c)(5) of the TCPA, Congress responded to the harms of actual people by creating a cause of action that protects their particular and concrete privacy interests.").

DISH now seeks an Article III do-over, this time with a twist, asserting that the *charities* that under the *cy pres* doctrine would receive unclaimed payments to class members must establish Article III standing to receive the funds. (DISH Br. at 9.) While

giving DISH credit for innovative thinking and persistence, Article III injury has been established and affirmed, and no court has required a recipient of *cy pres* funds to establish standing. Nor has any court found, as DISH argues, that *cy pres* would violate the Rules Enabling Act or the Seventh Amendment. *Cy pres* is a *remedy,* a means of distributing a judgment obtained on the merits, and not a merits claim subject to a jury's determination or an Article III standing analysis.

DISH supports the balance of its opposition to *cy pres* with citation to inapposite cases implicating circumstances not present here — such as *Klier v. Elf Atochem North America, Inc.*, 658 F.3d 468 (5th Cir. 2011), which held that a district court abused its discretion in designating unclaimed settlement funds to charities rather than class members, or *Augustin v. Jablonski*, 819 F. Supp. 2d 153 (E.D.N.Y. 2011), which found it impermissible to increase class member recoveries by the amount of undistributed funds, a method Plaintiff has never proposed.

*Cy pres* distribution not only is doctrinally sound and legally permissible, it is the best way to give effect to the judgment of the jury, this Court, and the Fourth Circuit that DISH is liable for 51,119 violations, the penalty per violation is $1,200, and that amount, plus interest, is the price DISH must pay for its misconduct.

### *Argument*

1. <u>*Cy pres* recipients need not establish Article III standing.</u>

There is all the difference in the world between a plaintiff's standing to sue at the outset and the downstream effect of the consequences of suit once it has been adjudicated

in the plaintiff's favor. The point is compellingly illustrated in *Jackson Women's Health Organization v. Currier*, 349 F. Supp. 3d 536 (S.D. Miss. 2018).

The plaintiff in *Currier* was Mississippi's sole provider of abortion services, suing to permanently enjoin State legislation banning abortions beyond 15 weeks of the onset of the woman's last menstrual period, in contravention of Supreme Court precedent protecting the right to abortions until fetal viability at 23-24 weeks. The provider's policy, however, was to perform no abortions after 16 weeks. The State maintained that even if injunctive relief were warranted, its temporal bound could extend no farther than the plaintiff's self-imposed limit, permitting the legislative bar to stand beyond that point. According to the State, the plaintiff lacked standing to pursue an injunction restraining enforcement of the legislation generally "as to pre-viability abortions." 349 F. Supp. 3d at 543.

The district court rejected the State's argument, observing that it "conflated the [principles] of standing and remedies." *Id.* Given that the plaintiff had established injury-in-fact through the State's prohibition of a portion of its procedures, the remedy appropriately focused on the instrument of the injury, that is, the legislation that "could not be construed or applied without violating precedent," and that was "not constitutional under any set of circumstances." *Id.* at 544. The violation having been conclusively established and deemed sufficiently gross, there was simply no justification for circumscribing the remedy so as to reward the bad actor even a little for daring to do something it had no legal basis to try.

Just so here. That the class had standing to pursue its TCPA claims is the law of the case, *DISH* had its Seventh Amendment trial, and it has been conclusively established and

3

affirmed that DISH committed over 50,000 TCPA violations. Those violations were flagrant, as reflected by the $1,200 statutory penalty imposed, such that DISH has no legitimate basis to complain about the propriety of the proposed remedy. *See, e.g.*, *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1258 (11th Cir. 2003) ("[A] defendant has no interest in how the class members apportion and distribute a damage fund among themselves."); *see also* AMERICAN LAW INSTITUTE, Principles of the Law of Aggregate Litigation § 3.07, cmt. b (2010) (proceeding "from the premise that funds generated through the aggregate prosecution of divisible claims are presumptively the property of the class members").

*Cy pres* recipients of otherwise undistributed class funds are not litigants against the defendant; they are part of the remedy imposed to ameliorate the effects of the defendant's misconduct. No court has ever required a recipient of *cy pres* funds to prove its standing as if it were a party, and DISH can cite no authority to support its contrary proposition.

2. DISH's Seventh Amendment challenge seeks an unprecedented determination that Rule 23 is unconstitutional.

DISH's entire Seventh Amendment argument is this:

> [F]orcing DISH to pay for calls when no individual has demonstrated that he or she received them violates the Seventh Amendment and, given DISH's interest in only paying legitimate claims, its due process rights. The jury here found that DISH was liable to individuals who were injured because they received at least two violative phone calls during the class period. DISH cannot, consistent with the Seventh Amendment and due process, be made liable for individual claims that never were established.

