IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| THOMAS H. KRAKAUER, on behalf of a class of persons, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:14-CV-333 |
| DISH NETWORK, LLC, | ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

At trial in this class action, the jury found that Dish Network, LLC, made thousands of repeat telephone solicitations to thousands of residential phone numbers on the Do-Not-Call list, in violation of the Telephone Consumer Protection Act. The jury awarded damages of $400 per call, which the Court trebled after it found the violations were willful. Final judgment was entered against Dish and in favor of the plaintiff class in the amount of $61,342,800. The judgment was affirmed on appeal, Dish has satisfied the judgment, and the claims process has concluded.

Because not all of the judgment funds will be claimed by class members, the Court must decide what to do with these unclaimed funds. Reversion to Dish and escheat to the states are inappropriate. The Court will appoint a special master to help it evaluate potential *cy pres* recipients so that the Court can make an appropriate decision between federal escheat and *cy pres*.

## BACKGROUND

Through its agent, Dish made 51,119 telephone solicitations to 18,066 residential phone numbers on the Do-Not-Call list in willful violation of the Telephone Consumer Protection Act. Doc. 538 at 1. There are 18,066 class members, many of whom received more than one violative call. At trial, the jury awarded $400 per violative call, and the Court trebled this amount for willfulness to arrive at a total judgment in favor of the class of $61,342,800. Doc. 439. The Fourth Circuit affirmed the final judgment, *see Krakauer v. Dish Network, LLC*, 925 F.3d 643 (4th Cir. 2019), and the Supreme Court denied certiorari. Doc. 537.

The Court then approved attorney's fees and costs, Doc. 495, and determined that the attorney's fees and costs would be paid from the judgment as a whole. Doc. 538 at 1–2. The Court entered a final disbursement order to 13,000 class members, Doc. 560 ¶ 4, directing that fees and costs would be deducted from the $1,200 awarded per violative call, so that each class member will receive $812.99 for each such call. Doc. 560 at 2–3.[1]

Approximately 11,000 class members were identified fully and without contradiction in the existing data. *See* Doc. 560-1 (listing these class members). The remaining 7,000 were subject to a claims process, and 1,958 valid claims were submitted by class members. *See* Doc. 536 at 1; Docs. 560-2, 560-3 (listing successful claimants).

---

[1] These orders are presently on appeal, *see* Docs. 545, 562, but whatever the result of that appeal, there are certain to be unclaimed judgment funds in some amount. The disbursement order has been stayed for the time being. Doc. 568.

Thus, there are approximately 5,000 class members who have not claimed and will not receive their part of the judgment.  Doc. 538 at 2; *see* Doc. 560 at 3–4 (listing groups of class members who are entitled to payment).  Their share of the judgment funds available for distribution is approximately $11 million.  *See* Doc. 578 at 2; Doc. 581 at 2.  It is also likely that some class members may not cash their checks, adding to the unclaimed funds.  The Court must now determine what will happen to the undisbursed judgment funds.

## APPLICABLE LAW

"Most class actions result in some unclaimed funds."  *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1307 (9th Cir. 1990).  There are four common ways of distributing unclaimed funds:  reversion to the defendant, pro rata redistribution to class members who did file claims, escheating funds to the state or federal government, or *cy pres*.  *Id.*; *accord* 4 William B. Rubenstein, *Newberg on Class Actions* § 12:28 (5th ed. June 2020 Update).  No one has advocated for pro rata redistribution to class members who did file claims, and this possibility will not be discussed further.[2]

When money has been paid into the federal court to satisfy a judgment, those funds cannot be used for another purpose except by order of the court.  *See* 28 U.S.C. § 2041.  While the case law discussing distribution of unclaimed funds after a class action verdict and judgment is, unsurprisingly, thin, there is consensus that the decision of how

---

[2]*See In re Lupron Mktg. & Sales Practices Litig.*, 677 F.3d 21, 35 (1st Cir. 2012) (noting in the context of class action settlements that redistribution of unclaimed funds to already-compensated plaintiffs can result in an undeserved windfall and create incentives for suits where large numbers of absent class members were unlikely to make claims); *Van Gemert v. Boeing Co.*, 553 F.2d 812, 815–16 (2d Cir. 1977) (same).

