IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION

THOMAS H. KRAKAUER,
on behalf of a class of persons,

     Plaintiff,

v.                          Civil Action No. 1:14-cv-00333-CCE-JEP

DISH NETWORK, L.L.C.,

     Defendant.


**Report and Recommendation of
Special Master Leslie Winner Regarding *Cy Pres*
Distribution of Unclaimed Judgment Funds**

# TABLE OF CONTENTS

1. **Introduction** ………………………………………………….................1

2. **Summary of my relevant experience**………………………………………1

3. **My process for investigating and evaluating applicants**………………….. 2

    a. Criteria………………………………………………………… 3
    b. Notice………………………………………………………… 4
    c. Applications…………………………………………….....…..… 4
    d. Applications Received………………………………………… 4

4. **Summary of Recommendations**………………………………………5

    a. Proposed First Round Funding………………………………………5
    b. Proposed Second Round Funding………………………………………6
    c. Collective Impact of My Recommendations…………………………… 7

5. **Individual recommendations**………………………………………… 11

    a. National Association of Attorneys General ……….……………………11
    b. National Legal Aid and Defender Association (NLADA)……………… 13
    c. National Consumer Law Center, Inc. (NCLC)..……………………… 16
    d. San Francisco Consumer Action d/b/a Consumer Action……………… 17
    e. Columbia University–Technical Research……………………………… 19
    f. Columbia University–Policy Research……………………………….... 21
    g. National Association of Consumer Advocates Charitable
        Fund, Inc. (NACA)…..………………………………………… 22
    h. Electronic Privacy Information Center (EPIC)………………………… 23
    i. Public Justice Foundation (Public Justice)……………………………24
    j. United States Public Interest Research Group Education Fund ………… 26
    k. Public Knowledge………………………………………………27
    l. Consumer Report Inc. (CR) ……………………………………… 28
    m. Consumer Federation of America Inc. (CFA) ………………………… 29

6. **Other administrative matters**……………………………………………30

    a. Application Documentation……………………………………………30
    b. Award Documentation……………………………………………31

7. **Conclusion**……………………………………………….............. 32

i

## 1. Introduction

I am submitting this Report and Recommendation pursuant to Rule 53(e) of the Federal Rules of Civil Procedure, and this Court's order appointing me to serve as Special Master to assist the Court in "identifying, evaluating, and, if appropriate, recommending a *cy pres* recipient or recipients for unclaimed judgment funds." (Doc. 594).

This Report has six parts. In Part 2, I briefly describe my personal experience that informed my work. In Part 3, I describe my process for investigating and evaluating potential recipients. Part 4 contains a summary of my recommendations, and sets out the proposed recipients and proposed award amounts. Part 5 includes detail regarding each recommended recipient of an award. In Part 6, I address administrative matters related to the award process and the distribution of awards.

## 2. Summary of my relevant experience

I am a lawyer, licensed to practice law in North Carolina and admitted to the bars of the U.S. District Courts in North Carolina, the Court of Appeals for the Fourth Circuit, and the Supreme Court of the United States. I have worked both professionally and as a volunteer in capacities that informed my judgment in making these recommendations. To summarize:

- At the beginning of my career, I served as an attorney for the civil legal aid office that served Charlotte, North Carolina and the surrounding area. More recently I have served as Co-chair of the Board of the statewide North Carolina Justice Center. Together these experiences gave me an understanding of the needs and capacities of local and statewide organizations that provide civil legal services to clients who would otherwise not have access to legal counsel.

1

- In private practice, I was a trial lawyer with an extensive federal court, public interest litigation practice. My years as a public interest lawyer in many different contexts provided me with an understanding of how to work within the legal system, and within the parameters of federal legislation, with a goal of serving the public good.

- I served three terms in the North Carolina Senate, where I gained an understanding of the workings of state government, and interacted with a broad array of non-profit entities seeking to promote public good in ways that complemented laws and public policy. Since then I have served on the boards of numerous non-profit charitable and educational organizations.

- As Vice President and General Counsel for the University of North Carolina, I both engaged in extensive collaboration with the office of North Carolina's Attorney General, and I became familiar with considerations related to externally funded university research. Both of these experiences proved relevant to this work.

- I served as the Executive Director of the Z. Smith Reynolds Foundation for eight years. In that role I was responsible for making recommendations to its Board of Trustees for grants totaling approximately $16 million per year. I was responsible for developing and implementing an application and review process as well as for assessing the strengths and weaknesses of individual grant applications, including their financial stability and capacity to perform their proposed activities. I was also responsible for assessing the alignment of proposed projects with the goals of the Foundation.

## 3. My process for investigating and evaluating applicants

After familiarizing myself with the relevant Orders of this Court and factual and legal aspects of the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227, I conducted a scan of the major organizations in the United States that are engaged in activities to prevent violations or pursue enforcement of the TCPA. My process for soliciting applications was to develop criteria for the awards, create a notice of the *cy pres* award process and an online fillable application, and distribute the notice and application. I then made arrangements for archiving the documents received from

applicants and answered questions from perspective applicants. My process for making these recommendations was to review the materials submitted by all applicants, interview those applicants most likely to be appropriate recipients of awards, and, in a few cases, negotiate modifications of their budgets or proposals. At the conclusion of this process, taking into account the criteria listed below and the amount of funding likely to be available, and using my best professional judgment, I developed the recommendations set out in Parts 4 and 5, below.

