IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

THOMAS H. KRAKAUER, on behalf )
of a class of persons, )
)
Plaintiff, )
)
v. ) 1:14-CV-333
)
DISH NETWORK, LLC, )
)
Defendant. )

# MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

The Court must decide what will happen to the unclaimed funds from a final judgment in favor of members of a class who received unwanted and illegal telephone solicitations made on behalf of Dish Network, LLC. The Court previously decided that reversion to Dish and escheat to the states were inappropriate. The Court appointed a special master to help it evaluate potential *cy pres* recipients so that it could make an informed decision between federal escheat and *cy pres*.

The special master filed a final report with recommendations, Doc. 617, and no objections were filed. The special master has identified several potential *cy pres* recipients with new and ongoing projects that would provide substantial benefit to those class members who have not claimed their share of the judgment. These benefits are more targeted to the needs and interests of the class than federal escheat. A *cy pres* distribution along the lines suggested by the special master is appropriate, and the Court will enter a disbursement order to that effect.

## I. Background

At trial, the jury found Dish responsible for 51,119 telephone solicitations to 18,066 residential phone numbers on the Do Not Call Registry in willful violation of the Telephone Consumer Protection Act. Doc. 538 at 1. There are 18,066 class members, many of whom received more than one violative call. The jury awarded $400 per violative call, and the Court trebled this amount for willfulness to arrive at a total judgment in favor of the class of $61,342,800. Doc. 439. The Fourth Circuit affirmed the final judgment, *see* Doc. 509; *Krakauer v. Dish Network, LLC*, 925 F.3d 643 (4th Cir. 2019), and the Supreme Court denied certiorari. Doc. 537.

After approving attorney's fees and costs, Doc. 495, the Court held that attorney's fees and costs would be paid from the judgment as a whole. Doc. 538 at 1–2. After deduction of these fees and costs, each class member will receive $812.99 for each violative call. Doc. 560 at 2–3.

It is a certainty that not all these funds will be successfully disbursed to class members. These undisbursed funds fall into two categories.

First, as the parties have previously agreed, there are 4,869 class members who received 13,235 violative calls but who did not file the required claim form and thus will not receive their part of the judgment.[1] Doc. 578 at 2; Doc. 581 at 2; *see* Doc. 560 at 3–4

---

[1] Of the 18,066 total class members, 11,239 members were identified fully and without contradiction in the existing data. Doc. 560 at 3; *see* Doc. 560-1 (listing these class members). These class members did not have to file claims forms, and their checks will be mailed to last known addresses. The remaining 6,827 class members were subject to a claims process, and only 1,958 valid claims were submitted. *See* Doc. 536 at 1; Doc. 538 at 2; Docs. 560-2, 560-3

2

(finding 13,197 class members who are entitled to payment). This means that just under $10,760,000 in judgment funds, specifically $10,759,922.65, will not be distributed to class members,[2] and the question of what to do with these funds is ready for resolution.

Second, there will be additional undistributed funds available if some class members fail to timely deposit their checks or fail to provide their tax identification number to the claims administrator. This amount will not be known for some time, and no funds in this category are presently ascertainable for distribution. After the claims administrator files the first quarterly report, 210 days after the first checks are issued, Doc. 560 at ¶ 10,[3] the Court will have a better idea of the amount likely to fall in this category of unclaimed judgment funds.

The Court previously ruled out reversion of these unclaimed judgment funds to Dish and escheat to the states. Doc. 590, reported at *Krakauer v. Dish Network, LLC*, No. 1:14-CV-333, 2020 WL 6292991, (M.D.N.C. Oct. 27, 2020). It held open the question of whether such funds should escheat to the federal government or be distributed under the *cy pres* doctrine. *See Krakauer*, 2020 WL 6292991 at *7–8. To assist in answering that question, the Court appointed a special master to identify potential *cy pres*

---

(listing successful claimants). Thus, there are 4,869 unidentified class members who received 13,235 violative calls. At a rate of $812.99 per violative call, this leaves a total of $10,759,922.65 in unclaimed funds. *See also* Doc. 578 at 2 (showing similar calculations).

[2] In past orders, the Court has used a more general approximation of $11,000,000.

[3] The Court ordered disbursement $30,799,312.20 to the claims administrator on February 10, 2021, and ordered the claims administrator to proceed with the class disbursements by February 24, 2021. Doc. 607 at 4–5. The checks will only be good for 180 days after issuance and are thereafter void. Doc. 560 at ¶ 8. Class members who fail to provide relevant tax documents will receive a lesser amount of $595. *Id*. at ¶ 7.

candidates. Doc. 594. The special master's work is now complete, and she has submitted a report describing her selection criteria, notice and application process, and a list of candidates she recommends funding. Doc. 617 at 5–6.

