THOMAS KRAKAUER,
on behalf of a class of persons,

        Plaintiff,

  v.

DISH NETWORK L.L.C.,

        Defendant.

**Civil Action No. 1:14-cv-00333-CCE-JEP**

### DECLARATION OF DEREK SMITH REGARDING SUPPLEMENTAL 2025 CY PRES ANNUAL REPORTS

I, Derek Smith, declare as follows pursuant to Paragraph 10 of the Court's Supplemental Cy Pres Disbursement Order ("Order") (Docket No. 683):

1.    I am a Director of Settlement Administration at Verita Global LLC, formerly KCC Class Action Services, LLC ("KCC"). My business address is 1 McInnis Parkway, Suite 250, San Rafael, California 94903. I am familiar with, and have personal knowledge of, the matters stated in this declaration and am competent to testify about them if called upon to do so.

2.    KCC has received the supplemental annual reports for expenditures in 2025 from each of the seven cy pres beneficiaries whose original reports showed incomplete spending of the 2025 payment amounts. True and correct copies of the supplemental reports are attached hereto as Exhibit A.

3.      Through April 30, 2026, one cy pres beneficiary reported unspent amounts from the 2025 payments. The National Association of Attorneys General reported an unspent amount of $172,742.76 and stated that it will return the amount to the Fund.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29th day of May 2026.

DEREK SMITH

Director of Settlement Administration,
Verita Global LLC

# EXHIBIT A

# Krakauer Cy Press Report

Columbia University - May 2026

### Expenditures

We expended all funds ($52,543 direct costs, $15,763 indirect costs).

### Funded Activities

During the spring 2026 semester, 9 Masters (Computer Science) students, one Associate Research Scientist, and the PI contributed to the project.

We worked on solutions for two of the principal vectors for fraud: email phishing, including business email compromise, and preventing fraudulent voice calls, particularly for vulnerable populations.

The email project was split into three sub-projects. *Email Guardian* is a skill-based LLM-orchestrated architecture for low-false-positive email phishing detection. Email Guardian is designed around a simple deployment principle: in a false-positive-sensitive setting, the large language model should not betheprimaryphishingclassifier. Instead, the system should expose explicit evidence-producing skills, route among them through a model scheduler, and allow LLM intervention only under tight guardrails. Email Guardian implements that design as a skill-based architecture over a local Model Context Protocol (MCP) server. The skill library includes Rspamd scanning, header authentication analysis, a calibrated content model, URL reputation checks, urgency detection, scam indicators, spam-campaign detectors, error-pattern memory, IMAP-based mailbox binding and monitoring, and a guarded review skill.

The second sub-project developed MAESTRO (Multi-Agent Email Security via Reinforcement Orchestration).

The third sub-project created a data set combining all known phishing email collections, and added recent examples of phishing emails.

The voice-over-IP project created a functional prototype that provides an adaptive call screening system suited for vulnerable populations. Phone-based scam and spam concentrate their largest per-incident losses on older adults, and although mandatory STIR/SHAKEN deployment under the TRACED Act now signs roughly 70% of US calls, the protocol attests only who signed a call and not whether the content is legitimate: a compliant scam carrier can sign every scam call at attestation level A. The project created a proof-of-concept VoIP screening prototype, designed for households with vulnerable residents. It routes inbound calls on the cross product of three independent trust signals (caller-number tier, signer tier, and attestation level) through an ordered first-match rule ladder. For example, calls from medical or other trusted callers, based on government provider databases, callers who know a secret numeric code (e.g., caretakers and relatives), and previous contacts are permitted, while unknown callers are required to state their intent. A machine learning model then analyzes the content and either rings the phone or escalates the call to a trusted third party, e.g., a monitoring service or family

member. The figures below illustrate the call treatment steps and the audio feature and text extraction. We have demonstrated live calls from a regular phone, using a commercial voice-over-IP provider.



The email prototypes are close to deployable. We will continue to develop the voice prototype during the summer to facilitate the creation of a dynamic trusted caller list.