(DISH Br. at 10.) The answer to all of DISH's constitutional challenges — standing, Seventh Amendment, and due process — is more or less the same. *Cy pres* recipients are

4

not required to be "individuals who were injured" by DISH's misconduct, such that they would need to "establish" their "individual claims." DISH's constitutional arguments are each a variation on the theme that those who receive *cy pres* awards are the equivalent of litigants who must establish a cognizable injury, who must be found by a jury to somehow prove deserving of the class's largesse, and whose (nonexistent) "claims" must otherwise be forged in the crucible of trial, hammered and shaped in conformance with DISH's due process rights.

That cannot be the case. Disbursement of unclaimed class funds by a number of mechanisms short of reversion to the defendant has long been approved throughout the federal judiciary, as documented in Plaintiff's opening brief. *Cy pres*, escheat, and redistribution to identifiable class members have each, by operation of federal common law, been engrafted onto the class action mechanism by virtue of the discretion afforded by Rule 23(d) and by the courts' inherent discretion to fashion appropriate remedies.

No court has ever held *cy pres* distribution unconstitutional as violative of the Seventh Amendment or of due process. Instead, the courts have striven, in the rare instances when tension has been asserted between Rule 23 and the federal jury trial guarantee, to accommodate and assuage any constitutional concerns while preserving the utility of the class action vehicle. *See, e.g.*, *Simon v. Philip Morris, Inc.*, 200 F.R.D. 21, 46-47 (E.D.N.Y. 2001) ("[T]he language and spirit of the Federal Rules of Civil Procedure together with the history of the Seventh Amendment and subsequent case law demonstrate that the Reexamination Clause should not be read as a mandate to constitutionalize civil procedure in order to frustrate the class action mechanism — a device created to foster

5

judicial economy and efficiency by adjudicating, to the extent possible, issues that affect many similarly situated persons." (citations and internal quotation marks omitted)).

3. *Cy pres* does not violate the Rules Enabling Act.

Congress, through the Rules Enabling Act, 28 U.S.C. § 2072 (the "Act"), authorized the Supreme Court, *inter alia*, "to prescribe general rules of practice and procedure" for the inferior federal courts, so long as those rules do not "abridge, enlarge or modify any substantive right." DISH does not really expound on how any *cy pres* award in this matter would violate the Act, except to trot out once more its argument that potential recipients be treated as litigants. *See* DISH Br. at 10 (pointing out inappositely that a **losing** TCPA plaintiff triggers no obligation "to pay a charity or the government as a consolation"). In the end, DISH has no substantive right to any portion of the penalties for which it was adjudicated liable in the name of compensation **and** deterrence, and was thereby compelled to pay. *See* Doc. 293 at 13 (jury instructed that it "can and should also consider the need to punish companies that violate the Act, and the need to deter future violations"). The Fourth Circuit upheld this Court's trebling of the jury's award as serving the purpose of deterring future misconduct.

The idea that *cy pres* distribution implicates the Act emanates from a law review article, sprinkled liberally throughout Judge Jones's concurring opinion in *Klier*, *supra*. *See* 658 F.3d at 482 (Jones, J., concurring) ("*Cy pres* distributions **arguably** violate the Rules Enabling Act." (emphasis added)). But no court — not even the Fifth Circuit in *Klier* — has invalidated a *cy pres* award as contrary to the Act. *See id.* at 473 (acknowledging that district courts, in appropriate cases, "often dispose of these unclaimed

6

finds by making what are known as *cy pres* distributions"). DISH has offered no credible basis for this Court to be the first.

    4. <u>The Court has ample discretion to make a *cy pres* award, which remains the best option to effectuate the jury's findings.</u>

Plaintiff's opening brief explained that district courts, inherently and through Rule 23(d), possess broad discretion to formulate "equitable decrees involving the distribution of any unclaimed class action funds." *Van Gemert v. Boeing Co.*, 739 F.2d 730, 737 (2d Cir. 1984); *see also Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1307 (9th Cir. 1990). It is well-established that unclaimed class action funds may be disbursed through *cy pres* awards, as well as by escheat, pro rata redistributions, and by reversion. *See* 4 William B. Rubenstein, *et al.*, NEWBERG ON CLASS ACTIONS § 12:28 (5th ed. 2011) [hereinafter *Newberg*]. No principled rationale supports DISH's assertion that "[r]eversion is the superior, and the only appropriate, disposition for the unclaimed funds in this case." (DISH Br. at 7.)