3

to distribute unclaimed funds falls within the general equitable powers of the court and that the court has broad discretion in distributing these funds. *See Six Mexican Workers*, 904 F.2d at 1307; *Van Gemert v. Boeing Co.*, 739 F.2d 730, 737 (2d Cir. 1984) (noting that distribution of unclaimed class action funds is equitable, requiring the exercise of discretion in light of "the circumstances of the particular case"). "The district court's choice among distribution options should be guided by the objectives of the underlying statute and the interests of the silent class members." *Six Mexican Workers*, 904 F.2d at 1307; *see also see also Ira Holtzman, CPA, & Assocs. v. Turza*, 728 F.3d 682, 689–90 (7th Cir. 2013) (collecting authorities and noting that "[m]oney not claimed by class members should be used for the class's benefit to the extent that is feasible.").

1. **Reversion**

Reversion would return unclaimed judgment funds to Dish. "[R]eversion to the defendant may be appropriate when deterrence is not a goal of the statute or is not required by the circumstances." *Six Mexican Workers*, 904 F.2d at 1308. Conversely, reversion is not appropriate when deterrence is a statutory goal, unless otherwise required by the circumstances. *See Harris v. Vector Mktg. Corp.*, No. C-08-5198 EMC, 2011 WL 1627973, at \*12 (N.D. Cal. Apr. 29, 2011) (discussing fairness of class action settlement requiring reversion of unclaimed funds when statute violated had a deterrence purpose).

For example, in *Van Gemert v. Boeing Co.*, the Second Circuit affirmed a decision to revert unclaimed funds back to the defendant in a securities action when "during each step of the process Boeing had acted without malice, without bad faith and relied on the advice of others before taking each step," including the advice of outside law firms. 739

4

F.2d at 737. Because "[the defendant] complied with the letter of the then existing law and could not have anticipated" its liability, reversion was appropriate. *Id.*

Reversion is not appropriate in every case where distribution to the class is not possible. It can "undermine the deterrence function of class actions . . . by rewarding the alleged wrongdoer simply because distribution to the class [is not] viable." *In re Lupron Mktg. & Sales Practices Litig.*, 677 F.3d 21, 32–33 (1st Cir. 2012) (quoting Am. Law Inst., *Principles of the Law of Aggregate Litigation* § 3.07 cmt. b. (Apr. 1, 2009) (proposed final draft)); *accord Six Mexican Workers*, 904 F.2d at 1309 (remanding for decision between *cy pres* and escheat after claims period expires, noting that "[i]n light of the deterrence objective of FLCRA and the nature of the violations, we find that reversion of the funds to the defendants is not an available option.").

## 2. *Cy pres* distribution

With *cy pres* distribution, an organization that suitably represents the interests of or benefits the class members receives the unclaimed funds. *Cy pres* and variations of *cy pres* have often been used as a remedy when class actions are settled. This happens most typically as part of the settlement terms, *see, e.g.*, *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Products Liab. Litig.*, No. 8:10ML 02151 JVS, 2013 WL 3224585, at *13 (C.D. Cal. June 17, 2013) (approving a charitable contribution as part of a settlement and distinguishing it from *cy pres*); *Perry v. FleetBoston Fin. Corp.*, 229 F.R.D. 105, 117-18 (E.D. Pa. 2005) (approving *cy pres* donation to "an appropriate non-profit, legal, charitable or educational organization or entity" as part of class settlement), or, in some cases, when "it is not feasible to make further distributions

to class members." 4 Rubenstein, *supra*, § 12:32.[3]  But *cy pres* has also been used when a verdict and judgment has been entered.  *See Nelson v. Greater Gadsden Hous. Auth.*, 802 F.2d 405, 409 (11th Cir. 1986) (affirming post-verdict order directing the defendant to use any unclaimed funds to improve the utility system that was the subject of the lawsuit).  Other courts have indicated in dicta that a *cy pres* distribution can be appropriate for unclaimed funds after verdict.  *See Six Mexican Workers*, 904 F.2d at 1307–08;[4] *Holtzman v. Turza*, 828 F.3d 606, 609 (7th Cir. 2016) (noting in dicta that the "absence of a settlement" does not make a *cy pres* remedy impossible and that "the inability to track down the current address of a victim who has moved should not automatically benefit the wrongdoer.").[5]

Such distribution to a charity or nonprofit should address the objectives of the underlying statutes, target the plaintiff class, and provide reasonable certainty that class members will benefit.  *See Nachshin v. AOL, LLC*, 663 F.3d 1034, 1040 (9th Cir. 2011) (reversing order authorizing *cy pres* distribution as part of settlement where distribution

---

[3] At least one court has held in the settlement context that if *cy pres* is not part of the settlement agreement, it should be used "only when it is not feasible to make further distributions to class members."  *Klier v. Elf Atochem N. Am, Inc.*, 658 F.3d 468, 475 (5th Cir. 2011).