### a. Criteria

I developed criteria for the award based on the Memorandum and Opinion of the Court dated October 27, 2020 (Doc. 590), the Order of the Court dated November 6, 2020 (Doc. 594), and principles of sound grantmaking based on my experience in the field. The criteria were:

- Applicants must be a tax exempt organization under § 501(c)(3) of the Internal Revenue Code, a state governmental entity as identified by 47 USC § 227(e)(6) or (g)(1), or a non-§ 501(c)(3) state university or college. If the applicant is a state entity, it must be able to provide assurance that funds will be used for their intended purpose, and will not revert to the state's general fund;

- Organizations that receive the award must "benefit the class by their work on behalf of consumers injured by willful violators of the TCPA, like Dish, by, for example, providing direct services, support, research, or advocacy for such consumers individually or in the aggregate[.]" Doc. 590 at 15;

- Funds from the award must be used to further the purposes of the TCPA;

- An applicant must demonstrate its capacity to implement its proposed project. An applicant's capacity was evaluated, in part, "based on their experience and record of curbing abusive telemarketing practices that threaten consumer privacy[.]" Doc. 594 at 2; and

3

- Each awardee must agree to certify to the Court, at the end of the award period, that the funds it received were used solely for the project described and the purposes stated in its application.

### b. Notice

To assure that potentially appropriate recipients of these funds were aware of the award process, I spoke with several entities known to be experts in this field and compiled a list of organizations that should receive notice. I then developed a notice, and I distributed it to all the identified entities, obtaining agreement from several of them to further distribute the notice to their appropriate email networks. A list of these entities is at Attachment A. The Notice itself is Attachment B, and it may be found at http://www.dishnetworkclassaction.com/application-for-cy-pres.aspx.

### c. Applications

Applicants were required to complete an electronic application. *See* Attachment B and the link above. Each applicant was required to attach a project budget, and, with exceptions noted below, proof of their tax exempt status and two years of profit and loss statements (or other evidence of financial stability). All of these documents were emailed to the Special Master, and, for archiving purposes, to the Claims Administrator, KCC. Applications were due by January 29, 2021. In a few cases, I requested and received revised applications or project budgets, and those were also archived.

### d. Applications Received

Thirty-eight applications, requesting approximately $23,098,000, were received. They proposed activities including consumer education and counseling, research, violation prevention, enforcement, and advocacy related to the TCPA. They came from

4

large and small organizations and from states across the United States, from Florida to Alaska, from California to Maine, and many points in between.

### 4. Summary of Recommendations

#### a. Proposed First Round Funding.

I recommend that the Court award $11,042,671 in undistributed *cy pres* funds to the twelve organizations — the "First Round Funding" — set out below and listed in Attachment C. These recommendations are individually discussed in Part 5 below. If that amount is not available, I recommend that the deficit be deducted from these awards *pro rata*.

My recommended recipients and amounts are:

| Organization Name | Recommendation |
|---|---:|
| Attorneys General/National Association of Attorneys General | 2,000,000 |
| National Legal Aid and Defender Association | 3,454,238 |
| National Consumer Law Center, Inc. | 1,708,810 |
| San Francisco Consumer Action | 675,000 |
| Columbia University–Technical Research | 254,223 |
| National Association of Consumer Advocates Charitable Fund Inc. | 450,000 |
| Electronic Privacy Information Center | 700,000 |
| Public Justice Foundation | 369,000 |
| United States Public Interest Research Group Education Fund | 250,000 |
| Public Knowledge | 102,400 |
| Consumer Reports Inc. | 1,000,000 |
| Consumer Federation of America Inc. | 79,000 |
| **Total** | **$11,042,671** |

### b. Proposed Second Round Funding

If funds in excess of $11,042,671 are available, I recommend that an additional $2,880,038 be distributed through "Second Round Funding" in amounts also included in Attachment C, and also individually discussed below. These amounts are:

| Organization Name | Recommendation |
|---|---|
| Attorneys General/National Association of Attorneys General | 2,000,000 |
| San Francisco Consumer Action | 75,000 |
| Columbia University–Technical Research | 89,708 |
| Columbia University–Policy Research | 82,330 |
| National Association of Consumer Advocates Charitable Fund Inc. | 150,000 |
| Electronic Privacy Information Center | 300,000 |
| Public Justice Foundation | 140,000 |
| Consumer Federation of America Inc. | 43,000 |
| **Total** | **$2,880,038** |

Each of the projects or project supplements recommended for Second Round Funding would further the purposes of the TCPA and would benefit the *Krakauer* class. Three of the additional amounts are the fourth year of a project which I trimmed to three years because of limited resources. Four additional amounts are beneficial additional aspects of projects I recommended for First Round funding but trimmed because of limited resources. One recommendation is to increase the total amount available for a project I recommended funding in the first round, but at a lower amount.

If there had been more funds available for the First Round Distribution, I would have recommended all of these additional funds. Because funds were limited, I had to prioritize, and I viewed the projects designated for Second Round Funding as lower priority, but still worthwhile and appropriate if funds are available.

6

The total funding of First and Second Round Distributions is $13,922,709. If there are funds remaining after the additional recommendations are fully funded, I recommend that these excess funds be awarded to National Association of Attorneys General to add to its ongoing fund to support the costs of collaborative efforts by the states' Attorneys General to enforce the TCPA, as discussed below.

### c. Collective Impact of My Recommendations

In addition to looking at each of the applications individually, I have considered how they fit together collectively to further the purposes of the TCPA and benefit the members of the plaintiff class.