The Court provided the parties with an opportunity to be heard on the special master's report by allowing time for objections in accordance with Federal Rule of Civil Procedure 53(f)(2). Doc. 594 at ¶ 4. No objections were filed.

## II.     Applicable Law

"Most class actions result in some unclaimed funds." *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1307 (9th Cir. 1990). When money has been paid into the federal court to satisfy a judgment, those funds cannot be used for another purpose except by order of the court. *See* 28 U.S.C. § 2042. The decision of how to distribute unclaimed funds falls within the general equitable and discretionary powers of the court. *See Six Mexican Workers*, 904 F.2d at 1307; *Van Gemert v. Boeing Co.*, 739 F.2d 730, 737 (2d Cir. 1984) (noting that distribution of unclaimed class action funds is equitable, requiring the exercise of discretion in light of the particular circumstances).

There are four common ways of distributing unclaimed funds: reversion to the defendant, *pro rata* redistribution to class members who did file claims, escheating funds to the state or federal government, or *cy pres*. *Six Mexican Workers*, 904 F.2d at 1307; *accord* 4 William B. Rubenstein, *Newberg on Class Actions* § 12:28 (5th ed. December 2020 Update). "The district court's choice among distribution options should be guided by the objectives of the underlying statute and the interests of the silent class members." *Six Mexican Workers*, 904 F.2d at 1307; *see also Ira Holtzman, CPA*, *v. Turza*, 728 F.3d

682, 689–90 (7th Cir. 2013) (collecting authorities and noting that "[m]oney not claimed by class members should be used for the class's benefit to the extent that is feasible."). As the Court already decided against reversion, *pro rata* redistribution to the identified class members, and state escheat, *Krakauer*, 2020 WL 6292991 at *7–8, these possibilities will not be discussed further.

The Court has previously discussed the law surrounding *cy pres* distribution and federal escheat at length. *See id.* at *2–4. That discussion is adopted by reference. In summary, *cy pres* allows an organization that suitably represents the interests of or benefits the class members to receive the unclaimed funds. Such distribution to a charity or nonprofit should address the objectives of the underlying statutes, target the plaintiff class, and provide reasonable certainty that class members will benefit. *See id.* at *3 (collecting cases). Escheat has a statutory basis. When funds paid into court to satisfy a judgment have been unclaimed for five years, the court shall "cause such money to be deposited in the Treasury in the name and to the credit of the United States." 28 U.S.C. § 2042. Escheat is appropriate when the court cannot develop an appropriate *cy pres* distribution or otherwise finds *cy pres* to be inappropriate. *Six Mexican Workers*, 904 F.2d at 1308. Contrasted with escheat, *cy pres* funds are "targeted more specifically to the class's interests than when they simply go into the general treasury." 4 Rubenstein, *supra*, § 12:32.

## III. The Special Master's Report and Recommendation

The special master identified twelve organizations with specific projects that address one or more of the objectives of the TCPA and target the interests of the plaintiff

5

class. The special master selected the organizations based on criteria developed from the Court's previous orders and principles of sound grantmaking based on the special master's extensive experience in the field. Doc. 617 at 5. That criteria required:

- Applicants to be a § 501(c)(3) tax exempt organization, a state governmental entity as identified by 47 U.S.C. § 227(e)(6) or (g)(1), or a state university or college.

- Organizations that receive the award to benefit the class through their work on behalf of consumers injured by willful violators of the TCPA, for example by providing direct services, support, research, or advocacy for consumers;

- Funds from the award to be used to further the purposes of the TCPA;

- Applicants to demonstrate their capacity to implement the proposed project, with capacity evaluated, in part, based on their record and experience in the relevant field; and

- Each awardee to agree to certify to the Court, at the end of the award period, that the funds received were used solely for the project described and the purposes stated in its application.

*Id*. at 5–6.

The special master created a notice system and solicited applications. *Id*. at 6. Each applicant was required to complete an application, *id*.; *see* Doc. 617-2, include a budget, and provide proof of tax-exempt status (with some exceptions) and two years of profit and loss statements. *See* Doc. 617 at 6. Some 38 entities from across the country applied, proposing activities that ranged from consumer education and counseling to research, enforcement, and advocacy related to the TCPA. *Id*.

The special master evaluated all the applications and identified twelve organizations appropriate for a *cy pres* distribution. *Id*. at 7. She provided a detailed

6

report with a sensible and reasonable explanation for selecting each individual organization. *Id*. at 13–32. In addition to looking at the applications individually, the special master considered how they collectively fit together to further the purposes of the TCPA and benefit the members of the plaintiff class. *Id*. at 9–12.