Henning Schulzrinne



May 15, 2026

Derek F. Smith
Director
Settlement Administration
One McInnis Pkwy, Suite 250 | San Rafael, CA 94903

Re: Krakauer Settlement Funds

Dear Mr. Smith:

Pursuant to the award of *cy pres* funds in the Krakauer class action settlement, the Consumer Federation of America was awarded $79,000 over a two-year period ($39,500 each year) to further the purpose of this important case. This report provides a summary description of the work performed from 12/15/25-4/31/26. CFA has now expended all of the *cy pres* funds from the Krakauer class action settlement.

Our original proposal was entitled "Take Back Your Phone," the purpose of which is to increase CFA's capacity to advocate to strengthen the Telephone Consumer Protection Act (TCPA) and defend it from attempts to weaken it, to enable CFA to update and enhance the information it provides for consumers about their telephone rights and recourse, and to launch a new campaign to promote that information. The steps we identified in the proposal were to increase staff that are engaged in TCPA advocacy, update educational materials for consumers, and place those materials on CFA's website along with accompanying marketing materials to promote the content.

Between 12/15/25 and 04/31/26, CFA's Director of Artificial Intelligence and Privacy, Ben Winters, has continued to dedicate time to defend the TCPA and robocall protections from a hostile administration and to encourage Congress and states to adopt stronger protections. Unfortunately, the FCC has become more focused on deregulatory efforts and censorship, threats to broadcast licenses, and attempts at social media regulation, efforts that are not traditionally within the scope of the FCC's work. However, Mr. Winters has continued to engage in extensive advocacy efforts to crack down on the use of artificial intelligence to facilitate scam robocalls and robotexts, working with both state and federal legislators, participating in educational opportunities, and advocating to relevant federal agencies. This includes working with and endorsing a bicameral bill to crack down on illegal robocalls, which would implement many of the TCPA strengthening protections CFA continues to advocate for. We also worked on comments on a proposed FCC rule as well as reply comments with a coalition of consumer protection organizations to call on the commission to improve the current rules around the TCPA and help people get protections from robocalls.

Mr. Winters, along with our Communications Director Nicholas Rubando and Research Associate Ethan Weiland, worked to publish "The True Cost of Scams," a large report featuring a data analysis

of how much money Americans are really losing to fraud and scams, which is directly relevant to and stemmed from the TCPA. The report concluded that the number was nearly $120 billion in 2024. As part of this report rollout, Mr. Winters and Mr. Rubando were able to speak to media, at events, and others in order to disseminate the urgent need to improve the current policy landscape to protect people against scams.

In terms of additional direct-to-consumer educational materials about limiting losses and bad scam outcomes, CFA used the funds to format and design information which will be published when we launch our new website in June 2026.

If you need any further information, please do not hesitate to ask.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Sincerely,

Susan Weinstock
President and CEO
Executed on May 19, 2026



**Electronic Privacy Information Center**
1519 New Hampshire Avenue NW
Washington, DC 20036, USA



📞 +1 202 483 1140
🖨 +1 202 483 1248
🐦 @EPICPrivacy
🌐 https://epic.org

**Funding Update for *Cy Pres* Funds From**

*Krakauker v. Dish Network, LLC*

**Electronic Privacy Information Center (EPIC)**
**Washington, DC**

**May 2026**

### CONTACT INFORMATION

Alan Butler, Executive Director
John Davisson, Deputy Director

Electronic Privacy Information Center (EPIC)
1519 New Hampshire Avenue NW
Washington, DC 20036
+1 202 483 1140 x103 (office)
butler@epic.org
davisson@epic.org

### AWARD EXPENDITURES

EPIC received a disbursement of its award in the amount of $276,000 on January 2, 2025. This supplemental report covers the expenditures related to EPIC's activities in 2025 funded in part by this award. EPIC's total organizational expenses for 2025 were $3,429,826. As of October 31, 2025, EPIC had spent $204,005.45 on staff payroll expenses (including salaries, pension, and payroll taxes) for time allocated to the EPIC Telephone Subscriber Privacy Project. These expenditures were summarized in the report that was provided to the Court in December 2025.

We are now providing a supplemental report, per the Court's order, confirming that we have spent the remaining $72,000 from the 2025 distribution on the EPIC Telephone Subscriber Privacy Project.