The jury found DISH liable for 51,119 violations of the TCPA, and it imposed a relatively stiff penalty for each in the belief that DISH's misconduct was serious enough to justify a proportionate response. This Court trebled the jury's award on the same rationale. Permitting reversion would intolerably erode the intended effect of the jury's verdict and this Court's judgment. *Cf. Fogie v. Thorn Americas, Inc.*, No. 3-94-359, 2001 WL 1617964, at *2 (D. Minn. Mar. 9, 2001) (directing distribution to *cy pres* recipient of unclaimed $150,000 rather than granting reversion to defendants adjudged liable for approximately 23,000 violations of usury statute, because "allowing Defendants to retain

7

such ill-gotten gains is completely contrary to the final judgment of this Court" and to the deterrence goals of the underlying legislation).

Reversion inappropriately rewards the offending party by permitting it to retain the fruits of its misconduct. *See* AM. LAW. INST., PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.07 cmt. B (2010) (rejecting reversion as a vehicle for disbursement of unclaimed funds because it would "undermine the deterrence function of class actions"). Reversion should only be considered in narrow circumstances — for example, where the defendant's misconduct was merely negligent and it has affirmatively acted in good faith to correct the resultant injury. *See, e.g.*, *Wilson v. Southwest Airlines, Inc.*, 880 F.2d 807, 815 (5th Cir. 1989).

Mindful that, just prior to the class period in this proceeding, DISH reached an agreement with forty-six state attorneys general to control its illegal telemarketing — and then almost immediately violated it — its protestation that "there is no need for further deterrence in this case" (DISH Br. at 2) lacks credibility. DISH says that it really means it this time, emphasizing the government's "continuing monitoring and enforcement rights, including through receipt of substantial telemarketing compliance document productions form DISH at six-month intervals." (DISH Br. at 12.) In essence, DISH promises to be good from now on, at least so long as someone is watching.

*Cy pres* distributions are not "fluid recovery" as the term is used in Fourth Circuit precedent. Whereas a *cy pres* recipient is almost always a charitable or nonprofit organization whose work facilitates the interests of the class, fluid recovery allocates class funds to "a group of individuals that closely approximates the class itself." *Newberg*

8

§ 12:27. The paradigmatic example occurred in *Daar v. Yellow Cab Co.*, 433 P.2d 732 (Cal. 1967), in which the defendant taxi company was alleged to have collected slightly higher fares than permitted by law. As it would have been cost-inefficient and largely futile to attempt to identify the class members who would individually be entitled to minimal damages, the action was nonetheless permitted to proceed to a settlement whereby the defendant ultimately rectified its overage by charging less for its future fares than would otherwise been permitted. Necessarily, the universe of customers reaping the benefits of the bargain fares did not correspond precisely with those who had previously been wronged.

The court of appeals in *Windham v. American Brands, Inc.*, 565 F.2d 59 (4th Cir. 1977) (DISH Br. at 15-16), expressly disapproved of fluid recovery as "a method of computing damages in a class action," a methodology that the court termed "'illegal, inadmissible as a solution of the manageability problems of class actions and wholly improper.'" *Id.* at 72 (quoting *Eisen v. Carlisle & Jacquelin*, 479 F.2d 1005, 1018 (2d Cir. 1973), *vacated on other grounds*, 417 U.S. 156 (1974)). *Cy pres* awards, of course, have nothing to do with "computing damages." Instead, the proper measure of damages is determined prior to the entry of judgment, only after which may *cy pres* be considered as a potential solution to the problem of the imperfect **distribution** of the damages **already** fully computed. Contrary to what DISH appears to believe, charitable entities are not individual class proxies, and computation is not distribution. Not even Judge Jones thinks differently. *See Klier*, 658 F.3d at 481 n.1 (Jones, J., concurring) (recognizing that "[a]t least one court has concluded that "fluid recovery" judgments—***which differ materially***

9

*from* **cy pres** *distributions*—do not violate the Rules Enabling Act" (citation omitted) (emphasis added)).

An examination of DISH's cited authorities on "fluid recovery" reveals that none involved *cy pres* distributions. *Eisen*, as the Fourth Circuit acknowledged in *Windham*, focused on the unsuitability of fluid recovery as a mechanism for calculating class damages in the first instance. *See* 479 F.2d at 1011 (indicating that "proof of damages" bore on problem of case manageability and noting that plaintiff "concedes that the action is not manageable if fluid class recovery is not permissible"). Similarly, in *Van Gemert v. Boeing Co.*, 553 F.2d 812, 816 (2d Cir. 1977) (DISH Br. at 16), no *cy pres* award was at issue; the court instead merely expressed its preference for reversion over what it called "fluid class" recovery, whereby funds unclaimed by some class members would be redistributed to those who had already filed valid proofs of claim.