[4] In dicta in *Six Mexican Workers*, the Ninth Circuit confusingly referred to *cy pres* as a fluid recovery.  904 F.2d at 1307.  Fluid recovery is not authorized in the Fourth Circuit.  *See Windham v. Am. Brands, Inc.*, 565 F.2d 59, 72 (4th Cir. 1977).  The Ninth Circuit's discussion of *cy pres* did not turn on whether the damages recovered were "fluid," as that term is used in *Windham*, or proven individually, as was the case here.  *See* discussion *infra*.  Despite this, its evaluation of the availability of *cy pres* is still helpful.

[5] Like this case, *Holtzman* has a complicated history, and for reasons previously discussed in other orders, some of its other holdings are either not persuasive or inapplicable to the different facts and procedural situation here.  *See Krakauer*, 2019 WL 7066834 at *6–7 & n.5.

failed to accomplish these three objectives); *Six Mexican Workers*, 904 F.2d at 1307 (*cy pres* must be consistent with "the objectives of the underlying statute," and in "the interests of the silent class members," by providing the "next best" option for them); *see also Holtzman*, 728 F.3d at 689 ("Money not claimed by class members should be used for the class's benefit to the extent that is feasible."). Contrasted with escheat, *cy pres* funds are "targeted more specifically to the class's interests than when they simply go into the general treasury." 4 Rubenstein, *supra*, § 12:32.

### 3. Escheat

Unlike the equitable remedies of reversion and *cy pres*, escheat has a statutory basis. When funds paid into court to satisfy a judgment have been unclaimed for five years, the court shall "cause such money to be deposited in the Treasury in the name and to the credit of the United States." 28 U.S.C. § 2042. Escheat is appropriate when the court cannot develop an appropriate *cy pres* distribution or otherwise finds *cy pres* to be inappropriate. *Six Mexican Workers*, 904 F.2d at 1308.

The federal escheat statute allows "[a]ny claimant entitled to any such money" to petition the court to receive appropriate payment, even after the escheat. 28 U.S.C. § 2042; *see Leider v. United States*, 301 F.3d 1290, 1293 (Fed. Cir. 2002). Ordinarily, "[b]ecause section § 2042 permits recovery even after the funds revert to the United States, the interests of the silent class members are fully protected." *Six Mexican Workers*, 904 F.2d at 1308. Federal escheat may be particularly appropriate when the judgment was based on violation of federal laws. *See In re Folding Carton Antitrust Litig.*, 744 F.2d 1252, 1255 (7th Cir. 1984).

7

In general, funds that escheat to a state government are directed to the state treasury at the end of litigation. *See* 4 Rubenstein, *supra*, § 12:31. Typically, the funds are not "earmarked for any specific purpose" and are thus used to fund "the basic public activities of the government," but escheat funds may be directed towards a particular government agency aligned with the goals of the statute. *Id.* As with federal escheat, state escheat laws typically establish procedures for claimants whose funds have escheated to seek recovery of those funds from the state. *See, e.g.*, *In re Toyota Motor Corp.*, 2013 WL 3224585 at *3 & n.12 (approving class action settlement agreement for state and federal claims providing that undistributed funds "will be escheated pursuant to applicable State law," which "would allow a class member to claim payments for a number of years.").