- *Benefiting a nationwide class*: I paid attention to having direct services, enforcement, and consumer education available to consumers, on the ground, throughout the country. This would be accomplished by the awards to the National Association of Attorneys General (NAAG) (which would enable states' attorneys general to enforce the TCPA collaboratively); the National Legal Aid & Defenders Association (NLADA) (which would provide attorney training, materials for consumer education, and pass through awards to civil legal aid offices spread across the United States); Consumer Action (which would provide consumer education through the 7000 community based organizations that it serves); and the National Association of Consumer Advocates (NACA) (which would provide continuing legal education and attorney support services to its network of consumer lawyers throughout the country);

- *Consumer Education and Prevention:* As part of their grants, NLADA and Consumer Action would develop up-to-date multi-lingual TCPA consumer education materials and digital education tools for distribution throughout their nationwide networks. The Consumer Federation of America would update its materials on telephone consumer rights, and would both distribute them through their broad network and launch a public media campaign to promote them. Consumer Reports, which has six million U.S. members, would educate consumers on how to use tools it would make available to enable those consumers to protect their private data from sale for use in telemarketing;

- *Enforcement:* In addition to NAAG (which would enable state attorneys general collaboratively to perform the enforcement role anticipated in 47 U.S.C. § 227(g)), and NLADA (which would enable TCPA victims who cannot afford lawyers to have access to legal counsel), the National Association of Consumer Advocates and the National Consumer Law Center each would provide legal education and support to consumer attorneys to enable them effectively to represent clients who have TCPA claims. In addition, Public Justice would use funding from this award for its staff attorneys to serve as counsel in litigation that raises issues relevant to preserving TCPA litigants' access to the civil courts;

- *Advocacy before the FCC and in the courts:* The National Consumer Law Center (NCLC) is widely acknowledged as the hub of not-for-profit entities that advocate to preserve and strengthen the consumer protections of the TCPA both at the Federal Communications Commission (FCC) and in the courts, through filing

8

*amicus* briefs in appropriate cases. The proposed award to NCLC would enable it to sustain and strengthen that work. Public Knowledge also contributes to this advocacy effort before the FCC, and many of the proposed recipient organizations contribute and sign on to *amicus* briefs. Consumer Reports will focus on regulations to allow consumers effectively to opt out of sales of their personal data to be used for telemarketing. US PIRG will advocate for robust enforcement of recent requirements for telephone service providers to verify the identity of incoming calls and to block illegal calls. Consumer Action and the Consumer Federation of America would bring direct consumer voices to this advocacy if they receive the Second Round funds recommended.

Collectively these organizations will benefit the plaintiff class by assuring that the regulations implementing the TCPA, and the legal framework enabling its enforcement, remain strong.

Also included in the advocacy proposals of some of the applicants is a portion of their effort to be focused on educating Congress concerning emerging telemarketing and robocalling trends. They would urge Congress to modify the TCPA as necessary to continue to fulfill the Act's original goal of protecting telephone consumer privacy. This advocacy would benefit the *Krakauer* class and other telephone consumers like them. If, however, the Court determines that advocating for amendments to the TCPA is not in furtherance of the purposes of the TCPA, then I recommend that the Court direct that recipients of funds not use those funds to advocate before Congress.

9

- *Addressing emerging technology and telecommunications trends:* Telemarketing and robocalling technology is much different today than it was in 1991 when the TCPA was enacted. One of the challenges of protecting the *Krakauer* class and other consumers from invasive and abusive calls that violate the TCPA is keeping up to speed with the emerging technology and trends. The research being proposed by the Columbia University Internet Real Time Lab (on machine identification of illegal robocalls so the telephone providers can block them); US PIRG's proposed work (on caller ID verification and blocking spoofed phone numbers); and EPIC's and Consumer Reports' proposed efforts (to prevent data brokers from collecting and selling consumer data for use in automated dialing and telemarketing) all address emerging practices that are harmful to telephone consumers. These kinds of efforts to address current trends and anticipated future developments are necessary for the TCPA to continue to protect telephone consumers as was intended.

## 5. Individual Recommendations

### a. NATIONAL ASSOCIATION OF ATTORNEYS GENERAL (NAAG) on behalf of STATE ATTORNEYS GENERAL

**Project Title:** NAAG Telemarketing and Robocall Fund
**Amount Requested:** $4,000,000 over four years (see revised proposal)
**First Round Recommendation:** $2,000,000 over four years
**Second Round Recommendation:** $2,000,000 over four years
**Project Purpose:** To provide funds necessary for the Attorneys General (AGs) to work collaboratively to enforce the TCPA.

Fifty-two U.S. state and territory attorneys general each signed a joint application requesting that NAAG be awarded funds to enable them, collaboratively, to perform their TCPA enforcement role as anticipated in 47 U.S.C. § 227(g). While these offices generally have attorneys on staff to engage in enforcement activities, they lack the funds to license up-to-date investigative data tools necessary to analyze large quantities of call records and other data, for experts to analyze the data and, if necessary, for expert witnesses. Most major robocall violations are nationwide and not limited to a single state, so enabling the AGs to work collaboratively is the most efficient and effective way for them to stop largescale offensive activities. In particular, an award would enable NAAG to license technology tools to be used for group efforts that no individual attorney general's office could afford. In addition, as law enforcement entities, attorneys general have access to call tracing records that private attorneys engaged in TCPA enforcement do not have. This kind of multistate enforcement of the TCPA would benefit the members of the *Krakauer* class nationwide.

NAAG is an organization that serves all the U.S. state and territory attorneys general. It has a long history of establishing funds for the benefit of state and territory

AGs, including funds resulting from *cy pres* awards. It has an established governing structure to assure that these funds will be used effectively and collaboratively.