The special master recommends two rounds of funding. The first round of proposed funding would distribute $11,042,671 to twelve organizations, as follows:

| Organization Name | Recommendation – First Round |
|---|---:|
| Attorneys General/National Association of Attorneys General | 2,000,000 |
| National Legal Aid and Defender Association | 3,454,238 |
| National Consumer Law Center, Inc. | 1,708,810 |
| San Francisco Consumer Action | 675,000 |
| Columbia University – Technical Research | 254,223 |
| National Association of Consumer Advocates Charitable Fund, Inc. | 450,000 |
| Electronic Privacy Information Center | 700,000 |
| Public Justice Foundation | 369,000 |
| United States Public Interest Research Group Education Fund | 250,000 |
| Public Knowledge | 102,400 |
| Consumer Reports, Inc. | 1,000,000 |
| Consumer Federation of America, Inc. | 79,000 |
| **First Round Total** | **$11,042,671** |

If there are additional unclaimed funds, the special master proposes a second-round distribution of $2,880,038 to some of the same organizations recommended in the first round:

| Organization Name | Recommendation – Second Round |
|---|---:|
| Attorneys General/National Association of Attorneys General | 2,000,000 |
| San Francisco Consumer Action | 75,000 |

| | |
|---|---:|
| Columbia University – Technical Research | 89,708 |
| Columbia University – Policy Research | 82,330 |
| National Association of Consumer Advocates Charitable Fund, Inc. | 150,000 |
| Electronic Privacy Information Center | 300,000 |
| Public Justice Foundation | 140,000 |
| Consumer Federation of America Inc. | 43,000 |
| **Second Round Total** | **$2,880,038** |

The special master recommends that, if needed, all *cy pres* awards should be adjusted *pro rata* in accordance with what is available for distribution. *Id*. at 7.

## IV. Analysis and Discussion

In choosing between a *cy pres* distribution and federal escheat for the unclaimed funds, the Court is guided by the objectives of the underlying statute and the interests of the silent class members. *Six Mexican Workers*, 904 F.2d at 1307; *Holtzman*, 728 F.3d at 689–90. Those objectives and interests are better met by a *cy pres* distribution to the organizations identified by the special master.

Each of these organizations works to address one or more of the objectives of the TCPA and targets the interests of the plaintiff class. *See* Doc. 617 at 13–32. Individually, each organization is well-established with a positive track record. As a group, the selected organizations would use the funds to benefit the class with direct services, enforcement, and consumer education throughout the country. *Id*. at 9. Many of the organizations advocate directly before the FCC and in the courts, *id*. at 10–11, and some proposed projects would address emerging technology and telecommunications trends. *Id*. at 12. A *cy pres* distribution to these organizations provides reasonable certainty that class members will benefit from their work. The proposed projects from

8

these organizations will serve the interests of the class and will strengthen the TCPA's legal framework and safeguards.

Escheat to the federal government, on the other hand, would not necessarily serve the interests of the class, nor would it necessarily strengthen the TCPA's legal framework and safeguards. It is possible that the money could end up directed to TCPA enforcement, to strengthening the Do Not Call Registry, or other purposes focused on reducing unwanted telephone solicitations. But there is no guarantee that would happen, and the money could be spent on unrelated items in the federal budget. A *cy pres* distribution is far more likely to directly benefit the interests of the class and provides greater certainty that the funds will benefit the class than escheating a bulk sum to the federal government that will be budgeted in an unknown way. Escheat also lacks the permanence of *cy pres*, as the relevant federal statute establishes procedures for claimants whose funds have escheated to seek recovery of those funds at a later date. *See* 28 U.S.C. § 2042. This conflicts with the careful claims process established by court order, which included now long-past deadlines. The possibility of a post-litigation claims process in some other forum would undermine legitimate interests in finality.

Because there are excellent *cy pres* options that benefit the interests of the class and support the statutory goals, and those goals would not be met as fully by federal escheat, a *cy pres* distribution is the most appropriate option for the unclaimed funds.

The distribution suggested by the special master is also appropriate. The special master created an impartial and transparent process open to all. Her report is organized and sensible, the recommended projects are directed towards the statutory goals, and the

special master's explanation of why she chose these projects is compelling. The projects have specific budgets for specific work. The recommended distribution is precisely divided and earmarked for a range of projects that will provide the class with a diverse array of benefits related to the TCPA claims underlying the judgment. For the reasons stated in the special master's report, the recommended projects are appropriate for funding by a *cy pres* distribution.[4]

The amount presently available, $10,759,922.65, *see supra* note 1, is about $300,000 less than the initial $11,042,671 suggested by the special master for the first round of *cy pres* distributions. Out of an abundance of caution directed at ensuring the Court only disburses available funds, the Court will order immediate disbursement of $10,550,000.