The attached "EPIC TSPP Nov-Dec 2025 Expenditures," summarizes the amount spent on salaries, pension, and payroll tax for the month of November and December 2025. The report also summarizes the amounts spent on "allocated benefits" and "other allocated expenses" during the entire fiscal year of 2025; these amounts were calculated following closure of FY2025. This report confirms that EPIC spent a total of $339,433.94 on the Telephone Subscriber Privacy Project in 2025, with $276,000 of support from the award in *Krakauer v. Dish Network, LLC*. The supplemental report identifies the $44,960.51 in Nov. and Dec. payroll expenses and the $90,473.43 full-year allocated shared expenses. The prior report identifies the $204,005.45 in payroll expenses from Jan. – Oct. of 2025.

**P r i v a c y   i s   a   F u n d a m e n t a l   R i g h t .**

|                                         | Nov - Dec 25 |
|-----------------------------------------|-------------:|
| **Ordinary Income/Expense**             |              |
| **Expense**                             |              |
| 6120 · S/C's, Donation and Wire Fees    | 2,322.48     |
| 6150 · Depreciation Expense             | 11,003.60    |
| 6160 · Dues and Subscriptions           | 5,162.01     |
| 6170 · Books and Periodicals            | 12.61        |
| 6180 · Insurance - Workers Comp         | 482.28       |
| 6181 · Medical Insurance                | 30,986.38    |
| 6183 · Insurance - Liability            | 1,516.83     |
| 6190 · Interest Expense                 |              |
| 6191 · Finance Charge                   | 183.18       |
| 6193 · Mortgage Interest                | 6,576.69     |
| Total 6190 · Interest Expense           | 6,759.87     |
| 6230 · Licenses and Permits             | 1,573.59     |
| 6270 · Professional Fees                |              |
| 6271 · Accounting                       | 9,438.64     |
| 6275 · WEBSITE                          | 1,174.98     |
| Total 6270 · Professional Fees          | 10,613.62    |
| 6255 · Postage and Delivery             | 617.80       |
| 6265 · Printing and Reproduction        | 941.35       |
| 6350 · Communications                   |              |
| 6351 · Telephone                        | 1,117.72     |
| 6352 · Internet Service                 | 1,162.43     |
| Total 6350 · Communications             | 2,280.15     |
| 6380 · Repairs                          |              |
| 6383 · Building Repairs                 | 782.70       |
| Total 6380 · Repairs                    | 782.70       |
| 6384 · Cleaning - Office                | 1,304.41     |
| 6390 · Utilities                        |              |
| 6391 · Gas and Electric                 | 1,224.50     |
| 6392 · Water                            | 91.07        |
| Total 6390 · Utilities                  | 1,315.57     |
| 6395 · Property Tax                     | 3,976.04     |
| 6560 · Salaries                         | 40,739.79    |
| 6570 · Pension                          | 1,072.10     |
| 6355 · Conferences and travel           |              |
| 6375 · Meals                            | 2,044.74     |
| 6365 · Meetings                         | 554.00       |
| 6385 · Travel                           | 1,839.51     |
| Total 6355 · Conferences and travel     | 4,438.25     |
| 6393 · Trash                            | 490.82       |
| 6565 · Payroll Taxes                    | 3,148.62     |
| 6580 · Benefits                         |              |
| 6582 · Metro                            | 105.03       |
| 6581 · Health club                      | 2,007.03     |
| Total 6580 · Benefits                   | 2,112.06     |

Case 1:14-cv-00333-CCE-JEP    Document 695    Filed 05/29/26    Page 9 of 22

| | Nov - Dec 25 |
|---|---|
| 6771 · Supplies -Office/Other | 1,090.72 |
| 6780 · Marketing | 118.06 |
| 6900 · Miscellaneous | 572.23 |
| Total Expense | 135,433.94 |
| Net Ordinary Income | (135,433.94) |
| Net Income | (135,433.94) |