*Augustin v. Jablonsky* (DISH Br. at 8, 14, 16), *supra*, decided by a New York district court, unsurprisingly reached the same result as the Second Circuit in *Van Gemert*, buoyed by the earlier decision of the same court of appeals in *Eisen*. Again, no *cy pres* award was at stake. The court in *Jablonsky* simply held, as occurred in *Van Gemert*, that reversion was preferable to a *pro rata* distribution of unclaimed funds to claiming class members. *See* 819 F. Supp. 2d at 177. The *Jablonsky* court cited *Eisen* for the inexact proposition that "the Second Circuit condemns fluid recovery which is defined as a distribution of an aggregate class recovery or an unclaimed portion thereof under *cy pres* principles to the next best class of persons." *Id.* Given the nuances of analysis, the district court in *Jablonsky* can perhaps be forgiven for conflating the **principles** of *cy pres* (but not *cy pres*

10

itself) with the concept of a substitute class of **persons**, which the *Newberg* treatise and Judge Jones herself recognize have nothing to do with *cy pres* **entities**.

Finally, *Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781 (7th Cir. 2004) (DISH Br. at 17), offers no succor to DISH. Like all the other cases on which DISH relies to bootstrap its "fluid recovery" argument, *Mirfasihi* involved no actual *cy pres* award. Rather, counsel in the case contended that a subclass of 1.4 million members who would receive nothing from the settlement on appeal had nonetheless obtained a worthwhile "*cy pres* remedy" by having the $243,000 in restitution due them distributed instead to the primary class numbering only 190,000, who were otherwise due themselves to receive a maximum of $2.4 million. *See id.* at 784. Judge Posner, appreciating the origin of the term *cy pres* as a trust doctrine imperfectly analogous to the class action remedy of the same name, merely ruminated that the term "fluid recovery" as an alternative "is no less misleading." *Id.* There is simply no legal impediment, and particularly in the Fourth Circuit, to this Court's approval of a *cy pres* award of unclaimed class funds.

5. The Court has discretion to direct distribution via state unclaimed property funds.

Thirteen states have enacted laws expressly authorizing the collection and retention of "property received by a court as proceeds of a class action, and not distributed pursuant to the judgment." Ethan D. Millar and John L. Coalson, Jr., *The Pot of Gold at the End of the Class Action Rainbow*, 70 U. PITT. L. REV. 511, 519 (2009). The rest provide for the holding of unclaimed property generally. *See id.*

11

It is likely that, if the Category 3 funds are transferred to the unclaimed property repositories indicated by the class members' addresses, the vast majority of those funds will eventually escheat to the respective jurisdictions. DISH's professed concerns of "a wrongful end-run around the post-trial process for class member identification" (DISH Br. at 19) is thus misguided. For those few class members who successfully pursue belated claims for class proceeds, they must satisfy rigorous state requirements for proof of identity and residence. And those class members will generally receive less — perhaps much less — than they would have had they timely filed a claim in this proceeding, negating any suggestion of a deliberate stratagem to avoid this Court's claim protocols. This Court possesses ample discretion to direct disbursement of Category 3 funds to the various States and the District of Columbia for safekeeping pending the likelihood of escheat.

### *Conclusion*

For the reasons set forth above and in his opening brief, Plaintiff respectfully requests the Court grant his motion and rule in substantial conformance with Plaintiff's proposed order.

THOMAS H. KRAKAUER
By Counsel

/s/ John W. Barrett
John W. Barrett
Brian A. Glasser
Benjamin J. Hogan
Bailey & Glasser LLP
209 Capitol Street
Charleston, WV 25301
Telephone: (304) 345-6555
jbarrett@baileyglasser.com

12

/s/ J. Matthew Norris
J. Matthew Norris
Norris Law Firm, PLLC
1033 Bullard Court, Suite 207
Raleigh, NC 27615
(919) 981-4775
(919) 926-1676 facsimile
jmn@ncconsumerlaw.com

Matthew P. McCue
The Law Office of Matthew P. McCue
1 South Ave., Third Floor
Natick, MA 01760
Telephone: (508) 655-1415
mmcue@massattorneys.net

# CERTIFICATE OF SERVICE

The undersigned counsel certifies that the foregoing was filed through this Court's CM/ECF system, and that all attorneys of record will be sent a copy of the same electronically through that system.

/s/ John W. Barrett
John W. Barrett

Dated: May 21, 2020

## CERTIFICATION OF WORD COUNT

Pursuant to Local Rule 7.3, the undersigned verifies that, using the Microsoft Word count tool, the word count for Plaintiff's Reply in Support of Motion for Entry of Order Governing Disposition of Undisbursed Class Funds is 3,196 words. This word count does not include the caption, signature lines, certificate of service, cover page, table of contents or table of authorities.

Respectfully submitted**,**

/s/ John W. Barrett
John W. Barrett