In contrast to reversion, where the defendant is only deterred to the extent that the class claimed the damages, "escheat ensures full disgorgement from the defendant" and is more likely to achieve deterrence. 4 Rubenstein, *supra*, § 12:31. In the absence of a *cy pres* recipient whose interests reasonably approximate those of the class, allowing undistributed funds to escheat to the state or federal government is a "viable alternative;" it "will help serve the deterrence and enforcement goals" of the statutes violated, and if the class members live in the same jurisdiction that would receive the funds, they would benefit from the proposed distribution. *In re Motor Fuel Temperature Sales Practices Litig.*, No. 07-MD-1840-KHV, 2012 WL 5876558, at *6 (D. Kan. Nov. 20, 2012) (approving settlement where undistributed funds would escheat to the several states where class members purchased gas); *see also Nachshin*, 663 F.3d at 1041 (framing

8

escheat as an option courts should consider for unclaimed settlement funds "[i]f a suitable *cy pres* beneficiary cannot be located"); *Six Mexican Workers*, 904 F.2d at 1309 (remanding for decision between *cy pres* and escheat after claims period expires, noting that "[i]n light of the deterrence objective of FLCRA and the nature of the violations, we find that reversion of the funds to the defendants is not an available option.").

## POSITIONS OF THE PARTIES

The parties identify three options: 1) donation to a *cy pres* recipient, a charity or nonprofit organization whose work is substantively related to TCPA violations; 2) escheat to the government; or 3) reversion, where Dish would receive any undisbursed funds. Dish unsurprisingly advocates for reversion, Doc. 581 at 2, and the plaintiff maintains that most of the money should go to state unclaimed property funds—much of which would ultimately escheat to the state—and the remainder to an as-yet unidentified *cy pres* recipient. Doc. 578 at 7–8.

Specifically, the plaintiff asks that funds for the class members who did not submit claims but who are identified by name and address should escheat to those members' state unclaimed property funds. *Id.* at 7. They further request that all other unclaimed funds, whether those for successful claimants who do not timely deposit their checks, those who do not provide a tax identification number to the claims administrator and thus receive a lower payment, those who did not submit claims and are not identified by contact information in the administrator's database, or those whose claims were denied, should be distributed by *cy pres* to an entity to be determined in the future, *id.* at 8–9, after evaluation of potential recipients by a special master. *See* Doc. 589 at 2.

9

# DISCUSSION

"Congress enacted the Telephone Consumer Protection Act to prevent abusive telephone marketing practices" by prohibiting calls to numbers on the national Do-Not-Call registry and by allowing a private right of action against violators. *Krakauer*, 925 F.3d at 648. "Congress sought to deter an activity that, while pernicious and disruptive, does not trigger extensive liability in any single case." *Id.* at 656.

## 1. Reversion to Dish and State Escheat are Not Appropriate.

Here, the judgment funds represent 51,119 discrete and proven violations of the statute. Even if the specific person who received Dish's call was not successfully contacted, or someone who was identified did not timely file a claim, Dish still made the violative call to a member of the class and, thus, to a party: the class was defined in the first instance as the persons whose phone numbers received such calls, not by the names and addresses of the people involved.

The TCPA is a deterrence statute, and reversion does not support the statutory goal. That is particularly true here, where the Court found Dish willfully violated the statute. Moreover, Dish's obstructive conduct after judgment in connection with establishing a claims process resulted in substantial delays, *see, e.g.,* Doc. 495 at 2–3, which no doubt will increase the amount of unclaimed funds as people moved from addresses in the record and the possibility of contacting them about claiming their share of the judgment was reduced. Reversion to Dish is inappropriate.

Both a *cy pres* distribution and escheat support and further the aims of the TCPA. Each supports the deterrence purpose of the statute by ensuring that Dish does not escape

responsibility for the damages imposed as a result of its 51,000-plus violations, and each would support the punishment aspects of the treble damages provisions of the TCPA.

But escheat to the states is too costly to be feasible. It is likely to involve both significant administrative costs in dividing up the unclaimed funds between the states and significant resources from the court, class counsel, and the administrator in ensuring that orders appropriate under the laws of the many states are clearly crafted and entered.

Escheat to the federal government does not have these problems, as it would be relatively straightforward. It is appropriate, since violation of a federal statute was the basis for the judgment. And *cy pres*, assuming an appropriate recipient exists, is still potentially the best option.

Dish's contentions that reversion is preferable and that *cy pres* and escheat are either illegal or inappropriate are without merit. It makes numerous related arguments based on its view that it should not pay damages for calls "when no individual has demonstrated that he or she received them." Doc. 581 at 10.