NAAG has the administrative capacity to support these collaborative enforcement efforts. NAAG would retain 1% of any award as a fee to cover some of the costs of administering and distributing the funds.

The Internal Revenue Service has deemed NAAG to be an instrumentality of the States, not a § 501(c)(3) tax exempt organization. It is tax exempt in the same way that states are. See I.R.S. Letter of October 29, 2009, in the Appendix to this Report. Thus, NAAG is eligible for a *cy pres* award in the same way that an individual state would be.

I recommend a second-round award of $2 million if those funds are available. The costs of TCPA enforcement are ongoing with annual licensing fees, data analysis costs, and out of pocket litigation costs. An award to NAAG will be put into a fund which will occasionally be partially replenished by litigation cost recovery. It will be used for these purposes until it is fully expended. While $2 million over four years will provide a meaningful boost to the AGs' enforcement efforts, $1 million per year, or a total award of $4 million, could be put to good use.

If there are *cy pres* funds remaining after all the additional recommendations set out in Attachment C are fully funded, I recommend that these excess funds be awarded to NAAG to add to its an ongoing fund to support the costs of collaborative efforts by the state AGs to enforce the TCPA.

### b.  NATIONAL LEGAL AID AND DEFENDER ASSOCIATION (NLADA)

**Project Title:**  National Telephone Abuse Prevention Project
**Amount Requested:** $3,454,283 over four years
**First Round Recommendation:**  $3,454,283 over four years
**Project Purpose:** To create a nationwide network of legal aid organizations enabled to protect low income consumers from telemarketing and abusive debt collection calls that violate the TCPA.

The NLADA is a century old organization that supports virtually all of the organizations in the United States that provide free legal services to people whose income does not enable them to access to legal counsel. These populations are particularly vulnerable to fraud and other abuses resulting from telephone calls that are prohibited by the TCPA.

NLADA distributed the Notice in this matter to its members, and twenty-two of them applied for *cy pres* awards, requesting a total of $4,884,000. They spanned the country from Alaska and California to Florida and Maine. Most of these applicants had the same goals: to train their attorneys on how to advise clients to prevent abuses prohibited by the TCPA, to create consumer education materials, several of them also translating these into Spanish, and to engage in TCPA consumer education and enforcement activities. They requested amounts of funding ranging from $80,000 to $613,000, though most of them requested between $100,000 and $200,000. As Special Master, I found it difficult to judge the capacity of each of these organizations to implement its proposed project. Also, having each office determining how to conduct effective staff training and producing consumer education materials would be a redundant use of funds. NLADA also applied for a *cy pres* award to enable it to do a pass-through

13

award program for its members, which would have been, to a large extent, a duplication of funding for the individual legal aid applicants.

In response to my discussion with NLADA, it submitted a revised proposal to centrally supply common aspects of the proposals and to administer a pass-through award program for the twenty-two legal aid organizations that applied for *cy pres* awards. These awards will enable the selected legal aid organizations to screen clients for TCPA violations, broadly educate their client communities on how to prevent TCPA prohibited abuses and scams, engage in or arrange for *pro bono* representation or enforcement, and participant in national TCPA policy advocacy efforts.

NLADA proposes to:

1. Provide for the development, updating, and translation of TCPA consumer education materials, and maintain a TCPA website for use by the organizations receiving awards and also by all other legal aid organizations.

2. Solicit revised applications from the twenty-two organizations that applied for a *cy pres* award, taking into account the cost savings to each from the centralized services to be supplied by NLADA.

3. Select appropriate awardees from among the applicants. Note that while NLADA assumed it would be required to make an award to each of the 22 applicants, I recommend that it be allowed to exercise its judgment to select appropriate applicants from among the group.

4. Make appropriately sized awards of $100,000–$175,000 to be used by the organization over four years for TCPA consumer education, enforcement, and when appropriate, advocacy.

5. Contract for training on the TCPA for the staff of all the organizations receiving awards.

6. Develop and support a peer learning network among the staff of the awardee organizations.

7. Monitor the use of the awarded funds, and submit a final report to the Court.

Making one award to the NLADA to administer this fund will provide efficiency, assure that high quality training and materials are available to all of the organizations, and will provide a peer learning network so that the organizations can support each other in implementing its TCPA work. These activities will further the purposes of the TCPA. Although awards will not go to every state, consumer education materials will be available to legal aid offices in every state, and the geographically broad enforcement enabled by the pass through awards will benefit the members of *Krakauer* class and other similarly situated consumers.

NLADA has experience in implementing similar kinds of collaborative programs, including in area of consumer law, and its staff has the expertise to be able to implement this project well.

I am recommending an award of $3,454,283. Of these funds, $3,000,000 will go to pass through awards, and $454,284 will go to NLADA to administer the program and to

pay to contractors to provide attorney training and to develop materials. See NLADA Revised Project Budget in the Appendix.

### c. NATIONAL CONSUMER LAW CENTER, INC. (NCLC)

**Project Title:** TCPA Advocacy and Education Project
**Amount Requested:** $1,708,810 over four years
**First Round Recommendation:** $1,708,810 over four years
**Project Purpose:** To sustain and expand NCLC's advocacy and educational efforts to protect, strengthen, and facilitate the enforcement of the TCPA.

The NCLC is widely recognized as the lead non-profit organization engaged in advocacy and legal education to protect, strengthen, and enable the enforcement of the TCPA, and it is generally recognized as the leader of the coalitions of national and state organizations engaged in this work.