The special master suggests a *pro rata* distribution among the 12 entities, and that is certainly a reasonable approach. But there are a few shorter-term and smaller projects where a reduction might prevent the projects from beginning, and a strictly *pro rata* distribution is more complicated than perhaps is necessary. The Court has considered multiple alternatives and concludes that the simplest approach is to make *cy pres* distributions in the full recommended amount to each of the 12 programs except one,

---

[4] There were no objections to the special master's report, so *de novo* review is not required. *See* Fed. R. Civ. P. 53(f)(3) (requiring the district court to "decide de novo all objections to findings of fact recommended by a master"); *Quantum Sail Design Group, LLC v. Jannie Reuvers Sails, Ltd.*, 827 Fed. App'x 485, 494 (6th Cir. 2020) ("[T]he district court was only required to review *de novo* any objections to the Master's Report."). Nonetheless, the Court has evaluated the recommendations carefully and thoroughly at an equivalent level of review, in light of its fiduciary responsibilities to the class.

10

with the expectation that this one program will receive the remainder of the recommended amount if and when it becomes clear that there are additional funds available for *cy pres* distribution. The math is simpler, and the number of disbursements required of the Clerk will be fewer.

Upon review and consideration of all the projects, it appears that the NLADA project will be least impacted by a slight delay, as it anticipates using most of a *cy pres* distribution for grants over the course of four years. The reduction will still result in an immediate and quite large distribution and should not delay any grant funding at the end of the day.

The Court will enter a separate order disbursing unclaimed funds as follows:

| Organization Name | Recommendation | Cy Pres Distribution |
|---|---|---|
| Attorneys General/National Association of Attorneys General | 2,000,000 | 2,000,000 |
| National Legal Aid and Defender Association | 3,454,238 | 2,961,567 |
| National Consumer Law Center, Inc. | 1,708,810 | 1,708,810 |
| San Francisco Consumer Action | 675,000 | 675,000 |
| Columbia University – Technical Research | 254,223 | 254,223 |
| National Association of Consumer Advocates Charitable Fund, Inc. | 450,000 | 450,000 |
| Electronic Privacy Information Center | 700,000 | 700,000 |
| Public Justice Foundation | 369,000 | 369,000 |
| United States Public Interest Research Group Education Fund | 250,000 | 250,000 |
| Public Knowledge | 102,400 | 102,400 |
| Consumer Reports, Inc. | 1,000,000 | 1,000,000 |
| Consumer Federation of America, Inc. | 79,000 | 79,000 |
| **Total Distribution** | **$11,042,671** | **$10,550,000** |

The Court anticipates that once the amount of unclaimed funds from uncashed checks becomes clear, it will immediately award $492,671 to NLADA so it can complete the projects recommended by the special master for first round distribution, assuming that amount is available. If additional funds are available, the Court expects to distribute them in the amounts suggested by the special master for second round distribution.

## V. Housekeeping Matters.

The Court will enter a separate order disbursing the funds in the above amounts, as time permits. For transparency and accountability purposes, the Court will also require as a condition of the distribution that each *cy pres* beneficiary: (1) agree to spend the funds in the manner proposed in the application submitted to the special master, (2) file on the public docket an annual report confirming that use and explaining in summary fashion how the distributed *cy pres* funds were spent during the previous year, and (3) otherwise agree to answer the Court's questions about the spending of the money.

## VI. Conclusion

*Cy pres* distribution of the unclaimed judgment funds is appropriate and provides the clearest and most direct benefit to the class members. The special master's recommendations are the product of a careful, impartial, and in-depth selection process and the recommended groups will use the funds in appropriate ways. A disbursement order will be entered distributing $10,550,000 to the 12 groups identified by the special master in the amounts set forth herein.

It is **ORDERED** that the plaintiff's motion for entry of an order governing disposition of undisbursed class funds, Doc. 577, is **GRANTED** in part; all unclaimed

12

judgment funds will be disbursed to *cy pres* recipients; $10,550,000 will be disbursed shortly by separate order to recipients recommended by the special master in the amounts stated herein; and additional unclaimed judgment funds, if any, will be disbursed to appropriate *cy pres* recipients by later orders after the amounts become known and settled.

This the 29th day of April, 2021.

_____
UNITED STATES DISTRICT JUDGE

13