Case 1:14-cv-00333-CCE-JEP    Document 695    Filed 05/29/26    Page 10 of 22



# NATIONAL ASSOCIATION OF ATTORNEYS GENERAL

PRESIDENT
**William Tong**
Connecticut
Attorney General

PRESIDENT-ELECT
**Marty Jackley**
South Dakota
Attorney General

VICE PRESIDENT
**Brian Schwalb**
District of Columbia
Attorney General

IMMEDIATE PAST PRESIDENT
**John Formella**
New Hampshire
Attorney General

**Brian Kane**
Executive Director

1850 M Street NW
12th Floor
Washington, DC 20036
(202) 326-6000
www.naag.org

**May 13, 2026**

**Mr. Derek F. Smith**
Director, Class Action Services
**KCC**
1 McInnis Pkwy, Suite 250
San Rafael, CA 94903

Sent via email to: [Derek.Smith@kccllc.com](mailto:Derek.Smith@kccllc.com)

Re: *Krakauer v. Dish Network*, Report of National Association of Attorneys General

Dear Mr. Smith:

As required by the Court's Amended Disbursement Order, Doc. 674, and Supplemental *Cy Pres* Disbursement Order, Doc. 683, the following Supplemental Report is submitted on behalf of the National Association of Attorneys General (NAAG). This report is submitted under oath.

Amount of 2025 Funds Spent

NAAG received funding from the Claims Administrator for 2025. Those funds were deposited into the Telemarketing and Robocall Fund ("Fund"), a segregated account in accordance with the requirements of the Court's orders. Of the 2025 $500,000 award, we spent $322,257.24 in support of the state attorneys general anti-robocall, messaging, and telemarketing efforts and development of an in-person multistate training and conference event. NAAG assessed an administrative fee of 1% ($5,000) for managing the fund. As a result, we will be returning the remaining $172,742.76 to the Administrator in accordance with the Court's order.

How the 2025 Funds Were Spent

The National Association of Attorneys General Consolidated Consumer Protection and Charities Funds Committee ("Funds Committee") oversees the *Cy Pres* award which is held in the Telemarketing and Robocall Fund ("Fund"). Six attorneys general

make up the bipartisan Funds Committee. The Funds Committee provides grants that support the work of the attorneys general. Consistent with the Court's Order, the Fund may be used to enable state attorneys general to work collaboratively on multistate efforts to investigate and litigate violations of the TCPA, such as licensing technology that no one state could afford, including analytical tools and databases, training, to hire experts, and to pay investigation and litigation expenses. The Fund may also be used to provide training for AGO staff regarding robocall investigations and TCP enforcement, and travel for training and conferences related to robocall and telemarketing enforcement

The Anti-Robocall Multistate Litigation Task Force is a 51-member group (50 states + DC) of State Attorneys General formed in 2022 to examine industry-wide Traceback data to identify the most prolific VoIP Providers contributing to the high volume of robocall traffic both entering and originating within the U.S. The Task Force is focused on actively investigating and pursuing enforcement actions against various entities in the robocall ecosystem that are identified as being responsible for significant volumes of illegal and fraudulent robocall, telemarketing, and messaging traffic routed into and across the country.

As described below, attorneys general have been active working on robocall-related matters during 2025, and the expectation is that this work will be a continuing priority for attorneys general for the foreseeable future. The availability of the *Dish cy pres* funds will be a crucial resource to enable them to continue this important work.

In the last year, state attorneys general have been working on robocall-related concerns including the following:

In 2024, the Task Force worked to resolve investigations against an initial group of voice service provider targets. After working with experts on data analyses, the Task Force has issued several public-facing Notice letters, the last two batches in coordination with the Federal Communications Commission, which identify conduct likely violative of federal and state statutes, including the TCPA (https://ncdoj.gov/protecting-consumers/telephones-telemarketing/fighting-robocalls/warning-notices/). In 2025, the Task Force issued over 50 Notice letters to voice service providers, and 37 downstream voice service providers were notified that they were carrying call traffic highlighted in the Notice letters. Other investigations are not currently facing public.

Litigation against AZ-based Avid Telecom: This multistate action, State of AZ et al. v. Michael Lansky, dba Avid Telecom, et al., Case No. 4:23-cv-00233 (D. Ariz. 2023) was brought in AZ federal district court in May 2023 by 49 AGs against a VoIP provider and its principals. Defendants served as a gateway provider for billions of foreign-originated robocalls, provided robocallers with the technology needed to circumvent regulations, and ignored persistent and compounding notices from customers and authorities about illegal traffic. Data analyses of billions of call detail records were conducted to identify, among other things, violations of the TCPA. A case management plan was issued by the Court December 10, 2024, discovery has been ongoing with the assistance of experts on this

2

technologically complex issue. The court recently amended its scheduling order, setting the dispositive motion deadline for April 13, 2026. Defendants recently filed their Consolidated Motion for Summary Judgment.