First, this is an incomplete description of the remaining funds, as some will no doubt be due to people identified as class members who do not timely cash their checks or do not complete the requisite tax forms. Second, this is an old argument that has been repeatedly rejected by this Court and the Fourth Circuit. *See, e.g.*, *Krakauer*, 925 F.3d at 657–59, 658; *Krakauer v. Dish Network, LLC*, 1:14-CV-333, 2019 WL 7066834, at *5 (M.D.N.C. Dec. 23, 2019). The evidence at trial established that all these phone calls were received—that is, they were all answered phone calls. And, as noted *supra*, all class members whose phone numbers received violative calls are parties, even if some of these

11

people were not successfully contacted to receive the judgment proceeds that they are due. The jury verdict established that the violative calls were received, and the damages were imposed on a per-call basis; the fact that the claims process was imperfect does not erase the fact that Dish violated the TCPA when its agent made thousands of unwanted sales calls to numbers on the Do-Not-Call registry.

Dish contends the deterrence interest in this case has already been served because Dish and its retailers are subject to a permanent injunction in *United States v. Dish Network LLC*, No. 3:09-cv-03073, 2017 WL 3437784 (C.D. Ill. Aug. 10, 2017) that will regulate its conduct going forward, and it has also been "punished" in that case for many of the same phone calls at issue in this case. Doc. 581 at 13. But Dish's continued denial of responsibility for the violations found by the jury in proceedings before this Court— including in this very pending motion—belies the deterrent effect of the Illinois order. The evidence at trial established that Dish ignored consent judgments with states, and there no reason to think Dish will treat the Illinois injunction with more respect. The best deterrence, and one that is necessary here where the motivation for the violations was to sell more product and make more money, is the knowledge that future violations can result in a real and significant threat to the bottom line.

Dish further contends that *cy pres* distribution is prohibited because it would constitute a fluid recovery barred by the Fourth Circuit in *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 72 (4th Cir. 1977). As this Court has repeatedly explained when Dish has made this argument before, this case does not involve fluid recovery. *See, e.g.*, *Krakauer*, 925 F.3d at 650–51, 658; *Krakauer*, 2019 WL 7066834, at \*2, \*5. To repeat:

The Fourth Circuit reversed the *Windham* district court because its method of calculating and distributing damages for the *Windham* class circumvented the need to prove individualized damages, *see Windham v. Am. Brands, Inc.*, 68 F.R.D. 641, 657 (D.S.C. 1975), which was "illegal, inadmissible as a solution of the manageability problems of class actions and wholly improper." *Windham*, 565 F.2d at 72. In contrast, the *Windham* court approved the type of award at issue in this case, where "the fact of injury and damage breaks down in what may be characterized as virtually a mechanical task, capable of mathematical or formula calculation." *Id.* at 68 (internal quotations omitted).[6] The objections to fluid recovery do not exist where, as here, the plaintiff proved damages individually through class-wide proof. *See Six Mexican Workers*, 904 F.2d at 1307; *Nelson*, 802 F.2d at 409. *Cy pres* distribution in this case is not prohibited by the fluid recovery rule.

Dish also contends a *cy pres* distribution is prohibited because any *cy pres* recipient would not have standing, essentially arguing that a *cy pres* distribution would be unconstitutional. It cites no case or other authority to support this argument, Doc. 581 at 16, and any *cy pres* recipient would not be a party to this litigation. Moreover, standing is a case-or-controversy issue that typically arises in the context of determining federal

---

[6] Courts interpreting *Windham* have not read it to require reversion or to preclude *cy pres* distributions. *See, e.g.*, *In re Microsoft Corp. Antitrust Litig.*, 185 F. Supp. 2d 519, 522–23 (D. Md. 2002) (rejecting contention that *Windham* "forecloses a *cy pres* recovery here," noting that the court in *Windham* held a fluid recovery theory "cannot be used as a mechanism for certifying a litigation class," which is "an entirely different question" than how to distribute a class settlement fund); *Haywood v. Barnes*, 109 F.R.D. 568, 583–84 (E.D.N.C. 1986) (noting *Windham* did not apply since *Haywood* plaintiffs each sought damages in an amount determined by statute).

13

jurisdiction, which this Court obviously has. Indeed, if there is a question about standing in a non-jurisdictional sense, it is whether Dish has any "standing" to be heard on how the Court deals with unclaimed funds. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 481 (1980) (noting that after paying a final class action judgment, the defendant had "no interest in any part of the fund.").