Entities involved in the illegal robocall industry regularly devise novel ways to evade the restrictions of the TCPA. In addition, as technology evolves, from landline phones, to cellphones, to Voice over Internet (VoIP), the methods of violation of the TCPA also evolve. If the purposes of the TCPA are to be achieved, the regulations governing the TCPA and enforcement efforts also must evolve.

The NCLC leads the effort to address these evolving circumstances by coordinating advocacy to the Federal Communications Commission (FCC), engaging with willing telephone service providers to develop ways to stem invasive calls, providing continuing legal education for lawyers representing clients in TCPA cases, coordinating the writing of *amicus* briefs in significant TCPA cases, and working to increase consumers' understanding of the TCPA's protections and how to use them.

16

Currently NCLC has two senior attorneys who devote a substantial proportion of their time to TCPA work. This award would be used by NCLC to sustain its current efforts by covering a portion of the compensation of these attorneys, and the direct and indirect costs related to that work, and to hire an additional attorney who would devote half time to TCPA work.

### d. SAN FRANCISCO CONSUMER ACTION, d/b/a CONSUMER ACTION

**Project Title:** Consumer Action TCPA Education and Advocacy Project
**Amount Requested:** $750,000 over three years
**First Round Recommendation:** $675,000 for education and mini-grants over three years
**Second Round Recommendation:** $75,000 for advocacy over three years
**Project Purpose:** To educate and advocate for low and moderate income and limited English speaking consumers on the TCPA's protections, and to provide mini-grants to 50 community based organizations to educate their clients on the TCPA's privacy protections.

With origins in San Francisco, Consumer Action now serves a network of 7,000 community based organizations (CBOs) spread across the United States. Most of these CBOs serve low- and moderate- income consumers, some of whom have limited English-speaking capacity and, therefore, are especially vulnerable to telephone scammers. Consumer Action works with these CBOs over the course of many years to address the needs of consumers, enabling them to provide effective consumer protection education to their clients. This award would enable Consumer Action to focus its attention on TCPA prohibited telemarketing privacy invasions and abuses.

Consumer Action would provide consumer education by posting multi-lingual educational materials to their Privacy Information website, emailing them to their 100,000-person list, and supplying them to their 7,000 affiliated CBOs. They would also

17

produce videos, webinars, leaders' guides, curricula, and train-the-trainer sessions that will be available to their network of CBOs. Consumer Actions has a consumer hotline which would give TCPA related advice and offer referrals in English, Spanish, and two Chinese dialects. They would also distribute TCPA consumer protection information through Spanish and Chinese language media.

As a second part of the effort, Consumer Action proposes to run a program to provide $3750 mini-grants to 50 CBOs, with whom they have an ongoing relationship, to enable those organizations to focus on doing TCPA education with their clients. They would provide training to the staffs of the organizations, provide consumer education materials and webinars, enable these CBOs to network with each other to address common problems, and ask them to administer a survey instrument to their clients. This survey would provide information to other organizations and government agencies on the best ways to educate consumers about the TCPA. At the end of the mini-grant program, Consumer Action would collect the information necessary to certify that these funds had been used by the CBOs for their intended purpose.

Consumer Action has a long history of working with CBOs across the United States, and it has successfully administered mini-grant programs relating to other consumer protection issues in the past. It is the only organization that widely distributes consumer protection information in multiple languages.

This award will further the purposes of the TCPA and would benefit the *Krakauer* class by providing consumer education broadly across the United States, and, uniquely, by doing so in multiple languages.

18

If there are additional funds to be distributed, I recommend a second-round award of $75,000 to support Consumer Action's advocacy efforts. Consumer Action works in coalition with other organizations on policy matters related to the TCPA. They add value to this coalition because of the extensive information they have about consumer needs as a result of their hotline and their interactions with community based groups, and they frequently can identify consumers who are willing to share their stories publicly to personalize policy discussions.

### e. COLUMBIA UNIVERSITY, DEPARTMENT OF COMPUTER SCIENCE (TECHNICAL RESEARCH)

**Project Title:** Rapid Identification of Unwanted and Illegal Telemarketing Calls
**Amount Requested:** $343,932 over four years
**First Round Recommendation:** $254,223 over three years
**Second Round Recommendation:** $89,708 for a fourth year
**Project Purpose:** To develop techniques for outbound, intermediate, and terminal providers of voice services to enable them to identify and reject illegal calls, unwanted by their customers, using machine-learned call characteristics.

Currently telemarketers who are not readily identifiable often use spoof caller IDs or rapidly cycle through originating phone numbers, making their calls difficult to block. Spoofed caller ID numbers are numbers that appear on a consumer's telephone but are not the actual telephone number of the originating caller. For example, a caller ID which shows the consumer's area code may encourage the consumer to answer the call, but the call may actually have originated outside the United States.

Better technical methods are needed for telephone service providers to be able to identify and block illegal and unwanted calls without blocking legal and necessary robocalls from entities such as school systems or utility companies. The Columbia

19

University researchers propose to use data and end user anonymized call records, provided by three different types of telephone service providers, combined with data from the federal Do Not Call list, consumer-complaint data, and other enforcement tools.