Litigation against TX-based robocaller Spiller and FL-based call center/lead generator: This multistate action, State of Texas, et al. v Rising Eagle Capital Group, LLC, et al., Case No. 4:20-cv-2021 (S.D. Tex. 2020), was brought in TX federal district court in 2020 by 8 states against an originating robocall provider of health insurance campaigns and auto warranty campaigns and the call center/lead generator responsible for creating and initiating the health insurance call campaigns. By August 2023, the litigation was resolved by agreement as to all defendants. Because the primary defendant John Spiller violated the injunctive terms of his March 2023 stipulated order by starting several other VoIP providers, in March 2024, Plaintiff States filed motions requesting that Spiller be found in civil contempt for violating the permanent injunction entered against him one year prior, and ordering that the monetary judgment for statutory damages and civil penalties in the amount of $122,339,320 is no longer suspended and is immediately due. In May 2025, the court issued a ruling permanently barring robocall scammer John Spiller from operating in the telecommunications industry and ordering him to pay more than $600,000 in costs and attorney's fees for violating the court's order that North Carolina won against Spiller in March 2023

The NAAG Funds Committee approved a grant request by the Anti-Robocall Task Force for up to $495,000 ($500,000 less $5,000 for NAAG's administrative fee for managing the grant) from the Telemarketing and Robocall Fund. North Carolina Attorney General Jeff Jackson and Ohio Attorney General Dave Yost submitted the bipartisan grant request for funding to support the Robocall Task Force. If the Court continues to award NAAG the *Dish cy pres* as per the distribution schedule, the Fund Committee approved ongoing grants to support the Task Force's work each year of up to $250,000 through 2028. Additional investigation and litigation target- specific funds may be requested in the future.

The Robocall Task Force's grant request to the Fund Committee for up to $495,000 from the 2025 *Cy Pres* award was approved to cover costs and services related to investigation and litigation and consistent with the Fund's purposes. The Task Force grant funds pay for data analysts and other experts, for industry subscription services and tools that support investigation, and services that provide the storage and additional analysis of data sets, such as monthly storage on Everlaw and use of Everlaw's data tools. Miscellaneous costs included reimbursement of *pro hac vice* court fees, travel and lodging expenses for investigation and litigation, registration fees and costs for certain in-person training sessions and target-related meetings that further the work of multistate work. The bipartisan Task Force Leadership and/or its Executive Committee determines the targets, investigations, tools, and training necessary to meet the Task Force priorities.

The Robocall Task Force grant provided for repayment of $238,829.41 to the Financial Services Fund for Task Force investigation and litigation costs incurred prior to December 31, 2025. The administrative reorganization within NAAG in 2024, including the

3

reorganization of fund committees, did not permit the 2024 *Cy Pres* funds disbursed to NAAG to be made available for state attorneys general use in 2024. For the Robocall Task Force to continue its work during the interim, Task Force funding was supported by other NAAG grant funds. Thus, the Robocall Task Force requested the 2025 award be used to reimburse NAAG's other funds for the Robocall Task Force's expenses. The Funds Committee also approved the grant funding for the ongoing investigation and litigation, some of which were incurred in 2025, but were reimbursed or paid from January 1 to April 30, 2026, to be paid from the 2025 Cy Pres award. From January 1, 2026 – April 30, 2026, the Robocall Task Force expended 45,120.55

In the Fall of 2025, the Robocall Task Force and the NAAG Center for Consumer Protection began planning an in-person national Anti-Robocall Summit. The last in-person robocall conference was in 2022. The Summit planning committee, made up of leaders of the Task Force, solicited proposed topics, and has worked diligently to develop an engaging agenda. NAAG provided the Task Force with a proposed budget based on the data available from the last in-person Summit. The Summit budget provides for one scholarship per state attorney general office to travel to the Summit, lodging, meals, and per diem. It also budgeted scholarships for government speakers and experts who otherwise could not attend. NAAG agreed to provide logistical and programming support for the Summit if the Robocall Task Force was able to get grant funding approved. The projected budget of $177,023 anticipates a small offset through registration fees revenue. NAAG entered a contract on January 30, 2026 for the Summit venue in Asheville, North Carolina for lodging, conference rooms, and meals for $38,307.28 and NAAG has agreed to front the additional costs of the 2026 conference and then seek reimbursement from the Fund from the 2026 award.