Dish next argues that escheat would result in a windfall to the states, relying on *Boeing*. Doc. 581 at 21. In affirming the trial court decision ordering reversion, the Second Circuit did note the special master's conclusion that "the fact that certain private plaintiffs had failed to come forward to collect on their judgment should not entitle the states to a windfall." *Van Gemert*, 739 F.2d at 737. This factor does weigh against escheat to the states, but it does not preclude it, as no equitable remedy for unclaimed funds is perfect.

## 2. Deciding between *Cy Pres* and escheat to the federal government.

As previously noted, both *cy pres* and escheat to the federal government are consistent with the deterrence purposes of the TCPA and are feasible, cost-efficient options, as would be some combination of the two. But in order to appropriately exercise its discretion, the Court needs to know whether there are in fact appropriate *cy pres* recipients and to make a concrete comparison to federal escheat. This is not a decision that can be made hypothetically.

When courts decide that *cy pres* is appropriate, it appears to always be in the context of an identified *cy pres* recipient. This is consistent with the case law, which requires *cy pres* recipients to promote the objectives of the TCPA and benefit the interests

14

of the class members.  *See Nachshin*, 663 F.3d at 1040 (noting that *cy pres* distribution should address the objectives of the underlying statutes, target the plaintiff class, and provide reasonable certainty that class members will benefit); *see also supra* at pp. 6-7.  If there are organizations that benefit the class by their work on behalf of consumers injured by willful violators of the TCPA, like Dish, by, for example, providing direct services, support, research, or advocacy for such consumers individually or in the aggregate, a *cy pres* distribution might be appropriate.  Such a distribution would likely further the interests of those who, for a variety of reasons, did not claim the funds they were due.  But if there is not an appropriate *cy pres* recipient, then *cy pres* distribution would not be a good option and escheat would be the logical choice.[7]

To that end, the Court has considered and will adopt class counsel's proposed procedure to appoint a special master who can identify and evaluate appropriate *cy pres* recipients and make a recommendation to the Court.  *See* Doc. 589.  It makes sense to have a special master receive proposals; this will not clog up the docket, will allow for faster elimination of obviously specious or inappropriate recipients, and will provide a careful evaluative recommendation for an appropriate recipient, if there is one.  It would be particularly time-consuming for the court to undertake this task on its own in the middle of a pandemic, which is causing disruptions and delays throughout the court system and which is requiring a significant amount of time and attention from judges and

---

[7] The Court has not ruled out federal escheat, in whole or in part, even if there is a good candidate for a *cy pres* recipient.  That evaluation is better made in context and in comparison to a specific candidate or candidates.

court personnel. Under these exceptional circumstances, and in aid of a timely decision, the Court finds and concludes that appointment of a special master is appropriate under both Federal Rule of Civil Procedure 53(a)(1)(B)(i) and Rule 53(a)(1)(C).

Specifically, pursuant to Rule 53, the Court gives notice of its intent to appoint a special master to identify, evaluate, and recommend an appropriate *cy pres* recipient or recipients, in light of the purposes of the TCPA and the interests of and benefits to the class members who do not claim their share of the judgment. Class counsel has already suggested candidates for the special master. Doc. 589 at 3–4. The Court is familiar with all the suggested special masters from its years on the state and federal bench and is comfortable appointing a special master from that list. If any party wishes to be heard further as to the propriety of the appointment or as to a suggested appointment, *see* Rule 53(b)(1), the party may file an appropriate brief or suggestion within seven business days. The Court previously approved an hourly compensation rate of $350 for a different special master appointed to handle the claims process. *See* Doc. 448 at 4. If that rate is not appropriate or acceptable to any of the plaintiff's four suggested special masters, it would be helpful if the plaintiff could so advise the Court. For any other suggestions, an acceptable hourly rate should be included.

It is **ORDERED** that:

1. The defendant's motion regarding disposition of unclaimed funds, Doc. 580, asking that all unclaimed funds revert to Dish is **DENIED**.

2. The plaintiff's motion for entry of an order governing disposition of undisbursed class funds, Doc. 577, is **DENIED** in part, to the extent it suggests

16

escheat to state governments, and otherwise is held open for the Court to decide between *cy pres* and federal escheat.

3. Notice is given pursuant to Federal Rule of Civil Procedure 53(b)(1) of the intent to appoint a special master and the matter is held open for seven business days in case any party wishes to be heard or heard further as to that appointment.

This the 27th day of October, 2020.

_____
UNITED STATES DISTRICT JUDGE

17