The implementation of what is known as the STIR/SHAKEN caller ID verification technology and accompanying regulation, 47 CFR § 64.6301, makes this an important time for this research. The new STIR/SHAKEN technology and regulations establish a framework for carrier responsibility to verify the identity of callers and to block calls with spoofed caller IDs, and the regulations set a June 30, 2021 deadline for compliance. This research would both to help providers identify bogus numbers and prevent the use of techniques that by-pass the regulation. If a better way can be developed to identify illegal calls before they reach the consumer, many telephone providers will use it voluntarily, as doing so will upgrade the quality of their service to their customers. If appropriate, the research will provide a basis for updating consumer protecting TCPA regulations.

The principal investigator for this work, Dr. Henning Schulzrinne, has been deeply involved with voice technologies since the mid-1990's, sometimes as a professor, and sometimes as the Chief Technology Officer for the FCC. He is highly qualified to lead this research. This proposal will cover the cost a fulltime graduate student researcher, and will not be used to cover Professor Schulzrinne's salary, which will be covered from other sources.

If there are additional funds available, I recommend a second-round award of $89,708. The recommended first-round funds provide for a graduate student to assist with this research for three years. This problem will, however, be ongoing, as new evasive

technologies and techniques are developed, and funding this project for a fourth year would be appropriate.

NOTE: Columbia University does not have a § 501(c)(3) certification letter, because the University was established before the adoption of the Internal Revenue Code, and its tax exempt status was grandfathered. It has provided alternative documentation of its tax-exempt status which is included in the Appendix to this Report. In addition, the application process did not require universities to provide evidence of institutional financial stability such as a Profit and Loss Statement for the whole university.

### f. COLUMBIA UNIVERSITY, DEPARTMENT OF COMPUTER SCIENCE (POLICY RESEARCH)

**Project Title:** Policy Research for Detecting and Preventing Unwanted Calls
**Amount Requested:** $82,330 over one year
**First Round Recommendation:** None
**Second Round Recommendation:** $82,330
**Project Purpose:** To develop policy options to address the evolving illegal telemarketing and robocalling techniques.

This project is a supplement to the Columbia University technical research project discussed above. Entities intent on violating the TCPA will improve their technologies, increase stealth, and modify their operations to bypass call authentication technologies, making it difficult to enforce the TCPA. This project will research policies, including those in use in other countries, that can protect telephone consumer privacy by making TCPA violations less economically viable and easier to detect. The research would determine what policies are in place elsewhere, how successful those approaches have been, and whether they can be translated into United States as voluntary carrier commitments or TCPA regulations.

21

This project would also be led by Prof. Schulzrine, whose qualifications are discussed above. The combination of his technical expertise and his understanding of the TCPA regulatory framework makes him uniquely qualified to lead this research. To his knowledge, no one else is doing this kind of policy research.

While I did not include funding this research for first-round funding, it will promote the purposes of the TCPA and benefit the *Krakauer* class by helping enable TCPA regulations to keep up with the evolving practices of illegal telemarketers and robocallers. I recommend second-round funding of this proposal if there are funds available.

### g. NATIONAL ASSOCIATION OF CONSUMER ADVOCATES CHARITABLE FUND INC. (NACA)

**Project Title:** TCPA Education and Advocacy Initiative
**Amount Requested:** $600,000 over four years
**First Round Recommendation:** $450,000 over four years for attorney training and support and advocacy
**Second Round Recommendation:** $150,000 over four years for consumer education
**Project Purpose:** To train consumer protection attorneys on how to represent clients with issues covered by the TCPA, support them in this work, and enable them and their clients to participate in advocacy to protect and strengthen the enforcement of the TCPA.

NACA is an organization with 1600 members from across the United States, almost all of whom are attorneys practicing consumer law. NACA enables its members to do their work effectively by providing them with continuing legal education, a document library, a peer network, and other support.

This award would enable NACA to develop and provide both introductory and advanced TCPA training to its members through webinars and an e-course and to build its document library with resources relevant to the TCPA. These efforts will both increase

22

the number of lawyers available to represent clients with TCPA claims and also increase the quality of that work. Augmenting private enforcement of the TCPA will further the purposes of the TCPA and will benefit the *Krakauer* class.

The advocacy portion of the work would be to collect the stories of their members' consenting clients. They would disseminate these stories to other groups working on TCPA policy advocacy, to the general public as consumer education, and to relevant policy makers. These actual stories will add a narrative of on the ground reality to the larger policy discussions.

I recommend a second-round award of $150,000 to NACA. The third aspect of NACA's proposal is to produce TCPA consumer education videos in English and Spanish for NACA's members to distribute to all of their clients. This broad consumer education would be worthwhile, but NACA is not primarily focused on consumer education, and for that reason I am recommending that this portion of the proposal be funded only if additional funds are available.

### h. ELECTRONIC PRIVACY INFORMATION CENTER (EPIC)

**Project Title:** Telephone Subscriber Privacy Project
**Amount Requested:** $1,000,000 over four years
**First Round Recommendation:** $700,000 over three years
**Second Round Recommendation:** $300,000 for a fourth year
**Project Purpose:** To protect the privacy of telephone subscribers, primarily by working to limit the collection and sale of subscriber telephone numbers and other private data, and by other advocacy efforts to protect and strengthen the TCPA.

EPIC's primary goal is to protect consumer privacy and civil liberties in the information age. This award would enable EPIC both to sustain and expand that work as it relates to the TCPA and to initiate a new project to expose the unregulated growth of

23

the data broker industry which targets telephone subscribers. This growing practice enables increasing numbers of unwanted, illegal telephone calls.