The Summit agenda topics include VoIP provider liability, pursuit of third-party facilitators, updates on recent robocall case law post *McLaughlin* and *Loper Bright*, as well as in depth sessions on mastering the Industry Traceback Group Portal, ZipDX's RRAPTOR, and YouMail Protective Services. The public half day of the conference includes industry and federal partners for sessions on Know Your Customer, Know Your Traffic, and Know Your Upstream Providers.

Because not all the 2025 *Dish Cy Pres* award was spent, NAAG is returning unspent funds to the Administrator. Following the conclusion of the distribution schedule outlined in the Court's Order 683, it is the expectation that these funds will be returned NAAG to continue to support the ongoing anti-robocall work of the attorneys general.

| | | |
|---|---|---|
| 2025 Cy Pres | $ 500,000.00 | |
| FSF Grant No. 40043 Repayment | | $238,829.41 |
| Robocall Task Force Costs Grant Nos. 40043 and 40062 (1/1/2026 - 4/40/2026) | | $45,120.55 |
| Robocall Summit/ Hotel Contract | | $ 38,307.28 |
| Total Expenditures | | $ 322,257.24 |
| | | |

4

| NAAG Administrative Fee | | $ 5,000.00 |
|---|---|---|
| | | $ 172,742.76 |
| Uncommitted Fund | $ 172,742.76 | |

Please contact me if you have any questions or need additional information.

Sincerely,

Kate Donoven
Director, Center for Consumer Protection
kdonoven@naag.org

5



**Supplemental Report to Claims Administrator for Year 2**
**Krakauer v. DISH Network, L.L.C.,**
**United States District Court for the Middle District of North Carolina,**
**No. 1:14-CV-333**

The National Legal Aid and Defender Association (NLADA) was awarded $5,906,420 over four years to support a National Telephone Abuse Prevention Project (NTAPP). NLADA submitted its Year 2 report describing how the funds distributed to legal aid programs advance consumer protection efforts across the country. This supplemental report documents NLADA's activities and spending of the $35,047.67 remaining as of December 15, 2025 from the total $1,476,605.00 *cy pres* award received in 2025.

As described in NLADA's 2025 report submitted December 14, 2025, NTAPP is a nationwide legal services initiative aimed at protecting low-income consumers from abusive debt collection and telemarketing calls that violate the Telephone Consumer Protection Act (TCPA). NLADA, in partnership with the National Consumer Law Center (NCLC), the National Association of Consumer Advocates (NACA) is coordinating a network of 28 geographically diverse legal aid providers located in all regions of the United States to protect low-income consumers from violations of the TCPA. The *cy pres* award is funding consumer protection work including client representation, community education, advocacy and professional training and development related to NTAPP. NTAPP activities include legal services that build and sustain the capacity to protect low-income consumers from scams, telemarketing and abuse debt collection that violate the Telephone Consumer Protection Act, including the causes and consequences of these practices.

Following a successful launch of NTAPP in 2024, NLADA established ongoing collaboration, resource sharing, and strategizing among the participating programs throughout 2025. In particular, staff at NTAPP programs regularly participate in virtual monthly convenings, and almost all of the programs send staff to the Consumer Rights Litigation Conference (CRLC) in the fall with support from NLADA. The $35,047.67 remaining at the time NLADA submitted its Year 2 report were spent in support of the following activities by December 31, 2025:

- $16,496.93 to reimburse programs for travel to CRLC

- $5,967 to reimburse programs for registration at CRLC

- $12,583.74 on staff compensation to administer NTAPP

As discussed in the Year 2 report, NLADA is using NTAPP funding to intentionally expand the national network of consumer advocates in legal services to facilitate increased collaboration. The annual national Consumer Rights Litigation Conference serves as an invaluable opportunity to convene in person and discuss substantive strategy. The NTAPP online community – including a listserv, resource hub, and virtual meetings – builds relationships between new and experienced attorneys, as well as connects advocates from different regions or who have expertise on various substantive issues. The forum also supports identifying and responding to nationwide trends such as



the problem of "sewer service," where debt collectors falsely claim to have properly served a defendant but in fact do not. Finally, the robust partnership NLADA enjoys with the National Consumer Law Center, and the National Association of Consumer Advocates affords NTAPP programs unparalleled access to experts and professional development opportunities.