EPIC will hire a legal fellow as a dedicated attorney for this project. This fellow would be on a track to becoming an EPIC staff attorney. The fellow will continue and expand EPIC's work on TCPA *amicus* briefs and advocacy before the FCC, focusing on protected privacy concerns. In the third year, the fellow will be supported by a technologist who will do research on the technology behind the sale of personal data for use in robocalls, and the attorney will do research into policies that can potentially address the problem. This research will be followed by appropriate policy advocacy.

In addition, EPIC will produce digital educational resources for consumers on telemarketing practices focusing on how to protect their privacy and data. These will be housed on EPIC's widely used privacy website.

If there are additional funds, I recommend a second-round award to EPIC of $300,000 for the fourth year of the project. While three years of funding will enable EPIC to hire a legal fellow and begin doing the data brokering research, a fourth year would enable EPIC to proceed further with data brokering initiative.

### i. PUBLIC JUSTICE FOUNDATION (PUBLIC JUSTICE)

**Project Title:** Eliminating Barriers to Consumer Enforcement of the TCPA
**Amount Requested:** $509,046 over four years
**First Round Recommendation:** $369,000 over three years
**Second Round Recommendation:** $140,000 for a fourth year
**Project Purpose:** To protect access to the civil courts by consumers who are the victims of TCPA violations, in order to compensate the victims and to deter future violations.

24

Public Justices has 2,600 members, most of whom are lawyers. It focuses on supporting and co-counseling with these lawyers in cases concerning environmental sustainability, corporate predatory behavior (including invasions of privacy), and civil rights.

These funds would enable Public Justice to hire a lawyer to focus on TCPA impact cases and on other consumer cases that could create barriers to the ability of TCPA victims to enforce the TCPA through the civil courts. Examples of these barriers are expanding implied consent or enforcing hidden mandatory arbitration clauses. Public Justice is unique in that most organizations with consumer lawyers on staff focus on the appellate courts. Public Justice's litigators serve as lead counsel or co-counsel on cases at the trial level when those cases raise issues with the potential to limit victims' access to the courts. They also work on relevant cases in the appellate courts and on *amicus* briefs.

The funds would also be used to write white papers addressing emerging defenses in TCPA litigation, and to provide legal education and consultation to their members on TCPA enforcement and on responding to access limiting legal issues and other defenses.

These activities promote the purposes of the TCPA and benefit the *Krakauer* class by providing representation to TCPA victims and by protecting their future ability to enforce the TCPA through the civil courts.

I recommend a second-round award to Public Justice of $140,000 to enable this project to be implemented for a fourth year. Having four years of secure funding would make it easier for Public Justice to recruit and hire a highly qualified lawyer to engage in TCPA work.

25

### j. UNITED STATES PUBLIC INTEREST RESEACH GROUP EDUCATION FUND (PIRG)

**Project Title:** Research and Advocacy for Carrier Accountability
**Amount Requested:** $250,000 over two years
**First Round Recommendation:** $250,000 over two years
**Project Purpose:** To determine what the major telephone service providers in each state have done to comply with the new STIR/ SHAKEN regulations, 47 CFR § 64.6301, publicize a report on their findings, and educate consumers on what they should expect, with goals to put pressure on providers to comply with the regulations and to encourage voluntary compliance.

PIRG has a long history of investigative reporting that has resulted in protection for consumers. This proposal is to enable PIRG to use its investigative reporting capacity to combat illegal telemarketing and spoofed calls on landlines, cell phones and through VoIP providers.

One of the ways to protect consumers from the invasions and other costs of illegal telemarketing and robocalls is for telephone service carriers to accept responsibility for validating the calls they allow through their systems and for blocking illegal ones before they reach consumers' phones.

This need is addressed by the STIR/SHAKEN standards and regulations, discussed above in part 5.e, *supra*. These regulations require compliance by June 30, 2021. There is evidence that industry is dragging its feet in complying, and many providers are asking for extensions of time to comply. PIRG predicts that many carriers also will be minimally compliant or will exaggerate the extent of their compliance.

PIRG proposes to use the investigative journalism capacity of its staff to determine the compliance with the STIR/SHAKEN regulations by the major telephone service and VoIP providers in every U.S. state. No one else is assembling this information.

26

PIRG would compile this information in a reader-friendly report which they would publicize through traditional and social media and would use the information in guides that they would use to educate consumers. They will also provide the report and underlying data to the coalition of organizations that work to enforce the TCPA.

Requiring and encouraging telephone providers to block calls with spoofed caller IDs will benefit the members of the *Krakauer* class, and increasing compliance with the STIR/SHAKEN regulations will further the purposes of the TCPA.

### k. PUBLIC KNOWLEDGE

**Project Title:** Communications Consumer Privacy Initiative
**Amount Requested:** $102,400 over 4 years
**First Round Recommendation:** $102,400 over 4 years
**Project Purpose:** To protect the privacy rights of communications users by advocating for assertive enforcement and interpretation of TCPA regulations in the face of emerging technologies and marketplace changes, and by cultivating an early career expert in the field.

Public Knowledge is a mission driven think tank that promotes, *inter alia*, protection of consumer security and privacy. Public Knowledge proposes to use its expertise in communications law and technology to advocate before the FCC, working to uphold and strengthen current TCPA regulations, and to cultivate a TCPA expert from within its early career policy staff. The funding would be used to pay a portion of the salary of an early career staffer and a portion of the salary of a supervisory senior staffer who would also engage in TCPA advocacy work.

27

## l. CONSUMER REPORTS, INC. (CR)

**Project Title:** Preserving TCPA and Personal Privacy in the Digital Age
**Amount Requested:** $1,000,000 over two years (see Consumer Reports' Revised Proposal)
**First Round Recommendation:** $1,000,000 over two years
**Project Purpose:** To make it more difficult for data brokers to collect, sell, and share personal consumer information for use by telemarketers to target consumers.