As described in this report, NLADA spent all of the 2025 NTAPP funds by December 31, 2025 and appreciates the ongoing ability to use NTAPP funds to support legal services to protect consumers across the country.

Sworn Statement

I hereby declare under oath that the above report is a true and accurate summary of how the National Legal Aid and Defender Association utilized the remainder of its 2025 funds in accordance with its proposed project to the best of my knowledge and belief.

_Anne K Sweeney_

Anne K. Sweeney, Chief, Legal Services
National Legal Aid & Defender Association

_May 15, 2026_

Date



# consumeraction

May 15, 2026

Mr. Derek F. Smith, Director
Settlement Administration
One McInnis Parkway, Suite 250
San Rafael, CA 94903

Dear Mr. Smith,

As required by Order 683, below is our supplemental report regarding the use of the previously reported unspent funds of $70,780.31 related to the Krakauer vs. Dish case. I've also attached a financial statement.

Since our last report submitted in December 2025, our community outreach team conducted 14 in-person multilingual (English/Spanish/Chinese) train-the-trainer sessions and consumer education workshops on the Telephone Consumer Protection Act and consumer privacy. These events were attended by representatives of community-based organizations, small business representatives, and individual consumers.

We also participated as panelist on California Department of Financial Protection and Innovation's "2026 Financial Literacy Month Resource Webinar: Spring Clean Your Finances" where we presented on how consumers can protect themselves from scams and avoid unwanted calls and robocalls using tips from Consumer Action's TCPA project educational materials.

In addition, we hosted 2 webinars for community-based organizations on the TCPA, robocalls and protecting consumer privacy and posted them on our website and YouTube channel for post-event viewing.

As previously reported, we continue to provide mini-grants to selected community-based organizations who attend our train-the-trainers to encourage them to hold workshops for the communities they serve. This grant program has continued to be successful in encouraging local direct service providers to educate low-income, multilingual and underserved consumers about their rights under TCPA and how to protect their personal information.

We produced three new educational videos and launched a new section on our website's homepage connecting users with our multilingual educational materials and the new videos -- Stop Unwanted Calls & Texts | Consumer Action. We also participated in several print and television media interviews including California Skylink 38.2 Chinese television interview, Sing Tao Chinese Radio AM 1450 interview, World Journal Chinese print article, and San Francisco's KTSF Television Channel 26 interview.

In terms of our advocacy work, we continue to monitor and comment on TCPA and privacy related regulatory and legislative activity on the federal and state level to ensure consumer rights are not eroded and current protections remain in place, if not strengthened.

I'm available to answer any questions you may have about this report and related activities.