Consumer Reports is a six-million member consumer advocacy organization that directly provides consumers with tools and information they can use to better navigate the marketplace. Unwanted robocalls are one of the top complaints Consumer Reports receives from consumers. The collection, sale, and re-sale of personal data accelerate TCPA violations. CR's proposal has two parts; both support work that will enable consumers to assert a legally enforceable "Do Not Sell My Personal Information" option. The first includes (a) work with a coalition to develop the technical standards for this option, (b) promotion of consumer use of CR's security and privacy planner, which includes personal data protection features, and (c) development of an authorized agent service. This authorized agent service would allow consumers to sign up to permit the authorized agent to opt-out of the sale of the consumer's data by hundreds of companies without the consumer's having to interface with each company separately.

The second part of the proposal is to continue CR's policy advocacy in support of the TCPA. It is currently working to ensure that all technologies currently used to send robocalls are covered by the TCPA's consent requirement. *See* 47 USC § 227(b)(1)(a). The award would also allow CR to broaden its advocacy efforts to expanding and

enforcing privacy protections to stop the sale and misuse of personal data for robocalling and related purposes.

This combination of efforts to educate consumers to protect their own data, to develop systems to enable consumers to do that more efficiently and effectively, and to advocate for laws or regulations requiring companies to honor "Do Not Sell" requests are all important steps towards stemming the ever increasing sale and use of personal data for telemarketing calls that violate of the TCPA.

### m.  CONSUMER FEDERATION OF AMERICA, INC. (CFA)

**Project Title:** Take Back Your Phone!
**Amount Requested:** $122,000 over two years
**First Round Recommendation:** $79,000 over two years for consumer and media outreach
**Second Round Recommendation:** $43,000 over two years for advocacy
**Project Purpose:** To update and enhance the information CFA provides to consumers about their telephone rights and recourse, and to launch a media campaign to promote that information.

The CFA is an association of 250 non-profit consumer groups, some of which are local or regional, and some of which are nationwide. Their strength is the breath of their membership base and the expertise of their staff on consumer protection issues. The lead staff member for this project is a member of the FCC's Consumer Advisory Council. CFA's efforts to protect consumers from fraud led them to work on the TCPA, work that they have pursued because of the TCPA's potential to protect consumers from fraud and nuisance calls in addition to protecting their privacy. CFA provides information to consumers through its member organizations and also through public media campaigns.

29

Funds from this award would enable CFA to update and enhance the guide and infographics about consumer telephone rights and recourse it provides to consumers through the internet and social media. CFA will also launch a public media campaign to promote this information. It will commission a consumer-knowledge survey to demonstrate the need for consumer education on the TCPA and will use the results from the survey to create ready-to-use news articles to distribute to media outlets, and to conduct a radio/ television media tour to promote the information. CFA will also encourage its members to push its telephone consumer rights and recourse guide and infographics out to their constituencies.

If there are additional funds, I recommend a second-round award of $43,000 to CFA. A second aspect of CFA's proposal would provide funds to increase its capacity for policy advocacy to defend and strengthen the TCPA as part of the coalition that engages in this work. This advocacy work is not CFA's primary unique strength, but it is valuable, and a second-round award would be appropriate.

## 6. Other administrative matters:

### a. Application Documentation

    i.    A copy of the organizations' applications and project budgets for the organizations that are recommended to receive *cy pres* awards, as well as tax exemption documents for the two organizations that do not have IRS § 501(c)(3) letters, are contained in the Appendix to this Report, which is being concurrently filed.

30

ii. All original documents submitted by applicants to the Special Master, plus any amended and clarifying documents, are being archived by the Claims Administrator, KCC. The Order of November 6, 2020 (Doc. 594) requires that these documents be archived until January 2, 2025. Because some of the recommended awards provide for funds to be expended over the course of four years, however, I recommend that these documents be archived for five years after all *cy pres* funds in this matter have been distributed.

iii. Public records: The archived documents that are not included in the Appendix include applications from organizations that are not being recommended to receive awards, and non-public financial and other internal information from organizations that are recommended to receive awards. These documents should not become public records, and I recommend that only the Court have access to the archived documents not included in the Appendix unless otherwise ordered.

**b. Award Documentation**

I recommend that each applicant that the Court approves to receive an award be required to sign an Award Agreement before funds are distributed to it. This Award agreement should:

i. State the amount and purpose of the award and the length of time within which it must be spent;

ii. Set out any restrictions on the expenditure of the funds;

31

iii.  Require the awardee's agreement that the funds will be used solely for purposes stated in the award;

iv.  Require the awardee to notify the Court if the primary contact for the award or the contact information for that person has changed; and

v.  Require the awardee to report to the Court when all awarded funds have been expended and to certify that the funds were used for their intended purpose.

## 7. Conclusion

This Court has asked me, as Special Master, to recommend an appropriate *cy pres* recipient or recipients of unclaimed judgment funds in this case. After an application solicitation process which I believe was open and accessible, and consideration of the submitted applications informed by my understanding of best practices in grantmaking, I used my best judgment to select recipients whose proposed projects, individually and collectively, would benefit the *Krakauer* class and further the purposes of the TCPA. The recommended organizations each has the capacity to implement its proposed project(s). I recommend each of them to receive a *cy pres* award.

This 22d day of March, 2021

/s/ Leslie J. Winner
Leslie J. Winner
Special Master

32