Best,

Anna Flores
Executive Director

# Consumer Action
# Statement of Activity by Class
### May 2025 - March 2026

| | Programs | DISH-Cy Pres | Total Programs | TOTAL |
|---|---|---|---|---|
| **Revenue** | | | | |
| 43405 Cy Pres Awards | | 177,263.31 | 177,263.31 | 177,263.31 |
| **Total Revenue** | $ 0.00 | $ 177,263.31 | $ 177,263.31 | $ 177,263.31 |
| **Gross Profit** | $ 0.00 | $ 177,263.31 | $ 177,263.31 | $ 177,263.31 |
| **Expenditures** | | | | |
| 50500 COMPENSATION | | | 0.00 | 0.00 |
| 50507 Salaries | | 122,542.56 | 122,542.56 | 122,542.56 |
| 50514 Payroll Taxes | | 9,857.62 | 9,857.62 | 9,857.62 |
| 50535 Employment Benefits | | 14,744.03 | 14,744.03 | 14,744.03 |
| 50536 Payroll Processing Fees | | 333.62 | 333.62 | 333.62 |
| 50537 Workers Compensation | | 340.65 | 340.65 | 340.65 |
| **Total 50500 COMPENSATION** | $ 0.00 | $ 147,818.48 | $ 147,818.48 | $ 147,818.48 |
| 50505 Equipment & Depreciation | | 416.12 | 416.12 | 416.12 |
| 50510 Dues, Fees & Misc. | | 348.83 | 348.83 | 348.83 |
| 50511 Bank Charges and Fees | | 39.80 | 39.80 | 39.80 |
| 50515 Audit & Accounting | | 4,389.23 | 4,389.23 | 4,389.23 |
| 50520 Legal and Consultants | | 2,290.49 | 2,290.49 | 2,290.49 |
| 50545 Insurance | | 1,230.46 | 1,230.46 | 1,230.46 |
| 50560 Rent & Parking | | 1,450.41 | 1,450.41 | 1,450.41 |
| 50570 Postage & Shipping | | 1,190.23 | 1,190.23 | 1,190.23 |
| 50575 Printing & Copying | | 2,467.17 | 2,467.17 | 2,467.17 |
| 50590 Supplies | | 612.27 | 612.27 | 612.27 |
| 50595 Telephones | | 1,098.32 | 1,098.32 | 1,098.32 |
| 50600 Translations | | 6,583.44 | 6,583.44 | 6,583.44 |
| 50610 Travel | | 3,340.40 | 3,340.40 | 3,340.40 |
| 50611 Travel - Meals | | 463.23 | 463.23 | 463.23 |
| **Total 50610 Travel** | $ 0.00 | $ 3,803.63 | $ 3,803.63 | $ 3,803.63 |
| 50615 Conference Expenses | | 249.04 | 249.04 | 249.04 |
| 50626 Computer Services | | 3,328.27 | 3,328.27 | 3,328.27 |
| 50635 Stipends | | 6,100.00 | 6,100.00 | 6,100.00 |
| 60300 Awards and Grants | | 24,000.00 | 24,000.00 | 24,000.00 |
| 68300 Meetings & Event Expenses | | 6,867.78 | 6,867.78 | 6,867.78 |
| **Total Expenditures** | $ 0.00 | $ 214,283.97 | $ 214,283.97 | $ 214,283.97 |
| **Net Operating Revenue** | $ 0.00 | -$ 37,020.66 | -$ 37,020.66 | -$ 37,020.66 |
| **Net Revenue** | $ 0.00 | -$ 37,020.66 | -$ 37,020.66 | -$ 37,020.66 |

Thursday, Apr 23, 2026 08:40:02 AM GMT-7 - Accrual Basis



**TO:** Claims Administrator / Derek F. Smith, KCC, Director, Settlement Administration, One McInnis Pkwy, Suite 250 | San Rafael, CA 94903

**FROM:** Teresa Murray, Consumer Watchdog Director, U.S. PIRG Education Fund

**RE:** **Supplemental report.**
Expenditure of funds totaling $395,000 for calendar year 2025, Amended Disbursement Order and Supplemental Order, THOMAS H. KRAKAUER v. DISH NETWORK L.L.C.

**DATE:** **May 5, 2026**

**Submitted electronically: derek.smith@veritaglobal.com**

This is our supplemental report for 2025, following our Dec. 14, 2025 report.

Even since our report in December 2025, scam and spam calls and texts continue to be a bigger problem. The full year statistics from the Federal Trade Commission are now available. They show that the median amount lost from scam phone calls increased by 22% in 2025 compared with 2024, according to the FTC. And the volume of both scam calls and texts reported to the FTC increased as well.

We spent the remainder of our funds allocated for calendar year 2025 on our consumer outreach project, with education sessions and trainings aimed at vulnerable populations often targeted by scammers: the elderly, and military service members and veterans.

The potential for people becoming victims seems to be getting worse, despite some new efforts by the Federal Communications Commission and state attorneys general. We unfortunately don't anticipate it will let up anytime soon, especially because of scams fueled by and often made more believable by artificial intelligence.

We are working to use the money designated for calendar year 2026 in ways that are most effective in educating the public, pushing for change at the federal level and pressuring phone companies to do more to protect their customers and everyone else. We also are working on a national webinar and short-take videos for social media for later this year. We look forward to telling you in December what we've accomplished this year.